## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

### ATLANTA DIVISION

|  |  |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., a nonprofit organization on behalf of members residing in Georgia; SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, a Georgia nonprofit organization; ERIC T. WOODS; KATIE BAILEY GLENN; PHIL BROWN; JANICE STEWART, | **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |
| *Plaintiffs*, | **STATUTORY CLAIMS ONLY -- SINGLE-JUDGE DISTRICT COURT** |
| vs. | |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia. | |
| *Defendant*. | |

### INTRODUCTION

1.      Section 2 of the Voting Rights Act makes it illegal for States to draw district lines that water down the voting strength of voters from particular racial groups. Yet Georgia's newly-adopted legislative maps do just that. The new State Senate and State House maps dilute the voting strength of Black Georgians

because they fail to include more than a half-dozen additional districts where Black voters could form a majority and have the opportunity to elect candidates of their choice.

2.     Georgia is one of the fastest growing states in the Nation—and that growth has been driven entirely by Black Georgians and other Georgians of color. Over the last decade, Georgia's Black population grew by 16 percent, while the population of white Georgians fell during the same period. Black Georgians today comprise a third of Georgia residents, and people of color now make up nearly half of the State's population. The growth of the State's Black and other minority communities is driving Georgia's continued economic growth and its increasing prominence on the national stage.

3.     Yet the new legislative maps for Georgia's General Assembly, which were rushed through the legislative process in a week and a half, do not account for the growth of Georgia's Black population. Rather, the new maps systematically minimize the political power of Black Georgians in violation of federal law.

4.     Georgia's growing Black population could easily support over a half-dozen new Black-majority State Senate and State House districts in areas where Black voters, despite voting cohesively, have previously been unable to elect candidates of their choice. That includes new Black-majority districts in areas

around metro Atlanta, Augusta, Southwestern Georgia, and elsewhere across the State. But the State's maps do not do that. Instead, the State drew only a small handful of new Black-majority districts, mostly in areas that were already electing Black-preferred candidates. Thus, despite the tremendous growth of the State's Black population over the past decade, Black Georgians will have few new political opportunities in the State Senate and State House under the State's new maps.

5.     The State's maps negate the unprecedented growth of Black communities in Georgia, unnecessarily packing Black Georgians together in some places, dissecting areas with large, cohesive Black populations in others, and ultimately diminishing Black Georgians' true voting strength statewide and in specific districts. Especially in light of Georgia's legacy of racial discrimination against and subordination of its Black population and the ongoing, accumulated effects of that legacy, the State's maps will prevent Black Georgians from exercising political power on an equal playing field with white Georgians.

6.     Georgia can and must do better than this. The State's manipulation of the redistricting process to dilute the political strength of Black voters robs fellow citizens of the ability to engage in politics with equal dignity and equal opportunity, violating Section 2 of the Voting Rights Act of 1965, as amended 52

U.S.C. § 10301. Plaintiffs—Alpha Phi Alpha Fraternity Inc., the Nation's oldest Black fraternity; the Sixth District of the African Methodist Church, one of the Nation's oldest Black churches; and Eric Woods, Katie Bailey Glenn, and Phil Brown, individuals whose votes will be diluted under Georgia's unfair maps— accordingly seek declaratory and injunctive relief blocking the implementation of the unlawful new maps for both chambers of the General Assembly.

## JURISDICTION, COURT TYPE, AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under federal law. This Court also has jurisdiction of this action pursuant to 28 U.S.C. §§ 1343(a)(4) and 1357, because this is a civil action to secure equitable relief under Section 2 of the Voting Rights Act, which is an Act of Congress that protects the right to vote.

8.     Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

9.     The challenge here is based solely on the federal Voting Rights Act. Accordingly, there is no basis to convene a three-judge court pursuant to 28 U.S.C. § 2284, and the case is properly before a single-judge district court.

10.     This Court has personal jurisdiction over the Defendant, who is a citizen of the State of Georgia and resides within this District.

11.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of Georgia, as the Georgia Assembly sits within this District.

## PARTIES

12.     Plaintiff ALPHA PHI ALPHA FRATERNITY INC. ("Alpha Phi Alpha") is the first intercollegiate Greek-letter fraternity established for Black Men. Founded at Cornell University in 1906, Alpha Phi Alpha's members have long stood up for the civil rights of Black Americans. Members of the fraternity have included civil rights leaders such as Martin Luther King, Jr., Thurgood Marshall, and W.E.B. DuBois. Alpha Phi Alpha has thousands of members in Georgia, including Black Georgians who are registered voters and reside in newly drawn districts whose boundaries dilute Black voting strength, including new Georgia Senate Districts 16, 17, and 23 as well as the Georgia House Districts drawn in those areas and in other areas discussed herein. These members suffer harm because they are denied the opportunity to elect candidates of their choice.

13.     Alpha Phi Alpha has long made political participation for its members and Black Americans an organizational priority. Beginning in the 1930s, Alpha Phi

Alpha created a National Program called "A Voteless People is a Hopeless People," which seeks to enhance Black political participation and voting.  Alpha Phi Alpha actively registers voters through its "First of All, We Vote" initiative, holds events to raise political awareness and empower Black communities, and fights efforts to diminish Black political power. The new maps directly affect those efforts by undermining the ability of Black Georgians, including members of Alpha Phi Alpha, to elect representatives of their choice.

14.    Georgia's unfair and discriminatory redistricting frustrates and impedes Alpha Phil Alpha's organizational priorities by diminishing the voices and diluting the voting strength of Black Georgians, who Alpha Phi Alpha works to empower and engage in greater civic and political participation. If the new maps take effect, Alpha Phi Alpha will be forced to divert resources from its broader voter registration and community empowerment initiatives to the affected districts in order to protect the representation and interests of its members and to try to counteract the negative effects of vote dilution.

15.    Plaintiff SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH ("AME Church") is a nonprofit religious organization. The AME Church traces its roots to 1816 as the first independent Protestant denomination founded by Black people in response to segregation and

discrimination in the Methodist Episcopal Church. The Sixth District is one of twenty districts of the AME Church, and covers the entirety of the State of Georgia.

16.    There are more than 500 member-churches that are part of the AME Church in Georgia, with 36 congregations and tens of thousands of members in Atlanta alone. AME Church's members include Black Georgians who are registered to vote and reside in newly drawn districts whose boundaries dilute Black voting strength, including proposed new including new Georgia Senate Districts 16, 17, and 23 as well as the Georgia House Districts drawn in those areas and in other areas discussed herein. These members suffer harm because they are denied the opportunity to elect candidates of their choice.

17.    Encouraging and supporting civic participation among its members is a core aspect of the AME Church's work. Advocating for the right to vote, regardless of candidate or party, and encouraging the AME Church's eligible members to vote has been a priority of the Church. The 1965 civil rights march from Selma to Montgomery in Alabama was organized in and began at the steps of Brown Chapel AME Church in Selma. After they were beaten by Alabama state troopers on the Edmund Pettus Bridge on "Bloody Sunday," the wounded marchers fled back to the sanctuary of Brown Chapel. AME Church's current

activities in support of voter participation reflect this storied history. Today, AME Church continues to encourage civic participation by holding "Souls to the Polls" events to transport churchgoers to polling locations during advance voting periods, registering voters for elections, hosting "Get Out the Vote" efforts to increase voter turnout, and providing food, water, encouragement, and assistance to voters waiting in lines at polling locations. The new maps directly affect those efforts by undermining the ability of Black Georgians, including the Church's members, to elect representatives of their choice.

18.     Georgia's unfair and discriminatory redistricting frustrates and impedes AME Church's core organizational priorities by diminishing the voices and diluting the voting strength of Black Georgians, who AME Church works to empower and engage in greater civic and political participation. If the new maps take effect, AME Church will be forced to divert resources from its broader voter registration and community empowerment initiatives to the affected districts in order to protect the representation and interests of its members and to try to counteract the negative effects of vote dilution.

