# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

**ATLANTA DIVISION**

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., et al.; <br><br>      *Plaintiffs*, <br><br>      vs. <br><br> BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia. <br><br>      *Defendant*. | Case No. 1:21-cv-05337-SCJ |

**DECLARATION OF DR. ADRIENNE JONES**
**PRELIMINARY REPORT**

**January 7, 2022**

# TABLE OF CONTENTS

BACKGROUND AND QUALIFICATIONS ................................................................. 3

STATEMENT OF PURPOSE ..................................................................................... 4

SUMMARY OF OPINIONS ....................................................................................... 5

DISCUSSION ............................................................................................................. 6

   I.   The State of Georgia Has a History of Official Discrimination in Voting and Has Used a Bevy of Methods that Hinder Black Georgians' Ability to Participate in the Political Process (Factors 1 and 3) ........................................................................................ 6

   A.  The Voting Rights Act and New Measures to Suppress and Dilute the Black Vote. ......... 7

      1)   Persistent Resistance to the Voting Rights Act ....................................... 7

      2)   At-Large Voting Systems ......................................................................... 9

      3)   Majority Vote Requirements and Numbered Posts ................................ 10

      4)   Redistricting ............................................................................................ 12

      5)   New Restrictions on Running for Office ................................................ 13

      6)   Official Elimination, Weakening or Increased Oversight of a Position After a Black Person is Elected............................................................................... 14

         i.   A School Board Example: Sumter County, Georgia ........................... 14

         ii.   A Black Mayor is Elected in Stockbridge ......................................... 15

         iii.   Removal of Black County Election Board Members ........................ 15

      7)   Felon Disenfranchisement ...................................................................... 16

   B.  More Recent History: Laws and Official Practices with a Discriminatory Impact on Black Voters .................................................................................................................. 17

      1)   Exact Match Voter Registration Requirement ....................................... 17

      2)   Voter Purges ........................................................................................... 20

      3)   Time/Place Restrictions .......................................................................... 21

      4)   Failure to Provide Voter Registration Opportunities at Public Assistance Offices 22

      5) Backlash to Record Black Voter Turnout in the 2020 Election .................................. 23

   II.   Both Explicit and Subtle Racial Appeals Continue to Play a Central Role in Political Campaigns in Georgia (Factor 6)........................................................................................ 25

   III.   Black Georgians Have Historically Been Underrepresented in Public Office and That Underrepresentation Persists Today, Particularly in Areas that are the Focus of the Lawsuit (Factor 7)............................................................................................................. 29

CONCLUSION.............................................................................................................. 36

## BACKGROUND AND QUALIFICATIONS

I am a political scientist and lawyer by education and training. I am an Assistant Professor of Political Science at Morehouse College in Atlanta, Georgia, and I teach political science and serve as the Pre-Law Director. I have taught political science at the university level for 22 years, since 1999.

I obtained a Ph.D. and M.Phil from the City University of New York Graduate Center. My primary Ph.D. training was in American Politics, with a minor in public policy. I also obtained a J.D. from the University of California at Berkeley School of Law. In addition to Morehouse College where I currently teach, I have taught at: The City College of New York, The Center for Workers Education, The University of Wisconsin at Platteville, and Radford University.

I have particular expertise in the history of racial discrimination in voting and the Voting Rights Act of 1965, 52 U.S.C. § 10301, et seq. (VRA). My doctoral dissertation titled, *The Voting Rights Act Under Siege: The Development of the Influence of Colorblind Conservatism on the Federal Government and the Voting Rights Act* presents my research on the VRA between 1965 and 2013. I have published two peer-reviewed articles on the VRA, *When Yes Means No: GOP Congressional Strategy and the Reauthorization of the VRA in 2006*, and *How to Win a "Long Game": The Voting Rights Act, the Republican Party, and the Politics of Counter-Enforcement* in Political Science Quarterly. I have also published lay opinion pieces about the VRA and Black American history and politics. I have made presentations on the same topics, including on the VRA at the Southern Political Science Association. My C.V. lists both my presentations and publications, and is included in the Appendix to this report. At present, I am writing articles and a book on the VRA based on my doctoral dissertation.

As a political science professor, I am regarded as the public law expert in my department. My courses are based in American Government, public policy, and law. These courses include, but have not been limited to, National Government, Constitutional Law I and II, Race and Law, Issues in Civil and Criminal Law, and similar courses. Presently, at Morehouse College, I teach Race and Law, National Government, Constitutional Law, and the Senior Seminar. I also serve as the campus pre-law director.

I am serving as an expert witness in *Fair Fight Action v. Raffensperger*, 1:18-cv-05391 (N.D. Ga. 2019) as an expert on the history of voter suppression in Georgia. In that case, the Court qualified me as an expert to testify about the history of voter suppression in Georgia. *Fair Fight Action v. Raffensperger*, 1:18-cv-05391 (N.D. Ga. 2019), Dkt. 577 at 11.

For my work in this case, I am being compensated $300 per hour. My compensation is not contingent on the analysis and opinions offered or on the outcome of this litigation.

3

**STATEMENT OF PURPOSE**

I have been asked by plaintiffs' counsel in this case to examine any relevant historical and contemporary evidence of certain social and historical factors, and how, if at all, these factors impair Black voters' ability to participate fully and equally in the political process and to elect candidates of their choice.

Specifically, I have focused my analysis on several factors set forth by the U.S. Senate Judiciary Committee during the amendment of Section 2 of the Voting Rights Act in 1982 and subsequently referenced by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30 (1986) (the "Senate Factors"). My report focuses on Senate Factors 1, 3, 6, and 7, which are:

- **Factor 1:** The "extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process."
- **Factor 3:** The "extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group."
- **Factor 6:** Whether "political campaigns have been characterized by overt or subtle racial appeals."
- **Factor 7:** The "extent to which members of the minority group have been elected to public office in the jurisdiction."

In conducting my analysis and reaching the opinions contained in this report, I have objectively examined different types of sources—including the legislative and judicial record, newspaper coverage, campaign literature, and public statements, along with the existing scholarship and the established historical background—to learn and describe the history of Georgia and its official relationship to Black voter access historically, to determine the practices that create barriers for Black voters to participate in elections in Georgia as voters and as candidates. Additionally, I examined Georgia's state Senate and House districting maps and historical election data, amongst other sources, to evaluate the degree to which Blacks have been elected to office.[1] I have weighed all of that material collectively in forming my opinions.

I have directed my research assistant, Andrea Evans, to assist me in this assignment on compiling and analyzing data pursuant to my instructions and supervision, particularly related to Senate Factor 7.

---

[1] See Part III, *infra*, for a more detailed description.

**SUMMARY OF OPINIONS**

My major opinions are summarized briefly as follows:

Factor 1: Georgia has an undisputed history of discrimination against Black citizens with regard to the franchise, in particular but not limited to Black citizens registering to vote and voting. The state has used traditional Jim Crow tactics including, poll taxes, literacy and understanding tests, the white primary, and the County Unit System.

Factor 3: Georgia has made significant use of voting practices and procedures that enhance the opportunity for discrimination against Black Georgians. Georgia has used, and continues to use, at large voting systems, majority vote requirements and numbered posts, redistricting, restrictions on running for office, felony disenfranchisement, which all enhance the opportunity to dilute the votes of Black citizens. Georgia has also used numerous practices in regulating voter registration (including voter purges, Exact Match, and where voter registration services are offered) and practices regarding the time, locations, and manner of registration and voting, which disproportionately impact Black voters. Many voting practices exercised by Georgia have routinely been adopted with the intention to ensure the ability to limit Black citizen access to the ballot box and to elected office. But regardless of intent, these are voting practice and procedures that disproportionately restrict Black voter access affect the ability of Black people in Georgia to participate equally.

Black citizens have not enjoyed the assumption that they have the right to vote or that the right is sacrosanct because the state has routinely used methods listed in Factor 3.

Factor 6: Political campaigns have historically and presently been characterized by overt and subtle racial appeals. Traditionally explicit racial appeals were made in political campaigns during Constitutional debate and campaigns for public office. Before 1966, every Georgia governor ran on a platform that included blatantly racist, anti-Black appeals. Since the 1970s, the popularity of blatant appeals has receded and so political campaigns have engaged in both explicit appeals and *implicit* appeals, i.e., dog-whistle politics, to galvanize and mobilize white voters in the state. Racial appeals are de rigueur, and effective in political campaigns in the state.

Factor 7:
Black Georgians have been and continue to be underrepresented in public office. Despite persistently making up a significant portion of the state population, Georgia Blacks have faced barriers to being elected to public office, both historically and contemporarily. Since 1965, out of the 365 total seats in the U.S. Congress allocated to Georgia, only 12, or 3.28%, have been occupied by Black officials. At the state level, only two Black people have been elected to non-judicial statewide office in its entire 233 years. There are, moreover, areas in the state, including areas that are at issue in this lawsuit, that have not elected any Black officials to the Georgia Assembly for at least the last fifteen years (the time period of my analysis given the availability of publicly available districting maps).

**DISCUSSION**

I.   **The State of Georgia Has a History of Official Discrimination in Voting and Has Used a Bevy of Methods that Hinder Black Georgians' Ability to Participate in the Political Process (Factors 1 and 3)**

Courts have repeatedly recognized Georgia's long history of official discrimination in voting.

> Georgia's history of discrimination "has been rehashed so many times that the Court can all but take judicial notice thereof. Generally, Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception."

*Wright v. Sumter Cty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1310 (M.D. Ga. 2018) (quoting *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994)), *aff'd*, 979 F.3d 1282 (11th Cir. 2020); *Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013) (recognizing "Georgia's undisputed history of discrimination"), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015); *see also Johnson v. Miller*, 864 F. Supp. 1354, 1379–80 (S.D. Ga. 1994) ("[W]e have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases."), *aff'd and remanded sub nom. Miller v. Johnson*, 515 U.S. 900 (1995).

In the nine decades from the end of Reconstruction through the passage of Civil Rights Act in 1965, Georgia emerged as the leader of state-sponsored voter suppression. During this period, Georgia state and local officials "adopted virtually every one of the traditional 'expedients' to obstruct the exercise of the franchise by blacks, including literacy and understanding tests, the poll tax, felony disenfranchisement laws, onerous residency requirements, cumbersome registration procedures, voter challenges and purges, the abolition of elective offices, the use of discriminatory redistricting and apportionment schemes, the expulsion of elected blacks from office, and the adoption of primary elections in which only whites were allowed to vote."[2] It is no surprise that legal experts have observed that "No state was more systematic and thorough in its efforts to deny or limit voting and office holding by blacks" than Georgia. [3]

Much has changed since the Jim Crow era, but that past remains with us today. As a scholar whose work is focused on the 1965 Voting Rights Act, I will focus my discussion here primarily on the particular forms and instances of official election and voting-related discrimination in Georgia that have persisted in the modern period, defined as the period starting from the 1960s to the present. In doing so, however, I will also highlight the ways in which the devices and mechanisms that have burdened Black political participation in more recent times often have their roots in the more explicit discriminatory measures of Jim Crow.

---

[2] McDonald, Laughlin. *A Voting Rights Odyssey: Black Enfranchisement in Georgia*. Cambridge University Press, 2003, 3.

[3] McDonald, *Odyssey*, 2.

### A.  The Voting Rights Act and New Measures to Suppress and Dilute the Black Vote.

### 1)  Persistent Resistance to the Voting Rights Act

Considered the crown jewel of civil rights legislation,[4] the VRA was designed to solve the problem of Black voter access and exclusion of Black Americans from the polity. Georgia resisted the VRA from its inception. When the VRA of 1965 was being debated in Congress, Georgia representatives complained vehemently that the law was an inappropriate imposition on states' sovereignty. Then-Georgia Governor Carl Sanders wrote to President Lyndon B. Johnson "urging defeat of the voting rights bill."[5] In his nine-page letter, Sanders argued that states determine all aspects of voting. He objected to the prohibition of literacy tests, and called the empowerment of federal registrars "extreme." Overall, Sanders considered the VRA "unnecessary," despite the state's culture of voter discrimination or, more accurately, because of it.[6]

Once the VRA passed, Georgia joined as a plaintiff with South Carolina in a lawsuit attacking the constitutionality of the VRA.[7] When the lawsuit failed, Georgia simply refused to comply with the law generally and with the preclearance process specifically for almost a decade and half.[8]

In the early years of VRA enforcement, Georgia refused to submit new laws for preclearance. Between 1965 and 1967, the state submitted exactly *one* of its hundreds of voting law changes to the U.S. Department of Justice ("DOJ") for preclearance.[9] And, the state resisted the requirements to ensure registration and ballot casting by all state citizens. A 1968 report of the U.S. Commission on Civil Rights reported that in 34 counties in Georgia, fewer than 10% of Black citizens were registered. In the state's 21 counties with Black voting age majorities, an average of only 15% of Black Georgians were registered, compared to 91% of whites.[10] By 1982, preclearance compliance by the state had improved but approximately 361 acts of the General Assembly and an unknown number of local changes went unsubmitted.[11]

Even through the most-recent reauthorization of the VRA, Georgia continued to oppose the legislation. In 2006, Georgia Congressional representatives took the lead in opposing

---

[4] Herbert H. Denton, *Reagan Signs Voting Rights Act Extension*, WASH. POST, June 30, 1982, https://www.washingtonpost.com/archive/politics/1982/06/30/reagan-signs-voting-rights act-extension/b59370f1-fc93-4e2f-b417-2b614ea55910/ (quoting President Reagan as calling the right to vote "the crown jewel of American liberties").

[5] McDonald, *Odyssey*, 3.

[6] McDonald, *Odyssey,* 11-12.

[7] *See* Brief on Behalf of the State of Georgia, 1965 WL 115335, *South Carolina v. Katzenbach*, 383 U.S. 301 (1966).

[8] U.S. Department of Justice, "Number of Changes Submitted under Section 5 and Reviewed by the Department of Justice, by State and Year, 1965-December 31, 1980"

[9] U.S. Department of Justice, "Number of Changes Submitted under Section 5 and Reviewed by the Department of Justice, by State and Year, 1965-December 31, 1980."

[10] U.S. Commission on Civil Rights, Political Participation (Washington, D.C. Government Printing Office, 1968), pp. 232-39.

[11] McDonald, *Odyssey*, 175

7

reauthorization of the temporary provision of the VRA in particular, Section 5 and preclearance. After the two parties agreed to renew the Act "as is," Georgia Representative Lynn Westmoreland led colleagues in a demand for debate to express on the record their opposition to the VRA and to preclearance in particular. Despite the assertion by Westmoreland and the "Rebels" that preclearance was no longer necessary,[12] Georgia's submissions to the DOJ continued to be met with objections for failing to show that a submitted change has neither a discriminatory purpose nor a discriminatory effect.[13]

Georgia's resistance to the VRA is consistent with its history of resisting the expansion of voting rights to Black citizens at every turn. Just two years after Georgia was re-admitted to the Union following the Civil War, it was again evicted when the legislature expelled its Black elected officials.[14] As soon as the Reconstruction period closed in 1877, Georgia adopted a new Constitution, and officially imposed barriers to Black voters yet *again*.[15] As Justice Ginsburg described:

> After a brief interlude of black suffrage enforced by federal troops but accompanied by rampant violence against blacks, Georgia held a constitutional convention in 1877. Its purpose, according to the convention's leader, was to "'fix it so that the people shall rule and the Negro shall never be heard from.'" In pursuit of this objective, Georgia enacted a cumulative poll tax, requiring voters to show they had paid past as well as current poll taxes; one historian described this tax as the "most effective bar to Negro suffrage ever devised."[16]

Other mechanisms were also introduced with the explicit aim of resisting the expansion of voting rights to Black citizens. In 1890, the Georgia state legislature gave political parties the exclusive power to regulate and conduct primary elections.[17] And in 1894, the legislature adopted a law

---

[12] Wallsten, Peter, and Johanna Neuman. "Voting Rights Act Renewal Divides GOP." *Los Angeles Times*, July 12, 2006. https://www.latimes.com/archives/la-xpm-2006-jul-12-na-voting12-story.html. (describing Westmoreland as complaining that the VRA "unfairly targeting his home region because of its past -- and failing to account for progress in racial relations" and also acknowledging that he would "feel fine" if preclearance was not reauthorized).

