# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

ALPHA PHI ALPHA FRATERNITY
INC., a nonprofit organization on
behalf of members residing in Georgia;
SIXTH DISTRICT OF THE
AFRICAN METHODIST
EPISCOPAL CHURCH, a Georgia
nonprofit organization; ERIC T.
WOODS; KATIE BAILEY GLENN;
PHIL BROWN; JANICE STEWART,

   *Plaintiffs*,

  vs.

BRAD RAFFENSPERGER, in his
official capacity as Secretary of State
of Georgia.

   *Defendant*.

**Case No. 1:21-cv-05337-SCJ**

## <u>PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR<br>RENEWED MOTION FOR A PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

    A.   Georgia's Black Population Has Grown Tremendously......................3

    B.   Georgia's New Legislative Maps Disregard the Growth of the State's Black Population ......................................................................4

    C.   The 2021 Maps Continue Georgia's History of Subordinating Black Voters Like Plaintiffs .........................................................10

ARGUMENT ......................................................................................................13

  I.   Plaintiffs Are Likely to Succeed on the Merits .......................................14

    A.   Plaintiffs Satisfy The *Gingles* Preconditions .....................................16

      1.   Gingles Precondition 1: At Least Seven Additional, Reasonably Compact Black-Majority Districts Can Be Drawn ............................16

      2.   *Gingles* Precondition 2: Black Communities Are Politically Cohesive in Those Areas Where the State Could Have Drawn Additional Black-Majority Senate and House Districts...................................................18

      3.   *Gingles* Precondition 3: Blocs of White Voters Prevent the Election of Black-Preferred Candidates in Those Areas Where the State Could Have Drawn Black-Majority Senate and House Districts .................20

      4.   Plaintiffs' Remedial Maps Prove That a Remedy Is Feasible ...........25

    B.   Plaintiffs Will Prove That The Challenged Maps Dilute Black Voting Strength.........................................................................25

  II.   Plaintiffs Will Suffer Irreparable Injury Without Injunctive Relief........33

  III.   The Balance of Hardships Favors Issuing a Preliminary Injunction........34

  IV.   Injunctive Relief is in the Public Interest .................................................35

CONCLUSION ...................................................................................................36

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Adamson v. Clayton County Elections & Registration Board*, 876 F. Supp. 2d 1347 (N.D. Ga. 2012) ........................................................34

*Askew v. City of Rome*, 127 F.3d 1355 (11th Cir. 1997) .........................................18

*Brooks v. State Board of Elections*, 848 F. Supp. 1548 (S.D. Ga. 1994) ...............25

*Busbee v. Smith*, 549 F. Supp. 494 (D.D.C. 1982), *aff'd mem.* 459 U.S. 1166 (1983) ........................................................................26

*Charles H. Wesley Educational Foundation v. Cox*, 324 F. Supp. 2d 1358 (N.D. Ga. 2004) .....................................................34

*Cofield v. City of LaGrange*, 969 F. Supp. 749 (N.D. Ga. 1997) ..........................25

*Covington v. North Carolina*, No. 1:15-CV-399, 2017 U.S. Dist. LEXIS 198313 (M.D.N.C. Dec. 1, 2017) .......................................17

*Crumly v. Cobb County Board of Elections & Voter Registration*, 892 F. Supp. 2d 1333 (N.D. Ga. 2012) .................................................34

*Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998) ....................................................17

*Georgia State Conference of the NAACP v. Fayette County Board of Commissioners*, 118 F. Supp. 3d 1338 (N.D. Ga. 2015) ..................16, 33, 35

*Georgia State Conference of the NAACP v. Fayette County Board of Commissioners*, 775 F.3d 1336 (11th Cir. 2015) ........................14, 15, 21, 34

*Georgia State Conference of the NAACP v. Fayette County Board of Commissioners*, 950 F. Supp. 2d 1294 (N.D. Ga. 2013), *aff'd in part, vacated in part, rev'd in part*, 775 F.3d 1336 (11th Cir. 2015) ...........................................................................28

*Georgia State Conference of the NAACP v. Georgia*, 312 F. Supp. 3d 1357 (N.D. Ga. 2018) ..................................................18

*Georgia v. United States*, 411 U.S. 526 (1973) ........................................26

*Hall v. Holder*, 117 F.3d 1222 (11th Cir. 1997) ....................................21

*Johnson v. Hamrick*, 296 F.3d 1065 (11th Cir. 2002) ............................19

*League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006) ........................................................................15, 25

*McCain v. Lybrand*, 465 U.S. 236 (1984) .............................................10

*Missouri State Conference of the NAACP v. Ferguson-Florissant School District*, 201 F. Supp. 3d 1006 (E.D. Mo. 2016) ..............................17

*Negron v. City of Miami Beach*, 113 F.3d 1563 (11th Cir. 1997) ............6

*Scott v. Roberts*, 612 F.3d 1279 (11th Cir. 2010) ...................................33

*Shelby County v. Holder*, 570 U.S. 529 (2013) ......................................11

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000) ..................................13

*Solomon v. Liberty County Commissioners*, 221 F.3d 1218 (11th Cir. 2000) (en banc) ........................................................................28

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .......................................*passim*

*United States v. Marengo County Commission*, 731 F.2d 1546 (11th Cir. 1984) ........................................................................28, 29

*United States v. McGregor*, 824 F. Supp. 2d 1339 (M.D. Ala. 2011) ....................26

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) .....................................31

*Vieth v. Jubelirer*, 541 U.S. 267 (2004) ................................................4

*Westwego Citizens for Better Government v. Westwego*, 872 F.2d 1201 (5th Cir. 1989) ........................................................................19

*White v. Regester*, 412 U.S. 755 (1973) .................................................28

*Wright v. Sumter County Board of Elections & Registration (Wright II)*, 979 F.3d 1282 (11th Cir. 2020)
........................................................................................................*passim*

*Wright v. Sumter County Board of Elections (Wright I)*, 301 F. Supp. 3d 1297 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020) ..........19, 25

## STATUTES, RULES, AND REGULATIONS

52 U.S.C. § 10301 ..............................................................................................11, 13

## OTHER AUTHORITIES

Erica Thomas, *Georgia's New Voting Restrictions Are a Step Back Into Our State's Dark History*, Time (Mar. 31, 2021, 4:50 PM) ..................28

Georgia General Assembly, Meeting Archives, Senate Committee on Reapportionment and Redistricting, https://www.legis.ga.gov/committees/senate/140 (last visited January 2, 2022)..............................................................................................12

Georgia General Assembly, Votes on H.B. 1EX, https://www.legis.ga.gov/legislation/60897 (last visited January 2, 2022) ..............................................................................................12

Georgia General Assembly, Votes on S.B. 1EX, https://www.legis.ga.gov/legislation/60894 (last visited January 2, 2022) ..............................................................................................12

November 4, 2021 Meeting of Senate Committee on Reapportionment & Redistricting, Hearing on S.B. 1EX, 2021 Leg., 1st Special Sess. (2021) (statement of Senator John F. Kennedy, Chairman, S. Comm. Reapp. & Redis. at 1:00:44 – 1:01:01), https://tinyurl.com/mu8v4sf6 ..............................................27

