# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**

**ATLANTA DIVISION**

ALPHA PHI ALPHA FRATERNITY INC., et al.;

       *Plaintiffs*,

       vs.

BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia.

       *Defendant*.

Case No. 1:21-cv-05337-SCJ

**DECLARATION OF DR. JASON MORGAN WARD**
**PRELIMINARY REPORT**

**January 6, 2022**

# TABLE OF CONTENTS

I. SUMMARY OF OPINIONS ...................................................................................1

II. BACKGROUND AND QUALIFICATIONS ............................................................2

III. MATERIALS REVIEWED ....................................................................................2

IV. DISCUSSION

    Introduction……………………………………………………...………..……..……..2

    Emancipation, Reconstruction, and "Redemption"…………..……...……………..…..4

    Redemption's Incomplete Victory and the Push for Black Disfranchisement…………......6

    The Politics of Mob Violence and Historical Memory………………………………......8

    The Nationalization of Civil Rights and the End of "the White Man's Party"…………...11

    White Resistance to the Voting Rights Revolution…………………………..…….......13

    Race, Redistricting, and the Rise of Republican Georgia…………………..……......17

    Racial Appeals, Voter Suppression, and Twenty-First Century Political Violence…..…...19

V. CONCLUSION ....................................................................................................21

VI:  APPENDICES

    Curriculum Vitae……………………………………………………………...…..22

    Reliance Materials…………………………………………………………..…..31

## I. SUMMARY OF OPINIONS

My name is Jason Morgan Ward. I am Professor of History at Emory University. I have been retained by the plaintiffs in this litigation to prepare a report on the history of voter intimidation, racial violence, and racial appeals in Georgia from the end of the Civil War to the present. My report focuses on the role of racial intimidation, violence, and rhetoric in suppressing the political participation and undermining the voting rights of Black Georgians. I am being compensated for my work at a rate of $250 per hour, in addition to reasonable expenses for my services. My compensation is not contingent on the analysis and opinions offered or on the outcome of this litigation. Based on my professional training, historical expertise, and review of the research materials summarized below, it is my opinion that:

- Georgia has a long history of state-sanctioned discrimination against Black voters that extended beyond written law to harassment, intimidation, and violence. Voter intimidation and racial violence in Georgia has increased in historical moments where defenders of white political control perceived their power to be threatened. Historically, the threat of violence has consistently served as a precursor to restrictions on voting but also as a rationale for those policies.

- Racial appeals, both overt and subtle, have characterized political campaigns and advocacy for voting restrictions since the end of the Civil War. This pattern persists into the present. In Georgia, racial appeals have evolved from overt and inflammatory rhetoric in the Reconstruction, Jim Crow, and civil rights eras to an intentionally coded language that conflates Black voting with urban politics, the welfare state, federal intervention, and electoral corruption.

- Voter suppression tactics have evolved as well, but the history of racial violence, intimidation, and appeals is not a linear story of progress and refinement. Georgia Democrats in the late-nineteenth and early-twentieth century murdered political adversaries, but they also pioneered an array of voter restrictions—including poll taxes, literacy tests, and exemption clauses—that survived legal challenges precisely because they intentionally avoided mention of race. In response to the voting rights reforms and renewed Black political participation by the middle of the twentieth century, state and local officials utilized legal maneuvers and bureaucratic tactics like purges and challenges that closely resemble present-day voter suppression.

- Disfranchisement and vote dilution are racial, but they are also spatial. Redistricting emerged as a favored tactic of advocates of voting restrictions in the decades after the demise of the county-unit system, a distinct Georgia institution that diluted urban voting strength by assigned electoral votes ("units") in party primaries of two, four, and six to rural, town, and city counties. This system inflated the power of rural counties—which possessed two-thirds the voting power of urban counties despite their much smaller populations—and entrenched political power in rural Georgia. That spatial dynamic persists in efforts to discredit and dilute the electoral power of the state's growing metropolitan areas via legislative redistricting.

1

## II.  BACKGROUND AND QUALIFICATIONS

I am currently employed as Professor and Director of Graduate Studies in the Department of History at Emory University. I received a B.A. (2001) in history, with highest honors, from Duke University (2001), and an M.A. (2005), M.Phil. (2006), and Ph.D. (2008), all in history, from Yale University.

I specialize in the history of the modern United States, with a focus on the American South, politics, civil rights, and racial violence. I have published book-length studies on the history of racial violence in the twentieth-century South and the politics of white supremacy and racial segregation in the mid-twentieth century. My 2011 book, *Defending White Democracy: The Making of a Segregationist Movement and the Remaking of Racial Politics, 1935-1965,* required extensive research in Georgia's political history. In addition, I have published peer-reviewed articles and book chapters on the South's relationship with the federal government, white supremacist violence, and the role of the historical memory of Reconstruction in twentieth-century southern politics. In total, I have published two books, eleven chapters and articles, and numerous shorter essays and reviews.

I present regularly to academic and lay audiences, and I have provided commentary on racial politics, racial violence, and civil rights for *CNN, New York Times, Washington Post, Los Angeles Times, Atlanta Journal-Constitution*, and *The American Historian.* I have taught undergraduate and graduate courses in my area of specialization for fourteen years. I have attached a detailed record of my professional qualifications in the attached curriculum vitae, which I prepared and know to be accurate.

## III. SOURCES AND MATERIALS REVIEWED

In preparing this report, I have consulted a broad range of sources on politics, civil rights, voter intimidation, and racial violence in Georgia, from the end of the Civil War to the present. Sources that I have consulted include: published works by historians and other scholars, historical newspapers, state and federal government records, published reports from state and federal agencies, and the papers of historical figures and organizations.

## IV. DISCUSSION

### Introduction

The purpose of this report is to outline the history of racial violence, intimidation, and appeals, and their relationship to politics in Georgia since the Civil War. Since the constitutional revolution of the Reconstruction era, which defined newly emancipated Black Georgians as citizens of the United States with suffrage and civil rights, those seeking to limit Black voting have consistently utilized violence, intimidation, and racial appeals in response to perceived and actual threats to their political power. This report will highlight pivotal moments in the evolution of racial politics and white resistance to racial change, with a focus on the connection between rhetoric, action, and policy in the history of voter intimidation, suppression, and dilution.

2

The history of voter intimidation and disfranchisement in Georgia and across the South reveals the power of racial rhetoric but also its malleability. Those who have sought, and fought, to limit the franchise since the extension of equal protection and prohibitions on discrimination in the wake of the Civil War have shifted identities and affiliations. Like party affiliations, the rhetorical justifications for voter suppression have evolved. Regardless of these shifts in political identity and language, attempts to limit the franchise have consistently revolved around race and, more specifically, the civic fitness of Black Americans and other racial and ethnic minorities for equal protection and participation in Georgia's governance.

In the century between Civil War and Civil Rights, those seeking to limit voting rights experimented with a range of political strategies, policy solutions, and extralegal methods, many of which appeared at first glance to be ostensibly nonracial despite their demonstrably racial motives and results. Georgia, arguably more than any other southern state, reflects the broad range of strategies that politicians of all stripes employed to restrict Black voting rights as well as the variety of rhetorical strategies they used to justify this political agenda. Few states were as systematic and comprehensive in their attempts to deny the franchise to Black citizens, and thus it is no surprise that Georgia's history of voter intimidation and racial violence rivals that of its most notorious counterparts.

Beyond overt racial appeals, this report highlights two consistent patterns of political rhetoric and mobilization to fuel violent resistance to Black politics and justify policy initiatives aimed at neutralizing the threat it posed to white dominance. The first of these patterns is the connection that defenders of white political control have drawn between local and national politics, which from the antebellum era to contemporary voting rights struggles has centered on the power of the federal government to intervene in local affairs to ensure equal protection and civil rights. Consistently, when local and state officials in Georgia have perceived seemingly distant and abstract political developments as threats to the racial status quo, inflammatory rhetoric, intimidation, and violence increased in response.

A second consistent and distinguishing feature of Georgia's history of racial politics and violence is the exploitation of the rivalry between rural and urban—particularly the Atlanta metropolitan area. As demonstrated by the 1906 Atlanta riot that precipitated a wave of disfranchisement measures two years later, the implementation of a county-unit system that diluted urban political power and a moderating influence on state politics, and a persistent rhetorical strategy that equates urban politics with corruption and malfeasance, advocates of voting rights restrictions in Georgia have gone to greater lengths than their counterparts in other southern states to undermine and delegitimize urban political power.

That their primary target, Atlanta, is the modern South's most populous and most multicultural metropolitan area only underscores that symbolic and strategic importance of the urban/rural divide in Georgia's racial politics. By the 1950s, the urban "bloc" vote had become the stand-in for the "Black" vote among voting rights opponents, and they have consistently targeted Georgia's cities with voter suppression and dilution tactics in the decades since. With the demise of the county unit system, redistricting became the primary battleground for diluting the power of Black voters.

3

**Emancipation, Reconstruction, and "Redemption" (1865-1877)**

The emancipation of enslaved Black Georgians and the extension of civil rights and protections via the "Reconstruction Amendments" to the United States Constitution (the Thirteenth, Fourteenth, and Fifteenth Amendments) revolutionized politics in a state whose constitution had previously barred all Black men—free or enslaved—from voting. In the first two years following Confederate surrender, Georgia's white legislators resisted this constitutional revolution by voting nearly unanimously to reject the Fourteenth Amendment in 1866 and, two years later, to expel twenty-nine newly elected Black Republican legislators from the General Assembly. The next year, the Republican governor presided over the white-majority legislature's rejection of the Fifteenth Amendment. Georgia's defiance, expressed through political channels and an increasing barrage of violence, prompted the federal government to resume military occupation of the state by the end of 1869.

Beyond the legislature, the newly established Ku Klux Klan, a terrorist wing of the Conservative-Democratic coalition led by ex-Confederate general John B. Gordon, engaged in a spree of political assassinations and massacres aimed at Black Georgians and their white Republican allies. Others joined in the violence and intimidation unmasked. In anticipation of the 1868 campaign season, Georgia Democrats called on their supporters to "clean up their muskets, rifles, and shot guns."[1] On September 15, an armed band of white supporters in Camilla opened fire on a mostly Black group of marchers who had entered the town to stage a Republican political rally. The Camilla Massacre claimed as many as a dozen Black victims, several of whom died at the hands of white attackers who pursued fleeing marchers and summarily executed wounded defenseless Black marchers they encountered. The notorious event not only depressed Republican turnout in Black-majority southwest Georgia, but also emboldened white Democrats to stuff ballot boxes, throw out Republican votes, and step up their anti-Reconstruction rhetoric.[2]

The upsurge in violence and corruption during the 1868 campaign season—a presidential election year—illustrated not only the political calculus of racial violence but also the connection between local and national politics. The violence served not only to demoralize and depress support for Reconstruction in Georgia and beyond, but also to demonstrate the illegitimacy of Georgia's interracial coalition government and its inability, despite federal support, to maintain order and keep people safe. In the words of a former Confederate officer, the Klan's terror campaign had a clear political objective: "to defy the reconstructed State Governments, to treat them with contempt, and show that they have no real existence."[3]

The violence in Georgia and throughout the South inspired an unprecedented effort by the federal government to enforce voting rights and root out Klan terrorists, a campaign spearheaded by the nation's first attorney general—white Georgia Republican Amos Akerman. However, persistent racial violence and voter intimidation in Georgia not only resulted in a relatively swift reestablishment of white Democratic control following the midterm elections in 1870, but also provided a blueprint for other southern states to resist Reconstruction. Recurrent violence during the 1872 elections demonstrated that Democrats would consolidate their control through force.

