## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ALPHA PHI ALPHA FRATERNITY
INC., *et al.*,

     *Plaintiffs*,

v.

BRAD RAFFENSPERGER,

     *Defendant*.

CIVIL ACTION

FILE NO. 1:21-CV-05337-SCJ

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION[1]

---

[1] Plaintiffs filed two motions for preliminary injunction in this case, [Doc. 26] and [Doc. 39], that are largely identical. While this brief responds to [Doc. 39] per this Court's order, [Doc. 36], both motions should be denied for the reasons contained in this brief.

# INTRODUCTION

The Georgia General Assembly spent from June 15, 2021 through November 22, 2021 creating redistricting plans for the state House and state Senate. Plaintiffs ask this Court—on an emergency basis—to declare those efforts a violation of the Voting Rights Act and put new maps in place that differ in every respect from those adopted by the legislature. According to an analysis by Defendant's expert, only *one district* out of 236 state Senate and state House districts on Plaintiffs' illustrative plans is the same as those adopted by the legislature. In short, Plaintiffs do not seek to fix a few isolated problems. They do not seek targeted relief involving a limited number of districts. They seek to completely redraw the plans for the state Senate and state House in a matter of days without input from the public, elected officials, or anyone else except their expert's view—and they seek to do so too late to afford any relief for the 2022 elections.

This Court should deny Plaintiffs' motion because voters are not well served by a "chaotic, last-minute reordering of . . . districts. It is best for candidates and voters to know significantly in advance of the petition period who may run where." *Favors v. Cuomo*, 881 F. Supp. 2d 356, 371 (E.D.N.Y. 2012) (three-judge court) (citing *Diaz v. Silver*, 932 F. Supp. 462, 466-68 (E.D.N.Y. 1996) (three-judge court)).

But this Court should also deny the motion because (1) Plaintiffs have not shown they can prevail on the merits of the claim since they have not submitted evidence of the compactness of the relevant minority community, they only offer unconstitutional remedies, and significant reason for doubt exists about the legal effect of the polarized voting they identify; (2) Section 2 cases are not well-designed for preliminary injunctions given the fact-intensive nature of the claims, preventing a searching analysis of the totality of the circumstances; (3) significant questions exist about this Court's ability to act without a three-judge panel and when no private right of action exists; and (4) the remaining injunctive factors do not favor Plaintiffs. This case can proceed on a non-emergency track to hear Plaintiffs' claims in time for the 2024 elections, but this Court should not disrupt the 2022 election process.

## FACTUAL BACKGROUND

### I.    The 2021 redistricting plans.

The Georgia General Assembly began the process of developing redistricting maps on June 15, 2021, holding a series of joint committee meetings through the summer to take input from voters.[2] The committees

---

[2] Committee Meeting Archives, https://www.house.ga.gov/Committees/en-US/CommitteeArchives114.aspx

released an educational video about the process during their first meeting.[3]
They created an online portal for voters to offer comments and made all of those
comments public.[4] They undertook a day of committee education from a variety
of groups interested in the redistricting process.[5] They adopted committee
guidelines to govern the creation of redistricting plans.[6] Both House and
Senate committee chairs sought to meet with every member of their respective
bodies to gain input.

The Democratic caucuses of the House and Senate released proposed
plans.[7] The chairs likewise released draft plans for each body. Both chairs then
made further modifications based on guidance from individual legislators and

---

[3]      Joint      Redistricting      Informational      Video,
https://www.youtube.com/watch?v=RXbgkTxXOkQ

[4] Joint Reapportionment Public Comments, https://www.legis.ga.gov/joint-office/reapportionment/public-comments

[5]      August      30,      2021      Joint      Meeting,
https://www.youtube.com/watch?v=kUed1Ku6zBQ

[6] House Guidelines: https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/2021-2022-house-reapportionment-committee-guidelines.pdf?sfvrsn=f1b4cc44_2; Senate Guidelines: https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/2021-senate-redistricting-committee-guidelines.pdf?sfvrsn=a9bbb991_2

