# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ALPHA PHI ALPHA FRATERNITY
INC., a nonprofit organization on
behalf of members residing in Georgia;
SIXTH DISTRICT OF THE
AFRICAN METHODIST
EPISCOPAL CHURCH, a Georgia
nonprofit organization; ERIC T.
WOODS; KATIE BAILEY GLENN;
PHIL BROWN; JANICE STEWART,

      *Plaintiffs*,

vs.

BRAD RAFFENSPERGER, in his
official capacity as Secretary of State
of Georgia.

      *Defendant*.

Case No. 1:21-cv-5337

## PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................2

I.   Plaintiffs Established The Gingles Preconditions ...........................................2

   A.   Plaintiffs Satisfy Gingles I By Demonstrating Geographically
        Compact Black Populations And Appropriate Illustrative Plans
        That Eliminate The State's Section 2 VRAA Violations......................2

   B.   Plaintiffs Satisfy The Second And Third Gingles Preconditions..........7

II.  The Totality Of The Circumstances Weigh Strongly In Favor Of
     Plaintiffs.......................................................................................11

III. The Remaining Preliminary Injunction Factors Favor Plaintiffs .................14

CONCLUSION ...................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Crumly v. Cobb Cnty. Bd. of Elections & Voter Registration*, 892 F. Supp. 2d 1333 (N.D. Ga. 2012) ......................................................... 4

*Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-5391-SCJ (N.D. Ga. 2021) (Dkt. 636) ...................................................................... 14

*Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338 (N.D. Ga. 2015) ................................................ 11

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294 (N.D. Ga. 2013), *aff'd in part, vacated in part, rev'd in part on other grounds*, 775 F.3d 1336 (11th Cir. 2015) .............. 9, 10

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 996 F. Supp. 2d 1353 (N.D. Ga. 2014) ................................................ 3

*Gingles*. *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) (en banc) .................... 8, 9

*Goosby v. Town Bd. of Town of Hempstead*, 180 F.3d 476 (2d Cir. 1999) ............................................................................................ 8

*Larios v. Cox*, 314 F. Supp. 2d 1357 (N.D. Ga. 2004) (per curiam) ........................ 4

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ........................................................................................ 11

*League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022 WL 110261 (Ohio Jan. 12, 2022) ................................................. 16

*LULAC v. Perry*, 548 U.S. 399 (2006) ................................................................. 2

*Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018) .......................................................................................... 10

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ............................................................. 15

*Thomas v. Bryant*, 938 F.3d 134 (5th Cir. 2019), *vacated as moot sub nom. Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020) (en banc) (per curiam) .................................................................................16

*United States v. Dallas Cnty. Comm'n*, 791 F.2d 831 (11th Cir. 1986)..................11

*United States v. State of Georgia*, 1996 WL 480861 (N.D. Ga. Apr. 9, 1996) ..................................................................................11

*Wise v. Lipscomb*, 437 U.S. 535 (1978)....................................................3

*Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020) ...........3, 12

**INTRODUCTION**

Fair districts that do not dilute minority voting strength are fundamental to our democracy. Election administration is a necessarily flexible endeavor, and an illegal election can never be undone. Recognizing these basic truths, federal courts routinely craft interim remedies that balance the need for orderly elections with the right of every citizen to equal participation in the political process. Plaintiffs ask this Court to do no more here, but also no less.

The State's opposition argues that, in light of ostensibly immovable deadlines and the supposed complexity of unraveling its own unlawful conduct, there is no relief that the Court may grant before this fall's elections. In essence, the State asserts that it *must* be permitted to conduct one round of illegal elections per redistricting cycle. *See* Opp. 1-2. That position would eviscerate the guarantees of the Voting Rights Act ("VRA"), and its premise is belied by the State's own conduct. Just twelve days elapsed from the publication of the challenged maps to their passage in the General Assembly—hardly the searching, "160-day long" ordeal described in the opposition, Opp. 4. Yet despite the predictability of litigation just like this, the maps then sat on the Governor's desk for nearly 40 days before they were signed into law. Compl. ¶60.

