## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

RICHARD ROSE, *et al.*,

     Plaintiffs,

            v.

BRAD RAFFENSPERGER, in his capacity as Secretary of State of the State of Georgia,

     Defendant.

Civil Action No.
1:20-cv-02921-SDG

### OPINION AND ORDER

This case presents the novel question of whether there can be vote dilution in violation of Section 2 of the Voting Rights Act (VRA) when the challenged election is held on a statewide basis. On the parties' cross-motions for summary judgment, the Court concludes that certain disputes of material issues of fact require a trial and preclude complete resolution at this stage. After careful consideration of the parties' briefing, and with the benefit of oral argument, the Court **DENIES** Defendant's motion for summary judgment [ECF 80] and **GRANTS in part** and **DENIES in part** Plaintiffs' partial motions for summary judgment [ECF 56; ECF 79]. Plaintiffs' Motion for Judicial Notice of Census Data [ECF 57] is **GRANTED**.

## I. Background

The Georgia Public Service Commission (the Commission) exists by virtue

of the State Constitution:

> There shall be a Public Service Commission for the
> regulation of utilities which shall consist of five members
> who shall be elected by the people.

GA. CONST. ART. IV, § 1, ¶ I(a) (2021). The commissioners serve terms of six years.

*Id.* The Georgia Constitution also dictates that "[t]he filling of vacancies and

manner and time of election of members of the [Commission] shall be as provided

by law." GA. CONST. ART. IV, § 1, ¶ I(c). The method of election is therefore

prescribed by statute. O.C.G.A. § 46-2-1. Commissioners' terms are staggered, and

general elections take place every two years. *Id.* § 46-2-1(d). Each commissioner is

required to live in one of five residence districts, but "each member of the

commission shall be elected state wide by the qualified voters of this state who are

entitled to vote for members of the General Assembly." O.C.G.A. § 46-2-1(a).

A commissioner must continue to live in that particular district throughout the

term. *Id.* § 46-2-1(b).

Plaintiffs are residents of and registered voters in Fulton County, Georgia.[1] They are all African American.[2] The sole Defendant is Brad Raffensperger, sued in his official capacity as the Georgia Secretary of State.[3] On July 14, 2020, Plaintiffs filed suit asserting that the method of electing members of the Commission causes improper dilution of their votes.[4] They seek a declaratory judgment that this violates Section 2 and an order directing the Secretary to administer Commission elections in a manner that complies with the VRA.[5]

On May 27, 2021, Plaintiffs moved for partial summary judgment on certain of the Secretary's affirmative defenses.[6] The Secretary opposed the motion and Plaintiffs replied.[7] After the close of discovery, on July 9, Plaintiffs filed a second motion for partial summary judgment on the Secretary's remaining affirmative defenses and the *Gingles* prerequisites.[8] The Secretary opposed this motion

---

[1]    ECF 62-1 (Def.'s Resp. to Pls.' SUMF), No. 1.

[2]    *Id.*

[3]    ECF 1 (Compl.), ¶ 10.

[4]    *See generally* ECF 1 (Compl.).

[5]    *Id.* at 10–11 (*ad damnum* clause).

[6]    ECF 56 (Pls.' First MSJ) (First, Second, Fourth, Fifth, and Sixth Defenses).

[7]    ECF 62 (Def.'s Resp. to Pls.' First MSJ); ECF 68 (Pls.' Reply on First MSJ).

[8]    ECF 79 (Pls.' Second MSJ) (Third, Seventh, Eighth, Ninth, and Tenth Defenses).

(in most respects), and Plaintiffs replied.[9] Also on July 9, the Secretary filed his own motion for summary judgment.[10] Plaintiffs opposed, and the Secretary filed a reply.[11] On July 28, the United States filed an *amicus* brief.[12] The Court heard argument on November 8.[13] The basis for the Court's rulings follows.

## II.    Applicable Law

### A.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either

---

[9]    ECF 85 (Def.'s Resp. to Pls.' Second MSJ); ECF 87 (Pls.' Reply on Second MSJ).

[10]   ECF 80 (Def.'s MSJ).

[11]   ECF 84 (Pls.' Resp. to Def.'s MSJ); ECF 88 (Def.'s Reply on MSJ).

[12]   ECF 86 (U.S. Stmt. of Interest).

[13]   ECF 95 (minute entry); ECF 96 (Nov. 8, 2021 H'g Tr.).

(1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

**B.      The Voting Rights Act**

Section 2 of the VRA prohibits practices that deny or abridge the right to vote of any United States citizen based on race or color. 52 U.S.C. § 10301(a). Such a violation is established

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b). Section 2 does not, however, create an entitlement to proportional representation for members of a protected class. *Id.*

**1.      *Gingles***

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court first interpreted Section 2 after Congress amended it in 1982. The amendment emphasized that a court's focus must be on the *results* of the challenged practices rather than the intent behind their adoption. *Id.* at 35–36. Under *Gingles*, plaintiffs must satisfy three prerequisites to establish a vote-dilution claim:

> ***First***, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates. ***Second***, the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests. ***Third***, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it — in the absence of special circumstances, such as the minority candidate running unopposed — usually to defeat the minority's preferred candidate.

*Id.* at 50–51 (second emphasis in original) (footnotes omitted) (citations omitted).

While at-large elections are not *per se* violations of Section 2, they are impermissible if under the totality of the circumstances they "result in unequal access to the electoral process." *Id.* at 46.

