# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., a nonprofit organization on behalf of members residing in Georgia; SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, a Georgia nonprofit organization; ERIC T. WOODS; KATIE BAILEY GLENN; PHIL BROWN; JANICE STEWART, <br><br> *Plaintiffs*, <br><br> vs. <br><br> BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia. <br><br> *Defendant*. | **Case No. 1:21-cv-05337-SCJ** |

## PROPOSED BRIEF OF *AMICI CURIAE* FAIR DISTRICTS GA AND THE ELECTION LAW CLINIC AT HARVARD LAW SCHOOL IN SUPPORT OF PLAINTIFFS

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record for a party to this action certifies that the following is a full and complete list of all parties in this action, including any parent corporation and any publicly held corporation that owns 10% or more of the stock of a party:

- Election Law Clinic

- Fair Districts GA

2. The undersigned further certifies that the following is a full and complete list of all other persons, associations, firms, partnerships, or corporations having either a financial interest in or other interest which could be substantially affected by the outcome of this particular case:

- All persons employed in the Secretary of State's Office.

3. The undersigned further certifies that the following is a full and complete list of all persons serving as attorneys for the *Amici* in this proceeding, of which we are thus far aware:

- Ruth M. Greenwood, Theresa J. Lee, and Daniel J. Hessel, Election Law Clinic;

- Albert M. Pearson, Albert M. Pearson, LLC.

Pursuant to Eleventh Circuit Rule 29-2 and Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici Curiae* further certify that no party's counsel authored the brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than *Amici Curiae* or their counsel contributed money that was intended to fund preparing or submitting the brief.

This 4th day of February, 2022.

*s/ Albert M. Pearson*

Albert M. Pearson
State Bar Number: 569275
Albert M. Pearson, LLC
2897 North Druid Hills Road
Box 162
Atlanta, GA 30329
(404) 281-4087
amp1859law@gmail.com

*Attorney for Amici Curiae*

# TABLE OF CONTENTS

**Certificate of Interested Persons and Corporate Disclosure Statement** ...............................................................ii

**Table of Contents** ...........................................................................iv

**Table of Citations** .........................................................................v

**Introduction and Summary of the Argument** ...................................1

**Interest of Amici Curiae** .............................................................1

**Argument** .....................................................................................3

I.     Defendant's remedy-based arguments about Plaintiffs' illustrative maps are misplaced. ...........................................3

II.    Thousands of maps that comply with the Voting Rights Act and the General Assembly's discretionary choices can be drawn on a short timeline. ...............................................................6

     A.    Method .........................................................................7

     B.    Simulated Plans' Similarities to the Enacted Plans .................9
            i.    Population Overlap .......................................9
            ii.    Geographic Splits ........................................ 11
            iii.    Compactness ............................................. 12

**Conclusion** ............................................................................... 14

**Certificate of Compliance** ......................................................... 15

**Certificate of Service** ............................................................... 16

# TABLE OF CITATIONS

## Cases

*Askew v. City of Rome*
127 F.3d 1355 (11th Cir. 1997) ..................................................................5

*Bartlett v. Strickland*
556 U.S. 1 (2009)..................................................................................... 12

*Crumly v. Cobb Cnty. Bd. of Elections & Voter Registration*
892 F. Supp. 2d 1333 (N.D. Ga. 2012)......................................................5

*Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*
950 F. Supp. 2d 1294 (N.D. Ga. 2013), *aff'd in part, rev'd in part, vacated in part*,
755 F.3d 1336 (11th Cir. 2015) .......................................................... 4, 12

*Johnson v. Mortham*
926 F. Supp. 1460 (N.D. Fla. 1996) ..........................................................5

*Lawyer v. Dep't of Just.*
521 U.S. 567 (1997).....................................................................................5

*Nipper v. Smith*
39 F.3d 1494 (11th Cir. 1994) ..............................................................4, 5

## Other Authorities

2021-2022 Guidelines for the House Legislative and Congressional
Reapportionment Committee
https://www.legis.ga.gov/api/document/docs/default-
source/reapportionment-document-library/2021-2022-house-
reapportionment-committee-guidelines.pdf?sfvrsn=f1b4cc44_2 ...........................9

2021 Committee Guidelines
https://www.legis.ga.gov/api/document/docs/default-
source/reapportionment-document-library/2021-senate-redistricting-
committee-guidelines.pdf?sfvrsn=a9bbb991_2......................................................9

Christopher T. Kenny et al.,
*redist: Simulation Methods for Legislative Redistricting*, The
Comprehensive R Archive Network (2021), https://CRAN.R-
project.org/package=redist......................................................................................7

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

It's not hard to draw Georgia districts that respect the General Assembly's discretionary choices while also complying with the Voting Rights Act's ("VRA") requirement that Black communities be fairly represented.  Defendant in this case conflates the liability and remedy stages of a VRA § 2 case to elide that point and insist that neither the General Assembly nor the Court has sufficient time to create an interim remedial plan.  Not so.  As this brief illustrates, it would take only days to create thousands of plans that both reflect the General Assembly's discretionary choices and also comply with the non-discretionary legal mandate that Black Georgians' voices are undiluted.

