# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., a nonprofit organization on behalf of members residing in Georgia; SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, a Georgia nonprofit organization; ERIC T. WOODS; KATIE BAILEY GLENN; PHIL BROWN; JANICE STEWART, <br><br> *Plaintiffs*, <br><br> vs. <br><br> BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia. <br><br> *Defendant*. | **Case No. 1:21-cv-5337** |

# PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

I.   Background Facts ........................................................................... 1

    A.   Plaintiffs ............................................................................ 1

    B.   Defendant ........................................................................... 3

    C.   The 2021 Redistricting Process ........................................... 4

    D.   Timing of the Suit ............................................................. 5

    E.   Coordinated Preliminary Hearing ....................................... 7

II.   Gingles Precondition I – Sufficiently Large and Geographically Compact Minority Populations ............................................................................ 7

    A.   Demographic Change in Georgia ......................................... 8

    B.   Lack of Growth In Black-Majority State Legislative Districts ............. 8

    C.   Cracking Black Voting Populations ...................................... 10

    D.   Drawing Additional Senate and House Districts .................... 11

    E.   Proper Measure of Black Population ..................................... 11

    F.   Plaintiffs' Expert Testimony at the February 7 – 14 Hearing .......... 12

    G.   Defendant's Expert Testimony ............................................ 26

    H.   The Illustrative Maps ........................................................ 30

III.   Gingles Precondition II: Political Cohesion of Black Voters ................... 50

IV.   Gingles Precondition III: Success of White Bloc Voting ........................ 54

V.   Totality of the Circumstances: All Relevant Factors Weigh Decisively In Favor Of A Finding Of Vote Dilution .................................................... 57

    A.   Senate Factor One: Georgia Has A History Of Voting-Related Discrimination Against Black Voters. ................................... 57

    B.   Senate Factor Two: Voting in Georgia is Extremely Polarized Along Racial Lines. ........................................................... 62

    C.   Senate Factor Three: Use of Voting Practices or Procedures That May Enhance The Opportunity For Discrimination ................ 70

    D.   Senate Factor Four: Georgia Does Not Use Slating Processes For General Assembly Elections. ............................................. 76

E.   Senate Factor Five: Black Voters Today Suffer From the Vestiges of Georgia's Centuries of Discrimination Which Hinder Political Participation. .......................................................................... 76

F.   Senate Factor Six: Overt and Subtle Racial Appeals Are Common In Georgia Politics. ........................................................................ 80

G.   Senate Factor Seven: Black Georgians Are Significantly Underrepresented in Elected Office. ..................................................... 83

H.   Senate Factor Eight: Georgia is Unresponsive to the Needs of Black Georgians .................................................................................. 85

I.   Senate Factor Nine: Defendant's Justifications are Tenuous ............ 86

VI.   Remedies ....................................................................................... 87

A.   Plaintiffs Will Suffer Irreparable Harm Absent Relief ...................... 87

B.   The Court Can Craft Relief That Does Not Result In Significant Hardship to the State .......................................................... 88

VII.   Jurisdiction Is Proper ........................................................... 98

VIII.   Plaintiffs Have a Private Right of Action ............................................ 98

IX.   The Preliminary Injunction Standards Have Been Satisfied ..................... 100

A.   Plaintiffs Are Likely to Succeed on the Merits ................................ 100

B.   The Remaining Preliminary Injunction Factors Weigh Heavily in Favor of Relief ................................................................ 142

C.   The Purcell Principle Does Not Bar Relief ........................................ 145

X.   Conclusion ................................................................................ 153

<u>PROPOSED FINDINGS OF FACTS</u>

**I.    Background Facts**

**A.    Plaintiffs**

**a.    Alpha Phi Alpha Fraternity Inc.**

1.    Plaintiff Alpha Phi Alpha Fraternity Inc. is the first intercollegiate Greek-letter fraternity established for Black men. Doc. No. [94], at 2, ¶ 1.

2.    Alpha Phi Alpha Fraternity Inc. has thousands of members in Georgia, including Black Georgians who are registered voters who live in Senate Districts 16, 17, and 23 under the Enacted Senate Plan, as well as in House Districts 74, 114, 117, 128, 133, 134, 171, and 173 under the Enacted House Plan. Doc. No. [94], at 2, ¶2.

3.    Alpha Phi Alpha Fraternity Inc. has long made political participation for its members and Black Americans an organizational priority, including through programs to raise political awareness, register voters, and empower Black communities. Doc. No. [94], at 2, ¶ 3.

4.    Harry Mays is a member of Alpha Phi Alpha Fraternity Inc. Doc. No. [94-2], at 4, ¶ 4. Mr. Mays resides in House District 117 under the State's Enacted House Plan, and under Plaintiffs' illustrative maps, would reside in a new majority Black House District. Doc. No. [94], at 2, ¶¶ 5-6.

**b.    Sixth District of the African Methodist Episcopal Church**

5.    Plaintiff Sixth District of the African Methodist Episcopal Church ("AME Church") is a nonprofit religious organization. Doc. No. [94], at 2, ¶ 7.

6.    The Sixth District is one of twenty districts of the African Methodist Episcopal Church and covers the entirety of the State of Georgia. Doc. No. [94], at 2, ¶ 8. In Georgia, the AME Church has more than 500 member-churches and tens of thousands of members, with churches

1

located in Senate Districts 16, 17, and 23 under the Enacted Senate Plan as well as in House Districts 74, 114, 117, 128, 133, 134, 171, and 173 under the Enacted House Plan. Doc. No. [94], at 3, ¶¶ 9-11.

7.   The AME Church has long made encouraging and supporting civic participation among its members a core aspect of its work, including through programs to register voters, transporting churchgoers to polling locations, hosting "Get Out the Vote" efforts, and providing food, water, encouragement, and assistance to voters waiting in lines at polling locations. Doc. No. [94], at 3, ¶ 12.

8.   Plaintiff Phil S. Brown is a member of the Lofton Circuit AME Church in Wrens, Georgia, and Plaintiff Janice Stewart is a member of the Saint Peter AME Church in Camilla, Georgia. Doc. No. [94], at 3, ¶¶ 13-14.

### c.   Eric T. Woods

9.   Plaintiff Eric T. Woods is a Black citizen of the United States who resides in Tyrone, Georgia in Fayette County. Doc. No. [94], at 3, ¶¶ 15-16. Mr. Woods has been a registered voter at his current address since 2011. Doc. No. [94], at 3, ¶ 17.

10.   Mr. Woods resides in State Senate District 16 under the Enacted Senate Plan, and under Plaintiffs' illustrative maps, Mr. Woods would reside in a new majority Black Senate District. Doc. No. [94], at 3, ¶¶ 18-19.

### d.   Katie Bailey Glenn

11.   Plaintiff Katie Bailey Glenn is a Black citizen of the United States who resides in McDonough, Georgia in Henry County. Doc. No. [94], at 4, ¶¶ 20-21. Ms. Glenn has been a registered voter at her current address for approximately 50 years. Doc. No. [94], at 4, ¶ 22.

12.   Ms. Glenn resides in State Senate District 17 under the State's Enacted Senate Plan, and Enacted House District 117 under the State's Enacted House Plan; under Plaintiffs' illustrative maps, Plaintiff Katie Bailey

Glenn would reside in a new majority Black House District. Doc. No. [94], at 4, ¶¶ 23, 25.

### e.    Phil S. Brown

13.    Plaintiff Phil S. Brown is a Black citizen of the United States who resides in Wrens, Georgia in Jefferson County. Doc. No. [94], at 4, ¶¶ 26-27. Mr. Brown has been a registered voter at his current address for years. Doc. No. [94], at 4, ¶ 28.

14.    Mr. Brown resides in State Senate District 23 under the State's Enacted Senate Plan, and under Plaintiffs' illustrative maps, Mr. Brown would reside in a new majority Black Senate District. Doc. No. [94], at 4, ¶¶ 29-30.

### f.    Janice Stewart

15.    Plaintiff Janice Stewart is a Black citizen of the United States who resides in Thomasville, Georgia in Thomas County. Doc. No. [94], at 5, ¶¶ 31-32. Ms. Stewart has been a registered voter at her current address for years. Doc. No. [94], at 4, ¶ 33.

16.    Ms. Stewart resides in State House District 173 under the State's Enacted House Plan; under Plaintiffs' illustrative maps, Ms. Stewart would reside in a new majority Black House District. Doc. No. [94], at 5, ¶¶ 34-35.

### B.    Defendant

17.    Defendant Brad Raffensperger is the Georgia Secretary of State and the chief elections official in the State of Georgia. Secretary Raffensperger is sued in his official capacity. Doc. No. [94], at 5, ¶ 36.

18.    Secretary Raffensperger is responsible for overseeing the conduct of Georgia's elections and implementing election laws and regulations, including the State House and State Senate district maps at issue in this litigation. See Ga. Code Ann. § 21-2-50(a); Ga. Comp. R. & Regs. 590-1-1-.01, .02 (2018); Jacobsen v. Fla. Sec'y of State, 974 F.3d 1236 (11th Cir. 2020).

3

C.      **The 2021 Redistricting Process**

19.     The General Assembly's 2021 Committee Guidelines for both the House and Senate set forth "General Principles for Drafting [Redistricting], Plans," among which is that "[a]ll plans adopted by the Committee will comply with Section 2 of the Voting Rights Act of 1965, as amended." Doc. No. [39-17], at 3, ¶3; <u>see also</u> Doc. No. [94], at 5, ¶ 37.

20.     The General Assembly's 2021 Committee Guidelines also provide that "[t]he Committee should consider: (a) The boundaries of counties and precincts; (b) Compactness; and (c) Communities of interest." Doc. No. [39-17], at 3, ¶3; <u>see also</u> Doc. No. [94], at 5, ¶ 37.

21.     The General Assembly's 2021 Committee Guidelines provide that "[e]fforts should be made to avoid the unnecessary pairing of incumbents." Doc. No. [39-17], at 3, ¶8; <u>see also</u> Doc. No. [94], at 5, ¶ 37.

22.     Georgia's traditional redistricting principles include population equality, compactness, contiguity, respect for communities of interest, and the non-dilution of minority voting strength. Doc. No. [39-17], at 3, ¶8; <u>see also</u> Doc. No. [94], at 5, ¶ 37.

23.     Georgia's traditional principles also include following, to the extent possible, county and voting district (VTD) boundaries. Doc. No. [39-17], at 3, ¶3; <u>see also</u> Doc. No. [94], at 5, ¶ 37.

24.     With respect to population equality, Georgia generally seeks for its legislative districts to comply with a 1% limitation on population deviations for the State Senate and 1.5% for the State House. Doc. No. [94], at 5, ¶ 39.

25.     All of the public town hall meetings convened by the State's Redistricting Committees were held during June and July 2021. Doc. No. [94], at 6, ¶ 43.

26.     On August 21, 2021, the Census Bureau released the detailed population counts that Georgia used to redraw districts. Doc. No. [94], at 6, ¶ 44.

27.     The Enacted Senate and House Plans were first released on November 2, 2021. Doc. No. [94], at 6, ¶ 47.

28.     The 2021 Special Session of the Georgia General Assembly convened on November 3, 2022, by Governor Kemp's proclamation. Governor's Proclamation Convening the Gen. Assembly of Ga. in Special Sess. (Sept.                23,                2021), https://gov.georgia.gov/document/document/convening-general-assembly-georgia-special-session-92321pdf/download.

29.     There are 56 Senate districts in Georgia. Doc. No. [94], at 7, ¶ 59.

30.     There are 180 House districts in Georgia. Doc. No. [94], at 8, ¶ 64.

**D.     Timing of the Suit**

31.     The Georgia General Assembly passed the Senate and House Plans on November 12, 2021. Doc. No. [94], at 7, ¶ 56.

32.     Not a single Black legislator voted in favor of the Enacted Senate or House Plans. Doc. No. [94], at 7, ¶ 57.

33.     The 2021 Special Session of the Georgia General Assembly adjourned on November 22, 2021. Ga. Senate Daily Status Report (Nov. 22, 2021), https://www.legis.ga.gov/api/document/docs/default-source/senate-calendars/2021ex/senate-daily-status-2021ex-legislative-session-day-15.pdf?sfvrsn=b3e46ada_2;   Ga. House of Representatives Daily Status Report (Nov. 22, 2021), https://www.legis.ga.gov/api/document/docs/default-source/house-calendars/20212022/11222021.pdf?sfvrsn=795eb5ce_2.

34.     After a delay of 38 days, Governor Kemp signed the Plans into law on December 30, 2021. Doc. No. [94], at 7, ¶ 58.

5

35.    Plaintiffs filed this suit on December 30, 2021, hours after Governor Kemp signed the Plans. <u>See</u> Doc. No. [1].

36.    Plaintiffs filed a Motion for a Preliminary Injunction on January 7, 2022. <u>See</u> Doc. No. [26].

37.    Plaintiffs filed a Renewed Motion for a Preliminary Injunction one week after their initial motion. The Renewed Motion differed from the original only through minor updates to expert reports. <u>See</u> Doc. No. [39].

38.    The parties consented to an expedited briefing schedule. <u>See</u> Doc. No. [62].

39.    Defendant filed a motion to dismiss, arguing that Plaintiffs failed to request a three-judge court for an action involving "the apportionment of congressional districts or the apportionment of any statewide legislative body," <u>see</u> 28 U.S.C. § 2284(a), and that this Court, therefore, lacks subject matter jurisdiction over Plaintiffs' claims. Doc. No. [43-1], at 2.

40.    Defendant also asserted that even if this case is properly before a single-judge court, Plaintiffs' Complaint fails to state a claim against Defendant for declaratory relief because Congress has not expressed an intent to provide a private right of action under Section 2. Doc. No. [43-1], at 13.

41.    This Court determined that the plain language of § 2284(a), its legislative history, and other cases confirmed that a three-judge panel was not required in this matter. Doc. No. [65].

42.    This Court also determined that Section 2 provides a private right of action. It acknowledged that lower courts have treated the question of whether the VRA furnishes an implied right of action under Section 2 as an open question but determined that lower courts have consistently answered the question in the affirmative. Doc. No. [65], at 33.

43.  This Court denied Defendant's motion to dismiss and declined to authorize an immediate appeal. Doc. No. [65], at 34.

44.  The Court began the preliminary injunction hearing on February 7, 2022 and concluded the hearing on February 14, 2022.

**E.    Coordinated Preliminary Hearing**

45.  This Court held a six-day coordinated preliminary injunction hearing in <u>Alpha Phi Alpha et al. v. Raffensperger</u> (1:21-cv-05337-SCJ), <u>Pendergrass et al. v. Raffensperger et al.</u> (1:21-cv-05339-SCJ), and <u>Grant et al. v. Raffensperger et al.</u> (1:22-cv-00122-SCJ).

46.  <u>Alpha Phi Alpha</u> and <u>Grant</u> challenge Georgia's state legislative maps, and <u>Pendergrass</u> challenges Georgia's congressional maps, all under Section 2 of the Voting Rights Act for unlawful vote dilution.

47.  All written declarations or reports submitted by the <u>Alpha Phi Alpha</u> Plaintiffs' witnesses were admitted into evidence at the start of the coordinated hearing. <u>See</u> (Feb. 7, 2022, Morning Tr.), Tr. 31:19–25. This included written submissions of witnesses who did not testify live at the hearing. Witnesses who did not testify at the hearing but whose written submissions were admitted into evidence included Mr. Sherman Lofton, Jr., State Director of Plaintiff Alpha Phi Alpha Fraternity Inc (Doc. No. [70-2]).; Dr. Traci Burch, a political scientist who opined on Senate Factors 5 and 8 (Doc. No. [39-9]); Dr. Jason Morgan Ward, a historian who opined on Senate Factors 1 and 6 (Doc. No. [39-10]); as well as individual plaintiffs Katie Bailey Glenn (Doc. No. [39-11]), Phil Brown (Doc. No. [39-12]), Janice Stewart (Doc. No. [39-13]), and Eric Woods (Doc. No. [39-14]).

48.  The coordinated hearing included live testimony from 15 witnesses (10 experts and 5 fact witnesses); more than 250 pages of pre-hearing briefing; reports from 13 experts; and nearly 100 hearing exhibits. The transcript of the preliminary injunction hearing spans approximately 1,300 pages.

**II.    <u>Gingles</u> Precondition I – Sufficiently Large and Geographically Compact Minority Populations**

### A.      Demographic Change in Georgia

49.    From 2010 to 2020, Georgia's population grew by over 1 million people to a total of 10.71 million, which represents an increase of 10.6% from 2010. Doc. No. [94], at 8, ¶ 77.

50.    Georgia's population growth over the last decade was driven to a significant extent by the growth of Georgia's Black population, which increased by 16% during 2010-2020, an increase of 484,048 persons. Doc. No. [94], at 8–9, ¶¶ 78–79; (Feb. 7, 2022, Afternoon Tr.), Tr. 115:9–11; Doc. No. [35], at 15, ¶ 35.

51.    Under the 2020 Census, any part Black Georgians comprise the largest minority population in the state at 33.03% of the total population. Doc. No. [94], at 9, ¶ 82.

52.    From 2010 to 2020, Georgia's white population decreased by 51,764, or approximately 1%. Doc. No. [94], at 9, ¶ 80; Feb. 7 Tr. 115:9–11.

53.    Since 1990, the Black population in Georgia has doubled, from 1.75 million to 3.54 million today. Feb. 7 Tr. 115:21–22.

54.    Georgia's Black population has also increased since 1990 from about 27% of the population to over 33% according to the 2020 Census. Over the same time period, the percentage of the population identifying as non-Hispanic White has dropped from 70% to 50%. Doc. No. [94], at 9, ¶ 81.

55.    As described by Plaintiffs' mapping expert William Cooper, the growth in the statewide Black population from 2010-2020 of 484,048 persons is equivalent to the population of 2.5 State Senate districts or 8 State House districts. Feb. 7 Tr. 116:14–23.

### B.      Lack of Growth In Black-Majority State Legislative Districts

56.    There are 56 Senate districts in Georgia. Doc. No. [94], at 7, ¶ 59.

57.    The ideal population of a Georgia House seat is 59,511. Doc. No. [39-3], at 8, ¶ 12 n.6. The ideal population of a Georgia Senate seat is 191,284. <u>Id.</u>

58.    The State's Enacted Senate Plan contains 14 Black-majority Senate districts using 2020 Census data. Doc. No. [94], at 7, ¶ 60.

59.    The 2014 Senate plan contained 13 majority-Black districts using 2020 Census data, plus a 14th district with a Black voting age population of 49.76% using 2020 Census data. Doc. No. [39-3], at 7–8, ¶ 13 & n.7. Using then-current 2010 Census numbers, the 2014 Senate Plan had at least 14 majority-Black Senate districts when it was enacted. <u>Id.</u> Consistent with Mr. Cooper's testimony and analysis, the Court finds the number of Black-majority Senate districts is effectively unchanged from the prior 2014 Plan to the 2021 Plan.

60.    The 2006 Senate plan contained 13 majority-Black districts. Doc. No. [39-3], at 26, ¶ 58 & fig. 10.

61.    There are 10 majority-Black Senate districts in the Metro Atlanta area under the Enacted Senate Plan. There were also 10 in the 2014 Plan and 10 in the 2006 Plan. Doc. No. [39-3], at 26, fig. 10.

62.    Mr. Cooper testified that the number of Black-majority Senate Districts in the Enacted Senate Plan does not reflect the growth in the Black population over the past decades, either statewide or in Metro Atlanta. Feb. 7 Tr. 127:12–25, 128:5–8.

63.    There are 180 House districts in Georgia. Doc. No. [94], at 8, ¶ 64.

64.    The State's 2021 Enacted House Plan contains 49 Black-majority House districts using 2020 Census Data. Doc. No. [94], at 8, ¶ 65.

65.    The previous 2015 House plan contained 47 majority-Black House districts at the time it was enacted. Doc. No. [94], at 8, ¶ 66.

66.    The 2006 House plan contained 45 majority-Black House districts. Doc. No. [39-3], at 45, fig. 23.

67.  The number of majority-Black House districts in the Metro Atlanta area has grown from 30 in 2006 to 33 at present. Doc. No. [39-3], at 45, fig. 23.

68.  Mr. Cooper testified that the number of Black-majority House Districts in the 2021 Enacted House Plan does not reflect the growth in the Black population over the past decades, either statewide or in Metro Atlanta. Feb. 7 Tr. 178:6–19, 130:10–13.

## C.  Cracking Black Voting Populations

69.  The percentage of Black Georgians of voting age in majority-Black Senate districts has hovered around 50% since the mid-2000s, while the percentage of the NH White VAP in majority-White districts has stayed above 80% over the same timeframe, a 30-point gap. Doc. No. [39-3], at 26–27, ¶ 59 & fig. 11.

70.  Mr. Cooper attested and testified that the disparity between the percentage of Black voters in Black-majority districts and white voters in white-majority districts indicates that Black populations are disproportionately "cracked" or divided into majority-White Senate districts rather than placed in majority-Black Senate districts. Doc. No. [39-3], at 26–27, ¶ 59; Feb. 7 Tr. 129:11–18.

71.  The percentage of Black Georgians of voting age in majority-Black House districts is only slightly higher than in the 1990s (52% vs. 45%). Under the 2021 Plan, the percentage of the NH White population in majority-White districts is 76%. Doc. No. [39-3], at 44–45, ¶ 93 & fig. 24.

72.  Mr. Cooper attested and testified that the disparity between the percentage of Black voters in Black-majority districts and white voters in white-majority districts indicates that Black populations are disproportionately "cracked" or divided into majority-White districts in the House as well. Doc. No. [39-3], at 44–45, ¶ 93; Feb. 7 Tr. 131:7–12.

10

73.  Mr. Cooper further testified that adding more Black-majority districts would ameliorate the disparity: "[T]he gap would begin to close as more majority Black districts are created." Feb. 7 Tr. 131:13–16.

74.  Mr. Cooper testified: "[W]e know that the population [of the entire metro Atlanta area and the 11-county area] increased by 400,000 — over 400,000 African Americans just over a 10-year span. And so, it just—it just boggles the mind that it wouldn't be possible to create an additional Black district in metro Atlanta. I don't even see how you can suggest otherwise." Feb. 7 Tr. 198:9–15.

**D.    Drawing Additional Senate and House Districts**

75.  Mr. Cooper testified that, taken together, the demographic data suggests that additional Black-majority Senate and House districts can be drawn. Feb. 7 Tr. 129:19–23.

76.  Indeed, Mr. Cooper testified that "there's virtually been no change in the number of Senate and House districts since the 2006 Plan." Feb. 7 Tr. 127:15–18. He said that "it's kind of impossible to understand why they're not more majority Black House and Senate districts in the state, given all of the growth that has been happening over the past 30 years, but especially over the past 20." Feb. 7 Tr. 127:20–24.

77.  Mr. Cooper testified: "I don't see how in the world with a straight face that you could suggest that you couldn't draw additional majority Black Districts in Metro Atlanta where the population increased by 400,000 persons, Black population since 2010. It's just almost self-evident." Feb. 7 Tr. 178:10–15.

**E.    Proper Measure of Black Population**

78.  Any Part Black Voting Age Population ("AP BVAP") refers to the population of people who self-identify as Black on the Census form, whether in combination with other races or not. Doc. No. [39-3], at 4, ¶ 5 n.1; Grant Doc. No. [20-1], ¶ 14 n.4; Feb. 7 Tr. 181:19–25.

79.  Mr. Cooper uses the AP BVAP metric in defining which districts are majority-Black. Doc. No. [39-3], at 4, ¶ 5 n.1; Feb. 7 Tr. 41:22-42:20.

11

80.    Mr. Cooper testified that he has routinely reported the any-part definition of Black as an expert in redistricting cases. Feb. 7 Tr. 42:6–20.

81.    Defendant's expert, Mr. Morgan, also testified that he used the any-part definition of Black in his analysis. Feb. 7 Tr. 11:11–15.

**F.    Plaintiffs' Expert Testimony at the February 7 – 14 Hearing**

**a.    Mr. Cooper's Experience and Credibility**

82.    Mr. Cooper has testified at trial or by declaration as an expert witness in roughly 100 cases over a period of approximately 30 years. Feb. 7 Tr. 34:20–35:3.

83.    Mr. Cooper has served as an expert in 10 redistricting cases in Georgia alone. Feb. 7 Tr. 35:4-36:12.

84.    Mr. Cooper served as an expert in two post-2010 local-level Section 2 cases in Georgia: <u>NAACP v. Fayette County</u> and <u>NAACP v. Emanuel County</u>. In both cases, the parties settled on redistricting plans developed by Mr. Cooper (with input from the respective defendants). Doc. No. [39-3], at 3, ¶ 3.

85.    In the latter part of the decade, Mr. Cooper served as the <u>Gingles</u> 1 expert in three additional Section 2 cases in Georgia, which were all voluntarily dismissed after the 2018 elections: <u>Georgia NAACP v. Gwinnett County</u>), No. 1:16-cv-02852-AT; <u>Thompson v. Kemp</u>, No. 1:17-cv-01427 (N.D. Ga. 2018); and <u>Dwight v. Kemp</u>, No. 1:18-cv-2869 (N.D. Ga. 2018). Doc. No. [39-3], at 3, ¶ 3.

86.    Mr. Cooper testified that his work in <u>NAACP v. Fayette County</u> and <u>Georgia NAACP v. Gwinnett County</u> informed his understanding of the demographic changes that had taken place in the last decade in those counties. Feb. 7 Tr. 184:1–12. Similarly, Mr. Cooper drew on his work in <u>Thompson v. Kemp</u>, where he was asked to examine the demographic impact of modifications to State House District 105 in Gwinnett County and House District 111 in Henry County, to assess

the demographics and characteristics of Henry County. Feb. 7 Tr. 145:20-146:10.

87. Mr. Cooper has served as an expert for both plaintiffs and defendants in redistricting litigation. Feb. 7 Tr. 37:22-38:15.

88. Mr. Cooper was forthright with the Court when discussing the characteristics of Plaintiffs' illustrative maps and affirmatively disclosed that while the illustrative plans were acceptable for <u>Gingles</u> 1 purposes, improvements could be made in the remedial phase. Feb. 7 Tr. 149:7–24, 150:21-154:1.

**b.   Mr. Cooper's analysis**

89. Mr. Cooper was asked to determine whether the African American population in Georgia is sufficiently large and geographically compact to allow for the creation, employing traditional districting principles, of additional majority-Black Senate and House districts beyond those created in the legislative plans that were signed into law by Governor Kemp on December 30, 2021. Doc. No. [39-3], at 3, ¶ 3.

90. Mr. Cooper was guided by the traditional redistricting principles, including population equality, compactness, contiguity, respect for communities of interest, and the non-dilution of minority voting strength, in drawing Plaintiffs' illustrative plans. Doc. No. [39-3], at 5, ¶ 8.

91. Mr. Cooper testified that there was "no goal per se" to draw additional black districts as part of his analysis; he was "just asked to see whether additional districts could be created, given the present demographics of 2020." Feb. 7 Tr. 164:19–25.

92. Mr. Cooper analyzed population and geographic data from the Decennial Census and the American Community Survey in preparing his expert report. Doc. No. [39-3], at 78, ¶ 1.

93. Mr. Cooper used a geographic information system called Maptitude for Redistricting, a system used by many local and state governing bodies, for his districting analysis. Doc. No. [39-3], at 78, ¶ 2.

13

94.   Mr. Cooper developed Plaintiffs' Illustrative plans by starting with the prior Senate and House plans from 2014 and 2015 as a baseline. Feb. 7 Tr. 125:12–19.

    **c.**    **Mr. Cooper's Adherence to Traditional Redistricting Principles**

        **i.**    **Georgia's Reapportionment Guidelines**

95.   In 2021, The Georgia General Assembly expressed its redistricting principles in two documents titled "2021-2022 Guidelines for the House Legislative and Congressional Reapportionment Committee" and "2021 Committee Guidelines" for the Senate. These documents were promulgated by the House Legislative and Congressional Reapportionment Committee and the Senate Reapportionment & Redistricting Committee, respectively. Doc. No. [39-17]; Doc. No. [39-18].

96.   Those traditional redistricting principles are: maintaining population equality between districts; compliance with Section 2 of the Voting Rights Act; compliance with the United States and Georgia Constitutions; contiguity; drawing exclusively single-member districts; considering avoiding splits of counties and precincts, compactness, maintaining communities of interest; and avoiding unnecessary pairing of incumbents. Doc. No. [39-17], at 3; Doc. No. [39-18], at 3.

97.   Mr. Cooper specifically referred to these criteria in his report (Doc. No. [39-3], at 5, ¶ 8), and he testified in detail about how he followed them in drawing the Illustrative House and Senate Plans. Feb. 7 Tr. 131:22-140:11.

98.   Mr. Cooper testified that he considered and balanced all the traditional redistricting criteria when drawing Plaintiffs' Illustrative Plans. See Feb. 7 Tr. 49:13-51:5, 132:6-133:13, 133:21-134:14, 135:9–21, 136:4–16, 138:11-140:1, 140:2–7.

99.   Gina Wright, the State's mapping expert, confirmed that the traditional redistricting principles set forth in the 2021 Guidelines for

the House Legislative and Congressional Reapportionment Committees were the appropriate factors to consider when redistricting in Georgia. (Feb. 11, 2022 Morning Tr.) Tr. 87:18-90:2.

100.    Ms. Wright testified that the 2021 Guidelines for the House Legislative and Congressional Reapportionment Committees identified compactness, county and precinct splits, and maintaining communities of interest as factors that should be considered, which could involve "trade-offs" and a "balancing act" between the different factors, whereas other principles, such as compliance with the Voting Rights Act, were mandatory. Feb. 11 Tr. 89:5–23, 92:1–5.

101.    Blakeman Esselstyn, the mapping expert for the <u>Grant</u> Plaintiffs, also specifically referred to the Guidelines in his report, and stated that Plaintiffs' Illustrative Plans were drawn to comply with and balance the principles in the Guidelines. <u>Grant</u> Doc. No. [20-1], at 14, 24, ¶¶ 29, 44.

102.    Mr. Cooper testified that, with respect to Plaintiffs' Illustrative Plan, "I have attempted to balance [the traditional principles] together and I think overall, the Plan does comply with traditional redistricting principles." Feb. 7 Tr. 230:22–24. Mr. Cooper testified that none of the traditional redistricting criteria predominated over any of the others in his process. Feb. 7 Tr. 140:3–7 ("I tried to balance them all. I was aware of them all and I tried to achieve plans that were fair and balanced.").

103.    In general, Mr. Cooper testified that the redistricting process involves a balancing act, and that the redistricting principles are at times in tension with one another. Feb. 7 Tr. 90:20–22 ("[I]t's a matter of balancing things; because I was able to avoid changing six of the districts, I might have sacrificed compactness overall."); Feb. 7 Tr. 100:1–9; ("Well, I looked at all of the factors that are part of the traditional redistricting principles and tried to balance them. . . . The idea was to balance those factors and show that a district could be created if it could be created.").

104.  Defendant's expert Ms. Wright testified similarly, agreeing that adherence to traditional criteria when drawing districts is "a balancing act," (Feb. 11 Tr. 89:14–19), often involving making trade-offs between principles like maintaining communities of interest and compactness, or avoiding splits of political subdivisions. Feb. 11 Tr. 89:10–22. As Ms. Wright further testified: "You try to consider all of [the factors], but sometimes you do have to make those determinations." Feb. 11 Tr. 89:22–23.

105.  When asked whether his Illustrative Plans were "valid, alternative plans applying all of the traditional redistricting principles" Mr. Cooper testified, "absolutely, yes." Feb. 7 Tr. 232: 15–21. Mr. Cooper affirmed that his Illustrative Plans were "totally acceptable." Feb. 7 Tr. 231: 24–25.

### ii.    Population Equality

106.  Georgia's redistricting guidelines provide that district populations should be "substantially equal as practicable." Feb. 11 Tr. 88:1–5; see also Doc. No. [39-17], at 3; Doc. No. [39-18], at 3.

107.  Mr. Cooper testified that his plans each contain minimal population deviation and documented that in his report. Doc. No. [39-3], at 5, ¶ 8; Feb. 7 Tr. 132:2–24.

108.  The Illustrative House Plan contains 2.96% population deviation overall, while the Enacted House Plan contains 2.74% population deviation overall. Doc. No. [59-2], at 27–29; Doc. No. [39-5], at 18–20. Thus, both House plans are within plus-or-minus 1.5%.

109.  The Illustrative Senate Plan contains 1.99% population deviation overall, which is lower than the Enacted Senate Plan, which contains 2.01% population deviation overall. Doc. No. [59-2], at 25; Doc. No. [39-3], at 151. Both Senate plans are thus right around plus-or-minus 1% deviation.

110.  Ms. Wright agreed that Georgia's standards for population deviation are to draw districts "as close to zero as possible" and that it would

16

be "really difficult" to go lower than plus-or-minus 1%. Feb. 11 Tr. 88:1–22.

### iii.   Contiguity

111.   The principle of contiguity instructs that "[a]ll pieces . . . of the district must fit together." Feb. 7 Tr. 61:21-62:3.

112.   Mr. Cooper states that both the Illustrative House and Senate Plan respect the principle of contiguity. Doc. No. [39-3], at 5, ¶ 8.

113.   This point was not disputed by Defendant's experts Mr. Morgan or Ms. Wright.

### iv.   Compactness

114.   The parties' experts each evaluated the 2021 Enacted House Plan and Plaintiffs' Illustrative House Plan using the Reock and Polsby-Popper analyses, two commonly used measures of a district's compactness.

115.   According to Mr. Cooper, "[t]he Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. . . . The measure is always between 0 and 1, with 1 being the most compact." Doc. No. [39-3], at 42, ¶ 85 n.21; Feb. 7 Tr. 59:24-60:4.

116.   The Polsby-Popper test, in contrast, "doesn't look at area, but [] looks at the perimeter of the district." Feb. 7 Tr. 60:5–11. It "computes the ratio of the district area to the area of a circle with the same perimeter." Doc. No. [39-3], at 42, ¶ 85 n.22. Similar to the Reock measure, the Polsby-Popper test "is always between 0 and 1, with 1 being the most compact." Id.; Feb. 7 Tr. 60:5–11.

117.   Mr. Cooper testified that "[s]ometimes those two measures are in conflict; you can have a high REOC [sic] score but a lower Polsby-Popper score, and vice versa." Feb. 7 Tr. 60:11–13.

118.   Mr. Cooper's report provides the compactness of the 2021 Enacted Plans using several different measures. Under the Polsby-Popper

17

metric, the 2021 Enacted House Plan has a range of scores from 0.10 to 0.59, with an average score of 0.28. Doc. No. [39-6], at 146–53. Under the Reock metric, the 2021 Enacted House Plan has a range of scores from 0.12 to 0.66, with an average score of 0.39. Id.

119.  The 2021 Enacted Senate Plan has a range of Polsby-Popper scores from 0.12 to 0.50, with an average score of 0.29. Doc. No. [39-4], at 53–58. Under the Reock metric, the 2021 Enacted Senate Plan has a range of scores from 0.17 to 0.68, with an average score of 0.42. Id.

120.  Mr. Cooper testified that "[T]he average score for my plans... is in line with the State's Plan. It's nothing out of the ordinary for a State Legislative Plan, that, of course, that you see in the illustrative plan." Feb. 7 Tr. 133:17–20. That is accurate: The compactness scores of the Illustrative House and Senate Plans are in the range of the scores obtained by the 2021 Enacted Plans.

