# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., *et al.*, <br><br>     *Plaintiffs*, <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, <br><br>     *Defendant*. | CASE NO. 1:21-CV-05337-SCJ |

## DEFENDANT'S BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

After engaging in a months-long process in 2021 that sought broad input and despite COVID-related Census delays, Georgia implemented redistricting maps for the General Assembly that split fewer counties than prior plans, paired very few incumbents, and increased or maintained the number of majority-Black districts. Plaintiffs claim these maps result in "a denial or abridgement of the right . . . to vote on account of race or color," 52 U.S.C. § 10301(a), because they say the General Assembly had an obligation to draw 17 majority-Black Senate districts instead of 14 in the enacted plan and 54

majority-Black House districts instead of 49 in the enacted plan, so the adopted maps constitute illegal vote dilution.

But Section 2 does not allow this court to infer vote dilution "from mere failure to guarantee a political feast," *Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994) (majority op.), because the "[f]ailure to maximize cannot be the measure of § 2." *Id.*

This means that Section 2 is not simply a checklist—"do we have a map with more districts, polarized voting, and a history of discrimination? End of analysis!"—instead, this Court is required to "conduct an intensely local appraisal of the design and impact of a voting system." *Johnson v. Hamrick*, 296 F.3d 1065, 1074 (11th Cir. 2002) (quoting *Negron v. City of Miami Beach*, 113 F.3d 1563, 1566 (11th Cir. 1997)). And the alleged dilution of the right to vote "must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc) (quoting *Nipper v. Smith*, 39 F.3d 1494, 1515 (11th Cir. 1994) (en banc)); *accord Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2359 (2021) (Kagan, J, dissenting) (Section 2 asks whether an election law interacts with conditions "to ***cause*** race-based inequality in voting opportunity" (emphasis added)). This local appraisal also does not mean the adopted plans have to beat Plaintiffs'

maps in a "beauty contest." *Bush v. Vera*, 517 U.S. 952, 977 (1996) (O'Connor, J.). This is at least in part because "the Constitution charges States, not federal courts, with designing election rules." *Curling v. Raffensperger*, 50 F.4th 1114, 1122 (11th Cir. 2022).

Thus, instead of engaging in a wholesale review of the legislature's choices, this Court must answer two fundamental questions, in an area of law that is "notoriously unclear and confusing," *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring):

- Did the Georgia General Assembly adopt a map that dilutes the right to vote of Black voters in Georgia on account of race or color when it drew a Senate map without three additional majority-Black Senate districts in metro Atlanta and Augusta? If so, which of these districts should have been drawn and why?

- Did the Georgia General Assembly adopt a map that dilutes the right to vote of Black voters in Georgia on account of race or color when it drew a House map without five additional majority-Black House districts in metro Atlanta, Macon, Augusta, and/or[1]

---

[1] Given the conflicting views of Plaintiffs' experts in this case and *Grant* on where these additional districts should be located, the "and/or" is important in determining what Plaintiffs say the General Assembly failed to do.

Southwest Georgia? If so, which of these districts should have been drawn and why?

As discussed below, Plaintiffs cannot prevail on their claims after discovery. This Court should determine that Plaintiffs have failed to present evidence that Georgia's legislative maps dilute the right to vote on account of race or color and dismiss this case.

First, the maps proposed by Plaintiffs do not meet prong one of *Thornburg v. Gingles*, 478 U.S. 30 (1986), because they are improperly focused on race and thus cannot be implemented and because they do not demonstrate the State should have drawn additional majority-Black districts. Plaintiffs' expert utilized racial shading, racial splits, and other tools while drawing and could not identify communities beyond race when preparing the maps that united disparate communities of Black voters. Indeed, if Georgia had used the same processes Plaintiffs' experts used, it would be accused of racial gerrymandering.[2]

---

[2] In fact, while Georgia is accused of not considering race enough in this case by failing to draw a sufficient number of majority-Black districts, it is accused of considering race too much by plaintiffs who say the congressional plans are racial gerrymanders in the *Ga. NAACP* and *Common Cause* three-judge panel cases.

Second, the second and third prongs of *Gingles* are not met because Plaintiffs' experts studiously avoided any analysis of the cause of the polarization they found, opting instead to refer to any voting pattern where the majority votes to defeat the minority as "racially polarized." But the requirement of Section 2's text that any vote dilution be "on account of race or color" requires that it not be "on account of politics." Plaintiffs' failure to address this issue in discovery is fatal to their claims.

As discussed below, after discovery, there is no material fact in dispute that could cause this case to continue. This Court should grant judgment as a matter of law to Defendant.

## FACTUAL BACKGROUND[3]

### I.   Georgia's redistricting plans.

Following the delayed release of Census data in 2021,[4] the Georgia General Assembly began working on redistricting maps ahead of its November

---

[3] As required by this Court's instructions, III. I., all citations to the record are included in the brief and in the accompanying Statement of Material Facts (SMF) that is filed contemporaneously with this brief. The SMF includes the full citations to the shortened deposition citations in the brief, along with the exhibits and deposition excerpts required by the Local Rules.

