IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, <br><br> *Defendant.* | CASE NO. 1:21-CV-05337-SCJ |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendants Brad Raffensperger, in his official capacity as Secretary of State ("Defendant") pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 submits this Statement of Material Facts as to Which There is No Genuine Issue to be Tried.

1. The 2020 Census data showed that the increase in the percentage of Black voters in Georgia from 2010 to 2020 was slightly more than two percentage points. Report of William Cooper, attached as Ex. A ("Cooper Report"), ¶ 50.

2. Further Census data has shown decreases in the Black Citizen Voting Age Population between 2019 and 2021. Deposition of William Cooper [Doc. 221] ("Cooper Dep.") 99:11-23, 100:10-16.

3. Both chairs of the House and Senate committees with jurisdiction over redistricting sought to meet with all of their colleagues, both Republican and Democratic, to gain input on their areas of the state. Deposition of Gina Wright [Doc. 225] ("Wright Dep.") 68:17-69:7.

4. Consistent with past redistricting cycles, the joint House and Senate committees also held a series of "listening sessions" across the state to hear from citizens about maps, including several Zoom meetings. Deposition of John Kennedy [Doc. 226] ("Kennedy Dep.") 171:13-20, 194:1-195:10.

5. And for the first time in 2021, the General Assembly provided a public comment portal online, seeking comments from the public. Wright Dep. 252:20-253:4.

6. After holding a committee education day where a variety of stakeholder groups presented about map-drawing, the committees adopted guidelines to govern the map-drawing process. Kennedy Dep. 161:1-4; Deposition of Bonnie Rich [Doc. 227] ("Rich Dep.") 214:19-215:7.

7. To prepare maps, Gina Wright, the director of the Joint Reapportionment Office, drafted "blind" maps for the House and Senate,

drawing based on her own knowledge of Georgia and the historic districts. Wright Dep. 45:15-25 (Senate map); 62:17-62:24 (House map).

8. The chairs of the House and Senate committees then met with Ms. Wright to adjust district boundaries based on the input they received from members and from others. Wright Dep. 54:3-20, 77:2-7 (Senate map); 197:2-6 (House map).

9. When Democrats requested changes, some of those changes were included. Wright Dep. 59:5-60:7 (Sen. Rhett).

10. Information about draft maps was also shared with members of the Democratic caucus, which had its own counsel and map-drawers. Wright Dep. 223:14-224:4, 226:11-17; Deposition of Derrick Jackson [Doc. 228] ("Jackson Dep.") 12:9-21.

11. The chairs and Ms. Wright also consulted with counsel about compliance with the Voting Rights Act. Wright Dep. 92:8-20.

12. While racial data was available, the chairs of each committee focused on past election data to evaluate the partisan impact of the new plans while drawing with awareness of Republican political performance. Wright Dep. 55:25-56:7; 140:3-11; 140:17-19; 257:21-258:1; 258:2-14.

13. The resulting Senate map reduced the number of split counties from the prior plan, did not pair any incumbents of either party, and

maintained the same number of majority-Black districts as prior plans. Cooper Report ¶ 116, Figure 21; Kennedy Dep. 106:4-11; Cooper Report ¶ 70, Figure 11.

14. Similarly, the state House maps also reduced the number of split counties, increased the number of majority-Black districts in metro Atlanta, and paired a small number of incumbents. Cooper Report ¶ 189, Figure 37; Rich Dep. 125:4-11, 196:17-22; Cooper Report, ¶ 132, Figure 23.

15. The Governor signed the plans on December 30, 2021, and they were used in the 2022 elections. [Doc. 141, ¶ 60].

16. Plaintiff Eric Woods ("Woods") has resided at his current address in Fayette County, Georgia for approximately 15 years. Deposition of Plaintiff Eric Woods [Doc. 217] ("Woods Dep.") at 13:4-12.