19.     Plaintiff ERIC T. WOODS is a Black citizen of the United States and the State of Georgia. Mr. Woods is a resident of Tyrone, Georgia in Fayette County and has been registered to vote at his current address since 2011. Under the

State's new State Senate plan, he will reside in State Senate District 16. He lives in a region where Black Georgians form a cohesive political community and tend to support the same candidates, and where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a district in which Black voters would have the opportunity to elect their preferred candidates. However, under the State's redistricting plan, Mr. Woods' candidate of choice will typically be outvoted by the white majority in the district in which he now resides. The State's new plan dilutes Mr. Woods' voting power and denies him an equal opportunity to elect a candidate of his choice to the Georgia State Senate.

20.     Plaintiff KATIE BAILEY GLENN is a Black citizen of the United States and the State of Georgia. Ms. Glenn is a resident of McDonough, Georgia in Henry County and has been registered to vote at her current address for approximately 50 years. Under the State's new State Senate plan, she will reside in State Senate District 17 and State House District 117. She lives in a region where Black Georgians form a cohesive political community and tend to support the same candidates, and where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a district in which Black voters would have the opportunity to elect their preferred candidates.

However, under the State's redistricting plan, Ms. Glenn's candidate of choice will typically be outvoted by the white majority in the district or districts in which she now resides. The State's new plan dilutes Ms. Glenn's voting power and denies her an equal opportunity to elect a candidate of her choice to the Georgia State Senate and/or the Georgia State House.

21.    Plaintiff PHIL S. BROWN is a Black citizen of the United States and the State of Georgia. Mr. Brown is a resident of Wrens, Georgia in Jefferson County and a member of the local AME Church. He has been registered to vote at his current address for years. Under the State's new State Senate plan, he will reside in State Senate District 23. He lives in a region where Black Georgians form a cohesive political community and tend to support the same candidates, and where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a district in which Black voters would have the opportunity to elect their preferred candidates. However, under the State's redistricting plan, Mr. Brown's candidate of choice will typically be outvoted by the white majority in the district in which he now resides. The State's new plan dilutes Mr. Brown's voting power and denies him an equal opportunity to elect a candidate of his choice to the Georgia State Senate.

22.     Plaintiff JANICE STEWART is a Black citizen of the United States and the State of Georgia. Ms. Stewart is a resident of Thomasville, Georgia in Thomas County and a member of the local AME Church. She has been registered to vote at her current address for years. Under the State's new State House plan, she will reside in State House District 173. She lives in a region where Black Georgians form a cohesive political community and tend to support the same candidates, and where the Black community is sufficiently large and geographically compact to constitute a majority of eligible voters in a district in which Black voters would have the opportunity to elect their preferred candidates. However, under the State's redistricting plan, Ms. Stewart's candidate of choice will typically be outvoted by the white majority in the district in which she now resides. The State's new plan dilutes Ms. Stewart's voting power and denies her an equal opportunity to elect a candidate of her choice to the Georgia State House.

23.     Defendant BRAD RAFFENSPERGER is being sued in his official capacity as the Secretary of State of Georgia. Defendant RAFFENSPERGER is the State of Georgia's chief election officer and as such is responsible for overseeing the conduct of its elections and implementing election laws and regulations, including the State House and State Senate district maps at issue in this litigation.

*See* Ga. Code Ann. § 21-2-50(b); Ga. Comp. R. & Regs. 590-1-1-.01, .02 (2018);

*Jacobsen v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020).

## LEGAL BACKGROUND

24.     The Voting Rights Act of 1965 (the "VRA") is the crown jewel of the
Civil Rights Movement—a hard won and sweeping national reform that sought to
replace the disenfranchisement and racial discrimination of the Jim Crow era with
a true multi-racial democracy. Both Democratic and Republican members of
Congress and presidents have repeatedly reauthorized and expanded the VRA,
including most recently in 2006, when the statute was reauthorized by a massive
bipartisan majority in the U.S. House of Representatives, a unanimous U.S. Senate,
and the "proud" signature of President George W. Bush.

25.     The VRA prohibits any state law or practice "which results in a denial
or abridgement of the right of any citizen of the United States to vote on account of
race or color . . . ." 52 U.S.C. § 10301(a). The VRA has always applied to
redistricting, and Section 2 of the VRA in particular bars any redistricting scheme
whereby members of a racial minority group "have less opportunity than other
members of the electorate to participate in the political process and to elect
representatives of their choice." 52 U.S.C. § 10301(b).

26.     As Congress made clear when it reauthorized and amended the VRA in the 1980s, a Section 2 claim may be established purely based on discriminatory effects, and does not require discerning or ferreting out any particular intent on the part of state lawmakers. *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). A court considering a potential Section 2 violation in the redistricting context thus needs only determine whether the result of the enacted plan is the dilution of minority political strength, regardless of any intent. In this way, the VRA continues to operate as a powerful tool for uprooting and ameliorating "the accumulation of discrimination" that can stymie political participation among racial minority groups.

27.     The unlawful dilution of Black voting strength "may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Gingles*, 478 U.S. at 46 n.11.

28.     Courts applying Section 2's effects-based standard rely on the test laid out in the Supreme Court's *Gingles* decision. Under the *Gingles* standard, a plaintiff challenging a redistricting scheme as a dilution of minority voting strength must first show that three preconditions are met: (1) the racial minority group or groups are sufficiently large and geographically compact to constitute a majority in

a single-member district; (2) the minority group is politically cohesive; and (3) the white majority votes as a bloc such that it will usually defeat the minority group's preferred candidate. 478 U.S. at 49–51.

29.     Beyond those preconditions, vote-dilution claims under Section 2 are subject to "[a] totality of circumstances" analysis, guided by factors enumerated by Congress in a Senate Report that accompanied the 1982 amendment to the VRA.[1] The Senate Report itself and the cases interpreting it have made clear that these factors are not-exhaustive and that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the

---

[1] These non-exhaustive factors include: (1) the extent of any history of official discrimination that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting is racially polarized; (3) the extent to which the State has voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) whether the members of the minority group have been denied access to a candidate slating process, if any; (5) the extent to which members of the minority group in the State bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction. *See* S. Rep. No. 97-417, at 28–29 (1982). Courts have also considered (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (9) whether the policy underlying the State's use of the challenged standard, practice or procedure is tenuous.

other." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. 97-417, at 29 (1982)). The ultimate question is whether minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

## STATEMENT OF FACTS

### BLACK POPULATION GROWTH IN GEORGIA

30.    Georgia has undergone a dramatic demographic shift over the last decade. The State's population grew by over 1 million people to 10.71 million people, up 10.6% from 2010. Black, Latino, Asian, and multiracial Georgians collectively account for *all* of this population growth.

31.    Georgia's Black population in particular increased by almost half a million people over the past decade—a 16% jump—while the State's overall white population fell during the same period. Today, a third of Georgia residents are Black.[2]

---

[2] Unless otherwise noted, and wherever possible, references to "Black" in this Complaint refer to the demographic category "any part Black," and thus include people who identify as mixed race or multiracial so long as they identify as any part Black. This category is slightly different from another demographic category, "Non-Hispanic Black."

32.     Georgia's steady demographic shift has resulted in the white percentage of the electorate decreasing and the percentage of voters of color increasing. Between 2000 and 2019, Georgia's eligible voter population grew by 1.9 million, with nearly half of this increase attributed to growth in the State's Black voting population, according to a Pew Research Center analysis of data from the 2019 American Community Survey (the "2019 ACS Survey").[3]

33.     By 2019, the Black voting-eligible population in Georgia had reached a record high of 2.5 million eligible voters, making up a third of the State's total electorate. As a share of eligible voters in the State overall, Black voters saw a 5-point increase between 2000 and 2019.