[13] *See, e.g.*, Thomas E. Perez, U.S. Assistant Attorney Gen. to Dennis R. Dunn, Ga. Deputy Attorney Gen. (Dec. 21, 2012) (objecting to state legislation moving the election date for mayoral and commissioner elections for the consolidated government of Augusta-Richmond from November to July as DOJ's analysis found it would a retrogressive effect on the ability of minority voters to elect candidates of choice to office and state did not show it was not motivated by a discriminatory purpose); Thomas E. Perez, U.S. Assistant Attorney Gen. to Andrew S. Johnson, Arnold, Stafford, & Randolf & B. Jay Swindell, McCullough & Swindell (Aug. 27, 2012) (objection to redistricting plan for the Board of Education and Board of Commissioners for Long County, Georgia, which would need to be approved by the state, because the under the proposed plan African American voters experience avoidable retrogression of their ability to elect candidate their choice); Loretta King, Acting Assistant Attorney Gen. to Thurbert E. Baker, Georgia Attorney Gen. (May 29, 2009) (objecting to exact match voter registration protocol).

[14] United States Statutes at Large, 41 Cong. Ch. 299, July 15, 1870, 16 Stat. 363-64; Gabriel J. Chin, "The Voting Rights Act of 1867: The Constitutionality of Federal Regulation of Suffrage during Reconstruction," 82 N.C. L. Rev. 1581 (2004); McDonald, Odyssey, 24.

[15] McDonald, *Odyssey*, 36-37.

[16] *Miller v. Johnson*, 515 U.S. 900, 936–37 (1995) (Ginsburg, J., dissenting) (quoting McDonald, Binford, & Johnson, Georgia, in Quiet Revolution in the South 68 (C. Davidson & B. Grofman eds. 1994) (quoting Robert Toombs) & A. Stone, Studies in the American Race Problem 354–355 (1908)).

[17] Ga. Laws 1890, p. 210.

which required the racial designation of voters.[18] In 1900, the Georgia Democratic Party adopted rules limiting voting in all state primaries to whites.[19] Georgia continued to use a whites-only Democratic primary and defend that practice in courts,[20] even several years after the U.S. Supreme Court's 1944 *Smith v. Allright* ruling that the conduct of primary elections is a "state function" (that should not violate the 15th Amendment).[21] And after the passage of the Civil Rights Act of 1957, one of the federal government's first major pieces of legislation protecting Black voting rights, the Georgia General Assembly responded by adopting a resolution by unanimous vote calling for the repeal of the Fourteenth and Fifteenth Amendments because they were "malignant acts of arbitrary power" and "are null and void and of no effect."[22] Then in 1958, Georgia adopted a more difficult voter registration test.[23]

### 2) At-Large Voting Systems

Key to Georgia's resistance to expansion of the franchise to Black citizens after the passage of the VRA was a widespread shift to at-large election schemes by local governments and school boards. At-large voting systems, where all voters cast their ballots for all candidates in the jurisdiction, can dilute Black votes, even where large numbers of Black citizens are registered to vote. This is because Black voters who could constitute a majority of a would-be district often do not have sufficient numbers to constitute a majority across at-large jurisdictions, which combine districts. Thus, the state, by passing legislation which authorized at-large schemes, facilitated local jurisdictions blocking Black voters from electing their preferred candidates by submerging them in white majorities.[24] As the Supreme Court observed in holding that Section 5 of the VRA was applicable to a change from district to at-large voting for county supervisors: "Voters who are members of a racial minority might well be in the majority in one district, but in a decided minority in the county as a whole. This type of change could therefore nullify their ability to elect the candidate of their choice just as would prohibiting some of them from voting."[25]

In relationship to districting and at-large voting systems, the Supreme Court's 1973 decision, *White v. Regester*, "gave a huge boost to the voting rights enforcement campaign in Georgia."[26] In *White,* the Supreme Court invalidated an at-large election district in Texas as unconstitutional

---

[18] Ga. Laws 1894, pp. 1 15, 1 17.

[19] Numan v. Bartley, The Creation of Modern Georgia, (Athens: University of Georgia Press, 1983), p. 139.

[20] *King v. Chapman*, 62 F. Supp. 639 (M.D. Ga. 1945), *aff'd*, 154 F.2d 460 (5th Cir. 1946).

[21] 321 U.S. 649, 661 (1944) (overruling *Grovey v. Townsend,* 295 U.S. 45, 52-53 (1935), which had held that a Texas county clerk's compliance with the Democratic party rule was not unconstitutional because there was no state action involved.).

[22] Ga. Laws 1957, p. 348.

[23] Ga. Laws 1958, p. 269. The test required voter registration applicants either pass a literacy test or correctly answer 20 of 30 questions. The questions included: "1. What is a republican form of government?"; "11. Who is the Solicitor General of the State Judicial Circuit in which you live and who is the Judge of such Circuit? (If such Circuit has more than one Judge, name them all.)"; "19. How does the Constitution of Georgia provide that a county site may be changed?" *See* Questions and Answers Under Section 19 of 1958 Registration law (Act. No. 321), https://vault.georgiaarchives.org/digital/collection/adhoc/id/546/rec/6.

[24] For example, the Georgia Assembly changed the law in 1972 so that the members of the Board of Commissioners of Wilkes County, Georgia "would be elected at large, while still required to reside in the districts previously used." *Wilkes Cty., Ga. v. United States*, 450 F. Supp. 1171, 1173 (D.D.C.), *aff'd*, 439 U.S. 999 (1978).

[25] *Allen v. State Bd. of Elections*, 393 U.S. 544, 569 (1969).

[26] McDonald, *Odyssey*, 159.

based on a theory of vote dilution.[27] The Court held in *White* that single member districts were necessary to integrate Black voters and to allow them the potential to elect candidates of their choice.[28]

Subsequently, many challenges were filed in Georgia against the at-large jurisdiction systems used in city and school board elections—none of which had been precleared by the Department of Justice.[29] Federal courts struck down a number of at-large systems challenged in court. In Fulton County, for example, a federal district court found that under the at-large voting system no Black representatives had been elected to the Fulton County Commission despite Black Georgians making up a "substantial minority population."[30] Similar decisions applied to local government and school board lawsuits across the state.[31]

But the use of at-large districts, which can deprive Black voters of the opportunity to elect candidates of their choice, continues today. In 2015, Fayette County's at large method of electing members to the Fayette County board of commissioners and board of education was enjoined by a federal district court for violating Section 2 of the VRA.[32] A Black candidate was elected to the Fayette County Board of Commissioners for the first time under the Court's remedial plan.[33] *See also* discussion of recent example of the use of at-large districts for Sumter County school board, Part I.6.i., *infra.*

### 3)  Majority Vote Requirements and Numbered Posts

Majority vote requirements and numbered posts were used by some of Georgia's elected officials as a tactic that could be used to replace the impact of the infamous County Unit System, which had limited the ability of Black Georgians to elect a candidate of their choice.

Under the County Unit System, formally instituted in 1917, the 121 "rural" counties were each assigned 2 points, the 30 "town" counties were each granted 4 points, and the 8 "urban" counties were each granted 6 points. Most of the Black population in the state lived in town and urban counties. Because the 121 ruralities constituted a majority of the counties, the points accrued by rural counties trumped the 'electoral' shares of town and urban counties. A state-wide candidate who carried the Democratic primary with the most points, was elected.[34] The system was, as described by a federal court, "employed to destroy black voting strength."[35] It was ultimately struck down by the Supreme Court in the 1963 decision *Gray v. Sanders*, which held that Georgia's County Unit System violated the 14th Amendment Equal Protection Clause, and represented a failure of the "one person, one vote" imperative.[36]

---

[27] *White v. Regester*, 412 U.S. 755, 770 (1973).

[28] *White v. Regester*, at 769.

[29] McDonald, *Odyssey*, 158-163.

[30] *Pitts v. Busbee*, 395 F. Supp. 35, 40-41 (N.D. Ga. 1975), *vacated on other grounds*, 536 F.2d 56 (5th Cir. 1976).

[31] McDonald, *Odyssey*, 160.

[32] *Georgia State Conference of NAACP v. Fayette Cty Bd. of Com'rs*, 118 F. Supp. 3d 1338, 1339 (N.D. Ga. 2015).

[33] *Georgia State Conference of NAACP*, 118 F. Supp. 3d at 1340.

[34] Buchanan, Scott. "County Unit System." In *New Georgia Encyclopedia*, August 21, 2020. https://www.georgiaencyclopedia.org/articles/counties-cities-neighborhoods/county-unit-system.

[35] *Busbee v. Smith*, 549 F. Supp. 494, 499 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983).

[36] 372 U.S. 368, 381 (1963).

The very next year, the Georgia legislature adopted a statewide comprehensive majority-vote requirement. The champion of enacting the requirement, Denmark Groover, was reported to have explained that "a majority vote would again provide protection which he said was removed with the death of the county unit system, indicating it would thwart election control by Negroes and other minorities."[37] Before the Senate Rules Committee, Groover explained a majority vote requirement was necessary because "We have a situation when the federal government interceded to increase the registration of Negro voters."[38]

Groover's comments exposed the discriminatory effects that a facially race-neutral majority vote system brought about. Where there are more than two candidates running for a position, under a plurality-vote system, whoever gets the most votes wins. But under a majority-vote system, the two candidates who receive the most votes must have a runoff. That means that whenever a Black candidate runs for office, especially in instances where the Black candidate runs against two white candidates, white voters have the opportunity to coalesce around the white candidate at the run-off stage if the Black candidate had received a plurality in the general election. In *City of Rome, Georgia v. United States*, 446 U.S. 156, 183-84 (1980), the Supreme Court upheld a lower court's finding that Rome, Georgia's majority vote scheme "significantly" decreased the opportunity for a Black candidate to be elected in the situation described above. The Court explained that "even if [the Black candidate] gained a plurality of votes in the general election, [he] would still have to face the runner-up white candidate in a head-to-head runoff election in which, given bloc voting by race and a white majority, [he] would be at a severe disadvantage."[39] Similarly, in *Rogers v. Lodge*, the majority vote requirement was found to was found "to submerge the will of the minority" and thus "deny the minority's access to the system." 458 U.S. 613, 627 (1982).

Majority vote and number posts requirements continue to be used in Georgia today.[40] As the DOJ explained, in the context of objecting to a change to a majority vote requirement for city council in the City of Tignall in Wilkes County: "Minority candidates who are forced into head-to-head contests with white candidates in [a] racially polarized voting environment are more likely to lose than would be the case under the existing system with concurrent terms and a plurality vote requirement."[41]

The legislation enacting a majority-vote requirement statewide was accompanied by a numbered-post requirement—meaning that candidates for seats on multi-seat bodies are required to run for

---

[37] Kousser, J. Morgan, Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction. University of North Carolina Press, 1999, 229.

[38] *Id.* The legislation that passed the Georgia Assembly and became law and 1964 was separately introduced and had the support of an "Election Laws Study Committee," both required a majority vote in primaries and general elections for all, or nearly all, local and state offices. *Id.* at 228.

[39] *City of Rome v. United States*, 446 U.S. 156, 184 (1980) (quoting *City of Rome, Ga. v. United States*, 472 F. Supp. 221, 244 (D.D.C. 1979)).

[40] Ga. Code Ann. § 21-2-501 (providing "no candidate shall be nominated...or elected to public office ...unless such candidate shall have received a majority of the votes cast" with certain exceptions).

[41] Letter to Melvin P. Kopecky, Kopecky & Roberts from Bill Lann Lee, U.S. Acting Assistant Attorney General to (Mar. 17, 2000), https://www.justice.gov/crt/records/vot/obj_letters/letters/GA/GA-2640.pdf.

11

specific seats.[42] The Supreme Court affirmed the district court's finding in *Rogers v. Lodge*, that such a "requirement that candidates run for specific seats . . . prevents a cohesive political group from concentrating on a single candidate," and thus "minimize[s] the voting strength of racial minorities."[43]

### 4) Redistricting

While under the auspices of the VRA's preclearance regime, Georgia deliberately used discriminatory districting maps to limit the Black vote. One such example of this was in 1971, when the state made new districts for Congress. The plan divided Black Atlanta into three districts, making the traditionally Black 5th district into a majority white one. The plan specifically excluded the residences of Andrew Young and Maynard Jackson, two Black candidates for Congress, to prevent them from running, but included the residences of several potential white 5th District candidates. White state legislators drummed up support for the plan by threatening that, if the 5th district maintained a Black majority, it was highly likely that Julian Bond, another potential Black candidate would be elected to Congress.[44] Georgia representatives insisted that the proposed districting plan was necessary to protect the state, despite its severely irregular shape. When Georgia sought to have the district plan precleared, the federal government objected, forcing the state to return Young and Jackson's residences to the 5th district and to increase the Black percentage in the 5th district from 38% to 44%. In 1972 under the revised redistricting plan, Andrew Young was elected, making him "the first black person elected to Congress from Georgia since Reconstruction."[45]

Georgia's 1981 redistricting plans again drew objections including the plans for congressional, state and local redistricting. In a repeat of the antics of the early 1970s, white legislators rejected the plan proposed by the Black politician from Fulton County, Julian Bond, in favor of a plan that would maintain white majority voting strength.[46] Julian Bond's proposed plan to increase the percentage of the Black vote in the 5th Congressional district to 69% was rejected. Legislators complained that the plan would cause white flight and racial discord.[47] Instead, white legislators submitted a plan that would reduce the power of Back voters in Fulton County.[48]

The resulting court challenge by Georgia to the Department of Justice denial of preclearance of the 1981 districting plan, is notable. The case was reviewed by the United States District Court for the District of Columbia.[49] The state argued its districting was driven by a desire to create a district for white "mountain counties . . . which were described as having peculiarly unified interests and concerns."[50] The district court found that racial discrimination was the purpose of the 1981 plan, and it noted that the state treated Black and white districts which held unified interests, in a disparate manner. The court also made an explicit finding that the chair of the

---

[42] McDonald, *Odyssey*, 99.

[43] 458 U.S. at 627.

[44] McDonald, *Odyssey*, 149-150.

[45] Jones, Bartlett C., *Flawed Triumphs: Andy Young at the United Nations*, University Press of America, 1996, 3.

[46] *Busbee v. Smith*, 549 F. Supp. 494, 499 (D.D.C. 1982); McDonald, *Odyssey*, 168.

[47] *Busbee v. Smith*, 549 F. Supp. at 507, 510.

[48] McDonald, *Odyssey*, 169-173.

[49] *Busbee v. Smith*, 549 F. Supp. 494, 499 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983).

[50] *Busbee v. Smith*, 549 F. Supp. 494, 499 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983).