November 5, 2021 Meeting of Senate Committee on Reapportionment & Redistricting, Hearing on S.B. 4 and Public Comments, 2021 Leg., 1st Special Sess. (2021), https://tinyurl.com/mu8v4sf6......................33

iv

Nick Corasaniti & Reid J. Epstein, *What Georgia's Voting Law Really
Does*, N.Y. Times (Apr. 2, 2021) ..................................................................28

## **INTRODUCTION**

Georgia's newly adopted districting schemes for its General Assembly unlawfully dilute the voting strength of Black Georgians in violation of the Voting Rights Act (the "VRA"). This Court should enjoin their use because Plaintiffs are likely to succeed in this litigation by showing that the challenged plans deny Black voters an opportunity to elect their preferred candidates in at least seven districts (three in the Senate, four in the House) that should have been drawn in and around the Atlanta metro area, Augusta, and Southwest Georgia; and because holding elections using the State's recently enacted maps (the "2021 Maps") would violate the law and irreparably harm Plaintiffs and other Black voters across Georgia.

Section 2 of the VRA makes it unlawful for a state to dilute the voting strength of particular racial groups such that it is more difficult for members of one group to elect their preferred candidates. That is precisely what Georgia's 2021 Maps do. In the last decade, Georgia's Black population grew by nearly half a million people, while the white population declined. Yet the new maps contain the same number of majority-Black State Senate districts, and only two more majority-Black House districts (out of 180) than the previous redistricting plans. The 2021 Maps thus maintain white-majority districts in areas where burgeoning Black populations would support new Black-majority districts, and essentially freeze Black political

power in the General Assembly. That is vote dilution. As Plaintiffs are likely to show, every element of the Section 2 test is met: Plaintiffs have submitted maps with at least seven additional majority-Black districts beyond those in the 2021 Maps and can show that voting in the areas around those districts is racially polarized, such that under the 2021 Maps Black voters will be unable to elect candidates of their choice. The past and present reality of politics in Georgia confirms that Black voters in those areas have less opportunity than other citizens to elect candidates of their choice. That reality includes, among other things, over a century of egregious official discrimination in voting (including well after the passage of the VRA in 1965), unremedied socioeconomic disparities that continue to make voting and participation more difficult, and the persistent inability of Black candidates to win General Assembly elections in the precise areas where the districts challenged in this suit are located.

The newly enacted districting scheme violates the VRA and will cause Plaintiffs irreparable and irremediable harm. The State cannot justify holding elections using illegal, discriminatory districts, which will allow the benefits of incumbency to vest in officeholders who owe their seats to vote dilution. The burden of redrawing the maps to comply with the law is minimal—the 2021 Maps sailed through the legislative process in less than two weeks, and Plaintiffs have already

drawn a remedial plan that complies with the law (the "Illustrative Maps"). Thus, the State can have new, lawful maps in place in time to proceed with the current primary and general election schedule. This Court should enjoin the use of the 2021 Maps.

## BACKGROUND

### A.    Georgia's Black Population Has Grown Tremendously

Georgia has grown by hundreds of thousands of citizens since legislative districts in the State were last apportioned. That growth has been driven entirely by an increase in the number of persons of color; the State's white population has declined during that time. *See* Ex. A, Cooper Report ("Cooper") ¶33. This dramatic demographic shift changed the electorate by increasing the percentage of Black voters and decreasing the percentage of white voters. Cooper ¶43. Over the last decade, Georgia's Black population grew by 16%, representing almost half a million people. Cooper ¶35. That growth was regionalized and concentrated; much of the Black population growth took place in counties in and around the metro Atlanta area. Cooper ¶¶44, 49-50. And in other areas, such as the Augusta and southwest Georgia regions, the relative size of the Black population increased, even as population decreased overall, due to white population decline. Cooper ¶51. Black Georgians now account for nearly one-third (33.03%) of Georgia's population and comprise by

3

far the largest minority population in the state. Cooper ¶¶35-36.

**B.**    **Georgia's New Legislative Maps Disregard the Growth of the State's Black Population**

Despite the tremendous growth in the Black population, the 2021 Maps—enacted on December 30, 2021 as part of the decennial redistricting process—fail to provide virtually any new political opportunities for Black Georgians. Instead, the number of majority-Black Senate districts is unchanged from nearly a decade ago, and the number of majority-Black House districts has barely increased. *See* Cooper ¶12. The State's 2021 Senate Plan (the "2021 Senate Map") provides for just 14 majority-Black Senate districts out of 56 total Senate districts—the same overall number as existed in the previous plan.[1] Cooper ¶¶13, 58. The State's 2021 House Plan (the "2021 House Map") added only two additional Black-majority districts (out of 180) beyond the number in the plan from a decade ago, and only five such districts since 2006. Cooper ¶¶14, 91.

This minimal increase in the number of Black-majority districts in Georgia despite significant Black population growth was orchestrated by "packing" large

---

[1] The previous plan contained 15 majority-Black districts when it was enacted, according to 2010 Census data. Two districts slipped below 50% Black voting-age population ("BVAP") by the time of the 2020 Census, though one, at 49.76% BVAP, is still counted as majority-Black in expert demographer William Cooper's Report, for a total of 14. *See* Cooper ¶13 n.8, ¶58 n.19.

numbers of Black Georgians into districts that were already majority-Black, and then "cracking" additional communities of Black Georgians by assigning them to districts where their votes would be outweighed by larger numbers of white voters.[2] This continued failure to provide representation adequately accounting for Black population growth is particularly evident in the south Metro Atlanta region. Between 2000 and 2020, the Black population there quadrupled, from 74,249 to 294,914, while the number of majority-Black Senate districts has barely changed. Cooper ¶¶50, 58.

The concentrated growth of Black voters is borne out in the distribution of Black and white voters in the 2021 Maps. Around half of Black voters live in Black-majority districts, while 80% or more non-Hispanic white voters live in white-majority districts. Cooper ¶59. This pattern shows that, under the 2021 Maps, white voters are disproportionately more likely to form a numerical majority in their Senate and House Districts, and Black voters are substantially more likely to find themselves in the minority, where racially polarized voting patterns will usually prevent them from electing candidates of their choice. *See generally* Ex. B, Handley

---

[2] *See Vieth v. Jubelirer*, 541 U.S. 267, 286 n.7 (2004) (plurality opinion) ("'Packing' refers to the practice of filling a district with a supermajority of a given group …. 'Cracking' involves the splitting of a group … among several districts to deny that group … a majority in any of those districts.").

Report ("Handley") at 11-13. The resulting dilution of Black voting strength occurred in multiple regions across the State with large Black populations where the State could have drawn new majority-Black districts but opted not to do so.