---

[1] Carole Emberton, *Beyond Redemption: Race, Violence, and the American South After the Civil War* (Chicago: University of Chicago Press, 2013), 138.
[2] Lee W. Formwalt, "The Camilla Massacre of 1868: Racial Violence as Political Propaganda," *The Georgia Historical Quarterly* 71, no. 3 (Fall 1987): 399-426.
[3] Eric Foner, *A Short History of Reconstruction, 1863-1877* (New York: Harper Perennial, 1990), 191.

4

"Burke County, with an actual Republican majority of 1,500," *Harpers Weekly* reported, "has been Ku-Kluxed into showing a Democratic majority of 800." Elsewhere, gun-wielding vigilantes and "sabre clubs" patrolled roads and polling places to depress Black turnout.[4]



Courtesy Harpers Weekly, 19 October, 1872.

Racial violence and voter intimidation during Reconstruction demonstrated a pattern that persisted in subsequent political struggles over Black politics. In terms of strategy and tactics, Georgia frequently led the way. At other times, Georgia followed the blueprint laid out by its southern "sister" states. In all cases, disfranchisement was simultaneously a coordinated regional effort and a struggle that played out differently from state to state.

That interplay between state, region, and nation helps explain Georgia's active role in the struggle to end Reconstruction and undermine interracial politics after 1871. In neighboring South Carolina, a coalition of Black and white Republicans retained control until 1876, a presidential election cycle that culminated in the formal end of Reconstruction. That summer, just across the river from Augusta, white vigilantes followed the blueprint laid out in Camilla eight years earlier and attacked local Black militiamen marching in a Fourth of July parade. Reinforced by white Georgians who hauled a cannon across the Savannah River to fire at barricaded militiamen, the heavily armed vigilantes disarmed their opponents and executed six Black men. A survivor later testified that a man shouted, "By God! We will carry South Carolina now!" during the attack.[5]

This pattern of seemingly spontaneous "riots" continued into the fall, when white Democrats in the three southern states still under Republican control contested electoral votes that would decide

---

[4] "The Georgia Election," *Harpers Weekly,* 19 October 1872, 883.
[5] *South Carolina in 1876: Report on the Denial of the Elective Franchise in South Carolina at the State and National Election of 1876* (GPO, 1877), 47.

the presidency and threatened violent resistance if Democrat Samuel Tilden was not inaugurated in early 1877. With the threat of "Tilden or Blood" looming over the nation's capital, national leaders reached a compromise that awarded the disputed electoral votes from South Carolina, Louisiana, and Florida—and thus the presidency—to Republican Benjamin Hayes in exchange for his promise to withdraw remaining federal troops from the South. Just months later, delegates gathered in Atlanta to write a new state constitution that upheld the poll tax and wrote racial segregation into state law. Former state legislator, congressman, and senator Robert Toombs reportedly boasted that "the Negro shall never be heard from" under the newly ratified Constitution of 1877.[6]

### Redemption's Incomplete Victory and the Push for Black Disfranchisement (1877-1908)

While Reconstruction as a policy and political regime was relatively short-lived, the lessons of Reconstruction lived on in the rhetoric, symbols, and actions of opponents of Black voting rights for generations. For advocates of white supremacy, the lesson handed down from the "redeemers" who overthrew Reconstruction was that Black politics—and any outside attempt to promote or enforce Black political participation—must be met with unified and vigorous resistance. The violent suppression of Reconstruction did not eradicate Black politics from Georgia, but it provided the rationale for an ongoing campaign to stamp out Black civic equality by any means necessary.

Even moderating voices such as Atlanta's Henry Grady, who advocated for a New South agenda of economic modernization, made clear that the foundation of a peaceful and prosperous South rested on white political unity and black disfranchisement. "The very worst thing that could happen to the South," he warned in an 1888 speech, "is to have her white vote divided into factions, and each faction bidding for the negro who holds the balance of power." Like most white Georgians of his generation, Grady lived in the wake of Reconstruction and imbibed the anti-Black rhetoric that white supremacists handed down—that Black Georgians were, in his words, "a vast mass of impulsive, ignorant, and purchasable votes."[7]

This argument fueled the push for a Solid South in which white voters closed ranks around a single-party system in which the Democrats—the "white man's party" that "redeemed" the South from Reconstruction—held sway with no viable political opposition. That argument also fueled a push to write Black Georgians out of politics through legislation, a self-proclaimed white supremacy campaign that picked up steam in the 1890s and resulted in a barrage of disfranchisement measures adopted state-by-state over two decades.

This renewed push to make permanent the stated political objectives of the anti-Reconstruction Democrats was in part a response to the ongoing, if diminished, presence of Black southerners in state and local politics but also the emergence of political challenges to one-party rule. The most immediate threat to single-party rule in Georgia, and the movement that seemed the most receptive to Black political participation, was the agrarian Populist movement that swept the nation in the early 1890s. In North Carolina, for example, Populists and Republicans formed a "fusion" coalition that took control of state government in 1894. In Georgia, Populists made a

---

[6] J. Morgan Kousser, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910,* (New Haven: Yale University Press, 1974), 209.

[7] *Life and Labors of Henry W. Grady: His Speeches, Writings, Etc.* (New York: H.C. Hudgins and Co, 1890), 296-7.

6

similar attempt to do precisely what Grady had warned against—splitting the white vote and appealing to Black Republicans to gain the political advantage.

The Populist threat to single-party rule and white unity proved sufficiently disconcerting to Georgia Democrats that they ramped up their campaign of white supremacist rhetoric and violence. Following the Populists' success in the 1890 midterms, the Democrats engaged in widespread fraud and intimidation—including marching Black laborers to polling places to cast ballots in favor of Democrats—during the 1892 elections.[8] After fending off the Populist challenge with the help of coerced Black votes, Democrats in Georgia implemented the most explicitly racial of the state's disfranchisement tactics—the white primary. Adopted in 1900 by the state party's executive committee, the measure created a primary system in which "the white Democrats of the state may give expression of their choice." By permitting political parties to set the rules for state-supported primaries, Georgia officials endorsed the elimination of Black voters from the only elections that mattered in the one-party Solid South.[9]





The adoption of the white primary marked the opening salvo in a decade marked by increasingly volatile racial rhetoric, a deadly race riot, and a resulting wave of disfranchisement measures more sweeping than any other southern state. In the months leading up the 1906 governor's race, candidates played to white fears of Black social and political advancement. Clark Howell, editor of the *Atlanta Constitution,* and his opponent, former *Atlanta Journal* publisher Hoke Smith, used their respective papers to consolidate white public support for disfranchisement. Both newspapermen appreciated the power of the press to mobilize white voters, particularly through cartoons and editorials warning of "Negro domination" and imperiled white women.

*Figure 2: White Georgians followed closely news of white supremacy campaigns in other southern states and celebrated reestablishment of Democratic control in North Carolina in 1898. Georgia Democrats used similar arguments and imagery to discredit their political opponents and build momentum for their own disfranchisement measures adopted ten years later.* Courtesy *Atlanta Constitution*, 2 October 1898, 5.

Building on a rhetorical strategy that linked Black politics to *social equality*—a euphemism for interracial sex and miscegenation—the state's leading newspapers fanned the flames of white resentment by running unsubstantiated reports of Black assaults on white women. The propaganda campaign reached a crescendo in late September of 1906, when white mobs responded by attacking hundreds of Black Atlantans and killing as many as forty victims over the course of several days. The Atlanta Race Riot made headlines across Europe and undercut the

---

[8] C. Vann Woodward, *Tom Watson: Agrarian Rebel* (New York: MacMillan, 1938), 241-2.

[9] Quoted in Russell Korobkin, "The Politics of Disfranchisement in Georgia," *The Georgia Historical Quarterly* 74 (Spring 1990), 40.

city's progressive image, but the violence and overt racial appeals provided more momentum for disfranchisement. In its 1906 platform, the Georgia Democratic Party called for an amendment to the state constitution designed "to exclude the largest possible percentage of the ignorant and purchasable negro vote, under the limits imposed by the Federal Constitution."[10]

The reference to the U.S. Constitution revealed a crucial component of southern white supremacist legislative and legal strategy. The architects of disfranchisement understood that explicitly racial election restrictions would face legal challenges on the grounds that they violated the "Reconstruction Amendments" that had extended citizenship and suffrage to Black Americans. They responded with a web of facially non-racial restrictions and requirements that would ensnare Black men while allowing white registrants to pass through. Georgia congressman Thomas Hardwick, who had first proposed the literacy test requirement as a state legislator in 1899, proclaimed that such measures should simultaneously "disfranchise every negro voter who can possibly be disfranchised" and "protect and safeguard every white voter in Georgia, however humble, however poor, however illiterate."[11]

Given that similar measures in other states withstood a Supreme Court challenge in *Williams v. Mississippi* (1898), Georgia Democrats forged ahead with a 1907 act to add a literacy test requirement to the state constitution. The amendment, which Georgia voters approved the following year, also included the so-called "fighting grandfather clause," a provision that exempted white registrants from the literacy requirement provided their ancestors had served in the Civil War, and a "good character" clause that empowered local registrars to find loopholes for semi-literate white citizens to register while adding pretexts to disqualify literate Black citizens. Combined with the poll tax, another ostensibly non-racial requirement that survived the reforms of the Reconstruction era and was later upheld in *Williams*, Georgia had erected the most imposing array of obstacles to Black voter registration of any southern state by the end of the twentieth century's first decade. As Georgia voting rights expert Laughlin McDonald concludes in his authoritative 2003 study, "no state was more systematic and thorough in its efforts to deny or limit voting and officeholding by African Americans after the Civil War."[12]

### The Politics of Mob Violence and Historical Memory (1880s-1930s)

The southern white supremacy campaigns that culminated in Georgia's 1908 disfranchisement amendments inspired a campaign of terror meant to force Black citizens into a subordinate state. The 1890s began with a Mississippi constitutional convention called—in the words of state representative and future U.S. Senator James K. Vardaman, "to eliminate the nigger from politics" and ended with a violent coup that restored Democratic control in North Carolina.[13]

---

[10] "Text of the Platform Adopted by the Democratic Convention," *Atlanta Constitution,* 5 September 1906, p. 6; Michael Perman, *Struggle for Mastery: Disfranchisement in the South, 1888-1908* (University of North Carolina Press, 2001), 290.

[11] "Hon. Thos. Hardwick Addresses Convention," *Atlanta Constitution,* 5 September 1906, p. 2. For more on Hardwick's role in Black disfranchisement measures, see R. Volney Riser, *Defying Disfranchisement: Black Voting Rights Activism in the Jim Crow South, 1890-1908* (Louisiana State University Press, 2013), 97-98.

[12] Perman, *Struggle for Mastery,* 297; Laughlin. *A Voting Rights Odyssey: Black Enfranchisement in Georgia* (Cambridge University Press, 2003), 2.

[13] Quoted in Gloria J. Brown-Marshall, *The Voting Rights War: The NAACP and the Ongoing Struggle for Justice* (Rowman and Littlefield, 2016), 13.