[7] Notably, each of these Democratic plans included far fewer majority-Black districts than those proposed by Plaintiffs here and fewer on the House plan than the as-passed plan. Dec. of John Morgan, attached as Ex. A ("Morgan Dec.") at ¶¶ 9-13. The Democratic Senate plan included 15 majority-Black districts and the Democratic House plan included 45 majority-Black districts using any-part-Black voting age population. *Id.*

voters, with the final maps passing by the final day of the special session on November 22, 2021—completing a 160-day long process to arrive at redistricting maps, even accounting for the delays in the Census data release due to COVID-19.[8]

The final plans complied with the guidelines adopted by the committees. The adopted state Senate plan split only 29 counties, which was a reduction in the total number of splits from the prior plan. Morgan Dec. at ¶ 21. Likewise, the adopted state House plan split only 69 counties. *Id*. at ¶ 22.

The final plans also protected incumbents of both parties, pairing no incumbents who are running for reelection on the state Senate plan and only four incumbent pairings on the state House plan. Morgan Dec. at ¶¶ 14-18. The Senate plan includes districts that were also included in the maps drafted by the Democratic caucus. Morgan Dec. at ¶ 19.

## II.    The 2022 election timeline.

Georgia statutes contain specific provisions related to the timeline for elections. A copy of the 2022 election calendar for the state as generated by the

---

[8] Maps that were publicly released are included in the "Proposed Plans" tab on the Legislative and Congressional Reapportionment Office website, https://www.legis.ga.gov/joint-office/reapportionment

Secretary of State's office is attached as Ex. 1 to the Declaration of Michael Barnes, which is itself attached as Ex. B to this brief ("Barnes Dec.").

The 2022 election cycle effectively began on January 13, 2022, when candidates and their supporters could begin circulating nomination petitions. O.C.G.A. § 21-2-170(e). Only individuals who are "entitled to vote in the next election for the filling of the office sought by the candidate," O.C.G.A. § 21-2-170(c), may sign nomination petitions, so for district-based elections, final district maps are required for this process.

On March 7, 2022, candidates begin qualifying for office and voters may begin applying for absentee ballots for the primary elections. O.C.G.A. §§ 21-2-153(c)(1)(A) (qualifying), 21-2-381(a)(1)(A) (absentee applications). Leading up to the March 7 start of qualifying, county registrars are updating street segments in the voter-registration database, which is known as eNet. Barnes Dec. at ¶ 6. This process requires registrars to update voter districts and to conduct error checks to be sure voters are allocated to the right districts. Barnes Dec. at ¶ 7.

Once registrars have completed updating voter districts, the Secretary's office begins the process of creating "ballot combinations." Barnes Dec. at ¶ 8. Within one county, there can be a number of different combinations of Congressional, state Senate, state House, and local election districts and

currently there are more than 2,000 such combinations. Barnes Dec. at ¶ 9. Each of these combinations must be built into the election management database before qualifying so candidate names can be added and ballots can be generated for voters. Barnes Dec. at ¶ 9. This election cycle is the first time the Secretary's office has built ballot combinations for elections in the Dominion election management system following a statewide redistricting process. Barnes Dec. at ¶ 10.

Ballot combinations must be ready in time for candidate qualifying so that there is no delay preparing primary ballot proofs. Barnes Dec. at ¶ 11. When qualifying is completed on March 11, the Secretary's office adds each candidate name to the relevant contests in each district, so they appear on the correct ballot combinations. Barnes Dec. at ¶ 12. The Secretary's office then generates proofs of every ballot combination for each county and sends those proofs to county election officials for review and editing. Barnes Dec. at ¶ 13. County officials must complete their review and all edits must be made in time for absentee ballots to go out by the UOCAVA deadline of April 5, 2022. Barnes Dec. at ¶ 14; O.C.G.A. § 21-2-384(a)(2).