Plaintiffs, by contrast, filed their complaint within minutes of the Governor's

signature. This motion followed eight days later, and Plaintiffs made clear they were prepared for an expedited schedule that obviated administrative concerns. Dkt. 28 at 10. Again and again, Plaintiffs have moved with all possible speed to accommodate the supposed time constraints the State relies on in its brief. Again and again, the State manufactures reasons why this litigation is too late (Opp. 2), or too soon (Opp. 21), or too fast (Opp. 18 n.11), or too slow (Opp. 23).

Plaintiffs have moved with expedition because fundamental rights hang in the balance. The evidence supporting Plaintiffs' likelihood of success is not just strong but largely uncontested, and voters should not be forced to accept the unlawful diminution of their votes for even one election. The Court should grant the motion for preliminary injunction.

## ARGUMENT

I. **Plaintiffs Established The *Gingles* Preconditions**

A. **Plaintiffs Satisfy *Gingles I* By Demonstrating Geographically Compact Black Populations And Appropriate Illustrative Plans That Eliminate The State's Section 2 VRA Violations**

In baldly contending (Opp. 11-12) that Plaintiffs have not provided evidence to show the compactness of the minority population as required in Section 2 VRA cases, *LULAC v. Perry*, 548 U.S. 399, 433 (2006), the State simply ignores the substantial evidence offered by multiple experts. For example, demographer

William Cooper submitted a report, supported by numerous exhibits, identifying and describing with particularity key areas in the State with large and growing Black populations—including the Black Belt—where Black voters were sufficiently compact to support additional majority-Black districts. *See* Dkt. 39-3 (Cooper Decl.) ¶¶ 16-30 & Exs. C-F; *see also* Dkt. 39-9 (Burch Decl.) 29-33. The State's refusal to engage with this evidence cannot make it disappear.

The remainder of the State's *Gingles I* arguments take issue with Plaintiffs' remedial plans. None of these criticisms carry weight.

*First*, the Court need not adopt the Illustrative Plans as-is in order to rule in Plaintiffs' favor, as Defendant implies. Opp. 13. *Gingles* requires Plaintiffs to show their illustrative plan is "likely to give African Americans a more proportional representation … than does the current plan," not necessarily that it is the one that should be put into place. *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020). And once a plaintiff establishes a violation of the VRA, the legislature is given an opportunity to redraw the map. Only if it fails to do so will the Court devise a reapportionment plan. *See Wise v. Lipscomb*, 437 U.S. 535, 540 (1978); *see, e.g.*, *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1359 (N.D. Ga. 2014). The Illustrative Plans demonstrate that a viable remedy is

3

possible, which is all that is required at this stage.

*Second*, the State errs in asserting that the Illustrative Plans do not sufficiently defer to the legislature because they modify too many district lines. Opp. 14. There is no basis to defer to the legislature's choice of *unlawful* district lines. *See Larios v. Cox*, 314 F. Supp. 2d 1357, 1360–62 (N.D. Ga. 2004) (three-judge court) (per curiam). Moreover, the State dramatically overstates the extent to which the Illustrative Plans differ from the boundaries in the enacted maps; the districts in the two sets of maps overlap on average by about 65% for the Senate and 61% for the House. Cooper Rebuttal ¶16. And the State says nothing about the significance of the differences between the districts in the opposing plans; many are minor and could be revised at the remedy stage. *See* Cooper Rebuttal ¶19; *Crumly v. Cobb Cnty. Bd. of Elections & Voter Registration*, 892 F. Supp. 2d 1333, 1348 (N.D. Ga. 2012).

In any case, the disparities between the plans make sense. The benchmark for the Illustrative Plans was the prior enacted plans, not the 2021 Plans (which were signed into law mere weeks ago).[1] And even if the 2021 Plans had been the benchmark, the Illustrative Plans must alter district lines in a number of regions in

---

[1] Even if Mr. Morgan were using the right map, core constituency analysis is not germane to whether illustrative maps comply with traditional redistricting principles because preservation of prior district cores is not one of Georgia's traditional redistricting guidelines. Dkt. 39-17, Cooper Rebuttal ¶17.

order to remedy the significant vote dilution in the State's map while complying with Georgia's strict 1% (Senate) and 1.5% (House) population deviation requirements. Dkt. 39-17 Section III(A)(1). Under these significant constraints, even small changes to a single district necessarily ripple across others. Cooper Rebuttal ¶18.