### 2. Senate Factors

In addition to the three *Gingles* prerequisites, courts must generally consider several factors that were identified in the Senate Report accompanying the 1982 VRA amendment. *Id.* at 44–45. These Senate Factors are:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions,[14] or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Solomon v. Liberty Cnty., Fla.*, 899 F.2d 1012, 1015–16 (11th Cir. 1990) (Kravitch, J.

specially concurring). Two additional factors may also be probative:

8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

---

[14] "Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates." *Gingles*, 478 U.S. at 38 n.5 (internal quotation marks omitted) (citations omitted).

9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 1016. These "Senate Factors" will "typically establish" a Section 2 violation.

*Id.* at 1015. *See also Gingles,* 478 U.S. at 45 (concluding that these nine factors "will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims") (footnote omitted). Ultimately, *Gingles* "calls for a flexible, fact-intensive inquiry into whether an electoral mechanism results in the dilution of minority votes." *Brooks v. Miller*, 158 F.3d 1230, 1239 (11th Cir. 1998).

## III. Discussion

The Court first addresses whether (1) Plaintiffs have suffered a harm that gives them standing to sue and (2) the Secretary is the proper Defendant. The Court next considers the existence of an appropriate remedy, which is at the heart of the parties' dispute. Third, the Court assesses whether Plaintiffs have carried their burden to establish the three *Gingles* prerequisites. Finally, the Court examines the Secretary's affirmative defenses.

### A. Injury, Standing, and the Proposed Remedy

Constitutional standing is a necessary element of every case invoking federal jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Its existence is a threshold issue. *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir.

2019) ("Because standing to sue implicates jurisdiction, a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim, no matter how weighty or interesting."). Moreover, in order to carry their initial burden under *Gingles*, Plaintiffs must show that the challenged practice is tied to the injury sought to be remedied. *Gingles*, 478 U.S. at 50 n.17. And the proposed remedy must itself be feasible: If there is no feasible remedy, there can be no injury. *Davis v. Chiles*, 139 F.3d 1414, 1419–20. *See also id.* at 1423 ("[A] plaintiff must propose a viable and proper remedy in order to establish a prima facie case under Section Two.") (citations omitted). Here, the Secretary argues that Plaintiffs lack both statutory and constitutional standing because their injury is a partisan one, and the proposed remedy impermissible.[15]

### 1. The Nature of Plaintiffs' Injury

The parties agree that Plaintiffs *allege* they are being injured by the at-large method of electing members of the Commission because this system dilutes the strength of their votes.[16] But the Secretary argues that, because members of the Commission are elected on a statewide basis, Plaintiffs' only injury is that they do

---

[15]  *See, e.g.*, ECF 80-1 (Def.'s MSJ), at 4–14. *See also* ECF 37 (Ans.), at 2 (Third and Fourth Defenses).

[16]  ECF 1 (Compl.), ¶ 36; ECF 80-1 (Def.'s MSJ), at 6.

not like the outcome.[17] Thus, his Third and Fourth Affirmative Defenses respectively assert that Plaintiffs lack constitutional and statutory standing.[18] Plaintiffs counter that they are entitled to summary judgment on these defenses.[19]

Adopting the Secretary's interpretation would amount to a *per se* rule that vote dilution in violation of Section 2 can *never* take place on a statewide-level. Section 2, however, applies to both states and their political subdivisions, 52 U.S.C. § 10301(a). The Court finds no basis to adopt a blanket rule that vote dilution can never occur at a statewide level. Nor has the Secretary pointed to any case law that requires such an interpretation, although the Secretary is quick to note that neither Plaintiffs nor the United States have pointed to any case law supporting their interpretation either.[20]

If the Commission were a countywide commission rather than a statewide elected body, there would be little question that the current at-large method of elections could cause an injury for purposes of Section 2 and constitutional standing. *See, e.g.*, *Houston Lawyers' Ass'n v. Att'y Gen. of Tex.*, 501 U.S. 419, 421

---

[17]  ECF 80-1 (Def.'s MSJ), at 7–8.

[18]  ECF 37 (Ans.), at 2.

[19]  ECF 56 (Pls.' First MSJ), at 1, 7–9 (Fourth Defense); ECF 79 (Pls.' Second MSJ), at 1, 8–10 (Third Defense).

[20]  ECF 88 (Def.'s Reply on MSJ), at 3.

(1991) (concluding Section 2 applied to at-large, district-wide electoral scheme used for the election of trial judges in Texas); *Gingles*, 478 U.S. at 46–47 (recognizing that multimember districts and at-large voting schemes may dilute the votes of racial minorities); *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1550 (11th Cir. 1984) (concluding district court was clearly erroneous in holding that the county's at-large system had no discriminatory results). In fact, the Secretary concedes that the Section 2 injury *alleged* by Plaintiffs is "one that has been accepted by courts since the inception" of the VRA, although the Secretary asserts they have failed to *prove* the existence of that injury.[21]

The Court agrees with the United States' assertion that statewide vote dilution of the type alleged here is a cognizable injury under Section 2.[22] There is no legal basis to distinguish between States and their political subdivisions based on the language of Section 2. Plaintiffs must still, however, propose a viable remedy (without which they will lack the necessary injury for standing purposes).

To the extent the Secretary seeks summary judgment because Plaintiffs' vote-dilution injury is not cognizable and they therefore lack standing, his motion is **DENIED**. However, Plaintiffs' motions are **DENIED** to the extent they seek

---

[21]   ECF 88 (Def.'s Reply on MSJ), at 2.