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are non-partisan voting rights organizations dedicated to ensuring that the democratic process is open and fair for all voters.  In pursuit of that interest, *amici* engage in litigation and advocacy across a range of election law issues, with a focus on fair districting.

*Amicus curiae* Fair Districts GA ("FDGA") is a non-partisan, non-profit organization devoted to encouraging fair and transparent redistricting processes in Georgia.  FDGA seeks to equip legislators and citizens with impartial statistical

data to help Georgians understand existing district maps and evaluate new ones. FDGA has a history of grassroots advocacy for fair districting in Georgia and is a prominent advocate for redistricting reform.  In testimony before the Joint Legislative Redistricting Committee in August 2021 before the General Assembly had made public, or enacted, any maps, representatives of FDGA spotlighted the potential for the voting dilution now before the Court.  And in hearings with each of the House and Senate Redistricting Committees during the special legislative session in November 2021, representatives of FDGA presented specific analysis showing likely vote dilution in the proposed maps under consideration.[1]  This Court has welcomed FDGA as a "friend of the court" to assist in another redistricting case.  *See Amicus Curiae* Brief in Supp. of Pls.' Mot. for Prelim. Inj., *Thompson v. Kemp*, 309 F. Supp. 3d 1360 (N.D. Ga. 2018).  FDGA's interest is in providing unbiased redistricting data and encouraging fair districting in Georgia.

*Amicus curiae* Election Law Clinic at Harvard Law School ("ELC") is a non-partisan clinical program committed to protecting free and fair elections through litigation and legal advocacy.  Launched in 2021, ELC is the first in-house

---

[1] Documents detailing the analysis are available at Fair Districts GA, *Legislator Resource Page*, https://www.fairdistrictsga.org/for-legislators.

law school clinic in the United States designed entirely around a practice in

election law.  ELC's team of clinical instructors have litigated redistricting cases

throughout the country, including *Gill v. Whitford*, 138 S. Ct. 1916 (2018), and

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), as well as Voting Rights Act

cases.  ELC has represented *amici curiae* in several state courts and in the United

States Supreme Court.  *See, e.g.*, Brief of Scholars of Congressional Accountability

as *Amici Curiae* in Support of Neither Party, *W. Va. v. EPA*, No. 20-1530, 2022

WL 199369 (2022).  A key part of ELC's mission is to engage with political

scientists on methods of quantitative analysis that can shed light on empirical

questions in election law cases.  ELC's interest is in promoting equal

representation of minority communities, encouraging fair district maps, ensuring

courts receive the best information possible to analyze the redistricting claims

before them, and providing courts with appropriate tools to remedy redistricting

violations.

## ARGUMENT

**I.    Defendant's remedy-based arguments about Plaintiffs' illustrative maps are misplaced.**

Plaintiffs, as they must, have provided illustrative House and Senate plans (the

"Illustrative Plans") to satisfy their threshold *Gingles* demonstration that the General

Assembly could have drawn additional reasonably compact districts where racial minorities have opportunities to elect candidates of their choice.  *See, e.g.*, *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 950 F. Supp. 2d 1294, 1299 (N.D. Ga. 2013), *aff'd in part, rev'd in part, vacated in part*, 755 F.3d 1336 (11th Cir. 2015) (noting plaintiffs' use of an illustrative plan to meet the first *Gingles* precondition).  Defendant protests, conflating liability and remedy, while misreading *Nipper v. Smith* to "prohibit[] the separation of the first prong of liability under *Gingles* and the potential remedy."  Def.'s Response in Opp'n to Pls.' Mot. for Prelim. Inj. ("Opp'n") at 12 (citing *Nipper v. Smith*, 39 F.3d 1494, 1530–31 (11th Cir. 1994)).  But liability and remedy are distinct, and, contrary to Defendant's assertions, *Nipper*—which implicated an overhaul of judicial selection methods— does not preclude the ordinary separation of the liability and remedy phases of a case.  Here, Plaintiffs seek a conventional remedy requiring the General Assembly to redraw the Georgia House and Senate Plans to include the legally required number of districts that allow Black voters an opportunity to elect their candidates of choice. Plaintiffs' Illustrative Plans go to the *liability* question of the first *Gingles* precondition.  At this stage, this Court must determine only "whether it *can* fashion

a permissible remedy in the particular context of the challenged system." *Nipper*, 39 F.3d at 1531 (emphasis added).  It can.