121.  As reported in Mr. Cooper's report, the average Reock score of the Illustrative House Plan is identical to the average Reock score of the Enacted House Plan (0.39). Doc. No. [39-6], at 128. And the average Polsby-Popper score of the Illustrative House Plan (0.27) is almost identical to the average score for the 2021 Enacted House Plan (0.28). Id.

122.  The Illustrative House Plan has a range of Polsby-Popper scores between 0.11 and 0.61, which is similar to the range of Polsby-Popper scores of the Enacted House Plan (0.10 to 0.59). Doc. No. [39-6], at 128–35. The Illustrative House Plan also has a range of Reock scores between 0.16 and 0.66, which is superior to that of the Enacted House Plan (0.12 to 0.66). Id.

123.  As reported in Mr. Cooper's report, the average Polsby-Popper score of the Illustrative Senate Plan is 0.25, only slightly lower than the average score obtained by the 2021 Enacted Senate Plan (0.29). Doc. No. [39-4], at 39. And the average Reock score of the Illustrative Senate Plan is 0.38, similarly only slightly lower than the average Reock score of the Enacted Senate Plan (0.42). Id.

124.   As Mr. Cooper explained: "There is no bright line rule as to what is necessarily a compact district based on [the] various measures of compactness." Feb. 7 Tr. 59:15–17.

125.   Defendant's expert Mr. Morgan did not dispute that the average compactness scores of the Enacted House and Illustrative House maps are "basically identical" under both measures. Feb. 14 Tr. 15:1–17.

126.   Mr. Morgan also did not dispute that the average compactness scores of the Enacted Senate and Illustrative Senate maps have only a 0.04 differential. (Feb. 14, 2022, Morning Transcript), Tr. 15:18-16:1.

127.   In fact, Mr. Morgan conceded that certain districts at issue, such as Senate District 17, are more compact in the Illustrative Plan than in the Enacted Plan (Feb. 14 Tr. 16:10–14), while others at issue are nearly identically compact, such as Senate District 23 (Feb. 14 Tr. 16:15–18). Other districts that Mr. Morgan claimed were "far less compact" (Feb. 14 Tr. 16:19–22) were comparisons that he conceded he made between districts that are located in different places and share no overlap at all. Feb. 14 Tr. 17:14–22.

128.   In the end, Defendants offered no evidence or testimony to contest Mr. Cooper's opinion that the Illustrative and 2021 Plans were similarly compact or that the Illustrative Plan was within the acceptable range with respect to district compactness.

129.   Mr. Cooper did discuss Illustrative Senate District 18, which is not one of the new Black-majority districts at issue in this case. While the scores for Illustrative Senate District 18 are on the lower range of compactness, Mr. Cooper testified that the minimum Reock and Polsby-Popper scores for the least compact Senate District in the 2021 Enacted Plan (Senate District 39) are 0.17 and 0.12, respectively. Feb. 7 Tr. 228:25-229:7. By comparison, Illustrative Senate District 18 has a Reock score of 0.24 and a Polsby-Popper score of 0.11. Doc. No. [39-4], at 40. The Enacted Senate Plan district is thus less compact than Illustrative Senate District 18 on the Reock measure. Cf. Doc. No. [39-4], at 40. As Mr. Cooper testified, "Just looking at these two numbers,

19

without looking at the districts, it appears that District 18 is significantly more compact [than the least compact district in the Enacted Plan] based on Reock and only slightly less, in fact, for all intent and purposes as impacted under Polsby-Popper." Feb. 7 Tr. 229:21–24.

### v.    County/VTD Splits

130.   According to Mr. Cooper's report, county and VTD (voting tabulation district, otherwise known as a "precinct") splits for the Illustrative House and Senate Plans are within the norm for a typical legislative plan in Georgia. Doc. No. [39-3], at 43, 63, ¶¶ 87, 124.

131.   Mr. Cooper explained that the Illustrative House Plan splits four more counties than the Enacted House Plan (74 vs. 70 county splits); and that the Illustrative Senate Plan splits six more counties than the Enacted Senate Plan (35 versus 29 county splits). Feb. 7 Tr. 168:18–20, 207:2–5; Doc. No. [39-3], at 43, 63 & figs. 22, 37.

132.   Mr. Cooper testified that Georgia's geography and county lines can make minimizing county splits particularly challenging. Feb. 7 Tr. 168:20–22.

133.   With respect to voting tabulation districts (also known as precincts, or "VTDs") the Illustrative House Plan splits 83 more VTDs than the Enacted House Plan (262 vs. 179 VTD splits). Doc. No. [39-3], at 63., fig. 37. The Illustrative Senate Plan splits 10 more VTDs than the Enacted Senate Plan (47 vs. 37 VTD splits). Doc. No. [39-3], at 43, fig. 22.

134.   At present, there are just under 2,700 VTDs in Georgia. Doc. No. [39-3], at 5, ¶ 9 n.4.

135.   According to Mr. Cooper, the numbers of VTD splits in the Illustrative Plans are not meaningfully different from the Enacted Plans' VTD splits. Feb. 7 Tr. 136:24-137:15, 137:20-138:10.

136.   Mr. Cooper further testified that Georgia's at times non-compact municipal lines can make minimizing VTD splits particularly

challenging. <u>E.g.</u>, Feb. 7 Tr. 215:9–22 ("Baldwin County was rather tricky because the municipal lines just go all over to place and they're non-contiguous precincts. . . . I think as I have said earlier today, there's some places in Georgia that are even odder shaped than Milledgeville. . . . So, it's annexation and things that create that odd shape in some of the municipalities."); <u>see also</u> Alpha PX-046; Alpha PX-050; Alpha PX-051.[1]

137.    Mr. Cooper further testified that VTD splits should be considered less important than county splits because VTD boundaries shift over the course of a decade. Feb. 7 Tr. 58:18–20 ("Precincts are constantly changing in Georgia. Splitting a VTD should not be a problem at this stage of the decade."); Feb. 7 Tr. 58:21-59:3.  This testimony was not refuted.

### vi.    Communities of Interest

138.    Mr. Cooper testified that he considered respecting communities of interest when drawing Plaintiffs' Illustrative Plan. Feb. 7 Tr. 133:25-134:2. Mr. Cooper testified, "[I] [l]ooked at, as I mentioned, maps prepared by the State showing where the Regional Commission areas are. I looked at the [Census] Bureau Map showing where there are metropolitan areas, where there are micropolitan areas. I am familiar, of course, with county boundaries and town boundaries. So where possible, I try to follow those, and I tried to draw plans using whole precincts to the extent that I could. . . ." Feb. 7 Tr. 134:2–9.

139.    Mr. Cooper testified that respecting communities of interest is a "more subjective principle" and mapmakers must "at least be aware of historical components that might go into how one would draw a plan, regional interests, transportation corridors that may connect one part of a district to another. The economic base of the region you're looking at, the kinds of employment." Feb. 7 Tr. 50:12–17. Mr. Cooper

---

[1] The foregoing exhibits were tendered to the Court during the preliminary injunction hearing. Alpha PX-046 was admitted by the court. Feb. 7 Tr. 31:19–25. The Court instructed Plaintiffs to tender Alpha PX-050 and Alpha PX-051 to the record. Feb. 14 Tr. 176:5–9.

also testified that he considered socioeconomic data and commonalities as part of his consideration of communities of interest. Feb. 7 Tr. 222:20-223:16.

140.   Because of the variety of factors that can be taken into account, Mr. Cooper explained that "it is possible for two different people to have or two different plan drawers to have a different perspective of what amounts to a community of interest for a given place." Feb. 7 Tr. 50:17–21.

141.   Mr. Cooper also testified that he considered Georgia's Black Belt to be a community of interest. Feb. 7 Tr. 120:18–121:3; 134:17-19. Mr. Cooper testified that he used a definition of Black Belt counties from a study by the Georgia Budget and Policy Institute, which took into account not only present-day demographics, but also a history of large numbers of enslaved persons in the county, as well as contemporary poverty rates. Feb. 7 Tr. 134:19-135:8.

142.   Ms. Wright testified similarly that a community of interest could be "anything that unites people in an area and brings them together" and, consistent with Mr. Cooper's testimony, that whether or not a shared characteristic forms a community of interest is "in the eye of the beholder." Feb. 11 Tr. 90:5–10, 91:12.

143.   Ms. Wright agreed that communities of interest could consist of municipalities, counties, or an area of the State. Feb. 11 Tr. 90:11–22.

144.   Ms. Wright also agreed that communities of interest could be formed by an economic or commercial commonality. Feb. 11 Tr. 90:23-91:1.

145.   Ms. Wright agreed that communities of interest could be formed by a major road connecting two areas. Feb. 11 Tr. 91:2–5.

146.   Ms. Wright agreed that communities of interest could be indicated by demographic similarities, such as "a certain racial group that defines themselves as a community of interest," as well as other demographic or socioeconomic commonalities. Feb. 11 Tr. 90:6–10.

147.    With respect to the Black Belt, Ms. Wright testified it was "an area of the state and counties that stretch, roughly, from the Augusta area towards the Macon area that have had a longstanding history and tradition of significant black populations in those counties. Some of those counties still today have majority African-American population in them." Feb. 11 Tr. 54:19-55:5. She agreed that Black Belt counties shared socioeconomic similarities. Feb. 11 Tr. 101:2-20.

### vii.    Incumbent Pairings

148.    Mr. Cooper sought to avoid incumbent pairings from the start by using publicly available incumbent address information. Doc. No. [39-3], at 44, ¶ 88; Feb. 7 Tr. 138:11–35.

149.    After Mr. Cooper was provided with proper incumbent addresses, Mr. Cooper generated revised Illustrative Plans that sharply reduced the incumbent pairings. Feb. 7 Tr. 139:1–8.

150.    Mr. Cooper's revised Illustrative Plans reduced incumbent pairings while maintaining the same number of majority-Black districts. Feb. 7 Tr. 139:14–15 ("And so very late in the course of this litigation, I received a file of incumbent addresses that the State of Georgia had prepared for their redistricting work, and there were a few discrepancies. So ultimately, I did another illustrative plan just to show that I could sharply reduce the number of the incumbent pairs that is the State has identified that I did not realize was a completely incumbent conflict.").

151.    Mr. Cooper testified that he was able to reduce incumbent pairings in "three or four hours." Feb. 7 Tr. 139:16–18.

152.    Mr. Cooper's revised Illustrative Plans pair incumbents seeking reelection in only one Senate District. Doc. No. [59-2], at 6, ¶ 12.

153.    Mr. Cooper's revised Illustrative Plans pair incumbents seeking reelection in six House Districts. Doc. No. [59-2], at 6, ¶13.

154.  Mr. Morgan contends that the Enacted Senate Plan does not pair incumbents who are seeing reelection and pairs incumbents seeking reelection in four House Districts. Doc. No. [45-1], at 10.

155.  Defendant's expert Ms. Wright speculated that incumbents may be paired in the Illustrative Plan but did not conduct analysis using the incumbent address information available to her. Feb. 11 Tr. 40:8–15

### viii.   Non-Dilution of Minority Voting Strength

156.  According to Mr. Cooper's testimony, non-dilution of minority voting strength means that "one should attempt to draw districts that are cognizant of race to a certain extent, just to make sure that you are not cracking or fragmenting majority population based on race or ethnicity." Feb. 7 Tr. 135:11–14.

157.  Mr. Cooper further testified that in drawing Plaintiffs' Illustrative Plans, he "was aware of race as traditional redistricting principles suggest one should be" with respect to the principle of non-dilution of minority voting strength. Feb. 7 Tr. 135:17–21.

158.  Defendant's expert Ms. Wright agreed that ensuring that legislative maps do not dilute the minority vote means that it might be necessary to draw a new Black-majority district in the area of the state where the Black population is large and concentrated enough. Feb. 11 Tr. 91:19-92:1.

### ix.   Core Retention

159.  Georgia's Reapportionment Guidelines do not identify as a traditional redistricting principle the goal to preserve existing district cores among "General Principles for Drafting Plans." Doc. No. [39-17], Doc. No. [39-18].

160.  Ms. Wright agreed that core retention is not listed as one of the criteria in the Georgia Reapportionment Guidelines. Feb. 11 Tr. 66:20–24.

### x.   Racial Considerations

161. Mr. Cooper testified that he was "aware of race as traditional redistricting principles suggest one should be." Feb. 7 Tr. 135:17–18.

162. Mr. Cooper explained that considering race was required to comply with the Voting Rights Act, which is federal law. Feb. 7 Tr. 135:20–21.

163. Mr. Cooper testified that he did not aim to draw any minimum number of Black-majority districts in his analysis. Feb. 7 Tr. 135:22–136:3.

164. When asked by the State whether his goal "really was to create an additional majority Black district in the creation of [his] House and Senate Plans," he answered that his goal "was to determine whether or not additional majority Black districts could be created. So there was no goal per se." Feb. 7 Tr. 164:19–21.

165. Mr. Cooper repeatedly testified that he balanced all redistricting principles and stated that no one principle predominated. Feb. 7 Tr. 140:3–7, 230:17–25.

166. Mr. Esselstyn also testified that it was necessary for him to consider race in his analysis because a "key metric" in a Section 2 analysis "is whether a district has a majority of the Any Part Black population." Feb. 9 Tr. 155:15–22.

167. Mr. Esselstyn also testified that compliance with the Voting Right Act was a redistricting criterion. Feb. 9 Tr. 156:7–9.

168. Similar to Mr. Cooper, Mr. Esselstyn stated that he was tasked with investigating whether or not "there are areas in Georgia where the Black population is sufficiently large and geographically compact to create additional majority Black districts." Feb. 9 Tr. 150:11–16.

169. When the Court asked Mr. Esselstyn whether it was his "motivation to get the Black population to make it over 50 percent" such that race "was the controlling reasoning," Mr. Esselstyn stated that race was just one factor that he considered. Feb. 9 Tr. 253:19–25.

25

170. Mr. Esselstyn stated that he considered several redistricting criteria when he conducted his analysis and that no single criterion predominated. Feb. 9 Tr. 156:10–22, 157:10–12.

## G.    Defendant's Expert Testimony

### a.    Ms. Wright's Testimony

171. Ms. Wright is an experienced map drawer and a busy public servant. In this particular case, her conclusions were vague and not well supported. Notably, Ms. Wright acknowledged at the hearing that she had been unable to spend significant time on her report. Feb. 11 Tr. 78:1–2 ("I expected there would be time for more detailed analysis and data later.").

172. In her report and at the hearing, Ms. Wright stated her opinion that various mapping decisions were made to further an "apparent" "racial goal" and repeatedly stated that she could find "no reason" other than race that might justify the new majority-Black districts drawn by Mr. Cooper. Feb. 11 Tr. 36:11–16, 98:20–23, 103:1–5; see also Doc. No. [89], at 7–11, ¶¶ 11–13, 17–19. At times, she identified municipalities or communities within districts that she believed to be dissimilar, but often did not provide any explanation as to which characteristics made them dissimilar in her opinion. Doc. No. [89], at 7–11, ¶¶ 11–13, 17–19.

173. Ms. Wright did not indicate that she read Mr. Cooper's reports or heard his testimony regarding the illustrative districts, only that she reviewed the Illustrative Plans themselves. Doc. No. [89], at 5–6, ¶ 8; Feb. 11 Tr. 34:5-9.

174. Ms. Wright testified that communities of interest relevant to redistricting could be indicated by "anything that unites people in an area," (Feb. 11 Tr. 90:5–7), including municipalities (Feb. 11 Tr. 90:11–13), roadways (Feb. 11 Tr. 91:2–5), economic connections (Feb. 11 Tr. 90:25-91:1), or demographic and socioeconomic similarities (Feb. 11 Tr. 91:6–12).

175.   At the hearing, however, she conceded that when it came to the Illustrative Plan districts on which she was offering her opinions, she did not consider or analyze socioeconomic similarities (Feb. 11 Tr. 95:3–6, 97:6–14, 103:16–23), economic or regional development connections (Feb. 11 Tr. 110:16–18, 103:24-104:1), or Census area overlaps (Feb. 11 Tr. 108:17–20), and in some cases did not consider important municipalities in the district (Feb. 11 Tr. 93:14-95:16) or could not name a single municipality or community that she considered in the relevant district. Feb. 11 Tr. 104:11-105:3.

176.   Notably, Ms. Wright acknowledged that the communities-of-interest analysis is ultimately "in the eye of the beholder." Feb. 11 Tr. 90:8–10, 91:12, 108:21–22.

177.   In addition, Ms. Wright affirmatively acknowledged that various non-racial connections between the illustrative districts in question did exist.  For example:

- She acknowledged that Illustrative Senate District 17 united nearby municipalities in the Atlanta suburbs. Feb. 11 Tr. 93:17-95:20.

- She acknowledged that Illustrative Senate District 28 unites nearby communities along US-41 in the "south Metro." Feb. 11 Tr. 103:24-104:10.

- She acknowledged that Illustrative House District 144 unites municipalities that share commonalities, like the neighboring county seats of Milledgeville and Eatonton. Feb. 11 Tr. 107:3–13.

178.   Ms. Wright also acknowledged that the 2021 plans do most of the same things that she criticized the illustrative map for doing, such as splitting counties and municipalities (Feb. 11 Tr. 97:18-98:4, 105:10–18, 105:22-106:4, 109:22-110:2), or including areas that are different from one another in a single district (Feb. 11 Tr. 106:21-107:2).

179.   Ms. Wright also acknowledged instances where the 2021 Map appears to be drawn in ways that dilute Black voting strength, such

27

as dividing the area around majority-Black Griffin between three majority white House districts (Feb. 11 Tr. 105:22-106:7), or splitting plurality-Black Newton County so that half of it is in majority-white Senate District 17 (Feb. 11 Tr. 97:18-98:15).

180. Ms. Wright analyzed voter registration data to identify whether the new majority-BVAP districts in the illustrative plan also had majority-black voter registration rates. That analysis was fundamentally flawed, however, because Ms. Wright calculated the percentage of black registration voters out of a total that includes 8.8 percent of registered voters whose race was undisclosed, a group which could include additional black voters unaccounted for by Ms. Wright's analysis. Feb. 11 Tr. 77:16–18, 111:19-112:9.

181. Ms. Wright acknowledged that, if registered voters of unknown race were excluded from the denominator, all of the new BVAP-majority districts would have over 50% Black registered voters. Feb. 11 Tr. 112:10–25.  She also acknowledged that she did not know the race of voters who are listed as unknown in the voter file, some of whom could be Black, and that she could not say whether the number of Black registered voters would be over 50% if the race of all voters was known. Feb. 11 Tr. 113:1–23.

182. There is no question that Ms. Wright is a dedicated public servant with a difficult and essential job. However, in this case, her analysis was not sufficiently thorough or well-supported for the Court to credit. Feb. 11 Tr. 20:10-22:21.

### b.   Mr. Morgan's Testimony

183. Mr. Morgan's previous redistricting work includes drawing a map that was ultimately struck down as an unconstitutional racial gerrymander, (Feb. 11 Tr. 183:24-184:6), as well as serving as an expert for the defense in a case in Georgia where the map was ultimately found to have violated the Voting Rights Act. Feb. 14 Tr. 9:21-10:6.

184. Mr. Morgan compared the number of BVAP-majority House and Senate Districts between the Illustrative Plans and the plans proposed

by the Democratic Caucus in the Georgia General Assembly. Doc. No. [45-1], at 5, ¶ 9. However, he conceded that the fact that a plan had been proposed by a particular political party had no bearing on compliance with the Voting Rights Act. Feb. 11 Tr. 12:6–13. His analyses of the Democratic proposals are accorded no weight.

185.   Mr. Morgan ran core constituency comparisons between the Enacted House and Senate plans and the Illustrative plans. Doc. No. [45-1], at 11, ¶ 19. However, Mr. Morgan was not aware of any instances in which the Enacted  House and Senate plans had been used in an election. Feb. 11 Tr. 12:14-13:1. In any event, core preservation is not one of Georgia's traditional redistricting principles. Doc. No. [39-17], at 3; Doc. No. [39-18], at 3.

186.   Mr. Morgan claimed that his core constituency analysis showed that the Illustrative House and Senate plans do not share geography in common with the 2021 plans. Doc. No. [45-1], at 11, ¶ 19. However, Mr. Morgan conceded that he was referring only to districts with 100% overlap, and that he discounted districts with any less overlap, even if they shared 98% of their geography in common. Feb. 14 Tr. 14:2-9. Mr. Morgan did not dispute that, overall, the Illustrative House plan has 61% overlap with the 2021 adopted House plan, and the Illustrative Senate plan has 65% overlap with the adopted Enacted Senate plan. Feb 14 Tr. 13:1-14:25; see also Doc. No. [59-2], at 7, ¶16.

187.   Mr. Morgan does not contend that Plaintiffs' Illustrative Plans fail to comply with traditional districting principles, (Feb. 14 Tr. 10:24-11:2), and offers no analysis regarding, for example, respecting communities of interest. Feb. 14 Feb. 14 Tr. 10:21–23. Nor does Mr. Morgan dispute Plaintiffs' demographic analysis regarding the size and concentration of Black populations in Georgia. Feb. 14 Tr. 11:7–10.

188.   Mr. Morgan did not dispute that the average compactness scores of the Enacted House and Illustrative House maps are "basically identical" under both measures. Feb. 14 Tr. 15:1–17.

189. Mr. Morgan also did not dispute that the average compactness scores of the Enacted Senate and Illustrative Senate maps are nearly identical, with only a 0.04 differential. Feb. 14 Tr. 15:18-16:1.

190. In other litigation, Mr. Morgan has characterized districts with Polsby-Popper scores as low as .08 as sufficiently compact. Feb 14 Tr. 17:23-19:11. None of the districts in the Cooper illustrative plan has a Polsby-Popper score lower than 0.11. Doc. No. [39-4], at 39.

**H.    The Illustrative Maps**

    **a.    South Metro Atlanta**

        **i.    Demographic Change**

191. The Atlanta Metropolitan Statistical Area (hereinafter "Metro Atlanta") consists of the following 29 counties: Barrow, Bartow, Butts, Carroll, Cherokee, Clayton, Cobb, Coweta, Dawson, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Haralson, Heard, Henry, Jasper, Lamar, Meriwether, Morgan, Newton, Paulding, Pickens, Pike, Rockdale, Spalding, and Walton. Doc. No. [94], at 9, ¶ 85; Feb. 7 Tr. 94:23-95:2.

192. Under the 2000 Census, the population in the 29-county Metro Atlanta area was 29.29% any part Black, increasing to 33.61% in 2010, and 35.91% in 2020. Feb. 7 Tr. 118:14–17.

193. Since 2000, the Black population in Metro Atlanta has grown from 1,248,809 to 2,186,815 in 2020. Doc. No. [94], at 9, ¶ 86.

194. The southern portion of the Metro Atlanta area contains the following five counties: Fayette, Spalding, Henry, Rockdale, and Newton. Doc. No. [94], at 9, ¶ 87.

195. In 2000, 18.51% of the population in the five-county Fayette-Spalding-Henry-Rockdale-Newton area was Black. By 2010, the Black population in that area more than doubled to reach 36.70% of the overall population, then grew to 46.57% in 2020. Doc. No. [94], at 9, ¶ 88; Feb. 7 Tr. 120:12–13.

196. Between 2000 and 2020, the Black population in the south Metro Atlanta region quadrupled, from 74,249 to 294,914. Doc. No. [94], at 10, ¶ 89.

197. Fayette and Spalding Counties have seen 8,373 new Black individuals of voting age and 2,752 new Black individuals of voting age respectively, in their any part Black populations over the last decade. Doc. No. [94], at 10, ¶ 91. These changes represent increases of 54.5% in Fayette County, and 18.7% in Spalding County since 2010. Doc. No. [39-1], at 95, 97.

198. Henry County's Black population has increased by 38,225 new Black individuals of voting age in the last decade. Doc. No. [94], at 10, ¶ 95. As Mr. Cooper explained, Henry County has "just undergone tremendous demographic change over the past 30 years" since 1990, Henry County was only 9% Black. Feb. 7 Tr. 124:21-125:4. This shift represents an increase of 74.3% since 2010. Doc. No. [39-1], at 96.

199. Newton County's Black population has increased by 12,748 new Black individuals of voting age in the last decade. Doc. No. [94], at 10, ¶ 96. This represents an increase of 46.1% since 2010. Doc. No. [39-1], at 97.

### ii.  Enacted Senate District 16 Demographics

200. Senate District 16 under the Enacted Senate Map is located in the south and southwestern part of the Atlanta Metro area and includes parts of Fayette and Spalding Counties. Doc. No. [39-3], at 34, ¶ 77; Doc No. [39-4], at 27, 29.

201. Senate District 16 under the Enacted Senate Map was drawn with a Black voting age population of under 23% by combining Fayette and Spalding Counties with whiter and more rural Pike and Lamar Counties. Doc. No. [39-3], at 34–35, ¶ 77; Doc. No. [39-4], at 29.

202. Neighboring Senate District 34 under the Enacted Senate Map was drawn with a Black voting age population of 69.54%. Doc. No. [39-3], at 151.

203.    Neighboring Senate District 44 under the Enacted Senate Map was
drawn with a Black voting age population of 71.34%. Doc. No. [39-3],
at 151.

### iii.    Illustrative Senate District 28

204.    The Illustrative Senate Plan includes a new majority-Black Senate
District (Illustrative Senate District 28) around where Enacted Senate
Plan District 16 was drawn.

205.    Illustrative Senate District 28 has a BVAP of 52.74%. Doc. No. [39-4],
at 25. Illustrative Senate District 28 by "unpack[s]" some of the Black
population in Enacted Senate Districts 34 and 44, and "uncrack[s]" the
Black populations in Enacted Senate District 16. Doc. No. [39-3], at 36,
¶ 78; Doc. No. [39-3], at 34, Fig. 15.

206.    Illustrative Senate District 28 includes parts of Spalding, Clayton, and
Fayette Counties. Doc No. [39-4], at 26. It overlaps with Enacted
Senate District 16 in parts of Fayette County and Spalding County.
Doc No. [39-4], at 29.

207.    Mr. Cooper testified that in drawing Illustrative Senate District 28, he
did not make line-drawing decisions purely in order to draw new
majority-Black districts. Feb. 7 Tr. 191:1–8 ("'Q: Is it fair to say you
chose to include Clayton County in District 28 solely to make that
district majority Black?' 'A: No. I was attempting to unpack a little bit
of the population in Clayton County, even though it was outside of
the five-county region.'").

208.    As expressed in Mr. Cooper's testimony, Illustrative Senate District
28 complies with traditional redistricting criteria. The counties
composing Illustrative Senate District 28—namely, Fayette, Spalding,
and Clayton Counties—are more similar to each other than are those
in Enacted Senate District 16. Specifically, these counties share certain
socioeconomic characteristics, such as similar Black and Latino labor
participation rates (Doc. No. [59-2], at 13, ¶¶ 37–38), and a similar
suburban and exurban nature, in comparison to the more rural and

predominantly white Pike and Lamar Counties, which were excluded from Illustrative Senate District 28 (Feb. 7 Tr. 143:23-143:25).

209. Mr. Cooper testified that localities like Griffin are neighbors to Clayton County. Feb. 7 Tr. 191:13-191:15. He further noted that these parts of Spalding and Fayette counties are changing, warranting grouping them with Clayton County. Feb. 7 Tr. 191:14-191:18.

210. Ms. Wright's assertion that Jonesboro and Griffin, both included in Illustrative Senate District 28, lack communal characteristics was made without consideration of education levels or other socioeconomic indicia. Feb. 11 Tr. 103:16-23.

211. Additionally, Ms. Wright did not consider that Jonesboro and Griffin are connected by the old Dixie Highway, U.S. 41, or that their respective high schools play each other in high school football. Feb. 11 Tr. 103:24-104:7.

212. Illustrative Senate District 28 is comparable to Illustrative Senate District 16 on compactness measures. Illustrative Senate District 28 has a Reock score of 0.49 and a Polsby-Popper score of 0.22, while Enacted Senate District 16 has a Reock score of 0.37 and a Polsby-Popper of 0.31. Doc. No. [39-4], at 40, 54.

### iv.   Enacted Senate District 17 Demographics

213. Senate District 17 under the Enacted Senate Map is located in the southeastern part of the Atlanta Metro area, and includes parts of Henry, Newton, and Walton Counties, and all of Morgan County. Doc. No. [39-3], at 37, ¶ 79; Doc. No. [39-4], at 31, 33.

214. Senate District 17 under the Enacted Senate Map was drawn with a Black voting age population of under 34% by combining portions of Henry and Newton Counties with predominantly White populations in Walton and Morgan Counties, and by placing some of the Black population of Newton County into another majority-Black district, Senate District 43. Doc. No. [39-3], at 38–39, ¶¶ 80–81 & n.20; Doc. No. [39-4], at 33.

215.   Henry County is now majority-Black after significant growth in the Black population over the last decade. Feb. 7 Tr. 144:14–18.  Henry County is nearly majority-BVAP (49.8%) as well. Doc. No. [39-3], at 97.

216.   Mr. Cooper testified that he was "baffled" by the decision to include Henry in a majority-white county despite the growth in the Black population there, and opined that "this does reflect cracking of the Black population [which is] essentially [sub]merged into an area that is predominantly White." Feb. 7 Tr. 145:1–10. Submerging the Black population in Henry County in this manner "avoids the chance to create a majority Black district" as Mr. Cooper did in Illustrative Senate District 17. Feb. 7 Tr. 145:1–10.

217.   Newton County has also experienced significant Black population growth in recent years. Feb. 7 Tr. 146:11–16.

218.   The Enacted Senate plan splits Newton between District 17, a majority white district, and District 43. Feb. 7 Tr. 146:17–23.

219.   Senate District 43 under the Enacted Senate Map was drawn with a Black voting age population of 64.33%. Doc. No. [39-3], at 151.

**v.   Illustrative Senate District 17**

220.   The Illustrative Senate Plan includes a new majority-Black Senate District (Illustrative Senate District 17) around where Enacted Senate Plan District 17.  The Illustrative Senate Plan effectively "unpack[s]" some of the Black population in neighboring Senate District 43, and "uncrack[s]" the Black population in Senate District 17. Doc. No. [39-3], at 39, ¶ 81; id. at 37, fig. 17.

221.   Illustrative Senate District 17 has a BVAP of 62.46%. Doc. No. [39-4], at 25.

222.   Illustrative Senate District 17 includes parts of Dekalb, Henry, and Rockdale Counties. Doc. No. [39-4], at 31. Enacted Senate District 17 includes all of Morgan County, parts of Henry, Newton, and Walton

Counties. Doc. No. [39-4], at 33. The districts therefore overlap in the region of Henry County. Doc. No. [39-4], at 31, 33.

223.   Illustrative Senate District 17 unites counties with certain socioeconomic characteristics in common, such as similar educational attainment rates among Black residents in Henry, Rockdale, and Dekalb Counties. Doc. No. [59-2], at 14, ¶ 40.

224.   The counties that comprise the Enacted Senate District 17 do not share these socioeconomic characteristics. For example, Walton and Morgan Counties are considerably whiter than Henry County, and Black residents in Walton and Morgan Counties are significantly less likely to have received a bachelor's degree or higher than Black residents in Henry County. Doc. No. [59-2], at 14, ¶ 41.

225.   When Mr. Cooper was asked whether he could identify any community of interest or connection between Stonecrest in South Dekalb and McDonough in Henry County, both of which are included in Illustrative Senate District 17, he testified: "They are a very urbanized area, suburban to urban with significant Black population close by. There's not a lot of distance to travel, so there are similarities. They think of themselves as being from Atlanta." Feb. 7 Tr. 199:10–16. Similarly, he explained that "Henry County is part of core Atlanta and has a suburban population. So it's really more closely aligned with core Atlanta than it would be with the outreaches of the Atlanta MSA, for example." Feb. 7 Tr. 146:4–7.

226.   Ms. Wright claimed that Illustrative Senate District 17 ties together communities with "few if any characteristics [in common]" (Doc. No. [89], at 8, ¶ 13), and gave Stonecrest and communities outside the city of McDonough as examples. Feb. 11 Tr. 31:5-32:21. But Ms. Wright conceded that, in judging those communities as dissimilar, she did not assess factors which she agrees could create communities of interest, such as socioeconomic commonalities. Feb. 11 Tr. 90:5-91:12 (socioeconomic commonalities can create a community of interest); Feb. 11 Tr. 95:4-6 (Ms. Wright's failure to analyze such characteristics in Stonecrest and McDonough). Ms. Wright also acknowledged that McDonough and Stonecrest are both substantially-sized

municipalities located near one another in the Atlanta suburbs. Feb. 11 Tr. 94:14–18.

227.    As Ms. Wright conceded, the State's map unites dissimilar communities in its own enacted plan. Ms. Wright acknowledged that Morgan and Henry Counties are united in the State's Senate District 17. Feb. 11 Tr. 96:4–15. But Henry County, according to Mr. Cooper's analysis of demographic data, has experienced major demographic shifts over the last decade. He testified, "The Black population has been increasing significantly. Henry County is now majority Black, if I'm not mistaken." Feb. 7 Tr. 144:14–18. Morgan County, in contrast, is a more rural area, according to Ms. Wright's own testimony (Feb. 11 Tr. 96:16–23), with only a 26% Black population as of 2018. Doc. No. [39-3], at 87.

228.    Illustrative Senate District 17 also beats Enacted Senate District 17 on compactness scores, with 0.18 Polsby-Popper and 0.37 Reock scores, compared with 0.17 Polsby-Popper and 0.35 Reock scores for the Enacted District. Doc. No. [39-4], at 40, 54. It also has an identical number of municipal and county splits as the Enacted District 17. Doc. No. [59-2], at 14, ¶ 41.

229.    In addition to Illustrative Senate District 17, under the Illustrative Senate Plan, almost all of Newton County is kept whole and included in Illustrative Senate District 43, which is compact and is also majority-Black. Feb. 7 Tr. 14:17–20; Doc. No. [39-4], at 25.

                    vi.    Esselstyn State Senate Plan

230.    Mr. Esselstyn also demonstrated that it is possible to draw two additional Black-majority Senate districts in similar parts of the South Metro Atlanta area while complying with traditional redistricting principles.

231.    Mr. Esselstyn drew one additional majority-Black Senate District (District 28) in the southwestern Metro Atlanta area with a BVAP of 57.28%. Grant Doc. No. [20-1], at 13, ¶ 27, fig. 7, tbl. 1. In Mr. Esselstyn's Illustrative Plan, District 28 is composed of portions of

36

Clayton, Coweta, Fayette, and Fulton Counties, and overlaps with Illustrative Senate District 28 in north Fayette County. <u>Grant</u> Doc. No. [20-1], at 13, ¶ 27, fig. 7.

232. Mr. Esselstyn drew another additional majority-Black Senate district (District 25) in the southeastern Metro Atlanta area with a BVAP of 58.93%. <u>Grant</u> Doc. No. [20-1], at 12, ¶ 26, fig. 6, tbl. 1. In Mr. Esselstyn's Illustrative Plan, District 25 is composed of portions of Clayton and Henry Counties, and overlaps with Illustrative Senate District 17 in Henry County. <u>Grant</u> Doc. No. [20-1], at 12, ¶ 26, fig. 6.

### vii.   Illustrative House District 73

233. The Illustrative House Plan includes an additional Black-majority district, Illustrative House District 73, in the South Metro Atlanta area in an area that includes adjacent areas in south Clayton, south Henry, and Spalding Counties. Doc. No. [39-03], at 54–55, ¶ 113; Doc. No. [39-06], at 58.