[4] That Census data showed that the increase in the percentage of Black voters in Georgia from 2010 to 2020 was slightly more than two percentage points. SMF ¶ 1; Cooper Report, ¶ 50. But further Census data has shown decreases in the Black Citizen Voting Age Population between 2019 and 2021. SMF ¶ 2; Cooper Dep. 99:11-23, 100:10-16.

2021 special session. Both chairs of the House and Senate committees with jurisdiction over redistricting sought to meet with all of their colleagues, both Republican and Democratic, to gain input on their areas of the state. SMF ¶ 3; Wright Dep. 68:17-69:7. Consistent with past redistricting cycles, the joint House and Senate committees also held a series of "listening sessions" across the state to hear from citizens about maps, including several Zoom meetings. SMF ¶ 4; Kennedy Dep. 171:13-20, 194:1-195:10. And for the first time in 2021, the General Assembly provided a public comment portal online, seeking comments from the public. SMF ¶ 5; Wright Dep. 252:20-253:4. After holding a committee education day where a variety of stakeholder groups presented about map-drawing, the committees adopted guidelines to govern the map-drawing process. SMF ¶ 6; Kennedy Dep. 161:1-4; Rich Dep. 214:19-215:7.

To prepare maps, Gina Wright, the director of the Joint Reapportionment Office, drafted "blind" maps for the House and Senate, drawing based on her own knowledge of Georgia and the historic districts. SMF ¶ 7; Wright Dep. 45:15-25 (Senate map); 62:17-62:24 (House map). The chairs of the House and Senate committees then met with Ms. Wright to adjust district boundaries based on the input they received from members and from

others.[5] SMF ¶ 8; Wright Dep. 54:3-20, 77:2-7 (Senate map); 197:2-6 (House map). The chairs and Ms. Wright also consulted with counsel about compliance with the Voting Rights Act. SMF ¶ 11; Wright Dep. 92:8-20. While racial data was available, the chairs of each committee focused on past election data to evaluate the partisan impact of the new plans while drawing with awareness of Republican political performance. SMF ¶ 12; Wright Dep. 55:25-56:7; 140:3-11; 140:17-19; 257:21-258:1; 258:2-14.

The resulting Senate map reduced the number of split counties from the prior plan, did not pair any incumbents of either party, and maintained the same number of majority-Black districts as prior plans. SMF ¶ 13; Cooper Report ¶ 116, Figure 21; Kennedy Dep. 106:4-11; Cooper Report ¶ 70, Figure 11. Similarly, the state House maps also reduced the number of split counties, increased the number of majority-Black districts in metro Atlanta, and paired a small number of incumbents. SMF ¶ 14; Cooper Report ¶ 189, Figure 37; Rich Dep. 125:4-11, 196:17-22; Cooper Report, ¶ 132, Figure 23. The Governor

---

[5] When Democrats requested changes, some of those changes were included. SMF ¶ 9; Wright Dep. 59:5-60:7 (Sen. Rhett). Information about draft maps was also shared with members of the Democratic caucus, which had its own counsel and map-drawers. SMF ¶ 10; Wright Dep. 223:14-224:4, 226:11-17; Jackson Dep. 12:9-21.

signed the plans on December 30, 2021, and they were used in the 2022 elections. SMF ¶ 15; [Doc. 141, ¶ 60].

## II.   The individual Plaintiffs.

All of the individual plaintiffs in this case consider themselves to be members of the Democratic Party, have held positions in the Democratic Party, and most of them have never voted for a Republican candidate. SMF ¶¶ 16-31; Woods Dep. 27:13-19, 19:9-25, 28:19-29:7; Glenn Dep. 25:2-14, 25:19-24, 28:13-15; Brown Dep. 36:7-16, 24:4-32:3, 37:15-18; Stewart Dep. 25:11-25. Given the political nature of the polarization discussed below and the partisan impact of this case, the political goals of Plaintiffs are relevant for this Court's consideration.

## III.   Plaintiffs' proposed maps.

Plaintiffs began planning for this litigation before the Georgia maps were even complete—retaining experts to begin drawing alternative maps before the special session convened. SMF ¶ 32; Cooper Dep. 24:18-25:11. After the Governor signed the maps, Plaintiffs immediately sued.

**A. Overall *Alpha Phi Alpha* maps.**

Plaintiffs' goal in offering their illustrative plans was to determine whether they could draw additional majority-Black[6] districts beyond those drawn by the state plans. SMF ¶ 33; Cooper Dep. 34:24-35:5. When creating the various plans, Plaintiffs' map-drawer expert could not explain compliance with other traditional factors, but instead focused on the racial makeup of the plans.