17. Woods has considered himself to be a member of the Democratic Party since the age of 18. Woods Dep. at 27:13-19.

18. Woods has been a member of the Fayette County Democratic Committee since 2017. Woods Dep. at 19:9-25.

19. During the time that he has been a member of the Democratic Party, Woods' activities for the Democratic Party have included assisting with voter registration efforts and volunteering on political campaigns for Democratic Party candidates. Woods Dep. at 28:9-18, 29:13-30:4.

20. According to Woods, he has never considered himself a member of the Republican Party, and has never voted for a Republican Party candidate. Woods Dep. at 28:19-29:7.

21. Katie Bailey Glenn lives in Henry County. Deposition of Katie Bailey Glenn [Doc. 218] ("Glenn Dep.") at 10:8-9, 14-16.

22. Glenn is a Democrat. Glenn Dep. at 25:12-14.

23. Glenn served as a poll watcher for the Democratic Party in Henry County. Glenn Dep. at 25:19-24.

24. Glenn has never voted for a Republican candidate. Glenn Dep. at 28:13-15.

25. Plaintiff Phil Brown has resided at his current address in Jefferson County, Georgia since 1999. Deposition of Plaintiff Phil Brown [Doc. 219] ("Brown Dep.") at 18:6-19:7.

26. Brown has considered himself to be a member of the Democratic Party since the time he started voting. *Id.* at 36:7-16.

27. Brown is currently the Vice Chair of the Democratic Committee of Jefferson County and has been a member for 20-25 years. *Id.* at 24:4-32:3.

28. Brown does not recall ever voting for a candidate of the Republican Party. *Id.* at 37:15-18.

29. Janice Stewart resided in Thomasville, Georgia on December 30, 2021. Deposition of Janice Stewart [Doc. 220] ("Stewart Dep.") at 11:24-12:5.

30. Stewart is registered to vote in Thomas County, Georgia. *Id.* at 23:18-19.

31. Stewart considers herself to be a member of the Democratic party, but she has never served in any position, served on any committees, or participated in any activities of the Democratic party. *Id.* at 25:11-25.

32. Plaintiffs began planning for this litigation before the Georgia maps were even complete—retaining experts to begin drawing alternative maps before the special session convened. Cooper Dep. 24:18-25:11.

33. Plaintiffs' goal in offering their illustrative plans was to determine whether they could draw additional majority-Black districts beyond those drawn by the state plans. Cooper Dep. 34:24-35:5.

34. Map-drawers distinguish "majority-minority" from "majority-Black." Majority-minority districts have a majority of non-white and Latino voters, while majority-Black districts are districts where Black voters as a single racial category constitute a majority of a district. Cooper Dep. 37:23-38:1, 38:25-39:5

35. Plaintiffs' expert, Mr. Cooper, does not believe that a metric can identify whether race predominated in the drafting of a district plan. Cooper Dep. 40:21-41:7.

36. When Mr. Cooper was creating his illustrative maps, he turned on features in the software to indicate where Black individuals were located. Cooper 60:10-18, 61:16-22.

37. Unlike the legislature, Mr. Cooper did not have any political data available to him. Wright Dep. 55:25-56:7; 140:3-11; 140:17-19; 257:21-258:1; 258:2-14; Cooper Dep. 68:17-68:3.

38. Mr. Cooper did not review any public comment. Cooper Dep. 128:20-25.

39. Mr. Cooper also views all Black Americans as sharing a community of interest for purposes of his map-drawing. Cooper Dep. 94:15-94:20, 95:1-6.

40. Mr. Cooper's preliminary-injunction plans contained the maximum number of Black districts he drew for any legislative plan in Georgia. Cooper Dep. 34:24-35:5.

41. Although Mr. Cooper created five additional majority-Black Senate districts for the preliminary-injunction proceedings, his expert report

only includes four additional majority-Black Senate districts. Cooper Dep. 66:25-67:11.

42. In order to create the additional Senate districts, Mr. Cooper changed more than half of all districts from the enacted plan. Cooper Dep. 156:20-157:11.