34.     Much of Georgia's population gain comes from the fast-growing and rapidly diversifying metro Atlanta and surrounding counties. Today, the growth of Black, Hispanic, and Asian populations in the metro Atlanta area has transformed some of Atlanta's suburbs from predominantly white into multiracial communities. Among those metro Atlanta counties that have seen double-digit growth over the

---

[3] Abby Budiman & Luis Noe-Bustamante, *Black Eligible Voters Have Accounted for Nearly Half of Georgia Electorate's Growth Since 2000*, Pew Rsch. Ctr. (Dec. 15, 2020), https://www.pewresearch.org/fact-tank/2020/12/15/black-eligible-voters-have-accounted-for-nearly-half-of-georgia-electorates-growth-since-2000/

last ten years are Fayette, Clayton, Dekalb, Henry, Rockdale, Walton, Spalding, and Newton Counties. Many of these metro Atlanta counties, like Clayton, already had large or even majority Black populations to begin with, and all had significant further increases in their Black populations over the last decade.

35.    In addition to metro Atlanta, a substantial part of Georgia's Black population (including much of the rural Black population) is distributed across counties located in the "Black Belt"—a region of the American South where Black slave labor historically was concentrated and where Black Georgians today comprise a substantial portion of the population.  Georgia's Black Belt consists of predominantly rural counties across a swath of the state's central and southern regions. Those counties include a number of counties outside and near the city of Augusta that have large Black populations, among others, Burke, Hancock, Jefferson, Richmond, Taliaferro, and Washington Counties. Some counties in that area (such as Richmond and Burke) have seen significant population growth over the last decade, while others, even where there has been overall population decline, have nevertheless seen relative gains in the Black percentage of the population. Those counties also include a number of counties outside and near the cities of Columbus and Albany in southwestern Georgia that have large Black populations, among others, Marion, Stewart, Webster, Sumter, Terrell, Early, Dougherty,

Mitchell, and Thomas Counties. Some counties in that area have seen population growth over the last decade, while others, even where there has been overall population decline, have nevertheless seen relative gains in the Black percentage of the population.

## THE 2021 REDISTRICTING PROCESS IN GEORGIA

36.    From start to finish, the General Assembly's 2021 redistricting process was an opaque affair that denied the public generally, and Black voters and their representatives in particular, any ability to meaningfully participate.

37.    That is particularly troubling because the present redistricting effort is the first full cycle in over 50 years that will have occurred without approval or oversight from the United States Department of Justice, which had previously conducted such oversight pursuant to Section 5 of the VRA.

38.    Prior to 2013, the redistricting process in Georgia was subject to Section 5's "preclearance" requirement. Under that requirement, any change in the rules or process with respect to voting in jurisdictions with the worst records and histories of discrimination in voting (so-called "covered jurisdictions") could not be enforced unless and until the jurisdiction first obtained a determination of the change's fairness to minority voters from a federal court in Washington, D.C. or

from the United States Attorney General. The State of Georgia was a covered jurisdiction under the Section 5 regime.

39.     However, in 2013, the United States Supreme Court in *Shelby County, Ala., v. Holder*, 570 U.S. 529 (2013), struck down the formula used to determine which jurisdictions were covered by Section 5 of the VRA, functionally ending the preclearance regime. As a result, jurisdictions like Georgia no longer need to seek preclearance for changes to their voting rules.

40.     The Georgia Senate Committee on Reapportionment and Redistricting (the "Senate Committee") and the Georgia House Committee on Legislative and Congressional Reapportionment (the "House Committee" and, together with the Senate Committee, the "Redistricting Committees") are responsible for creating and updating Congressional and state legislative district lines in accordance with U.S. Census data.

41.     This year, the Redistricting Committees presided over a process that was marked by a lack of transparency, and that culminated in a rushed special legislative session to pass the challenged maps.

*No Meaningful Public Participation: "Town Halls" Before Full Census Data Release and No Maps for the Public to Review*

42.     From the start, advocates for transparency in the redistricting process called on the Redistricting Committees to adopt guidelines that would ensure that the public could review and comment on proposed maps prior to the General Assembly taking them up.[4] State Senate Minority Leader Gloria Butler, a member of the Senate Committee who represents a majority-Black Senate district, similarly urged that "Georgians are entitled to not only examine the criteria used to create their own districts, but also provide substantive feedback on any proposed maps before they are adopted."[5]

43.     Despite those calls, the Redistricting Committees adopted guidelines that contained no requirement to publicize the proposed plans in advance.[6]

---

[4] Letter from Fair Districts GA, et al., to the Honorable Geoff Duncan & the Honorable David Ralston, *Public Participation in the Upcoming Redistricting Process* (Apr. 19, 2021).

[5] David Armstrong, Sherry Liang, & Stephen Fowler, *Georgians Urge Transparency in Redistricting Process, Demand End to Backroom Deals*, GPB (July 29, 2021); *see also, e.g.*, Ross Williams, *Calls for Transparency During Georgia Redistricting Tour a Common Refrain – and a Longshot*, Ga. Recorder (July 30, 2021).

[6] House Committee, 2021–2022 Guidelines for the House Legislative and Congressional Reapportionment Committee, https://www.house.ga.gov/Documents/CommitteeDocuments/2021/Legislative_an

44.     Rather than giving the public an opportunity to comment on the actual proposed maps, the Redistricting Committees convened a series of "town-hall meetings," all of which were held in the two-month period *before* the August 2021 release of the Census block-level data (i.e., the information that states use to redraw congressional and state legislative districts), and months before any maps were proposed.

45.     No town halls were held in three of metro Atlanta's most populous counties—Gwinnett, Cobb, and DeKalb counties.

46.     Despite having no proposed maps on which to comment and no Census block-level data to analyze, hundreds of Georgians nevertheless participated in the town hall meetings to make their voices heard. During the hearings, speakers called for fairness in drawing maps, more opportunities for meaningful public input, and more transparency in the process.[7]

47.     The other avenue for public participation was a web portal, where the Chairs of the Redistricting Committees frequently noted that members of the

---

d_Congressional_Reapportionment/2021-
2022%20House%20Reapportionment%20Committee%20Guidelines.pdf.

[7] Stephen Fowler, Sherry Liang, & David Armstrong, *Here's What Georgians Had to Say About 2021 Redistricting at Town Halls Across the State*, GPB (Aug. 10, 2021).

public could submit comments about redistricting via a web portal. However, the web portal only allowed Georgians to submit comments as text. Members of the public who wished to submit their own proposed maps or any other types of attachments were unable to do so. The Redistricting Committees also failed to make the hearing process accessible to non-English speakers.[8]

### The Governor Calls a Special Legislative Session Before Any Maps Are Shown to the Public.

48.    On September 23, before the Redistricting Committees had proposed any maps, Governor Brian Kemp called for a special legislative session of the General Assembly, to begin on November 3, 2021, in order to finalize congressional and state legislative maps. Four days later, Lieutenant Governor Geoff Duncan and Senate Committee Chairman John F. Kennedy released the first proposed map of the State's congressional (but not its state legislative) districts.

49.    On October 28, 2021, with the special session starting the next week, the Senate Democratic Caucus publicly released its proposed Senate map for consideration (the "Senate Democratic proposal"). On October 29, 2021, the House

---

[8] *See, e.g.*, Dave Williams, *Rights Groups Push for Redistricting Maps Reflecting Growth of Minorities*, Statesboro Herald (Aug. 30, 2021), https://www.statesboroherald.com/local/rights-groups-push-redistricting-maps-reflecting-growth-minorities/.

Democratic Caucus publicly released its proposed House map for consideration (the "House Democratic proposal").

50.    On November 2, 2021, while municipal elections were under way across the State of Georgia, and with the start of the special session less than 24 hours away, the Redistricting Committee Chairs released proposed Senate and House maps (the "Senate Committee proposal" and "House Committee proposal," respectively) for consideration during the special session.

***The State Senate Map Is Rushed Through the Legislative Process***

51.    The Senate map was rushed through the entire legislative process in under two weeks.

52.    Specifically, on November 4, 2021, less than 48 hours after the Senate Committee proposal was first released, the Senate Committee convened to discuss the proposal.