Georgia House appropriations committee, Joe Mack Wilson, who dominated the redistricting process in the lower chamber and who often expressed his hate for "blacks and Republicans," was a "racist."[51] Ultimately, the state districting plan included a 65% Black voting percentage in the 5th district. That plan resulted in the election of John Lewis to the 5th congressional in 1986 in a contest against Julian Bond.[52]

Unfortunately, the misuse of race in redistricting has continued into the 21st Century. Indeed, there is "compelling" evidence that "race predominated" the 2015-mid-decade redistricting of two house districts in the General Assembly.[53] *Atlanta Magazine* reported, "lawmakers decided to swap out heavily black and Latino areas" in, among others, a house district in Henry County, an area at issue in this case, "with nearby precincts that leaned Republican," allowing a white Republican incumbent to "eke[] out a victory" two years later.[54] Henry County's House District 111 was redistricted to decrease the Black share of the voting age population by "just over 2%," which "likely changed the outcome of the 2016 election" because without the change, the district "would have become significantly more diverse."[55] In 2016, the white Republican, Brian Strickland, defeated Black Democratic challenger, Darryl Payton by just 950 votes.[56]

### 5) New Restrictions on Running for Office

As part of its effort to prevent Black representation since passage of the VRA in 1965, the Georgia government has also arbitrarily changed the requirements for running for office. For example, in 1972, when John E. White, of Albany, Georgia, an employee of the Dougherty County Board of Education, announced that he would run for a seat in the Georgia House of Representatives, the first Black candidate to do so since Reconstruction, the Board adopted a new rule, "Rule 58", the following month. Rule 58 required Board employees to take an unpaid leave of absence while running for or serving in a government office.[57] White subsequently ran for office three times and lost more than $11,000 in unpaid salary as a result. White sued, arguing that Rule 58 had not been precleared under the VRA even though it was a "standard, practice or procedure with respect to voting," enacted by a covered jurisdiction. White stressed that he was the first Black person to run for the General Assembly from the county and that no

---

[51] *Busbee v. Smith*, 549 F. Supp. at 500.

[52] Dudley Clendinen, "Ex Colleague Upsets Julian Bond in Atlanta Congressional Runoff," *The New York Times*, September 3, 1986.

[53] *Georgia State Conf. of NAACP v. Georgia*, 312 F. Supp. 3d 1357, 1365 (N.D. Ga. 2018).

[54] Thomas Wheatley, "*How Redrawing Districts has Kept Georgia Incumbents in Power*," *Atlanta Magazine*, January 12, 2018. https://www.atlantamagazine.com/news-culture-articles/redrawing-districts-kept-georgia-incumbents-power/.

[55] *Georgia State Conf. of NAACP v. Georgia*, 312 F. Supp. 3d 1357, 1363 (N.D. Ga. 2018)

[56] "Georgia 111th District State house Results: Brian Strickland Wins," *The New York Times*, August 1, 2017. https://www.nytimes.com/elections/2016/results/georgia-state-house-district-111; Nat'l Democratic Redistricting Committee "Eric Holder and Democrats begin redistricting wars in Georgia," October 11, 2017. https://democraticredistricting.com/eric-holder-and-democrats-begin-redistricting-wars-in-georgia. When this districting was later challenged as an unconstitutional racial gerrymander, the court found "compelling" evidence that race predominated in the drawing of those district lines, but ultimately denied a preliminary injunction because state officials had denied the use of race under oath, and binding Supreme Court case law created an especially elevated standard for establishing unconstitutional racial gerrymandering in the absence of direct evidence. *Georgia State Conf. of NAACP v. Georgia*, 312 F. Supp. 3d 1357, 1367 (N.D. Ga. 2018).

[57] *Dougherty County, Georgia Bd. of Ed. v. White*, 439 U.S. 32, 34 (1978).

other Dougherty County employees had been subject to the same rule. Ultimately, the Supreme Court held that Rule 58 should have been submitted for preclearance. The Court enjoined application of the law and ordered preclearance compliance. The Court explained: "By imposing a financial loss on [Board] employees who choose to become candidates, [the Rule] makes it more difficult for them to participate in the democratic process and, consequently, restricts the field from which the voters may select their representatives."[58]

### 6) Official Elimination, Weakening or Increased Oversight of a Position After a Black Person is Elected.

Another tactic that has long been used by Georgia government officials to dilute the power of Black voters is to respond to the election of a Black candidate in local government by weakening or eliminating the office to which the Black candidate was elected. In September of 1868, just a few months after Georgia ratified the 14th Amendment and elected a Republican governor, the state legislators (on a bipartisan basis) forcibly removed the identifiable Black legislators from the states house in 1868, save those who could not be identified "because their fair complexion (sic) made it impossible to prove that they were African American."[59] These changes to local government entities and districts continue today.

*i.    A School Board Example: Sumter County, Georgia*

The General Assembly has assisted counties in changing district lines when government entities like a school board, have become majority Black.

Sumter County is in Southwest Georgia. The County includes part of the city of Andersonville and the cities of Americus and Plains. Today, the population of Sumter County is 52.3% Black and 47.2% white. The Sumter County school population is 78% Black and 6 % white. The disparity between the demographics of the county and the schools are, in part, attributable to the county's history of resisting school integration.[60]

When the Sumter County School Board became majority Black for the first time in 2010, the General Assembly approved a change proposed by the lame duck School Board that would reduce the size of the Board from nine members to seven, and make two of the seats on the Board at-large seats.[61] The Plaintiff brought suit, alleging that the new at-large seats and the packing of Black voters into two districts diluted Black voting strength. The Eleventh Circuit agreed with the district court's finding that this change violated Section 2 of the VRA.[62]

---

[58] *Id.* at 40.

[59] Franklin, John Hope, Reconstruction and the Civil War, University of Chicago Press, 1994, 130-131; *see also* Drago, Edmund L. Black Politicians and Reconstruction in Georgia: A Splendid Failure. University of Georgia Press, 1992, 69-70; Georgia House Journal, July 21, 1868, pp. 49-50; McDonald, Odyssey, 21.

[60] Sumter County used a template established by the Sibley committee called the "school choice plan" which provided that local school systems be free to decide whether to integrate or not. *See* Bartley, *The Creation of Modern Georgia*, 195.

[61] *Wright v. Sumter Cty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1304 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020); H.B. 836 (2014) (enacted); H.B. 836 (2011).

[62] *Wright v. Sumter Cty. Bd. of Elections & Registration*, 301 F. Supp. 3d at 1326, *aff'd*, 979 F.3d 1282, 1287, 1297–98, 1311 (11th Cir. 2020).

In addition to the attempted changes to the Sumter County School Board, county residents and white school board members also subjected the school board to unprecedented oversight designed to cast the school board as incompetent and justify the removal of the majority-Black board.[63] After a legal challenge,[64] the district court provided a districting plan for the school board that for the time being, will result in an opportunity for Sumter County's Black residents to equitably participate in the operation of the school board.[65]

### ii.    A Black Mayor is Elected in Stockbridge

Five months after the city of Stockbridge in Henry County, an area at issue in this case, elected its first Black mayor and an all-Black city council in 2017, the state legislature passed two bills allowing for Eagle's Landing, a whiter and wealthier community in Stockbridge, to break off and form its own city.[66] It would have become the first city in Georgia to be created by splitting from an existing city.[67] A former mayor of Stockbridge, Lee Stuart, who is white, publicly stated that some residents do not want to live in a city governed by an all-Black squad of officials.[68] The referendum was ultimately defeated, after a costly campaign by Stockbridge.[69]

### iii.    Removal of Black County Election Board Members

Black county election board members have been removed across the State this year as a result of the General Assembly's repeated intervention in local election administration, including in areas like Spalding County, that are at issue in this case. In particular, the General Assembly has repeatedly passed county-specific legislation since 2021 altering the boards' operation. Most of the county-specific bills empower the local County Commission to purge the existing election board members and appoint new ones; one (in Spalding County) changed the rules so the decisive fifth board member is chosen by local judges instead of by a coin toss.[70]

---

[63] Casey, Nicholas. "A Voting Rights Battle in a School Board 'Coup.'" *The New York Times*, October 25, 2020, sec. U.S. https://www.nytimes.com/2020/10/25/us/politics/voting-rights-georgia.html.

[64] *Wright v. Sumter Cty. Bd. of Elections & Registration*, 979 F.3d 1282, 1287 (11th Cir. 2020).

[65] The current school board, elected in 2020 under the district map approved by the District Court, is for only the second time in history, majority Black. Former School Board member Kelvin Pless told the expert that in the last month or two, racial tension on the school board has again become apparent and has been covered in the Americus Times Recorder. *See* Tracey K. Hall, "A man in the arena: Jim Reid," *Americus Times Recorder*, December 28, 2021. https://www.americustimesrecorder.com/2021/12/28/a-man-in-the-arena-jim-reid/.

[66] Brentin Mock. "Is Atlanta's Cityhood Movement Spiraling Out of Control?" *Bloomberg CityLab*, April 16, 2018. https://www.bloomberg.com/news/articles/2018-04-16/is-atlanta-s-cityhood-movement-spiraling-out-of-control.

[67] Asia Ashley. "Stockbridge De-Annexation, Pro-Eagle's Landing Bill Heads to Governor." *Henry Herald*, March 6, 2018. https://www.henryherald.com/news/stockbridge-de-annexation-pro-eagle-s-landing-bill-heads-to-governor/article_1a44e139-7a92-535f-8ea4-5232d2c4ed3f.html.

[68] Mock, "Is Atlanta's Cityhood Movement Spiraling Out of Control?"

[69] *See* Leon Stafford, "Eagle's Landing secession attempt from Stockbridge defeated by voters," The Atlanta Journal-Constitution, November 6, 2018; Leon Stafford, "Stockbridge spent more than $600,000 to defeat Eagle's Landing cityhood," The Atlanta Journal-Constitution, Nov. 28, 2018, https://www.ajc.com/news/local-govt--politics/stockbridge-spent-more-than-600-000-defeat-eagle-landing-cityhood/S2TyIuEUYXEwIjctab6RtL/.

[70] Oliphant, James, and Nathan Layne. "Georgia Republicans Purge Black Democrats from County Election Boards." *Reuters*, December 10, 2021, https://www.reuters.com/world/us/georgia-republicans-purge-black-democrats-county-election-boards-2021-12-09/.

H.B. 769, which passed the Georgia Assembly, "provid[ed] for the termination of the term of the present fifth member" of the board of elections for Spalding County, to be replaced by a fifth member "selected and appointed by the vote of a majority of judges of the Superior Court of Spalding County."[71] No Black person had ever served as a superior court judge of Spalding County. Until August 19, 2021, no Black person had served as a Superior Court judge for the Griffin Judicial Circuit covering Fayette, Pike, Spalding, and Upson counties.[72]

Those changes have resulted in the removal of a number of Black officials from county election boards. Indeed, Black county election board members have been a particular focus of this effort. As of June 2021, at least five of the ten county election board members removed from local boards have been people of color[73]—including and two Black board members in Morgan County, one of the areas of focus in this litigation.[74]

"County election boards have broad authority over voter access, such as polling locations and early-voting procedures."[75] These newly reconstructed boards have begun to make changes in the voting process that are likely to reduce the Black vote. For example, Spalding County ended Sunday voting for municipal elections, which had been "instrumental in boosting turnout of Black voters in last year's [2020] election."[76] Sunday early voting has been especially important for congregants of Black churches such as Plaintiff AME Church, which regularly hold "Souls to the Polls" events after church services that help transport Black voters to the polls.[77] Finally, Lincoln County (north of Augusta, an area at issue in this case) is currently considering eliminating all but one of its polling locations.[78]

### 7) Felon Disenfranchisement

Felon disenfranchisement is one of the methods of voter suppression exercised by the state of Georgia since Reconstruction, when it was enshrined in Georgia's 1877 Constitution to counteract changes made during Reconstruction to grant rights to former slaves.[79] At the post-Civil War constitutional convention of October 1865, the all-white Georgia delegation codified the Georgia Black Codes, basing them on the colonial Slave Codes that regulated all aspects of

---

[71] H.B. 769, Sec. 2(b) (2021).

[72] Cal Beverly, "Gov. Kemp Makes Historic Appointment to the Fayette Superior Court," *The Citizen*, July 20, 2021. https://thecitizen.com/2021/07/20/gov-kemp-makes-historic-appointment-to-the-fayette-superior-court/; 2001 Alumna, "Judge Rhonda Kreuziger, Appointed Griffin Judicial Circuit Superior Court Judge," John Marshall Law School, September 21, 2021, https://www.johnmarshall.edu/2001-alumna-rhonda-kreuziger-appointed-griffin-judicial-circuit-superior-court-judge/.

[73] Corasaniti, Nick, and Reid J. Epstein. "How Republican States Are Expanding Their Power Over Elections." *The New York Times*, June 19, 2021, sec. U.S. https://www.nytimes.com/2021/06/19/us/politics/republican-states.html.

[74] Oliphant and Layne. "Georgia Republicans Purge Black Democrats from County Election Boards."

[75] Oliphant and Layne, "Georgia Republicans Purge Black Democrats from County Election Boards."

[76] Oliphant and Layne, "Georgia Republicans Purge Black Democrats from County Election Boards."

[77] Doubek, James, and Steve Inskeep. "Black Church Leaders in Georgia on the Importance of 'Souls to the Polls.'" *NPR*, March 22, 2021, https://www.npr.org/2021/03/22/977929338/black-church-leaders-in-georgia-on-the-importance-of-souls-to-the-polls

[78] *Id*.

[79] Georgia Const. of 1877 art. II, § I; *see also* McDonald, *Odyssey*, 36; Barrett Holmes Pitner, "How Georgia Will Use 'Moral Turpitude' to Strip Black People of their Votes in 2020," Daily Beast, June 3 2019. https://www.thedailybeast.com/how-georgia-will-use-moral-turpitude-to-strip-black-people-of-their-votes-in-2020?ref=scroll.

Black enslaved people's lives, including prohibiting slaves from voting. Felony disenfranchisement laws have their roots in these Codes.[80] The Georgia Black Code applied indiscriminately to all Black people regardless of status, and it created a voting regime under which "the deprivation or loss of the vote would occur not at the ballot box at every election but at the point of registration and probably once."[81] A key mechanism of this regime comprised criminal exclusion laws that disqualified Black voters for the most minor of offenses. Georgia's 1877 Constitution facilitated this by providing: "no person who has been convicted of a felony involving moral turpitude may register, remain registered, or vote except upon completion of the sentence."[82]

Today in Georgia, that legacy continues. People convicted of felonies in Georgia lose the right to vote until they have completed their sentences, and that includes post release probation or parole periods and the payment of fees.[83] Georgia is 10th in the nation for incarceration and *first* for correctional supervision, i.e. probation and parole.[84] Probationary sentences in Georgia are on average 6.3 years which is essentially double the U.S. average.[85] The disenfranchisement due to this substantial carceral state continues to fall disproportionately on Black Georgians. Indeed, in 2020, over *half* of the estimated 275,089 Georgians prevented from voting due to felony convictions are Black.[86] As of 2016, the state ranked 6th in the nation for largest population of disenfranchised Black voters.[87]

### B. More Recent History: Laws and Official Practices with a Discriminatory Impact on Black Voters

#### 1) Exact Match Voter Registration Requirement

The adoption of requirements that create barriers to voter registration is a tactic that state officials across the South, including in Georgia, have historically used to prevent Black citizens from having access to the ballot box. During the "Redeemer" period, "[m]any of the disenfranchising laws were designed expressly to be administered in a discriminatory fashion, permitting whites to vote while barring blacks. Small errors in registration procedures or marking

---

[80] Walton, Hanes, Jr., Sherman Puckett, and Donald Deskins. "Chapter 26: Felon and Ex-Felon Disenfranchisement: The Newest Technique of Vote Dilution and Candidate Diminution." In *The African American Electorate: A Statistical History*, 653–71, 655. Washington: CQ Press, 2012. https://doi.org/10.4135/9781452234397.