### 1.   *Atlanta Metro Area*

In the Atlanta Metro Area, the State denied Black voters an opportunity to elect candidates of their choice in at least two State Senate districts and two House districts. In Senate District 16 under the 2021 Senate Map, Black voters in Fayette and Spalding Counties, both of which have seen double-digit growth in their Black populations (including massive, 50% growth in Fayette County), are combined with rural, majority white areas, resulting in a district that is under 23% Black. Cooper ¶77.[3] Meanwhile, adjacent Senate Districts 34 and 44, which include parts of Fayette and Clayton Counties (the latter being one of the State's largest), were drawn with Black populations of approximately 70% and 65%. Cooper ¶78. The State should have drawn a new Black-majority district in this area by "unpacking" the Black population in Senate Districts 34 and 44, and "uncracking" the growing Black population in Senate District 16 in Fayette and Spalding Counties. Cooper ¶78. It

---

[3] In discussing the percentage of a district's population that is Black, we refer to the BVAP metric unless otherwise noted. *See Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1291 (11th Cir. 2020) (affirming Section 2 violation shown through maps drawn using BVAP).

did not do so, thereby preventing Black voters in Senate District 16 from forming a cohesive community to elect candidates of their choice.

Senate District 17 under the 2021 Senate Map includes parts of Henry, Newton, and Walton Counties in the southeastern Atlanta Metro area. Cooper ¶80. Henry County's Black population has increased by almost 75% in the last decade, and Newton County's has increased by more than 45%. *Id.* But the State drew Senate District 17 as under 34% Black, negating the ability of the growing Black community in that area to elect candidates of its choice. *Id.* It did so while packing Black voters in neighboring Senate Districts 10 (over 70% Black) and 43 (almost 65% Black), which include parts of neighboring Rockdale County, as well as parts of Henry and Newton Counties. Cooper ¶81. Rockdale County's Black voting age population similarly increased by 53% over the last decade, and the county is majority Black. Cooper ¶80. The State should have drawn a new Black-majority district here too, by "unpacking" some of the Black population in Senate Districts 10 and 43 across Rockdale County and "uncracking" the Black population in Senate District 17 in Henry and Newton Counties. Cooper ¶81. But it did not do so.

In addition, the State denied Black voters an opportunity to elect their preferred candidates in at least two House districts in the area in and around Spalding, Clayton, and Henry Counties, i.e., in and around the area where House

7

Districts 74 and 117 were drawn in the 2021 House Map (and in the same burgeoning south Atlanta Metro area where Senate Districts 16 and 17 were drawn in the 2021 Senate Map). The State should have "unpacked" the Black population in neighboring districts like House District 78 (71.5% Black) and 116 (over 58% Black) and "uncracked" the Black populations in House Districts 74, 117, and 134, which include Henry and Spalding Counties. Cooper ¶112-15.  The State failed to draw these new Black-majority districts that would have allowed Black voters in these growing areas to elect candidates of choice.

### 2. *Augusta Area*

In the Augusta area, the State denied Black voters an opportunity to elect candidates of their choice in one State Senate district and at least one House district. Senate District 23 in the 2021 Senate Map lies near the city of Augusta in the "Black Belt" region, which historically had, and currently has, a large Black population. Cooper ¶¶16, 83; Ex. D, Burch Report ("Burch") 29-33. Senate District 23 includes outlying portions of Richmond County, as well as a number of surrounding counties like Burke, Jefferson, Warren, and Taliaferro. Neighboring Senate Districts 22 and 26 include parts of adjacent Black Belt counties with significant and growing Black populations. Cooper ¶25. The region overall has seen recent increases in the Black voting age populations and a decline in the white population. Cooper ¶¶51, 82. The

8

State should have drawn a new Black-majority Senate district by "unpacking" the Black population in Senate Districts 22 and 26 and "uncracking" the Black population in Senate District 23, thereby achieving a more even distribution in the Augusta region. Cooper ¶83. Because it chose not to, Senate District 23 has a Black voting age population under 36%, preventing Black voters in this area of the historic Black Belt from joining adjacent cohesive communities to elect candidates of their choice. Cooper ¶82.

The State should have drawn a new Black-majority House district in and around Augusta in the Black Belt region that includes Baldwin, Wilkinson, and Taliaferro Counties. These counties have substantial populations of Black voters who are currently included in non-majority-Black districts under the 2021 House Map. Cooper ¶¶116-17. The State should have "unpacked" the Black populations in neighboring Black-majority districts like House Districts 129 and 130 (both in Augusta entirely within Richmond County), and House Districts 128, 131, and 132; and "uncracked" the Black population in, for example, District 133 (which includes parts of Baldwin County) and House District 155 (which includes Wilkinson County). Cooper ¶¶116-17. In sum, the Illustrative House Map draws six Black-majority districts where the 2021 Plan draws five. Cooper ¶117.

### 3.     Southwest Georgia

The State denied Black voters an opportunity to elect candidates of their choice in at least one House district in the Black Belt in southwest Georgia. This area includes Dougherty, Mitchell, and Thomas Counties, where House Districts 171 and 173 in the 2021 House Map were drawn with Black populations under 40%. Cooper ¶118. The State's maps should have "unpacked" the Black population in nearby House District 153 (which includes the city of Albany and was drawn with a Black population of nearly 70%), and "uncracked" the Black populations in House Districts 171 and 173. Cooper ¶¶118-19. Overall, the Illustrative Maps show that a total of seven majority-Black House districts can be drawn in the southwest Georgia Black Belt region, but the 2021 House Map contains only six. Cooper ¶120.

### C.     **The 2021 Maps Continue Georgia's History of Subordinating Black Voters Like Plaintiffs**

The 2021 Maps, which functionally nullify the historic growth in Georgia's Black population over the past decade, continue a long history of denying Black Georgians the full political rights afforded to white citizens. The VRA was written to remedy such wrongs. *McCain v. Lybrand*, 465 U.S. 236, 243-44 (1984). That sweeping national reform was enacted to reverse the systematic disenfranchisement of the Jim Crow era—a period that, in Georgia, saw poll taxes, whites-only primaries, literacy tests, grandfather clauses, blatant ballot box stuffing, and racially

motivated murder used to suppress the political power of Black citizens, *see generally* Ex. E, Ward Report ("Ward") at 4-17—and usher in a new era of full political equality, *McCain*, 465 U.S. at 243-44. Congress made clear that "the purpose of the Voting Rights Act was not only to correct an active history of discrimination" in voting matters specifically, "but also to deal with the accumulation of discrimination" in other areas of life that have restricted Black political participation. *Thornburg v. Gingles*, 478 U.S. 30, 44-45 & n.9 (1986) (citation omitted).

Since its passage, the VRA has operated as a powerful tool for dismantling state and local policies that stymie political participation among racial minority groups. In particular, Section 2 of the VRA prohibits any redistricting scheme whereby members of a racial minority group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," 52 U.S.C. § 10301(b), without any need to show discriminatory intent. *Gingles*, 478 U.S. at 71.[4] Section 2 prohibits districting

---

[4] Section 5 of the VRA—prior to its functional termination by the Supreme Court in *Shelby County v. Holder*, 570 U.S. 529 (2013)—required states with the worst records of voting discrimination to obtain preclearance from the federal government to change any voting rules or processes. Georgia was designated as a covered jurisdiction subject to Section 5 preclearance, due to its long history of racially discriminatory practices and procedures in voting and elections.

schemes that result in vote dilution, i.e., when a cohesive minority population's voting strength is reduced, usually by "submerg[ing]" them in white majority areas and thereby impairing their ability to elect representatives of their choice. *Id.* at 68.