During the decade, as Georgia Democrats campaigned for disfranchisement, lynching surged statewide. Georgia mobs lynched nearly two hundred victims during the 1890s, an average of roughly one victim per month. While the reasons given for these extrajudicial killings varied, the increase in mob violence proceeded apace with inflammatory campaigns to erase Black Georgians from public life.

Advocates of disfranchisement, including prominent state and local officials, stoked fears of Black criminality and interracial sexuality to achieve their political objectives, and lynch mobs responded by targeting Black Georgians accused of rape, murder, and other acts of aggression toward white victims. In 1889, sixty white men lynched Black laborer Dan Malone after he allegedly "attempted to assault a respectable white woman" in Henry County.[14] Newspaper reports rarely challenged local accounts of mob violence, which took for granted the guilt of the victims. Mob violence provoked by rape allegations proved particularly brutal and ritualistic. In the waning months of Georgia's most deadly lynching decade, hundreds gathered in Coweta County in 1899 to torture, mutilate, and burn Sam Hose, a Black laborer accused of killing his employer and then raping his wife. Atlantans who had ventured to Newnan for the spectacle reportedly returned home with charred bones and wood scraps as souvenirs.[15]

Apologists for lynching drew a direct line between Black politics and Black crime. "So long as your politics take the colored man into your embrace on election day…," Georgia reformer and suffragette Rebecca Latimer Felton warned in 1898, "and so long as the politicians use liquor to befuddle his understanding and make him think he is a man and a brother…so long will lynchings prevail." Felton, the wife of a former Georgia congressman, and who would later become the first woman to serve in the U.S. Senate, argued that if mob violence was necessary "to protect woman's dearest possession from the ravening human beasts—then I say lynch; a thousand times a week if necessary."[16]

As Felton's argument makes clear, lynching was an inherently political act because those who participated perceived their Black victims—and any Black person they believed to be defying white supremacy in any way—as a threat to the political and social order they were trying to create. Consequently, mob violence increased as white supremacists built a web of legislative and constitutional barriers to voting. However, even after advocates of disfranchisement achieved their stated political objectives with the establishment of the Democratic white primary in 1900 and the literacy test amendment eight years later, white Georgians continued to lynch Black victims. In fact, in the decade (1910-1920) following the disfranchisement push, the number of recorded lynchings in Georgia increased. That the practice persisted demonstrates not only as a tactic to achieve political goals but also a tool for maintaining political control. Ongoing mob violence reflected key lessons handed down from Reconstruction—that Black politics was a problem that would not stay settled, and that generation after generation would have to guard against the reemergence of that threat.

School curriculum and popular culture reinforced these lessons. A survey of social studies and history textbooks published during the era identified three recurrent themes American

---

[14] "A Negro Lynched," *New York Times,* 23 July 1889, 1

[15] Philip Dray, *At the Hands of Persons Unknown: The Lynching of Black America* (Modern Library, 2003), 13-14.

[16] J.A. Holman's coverage of Felton's speech in the *Atlanta Journal* was reprinted in the Wilmington [N.C.] *Weekly Star,* August 26, 1898, p. 1, in the weeks before the deadly Wilmington Massacre. Crystal Feimster, *Southern Horrors: Women and the Politics of Rape and Lynching* (Harvard University Press, 2009), 127.

schoolchildren learned about Black voters and public officials during the Reconstruction era—they were ignorant, lazy, and corrupt. "In the exhausted states already amply 'punished' by the desolation of war," David Saville Muzzey wrote in his popular *History of the American People,* "the rule of the Negro and his unscrupulous carpetbagger and scalawag patrons, was an orgy of extravagance, fraud and disgusting incompetency." This national consensus on Reconstruction filtered down from Ivy League professors and best-selling textbook authors to local historians. In a history of McDuffie County, Georgia, sponsored by the local chapter of the United Daughters of the Confederacy (UDC), the authors concluded that "the Negro gained nothing by his adventure in politics; he did not have the stability nor reasoning power to really give to politics any thing worth while and was only the tool in the hands of others."[17]

Popular culture also reinforced the notion that violence was necessary to eliminate the "menace" of Black politics. The 1915 blockbuster *The Birth of a Nation,* an adaptation of a series of wildly popular novels by Thomas Dixon, rehabilitated the Ku Klux Klan as heroes who subdued emboldened and lustful Black men and saved the South from the horrors of Reconstruction. The film inspired the Klan's resurgence, a national phenomenon launched later that year in a cross-burning ceremony at Georgia's Stone Mountain.



*Figure 3: This commemorative postcard memorialized the rebirth of the Ku Klux Klan at Stone Mountain on Thanksgiving Day, 1915. The Klan soon spread nationwide and enlisted several million members.*

The owner of the mountain, a prominent Georgia Klansman, soon deeded the north face to the UDC for a Confederate memorial that would be completed a half century later. Atlanta UDC leader Helen Plane advocated for inclusion of hooded Klansmen in the planned bas relief sculpture. The Klan "saved us from negro domination and carpet-bag rule," she argued, so it was fitting "that it be immortalized on Stone Mountain."[18] While the eventual sculpture would feature only Jefferson Davis, Robert E. Lee, and Stonewall Jackson, the political message of Confederate memorialization was clear—violence and intimidation was necessary to prevent challenges to white political and social dominance.

---

[17] W.E.B. du Bois, *Black Reconstruction in America* (New York: Russell and Russell, 1935), 712; Quoted in McDonald, *Voting Rights Odyssey,* 44.
[18] David B. Freeman, *Carved in Stone: The History of Stone Mountain* (Mercer University Press, 1997), 61-62.

## The Nationalization of Civil Rights and the End of "the White Man's Party" (1908-1948)

The threats that white supremacists perceived were at once immediate and distant, as the forces of migration, urbanization, and war mobilization transformed Georgia. Discrimination and violence accelerated the exodus of Black Georgians from rural areas, both to the state's growing cities but also to northern industrial areas where they could exert greater political pressure. Just as white resentment of Atlanta's increasingly prosperous Black middle class helped to fuel the 1906 race riot, anxieties about Black mobility and mobilization in the 1910s boiled over in recurrent and brutal acts of violence.

The equation of Black advancement with imperiled white womanhood persisted, as evidenced in the 1918 Fayette County lynching of a Black man accused of assaulting a white woman and kidnapping her baby.[19] Yet white mobs expressed little regard for Black womanhood later that year, when they lynched Mary Turner for threatening to report the mob killing of her husband to authorities. In response, a mob hung her upside down from a tree, set her on fire, cut her unborn baby from her womb, and stomped the fetus while she burned to death. The Turners were two of at least eleven victims killed in a lynching spree through Brooks and Lowndes counties.[20]

The violence of 1918 spilled over into 1919, as white mobs targeted returning Black World War I veterans and responded to perceived threats to white supremacy. An April "riot" in Jenkins County, which claimed at least four Black victims, and a May lynching in Warren County attended by an estimated three hundred white farmers, foreshadowed a summer of violence that swept the nation during the "Red Summer" of 1919. Mobs in Georgia burned Black churches, targeted Black men accused of criticizing racial discrimination, and, in Early County, beat a Black veteran to death for refusing to take off his military uniform.[21] These brutal incidents not only demonstrated that disfranchisement had failed to stem racial conflict, as its advocates had promised it would, but also fueled a national protest campaign that resulted in a series of federal anti-lynching bills sponsored by northern congressmen who answered to a growing number of Black constituents—many of them migrants from southern states like Georgia.

Anxieties over Black mobility and rural decline also help to explain why the state legislature chose in 1917 to formalize a scheme that diluted the power of urban voters in state primary elections. The county unit system, which allotted six votes each to eight urban counties, four votes each to thirty "town" counties, and two votes each to 121 "rural" counties, effectively negated the power of Georgia's growing towns and cities to counter the disproportionate power of the state's rural political elites.

That disproportionate share of power trickled up to national politics via existing disfranchisement and dilution tactics like the poll tax. While defenders of the requirement openly expressed their desire to avoid depressing the white vote, critics pointed out that the tax depressed white voter turnout to rates far below those in states that did not require the tax. Anti-poll tax researchers pointed out that more Rhode Island voters cast ballots for their two representatives to Congress than voters in Georgia and three fellow poll-tax states cast for their thirty-two congressmen. A Georgian could win election and rise through the ranks of congressional seniority with as few as

[19] "Negro Lynching by Georgia Mob," *New York Times,* 19 February 1918

[20] Walter F. White, "The Work of a Mob," *The Crisis* 16 (September 1918): 221-3

[21] Cameron McWhirter, *Red Summer: The Summer of 1919 and the Awakening of Black America* (Henry Holt, 2011), 1-11, 51; "Crime," *The Crisis* 18 (July 1919): 155

five thousand votes per election, while a candidate from a northern state might require twenty times as many votes to win a seat in Congress.[22]

Political leaders committed to preserving this power imbalance on the local, state, and national level were the earliest and most vocal opponents of voting rights campaigns. In 1936, Governor Eugene Talmadge, a former state agricultural commissioner who capitalized on the county-unit system formidable rural support base, attacked the liberalizing national Democratic Party for undermining white supremacy in Georgia. Talmadge argued that the Roosevelt administration had caved to northern Black political pressure and could no longer be trusted to remain the "white man's party" of previous generations. He sought to undermine support for popular New Deal relief programs by spreading false rumors that the Works Progress Administration and other federal agencies were forcing white women to work in desegregated facilities. Through his inflammatory tabloid *The Statesman* and increasingly vitriolic speeches, Talmadge argued that President Franklin Roosevelt and national Democrats were actively wooing Black voters previously loyal to the Republican Party, in language that paralleled the white supremacist attacks on Reconstruction.

Georgia's political establishment attempted to distance itself from racial extremism on the grounds that white supremacy was firmly established. Continued agitation of racial issues by white politicians, they argued, was irresponsible. When Eugene Talmadge attempted to "primary" former governor and first-term U.S. senator Richard Russell in 1936, Russell had to both pledge allegiance to the racial status quo and distance himself from his inflammatory challenger. "Any southern white man worth a pinch of salt would give his all to maintain white supremacy," former governor and first-term U.S. senator Richard Russell lamented in 1936, "and it is a disgrace that some should constantly seek to drag the negro issue into our primaries, where as a matter of fact they do not in any way participate and cannot."[23]

Nationally, Talmadge and his allies pointed to proposed anti-lynching legislation, and anti-poll tax campaign to argue that white supremacy was under attack. By the end of the 1930s, caught between hardcore white supremacists at home and an increasingly liberal national Democratic Party, establishment Georgia Democrats amped up their racial rhetoric and condemned threats to white supremacy. Just two years after fending off a race-baiting primary challenge from Talmadge in 1936, Georgia senator Richard Russell joined a southern filibuster of an anti-lynching bill during which he complained that his party had become the "Afro-Democratic Party" and warned of a slippery slope of civil rights legislation that would culminate in a bill allowing for racial intermarriage.[24] Two years later, Russell's senior colleague Walter George repackaged Reconstruction-era fears of northern meddling at a reelection campaign stop in Lamar County, where he warned that national reformers wanted "to send a Connecticut judge down here…to try you on an anti-lynching charge."[25]

---

[22] Rhode Island, with a population of 637,000, cast 314,023 votes and elected 2 representatives, while Georgia, South Carolina, Mississippi, and Alabama, with a population of 9.3 million, cast 264,419 ballots and elected 32 representatives. *Poll Tax Repealer,* September 1942, p. 1.