In order to ensure that all of these deadlines are met, the Secretary's office has instructed county election officials to complete the reallocation process for voters no later than February 18, 2022. Barnes Dec. ¶ 15, Ex. 2.

County registrars generally need several weeks to complete the reallocation process for voters in their particular counties. Barnes Dec. at ¶ 16.

### III. Plaintiffs' illustrative plans.

Plaintiffs dismiss any timing concerns by pointing to their illustrative plans, which they say can "easily expedite" the process of addressing their concerns by being adopted by the Court.[9] [Doc. 39-1, p. 41]. But those plans redraw almost every district on the state Senate and state House plans while adding five majority-Black Senate districts and five majority-Black House districts. [Doc. 39-3, pp. 6-7] (the "Cooper Report").

Plaintiffs' illustrative plans differ in every respect from the adopted plans and violate a number of the guidelines adopted by the General Assembly. An analysis of the illustrative plans compared to the adopted plans found that only one district—House District 003—was the same on both the illustrative plans and the House plans adopted by the General Assembly. Morgan Dec. at ¶ 19. Not a single district of the illustrative Senate plan was the same as the adopted Senate plan. *Id.*

---

[9] This sets aside the fact that the *Alpha Phi Alpha* plaintiffs and the *Grant* plaintiffs disagree on the required remedial districts for the state Senate and state House plans.

The illustrative plans also split more political subdivisions than the adopted plans, which is contrary to the legislative guidelines that prioritized leaving political subdivisions intact. The illustrative House plan splits five more counties and more than 70 additional precincts than the adopted House plan. Morgan Dec. at ¶¶ 20-22. The illustrative Senate plan likewise splits four more counties and nine more precincts than the adopted Senate plan. *Id.*

Using the incumbent databases provided by the General Assembly, the illustrative House plan places 26 incumbents in the same districts, as opposed to the adopted plan, which pairs far fewer.[10] Morgan Dec. at ¶¶ 17-18. The illustrative Senate plan likewise pairs more incumbents than the adopted plan, including Sens. Donzella James (D) and Horacena Tate (D) and Sens. Carden Summers (R) and Larry Walker (R). Morgan Dec. at ¶¶ 15-16. That is a sharp contrast to the adopted Senate plan, which pairs no incumbents that are running for reelection. *Id.*

The districts on the illustrative Senate plan are less compact overall than the adopted Senate plan, with the average Polsby-Popper and Reock compactness scores for the plans lower than the compactness of the adopted

---

[10] Given the provisions of the Georgia Constitution on candidate residency, it is impossible at this point for candidates to move into new districts before qualifying and still be eligible to run. GA. CONST. Art. III, Sect. II, Para. III.

Senate plan. Morgan Dec. at ¶¶ 23-24. While the overall compactness scores on the House plan are similar to the adopted plan, several districts on the illustrative plan are far less compact than the adopted House plan. *Id.*

## ARGUMENT AND CITATION OF AUTHORITY

### I.    Applicable legal standards.

### A.    Plaintiffs' burden to obtain a preliminary injunction.

Because preliminary injunctions are such extraordinary and drastic remedies, courts may not grant this type of relief "unless the movant clearly established the burden of persuasion as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F. 3d 1301, 1306 (11th Cir. 1998) (cleaned up). Plaintiffs must show that: (1) they have a substantial likelihood of success on the merits of their claims; (2) they will likely suffer irreparable harm in the absence of an injunction; (3) the balance of equities tips in Plaintiffs' favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

A preliminary injunction is never granted as a matter of right, even if a plaintiff can show a likelihood of success on the merits. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018). While it is already a form of extraordinary relief, that relief is even more drastic in the context of elections, because of the public

interest in orderly elections and election integrity. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006).

Further, when "an impending election is imminent and a State's election machinery is already in progress," equitable considerations justify a court denying an attempt to gain immediate relief. *Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *see also Repub. Nat'l Comm. v. Dem. Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). This is because parties must show they exercised reasonable diligence in filing their request for relief, especially in the context of elections. *Benisek*, 138 S. Ct. at 1944.