*Third*, Defendant accuses Plaintiffs of being singularly focused on racial considerations at the expense of traditional redistricting principles. Opp. 14-15. The record again belies this claim. Mr. Cooper drew additional Black-majority districts consistent with traditional districting principles, such as compactness, minimizing county splits, incumbent protection, and maintaining communities of interest, *see* Cooper Decl. ¶¶5, 8; *see also* Cooper Rebuttal ¶30.

The State specifically targets HD144 and SD23, but these challenges falter. With respect to HD144, Mr. Cooper brought much of the historical Black Belt into a Black-majority district, respecting a longstanding community of interest. He united Milledgeville (almost 50% Black) with Hancock County and much of the Census-recognized Milledgeville micropolitan statistical area, which is defined by regional economics and transportation patterns beyond race. Cooper Rebuttal ¶31. In doing so, Mr. Cooper remedied the 2021 House Plan's split of Baldwin County, which separated Milledgeville from the Black Belt and diluted Black voting strength there, as well as its dilution of the voting strength of Black voters in Eatonton (almost 60%

Black) and elsewhere. Cooper Rebuttal ¶¶31, 33. Mr. Cooper also properly drew SD23 to encompass the Eastern Black Belt area, preserving a significant community of interest united by history (Cooper Decl. ¶22), geography (Cooper Decl. ¶¶16, 23, Exs. D, F), and socioeconomic similarities (Cooper Decl. Ex. CD; Cooper Rebuttal ¶¶34-35)—not merely race.

The State wrongly downplays Mr. Cooper's efforts to retain communities of interest. Indeed, Plaintiffs' socioeconomic and other evidence (Cooper Decl. Ex. CD) further demonstrates how the Illustrative Plans unify Black communities in the Metro Atlanta area with similar socioeconomic traits, such as high labor force participation rates in Fayette, Spalding, and Clayton Counties (Cooper Rebuttal ¶¶36-37); comparatively higher levels of post-secondary education in Henry, Rockdale, and Dekalb Counties (Cooper Rebuttal ¶¶39-40); or lower levels of education in the State-recognized economic, cultural, and transportation corridor connecting Dougherty, Thomas, and Mitchell Counties (Cooper Rebuttal ¶¶47-48). This rebuts the claim that the Illustrative districts' boundaries are "unexplainable other than on the basis of race." Opp. 14-15.

The State's remaining arguments similarly fail. Its proffered expert concedes that the Illustrative Plan districts are "similar" to the 2021 Plans' in terms of overall compactness, Morgan Decl. ¶24; *see also id.* Fig. 5 (listing comparable compactness

scores for districts in both sets of plans), and the specific Illustrative Plan districts that Defendant highlights fall within the norm, Cooper Decl. ¶¶84, 123; Cooper Rebuttal ¶28. The State also takes issue with the splits of political subdivisions in the Illustrative Plans (Morgan Decl. ¶¶21-22), but the number of county splits in the Illustrative House Plan (74) is comparable to the number in the State's map (69); the same is true for the Illustrative Senate Plan (33 versus 29 in the State's map). *Id.* The number of municipal splits in the Illustrative Plans are within the norm and on par with the 2021 Plans. Cooper Rebuttal ¶¶20-25. Finally, the State takes issue with incumbent pairings in the Illustrative Plans, most of which were only made known to Plaintiffs with the filing of Defendant's opposition brief and the subsequent disclosure of an internal database with updated incumbent address information. *See* Morgan Decl. ¶¶15-18; Cooper Rebuttal ¶4. Mr. Cooper was able to resolve more than half of the newly identified conflicts in just a few hours, bringing the Illustrative Plans close to par with the 2021 Plans. *See* Cooper Rebuttal ¶¶9-13 and Exs. A1-A7.

## B. Plaintiffs Satisfy The Second And Third *Gingles* Preconditions

The State's only argument on the second and third *Gingles* preconditions is unsupported speculation that "partisanship explains the polarization better than race." Opp. 16. But evidence about the *causes* of any racially polarized outcomes is relevant only to the totality of the circumstances, not the *Gingles* preconditions. And

the State's conclusory assertions fail on the facts—the unrebutted record proves race drives racially polarized voting in the areas at issue.