[22]   ECF 86 (U.S. Stmt. of Interest), at 5–10.

summary judgment on the Secretary's Third and Fourth Affirmative Defenses because, if Plaintiffs are unable to establish after trial that their proposed remedy is feasible, they will not have shown the existence of an injury. *Davis*, 139 F.3d at 1419–20. Those defenses therefore remain viable.

### 2. The Secretary as Defendant

For a plaintiff to have constitutional standing, his alleged injury must be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (alterations in original) (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). Further, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (citing *Simon*, 426 U.S. at 38, 43, 96).

The Secretary argues that he is not the proper Defendant because an order enjoining him from administering elections for members of the Commission and directing him to comply with Section 2 would not redress Plaintiffs' purported injury.[23] The Secretary declares that, under such an injunction, the Governor could simply continuously appoint people to vacant positions on the Commission since

---

[23]   ECF 80-1 (Def.'s MSJ), at 10–14. *See also* ECF 37 (Ans.), at 1 (Second Defense).

the Secretary would be unable to administer elections for those positions.[24] Plaintiffs counter that the Secretary conceded the issue of whether he is a proper party by failing to identify any missing but necessary parties in his initial disclosures or the joint preliminary report.[25]

This is the same basic argument the Secretary made at the motion to dismiss stage, which was rejected by the Court.[26] At the time, the Secretary served as the Chair of the State Election Board, which was responsible for adopting rules and regulations governing the conduct and administration of elections. O.C.G.A. §§ 21-2-30(d), -31(2) (2008). But that statute was amended, effective March 25, 2021. Act of Mar. 25, 2021, 2021 Ga. Laws Act 9 (S.B. 202). The Secretary is no longer Chair, and is only an *ex officio*, nonvoting member of the State Election Board. O.C.G.A. § 21-2-30(a), (d) (2021). The question before the Court is whether these changes mean that the Secretary is no longer a necessary or sufficient Defendant.

Although the parties disagree about the scope of the Secretary's current duties,[27] he or his office remain responsible for (among other things) qualifying

---

24   ECF 80-1 (Def.'s MSJ), at 11–12.

25   ECF 56 (Pls.' First MSJ), at 6.

26   ECF 36 (Jan. 5, 2021 Op. & Order), at 29–33.

27   *See, e.g.*, ECF 85-1 (Def.'s Resp. to Pls.' SUMF), No. 2.

certain candidates for elections, including political-body and independent candidates for the Commission; building the databases used to create absentee ballots and program voting machines; and certifying election results.[28] The Secretary also co-signs the commission ultimately issued to the winner of an election for the Commission.[29] *See generally* O.C.G.A. § 21-2-50(a) (2019).

The Secretary admits that his proffered hypothetical—in which the Governor simply appoints commissioners to fill vacancies, *ad infinitum*—would violate the Georgia constitutional provision that requires members of the Commission to be "elected by the people."[30] GA. CONST. ART. 4, § 1, ¶ I. Georgia law provides that the Governor shall appoint a person to fill any vacancy on the Commission, and that such person shall "hold his office until the next regular general election." O.C.G.A. § 46-2-4. The Court presumes that the Governor will abide by his State and Federal constitutional duties. Therefore, the Court will not credit counsel's hypothetical as providing any reasonable basis to conclude that the Secretary is not the proper Defendant in this action.

---

[28]   ECF 79-1 (Def.'s Stipulated Facts), ¶¶ 1–2, 4.

[29]   *Id.* ¶ 5.

[30]   ECF 80-1 (Def.'s MSJ), at 13–14.

If Georgia's current method of electing members of the Commission violates Section 2 and the Secretary is enjoined from conducting elections under that process, the cause of Plaintiffs' alleged vote-dilution injury will be stopped. This is enough under *Lujan* for purposes of traceability and redressability. 504 U.S. at 561. Nothing about such an injunction would prevent the next regular election from taking place as the Secretary pontificates.[31] Rather, under this scenario, the election would take place, with the Secretary certifying the results, using a method that complies with Section 2—whether that method is developed by the Georgia General Assembly or this Court. *See, e.g., Perry v. Perez*, 565 U.S. 388, 391–92 (2012) (per curiam) (noting that, when the Texas legislature failed to enact new redistricting plans after the 2010 census, "[i]t thus fell to the District Court in Texas to devise interim plans for the State's" elections) (citation omitted).

The changes in Georgia's election law do not, therefore, alter the conclusion the Court reached at the motion to dismiss stage.[32] The Secretary's motion is **DENIED** as to (1) redressability to the extent he argues he is the incorrect Defendant and (2) the argument that Plaintiffs' injury is not cognizable. Plaintiffs'

---

[31] ECF 88 (Def.'s Reply on MSJ), at 6.

[32] ECF 36 (Jan. 5, 2021 Op. & Order), at 28–33.

first motion for summary judgment is **GRANTED** to the extent it seeks judgment

on the Secretary's Second Affirmative Defense.

### 3.    Plaintiffs' Proposed Remedy

"In assessing a plaintiff's proposed remedy, a court must look to the totality

of the circumstances, weighing both the state's interest in maintaining its election

system and the plaintiff's interest in the adoption of his suggested remedial plan."

*Davis*, 139 F.3d at 1419–20 (citing *Houston Lawyers' Ass'n*, 501 U.S. at 426). *See also*

*Brooks*, 158 F.3d at 1239 (same). The Eleventh Circuit has, however, cautioned that

"[i]mplicit in th[e] first *Gingles* requirement is a limitation on the ability of a federal

court to abolish a particular form of government . . . ." *Davis*, 139 F.3d at 1421

(quoting *Nipper v. Smith*, 39 F.3d 1494, 1531 (11th Cir. 1994) (plurality opinion)).