Should Plaintiffs prevail in the liability phase of this case, the Court need not adopt their Illustrative Plans.  Instead, the General Assembly would have an opportunity to "timely adopt a valid redistricting plan" that complies with federal law. *Johnson v. Mortham*, 926 F. Supp. 1460, 1494 (N.D. Fla. 1996).  And, if the Court were forced to step in, it would have substantial leeway in crafting plans with remedies tailored to the VRA violations.  *See Lawyer v. Dep't of Just.*, 521 U.S. 567, 576 (1997); *see also Johnson*, 926 F. Supp. at 1494–95 (discussing the Court's power to enter orders or use Special Masters to adopt and propose redistricting plans).  Court-ordered remedies often differ from illustrative plans.  *See, e.g.*, *Crumly v. Cobb Cnty. Bd. of Elections & Voter Registration*, 892 F. Supp. 2d 1333, 1344–45 (N.D. Ga. 2012); *see also Askew v. City of Rome*, 127 F.3d 1355, 1376 (11th Cir. 1997) (noting that while "none of Plaintiffs' proposals is a completely satisfactory remedy," they nevertheless satisfied the first *Gingles* precondition).  The upshot is that Defendant's concerns about the Illustrative Plans are misplaced because myriad remedial options will be available if Plaintiffs prove their allegations.

## II. Thousands of maps that comply with the Voting Rights Act and the General Assembly's discretionary choices can be drawn on a short timeline.

The Court need not be concerned about whether a remedy that both complies with federal law and respects the General Assembly's discretionary choices exists. As detailed below, thousands of maps can do just that, and can be created on a short timeline. *Amicus* ELC staff includes an in-house pre-doctoral fellow, Christopher T. Kenny who, in a matter of days, has created five thousand House and five thousand Senate district plans that respect the discretionary choices reflected in the General Assembly's enacted plans (the "Enacted Plans") while also matching the number of districts with a majority of Any Part Black Voting Age Population ("BVAP") in the Plaintiffs' Illustrative Plans (54 majority-BVAP districts in the House Illustrative Plan and 19 majority-BVAP districts in the Senate Illustrative Plan, *see* Decl. of William S. Cooper, ECF No. 39-3, at 3 and 6 ("Cooper Decl.")).  Mr. Kenny is a Ph.D. candidate in the Department of Government at Harvard University, studying American Politics and Political Methodology, with a substantive focus on redistricting.  He has analyzed Georgia's

state House and Senate districts using open-source, publicly available software that allows his analysis to be vetted and replicated.[2]

## A. Method

Mr. Kenny used a "merge-split" algorithm[3] to simulate five thousand redistricting plans for each of the House and Senate.  The algorithm applies constraints based on contiguity, population, compactness, and administrative boundaries, and encourages similarity to the Enacted Plans.[4]  An open-source software package is available to review and implement the algorithm.[5]  This algorithm was chosen so that the results would illustrate whether it is possible to draw many plans that match the number of majority-BVAP districts in Plaintiffs'

---

[2] Mr. Kenny's code, replication data, and results are available on GitHub at https://github.com/electionlawclinic.
[3] A merge-split algorithm randomly splits and merges adjacent districts based on inputted criteria.
[4] The way in which each constraint should be addressed in a particular run of the algorithm can be modified to meet various specifications of the criteria, for example a particular threshold can be set for compactness, population deviations, and so on.
[5] Christopher T. Kenny et al., *redist: Simulation Methods for Legislative Redistricting*, The Comprehensive R Archive Network (2021), https://CRAN.R-project.org/package=redist.

Illustrative Plans, while still respecting the General Assembly's discretionary choices.[6]

Mr. Kenny's analysis had three steps.  First, he analyzed the Enacted Plans and identified which districts would need to be redrawn.  To do this, Mr. Kenny used Plaintiffs' expert William Cooper's plans, *see* Cooper Decl., and identified the illustrative districts with a majority-BVAP in each of the Illustrative Plans.  He then overlapped these districts with the Enacted Plans.  The districts in the Enacted Plans that geographically overlapped with Mr. Cooper's majority-BVAP districts were selected to be redrawn.  All non-overlapping districts—27 Senate districts (about 48% of all Senate districts) and 103 House districts (about 57% of all House districts) (the "frozen" districts)—were kept *exactly* as drawn in the Enacted Plans.