234. Illustrative House District 73 is 60.6% Black using the AP BVAP metric. Doc. No. [59-02], at 28.

235. In the Enacted House Plan, a corresponding district, District 74, excludes Clayton County but includes portions of south Henry County as well as less populated portions of Fayette County and Spalding County. Doc. No. [39-06], at 60.

236. Enacted House District 74 has a BVAP of 25.5%. Doc. No. [39-05], at 19.

237. Illustrative House District 73 (Reock of 0.44 and Polsby-Popper of 0.20) is comparably compact to Enacted House District 74 (Reock of 0.50 and Polsby-Popper of 0.25). Doc. No. [39-06], at 130, 148.

238. Both the Illustrative and Enacted House Plans split Henry, Spalding, Clayton, and Fayette Counties in various ways and are comparable on that metric. Doc. No. [39-06], at 58, 60.

239. Illustrative House District 73 unites nearby, adjacent communities on either side of the line between south Clayton and Henry Counties which have socioeconomic commonalities. Doc. No. [59-02], at 15–16, ¶ 44.

240. For example, a similar proportion of the population in Henry, Spalding, and Clayton counties are in the labor force (71.0%, 58.2%, and 69.5% respectively). Doc. No. [59-02], at 15-16, ¶ 44.

241. Ms. Wright claimed in her report that the configuration of House District 73 connects "communities that share little to no common interests" in other neighboring districts, namely Illustrative House Districts 78 and 109. Doc. No. [89], at 9, ¶ 16.

242. Ms. Wright did not specifically identify any of the South Metro communities in those areas that she says are united despite purportedly not sharing common interests. Doc. No. [89], at 9, ¶ 16; Feb. 11 Tr. 104:11-105:3.

243. Mr. Esselstyn also drew a Black-majority House district (District 78) in the same area, at the intersection of Clayton, Henry, and Spalding Counties. <u>Grant</u> Doc. No. [20-1], at 22, Fig. 12.

### viii.   Illustrative House District 110

244. The Illustrative House Plan also includes an additional Black-majority district, Illustrative House District 110, in an area that includes adjacent portions of Henry County and Spalding County, including much of Griffin, Spalding County's seat and largest city, which is majority-Black. Doc. No. [39-03], at 55–56, ¶ 114; Doc. No. [39-06], at 62.

245. Illustrative House District 110 is 52.4% Black using the AP BVAP metric. Doc. No. [39-05], at 25.

246. In the Enacted Senate Plan, the same portions of Henry and Spalding Counties are split between Enacted House Districts 117 and 134, which have BVAPs of 36.6% and 33.6%, respectively, effectively

cracking the voting strength of the Black population in those areas. Doc. No. [39-06], at 64; Doc. No. [39-05], at 19–20.

247. Illustrative House District 110 is more compact (Reock of 0.44 and Polsby-Popper of 0.24) than the corresponding districts in the Enacted House Plan, including Enacted House District 117 (Reock of 0.41 and Polsby-Popper of 0.28). Doc. No. [39-06], at 132, 150.

248. The State does not contest that Illustrative House District 110 is compact.

249. Nor does the State contest that Illustrative House District 110 unites communities with common features and interests.

250. Ms. Wright attested and testified that Illustrative House District 110 is problematic because Spalding County has traditionally been split between two districts. Doc. No. [89], at 9–10, ¶ 17; Feb. 11 Tr. 39:6–8.

251. Ms. Wright acknowledged during her testimony that the Enacted House Plan also breaks that tradition. Feb. 11 Tr. 39:8–9, 105:22-106:1.

252. Ms. Wright claimed that Illustrative House District 110's configuration caused certain precincts to be split in neighboring Illustrative House District 111 "with no apparent goal other than to create a majority black district." Doc. No. [89], at 10, ¶ 17.

253. Mr. Cooper testified that those splits in Illustrative House District 111 were required to maintain population equality. Feb. 7 Tr. 132:6–24.

254. In fact, the Enacted House Plan cracks the Black population of Spalding County into three different districts, in none of which the Black population exceeds 50 percent. Doc. No. [39-6], at 60.

255. Moreover, Mr. Cooper noted in his rebuttal report that the counties within Illustrative House District 110 "share certain socioeconomic characteristics that make them similar to one another." Doc. No. [59-2], at 15, ¶ 44.

**b.    Eastern Black Belt**

### i.     The Black Belt: Community of Interest

256.   The "Black Belt" refers to a swath of the American South that historically had large numbers of enslaved Black persons, and that today continues to have substantial Black populations. Doc. No. [39-3], at 10–11, ¶ 16 & fig. 1; Doc. No. [39-3], at 82; Feb. 7 Tr. 120:18–121:3. The counties in the Black Belt "still have a connection to that past. They tend to be, oftentimes, counties that are poor, and certainly the Black population is still the highest percentage in most of those counties." Feb. 7 Tr. 120:18–121:3.

257.   Mr. Cooper identified the Black Belt as a community of interest based on a shared history and socioeconomic considerations. He testified that "historical record is clear. Countless books have been written. I've relied on a map that was prepared by the Georgia Budget and Policy Institute in a 2019 publication looking at the Black Belt of Georgia which the GPPI document identifies as school districts in Georgia that are over 30 percent Black in terms of the student body representation and over 30 percent poverty of those students." Feb. 7 Tr. 134:18-25.

258.   Mr. Esselstyn also testified that the Black Belt could be considered a community of interest (Feb. 9, 2022, Afternoon Tr.), Feb. 9 Tr. 167:5-167:11.

259.   Mr. Esselstyn also confirmed that "Fall Line" cities like Milledgeville and Augusta have "ecological, historical, and economic" ties that support finding that they are a community of interest. Feb. 9 Tr. 192:10–15.

260.   Ms. Wright explained that the Black Belt was "an area of the state and counties that stretch, roughly, from the Augusta area towards the Macon area that have had a longstanding history and tradition of significant black populations in those counties. Some of those counties still today have majority African-American population in them." Feb. 11 Tr. 54:19-55:5.

261.   Ms. Wright agreed that Black Belt counties shared socioeconomic similarities. Feb. 11 Tr. 101:2-20.

262.   Dr. Traci Burch's opinion confirms that the Black Belt is a community of interest with shared historical, geographical, and socioeconomic characteristics. Doc. No. [39-9], at 30–34.

263.   The Court accepts Dr. Burch as qualified to testify as an expert in Georgia history, political analysis, political behavior, barriers to voting, and political participation.

264.   The Court finds Dr. Burch credible, her analysis methodologically sound, and her conclusions reliable.

265.   Based on the testimony and evidence presented, the Court finds that a community of interest exists among counties in Georgia's Black Belt based upon shared historical, demographic, socioeconomic, and other characteristics.

### ii.   Eastern Black Belt Area Demographic Change

266.   The Georgia Department of Community Affairs ("GDCA") has prepared regional commission maps, including of the Central Savannah River Area region. Doc. No. [39-3], at 12, ¶ 23; Doc. No. [39-3], at 92.

267.   The Central Savannah River Area counties include: Jenkins, Burke, Richmond, Jefferson, McDuffie, Wilkes, Taliaferro, Glascock, Warren, Washington, and Hancock. Ten of these 11 contiguous counties - excluding Glascock—are identified as part of Georgia's Black Belt by the Georgia Budget and Policy Institute. Doc. No. [39-3], at 12–13, ¶ 24.  All 10 are at least 40% Black. Doc. No. [94], ¶ 104.

268.   Mr. Cooper identified this set of 11 counties as the "Eastern Black Belt."  According to his analysis, the Black population in the Eastern Black Belt region was 45.02% of the total population in 1990, climbing to 54.62% in 2020. Doc. No. [39-3], at 23, ¶ 52.  In other words, the Black population in that area has become more concentrated over time.

269.  This concentration is due in part to white depopulation. Since 1990, there has been a 28.7% decline in the NH White population in the Eastern Black Belt region. Doc. No. [39-3], at 22–23, ¶ 51.

270.  The White population declined sharply from 174,000 in 1990 to 124,000 in 2020. So even though overall the total population in the Eastern Black Belt region has remained relatively constant over the 30-year period, that is because of the growth in the black population. Feb. 7 Tr. 122:3–9.

### iii.   Senate District 23 Demographics

271.  Senate District 23 under the Enacted Senate Map is located in the region identified by Mr. Cooper as the Eastern Black Belt, near the City of Augusta, and includes parts of Richmond, Burke, Jefferson, Warren, and Taliaferro Counties. Doc. No. [39-3], at 40-41, ¶ 82; Doc. No. [39-3], at 141; Doc. No. [39-4], at 36.

272.  Senate District 23 under the Enacted Senate Map was drawn with a Black voting age population of under 36%. Doc. No. [39-3], at 40-41, ¶ 82; Doc. No. [39-3], at 41, Fig. 20; Doc. No. [39-3], at 151; Doc No. [39-4], at 37.

273.  Senate District 22 under the Enacted Senate Map was drawn with a Black voting age population of 56.50%. Doc. No. [39-3], at 151.

274.  Senate District 25 under the Enacted Senate Map was drawn with a Black voting age population of 33.48%. Doc. No. [39-3], at 151.

275.  Senate District 26 under the Enacted Senate Map was drawn with a Black voting age population of 56.99%. Doc. No. [39-3], at 151.

276.  Mr. Cooper concluded that a new majority-Black Senate District can be drawn around where Enacted Senate Plan District 23 was drawn by "unpacking" some of the Black population in Senate Districts 22 and 26, and by "uncracking" the Black populations in Senate Districts 23 and 25. Doc. No. [39-3], at 44, ¶82; Doc. No. [39-3], at 40, Fig. 20; Doc. No. [39-4], at 35.

42

277.    Illustrative Senate District 23 united a swath of predominantly rural counties in the Eastern Black Belt region. Doc. No. [59-2], at 12, ¶ 34.

278.    The counties and municipalities that were drawn together in Illustrative Senate District 23 share socioeconomic commonalities. Doc. No. [59-2], at 13, ¶ 35.

279.    For example, a similarly significant proportion of Black residents across the Illustrative Senate District 23 counties had incomes that fell below the poverty line (ranging from 20.1% of the Black population to 38.4% of the Black population). Doc. No. [59-2], at 15, ¶ 43.

280.    In addition to some of the counties already mentioned, Mr. Cooper testified that he included additional counties, such as Baldwin, Twiggs, and Wilkinson, as well as a precinct in Houston County, in order to come within equal population requirements. Feb. 7 Tr. 201:4–8.  Consistent with the GBPI study, Mr. Cooper also identified those counties as part of the Black Belt. Doc. No. [39-3], at 22, ¶ 53; 40-41, ¶ 83, 188.   Mr. Cooper also explained that Baldwin and Hancock Counties together comprise a community of interest, namely the Milledgeville micropolitan statistical area, which is designated by the U.S. Census Bureau. Feb. 7 Tr. 204:16–23.

281.    Mr. Cooper testified that Robins Air Force Base, which is included in Illustrative Senate District 23, was "sort of unique" because "it's a military area and it doesn't necessarily fit well into any particular District" due to its transient population. He drew the base into Senate District 23 because he needed to adjust the population deviation and he "noticed that the State had also split a line right around the military base." He "[did not] know what impact it had on the Black VAP in that particular district." Feb. 7 Tr. 202:15-204:5.

282.    Ms. Wright acknowledged that Illustrative Senate District 23 is oriented along the east-west axis of the State across Middle Georgia, a region that she also identified as the Black Belt. Feb. 11 Tr. 102:19-25, 54:19-55:5, 101:2-20.

43

283.    Compared to Enacted Senate District 23, Illustrative Senate District 23 is nearly identical on both measures of compactness: Enacted Senate District 23 has a Reock score of 0.37 and a Polsby-Popper score of 0.16, while Illustrative Senate District 23 has a Reock score of 0.35 and a Polsby-Popper score of 0.16. Doc. No. [39-4], at 39, 53.

284.    Both Enacted Senate District 23 and Illustrative Senate District 23 split 2 counties each: Enacted Senate District 23 splits Columbia and Richmond Counties, while Illustrative Senate District 23 splits Houston and Richmond counties. Doc. No. [39-4], at 60, 76.

### iv.    Mr. Esselstyn's Confirming Analysis

285.    Mr. Esselstyn independently concluded that a new Senate District can be drawn in the Eastern Black Belt region. Feb. 8 Tr. 170:3–5.

286.    In the words of Mr. Esselstyn, Mr. Esselstyn's Illustrative Senate District 23 "extends from sort of the southeastern most point in Screven County along the South Carolina border and then extends -- it's not linear, but it kind of moves to the west and the north up to [Taliaferro] County and incorporates part of Richmond County in the great Augusta area and then as far west as part of Baldwin County." Feb. 8 Tr. 170:15–20.

287.    Specifically, Mr. Esselstyn's District 23 "includes all of Burke, Glascock, Hancock, Jefferson, Screven, Taliaferro, Warren, and Washington Counties, and parts of Baldwin, Greene, McDuffie, Richmond, and Wilkes Counties." Grant Doc. No. [20-1], at 11, ¶ 25, Fig. 5.

288.    In comparison, Mr. Cooper's Illustrative District 23 has substantial overlap in this region: it also includes all of Burke, Hancock, Jefferson, Taliaferro, and Washington Counties, as well as all of Baldwin, Wilkinson, Jenkins, and Twiggs Counties, and parts of Houston and Richmond Counties. Doc. No. [39-4], at 34.

289.   Mr. Esselstyn's Illustrative Senate District 23 scores as more compact on the Polsby-Popper metric than the 2021 Senate District 23. <u>Grant</u> Doc. No. [39-1], at 9, ¶ 16.

### v.   Senate District 18

290.   Illustrative Senate District 18 is not a majority-Black district and is not located in an area in which Plaintiffs argue that the Voting Rights Act requires a new Black-majority district. Doc. No. [39-4], at 2. It is located to the east of Illustrative Senate District 23, on the other side of Macon.

291.   Mr. Cooper testified that Senate District 18 was not drawn on account of racial concerns; rather, he testified it was configured in this particular way in his plan because he was "trying to work with whole counties." Feb. 7 Tr. 149:3–12.

292.   Illustrative Senate District 18 splits two fewer municipalities than in the 2021 map. Doc. No. [39-4], at 60-64, 76-80.

293.   Mr. Cooper explained that Illustrative Senate District 18 doesn't break county lines anywhere "except by precincts in Sumpter and Bibb, that it is within range of being acceptable." Feb. 7 Tr. 155:7-9.

294.   Mr. Cooper testified that he could redraw Senate District 18 to make it more compact while still preserving nearby Black-majority districts, including Illustrative Senate District 23. Feb. 7 Tr. 151:13-16.

295.   But Mr. Cooper also testified that Illustrative Senate District 18 is within the range of compactness, and the State's Senate map has districts that are even less compact. Feb. 7 Tr. 232:6-14, 161:22-24; 155:7-9; 149:7-24, 154:24-155:19.

### vi.   House District 144 Demographics

296.   The 2021 House Plan includes five majority-Black House districts in and around Augusta: Districts 126, 128, 129, 130, and 132. Doc. No. [39-3], at 58-59, ¶ 116.

45

297. Mr. Cooper concluded that an additional majority-Black district (Illustrative House District 144) can drawn in the Eastern Black Belt area. Doc. No. [39-3], at 59-60, ¶ 117.

298. Illustrative House District 144 brings a substantial swath of the historical Black Belt area into a Black-majority district. Doc. No. [59-2], at 11, ¶ 31.

299. Illustrative House District 144 unites the population center of Milledgeville in the same district with eastern Baldwin County and Hancock County. Doc. No. [59-2], at 11, ¶ 31.  As previously noted, Baldwin County and Hancock County together form the Milledgeville micropolitan statistical area, which is defined by regional economics and transportation patterns beyond race. Doc. No. [59-2], at 11, ¶ 31.

300. Illustrative House District 144 includes Eatonton, which is a county seat that is almost 60% Black, but that was drawn into a district that caused the votes of Black citizens to be diluted under the 2021 House Plan. Doc. No. [59-2], at 12, ¶ 33; Feb. 7 Tr. 215:1.

301. Mr. Cooper testified that he followed precinct lines where possible in drawing Illustrative House District 144. Feb. 7 Tr. 215:2–4.

302. The counties within Illustrative House District 144 share certain socioeconomic characteristics that make them similar to one another. For example, a similarly low proportion of Black residents in the illustrative counties have received a bachelor's degree or higher (ranging from 5.7% to 12.7% of the Black population). Doc. No. [59-2], at 16, ¶ 46.

303. Mr. Cooper testified that he consulted micropolitan areas, the Regional Commission Maps, and information about poverty rates in the counties and the percentage of children in school who are Black, based on the information in the GBPI report, in drawing Illustrative House District 144. Feb. 7 Tr. 214:20–23.

304.   Mr. Cooper testified that he looked at the fact that the areas shared high poverty rates, low percentages of the population with college degrees, and were more economically depressed than the Atlanta area. Feb. 7 Tr. 219:25–220:3.

### vii.   Mr. Esselstyn's Confirming Analysis

305.   Mr. Esselstyn independently concluded that new House districts can be drawn in the Eastern Black Belt region. (Feb. 8, 2022, Afternoon Tr.), Tr. 179:5–7.

306.   Mr. Esselstyn explained that his new House District 149 is the eastern part of Bibb County, Twiggs and Wilkinson County, and a portion of Baldwin County. Feb. 8 Tr. 179:9–11.

307.   Mr. Esselstyn testified that his House District 149 respects communities of interest. Feb. 8 Tr. 192:18-193:2.

308.   When asked why he drew his House District 149 in the manner he did and whether the predominating concern was race Mr. Esselstyn said it was not. Feb. 8 Tr. 254:1–3.

### c.   Southwest Georgia

### i.   Demographic Change

309.   The Enacted Senate Plan includes a majority-Black district in Southwest Georgia, Senate District 12. Feb. 7 Tr. 123:6–9.

310.   The area comprising Senate District 12 under the 2021 state Senate Plan includes Sumter, Webster, Stewart, Quitman, Clay, Randolph, Terrell, Calhoun, Dougherty, Early, Miller, Baker, and Mitchell Counties. Doc. No. [94], at 11, ¶ 108.

311.   Senate District 12 encompasses part of the Southwest Georgia and the Valley River Area regional commission areas identified by the Georgia Department of Community Affairs. Doc. No. [39-3], at 93.

312. Twelve of the counties in Senate District 12—excluding Miller – are identified by the Georgia Budget and Policy Institute as Black Belt counties. Doc. No. [39-3], at 83.

313. The southwestern Black Belt has experienced a population decline since 2010, after holding relatively stable between 1990 and 2010. All of the population loss can be attributed to a steady decline in the NH White population over the past several decades. Doc. No. [39-3], ¶ 54.

314. From 2000 to 2020, the proportion of the any part Black population in the set of southwest Georgia counties comprising Senate District 12 grew, representing just over half the population in 2000 at 55.33%, but 60.6% of the population by 2020. Doc. No. [94], at 11, ¶ 109.

315. In 1990, NH Whites constituted about half of the overall population in the Senate District 12 region. By 2020, NH Whites comprised only about one-third of the population. Over the same time period, the Black population grew in absolute terms from 102,728 to 115,621, representing just under half the population in 1990, but 60.6% of the population by 2020. Doc. No. [39-3], at 24, ¶ 55.

316. The following counties in southwest Georgia are at least 40% any part Black: Sumter, Webster, Stewart, Quitman, Clay, Randolph, Terrell, Calhoun, Dougherty, Early, Baker, and Mitchell Counties. Doc. No. [94], at 11, ¶ 107.

317. Doughterty County is 68.9% BVAP, which represents a 4.8% increase from 2010. Doc. No. [39-3], at 102.

318. Mitchell County is 46.4% BVAP, which is roughly the same proportion as 2010. Doc. No. [39-3], at 103.

319. Thomas County is 35% BVAP, which is roughly the same as 2010. Doc. No. [39-3], at 104.

320. A Senate district consists of population sufficient to draw approximately 3 House districts. Feb. 7 Tr. 123:16–19.

321. In the area where Enacted Senate District 12 was drawn with a Black-majority population, only 2 of the 3 House districts in the Enacted House Plan are majority Black. This fact, combined with the increase in the proportion of the Black population in the area over the last decade, indicates that an additional Black-majority House district can very likely be drawn in the area of Southwest Georgia covered by Enacted Senate District 12. Feb. 7 Tr. 123:6–19, 124:8–16.

### ii.    Composition of House District 153

322. An Additional Black-majority district, House District 153 the Illustrative Plan, can be drawn in Southwest Georgia in the area South of Albany, including Dougherty, Mitchell and Thomas Counties. Doc. No. [39-3], at 59–60, ¶ 118.

323. Illustrative House District 153 has a BVAP of 57.96%. Doc. No. [39-5], at 24.

324. Illustrative House District 153 includes all of Mitchell County, and parts of Dougherty and Thomas Counties. Doc. No. [39-6], at 70.

325. The Enacted House Districts in this region are House Districts 171, 153, and 173. House District 171 includes all of Mitchell and Decatur Counties, and parts of Grady County. Alpha PX-047.[2] House District 153 includes parts of Dougherty County. Alpha PX-047. House District 173 includes parts of Dougherty and Grady Counties. Alpha PX-047.

326. The Enacted House Plan instead draws two majority-white districts that cover this area: House District 171, which contains majority-Black Mitchell County and is only 40% BVAP; and House District 173, which contains part of majority-Black Thomas County and is only 36% BVAP. Under the State's configuration, Dougherty County, which contains the majority-Black city of Albany, is split among four districts, one of which (House District 153) is nearly 70% Black. Doc. No. [39-3], at 59–60, ¶ 118

---

[2] Alpha PX-047 was admitted by the court. Feb. 7 Tr. 159:20–25.

327.   Illustrative House District 153 creates a Black-majority district in the Western Black Belt and unites the cities of Thomasville and Albany because "there are clear connections between Albany and Thomasville." In particular, they are part of "the same Regional Commission and it's connected by a major highway that's featured in the Georgia tourist volume I think that you can get at rest stops." (Feb. 7, 2022, Afternoon Tr.), Tr. 160:19–161:9; Doc. No. [59-2], at 17, ¶ 48.

## III.   <u>Gingles</u> Precondition II: Political Cohesion of Black Voters

328.   Plaintiffs' expert Dr. Lisa Handley has over 35 years of experience as a voting rights and redistricting expert. She holds a Ph.D. in political science from George Washington University. She has published widely on the topic of redistricting and minority vote dilution, and has advised scores of jurisdictions and other clients on minority voting rights and redistricting-related issues. <u>See</u> (Feb. 10, 2022, Morning Tr.), Tr. 79:6–80:19. She has performed racial bloc voting analyses hundreds of times over the course of her career and has been accepted as an expert witness in litigation involving voting rights and redistricting scores of times, Feb. 10 Tr. 80:5–25, including on behalf of jurisdictions defending Section 2 cases, Feb. 10 Tr. 102:23-103:6. Courts have routinely accepted and relied on her expert testimony using the exact methodology she relied on in this case. Feb. 10 Tr. 84:25-85:4; Doc. No. [118-2], at 3, ¶ 4.

329.   The Court accepted, and Defendant did not object to, Dr. Handley as being qualified to testify as an expert in racial polarization analysis and analysis of minority vote dilution and redistricting. Feb. 10 Tr. 81:8–17. The Court finds Dr. Handley credible, her analysis methodologically sound, and conclusions reliable. The Court credits Dr. Handley's testimony and conclusions.

330.   Dr. Handley analyzed voting patterns by race in six areas of Georgia to determine whether voting was racially polarized. Doc. No. [39-7], at 2. As part of that analysis, she also considered whether Black voters had the opportunity to elect candidates of their choice in these areas under the Illustrative Plans as compared to the Enacted Plans. <u>See</u> Feb. 10 Tr. 81:21–25; Doc. No. [39-7], at 7–8.

331.  Dr. Handley conducted her analysis on the six areas in Georgia that "are the focus of this litigation." Feb. 10 Tr. 83:7–8. Dr. Handley, accordingly, analyzed voter behavior in the Eastern Atlanta Metro Region, the Southern Atlanta Metro Region, East Central Georgia with Augusta, the Southeastern Atlanta Metro Region, Central Georgia, and Southwest Georgia. See Doc. No. [39-7], at 7–8. The particular boundaries of these regions are detailed in her report. Doc. No. [39-7], at 6–7.

332.  Dr. Handley employed three commonly used, well-accepted statistical methods to conduct her racially polarized voting analysis. These methods are called homogeneous precinct analysis, ecological regression, and ecological inference ("EI") and have been widely used and accepted by courts in voting rights cases. Feb. 10 Tr. 83:21–23; see also Feb. 10 Tr. 84:3–19, 85:12–25 (Dr. Handley); Doc. No. [39-7], at 3–5. Dr. Handley has used all three techniques in previous cases, see Feb. 10 Tr. 83:19-85:4 (Dr. Handley), as has Defendant's racially polarized voting expert, Dr. John Alford, see (Feb. 11, 2022, Afternoon Tr.), Tr. 168:21–24 (Dr. Alford). Dr. Handley uses homogeneous and ecological regression to check the estimates produced by EI. Feb. 10 Tr. 84:2–19.

333.  Dr. Handley used a form of EI called "King's EI." Doc. No. [118-2], at 3, ¶ 4; Feb. 10 Tr. 84:20–24. Dr. Alford agrees that King's ecological inference is "the gold standard for experts in this field doing a racially-polarized voting analysis." Feb. 11 Tr. 163:20–23. Dr. Handley has employed King's EI in numerous prior cases, and courts have routinely accepted her use of that methodology to assess racially polarized voting. Doc. No. [118-2], at 3, ¶ 4; Feb. 10 Tr. 84:20-85:4.

334.  Dr. Handley employed EI to calculate estimates of the percentage of Black and white voters in the six areas that voted for each candidate in statewide elections for U.S. Senate, Governor, Commissioner of Insurance, and School Superintendent, as well as statewide Democratic primaries for Governor, Lieutenant Governor, Commission of Insurance, School Superintendent, and Commissioner of Labor. Doc. No. [39-7], at 5–6; Feb. 10 Tr. 86:3–4; Doc. No. [118-1].

51

She also looked at 26 state legislative elections in the areas of interest. Feb. 10 Tr. 86:6–7, 91:12–17; Doc. No. [59-7], at 5, 7–10.

335.   Dr. Handley evaluated recent statewide general elections and state legislative general elections in the six areas of interest. Feb. 10 Tr. 86: 1–7.

336.   All but two of the statewide general elections that Dr. Handley examined involved Black and white candidates. Doc. No. [39-7], at 6. Dr. Handley finds that these elections are the most probative for measuring racial polarization. Feb. 10 Tr. 86:16–20. Courts and Defendant's expert have agreed. Feb. 11 Tr. 170:25–171:7. Dr. Handley also analyzed the 2020 U.S. Senate general election and 2021 U.S. Senate runoff election with Jon Ossoff, in part because Black candidates ran in the primary. Feb. 10 Tr. 86:23–87:3.

337.   Dr. Handley determined that an election was racially polarized if, according to her EI analysis, "the outcome would be different if the election were held only among black voters compared to only among white voters." Feb. 10 Tr. 83:13–14.

338.   In all six areas that Dr. Handley examined, Black voters were cohesive in supporting their preferred candidates. Doc. No. [39-7], at 23. In every statewide general election that Dr. Handley analyzed, racial polarization was stark, with the vast majority of Black voters supporting one candidate and the vast majority of white voters supporting the other candidate. See Feb. 10 Tr. 90:18–20; 101:22–23; Doc. No. [118-1]; see also, e.g., Feb. 10 Tr. 91:6–7, 24–25. Indeed, Black-preferred candidates typically received more than 98% of the Black vote in statewide races in these areas. Doc. No. [118-1].

339.   The Pendergrass/Grant Plaintiffs' expert, Dr. Maxwell Palmer, similarly found that Black voters cohesively supported their preferred candidates in all of the elections he examined in areas similar to those analyzed by Dr. Handley. See Feb. 10 Tr. 48:25–49:11; Grant Doc. No. [20-2], at 7, ¶¶ 17-18.

52

340. Like Dr. Handley, Dr. Palmer found that Black voters were "highly cohesive" in the elections he examined in similar areas to Dr. Handley with a "clearly defined preferred candidate." Feb. 10 Tr. 53:12–13; <u>Grant</u> Doc. No. [20-2], at 7, ¶ 17. Dr. Palmer also found "strong evidence of racially polarized voting" in every area that he examined. Feb. 10 Tr. 60:24; <u>Grant</u> Doc. No. [20-2], at 7–8, ¶ 18.

341. Defendant's expert, Dr. Alford, does not dispute Dr. Handley's conclusions as to the second <u>Gingles</u> precondition, testifying that in general elections in Georgia, Black voters are "very cohesive." Feb. 11 Tr. 154:15–17; <u>see also</u> Doc. No. [87], at 6. He concluded the same of white voters. Feb. 11 Tr. 154:18–19; <u>see also</u> Doc. No. [87], at 6.

342. Dr. Alford also found the conclusions of Drs. Handley and Palmer's reports as "entirely compatible with each other," Feb. 11 Tr. 145:21, and that both analyses showed polarized voting, Feb. 11 Tr. 142:9–13. Dr. Alford said that "[i]t would be hard to get a difference more stark" between the voting patterns of Black and white voters as reflected in the analyses of Drs. Handley and Palmer. Feb. 11 Tr. 154:20–22.

343. Dr. Handley's analysis of state legislative general elections in the areas of interest also found starkly racially polarized voting. Feb. 10 Tr. 91:8–25; Doc. No. [59-7], at 5, 7–10.

344. She analyzed recent biracial elections (that is, contests that included both Black and white candidates) in General Assembly districts wholly contained within or overlapping with the additional majority Black-majority districts drawn by Plaintiffs' expert demographer. Feb. 10 Tr. 91:8–17; Doc. No. [39-7], at 8–11. There were eight recent state senate contests, and 18 State house contests that were biracial contests. Doc. No. [39-7], at 8–11.

345. All 26 of these state legislative elections were racially polarized, with Black candidates receiving a minuscule share of the white vote and the overwhelming support of Black voters. <u>See</u> Feb. 10 Tr. 91:8–25; Doc. No. [59-7], at 5, 7–10. Indeed, in all but one of the 26 recent state legislative general elections that Dr. Handley analyzed, over 95% of

Black voters supported the same candidate. Doc. No. [59-7], at 5, 7–10.

## IV. <u>Gingles</u> Precondition III: Success of White Bloc Voting

346. Dr. Handley also concluded that the starkly racially polarized voting in the areas that she analyzed substantially impedes the ability of Black voters to elect candidates of their choice to the Georgia General Assembly unless districts are drawn to provide Black voters with this opportunity. <u>See</u> Feb. 10 Tr. 82:16-83:4; 95:9-96:3; 99:12–18; Doc. No. [39-7], at 12.

347. Dr. Handley found that white voters voted as a bloc against Black-preferred candidates in all the general elections that she analyzed. Doc. No. [39-7], at 8; <u>see</u> Doc. No. [118-1]; Feb. 10 Tr. 90:18–20; 101:22–23 (statewide elections "starkly polarized"); <u>see also</u> Doc. No. [59-7], at 5, 7–10; Feb. 10 Tr. 91:22–25 (legislative elections "just as starkly polarized").

348. In the state legislative elections Dr. Handley analyzed, the Black-preferred candidate on average secured the support of less than 5% of white voters in Senate races and less than 9.5% of white voters in House races. Doc. No. [39-7], at 8; Doc. No. [59-7], at 5, 7-10. Given this low level of support, it is unsurprising that Dr. Handley also found that blocs of white voters in the areas of interest were able to consistently defeat Black-preferred candidates in state legislative general elections, except where the districts were majority Black. Feb. 10 Tr. 95:21-96:3; <u>see also</u> Doc. No. [118-1].

349. In and around Illustrative Senate District 17, white voters consistently joined together to defeat Black-preferred candidates in districts that were not majority Black. Feb. 10 Tr. 94:8–14; 95:7–20. For example, prior Senate District 17 elected candidates in 2016, 2018, and 2020 supported by nearly all white voters and essentially no Black voters. <u>See</u> Feb. 10 Tr. 94:20-95:20 (characterizing all three elections as "starkly polarized . . . with the vast majority of black voters supporting the black candidate, and the vast majority of white voters

in both instances supporting the white candidate"); Doc. No. [39-7], at 10; Doc. No. [59-7], at 7.

350.   In and around Illustrative Senate District 28, white voters consistently joined together to defeat Black-preferred candidates. Feb. 10 Tr. 95:21-96:3; Doc. No. [118-1]. For example, in the 2020 election in prior Senate District 16, 90% of white voters supported the winning candidate while over 90% of Black voters supported the losing candidate. Doc. No. [39-7], at 11; Doc. No. [118-1].

351.   In and around Illustrative Senate District 23, white voters consistently joined together to defeat Black-preferred candidates. Feb. 10 Tr. 95:21-96:3; Doc. No. [118-1]. In the only recent contested election in prior Senate District 23, which overlaps with Illustrative District 23, over 90% of white voters supported the victorious white candidate, and the Black voters overwhelmingly supported the losing Black candidate. Doc. No. [39-7], at 11; Doc. No. [59-7].

352.   In and around Illustrative House District 144, white voters consistently joined together to defeat Black-preferred candidates. Feb. 10 Tr. 95:21-96:3; Doc. No. [118-1]. In the last two contested elections in prior District 145, which overlaps with Illustrative District 144, the Black candidate lost to the white-preferred candidate despite overwhelming support from Black voters. Doc. No. [39-7], at 11; Doc. No. [59-7].

353.   In and around Illustrative House District 153, white voters consistently joined together to defeat Black-preferred candidates. Feb. 10 Tr. 95:21-96:3; Doc. No. [118-1]. For example, in prior District 173, which overlaps with Illustrative House District 153, blocs of white voters defeated Black candidates preferred by upwards of 96% of Black voters in 2016 and 2020. In both races, the white-preferred, winning candidates secured more than 90% of the white vote. Doc. No. [59-7], at 8, 10.

354.   Dr. Handley also used recompiled election results with official data from 2016, 2018, and 2020 statewide election contests and 2020 Census data, to determine whether Black voters have an opportunity to elect

their candidates of choice in the newly proposed districts in both the Illustrative and Enacted Plans. Feb. 10 Tr. 92:18–93:3, 7–9; Doc. No. [39-7], at 2–4. Recompiled elections analysis has been accepted by courts and used by special masters specifically for the purpose of evaluating the opportunity to elect given to Black voters under a districting plan. Feb. 10 Tr. 92:1-93:17.

355.  To do so, Dr. Handley calculated a "General Election" or "GE" effectiveness score, which averaged the vote share of Black-preferred candidates in 5 prior statewide elections in each of the proposed districts in the Illustrative Plans and the Enacted Plans in the areas of focus. Feb. 10 Tr. 92:18–93:3, 7–9; Doc. No. [39-7], at 12.

356.  The GE Scores show that, on average, Black-preferred candidates receive less than 50% of the vote outside of districts that are majority-Black. See Feb. 10 Tr. 97:4-99:11; Doc. No. [39-7], at 12–23. This means that Black-preferred candidates are likely to be defeated in the non-majority Black districts Dr. Handley evaluated in each of the areas. See Feb. 10 Tr. 97:4-99:11; Doc. No. [39-7], at 12–23.