Plaintiffs' expert, Mr. Cooper, does not believe that a metric can identify whether race predominated in the drafting of a district plan. SMF ¶ 35; Cooper Dep. 40:21-41:7. But when he was creating his illustrative maps, he turned on features in the software to indicate where Black individuals were located. SMF ¶ 36; Cooper 60:10-18, 61:16-22. Unlike the legislature, Mr. Cooper did not have any political data available to him. SMF ¶ 37; Wright Dep. 55:25-56:7; 140:3-11; 140:17-19; 257:21-258:1; 258:2-14; Cooper Dep. 68:17-68:3. He also did not review any public comments. SMF ¶ 38; Cooper Dep. 128:20-25. Mr. Cooper also views all Black Americans as sharing a community of interest for

---

[6] Map-drawers distinguish "majority-minority" from "majority-Black." Majority-minority districts have a majority of non-white and Latino voters, while majority-Black districts are districts where Black voters as a single racial category constitute a majority of a district. SMF ¶ 34; Cooper Dep. 37:23-38:1, 38:25-39:5.

purposes of his map-drawing. SMF ¶ 39; Cooper Dep. 94:15-94:20, 95:1-6. Mr. Cooper's preliminary-injunction plans contained the maximum number of Black districts he drew for any legislative plan in Georgia. SMF ¶ 40; Cooper Dep. 34:24-35:5.

### B. Illustrative Senate plan.

Although Mr. Cooper created five additional majority-Black Senate districts for the preliminary-injunction proceedings, his expert report only includes four additional majority-Black Senate districts. SMF ¶ 41; Cooper Dep. 66:25-67:11. In order to create the additional Senate districts, Mr. Cooper changed more than half of all districts from the enacted plan. SMF ¶ 42; Cooper Dep. 156:20-157:11.

In drafting the illustrative Senate districts, Mr. Cooper sacrificed traditional redistricting principles to create majority-Black districts, connecting Black voters wherever he could find them. To create Senate District 23, Mr. Cooper crossed his own regions and the boundaries of various regional commissions to connect Black voters separated by intervening white populations. SMF ¶ 43; Cooper Dep. 142:15-143:7. Despite not being able to identify which counties are in the Black Belt, SMF ¶ 44, Cooper Dep. 80:19-21, Mr. Cooper relied on counties in illustrative District 23 as being in the Black Belt for any possible connections. SMF ¶ 45; Cooper Dep. 144:20-145:9, 145:20-

146:4. Mr. Cooper also made racial splits of counties in the creation of illustrative District 23, including higher concentrations of Black voters in counties while excluding lower concentrations of Black voters when a county was split. SMF ¶ 46; Morgan Report, ¶¶ 33-37.

To create Senate Districts 17 and 28, Mr. Cooper strategically cut counties to ensure that areas with higher concentrations of Black voters were connected with more distant concentrations of white voters. SMF ¶ 47; Morgan Report, ¶¶ 25-30. This resulted in the largest counties by population in illustrative Senate Districts 17 and 28 not containing a majority of Black individuals. SMF ¶ 48; Cooper Dep. 118:12-17, 119:23-120:7. Mr. Cooper could not identify a community of interest between northern Clayton County and rural Spalding County in his configuration of this South Metro area beyond the race of the individuals in both parts of the district. SMF ¶ 49; Cooper Dep. 130:14-131:2.

Further, the illustrative Senate plan does not comply with traditional redistricting principles when compared to the enacted Senate plan. Although the illustrative plan has a similar number of county splits, that is only because Mr. Cooper unsplit counties in parts of the state unrelated to the additional majority-Black districts to make the total split number appear more similar. SMF ¶ 50; Morgan Report, ¶¶ 36-39.

### C. Illustrative House plan.

Mr. Cooper offered the same increase of five majority-Black House districts on his preliminary-injunction plan and expert report, but located those five districts in different places. SMF ¶ 51; Cooper Dep. 167:11-17. In order to create the additional House districts, Mr. Cooper changed more than half of all of the House districts from the enacted plan. SMF ¶ 52; Cooper Dep. 205:7-205:11.

In drafting the illustrative House districts, Mr. Cooper again sacrificed traditional redistricting principles to create majority-Black districts, connecting Black voters wherever he could find them. To create House District 133 as a new majority-Black district, Mr. Cooper had to add county splits in the area over the enacted plan, including splitting *seven* rural counties in several adjoining districts. SMF ¶ 53; Morgan Report, ¶¶ 59-62; Cooper Dep. 187:2-9; 187:20-188:6. To create House District 145 as a new majority-Black district, Mr. Cooper had to adjust Macon districts so that no House district is wholly within Bibb County and each of the majority-Black districts in that area includes population from downtown Macon, including one district that crosses out of the Macon Census statistical area. SMF ¶ 54; Cooper Dep. 196:21-197:18, 198:7-198:11. To create Districts 74 and 117 in metro Atlanta, Mr. Cooper had to connect portions of counties with higher concentrations of Black

12

voters with more-rural, white areas. SMF ¶ 55; Cooper Dep. 174:10-20, 175:20-176:7. Finally, in southwest Georgia, when he created District 171, Mr. Cooper did not rely on the Corridor Management Plan he cited until after drawing the district and did not verify that all parts of the historic route were included. SMF ¶ 56; Cooper Dep. 191:14-21, 192:9-16, 192:23-193:12. Illustrative District 171 also connects disparate enclaves of Black population and splits additional counties to include Black population in the district. SMF ¶ 57; Morgan Report, ¶¶ 65-66.