43. To create Senate District 23, Mr. Cooper crossed his own regions and the boundaries of various regional commissions to connect Black voters separated by intervening white populations. Cooper Dep. 142:15-143:7.

44. Mr. Cooper was unable to identify which counties are in the Black Belt. Cooper Dep. 80:19-21.

45. Mr. Cooper relied on counties in illustrative Senate District 23 as being in the Black Belt for any possible connections. Cooper Dep. 144:20-145:9, 145:20-146:4.

46. Mr. Cooper also made racial splits of counties in the creation of illustrative Senate District 23, including higher concentrations of Black voters in counties while excluding lower concentrations of Black voters when a county was split. Report of John Morgan, attached as Ex. B ("Morgan Report"), ¶¶ 33-37.

47. To create Senate Districts 17 and 28, Mr. Cooper strategically cut counties to ensure that areas with higher concentrations of Black voters were

connected with more distant concentrations of white voters. Morgan Report, ¶¶ 25-30.

48. This resulted in the largest counties by population in illustrative Senate Districts 17 and 28 not containing a majority of Black individuals. Cooper Dep. 118:12-17, 119:23-120:7.

49. Mr. Cooper could not identify a community of interest between northern Clayton County and rural Spalding County in his configuration of this south metro area beyond the race of the individuals in both parts of the district. Cooper Dep. 130:14-131:2.

50. Although the illustrative plan has a similar number of county splits, that is only because Mr. Cooper unsplit counties in parts of the state unrelated to the creation of additional majority-Black districts to make the total split number appear more similar. Morgan Report, ¶¶ 36-39.

51. Mr. Cooper offered the same increase of five majority-Black House districts on his preliminary-injunction plan and expert report, but located those five districts in different places. Cooper Dep. 167:11-17.

52. In order to create the additional House districts, Mr. Cooper changed more than half of all of the House districts from the enacted plan. Cooper Dep. 205:7-205:11.

53. To create House District 133 as a new majority-Black district, Mr. Cooper had to add county splits in the area over the enacted plan, including splitting *seven* rural counties in several adjoining districts. Morgan Report, ¶¶ 59-62; Cooper Dep. 187:2-9; 187:20-188:6.

54. To create House District 145 as a new majority-Black district, Mr. Cooper had to adjust Macon districts so that no House district is wholly within Bibb County and each of the majority-Black districts in that area includes population from downtown Macon, including one district that crosses out of the Macon Census statistical area. Cooper Dep. 196:21-197:18, 198:7-198:11.

55. To create House Districts 74 and 117 in metro Atlanta, Mr. Cooper had to connect portions of counties with higher concentrations of Black voters with more-rural, white areas. Cooper Dep. 174:10-20, 175:20-176:7.

56. Finally, in southwest Georgia, when he created House District 171, Mr. Cooper did not rely on the Corridor Management Plan he cited until after drawing the district and did not verify that all parts of the historic route were included. Cooper Dep. 191:14-21, 192:9-16, 192:23-193:12.

57. Illustrative House District 171 also connects disparate enclaves of Black population and splits additional counties to include Black population in the district. Morgan Report, ¶¶ 65-66.

58. To create the additional majority-Black districts on his illustrative House plan, Mr. Cooper elongates other surrounding districts to create "room" for the new districts to connect racially disparate populations. Morgan Report, ¶¶ 50-54, 56.

59. Creating additional majority-Black districts impacts the compactness of the districts, lowering the overall compactness of the districts created in the illustrative plan. Morgan Report, ¶ 55 Chart 8.

60. The illustrative House plan has higher total population deviations than the enacted plan. Cooper Dep. 200:7-11.

61. Although the illustrative plan has a number of county splits similar to the enacted plan, that is only because Mr. Cooper unsplit counties in parts of the state unrelated to creating more majority-Black districts to make the total split number appear more similar. Morgan Report, ¶¶ 68-76; Cooper Dep. 202:22-203:14.