53.    During the legislative process, proponents of the Senate Committee proposal indicated that they believed their only obligation under the Voting Rights Act was to maintain existing majority-minority districts, which they viewed as "voting-rights protected districts." Contrary to that apparent belief, however, the Voting Rights Act applies to every aspect of the redistricting process, and prohibits

the State from taking *any* action to prevent its Black citizens from participating in politics on equal footing.

54.     The next day, November 5, the Senate Committee convened again. Senator Butler explained that the Senate Democratic proposal provided more minority-majority districts and Black-majority districts than the Committee proposal did. At the end of the meeting, Senator Butler moved to table a vote on the Senate Committee proposal, noting that more time was needed to assess the proposed maps. The motion failed. The Committee map was then passed out of the Committee, less than 72 hours after it had been released to the public.

55.     On November 9, 2021, one week after the Senate Committee proposal was released to the public, the full Senate passed the Committee map, now stylized as Senate Bill 1EX ("S.B. 1EX"). On November 15, 2021, less than two weeks after the map was released to the public, the House passed S.B. 1EX. Not a single legislator of color in the House or the Senate voted in favor of S.B. 1EX.

***The State House Map Is Rushed Through the Legislative Process***

56.     The State House map was rushed through the legislative process in mere days, similarly without transparency or opportunity for meaningful debate or public engagement.

57.     On November 5, 2021, less than 72 hours after the House Committee proposal had been released, the House Committee convened to discuss the proposal and the House Democratic proposal.

58.     On November 8, 2021, the House Committee held a hearing to consider the proposed maps. This hearing was the first time the public would be able to comment on the proposed House maps. Less than *two hours* before the hearing began, a new version of the House Committee proposal was released, now styled as House Bill 1EX ("H.B. 1EX"). The House Committee Chair explained that the revised version was "probably 75% the same" as the previous House Committee proposal. H.B. 1EX was quickly passed out of Committee.

59.     On November 10, 2021, approximately 48 hours after H.B. 1EX was publicly released, the full House voted to pass the new proposal. On November 12, 2021, 4 days after H.B. 1EX was publicly released, the Senate voted to pass the new proposal. Not a single legislator of color in the House or the Senate voted in favor of H.B. 1EX.

60.     On December 30, 2021 Governor Kemp signed S.B. 1EX and H.B. 1EX into law. Despite the General Assembly's rushing those measures through the legislative process in less than two weeks, Governor Kemp waited for nearly 40 days after the special session ended before signing them into law.

### THE HASTILY-PASSED MAPS DILUTE BLACK VOTING STRENGTH

61.    In the end, despite the tremendous growth in Georgia's Black population, the districts that emerged from the General Assembly's hasty process included few, if any, new Black majority State Senate and State House districts in any areas that were not already electing candidates supported by Black voters. In other words, the State drew maps that systematically impede the growth of Black communities' political power, despite the growth in their populations. Those new maps for both the State Senate and the State House dilute Black voting strength statewide and in specific districts and undercut the ability of Black voters to participate in politics and exercise political power on equal footing with white voters.

62.    Georgia's Black population is sufficiently numerous and geographically compact to comprise the majority of the voting age population in *at least* three Senate districts that the State failed to draw.

63.    This includes areas in the southern metro Atlanta region, and specifically in and around new Senate Districts 16 and 17. The areas in and around these districts have seen enormous change and diversification over the last decade, including substantial growth of the Black population. Instead of drawing new majority Black districts in those areas to accurately reflect the growth of the Black

population, as they could have, the Redistricting Committee drew and jammed through the legislative process a map that carves up the large, cohesive Black communities in those areas, rendering Black voters in those districts unable to elect candidates of their choice despite those communities' booming populations.

64.     Senate District 16 ("SD16") in S.B. 1EX includes all or part of Fayette, Spalding, Pike, and Lamar Counties, and lies in the southwestern part of the burgeoning Atlanta metropolitan area. In Fayette County, the largest of those, the Black voting-age population has increased by over 50% over the last 10 years, while the white voting-age population has decreased slightly. In Spalding County, the second-largest in that group, the Black voting-age population is up by over 18%. Meanwhile, sizeable Clayton County, which borders Fayette County, is approximately 75% Black, and the Black voting-age population there has also grown by approximately 30% over the last decade. Black voters are sufficiently numerous in the area in and/or around SD16 that a district could have been drawn in that area with Black voting-age population greater than 50%. In particular, the State could have drawn an additional majority-Black district in the southern portion of the Atlanta metro region, around where SD16 was drawn, by "unpacking" the Black population in Senate Districts 34 and 44 (which include parts of Clayton and Dekalb counties as well as part of Fayette County) and

thereby "uncracking" the Black population in SD16. Instead, the Black voting-age population of SD16 under S.B. 1EX is just 24%.

65.     Senate District 17 ("SD17") in S.B. 1EX includes parts of Henry, Newton, and Walton Counties (as well as all of Morgan County), and lies in the central-eastern part of the burgeoning Atlanta metropolitan area. Those counties have also seen explosive growth in the Black population over the past decade. Henry County's Black voting-age population increased by almost 75% in the last decade; Newton County's increased by more than 45%; Walton County's by over 40%. Meanwhile, sizeable Dekalb and Rockdale Counties, which border Henry, Newton, and Walton Counties, both have large and growing Black populations. Dekalb County is around 50% Black and its Black voting-age population increased by 12% over the last decade; Rockdale County is almost 60% Black and its Black voting-age population increased by 53% over the last decade. Black voters are sufficiently numerous in the area in and/or around SD17 that a district could have been drawn in that area with a Black voting-age population greater than 50%. In particular, the State could have drawn an additional majority-Black State Senate district in the southeastern portion of the Atlanta metro region, around where SD17 was drawn, by "unpacking" the Black population in (among others) Senate Districts 10 and 43 (which include parts of Henry, Rockdale, and Newton

28

Counties) and "uncracking" the Black population in SD17, which under S.B.1 EX, has been combined with predominantly white populations in Walton and Morgan Counties. The Black voting-age population of SD17 under S.B. 1EX is less than 34%.

66.     Another new Black-majority State Senate district could have been drawn in the area west of Augusta, including portions of what is known as Georgia's Black Belt, which includes the area in and around Senate District 23 ("SD23") in S.B. 1EX. The relative size of the Black population in that area has increased over the last decade. For example, SD23 under S.B. 1EX includes a significant portion of Richmond County, where an already-large Black voting-age population has increased in the last decade by double digits, as well as Burke County (among others), which also already had a substantial Black population and which also has seen increases in its Black voting age populations. Meanwhile, additional nearby counties with significant and growing Black populations, such as Baldwin, Hancock, and Washington Counties, were left out of SD23 under S.B. 1EX. A district could have been drawn in that area in and/or around SD 23 such that the Black voting-age population of that district was greater than 50%. In particular, the State could have drawn an additional majority-Black State Senate district in the Augusta region, around where SD23 was drawn, by "unpacking" the

Black population in Senate Districts 22 and 26 and "uncracking" the Black population in SD23 and Senate District 25. But here, too, the State failed to draw a district that accorded a cohesive Black community the opportunity to elect candidates of their choice, instead dividing up Black voters and drawing a district in which white bloc voting would continue to defeat Black voters' candidates of their choice.

67.     In the end, S.B. 1EX, which was summarily rushed through the legislative process, created only a single new Black majority State Senate district in the entire state, and it did so in an area that was already electing Black-preferred candidates, thus ensuring that the massive growth of the Black population in Georgia would not translate into an increase in political power in the Georgia State Senate.

68.     Georgia's Black population is also sufficiently numerous and geographically compact to comprise the majority of the voting age population in *at least* five House districts that the State failed to draw.

69.     At least three new, additional Black-majority House Districts could have been drawn in the southern and eastern portions of the Atlanta metro area, in similar places to SDs 16 and 17 as discussed above.