[81] *Id.* at 657.

[82] Georgia Const. of 1877 art. II, § I.

[83] Christopher Uggen, Ryan Larson, Sarah Shannon, and Arleth Pulido-Nava. "Locked Out 2020: Estimates of People Denied Voting Rights Due to a Felony Conviction." The Sentencing Project, October 15, 2020, 6. https://www.sentencingproject.org/wp-content/uploads/2020/10/Locked-Out-2020.pdf.

[84] Alexi Jones. "Correctional Control 2018: Incarceration and Supervision by State." Prison Policy Initiative, December 2018. https://www.prisonpolicy.org/reports/correctionalcontrol2018.html.

[85] "Georgia Council on Criminal Justice Reform." Council of State Governments Justice Center, July 2016.

[86] The Sentencing Project, "Locked Out 2020," 17 Table 4 (52.29% of disenfranchised voters with felony convictions are Black).

[87] The Sentencing Project. "6 Million Lost Voters: State-Level Estimates of Felony Disenfranchisement, 2016." Table 4: Estimates of Disenfranchised African Americans with Felony Convictions, 2016. Accessed December 30, 2021, https://www.sentencingproject.org/publications/6-million-lost-voters-state-level-estimates-felony-disenfranchisement-2016/.

ballots might or might not be ignored at the whim of election officials."[88] In 1913, for example, Georgia passed a bill implementing a system of permanent registration, requiring all voters to submit to examination by a board of registrars,[89] where the board was often comprised of whites who were hostile to Black voting.

Policies which limit Black voters' access to the ballot box through registration barriers continue today, even if the methods deployed by Georgia's elections officials appear to be less hostile. Shortly before the 2008 presidential election, the Georgia Secretary of State's office began implementing an automated voter registration verification protocol, which would later become known as "Exact Match," without first obtaining preclearance from the DOJ.[90] The U.S. District Court for the Northern District of Georgia held that doing so violated Section 5 of the Voting Rights Act.[91] Georgia then filed for preclearance of its procedures.[92]

In 2009, the DOJ objected to Georgia's implementation of a voter verification registration program which "seeks to match the information provided by the applicant with the information maintained by the state's Department of Driver Services [DDS] and, in many cases, the federal Social Security Administration [SSA], and provides a list of those persons whose information does not match to local registrars," and considers those individuals on that list to be not registered to vote.[93] "Because the state implemented these changes in violation of Section 5," the DOJ had "the actual results of the state's verification process."[94] The DOJ's analysis of the data found that it was "error-laden" and "impact of these errors falls disproportionately on minority voters."[95] Specifically, the DOJ concluded "the different rate at which African American applicants are required to undertake an additional step before becoming eligible voters is statistically significant."[96] After Georgia revised its verification process to include "daily monitoring of the voter verification process and prompt notice to applicants who could not be verified," the DOJ indicated it would not object to the revised process.[97]

But an analysis of data provided by the Secretary of State's office for July 2013 through July 2016 showed that the implementation of the revised Exact Match continued to create disproportionate barriers to voter registration for Black voters. 63.6% of the applications that were cancelled as a result of failure to match were from Black people; 13.6% were from white people.[98] And considering the impact of "Exact Match" leading to both cancelled and pending

---

[88] Keyssar, *The Right to Vote*, 112.

[89] Ga. Laws 1913, pp. 115-17.

[90] *Morales v. Handel*, No. 1:08-CV-3172, 2008 WL 9401054, at *7 (N.D. Ga. Oct. 27, 2008); Order*, Fair Fight Action v. Raffensperger,* 1:18-CV-05391-SCJ (N.D. Ga.), ECF No. 636 at 6 ("The term 'Exact Match' means the voter verification program for voter registration application data, including citizenship status, used by the State of Georgia to meet the requirements of the Help America Vote Act").

[91] *Morales v. Handel*, No. 1:08-CV-3172, 2008 WL 9401054, at *8 (N.D. Ga. Oct. 27, 2008).

[92] *Id.*

[93] Letter to Thurbert E. Baker, Georgia Attorney General from Loretta King, Acting Assistant Attorney General at 2 (May 29, 2009)

[94] *Id.* at 3.

[95] *Id.*

[96] *Id.*

[97] Order, *Fair Fight Action v. Raffensperger,* 1:18-CV-05391-SCJ (N.D. Ga.), ECF No. 636 at 8.

[98] Complaint, *Georgia State Conference of the NAACP v. Kemp,* 2:16-cv-00219 (Sept 14, 2016), ECF No. 1. at paras. 86-90.

status applications, Black voter applicants were negatively impacted at *eight times* the rate of white voter applicants.[99] After the Georgia State Conference of the NAACP and others filed suit challenging the practice,[100] the Secretary of State agreed that anyone whose information did not meet the exact match would be placed on the "pending" list but permitted to vote on showing satisfactory identification without any obligation to cure.[101] Additionally, all applications that had been cancelled since October 1, 2013 were restored to "pending," allowing those more than 42,000 applicants[102] to finalize their registration and making them eligible to vote upon showing of satisfactory identification.[103]

In 2017, the state legislature passed a statute[104] implementing the same "exact match" policy the Secretary of State entered a settlement to stop using the year before (the settlement agreement bound the Secretary of State "[u]nless mandated by a future statutory requirement"[105]). This law like the previous iteration of this policy, required that a voter's government issued ID must precisely match their names as listed on the Georgia voter rolls, so that a misspelled name, for example, can cause a no match result. Unsurprisingly, like the previous very similar iterations of the law, disproportionately affected minority voters, according to an analysis of data produced by the Georgia Secretary of State's office showing that on July 4, 2018, approximately 51,111 voter registration applicants were "pending" for reasons related to the "exact match" protocol.[106] 80.15% of those pending applications were submitted by African-American, Latino and Asian-American applicants.[107] Only 9.83% of the "pending" for failure to verify applications were submitted by applicants identifying as white.[108]

The "exact match" law has changed since 2017,[109] but the current iteration, and its implementation, is the subject of ongoing litigation.[110] As part of this litigation, the Secretary of

---

[99] *Id.* at para. 99.

[100] *Id.*

[101] Settlement Agreement, *Georgia State Conference of the NAACP v. Kemp*, 2:16-cv-00219, at 3 (Sept 14, 2016).

[102] Complaint, *Georgia State Conference of the NAACP v. Kemp*, 2:16-cv-00219, at 4 (Sept 14, 2016), ECF No. 1, at para. 7.

[103] Settlement Agreement, *Georgia State Conference of the NAACP v. Kemp*, 2:16-cv-00219, at 3 (Sept 14, 2016).

[104] HB 268 (2017)

[105] Settlement Agreement, *Georgia State Conference of the NAACP v. Kemp*, 2:16-cv-00219, at 2 (Sept 14, 2016).

[106] Amended Complaint, *Georgia Coalition for the Peoples' Agenda v. Kemp*, 1:18-cv-04727-ELR (N.D. Ga. Oct. 19, 2018), Dkt 15, at para. 70.

[107] *Id.*

[108] *Id.* Georgia did repeal this law in 2019, and pass a new match law, HB 316, which registered applicants flagged for minor discrepancies to vote, and required that they produce proof of identity to a poll official before voting. Campaign Legal Center. "Georgia Moves to Abandon Problematic Exact Match Policy," April 5, 2019. https://campaignlegal.org/update/georgia-moves-abandon-problematic-exact-match-policy.

[109] HB 316.

[110] *See generally, Fair Fight Action v. Raffensperger,* 1:18-CV-05391-SCJ (N.D. Ga.); *Georgia Coal. for People's Agenda, Inc. v. Kemp,* 347 F. Supp. 3d 1251, 1263 (N.D. Ga. 2018). The state continues to verify voters using old DDS information though it has relaxed its insistence that every dash or typo not included on both a voter's identification and the state's voting roll be a justification for denying voters the right to cast ballots. *See* Stanley Augustin, Georgia Largely Abandons Its Broken 'Exact Match' "Voter Registration Process," Lawyers' Committee for Civil Rights Under law (Apr. 5, 2019), https://www.lawyerscommittee.org/georgia-largely-abandons-its-broken-exact-match-voter-registration-process/.

State's "General Counsel has testified as follows: 'of the [records] that failed verification, I would say our office was aware that it's a largely African American population.'"[111]

### 2) Voter Purges

After *Shelby*, Georgia passed restrictions that would previously have required review by the Department of Justice. Between 2012 and 2016, the state purged 1.5 million voters, twice the number removed between 2008 and 2012.[112] An additional half a million were removed in 2017.[113]

Voter purges were historically used in Georgia to suppress Black voters. In 1946, former Georgia Governor Eugene Talmadge provided supporters a means of reducing the number of Black voters; in a newspaper article he wrote: "If the white citizens of the State of Georgia will wake up, they can disqualify and mark off the voters' list three-fourths of the Negro vote in this state."[114] He urged supporters to challenge whether Black voters were properly qualified, and mailed thousands of mimeographed challenge forms to supporters, which lead to massive purges of Black voters across the state.[115] Of Black voters who attempted to vote in primaries en masse in more than 30 counties, an estimated 15,000 to 25,000 had been purged from voting rolls.[116] "[T]he success of the Talmadge candidacy was achieved by policies curtailing black voting or by election irregularities."[117]

Part of the success of Talmadge's strategy of challenging Black voters was based on the ability of challengers to use voter race data. In 1894 the legislature adopted a law which required the racial designation of voters.[107]As part of the 1908 "Disfranchisement Act," Georgia required voter registration lists to show the race of all voters.[108]

As another example, in 1955 a United States District Court judge found that Black citizens in Randolph County had been unlawfully purged in 1954. Despite their eventual victory, the purges were successful in preventing hundreds of Black voters from participating in the September 1954 Democratic primary and the November general election, despite the plaintiffs' prayer for a preliminary injunction.[118] On July 15, 1954, the Board of Registrars issued notices to 525 Black registered voters requiring them to show cause why their names should not be stricken from the

---

[111] Order, *Fair Fight Action v. Raffensperger,* 1:18-CV-05391-SCJ (N.D. Ga.), ECF No. 636 at 15-16.

[112] Reis Thebault and Hannah Knowles. "Georgia Purged 309,000 Voters from Its Rolls. It's the Second State to Make Cuts in Less Than a Week." *Washington Post*, December 17, 2019. https://www.washingtonpost.com/nation/2019/12/17/georgia-purged-voters-its-rolls-its-second-state-make-cuts-less-than-week/.

[113] *Id*.

[114] Bernd, Joseph L. "White Supremacy and the Disfranchisement of Blacks in Georgia, 1946." *The Georgia Historical Quarterly* 66, no. 4 (1982): 494.

[115] *Id.*

[116] Key, Valdimer Orlando. *Southern Politics in State and Nation*. Knoxville: University of Tennessee Press, 1984, 570.

[117] Bernd, "White Supremacy and the Disfranchisement of Blacks in Georgia, 1946," 500.

[118] *Thornton v. Martin*, Civ. No. 520, 1 Race Rel. L. Rep. 213 (M.D. Ga. Nov. 23, 1956).

list of voters on July 21.[119] When the Black registered voters appeared, they were given a test, after which, 175 of 225 were deemed to be "unqualified as a voter."[120]

### 3) Time/Place Restrictions

Manipulation of the time and location of registration and voting has been historically used by Georgia to limit Black participation.

To provide two examples of such impediments: First, a 1873 law allowed local election supervisors to "close their registration rolls to new applicants except during those times when Black farmers were too busy to register, such as planting or harvest time."[121] In addition, polling places were placed in inconvenient locations for Blacks and maintained limited hours.[122] Second, in 1960, a district court found that the Registrar of Terrell County, "[d]elay[ed] action upon applications for registration by Negroes while not delaying such action with respect to applications by whites," thus preventing Black people from becoming registered.[123] As a result of this, and other barriers, in 1960, there were approximately 3,000 registered white voters and only 53 registered Black voters.[124] The county was approximately 64 percent Black.[125]

In today's Georgia, the time and location of registration and voting continue to affect the ability of Black voters to participate. Between 2012 and 2018, the state closed 214 voter precincts, decreasing the number of precincts in many minority majority neighborhoods.[126] In 5 of the counties where polls were closed after *Shelby*,[127] the Black turnout was under 50% in the 2020 election.[128] In 2008 turnout was 65.33% in Bacon, 75.91% in Habersham, 77.50% in Lowndes, 61.36% in Lumpkin, and 67.69% in Franklin County.[129] These precinct closures and the voter purges would have been subject to preclearance before *Shelby v. Holder*.[130]

---

[119] *Id.* at 214.

[120] *Id.* at 214.

[121] Zelden, Charles L. *Voting Rights on Trial: A Handbook with Cases, Laws, and Documents*. Santa Barbara: ABC-CLIO, 2002, 75.

[122] *Id.* at 74.

[123] *United States v. Raines*, 189 F. Supp. 121, 126 (M.D. Ga. 1960)

[124] *Raines*, 189 F. Supp. at 125.

[125] McDonald, *Odyssey*, 46.

[126] Patrik Jonsson. "Voting After Shelby: How a 2013 Supreme Court Ruling Shaped the 2018 Election." *Christian Science Monitor*, November 21, 2018. https://www.csmonitor.com/USA/Justice/2018/1121/Voting-after-Shelby-How-a-2013-Supreme-Court-ruling-shaped-the-2018-election.

[127] Niesse, Mark, and Maya T. Prabhu. "Voting Locations Closed across Georgia after Supreme Court Ruling." The Atlanta Journal-Constitution, April 31, 2018. https://www.ajc.com/news/state--regional-govt--politics/voting-precincts-closed-across-georgia-since-election-oversight-lifted/bBkHxptlim0Gp9pKu7dfrN/.

[128] Georgia Secretary of State. "Elections," 2018. https://sos.ga.gov/index.php/elections.

[129] Georgia Secretary of State. "Elections," 2018. https://sos.ga.gov/index.php/elections.