The 2021 Maps will dilute the votes of Black Georgians like Plaintiffs, who include individual voters from places like Henry and Fayette Counties in the Atlanta Metro area, Jefferson County near Augusta, and Thomas County in southwestern Georgia. *See* Exs. F-I. Plaintiffs also include the Nation's oldest Black fraternity, Alpha Phi Alpha, and one of the Nation's largest and oldest Black churches, the AME Church, whose members live in those affected areas. *See* Exs. J, K. These voters were drawn into white-majority districts under the 2021 Maps, but should have been included in additional majority-Black districts where they would have been able to join with other Black voters to elect candidates of their choice.

The Legislature's rushed 2021 redistricting process provided no real opportunity for Georgia's Black voters, like Plaintiffs, to meaningfully raise concerns with the 2021 Maps. Every town hall meeting convened by the State's Redistricting Committees was held *before* the August 2021 release of the key Census data that Georgia used to redraw districts, and well before any of the maps were even

proposed.[5] Less than two weeks after the 2021 Maps were released on November 2, 2021, the Legislature passed both largely on a party-line vote, and not a single legislator of color voted in favor.[6] Although a Section 2 claim does not require demonstrating discriminatory intent, the opaque and superficial process through which these maps were passed further undermines their legitimacy and illustrates the need for relief from this Court.

## ARGUMENT

A preliminary injunction shall issue if the moving party shows "(1) … a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

All four factors strongly weigh in Plaintiffs' favor. The maps violate Section 2 by diluting Black voting strength and undermining Black Georgians' equal

---

[5] *See* Georgia General Assembly, Meeting Archives, Senate Committee on Reapportionment and Redistricting, https://www.legis.ga.gov/committees/senate/140 (last visited January 2, 2022).

[6] *See* Georgia General Assembly, Votes on S.B. 1EX, https://www.legis.ga.gov/legislation/60894 (last visited January 2, 2022); Georgia General Assembly, Votes on H.B. 1EX, https://www.legis.ga.gov/legislation/60897 (last visited January 2, 2022).

participation in the political process; and the State has no legitimate interest in conducting elections using unlawful maps. Accordingly, this Court should enjoin the State's 2021 Maps.

## I. Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs can show that the State's 2021 Maps dilute the votes of Black Georgians in violation of Section 2 of the VRA. That analysis proceeds in two parts.

First, *Thornburg v. Gingles* sets forth three preconditions for determining whether a districting scheme may "impair minority voters' ability to elect representatives of their choice." 478 U.S. at 50-51; *see also* 52 U.S.C. § 10301(b); *Wright v. Sumter Cnty. Bd. of Elections & Registration (Wright II)*, 979 F.3d 1282 (11th Cir. 2020) (affirming finding of Section 2 violation). A plaintiff must first show that an affected racial minority group (here, Black voters) is "sufficiently large and geographically compact" to comprise a majority of the voting-age population in a district. *Gingles*, 478 U.S. at 50-51. Next, the racial minority group must be "politically cohesive," meaning group members tend to vote similarly. *Id.* at 51. A politically cohesive group of Black voters, for example, would be likely to elect Black-preferred candidates if drawn into a district with sufficient Black voting strength. *Id.* Finally, the racial majority group (typically, as here, white voters) must also vote as a bloc, such that Black-preferred candidates will typically be defeated

14

in the area under the challenged scheme. *Id.* In this Circuit, a plaintiff must also provide an illustrative remedial map to demonstrate that a remedy is feasible. *See, e.g.*, *Wright II*, 979 F.3d at 1302. Plaintiffs satisfy these requirements.

After demonstrating the *Gingles* preconditions, Plaintiffs must show that, based on the totality of the circumstances, the 2021 Maps result in an unequal opportunity for minority voters to participate in the political process and to elect representatives of their choosing. *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1342 (11th Cir. 2015). It is "the very unusual case in which a plaintiff can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Wright II*, 979 F.3d at 1304 (internal quotation marks omitted). In assessing the totality of the circumstances, courts consider a set of factors drawn from a Senate Judiciary Committee report accompanying the 1982 amendments to the VRA (the "Senate Factors"). *Id.* Courts "are not limited to considering solely these factors, and the factors are 'neither comprehensive nor exclusive.' Nor is there a requirement that 'any particular number of factors be proved, or that a majority of them point one way or the other.'" *NAACP*, 775 F.3d at 1342 (quoting *Gingles*, 478 U.S. at 45). The ultimate inquiry is whether, in light of all relevant considerations, the challenged districting scheme dilutes Black voting strength and "results in an unequal

opportunity for [Black] voters to participate in the political process and to elect representatives of their choosing." *Id.* As explained below, the balance of the Senate Factors weighs heavily in Plaintiffs' favor, too.

### A.   Plaintiffs Satisfy The *Gingles* Preconditions

#### 1. Gingles Precondition 1: At Least Seven Additional, Reasonably Compact Black-Majority Districts Can Be Drawn

"In a district line-drawing challenge, 'the first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice.'" *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399, 402 (2006). This requirement is satisfied where plaintiffs show that at least one additional reasonably compact, majority-Black district could be drawn beyond the number in the challenged map. *See Wright II*, 979 F.3d at 1304 (challenged map had two Black-majority districts, plaintiff's map featured three); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1343 (N.D. Ga. 2015) (granting preliminary injunction when illustrative map included additional majority-minority district). Courts assess compactness using a variety of metrics, including the "Reock" test, which compares the area in each district to a circle and assigns a value between zero and one, with one being the most compact. *Wright II*, 979 F.3d at 1308.

Here, expert demographer William Cooper's Illustrative Maps create

16

additional, reasonably compact, and majority-Black districts beyond those drawn by the State. *See* Cooper ¶¶7-8. As relevant here, the Illustrative Maps show that Georgia's Black population is sufficiently numerous and geographically compact to support at least three additional Senate districts that the State failed to draw, and at least four House districts that the State failed to draw, in the areas discussed *supra* 6-10. *See* Cooper ¶¶71, 106. The Illustrative Maps' Reock scores are in the same range of average compactness as the 2021 Maps. *See* Cooper ¶¶84-85, 121-23; Cooper Ex. S.[7] They also follow traditional redistricting principles, such as population equality, contiguity, maintaining political and geographical boundaries, protection of incumbents, and maintaining communities of interest. *See* Cooper ¶¶84-89, 121-28; *see also Davis v. Chiles*, 139 F.3d 1414, 1425 (11th Cir. 1998) (compactness found when proposed district is "consistent with traditional districting principles").[8]

Moreover, the majority-Black districts in the Illustrative Maps would give Black voters in the challenged House and Senate Districts the ability to elect

---

[7] Proposed districts do not need to have higher compactness scores than challenged districts in order to be sufficiently compact under *Gingles*. *See, e.g.*, *Covington v. North Carolina*, No. 1:15-CV-399, 2017 U.S. Dist. LEXIS 198313, at *36-40 (M.D.N.C. Dec. 1, 2017); *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1030 (E.D. Mo. 2016).