[23] Richard B. Russell to Allen Reid, 4 February 1936, Series IV, Subseries B, Box 19, Folder 15, Richard B. Russell Papers, Richard B. Russell Library for Political Research and Studies, University of Georgia, Athens.

[24] *Congressional Record,* 75th Cong., 3rd Sess., 26 January 1938, p. 1102.

[25] "Georgia's George Relies on Prejudice to Save His Seat," New York *Amsterdam News,* 27 August 1938, A3.



22.50

**Non-Partisan Picture Of Race Mixing In The South**

Read The Editorials Reproduced In This Pamphlet And See Whether Racial Equality Is Being Demanded

*The Best Way to Keep Negroes Out Of White Schools Is To Keep Educators Who Condone It Out Of School System. — Eugene Talmadge.*

**RE-ELECT**

**EUGENE TALMADGE**

**GOVERNOR**

*Figure 4: Talmadge campaign literature emphasized threats to racial segregation and the governor's commitment to maintain the embattled white primary.* Courtesy Special Collections, McCain Library and Archives, University of Southern Mississippi.

By the start of World War II, white Georgians had neither shaken their allegiance to the Democratic Party nor forgotten the rationale for a one-party Solid South. However, from the earliest signs of Black political influence in national politics and the rather rapid defection of Black voters from the Republican Party, opponents of Black voting rights in Georgia openly debated their political positions—including defection from the Democratic Party. They also renewed calls for intimidation and violence to counter mounting attempts by Black Georgians to reclaim their constitutional right to the franchise.

## White Resistance to the Voting Rights Revolution (1944-1965)

Wartime change accelerated that process. Civil rights activists launched a "Double Victory" campaign to defeat totalitarianism abroad and racial discrimination at home. One victory with significant implications for racial politics and Black voting rights in Georgia was the 1944 *Smith v. Allwright* decision, in which the U.S. Supreme Court struck down the white primary as unconstitutional. That de`cision simultaneously fueled a voter registration drive in Georgia, spearheaded in many communities by returning Black veterans, and a surge in voter intimidation and violence. Former governor Eugene Talmadge, who had lost a bid for a fourth term in 1942 despite pledging to save the imperiled white primary, roared back in 1946 with a campaign strategy that simultaneously revived the violent tactics of earlier generations with forward-looking strategies that previewed the voter suppression strategies of the post-civil rights era.

Georgia's campaign cycles in the late 1940s were the bloodiest and most inflammatory since the disfranchisement campaign at the turn of the century. During the 1946 primary season, a mob lynched two Black married couples at the Moore's Ford Bridge at the border of Walton and Oconee counties, allegedly in retaliation for the stabbing of a local white man. A few days after the primary, white vigilantes assassinated World War II veteran Maceo Snipes after he cast the lone Black ballot in Taylor County.[26] The violence compelled a seventeen-year-old Martin Luther King, Jr, then a student at Morehouse College, to pen a letter to the editor of the state's largest newspaper demanding "the basic rights and opportunities of American citizens."[27]

---

[26] Carol Anderson, *One Person, No Vote: How Voter Suppression Is Destroying Our Democracy* (Bloomsbury Publishing, 2018), 15.

[27] M. L. King, Jr., "Letters to the Editor," *The Atlanta Journal Constitution*, 6 August 1946.



*Figure 5: The Talmadge campaign distributed thousands of challenge forms, like this sample from Appling County, to intimidate and disqualify Black voters in the 1946 Democratic primary. Courtesy NAACP Papers.*

The 1946 primary reflected the persistent impact of racial violence and vote dilution on Georgia politics, as Talmadge won in a county-unit landslide despite losing the popular vote by more than fifteen thousand votes. Yet the inflammatory primary campaign also foreshadowed less overt voter suppression strategies. An extensive FBI investigation confirmed that Talmadge and his supporters blanketed the state with "challenge forms" that white voters could use to dispute Black votes. In Douglas County, members of a local "Talmadge club" distributed the forms to local white citizens who "knew the local negroes and knew which ones should be challenged." Meanwhile, Talmadge telegrammed the tax commissioner in Rockdale County for lists of registered voters by race in a similar effort to identify and target Black voters for challenges.[28] Though both schemes proved unsuccessful, they demonstrated the willingness of candidates and local officials to collude in subtler suppression tactics that would attract less outside scrutiny—and eliminate more votes—than violent intimidation.

---

[28] Edward T. Kassinger, "Unknown Subjects: Racial Discrimination in Registration of Negro Voters, State of Georgia," 24 October 1946, 128-31, 326-8, folder 1, file 44-114, Records of the Federal Bureau of Investigation, National Archives and Records Administration, College Park, Maryland; Joseph L. Bernd, "White Supremacy and the Disfranchisement of Blacks in Georgia, 1946," *The Georgia Historical Quarterly* 66 (Winter 1982): 492-513.

The politics of voter exclusion continued to fuel Georgia politics in the next electoral cycle, as the late governor's son Herman Talmadge campaigned on a pledge to replace the outlawed white primary with "a primary just as white as we can get it."[29] Talmadge allies like Carroll County state representative Willis Smith endorsed this effort. "This is a white man's country," Smith declared, "and we must keep it that way."[30]

Although Black voter registration had surged in the wake of *Smith v. Allwright,* Talmadge's allies, including a resurgent Ku Klux Klan, spearheaded a campaign of voter suppression. Georgia Ku Klu Klan leader Samuel Green led a procession of 249 Klansmen through Wrightsville on the eve of the Johnston County primary. "Again you will see Yankee bayonets trying to force social and racial equality…," Green warned a crowd of 700 local white supporters. "If that happens there are those among you who will see blood flow in the streets." Although an estimated four hundred Black residents had registered to vote in Johnson County by March 1948, none showed up the next day to cast a ballot in the local primary.[31] In the months that followed, Talmadge supporters placed miniature coffins on the doorsteps of Black community leaders, scattered warning leaflets in Black neighborhoods, and, on primary day in Montgomery County, gunned down black World War II veteran Isaiah Nixon shortly after he cast a ballot.[32]

Following his election, Talmadge unveiled a four-point plan to purge the state's voter rolls and require re-registration every two years subject to a revived poll tax and a revamped "education requirement" that gave wide latitude to local officials to purge Black voters and reject new registrants. In one particularly blunt interpretation of the new registration rules, the Johnson County sheriff proposed that applicants sign a pledge in support of white supremacy. Historian Stephen G.N. Tuck estimates that nearly twelve thousand Black voters were purged "almost immediately" and thousands more failed to register under Talmadge's neo-disfranchisement regime.[33] Surging Black voter registration, which increased from 20,000 to 125,000 between 1940 to 1947, launched a white backlash to expanded voting rights. The pace of Black voter registration slowed significantly during the 1950s, although Black Georgians registered at rates well beyond neighboring states.[34]

Opponents of voting rights in Georgia placed the blame for relatively high Black registration on the "bloc" vote in Atlanta and smaller cities. From the 1940s through the 1960s, "bloc voting" meant "Black voting" for a succession of local and statewide candidates who rode racial backlash into office. In language that harkened back seventy-five years, Herman Talmadge argued that unless "an aroused White Southern electorate…halt and defeat this bloc voting," the region would "undergo a mid-Twentieth Century reconstruction period."[35] While Talmadge did little to veil his racial message, his political successors appreciated and accelerated their attacks on the "bloc"

---

[29] "Georgia Negroes Appeal to Courts as Dixiecrats Purge Voting Lists," *Chicago Defender*, 14 August 1948.

[30] *Carrolton Branch of the NAACP v. Stallings*, 829 F. 2d 1547 (11th Cir. 1987), 1551.

[31] "Sheet, Sugar Sack, and Cross," *Time*, 15 March 1948.

[32] Jason Morgan Ward, *Defending White Democracy: The Making of a Segregationist Movement and the Remaking of Racial Politics, 1936-1965* (University of North Carolina Press, 2011), 110-1; Jennifer E. Brooks, *Defining the Peace: World War II Veterans, Race, and the Remaking of Southern Political Tradition* (University of North Carolina Press, 2004), 161.

[33] Stephen G.N. Tuck, *Beyond Atlanta: The Struggle for Racial Equality in Georgia, 1940-1980* (University of Georgia Press, 2001), 76.

[34] Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (Columbia University Press, 1976), 134.

[35] Herman Talmadge, *You and Segregation* (Birmingham: Vulcan Press, 1955), 25.

vote through less overt language. Georgia House Speaker and Troup County representative Fred Hand stressed the strategic importance of targeting the "ignorant bloc vote" rather than "negros" by name. "I like to think of it that way," he explained, "instead of going into this color angle."[36]

While Talmadge's successors largely heeded this advice to play down the "color angle" in their resistance to voting rights, their response to *Brown v. Board* (1954) revealed the straight line they drew between black disfranchisement and the survival of racial segregation. Three years after the Supreme Court's ruling on segregated schooling, the Georgia legislature voted unanimously to call for the repeal of the Fourteenth and Fifteenth Amendments. Legislators also took aim at the National Association for the Advancement of Colored People (NAACP), which Talmadge had blamed for controlling the "bloc vote."[37] Just months after Georgia asked to invalidate two out of the three Reconstruction Amendments, the United States Congress passed the first civil rights act since Reconstruction. The Civil Rights Act of 1957, which included several modest voting protections, proved sufficiently threatening that Georgia's legislature responded with yet another rewrite of its state election laws that included a revamped citizenship test, a "good character" provision, and a requirement that new voters register in person. All of these measures aimed to suppress the Black vote.[38]

By the end of the 1950s, voting rights opponents in Georgia agreed that the county unit system remained the strongest bulwark against Black political power. State senate president pro tempore and future governor Carl E. Sanders of Augusta argued that the system protected Georgia from "pressure groups or block votes" and remained essential for "maintaining conservative government and keeping liberals and radicals from taking over."[39] Every Georgia governor of the civil rights era professed loyalty to the county-unit system, and its invalidation in *Gray v. Sanders* (1962) and the corresponding rejection of the state's legislative apportionment by a U.S. District Court sent defenders of vote dilution scrambling.