## B.    Standard for Section 2 redistricting cases.

Section 2 of the Voting Rights Act prohibits jurisdictions from diluting the strength of minority voters through a "standard, practice, or procedure" "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Proof of illegal vote dilution is established through a "totality of the circumstances" analysis. 52 U.S.C. § 10301(b).

To prove a violation of Section 2 in a vote-dilution case, a plaintiff bears the burden of first proving each of the three *Gingles* preconditions: "(1) that the minority group is 'sufficiently large and geographically compact to constitute a majority in a single-member district'; (2) that the minority group

is 'politically cohesive'; and (3) that sufficient racial bloc voting exists such that the white majority usually defeats the minority's preferred candidate." *Nipper v. Smith*, 39 F. 3d 1494, 1510 (11th Cir. 1994). After a plaintiff establishes the three preconditions, a court then reviews the so-called "Senate Factors" to assess the totality of the circumstances. *Id*. at 1512; *Thornburg v. Gingles*, 478 U.S. 30, 79, 106 S. Ct. 2752 (1986); *Johnson v. De Grandy*, 512 U.S. 997, 1011, 114 S.Ct. 2647 (1994). Failure to establish one of the *Gingles* preconditions is fatal to a Section 2 claim because each of the three prongs must be met. *See Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F. 3d 1335, 1343 (11th Cir. 2000); *Burton v. City of Belle Glade*, 178 F. 3d 1175, 1199 (11th Cir. 1999); *Brooks v. Miller*, 158 F. 3d 1230, 1240 (11th Cir. 1998); *Negron v. City of Miami Beach, Fla.*, 113 F. 3d 1563, 1567 (11th Cir. 1997).

II.   **Plaintiffs cannot succeed on the merits because their illustrative plans are not appropriate remedies (*Gingles* prong 1).**

   A.   **Plaintiffs have submitted no evidence on the compactness of the minority communities at issue.**

Plaintiffs fail to provide critical evidence on the first prong of *Gingles*, which requires a plaintiff to prove that the minority community is "sufficiently large and geographically compact to constitute a majority in a single district." 478 U.S. at 50-51. The various scores and calculations about Plaintiffs' illustrative plans do not provide any useful information to the Court on this

factor. Plaintiffs must do more than just draw a district—they must demonstrate connections between the disparate geographic communities they unite that go beyond race. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433, 126 S. Ct. 2594, 2618 (2006) (*LULAC*); *Bush v. Vera*, 517 U.S. 952, 997, 116 S. Ct. 1941 (1996). By relying solely on compactness scores of the *districts*, they miss the requirement of compactness of the underlying *community*.

Compactness of minority communities does not eliminate the need to consider the geographic boundaries in which those minority communities are situated. The Section 2 analysis of compactness is not centered on "the relative smoothness [and contours] of the district lines," but rather the compactness of the minority population itself. *LULAC*, 548 U.S. at 432-433. The inquiry, therefore, is whether "*the minority group* is geographically compact." *Id*. at 433 (quoting *Shaw v. Hunt*, 517 U.S. 899, 916 (1996) ("*Shaw II*")) (emphasis added). The lack of evidence on this point dooms Plaintiffs' claim to emergency relief.

**B.    The illustrative plans are not appropriate remedies.**

But even if Plaintiffs had shown some evidence of the compactness of the minority community, their claims still fail to pass the first prong of *Gingles*. The Eleventh Circuit prohibits the separation of the first prong of liability under *Gingles* and the potential remedy. *Nipper*, 39 F. 3d at 1530-31; *see also*

12

*Burton*, 178 F. 3d at 1199 ("We have repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy."); *accord Wright v. Sumter Cty. Bd. of Elections & Registration*, 979 F. 3d 1282, 1302 (11th Cir. 2020). Whatever plan is used to demonstrate a violation of the first prong of *Gingles* must also be a remedy that can be imposed by the Court. *Nipper*, 39 F. 3d at 1530-31. In short, if a plaintiff cannot show that the plan used to demonstrate the first prong can also be a proper remedy, then the plaintiff has not shown compliance with the first prong of *Gingles*. *Wright*, 979 F. 3d at 1302.