*First*, a defendant's attempt to "show[] that the community's voting patterns can best be explained by other, non-racial circumstances" does "not rebut[] the plaintiff's evidence of racial bloc voting" under *Gingles*. *Nipper v. Smith*, 39 F.3d 1494, 1524 & n.60 (11th Cir. 1994) (en banc) (opinion of Tjoflat, C.J.). Instead, such evidence—which the State has failed to offer here—would go only to the broader "totality of the circumstances" and would have no effect on whether the preconditions themselves have been met. *Id.* Said otherwise, "inquiry into the *cause* of white bloc voting is not relevant to a consideration of the *Gingles* preconditions." *Goosby v. Town Bd. of Town of Hempstead*, 180 F.3d 476, 493 (2d Cir. 1999) (collecting cases).

*Second*, the State offers no response (expert or evidentiary) to Plaintiffs' exhaustive evidence that cohesive communities of Black voters support the same candidates, and blocs of white voters consistently defeat those candidates where Black voters are not in the majority. *See* Br. 18-25; Dkt. 39-7 (Handley); Opp. 16-18. Across dozens of races in the areas where the State could have drawn additional Black-majority districts, Black voters have coalesced around a Black candidate, only to see their chosen representative defeated by a white candidate backed by a bloc of

white voters. *See* Handley Corrected app. B; Br. 21-24. When statewide races are analyzed in the areas relevant here, the results are the same. *See* Handley 14-20 (detailing the "GE Score" in the enacted districts, which averages the share of the vote received by Black-preferred candidates). These primarily biracial contests provide "the most probative evidence of whether minority voters have an equal opportunity to elect candidates of their choice." *Nipper*, 39 F.3d at 1540. The State's "conclusory assertion" that this consistent pattern of "racial bloc voting could potentially be related to politics rather than race" should be rejected out of hand. *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1316 (N.D. Ga. 2013) (so doing), *aff'd in part, vacated in part, rev'd in part on other grounds*, 775 F.3d 1336 (11th Cir. 2015).

Even if partisanship were to be considered, Dr. Handley's analysis also shows consistent racially polarized voting in Democratic primary elections in the areas where the State could have drawn additional Black-majority districts. *See* Handley 8 & app. A; Handley Rebuttal 1-2.[2] In all six areas, at least 62.5% of the eight

---

[2] An exception to racially polarized voting in these areas is Jon Ossoff's primary race, but "there is less probative value in an election that is marked by special circumstances that suggest that the election was not representative of the typical way in which the electoral process functions." *Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1040 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018). Little needs to be said about how atypical the political

Democratic primaries analyzed were polarized.  Handley Rebuttal 1. For example, in the 2018 Democratic primary for Lieutenant Governor, the white candidate received an average of more than 83% of the white vote in these areas, and the Black candidate received an average of nearly 60% of the Black vote. Handley app. A. Similarly, in the 2018 Democratic primary for the Commissioner of Insurance, the white candidate received on average more than 60% of the white vote, and the Black candidate received on average more than 78% of the Black vote. *Id.* These contests, in which party affiliation is taken out of the equation, rebut the conclusory assertion that party, not race, drives voting choice.

More fundamentally, Plaintiffs' experts have also described how race affects political affiliation, particularly in Georgia. Dr. Burch described how "living in Black belt areas with … legacies of slavery predict white partisan identification and racial attitudes." Dkt. 39-9 at 34. Dr. Ward described how the composition and positions of political parties in Georgia were forged in response to the history of Black political participation. Dkt. 39-10 at 6, 17-18. Dr. Jones detailed how "[r]acial resentment and fear" have driven political strategies and campaigns into the present

---

situation was in January 2021. The State also gets the import of the 2021 Senate run-offs backward; the fact that a candidate was, in these exceptional circumstances, preferred by nearly all Black voters and less than a third of white voters simply demonstrates the durability of racially polarized voting in Georgia. *See* Handley 26.

day. Dkt. 39-8 at 28-31.[3] This confirms what the numbers made clear. The State's proffer of "no evidence, only speculation" cannot overcome Plaintiffs' showing of racially polarized voting. *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1346 (N.D. Ga. 2015).