*Cf. Holder v. Hall*, 512 U.S. 874 (1994) (plurality opinion) (concluding a plaintiff

cannot maintain a Section 2 action against the size of a government body).

Plaintiffs' proposed remedy is therefore relevant to both the first *Gingles*

prerequisite and the totality-of-the-circumstances analysis. This does not mean,

however, that the Court must rule on whether Plaintiffs have satisfied the remedy

portion of the first prerequisite for the case to advance to trial. *See, e.g., Brooks*, 158

F.3d at 1240 (finding no error in district court's conclusion—after bench trial—that

the harm that would result from plaintiffs' proposed remedy was "too great to

justify ordering such a system" and that the plaintiffs had therefore failed to establish the first prerequisite); *Ala. State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Alabama* (*Alabama NAACP*), Case No. 2:16-cv-731-WKW, 2020 WL 583803, at *4, *37 (M.D. Ala. Feb. 5, 2020) (concluding after six-day bench trial that the plaintiffs had failed to meet the first prerequisite because they had not shown "that a feasible remedy can be fashioned"). The Court concludes that summary judgment on matters related to Plaintiffs' proposed remedy is inappropriate.

### *i.* The State's Interests

The Secretary's Eighth Affirmative Defense asserts that the relief Plaintiffs seek would "result in a violation of the U.S. Constitution because Plaintiffs' proposed remedies require the alteration of the form of government of the State of Georgia."[33] His discovery responses further explained that this defense is based on Georgia's sovereignty under the Guaranty Clause of the U.S. Constitution (ART. IV, § 4) and the Tenth Amendment since (he argues) Plaintiffs' proposed remedy would require a change in Georgia's Constitution.[34] Thus, the Secretary contends that a remedy requiring the election of Commission members through

---

33    ECF 37, at 2 (Eighth Defense).

34    ECF 85-1 (Def.'s Response to Pls.' SUMF), ¶ 4.

districts rather than at-large would force a new form of government on the State and "fundamentally alter[ ] the nature that [the] sovereign state has set up [for] its constitutional commissions to govern utilities."[35] He compares this case to *Holder v. Hall*, 512 U.S. 874, in which the Supreme Court held that Section 2 cannot be used to change the size of a government body.[36]

The Secretary further argues that, "given the unique interests of the State in the design of the [Commission]," Plaintiffs cannot demonstrate a permissible remedy to their alleged injury.[37] He asserts that members of the Commission exercise authority over and "take calls from constituents across" the entire State.[38] Accordingly, he concludes that the "unique nature of the structure and purpose" of the Commission—including its quasi-judicial function—"is furthered by statewide elections" of its members.[39]

---

[35]  ECF 80-1 (Def.'s MSJ), at 16.

[36]  *Id.* at 18. *See generally id.* at 18–20.

[37]  *Id.* at 16 (citing *Nipper*, 39 F.3d at 1530–31 (plurality opinion)). *See also* ECF 37 (Ans.), at 2 (Eighth Defense).

[38]  ECF 80-1 (Def.'s MSJ), at 16–17.

[39]  *Id.* at 18. The order denying the motion to dismiss addresses the Secretary's arguments that the Court should apply judicial-elections cases. *See generally* ECF 36 (Jan. 5, 2021 Op. & Order), at 34–39.

The Secretary acknowledges, however, that the precise issue in this case is one of first impression.[40] He also accepts that the State's interests are a factor to be considered "in weighing the totality of the circumstances,"[41] so they are not a *per se* bar to Plaintiffs' preferred remedy. "Because the State's interest in maintaining an at-large, district-wide electoral scheme for single-member offices is merely one factor to be considered in evaluating the 'totality of circumstances,' that interest does not automatically, and in every case, outweigh proof of racial vote dilution." *Houston Lawyers' Ass'n*, 501 U.S. at 427 (concluding that a state's interest in maintaining its electoral system is properly considered under the totality of the circumstances).

Plaintiffs contest the factual and legal predicates on which the Secretary's arguments are based.[42] They assert that summary judgment in favor of the Secretary is inappropriate and that there remain disputed issues of fact.[43] The United States' *amicus* brief also asserts that the Secretary misapplies *Holder* because

---

[40]   ECF 80-1 (Def.'s MSJ), at 18.

[41]   *Id.* at 17–18 (citing *Brnovich*, 594 U.S. ___, 141 S. Ct. 2321, 2339–40 (2021)).

[42]   ECF 79 (Pls.' Second MSJ), at 11–14.

[43]   ECF 84 (Pls.' Resp. to Def.'s MSJ), at 11. *See generally id.* at 9–16.

nothing in Plaintiffs' proposed plan requires a change in the number of commissioners.[44]

The Court concludes that these matters, including the State's interests in maintaining its current form of electing members to the Commission, involve disputed issues of material fact that cannot be resolved on the parties' cross-motions for summary judgment. However, questions of first impression on Georgia law are also involved, so some additional discussion is warranted.