Second, Mr. Kenny generated two sets of five thousand plans, one set for each of the House and Senate (the "Simulated Plans"), changing only the non-

_____

[6] The ten thousand plans produced by this algorithm are not a representative sample of *all possible* illustrative plans that match the number of majority-BVAP districts in Plaintiffs' Illustrative Plans and respect legislative choices.  This algorithm was used simply to show *the existence* of at least five thousand plans that would meet those criteria for each the House and the Senate.

frozen districts, using the algorithm discussed above.  The constraints created Simulated Plans similar to the Enacted Plans while maintaining Mr. Cooper's number of majority-BVAP districts.

Finally, Mr. Kenny generated summary statistics to analyze the similarities between Simulated Plans and the Enacted Plans.

**B. Simulated Plans' Similarities to the Enacted Plans**

The Simulated Plans respect the discretionary choices[7] of Georgia's General Assembly by preserving the district population, geographical splits, and compactness of its Enacted Plans.

**i.     Population Overlap**

As an initial matter, it bears emphasizing that Mr. Kenny left wholly unchanged any districts that did not overlap with the geographic areas Plaintiffs allege reflect VRA non-compliance.  All told, that means that 48% of Senate

---

[7] *See* 2021-2022 Guidelines for the House Legislative and Congressional Reapportionment Committee at III.A.7,
https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/2021-2022-house-reapportionment-committee-guidelines.pdf?sfvrsn=f1b4cc44_2; 2021 Committee Guidelines at III.A.7,
https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/2021-senate-redistricting-committee-guidelines.pdf?sfvrsn=a9bbb991_2.

districts and 57% of House districts remain unchanged in each of the ten thousand Simulated Plans.

Moreover, even when the altered districts are considered, the Enacted Plans are largely undisturbed in the Simulated Plans.  An average of 85.4% of the Georgia population[8] would remain in the same House district in the Simulated Plans as in the Enacted House Plan.  An average of 76.2% of the Georgia population[9] would remain in the same Senate district in the Simulated Plans as in the Enacted Senate Plan.[10]

These figures reflect that the Simulated Plans respect the discretionary choices the General Assembly made while matching the number of majority-BVAP districts drawn by Plaintiffs' expert in his report.  These maps are a far cry from the "complete[] redraw[ing]" of which Defendant complains.  Opp'n at 1.

---

[8] The range of the Georgia population that would remain in the same House district in the Simulated Plans is between 83.6% and 87.4%.

[9] The range of the Georgia population that would remain the same Senate district in the Simulated Plans is between 74.5% and 77.2%.

[10] To calculate this, Mr. Kenny matched the population numbers of the Simulated Plans to the Enacted Plans using the algorithm available in the software package identified in footnote 2.  This produces a percentage of the total population whose simulated district overlaps with their enacted district.  A population-weighted average is an approximate weighted average of the individual district overlaps; each district does not have the same percentage of overlap.

### ii.    Geographic Splits

The Simulated Plans largely maintain—and on one metric, reduce—the administrative splits in the Enacted Plans, a discretionary criterion the General Assembly prioritized.  *See supra* n.7.

Mr. Kenny reviewed two types of administrative splits: precinct splits and county splits.  Precincts (defined as voting tabulation districts ("VTDs"), released with the decennial Census) are considered "split" when the VTD has pieces in more than one district.

*Each* of the five thousand Simulated House Plans splits fewer precincts than the Enacted House Plan.  Similarly, many of the Simulated Senate Plans also split fewer precincts than the Enacted Senate Plan, although a small subset of the Simulated Senate Plans split slightly more—the reason being that some precincts are non-contiguous and so could be split into separate Senate districts.  In other words, none of the five thousand Simulated Senate Plans splits a single contiguous precinct that the Enacted Senate Plan does not already split.

The Simulated Plans further respect the General Assembly's choice to try to avoid county splits.  *See supra* n.7.  The Simulated Plans split only slightly more counties than the Enacted Plans.  Specifically, the Simulated House Plans split an

average of only 6.9% of Georgia counties that the Enacted House Plan left whole;

the Simulated Senate Plans split an average of about 10% of counties not split in

the Enacted Senate Plan.  In each instance, this small handful of extra county splits

are necessary in the Simulated Plans to meet the number of majority-BVAP

districts drawn by Mr. Cooper.[11]  *Cf. Bartlett v. Strickland*, 556 U.S. 1, 7 (2009)

(noting federal law supersedes state districting criteria).