357.  Based on her analysis of GE scores, Dr. Handley also found that the Illustrative Plans provide "at least one additional black opportunity district compared to the enacted plan" in the areas she analyzed. Feb. 10 Tr. 83:2–4; Doc. No. [39-7], at 12-20. That is, each of the new majority-Black districts in the areas of interested created by the Illustrative Plans have a GE Score indicating that Black-preferred candidates would have received more than 50% of the vote and thus provide Black voters with an opportunity to elect their preferred candidates that they would not have under the 2011 Plans. See Doc. No. [39-7], at 22–23.

358.  Accordingly, Dr. Handley concluded that as a result of the stark racial polarization, candidates preferred by Black voters were consistently unable to win elections are will likely continue to be unable to win elections outside of majority-Black districts in the areas she analyzed. Feb. 10 Tr. 95:24–96:3; Doc. No. [39-7], at 8–9.

359.   Dr. Palmer's analysis was substantially in accord. He found "high cohesion among white voters" in support of the opponent of the Black-preferred candidate in the elections and areas he analyzed. Feb. 10 Tr. 53:17–18; <u>Grant</u> Doc. No. [20-22], at 9, ¶¶ 19-20. Like Dr. Handley, he also found that "black-preferred candidates are generally unable to win elections in these areas, except in the black majority districts." Feb. 10 Tr. 48:11–13; <u>Grant</u> Doc. No. [20-22], at 9, ¶¶ 19-20. He likewise concluded "that all the new black majority districts in all the new illustrative maps would perform for black-preferred candidates." Feb. 10 Tr. 48:7–8; <u>see also Grant</u> Doc. No. [20-22], at 9, ¶¶ 19-20.

## V.   Totality of the Circumstances: All Relevant Factors Weigh Decisively In Favor Of A Finding Of Vote Dilution.

360.   The Court finds that each of the relevant Senate Factors—which animate Section 2's totality-of-the-circumstances inquiry—point decisively in Plaintiffs' favor.

### A.   Senate Factor One: Georgia Has A History Of Voting-Related Discrimination Against Black Voters.

361.   The first Senate Factor is "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." <u>Thornburg v. Gingles</u>, 478 U.S. 30, 36–37 (1986).

362.   Defendant admitted that "Georgia has a terrible history of official state-sponsored racism." (Feb. 14, 2022, Afternoon Tr.), Feb. 14 Tr. 150:18–19. Georgia's long history of state-sanctioned discrimination against its Black citizens has specifically targeted their ability to vote and otherwise participate in the political process. Doc. No. [39-10], at 4 (Expert report of Jason Morgan Ward "Ward Report")). This state-sanctioned discrimination has extended beyond the adoption of facially discriminatory laws to include harassment, intimidation, and violence. Doc. No. [39-10], at 4 (Ward Report).

363.   "Georgia's history of discrimination 'has been rehashed so many times that the Court can all but take judicial notice thereof. Generally, Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.'" Wright v. Sumter Cnty. Bd. of Elections & Registration, 301 F. Supp. 3d 1297, 1310 (M.D. Ga. 2018) (quoting Brooks v. State Bd. of Elections, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994)), aff'd, 979 F.3d 1282 (11th Cir. 2020).

364.   Before the emancipation of enslaved Black Georgians and the extension of civil rights via the Thirteenth, Fourteenth, and Fifteenth Amendments to the U.S. Constitution, Georgia had barred all Black men from voting and holding office. Doc. No. [39-10], at 7; Feb. 10 Tr. 8:23-9:1 (Dr. Burton) ("[T]he first constitution of 1865 was very explicit, only white men were enfranchised, and the constitution even went further and put into the constitution that African-Americans could not hold office in the State of Georgia.").

365.   In the years following the Confederate surrender, Georgia's white legislators voted to reject the Fourteenth and Fifteenth Amendments and to expel Georgia's newly elected Black Republican legislators from the General Assembly. Doc. No. [39-10], at 7 (Ward Report).

366.   At the same time, the newly established Ku Klux Klan engaged in a spree of political assassinations and massacres of Black Georgians and their white allies. Doc. No. [39-10], at 7 (Ward Report). In one notable incident, the Camilla Massacre, as many as a dozen Black participants in a political rally in Camilla, Georgia were killed by white attackers. The Camilla Massacre intimidated many Black voters from going to the polls in subsequent elections. Doc. No. [39-10], at 7 (Ward Report).

367.   By 1871, white Democrats had retaken control of the Georgia Legislature, reinstituted an annual poll tax, and voted to remove the Republican Governor, functionally ending political Reconstruction in Georgia. Doc. No. [39-10], at 7 (Ward Report); Feb. 10 Tr. 9:11–23 (Dr. Burton).

368.    When Georgia ratified a new State Constitution in 1877, it enacted a cumulative poll tax and wrote racial segregation into law. Doc. No. [39-10], at 9 (Ward Report); Feb. 10 Tr. 9:18–23 (Dr. Burton). The purpose of the Constitutional Convention, "according to the convention's leader, was to "'fix it so that the people shall rule and the Negro shall never be heard from.'" Doc. No. [39-8], at 9 (quoting <u>Miller v. Johnson</u>, 515 U.S. 900, 936–37 (1995) (Ginsburg, J., dissenting)). The cumulative poll tax, "required voters to show they had paid past as well as current poll taxes; one historian described this tax as the "most effective bar to Negro suffrage ever devised." <u>Id.</u> Of all states, historians and legal experts have noted that in the years after the Civil War, Georgia had the most systematic and thorough system of denying its Black citizens the right to vote. Doc. No. [39-10], at 11; Doc. No. [39-8], at 7; (Feb. 10, 2022, Afternoon Tr.), Feb. 10 Tr. 174:15–21 (Dr. Jones).

369.    In 1900, the Georgia Democratic party adopted white primaries, effectively eliminating the participation of Black voters in Georgia politics in what had once again become a one-party state. Doc. No. [39-10], at 10; Feb. 10 Tr. 10:8–12 (Dr. Burton). All white primaries continued until 1946, several years after they were struck down by the Supreme Court in 1944. Doc. No. [39-8], at 10 (citing <u>Smith v. Allwright</u>, 321 U.S. 649 (1944); <u>King v. Chapman</u>, 62 F. Supp. 639 (M.D. Ga. 1945), <u>aff'd</u>, 154 F.2d 460 (5th Cir. 1946)); Doc. No. [39-10], at 16.

370.    In 1908, Georgia passed the so-called "Disenfranchising Act," adding a literacy test requirement for voting to its state constitution, with "grandfather" clauses that exempted white registrants from the test if their ancestors had served in the Civil War, and a "good character" clause that empowered the local registrar to exempt more white citizens. Doc. No. [39-10], at 11; <u>Pendergrass</u> Doc. No. [34-3], at 18–19. Then-Governor Hoke Smith justified this law by the need for "honest elections in Georgia," and a "first step toward purifying the ballot," which could begin by "keeping registration lists above suspicion," and by "the exclusion of the ignorant and purchasable negro." <u>Pendergrass</u> Doc. No. [34-3], at 17–18. The Supreme Court stated in

South Carolina v. Katzenbach, 383 U.S. 301 (1966) that Georgia's literacy test and grandfather clause were "specifically designed to prevent Negroes from voting."

371. The 1908 Disenfranchising Act had a devastating impact on Black voters. In 1908, 33,816 Black Georgians were registered to vote. Two years later, only 7,847 African Americans were registered, a decrease of more than 75 percent. In comparison, fewer than six percent of white voters were disfranchised by Georgia's new election laws. Pendergrass Doc. No. [34-3], at 20. Georgia also adopted a "County Unit" voting system, which "extremely malapportioned" the state, effectively giving white, rural populations control of the state, at the expense of Black, urban populations, and severely limiting the ability of Black Georgians to elect a candidate of their choice. Feb. 10 Tr. 11:18-12:18 (Dr. Burton); Feb. 10 Tr. 174:22-175:2 (Dr. Jones). By 1960, Fulton County was the most underrepresented county in its state legislature of any county in the United States. DeKalb County was in third place. Pendergrass Doc. No. [34-3], at 29. The County Unit System, which governed until it was struck down in 1963 by the Supreme Court in Gray v. Sanders, 372 U.S. 368, 381 (1963), has been described by a federal court as "employed to destroy black voting strength." Doc. No. [39-8], at 12 (quoting Busbee v. Smith, 549 F. Supp. 494, 499 (D.D.C. 1982), aff'd, 459 U.S. 1166 (1983)).

372. Between 1965-1981, the United States Department of Justice ("DOJ") objected to 266 voting changes submitted for preclearance from Georgia—almost 1/3 of DOJ's objections to voting practices submitted for preclearance from all states during that time period. Doc. No. [39-8], at 8–9. And Georgia has consistently opposed federal voting rights legislation, opposing the passage of the Voting Rights Act of 1965 ("VRA"), suing to strike down the VRA, refusing to comply with the VRA for years after its passage, and as recently as 2006, opposing the VRA's reauthorization. Doc. No. [39-8], at 8–9.

373. And as Georgia's traditional means of disenfranchising its Black citizens have been outlawed, Georgia has simply updated its methods. Even many years after the passage of the Voting Rights Act,

Georgia still had enormous disparities in the proportions of its Black and white citizens that were registered to vote. Feb. 10 Tr. 13:23-14:8 (Dr. Burton); Doc. No. [39-8], at 8. This was due to the continuing context of racial violence and intimidation in the state, as well as many disenfranchisement techniques that Georgia continued to use without complying with the preclearance requirement under the Voting Rights Act. Feb. 10 Tr. 14:11–23 (Dr. Burton); Doc. No. [39-8], at 8. Indeed, between 1965 and 1967, Georgia submitted only one of its hundreds of voting law changes to the DOJ for preclearance. Doc. No. [39-8], at 8.

374.    One tactic Georgia has continually used to minimize the voting power of its Black citizens is redistricting. From 1970, the first redistricting cycle covered by the Voting Rights Act, to 2000, the last redistricting cycle subject to preclearance, the DOJ objected to every one of Georgia's redistricting plans. Feb. 10 Tr. 15:20-16:11 (Dr. Burton); Doc. No. [39-8], at 13–14.

375.    In 2015, the Georgia General Assembly undertook mid-decade redistricting. Henry County's House District 111 was redistricted to decrease the Black share of the voting age population by "just over 2%," or 948 people, which "likely changed the outcome of the 2016 election" because without the change, the district "would have become significantly more diverse." Doc. No. [39-8], at 14 (quoting Ga. State Conf. of NAACP v. Georgia, 312 F. Supp. 3d 1357, 1363 (N.D. Ga. 2018)). In 2016, the white Republican, Brian Strickland, defeated Black Democratic challenger, Darryl Payton by just 950 votes. Doc. No. [39-8], at 14.

376.    And in 2018, the U.S. Commission on Civil Rights determined that Georgia was the only state that was still using the five most common restrictions that impose difficulties for minority voters as of 2018. Feb. 10 Tr. 16:23-17:8 (Dr. Burton). Those tactics include voter ID laws, proof of citizenship requirements, voter purges, cutting opportunities for early voting, and widespread polling place closures. Feb. 10 Tr. 17:4–8 (Dr. Burton). Those strategies will be discussed in more length under Senate Factor 3.

61

**B.     Senate Factor Two: Voting in Georgia is Extremely Polarized Along Racial Lines.**

377.   The second Senate Factor is "the extent to which voting in the elections of the state or political subdivision is racially polarized." Gingles, 478 U.S. at 37.

378.   For the reasons discussed at length above, the Court finds that voting in Georgia in the areas at issue is racially polarized and starkly so. See supra Parts III, IV. Plaintiffs have presented expert reports and testimony that voting is polarized in the specific regions of Georgia at issue in this case. See, e.g., Feb. 10 Tr. 82:9-83:8 (Handley: "Voting was quite starkly polarized in the general elections that I looked at[.]"); Doc. No. [39-7], at 7. In those areas, Black and white voters are cohesive in supporting different, preferred candidates. Doc. No. [39-7], at 7; Feb. 10 Tr. 60:24 (Palmer); Grant Doc. No. [20-2], ¶ 18.

379.   This finding is reinforced by the fact that courts have repeatedly recognized the high degree of racially polarized voting in Georgia. See, e.g., Ga. State Conf. of NAACP, 312 F. Supp. 3d at 1360 ("[V]oting in Georgia is highly racially polarized."); Wright v. Sumter Cnty. Bd. of Elections & Registration, 979 F.3d 1282, 1306 (11th Cir. 2020) (noting "the high levels of racially polarized voting" in Sumter County).

380.   That voting in Georgia is racially polarized was further corroborated by the chair of the Senate committee who drew the Enacted Senate Map. He conceded, "based on the pattern of Georgia, that we do have racially polarized voting in Georgia." November 4, 2021 Meeting of Senate Committee on reapportionment & Redistricting, Hearing on S.B. 1EX, 2021 Leg., 1st Special Sess. (2021) (statement of Senator John

F. Kennedy, chairman, S. Comm. Reapp. & Redis. at 1:00:44 – 1:01:01), https://www.youtube.com/watch?v=RhQ7ua0db9U.3  4.

381.    Against Plaintiffs' evidence of racially polarized voting, Defendant offers the testimony of Dr. John Alford, who performed no actual analysis of his own. Feb. 11 Tr. 162:4–20. (admitting his report "contains no statistical analysis of the voting behavior"); see also Doc. No. [87], at 3. Based only on his review of Plaintiffs' experts' reports, Dr. Alford claims that race does not explain the extreme polarization seen in Georgia, and instead suggests that partisanship may be driving these results. See Feb. 11 Tr. 142:21–143:10. This Court finds Dr. Alford's opinions unpersuasive and accordingly gives them little weight, as many courts have previously done.

382.    As an initial matter, Dr. Alford's very premise—that race and partisanship are somehow distinct causal mechanisms when it comes to voter behavior—lacks support.

383.    While Dr. Alford claims that "the voting pattern is clearly one of partisan polarized voting, with 90% cohesive Black vote for the Democrat and 90% cohesive White vote for the Republican candidate," Doc. No. [87], at 5, he does not purport to show that party loyalty (or some other factor related to "partisanship") is the *cause* of the undisputed polarized voting between Black and white voters. See Doc. No. [87], at 4 (observing "Black voters support Democratic candidates and White voters support Republican candidates."); Doc. No. [87], at 3 (observing "Dr. Palmer's analysis demonstrates [] that Black voters provide uniformly high levels of support for Democratic candidates and White voters provide uniformly high levels of support

---

4   A video recording of the November 4, 2021 Meeting of Senate Committee on Reapportionment & Redistricting was previously accessible, but is inexplicably no longer accessible, at A16. See *Alpha* Exhibit A16, Doc. No. 70, at 2. Plaintiffs found the same video recording that the Georgia State Senate published on a different website and cited to the working link. Plaintiffs however acknowledge that the link to the YouTube video recording was not admitted into evidence.

for Republican candidates"). Dr. Alford's only discussion of causation is to "point out that it's not possible, ...to separate out what seems to be the primary cause of this kind of pattern in voting, which is part of polarization." See Feb. 11 Tr. 143:4–10.

384. Dr. Alford's speculation about the role of partisanship is contradicted by the record. Dr. Burton testified that, in Georgia, "[y]ou cannot separate partisanship and race." Feb. 10 Tr. 20:4 (Dr. Burton). As he explained, that was at least in part because "[t]he policies that are supported by Republicans are antithetical to the policies that most minority and black voters want . . . ." Feb. 10 Tr. 22:17–19 (Dr. Burton). Dr. Burton also explained that attempts to disenfranchise Black voters in Georgia have been perpetuated by both parties, further highlighting that such acts of discrimination were on the basis of race, not party. Feb. 10 Tr. 40:3–8 (Dr. Burton).

385. Dr. Handley also testified that the State's arguments about the role of party in explaining Georgia's voting patterns was overly simplistic. Feb. 10 Tr. 99:22-100:6 (Dr. Handley). In fact, "race impacts political attitudes and partisan voting choices." Feb. 10 Tr. 100:7–12 (Dr. Handley); see Grant Doc. No. [36-2], at 7–8 (discussing NAACP Civil Rights Federal Legislative Report Card, The Pew Research Center's Beyond Red and Blue: The Political Typology survey, and Georgia Specific NORC poll positions and preferences on issues and policies related to race, such as civil rights, continue to drive the division between the Democratic Party and Republican Party in Georgia).

386. Dr. Alford himself acknowledged that polarization can reflect both race and partisanship, and that "it's possible for political affiliation to be motivated by race." Feb. 11 Tr. 171:8–16.

387. Race, and issues linked to race, have long played a role in separating Black and white voters along partisan lines, and they continue to contribute to the partisan divisions we see today in Georgia. Grant Doc. No. [36-2], at 9. "The relationship between racial attitudes and partisan affiliation is especially strong in the South." Doc. No. [59-7], at 2-3. As just one example, Dr. Traci Burch described how "living in

Black belt areas with . . . legacies of slavery predict white partisan identification and racial attitudes." Doc. No. [39-9], at 34.

388. The current party configuration is based in the Democratic Party's embrace of civil rights policies in the mid-20th Century caused Black voters to leave the Republican Party (the Party of Lincoln) for the Democratic Party, and sparked what Earl Black and Merle Black describe as the "Great White Switch," in which white voters abandoned the Democratic Party for the Republican Party. Grant Doc. No. [36-2], at 3. Historians agree that Goldwater "sought to create a general polarization of southern voters along racial lines." Id. Richard Nixon implemented what was called the "Southern Strategy," by telling his staff, "don't go for Jews and Blacks," so that the Democratic Party in the South became identified as the "Negro party through most of the South," causing whites in the South to become Republicans, and allowing the Republican Party to become the majority party in what had traditionally been the solid Democratic South. Id.

389. Dr. Jason Moran Ward described how the composition and positions of political parties in Georgia were forged in response to the history of Black political participation. Doc. No. [39-10], at 6, 17–18. The dramatic upsurge in Black voter registration following the VRA "fractured and transformed the state's Democratic Party," and it "revived and reshaped an increasingly competitive Republican Party." Id. at 17. Georgia's "New Guard" Republicans concluded they could "get along without the block [sic]," a euphemism for Black voters, and offset votes lost among rapidly increasing Black registrants by wooing conservative white Democrats. Id. at 17–18. For example, Fulton County's Fletcher Thompson, one of the first Republicans to win election to the Georgia Senate, took his fight against the "forced racial balance" to Congress, while DeKalb's Ben Blackburn pledged to protect the suburbs from "the welfare mother with her numerous kids" who "might be moved in next door" by federal public housing initiatives. Id. at 18.

390.   The intentional race based strategic decisions of political parties have led to political parties in Georgia that historically and today, are largely divided by race. Since 1908, when the last Black person to be elected as part of the Reconstruction era left office, the Republican Party has only elected two Black people to the Georgia Assembly. And up until 1963, the Democratic Party had never elected a Black member to the Georgia Assembly. Since 2000, 59% of Democratic Party elected officials are Black. A mere 0.5% of Republican Party elected officials have been Black. The 2020 election shows this racial division in parties continues for state legislative races: Of the 138 seats that the Republicans secured, 0 were won by Black legislators; of the 99 the Democratic party secured, 68 of them went to Black candidates. Doc. No. [39-8], at 34.

391.   Dr. Alford's alternative and unsupported claim that the polarization between Black and white voters is "partisan polarization" is also undermined by Dr. Handley's analysis of recent statewide Democratic primaries, in which party cannot motivate voter behavior. Dr. Handley found evidence of racial polarization in statewide Democratic primary contests in the areas of Georgia at issue in this case. Feb. 10 Tr. 100:13–16 (Dr. Handley); Doc. No. [59-7], at 2–3. The only regular exceptions to this were the two recent Democratic primaries in which Black voters supported white candidates (Jon Ossoff in the 2020 primary for U.S. Senate and Jim Barksdale in his bid for the Democratic nomination for U.S. Senate in 2016). See Doc. No. [39-7], at 23.

392.   Specifically, she found that in all six areas analyzed, at least 62.5% of the eight primaries analyzed showed evidence of racial polarization. Doc. No. [59-7], at 2–3. For example, in the 2018 Democratic primary for Lieutenant Governor, the white candidate received an average of more than 83% of the white vote in these areas, and the Black candidate received an average of nearly 60% of the Black vote. Doc. No. [118-1], at 3–13. Similarly, in the 2018 Democratic primary for the Commissioner of Insurance, the white candidate received on average more than 60% of the white vote, and the Black candidate received on average more than 78% of the Black vote. Doc. No. [118-1], at 3–13.

393.   Although Dr. Handley acknowledged that polarized voting "is less stark in the primaries" and in a few instances the support of Black and white voters for the same candidate is close, Feb. 10 Tr. 101:3–23, the majority of primaries she analyzed across all six areas still demonstrated evidence of racially polarized voting. See Doc. No. [59-7], at 2–3. Defendant and Dr. Alford provide no evidence to the contrary.

394.   Although there is no requirement that a plaintiff claiming minority vote dilution present evidence drawn from primary elections, such evidence is especially useful in teasing out the relationship between racial polarization and partisan polarization – and Dr. Alford previously testified to this. See Perez v. Pasadena Indep. Sch. Dist., 958 F. Supp. 1196, 1225 (S.D. Tex. 1997) ("Dr. Alford testified that an analysis of primary elections is preferable to general elections because primary elections are nonpartisan and cannot be influenced by the partisanship factor."), aff'd, 165 F.3d 368 (5th Cir. 1999); accord Feb. 11 Tr. 172:13–16. By definition, partisan affiliation cannot explain polarized election outcomes when Democrats run against other Democrats. Accordingly, Dr. Handley's findings of racial polarization within Democratic Party primaries are especially compelling here in dispelling the supposition that Georgia's stark racial polarization reduces to partisanship.

395.   Dr. Alford raises some questions and criticisms of Dr. Handley's analysis of Democratic primary elections. The Court finds this testimony unsupported and specious and thus affords it little weight.

396.   First, Dr. Alford voiced some concern about the type of ecological inference analysis that Dr. Handley employed. Dr. Alford asserted that Dr. Handley did not use "King's EI" but instead an "iterative version of it" that lacks "an appropriate test of statistical significance." Feb. 11 Tr. 165:13–15. However, as Dr. Handley clarified, she did use King's EI to produce her results, and she ran it more than once (hence "iteratively"). See Doc. No. [118-2], ¶ 1. As Dr. Handley explained, she has used—and courts have accepted and

relied upon—this exact method of EI in numerous prior minority vote dilution cases. Feb. 10 Tr. 84:25-85:4; Doc. No. [118-2], ¶ 4.

397. Dr. Alford also claimed that Dr. Handley should have used a version of EI in this case called "RxC." However, Dr. Handley credibly explained why her use of King's EI here was appropriate. As Dr. Handley explained, she only uses EI RxC analysis in two situations: (1) when "estimating the voting patterns of more than two racial/ethnic groups," and/or (2) when she lacks data showing "turnout by race, but instead must rely on voting age population by race to estimate voting patterns." Doc. No. [118-2], ¶¶ 1–2. Because neither was present here—in other words, because (1) only two major racial groups are present in the contested areas, i.e., Black Georgians and white Georgians, and (2) Georgia tabulates and publishes data regarding turnout by race—King's EI was an appropriate methodology. Doc. No. [118-2], ¶¶ 1–2.

398. Dr. Alford next criticized Dr. Handley for not including confidence intervals in her report. But as she explained, this is her typical practice. Feb. 10 Tr. 85:5–10; Doc. No. [118-2], ¶ 5. She testified, moreover, that she "calculate[d] them" in this case, "ha[s] them available," and would be willing and able to "supply them if requested." Feb. 10 Tr. 85:7–10; see also Doc. No. [118-2], ¶ 5. She further testified that the confidence intervals "were very tight" and that "there were only a handful of instances in which you could say that confidence intervals overlapped." Feb. 10 Tr. 101:3–12.

399. Dr. Alford's criticisms regarding confidence intervals ring hollow for several additional reasons as well.

400. First, Defendant did not request Dr. Handley's confidence interval calculations. Doc. No. [118-2], ¶ 6. If this information were as important as Dr. Alford suggests, one would have expected him to request it. Dr. Handley also supplied Defendant with the data and programming necessary to generate and evaluate Dr. Handley's confidence intervals. Doc. No. [118-2], ¶ 6. Dr. Alford did not, however, do so. Feb. 11 Tr. 162:4–20; Doc. No. [118-2], ¶ 6. Dr. Alford also admitted that he "personally do[es] not always rely on

68

confidence intervals when there are consistent voting patterns." Feb. 11 Tr. 167:19–22.

401.  Second, Dr. Handley reported her "point estimates" when conveying her EI analysis. Feb. 10 Tr. 105:23–24. Dr. Handley and Dr. Alford agree that the point estimates Dr. Handley reported are her "best estimate" of the share of voters favoring a given candidate. Feb. 10 Tr. 101:13–14 (Dr. Handley); Feb. 11 Tr. 167:15–18 (Dr. Alford); Feb. 11 Tr. 168:15–17 (Dr. Alford).

402.  Third, Dr. Alford did not address, let alone critique, Dr. Handley's use of homogenous precinct analysis. Feb. 11 Tr. 164:25-165:2 (Dr. Alford). As Dr. Handley explained, this additional methodology serves as a check on her use of EI. Feb. 10 Tr. 84:3–10.

403.  Fourth, Dr. Alford acknowledged that "the lack of confidence intervals in the general election doesn't stop you from drawing conclusions about the general elections." Feb. 11 Tr. 169:24-170:1.

404.  Ultimately, this Court credits Dr. Handley's explanation for the type of EI she used in this case, and I find that Dr. Alford's criticisms of her methodology to be unpersuasive. Dr. Alford simply does not have the same level of experience and expertise regarding the statistical methods at issue here; he has never published a paper on racially polarized voting, has never published any peer-reviewed articles using the ecological inference method, and has never written about Section 2 of the Voting Rights Act in an academic publication. Feb. 11 Tr. 160:8–16 (Dr. Alford).

405.  Moreover, this is not the first time Dr. Alford has proffered theories that were rejected by courts. See, e.g., NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist., 462 F. Supp. 3d 368, 381 (S.D.N.Y. 2020) ("[Dr. Alford's] testimony, while sincere, did not reflect current established scholarship and methods of analysis of racially polarized voting and voting estimates."), aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist., 984 F.3d 213 (2d Cir. 2021); Flores v. Town of Islip, 382 F. Supp. 3d 197, 233 (E.D.N.Y. 2019) ("Dr. Alford maintains that at least 80% of the white majority in Islip must vote

against the Hispanic-preferred candidate for the white bloc vote to be sufficient. This theory has no foundation in the applicable caselaw."); Lopez v. Abbott, 339 F. Supp. 3d 589, 609 (S.D. Tex. 2018) ("While Dr. Alford suggested that cohesion levels of 60-70% were too low to be significant, he did not articulate any factual or methodological reason for his opinion and he agreed that Hispanics voted cohesively for their preferred candidate. His testimony that over 70% was required for compliance with Gingles is not corroborated in the briefing."); Patino v. City of Pasadena, 230 F. Supp. 3d 667, 709–13 (S.D. Tex. 2017) (finding in favor of Plaintiffs as to Gingles' second and third prongs, contrary to Dr. Alford's testimony on behalf of the Defendant jurisdiction), stay denied pending appeal, 667 F. App'x 950 (5th Cir. 2017) (per curiam); Montes v. City of Yakima, 40 F. Supp. 3d 1377, 1401–07 (E.D. Wash. 2014) (same); Benavidez v. Irving Indep. Sch. Dist., No. 3:13–CV–0087–D, 2014 WL 4055366, at *11–13 (N.D. Tex. Aug. 15, 2014) (same); Fabela v. City of Farmers Branch, No. 3:10–CV–1425–D, 2012 WL 3135545, at *8–13 (N.D. Tex. Aug. 2, 2012) (same); Benavidez v. City of Irving, 638 F. Supp. 2d 709, 722–25, 731–32 (N.D. Tex. 2009) (same).

## C. Senate Factor Three: Use of Voting Practices or Procedures That May Enhance The Opportunity For Discrimination

406. The third Senate Factor is "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." Gingles, 478 U.S. at 37.

407. Georgia has an extensive history of employing voting procedures and practices that increase the opportunity for discrimination against Black voters, including in the areas at issue in this case.

408. As Dr. Adrienne Jones explained, there are many different methods states have used that have the *effect* of discriminating against Black voters, and Georgia has used all of them. Feb. 10 Tr. 174:17–21 (Dr. Jones). And when methods are no longer useful in disenfranchising

70

Black voters, Georgia will select new ones. Feb. 10 Tr. 175:3–15 (Dr. Jones).

### a.    At Large Elections

409.   Georgia permits local jurisdictions to use at-large voting systems. Doc. No. [39-8], at 10–11. At-large voting systems can unlawfully dilute the voting strength of Black voters, and have been held to do so, including in Fulton County, Sumter County, and Fayette County, among others. See, e.g., Wright v. Sumter Cnty. Bd. of Elections & Registration, 301 F. Supp. 3d at 1326, aff'd, 979 F.3d 1282, 1287, 1297–98, 1311 (11th Cir. 2020); Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 118 F. Supp. 3d 1338, 1339 (N.D. Ga. 2015); Pitts v. Busbee, 395 F. Supp. 35, 40–41 (N.D. Ga. 1975), vacated on other grounds sub nom. Pitts v. Cates, 536 F.2d 56 (5th Cir. 1976).

410.   After the U.S. Supreme Court outlawed white-only primaries, many Georgia jurisdictions predominantly shifted to at-large elections to prevent Black voters from electing their candidates of choice. At-large voting was used in areas at issue in this case include for county commission (including Burke, Morgan, Newton, Sumter, Richmond and Henry counties), boards of education (including Henry and Mitchell counties), and cities (including Waynesboro, Americus, and Covington) elections—none of which had been precleared by the Department of Justice. Doc. No. [39-8], at 10.

411.   When the Sumter County School Board became majority Black for the first time in 2010, the General Assembly approved a change proposed by the lame duck School Board that would reduce the size of the Board from nine members to seven, and make two of the seats on the Board at-large seats. The district court found that the new at-large seats and the packing of Black voters into two districts diluted Black voting strength in violation of Section 2 of the VRA, and the Eleventh Circuit affirmed in 2020. Doc. No. [39-8], at 15.

### b.    Majority Vote and Number Posts Requirements

412.   Georgia uses majority vote and number posts requirements in elections for statewide and local offices. Doc. No. [39-8], at 11–13.

413.   A champion for enacting a majority vote requirement, Denmark Groover, was reported to have explained that "a majority vote would again provide protection which he said was removed with the death of the county unit system, indicating it would thwart election control by Negroes and other minorities." Before the Senate Rules Committee, Groover explained a majority vote requirement was necessary because "We have a situation when the federal government interceded to increase the registration of Negro voters." Doc. No. [39-8], at 11.

414.   Federal courts have recognized that majority vote and number posts requirements can limit the ability of Black voters to elect a candidate of their choice. See, e.g., Solomon v. Liberty Cnty. Comm'rs, 221 F.3d 1218, 1222, 1235 (11th Cir. 2000) (en banc) ("the majority vote requirement…can enhance the possibility of discrimination against black voters in Liberty County"); City of Rome v. United States, 446 U.S. 156, 184 (1980); Rogers v. Lodge, 458 U.S. 613, 627 (1982).

415.   Cities across Georgia adopted majority vote requirements during the 1960s and 1970s, including cities in the areas of focus of this case, including Augusta, Athens, Camilla, Cochran, Crawfordville, Lumber City, Madison, and Waynesboro. Doc. No. [39-8], at 11.

416.   As the DOJ explained in 2000, "Minority candidates who are forced into head-to-head contests with white candidates in [a] racially polarized voting environment are more likely to lose than would be the case under [a] system with concurrent terms and a plurality vote requirement." Doc. No. [39-8], at 12.

   c.   **Disproportionate Voter Registration Burdens**

417.   Georgia's implementation of its voter verification registration program beginning in 2008 has been shown to have a disproportionate impact on Black Georgians. Doc. No. [39-8], at 19–21.

418. In 2009, the DOJ objected to the program based on a finding that it was "error-laden," and that the "impact of these errors falls disproportionately on minority voters," specifically, "the different rate at which African American applicants are required to undertake an additional step before becoming eligible voters is statistically significant." Doc. No. [39-8], at 19–20.

419. While Georgia did revise its verification process, data provided by the Secretary of State's office for July 2013 through July 2016 showed that Georgia's revised voter verification registration program led to Black voter applicants to be negatively impacted at eight times the rate of white voter applicants. Doc. No. [39-8], at 20.

420. The Secretary of State's General Counsel even said, regarding Georgia's voter verification registration program, that "'of the [records] that failed verification, I would say our office was aware that it's a largely African American population.'" Doc. No. [39-8], at 21.

421. In 2010, an investigation revealed that Georgia was failing to offer voter registration services through its the public assistance offices as required under the National Voter Registration Act. Doc. No. [39-8], at 24–25. This failure disproportionately affects Black Georgians who are more likely to be in poverty (average percentage of Black households in poverty in Georgia in 2010 was roughly 26.4% compared to 11.5% of white households), and disproportionately more likely to participate in public assistance programs, (82.1% of Temporary Assistance for Needy Families (TANF) recipients in Georgia were Black compared to 15.3% of white Georgians, in 2008-2009). Doc. No. [39-8], at 25. A federal district court noted that the Georgia legislature "has been proactive in implementing procedures to register voters through offices that do not provide public assistance" and that the state "seems to favor a less inclusive group of eligible citizens for voter registration." Ga. State Conf. of NAACP v. Kemp, 841 F. Supp. 2d 1320, 1332 (N.D. Ga. 2012).

422. Georgia's manipulation of voter registration opportunities—in addition to the state-sanctioned discriminatory practices discussed in Senate Factor One—has disproportionately prevented Black

Georgians from participating in the political process. Indeed, as far back as 1873, Georgia passed a law allowing local election supervisors to close their registration rolls to new applicants except during those times when Black farmers were too busy to register, such as planting or harvest time. Doc. No. [39-8], at 23.

### d. Voter Purges

423. Georgia also has a history of purging voters in order to suppress the Black vote. Doc. No. [39-8], at 21–23.

424. In the early 1900s, Georgia enacted the "Challenge Law," which required voter registration books to be open to allow any citizen to challenge for any reason a person's ability to vote. Pendergrass Doc. No. [34-3], at 19–20; Feb. 10 Tr. 10:20-11:4 (Dr. Burton). This law was passed specifically to intimidate Black citizens, and discourage them from registering to vote. Feb. 10 Tr. 11:3–4 (Dr. Burton). The "Challenge Law" remains largely unchanged to this day. Pendergrass Doc. No. [34-3], at 20, 40.

425. In 1946, in the first election after the all-white primary was struck down, former Georgia Governor Eugene Talmadge urged supporters to challenge whether Black voters were properly qualified, and mailed thousands of mimeographed challenge forms to supporters, which lead to massive purges of Black voters across the state. Doc. No. [39-8], at 21–22.

426. In 1955, a United States District Court judge found that Black citizens in Randolph County had been unlawfully purged in 1954. Doc. No. [39-8], at 22. The purges were successful in preventing hundreds of Black voters from participating in the September 1954 Democratic primary and the November general election. Doc. No. [39-8], at 22.