To create the additional majority-Black districts on his illustrative House plan, Mr. Cooper elongates other surrounding districts to create "room" for the new districts to connect racially disparate populations. SMF ¶ 58; Morgan Report, ¶¶ 50-54, 56. This impacts the compactness of the districts, lowering the overall compactness of the districts created in the illustrative plan. SMF ¶ 59; Morgan Report, ¶ 55 Chart 8.

Further, the illustrative House plan does not comply with traditional redistricting principles when compared to the enacted House plan. It has higher total population deviations than the enacted plan. SMF ¶ 60; Cooper Dep. 200:7-11. Although the illustrative plan has a number of county splits similar to the enacted plan, that is only because Mr. Cooper unsplit counties

in parts of the state unrelated to changes to make the total split number appear more similar. SMF ¶ 61; Morgan Report, ¶¶ 68-76; Cooper Dep. 202:22-203:14.

### D. Lack of agreements among experts.

Plaintiffs' experts in this case do not necessarily agree with experts in other cases. For example, unlike Mr. Cooper, Mr. Esselstyn did not draw any new majority-Black House districts in east Georgia or in southwest Georgia. SMF ¶ 62; Esselstyn Report, ¶ 48, Figure 13. Unlike Mr. Esselstyn, Mr. Cooper only drew one additional majority-Black state House district in Macon and did not draw an additional majority-Black district in western metro Atlanta. SMF ¶ 63; Cooper Report, ¶ 153.

Mr. Cooper and Mr. Esselstyn also located their new majority-Black Senate districts in metro Atlanta in different places, with Mr. Cooper drawing his District 28 without Coweta County and his District 17 into DeKalb County as opposed to the placement on Mr. Esselstyn's plans. SMF ¶ 64; Cooper Report, ¶¶ 85-86; Esselstyn Report, ¶ 27, Figure 4.

### ARGUMENT AND CITATION OF AUTHORITIES

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden but is not required to negate the opposing party's claims. Instead, the moving party may point out

the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Marion v. DeKalb County, Ga.* 821 F. Supp. 685, 687 (N.D. Ga. 1993).

Section 2 of the Voting Rights Act prohibits jurisdictions from diluting the strength of minority voters through a "standard, practice, or procedure" "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). Proof of illegal vote dilution is established through a "totality of the circumstances" analysis. 52 U.S.C. § 10301(b).

In order to show a Section 2 violation, a plaintiff bears the burden of first proving *each* of the three *Thornburg v. Gingles*, 478 U.S. 30 (1986), preconditions[7]:

> Specifically, plaintiffs in vote dilution cases must establish as a threshold matter: (1) that the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) that the minority group is "politically cohesive"; and (3) that sufficient racial bloc voting exists such that the white majority usually defeats the minority's preferred candidate.

*Nipper v. Smith*, 39 F.3d 1494, 1510 (11th Cir. 1994) (quoting *Gingles*, 478 U.S. at 50-51). Only after establishing the three preconditions does a court begin a

---

[7] These preconditions are also frequently referred to in cases as the *Gingles* "prongs." *See, e.g., Bartlett v. Strickland*, 556 U.S. 1, 17 (2009); *Johnson*, 296 F.3d at 1073.

review of the so-called "Senate Factors" to assess the totality of the circumstances. *Id*. at 1512; *Gingles*, 478 U.S. at 79; *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994). Failure to establish one of the *Gingles* prongs is fatal to a Section 2 claim because each of the three prongs must be met. *See Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1343 (11th Cir. 2000); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999); *Brooks v. Miller*, 158 F.3d 1230, 1240 (11th Cir. 1998); *Negron v. City of Miami Beach*, 113 F.3d 1563, 1567 (11th Cir. 1997). And of course, while these preconditions are *necessary* to proving a Section 2 claim, they are not *sufficient*. *Johnson,* 512 U.S. at 1011 (*Gingles* preconditions are not "sufficient" to "prove a § 2 claim.").

## I.   Plaintiffs cannot establish the first *Gingles* precondition.

As this Court already found, illustrative plans cannot "subordinate traditional redistricting principles to racial considerations substantially more than is reasonably necessary to avoid liability under Section 2." *Alpha Phi Alpha Fraternity v. Raffensperger*, 587 F. Supp. 3d 1222, 1264 (N.D. Ga. 2022) (citing *Davis*, 139 F.3d at 1424). The evidence demonstrates that Plaintiffs have gone beyond that limitation here.