62. Unlike Mr. Cooper, Mr. Esselstyn did not draw any new majority-Black House districts in east Georgia or in southwest Georgia. Report of

Blakeman Esselstyn in *Grant*, attached as Ex. C ("Esselstyn Report"), ¶ 48, Figure 13.

63. Unlike Mr. Esselstyn, Mr. Cooper only drew one additional majority-Black state House district in Macon and did not draw an additional majority-Black district in western metro Atlanta. Cooper Report, ¶ 153.

64. Mr. Cooper and Mr. Esselstyn also located their new majority-Black Senate districts in metro Atlanta in different places, with Mr. Cooper drawing his District 28 without Coweta County and his District 17 into DeKalb County as opposed to the placement on Mr. Esselstyn's plans. Cooper Report, ¶¶ 85-86; Esselstyn Report, ¶ 27, Figure 4.

65. Mr. Cooper could identify practically nothing beyond the race of the voters in a number of his districts that united them. Cooper Dep. 130:14-131:2.

66. Plaintiffs' expert explained, "It's irrelevant, the race of the candidate that voters are supporting. It's only relevant who they're supporting and whether they're supporting the same candidate or not." Deposition of Lisa Handley [Doc. 222] ("Handley Dep.") 95:24-96:02.

67. While Dr. Handley did examine some primary contests in the relevant areas she analyzed, she did not consider their impact when arriving at her conclusion that the voting in Georgia is racially polarized. "A hundred

percent of the general elections were polarized… That's higher than 55 percent [of the primaries I analyzed]." Handley Dep. 97:04-11.

68. Dr. Handley's conclusion "that voting is polarized in Georgia is based on the general elections." Handley Dep. 98:07-13.

69. Black voters in Georgia as a group overwhelmingly vote for Democrats and against Republicans. This is true regardless of the race of the candidate. *See* Deposition of John Alford [Doc. 229] ("Alford Dep.") 112:13-117:13.

70. Black voters in Georgia as a group overwhelmingly vote for Democrats and against Republicans when the Democratic candidate is white. *Id.*

71. Black voters in Georgia as a group overwhelmingly vote for Democrats and against Republicans when the Democratic candidate is Black. *Id.*

72. Black voters in Georgia as a group overwhelmingly vote for Democrats and against Republicans when the Republican candidate is white. *Id.*

73. Black voters in Georgia as a group overwhelmingly vote for Democrats and against Republicans when the Republican candidate is black. *Id.*

Respectfully submitted this 20th day of March, 2023.

>Christopher M. Carr
>Attorney General
>Georgia Bar No. 112505
>Bryan K. Webb
>Deputy Attorney General
>Georgia Bar No. 743580
>Russell D. Willard
>Senior Assistant Attorney General
>Georgia Bar No. 760280
>Elizabeth Vaughan
>Assistant Attorney General
>Georgia Bar No. 762715
>**State Law Department**
>40 Capitol Square, S.W.
>Atlanta, Georgia 30334
>
>*/s/ Bryan P. Tyson*
>Bryan P. Tyson
>Special Assistant Attorney General
>Georgia Bar No. 515411
>btyson@taylorenglish.com
>Frank B. Strickland
>Georgia Bar No. 687600
>fstrickland@taylorenglish.com
>Bryan F. Jacoutot
>Georgia Bar No. 668272
>bjacoutot@taylorenglish.com
>Diane Festin LaRoss
>Georgia Bar No. 430830
>dlaross@taylorenglish.com
>Donald P. Boyle, Jr.
>Georgia Bar No. 073519
>dboyle@taylorenglish.com
>Daniel H. Weigel

Georgia Bar No. 956419
dweigel@taylorenglish.com
**Taylor English Duma LLP**
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249

*Counsel for Defendant*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Statement has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/Bryan P. Tyson*
Bryan P. Tyson