70.     In particular, the State could have drawn an additional Black-majority House District in the area in and/or around Spalding, Clayton, and Henry Counties, in and/or around the area where House Districts 74 and 117 under H.B. 1EX (and where Senate Districts 16 and 17 under S.B. 1EX) were drawn, by "unpacking" the Black population in (among others) House District 78 (which stretches into Clayton County) and "uncracking" the Black population in House Districts 74 and/or 117, including in parts of Henry and Spalding Counties that have seen substantial growth in their Black populations but that were both drawn into districts with Black voting-age populations well below 40%. As already explained, Black voters are sufficiently numerous in those counties and the areas around them that an additional House District could have been drawn such that the Black voting-age population of the district was greater than 50%. Yet with H.B. 1EX, the General Assembly failed to do that.

71.     The General Assembly also could have drawn at least one additional Black-majority House District in the area in and/or around Henry and/or Spalding Counties, in and/or around where House District 117 under H.B. 1EX (and Senate District 17 under S.B. 1EX) was drawn, for example, by "unpacking" the Black population in (among others) House District 116 and "uncracking" the Black population in House Districts 117 and 134. As already explained, those counties

31

and the areas around them also have sizeable and growing Black populations. Black voters are sufficiently numerous in that area that an additional House District could have been drawn such that the Black voting-age population of the district was greater than 50%. Yet with H.B. 1EX, the General Assembly failed to do that.

72.    The General Assembly also could have drawn an additional Black-majority House District in the area in and/or around Newton County, in and/or around where House District 114 under H.B. 1EX was drawn, by "unpacking" the Black population in (among others) House District 92 and "uncracking" the Black population in House District 114. As already explained, Newton County's voting-age population is nearly 50% Black, and the Black voting-age population has increased by over 45% over the last decade. Black voters are sufficiently numerous in that area that an additional House District could have been drawn such that the Black voting-age population of the district was greater than 50%. Yet with H.B. 1EX, the General Assembly failed to do that, instead cracking Newton County in half.

73.    The General Assembly also could have drawn an additional Black-majority House District in the area outside Augusta, for example in and/or around (among others) Baldwin County, and in and/or around the area where (among

others) House Districts 118, 124, 133, 149, and 155 under H.B. 1EX (and Senate District 23 under S.B. 1EX) were drawn, by (among other things) "uncracking" the Black population in House Districts 133 (which includes parts of Baldwin County and Milledgeville) and 155 (which includes Wilkinson County). As already explained, those counties and the areas around them (among others) have sizeable and growing Black populations. Black voters are sufficiently numerous in that area that an additional House District could have been drawn with a Black voting-age population of the district was greater than 50%. Yet with H.B. 1EX, the General Assembly failed to do that, ultimately drawing five total Black-majority House Districts in and around Augusta when it could have drawn six.

74.    The General Assembly also could have drawn an additional Black-majority House District in the area around Columbus and Albany in the southwestern portion of the State, in and/or around (among others) Muscogee, Marion, Stewart, Webster, Sumter, Terrell, Dougherty, Mitchell, and Thomas Counties, and in and/or around the area where House Districts 137, 140, 141, 150, 153, and 154 under H.B. 1EX were drawn. As already explained, those counties and the areas around them have sizeable Black populations. Black voters are sufficiently numerous in that area that an additional House District could have been drawn such that the Black voting-age population of the district was greater

33

than 50%. Yet with H.B. 1EX, the General Assembly failed to do that, drawing six total Black-majority House Districts in the Southwestern Georgia region around Columbus and Albany when it could have drawn seven. An additional majority-Black district could have been drawn in the region by (for example) "unpacking" the Black population in House District 153 (which includes Albany), and "uncracking" the Black populations in House Districts 171 and 173 (which include Mitchell and Thomas Counties).

75.   The General Assembly also failed to draw other potential new Black-majority districts in other parts of the State, diluting the voting strength of Black voters in those areas as well.

76.   The State ultimately drew only a total of two additional Black majority State House districts in the entire state, and, as with the Senate map, it did so largely in areas that were already electing Black-preferred candidates, again minimizing the growth of Black political power.

77.   Instead of drawing districts reflecting the tremendous growth of the State's Black population over the last decade, the State instead repeatedly opted to draw fewer, more concentrated Black-majority districts, effectively "packing" black voters in some districts and "cracking" other cohesive Black populations, thereby diluting their strength in the regions at issue.

78.    Black voters in Georgia tend to vote similarly, and Black communities exhibit substantial cohesion in terms of voters' candidate preferences. White voters in Georgia likewise tend to vote cohesively against Black-preferred candidates. This phenomenon, known as "racially-polarized voting," exists in each of the areas where the challenged districts just discussed were drawn, with Black voters tending to vote cohesively as a bloc, and white voters also voting as a bloc against the Black-preferred candidates.

79.    The level of racially polarized voting in those areas where the challenged districts discussed above are located means that the preferred candidates of Black voters will typically be defeated by a white majority under the districting scheme enacted by S.B. 1EX and H.B. 1EX.

80.    Thus, under the maps as Georgia drew them, Black voters whose communities are sufficiently numerous to constitute a working majority and elect candidates of their choice will nevertheless be marginalized, with their political strength diluted.

81.    The totality of the circumstances in this case[9] confirms that Black voters in Georgia have less opportunity than white voters to participate in the political process and elect representatives of their choice.

**1. Georgia's History of Subordinating Black Voters, Including Through the Redistricting Process**

82.    Georgia has a long and well-documented history of state-sanctioned discrimination against Black voters, which resonates into the present and burdens Black political participation.

83.    For over a century, unrelenting discrimination was "ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception." *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994); *see also Johnson v. Miller*, 864 F. Supp. 1354, 1379–80 (S.D. Ga. 1994) ("[W]e have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases."), *aff'd and remanded sub nom. Miller v. Johnson*, 515 U.S. 900 (1995); *Ga. State Conf. of the NAACP v.*

---

[9] As noted already, the determination whether a challenged districting scheme unlawfully dilutes Black voting strength is based on the totality of the circumstances, taking into account a non-exhaustive set of historical and contextual factors known as the "Senate Factors." *See supra* n.1 and accompanying text.

*Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015).

84.     After Reconstruction, state and local governments in Georgia contrived numerous formal legal means to effectively eradicate the Black vote, such as poll taxes, whites-only primaries, literacy tests, and grandfather clauses. Polling places were moved without notice, ballots went unrecognized, ballot boxes were "stuffed" with fraudulent ballots, and vote counts were manipulated.[10]

85.     Those methods of discrimination survived well into the twentieth century. The poll tax, for example, was not abolished until 1945, after it had been in effect for almost 75 years. Whites-only primaries remained in place until 1945, when a federal court invalided the system in *King v. Chapman*, 62 F. Supp. 639 (M.D. Ga. 1945), *aff'd sub nom. Chapman v. King*, 154 F.2d. 460 (5th Cir. 1946), *cert. denied*, 327 U.S. 800 (1946). Georgia's literacy test and grandfather clause, which the Supreme Court noted in *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), were "specifically designed to prevent Negroes from voting" (*id.* at 310–

---

[10] John Hope Franklin, *Slavery to Freedom: A History of Negro Americans* 333 (Alfred A. Knopf, 3d ed. 1967).

11), remained in place until the enactment of the Voting Rights Act of 1965. As recently as 1962, 17 municipalities and 48 counties in Georgia required racially segregated polling places.

86. Georgia's redistricting scheme for the General Assembly in particular has systematically undermined Black representation. In 1917, Georgia established the "county-unit" voting system, which assigned different voting power to urban and rural counties, diminishing the voting strength of urban areas where there tended to be greater numbers of Black voters. This system was in place for nearly half a century, until the U.S. Supreme Court struck it down as contrary to the principle of "one person, one vote." *See Gray v. Sanders*, 372 U.S. 368, 381 (1963).