[130] Allie Gottlieb, The Struggle for Voting Rights in Georgia, Regulatory Review (Jan. 4, 2021), https://www.theregreview.org/2021/01/04/gottlieb-struggle-voting-rights-georgia/

### 4) Failure to Provide Voter Registration Opportunities at Public Assistance Offices

There are numerous other ways in which Georgia's actions in recent history continue to impose barriers to vote for Black voters. In 2011, for example, Georgia was sued by the Georgia NAACP and others for failing to offer voter registration services through its the public assistance offices as required under the National Voter Registration Act. The average percentage of Black households in poverty for all counties in Georgia in 2010 was approximately 26.4% versus 11.5%for whites.[131] Total unemployment in 2010 was approximately 10%.[132] Black unemployment was higher than that of whites, 11.6% versus 8-9%. Black people have received public assistance at disproportionate rates. For example, in 2008-2009, 82.1% of TANF recipients in Georgia were Black compared to 15.3% who were white.[133]

The effects of Georgia's decision were clear: between 1995-1996, 103,942 Georgians registered to vote at public assistance offices.[134] In contrast, in 2008-2010, Georgia reported a huge decline in the number of voter registration forms through public assistance offices—either 279 total registrations or 13,443 registrations depending on which part of Georgia's inconsistent reporting one considers.[135]

An investigation conducted by the plaintiffs in that 2011 lawsuit found that "[n]one of the [public assistance] offices visited by the investigators in September 2010 included a voter registration form with the benefits application, and eight of the eleven offices could not even provide a voter registration application upon request."[136]

"The September 2010 survey results also showed, '[A]mong the [public assistance] clients interviewed after completing NVRA-covered transactions ..., 44 of 50 reported that they were not offered voter registration; almost none of the 50 had been provided a voter preference form; and none of the 23 [public assistance] clients who had met with a caseworker during their visit to

---

[131] The Kaiser Family Foundation. "Poverty Rate by Race/Ethnicity," October 23, 2020. https://www.kff.org/other/state-indicator/poverty-rate-by-raceethnicity/.
[132] "Georgia Unemployment Up to 10.1%." *Atlanta Business Chronicle*, December 16, 2010. https://www.bizjournals.com/atlanta/news/2010/12/16/georgia-unemployment-up-to-101.html.
[133] "Characteristics and Financial Circumstances of TANF Recipients, Fiscal Year 2009: Table 21: TANF - Active Cases, Percent Distribution of TANF Adult Recipients by Ethnicity/Race, October 2008 - September 2009." U.S. Department of Health and Human Services: Office of Family Assistance, August 24, 2010. https://www.acf.hhs.gov/ofa/data/characteristics-and-financial-circumstances-tanf-recipients-fiscal-year-2009-57.
[134] "Implementing the National Voter Registration Act: A Report to State and Local Election Officials on Problems and Solutions Discovered 1995 -1996." Washington, D.C.: The Office of Election Administration: Federal Election Commission, March 1998, 127 Appendix C, Table 2 https://www.eac.gov/sites/default/files/eac_assets/1/28/Implementing%20the%20NVRA--Report%20to%20State%20and%20Local%20Election%20Of.pdf.
[135] "The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 2009-2010: A Report to the 112th Congress." Washington, D.C.: U.S. Election Assistance Commission, June 30, 2011, 39 Appendix B, Table 2a. https://www.eac.gov/sites/default/files/eac_assets/1/28/2010%20NVRA%20FINAL%20REPORT.pdf; *see also id.* at 44, Appendix B, Table 2b; 52, Appendix B, Table 2d.
[136] *Georgia State Conf. of N.A.A.C.P. v. Kemp*, 841 F. Supp. 2d 1320, 1325 (N.D. Ga. 2012) (quoting plaintiffs' complaint).

the [public assistance] office had been offered the opportunity to register to vote by the caseworker.'"[137]

Georgia moved to dismiss, arguing that it was not required to provide "voter registration applications to public assistance clients unless those clients appear in person," meaning it did not have to provide them by mail.[138] In denying the Defendants' motion to dismiss, the district court observed:

> that while Georgia has chosen not to implement procedures for distributing voter registration application forms to public assistance clients applying remotely, its legislature has been proactive in implementing procedures to register voters through offices that do not provide public assistance. Specifically, in 2004, Georgia passed O.C.G.A. § 21–2–221.1. 2004 Ga. Laws 732. Its operative provision provides, in relevant part, "Each application to obtain a resident hunting, fishing, or trapping license…shall also serve as an application for voter registration unless the applicant declines to register to vote through specific declination or by failing to sign the voter registration application." O.C.G.A. § 21–2–221.1. The court declines to speculate on the motives behind Georgia's choice to automatically convert applications for those wishing to hunt or fish in Georgia into voter registration applications and then fight the proposition that Georgia is required to merely offer voter registration applications to applicants for public assistance. The court will offer an observation, however: the NVRA expresses a policy of increasing the number of eligible citizens who register to vote and implements that policy by reaching a wide range of citizens through offices they are likely to contact, especially after a change of address. Georgia, however, seems to favor a less inclusive group of eligible citizens for voter registration.[139]

Following the court's decision, Georgia settled the case and agreed to change its policies and practices to make voter registration more widely available through its public assistance offices, to provide training, to designate coordinators responsible for ensuring compliance with the National Voter Registration Act in public assistance offices, and to undergo monitoring of the settlement agreement.[140]

### 5) Backlash to Record Black Voter Turnout in the 2020 Election

During the 2020 election Black voters were able to overcome tactics[141] to minimize minority access in prior years and accessed the polls in record numbers. The state expanded in particular absentee vote by mail as part of an effort to ensure that voters had access to the polls despite the

---

[137] *Id*. (quoting complaint).

[138] *Id.* at 1328.

[139] *Id.* at 1332.

[140] Settlement Agreement, Georgia State Conf. of N.A.A.C.P. v. Kemp, No. 1:11-cv-01849 (N.D. Ga. April 8, 2012), ECF No. 55, Exhibit A.

[141] Fowler, Stephen. "Why Do Nonwhite Georgia Voters Have to Wait in Line for Hours? Their Numbers Have Soared, and Their Polling Places Have Dwindled." *ProPublica*, October 17, 2020. https://www.propublica.org/article/why-do-nonwhite-georgia-voters-have-to-wait-in-line-for-hours-their-numbers-have-soared-and-their-polling-places-have-dwindled?token=_Q2PjoPDva608iMRGpDGHnrBxVfvt7EH.

global Coronavirus pandemic. Absentee ballot applications were mailed to every active, registered voter for the primary elections,[142] and third-party groups were allowed to provide absentee ballot applications to voters by request.[143] Drop boxes were plentiful, especially in metropolitan Atlanta, and located outside of polling locations to allow voters to drop absentee ballots 24-7.[144]

Turnout was unprecedented in the November 2020 election,[145] arguably fueled by some degree by the increased access but also by the mobilization of voters and the high-profile nature of the elections.[146]

In between the presidential election and the Senate runoff election, the state Senate Republican Caucus announced that they would push for the changes to the procedures that had increased voting access—including ending absentee voting without cause and banning ballot drop boxes— during the next legislative session.[147] And when the state legislature convened for the regular legislative session, shortly after the Senate runoff election, the sole issue during the session appeared to be preparing proposals to change Georgia voting laws. The new voting laws at issue were measures that would give authority to the state legislature to take over county election boards, restrict absentee mail-in voting, and disenfranchise voters who vote at the wrong precinct in addition to multiple additional measures. That would make voting more difficult for Georgians and radically change the voting regulations in the counties where Black Georgians voted. State legislators in support of the new measures argued that they would be designed to make voting more secure against fraud and accessible.[148]

During the legislative session, state legislators in the General Assembly rushed to draft and approve the legislation that became SB 202.[149] Hearings were often called outside business hours with limited notice to the public, and leaders in the Georgia State legislature made the final drafts of SB202 public only hours before the final vote.

---

[142] Emil Moffat. "Georgia Sent Out Nearly 7 Million Absentee Ballot Applications For Primary, But Proposed Bill Won't Let It Happen Again." *WABE*, June 24, 2020. https://www.wabe.org/georgia-sent-out-nearly-7-million-absentee-ballot-applications-for-primary-but-proposed-bill-wont-let-it-happen-again/.

[143] Niesse, Mark. "Groups Mass Mail Absentee Ballot Applications to Georgia Voters." *The Atlanta Journal-Constitution*, August 25, 2020.

[144] Niesse, Mark, Stephen Fowler, Sarah Kallis, and Isaiah Poritz. "Drop Box Use Heavy in Democratic Areas before Georgia Voting Law." *The Atlanta Journal-Constitution*, July 12, 2021, https://www.ajc.com/politics/drop-box-use-soared-in-democratic-areas-before-georgia-voting-law/N4ZTGHLWD5BRBOUKBHTUCFVOEU/.

[145] Georgia Secretary of State. "General Election Turnout by Demographics November 2020." Accessed December 30, 2021. https://sos.ga.gov/index.php/elections/general_election_turnout_by_demographics_november_2020.

[146] Olivia B. Waxman. "Stacey Abrams and Other Georgia Organizers Are Part of a Long—But Often Overlooked—Tradition of Black Women Working for the Vote." *Time*, January 8, 2021. https://time.com/5909556/stacey-abrams-history-black-women-voting/.

[147] Ben Nadler, "Georgia Senate GOP push for end to no-excuse absentee voting," *AP*, December 8, 2020. https://apnews.com/article/election-2020-joe-biden-donald-trump-legislature-georgia-db63d0d40fddd0724faffdffc8b72c0c.

[148] "Legislator Introduces Bill to Eliminate Ballot Drop Boxes in Georgia." FOX 5 Atlanta, December 13, 2021. https://www.fox5atlanta.com/news/georgia-legislator-introduces-bill-to-eliminate-ballot-drop-boxes"

[149] NAACP Legal Defense and Educational Fund. "Facts About LDF's Lawsuit Challenging Georgia's Voter Suppression Law." Accessed December 30, 2021. https://www.naacpldf.org/naacp-publications/ldf-blog/important-facts-about-ldfs-lawsuit-challenging-georgias-voter-suppression-bill/.

Once the legislation was passed by both houses, it was taken *immediately* to Governor Kemp's office. Kemp signed the legislation in his office surrounded by six white state officials.[150] A Black state legislator who attempted to attend the closed signing, was turned away from the governor's suite, and arrested.[151] Black civil and voting rights organizations such as the National Urban League, the National Action Network and National Coalition on Black Civic Participation decried the bill as "pure voter suppression."[152]

SB202 placed a number of limitations on voter access, arguably designed to disproportionately impact Black, minority, poor and youth voters.[153] The law requires voters seeking absentee ballots to provide personal identifying information, shortens the duration for applying for ballot, and shortens the period in which to return applications.[154] Such restrictive requirements on absentee voting will disproportionately impact Black voters who used absentee voting in greater numbers, an increase from 23 to 31% in 2020 versus previous elections.[155] In November 2020, 29.27 percent of Black voters cast an absentee ballot, compared to 23.88 percent of white voters, while in the January 2021 general election runoff, 27.65 percent of Black voters cast an absentee ballot, compared to 21.72 percent of white voters.[156]

SB 202 also significantly restricts access to drop boxes, placing severe caps on the total number of drop boxes and requiring precincts to maintain the boxes only inside, subject to more limited hours that polls are open during Early Voting hours. For example, in 2020 there were 94 drop boxes for the six million residents of metro Atlanta. Yet, after SB 202, there will only be 23 boxes available, none of which will be accessible outside Early Voting locations or outside Early Voting hours.[157]

## II.     Both Explicit and Subtle Racial Appeals Continue to Play a Central Role in Political Campaigns in Georgia (Factor 6).

Racial resentment and fear have also often been incorporated into political campaign strategies in the State of Georgia. For instance, prior to 1966, every Georgia Governor ran on a platform that

---

[150] John Blake. "These Two Photos Show Who Georgia's New Elections Law Benefits – and Hurts." CNN, March 26, 2021. https://www.cnn.com/2021/03/26/politics/georgia-voting-law-two-photos/index.html.

[151] Diaz, Jaclyn. "Georgia Lawmaker Arrested As Governor Signs Law Overhauling Elections." *NPR*, March 26, 2021, sec. Politics. https://www.npr.org/2021/03/26/981471672/police-arrest-georgia-lawmaker-as-governor-signs-law-overhauling-elections.

[152] National Action Network. "Civil Rights Leaders Denounce Passage of Georgia Senate Bill 202 as 'Pure Voter Suppression,'" News Release, March 27, 2021. https://nationalactionnetwork.net/newnews/civil-rights-leaders-denounce-passage-of-georgia-senate-bill-202-as-pure-voter-suppression/.

[153] Fowler, Stephen. "What Does Georgia's New Voting Law SB 2020 Do?," *GPB NEWS*, Mar. 27, 2021. https://www.gpb.org/news/2021/03/27/what-does-georgias-new-voting-law-sb-202-do (listing some examples of how SB202 affects voters in Georgia).

[154] *Id.*

[155] Kevin Morris, Geoergia's Proposed Voting Restrictions Will Harm Black Voters Most, March 6, 2021, https://www.brennancenter.org/our-work/research-reports/georgias-proposed-voting-restrictions-will-harm-black-voters-most. Black use of absentee ballots increased from 23to 31%.

[156] Complaint, *United States v. Georgia*, 1:21-cv-02575 (June 25, 2021), ECF No. 1, at para. 22.

[157] Thompson, Derek. "The Truth About Georgia's Voter Law." *The Atlantic*, April 8, 2021. https://www.theatlantic.com/ideas/archive/2021/04/georgia-voting-rights-fiasco/618537/.

included blatantly racist, anti-Black appeals.[158] Modern political campaigns in Georgia continue to heavily feature both explicit racial appeals and subtle racial appeals in the form of dog-whistle politics.

Dog-whistle politics refers to racist appeals that are made implicitly instead of explicitly, using coded speech and visual imagery designed to invoke racial animus.[159] Negative stereotypes and beliefs about Black people are a standard part of American and Georgia state history that continue to pervade the culture.[160] Dog whistling in campaign advertisement is an effective method of mobilizing white racial resentment while adhering to norms of racial equity.[161] Lee Atwater, the premiere dogwhistle in the 1980s and 1990s, described the development of the strategy as follows:

> You start out in 1954 by saying, "Nigger, nigger, nigger." By 1968 you can't say "nigger"—that hurts you, backfires. So you say stuff like, uh, forced busing, states' rights, and all that stuff, and you're getting so abstract. Now, you're talking about cutting taxes, and all these things you're talking about are totally economic things and a byproduct of them is, blacks get hurt worse than whites.… "We want to cut this," is much more abstract than even the busing thing, uh, and a hell of a lot more abstract than "Nigger, nigger."[162]

Atwater who also helped facilitate the quintessential example of the use of dog whistle campaigning: the 1984 Willie Horton advertisement sponsored by the George H. W. Bush campaign. The ad, as described by Bill Keller, editor-in-chief of The Marshall Project, "features a portrait of this very scary looking, disheveled, wild-eyed," incarcerated black man who raped and killed innocent citizens while on furlough in Massachusetts. Atwater explained "by the end of this campaign, you're going to think that Willie Horton is Michael Dukakis' running mate."[163] The advertisement did not explicitly mention race, but used imagery and coded speech to play on white fear, not just of crime, but of black crime.[164]

One example of an explicit virulent racial appeal is a 2018 robo-call's labeling of describing Governor candidate Stacey Abrams as the "Negress Stacey Abrams" and "a poor man's Aunt

---

[158] McDonald, *Odyssey*, 85. ("Every modern Georgia governor, through the election of Lester Maddox in 1966, was in fact a vocal supporter of the Jim Crow system.").

[159] Perlstein, Rick. "Exclusive: Lee Atwater's Infamous 1981 Interview on the Southern Strategy," November 13, 2012. https://www.thenation.com/article/archive/exclusive-lee-atwaters-infamous-1981-interview-southern-strategy/.

[160] Ibram X. Kendi. *Stamped from the Beginning: The Definitive History of Racist Ideas in America*. New York: Nation Books, 2016.

[161] Ian Haney López. "Third Rail Series Lecture: UC Berkeley, 'Dog Whistle Politics: Coded Racism and Inequality for All.'" Center for the Study of Race and Ethnicity in America, Brown University, April 2, 2015. https://www.brown.edu/academics/race-ethnicity/events/third-rail-series-lecture-ian-haney-l%C3%B3pez-uc-berkeley-dog-whistle-politics-coded-racism-and; Haney López, Ian. *Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class*. Oxford University Press, 2015.

[162] Perlstein, "Exclusive: Lee Atwater's Infamous 1981 Interview on the Southern Strategy."

[163] The Takeaway. "The Campaign Ad That Reshaped Criminal Justice," May 18, 2015. https://www.wnycstudios.org/podcasts/takeaway/segments/crime-reshaped-criminal-justice.