[8] Notably, these same principles were enumerated in the Legislature's redistricting guidelines prior to enacting the 2021 Maps. *See* Exs. L, M.

candidates of their choice, *see* Handley 12-13, and thus constitute a "proper remedy" for a VRA violation. *Wright II*, 979 F.3d at 1302.[9] Plaintiffs are therefore substantially likely to satisfy the first *Gingles* precondition.

### 2. *Gingles* Precondition 2: Black Communities Are Politically Cohesive in Those Areas Where the State Could Have Drawn Additional Black-Majority Senate and House Districts

The second *Gingles* precondition requires the protected group be "politically cohesive," which plaintiffs often demonstrate by "showing that a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 51, 56. Courts have repeatedly found Georgia's Black communities to be politically cohesive.[10] This case is no different.

Dr. Lisa Handley analyzed the connection between race, voting, and election

---

[9] In each of the Illustrative Districts subject to this motion, the Black-preferred candidate would have won statewide elections between 2018 and 2020 with an average of 66.1% of the vote in House District 73, 56.1% in House District 110, 53.5% in House District 144, and 53.8% in House District 153; and with at least 63.5% of the vote in Senate District 17, 51.9% in Senate District 23, and 59.2% in Senate District 28. *See* Handley 14-20.

[10] *See, e.g.*, *Wright II*, 979 F.3d at 1304 ("[B]lack voters in Sumter County were 'highly cohesive'" because in most elections "the overwhelming majority of African Americans voted for the same candidate"); *Askew v. City of Rome*, 127 F.3d 1355, 1377 (11th Cir. 1997) (observing that "both empirical and anecdotal evidence indicate that Rome[, Georgia's] black community is 'cohesive,'" in large part because "[t]he black community consistently ranks black candidates as their favorite candidates"); *Ga. State Conf. of the NAACP v. Georgia*, 312 F. Supp. 3d 1357, 1360 (N.D. Ga. 2018) ("[V]oting in Georgia is highly racially polarized.").

outcomes in the geographic areas where the Illustrative Maps draw additional Black-majority districts beyond the 2021 Senate and House Maps. *See generally* Handley 5-7. Dr. Handley used official data from 2016, 2018, and 2020 statewide election contests and 2020 Census data, and then employed three statistical techniques to estimate voting patterns: homogeneous precinct analysis, ecological regression, and ecological inference. Handley 2-4.[11] Dr. Handley then analyzed the five recent statewide election contests that included Black candidates, as well as the two U.S. Senate contests in which Jon Ossoff ran. Handley 5 n.4. In addition, Dr. Handley analyzed state legislative contests that included Black candidates. Handley 7.[12]

Dr. Handley's analysis demonstrates that the communities of Black voters in the areas where the State failed to draw additional Black-majority districts are politically cohesive. Black voters in these areas almost always vote for the same candidates, including in all of the recent general elections Dr. Handley analyzed.

---

[11] Courts have relied on all three methods and ecological inference has been called the "gold standard" for racially polarized voting analysis. *Wright v. Sumter Cnty. Bd. of Elections (Wright I)*, 301 F. Supp. 3d 1297, 1305 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020).

[12] Dr. Handley properly relies on data from both elections involving the districts at issue (endogenous elections) and elections outside those districts (exogenous elections). *See, e.g.*, *Wright II*, 979 F.3d at 1290-91, 1304; *Johnson v. Hamrick*, 296 F.3d 1065, 1077 & n.3 (11th Cir. 2002). Because courts have "read *Gingles* to allow flexibility in the face of sparse data," they have found exogenous data to be particularly probative when endogenous election data is sparse. *See Westwego Citizens for Better Gov't v. Westwego*, 872 F.2d 1201, 1209 n.11 (5th Cir. 1989).

Handley 7. That kind of "[b]loc voting by blacks tends to prove that the black community is politically cohesive" within the meaning of the second precondition. *Gingles*, 478 U.S. at 68. Indeed, Dr. Handley's analysis shows that in the seven statewide general elections examined, Black voters overwhelmingly supported a single preferred candidate—the average percentage of the Black vote received by the candidate of choice in these areas was between 65.3% and 99.6%. Handley app. A.[13] Further, each of the 24 biracial state legislative elections Dr. Handley analyzed were extremely racially polarized.[14] In all but one race, over 95% of Black voters supported the same candidate, a candidate who on average secured the support of less than 5% of white voters in Senate races and less than 9.5% of white voters in House races. Handley 7 & app. B. "[S]howing that a significant number of minority group members usually vote for the same candidates," as happened here across dozens of races over numerous years, suffices to satisfy the second *Gingles* precondition. *Gingles*, 478 U.S. at 56.

### 3. *Gingles* Precondition 3: Blocs of White Voters Prevent the Election of Black-Preferred Candidates in Those Areas Where the State

---

[13] These percentages refer to the ecological inference estimates in Appendix A of Dr. Handley's expert report.

[14] Courts may—as Dr. Handley has—"accord extra weight to campaigns involving minority candidates." *Hamrick*, 296 F.3d at 1078. In addition, because the third precondition is concerned with "larger trends," "a pattern of racial bloc voting that extends over a period of time"—which Dr. Handley has identified in the areas in question—"is more probative." *Id.* at 1074 (quoting *Gingles*, 478 U.S. at 57).

20

### Could Have Drawn Black-Majority Senate and House Districts

Under the third *Gingles* precondition, a racial "minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." 478 U.S. at 51 (citations omitted). In Georgia, white voters typically support the same candidate, and that bloc is usually large enough to defeat Black-preferred candidates for General Assembly.[15] Here, blocs of white voters in the areas where the State failed to draw additional Black-majority districts usually defeat the Black-preferred candidate, particularly in General Assembly elections involving Black candidates, which are the most probative under the third precondition. *Wright I*, 301 F.Supp.3d at 1314-18.

To determine the presence of decisive white bloc voting in the areas at issue here, Dr. Handley conducted multiple analyses. For one, she examined elections in certain prior plan districts that overlap with the Black-majority districts the State

---

[15] *See, e.g.*, *Wright II*, 979 F.3d at 1304 (third precondition met when in the "most probative" elections in Sumter County, "white residents voted as a bloc to defeat the black-preferred candidate"); *NAACP*, 775 F.3d at 1340 (observing that because "non-African-American voters preferr[ed] white candidates" "no African-American candidates had ever been elected" to the offices in question); *Hall v. Holder*, 117 F.3d 1222, 1229 (11th Cir. 1997) ("Racial bloc voting by the white majority usually suffices to keep black citizens out of office.").

should have drawn (and that Plaintiffs' Illustrative Maps do draw). *See* Handley 8-13. Her analysis shows that white bloc voting in these areas has usually defeated Black-preferred candidates in the past. Specifically:

*Eastern Atlanta Metro Region:* In and around Illustrative Senate District 17, white voters consistently joined together to defeat Black-preferred candidates. For example, prior Senate District 17, which substantially overlaps with Illustrative Senate District 17 in Henry County, elected candidates in 2016, 2018, and 2020 supported by nearly all white voters and essentially no Black voters. Handley 6, 9.