Both the county unit system and legislative apportionment in Georgia inflated the power of rural counties and diluted the power of the urban "bloc vote" that defenders of white political power vilified. [40] In response to the "one person, one vote" precedent established in *Gray v. Sanders,* state legislators rallied behind a series of redistricting plans that included majority-vote requirement for local, state, and federal elections. This requirement, as Bibb County representative and self-proclaimed "county unit man" Denmark Groover argued in 1963, would "prevent special pressure groups from controlling elections." Speaking candidly with his colleagues, Groover warned that a majority vote requirement was necessary to "thwart election control by negroes and other minorities."[41]

The legislative scramble to preserve malapportionment and depress Black political power collided with grassroots voter registration drives and unprecedented federal action on civil rights. Buoyed by the Civil Rights Acts of 1960 and 1964, civil rights groups in Georgia helped to raise the

[36] Ward, *Defending White Democracy,* 111.
[37] McDonald, *Voting Rights Odyssey,* 71.
[38] McDonald, *Voting Rights Odyssey,* 72-4.
[39] J. Morgan Kousser, *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction* (University of North Carolina Press, 1999), 204.
[40] McDonald, *Voting Rights Odyssey,* 84.
[41] McDonald, *Voting Rights Odyssey,* 12, 92.

stagnating voter registration rate from roughly a quarter of eligible Black voters in the early 1960s to just over sixty percent by decade's end.[42]

Civil rights activists persisted in the face of police harassment and vigilante violence—from burning Black churches and firing into Black homes at night to attacking civil rights workers in broad daylight. Low registration rates persisted in rural counties, including Jefferson, McDuffie, Warren, and thirty-one others, where less than ten percent of eligible Black voters had registered successfully by 1965. In Glascock County, for example, only *one* Black resident had successfully registered to vote despite the passage of three federal civil rights bills between 1957 and 1964.[43]

Local intransigence and violent resistance compelled the passage of the Voting Rights Act of 1965. The enactment of the most expansive voting rights protections since Reconstruction produced dramatic results on the ground. In Black-majority Burke County, for example, the number of registered Black voters had stalled out despite the series of civil rights bills passed between 1957 and 1964. Yet while the number of registered voters increased by only *two* (425 to 427) between 1958 and 1965, the number of registered Black voters surged to 2,760—from less than seven percent registered to nearly 42 percent of those eligible—in the two years following passage of the Voting Rights Act.[44]

## Race, Redistricting, and the Rise of Republican Georgia (1964-2013)

The dramatic upsurge in Black registration fractured and transformed the state's Democratic Party. This voting rights revolution also revived and reshaped an increasingly competitive Republican Party. The resurgent GOP's support base lay in the booming metropolitan suburbs rather than the rural counties that had dominated Georgia politics for decades, but the new Georgia Republicans shared with the old Georgia Democrats an opposition to urban political power, federal intervention, and—consequently—an expansive view of voting rights. Howard "Bo" Callaway, a former Democrat who switched parties in 1964 and became Georgia's first Republican congressman since Reconstruction, opposed the Voting Rights Act on the grounds that it could be "the first step" toward "complete Federal control" of local elections.[45]

Callaway, who owed his election to conservative presidential candidate Barry Goldwater's success in the Deep South in 1964, avoided the racist dog whistles of Georgia Democrats but lined up with them in support of literacy tests and other voting requirements long used to depress Black registration. In the 1966 midterms, Callaway won re-election and was joined in Congress by two Atlanta-area Republicans who replaced the only two Georgia Democrats who had voted for the Voting Rights Act the previous year. Fulton County's Fletcher Thompson, one of the first Republicans to win election to the Georgia Senate, took his fight against the "forced racial balance" to Congress, while DeKalb's Ben Blackburn pledged to protect the suburbs from "the

---

[42] Kousser, *Colorblind Injustice,* 201; Lawson, *Black Ballots,* 331.

[43] U.S. Commission on Civil Rights, *Political Participation: A Study of the Participation by Negroes in the Electoral and Political Processes in 10 Southern States Since Passage of the Voting Rights Act of 1965* (GPO, 1968), 232-9.

[44] McDonald, *Voting Rights Odyssey,* 10, 57; Commission on Civil Rights, *Political Participation*, 232-3.

[45] Hearings before Subcommittee No. 5 of the Committee on the Judiciary, House of Representatives, 89th Cong., 1st sess., H.R. 6400 and other Proposals to Enforce the 15th Amendment of the Constitution of the United States, March 18, 19, 24, 25, 29, 30, 31, and April 1, 1965, Serial No. 2, pp. 542-3.

17

welfare mother with her numerous kids" who "might be moved in next door" by federal public housing initiatives.[46]

Georgia's "New Guard" Republicans couched their opposition to civil and voting rights initiatives in a language of limited government and personal freedom. Yet in a conscious bid to court disaffected Democrats, historian J. Morgan Kousser notes, they "shunned those blacks whom they did not entirely alienate." In response to the segregationist "bloc vote" argument, which equated Black urban politics with corruption and irresponsibility, New Guard Republicans concluded they could "get along without the block [sic]" and offset votes lost among rapidly increasing Black registrants by wooing conservative white Democrats.[47]

This strategy proved quite successful, as a Republican platform of limited government, local control, and property rights resonated with arguments conservative Democrats in Georgia had made for decades. The racial and spatial continuities stood out as well as an overwhelmingly white Republican party, drawing its votes primarily from rural and suburban areas, squared off against the cities. As suburban Atlanta congressman Newt Gingrich argued, the Georgia Republicans "want safety, and they believe big cities have failed and are controlled by people who are incapable of delivering goods and services."[48]

White Georgia legislators, including a growing number of Republicans, aimed their vote dilution strategies at the cities as well. Redistricting emerged as a favored tactic after the demise of the county-unit system. In the wake of the 1970 census, Georgia legislators submitted a number of redistricting plans that drew objections under Section 5 of the Voting Rights Act for "diluting black voting strength" in and around Atlanta.[49] Ten years later, redistricting proposals received federal scrutiny, particularly at the congressional level where legislators managed to create nine white-majority districts out of ten total seats. Although Black Georgians accounted for over a quarter of the state's population in the 1980 census, white legislators—including Cobb County Democrat Joe Mack Wilson who lamented the prospect of more "nigger districts"—attempted to limit Black-majority districts to one-tenth of the state's congressional delegation.[50]

Over the following three redistricting cycles, as the power balance shifted from Democrats to Republicans and the ideological alignment of each party solidified, Georgia's redistricting plans continued to draw objections for their consistent tendency to dilute Black votes. Demographic change complicated those efforts, as the Black proportion of the state's population grew from 26 percent in 1980 to over 30 percent in 2010. The spatial and racial equation of Black voting with urban politics persisted yet the primary driver of Black population growth in these decades was suburban. As the Black population of metropolitan Atlanta not only grew numerically but also expanded geographically, the suburbanization that fueled the rise of the Republican Party in the

---

[46] Kevin M. Kruse, *White Flight: Atlanta and the Making of Modern Conservatism* (Princeton University Press, 2007), 252-3.

[47] Kousser, *Colorblind Injustice,* 207.

[48] Peter Applebome, *Dixie Rising: How the South is Shaping American Values, Politics, and Culture* (Harcourt, Brace, and Co., 1996)*,* 43-4.

[49] McDonald, *Voting Rights Odyssey,* 92.

[50] "Voting Rights: Evidence of Continued Need," Hearing Before the Subcommittee on the Constitution of the Committee on the Judiciary, House of Representatives, 109th Cong. 2nd sess., March 8, 2006, Serial No. 109-103, vol. I, p. 111.

latter decades of the twentieth century had also transformed the racial and spatial dynamics of redistricting.[51]

**Racial Appeals, Voter Suppression, and Twenty-First Century Political Violence**

Redistricting remained a powerful tool for voter dilution in the twenty-first century, but the Supreme Court's decision in *Shelby v. Holder* (2013) to invalidate Section 5's coverage formula also opened the door for increased voter restrictions. In the eight years since, Georgia officials enacted several measures, from changes to election dates and precinct locations to voter identification requirements and voter purges, that would have been more difficult before the *Shelby* decision. Indeed, some of these tactics more closely resemble suppression tactics from the Jim Crow era—voter purges and challenges, in particular—than the disfranchisement practices later targeted by the Voting Rights Act and other civil rights legislation in the 1950s and 1960s.

The rationale for these measures, which focuses on election fraud, traded in rhetoric that resonates with disfranchisement arguments of the past. For example, Richmond County legislator Sue Burmeister, an early and enthusiastic backer of voter identification measures, complained in 2005 that Black voters in her district's Black-majority precincts only showed up when they were "paid to vote."[52] As in previous generations, while these measures remain race neutral on their face, their true impact is revealed by the racial appeals their supporters use to defend them. Nathan Deal, a former Democratic congressman turned Republican gubernatorial candidate, ridiculed criticism of voter ID measures as "the complaints of ghetto grandmothers who didn't have birth certificates" during his successful run for governor in 2009.[53]

Backers of voting restrictions also kept alive longstanding arguments about civic fitness and "education." The year after the *Shelby* decision, DeKalb County representative Fran Millar criticized Sunday voting at a mall "dominated by African American shoppers and…near several large African American mega churches." Aiming his comments at the south end of a metropolitan county transformed by Black suburbanization and immigration, Millar announced on social media, "I would prefer more educated voters than a greater increase in the number of voters."[54]

The voter suppression campaign that picked up momentum in the wake of *Shelby* ran headlong into cultural and racial conflicts fueled by other demographic changes. While Georgia's Black population has grown significantly since 1980—after several decades of stagnation due to outmigration—other racial and ethnic minority populations have grown faster. The new racial politics reflect a diversifying population and fears of white decline. Responding to the demographic transformations that have reshaped Georgia into the South's most multicultural and metropolitan state, some gubernatorial candidates melded rhetoric of imperiled heritage, illegal immigration, and voter fraud into a potent blend. Most vocal was Michael Williams, a Forsyth County legislator who toured the state in a "deportation bus" and pledged to fight "liberal cities"

[51] Karen Pooley, "Segregation's New Geography: The Atlanta Metro Region, Race, and the Declining Prospects for Upward Mobility," *Southern Spaces*, 15 April 2015, n.p.
[52] Anderson, *One Person, No Vote*, 60
[53] Aaron Gould Sheinin, "Deal Apologizes for 'Ghetto' Remark," *Atlanta Journal-Constitution,* 6 October 2009.
[54] Hunter Schwarz, "Georgia State Senator Upset Over Efforts to Increase Voter Turnout in Black, Democratic Area," *Washington Post,* 10 September 2014.

on immigration policies. Yet Williams, who represented a county where white mobs ran out most Black residents in a violent 1912 racial cleansing, showed more concern for the erasure of Confederate monuments and the "defacing of Stone Mountain"—the site of the Ku Klux Klan's rebirth in 1915.[55]

For constituents who feel under siege in an era of tremendous demographic and cultural change, these racial appeals fuel support for a slew of strategies designed to preserve their political power and advantage. As in previous generations, those tactics are racial but also spatial, as former President Trump's attacks on Atlanta officials and voters bear out. From his 2017 attack on voting rights icon John L. Lewis' "crime infested" congressional district to unsubstantiated claims that Fulton County election officials fabricated tens of thousands of ballots, shredded "thousands and thousands" more, and forged "at least a couple hundred thousand" absentee ballot signatures in the 2020 presidential election, Trump revived an age-old tactic of targeting urban Georgia—and urban Georgians—as a uniquely unfit for governance.[56]

These claims matter because they demonstrate the historical link between voter suppression and political violence. To an extent not seen since the Reconstruction era, allegations of voter fraud and political corruption aimed primarily at Atlanta and metropolitan areas fueled the threat of blood flowing in the streets of the nation's capital. Hundreds of armed rioters, including a Georgia-born man who entered the Senate Chamber with zip ties, a Henry County man who threatened Capitol police with death, and a Cobb County woman who died in the crowd crush, believed themselves to be part of a patriotic attempt to save their country. "We occupied the Capitol and shut down the Government," bragged an attorney from Sumter County. "We shut down their stolen election shenanigans."[57]

With the violent response to the 2021 election results, and the claims of malfeasance and corruption in Georgia, as pretext, diehard supporters of voter restrictions redoubled their efforts. In early 2021, Columbia County state representative Barry Fleming introduced House Bill 531, which ramped up restrictions on absentee ballots, early voting, and ballot drop boxes. These restrictions included restrictions on Sunday voting options that have historically boosted Black voter turnout.[58] Large portions of this bill were later incorporated into Senate Bill 202, a sweeping piece of legislation that was passed by the legislature and signed by the Governor in March of 2021.