Plaintiffs cannot succeed because their illustrative plans are not proper remedies. First, the plans cannot be ordered as remedies by the Court because they do not defer to the legislature's policy choices for any districts except for one. Morgan Dec. at ¶¶ 19, 25. This is not a situation where Plaintiffs identified a few specific problems and modified those districts in the context of a larger statewide plan. Instead, they propose redrawing 179 of the 180 House districts and all 56 state Senate districts. *Id.*

"The Court has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to pre-empt." *Wise v. Lipscomb*, 437 U.S. 535, 539, 98 S. Ct. 2493, 2497 (1978). Instead of merely correcting the districts they claim are

illegal, Plaintiffs' expert drew a brand-new plan that reflected Plaintiffs' policy preferences. This is not appropriate deference to the legislature's policy decisions in districts that are not challenged by Plaintiffs and thus the illustrative plans cannot be ordered as a remedy. *Id*. Without a proper remedy, Plaintiffs are not likely to succeed as to the first prong of *Gingles*.

But that is not the only problem with Plaintiffs' proposed remedies. The second problem is that the boundaries of the districts on the illustrative plans are "unexplainable other than on the basis of race," which is unconstitutional. *Miller v. Johnson*, 515 U.S. 900, 910, 115 S. Ct. 2475, 2485 (1995). In creating the illustrative plans on which Plaintiffs rely, their expert had a singular goal: to create "additional majority-Black Senate and House districts beyond those created in the legislative plans that were signed into law." Cooper Report at ¶ 5. But "[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Bush v. Vera*, 517 U.S. 952, 979 (1996). While Plaintiffs' expert gives lip service to traditional redistricting principles, he never identifies a single factor he used to draw the illustrative plans besides race—not even "traditional districting principles such as maintaining communities of interest and traditional boundaries." *LULAC*, 548 U.S. at 433 (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997)). *See* Cooper Report at ¶¶ 71-83, 106-120. And in a number of places, he explains his

14

decision to draw particular districts solely based on the racial characteristics of those districts. *See, e.g.*, Cooper Report at ¶¶ 78, 81, 117, 119. The Voting Rights Act does not ask merely whether more majority-Black districts can be drawn—it asks whether *reasonably compact* majority-Black districts can be drawn if all other factors are also met. *Shaw II*, 517 U.S. at 913.

The decision in the illustrative plans to split certain counties also suggests that they were drawn primarily based on race in pursuit of apparent racial goals. For example, illustrative House District 144 is barely over majority status (50.5%) but splits Baldwin and Putnam Counties to reach Black voters in Milledgeville and Eatonton, respectively, while avoiding white voters around Lake Oconee. Cooper Report at ¶ 116, Figure 32, Ex. AA.

The illustrative plans also do exactly what the Supreme Court says plaintiffs cannot—uniting disparate geographic communities solely based on race. *LULAC*, 548 U.S. at 433. For example, illustrative Senate District 23 unites Black residents of Augusta/Richmond County with Black residents of Warner Robins in Houston County halfway across the state, with no indication how Plaintiffs concluded that those individuals share anything in common besides their skin color. Cooper Report at ¶ 82, Ex. N-1; *LULAC*, 548 U.S. at 433. The district also barely crosses the threshold as a majority-Black district. *Id*.

Thus, the illustrative plans are not appropriate remedies and Plaintiffs have not shown they are likely to succeed on the first prong of *Gingles*. *Burton*, 178 F. 3d at 1199. This alone is fatal to their preliminary-injunction motion.

## III.  Plaintiffs are not likely to succeed on the merits because of the nature of significant questions about the cause of polarized voting (*Gingles* prongs 2 and 3).