## II. The Totality Of The Circumstances Weigh Strongly In Favor Of Plaintiffs

The State claims that Plaintiffs cannot make the necessary showing under the totality of the circumstances "on an emergency basis," Opp. 18, but courts can and do order preliminary relief in cases like this one. *See, e.g.*, *United States v. Dallas Cnty. Comm'n*, 791 F.2d 831, 833 (11th Cir. 1986) (ordering district court to enter preliminary injunction on Section 2 claims); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 24-249 (4th Cir. 2014) (same); *United States v. State of Georgia*, 1996 WL 480861, at *1 (N.D. Ga. Apr. 9, 1996) (granting preliminary injunction in Section 5 case less than a month after complaint filed). Here, the record that Plaintiffs have marshalled sharply demonstrates that the challenged 2021 Plans unlawfully dilute the voting strength of particular Black communities in multiple regions of the State, "result[ing] in an unequal opportunity for minority voters to

---

[3] Dr. Handley's Rebuttal further examines the link between race, party, and electoral outcomes, and notes that "[t]he relationship between racial attitudes and partisan affiliation is especially strong in the South." Handley Rebuttal 2-3.

participate in the political process and to elect representatives of their choosing." *Wright*, 979 F.3d at 1305. Indeed, the State barely bothers to contest much of that evidence.

*First*, the State does not contest the lengthy history of official discrimination in Georgia, including in the particular areas involving the challenged districts. Dkt. 39-10 at 7-8, 12, 13-17, 20-21 (describing history of discrimination in the challenged areas); Dkt. 39-8 at 9 n.14, 11, 12, 14-18, 22-23 (describing official measures to suppress Black vote in the challenged areas). It does not contest massive evidence of the socioeconomic disparities that burden Black communities' political participation including, again, in the particular areas where the challenged districts lie, and it does not contest the lack of responsiveness of state policymakers to Black voters' concerns. Dkt. 39-9. The State does not contest Plaintiffs' evidence of racial polarization or that Black candidates are almost never elected to the General Assembly in the specific areas at issue in this case. Dkt. 39-7; Dkt. 39-8 at 34-39. In short, Plaintiffs have offered precisely the type of "intensely local appraisal" of the areas at issue that is most compelling in establishing a Section 2 violation under the totality-of-the-circumstances test—an appraisal that stands largely unchallenged.[4]

---

[4] The State also argues that Plaintiffs' motion should be denied for the reasons in its motion to dismiss. For the reasons in the opposition to that motion, the State's

The few potshots that the State does take lack merit. First, the State contests whether Georgia employs practices undermining Black voters by pointing to a single recent instance in which Black voters were able to overcome the discriminatory majority vote requirement. But how that requirement played out in one exceptional election, *see supra* 9 n.2, does not outweigh its recognized effects in impairing Black voters' ability to elect candidates of their choice. Br. 28 n.20. More importantly, the State does not dispute the existence of other recent voting measures that have disproportionately impacted Black voters, such as voter purges, barriers to registration, abolition of elective offices, expulsion of Black office holders, polling place closures, restrictions on absentee voting and ballot drop boxes, at-large voting systems, and the enactment of S.B. 202 directly following unprecedented Black voter turnout in the 2020 election. Dkt. 39-8 at 10-28.

*Second*, the State's assertion that there is "scant" evidence of racial appeals in recent political campaigns, Opp. 20, rings false. Plaintiffs submitted numerous recent examples, *see, e.g.*, Dkt. 39-10 at 22-24; Dkt. 39-8 at 28-32. For example, during the 2018 gubernatorial campaign, candidate Stacey Abrams was referred to as the "Negress Stacy Abrams" and "a poor man's Aunt Jemima." Dkt. 39-8 at 29.

---

meritless jurisdictional arguments have no bearing on Plaintiffs' likelihood of success.

A successful white Congressional candidate in 2020 referred to Black people as "slaves" to the Democratic party. A Black candidate was recently called an "it," and others were accused of being "not qualified" and wanting to "put a bunch of blacks in leadership positions" if elected. *Id.* at 29, 31.[5]

As the record amassed by Plaintiffs shows, almost every one of the Senate Factors indicates an environment in which Black voters in the particular areas at issue here do not have a fully equal opportunity to participate in politics and elect candidates of choice. The unlawful dilution of their votes cries out for a remedy.