### ii. The State's Chosen Form of Government

All Georgia voters currently may vote for each member of the Commission. O.C.G.A. § 46-2-1(a). Plaintiffs' proposed remedy would change that system such that voters would only be eligible to vote for the one member of the Commission for the particular voting district in which the voter resides.[45] The Secretary asserts that implementing such a system would impermissibly force the State to adopt a new form of government.[46] Plaintiffs' briefing does not tackle this issue head on, focusing primarily on the Secretary's arguments about the State's specific interests

---

[44]  ECF 86 (U.S. Stmt. of Interest), at 10–13.

[45]  ECF 80-1 (Def.'s MSJ), at 18; ECF 84 (Pls.' Response to Def.'s MSJ), at 9–11. *See also* ECF 96 (Nov. 8, 2021 H'g Tr.), at 7–8.

[46]  ECF 80-1 (Def.'s MSJ), at 15–16; ECF 96 (Nov. 8, 2021 H'g Tr.), at 7–8.

in maintaining the current system.[47] However, the parties ably addressed this point during oral argument.[48]

In effect, the issue centers on the meaning of the phrase "elected by the people" in the constitutional provision establishing the Commission. GA. CONST. ART. IV, § 1, ¶ I(a). The phrase is not used elsewhere in the Georgia Constitution in a similar context from which the Court might glean meaning. Nor has the Court found, or the parties pointed to, any case law on point. Does "elected by the people" mean that Georgia's Constitution requires all eligible voters in the State to have the opportunity to vote for each member of the Commission, or is that outcome only dictated by the statute (O.C.G.A. § 46-2-1(a)), which requires members of the Commission to be elected statewide? Stated somewhat differently, does implementing Plaintiffs' proposed remedy require abrogating the State Constitution? The parties disagree sharply about the answer.

During oral argument, the Secretary urged this Court to certify the issue to the Georgia Supreme Court.[49] Plaintiffs counter that this is unnecessary because the answer is irrelevant—no matter its interpretation, the State Constitution

---

[47]   ECF 84 (Pls.' Response to Def.'s MSJ), at 10–16.

[48]   *See generally* ECF 96 (Nov. 8, 2021 H'g Tr.).

[49]   ECF 96 (Nov. 8, 2021 H'g Tr.), at 7–8.

cannot override Section 2.[50] While Plaintiffs' point about Section 2 is well taken, it certainly does not make the answer immaterial. Whether the at-large election of members of the Commission is required by the Georgia Constitution or only by statute bears on the totality-of-the-circumstances analysis the Court must undertake. It could affect, for example, the weight the Court should place on the State's interests in maintaining its current form of electing members of the Commission. *Davis*, 139 F.3d at 1421. Clarity on these issues may be necessary for the Court to assess the totality of the circumstances.

Given the issues that remain to be presented at trial, however, the Court cannot conclude that certification is required at this stage. The Georgia Supreme Court does not "give advisory opinions or respond to certified questions that are anticipatory in nature." *GEICO Indem. Co. v. Whiteside*, 311 Ga. 346, 346 n.1 (2021) (citing *CSX Transp. v. City of Garden City,* 279 Ga. 655, 658 n.5 (2005)). It is possible this Court may be able to rule after trial without needing to certify any questions. Ga. Sup. Ct. R. 46 (permitting certification of legal questions to that court when "it

---

[50]    ECF 96 (Nov. 8, 2021 H'g Tr.), at 39–41 (citing *City of Rome v. United States*, 446 U.S. 156 (1980), abrogated on other grounds as stated in *Northwest Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 209–11 (2009); *Marengo Cnty. Comm'n*, 731 F.2d 1546). *See also* ECF 84 (Pls.' Resp. to Def.'s MSJ), at 13 (citing S. Rep. No. 97-417, at 29 n.117 (1982); *Hous. Laws.' Ass'n*, 501 U.S. at 427; *Marengo Cnty. Comm'n*, 731 F.2d at 1571).

shall appear [to the certifying court] . . . that there are involved in any proceeding before it questions or propositions of the laws of this State **which are determinative of said cause** and there are no clear controlling precedents in the appellate court decisions of this State") (emphasis added). Waiting until after trial to assess whether certification is appropriate will obviate the risk of presenting questions that ultimately may not be dispositive. Moreover, it would provide the Georgia Supreme Court with a complete record to consider in ruling on any questions that this Court does certify. *See, e.g.*, Ga. Sup. Ct. R. 47 ("The Court certifying to this Court a question of law shall formulate the question and cause the question to be certified and transmitted to this Court, **together with copies of such parts of the record and briefs in the case as the certifying Court deems relevant**.") (emphasis added).

### 4. Summary

Georgia's interests in maintaining the at-large method of election of members of the Commission (and thus the appropriateness of the remedy sought by Plaintiffs) cannot be determined on summary judgment. Accordingly, the Court **DENIES** Plaintiffs' request for judgment in its favor on the Secretary's Eighth Affirmative Defense. It is also therefore improper to conclude as a matter

of law that Plaintiffs suffered no injury and thus lack standing. The Court **DENIES** the Secretary's Motion for Summary Judgment.

### B. The *Gingles* Prerequisites

The Supreme Court has made clear that the three part test of *Gingles* is a threshold that a plaintiff must meet in order to maintain a section 2 claim. *Solomon*, 899 F.2d at 1017 (Kravitch, J. specially concurring). These requirements

> present mixed questions of law and fact. Initially, the district court must make findings of fact concerning the polity's demographics and actual voting patterns in particular elections. The subsequent determination of the legal inferences to be drawn from those facts, however, involve questions of law and the application of legal standards.