### iii.    Compactness

Finally, the Simulated Plans are comparably compact to the Enacted

Plans.  Mr. Kenny measured geographic compactness using the familiar Reock and

Polsby-Popper measures.  Each are defined in Mr. Cooper's Declaration, Cooper

Decl. at 41, and are regularly used by courts to assess the compactness of districts.

*See Ga. State Conf. of the NAACP*, 950 F. Supp. 2d. at 1308–09 & n.14 (using both

the Reock and Polsby-Popper metrics to assess compactness).  The less contorted

the district's boundaries and the more it resembles a circle, the more compact it

will be under these measures.  Larger scores indicate more compact districts.

---

[11] All told, the Simulated House Plans split an average of 159 precincts and 80.1 counties, while the Enacted House Plan splits 185 precincts and 69 counties.  The Simulated Senate Plans split an average of 49.5 precincts and 45.3 counties, while the Enacted Senate Plan splits 47 precincts and 29 counties.

Using these methods, the Simulated Plans, on average, are only slightly less compact than the Enacted Plans. The average Reock and Polsby-Popper scores for the Simulated House Plans are 0.37 and 0.25, respectively, while the Enacted House Plan's scores are 0.39 and 0.28, respectively. The average Reock and Polsby-Popper scores for the Simulated Senate Plans are 0.38 and 0.23, respectively, while the Enacted Senate Plan's scores are 0.42 and 0.29, respectively. By any standard, these are small differences.

In sum, Mr. Kenny produced ten thousand Simulated Plans—five thousand for each of the House and Senate—in a matter of days, using publicly available software. All told, the plans he generated keep an average of 85.4% of Georgians in precisely the same House district, and an average of 76.2% of Georgians in precisely the same Senate district, as in the Enacted Plans. The Simulated Plans are also comparable to the Enacted Plans on the metrics the General Assembly prioritized—and in some cases beat the Enacted Plans on those metrics. All while drawing as many majority-BVAP districts as Plaintiffs' expert, Mr. Cooper.

## CONCLUSION

The Court should rest assured that literally thousands of plans exist that both respect the General Assembly's discretionary choices in the Enacted Plans and create as many majority-BVAP districts as identified by Plaintiffs' expert.

Dated February 4, 2022                                Respectfully submitted,

*/s/ Ruth M. Greenwood*                            */s/Albert M. Pearson*
Ruth M. Greenwood*                                 Albert M. Pearson
Theresa J. Lee*                                    State Bar Number: 569275
Daniel J. Hessel*†                                 Albert M. Pearson, LLC
Election Law Clinic‡                               2897 North Druid Hills Road
Harvard Law School                                 Box 162
5112 Wasserstein Hall                              Atlanta, GA 30329
6 Everett Street                                   (404) 281-4087
Cambridge, MA 02138                                amp1859law@gmail.com
(617) 998-1010
rgreenwood@law.harvard.edu
thlee@law.harvard.edu
dhessel@law.harvard.edu


                                                   *Attorneys for Amici Curiae*

* Motion for *pro hac vice* admission forthcoming
† Federal practice only
‡ Counsel wish to acknowledge the assistance of Delaney Herndon, Anna Jessurun, and Mary Samson, law students in the Election Law Clinic at Harvard Law School, in preparing this brief.

14

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, using a font type of Times New Roman and a point size of 14.

The undersigned hereby certifies that, exclusive of the exempted portions of the brief set forth in Fed. R. App. P. 32(f) and 11th Cir. Rule 32-4, and in accordance with Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(A), this brief is 14 pages and is therefore less than half the length authorized for a principle brief.

*s/ Albert M. Pearson*

Albert M. Pearson
State Bar Number: 569275
Albert M. Pearson, LLC
2897 North Druid Hills Road
Box 162
Atlanta, GA 30329
(404) 281-4087
amp1859law@gmail.com

*Attorney for Amici Curiae*

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day caused to be served the foregoing

**PROPOSED BRIEF OF *AMICI CURIAE* FAIR DISTRICTS GA AND**

**THE ELECTION LAW CLINIC AT HARVARD LAW SCHOOL IN**

**SUPPORT OF PLAINTIFFS** with the Clerk of Court using the CM/ECF

system, which will automatically send email notification of such filing to all

counsel or parties of record on the service list.

This 4th day of February, 2022.

*s/ Albert M. Pearson*

Albert M. Pearson
State Bar Number: 569275
Albert M. Pearson, LLC
2897 North Druid Hills Road
Box 162
Atlanta, GA 30329
(404) 281-4087
amp1859law@gmail.com

*Attorney for Amici Curiae*