427. Between 2012 and 2016, Georgia purged 1.5 million voters, twice the number removed between 2008 and 2012. Doc. No. [39-8], at 21. An additional half a million were removed in 2017. Doc. No. [39-8], at 21. This purge of 500,000 voters in a single day, "may represent the

largest mass disenfranchisement in U.S. history." Doc. No. [39-8], at 21.

428.    In 2016, the majority-white County Board of Elections and Registration of Hancock County, one of the counties in the areas at issue in this case, challenged the legality of 187 voters, nearly all Black, on the basis of the challenges based on "unsubstantiated 'third party' allegations about individual residents." Doc. No. [39-8], at 22–23.

    **e.    Limiting Voting Opportunities**

429.    Between 2012 and 2018, Georgia closed 214 voter precincts, which reduced the number of precincts in many majority-minority neighborhoods. Doc. No. [39-8], at 23. In five counties with such closures, the Black turnout rate dropped from over 60% in 2008 (Bacon with 65.33%; Habersham with 75.91%; Lowndes with 77.50%; Lumpkin with 61.36%; and Franklin with 67.69%) to under 50% in 2020. Doc. No. [39-8], at 23. As Dr. Burton corroborated, closing of polling places widely disadvantages Black voters. Feb. 10 Tr. 17:19-18:2 (Dr. Burton).

430.    During the 2020 election Black voters were able to overcome tactics to minimize minority access in prior years and accessed the polls in record numbers – given a particular confluence of unique factors. The state expanded in particular absentee vote by mail as part of an effort to ensure that voters had access to the polls despite the global Coronavirus pandemic. Absentee ballot applications were mailed to every active, registered voter for the primary elections, and third-party groups were allowed to provide absentee ballot applications to voters by request. Drop boxes were plentiful, especially in metropolitan Atlanta, and located outside of polling locations to allow voters to drop absentee ballots 24-7. Additionally, voters were mobilized by the uniquely high-profile nature of the elections. Doc. No. [39-8], at 26–27.

431.    In March 2021, the Georgia Legislature passed S.B. 202. S.B. 202, among other provisions, requires voters seeking absentee ballots to provide personal identifying information, shortens the duration for

applying for ballots, and shortens the period in which to return applications. Doc. No. [39-8], at 26–28. These restrictive requirements on absentee voting will disproportionately impact Black voters, who used absentee voting more than white voters in Georgia during the last election. Doc. No. [39-8], at 28. In November 2020, 29.27% of Black voters cast an absentee ballot, compared to 23.88% of white voters, and in the January 2021 general election runoff, 27.65% of Black voters cast an absentee ballot, compared to 21.72% of white voters. Doc. No. [39-8], at 28.

432.   S.B. 202 also caps the number of ballot drop boxes and requires precincts to maintain drop boxes indoors. Doc. No. [39-8], at 28. In the 2020 election, in the four core Atlanta Metro counties, Cobb, DeKalb, Fulton, and Gwinnett, 56% of absentee ballot voters, or 305,000 of 547,000, used drop boxes. After SB 202, the number of drop boxes in those counties is estimated to drop from the 111 available in the 2020 election to 23. In Fulton County, the number is estimated to drop from 38 to 8. Cobb County Election Director Janine Eveler told the Atlanta Journal-Constitution that, in light of SB 202, drop boxes "are no longer useful. The limited numbers mean you cannot deploy them in sufficient numbers to reach the voting population." Pendergrass Doc. No. [34-3], at 51.

**D.      Senate Factor Four: Georgia Does Not Use Slating Processes For General Assembly Elections.**

433.   The fourth Senate Factor is "if there is a candidate slating process, whether the members of the minority group have been denied access to that process." Gingles, 478 U.S. at 37. There is no slating process involved in Georgia's state legislative elections, so this factor is not relevant to this case.

**E.      Senate Factor Five: Black Voters Today Suffer From the Vestiges of Georgia's Centuries of Discrimination Which Hinder Political Participation.**

434.   The fifth Senate Factor is "the extent to which members of the minority group in the state or political subdivision bear the effects of

discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." <u>Gingles</u>, 478 U.S. at 37.

435.　As a result of Georgia's long history of discriminating against Black residents in nearly every aspect of daily life, the Black community in Georgia suffers socioeconomic disparities that impair their ability to participate in the political process. Doc. No. [39-9], at 6–7. The State made no attempt to dispute this fact. Feb. 14 Tr. 152:3–8.

436.　Black Georgians suffer disparities in socioeconomic status, including in the areas of education, employment, income, and housing. Doc. No. [39-9], at 6.

437.　Georgia operated a system of separate and unequal public education for white and Black students until well into the 1970s, long after the Supreme Court's decision in <u>Brown v. Board of Education</u>. Doc. No. [39-9], at 9. As of 2007, 109 of 180 school districts in Georgia had been involved in litigation involving school desegregation. Doc. No. [39-9], at 9. Georgia's history of *de jure* segregation in education affects socioeconomic and political equality today, as more than one-third of Georgia's current electorate was of school age when Georgia still enforced segregation in public schools. Doc. No. [39-9], at 10.

438.　Educational segregation continues to affect the lives of Black Georgians. Black students continue to grow up under conditions of educational segregation, and racial gaps persist along various metrics, including reading proficiency, math proficiency, and attainment of bachelor's degrees and postgraduate degrees. Doc. No. [39-9], at 11. These educational disparities affect political participation, with the highest turnout occurring among people with the most education. Doc. No. [39-9], at 8; <u>Grant</u> Doc. No. [20-4], at 7.

439.　In addition to educational disparities, Black Georgians face racial discrimination in employment even in the absence of a criminal background, and are nearly twice as likely to be unemployed compared to white Georgians. Doc. No. [39-9], at 11–13.

440.   Black Georgians also tend to fare worse in terms of financial resources compared to white Georgians. The median income for Black Georgian households is about $25,000 less than that of white Georgian households, and Black Georgians experience poverty rates more than double those of white Georgians. Doc. No. [39-9], at 12. According to Census estimates, Black Georgians are nearly three times more likely than white Georgians to receive SNAP benefits. <u>Grant</u> Doc. No. [56], at 13 ¶ 82. Studies show that voters with greater financial resources are more likely to vote. Doc. No. [39-9], at 7.

441.   There are racial gaps in involuntary residential mobility for Georgians, with Black Georgians more vulnerable to evictions and foreclosures due to racial discrimination. Doc. No. [39-9], at 14–15. Such residential mobility increases the administrative burdens faced by Black Georgians in maintaining voter registration by meeting residency requirements. Doc. No. [39-9], at 14.

442.   Racial residential segregation is a persistent feature of several cities and metropolitan areas in Georgia, including Atlanta, Augusta, and Albany, and reflects Georgia's long history of racial discrimination in housing and lending. Doc. No. [39-9], at 15–16, 21. Racial residential segregation matters in the context of voting because segregated Black areas have less access to public goods such as polling places or transportation that might matter for voting. Doc. No. [39-9], at 14.

443.   Racial residential segregation also affects health outcomes. Doc. No. [39-9], at 26. Black Georgians fare worse than white Georgians in terms of various health outcomes, such as infant mortality, hypertension, diabetes, obesity, overall mortality rates, and cancer. Doc. No. [39-9], at 24–26. Black Georgians between the age of 19-64 years old are more likely to lack health insurance than white Georgians in the same age demographic, which affects access to health care and health outcomes. Doc. No. [39-9], at 25. These health conditions affect the ability of Black Georgians to overcome the costs or physical obstacles of voting. Doc. No. [39-9], at 24.

444.   Black Georgians also disproportionately bear the brunt of the consequences of the state's criminal justice system, which is a result

of discrimination in policing, sentencing, and at other stages of the justice system. Doc. No. [39-9], at 26–28.

445.   Increased contact with the criminal justice system decreases voter turnout through demoralizing effects on the Black community and voter mobilization efforts. Doc. No. [39-9], at 26, 28. Indeed, the disproportionate impact of Georgia's criminal justice system on Black Georgians has roots in the Reconstruction era, when the Georgia Legislature passed "Black Codes" to control and target newly freed slaves. Doc. No. [39-9], at 27.

446.   Black Georgians engage in political activities (such as donating to campaigns, contacting public officials, and posting political signs) at a lower rate than white Georgians. Grant Doc. No. [20-4], at 24. This disparity is directly attributable to socioeconomic disparities in health, education, and income. Grant Doc. No. [20-4], at 24.

447.   All these racial disparities in various areas of life are vestiges of Georgia's long history of discrimination against its Black residents, and these interfere with Black Georgians' ability to effectively participate in the political process today. Doc. No. [39-9], at 6.

448.   The Court finds that Georgia Secretary of State's voter turnout data speaks to Black Georgians' diminished ability to participate effectively in the political process.[5]

    a.   In the 2020 general election, the turnout rate for white Georgian voters was 72.6%, and the turnout rate for Black Georgian voters was 60%. Grant Doc. No. [20-4], at 8.

    b.   In the 2018 general election, the turnout rate for white Georgian voters was 62.2%, and the turnout rate for Black Georgian voters was 53.9%. Grant Doc. No. [20-4], at 8.

---

[5]  The Court has taken judicial notice of the voter turnout data contained on the Georgia Secretary of State's website. See Dimanche v. Brown, 783 F.3d 1204, 1213 (11th Cir. 2015).

    c.     In the 2016 general election, the turnout rate for white Georgian voters was 67.9%, and the turnout rate for Black Georgian voters was 56.2%. <u>Grant</u> Doc. No. [20-4], at 8.

    d.     In the 2014 general election, the turnout rate for white Georgian voters was 47.5%, and the turnout rate for Black Georgian voters was 40.6%. <u>Grant</u> Doc. No. [20-4], at 8.

    e.     In the 2012 general election, the turnout rate for white Georgian voters was 75.7%, and the turnout rate for Black Georgian voters was 72.6%. <u>Grant</u> Doc. No. [20-4], at 8.

449.    This racial gap in voter turnout is replicated in all but two counties in Georgia. The disparity also remains true when looking at the turnout rate among registered voters. <u>Grant</u> Doc. No. [20-4], at 8-12.

**F.    Senate Factor Six: Overt and Subtle Racial Appeals Are Common In Georgia Politics.**

450.    The sixth Senate Factor is "whether political campaigns have been characterized by overt or subtle racial appeals." <u>Gingles</u>, 478 U.S. at 37.

451.    The Court finds that historically and in recent years, both overt and subtle racial appeals have been used prevalently in political campaigns in Georgia. Doc. No. [39-8], at 28–32; Doc. No. [39-10], at 15–22; Feb. 10 Tr. 175:16-176:1 (Dr. Jones) ("[H]istorically in the 1940s, all the governments used blatant racist campaigns…and then since then, more subtle appeals…now the culture has sort of opened up to both blatant and subtle appeals."); Feb. 14 Tr. 152:16–18 (Mr. Tyson: "Dr. Jones testified about some terrible racial appeals and campaigns, and, obviously, those shouldn't have happened and they're terrible.").

452.    Prior to 1966, every Georgia governor ran on a platform that included racist, anti-Black appeals. Doc. No. [39-8], at 28.

453.    Former governor and first-term U.S. Senator Richard Russell said in 1936 that "it is a disgrace that some should constantly seek to drag the

negro issue into our primaries, where as a matter of fact they do not in any way participate and cannot." Doc. No. [39-10], at 15.

454. Former Georgia House Speaker Fred Hand spoke of targeting the "ignorant bloc vote" in reference to Black voters. Doc. No. [39-10], at 19.

455. Over time, candidates shifted from overt to more subtle racial appeals. As Dr. Burton explained, paraphrasing Lee Atwater, "when you learn that you can't use the old racial appeals that have been used before, [] you use words that become associated and carry the same meaning." Feb. 10 Tr. 31:7–13 (Dr. Burton). Dr. Burton gave a number of examples of racially coded terms – including "welfare queen," "strapping young buck," "busing," and "law and order" --that also signify "the old tropes that came out of Reconstruction of the dangerous black men, of the dangers of black people, of criminality being associated with black people." Feb. 10 Tr. 31:13–24 (Dr. Burton).

456. Richmond County legislator Sue Burmeister claimed in 2005 that Black voters in her district's Black-majority precincts only showed up when they were "paid to vote." Doc. No. [39-10], at 22.

457. During the 2009 gubernatorial campaign, former congressman Nathan Deal ridiculed criticism of voter ID measures as "the complaints of ghetto grandmothers who didn't have birth certificates." Doc. No. [39-10], at 22.

458. In 2014, DeKalb County representative Fran Millar criticized Sunday voting near "several large African American mega churches," stating that he "would prefer more educated voters than a greater increase in the number of voters." Doc. No. [39-10], at 22.

459. In 2016, Douglas County Commissioner Tom Worthan, facing a Black female opponent, said that governments run by Black officials "bankrupt you," and that if a Black candidate were elected, he was "afraid he'd put a bunch of blacks in leadership positions" that "they're not qualified to be in." Doc. No. [39-8], at 32.

460.  State Senator Michael Williams, a former Forsyth County legislator who ran for Governor in 2018, toured the state in a "deportation bus" and pledged to "put [illegal immigrants] on this bus and send them home." Williams also campaigned on protecting sculptures of Confederate soldiers at Stone Mountain. Doc. No. [39-10], at 22–23.

461.  In 2018, a robo-call labelled Governor candidate Stacey Abrams as the "Negress Stacey Abrams" and "a poor man's Aunt Jemima." Doc. No. [39-8], at 29. As Dr. Jones explained, this language invokes images of slavery and is an attack on Abrams's qualifications and electability. Feb. 10 Tr. 178:9-179:7 (Dr. Jones) ("[T]his is a Robo call that's going out to members of the public and it's using language that invokes slavery...and slaves are considered lowly, problematic, arguably dangerous...Aunt Jemima actually has an image of a slave...which is very familiar to people...It casts Stacey Abrams also as slavish...it attacks her – the quality of her campaign, of her qualifications to run for governor...which, of course, can decrease a person's feeling that Stacey Abrams is arguably electable and they will take her seriously as a candidate in this election.").

462.  In 2018, after photos surfaced of members of the New Black Panther Party marching in support of Abrams, Brian Kemp posted the photos on social media channels with the caption "How radical is my opponent? Just look at who is backing her campaign for governor," and urging followers to "RT[re-tweet] if you think Abrams is TOO EXTREME for Georgia!" Doc. No. [39-8], at 29–30. As Dr. Jones explained in detailed testimony, this was an attempt to cast Abrams as violent and dangerous. Feb. 10 Tr. 182:5-183:4 (Dr. Jones) ("[New Black Panther Party is] a virulently racist and anti-Semitic organization which leaders have encouraged violence against Jews and law enforcement officers . . . it's plainly stating that [Abrams'] campaign is a threat to the state.").

463.  In a Facebook advertisement sponsored by then-Senator Kelly Loeffler's campaign, Rev. Raphael Warnock's skin color was artificially darkened. Doc. No. [39-8], at 30. As Dr. Jones explained, the darkening of Warnock's skin color made him look more menacing

and less electable. Feb. 10 Tr. 176:16-177:19 (Dr. Jones) ("[T]his conveys . . . that Raphael Warnock is unelectable, dangerous . . . someone who should be of concern to voters, and they should not vote for him."). Loeffler's campaign spent ten times as much money on the ads in which Warnock appeared darker than on the ads with Warnock's actual complexion. Doc. No. [39-8], at 30.

464.   Another racially charged advertisement sponsored by the Loeffler campaign featured white children in school—stating Save the Senate Save America on top—juxtaposed with Warnock's image on top of footage of protests against police violence. Doc. No. [39-8], at 30–31; Feb. 10 Tr. 179:12-181:24. Dr. Jones explained in detail how this advertisement cast Warnock as dangerous and problematic. Feb. 10 Tr. 180:14–15 ("So [Warnock] is a dark menacing Black man who is being . . . associated with gangster and thuggism.").

465.   The Court finds that these are just a few examples of many other political campaign ads that use racial appeals and represent a political environment in which racial appeals are pervasive. See Doc. No. [39-8], at 30–31 (describing additional examples).

466.   The Court finds that even racial appeals by unsuccessful candidates weigh toward vote dilution. As Dr. Jones explained, racial appeals are relevant even if the candidate using them eventually lost the election because it shows that the candidate thought the appeals to racism would work in Georgia. Feb. 10 Tr. 183:23-184:10 (Dr. Jones).

**G.   Senate Factor Seven: Black Georgians Are Significantly Underrepresented in Elected Office.**

467.   The seventh Senate Factor is "the extent to which members of the minority group have been elected to public office in the jurisdiction." Gingles, 478 U.S. at 37.

468.   Black people in Georgia remain underrepresented in public office, particularly in the elected offices and areas at issue in this litigation. Doc. No. [39-8], at 32–35.

469.    In its entire history as a state, Georgia has sent only twelve Black members to Congress—eleven to the House of Representatives, and one, current Senator Raphael Warnock, to the Senate. Doc. No. [39-8], at 33. Since 1965, only 3.28% of Georgia's total seats in Congress have been occupied by Black officials. Doc. No. [39-8], at 33; Feb. 10 Tr. 184:17–21.

470.    At the state level, only two Black people have been elected to non-judicial statewide office in Georgia, and Georgia has never had a Black governor or lieutenant governor. Doc. No. [39-8], at 33; Feb. 10 Tr. 184:24-185:1 (Dr. Jones).

471.    Black citizens are also underrepresented in Georgia's General Assembly. As of 2021, Black Senators make up 28.88% of the State Senate, and 28.57% of the State House. Doc. No. [39-8], at 33. With Georgia now 33% Black, this means that Black Georgians are underrepresented in the State House by the equivalent of more than seven State House seats, and several State Senate seats. Doc. No. [39-8], at 33–34.

472.    Black candidates who are elected to the General Assembly in 2020, all were elected in districts where the percentage of registered voters who are white is under 54.9%, with the vast majority elected from districts where the percentage of registered voters who are white is under 40%. Doc. No. [39-8], at 33–34.

473.    The lack of Black representation in the Georgia General Assembly is starkly evident in the districts at issue in this case. Enacted districts in the areas at issue in this case are made up of primarily geographical areas that have not elected a Black candidate to the General Assembly over at least the last 15 years. Doc. No. [39-8], at 35; Feb. 10 Tr. 185:17-187:12 (Dr. Jones). This includes House Districts 133, 134, 149, 171, 173, 74, 117, and 124, and Senate Districts 16, 17, and 23. Doc. No. [39-8], at 35–39. And only very small portions of the remaining districts—House Districts and Senate Districts—have had limited Black representation in the General Assembly over the last fifteen years. Doc. No. [39-8], at 35–39.

**H.    Senate Factor Eight: Georgia is Unresponsive to the Needs of Black Georgians**

474.    The eighth Senate Factor is "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." <u>Gingles,</u> 478 U.S. at 37.

475.    Elected officials in Georgia have routinely ignored or failed to respond to the particularized needs of the Black community. Doc. No. [39-9], at 29.

476.    The longstanding and persistent gaps in socioeconomic status, education, residential conditions, involvement with the criminal justice system, and health outcomes between white and Black Georgians, <u>see</u> <u>supra</u> Part V.E., demonstrate the lack of responsiveness of Georgia's public officials to the particularized needs of the Black community. Doc. No. [39-9], at 29.

477.    While persistent test score gaps and educational segregation continue to pose problems for Georgia's Black students, the State ranks 43rd in per pupil expenditures for public and elementary schools. Doc. No. [39-9], at 29.

478.    Black Georgians have worse health outcomes and are less likely to have health insurance, yet the State has not accepted the federal Medicaid expansion. Doc. No. [39-9], at 29.

479.    In yet another example of elected officials' failure to consider Black Georgians' particularized needs, the Georgia Legislature passed S.B. 202 in March 2021. S.B. 202 instituted, among other things, changes to election administration in counties with large Black communities. Doc. No. [39-8], at 27–28. It was unanimously decried by civil rights groups, civic institutions serving the Black community, and political leaders of the Black community as an unwarranted burden on the right to vote that will disproportionately fall upon Black voters. Doc. No. [39-8], at 27–28.

480.   As Director Sherman Lofton, Jr., stated "Black voters in Georgia could exert more political pressure on our state government to address systemic inequality and continuing discrimination in these areas . . . ." Doc. No. [70-2], at 5, ¶ 11.

481.   Black Georgians are also on average less satisfied with their public officials, policy outcomes, and the public services they receive than are white Georgians. Doc. No. [39-9], at 29.

I.     **Senate Factor Nine: Defendant's Justifications are Tenuous**

482.   The ninth Senate Factor is "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." Gingles, 478 U.S. at 37.

483.   There is no substantial justification for Georgia's failure to draw additional majority-minority districts that could have been drawn using the 2020 Census data.

484.   The General Assembly instead drew new maps intending only to maintain existing majority-minority districts. The State admitted that "ultimately we have maps that are...similar to the plans that existed previously." Feb. 14 Tr. 153:14–16. When discussing the justification for the makeup of the proposed districts, the chair of the Senate committee who drew the Enacted Senate Map described several Black-majority districts as "Voting Rights Act district[s]" and stated that if a district was previously a "Voting Rights Act district," then they "maintained it" as a Voting Rights Act district. November 4, 2021 Meeting of Senate Committee on Reapportionment & Redistricting, Hearing on S.B. 1EX, 2021 Leg., 1st Special Sess. (2021) (statement of Senator John F. Kennedy, Chairman, S. Comm. Reapp. & Redis. at 30:17–30:28; 31:57–32:12; 35:42–36:31; 36:59–37:09; 37:45–37:59; 38:10–

38:40;                                          42:06–42:18),
https://www.youtube.com/watch?v=RhQ7ua0db9U.67

485. Georgia provided no real opportunity for Georgia's Black voters to meaningfully raise concerns with the new maps. Every town hall meeting convened by the State was held before the August 2021 release of the key Census data that Georgia used to draw the new maps, and several months before the maps were released to the public. Doc. No. [94], at 6, ¶¶ 43-44, 47. Then, the State rushed through the legislative process and passed the new Senate and House maps in less than two weeks after they were first released to the public. Doc. No. [94], at 6–7, ¶¶ 47, 56. Not a single Black legislator voted in favor of the new maps. Doc. No. [94], at 7, ¶ 57.

## VI.   Remedies

### A.   Plaintiffs Will Suffer Irreparable Harm Absent Relief

486. Plaintiffs are individual voters and organizations made up of voters who live in House and Senate districts that are not majority Black under Georgia's enacted maps, but who would live in majority Black house and senate districts under Plaintiffs' illustrative plans. Doc. No. [94], at 2–5, ¶¶ 6, 19, 25, 30, 35.

487. Because the enacted House and Senate districts in which Plaintiffs live are not majority Black and voting in their House and Senate districts is racially polarized, Plaintiffs will not be able to elect candidates of their choice. See supra Parts III, IV.

488. The enacted maps "directly affect [the] AME Church's advocacy efforts by undermining the ability of Black Georgians, including the

---

7   A video recording of the November 4, 2021 Meeting of Senate Committee on Reapportionment & Redistricting was previously accessible, but is inexplicably no longer accessible, at A16. See Alpha Exhibit A16, Doc. No. 70, at 2. Plaintiffs found the same video recording that the Georgia State Senate published on a different website and cited to the working link. Plaintiffs however acknowledge that the link to the YouTube video recording was not admitted into evidence.

Church's members, to elect representatives of their choice." Doc. No. [70-1], at 7, ¶ 14. Furthermore, the "AME Church will be forced to divert resources from its broader voter registration and community empowerment initiatives to areas where Black voting strength has been unlawfully watered down in order to protect the representation and interests of its members." Id. ¶ 15.

489.   If remedial maps, like Plaintiffs' remedial maps, are not implemented ahead of the 2022 election "Alpha Phi Alpha will be forced to divert resources from its voter education and registration programming to the affected districts in order to protect the representation and interests of its members in the community." Doc. No. [70-2], at 7, ¶ 17.

490.   The Court finds that there is no relief that the Court could provide to Plaintiffs to remedy the harm to them of proceeding under the state's enacted maps in the upcoming 2022 elections. That is to say that the harm is, by definition, irreparable once an election goes forward under the enacted plans.

**B.   The Court Can Craft Relief That Does Not Result In Significant Hardship to the State**

491.   The Court finds that much of the hardship that would result from granting Plaintiffs' requested relief would be mitigated by moving the currently scheduled May 24, 2022 primary election to July 26, 2022, and implementing a remedial plan that causes the least changes to the currently enacted plan.

492.   Since 2000, Georgia general primary elections have been held as early as May 20 and as late as August 20. See Doc. No. [101], at 3–4. During that same time period, Georgia general primary runoff elections have been held as early as July 22 and as late as September 10. See id.

   a.   In 2000, the general primary election was held on July 18 and the general primary runoff election was held on August 8. See id. at 3.

b.  In 2002, the general primary election was held on August 20 and the general primary runoff election was held on September 10. See id.

c.  In 2004, the general primary election was held on July 20 and the general primary runoff election was held on August 10. See id.

d.  In 2006, the general primary election was held on July 18 and the general primary runoff election was held on August 8. See id.

e.  In 2008, the general primary election was held on July 15 and the general primary runoff election was held on August 5. See id.

f.  In 2010, the general primary election was held on July 20 and the general primary runoff election was held on August 10. See id.

g.  In 2012, the general primary election was held on July 31 and the general primary runoff election was held on August 21. See id.

h.  In 2014, the general primary election was held on May 20 and the general primary runoff election was held on July 22. See id.

i.  In 2016, the general primary election was held on May 24 and the general primary runoff election was held on July 26. See id.

j.  In 2018, the general primary election was held on May 22 and the general primary runoff election was held on July 24. See id. at 4.

k.  In 2020, the general primary election was held on June 9 and the general primary runoff election was held on August 11. See id.

493.    As these dates indicate and as testimony by multiple witnesses confirmed, until recently Georgia held its post-redistricting primary elections later in the year than currently scheduled for this year. <u>See</u> (Feb. 9, 2022 Morning Tr.), Feb. 9 Tr. 12:3–7 (Lynn Bailey); Feb. 9 Tr. 110:15–18 (Nancy Boren).

494.    Georgia has moved a number of elections and election-related deadlines in the last decade.

    a.    In 2012, this Court ordered Georgia to extend the ballot receipt deadline for any federal primary runoff election by seven days in order to allow adequate time for absent uniformed services voters and overseas voters to vote by absentee ballot. <u>United States v. Georgia</u>, 892 F. Supp. 2d 1367, 1369, 1378 (N.D. Ga. 2012) (extending deadline for receipt of UOCAVA ballots for August 21, 2012 primary). The 2012 Georgia elections were timely held. <u>See</u> Ga. Sec'y of State, Georgia Election Results, https://sos.ga.gov/elections/election_results/.

    b.    In 2017, another judge in the Northern District of Georgia extended the voter registration deadline for a special runoff election from March 20 to "no earlier than May 21." <u>Ga. State Conf. of the NAACP v. Georgia</u>, No. 1:17-cv-1397-TBC, 2017 WL 9435558, at *6 (N.D. Ga. May 4, 2017). The 2017 special runoff election was timely held. <u>See</u> Ga. Sec'y of State, Current and Past Election Results, https://sos.ga.gov/index.php/Elections/current_and_past_elections_results.

    c.    In 2020, the Georgia primary election was postponed twice due to the COVID-19 pandemic, ultimately moving from May 19 to June 9. <u>See</u> Feb. 9 Tr. 27:9 (Ms. Bailey); Feb. 9 Tr. 89:2–90:1 (Richard Barron). Although that created additional work for Georgia election officials, they "got the job done," Feb. 9 Tr. 27:10–16 (Ms. Bailey), and the 2020 primaries, runoffs, and general elections were timely held, <u>see</u> Ga. Sec'y of State, Current and Past Election Results,

https://sos.ga.gov/index.php/Elections/current_and_past_e lections_results.

495.    As part of the redistricting process following the 2010 census, the Georgia Assembly passed adjustments to the State House map on February 23, 2012. <u>See</u> HB 829, Ga. Gen. Assembly, https://www.legis.ga.gov/legislation/35433. The general primary was still timely held on July 31. <u>See</u> Doc. No. [101], at 3.

496.    The testimony of all of the election officials confirmed that additional time to administer the 2022 election would not create hardship, but would instead benefit the administration of the election. <u>See</u> Feb. 8 Tr. 77:17 (Michael Barnes: "We could use as much time as we can be granted, yes, sir."); Feb. 9 Tr. 40:20–23 (Ms. Bailey: "[T]his is the calendar that we have. It is a calendar with which I have never been completely comfortable in light of the fact that we have redistricting going on at the same time as these major elections."); Feb. 9 Tr. 112:3, 15–16 (Ms. Boren) ("Additional time is always a good thing to have. . . . The additional time would give us time to cross our T's and dot our I's."); Feb. 9 Tr. 123:1–4 (The Court: "And so as an example, if the primary election were pushed back to the date when the runoff election is currently scheduled, would you feel confident in your ability to prepare?" Ms. Boren: "Yes, I would feel more confident.").

497.    Reflecting that same concern, the Georgia Voter Registration Election Officials Association (GAVREO) sent a resolution to the Governor prior to the special session asking him to consider changing the election calendar, pushing the primary back to late June. <u>See</u> Feb. 9 Tr. 54:9–15 (Ms. Bailey); <u>Grant</u> Ex. 68 (GAVREO Resolution).

498.    The GAVREO resolution was passed on August 30, 2021. <u>See</u> <u>Grant</u> Ex. 68. This was before Governor Kemp called for a November special session of the Georgia General Assembly on September 23, 2021. <u>See</u> Mark Niesse, Kemp Calls Special Session to Redraw Georgia's Political Maps, Atlanta J.-Const. (Sept. 23, 2021), https://www.ajc.com/politics/kemp-calls-special-session-to- redraw-georgias-political-

maps/KHTZEBR2W5CMPOZVC3JJFV26OY/ (reporting on Governor Kemp's call for a special session).

499. Georgia's election officials are experienced in dealing with moving district lines. In Muscogee County, for example, the school board lines were just redrawn after the Legislative Reapportionment office rejected the initial set of districts. See Feb. 9 Tr. 107:2-108:4 (Ms. Boren). The county elections office only received the new district lines on Monday, February 7. See Feb. 9 Tr. 107:4–6 (Ms. Boren). But Nancy Boren, the Director of Elections and Voter Registration in Muscogee County, was confident the election could move forward as scheduled. See Feb. 9 Tr. 107:7–10 (Ms. Boren).

500. Plaintiffs' experts have also drawn illustrative maps showing that it is possible to leave a large proportion of legislative districts in the State Senate and House unchanged from the State's Plans while still drawing additional majority Black districts. Mr. Esselstyn's plan left the State Senate map unchanged in 90 counties, and the State House map unchanged in 119 counties—meaning the majority of counties would have no additional redistricting work to do. See Feb. 8 Tr. 120:24–121:8 (Mr. Esselstyn).

501. And as demonstrated by Amici Curiae Fair Districts GA and the Election Law Clinic at Harvard Law School, thousands of Senate and House plans can be drawn that both include the same number of majority-BVAP districts as in Mr. Cooper's plan and keep significant proportions of voters in their existing districts. For purposes of Amici's analysis, 48% of Senate districts and 57% of House districts were kept exactly as drawn in the State's plans. Doc. No. [90-1], at 14.

502. Richard Barron, Director of Elections and Voter Registration for Fulton County, testified that if the state legislative maps were redrawn, it would take his staff two to three weeks to update the street segments. See Feb. 9 Tr. 84:5–10.

503. If the state legislative maps are redrawn, elections officials will not need to re-enter local data; instead, they can rely on the work they have already done there. See Feb. 9 Tr. 44:17–25 (Ms. Bailey).

504.   The election officials who testified also said that, in those counties unaffected by any changes in State House and Senate district lines, no additional work would be necessary. <u>See</u> Feb. 8 Tr. 85:11–15 (Mr. Barnes); Feb. 9 Tr. 62:18–23 (Ms. Bailey); Feb. 9 Tr. 84:15-19 (Mr. Barron).

505.   Counties in Georgia have the ability to hire temporary workers to staff up if needed, as they did during the 2020 recounts. <u>See</u> Feb. 9 Tr. 27:24-28:6 (Ms. Bailey).

506.   The February 18 deadline to update street segments in ElectioNet is not a statutory deadline, but is instead a deadline imposed by the Secretary of State and which some counties are not expected to meet. <u>See</u> Feb. 9 Tr. 34:17–24 (Ms. Bailey).

507.   The street segments do not need to be updated in ElectioNet to proceed with candidate qualifying from March 7 to March 11. <u>See</u> Feb. 9 Tr. 57:6–13 (Ms. Bailey).

508.   All of the election officials testified that, if the dates for the 2022 elections were moved, they would be able to successfully administer the elections. <u>See</u> Feb. 8 Tr. 86:9–10 (Mr. Barnes: "If dates are moved, dates are moved, and then we start – then we work within those dates."); Feb. 9 Tr. 47:12–13 (Ms. Bailey: "I think that from the election official's perspective, that we could likely make – that we could make that work, of course."); Feb. 9 Tr. 91:9–11 (Mr. Barron: "Yeah, in our job we have a lot of – really, when you administer elections, you have to be able to adapt to all sorts of different timelines that may occur or, you know, various things.").

509.   Indeed, the elections officials who provided testimony all have recent experiences managing shifting Georgia voting deadlines, which were all successfully managed. <u>See</u> Feb. 8 Tr. 99:18–24 (Mr. Barnes: "As I said earlier, just two years ago, election dates were moved because of pandemic circumstances. We have – the legislature has moved election dates in the past. I believe there have been court-issued changes into the elections calendar, so the election calendar seems to always be in some type of flux based upon whatever circumstances

93

we're dealing with at the time."); Feb. 9 Tr. 89:24-90:1 (Mr. Barron: "In 2020, in March, the presidential preference primary was moved to – it was combined with the May general primary, and then that election was moved from May to June.").

510. If some deadlines are shifted until later in the calendar, a corresponding change in other deadlines would help to ameliorate concerns about the tightness of the timeline. For example, Lynn Bailey testified that "if we're going to change the qualifying period, then it would be helpful to, likewise, change the election date." Feb. 9 Tr. 8:14–16.

511. The State did not present evidence of any significant monetary costs associated with changing the election calendar in the manner proposed by Plaintiffs.

512. Election officials expressed some concern about having to find new polling places if the dates of the election were changed. But this Court has not yet set new election dates, and the State did not present any evidence that these concerns would materialize. See Feb. 9 Tr. 76:2–5 (Ms. Bailey).

513. Moreover, evidence was presented that it would be easier to find schools able to serve as polling places during summer vacation. Feb. 9 Tr. 67:15–23 (Ms. Bailey); Feb. 9 Tr. 89:7–9 (Mr. Barron: "You know, for schools that's going to be easier because it's easier for them, too, if we vote when there is no school in session."). In fact, that was one of the reasons the Georgia Association of Voter Registrars and Election Officials supported moving the primary elections to the summer. Feb. 9 Tr. 67:9–11 (Ms. Bailey) ("That takes me back to the resolution that the association was in support of, for that very reason to make more polling locations accessible."); see also Grant Ex. 68 (GAVREO Resolution) ("Whereas, election administrators in this Association attest that the late May general primary date has been very challenging since 2014, because schools are still in session and graduations or assemblies are being conducted in large public spaces that are desirable as polling places").