As Mr. Cooper testified, he used racial shading and other techniques in his efforts to create majority-Black districts. *See Miller v. Johnson*, 515 U.S. 900, 925 (1995) (use of racial shading in district maps). He was unable to

identify factors that connected areas of his new majority-Black districts beyond the common community of interest shared by all Black individuals. And when he split counties, he did so in ways that ensured higher concentrations of Black voters were included in the portions of counties in the new majority-Black districts. This cannot meet prong one because Mr. Cooper used techniques that constitute racial gerrymandering, which make his districts improper as a potential remedy.

The Eleventh Circuit prohibits the separation of the first prong of liability under *Gingles* and the potential remedy. *Nipper*, 39 F.3d at 1530-31; *see also Burton*, 178 F.3d at 1199 ("We have repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy."). Whatever plan is used to demonstrate the violation of the first prong of *Gingles* must also be a remedy this Court can impose. *Nipper*, 39 F.3d at 1530-31. In short, if a plaintiff cannot show that the plan used to demonstrate the first prong can also be a proper remedy, then the plaintiff has not shown compliance with the first prong of *Gingles*. *Id.* at 1530-31.

Additionally, Plaintiffs have presented no evidence of the geographic compactness of the Black community in the proposed new districts aside from the fact that they are drawn. This absence of evidence supports a grant of summary judgment to Defendant. *Marion*, 821 F. Supp. at 687. The Supreme

17

Court requires that the size and geographic compactness portions of the first *Gingles* prong relate to the community, not to any potential district created by a plaintiff: "The first *Gingles* condition refers to *the compactness of the minority population*, not to the compactness of the contested district." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (*LULAC*) (emphasis added) (quoting *Bush v. Vera*, 517 U.S. 952, 997 (1996)).

Mr. Cooper's districts combine distinct minority communities, often with intervening white population, and often barely achieve majority-Black status. Mr. Cooper could identify practically nothing beyond the race of the voters in a number of his districts that united them—in clear violation of the requirements of *LULAC*: "there is no basis to believe a district that combines two far-flung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates." *Id.*; SMF ¶ 65; Cooper Dep. 130:14-131:2.

## II.   Plaintiffs cannot establish the second and third *Gingles* preconditions.

Even if Plaintiffs have shown a proper remedy, they still cannot prevail because they have not shown legally significant racially polarized voting. The basis for a Section 2 vote-dilution claim must be more than a simple failure to win elections—because, in a majoritarian system, "numerical minorities lose

elections." *Holder v. Hall,* 512 U.S. 874, 901 (1994) (Thomas, J., concurring) (citations omitted). In order to succeed, Plaintiffs must show that minority voters, though able to vote, are unable to elect their preferred candidates because their votes have been "submerge[ed]" in a majority that votes as a "racial bloc" against them. *Gingles,* 478 U.S. at 46, 49-52. And this racial bloc voting, by its very terms, must be attributable to *race*, rather than, for example, race-neutral partisan politics. Otherwise, it is just *majority* bloc voting or, as Justice White put it, "interest-group" politics. *Id.* at 83 (White, J., concurring). And "Congress and the Supreme Court" have refused "to equate losses at the polls with actionable vote dilution where these unfavorable results owe more to party than race." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 860 (5th Cir. 1993).

**A. To establish vote dilution "on account of race," a plaintiff must prove *racial* bloc voting, not *majority* bloc voting attributable to ordinary partisan politics.**

In its ruling denying Plaintiffs' respective motions for preliminary injunction in this action, this Court "conclude[d] as a matter of law that, to satisfy the second *Gingles* precondition, Plaintiffs need not prove the causes of racial polarization, just its existence." *Alpha Phi Alpha Fraternity*, 587 F. Supp. 3d at 1303. Relying on the plurality opinion in *Gingles,* this Court stated "[f]or purposes of § 2, the legal concept of racially polarized voting incorporates

19

neither causation nor intent. *It means simply that the race of voters correlates with the selection of a certain candidate or candidates*; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates." *Id.* (emphasis original) (quoting *Gingles*, 478 U.S. at 62). But a closer review of the opinions shows that a majority of the justices in *Gingles* declined to endorse this approach to majority-bloc voting.

Justice White, in a concurring opinion, called it little more than "interest-group politics." *Gingles,* 478 U.S. at 83. Justice O'Connor, writing for the remaining justices, declared flatly that "I agree with Justice White that Justice Brennan's conclusion that the race of the candidate is always irrelevant in identifying racially polarized voting conflicts with *Whitcomb* and is not necessary to the disposition of this case." *Id.* at 101 (O'Connor, J., concurring). And it is important to note that Justice O'Connor arrived at this conclusion after endeavoring to construe what she called the "compromise legislation" of the amended Section 2. That is, the calculated equivocation in Part B of Section 2 that expressly disclaims a right to proportional representation cannot be given any substantive effect if all that matters when establishing racially polarized voting is whether minority voters and majority voters are voting differently. But the plurality view does just that:

> [T]he combination of the Court's definition of minority voting strength and its test for vote dilution results in the creation of a right to a form of proportional representation in favor of all geographically and politically cohesive minority groups that are large enough to constitute majorities if concentrated within one or more single-member districts. *In so doing, the Court has disregarded the balance struck by Congress in amending § 2* and has failed to apply the results test as described by this Court in *Whitcomb* and *White.*

*Id.* at 85 (emphasis added) (O'Connor, J., concurring in the judgment). Thus, while this Court was correct in identifying what a plurality of Justices in *Gingles* described as "racially polarized voting," it is just as true that an equally sized plurality of the *Gingles* Court rejected that view. When combined with Justice White's admonition against construing Section 2 as enshrining interest-group politics into law, the former plurality does not carry the day.

But even if this Court still disagrees with Defendant on this point, there is a remaining issue: The contrary view—that racial bloc voting is present anywhere a minority happens to vote for a different candidate than the majority—would raise serious questions about the constitutionality of Section 2, which cannot be validly understood to require changes in districts solely because of partisan voting behavior.

  **1.**  ***Statutory text, history, and precedent establish that if the majority blocks the minority group's preferred candidates because of ordinary partisan politics, there is no "racial bloc voting."***

Section 2 is designed to root out racially discriminatory laws. The text requires Plaintiffs to prove that there is a "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color.*" 52 U.S.C. § 10301(a) (emphasis added). It is Plaintiffs' burden to show that "the political processes leading to nomination or election in the State or political subdivision are not *equally open* to participation by members of a class of citizens… in that its members have less opportunity *than other members of the electorate* to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b) (emphasis added). Section 2 thus requires Plaintiffs to show that the "challenged law… *caused*" them, "on account of race" to have less opportunity to elect their preferred candidates than members of other races. *Greater Birmingham Ministries v. Sec'y of Ala.,* 992 F.3d 1299, 1329 (11th Cir. 2021) (emphasis in original).

The text explicitly does *not* "guarantee" partisan victories or "electoral success." *LULAC,* 548 U.S. at 428 (citation omitted). If minority voters' preferred candidates lose for non-racial reasons, such as failing to elect

candidates because they prefer Democrats in Republican-dominated areas, they nonetheless have *precisely* the same opportunity as "other members of the electorate," and they have correspondingly not suffered any "abridgement" of their right to vote "on account of race." 52 U.S.C. § 10301. Section 2 does not, in other words, relieve racial minorities of the same "obligation to pull, haul, and trade to find common political ground" that affects all voters. *De Grandy,* 512 U.S. at 1020.

This view is not some recent legal phenomenon, but rather was borne out in *Gingles* itself. Indeed, as Justice O'Connor explained, the view advocated by Plaintiffs here (and the view espoused by the plurality in *Gingles*) would effectively overturn *Whitcomb v. Chavis*, 403 U.S. 124 (1971), one of the two Supreme Court precedents that the "[a]mended § 2 intended to codify." *Gingles,* 478 U.S. at 83 (citations omitted). In *Whitcomb,* the Court explained that although residents in one area of Marion County consistently lost elections, that was because they "vote[d] predominantly Democratic," and Republicans generally won elections in the county. 403 U.S. at 153. "[H]ad the Democrats won all of the elections or even most of them, the ghetto would have no justifiable complaints about representation." *Id.* at 152. And the failure of *Democrats* was insufficient to show illegality. Thus, in *Gingles,* Justice O'Connor stressed that *Whitcomb* required courts to differentiate between

situations where race explains voting patterns from those where the partisan "interests of racial groups" simply "diverge." 478 U.S. at 100.

Section 2 cannot be rationally interpreted as prohibiting certain election practices when Republicans are in the majority but requiring other election practices where Democrats dominate. "The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates." *Baird v. Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992). Instead, as the Senate Report makes clear, the amended Section 2 applies only where "racial politics … dominate the electoral process." S. Rep. at 33 (emphasis added).

The alternative view would mandate not only a partisan preference but a racial preference. Here, for instance, Black Democrats—like white Democrats, Asian Democrats, and Latino Democrats—ordinarily fail to elect their preferred candidates because the majority of Georgia voters generally choose Republicans.[8] Although Plaintiffs claim that Black voters alone among that group are entitled to districts in which they are guaranteed electoral success, "Section 2 requires an electoral process 'equally open' to all, not a process that favors one group over another." *Gonzalez v. City of Aurora*, 535

_____

[8] With several notable exceptions in statewide races in 2020, 2021, and 2022.

F.3d 594, 598 (7th Cir. 2008). Section 2 does not require courts to mandate that Black Democrats vote more successfully than white Democrats. *Clements*, 999 F.2d at 861 ("[W]hite Democrats have in recent years experienced the same electoral defeats as minority voters. If we are to hold that these losses at the polls, without more, give rise to a racial vote dilution claim warranting special relief for minority voters, a principle by which we might justify withholding similar relief from white Democrats is not readily apparent.").