87. Voter discrimination in Georgia is far from ancient history. Even after the passage of the VRA in 1965, Georgia continued to adopt policies that suppressed or weakened the Black vote. As a result, the entire state of Georgia was designated as a covered jurisdiction subject to Section 5 preclearance, due to its long history of racially discriminatory practices and procedures in voting and elections.

88. During the first redistricting cycle after the VRA's passage, a three-judge district court upheld a federal objection to the State's redistricting plans and

38

determined that Georgia had diluted the Black vote in an Atlanta-based congressional district in order to ensure the election of a white candidate. *See Georgia v. United States*, 411 U.S. 526 (1973).

89.    The next cycle, when Georgia attempted to institute a redistricting plan following the 1980 U.S. Census, a federal district court again found the plan was designed with a racially discriminatory purpose. *Busbee v. Smith*, 549 F. Supp. 494, 499–500 (D.D.C. 1982), *aff'd mem.*, 459 U.S. 1166 (1983).

90.    In all, between 1968 and 2013, before the Section 5 preclearance process was effectively halted by the Supreme Court, the federal Department of Justice objected to state- and local-level election and districting measures in Georgia on the basis of racial discrimination over 170 times.

91.    Since 1982, plaintiffs secured favorable outcomes in at least 74 lawsuits brought against governmental units in Georgia under Section 2 of the Voting Rights Act, and that count is almost certainly underinclusive. At least five of these lawsuits resulted in reported judicial decisions; at least 69 more were settled favorably without a reported decision.  Indeed, in the last decade alone, Section 2 plaintiffs have successfully challenged a number of discriminatory practices taking place in the same regions and even the same counties as the districts challenged in this lawsuit, such as Fayette County in Metro Atlanta and

39

Sumter County in Southwestern Georgia. *See Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1305 (11th Cir. 2020); *Ga. State Conf. of the NAACP*, 950 F. Supp. 2d at 1314–16.

92.     In the years following the Supreme Court's abrogation of the VRA's preclearance requirements, Georgia and its counties and municipalities have enacted a deluge of discriminatory voting practices and procedures.[11] For example, since 2013 the State has  shuttered nearly 10% of its polling locations.[12] Former Secretary of State (and current Governor) Brian Kemp provided a manual to counties that repeatedly reminded them that they were no longer required to obtain preclearance from the Department of Justice in order to close polling locations in areas with "low incomes, small populations and substantial minority populations."[13]

93.     The above is just a sampling from Georgia's history of discrimination, segregation, and subordination. As courts in this district have held, the

---

[11] *See* Jennifer L. Patin, *Voting Rights Communication Pipelines: Georgia after Shelby County v. Holder*, Laws.' Comm. for Civ. Rts. Under L. (June 21, 2016), https://www.lawyerscommittee.org/georgiavra2016/.

[12] Mark Niesse, Maya T. Prabhu and Jacquelyn Elias, *Voting Precincts Closed Across Georgia Since Election Oversight Lifted*, The Atlanta J.-Const. (Aug. 31, 2018).

[13] *Id.*

accumulated weight of all that history has resulted in "diminished political influence and opportunity" for Black citizens in Georgia into the present day. *See, e.g.*, *Cofield v. City of LaGrange, Ga.*, 969 F. Supp. 749, 756–57 (N.D. Ga. 1997); *see also, e.g.*, *Ga. State Conf. of the NAACP*, 950 F. Supp. 2d at 1314–16 (N.D. Ga. 2013).

### 2. Subordination of Black Georgians through Political Violence

94.     The *de jure* political restrictions and other barriers to political power imposed by Georgia on its Black citizens have further been accompanied by the constant threat and reality of political violence as a tool to cement white dominance in the political arena. That violence, echoing through history to the present day, similarly undermines Black political participation.

95.     After the Civil War, and even before the end of Reconstruction, the Ku Klux Klan began organizing in Georgia and engaging in lethal voting-related violence to prevent Black men from participating in the political process.[14] For example, in 1868, twenty-eight newly-elected Black representatives—Georgians who had been enslaved until only a few years prior, and who had risen up to be elected to the General Assembly following the end of the war—were expelled from

---

[14] *See, e.g.*, Laughlin McDonald, *A Voting Rights Odyssey: Black Enfranchisement in Georgia* 29, 35-37 (Cambridge Univ. Press, 2003).

that body on the basis of racial animus. When a group of mostly Black citizens marched in protest, they were shot at, and some were killed, by hostile white citizens. This violent episode, known as the Camilla Massacre, intimidated many black voters from going to the polls on subsequent election days. Indeed, just months later, three Black men were gunned down outside a polling place in Savannah.[15]

96.     Throughout the late 19th century, white supremacists imposed a reign of terror meant to force Black Americans into a subordinate state. White mobs lynched nearly two hundred victims during the 1890s, an average of roughly one victim per month. Those lynchings continued well into the 1940s. While the reasons for these extrajudicial killings varied, the increase in mob violence correlated with campaigns to erase Black Georgians from public life.

97.     The rise of a mass civil rights movement and voting rights campaign in the wake of *Brown v. Board of Education* increased Black political participation, and also white resistance to this participation. This resistance often took the form of new waves of violence, such as the 16th Street Baptist Church bombing and the

---

[15] Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863–1877* 426 (N.Y.: Perennial Classics, 2002).

assassination of Martin Luther King, Jr., that were meant to terrorize Black citizens and suppress the burgeoning movement for Black political rights.

### 3. Racial Polarization in Georgia

98.     This Court has recognized that "voting in Georgia is highly racially polarized," and "[d]istricts with large black populations are likely to vote Democratic." *Ga. State Conf. of the NAACP v. Georgia*, 312 F. Supp. 3d 1357, 1360 (N.D. Ga. 2018); *see also, e.g.*, *Wright*, 979 F.3d at 1305.

99.     Indeed, Black voters in Georgia are politically cohesive. For example, in the 2008 presidential election, Barack Obama secured 98% of Black voter support in Georgia and only 23% of white voter support.

100.    More recently, 99% of Black voters supported Stacey Abrams for governor in 2018, compared to only 16% of white voters. And in recent runoff elections for U.S. Senate, Black voters' candidates of choice, Reverend Raphael Warnock and Jon Ossoff, won with roughly 97% of Black voter support compared to 18% of white voter support.

101.    The white majority usually votes as a bloc to defeat Black voters' candidates of choice. That is true with respect to statewide contests (notwithstanding a few recent victories by Black-preferred candidates in the 2020 presidential and U.S. Senate races that saw unprecedented turnout) and particularly

with respect to more localized contests in areas within or near the regions where Plaintiffs allege that additional Black majority districts can and should be drawn.

102.   Racial polarization is another factor supporting the conclusion that Black voters' political strength is diluted by the districting scheme drawn by the General Assembly in S.B. 1EX and H.B. 1EX. Those districts undermine Black representation, particularly when considered in combination with Black voters' geographic concentration and with the State's long legacy of unfair and discriminatory redistricting.

### 4. Discriminatory Electoral Devices

103.   Georgia's continued use of electoral devices that shut out racial minorities further undercuts Black voters' ability to participate in politics on equal footing. Chief among those devices is the majority vote requirement, whereby when no candidate receives an outright majority, the State requires a runoff election between the plurality winner and the candidate with the next highest number of votes.

104.   The majority-vote requirement is deeply rooted in racist policy.[16] The requirement was adopted in 1963, following the demise of the county-unit system.

---

[16] *See generally* Laughlin McDonald, *The Majority Vote Requirement: Its Use and Abuse in the South*, 17 Urb. Law. 429 (1985).

Federal court decisions in cases like *Toombs v. Fortson*, 205 F. Supp. 248 (N.D. Ga. 1962), and *Wesberry v. Sanders*, 376 U.S. 1 (1964), required the State to drop the county-unit system and reapportion its legislative districts to be roughly equal in population. Those decisions severely limited key tools that the white majority had previously used to suppress the political power of Black voters.