[164] Baker, Peter. "Bush Made Willie Horton an Issue in 1988, and the Racial Scars Are Still Fresh." *The New York Times*, December 4, 2018, https://www.nytimes.com/2018/12/03/us/politics/bush-willie-horton.html.

26

Jemima."[165] The 2018 Georgia gubernatorial context also featured racial appeals by dog whistle: after a photo surfaced of some members of the New Black Panther Party marching in support of Abrams—even though Abrams has never associated with the New Black Panther Party—Brian Kemp posted the photos on social media channels with the caption "How radical is my opponent? Just look at who is backing her campaign for governor," and urging followers to "RT [re-tweet] if you think Abrams is TOO EXTREME for Georgia!"[166]

In the 2020 runoff campaign, Rev. Raphael Warnock, who was running to be the second Black senator elected in the South since the end of Reconstruction and Georgia's first Black senator,[167] was the target of both overt and subtle, dog whistle, racial appeals. Warnock, who became the first Black Senator from a former Confederate state since Reconstruction, was "attacked more than any other candidate in paid TV commercials in the Georgia runoffs."[168]

An example of an explicit racial appeal made by then-Sen. Kelly Loeffler, is one where she accused Warnock of being "too extreme" because he had defended president Barack Obama's former pastor Jeremiah Wright, who she accused of being "divisive" and "hurtful" in "call[ing] on Americans to repent for their worship of Whiteness." [169] A Loeffler campaign surrogate, U.S. Rep. Doug Collins, referred to Warnock, a Black man, as an "it," saying—"There is no such thing as a pro-choice pastor. What you have is a lie from the bed of Hell. It is time to send it back to Ebenezer Baptist Church."[170]

Warnock's race was also invoked in a Facebook ad sponsored by Loeffler's campaign, where Warnock's skin color was artificially darkened. The Loeffler campaign used the same footage to create two ads, one with Warnock's actual complexion. Both ads were run on Facebook, but 10 times as much money was spent to boost the version in which Warnock appeared darker.[171]

Another example of a racially charged advertisement sponsored by the Loeffler campaign featured "a classroom of mostly white children … followed by grainy footage from what appears to be one of the summer's many protests against police violence, with Warnock's image laid on

---

[165] Cleve R. Wootson, Jr. "At Georgia Senate Debate, Warnock and Loeffler Argue over Coronavirus Relief, Police Funding." *Washington Post*, December 6, 2020, .https://www.washingtonpost.com/politics/2020/12/06/georgia-senate-debate-live-updates/.

[166] Glaser, April. "It Was Too Easy for Brian Kemp's Last-Minute Dog Whistle About Stacey Abrams to Go Viral." *Slate*, November 7, 2018. https://slate.com/technology/2018/11/brian-kemp-stacey-abrams-dog-whistle-black-panthers-facebook.html.

[167] Veronica Stracqualursi. "Warnock Will Make History as Georgia's First Black Senator." CNN, January 6, 2021. https://www.cnn.com/2021/01/06/politics/warnock-georgia-first-black-senator/index.html.

[168] Marc Caputo and Maya King. "Why Warnock Talks Puppies Instead of Race." Politico, January 3, 2021. https://www.politico.com/news/2021/01/03/raphael-warnock-georgia-race-453222.

[169] Wootson, Jr. "At Georgia Senate Debate, Warnock and Loeffler Argue over Coronavirus Relief, Police Funding."

[170] Galloway, Jim. "Opinion: The Kelly Loeffler, Raphael Warnock Runoff Crosses a Line." *The Atlanta Journal-Constitution*, December 1, 2020. https://www.ajc.com/politics/politics-blog/opinion-the-kelly-loeffler-raphael-warnock-runoff-crosses-a-line/Z7YGZ4MBOFFNJHKBBIJTN6SHJM/.

[171] Sollenberger, Roger. "Kelly Loeffler's New Facebook Ad Darkens Skin of Raphael Warnock, Her Black Opponent." Salon, January 4, 2021. https://www.salon.com/2021/01/04/kelly-loefflers-new-facebook-ad-darkens-skin-of-raphael-warnock-her-black-opponent/; Manthan Chheda. "Kelly Loeffler Campaign Caught Darkening Skin of Opponent Raphael Warnock in Facebook Ad." *International Business Times*, January 5, 2021, sec. Politics. https://www.ibtimes.sg/kelly-loefflers-campaign-caught-darkening-skin-opponent-raphael-warnock-facebook-ad-54651 (same).

top."[172] The ad ends by telling the viewer "saving the Senate is about saving American from that."[173]

In a December 2020 debate, Loeffler repeated the moniker, "radical, liberal Raphael Warnock" *thirteen* times in a single debate, or almost once every two minutes.[174] This repeated name-calling echoed Loeffler's television ads which claimed that Warnock "hosted a rally for Communist Dictator Fidel Castro," "praised Marxism," and would "give the radicals total control."[175]

Associating Black candidates or candidates who seek to represent causes important to Black people, like civil rights, with Communism is a well-established trope. In 1957, the Georgia legislature passed a resolution calling for the "Impeachment of Certain U.S. Supreme Court Justices" for their "pro-communist and unconstitutional decisions" including *Brown v. Board of Education*, 347 U.S. 348 (1954), and accused the justices of "committ[ing] high crimes and misdemeanors and [giving] aid and comfort to the communist enemies of the United States."[176] Lester Maddox, elected Governor of Georgia in 1966, "took out regular ads for his restaurant in Atlanta papers that excoriated, for example, 'the ungodly Civil Rights legislation that the politicians and the Communists and the Communist-inspired agitators are trying to pass in congress that will enslave all Americans.'"[177] Thus, when a Black candidate is repeatedly and consciously tagged as a communist and/or Marxist, the appeal is not limited to, or even primarily about, a debate about economic policy. Instead, it is a code that taps into a history that labels those who advocate for issues important to Black people as "communists," and communicates racial appeals without using the word "Black."[178]

As another example from 2020, Marjorie Taylor Greene, who was running for Congress in Georgia's 14th Congressional District, called the election of Reps. Rashida Tlaib and Ilhan Omar an "Islamic invasion" of the U.S. government, suggested that George Soros turned Jews over to Nazis, and described Black people as "slaves" to the Democratic Party.[179] This appeal was reminiscent of a social media message shared by the husband of congressional candidate and

[172] Day, Eli. "Kelly Loeffler's Familiar Dog Whistle." *The American Prospect*, December 10, 2020. https://prospect.org/api/content/c6fe9774-3b15-11eb-9b61-1244d5f7c7c6/.

[173] Bluestein, Greg. "Loeffler's Campaign Takes Aim at Warnock in First TV Broadsides." *The Atlanta Journal-Constitution*, November 12, 2020. https://www.ajc.com/politics/politics-blog/loefflers-campaign-takes-aim-at-warnock-in-first-tv-broadsides/ZAM5Y4NEQ5CCLALS7T6KKKN5YI/.

[174] Matt Cannon. "Kelly Loeffler Said 'Radical Liberal' 13 Times during Georgia Runoff Debate with Raphael Warnock." *Newsweek*, December 7, 2020. https://www.newsweek.com/kelly-loeffler-radical-liberal-georgia-runoff-debate-raphael-warnock-1552759.

[175] Gore, D'Angelo. "Loeffler-Warnock Runoff Starts with Attack Ads." *FactCheck.Org*, November 19, 2020. https://www.factcheck.org/2020/11/loeffler-warnock-runoff-starts-with-attack-ads/, (explaining that Warnock was just a youth pastor for a Harlem-based church where Castro once gave a speech in 1995 and Warnock was uninvolved in the event).

[176] Ga. Laws 1957, pp. 553, 558-60.

[177] Rick Perlstein. Nixonland: The Rise of a President and the Fracturing of America. Simon and Schuster, 2008, 131.

[178] Haney López, "Third Rail Series Lecture: UC Berkeley"

[179] Mutnick, Ally. "New GOP Headache as Candidate Condemned for Racist Videos Wins Republican Primary." *Politico*, August 11, 2020. https://www.politico.com/news/2020/08/11/house-candidate-condemned-for-racist-videos-wins-republican-primary-394008.

former Georgia Secretary of State Karen Handel who encouraged votes for his wife to "free the black slaves from the Democratic plantation."[180]

Another recent example of a dog whistle campaign involves mailers distributed to residents of Sandy Springs and Johns Creek, where several people of color were running for mayor and City Council seats. The mailers said: "We can't let Sandy Springs [or Johns Creek, in that city's case] turn into Atlanta." The flyer included side-by-side photos of a rundown apartment building and a protest.[181] Another flier in support of non-Black candidates read: "…Save Johns Creek from the partisan group targeting Johns Creek to radically change our quality of life."[182]

The messaging that Black candidates are unsavory, unqualified and incompetent because they are Black is a persistent racial appeal waged in Georgia political campaigns. In 2016, Tom Worthan, a longtime Douglas County Commissioner facing a Black female opponent, said that governments run by Black officials "bankrupt you," and that if an African-American sheriff candidate were elected, he was "afraid he'd put a bunch of blacks in leadership positions" that "they're not qualified to be in."[183] To explain his comments, Worthan said: "I spoke as a politician, trying to say what I needed to say to get a vote."[184]

These examples show that racial appeals—both explicit and subtle—continue to play an important role in political campaigns in Georgia.

### III.    Black Georgians Have Historically Been Underrepresented in Public Office and That Underrepresentation Persists Today, Particularly in Areas that are the Focus of the Lawsuit (Factor 7).

Senate Factor 7 is the "extent to which members of the minority group have been elected to public office in the jurisdiction," the state of Georgia.

Black Georgians have been and continue to be underrepresented in public office. Despite persistently making up a significant portion of the state population, Black Georgians have faced barriers to being elected to public office, both historically and contemporarily. There are, moreover, areas in the state, including areas at issue in this lawsuit, that have not elected any Black officials to the Georgia Assembly in at least the last fifteen years.

---

[180] Sophia Tesfaye. "Karen Handel's Husband Shares Meme Urging Voters to 'Free the Black Slaves from the Democratic Plantation.'" *Salon*, May 3, 2017. https://www.salon.com/2017/05/03/karen-handels-husband-shares-meme-urging-voters-to-free-the-black-slaves-from-the-democratic-plantation/.
[181] Dixon, Kristal. "Candidates Drag Atlanta Crime into Suburban Elections." *Axios*, October 28, 2021. https://www.axios.com/local/atlanta/2021/10/28/candidates-drag-atlanta-crime-into-suburban-elections.
[182] Murchison, Adrianne. "Crime Fears Emerge in Johns Creek, Sandy Springs Municipal Elections." *The Atlanta Journal-Constitution*, October 26, 2021. https://www.ajc.com/neighborhoods/north-fulton/crime-fears-emerge-in-johns-creek-sandy-springs-municipal-elections/HAMJ4MEMVVA3BCYC36ZOGR3OKM/.
[183] Ernie Suggs, "Douglas Leader's Racial Comments Spark Calls That He Resign," *Atlanta Journal-Constitution*, September 30, 2016. https://www.ajc.com/news/local/douglas-leader-racial-comments-spark-calls-that-resign/AVjoe8BDCXLsut6OBPjIHI/.
[184] *Id*.

The state has sent very few Black elected officials to the U.S. Congress. During the state's history, spanning over 200 years, there have only been twelve Black members of Congress elected from the state of Georgia (11 to the House of Representatives, 1 to the U.S. Senate). Until 1972, there had only been one Black candidate elected to the U.S. Congress from Georgia, Jefferson Franklin Long. His tenure was short, spanning just three months in 1871. Since 1965, out of the 365 total seats in the U.S. Congress allocated to Georgia, only 12, or 3.28%, have been occupied by Black officials. Raphael Warnock is the first Black person to represent Georgia in the U.S. Senate. Warnock was elected in 2020, a year when voting access was substantially expanded to make voting accessible despite the COVID pandemic.

At the state level, only two Black people have been elected to non-judicial statewide office in Georgia's entire 233 years: Labor Commissioner Mike Thurmond in 2002 and 2006 and former Attorney General Thurbert Baker in 1998, 2002, and 2006.[185] Georgia has never had a Black Governor[186]or Lieutenant Governor.[187]

Judge Robert Benham of the Georgia Court of Appeals was the first Black person ever elected to a statewide office in Georgia in 1984, but as is the case with the election of almost all appellate judges in Georgia, he had been first appointed to the position by the Governor, before running for, and winning election, to retain his seat.[188] While statewide judge positions in Georgia are formally selected by non-partisan election,[189] in practice the overwhelming majority of positions are filled by people who were appointed to an interim vacancy on the bench. Between 1964-2004, that was true for 91% of Georgia state supreme court justices.[190]

In the state capitol, as of 2021, there are 16 Black State Senators in Georgia out of 56 State Senate districts, meaning Black Senators make up 28.57% of the State Senate.[191] In the Georgia State House, there are 50 Black State Representatives out of 180 districts, meaning Black

---

[185] Order, *Fair Fight Action, Inc. v. Raffensperger*, 18-cv-05391-SCJ (N.D. Ga. Nov. 15, 2021), ECF No. at 636. *See also* Euell A. Nielsen, "Thurbert Earl Baker," BlackPast.org, September 26, 2020. https://www.blackpast.org/african-american-history/thurbert-earl-baker-1952/. History, Office of the Att'y Gen., https://law.georgia.gov/about-us/history (last visited Jan. 4, 2022).

[186] *See* Asma Khalid, "50 States And No Black Governors, But That Could Change In 2018," *NPR*, May 18, 2018. https://www.npr.org/2018/05/18/611783940/50-states-and-no-black-governors-but-that-could-change-in-2018.

[187] *See* Yussuf Simmons, "African American Lieutenant Governors," *Los Angeles* Sentinel, April 6, 2009, https://lasentinel.net/african-american-lieutenant-governors.html; Buchanan, Scott. "Lieutenant Governor." In *New Georgia Encyclopedia*, last modified Aug. 21, 2020. https://www.georgiaencyclopedia.org/articles/counties-cities-neighborhoods/county-unit-system.

[188] "Black Judge Wins Georgia Election," *New York Times,* August 16, 1984, https://www.nytimes.com/1984/08/16/us/black-judge-wins-georgia-election.html.

[189] Johnsen, Diane, Building a Bench: A Close Look at State Appellate Courts Constructed by the Respective Methods of Judicial Selection (October 3, 2016). 53 San Diego L. Rev. 829 (2016).

[190] Berry, Kate, and Cathleen Lisk. 2017. *Appointed and Advantaged: How Interim Vacancies Shape State Courts*. https://www.brennancenter.org/sites/default/files/analysis/Appointed_ and_Advantaged_How_Interim_Appointments_Shape_State_Courts.pdf.

[191] Carl Smith. "Blacks in State Legislatures: A State-by-State Map." *Governing* (blog), January 13, 2021. https://www.governing.com/now/blacks-in-state-legislatures-a-state-by-state-map.html; https://www.legis.ga.gov/members/senate.

Representatives make up 27.77% of the State House.[192] According to the 2020 census, Georgia is 33% Black.[193]

The 5.25% gap between the percentage of Black State Representatives and the Black population is significant. 5.25% of Georgia's population of 10,711,908 is 560,233 people, or the equivalent of more than 9 state house districts.[194] So, too, with the 4.43% gap between the percentage of Black Senators and the Black population. 4.43% of the population is 474,537 people, or the equivalent of several senate districts.[195]

The state parties too, historically and today, are divided by race. Since 1908, when the last Black person to be elected as part of the Reconstruction era left office, the Republican Party has only elected two Black people to the Georgia Assembly.[196] And up until 1963, the Democratic Party had never elected a Black member to the Georgia Assembly.[197] Since 2000, 59% of Democratic Party elected officials are Black. A mere 0.5% of Republican Party elected officials have been Black. The 2020 election shows this racial division in parties continues for state legislative races: Of the 138 seats that the Republicans secured, 0 were won by Black legislators; of the 99 the Democratic party secured, 68 of them went to Black candidates.[198] The exclusion of Black participation in the General Assembly is not unique to one party, but at all times only one party has elected Black officials. Black representation and influence are necessarily stymied because only one party appears to be open.