*Southern Atlanta Metro Region:* In and around Illustrative Senate District 28, white voters consistently joined together to defeat Black-preferred candidates. For example, in the 2020 election in prior Senate District 16, which overlaps with Illustrative District 28 in Fayette and Spalding Counties, 90% of white voters supported the victorious candidate while over 90% of Black voters supported the unsuccessful one. Handley 6, 10. The white-preferred candidate in prior District 16 also won in a racially polarized election in 2018. Handley 9 n.10.

*Black Belt Near Augusta:* In and around Illustrative Senate District 23, white voters consistently joined together to defeat Black-preferred candidates. In the only recent contested election in prior Senate District 23, which overlaps with Illustrative District 23 in Burke and Jefferson Counties, among others, over 90% of white voters

supported the victorious white candidate, and Black voters overwhelmingly supported the losing Black candidate. Handley 6, 10.

*Southeastern Atlanta Metro Region:* In and around Illustrative House Districts 73 and 110, white voters consistently joined together to defeat Black-preferred candidates. In the two recent contested elections in prior House District 73—which overlaps with Illustrative District 73 in Spalding and Henry Counties—the white-preferred candidate defeated the Black-preferred candidate in racially polarized elections. Handley 6, 10 & n.11. Notably, a Black candidate lost the 2016 election despite garnering nearly all of the Black vote because a sufficient number of white voters coalesced around another candidate. Handley 10. Similarly, in prior House District 130—which substantially overlaps with Illustrative District 110 in another portion of Spalding and Henry Counties—the only recent contested election occurred in 2020, and white voters overwhelmingly supported the winner; Black voters overwhelmingly supported the losing Black candidate. Handley 10.

*Central Georgia:* In and around Illustrative House District 144, white voters consistently joined together to defeat Black-preferred candidates. In the last two contested elections in prior District 145, which overlaps with Illustrative District 144 in Baldwin County, the Black candidate lost to the white-preferred candidate despite overwhelming support from Black voters. Handley 7, 10-11.

*Southwest Georgia:* In and around Illustrative House District 153, white voters consistently joined together to defeat Black-preferred candidates. For example, in prior District 173, which overlaps with Illustrative House District 153 in Mitchell County, blocs of white voters defeated Black candidates preferred by upwards of 96% of Black voters in 2016 and 2020. Handley 7 app. B. In both races, the white-preferred, winning candidates secured more than 90% of the white vote.[16]

Second, Dr. Handley also conducted a recompiled district analysis to analyze if the overlapping districts in the same areas of interest from the 2021 Maps would provide Black voters an opportunity to elect their candidates of choice.[17] *See* Handley 11-13. That analysis showed that the relevant districts in the 2021 Maps— such as Senate District 17 and House Districts 74 and 117 in south Metro Atlanta, Senate District 23 in the Augusta area, and House District 171 in Southwest Georgia—will not perform for Black voters as the State drew them. Handley 14-20.

In other words: Blocs of white voters usually defeated Black-preferred

---

[16] Statewide races further support these conclusions; in all but the extraordinary circumstances of the most recent elections—which determined control of the U.S. Senate and were conducted during a global pandemic—white and Black voters overwhelmingly supported different candidates, and white voters coalesced in sufficient numbers to elect their preference. Handley app. A.

[17] Recompiled district analysis applies the boundaries of a new or hypothetical district (here, those drawn in the 2021 Maps) to past election results, in order to analyze the election performance of the new district. *See* Handley 11.

candidates in the prior plan districts located in the areas of interest here, and blocs of white voters will continue usually to defeat Black-preferred candidates in the corresponding districts under the 2021 Maps. Yet the State could and should have drawn Black-Majority districts in those same areas, allowing tens of thousands more Black voters to elect candidates of their choice rather than being swamped by white bloc voting. Plaintiffs are substantially likely to establish the third *Gingles* precondition.

### 4.  Plaintiffs' Remedial Maps Prove That a Remedy Is Feasible

Plaintiffs must also "demonstrate the existence of a proper remedy," and are substantially likely to do so here. *Wright II*, 979 F.3d at 1302 (citation omitted). Plaintiffs' Illustrative Maps feature seven additional Black-majority Senate and House Districts. These maps accurately reflect the growth of the Black voting age population in Georgia and would remedy the unlawful vote dilution caused by the 2021 Maps. Cooper ¶¶71, 106, Exhibit N-1, Exhibit Z-1.

### B.  Plaintiffs Will Prove That The Challenged Maps Dilute Black Voting Strength

The State's failure to draw additional Black-majority districts denies Black Georgians like Plaintiffs and those they represent the ability to elect candidates of their choice—a conclusion supported by the balance of the relevant Senate Factors

that weigh heavily in Plaintiffs' favor. *LULAC*, 548 U.S. at 425-26.[18] Based on a "[s]earching practical evaluation of the past and present reality," and a "'functional' view of the political process," *Gingles*, 478 U.S. at 45 (citation omitted), Black Georgians in the areas in and around the challenged districts "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," *LULAC*, 548 U.S. at 425.

## 1. Georgia Has a Long History of State-Sanctioned Discrimination and Political Violence Against Black Voters

Senate Factor One recognizes that a history of discrimination and the accumulation of such discrimination has resulted in continued "diminished political influence and opportunity" for Black citizens, supporting a finding of a VRA violation. *Cofield v. City of LaGrange*, 969 F. Supp. 749, 757 (N.D. Ga. 1997). That Georgia weaponized the law against Black voters since the end of slavery is indisputable; this history "has been rehashed so many times that the Court can all but take judicial notice thereof." *Wright I*, 301 F. Supp. 3d at 1310 (quoting *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994)). For decades, Georgia instituted mechanisms to dilute the voting power of Black Georgians— including well after the passage of the VRA. *See, e.g.*, Ward 7, 8, 11, 15-16; *See*

---

[18] Senate Factor 4—the exclusion of members of the minority group from candidate slating processes—does not apply to the claims raised by Plaintiffs.

Ex. C, Jones Report ("Jones") 9-12; *Georgia v. United States*, 411 U.S. 526 (1973); *Busbee v. Smith*, 549 F. Supp. 494, 499-500 (D.D.C. 1982), *aff'd mem.* 459 U.S. 1166 (1983). These *de jure* political restrictions were accompanied by constant political violence as a tool to cement white dominance in the political arena. An organized campaign of violence and intimidation involving massacres, assassinations, lynching, and arson prevented and discouraged Black voters from participating in the political process at least until the 1960s. *See* Ward 4-17.