That the renewed push for voting restrictions followed the most serious threat to a national election in more than a century demonstrates the ongoing link between racial appeals, voter intimidation, and policies that depress and dilute minority voting strength. The current redistricting effort must be understood not only in the context of Georgia's longstanding history

---

[55] Molly Olmstead, "Georgia Gubernatorial Candidate Begins 'Deportation Bus' Tour With Promise to 'Fill This Bus With Illegals'," *Slate*, 16 May 2018.
[56] Hope Yen, Jeff Amy, and Michael Balsamo, "AP FACT CHECK: Trump's Made-Up Claims of Fake Georgia Votes," *Associated Press,* 3 January 2021.
[57] Associated Press, "Georgia Man Arrested in Connection With Capitol Riot," *US News and World Report*, 18 February 2021
[58] Ben Nadler and Anila Yoganathan, "Georgia House Passes GOP Bill Rolling Back Voting Access," *Associated Press,* 1 March 2021.

of racial violence, voter intimidation, and racial appeals, but also in the immediate context of an accelerated assault on voting rights.

## V.  CONCLUSION

Racial intimidation of and violence against Black voters has a long history in Georgia, and no state has fought harder to limit the franchise since Reconstruction. Political campaigns in the state, as well as advocacy for voter restrictions by elected officials, have consistently relied on overt and subtle racial appeals to mobilize support. Historically, the politics of voting rights in Georgia has pitted state against nation, and rural against urban.

While no state has been more comprehensive and consistent in the use of voter suppression measures, the erosion of Black political power via redistricting has increased in strategic importance even as other disfranchisement and dilution tactics have been eliminated. The racial and spatial nature of voter suppression in Georgia, which equates Black politics with urban politics, malfeasance, and corruption, has resulted in volatile rhetoric and results from Reconstruction to the present.

***

I reserve the right to modify and/or supplement my opinions, as well as to offer new opinions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted and executed on January 6, 2022.

_____

Dr. Jason Morgan Ward

# APPENDIX A
## Curriculum Vitae

### JASON MORGAN WARD
Professor and Director of Graduate Studies
Department of History, Emory University
561 South Kilgo Cir NE, Atlanta, GA 30322
307 Bowden Hall
jmward4@emory.edu
404-727-1505

## EDUCATION

**YALE UNIVERSITY**
Ph.D. in History, December 2008
  Dissertation, "Saving Segregation: Southern Whites, Civil Rights, and the Roots of Massive
    Resistance, 1936-1954"
M.A., M.Phil in History, May 2006

**DUKE UNIVERSITY**
A.B. in History, with Distinction, 2001

## RESEARCH AND TEACHING INTERESTS

History of the United States Since Reconstruction; African American History; History of the
American South; Violence and Extremism; Historical Memory

## SCHOLARSHIP

### PEER-REVIEWED PUBLICATIONS

**Books**
*Hanging Bridge: Racial Violence and America's Civil Rights Century.* New York: Oxford
  University Press. New York: Oxford University Press, 2016.
    Winner, Nonfiction Prize, Mississippi Institute of Arts and Letters, 2017
    Winner, McLemore Prize, Mississippi Historical Society, 2017
*Defending White Democracy: The Making of a Segregationist Movement and the Remaking of Racial
  Politics, 1936-1965.* Chapel Hill: University of North Carolina Press, 2011.

**Journal Articles and Book Chapters**

"Racial Violence in the United States since the Civil War." In *Cambridge World History of Violence*, vol. 4, edited by Louise Edwards, Nigel Penn, and Jay Winter. London: Cambridge University Press, 2020: 88-109.

"From the Great Depression to the 'End of Southern History'?" (co-authored with Jennifer Ritterhouse). In *Reinterpreting Southern Histories: Essays in Historiography*, edited by Craig Thompson Friend and Lorri Glover. Baton Rouge: Louisiana State University Press, 2020: 363-84.

 "Causes Lost and Found: Re-Fighting Reconstruction in the Roosevelt Era." In *Remembering Reconstruction: Struggles Over the Meaning of America's Most Tumultuous Era*, edited by Bruce E. Baker and Carole Emberton. Baton Rouge: Louisiana State University Press, 2017: 35-57.

"The 1956 D.C. School Hearings and the National Vision of Massive Resistance," *Journal of Civil and Human Rights* 1 (Spring/Summer 2015): 82-110.

"'A Monument to Judge Lynch': Racial Violence, Symbolic Death, and Black Resistance in Jim Crow Mississippi." In *Death in the American South*, edited by Craig Thompson Friend and Lorri Glover. New York: Cambridge University Press, 2014: 229-49.

"'Negroes, the New Deal, and...Karl Marx': Southern Antistatism in Depression and War." In *Nation Within a Nation: The American South and the Federal Government*, edited by Glenn Feldman. Gainesville: University Press of Florida, 2014: 102-21.

"'A War for States' Rights': The White Supremacist Vision of Double Victory." In *Fog of War: The Second World War and the Civil Rights Movement*, edited by Kevin M. Kruse and Stephen G. N. Tuck. New York: Oxford University Press, 2012: 126-44.

"'Nazis Hoe Cotton': Planters, POWs, and the Future of Farm Labor in the Deep South." *Agricultural History* 81 (Fall 2007): 471-92.
        Winner, Everett E. Edwards Award, Agricultural History Society, 2007

"'No Jap Crow': Japanese Americans Encounter the World War II South." *Journal of Southern History* 73 (February 2007): 75-104.

**Scholarly Introduction to Book Reissue**

"Introduction to the New Edition," *Mississippi Black Paper* (first published 1965 by Random House). Civil Rights in Mississippi Series. Jackson: University Press of Mississippi, 2017: vii-xxvii.

**OTHER PUBLICATIONS**

**Commentary in National Media and Professional Publications**

"Georgia's Voter Law Is Called 'Jim Crow 2.0' For A Reason," New York Times, March 31, 2021

"The Horrendous Message Behind Trump's 'Lynching' Tweet," *CNN*, October 23, 2019

"'A Mississippi Senator Joked About 'Public Hanging.' Here's Why That's Unacceptable," *Washington Post*, November 15, 2018

"Add This to the Courthouse Lawn: A Memorial to Lynching", *Los Angeles Times*, April 22, 2018

"The Myth of Southern Blood," *Washington Post*, August 21, 2017

"The Cause Was Never Lost," *The American Historian*, no. 6 (November 2015): 24-6.

"Dylann Roof and the White Fear of a Black Takeover," *Los Angeles Times*, June 19, 2015

"Southern 'Hanging Bridge': A Monument to Judge Lynch," *Los Angeles Times*, February 22, 2015

"Lynching, Murder, and the Judge," *Atlanta Journal-Constitution*, February 20, 2015

**Reference Articles**

"Walter F. White's 'U.S. Department of (White) Justice.'" In *Milestone Documents in African American History*, vol. 3, edited by Paul Finkelman. Dallas: Schlager Group, 2010: 1128-35.

**Review Essays**

"The Legacy Museum: From Enslavement to Mass Incarceration: The National Memorial for Peace and Justice, Montgomery, Alabama. The Equal Justice Initiative," *American Historical Review* 123 (October 2018): 1271-2

"Shades of Violence: Jim Crow Justice and Black Resistance in the Depression-Era South," *Southern Spaces,* 13 September 2018.

**Book Reviews**

Dave Tell. *Remembering Emmett Till* (Chicago: University of Chicago Press, 2019) in *Journal of African American History* 106 (Summer 2021): 544-6.

Donald J. Matthews, *At the Altar of Lynching: Burning Sam Hose in the American South* (New York: Cambridge University Press, 2017) in *Journal of American History* 105 (December 2018): 713-4.

Kim Lacy Rogers, *Life and Death in the Delta: African American Narratives of Violence, Resilience, and Social Change* (New York: Palgrave MacMillan, 2006) in *Oral History Review* 43 (December 2016): 227-8.

Glenn Feldman, *The Great Melding: War, the Dixiecrat Rebellion, and the Southern Model for America's New Conservatism* (Tuscaloosa: University of Alabama Press, 2015) in *American Historical Review* 121 (October 2016): 1315-6.

Ted Ownby, ed., *The Civil Rights Movement in Mississippi* (Jackson: University Press of Mississippi, 2013) in *Journal of American History* 101 (September 2014): 647.

Akinyele Omowale Umoja, *We Will Shoot Back: Armed Resistance in the Mississippi Freedom Movement* (New York: New York University Press, 2013) in *Reviews in American History* 42 (June 2014): 341-5.

Brett Gadsden, *Between North and South: Delaware, Desegregation, and the Myth of American Sectionalism* (Philadelphia: University of Pennsylvania Press, 2013) in *American Historical Review* 118 (December 2013): 1556-7.

Joseph Crespino, *Strom Thurmond's America* (New York: Hill and Wang, 2012) in *South Carolina Historical Magazine* 114 (January 2013): 59-60.

Chris Danielson, *After Freedom Summer: How Race Realigned Mississippi Politics, 1965-1986* (Gainesville: University Press of Florida, 2011) in *Journal of American Studies* 47 (February 2013): 291-2.

Glenn Feldman, ed., *Painting Dixie Red: When, Where, Why, and How the South Became Republican* (Gainesville: University Press of Florida, 2011) in *Journal of Southern History* 79 (February 2013): 221-3.

Tim S. R. Boyd, *Georgia Democrats, the Civil Rights Movement, and the Shaping of the New South* (Gainesville: University Press of Florida, 2012) in *Journal of American History* 99 (September 2012): 656-7.

Timothy J. Minchin and John A. Salmond, *After the Dream: Black and White Southerners Since 1965* (Lexington: University Press of Kentucky, 2011) in *Georgia Historical Quarterly* 95 (Summer 2012): 275-8.

John Howard, *Concentration Camps on the Home Front: Japanese Americans in the House of Jim Crow* (Chicago: University of Chicago Press, 2008) in *Journal of Southern History* 76 (February 2010): 197-9.

Paul Lombardo, *Three Generations, No Imbeciles: Eugenics, the Supreme Court, and* Buck v. Bell (Baltimore: Johns Hopkins University Press, 2008), and Michael Dorr, *Segregation's Science: Eugenics and Society in Virginia* (Charlottesville: University of Virginia Press, 2008) in *Virginia Magazine of History and Biography* 117 (2009): 302-4.

## PRESENTATIONS

**Invited Talks**

"Getting the Most Out of Your Graduate Degree," Beyond CMU Speaker Series, Department of History, Central Michigan University, March 12, 2021.

"American Lynching: Testimony, Dialogue, and Memory," Candler School of Theology, Candler School of Theology, Emory University, February 6, 2019.

"Racial Violence, Migration, and Mississippi's Hanging Bridge," Oregon Historical Society, Portland, Oregon, April 13, 2018.

*"The Swastika Entwined With Magnolia Blossoms: A Jewish Journalist Investigates Lynchings in the Wartime South," Holocaust Memorial Week, Oregon State University, Corvallis, April 12, 2018.*

"Monuments to Judge Lynch: Race, Memory, and the Violence of White Supremacy," Drexel University, Philadelphia, Pennsylvania, January 18, 2018.