Plaintiffs offer the declaration of Dr. Lisa Handley in their effort to demonstrate voting is racially polarized in Georgia. But a quick review of her report makes something obvious—partisanship explains the polarization better than race. For example, the support of Black voters for Sen. Warnock and Sen. Ossoff is virtually identical. [Doc. 39-7, p. 26]. That holds true for every Republican versus Democratic matchup Dr. Handley analyzed, regardless of the race of the candidate. *Id.*

In order to succeed, Section 2 plaintiffs do not just have to show that voting is racially polarized—they have to prove that electoral losses are the result of racial bias and not partisan voting patterns. *Solomon v. Liberty County*, 221 F. 3d 1218, 1225 (11th Cir. 2000) (en banc); *see also League of United Latin Am. Citizens v. Clements*, 999 F. 2d 831, 854 (5th Cir. 1993) (en banc) ("failures of a minority group to elect representatives of its choice that are attributable to 'partisan politics' provide no grounds for relief").

This matters because "what appears to be bloc voting on account of race may, instead, be the result of political or personal affiliation of different racial groups with different candidates." *Solomon*, 221 F. 3d at 1225. This is why Section 2 claims present an "often-unstated danger": "Unless courts 'exercise extraordinary caution' in distinguishing race-based redistricting from politics-based redistricting, they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the political arena." *Cooper v. Harris*, 137 S. Ct. 1455, 1490 (2017) (Alito, J., concurring in part) (quoting *Miller*, 515 U.S. 916) (cleaned up).

Several judges on the Eleventh Circuit believed that, where partisanship causes the defeat of minority-preferred candidates, it is reversible error to find a Section 2 violation. *Nipper*, 39 F. 3d at 1525. This interpretation of Section 2 was based on the purpose and legislative history of the VRA itself:

> [S]ection 2 . . . prohibits voting practices that deny minority voters equal access to the political process *on account of race.* Indeed, "[w]ithout an inquiry into the circumstances underlying unfavorable election returns, courts lack the tools to discern results that are in any sense 'discriminatory,' and any distinction between deprivation and mere losses at the polls becomes untenable."
>
> *        *        *
>
> Unless the tendency among minorities and white voters to support different candidates, and the accompanying losses by minority groups at the polls, are somehow tied to race, voting rights plaintiffs simply cannot make out a case of vote dilution.

*Id.* at 1523-24 (citations omitted) (emphasis in original). This requirement of this type of proof is also why the Court should allow time to fully investigate whether racial bias exists or whether the polarization Dr. Handley found is better explained by partisan behaviors.[11] And whether the Court considers partisanship as part of the *Gingles* prongs 2 and 3 analysis or under the totality of the circumstances, it should not grant emergency relief to Plaintiffs because of the questions of fact that remain—Plaintiffs have not "clearly established" their likelihood of success.[12] *McDonald's Corp.*, 147 F. 3d at 1306.

## IV. Plaintiffs are not likely to succeed on the totality-of-the-circumstances analysis on an emergency basis.

Plaintiffs are also not likely to succeed on the required totality-of-the-circumstances analysis. This Court's duty when considering the "Senate factors" is to determine whether "the totality of the circumstances results in an unequal opportunity for minority voters to participate in the political process and to elect representatives of their choosing as compared to other

---

[11] Given the short timeline for a response, Defendant reserves the right to present additional evidence on this point at any hearing on Plaintiffs' motion.
[12] Indeed, if Section 2 of the Voting Rights Act requires partisan districting schemes that benefit only Democratic candidates, its constitutionality would be suspect. *See City of Boerne v. Flores*, 521 U.S. 507, 530 (1997).

members of the electorate." *Ga. State Conference of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F. 3d 1336, 1342 (11th Cir. 2015) ("*Fayette*").