## III.    The Remaining Preliminary Injunction Factors Favor Plaintiffs

The State concedes that the irreparable harm inquiry collapses into the merits, because holding elections under unlawful maps would cause irreparable injury.  Br. 34 n.32. It is irrelevant that the individual Plaintiffs will be able to cast a ballot (Opp. 22) if they cannot vote on equal terms with their fellow citizens.

The State next claims that mandating lawful maps several months before the planned election will "harm candidates who have announced for office" and "result in voter frustration and confusion." Opp. 22. Notably absent from the State's

---

[5] The State incorrectly suggests that appeals to racism by "unsuccessful candidates" do not weigh toward vote dilution. Opp. 20. This Court has found to the contrary. Order on Motion for Summary Judgment at 45-46, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-5391-SCJ (N.D. Ga. 2021) (Dkt. 636).

concerns, however, is the interest that Black voters residing in the challenged districts have in obtaining an equal opportunity to elect candidates of their choice in the 2022 elections. That interest, guaranteed by the VRA, weighs heavily in favor of quickly implementing lawful state legislative maps (a feat the General Assembly accomplished once already in under two weeks). Br. 33-35.

Nor can the State broadly invoke *Purcell v. Gonzalez*, 549 U.S. 1 (2006) to ask this Court to leave the unlawful maps in place. Opp. 22. This case does not implicate the sort of year-long delay at issue in *Purcell*, or a change in election procedures one month before a general election that may generate voter confusion. Here there is sufficient time to finalize maps before voters even have an opportunity for confusion. Indeed, it is not unusual for courts to require states to quickly redraw district lines and extend impending election deadlines when needed.[6]

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' renewed motion for a preliminary injunction.

---

[6] *See, e.g.*, *Thomas v. Bryant*, 938 F.3d 134, 152 (5th Cir. 2019) (giving legislature 13 days to redraw state senate districts and moving qualification deadline by two weeks), *vacated as moot sub nom. Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020) (en banc) (per curiam); *League of Women Voters of Ohio v. Ohio Redistricting Comm'n*, 2022 WL 110261, at *28 (Ohio Jan. 12, 2022) (directing the state to adopt new maps within 10 days).

This 20th day of January, 2022.

Respectfully submitted,

/s/ Rahul Garabadu
Sean J. Young (Bar 790399)
*syoung@acluga.org*
Rahul Garabadu (Bar 553777)
rgarabadu@acluga.org
ACLU FOUNDATION OF
GEORGIA, INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

/s/ Debo P. Adegbile
Debo P. Adegbile
*debo.adegbile@wilmerhale.com*
Robert L. Boone
*robert.boone@wilmerhale.com*
Abigail Shaw*
*abby.shaw@wilmerhale.com*
Alex W. Miller
*alex.miller@wilmerhale.com*
Maura Douglas
*maura.douglas@wilmerhale.com*
Eliot Kim
*eliot.kim@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

/s/ Sophia Lin Lakin
Sophia Lin Lakin
*slakin@aclu.org*
Ari J. Savitzky
*asavitzky@aclu.org*
Jennesa Calvo-Friedman
*jcalvo-friedman@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

/s/ George P. Varghese
George P. Varghese
*george.varghese@wilmerhale.com*
Denise Tsai
*denise.tsai@wilmerhale.com*
Tae Kim*
*tae.kim@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

/s/ Charlotte Geaghan-Breiner
Charlotte Geaghan-Breiner
*charlotte.geaghan-*
*breiner@wilmerhale.com*

__/s/ Anuradha Sivaram__
Anuradha Sivaram
*anuradha.sivaram@wilmerhale.com*
Edward Williams
*ed.williams@wilmerhale.com*
De'Ericka Aiken
*ericka.aiken@wilmerhale.com*
Ayana Williams
*ayana.williams@wilmerhale.com*
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
(650) 858-6000 (t)
(650) 858-6100 (f)

*Attorneys for Plaintiffs*

\*Pro Hac Vice or Pro Hac Vice pending

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1</u>

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, using a font type of Times New Roman and a point size of 14.

*/s/ Rahul Garabadu*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused to be served the foregoing *Plaintiffs' Reply in Support of Renewed Motion for a Preliminary Injunction* with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel or parties of record on the service list:

This 20th day of January, 2022.

/s/ Rahul Garabadu