*Id.* at 1017 n.6. Accordingly, while those factual issues that are not in dispute are appropriately resolved here, the inferences to be drawn from them under the totality of the circumstances are not. They must await trial. As discussed below, unless otherwise noted, the parties do not dispute the following facts, which establish that Plaintiffs have satisfied the three basic *Gingles* prerequisites.

#### 1. Geography and Compactness

Under the first *Gingles* prerequisite, "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. *See also Wright v.*

*Sumter Cnty. Bd. of Elecs. & Registration*, 979 F.3d 1282, 1303 (11th Cir. 2020) (citing *Gingles*, 478 U.S. at 106). The minority group must have the potential to elect its representative of choice in a single-member district. *Wright*, 979 F.3d at 1303 (emphasis added) (citing *Growe v. Emison*, 507 U.S. 25, 40 (1993)).

Demographic information maintained by the Secretary's office shows that 29.95% of Georgia's electorate is "Black, not of Hispanic origin."[51] These voters are sufficiently numerous and geographically compact to form a majority in at least one single-member district in a five-district plan for the election of Commission members.[52] The illustrative plan proposed by Plaintiffs also shows—and the Secretary acknowledges—that the creation of such a district is possible.[53] Accordingly, the parties agree to all the necessary facts to establish this part of the first *Gingles* prerequisite.

---

[51]  ECF 79-1 (Def.'s Stipulated Facts), ¶ 10.

[52]  ECF 85-1 (Def.'s Resp. to Pls.' SUMF), No. 5.

[53]  ECF 1-3 (Pls.' Illustrative Districting Plan); ECF 35 (Dec. 8, 2020 H'g Tr.), at 40 (counsel for the Secretary acknowledging Plaintiffs' proposed map draws a majority-minority district).

Plaintiffs further contend that, had their proposed plan been in effect since 2012, it would have allowed Black voters to elect a candidate of their choice in at least one district.[54] The Secretary disputes this assertion.[55]

As the Court reads *Gingles* and its progeny, to satisfy the first prerequisite Plaintiffs need not prove their candidate of choice *would* have been elected. They have put forward enough facts—that the Secretary does not dispute—to establish that their proposed single-member, majority-minority district would give African Americans the **_potential_** to elect their representative of choice to the Commission. This is sufficient to satisfy the first prerequisite of geography and compactness. *Gingles*, 478 U.S. at 50 n.17 ("Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice.") (emphasis in original); *see also Solomon*, 899 F.2d at 1018 n.7 (Kravitch, J. specially concurring) ("So long as the *potential* exists that a minority group could elect its own representative in spite of racially polarized voting, that group has standing to raise a vote dilution challenge under the Voting Rights Act.") (citing *Gingles*, 478 U.S. at 50 n.17) (emphasis added).

---

[54] ECF 85-1 (Def.'s Resp. to Pls.' SUMF), No. 9.

[55] *Id.*

Plaintiffs are therefore entitled to summary judgment in their favor on the first *Gingles* prerequisite of geography and compactness because they have shown that African Americans are sufficiently large and geographically compact to constitute a majority in a single-member district. The Secretary may present evidence at trial about the inferences the Court should draw from these facts under the totality of the circumstances.

### 2. Political Cohesiveness

The second *Gingles* prerequisite is that "the minority group . . . show that it is politically cohesive." 478 U.S. at 50. The parties agree that Black voters have been politically cohesive in general elections for members of the Commission since 2012.[56] In fact, Plaintiffs' expert concluded—and the Secretary does not dispute— that such cohesion was present in all general and runoff elections for seats on the Commission from 2012 through the present.[57]

However, the Secretary asserts that there are "no particularized needs of the Black community in the context of utility regulation, because each ratepayer is treated the same and the process of ratemaking is applied statewide."[58] The

---

[56]   ECF 85-1 (Def.'s Resp. to Pls.' SUMF), No. 6.

[57]   *Id.*, No. 11.

[58]   ECF 79-1 (Def.'s Stipulated Facts), ¶ 8.

Secretary further argues that determining the causes of the polarization—racial or partisan—are inappropriate for resolution on summary judgment.[59]

The Court does not view this second prerequisite as requiring an assessment of the *relevancy* of political cohesion as applied to the functions of the Commission, nor the *causes* of polarization. Rather, the weight to be afforded to this *Gingles* prerequisite and the conclusions to be drawn from it should be part of the totality-of-the-circumstances analysis under the Senate Factors. *Gingles*, 478 U.S. at 37 (identifying extent of racial polarization in elections under second Senate Factor); *Solomon*, 899 F.2d at 1015 (Kravitch, J. specially concurring) (same). *See also Nipper v. Smith*, 39 F.3d 1494, 1497 (11th Cir. 1994) (Tjoflat, J. opinion) (noting Supreme Court and Eleventh Circuit have not yet determined under a totality analysis "whether section 2 plaintiffs . . . must demonstrate that their diminished opportunity to participate in the political process and to elect representatives of their choice is being caused by the interaction of racial bias in the voting community and the challenged scheme") (omission in original).

Plaintiffs are therefore entitled to summary judgment on the second *Gingles* prerequisite. In so ruling, the Court draws no conclusions or inferences about why

---

[59] ECF 85 (Def.'s Resp. to Pls.' Second MSJ), at 12–14.

candidates of choice were not elected, the causes of polarization, nor even the relevancy of these facts given the functions of the Commission.[60] The parties remain free to present evidence on these issues at trial.

### 3. Racial Bloc Voting

The third *Gingles* prerequisite requires that "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it — in the absence of special circumstances, such as the minority candidate running unopposed — usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (citations omitted).