514.    Testimony was also presented that government buildings and churches used as polling places were generally cooperative with changing election dates. Feb. 9 Tr. 89:9–11 (Mr. Barron: "The government buildings, it's easy to move the dates for those. And most of the churches that we use, those are available on Tuesdays. We usually try to get polling places reserved at the beginning of a calendar year and let them know what the dates are. But in 2020 we did have to change dates two different times on polling places.").

515.    Bishop Reginald Jackson of the AME Church testified that, while a number of AME churches are already serving as polling locations, he had previously offered the Secretary of State additional church locations for polling places, and he had no doubt that adequate locations would be available, even if election dates were moved. Feb. 9 Tr. 131:24–132:6, 135:6–9.

516.    The State cited the June 2020 primary to argue that moving the primary election would result in the loss of available polling locations. However, Mr. Barron noted that a vast majority of the polling places in Fulton County that could not be used for the June 2020 primary election became unavailable because of COVID-related concerns, not because of scheduling issues. Feb. 9 Tr. 95:12–13 ("Well, we lost 44 -- 44 of the 45 of the polling places that we lost were due to COVID, for COVID reasons").

517.    The Court also finds that the limited changes that must be made to the election calendar will not cause undue confusion among voters. There is ample time and opportunity to communicate any changes to the State House and Senate district lines to voters—both by the State and by interested community groups.

518.    Counties will communicate any changes related to House and Senate districts. Mr. Barron testified that counties are required to mail notices that provide information about changes in polling places. Feb. 9 Tr. 100:4–5 ("[I]n addition, we have to mail out precinct cards to voters as polling places changed.").

519.    Fulton County also sends mailings with information about early voting sites, Election day precinct sites, and absentee ballot information. Feb. 9 Tr. 100:5–9 (Mr. Barron: "We also do head of household mailings that list all the early voting sites, the Election Day site for that precinct, as well as how to vote absentee by mail. So that goes out to all of the households in Fulton County.")

520.    Candidates provide information to voters about changes related to elections. Feb. 9 Tr. 100:9-10 (Mr. Barron: "Candidates do a pretty good job of publicizing things."); Feb. 10 Tr. 150:3–13 (Mr. Carter: "You know if people are running against each other or five people are running in a primary and you move the date, all that has to happen is you have got to make sure that the voters, again, has the focus, get educated about when the date and at this point in this state, there is so much voter communication going on from candidates, from other organizations. I mean the voter communication infrastructure with everything else is enormous, and I think there's no doubt that, you know -- that the key is are the voters going to get educated about that. And the answer is definitely.")

521.    The Secretary of State's office publicizes election-related changes. Feb. 9 Tr. 100:10–12 (Mr. Barron: "Secretary of State's office also publicizes. They publicized a lot of the changes in 2020 to the election dates as well. Social media.")

522.    Community groups help communicate changes related to elections to voters. For example, the AME Church operates a robust voter education program which would help ameliorate any voter confusion that resulted from any changes made to House and Senate district lines. See Feb. 9 Tr. 134:14–22 (Bishop Jackson: "You know, I think our congregants are intelligent. They stay abreast of what's going on. If, in fact, the maps were changed, they would be aware of it. One of the things we do through Operation Voter Turnout, again, is voter education. So through our Operation Voter Turnout every local church, ever local AME church would be notified of the changes, how it would impact them. From my experience, dealing with Georgia, I don't think that would be confusion or a problem.")

96

523.    The State argues that any change in districting, or to the election schedule, will undermine voter confidence because mistakes may be made in the election.

524.    On the other hand, several witnesses testified to the confusion and loss of confidence that would occur if this Court concluded that the enacted plans violate the Voting Rights Act yet permitted elections under those unlawful Plans to proceed. See Feb. 9 Tr. 91:1–5, 101:1–3 (Mr. Barron); 136:23-25-137:1-4 (Bishop Jackson: "Because, in fact, the depending upon how these maps are drawn, if they are drawn in a way where, say, Blacks, AMEs where our votes, our voting power is diminished, our voting influence is undermined, that's a problem. And that's something that -- to get our attention, deserve our attention, and require us to seek to mediate it."); Feb. 10 Tr. 151:10–12 (Mr. Carter: "If you tell voters they are barely in a district that will not respect their interest or that they don't have the same voice, I don't how to remedy that after the fact.").

525.    The State has presented no evidence rebutting the testimony on these effects of proceeding under an unlawful map.

526.    This Court concludes that the risk of voter confusion and loss of confidence from an election held under illegal maps is serious and far greater than the effect of changes in election-related deadlines.

527.    Furthermore, with respect to voter confusion, this Court finds that because of the decennial redistricting process, voters do not yet know their precincts, candidates, or possibly even their districts; and voters will not know that information until they receive precinct cards from the Secretary of State's office. See Feb. 9 Tr. 10:13–23 (Ms. Bailey). The earliest those precinct cards could be sent would be after the Secretary of State's February 18, 2022, deadline for counties to provide their street level data, and some counties will miss that deadline. Feb. 9 Tr. 34:17–23 (Ms. Bailey); Feb. 8 Tr. 98:19-99:2 (Mr. Barnes).

528.    Any inconvenience to candidates would likewise be far outweighed by the harm to Georgia's Black voters of being forced to vote under legislative maps that violate the Voting Rights Act. As Jason Carter,

97

former State Senator and Democratic Nominee for Governor explained when asked if candidates would be inconvenienced if the district lines were to change: "As a candidate, I don't have any right to a district. It's not my district. It's the voter's district. . . . It's the voters that matter and whether they have got the right district." Feb. 10 Tr. 149:8–10, 20–22.

529.   The Court thus finds that the changes would be feasible before the general election in November without significant cost, confusion, or hardship.

## PROPOSED CONCLUSIONS OF LAW

### VII.   Jurisdiction Is Proper

530.   Jurisdiction in this court is proper. The Court previously determined that the text, legislative history, and cases interpreting § 2284(a) confirmed that a three-judge panel was not required in this case. Doc. No. [65].

531.   Jurisdiction in this court is proper because Plaintiffs have standing. Each of the individual Plaintiffs is a resident in an underrepresented district. As such, each plaintiff has "suffered the personal harm of having their voting strength diluted on account of their race." Rose v. Raffensperger, 511 F. Supp. 3d 1340, 1351–52 (N.D. Ga. 2021).

532.   The organizational plaintiffs have standing because each has members who would otherwise have standing to sue in their own right; they seek to protect interests are germane to the organization's purpose; and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977).

### VIII.   Plaintiffs Have a Private Right of Action

533.   Section 2 affords a private right of action to plaintiffs.

534.   This Court previously concluded that lower courts have treated the question of whether the VRA furnishes an implied right of action

under Section 2 as an open question. However, it acknowledged the recent trend of lower courts answering the open question in the affirmative. Doc. No. [65], at 33.

535.   This Court found these decisions to be persuasive. Doc. No. [65], at 33.

536.   This Court also drew guidance from the Supreme Court's opinion in Morse v. Republican Party of Virginia, 517 U.S. 186, 232 (1996), in which the Supreme Court stated: "Although § 2, like § 5, provides no right to sue on its face, 'the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965.'" Id. (citing S. Rep. No. 97–417, at 30); Doc. No. [65], at 33.

537.   This Court reasoned that the Supreme Court's precedent permits no other holding than one finding that Section 2 provides a private right of action. Doc. No. [65], at 34.

538.   Recent decisions to the contrary do not call this ruling into question.

539.   The district court in Arkansas State Conf. of NAACP v. Arkansas Board of Apportionment, No. 4:21-cv-01239 (D. Ark. Feb. 17, 2022), ruled that cases under Section 2 may only be brought by the Attorney General of the United States. Arkansas State Conf. of NAACP, Doc. No. [100].

540.   The court based its conclusion on reasoning that there is no express private right of action and judicially-inferred private rights of action are disfavored per Alexander v. Sandoval, 532 U.S. 275 (2001). Arkansas State Conf. of NAACP, Doc. No. [100].

541.   The court in Arkansas State Conf. of NAACP disregarded Morse, concluding that its "approach to the private-right-of-action analysis does not survive Sandoval and its progeny." Arkansas State Conf. of NAACP, Doc. No. [100], at 27.

542.   In sum, the Arkansas State Conf. of NAACP district court concluded that "[u]nder the current Supreme Court framework, it would be

inappropriate to imply a private right of action to enforce § 2 of the Voting Rights Act." Doc. No. [100], at 30.

543. However, the decision in Arkansas State Conf. of NAACP is contrary to the weight of authority finding that Section 2 does afford plaintiffs a right of action under Section 2 of the Voting Rights Act.

544. Moreover, it is not clear that Alexander v. Sandoval's holding operates retroactively to override Congress's understanding of Section 2 of the VRA at the time it was enacted. Certainly, the Supreme Court itself has not said so.

545. As a trial court, the views of the Arkansas State Conf. of NAACP court on the breadth of Alexander v. Sandoval are not binding authority on any court, let alone this one.

546. Accordingly, the Court should not reconsider its well-reasoned opinion based on an outlier decision from another district court.

## IX. The Preliminary Injunction Standards Have Been Satisfied

### A. Plaintiffs Are Likely to Succeed on the Merits

547. The Court concludes that Plaintiffs are substantially likely to succeed on the merits of their Section 2 claim in each of the challenged districts.

548. Section 2 of the VRA renders unlawful any state "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a); see also Thornburg v. Gingles, 478 U.S. 30, 36 (1986).

549. Dilution of a minority community's voting strength violates Section 2 if, under the totality of the circumstances, the "political processes leading to nomination or election in the State . . . are not equally open to participation by members of [a racial minority group], . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect

representatives of their choice." 52 U.S.C. § 10301(b); see also Gingles, 478 U.S. at 36.

550. "Dilution of racial minority group voting strength" in violation of Section 2 "may be caused by the dispersal of blacks into district in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." Gingles, 478 U.S. at 46 n.11.

551. A Section 2 claim has two components. First, Plaintiffs must satisfy the three preconditions set forth in Thornburg v. Gingles, 478 U.S. 30 (1986), by demonstrating that: (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district" (Gingles 1); (2) the minority group is "politically cohesive" (Gingles 2); and (3) the majority votes "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate" (Gingles 3). League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 425 (2006) ("LULAC") (quoting Gingles, 478 U.S. at 50-51). Second, Plaintiffs must, under the totality of circumstances, demonstrate that the challenged districting scheme results in the abridgment of their right to participate in politics on equal terms. See Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 775 F.3d 1336, 1342 (11th Cir. 2015) ("Fayette"); see 52 U.S.C. § 10301(b).

552. These requirements have been in place and applied by the courts in vote dilution claims, including statewide redistricting claims, for decades. See, e.g., Gingles, 478 U.S. at 48-51; LULAC, 548 U.S. at 425; Rose v. Raffensperger, 511 F. Supp. 3d 1340, 1349 (N.D. Ga. 2021).

553. Plaintiffs have clearly demonstrated a likelihood of success in meeting these requirements.

### i.   Gingles 1: Plaintiffs are substantially likely to succeed in setting forth the first element of the Gingles test

### 1.   General Legal Standard

554. To meet the first Gingles precondition, Plaintiffs must show that the Black population in a given area is "sufficiently large and

geographically compact" to comprise a majority of the voting-age population in one more additional Senate or House districts. <u>Gingles</u>, 478 U.S. at 50–51; <u>see also</u> <u>LULAC</u>, 548 U.S. at 402 ("In a district line-drawing challenge, 'the first <u>Gingles</u> condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice.'").

555.   The <u>Gingles</u> 1 showing is typically accomplished through an illustrative map demonstrating that one or more additional Black-majority districts can be drawn in the area or areas of focus. <u>Wright v. Sumter Cnty. Bd. of Elections & Registration</u>, 979 F.3d 1282, 1304 (11th Cir. 2020) (challenged map had two Black-majority districts, while plaintiff's illustrative map featured three); <u>Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs</u>, 118 F. Supp. 3d 1338, 1343 (N.D. Ga. 2015) (granting preliminary injunction when illustrative map included additional majority-minority district); <u>see also, e.g.</u>, <u>Fairley v. Hattiesburg</u>, 584 F.3d 660, 669 (5th Cir. 2009).

556.   However, such maps are only illustrative. In the event that a challenged map is determined to be unlawful or likely unlawful, the legislature (here, the Georgia General Assembly) "will be given the first opportunity to develop a remedial plan." <u>Clark v. Calhoun County</u>, 21 F.3d 92, 95 (5th Cir. 1994) ("[P]laintiffs' proposed district is not cast in stone. It was simply presented to demonstrate that a majority-black district is feasible in [the] county."). After all, "it is a fundamental tenet of voting rights law that, time permitting, a federal court should defer in the first instance to an affected state's or city's choice among legally permissible remedies." <u>Uno v. City of Holyoke</u>, 72 F.3d 973, 992 (1st Cir. 1995); <u>see also</u> <u>McDaniel v. Sanchez</u>, 452 U.S. 130, 150 n.30 (1981). Accordingly, "neither the plaintiff nor the court is bound by the precise lines drawn in these illustrative redistricting maps." <u>Luna v. County of Kern</u>, 291 F. Supp. 3d 1088, 1106 (E.D. Cal. 2018); <u>see also</u> <u>Chen v. City of Houston</u>, 206 F.3d 502, 519 (5th Cir. 2000) ("[T]here is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles.").

557.     The "ultimate end of the first <u>Gingles</u> precondition is to prove that a solution is possible, and not necessarily to present the final solution to the problem." <u>Bone Shirt v. Hazeltine</u>, 461 F.3d 1011, 1019 (8th Cir. 2006); <u>accord</u> <u>Davis v. Chiles</u>, 139 F.3d 1414, 1425 (11th Cir. 1998) (remedy must be "possible"); <u>see also, e.g.</u>, <u>Holloway v. City of Virginia Beach</u>, 531 F. Supp. 3d 1015, 1059 (E.D. Va. 2021). An illustrative map thus need "only show that a remedy may be feasibly developed." <u>Luna</u>, 291 F. Supp. 3d at 1106; <u>accord</u> <u>Nipper v. Smith</u>, 39 F.3d 1494, 1530–31 (11th Cir. 1994) (en banc) (Tjoflat, C.J., joined by one judge) (plaintiff must show a remedy is "permissible" and "feasible"); <u>S. Christian Leadership Conf. of Ala. v. Sessions</u> ("SCLC"), 56 F.3d 1281, 1289 (11th Cir. 1995) ("[P]laintiffs must show that an appropriate remedy can be fashioned."). A plaintiff does <u>not</u> need to come forward with "proof that a perfectly harmonized districting plan can be created." <u>Montes v. City of Yakima</u>, 40 F. Supp. 3d 1377, 1399 (E.D. Wash. 2014). "Indeed, conditioning a § 2 plaintiff's right to relief upon his or her ability to create a letter-perfect districting plan would put the cart before the horse." <u>Id.</u>

558.     Because the ultimate question in the <u>Gingles</u> 1 analysis is whether the minority population in a particular area is sufficiently numerous and compact to form a majority in a single-member district, courts appropriately analyze whether <u>Gingles</u> has been satisfied, and liability established, on a district-by-district basis. <u>See, e.g.</u>, <u>Perez v. Abbott</u>, 250 F. Supp. 3d 123, 143 (W.D. Tex. 2017) (conducting district-by-district analysis of Texas state legislative districts and determining that Section 2 liability was established as to some but not others).

559.     With respect to numerosity, a bright-line 50% plus one rule applies in assessing whether the minority population is "sufficiently large" for purposes of <u>Gingles</u> 1. <u>Bartlett v. Strickland</u>, 556 U.S. 1, 12 (2009) (plurality opinion) (internal quotations omitted).

560.     It is appropriate to use the "any-part Black voting age percentage" or "AP Black" metric in assessing whether such districts can be drawn. <u>See, e.g.</u>, <u>Wright v. Sumter Cnty. Bd. of Elections & Registration</u>, 979 F.3d 1282, 1291 (11th Cir. 2020); <u>see also</u> <u>Georgia v. Ashcroft</u>, 539 U.S.

461, 473 n.1 (2003) (approving of the use of AP Black metric). Notably, Defendant has not contested the use of this metric.

561.   With respect to the compactness of the minority population, for <u>Gingles</u> 1 purposes, compactness "refers to the compactness of the minority population, not to the compactness of the contested district." <u>LULAC</u>, 548 U.S. at 443. "While no precise rule has emerged governing § 2 compactness, the inquiry should take into account traditional redistricting principles such as maintaining communities of interest and traditional boundaries." <u>Id.</u> (internal quotation marks omitted).

562.   Thus, to meet <u>Gingles</u> 1, each illustrative new Black-majority district must be designed "consistent with traditional districting principles." <u>Davis</u>, 139 F.3d at 1425; <u>see also</u> <u>Wright v. Sumter Cnty. Bd. of Elections & Registration</u>, 301 F. Supp. 3d 1297, 1325–26 (M.D. Ga. 2018), <u>aff'd</u>, 979 F.3d 1282 (11th Cir. 2020).

563.   The bar on this score is not high. "The first <u>Gingles</u> precondition does not require some aesthetic ideal of compactness, but simply that the [minority] population be sufficiently compact to constitute a majority in a single-member district." <u>Houston v. Lafayette County</u>, 56 F.3d 606, 611 (5th Cir. 1995) (quoting <u>Clark</u>, 21 F.3d at 95).

564.   With respect to the traditional districting principles, there is no requirement that illustrative new Black-majority districts comport with those principles <u>better</u> than the districts in the enacted plan. Rather, the evidence must show only that it is "possible" to draw a new Black-majority district or districts, "consistent with" those principles. <u>Davis</u>, 139 F.3d at 1425; <u>accord</u> <u>LULAC</u>, 548 U.S. at 433 (<u>Gingles</u> 1 compactness inquiry "should <u>take into account</u> traditional districting principles") (emphasis added).

565.   Even an illustrative plan that is "far from perfect" may satisfy <u>Gingles</u> 1 so long as it meets that standard. <u>Wright v. Sumter Cnty. Bd. of Elections & Registration</u>, 301 F. Supp. 3d 1297, 1325–26 (M.D. Ga.

2018) (brackets and internal quotation marks omitted), aff'd, 979 F.3d 1282 (11th Cir. 2020); accord Montes, 40 F. Supp. 3d at 1398–99.

566.    It is appropriate—indeed, necessary—for race to be a consideration in drawing an illustrative plan for Gingles 1 purposes. That is because courts "require plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate." Davis, 138 F. 3d at 1425 (emphasis in the original); see also Fayette Cnty., 118 F. Supp. 3d at 1345 ("The intentional creation of a majority-minority district necessarily requires consideration of race."). As the Eleventh Circuit has explained, disallowing considerations of race in the Gingles 1 context would effectively "penalize" a plaintiff "for attempting to make the very showing that Gingles, Nipper, and SCLC demand," and would "make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action." Davis, 139 F.3d at 1425.

567.    Consideration of race accordingly does not mean that an illustrative plan must be subjected to strict scrutiny or any other heightened bar beyond the question of whether traditional districting principles were employed. To start, the Equal Protection Clause does not apply to a private party's experts at all, but only to the State. Illustrative maps merely show that a remedy is possible, and they lack the force of law. Consistent with this understanding, the Eleventh Circuit, and every other circuit to address this issue, has rejected attempts to graft the constitutional standard that applies to racial gerrymandering by the State onto the Gingles 1 vote dilution analysis. See Davis, 139 F.3d at 1417–18; see also, e.g., Bone Shirt, 461 F.3d at 1019; Clark, 88 F.3d at 1406–07; Sanchez v. State of Colorado, 97 F.3d 1303, 1327 (10th Cir. 1996); Cane v. Worcester County, 35 F.3d 921, 926 n.6 (4th Cir. 1994); Bridgeport Coal. for Fair Representation v. City of Bridgeport, 26 F.3d 271, 278 (2d Cir. 1995), vacated on other grounds sub nom. City of Bridgeport v. Bridgeport Coal. for Fair Representation, 512 U.S. 1283 (1994).

105

568.    Moreover, even if it were relevant in the context of an illustrative plan, a more stringent, strict-scrutiny standard would apply only where it is apparent that race was the "'predominant, overriding' consideration" in the drawing of district lines. Ga. State. Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs, 118 F. Supp. 3d 1338, 1345 (N.D. Ga. 2015) (quoting Miller v. Johnson, 515 U.S. 900, 920 (1995)); accord Clark v. Putnam County, 293 F.3d 1261, 1266–67 (11th Cir. 2002); see also Bush v. Vera, 517 U.S. 952, 958 (1996) (plurality opinion) ("Strict scrutiny does not apply merely because redistricting is performed with consciousness of race. Nor does it apply to all cases of intentional creation of majority-minority districts."). Such predominance may be shown by a total "disregard" for ordinary districting principles, for example where a proposed new Black-majority district is bizarrely shaped. Shaw v. Reno, 509 U.S. 630, 647 (1993) (strict scrutiny applied to 150-mile-long district in North Carolina that included areas with higher Black populations from Durham to Charlotte).

569.    Further, even if strict scrutiny did apply in the context of an illustrative plan drawn for Gingles 1 purposes, and even if a court were to determine that race had been the overriding consideration in the drawing of an illustrative district such that other traditional principles were disregarded, that would not necessarily render the illustrative plan an impermissible remedy. That is because the Supreme Court has "long assumed that one compelling interest" sufficient to satisfy strict scrutiny "is complying with operative provisions of the Voting Rights Act of 1965." Cooper v. Harris, 137 S. Ct. 1455, 1464 (2017); accord Askew v. City of Rome, 127 F.3d 1355, 1376 (11th Cir. 1997) ("[E]liminating violations of Section 2 is a compelling state interest."). Georgia's districting guidelines confirm that compliance "with Section 2 of the Voting Rights Act of 1965, as amended" is mandatory and not subject to balancing away with other factors. Doc. No. [39-17], at 3; Doc. No. [39-18], at 3; see also Feb. 11 Morning Tr. 12:11–13. A proposed district design that remedies vote dilution will still survive strict scrutiny so long as it is "reasonably

106

compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries," with no requirement that the illustrative district "defeat rival compact districts . . . in endless 'beauty contests.'" <u>Bush</u>, 517 U.S. at 977.

### 2. The Illustrative Plans add new majority-Black Senate and House districts while comporting with traditional districting principles

570. Here, the Illustrative Senate and House Plans identify multiple areas where the Black population is sufficiently numerous and compact to support the creation of additional Black-majority districts, and the illustrative Black-majority districts offered by Plaintiffs readily satisfy traditional districting principles, including population equality, geographic compactness and contiguity, avoiding political subdivision splits, and preservation of communities of interest.

571. The Court accepted expert mapper William Cooper in this case as qualified to testify as an expert in demographics and redistricting. Feb. 7 Tr. 112:22–23. It bears noting at the outset that Mr. Cooper's overall conclusion that more Black-majority districts can be drawn is well supported by this record.

572. Mr. Cooper's undisputed testimony, as well as the underlying Census numbers, show that the Black population in Georgia has increased by over 484,000 people, including over 400,000 in the Atlanta Metro area alone, over the last decade. Doc. No. [39-3], at 8, ¶ 12; Feb. 7 Tr. 178:13–14, 198:9–12. That pace of growth is consistent going back decades. Doc. No. [39-3], at 19–20, ¶ 43 & fig. 5. Despite that, and as Mr. Cooper testified unrefuted, there has not been a new Black-majority Senate district drawn since 2006, and perhaps 1 or 2 new Black-majority House districts, depending on how one counts them. Doc. No. [39-3], ¶ 58 & fig. 10, ¶ 91 & fig. 23; Feb. 7 Tr. 127:15–20. This stunning failure to account for such significant Black population growth is a strong indicator that, in the absence of new Black-majority districts, Black

voting strength is being diluted. See, e.g., Perez v. Abbott, 250 F. Supp. 3d 123, 179 (W.D. Tex. 2017) (three-judge court) ("The Court agrees that the overall configuration of Plan H283 is the product of intentional vote dilution," demonstrated in part by the map drawers' unwillingness "to creat[e] any new minority districts . . . despite the massive minority population growth statewide."); Black Pol. Task Force v. Galvin, 300 F. Supp. 2d 291, 315 (D. Mass. 2004) (three-judge court) ("We also deem it significant that, despite a growing African–American population, the Enacted Plan represents a step back from the previous redistricting scheme (enacted in 1993).").

573.   Mr. Cooper's undisputed testimony and his report also described how the number of Black-majority districts is disproportionately low compared to white-majority districts. Doc. No. [39-3], ¶¶ 59, 93. This unrefuted analysis further supports the overall conclusion that Black voting strength is being diluted because Black voters are disproportionately submerged in white-majority districts.

574.   Mr. Cooper's conclusion, both overall and as discussed below with respect to some of the specific areas where he drew new Black-majority districts, is also supported by the independent findings of Blakeman Esselstyn, the Gingles I expert in the Grant litigation. Mr. Esselstyn and Mr. Cooper independently drew illustrative plans starting from different baselines; with Mr. Cooper, like the State, starting from the prior 2014/2015 Benchmark Plans (Feb. 7 Tr. 140:8–23), while Mr. Esselstyn began his Illustrative maps using the 2021 enacted Plans (Feb. 9 Tr. 151:15–16). Nevertheless, both plans include two new Black majority Senate districts and two new Black-majority House districts in the South Atlanta Metro area. Doc. No. [39-03], at 35, 38, ¶¶ 78, 81, 113–14; Grant Doc. No. [20-1], at 11–12, 21, ¶¶ 26, 27, 41. Both include a new Black-majority Senate district in the more rural counties outside Augusta that have been referred to as part of the Black Belt. Doc. No. [39-3], at ¶¶ 82–83; Grant Doc. No. [20-1], at 10, ¶ 25. And both include a new Black-majority House district in Middle Georgia east of Macon, including Wilkinson County and

Milledgeville in Baldwin County. Doc. No. [39-3], at ¶ 117; <u>Grant</u> Doc. No. [20-1], at 22, ¶ 42. The extensive overlap between Cooper's and Esselstyn's plans, even though they worked independently and started from different places, is strong evidence of the underlying demographic reality that Black populations especially in those areas are sufficiently numerous and concentrated to support additional Black-majority Senate and House districts.

575.   The Court finds Mr. Cooper credible, his analysis methodologically sound, and his conclusions reliable. Mr. Cooper has decades of experience and has drawn scores of state legislative plans as a <u>Gingles</u> 1 expert. He also testified that he has extensive experience drawing electoral maps in Georgia, including General Assembly maps. He testified that he reviewed the districting criteria adopted by the State and sought to adhere to them. The Court notes that Mr. Cooper forthrightly answered questions about the various districts in his plan, including questions from the Court during the hearing, and readily conceded that one of the districts in his Senate Plan (Senate District 18, a district that is not a new Black-majority district and is not in any of the areas at issue in the case) could be improved and made more compact. Feb. 7 Tr. 149:7–24, 150:13-154:2, 154:21–23. The Court credits Mr. Cooper's testimony and conclusions.

576.   The Court also credits Mr. Cooper's detailed testimony, backed by the analysis in his report, that he complied with each of the traditional criteria with the Illustrative Senate and House Plans. <u>See</u> Feb. 7 Tr. 132:6-133:13, 133:21-134:14, 135:9–21, 136:4–16, 138:11-140:7.

577.   With respect to his adherence to traditional districting criteria, Mr. Cooper was repeatedly asked whether the Illustrative Plans were consistent with the traditional districting criteria and could constitute a valid remedy for vote dilution if enacted. He answered, "absolutely, yes." Feb. 7 Tr. 232:20. The Court credits this unequivocal, bottom-line response.

578. With respect to equal population, there is no dispute that Mr. Cooper adhered to this districting principle. Mr. Cooper stayed within the same tight population deviation limitations as the State's 2021 Plans. Doc. No. [39-03], at 5, ¶ 8; id. at 151; Doc. No. [39-04], at 25; Doc. No. [39-05], at 18–20, 24–26; Feb. 7 Tr. 132:2-133:7. Ms. Wright agreed it would be difficult to come much closer to the one-person, one-vote ideal than the 1% and 1.5% deviations to which Mr. Cooper adhered. Feb. 11 Tr. 88:1–22. The Court finds that Mr. Cooper adhered to this principle.

579. This Court also finds that Mr. Cooper adhered to the redistricting principles of compactness and contiguity. The Court credits Mr. Cooper's statement in his report that Plaintiffs' Illustrative Plans include only contiguous districts. Doc. No. 39-03, at 5, ¶ 8. The Court credits Mr. Cooper's testimony that Plaintiffs' Illustrative Plans were comparable to the 2021 Plans on the Reock and Polsby-Popper metrics for compactness, and within the acceptable range on those metrics. Feb. 7 Tr. 133:17-133:20. The Court also notes that Mr. Cooper's least compact district scores no worse on these metrics than the least compact district in the State's 2021 map (neither of which are in the particular areas of focus in any event).  Feb. 7 Tr. 229:21-229:24.  Mr. Morgan's testimony regarding these metrics was not inconsistent.

580. With respect to minimizing county and precinct splits, the Court finds that Mr. Cooper also adhered to this districting principle. The Court credits Mr. Cooper's testimony that he tried to minimize such splits. Feb. 7 Tr. 132:19–24, 136:8–13, 168:18–22, 207:2–5. The Court also credits his statement in his report that the Illustrative Plans are within the acceptable range on those metrics. Doc. No. [39-03], at 43, ¶ 87 & fig. 22; id. at 63, ¶ 124 & fig. 37. The Court also notes that Mr. Cooper's testimony is consistent with the split reports in the record, which show very similar numbers of county splits across the Illustrative Senate and House Plans and the Enacted Senate and House Plans. To be sure, out of nearly 2,700 precincts in Georgia (Doc. No. [39-03], at 5 n.4), the Illustrative House Plan splits 262 of them (Doc. No. [39-3],

110

at 63., fig. 37), i.e., 83 more than the 179 precincts split by the 2021 Enacted House Plan (Doc. No. [39-3], at 63., fig. 37). However, the Court credits Mr. Cooper's testimony that this relatively minor level of variation is within acceptable parameters. Feb. 7 Tr. 136:24-137:15; 137:20-138:10. Again, Mr. Morgan's testimony regarding these metrics was not inconsistent.

581.    With respect to communities of interest, the Court finds that Mr. Cooper adhered to this consideration as well. The Court credits Mr. Cooper's testimony that he considered municipalities (e.g., Feb. 7 Tr. 134:3–5, 136:11–12), census areas (e.g., Feb. 7 Tr. 95:3–6, 97:6–14, 103:16–23), regional commission areas (e.g., Feb. 7 Tr. 134:2–3, 161:24-162:6, 217:16–17), transportation routes (e.g., Feb. 7 Tr. 159:13–14, 162:6–8), economic connections (e.g., Feb. 7 Tr. 204:21–23, 219:25-220:2, 223:11–16), historical connections (e.g., Feb. 7 Tr. 120:18-121:3, 134:18–25), and demographic and socioeconomic similarities (e.g., Feb. 7 Tr. 143:23–25; 223:7–14) in evaluating communities of interest. As noted further below, Mr. Cooper offered various detailed examples of the ways he took these into account. Ms. Wright, the State's expert, validated many of those categories as indicative of communities of interest, and she ultimately agreed that the existence of any particular community of interest is "in the eye of the beholder." Feb. 11 Tr. 91:12. Notably, Mr. Cooper reported municipal splits in his Rebuttal Declaration, and his data shows that the Illustrative Senate Plan (204 splits) is essentially identical to the Enacted Senate Plan (203 splits) and that the Illustrative House Plan (436 splits) actually splits 24 fewer municipalities than the Enacted House Plan (460 splits). Doc. No. [59-2], p. 9.

582.    With respect to remedying vote dilution and complying with the Voting Rights Act, the Court concludes that, by drawing additional Black-majority Senate and House districts in areas where the Black population is sufficiently numerous and compact to support such districts, Mr. Cooper adhered to this principle. The Court also credits Mr. Cooper's testimony that, while he was aware of race, race was not

111

the predominant consideration in his drawing of the Illustrative Plans and that he instead sought to balance all relevant factors. Feb. 7 Tr. 135:15-136:3, 140:6–7; see, e.g., Alabama Legislative Black Caucus v. Alabama, 231 F.Supp.3d 1026, 1114-15 (M.D. Ala. 2017) (crediting such testimony). That conclusion is supported by Mr. Cooper's testimony on cross-examination, when he was repeatedly asked to articulate reasons other than race for particular districting decisions, and was able to do so. See, e.g., Feb. 7 Tr. 149:3–6, 160:19-161:9.

583.   With respect to seeking to avoid incumbent pairings, the Court finds Mr. Cooper also adhered to this consideration. The Court credits Mr. Cooper's testimony and his discussion in his reports that he used publicly available incumbent address data to avoid pairing incumbents and that, when he was given new, non-public incumbent address information, he quickly updated the Illustrative Plans so that they include only one more incumbent pairing in the Senate and only two more in the House relative to the 2021 Plan, while maintaining the same number of majority-Black districts. Doc. No. [59-2], at 5-6, ¶¶ 11–13; Tr. 139:1–8, 139:14–15.

584.   Mr. Cooper, Ms. Wright, and Mr. Esselstyn all agreed that drawing a state legislative map involves a "balancing act" between these various principles. See Feb. 7 Tr. 140:3–7 (Questioner: "Did any of the traditional criteria, the traditional redistricting principles you mentioned predominate over any of the others in your process?" Mr. Cooper: "No. I tried to balance them all. I was aware of them all and I tried to achieve plans that were fair and balanced."); Feb. 11 Tr. 89:14–23 (Questioner: "I imagine there are some tradeoffs, though, when you are start thinking about these different factors; is that right?" Ms. Wright: "You could say that." Questioner: "Would you say it is a balancing act?" Ms. Wright: "Yes." Questioner: "To balance the different factors, especially the sort of 'should consider' factors?" Ms. Wright: "Yes. You try to consider all of them, but sometimes you do have to make those determinations."); Feb. 9 Tr. 157:14–15 (Mr. Esselstyn: "It's a balancing act.").

585.    Mr. Cooper repeatedly said he attempted to balance all of these principles. See Feb. 7 Tr. 132:6-133:13; 133:21-134:14; 135:9–21; 136:4–16; 138:11-140:1; 140:2–7; see also Feb. 7 Tr. 49:13-51:5. The Court credits his testimony and finds that he did so. Moreover, the Illustrative Plans drawn by Mr. Cooper consistent with the traditional principles contain at least three new Black-majority Senate districts using the AP BVAP metric, and at least four such new house districts.

### 3.    The new districts in the areas of focus demonstrate that the Black population is sufficiently numerous and geographically compact

### (i)    South Atlanta Metro

586.    Plaintiffs have shown that the Black population in the South Metro Atlanta area, including Fayette, Spalding, and Henry Counties and other adjacent areas, is sufficiently numerous and geographically compact to support the addition of two more Black-majority Senate districts and two more Black-majority House districts.

587.    *Illustrative Senate District 28:* With respect to the Senate, the Illustrative Senate Plan includes a new Senate District, District 28, that includes much of Fayette County as well as adjacent portions of southern Clayton County and western Spalding County. Doc. No. [39-04], at 27. The record reflects that Clayton County already has a large (and still growing) Black population, Doc. No. [39-03], at 95, and that the Black population in Fayette and Spalding Counties has been growing by double digits, Doc. No. [39-03], at 96, 98.