Moreover, to hold that there is no racial component beyond simply observing that majority and minority vote differently would also eviscerate another aspect of Section 2: its emphatic rejection of a right to proportionality. 52 U.S.C. § 10301(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."). Avoiding a *requirement* of proportionality was a central focus of Congress in amending Section 2. *See Gingles*, 478 U.S. at 84 (O'Connor, J., concurring).

Given all this, it should be no surprise that other circuits have rejected a view of Section 2 that showing polarization is enough. The Fifth Circuit, for instance, has held that Section 2 plaintiffs cannot succeed when they "have not even attempted to establish proof of racial bloc voting by demonstrating that race, not … partisan affiliation, is the predominant determinant of political

preference." *Clements*, 999 F.2d at 855. Likewise, the First Circuit holds that "plaintiffs cannot prevail on a VRA Section 2 claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to [race]." *Vecinos De Barrio Uno v. City of Holyoke*, 72 F.3d 973, 981 (1st Cir. 1995). And Judge Tjoflat has opined that, even if a plaintiff has provided evidence of racial bloc voting, a "defendant may rebut the plaintiff's evidence by demonstrating the absence of racial bias in the voting community; for example, by showing that the community's voting patterns can best be explained by other, non-racial circumstances." *Nipper*, 39 F.3d at 1524 (plurality opinion).

To be sure, the courts disagree on whether the third *Gingles* factor or the totality phase is the appropriate time to ensure racial, as opposed to merely partisan, polarization exists. The Fifth Circuit, for instance, holds that there is no third *Gingles* factor without proof of racial, as opposed to partisan, polarization. *Clements*, 999 F.2d at 892. The Second Circuit—as this Court held in its Order denying the preliminary injunction—holds that the inquiry should be conducted at the totality-of-the-circumstances phase of analysis. *Goosby v. Town Bd.*, 180 F.3d 476, 493 (2d Cir. 1999); *see also Lewis v. Alamance County, N.C.*, 99 F.3d 600, 615 n.12 (4th Cir. 1996) (noting differences among circuit courts).

But this minor disagreement does not matter much. The key point is that Plaintiffs, who bear the ultimate burden of proof, must establish that race is the reason they supposedly lack equal "opportunity." 52 U.S.C. § 10301(b). And if voting patterns establish, instead, that Republicans always win (regardless of race), then non-Republican voters of *all* races have exactly the same opportunity to elect their candidates of choice, in every case. This is why this Court should require proof of racial bloc voting as part of the third *Gingles* factor (if race is not the "domina[nt]" reason for bloc voting, there can be no "racial bloc voting." S. Rep. at 33 (emphasis added)), even if the analysis is ultimately the same. As discussed below, Plaintiffs' lack of evidence on this point is fatal to their claims here.

## 2. If § 2 allowed partisan bloc voting to form the basis of a claim, it would be unconstitutional.

Beyond being irreconcilable with the text or binding precedent, a view that racial bloc voting requires only that the majority and minority voters vote differently would also make Section 2 unconstitutional. Congress enacted Section 2 under its power to enforce the Fifteenth Amendment, which prohibits only "purposeful discrimination," not laws that merely "resul[t] in a racially disproportionate impact." *City of Mobile v. Bolden*, 446 U.S. 55, 70 (1980) (citation omitted); *see also* U.S. CONST. amend. XV. Section 2's results test goes

beyond the constitutional provision that it purports to enforce, which makes sense to the extent that Section 2 can be understood as a tool for addressing invidious racial discrimination. But Congress certainly cannot privilege a particular political party in a favored electoral position. Congress may use its enforcement power only as a "congruen[t] and proportional[] ... means" to "remedy or prevent" the unconstitutional "injury" of intentional discrimination. *City of Boerne v. Flores*, 521 U.S. 507, 519–20 (1997). The Fifteenth Amendment's enforcement power does not allow Congress to "alter[] the meaning" of the Constitution. *Id*. at 519. Accordingly, to ensure that Section 2 stays within the bounds of the Fifteenth Amendment, the results test must be "limited to those cases in which constitutional violations [are] most likely." *Id*. at 533 (citation omitted).

If Section 2 were interpreted in a way that plaintiffs can establish racial bloc voting merely by showing the minority and majority vote differently, it would not fit within those constitutional bounds. As Justice White explained in his dissent in *Bolden*, the original results test was designed to target "objective factors" from which discrimination "*can be inferred*." 446 U.S. at 95 (emphasis added). The amendments to Section 2 were meant to "restore" that test. *Gingles*, 478 U.S. at 43-44 & n.8 (citations omitted). And as Defendant

will further explain below, their interpretation does not alter this "objective factors" test.

What is more, interpreting Section 2 to grant preferential treatment to particular racial groups would violate the Equal Protection Clause by compelling state action to benefit one racial group at the expense of others. *See* U.S. CONST. amend. XIV, § 1. "[S]ubordinat[ing] traditional race-neutral districting principles" to increase minority voting strength violates the Constitution. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). Where Section 2 is used not to undo racial bias but to undo a pattern of partisan voting, in favor of one (and only one) racial minority, that must be unconstitutional.[9]

---

[9] At a minimum, such an interpretation of Section 2 raises constitutional questions and should be avoided if possible. "When a serious doubt is raised about the constitutionality of an act of Congress, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (citation omitted). That is doubly true where the interpretation would "upset the usual constitutional balance of federal and state powers." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Courts should interpret statutes to do so only when congressional intent is "unmistakably clear." *Id.* (citations omitted).

**B. There is no racial bloc voting here because partisan politics, not race, explains the voting patterns highlighted by Plaintiffs, and Plaintiffs' experts offer no evidence disputing this.**

With the proper rule in place, Plaintiffs' claim fails under Section 2 because they "have not even attempted to establish proof of racial bloc voting by demonstrating that race, not ... partisan affiliation, is the predominant determinant of political preference." *Clements*, 999 F.2d at 855.

As established above, a successful Section 2 claim requires that *race*, not *party*, is the cause of "divergent voting patterns." *Id.* at 861. Plaintiffs must, therefore, *prove* as much. But Plaintiffs here did not even try to do so, instead just throwing up their hands or arguing that race and party are too inseparable ever to be considered separately. As the Plaintiffs' expert explained, "It's irrelevant, the race of the candidate that voters are supporting. It's only relevant who they're supporting and whether they're supporting the same candidate or not." SMF ¶ 66; Handley Dep. 95:24-96:02. And while Dr. Handley did examine some primary contests in the relevant areas she analyzed, she ignored their impact when arriving at her conclusion that the voting in Georgia is racially polarized. "A hundred percent of the general elections were polarized… That's higher than 55 percent [of the primaries I analyzed]." SMF ¶ 67; Handley Dep. 97:04-11. In other words, as soon as party was taken out of

the equation, the undisputed facts demonstrate that voters' behavior significantly altered. Dr. Handley, however, ignored these results and instead looked only at general elections to arrive at her conclusion that voting in Georgia is racially polarized. "[M]y conclusion that voting is polarized in Georgia is based on the general elections." SMF ¶ 68; Handley Dep. 98:07-13.

But one cannot determine whether the voting patterns of Georgia voters are due to *racial* politics when they only examine general elections because, as Plaintiffs' experts own reports clearly indicate, Black voters in Georgia as a group overwhelmingly vote for Democrats and against Republicans. This is true regardless of the race of the candidate. *See* SMF ¶ 69-73; Alford Dep. 112:13-117:13. It is true when the Democratic candidate is white. *Id.* It is true when the Democratic candidate is Black. *Id.* It is true when the Republican candidate is white. *Id.* It is true when the Republican candidate is black. *Id.* Thus the only thing Plaintiffs' expert has shown in her data is that Black Georgians vote cohesively for Democrats.

Plaintiffs' evidence of racial polarization is, in reality, nothing more than evidence of partisan polarization where a majority of voters support one party and a minority of voters support another party. This is, as Justice White described in *Gingles,* "interest group" politics. Plaintiffs' own political goals in bringing this case further illustrate that the issues in this case are not a matter

of race, but rather that the "most political activity in America"[10] had political consequences they do not like.

Moreover, the data and analysis provided by Plaintiffs' own experts plainly demonstrate that when party is removed from the equation, as in Dr. Handley's Democratic primaries analysis, the level of polarization drops off dramatically. That is simply not enough for Plaintiffs to carry their burden of proving racial polarization sufficient to satisfy prongs two and three of *Gingles*. To the contrary, all the Court has before it is evidence establishing that party, rather than race, explains the "diverge[nt]" voting patterns at issue. *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring). Plaintiffs' failure to offer any other evidence ends this case, because they failed to show that prongs two and three of *Gingles* are met.

## CONCLUSION

After discovery, there remains no issue of any material fact. Plaintiffs have not shown their proposed remedial map can function as a remedy, but even if they have, the lack of evidence of racially polarized voting is fatal to their claims because they have not shown the *Gingles* preconditions are met.

---

[10] *See, e.g.*, Charles S. Bullock III, *Redistricting: The Most Political Activity in America* (2nd Ed. 2021).

32

This Court should grant summary judgment to Defendant and dismiss this case.

Respectfully submitted this 20th day of March, 2023.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Elizabeth Vaughan
Assistant Attorney General
Georgia Bar No. 762715
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
btyson@taylorenglish.com
Frank B. Strickland
Georgia Bar No. 687600
fstrickland@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Donald P. Boyle, Jr.
Georgia Bar No. 073519

dboyle@taylorenglish.com
Daniel H. Weigel
Georgia Bar No. 956419
dweigel@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for Defendant*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Brief has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/Bryan P. Tyson*
Bryan P. Tyson