105.   The majority-vote requirement was a direct response to decisions like *Toombs* and *Wesberry*. Denmark Groover, who introduced the proposal, was recalled to have said on the state house floor, "[W]e have got to go to the majority vote because all we have to have is a plurality and the Negroes and the pressure groups and special interests are going to manipulate this State and take charge if we don't go for the majority vote."

106.   The majority vote/runoff system, which Georgia continues to deploy, weakens Black voters. When elections are decided using plurality voting, the white vote in a majority white jurisdiction can be split among several different candidates, while Black voters can—in theory—vote as a single bloc for a candidate of their choice, who could then end up winning with a plurality. But with majority runoff voting, even if white voters split their vote in the first round and a Black-preferred candidate somehow obtains a plurality, white voters receive a second chance to unite behind a white candidate to ensure victory.

107. The Supreme Court has acknowledged that runoff elections serve to dilute minority voting power in at-large elections. In *Rogers v. Lodge*, 458 U.S. 613 (1981), the Court upheld a trial-court finding that Georgia's majority-vote requirement, especially when combined with at-large voting, helped a white majority to consistently out-vote an organized Black minority, and thus worked "to submerge the will of the minority" and "deny the minority's access to the system." *Id.* at 627 (citation omitted); *see also City of Port Arthur v. United States*, 459 U.S. 159, 167 (1982) (U.S. Department of Justice properly conditioned approval of town's at-large election scheme on elimination of majority-vote requirement)). Yet Georgia continues to employ this discriminatory device, including in combination with at-large voting. *See also Georgia State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338 (N.D. Ga. 2015) (granting preliminary injunction against at-large voting scheme).

### 5. Ongoing Effects of Georgia's History of Discrimination

108. On top of those deeply ingrained patterns of discrimination in elections and voting itself, Black Georgians and others also face the continued burden of discrimination and disparities on a number of other fronts, from education, employment, and transportation, to healthcare, to housing, to unequal

treatment in the criminal justice system.  All of those disparities in turn affect the ability of Black Georgians to participate in politics on equal footing.

109.   For example, Georgia's history of segregated education, which persisted into the 1970s, continues to effect socioeconomic inequality in Georgia to this day. Many Black Georgians who attended segregated schools during the time of *de jure* segregation are in their 50s and 60s today—together, they comprise over a quarter of all Black voters in the state. And even today, many children in Georgia continue to attend effectively segregated and unequal schools, with Black children facing harsher school discipline, scoring lower on standardized testing, and attending college at lower rates.

110.   Black Georgians also face persistent disparities across a number of other economic metrics. In Georgia, the poverty rate for African Americans is double that of non-Hispanic whites (18.8% versus 9%), according to the 2019 ACS Survey. For Georgians under 18, that gap is even wider: The poverty rate for African Americans under 18 is nearly three times the rate of non-Hispanic whites (28.1% versus 9.5%).

111.   The same 2019 ACS Survey, shows a stark racial disparity in median household income ($47,083 for African Americans versus $71,790 for non-Hispanic whites) and median family income ($58,582 versus $87,271). It also

reveals that the unemployment rate of African Americans is nearly double that of non-Hispanic whites (7% versus 3.8%).

112.   Black Georgians have significantly lower rates of homeownership than non-Hispanic whites. Only 47% of African Americans own their own home compared to 75% non-Hispanic whites, according to the 2019 ACS Survey. And the median home values of African Americans who do own homes is significantly less than that of non-Hispanic whites ($164,900 to $220,100).

113.   These economic disparities also persist in access to transportation. For example, according to the 2019 ACS Survey, more than three times as many African Americans are part of a household that has no vehicle available as non-Hispanic whites (11.7% to 3.4%).

114.   Black Georgians also face disparities with respect to housing, experiencing more housing instability and moving more frequently.  In addition, Georgia continues to have high levels of residential segregation, including in Atlanta and the areas around Augusta and Columbus and Albany in Southwestern Georgia.

115.   Health outcomes also continue to be consistently worse for Black Georgians compared to whites. For example, the infant mortality rate of Black

infants is more than double that of white infants (11.2 versus 4.9).[17] Black women are nearly three times more likely to die from pregnancy-related causes than white women, and the Georgia Department of Public Health has found that 70% of such pregnancy-related deaths are preventable.[18]

116.   These and many other disparities dramatically affect political participation. The correlation, for example, between wealth and economic stability and voter participation, is well established. Indeed, socioeconomic factors such as education, income, poverty, and employment, as well as housing stability and access to healthcare, have all been shown to affect voting behavior, such that the persistent racial disparities amount to burdens on Black Georgians' ability to participate in the political process on equal footing.

117.   Meanwhile, criminal justice policies that disproportionately affect Black Georgians, like disenfranchisement for persons with criminal convictions,

---

[17] Kaiser Family Foundation, *State Health Facts: Infant Mortality Rate by Race/Ethnicity*, https://www.kff.org/other/state-indicator/infant-mortality-rate-by-race-ethnicity/?currentTimeframe=0&selectedDistributions=white--black-or-african-american&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Nov. 30, 2021).

[18] Ga. Dep't of Public Health, *Maternal Mortality Factsheet 2012–2016*, https://dph.georgia.gov/maternal-mortality (last visited Nov. 30, 2021).

directly block some Black Georgians from participating in politics, and further burden Black communities from exercising political power on a level playing field.

118.   These disparities are all interconnected, and spring from concerted policy decisions meant to isolate and marginalize Black Georgians in particular, among them the legacy and continued reality of segregated and unequal education, redlining and housing discrimination, discrimination in lending and employment, the imposition of punitive collateral consequences in the criminal justice system, and unremedied decisions around the construction public transportation infrastructure that cut off Black communities from economic opportunity. The collective weight of those policies and the disparities that flow from them all disadvantage Black Georgians' ability to fully participate in politics.

### 6.  Use of Racial Appeals in Political Campaigns

119.   Racial appeals have long been used by political campaigns in Georgia. At the height of Jim Crow, Georgia's Senator Walter George noted at a campaign stop in Barnesville (part of Senate District 16) that national reformers would seek "to send a Connecticut judge down here. . . to try you on an anti-lynching charge." While this type of racially-charged fearmongering may have changed in form, the sentiment has continued to pervade our political discourse. As just a few examples:

120.   In 2005, State Representative Sue Burmeister, who represented a Richmond County district at the time, complained that Black voters in her district's Black-majority precincts only showed up at the polls when they were "paid to vote."

121.   In 2009, Nathan Deal, a former Congressman who was elected Governor in 2010, ridiculed criticism of voter ID measures as "the complaints of ghetto grandmothers who didn't have birth certificates."

122.   State Senator Michael Williams, a former Forsyth County legislator who ran for Governor in 2018, toured the State in a "deportation bus" and pledged to "put them on this bus and send them home." Williams, who represented a county where white mobs ran out most Black residents in a violent 1912 racial cleansing, also campaigned heavily on protecting sculptures of Confederate soldiers at Stone Mountain.

### 7.  (Lack of) Success of Black Candidates

123.   Black voters have historically been and continue to be underrepresented in Georgia State government. From 1907 until 1962, not a single Black politician held a seat in the Georgia legislature. Thereafter, the State Senate had only two Black members until 1983, after the redistricting following the 1980 Census. And in 1999, less than 20% of both State chambers were Black, whereas

Black Georgians represented nearly 29% of the State's population according to the 2000 Census.[19]

124.   That disparity persists today: The voting age population of Georgia was almost 33% Black, but the Georgia General Assembly remains only 27% Black—a disparity that translates into several State Senators and as many as 10 or 11 members of the State House of Representatives.

125.   Meanwhile, Black candidates almost never win statewide office. Despite the fact that a third of voting-eligible Georgians are Black, Georgia elected its first Black Senator since Reconstruction only last year, and has still never elected a Black governor or a Black Secretary of State. Indeed, before this past year's Senate election, the last time a Black candidate won any statewide office in a contested election was in 2006.

126.   Moreover, in the particular areas where the districts at issue in this lawsuit are located, Black candidates have rarely and in some instances never before won election to the General Assembly.