I specifically analyzed certain areas of focus in this litigation, namely 3 Senate districts (16, 17, 23) and 8 House districts (74, 117, 124, 133, 134, 171, 173, 149), in the enacted plan to determine whether Black candidates have been elected to represent the areas represented in the districts, over the last 15 years. The districts I discuss here were identified for me by counsel. Because district boundaries (and their numbering) have changed over this period, I reviewed the state Senate and House district maps for the enacted plan (Exhibit B), the plan in effect from 2014-2020(Senate)/2015-2020(House) (Exhibit C), 2012-2014(Senate)/2012-2015(House) (Exhibit D), and the 2006 plan that was in effect from 2006-2012 (Exhibit E), to identify the relevant districts that cover the same geographical area in prior districting plans for each Senate

---

[192] Carl Smith. "Blacks in State Legislatures: A State-by-State Map." *Governing* (blog), January 13, 2021. https://www.governing.com/now/blacks-in-state-legislatures-a-state-by-state-map.html; https://www.legis.ga.gov/members/house.

[193] U.S. Census Bureau. "Georgia Among Top Five Population Gainers Last Decade." Census.gov. Accessed January 1, 2022. https://www.census.gov/library/stories/state-by-state/georgia-population-change-between-census-decade.html.

[194] EX B. at 5 (identifying population range for 2021 House districts as 58,678 to 60,308).

[195] Ex. A at 5 (identifying population range for 2021 Senate districts as 189,320 to 193,163

[196] KlarnerPolitics. "Dr. Carl E. Klarner - Biography & CV," 2018. https://www.klarnerpolitics.org/bio-1; Robert A. Holmes, The Georgia Legislative Black Caucus: An Analysis of a Racial Legislative Subgroup, Sage Journal of Black Studies, Vol. 30 No. 6, July 2000 768-790; Fort Valley State University. "Alumni Profile: Willie Lee Talton: GA's first black Republican legislator since Reconstruction." https://www.fvsu.edu/news/alumni-profile-willie-lee-talton (describing Talton as the first Black Republican elected to the Georgia legislature since Reconstruction when he was elected in 2005).

[197] Robert A. Holmes, The Georgia Legislative Black Caucus: An Analysis of a Racial Legislative Subgroup, Sage Journal of Black Studies, Vol. 30 No. 6, July 2000 768-790.

[198] KlarnerPolitics. "Dr. Carl E. Klarner - Biography & CV," 2018. https://www.klarnerpolitics.org/bio-1.

or House district at issue.[199] Using a database compiled by Carl Klarner, a political scientist who specializes in state legislative elections.[200] I identified the winner of each of the relevant state senate and house elections between 2006-2020 and the race of the winning candidate, in the geographical areas covered in the enacted plan, which is included in the Klarner database. I created a table of this information, attached here as Exhibit A.

Based on my analysis, I conclude that each of the enacted plan districts evaluated are comprised of large geographical areas that have not elected a Black candidate to the General Assembly over at least the last 15 years. I have limited this part of my evaluation to the past 15 years because that is the period for which Georgia makes its districting plans publicly available.[201]

The following summarizes my findings:

### HD 171 & HD 173

HD 171 includes Decatur County and portions of Mitchell and Grady counties that have not elected any Black representatives to the House in at least 15 years. The same is true of HD 173, which includes portions of Thomas and Grady counties.



---

[199] Georgia General Assembly. "Legislative and Congressional Reapportionment Office," 2022. https://www.legis.ga.gov/joint-office/reapportionment.
[200] KlarnerPolitics. "Dr. Carl E. Klarner - Biography & CV," 2018. https://www.klarnerpolitics.org/bio-1
[201] Georgia General Assembly. "Legislative and Congressional Reapportionment Office," 2022. https://www.legis.ga.gov/joint-office/reapportionment.

## HD 133 & HD 149

HD 133 includes portions of Jones and Baldwin counties that have not elected any Black representatives to the House in at least 15 years. The same is true of HD 149, which includes Wikinson, Twiggs, Bleckley, and Dodge counties, as well as part of Telfair counties.



## HD 124

HD 124 includes Oglethorpe, Greene, and Taliaferro counties, and as part of Putnam County, that has not elected any Black representatives in at least 15 years. There is one very small exception to this conclusion: a piece of the north east corner of Clarke County that has been included in enacted HD 124, was included in a different district from 2006-2010, and that former district did elect a Black representative during those years.



33

**HD 74, HD 117, HD 134, SD 16, & SD 17**



| **House 2021** | **Senate 2021** |

HD 134 includes portions of Spalding, Lamar, and Monroe counties that have not elected any Black representatives in at least 15 years.

HD 74 includes portions of Fayette, Spalding, and Henry counties that have not elected any Black representatives in at least 15 years. HD 74 also includes a portion of Henry County that, as part of a different district that included Clayton County, elected a Black candidate in 2006, thus that portion has not elected any Black representatives in the past 13 years.

HD 117 includes a portion of Henry County and Spalding County that has elected few Black representatives to the House in at least 15 years. In three elections, small portions of enacted HD 117 were part of different districts, and those districts elected a Black representative.

SD 16 includes Spalding, Pike, Lamar, and part of Fayette County counties, the vast majority of which has not elected a Black candidate to the state Senate in at least 15 years. A small portion of Fayette County that is in enacted SD 16 was previously combined with part of Clayton County as part of former SD 34, which has elected a Black candidate.

SD 17 includes Morgan County, as well as parts of Henry, Newton, and Walton counties, the vast majority of which has not elected any Black candidates to the state in at least 15 years. A small portion of the part of Henry County that is included in SD 17 was from part of former SD 10, which was made up of DeKalb and Henry County, and elected a Black state senator.

**SD 23**

| | |
|---|---|
| SD 23 includes Taliaferro, Warren, McDuffie, Glascock, Jefferson, Burke, Emanuel, Jenkins, and Screven counties, as well as portions of Columbia and Richmond counties, almost all of which have not elected Black candidates in at least 15 years. The small area of Richmond County between the border of enacted 22 and the border of Richmond County was part of SD 22 in the 2012-2020 map, and SD 22 has elected Black state senators. |  |

**CONCLUSION**

Historically, and contemporarily Blacks have had poorer treatment, less access to the franchise and elected office. Blacks have not been elected to the degree that they should have based on the population of the state historically and today.

***

I reserve the right to modify and/or supplement my opinions, as well as to offer new opinions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted and executed on January 7, 2022

_____

Adrienne Jones, PhD, J.D.

36

# Exhibits

**Exhibit A** ............... Data Concerning Certain Georgia State Legislative Officeholders 2006-2020

**Exhibit B** ................................................................ 2021 Enacted Senate & House District Maps

**Exhibit C** .............. Senate Districts - Effective for 2014 Election & House Districts – 2015 Maps

**Exhibit D** ................................................................2012 Senate & House District Maps

**Exhibit E** ........................................................ 2006 Senate & 2006 House District Maps

**Exhibit F** ................................................................................ M. Adrienne Jones C.V.

# Exhibit A

Georgia State Legislative Officeholders 2006-2020
for certain state house and state senate districts, with year and race of officeholder reported
Data source: Dr. Carl E. Klarner, Klarnerpolitics.org.

### HD 171 & HD 173

**HD 171**

| Year | HD171 | HD172 | HD173 |
|------|-------|-------|-------|
| 2020 | White | White | N/A |
| 2018 | White | White | N/A |
| 2016 | White | White | N/A |
| 2014 | White | White | N/A |
| 2012 | White | White | N/A |
| 2010 | White | White | White |
| 2008 | White | White | White |
| 2006 | White | White | White |

**HD 173**

| Year | HD175 | HD172 | HD173 | HD174 |
|------|-------|-------|-------|-------|
| 2020 | White | White | White | N/A |
| 2018 | White | White | White | N/A |
| 2016 | White | White | White | N/A |
| 2014 | White | White | White | N/A |
| 2012 | White | White | White | N/A |
| 2010 | White | White | White | White |
| 2008 | White | White | White | White |
| 2006 | White | White | White | White |

Georgia State Legislative Officeholders 2006-2020
for certain state house and state senate districts, with year and race of officeholder reported
Data source: Dr. Carl E. Klarner, Klarnerpolitics.org.

## HD 133 & HD 149

**HD133**

| Year | HD129 | HD144 | HD145 | HD125 | HD140 | HD141 |
|------|-------|-------|-------|-------|-------|-------|
| 2020 | White | White | White | N/A | N/A | N/A |
| 2018 | White | White | White | N/A | N/A | N/A |
| 2016 | White | White | White | N/A | N/A | N/A |
| 2014 | White | White | White | N/A | N/A | N/A |
| 2012 | White | White | White | N/A | N/A | N/A |
| 2010 | N/A | N/A | N/A | White | White | White |
| 2008 | N/A | N/A | N/A | White | White | White |
| 2006 | N/A | N/A | N/A | White | White | White |

**HD149**

| Year | HD154 | HD144 | HD149 | HD140 |
|------|-------|-------|-------|-------|
| 2020 | N/A | White | White | N/A |
| 2018 | N/A | White | White | N/A |
| 2016 | N/A | White | White | N/A |
| 2014 | N/A | White | White | N/A |
| 2012 | N/A | White | White | N/A |
| 2010 | White | White | N/A | White |
| 2008 | White | White | N/A | White |
| 2006 | White | White | N/A | White |

## HD 124

**HD 124**

| Year | HD113 | HD116 | HD120 | HD118 | HD114 | HD115 |
|------|-------|-------|-------|-------|-------|-------|
| 2020 | N/A | N/A | White | White | N/A | N/A |
| 2018 | N/A | N/A | White | White | N/A | N/A |
| 2016 | N/A | N/A | White | White | N/A | N/A |
| 2014 | N/A | N/A | White | White | N/A | N/A |
| 2012 | N/A | N/A | White | N/A | N/A | N/A |
| 2010 | White | White | N/A | N/A | Black | White |
| 2008 | White | White | N/A | N/A | Black | White |
| 2006 | White | White | N/A | N/A | Black | White |

Georgia State Legislative Officeholders 2006-2020
for certain state house and state senate districts, with year and race of officeholder reported
Data source: Dr. Carl E. Klarner, Klarnerpolitics.org.

## HD 74, HD 117, HD 134, SD 16, & SD 17

### HD 74

| Year | HD72 | HD73 | HD130 | HD126 | HD78 | HD109 | HD 111 |
|------|------|------|-------|-------|------|-------|--------|
| 2020 | White | White | White | N/A | N/A | N/A | N/A |
| 2018 | White | White | White | N/A | N/A | N/A | N/A |
| 2016 | White | White | White | N/A | N/A | N/A | N/A |
| 2014 | White | White | White | N/A | N/A | N/A | White |
| 2012 | White | White | White | N/A | N/A | N/A | White |
| 2010 | White | White | N/A | White | White | White | N/A |
| 2008 | White | White | N/A | White | White | White | N/A |
| 2006 | White | White | N/A | White | Black | White | N/A |

### HD 117

| Year | HD110 | HD111 | HD130 | HD109 | HD73 |
|------|-------|-------|-------|-------|------|
| 2020 | White | Black | White | Black | N/A |
| 2018 | White | Black | White | White | N/A |
| 2016 | White | White | White | White | N/A |
| 2014 | White | White | White | White | N/A |
| 2012 | White | White | White | White | N/A |
| 2010 | White | N/A | N/A | White | White |
| 2008 | White | N/A | N/A | White | White |
| 2006 | White | N/A | N/A | White | Black |

### HD 134

| Year | HD73 | HD141 | HD130 | HD129 | HD125 | HD126 |
|------|------|-------|-------|-------|-------|-------|
| 2020 | White | White | White | White | N/A | N/A |
| 2018 | White | White | White | White | N/A | N/A |
| 2016 | White | White | White | White | N/A | N/A |
| 2014 | White | White | White | White | N/A | N/A |
| 2012 | White | White | White | White | N/A | N/A |
| 2010 | White | N/A | N/A | White | White | White |
| 2008 | White | N/A | N/A | White | White | White |
| 2006 | White | N/A | N/A | White | White | White |

Georgia State Legislative Officeholders 2006-2020
for certain state house and state senate districts, with year and race of officeholder reported
Data source: Dr. Carl E. Klarner, Klarnerpolitics.org.

**SD 16**

| Year | SD16 | SD34 |
|------|------|------|
| 2020 | White | Black |
| 2018 | White | Black |
| 2016 | White | Black |
| 2014 | White | Black |
| 2012 | White | Black |
| 2010 | White | Black |
| 2008 | White | Black |
| 2006 | White | Black |

**SD 17**

| Year | SD17 | SD25 | SD46 | SD10 |
|------|------|------|------|------|
| 2020 | White | White | White | Black |
| 2018 | White | White | White | Black |
| 2016 | White | White | White | Black |
| 2014 | White | White | White | Black |
| 2012 | White | White | White | Black |
| 2010 | White | White | White | Black |
| 2008 | White | White | White | Black |
| 2006 | White | White | White | Black |

Georgia State Legislative Officeholders 2006-2020
for certain state house and state senate districts, with year and race of officeholder reported
Data source: Dr. Carl E. Klarner, Klarnerpolitics.org.

**SD 23**

**SD 23**

| Year | SD4 | SD22 | SD23 | SD24 | SD25 |
|------|-----|------|------|------|------|
| 2020 | White | Black | White | White | N/A |
| 2018 | White | Black | White | White | N/A |
| 2016 | White | Black | White | White | N/A |
| 2014 | White | Black | White | White | N/A |
| 2012 | White | Black | White | White | N/A |
| 2010 | White | N/A | White | White | White |
| 2008 | White | N/A | White | White | White |
| 2006 | White | N/A | White | White | White |

# Exhibit B

## 2021 Enacted Senate & House District Map

*Source: https://www.legis.ga.gov/joint-office/reapportionment

Client: S018
Plan: Senate-prop1-2021
Type: Senate

# Proposed Georgia Senate Districts



©2021 CALIPER

Legislative and Congressional
Reapportionment Office
Georgia General Assembly
Suite 407 Coverdell Legislative Office Bldg.

Map layers
Districts
County
0    20    40
Miles

# Proposed Georgia House Districts

Client: H097
Plan: House-prop1-2021
Type: House



©2021 CALIPER



Legislative and Congressional
Reapportionment Office

Georgia General Assembly
Suite 607 Coverdell Legislative Office Bldg.