## 2.  Voting in Georgia Is Highly Racially Polarized

The second Senate Factor recognizes that in an environment characterized by racially polarized voting, politicians can manipulate elections to "minimize or cancel out [minority voters'] ability to elect their preferred candidates." *United States v. McGregor*, 824 F. Supp. 2d 1339, 1346 (M.D. Ala. 2011) (quoting *Gingles*, 478 U.S. at 48). As discussed above, courts in this Circuit have repeatedly recognized the high degree of racially polarized voting in Georgia. *See supra* 18 n.10. Racially polarized voting was apparent in the 2020 U.S. Senate general elections, the 2021 U.S. Senate runoff elections, the 2018 gubernatorial race, and the 2018 contests for Commissioner of Insurance and School Superintendent. *See* Handley app. A; *supra* 20. Moreover, the chair of the Senate committee who drew the 2021 Senate Map conceded, "based on the pattern of Georgia, that we do have racially polarized voting

27

in Georgia."[19]

### 3. Georgia Uses Practices or Procedures That Undercut Black Voters' Ability to Participate in Politics and Elect Candidates of Choice

Under the third Senate Factor, voting practices and procedures "that have discriminatory results [and] perpetuate the effects of past purposeful discrimination," S. Rep. at 40, support a VRA violation. In recent election cycles, Georgia officials have purged millions of voters from voter rolls, closed precincts in Black-majority districts, imposed at-large voting systems for local government and school board elections, and implemented other practices and procedures that dilute Black Georgians' voting power. *See* Jones 9-27.[20] Additionally, recently enacted S.B. 202 contains several pernicious provisions that demonstrate it is yet another

---

[19] November 4, 2021 Meeting of Senate Committee on Reapportionment & Redistricting, Hearing on S.B. 1EX, 2021 Leg., 1st Special Sess. (2021) (statement of Senator John F. Kennedy, Chairman, S. Comm. Reapp. & Redis. at 1:00:44 – 1:01:01), https://tinyurl.com/mu8v4sf6.

[20] *See also, e.g.*, *NAACP*, 950 F. Supp. 2d at 1316 (numbered posts, residency requirements, staggered terms, and majority vote requirement impaired Black candidates' potential for electoral success), *aff'd in part, vacated in part, rev'd in part*, 775 F.3d 1336, 1343–44 (11th Cir. 2015); *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1222, 1235 (11th Cir. 2000) (en banc) ("the majority vote requirement … can enhance the possibility of discrimination against black voters in Liberty County"); *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1570 (11th Cir. 1984) (short window of hours for voters to register, Board of Registrars meeting only in county seat, and not in more rural areas, and having few Black poll officials and spurning offers of Black voters to serve as deputy registrars, "unquestionably discriminated" against Black voters).

installment in Georgia's long history of devices impairing the franchise.[21]

### 4. Black Georgians Face a Severe Burden of Discrimination and Disparities in Related Spheres of Life

The fifth Senate Factor recognizes that disparities in education, employment, and other related areas of life that arise from past discrimination depress minority political participation and hinder minorities' ability to participate effectively in the political process. *See, e.g.*, *White v. Regester*, 412 U.S. 755, 768 (1973); S. Rep. at 29 n.114. Black Georgians bear the effects of centuries of discrimination and inequality not only in the electoral process but in countless other areas of life. Black Georgians have poverty rates more than double those of non-Hispanic whites,[22] and suffer disparities in health access and outcomes,[23] involuntary residential mobility,[24] and employment.[25] Black Georgians also face continued segregated and unequal education,[26] discrimination in housing and lending and residential segregation,[27] and

---

[21] *See, e.g.*, Nick Corasaniti & Reid J. Epstein, *What Georgia's Voting Law Really Does*, N.Y. Times (Apr. 2, 2021), shorturl.at/irAMS; Erica Thomas, *Georgia's New Voting Restrictions Are a Step Back Into Our State's Dark History*, Time (Mar. 31, 2021, 4:50 PM), shorturl.at/bduE9.

[22] *See* Burch at 11-12.

[23] *See* Burch at 23-25.

[24] *See* Burch at 13-14.

[25] *See* Burch at 11-13.

[26] *See* Burch at 8-10.

[27] *See* Burch at 13-23.

disproportionate treatment in the criminal justice system.[28] These disparities result from policy choices, such as school segregation and redlining, intended to deprive Black Georgians of the benefits accorded to whites. Burch 9 n.1, 20-23. This "clear evidence of present socioeconomic or political disadvantage resulting from past discrimination" means Plaintiffs need not prove their disparities reduce political participation, *Marengo Cnty. Comm'n*, 731 F.2d at 1568-69, but there is robust evidence that they interfere with political participation. *See* Burch 5-6.

### 5.  Racial Appeals Are Used by Political Campaigns in Georgia

Under Senate Factor Six, the persistence of political campaigns characterized by overt or subtle racial appeals impairs the ability of Black voters to participate equally in the political process. *Gingles*, 478 U.S. at 80. Racial appeals in Georgia politics did not die in the Jim Crow era—they feature in recent elections and evoke the same rhetoric used to support disenfranchisement in the past. *See* Ward 19-21. For example, in 2005, State Representative Sue Burmeister complained that Black voters in her district's Black-majority precincts only showed up at the polls when they were "paid to vote." Ward 19. This rhetoric—aimed at delegitimizing the Black vote—resembles racist language from over a century ago.[29] In 2009, Nathan Deal, a

---

[28] *See* Burch at 25-28.

[29] *See* Ward at 6 (describing 1888 speech referring to Black Georgians as "a vast mass of impulsive, ignorant, and purchasable votes" as white supremacist rhetoric).

former Congressman who was elected Governor in 2010, ridiculed criticism of voter identification as "the complaints of ghetto grandmothers who didn't have birth certificates." Ward 19. These are but two examples demonstrating that the use of racial appeals to influence voter behavior continues. *See generally* Jones 27-31.

### 6. Georgia's State Government Lacks Black Representation

Senate Factor Seven concerns the extent to which Black candidates are elected to public office, which "contextualizes the degree to which vestiges of discrimination continue to reduce [Black] participation in the political process." *Veasey v. Abbott*, 830 F.3d 216, 261 (5th Cir. 2016) (en banc). Black candidates have historically struggled to win elections in Georgia state government. *See* Jones 32-34. Georgia has never had a Black governor or lieutenant governor, and only two Black candidates have been elected to non-judicial statewide office in Georgia's 233-year history. Jones 32. Moreover, the specific areas in which the Illustrative Maps draw new Black-majority districts have largely failed to elect Black General Assembly candidates going back at least 15 years. *See* Jones 35-38.  Such area and office-specific evidence is especially powerful. *See Wright II*, 979 F.3d at 1305-06.

### 7. Elected Officials Are Unresponsive to the Concerns of Black Georgians

The unresponsiveness of elected officials to Black voters' needs sheds light on the extent to which Black voters are denied access to the political process.