"Lifting the Veil: A Southern White Woman Goes Undercover in Jim Crow Mississippi," Summersell Center for the Study of the South, University of Alabama, Tuscaloosa, October 12, 2017.

"Migration, Civil Rights, and Mississippi's Hanging Bridge," Rapp Road Historical Association, Albany, New York, July 19, 2017.

"The First Federal Lynching Investigation in Mississippi History: Why It Failed and What It Can Teach Us," Osher Lifelong Learning Institute, University of Southern Mississippi, Hattiesburg, Mississippi, June 5, 2017.

"Hanging Bridge: Lessons in Testimony, Investigation, and Coalition," Banquet Keynote, Mississippi Historical Society, March 3, 2017.

"The Violence of Voter Suppression," Mississippi Freedom Project, Samuel Proctor Oral History Program-University of Florida, Delta State University, Cleveland, Mississippi, September 8, 2016.

"Racial Politics in Mississippi during World War II." History Is Lunch, Mississippi Department of Archives and History, Jackson, Mississippi, February 6, 2013.

"Mississippi, Manhattan, and the Racial Politics of World War II," Academic Lecture Series, St. John's University, Queens, New York, April 13, 2012.

"Racial Violence and Symbolic Death at Mississippi's Hanging Bridge," Colloquium in History and Culture, Drew University, Madison, New Jersey, April 12, 2012.

"Memory and the Making of a Segregationist Movement," Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University, New Haven, Connecticut, April 11, 2012.

"Wanting the World to See: Mississippi's Hanging Bridge and the Wartime Politics of Racial Violence," Civil Rights and Restorative Justice Project, Northeastern University School of Law, Boston, Massachusetts, April 10, 2012.

"Mississippi's Hanging Bridge and the Racial Politics of World War II," Millsaps Friday Forum, Millsaps College, Jackson, Mississippi, February 24, 2012.

"Your County Could Be Next: Recovering the Deep South's Freedom Struggle," 2011 Black Belt Symposium, University of West Alabama, Livingston, Alabama, April 7, 2011.

"Generational Narrative and the Civil Rights Century: The Case of Mississippi's Hanging Bridge," Triangle African American History Colloquium, University of North Carolina at Chapel Hill, January 28, 2011.

**Conference Participation**

"Reinterpreting Southern Histories: A Roundtable." Panelist, Annual Meeting of the Southern Historical Association, Louisville, Kentucky, November 8, 2019.

"The Black Vote: Unraveling the History of an American Idea." A Celebration of Glenda Gilmore and Her Legacy, Yale University, New Haven, Connecticut, April 20, 2018.

"'When the Lynch Rope Fails, There Is Always the Draft': Racial Violence, Activist Families, and Grassroots Resistance in the Vietnam Era." Annual Meeting of the American Studies Association, Denver, Colorado, November 19, 2016.

"'There is a Revolution in Mississippi Today': Black Women, Federal Dollars, and White Backlash in the Civil Rights Era," Annual Meeting of the Mississippi Historical Society, Jackson, Mississippi, March 4, 2016.

"Fifty Years since Lester Maddox: Georgia's Massive Resistance to the New Right." Panelist, Annual Meeting of the American Historical Association, Atlanta, Georgia, January 10, 2016.

"The Mississippi Welfare League and the Origins of Racial Troubleshooting." Paper presented at the Annual Meeting of the Organization of American Historians, St. Louis, Missouri, April 17, 2015.

"The Coming of Age: Race, Youth, and Politics in the Twentieth Century South." Panel Commentator, Annual Meeting of the Southern Historical Association, Atlanta, Georgia, November 14, 2014.

"'I Would Be Just Like the KKK Over There': Racial Violence, Draft Resistance, and the Mississippi Freedom Struggle." Paper presented at the Annual Convention of the Association for the Study of African American Life and History, Memphis, Tennessee, September 25, 2014.

"Hunger and Poverty Politics in Mississippi's Ongoing Freedom Struggle." Paper presented at the Annual Meeting of the Agricultural History Society, Banff, Alberta, Canada, June 15, 2013.

"Contesting Planter Law: Black Activism in Arkansas." Panel Chair and Commentator, Southern Labor Studies Association, New Orleans, Louisiana, March 9, 2013.

"A 'Southern City' No More: White Supremacists, Civil Rights Activists, and D.C. Segregation, 1944-1956." Paper presented at the Annual Meeting of the American Historical Association, New Orleans, Louisiana, January 5, 2013.

"Power, Poverty, and Peace: Mississippi's Grassroots Militants and the Summer of '66." Paper presented at The Fire Every Time: Reframing Black Power across the Twentieth Century and Beyond, Avery Research Center, College of Charleston, South Carolina, September 21, 2012.

"The FEPC and the Making of a Segregationist Movement." Paper presented at the Annual Meeting of the Southern Historical Association, Baltimore, Maryland, October 30, 2011.

"'For Revolution's Sake': Grassroots Militancy, White Resistance, and the Meaning of Freedom in Rural Mississippi." Paper presented at the San Francisco State University Rights Conference, San Francisco, California, September 16, 2011.

"Racial Capitalism, Free Enterprise, and the Political Economy of Massive Resistance," Paper presented at the Southern Industrialization Project Meeting, University of Southern Mississippi-Gulf Park Campus, Long Beach, Mississippi, June 5, 2011.

"'A Monument to Judge Lynch': Symbolic Death and Racial Resistance at Mississippi's Hanging Bridge." Paper presented at Dying, Mourning, and Memory in the American South: An Interdisciplinary Conference, North Carolina State University, Raleigh, North Carolina, April 1, 2011.

"Caught Between Two Wars: Poverty Politics, Draft Resistance, and a Mississippi Family's Freedom Struggle." Paper presented at A Centennial Celebration of Civil Rights, University of Southern Mississippi, Hattiesburg, Mississippi, October 23, 2010.

"The District of Columbia as a Segregationist Battleground, 1944-1963." Paper presented at the San Francisco State University Rights Conference, San Francisco, California, September 16, 2010.

*"The Grass Roots Problem: Elites, Everyday Southerners, and White Opposition to Civil      Rights." Paper presented at the Annual Meeting of the Organization of American Historians,      Seattle, Washington, March 27, 2009.*

"The 1942 Shubuta Lynchings and the White South's 'Double V'." Paper presented at the  Annual Meeting of the Southern Historical Association, New Orleans, Louisiana, October 11, 2008.

"Archibald Rutledge's 'Negro Problem': Plantation Nostalgia and Civil Rights in the South Carolina Lowcountry." Paper presented at the Annual Meeting of the South Carolina Historical Association, Columbia, South Carolina, March 1, 2008.

"'Nazis Hoe Cotton': Planters, POWs, and the Future of Farm Labor in the Deep South." Paper presented at World War II: After 60 Years, Siena College, Loudonville, New York, June 3, 2005.

---

**TEACHING**

**EMORY UNIVERSITY**

HIST 232: The Making of Modern America (introductory survey course)
HIST 385: Terrorism in America (advanced undergraduate lecture course)
HIST 488: Racial Violence in Modern America (advanced undergraduate seminar)
HIST 495a: Introduction to Historical Interpretation (undergraduate honors thesis seminar)

HIST 585: Violence in American History (graduate readings course)

## COURSES TAUGHT AT OTHER INSTITUTIONS

**Mississippi State University**
HI 1073: Modern U.S. History
HI 3343: Delta History Service & Experiential Spring Break
HI 3903: Historiography and Historical Methods
HI 4163: The United States, 1917-1945
HI 4173: The United States Since 1945
HI 4373: Modern Civil Rights Movement
HI 4493: Terrorism in America, 1865-2001
HI 8803: Graduate Colloquium: Violence in American History
HI 8823: Graduate Seminar in US History: 1877-present
HI 8823: Graduate Seminar in US History: Oral History Theory and Practice
HI 8963: Graduate Colloquium in United States History Since 1945

**University of Pennsylvania**
HIST 231/AFRC 229: Racial Violence in Modern America (advanced undergraduate seminar)

**Yale University**
HIST 449b: Mississippi and America (advanced undergraduate seminar)

## THESES AND DISSERTATIONS DIRECTED

**Current Doctoral Students**
Amelia Golcheski (dissertation director)
Robert Billups (dissertation committee member)
Samuel Klee (external committee member, Universitetet i Oslo, Norway)

**Senior Honors Theses Directed (Emory)**
Melanie Mills Dunn (2021)
Martin Pimentel (2020)
Christina Morgan (2019)

**Dissertations Directed**
Michael Murphy, "Inhospitable in the Hospitality State: The Mississippi State Hospital in the Jim
    Crow South, 1865-1966" (2018)
Kevin Boland Johnson, "Guardians of Historical Knowledge: Textbook Politics, Conservative
    Activism, and School Reform in Mississippi, 1928-1982" (2014)

## FELLOWSHIPS, HONORS, AND AWARDS

### EXTERNAL
Nonfiction Prize, Mississippi Institute of Arts and Letters, 2017
McLemore Prize (best book related to Mississippi history), Mississippi Historical Society, 2017
Mellon Postdoctoral Fellowship, Penn Humanities Forum, University of Pennsylvania, 2013-14

Sole runner-up, Allan Nevins Prize, Society of American Historians, 2009
Finalist, C. Vann Woodward Dissertation Prize, Southern Historical Association, 2009
Everett E. Edwards Award (best graduate student article), Agricultural History Society, 2007
Ellison Durant Smith Research Award, Caroliniana Library, University of South Carolina, 2007
Travel and Research Grant, Institute for Southern Studies, University of South Carolina, 2007
Joel Williamson Visiting Scholar Grant, Southern Historical Collection, University of North
    Carolina at Chapel Hill, 2007

**INTERNAL**

University Nominee, Carnegie Corporation of America Fellows Program, Mississippi State
    University, 2016, 2017
Dean's Eminent Scholar, College of Arts and Sciences, Mississippi State University, 2016
William E. Parrish Outstanding Teaching Award, Department of History, Mississippi State
    University, 2013
Carolyn S. Cobb Faculty Award for Excellence in Research, Teaching, and Service, Mississippi
    State University, 2011
Humanities and Arts Research Program Fellow, College of Arts and Sciences, Mississippi State
    University, 2010
Will Clark-State Pride Faculty Award for Excellence in Research, Teaching, and Service,
    Mississippi State University, 2010
Ethnic Studies Affiliate, Program on Ethnicity, Race, and Migration, Yale University, 2006
Hugh T. Lefler Award, Historical Society of North Carolina, best undergraduate paper, 2001
William Laprade Prize, Department of History, Duke University, best honors thesis, 2001

## ACADEMIC POSITIONS

**EMORY UNIVERSITY**
Professor of History, Fall 2018-present

**MISSISSIPPI STATE UNIVERSITY**
Professor of History, Fall 2017-Fall 2018
Associate Professor of History, Fall 2013-Spring 2017
Assistant Professor of History, Fall 2008-Spring 2013

**UNIVERSITY OF PENNSYLVANIA**
Mellon Postdoctoral Fellow, Penn Humanities Forum, Fall 2013-Spring 2014

**YALE UNIVERSITY**
Part-Time Acting Instructor, Spring 2008.

## ACADEMIC AND PROFESSIONAL SERVICE

**TO THE PROFESSION**

Organization of American Historians
>   Member, 2022 Annual Meeting Program Committee, Spring 2020-present
>   Member, Committee on Committees, May 2018-Spring 2020