This type of analysis is particularly ill-suited to emergency relief because the totality is generally weighed after significant discovery and a bench trial. Even grants of summary judgment to plaintiffs in Section 2 cases after discovery are "unusual." *Fayette*, 775 F. 3d at 1345. This is because "[n]ormally," Section 2 claims "are resolved pursuant to a bench trial." *Id.* at 1343. Ordering relief earlier in the case is problematic "due to the fact-driven nature of the legal tests required by the Supreme Court and [Eleventh Circuit] precedent." *Id.* at 1348. This remains true even when the parties agree on many basic facts at stages before a bench trial. *See Burton*, 178 F. 3d at 1187 (citing *Clemons v. Dougherty Cty., Ga.*, 684 F. 2d 1365, 1369 (11th Cir. 1982)).

Courts considering Section 2 claims must conduct an "intensely local appraisal" of the facts in the local jurisdiction, which is not generally amenable to resolution as a matter of law or on an emergency basis. *De Grandy*, 512 U.S. at 1020-21 (no statistical shortcuts to determining vote dilution); *Gingles*, 478 U.S. at 45, 78 (stating that courts must conduct a "searching practical evaluation of the 'past and present reality'" of the challenged electoral system and whether vote dilution is present is "a question of fact"); *White v. Regester*,

412 U.S. 755, 769-70 (1983) (assessing the impact takes place "in light of past and present reality, political and otherwise").

This is especially true when the Court faces difficulty weighing the totality of the circumstances as applied to Georgia in 2022. For example, the Senate factors include "majority vote requirements" as a discriminatory election practice. *Solomon*, 221 F. 3d at 1225-1226 (factor three). But a majority-vote requirement is the only way that Sen. Warnock and Sen. Ossoff—candidates Plaintiffs agree were preferred by Black voters in Georgia—succeeded in their recent elections.

Plaintiffs also offer scant evidence for many of the factors, especially considering the amount of relief they are seeking. For racial appeals, they only identify one statement from a former state representative made 17 years ago and one statement from former Governor Deal made 13 years ago. [Doc. 39-1, p. 36]. Plaintiffs' experts primarily identify other examples from unsuccessful candidates, which hardly would indicate that racism permeates Georgia political campaigns. [Doc. 39-8, pp. 28-30]. Indeed, Herschel Walker's widely reported frontrunner status[13] as the Republican nominee for U.S. Senate would tend to indicate a lack of racism in Georgia politics.

---

[13] *See, e.g.*, https://www.politico.com/news/2021/11/01/herschel-walker-georgia-senate-republican-primary-poll-518140

All of these factors demonstrate how difficult it is for the Court to assess the totality of the circumstances on an emergency basis and provide a separate basis for denying Plaintiffs' motion.[14]

## V.    Plaintiffs will not suffer any irreparable harm.

Because Plaintiffs are not likely to succeed on the merits, they are also not likely to suffer any irreparable harm. The lack of any certainty of vote dilution means that Plaintiffs will not certainly be harmed. The individual voter plaintiffs further will be entitled to vote in the upcoming elections, even if the candidates they support are not as favored in the current district configurations.

---

[14] Defendants were only able to identify a handful of cases where courts granted injunctions in Section 2 cases involving redistricting and those did not involve statewide redistricting plans. *See, e.g., Citizens for Good Gov't v. City of Quitman*, 148 F. 3d 472, 474 (5th Cir. 1998) (noting injunction issued to stop use of at-large method of election for county); *Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F. 3d 271, 273 (2d Cir. 1994) (appeal of injunction for city council elections); *Johnson v. Halifax Cty.*, 594 F. Supp. 161, 163 (E.D.N.C. 1984) (injunction granted to enjoin at-large method of electing county commissioners); *see also* Christopher Elmendorf and Douglas Spencer, *Administering Section 2 of the Voting Rights Act after Shelby County*, 115 Colum. L. Rev. 2143, 2158 (2015) ("Together, the fact-intensive nature of section 2 claims and the uncertain standard for liability make preliminary relief hard to obtain. Veteran litigators estimate that plaintiffs have secured preliminary injunctions in only about 5% of section 2 cases.").