The parties agree that, since 2012, of the 25 candidates for the Commission whose race was known, four were Black.[61] Candidates preferred by Black voters in those elections were (1) not supported by the majority of white voters and (2) defeated,[62] though such candidates are not themselves necessarily Black.[63] General elections for Commission members during that time were polarized along

---

[60]  *Id.* at 14 (arguing the Eleventh Circuit has held it is improper to resolve such issues at summary judgment).

[61]  ECF 79-1 (Def.'s Stipulated Facts), ¶ 11.

[62]  ECF 85-1 (Def.'s Resp. to Pls.' SUMF), No. 7.

[63]  *See, e.g.*, ECF 79-4 (Popick Expert Report), at 13 (identifying race of black-preferred candidates).

racial lines.[64] White voters thus vote sufficiently as a bloc in Commission elections to have defeated the Black-preferred candidate in every election since 2012.[65]

The parties also agree that their experts appropriately used a statistical estimating method called Ecological Inference (EI) to determine the existence of polarization in voting.[66] The EI method shows "significant polarization" in Georgia elections,[67] but the parties resolutely disagree about the cause(s). The Secretary attributes it to partisanship.[68] Plaintiffs counter that race heavily informs a voter's partisan preferences.[69] Plaintiffs also argue that the reason for the polarization is not relevant to an analysis of the *Gingles* prerequisites.[70]

In *Gingles*, the Supreme Court treated the terms "racial bloc" and "racial polarization" as interchangeable. 478 U.S. at 53 n.21. While the *extent* of racial polarization is one of the Senate Factors, *id.* at 55, the *existence* of racial-block voting is part of the *Gingles* third prerequisite. In establishing this prerequisite, "the

---

[64]   ECF 85-1 (Def.'s Resp. to Pls.' SUMF), No. 8.

[65]   *Id.*, No. 13.

[66]   ECF 87-2 (Pls.' Resp. to Def.'s SAMF), No. 1.

[67]   *Id.*, No. 2.

[68]   *See generally* ECF 80-3 (Barber Expert Report).

[69]   *See generally* ECF 80-4 (Fraga Rebuttal Report).

[70]   ECF 87-2 (Pls.' Resp. to Def.'s SAMF), Nos. 3–7, 9–10.

minority group demonstrates that submergence in a white multimember district

impedes its ability to elect its chosen representatives." *Id.* at 51.

> [T]he question whether a given district experiences
> legally significant racially polarized voting requires
> discrete inquiries into minority and white voting
> practices. A showing that a significant number of
> minority group members usually vote for the same
> candidates is one way of proving the political
> cohesiveness necessary to a vote dilution claim, and,
> consequently, establishes minority bloc voting within the
> context of § 2. And, in general, a white bloc vote that
> normally will defeat the combined strength of minority
> support plus white "crossover" votes rises to the level of
> legally significant white bloc voting.

*Id.* at 56 (citations omitted).

Further, the plurality opinion in *Gingles* concluded that, "[f]or purposes of

§ 2, the legal concept of racially polarized voting incorporates neither causation

nor intent. ***It means simply that the race of voters correlates with the selection of***

***a certain candidate or candidates***; that is, it refers to the situation where different

races (or minority language groups) vote in blocs for different candidates." *Id.* at

51 (emphasis added). Thus, four justices concluded that the existence of political

polarization does not negate the import of racial-bloc voting. *See also generally*

*Chisom v. Roemer*, 501 U.S. 380, 404 (1991) (emphasizing that "Congress made clear

that a violation of § 2 could be established by proof of discriminatory results

alone"); *Davis*, 139 F.3d 1414 (not requiring racial bias to be the cause of racial bloc

voting to establish the *Gingles* factors). Thus, the Court does not interpret the applicable case law as requiring proof of intentional racial bias on the part of the electorate to satisfy the third prerequisite under *Gingles*.

The Court concludes that Plaintiffs have shown the existence of racial-bloc voting as a matter of law, and entry of summary judgment in favor of Plaintiffs on the third *Gingles* prerequisite is appropriate. However, given the "discrete inquiries" necessary under the Senate Factors to assess "legally significant" racial polarization and the extent of such polarization, those elements and the weight they should receive must be examined at trial.

### 4. Summary

Plaintiffs' motions for summary judgment are **GRANTED** with respect to the three basic *Gingles* factors—(1) geography and compactness, (2) political cohesiveness, and (3) racial bloc voting. The causes of polarization, including the effects of partisanship, will be examined as part of the totality-of-the-circumstances analysis at trial, as will Plaintiffs' proposed remedy and injury.

### C. The Secretary's Affirmative Defenses

Plaintiffs' motions for summary judgment challenge all of the Secretary's affirmative defenses. Those defenses are:

1. The allegations in Plaintiffs' Complaint fail to state a claim upon which relief may be granted.

2. Plaintiffs' claims are barred for failure to name necessary and indispensable parties.

3. Plaintiffs lack constitutional standing to bring this action.

4. Plaintiffs lack statutory standing to bring this action.

5. Plaintiffs' federal claim against Defendant is barred by the Eleventh Amendment to the United States Constitution.

6. Plaintiffs' claim is barred by sovereign immunity.

7. Plaintiffs' Complaint requests relief that will result in a violation of the U.S. Constitution because Plaintiffs' proposed remedies require the use of race as a predominate factor in the redistricting process, which is prohibited by the Equal Protection Clause of the Fourteenth Amendment.

8. Plaintiffs' Complaint requests relief that will result in a violation of the U.S. Constitution because Plaintiffs' proposed remedies require the alteration of the form of government of the State of Georgia.

9. Defendant denies that Plaintiffs have been subjected to the deprivation of any right, privilege, or immunity under the Constitution or laws of the United States.[71]

The Secretary's Tenth Affirmative Defense is actually a reservation of rights:

"Defendant reserves the right to amend its defenses and to add additional ones, including lack of subject matter jurisdiction based on the mootness or ripeness

---

[71]   ECF 37 (Ans.), at 1–3.

doctrines, as further information becomes available in discovery."[72] The Secretary has withdrawn his Seventh, Ninth, and Tenth Affirmative Defenses,[73] and the Court has already addressed the Second, Third, Fourth, and Eighth Affirmative Defenses above. The Court addresses the Secretary's remaining affirmative defenses (First, Fifth, and Sixth) *seriatim*.

### 1. First Affirmative Defense: Failure to State a Claim

The Court has already ruled that Plaintiffs' Complaint withstood dismissal under Rule 12(b)(6).[74] Discovery is now complete. The Secretary's contention that Plaintiffs' first summary judgment motion was premature is therefore moot. The Secretary's argument about why the Court's Motion to Dismiss Order did not dispose of this defense is that the denial was "on an exceedingly charitable standard of review," and surviving summary judgment is different.[75] That is true but somewhat beside the point. As Plaintiffs point out, whether a party has failed to state a claim is determined based on the face of the pleading. To withstand dismissal under Rule 12(b)(6), "a ***complaint*** must [ ] contain sufficient factual

---

72   *Id.* at 3.

73   ECF 85, at 7 n.3.

74   ECF 36 (Jan. 5, 2021 Op. & Order).

75   ECF 62 (Def.'s Resp. to Pls.' First MSJ), at 2–3.

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283, 1289 (11th Cir. 2010) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Court has already ruled on the sufficiency of the Complaint, so the Secretary's First Affirmative Defense is moot and judgment in favor of Plaintiffs on that defense is appropriate. The Court **GRANTS** Plaintiffs' motion for summary judgment on the Secretary's First Affirmative Defense. This, of course, has no bearing on the burden Plaintiffs must carry to prevail at trial.

### 2. Fifth and Sixth Affirmative Defenses: Eleventh Amendment and Sovereign Immunity

The Court understands that the Secretary has maintained these defenses to preserve them for appellate review, since the Court has already rejected them.[76]

To reiterate, Supreme Court and Circuit precedent compel this Court to find that (1) private plaintiffs have standing to sue under Section 2; (2) such causes of action are not barred by the Eleventh Amendment; and (3) Section 2 is a valid exercise of congressional power under the Fourteenth and Fifteenth Amendments, overriding states' sovereign immunity. The Court **GRANTS** summary judgment in favor of Plaintiffs on the Secretary's Fifth and Sixth Affirmative Defenses.

---

[76] ECF 36 (Jan. 5, 2021 Op. & Order), at 41, 44–46.

## IV.   Conclusion

The Court **DENIES** Defendant's motion for summary judgment [ECF 80] in its entirety and **GRANTS in part** and **DENIES in part** Plaintiffs' partial motions for summary judgment [ECF 56; ECF 79]. Plaintiffs' motions are **GRANTED** with regard to the *Gingles* prerequisites of (1) geography and compactness; (2) political cohesiveness; and (3) racial bloc voting [ECF 79, at 15–19]. To the extent that Plaintiffs' proposed remedy is considered part of the first *Gingles* prerequisite, Plaintiffs' motions are **DENIED**. Neither Plaintiffs nor the Secretary [ECF 80-1, at 15–21] are entitled to summary judgment on that issue.

Plaintiffs' motions are **GRANTED** as to the Secretary's First and Second Affirmative Defenses [ECF 56, at 5–6].

Plaintiffs' motions are **DENIED** as to the Secretary's Third and Fourth Affirmative Defenses [ECF 56, at 7–9; ECF 79, at 8–10].

Plaintiffs' motions are **GRANTED** as to the Secretary's Fifth, Sixth, and Seventh Affirmative Defenses [ECF 56, at 9–10; ECF 79, at 8].

Plaintiffs' motions are **DENIED** as to the Secretary's Eighth Affirmative Defense [ECF 79, at 10–14].

Plaintiffs' motions are **GRANTED** as to the Secretary's Ninth and Tenth Affirmative Defenses [ECF 79, at 7].

Finally, Plaintiffs separately move the Court to take judicial notice of certain census data that they assert is relevant to the fifth Senate Factor.[77] While the Secretary does not believe the data is relevant to the resolution of this case, he does not oppose the Court taking judicial notice of the data itself.[78] Accordingly, Plaintiffs' Motion for Judicial Notice of Census Data [ECF 57] is **GRANTED**.

Within seven days after entry of this Order, the parties are **DIRECTED** to file a joint scheduling proposal, to include pre-trial deadlines, a proposed timeframe for trial (including an estimated length of the trial), and post-trial deadlines. The joint proposal may note areas of disagreement. Following receipt and review of the joint scheduling proposal, the Court will enter a trial order or schedule a conference for further discussion.

**SO ORDERED** this 24th day of January, 2022.

Steven D. Grimberg
United States District Court Judge

---

[77] ECF 57 (Pls.' Mot. for Judicial Notice), at 2.

[78] ECF 61 (Def.'s Resp. to Pls.' Mot. for Judicial Notice).