588.    Illustrative District 28 is 52.7% Black using the AP BVAP metric. Doc. No. [59-02], at 25. In the Enacted Senate Plan, a corresponding district, District 16, includes portions of Fayette County and all of Spalding County with Pike and Lamar Counties to the south. Doc. No. [39-04], at 29. Pike and Lamar are more rural, whiter, and at the very edges of the 29-county Atlanta Metro area (Doc. No. [39-03], at 97–98). 2021 District 16 has a BVAP of under 23%. Doc. No. [39-03], at 151.

113

589.   The State does not argue, nor is there any basis to argue, that Illustrative District 28 is non-compact, or non-contiguous. Nor does the district pair any incumbents.

590.   Instead, the State complains that Illustrative Senate District 28 splits Spalding County. But that does not take Illustrative Senate District 28 outside the bounds of traditional districting considerations. The State also suggests that Illustrative Senate District 28 (and neighboring illustrative Senate District 44) improperly unite communities in Clayton County (namely, Jonesboro) with Griffin in Spalding County. However, in her testimony, Ms. Wright acknowledged that these are both "South Metro" communities connected by a short drive on US-41 that might well have commonalities other than race; indeed, she said it would not surprise her if their schools played football against each other. Feb. 11 Tr. 103:24-104:7. And while Ms. Wright did not consider the socioeconomic characteristics of these communities (Feb. 11 Tr. 95:3–6, 97:6–14, 103:16–23), Mr. Cooper did do so and found them similar, Doc. No. [59-2], at 13, ¶¶ 36–38. Mr. Cooper also credibly testified that Illustrative Senate District 28 serves the principle of non-dilution by alleviating the unnecessary "packing" of Black voters that occurs in Clayton County under the Enacted Senate Map. Feb. 7 Tr. 190:14–16, 191:6–8.

591.   Notably, even though he started from a different baseline, Mr. Esselstyn also drew a new Black-majority Senate district in the same area that includes portions of Clayton and Fayette Counties. Grant Doc. No. [20-1], ¶ 27 & fig. 6. The fact that Mr. Esselstyn drew a similar district, even though he and Mr. Cooper worked independently and started from different places, is strong evidence of the underlying demographic reality that the Black population in the area is sufficiently numerous and concentrated to support an additional Black-majority Senate district.

592.   The Court finds that Senate District 28 is consistent with traditional districting principles and demonstrates that the Black population in

the area is sufficiently large and geographically compact as to constitute a majority in an additional Black-majority Senate District beyond what was drawn in the Enacted Senate Plan.

593.   In light of the foregoing, the Court further finds that race was not the overriding consideration in the configuration of Illustrative Senate District 28. Moreover, even if it was, and even if strict scrutiny applied, Illustrative Senate District 28 would pass strict scrutiny because it is reasonably compact and reasonably consistent with traditional districting principles while ameliorating the dilution of Black voting strength and ensuring compliance with the Voting Rights Act.

594.   ***Illustrative Senate District 17:*** The Illustrative Senate Plan also includes a new Senate District, District 17, in an area that includes a portion of Henry County (including McDonough, the seat of Henry County) as well as portions of Rockdale and DeKalb Counties. No. [39-04], at 31. The record reflects that all of those counties, as well as neighboring Newton County in the South Metro area, have large and fast-growing Black populations. Doc. No. [39-03], at 96, 98. In particular, the Black population of Henry County grew by 75% over the last decade, and by approximately 200% in the decade before that, such that Henry County is now plurality Black. Doc. No. [39-03], at 97.

595.   Illustrative District 17 is 62.5% Black using the AP BVAP metric. Doc. No. [59-02], at 25. In the Enacted Senate Plan, a corresponding district, District 17, includes portions of Henry County and Newton County and then stretches out to Madison and Walton Counties, which are more rural, whiter, and at the very edges of the 29-county Atlanta Metro area. No. [39-04], at 33. 2021 District 17 has a BVAP of 32%. Doc. No. [39-03], at 151. As Mr. Cooper testified, the configuration of Enacted Senate District 17 has the effect of "cracking" or diluting the voting strength of Black voters in Henry County by "submerg[ing]"

them in a district that includes outlying areas like Morgan County, which is 74% white. Feb. 7 Tr. 144:9-145:6; Doc. No. [59-2], at 3, ¶ 4.

596.    The State's own expert, John Morgan, conceded that Illustrative Senate District 17 is more compact than Enacted Senate District 17. Feb. 14 Tr. 16:10–14. Ms. Wright conceded that the State's Enacted Senate District 17 splits Newton County, whereas the Illustrative Senate Plan keeps it whole. Feb. 11 Tr. 97:18–20. The only criticism lodged by the State with respect to Illustrative Senate District 17 is that it combines Stonecrest in DeKalb County with certain outlying, unincorporated areas in Henry County. Doc. No. [89], at 7, ¶ 13. However, the State's Enacted Senate District 17 also combines disparate areas, such as fast-growing McDonough and Henry County in the Atlanta suburbs with Morgan County, whose county seat of Madison has a population of less than 5,000, and whose socioeconomic and demographic profile is very different.  Feb. 11 Tr. Tr. 96:4–15, 106:21-107:2.  Mr. Cooper meanwhile credibly testified that it was reasonable to include portions of Henry, Rockdale, and DeKalb in a single district, because they were suburban areas that were closely affiliated with Atlanta. Feb. 7 Tr. 199:10-16. Moreover, as he stated in his Rebuttal Declaration, these areas shared socioeconomic characteristics, including a much higher proportion of Black residents with bachelor's degrees or higher. Doc. No. [59-2], at 14, ¶ 40.

597.    Notably, even though he started from a different baseline, Mr. Esselstyn also drew a new Black-majority Senate district in the same area, anchored in Henry County, that includes portions of Henry and south Clayton Counties. Grant Doc. No. [20-1], ¶ 26 & fig. 6. Again, the fact that Mr. Esselstyn drew a similar district, even though he and Mr. Cooper worked independently and started from different places, is strong evidence of the underlying demographic reality that the Black population in the area is sufficiently numerous and concentrated to support an additional Black-majority Senate district.

598.   The Court finds that Senate District 17 is consistent with traditional districting principles and demonstrates that the Black population in the area is sufficiently large and geographically compact as to constitute a majority in an additional Black-majority Senate District beyond what was drawn in the Enacted Senate Plan.

599.   In light of the foregoing, the Court further finds that race was not the overriding consideration in the configuration of Illustrative Senate District 17. Moreover, even if it was, and even if strict scrutiny applied, Illustrative Senate District 17 would pass strict scrutiny because it is reasonably compact and reasonably consistent with traditional districting principles while ameliorating the dilution of Black voting strength and ensuring compliance with the Voting Rights Act.

600.   ***Illustrative House District 73:*** The Illustrative House Plan includes a new House District, District 73, in an area that includes adjacent areas in south Clayton, south Henry, and Spalding Counties. Doc. No. [39-03], ¶ 113; Doc. No. [39-06], at 58. As noted already, these counties have large and/or fast-growing Black populations. The main population centers in the district are next to one another in south Clayton and south Henry, along US-19.

601.   Illustrative House District 73 is 60.6% Black using the AP BVAP metric. Doc. No. [59-02], at 28. In the Enacted House Plan, a corresponding district, District 74, excludes Clayton County but includes portions of south Henry County as well as portions of Fayette County and Spalding County. Doc. No. [39-06], at 60. Enacted House District 74 has a BVAP of 25.5%. Doc. No. [39-05], at 19.

602.   Illustrative House District 73 (Reock of .44 and Polsby-Popper of .20) is comparably compact to Enacted House District 74 (Reock of .50 and Polsby-Popper of .25). Doc. No. [39-06], at 130, 148. Both House Plans split Henry, Spalding, Clayton, and Fayette Counties in various ways and are comparable on that score. <u>See</u> Doc. No. [39-06], at 58, 60.

Illustrative House District 73 unites nearby, adjacent communities on either side of the line between south Clayton and Henry Counties, and as noted already, Mr. Cooper identified socioeconomic commonalities between those communities. Doc. No. [59-02], ¶ 44. Ms. Wright claimed in her report that the configuration of House District 73 connects "communities that share little to no common interests" in other neighboring districts, namely Illustrative House Districts 78 and 109. Doc. No. [89], ¶ 16. However, even if such considerations regarding other districts bore on the question of whether Illustrative House District 73 was drawn consistent with traditional principles, Ms. Wright did not specifically identify any of the South Metro communities in those areas that she says are united despite purportedly not sharing common interests. Feb. 11 Tr. 104:11-105:3. The Court finds that Illustrative House District 73 is reasonably compact and unites neighboring communities, consistent with traditional districting principles.

603.   Notably, even though he started from a different baseline, Mr. Esselstyn also drew a Black-majority House district in the same area (District 78 in his plan), at the intersection of Clayton, Henry, and Spalding Counties. <u>Grant</u> Doc. No. [20-1], fig. 12. The fact that Mr. Esselstyn drew a similar district, even though he and Mr. Cooper worked independently and started from different places, is strong evidence of the underlying demographic reality that the Black population in the area is sufficiently numerous and concentrated to support an additional Black-majority House district.

604.   The Court finds that Illustrative House District 73 is consistent with traditional districting principles and demonstrates that the Black population in the area is sufficiently large and geographically compact as to constitute a majority in an additional Black-majority House District beyond what was drawn in the Enacted Senate Plan.

605.   In light of the foregoing, the Court further finds that race was not the overriding consideration in the configuration of Illustrative House

118

District 73. Moreover, even if it was, and even if strict scrutiny applied, Illustrative House District 73 would pass strict scrutiny because it is reasonably compact and reasonably consistent with traditional districting principles while ameliorating the dilution of Black voting strength and ensuring compliance with the Voting Rights Act.

606.   *Illustrative House District 110:* The Illustrative House Plan also includes a new House District, District 110, in an area that includes adjacent portions of Henry County and Spalding County, including much of Griffin, Spalding County's seat and largest city, which is majority-Black. Doc. No. [39-03], ¶ 114; Doc. No. [39-06], at 62. As noted already, the Black population in both counties is increasing by double digits.

607.   Illustrative House District 110 is 52.4% Black using the AP BVAP metric. Doc. No. [39-05], at 25. In the Enacted Senate Plan, the same portions of Henry and Spalding Counties are split between Enacted House Districts 117 and 134, which have BVAPs of 36.6% and 33.6%, respectively, effectively cracking the voting strength of the Black population in those areas. Doc. No. [39-06], at 64; Doc. No. [39-05], at 19–20.

608.   The State does not contest that Illustrative House District 110 is compact, and in fact it is comparably compact (Reock of .44 and Polsby-Popper of .24) than the corresponding districts in the Enacted House Plan, including Enacted House District 117 (Reock of .41 and Polsby-Popper of .28). Doc. No. [39-06], at 132, 150. Nor does the State contest that Illustrative House District 110 unites communities with common features and interests. Ms. Wright stated in her report and on the stand that Illustrative House District 110 is problematic because Spalding County has traditionally been split between two districts (see Doc. No. [89], ¶ 17; Feb. 11 Tr. 39:6–8), but she acknowledged during her testimony that the Enacted House Plan also breaks that purported tradition (see Feb. 11 Tr. 39:8–9, 105:22-106:1).

Ms. Wright also suggested that Illustrative House District 110's configuration caused certain precincts to be split in neighboring Illustrative House District 111 "with no apparent goal other than to create a majority black district." Doc. No. [89], ¶ 17. However, Mr. Cooper explained that those splits were required to maintain population equality. Feb. 7 Tr. 132:6–24. In the end, none of these complaints take Illustrative House District 110, which is compact and unites similar communities, outside the realm of traditional districting principles.

609. Notably, even though he started from a different baseline, Mr. Esselstyn also drew a new Black-majority House district in the same area of Henry County. <u>Grant</u> Doc. No. [20-1], fig. 12. Again, the fact that Mr. Esselstyn drew a similar district, even though he and Mr. Cooper worked independently and started from different places, is strong evidence of the underlying demographic reality that the Black population in the area is sufficiently numerous and concentrated to support an additional Black-majority House district.

610. The Court finds that Illustrative House District 110 is consistent with traditional districting principles and demonstrates that the Black population in the area is sufficiently large and geographically compact as to constitute a majority in an additional Black-majority House District beyond what was drawn in the Enacted Senate Plan.

611. In light of the foregoing, the Court further finds that race was not the overriding consideration in the configuration of Illustrative House District 110. Moreover, even if it was, Illustrative House District 110 would pass strict scrutiny because it is reasonably compact and reasonably consistent with traditional districting principles while ameliorating the dilution of Black voting strength and ensuring compliance with the Voting Rights Act.

(ii)   **Middle Georgia/Black Belt Senate and House Districts**

120

612.    Plaintiffs have also shown that the Black population in the portion of Georgia's Black Belt (also called Middle Georgia) between Augusta and Macon is sufficiently numerous and geographically compact to support the addition of one more Black-majority Senate district and one more Black-majority House district.

613.    *Illustrative Senate District 23:* With respect to the Senate, the Illustrative Senate Plan includes a new Senate District, District 23, that includes a portion of Richmond County outside Augusta as well as a number of largely rural counties in the area between Augusta and Macon that Mr. Cooper identified as part of Georgia's Black Belt, including Burke, Jenkins, Jefferson, Washington, Wilkinson, Twiggs, Baldwin, Hancock, and Taliaferro. Doc. No. [39-04], at 35.

614.    Mr. Cooper's analysis of a number of these counties reflects that this area has experienced a slight overall population decline, which includes both a small increase in the Black population and a more significant decrease in the white population. Doc. No. [39-03], at 22. The net result is that the Black population in the area has grown more concentrated. In 2000, the AP Black population in the region identified by Mr. Cooper was 50.66%; today, it is nearing 55%. Doc. No. [39-03], at 23.

615.    Illustrative District 23 is 50.5% Black using the AP BVAP metric. Doc. No. [59-02], at 25. In the Enacted Senate Plan, a corresponding district, District 23, stretches north-south from Taliaferro County, through Warren, McDuffie, Glascock, Jefferson, and Burke Counties, to Emanuel, Jenkins, and Screven Counties, picking up portions of Columbia and Richmond Counties as well. Doc. No. [39-04], at 37. Enacted Senate District 23 is 35.5% Black using the AP BVAP metric. Doc. No. [39-03], at 151.

616.    Illustrative Senate District 23 has virtually identical compactness scores to Enacted Senate District 23, as the State's expert John Morgan acknowledged. Feb. 14 Tr. 16:15–18. Both districts are geographically

121

large (which makes sense as they are comprised of largely rural counties), though as Ms. Wright acknowledged, Illustrative Senate District 23 is oriented more east-west along the axis of Middle Georgia and the State's Black Belt, whereas Enacted Senate District 23 runs north-south, bisecting that access. Feb. 11 Tr. 102:19-25. Both the Illustrative and Enacted Senate District 23 split two counties, so the two are comparable on that score as well. Doc. No. [39-4], at 209, 225, Exs. T-1, T-3.

617. Ms. Wright in her report criticized Illustrative Senate District 23 for uniting Warner Robins and Milledgeville and parts of Richmond County. Doc. No. [89], at 12, ¶ 11). Yet Ms. Wright also acknowledged during her testimony that it sometimes happens that areas that are different are nevertheless included in a single district. Feb. 11 Tr. 106:21–23. Moreover, Illustrative Senate District 23 also unites areas with commonalities. It unites Baldwin and Hancock Counties, which together form a micropolitan statistical area based on economic connections, as Mr. Cooper explained. Feb. 7 Tr. 204:16–23; Doc. No. [59-2], at 11-12, ¶¶ 31, 34. It unites Twiggs and Wilkinson Counties, which Ms. Wright elsewhere identified as constituting a community of interest (Doc. No. [89], at 10, ¶ 18). And it also unites a number of counties that Mr. Cooper identified as being part of the State's historic Black Belt, based on a study that used not only racial demographics, but also poverty rates and historical figures regarding the level of enslaved population prior to the civil war. Feb. 7 Tr. 222:20-223:16; Doc. No. [59-2], at 13, 15, ¶¶ 35, 43. Cf. Miller v. Johnson, 515 U.S. 900, 920 (1995) ("A State is free to recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests."). Ms. Wright in her testimony agreed that those counties identified in the study shared demographic commonalities. Feb. 11 Tr. 54:22-55:5; 101:2–20. Especially where the State has drawn a district of similar size, and similar compactness, with the same number of county splits, in the same general area, it cannot be said that Illustrative Senate District 23 does not conform to traditional districting principles.

618.   One other point warrants mentioning. During the hearing, the State suggested that Illustrative Senate District 18 (a white-majority district well east of District 23 that Mr. Cooper told the Court could and should be improved to reduce its length) was drawn the way it was in order to accommodate Illustrative Senate District 23, and that this meant that race improperly predominated in the drawing of Illustrative Senate District 23. Feb. 7 Tr. 18:25-20:5. However, the State ultimately did not present any evidence to support that suggestion. Rather, Mr. Cooper specifically testified that he could modify Illustrative Senate District 18 to make it more compact (by removing Monroe County and Worth County from the district) with no effect on Illustrative Senate District 23. Feb. 7 Tr.152:6-154:1. He also testified that Illustrative Senate District 18 was drawn to maintain equal population while avoiding county and precinct splits, and not because of race. Feb. 7 Tr. 149:53-6.

619.   While the Court agrees with Mr. Cooper that Illustrative Senate District 18 would require improvement in any remedial plan, such improvement to a district outside of the area at issue is not relevant to the Gingles 1 analysis, which is concerned with the numerosity and compactness of the minority population in the area where a new district is being drawn. See, e.g., Davis, 139 F.3d at 1425; accord LULAC, 548 U.S. at 433; Houston, 56 F.3d at 611.

620.   Moreover, even if Senate District 18's shape were relevant, the evidence in this record demonstrates that the district's shape was not required in order to draw Illustrative Senate District 23 in the area of focus or otherwise to serve any racial goal, and instead that Mr. Cooper sought to build the district out of whole counties and precincts to the greatest extent possible. See, e.g., Quilter v. Voinovich, 981 F. Supp. 1032, 1049 (N.D. Ohio 1997) (allegations regarding the shapes of some districts were insufficient to show disregard for traditional districting principles). Indeed, even if the Court were to assess the Illustrative Senate Plan as a whole (which, as just discussed, is not proper focus of the Gingles 1 inquiry), the Court

123

would still credit Mr. Cooper's testimony that his plan overall, including Illustrative Senate District 18, represents a "totally acceptable" balancing of the traditional districting principles for Gingles 1 purposes. Feb. 7 Tr. 231:24-232-21]; see Wright, 301 F. Supp. 3d at 1326 (approving "far from perfect" illustrative plan as satisfying the first Gingles precondition). In the end, "there is more than one way to draw a district so that it can reasonably be described as meaningfully adhering to traditional principles." Chen, 206 F.3d at 519.

621. Additionally, and in any event, Mr. Esselstyn, starting from a different baseline than Mr. Cooper, also drew a new Black-majority Senate district in the same area as Illustrative Senate District 23 that includes, among others, Taliaferro, Hancock, Washington, Jefferson, Burke, and part of both Richmond and Baldwin Counties. Grant Doc. No. [20-01], at 12, ¶ 27. Thus, even if any concerns about Illustrative Senate District 18 were relevant, the Esselstyn map independently confirms that a new Black-majority Senate District like Illustrative Senate District 23 can be drawn in the area without any problematic effects to any districts on the other side of Middle Georgia. More broadly, the fact that Mr. Esselstyn drew a similar district, even though he and Mr. Cooper worked independently and started from different places, is strong evidence of the underlying demographic reality that the Black population in the area is sufficiently numerous and concentrated to support an additional Black-majority Senate district.

622. The Court finds that Senate District 23 is consistent with traditional districting principles and demonstrates that the Black population in the area is sufficiently large and geographically compact as to constitute a majority in an additional Black-majority Senate District beyond what was drawn in the Enacted Senate Plan.

623. In light of the foregoing, the Court further finds that race was not the overriding consideration in the configuration of Illustrative Senate

District 28. Moreover, even if it was, and even if strict scrutiny applied, Illustrative Senate District 23 would pass strict scrutiny because it is reasonably compact and reasonably consistent with traditional districting principles while ameliorating the dilution of Black voting strength and ensuring compliance with the Voting Rights Act.

624. *Illustrative House District 144:* With respect to the House, the Illustrative House Plan includes a new House District, District 144, that includes counties identified by Mr. Cooper as part of the State's Black Belt, including Taliaferro, Warren, Hancock, Wilkinson, and parts of Putnam and Baldwin Counties.

625. Illustrative House District 144 is 50.4% Black using the AP BVAP metric. Doc. No. [59-02], at 29. In the Enacted Senate Plan, the area covered by Illustrative House District 144 is broken across 4 different House districts, including 2021 District 124 (25.6% Black), 2021 District 133 (36.8% Black), and 2021 District 149 (32.1% Black).

626. The State does not suggest that Illustrative House District 144 is impermissibly non-compact. Moreover, while Ms. Wright in her report criticized Illustrative House District 144 for splitting Baldwin and Putnam counties, she also acknowledged in her testimony that the Enacted House Plan splits those same counties. (Feb. 11, 2022, Morning Tr.), Tr. 109:22–110:2. In addition, Ms. Wright acknowledged that Illustrative House District 144 unites Eatonton and Milledgeville, two Middle Georgia county seats in adjacent counties that share common features. Feb. 11 Tr. 107:3-13. Mr. Cooper also explained that, in addition to the socioeconomic and demographic connections among Black Belt counties, his configuration of the map unites a larger proportion of the U.S. Census Bureau-designated Milledgeville micropolitan area, which includes both Milledgeville and neighboring Hancock County.  Feb 7 Tr. 158:2–7, 219:23-220:5.

125

627. Notably, even though he started from a different baseline, Mr. Esselstyn also drew an additional Black-majority House district in Middle Georgia, including Wilkinson County and Milledgeville in Baldwin County. <u>Grant</u> Doc. No. [20-1], ¶ 42; Tr. 190:13-191:3; 191:13-192:15. Again, the fact that Mr. Esselstyn drew a similar district, even though he and Mr. Cooper worked independently and started from different places, is strong evidence of the underlying demographic reality that the Black population in the area is sufficiently numerous and concentrated to support an additional Black-majority House district.

628. The Court finds that Illustrative House District 144 is consistent with traditional districting principles and demonstrates that the Black population in the area is sufficiently large and geographically compact as to constitute a majority in an additional Black-majority House District beyond what was drawn in the Enacted Senate Plan.

629. In light of the foregoing, the Court further finds that race was not the overriding consideration in the configuration of Illustrative House District 110. Moreover, even if it was, and even if strict scrutiny applied, Illustrative House District 110 would pass strict scrutiny because it is reasonably compact and reasonably consistent with traditional districting principles while ameliorating the dilution of Black voting strength and ensuring compliance with the Voting Rights Act.

### (iii) Southwest Georgia House District

630. Plaintiffs have also shown that the Black population in Southwest Georgia is sufficiently numerous and geographically compact to support the addition of one more Black-majority House district.

631. In particular, the Illustrative House Plan includes a new House District, District 153, that includes all of Mitchell County and portions of Dougherty County and Thomas County. Doc. No. [39-06], at 70.

632. Similar to his demographic analysis of the Black Belt counties near Augusta, Mr. Cooper's analysis in Southwest Georgia shows population decline overall, but also increased concentration of the Black population. Doc. No. [39-03], ¶ 54–55. In particular, Mr. Cooper looked at the grouping of counties (including Mitchell and Dougherty Counties) that comprise Enacted Senate District 12, which is majority-Black. In 2000, the AP Black population in those counties was 55.33%; today, it is 60.59%. Doc. No. [39-03], at 24, & fig. 9.

633. As Mr. Cooper explained, if the Black population in Southwest Georgia is numerous and compact enough to support a majority-Black, 57.97% BVAP Senate district, it is almost necessarily numerous and compact enough to support three majority-Black House districts, given that a Senate district is just over three times the size of a House district. Doc. No. [39-03], ¶ 27, 29. Despite that, there are only two majority-Black House districts in the area. Doc. No. [39-03], ¶ 29.

634. Illustrative House District 153 is 58% Black using the AP BVAP metric. Doc. No. [59-02], at 29. In the Enacted House Plan, a similarly shaped, corresponding district, District 171, also connects Mitchell County with additional counties further south, namely Grady and Decatur Counties. Doc. No. [39-03], at 60–62, & fig. 34. Enacted House District 171 is 39.6% Black using the AP BVAP metric. Doc. No. [39-05], at 20. Meanwhile, the Enacted House Plan also divides Dougherty County, which is 68.9% Black (Doc. No. [39-03], at 102), across four separate House districts, two of which are majority-white. Doc. No. [39-03], ¶ 118.

635. The State does not suggest that Illustrative House District 153 is impermissibly non-compact. Ms. Wright in her report suggests that the Illustrative House Plan contains additional county splits, but the Enacted House Plan also splits Thomas County, Grady County, and Sumter County (the same counties split in the Illustrative House Plan). [Doc. No. [39-06], at 393]. And as noted, the Enacted House Plan fractures Dougherty County four times rather than three. [Doc. No. [39-06], at 393]. Other than that, Ms. Wright suggested in her report and her testimony that she could not think of a reason to connect

Albany and Thomasville in a district. Doc. No. [89], at 10–11, ¶ 19; Feb. 11 Tr. 44:20-45:2. However, as Mr. Cooper explained, the relevant counties are demographically similar, and the district corresponds to a regionally significant transportation and economic corridor between the two Southwest Georgia cities. Feb. 7 Tr. 160:22-161:9.

636.   The Court finds that Illustrative House District 153 is consistent with traditional districting principles and demonstrates that the Black population in the area is sufficiently large and geographically compact as to constitute a majority in an additional Black-majority Senate District beyond what was drawn in the Enacted Senate Plan.

637.   In light of the foregoing, the Court further finds that race was not the overriding consideration in the configuration of Illustrative House District 153. Moreover, even if it was, Illustrative House District 28 would pass strict scrutiny because it is reasonably compact and reasonably consistent with traditional districting principles while ameliorating the dilution of Black voting strength and ensuring compliance with the Voting Rights Act.

### 4.   Conclusion regarding <u>Gingles</u> 1

638.   In sum, and consistent with the foregoing, the Court credits Mr. Cooper's analysis and conclusions and concludes that Mr. Cooper's analysis demonstrates that the Plaintiffs have satisfied the factual predicates of the first <u>Gingles</u> precondition as to each of the regions discussed above. Plaintiffs have shown, and the Court finds and concludes, that the Black population in the South Metro Atlanta is sufficiently numerous and geographically compact to constitute majorities in two additional Senate districts and two additional House districts. Plaintiffs have shown, and the Court finds and concludes, that the Black population in the Eastern portion of Georgia's Black Belt is sufficiently numerous and geographically compact to constitute majorities in one additional Senate district and one additional House district. And Plaintiffs have shown, and the Court finds and concludes, that the Black population in Southwest Georgia is sufficiently numerous and geographically compact to constitute a majority in one additional House district.

> ii.   **Gingles 2 & 3: Plaintiffs are substantially likely to succeed in setting forth the second and third elements of the <u>Gingles</u> test**
>
> 1.   **Plaintiffs have satisfied the second <u>Gingles</u> precondition**

639.   The second <u>Gingles</u> precondition requires the protected group be "politically cohesive," which plaintiffs may demonstrate by "showing that a significant number of minority group members usually vote for the same candidates." <u>Thornburg v. Gingles</u>, 478 U.S. 30, 51, 56 (1986); <u>accord</u> <u>Solomon v. Liberty Cnty.</u>, 899 F.2d 1012, 1019 (11th Cir. 1990) (Kravitch, J., concurring).

640.   Courts rely on statistical analyses to estimate the proportion of each racial group that voted for each candidate. <u>See, e.g.</u>, <u>Gingles</u>, 478 U.S. at 52–54; <u>Nipper v. Smith</u>, 39 F.3d 1494, 1505 n.20 (11th Cir. 1994) (en banc) (Tjoflat, C.J., joined by one judge) (citing <u>Nipper v. Chiles</u>, 795 F. Supp. 1525, 1533 (M.D. Fla. 1992)). In particular, courts have recognized homogeneous precinct analysis, ecological regression, and ecological inference as appropriate methods, and ecological inference has been called the "gold standard" for racially polarized voting analysis. <u>Wright v. Sumter Cnty. Bd. of Elections & Registration</u>, 301 F. Supp. 3d 1297, 1305 (M.D. Ga. 2018), <u>aff'd</u>, 979 F.3d 1282 (11th Cir. 2020) ("<u>Wright II</u>").

641.   Courts have repeatedly found that Georgia's Black communities are politically cohesive. <u>See, e.g.</u>, <u>Wright II</u>, 979 F.3d at 1304 ("[B]lack voters in Sumter County were 'highly cohesive'" because in most elections "the overwhelming majority of African Americans voted for the same candidate"); <u>Askew v. City of Rome</u>, 127 F.3d 1355, 1377 (11th Cir. 1997) (observing that "both empirical and anecdotal evidence indicate that Rome[, Georgia's] black community is 'cohesive,'" in large part because "[t]he black community consistently ranks black candidates as their favorite candidates"); <u>Ga. State Conf. of NAACP v. Georgia</u>, 312 F. Supp. 3d 1357, 1360 (N.D. Ga. 2018) ("[V]oting in Georgia is highly racially polarized.").

642.  The second Gingles precondition is satisfied here because there is no dispute that Black voters in Georgia are politically cohesive. See Gingles, 478 U.S. at 49; id. at 68 ("Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district."). The analyses of Drs. Handley and Palmer clearly demonstrate high levels of cohesiveness among Black Georgians in supporting their preferred candidates, and Dr. Alford expressly agreed with that conclusion. See Doc. No. [39-7], at 23; Feb. 10 Tr. 48:25-49:11; Feb. 11 Tr. 154:15–19; see generally supra Part III. Defendant has offered no evidence to rebut — and has in fact conceded — this overwhelming showing of cohesiveness.

## 2.  Plaintiffs have satisfied the third Gingles precondition

643.  Under the third Gingles precondition, a racial "minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." 478 U.S. at 51 (citations omitted).

644.  There is no specific threshold percentage required to demonstrate bloc voting, as "[t]he amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to elect representatives of their choice . . . will vary from district to district." Gingles, 478 U.S. at 56 (citations omitted). Instead, "a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." Id.

645.  Courts have previously found that in Georgia, white voters typically support the same candidate, and that bloc is usually large enough to defeat Black-preferred candidates. See, e.g., Wright II, 979 F.3d at 1304 (third precondition met when in the "most probative" elections in Sumter County, "white residents voted as a bloc to defeat the black-preferred candidate"); Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Elections, 775 F.3d 1336, 1340 (11th Cir. 2015) (observing that

because "non-African-American voters preferr[ed] white candidates" "no African-American candidates had ever been elected" to the offices in question); <u>Hall v. Holder</u>, 117 F.3d 1222, 1229 (11th Cir. 1997) ("Racial bloc voting by the white majority usually suffices to keep black citizens out of office.").

646.  The Court finds that Dr. Handley's analysis clearly demonstrates high levels of white bloc voting in Georgia in the areas analyzed. <u>See</u> Doc. No. [39-7], at 23; Feb. 10 Tr. 90:18–20, 101:22–23; Doc. No. [118-1].The Court also finds that Black-preferred candidates are consistently defeated in Georgia in these areas except in majority-Black districts. <u>Id.</u> Defendant has offered no evidence to the contrary.

647.  Defendant's suggestion that <u>Gingles</u>' second precondition requires the Plaintiffs to prove that race is the sole or predominant cause of racially polarized voting is contrary to law. It is well-established in this Circuit that evidence that "the community's voting patterns can best be explained by other, non-racial circumstances" such as partisan affiliation, does <u>not</u> "rebut[] the plaintiff's evidence of racial bloc voting" under the <u>Gingles</u> preconditions. <u>Nipper</u>, 39 F.3d at 1524 & n.60 (Tjoflat, C.J., joined by one judge); <u>see</u> <u>Sanchez v. State of Colorado</u>, 97 F.3d 1303, 1321 (10th Cir. 1996) (holding district court committed reversible error when it "adopted the State's statistical theory on the mistaken view that why voters vote a certain way answers <u>Gingles</u>' question about the existence of racial bloc voting."). Instead, such evidence—which the State has failed to offer here—if relevant at all, would go only to the broader "totality  of  the circumstances" and would have no effect  on whether the preconditions themselves have been met. <u>Id.</u> The other circuits are near-unanimous in their agreement on this point. <u>See, e.g.</u>, <u>Goosby v. Town Bd. of Hempstead</u>, 180 F.3d 476, 493 (2d Cir. 1999) (holding that the "inquiry into the <u>cause</u> of white bloc voting is not relevant to a consideration of the <u>Gingles</u> preconditions"; collecting cases); <u>Holloway v. City of Virginia Beach</u>, 531 F. Supp. 3d 1015, 1078 (E.D. Va. 2021) (noting that the First, Second, Fourth, Seventh, Tenth, and Eleventh Circuits take this approach).

648. "[E]xpanding the inquiry into the third <u>Gingles</u> precondition to ask not merely whether, but also why, voters are racially polarized . . . would convert the threshold test into precisely the wide-ranging, fact-intensive examination it is meant to precede." <u>United States v. Charleston Cnty.</u>, 365 F.3d 341, 348 (4th Cir. 2004). For purposes of evaluating the <u>Gingles</u> preconditions, causation is simply "irrelevant." <u>Id.</u> at 347.

649. This Court concludes that the Plaintiffs have satisfied the second and third <u>Gingles</u> preconditions, and that as to these preconditions, the merits are entirely clearcut in their favor.

### iii. Plaintiffs are substantially likely to succeed in showing that the totality of the circumstances weighs in favor of establishing a Section 2 violation

650. Having found that the Plaintiffs satisfied the <u>Gingles</u> preconditions, this Court must also "consider the 'totality of circumstances' to determine whether members of a racial group have less opportunity than do other members of the electorate.'" <u>League of United Latin Am. Citizens v. Perry</u>, 548 U.S. 399, 425-26 (2006).

651. "[I]t will be only the very unusual case in which the plaintiffs can establish the existence of the three <u>Gingles</u> factors but still have failed to establish a violation of § 2 under the totality of circumstances.'" <u>Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs</u>, 775 F.3d 1336, 1342 (11th Cir. 2015) (quoting <u>Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.</u>, 4 F.3d 1103, 1135 (3d Cir. 1993)). Therefore, where plaintiffs have satisfied the <u>Gingles</u> preconditions but a court determines the totality of the circumstances does not show vote dilution, "the district court must explain with particularity why it has concluded, under the particular facts of that case, that an electoral system that routinely results in white voters voting as a bloc to defeat the candidate of choice of a politically cohesive minority group is not violative of § 2 of the Voting Rights Act." <u>Jenkins</u>, 4 F.3d at 1135.

652. To determine whether vote dilution exists under the totality of the circumstances, the Court uses "a searching practical evaluation of the

past and present reality," which is an analysis "peculiarly dependent upon the facts of each case and requires an intensely local appraisal of the design and impact of the contested" district map. <u>Gingles</u>, 478 U.S. at 79 (internal quotation marks and citations omitted).

653. To undertake the totality-of-the-circumstances determination, courts use the nine factors drawn from a report of the Senate Judiciary Committee accompanying the 1982 amendments to the VRA, i.e., the "Senate Factors." <u>Fayette</u>, 775 F.3d at 1342.

654. The nine non-exhaustive Senate Factors are:

[1] the history of voting-related discrimination in the State or political subdivision;

[2] the extent to which voting in the elections of the State or political subdivision is racially polarized;

[3] the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting;

[4] if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

[5] the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

[6] the use of overt or subtle racial appeals in political campaigns; and

[7] the extent to which members of the minority group have been elected to public office in the jurisdiction.

The Report notes that two additional considerations may be probative:

133

[8] evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and

[9] that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value.

Gingles, 478 U.S. at 45.

655.   In considering the totality of the circumstances, the Senate Factors are "neither comprehensive nor exclusive," and "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." Gingles, 478 U.S. at 45. However, the Supreme Court has explained that "the most important" Senate Factors are the "extent to which minority group members have been elected to public office in the jurisdiction," Senate Factor 7, and the "extent to which voting in the elections of the state or political subdivision is racially polarized," Senate Factor 2. Gingles, 478 U.S. at 48 n.15.

656.   Each relevant consideration in the totality-of circumstances analysis points towards a conclusion of vote dilution.

### 1.    Factor One: History of Discrimination

657.   As to Senate Factor one, this Court agrees with the many other courts in this circuit to have opined on this issue, and concludes that Georgia has a long history of voting-related discrimination. See Wright v. Sumter Cnty. Bd. of Elections & Registration, 301 F. Supp. 3d 1297, 1310 (M.D. Ga. 2018) (quoting Brooks v. State Bd. of Elections, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994)).

658.   That some of this history is centuries old does not render it irrelevant. As courts have recognized, a history of discrimination "can severely impair the present-day ability of minorities to participate on an equal footing in the political process. Past discrimination may cause blacks to register or vote in lower numbers than whites. Past discrimination may also lead to present socioeconomic disadvantage, which in turn

can reduce participation and influence in political affairs." <u>Wright</u>, 301 F. Supp. at 1319 (quoting <u>United States v. Marengo Cnty. Comm'n,</u> 731 F.2d 1546, 1567 (11th Cir. 1984)). The accumulated weight of the history of voting in Georgia has resulted in "diminished political influence and opportunity" for Black citizens in Georgia into the present day. <u>Cofield v. City of LaGrange</u>, 969 F. Supp. 749 (N.D. Ga. 1997).

659.   Indeed, the Supreme Court instructs that "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and <u>historical</u> conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." <u>Gingles,</u> 478 U.S. at 47 (emphasis added).

660.   This Court concludes that Georgia has an extensive history of voting-related discrimination—both recent and distant—and that this factor weighs heavily in Plaintiffs' favor.

## 2.   Factor Two: Racially Polarized Voting

661.   Plaintiffs' expert, Dr. Handley, provides overwhelming evidence that Black and white voters in Georgia cohesively support different candidates, which is corroborated by the Pendergrass/Grant Plaintiffs' expert, Dr. Palmer. Defendant's expert, Dr. Alford, agrees. <u>See</u> Doc. No. [39-7], at 23; Feb. 10 Tr. 48:25-49:11; Feb. 11 Tr. 154:15–19; <u>see generally</u> <u>supra</u> Part III. This factor is undisputed and the polarization is "stark." Thus, the second Senate Factor weighs heavily in Plaintiffs' favor.

662.   "The legal concept of racially polarized voting, as it relates to claims of vote dilution, refers only to the existence of a correlation between the race of voters and the selection of certain candidates." <u>City of Carrollton Branch of N.A.A.C.P. v. Stallings</u>, 829 F.2d 1547, 1557 (11th Cir. 1987) (quoting <u>Gingles,</u> 478 U.S. at 74 (plurality opinion)).

663.   "It is the difference between the choices made by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred

representatives. Consequently, . . . under the 'results test' of § 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters." <u>Gingles</u>, 478 U.S. at 63 (plurality opinion). "All that matters under § 2 and under a functional theory of vote dilution is voter behavior, not its explanations." <u>Id</u>. at 73 (plurality opinion).

664. Defendant attempts to rebut the stark racial polarization in the areas at issue here by claiming that partisanship rather than race better explains the polarization. The Court rejects that argument for several reasons.

665. First, insofar as Defendant argues that Plaintiffs must show that electoral losses are the result of racial bias, that is wrong. Section 2 does not require that plaintiffs prove "racial animus," <u>Fayette Cnty.</u>, 950 F. Supp. 2d at 1321 n.29, or that "racism determines the voting choices of the white electorate." <u>Askew v. City of Rome</u>, 127 F.3d 1355, 1382 (11th Cir. 1997); <u>see also Nipper v. Smith</u>, 39 F.3d 1494, 1526 n.64 (11th Cir. 1994) (en banc) (Tjoflat, C.J., joined by one judge). "A discriminatory <u>result</u> is all that is required; discriminatory intent is not necessary." <u>Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs</u>, 775 F.3d 1336, 1342 (11th Cir. 2015).

666. The rule Defendant proposes is anathema to Section 2 of the VRA as amended by Congress in 1982. The 1982 Amendment restored the "results test," which does not require a showing of discriminatory intent. S. REP. 97-417, 2, 23 1982 U.S.C.C.A.N. 177, 179, 200. As described by the Senate Committee Report, the "main reason" that Congress restored the results test was "simply put, the [intent] test asks the wrong question." S. REP. 97-417, 36, 1982 U.S.C.C.A.N. 177, 214. The relevant question is whether the "electoral system operates today to exclude Blacks" or deny Black people a "fair opportunity to participate," and if so, "the system should be changed." S. REP. 97-417, 36, 1982 U.S.C.C.A.N. 177, 214. "The purpose of the Voting Rights Act was not only to correct an active history of discrimination...but also to deal with the accumulation of discrimination." S. Rep. 97-417, 5, 1982 U.S.C.C.A.N. 177, 182.

667.  Additionally, "the intent test is unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities." Id. Moreover, requiring proof of motivation creates the "inherent danger" in a defendant's "ability to offer a non-racial rationalization" even "for a law which in fact purposely discriminates. Id. at 37. See generally Solomon v. Liberty County, 899 F.2d 1012, 1015 (11th Cir. 1990) (en banc) (Kravitch, J., specially concurring) (discussing these considerations in the Senate Report).

668.  Requiring a plaintiff to negate non-racial causes put forth by a defendant under the totality of the circumstances inquiry would also effectively reintroduce the City of Mobile v. Bolden, 446 U.S. 55 (1980), intent test into the vote dilution analysis. A defendant could always come up with some plausible cause or causes which could explain away sustained racially polarized voting. Solomon v. Liberty County, 957 F. Supp. 1522, 1548–49 (N.D. Fla. 1997), aff'd, 221 F.3d 1218 (11th Cir. 2000).

669.  Second, even if the subjective reasons why Black and white Georgians vote overwhelmingly for different candidates can be relevant to the totality of the circumstances analysis, Defendant has not met his obligation to introduce evidence" that the undisputed racial polarization has an "innocent explanation[]." Nipper v. Smith, 39 F.3d 1494, 1526 n.64 (11th Cir. 1994) (en banc) (Tjoflat, C.J., joined by one judge). And even if racial polarization "may logically be explained by a factor other than race" it does not require "plaintiffs to prove racial bias in community," NAACP, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist., 462 F. Supp. 3d 368, 392 (S.D.N.Y. 2020), aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist., 984 F.3d 213 (2d Cir. 2021).

670.  Defendant's expert has a particular interpretation that he suggests may explain the undisputed evidence of "stark" racial polarization—that Black voters support Democratic candidates and white voters support Republican candidates, which he calls "partisan polarized voting." Having established "proof of the second and third Gingles factors," Plaintiffs have created "a sufficient inference that racial bias

137

is at work," and are "not required to prove the negative." <u>Nipper v. Smith</u>, 39 F.3d 1494, 1525 (11th Cir. 1994) (Tjoflat, C.J., joined by one judge). Defendant has not "rebut[ted] [this] proof of vote dilution by showing that losses by minority-preferred candidates are attributable to non-racial <u>causes</u>." <u>Id.</u> (emphasis added) (Tjoflat, C.J., joined by one judge). Dr. Alford's descriptive observation that there is "90% cohesive Black vote for the Democrat and 90% cohesive White vote for the Republican candidate," Doc. No. [87], at 5, does not "introduce evidence of [an] innocent explanation[]" for the undisputed polarization. <u>Nipper</u>, 39 F.3d at 1525 n.64 (Tjoflat, C.J., joined by one judge).

671. Plaintiffs are under "no obligation" to "search . . . out" such evidence "and disprove [non-racial explanations] preemptively." <u>Nipper</u>, 39 F.3d at 1525 n.64 (Tjoflat, C.J., joined by one judge). <u>Cf. Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs</u>, 118 F. Supp. 3d 1338, 1347 (N.D. Ga. 2015) ("the Court recognizes that Defendants have raised an interesting possibility that partisanship, not race, accounts for the lack of electoral success in Fayette County. But on the current record, the Court is unable to conclude that this is the case.")

672. Moreover, Plaintiffs provide undisputed evidence that race impacts political attitudes and partisan voting choices. <u>See</u> Doc. No. [59-7], at 3–4. In fact, Dr. Alford agrees that partisan affiliation can be motivated by race. Defendant's evidence, which does not even attempt to "isolate and measure for effect" the impact of party on voting patterns, fails to rebut Plaintiffs' evidence and "demonstrate that race-neutral factors explain the voting polarization." <u>United States v. Charleston Cnty.</u>, 316 F. Supp. 2d 268, 304 (D.S.C. 2003), <u>aff'd</u>, 365 F.3d 341 (4th Cir. 2004).

673. Plaintiffs also have introduced additional evidence of racial polarization that <u>cannot</u> be explained by partisanship – racial polarization in primary elections. Indeed, as Defendant's expert has previously testified, "primary elections are nonpartisan and cannot be influenced by the partisanship factor" <u>Perez v. Pasadena Indep. Sch. Dist.</u>, 958 F. Supp. 1196, 1225 (S.D. Tex. 1997), <u>aff'd</u>, 165 F.3d 368

(5th Cir. 1999). Accordingly, Dr. Handley's findings of racial polarization <u>within</u> Democratic Party primaries are especially compelling here in dispelling the supposition that Georgia's stark racial polarization reduces to partisanship.

674. In sum, Senate Factor Two weighs heavily in Plaintiffs' favor, whether or not the Court considers the subjective motivations of voters behind the undisputed "stark" racially polarized voting.

### 3. Factor Three: Use of Electoral Schemes Enhancing the Opportunity for Discrimination

675. As to Senate Factor 3, this Court concludes that Georgia has consistently used voting practices or procedures that may enhance the opportunity for discrimination against the minority group. It can hardly be disputed that that is true as a historical matter. And contemporary voting practices, like the various iterations of Georgia's "exact match" program, and the closing of polling locations, have been shown to disproportionately disadvantage Black voters. Doc. No. [39-8], at 17-20, 21.

676. None of the State's scattershot arguments change this conclusion. First, contrary to the State's argument, one exceptional instance in which Black voters were able to overcome the discriminatory effects of the majority vote requirement does not outweigh its recognized effects in impairing Black voters' ability to elect candidates of their choice. Second, the State points to automatic voting registration as one example of a voting procedure that tends to improve access to the polls, but has stopped short of providing any other examples or sufficient evidence to refute Plaintiffs' evidence that Georgia employs various voting practices that tends to enhance the opportunity for discrimination against Black Georgians. Third, while the State argues that it is still an open question whether Georgia's more recent voting restrictions will be struck down as unlawful, that does not mean that those restrictions—including limitations on the use of absentee voting, early voting, and drop boxes—do not enhance the opportunity for discrimination against Black Georgians.

677.   Senate Factor Three weighs heavily in Plaintiffs' favor.

### 4.   Factor Four: Slating Processes

678.   It is undisputed that Georgia uses no slating process for its General Assembly elections. As a result, this factor is irrelevant to this case, and the Court does not consider it to weigh in either parties' favor.

### 5.   Factor 5: Effects of Discrimination

679.   As to Senate Factor 5, the Court concludes that Black Georgians suffer socioeconomic hardships rooted in a history of discrimination that impedes their ability to participate in the political process compared to white Georgians, a racial gap that is captured by Georgia's own voter turnout data.

680.   Plaintiffs have offered overwhelming evidence that as a result of Georgia's long history of discriminating against Black residents in nearly every aspect of daily life, the Black community in Georgia suffers socioeconomic disparities that impair their ability to participate in the political process.

681.   Racial inequalities in financial resources can cause other relevant harms, like Black voters "not be[ing] able to provide the candidates of their choice with the same level of financial support that whites can provide theirs." Gingles, 478 U.S. at 70.

682.   Defendant does not dispute that Black Georgians today suffer from socioeconomic disparities in essentially every area of life. Nor does he dispute that these socioeconomic disparities have the effect of making it harder for one to participate in the political process.

683.   While the State argues that the record high voter turnout in 2020 signifies there is less difficulty in participating in the political process in recent years, that ignores the indisputable fact that the racial gap in voter turnout continues to persist, the unique factors which lead to high voter turnout in 2020 including increased access to absentee ballots and dropboxes, and the immediate rollback of such voter access measures in the wake of the participation of Black voters.

684. Because Defendants entirely fail to rebut Plaintiffs' evidence of significant effects of discrimination on Black Georgians that affect political participation, it weighs heavily in favor of a finding of vote dilution.

### 6. Senate Factor 6: Racial Appeals

685. As to Senate Factor 6, the Court concludes that there are ample recent and historical examples of the use of racial appeals in Georgia elections, which show that both subtle and overt racial appeals are pervasive in Georgia's political environment.

686. Examples include darkening the skim of a Black candidate, which courts have regularly recognized as a common tactic for racial appeals. See, e.g., United States v. Charleston Cnty., 318 F. Supp. 2d 302, 323 (D.S.C. 2002) (noting that "non-minority candidates have displayed photos of their black opponents prominently in campaign literature and sometimes darkened pictures to emphasize the racial distinction").

687. The State incorrectly suggests that appeals to racism by "unsuccessful candidates" do not weigh toward vote dilution. As this Court has previously explained, "this factor does not require that racially polarized statements be made by successful candidates. The factor simply asks whether campaigns include racial appeals." Order on Motion for Summary Judgment at 45-46, Fair Fight Action, Inc. v. Raffensperger, No. 1:18-cv-5391-SCJ (N.D. Ga. 2021) (Dkt. 636) (citing Gingles, 478 U.S. at 37).

688. That makes sense because, as Dr. Jones explained, racial appeals used in campaigns against a candidate who is able to overcome the racial appeal and win the election still provide evidence about the political environment and show that the political opponent thought the appeals to racism would work in Georgia. Feb. 10 Tr. 183:23-184:10.

689. Because Plaintiffs have shown that both overt and subtle racial appeals continue to be endemic in Georgia politics, this factor weighs heavily in the Plaintiffs favor.

141

### 7.      Factor 7: Lack of Electoral Success

690.   As to Senate Factor 7, the Court concludes that Black Georgians continue to have a lack of electoral success in U.S. Congress, state-wide office, and General Assembly from the areas at issue in this case. Such area specific evidence is especially powerful. See Wright II, 979 F.3d at 1305-06.

691.   The State's examples of two Black candidates who have yet to win are not enough to overcome the weight of the Plaintiff's evidence of underrepresentation in every corner of Georgia's public office. While Black Georgians do represent their communities in the General Assembly, significantly less than 1/3 of the General Assembly is Black, and the vast majority of those Black State Senators and Representatives come from majority-Black districts, demonstrating that the protections of the VRA are still needed in Georgia.

### 8.      Factor 8: Lack of Responsiveness

692.   As to Senate Factor 8, the Court concludes that the Georgia General Assembly is unresponsive to the interests and needs of its Black constituents, as shown by the continued disparity between white and Black Georgians.

### 9.      Factor 9: Tenuous Justification

693.   As to Senate Factor 9, the Court concludes that any justification for the State Senate and House Plans are tenuous. The State's justification that its maps better serve Georgia's redistricting principles was strongly disputed by Plaintiffs, and Mr. Cooper and Dr. Esselstyn demonstrated that it is possible to create plans with additional majority-Black districts that respect traditional redistricting principles.

### B.      The Remaining Preliminary Injunction Factors Weigh Heavily in Favor of Relief

#### a.      The Plaintiffs Would Suffer Irreparable Harm Absent Injunctive Relief

694. As the State candidly agreed, "if there is a Section 2 violation, the harm is irreparable. . . . [T]hose two go hand-in-hand." Feb. 14 Tr. 154:12–16.

695. Voting is "a fundamental political right, because [it is] preservative of all rights." Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886). It "is the beating heart of democracy" and therefore "is of the most fundamental significance under our constitutional structure." Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1315 (11th Cir. 2019) (citations omitted). "And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." Reynolds v. Sims, 377 U.S. 533, 555 (1964).

696. As the Eleventh Circuit has explained, a harm is "irreparable if it cannot be undone through monetary remedies." Scott v. Roberts, 612 F.3d 1279, 1295 (11th Cir. 2010) (quotation marks omitted). In turn, numerous courts have recognized that restrictions on the fundamental right to vote are a "significant, irreparable harm." Charles H. Wesley Educ. Found., Inc. v. Cox, 408 F.3d 1349, 1355 (11th Cir. 2005); see also, e.g., Martin v. Kemp, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018), stay denied sub nom. Ga. Muslim Voter Project v. Kemp, 918 F.3d 1262 (11th Cir. 2019); Fish v. Kobach, 840 F.3d 710, 752–53 (10th Cir. 2016); League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014); Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012). This reflects the unremarkable principle that, "[o]nce an election occurs, there can be no do-over and no redress." League of Women Voters, 769 F.3d at 247.

697. Thus, in view of this Court's finding, supra Part IX.B, that the enacted 2021 maps likely violate Section 2 of the Voting Rights Act, this Court further finds that the resulting harm suffered by the Plaintiffs would be severe and irreparable. Deprivations of Plaintiffs' rights under Section 2 would be impossible to remedy through any form of post-election relief.

**b.    The Balance of Equities Tip Decidedly in Favor of Relief**

143

698.   Vindicating voting rights is also in the public interest. The "cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest." Charles H. Wesley Educ. Found., 408 F.3d at 1355.

699.   Based on 1.5 days' worth of testimony involving 6 witnesses on this particular question, and as discussed further below, this Court also concludes that it can craft relief such that any hardship to the State will be outweighed by the public interest.

700.   This Court concludes that by ordering the Secretary of State to withhold issuance of any precinct cards, granting the Georgia General Assembly two weeks to enact plans consistent with the Voting Rights Act, ordering Plaintiffs to submit three proposed remedial plans that change the least number of districts from the currently enacted plans while complying with traditional redistricting criteria, and ordering that the General Primary Election be moved to July 26, 2022 with a corresponding change in other relevant deadlines, this Court can significantly limit the hardship to the State.

701.   This Court concludes that by ordering the Secretary of State to withhold issuance of any precinct cards until after the remedial maps are implemented no significant voter confusion will result. This is so because voters likely do not yet know their precincts, candidates, or districts, and will not know that information until they receive precinct cards.

702.   This Court concludes that it is appropriate to give the Georgia General Assembly two weeks to enact plans that comply with the Voting Rights Act.

703.   This Court concludes that to avoid any significant delay in implementing plans that comply with the Voting Rights Act, it is appropriate to order the Plaintiffs to submit remedial plans that change the least number of districts as compared to the currently enacted plans while complying with traditional redistricting principles. The Court concludes that based on the testimony of the election officials, a least changes plan will result in the least amount

of additional work for county and state election officials and will alleviate significant hardship.

704. The Court concludes that based on the testimony of state and county election officials moving the General Primary Election to July 26, 2022, will alleviate, not cause, significant hardship to the State. This Court is not writing on a blank slate. Prior to the commencement of this litigation, approximately 400 election officials asked the General Assembly to move the General Primary Election to the summer because they believed that additional time was needed to best administer the election and schools are easier to secure as polling locations during the summer months.

**C.   The Purcell Principle Does Not Bar Relief**

705. This Court concludes that Purcell and its progeny do not preclude the relief described above.

706. In Purcell v. Gonzalez, 549 U.S. 1 (2006) (per curiam), the Supreme Court reversed the Ninth Circuit's interlocutory injunction, which "enjoin[ed] operation of voter identification procedures just weeks before an election." Id. at *4.

707. According to Purcell, courts issuing orders related to elections are "required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures." Id. These specific election considerations include "voter confusion." Id. at *4-*5.

708. This Court has considered the election-specific context of this case and concludes that the relief that has been ordered will not result in voter confusion or otherwise incentivize voters to remain away from the polls. See id. at *5. Indeed, this Court concludes that given the unique factual circumstances, robust record on feasibility and hardship in this case, and the distance from the elections, the concerns that animated the decision in Purcell are not present here.

709. Furthermore, this case is distinguishable from other cases where courts, employing <u>Purcell</u>, have declined to provide relief for upcoming elections. For example, in <u>Democratic National Committee v. Wisconsin State Legislature</u>, 141 S. Ct. 28 (2020), the Supreme Court denied an application to vacate a stay imposed by the Seventh Circuit after a district court had initially extended the deadline for Wisconsin voters to return absentee ballots. But in that case, the district court had "intervened in the thick of election season to enjoin enforcement of a State's laws," <u>id.</u> at 28 (Robert, C.J., concurring), "just six weeks before the November election and after absentee voting had already begun," <u>id.</u> at 31 (Gorsuch, J., concurring). This Court's order comes more than eight months before the general election, and approximately five months before the rescheduled primary election.

710. Similarly, in <u>Republican National Committee v. Democratic National Committee</u>, 140 S. Ct. 1205 (2020), the Supreme Court stayed relief ordered by a district court just "five days before the scheduled election." <u>Id.</u> at 1206.

711. Additionally, <u>Curling v. Raffensperger</u>, 397 F. Supp. 3d 1334 (N.D. Ga. 2019), also involved far shorter time horizons. In that case, the court's order was issued on August 15, 2019, and plaintiffs had asked for changes in how the State's November 5, 2019 election would be conducted, less than three months away. The court determined that the "unique factual posture of the case"—where plaintiffs had asked for implementation of an entirely new "hand-marked paper ballot system for the 2019 elections," when the State had already announced plans to fully change its voting system for the 2020 elections— "weigh[ed] in favor of restraint." <u>Id.</u> at 1406. The time frame was much more condensed, and the practical difficulties of the State implementing the requested relief were much more extreme. <u>Id.</u> at 1405 ("But the Court remains concerned, based upon the entirety of the record evidence, about the State's capacity to manage a transition to paper ballots for the 2019 elections while overseeing and undergoing a simultaneous transition to the newly enacted voting system during this time").

146

712.   This Court is aware of and considers the Supreme Court's recent decision to stay the decision of the Northern District of Alabama in Merrill v. Milligan, 2022 WL 354467 (U.S. Feb. 7, 2022).   For the reasons discussed below, the Court does not find that this recent stay decision bars or otherwise suggests that the relief ordered here is improper.

713.   On January 24, 2022, a three-judge court in the Northern District of Alabama concluded that Alabama plaintiffs were "substantially likely to establish that the [Alabama 2021 congressional] Plan violates Section Two of the Voting Rights Act." Singleton v. Merrill, No. 2:21-cv-1291-AMM, 2022 WL 265001, at *2 (N.D. Ala. Jan. 24, 2022) (three-judge court) (per curiam). The court issued a preliminary injunction barring the Alabama Secretary of State from conducting congressional elections according to Alabama's 2021 redistricting plan, and it stayed the qualification deadline for 14 days "to allow the Legislature the opportunity to enact a remedial plan" that would create one "additional majority-Black congressional district, or an additional district in which Black voters otherwise have an opportunity to elect a representative of their choice." Id.

714.   In deciding that a preliminary injunction was appropriate, the Merrill court considered one uncontested declaration from the Alabama Director of Elections noting that there would be "substantial obstacles to changing the Congressional districts at this late date," and testimony from a former Congressman about potential harms faced by candidates for election. Singleton, 2022 WL 265001, at *51–52. The Merrill court—like other courts denying injunctive relief under Purcell—did not otherwise hear evidence on feasibility and hardship. Here, this Court heard lengthy, live testimony on feasibility and hardship in reaching the conclusions in this order.

715.   The unrebutted evidence in Merrill, which Alabama emphasized in its request to the Supreme Court for a stay, was that reassigning registered voters to new congressional lines "can take three to four months, particularly in the 45 of the State's 67 counties where the process is performed manually." Reply in Support of Stay at 25

(emphasis added); see Milligan v. Merrill, No. 2:21-cv-1530-AMM, ECF 79-7 at 4 (Declaration of Director of Elections for the Alabama Secretary of State's Office Explaining that "in 2017, following the Alabama Legislative Black Caucus redistricting litigation, the Alabama Legislature drew remedial Senate and House plans that altered only a portion of the districts in each plan. Even though only some districts were affected, local election officials struggled to complete the district assignment process in up to 4 months."). In contrast, the consistent testimony in this case is that county elections boards could re-allocated registered voters within two to four weeks of receiving new maps. *See* Feb. 9 Tr. 21:18-25 (Bailey) Feb. 9 Tr. 84:5–10 (Barron).

716.    On February 7, 2022, the Supreme Court issued an order staying the district court's preliminary injunction. See Merrill v. Milligan, 2022 WL 354467 (U.S. Feb. 7, 2022). While five Justices joined in the decision to grant the stay, we only know the reasoning of two of those Justices and the four Justices who dissented from granting the stay.

717.    Justice Kavanaugh wrote an opinion concurring in the grant of the stay, joined only by Justice Alito. In that concurrence, Justice Kavanaugh explained that the stay was "not a ruling on the merits," but instead "follows this Court's election-law precedents," which provide that "federal district courts ordinarily should not enjoin state election laws in the period close to an election." Id. at *1 (Kavanaugh, J., concurring in grant of applications for stays) (citing Purcell v. Gonzalez, 549 U.S. 1 (2006) (per curiam)). Justice Kavanaugh noted that Alabama's "primary elections begin (via absentee voting) just seven weeks from now, on March 30." Id.

718.    Justice Kavanaugh explained that the Purcell principle was "not absolute" or a bright line rule, but instead "a sensible refinement of ordinary stay principles for the election context." Id. at *2. Under Justice Kavanaugh's formulation, the Purcell principle "might be overcome even with respect to an injunction issued close to an election if a plaintiff establishes at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the

plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." Id.

719.   To be sure, this Court understands that Justice Kavanaugh's concurrence lacks the requisite majority of Justices to be precedential. However, to the extent that Justice Kavanaugh's opinion respecting the order may represent the current Purcell standard for granting injunctive relief, but see Marks v. United States, 430 U.S. 188, 193 (1977), all four factors are satisfied here such that the Purcell principle is "overcome."

720.   Furthermore, this Court's consideration of Justice Kavanaugh's concurrence is contextualized by the Supreme Court's decision in Shelby County v. Holder, where the Supreme Court explained that "injunctive relief [under § 2] is available in appropriate cases to block voting laws from going into effect." 133 S. Ct. 2612, 2619 (2013). Accordingly, Justice Kavanaugh's concurrence cannot be read in such a way that would preclude all pre-implementation preliminary injunctive relief under § 2.

### a.   The Merits are Entirely Clearcut in Favor of the Plaintiffs

721.   Justice Kavanaugh's concurring opinion in Milligan expressly disavowed "mak[ing] or signal[ing] any change to voting rights law." Milligan, 2022 WL 354467, at *1 (Kavanaugh, J., concurring in grant of applications for stays). Thus, the applicable Section 2 test remains the multipart framework set forth in Thornburg v. Gingles, 478 U.S. 30 (1986), and subsequent controlling cases decided by the Supreme Court and the Eleventh Circuit.

722.   Although Gingles may, in some respects, be somewhat "uncertain[]" in terms of its "nature and contours," Milligan, 2022 WL 354467, at *4 (Roberts, C.J., dissenting from grant of applications for stays); see also id. at *3 (Kavanaugh, J., concurring in grant of applications for stays), some fuzziness along the edges cannot obscure the clarity at Section 2's core.

149

723. This Court finds that—as discussed more thoroughly <u>supra</u> Part IX.A, and notwithstanding any uncertainty that might now exist about distinct legal issues raised by Milligan—the underlying merits are not remotely close. To the contrary, the underlying merits are "entirely clearcut" in favor of the Plaintiffs. <u>Milligan</u>, 2022 WL 354467, at *3. As Mr. Cooper said, the ability to draw additional majority-Black districts here, especially in Metro Atlanta in light of the phenomenal Black population growth there, is "almost self-evident." Feb. 7 Tr. 178:10–15.  And especially powerful here, two independent mappers, starting from two different baseline maps, both drew at least three new Black-majority Senate districts and at least three new majority-Black house districts in the same areas—powerful confirmation that those results are neither anomalous nor the result of an over-emphasis on race, but rather an expression of demographic reality.

724. Accordingly, the first of the four factors from Justice Kavanaugh's concurrence weighs in favor of the Plaintiffs.

**b.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief**

725. This Court has already concluded that Plaintiffs will suffer irreparable harm absent injunctive relief. <u>See</u> <u>supra</u> Part IX.B.a.

**c.    The Plaintiffs Promptly Brought Suit**

726. This Court finds that there was no delay in Plaintiffs' prosecution of their suit, much less an undue one. Plaintiffs filed suit within hours of the challenged Plans becoming law and, since then, have sought to expedite proceedings at every turn.

727. Plaintiffs brought suit within hours of the 2021 Georgia Senate and House Plans being signed into law, and have litigated their claims expeditiously at every turn. If Plaintiffs were found to have acted with undue delay in this case, then no case could have been timely filed challenging the 2021 Georgia State and House Plans.

728. If any relevant delay has occurred with respect to this litigation, it is the Governor's delay in signing the plans into law.

### d.   A Remedy is Feasible and Not Unduly Burdensome

729.   This Court concludes that the remedy described above is feasible and will not result in significant cost, confusion, or hardship.

730.   This Court concludes that the remedy ordered here will not result in significant cost because neither the State's or Plaintiffs' witnesses on feasibility claimed that any significant costs would result from entering remedial plans and moving the primary election to allow for more time to properly administer the election. Furthermore, to the extent costs may result from the potential need to move polling locations, the testimony presented at the hearing suggests that any such costs are speculative because the types of locations typically used for polling locations are likely to be available if the primary election is moved. See supra Part VI.B.

731.   This Court concludes that the remedy ordered here will not result in significant confusion to voters or candidates because based on the testimony presented at the hearing: (1) voters likely do not yet know their precincts, candidates, or districts and the remedy crafted here ensures that voters will not receive conflicting information, (2) voters will receive significant messaging from campaigns and Georgia's robust election information infrastructure about the change in election dates, and (3) candidates are capable of adapting to election changes to ensure that voters have a lawfully constructed district. See supra Part VI.B.

732.   With respect to hardship to the State, the Court notes as an initial matter that not all changes to election procedures should be presumed to create hardship; nor are all claims of hardship of equal weight. To presume otherwise could quickly turn this factor into a bright line rule against relief.

733.   This Court concludes that the remedy ordered here will not result in significant hardship to the State. Any hardship to the State would likely result from moving the primary election and corresponding dates. However, Georgia is uniquely situated because election officials in the state had already asked for additional time to conduct

the primary election before this litigation commenced. While the Court is assured that those county officials would have preferred to have received that relief during the November 2021 Special Session, the testimony of election officials at the hearing confirmed that even at this juncture additional time to administer the primary election would be welcomed. See supra Part VI.B. Furthermore, the calendar that the Court orders here will ensure that election officials have at least as much time as they did under the State's original calendar to complete the same tasks. By doing so, this Court ensures that election officials will be even better positioned to administer the election than they are today because much of the work of administering the election is already done and will not need to be redone based on the relief ordered here.

734.  For these reasons, this Court concludes that to the extent Justice Kavanaugh's concurrence is indicative of the Purcell standard, it is satisfied here based on the unique factual circumstances and testimony provided in this hearing.

735.  That unique factual record distinguishes this case from Merrill. Alabama had a January 28 deadline for qualifying, a full month-and-a-half before Georgia's March 11 deadline for qualifying. In Merrill, the District Court extended the qualification deadline, but did not reschedule the primary election or otherwise push any elections deadlines. Here, evidence has been presented that election deadlines, including the date of the primary election, could be extended by a month or more without imposing any significant burden on the State. If the Court were to reschedule the primary until later in the summer, it would simply return the State to the schedule it used before 2014, and address concerns that had been raised by the Georgia Voter Registration Election Officials Association.

736.  Despite both involving redistricting challenges, Milligan and this case are factually distinguishable; the record here does not show the kinds of hardships to the State that would require this Court to allow an election under unlawful maps to proceed. Said otherwise, Milligan does not compel any particular outcome in this case.

152

737. Furthermore, because <u>Purcell</u> and its progeny, including Justice Kavanaugh's concurrence, do not bar relief here, this Court concludes that it is in the public interest to provide the relief ordered here.

## X. Conclusion

738. "A preliminary injunction is an extraordinary remedy never awarded as of right." <u>Winter v. Nat'l Res. Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008). In the first instance, the crucial "judgments, about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make." <u>BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC</u>, 425 F.3d 964, 968 (11th Cir. 2005).

739. Based on the foregoing, this Court concludes that preliminary injunctive relief is appropriate. Plaintiffs have demonstrated that they are entitled to injunctive relief, whether assessed under the traditional factors, <u>see</u> <u>Winter</u>, 555 U.S. at 20, or under Justice Kavanaugh's "refinement . . . for the election context," <u>Milligan</u>, 2022 WL 354467, at *2 (Kavanaugh, J., concurring in grants of applications for stays).

Respectfully submitted,

/s/ Rahul Garabadu
Sean J. Young (Bar 790399)
*syoung@acluga.org*
Rahul Garabadu (Bar 553777)
*rgarabadu@acluga.org*
ACLU FOUNDATION OF GEORGIA,
INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

/s/ Debo Adegbile
Debo Adegbile
*debo.adegbile@wilmerhale.com*
Robert Boone
*robert.boone@wilmerhale.com*
Abigail Shaw
*abby.shaw@wilmerhale.com*
Alex W. Miller
*alex.miller@wilmerhale.com*
Cassandra Mitchell
*cassie.mitchell@wilmerhale.com*
Maura Douglas
*maura.douglas@wilmerhale.com*
Samuel Weitzman
*samuel.weitzman@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

/s/ Sophia Lin Lakin
Sophia Lin Lakin
*slakin@aclu.org*
Ari J. Savitzky
*asavitzky@aclu.org*
Jennesa Calvo-Friedman
*jcalvo-friedman@aclu.org*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

/s/ George P. Varghese
George P. Varghese
*george.varghese@wilmerhale.com*
Denise Tsai
*denise.tsai@wilmerhale.com*
Tae Kim
*tae.kim@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

/s/ Charlotte Geaghan-Breiner
Charlotte Geaghan-Breiner
*charlotte.geaghan-breiner@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
2600 El Camino Real
Suite 400

154

/s/ *Edward Williams*
Anuradha Sivaram
*anuradha.sivaram@wilmerhale.com*
Edward Williams
*ed.williams@wilmerhale.com*
De'Ericka Aiken
*ericka.aiken@wilmerhale.com*
Ayana Williams
*ayana.williams@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Palo Alto, CA 94306
(650) 858-6000 (t)
(650) 858-6100 (f)

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1</u>

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, using a font type of Book Antiqua and a point size of 13.

*/s/ Rahul Garabadu*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused to be served the foregoing *Plaintiffs' Findings of Fact and Conclusions of Law* with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel or parties of record on the service list:

This 18th day of February, 2022.

*/s/ Rahul Garabadu*