---

[19] *See* Charles S. Bullock III & Ronald Keith Gaddie, *Voting Rights Progress in Georgia*, 10 N.Y.U. J. Leg. & Pub. Pol'y 1, 29–30 & tbl.7 (2006).

### 8.  Unresponsiveness of Elected Officials to Black Voters

127.   Moreover, the candidates that *have* succeeded in the areas around the challenged districts have been unresponsive to the concerns of Black Georgians, further confirming that S.B. 1EX and H.B. 1EX will contribute to an unequal political playing field for Black voters.

128.   Such unresponsiveness is evidenced by the continuing, unremedied socioeconomic and other disparities faced by Black Georgians that were discussed already, none of which have been adequately addressed by elected policymakers.

129.   Another recent example of this unresponsiveness is the General Assembly's passage of S.B. 202, which was supported by every white Republican member of the General Assembly, including those who will represent Black voters in districts whose boundaries dilute Black voting power under the maps set forth in S.B. 1EX and H.B. 1EX. Civil rights groups, civic institutions serving the Black community, and political leaders and representatives of the community have unanimously decried S.B. 202—which imposes new restrictions on absentee voting and other new barriers to the franchise—as an unwarranted burden on the right to vote, and one that will fall disproportionately on the rights of Black Georgians in particular. Advocates also opposed provisions in the bill that appear to allow State officials to supplant local election boards in predominantly Black jurisdictions like

Fulton County. Black Georgians and their institutions, leaders, and representatives strenuously opposed S.B. 202 to no avail.

130.   The unresponsiveness of elected officials in Georgia to the concerns of Black Georgians is also evidenced by the ongoing purge of Black members of various county election boards in the State, including in Spalding and Morgan Counties.[20]

131.   It is also demonstrated by Georgia elected officials' opposition to the reauthorization of the VRA.  Georgia's representatives led an unsuccessful campaign against the VRA's reauthorization in 2006, rebelling against their own political party and trying to doom the legislation by proposing "poison pill" amendments to the VRA on the floor of the U.S. House of Representatives.

### 9.  Lack of Valid Rationale for the Discriminatory Maps

132.   Finally, the State has offered no valid rationale for its decision to systematically dilute Black political power in Georgia and to silence the voices of Black Georgians by refusing to draw new majority Black districts.

---

[20] James Oliphant and Nathan Layne, *Georgia Republicans purge Black Democrats from county election boards*, Reuters (Dec. 9, 2021), https://www.reuters.com/world/us/georgia-republicans-purge-black-democrats-county-election-boards-2021-12-09/?s=09.

133.   Tellingly, in the Georgia legislative hearings, legislators defending the new redistricting maps, when asked to justify why their proposed districts were drawn in the way they were drawn, explained that when a district was previously a "VRA district," they had "maintain[ed] the existing district."  This language demonstrates that legislators sought to do nothing more than maintain existing majority-minority districts from the 2011 redistricting process, and reveals a flawed understanding of what the Voting Rights Act requires. The Voting Rights Act demands more than mechanical preservation of existing majority-minority districts.

134.   Meanwhile, the State's rushed process hammers home the lack of any considered rationale for S.B. 1EX and H.B. 1EX. As explained already, the maps challenged here emerged from a shoddy process that contained no room for democratic debate. The Redistricting Committees never allowed the public to engage in the mapmaking process or review proposed maps ahead of time. Instead, the Committees jammed the proposed maps through the legislative process within days of their first being proposed, without meaningful deliberation or measured consideration, and without considering any alternatives.

135.   In sum, S.B. 1EX and H.B. 1EX unlawfully dilute the voting strength of Black Georgians in violation of Section 2 of the Voting Rights Act. The maps

drafted in 2021 could have—and should have—been drawn to give the increased Black population in Georgia a full and fair opportunity to elect representatives of their choosing and participate in politics on equal footing with white citizens. Instead, the State drew maps that dilute and weaken the Black vote. The broader context—including Georgia's long history of official and pervasive discrimination against Black voters, racially-polarized voting, discriminatory voting practices that survive in the State to this day, and other disparities that reflect the legacy of discrimination and that continue to disproportionately burden Black political participation—amply supports the conclusion that Georgia's unfair new redistricting scheme improperly and unlawfully dilutes the vote of Black citizens in Georgia.

## CLAIM FOR RELIEF

### COUNT 1: SECTION 2 OF THE VOTING RIGHTS ACT

136.   The allegations contained in the preceding paragraphs 1 through 123 are re-alleged as if fully set forth herein.

137.   S.B. 1EX violates Section 2 of the Voting Rights Act, as amended, 52 U.S.C. § 10301.

138.   S.B. 1EX denies or abridges the Plaintiffs' and/or their members' right to vote on account of their race and color, by diluting their voting strength as

Black citizens in Georgia. It does not afford Plaintiffs an equal opportunity to participate in the political process and to elect representatives of their choice and denies Plaintiffs the right to vote in elections without discrimination on account of their race and color, all in violation of 52 U.S.C. § 10301.

139.   H.B. 1EX also violates Section 2 of the Voting Rights Act, as amended, 52 U.S.C. § 10301.

140.   H.B. 1EX denies or abridges the Plaintiffs' and/or their members' right to vote on account of their race and color, by diluting their voting strength as Black citizens in Georgia. It does not afford Plaintiffs an equal opportunity to participate in the political process and to elect representatives of their choice and denies Plaintiffs the right to vote in elections without discrimination on account of their race and color, all in violation of 52 U.S.C. § 10301.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare S.B. 1EX and H.B. 1EX to be in violation of Section 2 of the Voting Rights Act;

B. Preliminarily and permanently enjoin the Defendant and his agents from holding elections under S.B. 1EX and H.B. 1EX;

C. Set a reasonable deadline for State authorities to enact or adopt redistricting plans for the Georgia State Senate and State House that do not abridge or dilute the ability of Black voters to elect candidates of choice and, if State authorities fail to enact or adopt valid redistricting plans by the Court's deadline, order the adoption of remedial redistricting plans that do not abridge or dilute the ability of Black voters to elect candidates of choice;

D. Order, if necessary, an interim electoral plan for the 2022 elections;

E. Order expedited hearings and briefing, consider evidence, and take any other action necessary for the Court to order a VRA-compliant plan for new State Senate and House districts in Georgia.

F. Award Plaintiffs' their costs, expenses, and disbursements, and reasonable attorneys' fees incurred in bring this pursuant to in accordance with 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988;

G. Retain jurisdiction over this matter until Defendant has complied with all orders and mandates of this Court;

H. Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ *Sean J. Young*              /s/ *Sophia Lin Lakin*
Sean J. Young (Bar 790399)      Sophia Lin Lakin*

*syoung@acluga.org*
Rahul Garabadu (Bar 553777)
*rgarabadu@acluga.org*
ACLU FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

/s/ *Debo Adegbile*
Debo Adegbile*
*debo.adegbile@wilmerhale.com*
Alex W. Miller*
*alex.miller@wilmerhale.com*
Maura Douglas*
*maura.douglas@wilmerhale.com*
Eliot Kim*
*eliot.kim@wilmerhale.com*
WILMER CUTLER PICKERING HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

Anuradha Sivaram*
*anuradha.sivaram@wilmerhale.com*
Ed Williams*
*ed.williams@wilmerhale.com*
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*slakin@aclu.org*
Ari J. Savitzky*
*asavitzky@aclu.org*
Jennesa Calvo-Friedman*
*jcalvo-friedman@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

George P. Varghese*
*george.varghese@wilmerhale.com*
Denise Tsai*
*denise.tsai@wilmerhale.com*
Tae Kim*
*tae.kim@wilmerhale.com*
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Charlotte Geaghan-Breiner*
*charlotte.geaghan-breiner@wilmerhale.com*
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
(650) 858-6000 (t)
(650) 858-6100 (f)

*Attorneys for Plaintiffs*

*Pro Hac Vice Forthcoming