Map layers

District Layer

☐ County

0        20        40

Miles

# Exhibit C

Georgia Senate Districts - Effective for 2014 Election & Georgia House Districts - 2015

*Source https://www.legis.ga.gov/joint-office/reapportionment

# Georgia Senate Districts- effective for 2014 election





# Georgia House Districts- 2015

Client: **State**
Plan: **House15**
Type: **House**



Legislative & Congressional
Reapportionment Office
Georgia General Assembly

# Exhibit D

## 2012 Senate & House District Map

*Source: https://www.legis.ga.gov/joint-office/reapportionment

# Senate 2012



©2021 CALIPER

# House 2012



©2021 CALIPER

# Exhibit E

## 2006 Senate & 2006 House District Maps

*Source https://www.legis.ga.gov/joint-office/reapportionment

# Senate 2006



©2021 CALIPER

# House 2006



©2021 CALIPER

# Exhibit F

# M. Adrienne Jones

950 Ponce de Leon Ave. NE Apt. #8
Atlanta, GA 30306
646-522-1029
adrienne.jones@morehouse.edu

## Education

**Ph.D.**    Political Science, City University of New York Graduate Center, 2015
**M.Phil.** Political Science, City University of New York Graduate Center, 2013
**J.D**.       University of California at Berkeley, 1996
**B.A.**      Modern Culture and Media (Semiotics), Brown University, 1993

## Professional Experience

| | |
|---|---|
| **Expert Witness**, ACLU | 2021-present |
| **Democracy Reform Expert**, Union of Concerned Scientists | 2021- present |
| **Instructor,** Open University, Minnesota Dept. of Corrections | 2020- 2021 |
| **Expert Witness**, Lawrence & Bundy, Atlanta, GA | 2019-present |
| **Assistant Professor,** Dept. of Political Science, Morehouse College | 2017-present |
| **Director of Pre-Law,** Dept. of Political Science, Morehouse College | 2017- present |
| **Visiting Professor**, Dept. of Political Science, Radford University | 2016-2017 |
| **Speechwriter for the Chancellor,** University of Wisconsin-Platteville (UWP) | 2016- present |
| **Interim Director of Transition**, External Affairs, UWP | 2015- 2016 |
| **Opinion Editorial Writer**, The Dubuque Telegraph Herald (monthly) | 2015-present |
| **Adjunct Lecturer**, Dept. of Social Science, UWP | 2014- 2016 |
| **Chief Public Relations Officer**, Office of the Chancellor, UWP | 2014-2015 |
| **Faculty Fellow**, Dept. of Social Science, UWP | 2011-2014 |
| **Adjunct Professor**, Dept. of Political Science, City College of New York (CCNY) and the Center for Workers Education (CWE) | 2001-2011 |
| **Pre-Law Advisor**, Pre-Law Program, CCNY | 2006-2011 |
| **Director**, Mock Trial and Moot Court Programs, CCNY | 2003- 2011 |

## Publications

Jones, M. Adrienne and Polsky, Andrew, How to Win a Long Game: The Voting Rights Act, The Republican Party, and the Politics of Counter- Enforcement, *Political Science Quarterly*, Vol. 136 – Number 2, Summer 2021.  https://www.psqonline.org/

Jones, Adrienne, "Voting in Georgia runoff went better than June's disastrous primary, but trouble still lingers,  The Conversation, January 5, 2021.

Jones, Adrienne, "Georgia's Election Disaster Shows How Bad Voting in 2020 Can Be," *The Conversation*, July 21, 2020.

Jones, M. Adrienne, "When Yes Means No: GOP Congressional Strategy and the Reauthorization of the VRA in 2006." *The Forum*, 16(2), 2018, pp. 289-312.Retrieved 17 Oct. 2018, from doi:10.1515/for-2018-0014.

Jones, Adrienne, "It's a War Movie," *Satya,* pp.48-53, 2016.

Op-Ed, "Erosion of the Voting Rights Act Threatens Fair Elections," Dubuque Telegraph Herald, August 8, 2015.

Op-Ed, "Confederate Flag Still a Sign That War Not Settled," Dubuque Telegraph Herald, July 19, 2015.

Op-ed, "The March on Selma: What's the Big Deal?" *Dubuque Telegraph Herald*, March 15, 2015.

Op-ed, "Supreme Court Decision a Sad Step Backward for Voting Rights," *Dubuque Telegraph Herald*, July 28, 2013.

Op-ed, "Scalia, Section 5 of the Voting Rights Act," *Dubuque Telegraph Herald*, June 9, 2013.

## Public Scholarship

Panelist, Political Rewind, GPB, 12/8/21

Panelist, Political Rewind, GPB, https://www.gpb.org/news/2021/11/22/political-rewind-contrasts-between-trials-of-rittenhouse-and-trio-charged-in-ahmaud

Expert, The Special Report with Areva Martin, 11/13/21, Homer Plessy on Road to Pardon,

Expert, Welcome to Atlanta Where the World Series Collides with Culture Wars,  USA Today (TBA) [10/27/21 interview Gabe Lacques]

https://www.usatoday.com/story/sports/mlb/2021/10/29/world-series-collides-politics-astros-braves-meet-atlanta/6185323001/?gnt-cfr=1

Panelist, Political Rewind, https://www.gpb.org/news/2021/10/20/political-rewind-plans-reintroduce-voting-rights-act-redistricting-could-pit-dems , GPB, 10/20/21

Panelist, Political Rewind, GPB, https://www.gpb.org/news/2021/09/01/political-rewind-call-get-vaccinated-ga-hits-new-covid-peaks-big-names-at-gop-fish , 9/1/21

Expert, Rep. Terri Sewell's voting rights bill just passed the House. Meet the Black women who paved her way. The Lily, 8/26/21 https://www.thelily.com/rep-terri-sewells-voting-rights-bill-just-passed-the-house-meet-the-black-women-who-paved-her-way/

Panelist, Political Rewind, https://www.gpb.org/news/2021/08/18/political-rewind-lawmakers-prepare-redraw-district-maps-and-georgians-plea-for-fair ,GPB, 8/18/21

Panelist, Political Rewind: The Coming Eviction Crisis Amid COVID; Voting Rights And Redistricting In Flux, GPB, 8/2/21

Panelist, Political Rewind, Political Rewind: National Debate Around Election Laws And Voting Rights Lands In Georgia, GPB,  7/19/21

Panelist, Political Rewind: Education, Race And Academic Freedom As Ga. Seeks Chancellor, Hannah-Jones Tenured GPB 7/1/21

Featured Panelist, Inside Merrick Garland's Vision of Justice, On Point, NPR, 6/21/21 https://www.wbur.org/onpoint/2021/06/21/merrick-garlands-vision-of-justice

Panelist, State Influence over GA. Elections Raises Concerns; What's Next for Buckhead? Political Rewind, GPB, 6/21/21 https://www.gpb.org/news/2021/06/21/political-rewind-state-influence-over-ga-elections-raises-concerns-whats-next-for

Expert, Stone Mountain Confederacy Removal? The World Tonight, BNC, 5/24/21 Dr. Jones_5.24.mp4

Panelist, Georgia Voting Rights: Withstanding the Fight Against Voter Suppression, The Players Coalition, 4/29/21

Interviewer, Conversations About Women in International Relations and Global Aspects of Gender Equality, International Women's Day Leadership Forum of Atlanta, 4/28/21

Panelist, Hope, Enfranchisement and Voter Suppression: South Africa and the USA, Andrew Young Center, 4/26/21

Panelist, Flash Panel, Jim Crow 2.0?, Oregon State University, 4/13/21

Expert, GPB TV Australia, Planet Animal, SB 202 Georgia Voting Legislation,  4/8/21 https://www.abc.net.au/news/programs/planet-america/2021-04-09/planet-america-9-april/13296640

Presenter, Democracy Under Threat in Times of Populism and Racial Nationalism Conference, 3/25/21

Interviewer, A Fireside Chat With David Kelly '96, Chief Legal Golden State Warriors, 3/10/21

Keynote, Voter Suppression in Georgia, with Rabbi Lydia Medwin at The Temple, 3/1/21

Panelist, Westlake High School Constitutional Law Panel with Dexter Weldon,  2/18/21

Expert, Georgia Runoff Election, NPR, On Point, 1/4/21

Expert, Georgia Elections (Senate Races)  MSNBC with Craig Melvin, 12/7/20

Keynote Speaker, Politics & Pandemics &2020 Vision The View from Georgia, The Brown Club of Georgia Presents, 11/17/20

Panelist, And the Winner Is … Post Election Analysis, Morehouse Journalism and Sports Program 11/12/20

Moderator, Andrew Young Center, Moral and Political Dimensions of this High Stakes Election, with Robert Franklin, Mayor Steven L. Reed, and Rev. Rafael Warnock, 10/27/20

Expert, Election Night, WURD on Politics, Philadelphia, WURD, November 3, 2020.
https://www.youtube.com/watch?v=h0SB6mB5v0U
Expert, Areva Martin Show, Georgia Run Off Elections, 11/9/2020 https://bit.ly/SRep100
Expert, Areva Martin Show, Georgia Primary Election/Voter Suppression, 10/21/2020
http://bit.ly/SRep92
Expert, How States Voted in Every Presidential Election,  From George Washington to Donald
Trump, Business Insider, October 15, 2020 https://www.businessinsider.com/presidential-
election-results-every-year-donald-trump-2020-10
Expert, Battleground Ballot Box, The History of Racist Voting Laws in Georgia, Georgia Public
Radio, October 12, 2020 https://www.gpb.org/news/2020/10/12/battleground-ballot-box-the-
history-of-racist-voting-laws-in-georgia
Panelist, Teach In, Higher Education in Prisons, ICW Democracy Under Threat, September 18,
2020 "Higher Education in Prisons"
Expert, BBC World News, US: March on Washington, August 28, 2020  https://we.tl/t-FXv6NVTHjn
Panelist, Teach In, Racial Justice Protests and Social Change, ICW Democracy Under Threat, July
28, 2020.
Expert, Indus News, *Scope with Waqur Rizvi* US: Minneapolis Protests/George Floyd, July 30, 2020
https://www.youtube.com/watch?v=cwLRW_u4W0k
Expert, Indus News, *Scope with Waqur Rizi* US Voting System Meltdown in Georgia, June 12,
2020 https://www.youtube.com/watch?v=gmwEOmbe9Mo&feature=youtu.be
Keynote Speech, "African Americans and the Vote," National Labor Relations Board, WDC, February
27, 2020.
Keynote Speech, "Black History Month Tea at Three," U.S. Attorneys Office for the Northern District
of Georgia, February 20, 2020.
Interviewer, Pete Buttigieg at Morehouse College, New Deal Democrats, November 18, 2019
Interviewee, "Minority Turnout is Low In Runoff Elections And That Will Matter," December 4, NPR,
GPB News, November 30, 2018.
Presenter, Morehouse College Crown Forum w/Byron Hurt, October 11, 2018.
Panelist, "The Politics of Rape," Morehouse College, Brisbane Inst., October 10, 2018.
Presenter, Crown Forum w/ john a. powell, February 22, 2018.
Panelist, *When Yes Means No the GOP and VRA*, Southern Political Science Association, New
Orleans, January 2018.
Moderator, Know Your Rights Panel, Crown Forum After Dark, October 25, 2017.
Moderator, Crown Forum After Dark, *Crown Heights* Panel, August 22, 2017.
Presenter, "The Voting Rights Act Under Siege: The Development of the Influence of Colorblind
Conservatism on Congress and the Voting Rights Act," City University of New York Political
Science Job Talk Colloquium, New York, NY, September 11, 2014.
Panelist, "Citizen Koch," Screening and Panel Discussion at Mindframe Theater, Dubuque
IA, August 17, 2014.
Guest Speaker, Introduction to Politics, "The VRA Today," UWP, Platteville, WI, October 3, 2013.
Panelist, "Voting in Iowa," Chambers Government Committee Meeting on the Legislative
Agenda, Dubuque, IA, September 12, 2012.
Presenter, "Voting Rights Act: Redistricting in Covered States," 2012 Midwest Political
Science Association (MPSA) Annual Meeting, Chicago, IL, April 12, 2012.
Speaker, "The Voting Rights Act and Redistricting in 2011," Invited Lecture for the Social Science
Lecture Series, UWP, Platteville, WI, January 27, 2011.

## Quoted

Michael Jones, Keep your eyes on Georgia, *Supercreator News*, November 30, 2021,
https://www.supercreator.news/p/keep-your-eyes-on-georgia
Janay Kingsberry, "Rep. Terri Sewell's voting rights bill passed the House. Meet the Black women
who paved her way." Washington Post: The Lily, August 25, 2021, https://www.thelily.com/rep-
terri-sewells-voting-rights-bill-just-passed-the-house-meet-the-black-women-who-paved-her-way/
Greg Bluestein Stacey Abrams Hasn't Said if Shell Run for Governor, Republicans Act Like She
Already Is," *Atlanta Journal Constitution*, 8/21/21, https://www.ajc.com/politics/stacey-abrams-

hasnt-said-if-shell-run-for-governor-republicans-act-like-she-already-is/2CL75C26MVFVDBFP7QG7EH6QZI/
Aris Folley and Marty Johnson, Black farmers facing 'extinction' fight for $5B in promised aid, The Hill, 8/12/21, https://thehill.com/policy/finance/567486-black-farmers-facing-extinction-fight-for-5-billion-in-promised-aid?rl=1
Eva Rothenberg, For Black Georgians, Voting Restrictions are More of the Same, CNN 3/28/21, https://www.cnn.com/2021/03/28/us/georgia-voting-jim-crow-slave-narratives/index.html
Profs argue Georgia runoffs are racist, Campus Reform, Tuesday, 1/5/21
https://www.campusreform.org/article?id=16567

## Fellowships and Awards

| | |
|---|---|
| **Andrew Young Center for Global Leadership Fellowship,** Morehouse College | 2019-2020 |
| **Faculty Fellowship**, University of Wisconsin, Platteville | 2011-2014 |
| **Black Male Initiative Fellowship Award**, CUNY | 2010 |
| **Dean K. Harrison Fellowship**, CUNY | 2011, 2013 and 2014 |

## Professional Service

| | |
|---|---|
| **Board Member**, Protect the Vote | 2021- present |
| **Democracy Council Member**, Union of Concerned Scientists | 2020-present |
| **Board Member**, JAMII | 2020- present |
| **Board Member, More Equitable Democracy** | 2020y-present |
| **DNC Boiler Room**, Fulton County | 2018- present |
| **Alum Member**, GC Alumni Committee, Political Science Department, City University of New York Graduate Center | 2018- present |
| **Secretary,** Faculty Council, Morehouse College | 2019-present |
| **Member,** Faculty Council, Morehouse College | 2018- present |
| **Student Member**, Executive Committee, Political Science Department, City University of New York Graduate Center | 2009-2011 |
| **Moot Court Judge,** Loras College Annual Moot Court Competition | 2010-2016 |
| **Board Member and Organizer** of the 2012 Multicultural Inclusive Conference, University of Wisconsin, Platteville | 2011-2012 |
| **Faculty Representative,** University Strategic Planning Committee for Diversity, University of Wisconsin-Platteville | 2013- 2015 |
| **Judge for Leadership Awards**, University of Wisconsin, Platteville, | 2013 |

## Employment History

| | |
|---|---|
| **Assistant Editor**, ABA Sports and Entertainment Law Journal | 1996-1997 |
| **Staff Attorney**, United States Court of Appeals | 1996-1999 |
| **Independent Filmmaker**, New York City, Los Angeles | 1996-2007 |
| **Interviewer**, The History Makers | 2007-2008 |
| **Staff Attorney**, Communications Workers of America | 2008-2011 |

## Membership in Volunteer and Professional Societies

| | |
|---|---|
| Brooklyn Salon | 2010-present |
| Writer, Class News, Hathaway Brown School | 2012 -present |
| Member, New York Bar Association | 2007-present |
| Co-Chair, MAC Committee, Brown Alumni Association | 2018-2020 |
| Member, Brown Alumni Association Board | 2014-2020 |
| Treasurer, Inman Page Black Alumni Council | 2012- 2014 |
| Treasurer, Black Documentary Collective | 2006-2011 |
| Member, North American Pre-Law Association | 2005-2011 |