*Gingles*, 478 U.S. at 45; S. Rep. at 29. The persistent disparities in socioeconomic status, health outcomes, and felony disenfranchisement in Georgia demonstrate the lack of responsiveness of public officials to the particularized public policy needs of Black Georgians. *See* Burch 5, 28. Consistent with these policy shortcomings, Black Georgians are on average less satisfied with their public officials, the direction of the State, and the quality of services they receive than are white Georgians. *See* Burch 5, 28. A recent example of disregarding Black Georgians' concerns is the passage—without the support of a single Black legislator—of S.B. 202 in March 2021. S.B. 202 controversially instituted, among other things, radical changes to election administration in counties with large Black communities. It was unanimously decried by civil rights groups, civic institutions serving the Black community, and political leaders of the Black community as an unwarranted burden on the right to vote that will disproportionately fall upon Black voters. The passage of S.B. 202 is a notable example that elected officials will continue to ignore the concerns of Black Georgians.

### 8. The Legislature's Justification for the Enacted Maps Is Tenuous

Under the ninth Senate Factor, demonstration of a tenuous justification for a voting policy or procedure supports a finding of a VRA violation. *Gingles*, 478 U.S. at 45; S. Rep. at 29. Here, the November 4, 2021 Senate hearings exposed the

tenuousness of the Legislature's rationale for the 2021 Maps. Asked to justify the makeup of their proposed districts, the chair of the Senate committee who drew the 2021 Senate Map described Black-majority districts as "VRA district[s]" and stated that if a district was previously a "VRA district," then they "maintained it" as a VRA district.[30] Said otherwise, regardless of the massive growth of the Black voting age population, the General Assembly drew new maps intending only to maintain existing majority-minority districts. Despite awareness of the maps' shortcomings, the Redistricting Committees jammed them through the legislative process within days, without considering alternatives, and did not allow the public to meaningfully review and comment on the proposed maps.[31]

## II.    Plaintiffs Will Suffer Irreparable Injury Without Injunctive Relief

Because the 2021 Maps dilute the voting strength of Black Georgians in violation of the VRA, Plaintiffs will be harmed in the absence of injunctive relief. *See NAACP*, 118 F. Supp. 3d at 1347-48. Such injury is irreparable because "it cannot be undone through monetary remedies," *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (citation omitted), and courts in this Circuit have repeatedly

---

[30] *See supra* 28 n.19 (statements of Senator John F. Kennedy, Chairman, S. Comm. Reapp. & Redis. at 30:17–30:28; 31:57–32:12; 35:42–36:31; 36:59–37:09; 37:45–37:59; 38:10–38:40; 42:06–42:18).
[31] *See supra* 12-13.

found that conducting elections that would infringe voting rights results in irreparable injury.[32] Here too, Plaintiffs will suffer irreparable harm if elections are conducted pursuant to the 2021 Maps because those schemes dilute Black Georgians' votes in violation of the VRA. No amount of money can undo the harm caused by vote dilution. *See NAACP*, 118 F. Supp. 3d at 1347-48 ("Given the fundamental nature of the right to vote, monetary remedies would obviously be inadequate in this case; it is simply not possible to pay someone for having been denied a right of this importance.").

## III. The Balance of Hardships Favors Issuing a Preliminary Injunction

Conducting the 2022 elections using the unlawful 2021 Maps would irreparably harm Plaintiffs, outweighing any burden an injunction might impose upon the Defendant. The requested injunction would not necessarily require the Defendant to postpone the dates of the 2022 primary election, let alone the general election. Primary elections will occur on May 24, with the general election scheduled for November 8. These elections are months away, which is sufficient time to implement a new map. Only the March 11 deadline for candidates to qualify for the

---

[32] *See, e.g.*, *Crumly v. Cobb Cnty. Bd. of Elections & Voter Registration*, 892 F. Supp. 2d 1333, 1344 (N.D. Ga. 2012); *Charles H. Wesley Educ. Found. v. Cox*, 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004); *aff'd*, 408 F.3d 1349 (11th Cir. 2005); *accord Adamson v. Clayton Cnty. Elections & Registration Bd.*, 876 F. Supp. 2d 1347, 1358 (N.D. Ga. 2012).

primary and general elections may require alteration. But as this Court has recognized in a similar case, any "additional effort" the State must expend to implement a new map is outweighed by harm to the fundamental right to vote. *NAACP*, 118 F. Supp. 3d at 1348. Further, any administrative burdens that the State may claim will result from an injunction "cannot begin to compare with the further denial of [Plaintiffs'] right[] to full and equal political participation." *Dillard*, 640 F. Supp. at 1363.

Nor would implementing maps be "impossible or unduly burdensome" for the State. *Id.* The 2021 Maps were passed in less than two weeks, and the General Assembly is set to reconvene on January 10, 2022. It can easily expedite the process by consulting or adopting the Plaintiffs' Illustrative Maps.

## IV.   Injunctive Relief is in the Public Interest

"Where, as here, Plaintiffs have established a substantial likelihood of success on the merits," courts have repeatedly held that "the public interest is best served by … ensuring that all citizens … have an equal opportunity to elect the representatives of their choice." *NAACP*, 118 F. Supp. 3d at 1348-49. Enjoining the unlawful 2021 Maps would protect that equal opportunity.

## <u>CONCLUSION</u>

For these reasons, the Court should grant Plaintiffs' renewed motion for a preliminary injunction and enjoin Defendant from holding elections using the 2021 Maps.

This 13th day of January, 2022.

Respectfully submitted,

/s/ *Sean J. Young*
Sean J. Young (Bar 790399)
*syoung@acluga.org*
Rahul Garabadu (Bar 553777)
*rgarabadu@acluga.org*
ACLU FOUNDATION OF
GEORGIA, INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

/s/ *Debo Adegbile*
Debo Adegbile (*pro hac vice*)
*debo.adegbile@wilmerhale.com*
Robert Boone**
*robert.boone@wilmerhale.com*
Alex W. Miller (*pro hac vice*)
*alex.miller@wilmerhale.com*
Maura Douglas*
*maura.douglas@wilmerhale.com*
Eliot Kim*
*eliot.kim@wilmerhale.com*

/s/ *Sophia Lin Lakin*
Sophia Lin Lakin (*pro hac vice*)
*slakin@aclu.org*
Ari J. Savitzky*
*asavitzky@aclu.org*
Jennessa Calvo-Friedman (*pro hac vice*)
*jcalvo-friedman@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

George P. Varghese*
*george.varghese@wilmerhale.com*
Denise Tsai*
*denise.tsai@wilmerhale.com*
Tae Kim*
*tae.kim@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

36

WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

Anuradha Sivaram (*pro hac vice*)
*anuradha.sivaram@wilmerhale.com*
Edward Williams*
*ed.williams@wilmerhale.com*
Ericka Aiken*
*ericka.aiken@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Facsimile: (617) 526-5000

Charlotte Geaghan-Breiner*
*charlotte.geaghan-breiner@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
(650) 858-6000 (t)
(650) 858-6100 (f)

*Attorneys for Plaintiffs*

*Pro Hac Vice Pending
**Pro Hac Vice Forthcoming

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1</u>

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, using a font type of Times New Roman and a point size of 14.

*/s/ Rahul Garabadu*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day caused to be served the foregoing ***Plaintiffs' Memorandum of Law in Support of Their Renewed Motion for a Preliminary Injunction*** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel or parties of record on the service list:

This 13th day of January, 2022.

*/s/ Rahul Garabadu*