Southern Historical Association
>   Member, 2022 Annual Meeting Program Committee, Fall 2021-present
>   Board of Editors, *Journal of Southern History*, Fall 2019-present
>   Member, Membership Committee, Fall 2018-Spring 2020

Manuscript Referee for The Kent State University Press, Louisiana State University Press, Oxford University Press, University of Arkansas Press, University of Georgia Press, University of Nebraska Press, University of North Carolina Press, University Press of Mississippi

Article Referee for *Journal of Southern History, Modern American History, Journal of Civil and Human Rights, Journal of American Studies, Southern Spaces, Journal of Southern Religion, Virginia Magazine of History and Biography, Alabama Review, Journal of Mississippi History*

External Reviewer for Northwestern University, University of North Carolina at Chapel Hill, Syracuse University, University of Texas-Rio Grande Valley, Millsaps College,

Faculty Collaborator, Civil Rights and Restorative Justice Project, Northeastern University School of Law, Boston, Massachusetts, Spring 2012-present

**TO THE UNIVERSITY**

**Emory University (Spring 2019-present)**
Member, President's Task Force on Untold Stories and Disenfranchised Populations, Spring 2021
Director of Graduate Studies, Department of History, Fall 2019-present
Member, Graduate Studies Committee, Department of History, Fall 2018-Spring 2019

**Mississippi State University (Fall 2008-Spring 2018)**
Faculty Associate, Center for the History of Agriculture, Science, and the Environment of the South (CHASES), Mississippi State University, Fall 2012-Spring 2018
Co-Creator, Course Designer, and Department Liason, Delta Alternative Spring Break, Office of Student Leadership and Community Engagement, Spring 2012-Spring 2018
Chair, Promotion and Tenure Committee, Department of History, Mississippi State University, Fall 2017-Spring 2018
Member, Teaching Evaluation Committee, Mississippi State University, Fall 2014-Spring 2017
Member, Curriculum Committee, College of Arts and Sciences, Mississippi State University, Fall 2010-Spring 2013

**PROFESSIONAL MEMBERSHIPS**
American Historical Association
Organization of American Historians
Southern Historical Association

# APPENDIX B
## Reliance Materials

**Government Documents**

*Congressional Record,* 75th Congress, 3rd Session, 1938.

Hearings before Subcommittee No. 5 of the Committee on the Judiciary, House of Representatives, 89th Cong., 1st sess., H.R. 6400 and other Proposals to Enforce the 15th Amendment of the Constitution of the United States, March 18, 19, 24, 25, 29, 30, 31, and April 1, 1965, Serial No. 2.

Kassinger, Edward T. "Unknown Subjects: Racial Discrimination in Registration of Negro Voters, State of Georgia," 24 October 1946, 128-31, 326-8, folder 1, file 44-114, Records of the Federal Bureau of Investigation, National Archives and Records Administration, College Park, Maryland.

*South Carolina in 1876: Report on the Denial of the Elective Franchise in South Carolina at the State and National Election of 1876*. United States: United States Government Printing Office, 1877.

United States Commission on Civil Rights, *Political Participation: A Study of the Participation by Negroes in the Electoral and Political Processes in 10 Southern States Since the Passage of the Voting Rights Act of 1965.* Washington, D.C.: United States Government Printing Office, 1968.

"Voting Rights: Evidence of Continued Need," Hearing Before the Subcommittee on the Constitution of the Committee on the Judiciary, House of Representatives, 109th Cong. 2nd sess., March 8, 2006, Serial No. 109-103, vol. I.

**Legal Records**

*Carrolton Branch of the NAACP v. Stallings,* 829 F. 2d 1547 (11th Cir. 1987)

**Manuscript Collections**

Papers of the National Association for the Advancement of Colored People. Library of Congress, Washington, District of Columbia.

Richard B. Russell Papers, Richard B. Russell Library for Political Research and Studies, University of Georgia, Athens.

Talmadge Pamphlets, Special Collections, McCain Library and Archives, University of Southern Mississippi, Hattiesburg, Mississippi.

**Published Primary Sources**

*Life and Labors of Henry W. Grady: His Speeches, Writings, Etc.* New York: H.C. Hudgins and Co, 1890.

Talmadge, Herman. *You and Segregation.* Birmingham: Vulcan Press, 1955.

**Newspapers, Periodicals, and Websites**

"A Negro Lynched," *New York Times,* 23 July 1889, 1.

Associated Press, "Georgia Man Arrested in Connection With Capitol Riot," *US News and World Report,* 18 February 2021.

"Crime," *The Crisis* 18 (July 1919): 155.

"Georgia Negroes Appeal to Courts as Dixiecrats Purge Voting Lists," *Chicago Defender,* 14 August 1948, 1-2.

"Georgia's George Relies on Prejudice to Save His Seat," [New York] *Amsterdam News,* 27 August 1938, A3.

"Hon. Thos. Hardwick Addresses Convention," *Atlanta Constitution,* 5 September 1906, 2.

King, Jr., M. L., "Letters to the Editor," *The Atlanta Journal Constitution,* 6 August 1946.

Nadler, Ben, and Anila Yoganathan, "Georgia House Passes GOP Bill Rolling Back Voting Access," *Associated Press,* 1 March 2021.

"Negro Lynching by Georgia Mob," *New York Times,* 19 February 1918, 6.

"North Carolina's Sweet Womanhood Appeals to the Ballot for Protection," *Atlanta Constitution,* 2 October 1898, 5.

Olmstead, Molly. "Georgia Gubernatorial Candidate Begins 'Deportation Bus' Tour With Promise to 'Fill This Bus With Illegals'," *Slate,* 16 May 2018.

*Poll Tax Repealer,* September 1942, 1.

Schwarz, Hunter. "Georgia State Senator Upset Over Efforts to Increase Voter Turnout in Black, Democratic Area," *Washington Post,* 10 September 2014.

"Sheet, Sugar Sack, and Cross," *Time,* 15 March 1948.

Sheinin, Aaron Gould. "Deal Apologizes for 'Ghetto' Remark," *Atlanta Journal-Constitution,* 6 October 2009

"Text of the Platform Adopted by the Democratic Convention," *Atlanta Constitution,* 5
  September 1906, 6.

"The Georgia Election," *Harpers Weekly,* 19 October 1872, 833.

White, Walter F. "The Work of a Mob," *The Crisis* 16 (September 1918): 221-3.

Yen, Hope, Jeff Amy, and Michael Balsamo, "AP FACT CHECK: Trump's Made-Up Claims of
  Fake Georgia Votes," *Associated Press,* 3 January 2021.

**Books and Articles**

Anderson, Carol. *One Person, No Vote: How Voter Suppression Is Destroying Our Democracy.*
  New York: Bloomsbury Publishing, 2018.

Applebome, Peter. *Dixie Rising: How the South is Shaping American Values, Politics, and
  Culture.* New York: Harcourt, Brace, and Co., 1996.

Bartley, Numan V. *The Creation of Modern Georgia.* Athens: University of Georgia Press, 1990.

Bernd, Joseph L. "White Supremacy and the Disfranchisement of Blacks in Georgia, 1946." *The
  Georgia Historical Quarterly* 66 (Winter 1982): 492-513.

Brooks, Jennifer E. *Defining the Peace: World War II Veterans, Race, and the Remaking of
  Southern Political Tradition.* Chapel Hill: The University of North Carolina Press, 2004.

Brown-Marshall, Gloria J. *The Voting Rights War: The NAACP and the Ongoing Struggle for
  Justice.* New York: Rowman and Littlefield, 2016.

Boyd, Tim S. R. *Georgia Democrats, the Civil Rights Movement, and the Shaping of the New
  South.* Gainesville: University Press of Florida, 2012.

Brundage, W. Fitzhugh. *Lynching in the New South: Georgia and Virginia, 1880-1930.* Urbana
  and Chicago: University of Illinois Press, 1993.

Dray, Philip. *At the Hands of Persons Unknown: The Lynching of Black America.* New York:
  Modern Library, 2003.

Du Bois, W.E.B. *Black Reconstruction in America.* New York: Russell and Russell, 1935.

Emberton, Carole. *Beyond Redemption: Race, Violence, and the American South After the Civil
  War.* Chicago: University of Chicago Press, 2013.

Feimster, Crystal. *Southern Horrors: Women and the Politics of Rape and Lynching.* Harvard
  University Press, 2009.

Foner, Eric. *A Short History of Reconstruction, 1863-1877.* New York: Harper Perennial, 1990.

Formwalt, Lee W. "The Camilla Massacre of 1868: Racial Violence as Political Propaganda." *The Georgia Historical Quarterly* 71 (Fall 1987): 399-426.

Freeman, David B. *Carved in Stone: The History of Stone Mountain.* Macon, Ga: Mercer University Press, 1997.

Godshalk, David Fort. *Veiled Visions: The 1906 Atlanta Race Riot and the Reshaping of American Race Relations.* Chapel Hill: University of North Carolina Press, 2005.

Grantham, Dewey W. "Georgia Politics and the Disfranchisement of the Negro, *The Georgia Historical Quarterly* 32 (March 1948): 1-21.

Kousser, J. Morgan. *Colorblind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction.* Chapel Hill: University of North Carolina Press, 1999.

———. *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910.* New Haven: Yale University Press, 1974.

Korobkin, Russell. "The Politics of Disfranchisement in Georgia," *The Georgia Historical Quarterly* 74 (Spring 1990): 20-58.

Kruse, Kevin M. *White Flight: Atlanta and the Making of Modern Conservatism.* Princeton: Princeton University Press, 2007.

Lawson, Steven F. *Black Ballots: Voting Rights in the South, 1944-1969.* New York: Columbia University Press, 1976.

McDonald, Laughlin. *A Voting Rights Odyssey: Black Enfranchisement in Georgia.* Cambridge: Cambridge University Press, 2003.

McWhirter, Cameron. *Red Summer: The Summer of 1919 and the Awakening of Black America.* New York: Henry Holt and Company, 2011.

Perman, Michael. *Struggle for Mastery: Disfranchisement in the South, 1888-1908.* Chapel Hill: University of North Carolina Press, 2001.

Pooley, Karen. "Segregation's New Geography: The Atlanta Metro Region, Race, and the Declining Prospects for Upward Mobility," *Southern Spaces*, 15 April 2015 [n.p., online]

Riser, R. Volney. *Defying Disfranchisement: Black Voting Rights Activism in the Jim Crow South, 1890-1908.* Baton Rouge: Louisiana State University Press, 2013.

Tolnay, Stewart Emory and E. M. Beck. *A Festival of Violence: An Analysis of Southern*

*Lynchings, 1882-1930.* Urbana: University of Illinois Press, 1995.

Tuck, Stephen G. N. *Beyond Atlanta: The Struggle for Racial Equality in Georgia, 1940-1980.* Athens: University of Georgia Press, 2001.

Ward, Jason Morgan. *Defending White Democracy: The Making of a Segregationist Movement and the Remaking of Racial Politics, 1936-1965.* Chapel Hill: The University of North Carolina Press, 2011.

Williams, Kidada E. *They Left Great Marks on Me: African American Testimonies of Racial Violence from Emancipation to World War I.* New York: New York University Press, 2012.

Woodward, C. Vann. *Tom Watson: Agrarian Rebel.* New York: MacMillan, 1938.