## VI.   The equities and the public interest counsel heavily against any injunctive relief.

Plaintiffs' proposed injunction is not in the public interest because the granting of an injunction and the confusion that will follow would likely harm candidates who have announced for office based on the adopted district maps and result in voter frustration and confusion.

Litigation involving elections is unique because of the interest in the orderly administration and integrity of the election process. *Purcell*, 549 U.S. at 4. The risks of voter confusion and conflicting orders counsel against changing election rules, especially when there is little time to resolve factual disputes. *Id.* at 5-6. That is even more true when facing a "chaotic, last-minute reordering of . . . districts. It is best for candidates and voters to know significantly in advance of the petition period who may run where." *Favors*, 881 F. Supp. 2d at 371.

Since the completion of the map-drawing process on November 22, 2021, the Secretary's office has been advising local election officials to prepare to update the voter-registration database with new district information for each voter. Barnes Dec. at ¶ 5, Ex. 2. The time-consuming process of updating the voter-registration database must be completed by February 18, giving registrars only a few weeks from now to complete the entirety of the process so

that ballot combinations can be built. Barnes Dec. at ¶¶ 7-17. Absentee ballots must be created, proofed, and printed prior to April 5, 2022 so they can be sent to overseas and military voters by the deadline set by federal law. Barnes Dec. at ¶ 14. Any delay past February 18, 2022 in having final district information included for each voter places a substantial likelihood that the Secretary's office will not be able to complete the relevant tasks in time to hold the 2022 primary elections as scheduled. Barnes Dec. at ¶¶ 15-17. Further, candidate qualifying begins on March 7, 2022, O.C.G.A. § 21-2-153(c)(1)(A), and candidates must have final districts in which to qualify for the 2022 elections.

Nominating petitions became available for distribution to voters on January 13, 2022 for candidates who wish to obtain ballot access through the signature process. O.C.G.A. § 21-2-170(e). Changing district boundaries after that date could mean that individuals who signed a nominating petition may have been "entitled to vote in the next election for the filling of the office sought by the candidate," O.C.G.A. § 21-2-170(c), when they signed, but may no longer be eligible if district boundaries are later changed.

Finally, if this Court were to enjoin the use of any or all of the challenged redistricting plans, new districts should have been in place by January 13. And, because of the primacy of legislatures in creating districting plans, the Supreme Court requires that, where practicable, federal courts should give a

"reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise*, 437 U.S. at 540. Even using an extremely accelerated timeline, it is impossible to finish briefing this case, hold a hearing, rule, allow the legislature to create a remedial plan, and either consider the legislature's remedial plan or create a court-drawn plan in time for the applicable deadlines in 2022.

Moreover, in this instance, it is not just candidates who may now be confused because of Plaintiffs' sought injunction, but also poll workers, election officials, and supervisors who have been preparing to carry out their duties with the assumption that redistricting maps adopted by the General Assembly would be in effect. If this Court in the eleventh hour enjoins the redistricting plans, it will likely hamper the smooth administration of the upcoming election and potentially result in voter confusion or outright disenfranchisement. The public interest and the equities clearly favor denying the motion for preliminary injunction and instead allowing Plaintiffs to litigate this case on a non-emergency basis and seek relief for the 2024 elections.

## VII.  This Court lacks jurisdiction to grant any relief.

This Court also lacks jurisdiction for all of the reasons outlined in Defendants' motion to dismiss based on the lack of jurisdiction for a single-

judge court to consider this case and on the lack of a private right of action under Section 2. [Doc. 43]. Defendants incorporate those arguments by reference as a separate basis to deny Plaintiffs' motion.

## CONCLUSION

The General Assembly spent almost six months creating the district plans that Plaintiffs challenge here. Given the lack of evidence of success on the merits, the significant jurisdictional questions, and the timeline for elections, this Court should deny Plaintiffs' motion.

This 18th day of January, 2022.

Respectfully submitted,

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson

Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 678600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for Defendant*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned certifies that the foregoing

Response Brief has been prepared in Century Schoolbook 13, a font and type

selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson