```
 1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF GEORGIA
 2                 ATLANTA DIVISION
 3   ALPHA PHI ALPHA          )
     FRATERNITY, INC., a      )
 4   nonprofit organization on )
     behalf of members         )
 5   residing in Georgia;      ) CASE NO.
     SIXTH DISTRICT OF THE     ) 1:21-CV-05337-SCJ
 6   AFRICAN METHODIST         )
     EPISCOPAL CHURCH, a       )
 7   Georgia nonprofit         )
     organization; ERIC T.     )
 8   WOODS; KATIE BAILEY       )
     GLENN; PHIL BROWN and     )
 9   JANICE STEWART,           )
                               )
10        Plaintiffs,          )
                               )
11   vs.                       )
                               )
12   BRAD RAFFENSPERGER, in    )
     his official capacity as  )
13   Secretary of State of     )
     Georgia,                  )
14                             )
          Defendant.           )
15
16
17        VIDEOTAPED DEPOSITION OF JOHN B. MORGAN
18               (Taken by Plaintiffs)
19               February 9, 2023
20                   9:40 a.m.
21
22                   Suite 200
                1600 Parkwood Circle
23               Atlanta, Georgia
24
25   Reported by:   Debra M. Druzisky, CCR-B-1848
```

1                    APPEARANCES OF COUNSEL
2    On behalf of the Plaintiffs:
3         ARI SAVITZKY, Esq.
          American Civil Liberties Union
4         125 Broad Street, 18th Floor
          New York, New York  10004
5         (212) 549-2500
          asavitzky@aclu.org
6
          -and-
7
          JOE ZABEL, Esq.
8         Wilmer Hale
          7 World Trade Center
9         250 Greenwich Street
          New York, New York  10007
10        (212)  230-8800
          joe.zabel@wilmerhale.com
11
12   On behalf of the Defendant:
13        BRYAN P. TYSON, Esq.
          DIANE LAROSS, Esq.
14        BRYAN F. JACOUTOT, Esq.
          Taylor English Duma
15        1600 Parkwood Circle, Suite 200
          Atlanta, Georgia  30339
16        (678) 336-7249
          btyson@taylorenglish.com
17
18   Also Present:
19        Leo Mileman, videographer
          Abha Khanna, Esq.
20        David Rollins-Boyd, Esq.
21                      --oOo--
22
23
24
25

1                    INDEX TO EXAMINATION
2      Witness Name:                                    Page
3      JOHN B. MORGAN
4          By Mr. Savitzky                              7
5
6
7
8                    INDEX TO 1 EXHIBITS
9         No.                Description              Page

10     Exhibit 1      Curriculum vitae of John B.      11
                      Morgan.
11
       Exhibit 2      12-5-22, Expert report of John   62
12                    B. Morgan re: The
                      above-captioned action.
13
       Exhibit 3      2021-2022 Guidelines for the     102
14                    House Legislative and
                      Congressional Reapportionment
15                    Committee re: Georgia.
16     Exhibit 4      5-31-18, Westlaw print-out re:   142
                      Vesilind v. Virginia State Board
17                    of Elections synopsis.
18     Exhibit 5      Stipulations re: Vesilind v.     145
                      Virginia State Board of
19                    Elections.
20     Exhibit 6      1-23-23, Expert Report of John   240
                      B. Morgan re: The
21                    above-captioned action.
22     Exhibit 7      12-5-22, Declaration of William  241
                      S. Cooper re: The
23                    above-captioned action.
24
25

1       INDEX TO PLAINTIFF'S EXHIBITS (Continued.)

2      No.                  Description                Page

3   Exhibit 8     Plan components with Population    330
                  Detail report.

4

                              - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  Morning.  We are
2      on the video record at 9:41 a.m. on
3      Thursday, February 9th, 2023.
4          Please note that the microphones are
5      sensitive and may pick up whispering and
6      private conversations.  Please mute your
7      phones at this time.
8          Audio and video recording will
9      continue to take place unless all parties
10     agree to go off the record.
11         This is media unit one of the video
12     recorded deposition of John Morgan, taken
13     by counsel for plaintiff, in the matter of
14     Alpha Phi Alpha Fraternity, Inc., et al.
15     versus Brad Raffensperger, filed in the
16     U.S. District Court for the Northern
17     District of Georgia, Atlanta Division.
18         Location of this deposition is Taylor
19     English in Atlanta, Georgia.
20         My name is Leo Mileman representing
21     Veritext, and I am the videographer.  The
22     court reporter is Debra Druzisky from the
23     firm Veritext.
24         Would counsel and all present please
25     introduce yourselves, after which the

1       court reporter will swear in the witness.

2            MR. SAVITZKY:  This is Ari Savitzky

3       from the American Civil Liberties Union

4       representing plaintiffs.

5            MR. ZABEL:  Joe Zabel from Wilmer

6       Hale also representing plaintiffs.

7            MR. TYSON:  And good morning.  Bryan

8       Tyson, Diane LaRoss in the room from

9       Taylor English for the defendants.  And

10      we're joined on Zoom by Bryan Jacoutot

11      from our firm as well.

12           THE VIDEOGRAPHER:  And if everyone on

13      Zoom could introduce yourselves, please?

14           MS. KHANNA:  This is Abha Khanna.

15      I'm an attorney for plaintiffs in a, I

16      believe it's been consolidated, or at

17      least a related case, the Pendergrass case

18      and the Grant case.

19           MR. ROLLINS-BOYD:  David

20      Rollins-Boyd, not making an appearance,

21      just observing.  I represent plaintiffs in

22      a related case.

23           MR. JACOUTOT:  Bryan Jacoutot

24      representing state defendants.

25           THE WITNESS:  I'm John Morgan.

1                    JOHN B. MORGAN,

2     having been first duly sworn, was examined and

3     testified as follows:

4                      EXAMINATION

5     BY MR. SAVITZKY:

6         Q.   All right.  Good morning, Mr. Morgan.

7         A.   Good morning.

8         Q.   My name's Ari Savitzky.  I am an attorney

9     for -- with the A.C.L.U.  I represent the

10    plaintiffs in this matter, Alpha Phi Alpha

11    Fraternity against Raffensperger.  I represent

12    Alpha Phi Alpha Fraternity, Sixth District of the

13    A.M.E. Church, Eric Woods, Katie Bailey Glenn, Phil

14    Brown, Janice Stewart.

15              Could you just state your full name for

16    the record and spell your last name?

17        A.   Sure.  John Bennett Morgan, M-O-R-G-A-N.

18        Q.   And what is the address of your place of

19    work?

20        A.   It is ███████████████████████████████

21    ████████  Springfield, Virginia.

22        Q.   So thank you for taking the time to be

23    here today.  Before we get started, I just want to

24    briefly go over some ground rules.  Your answers

25    are going to be under oath, you were just sworn,

1    meaning that you're swearing to their truthfulness

2    and accuracy.

3              Do you understand that?

4         A.    Yes.

5         Q.    The oath you took has the same effect as

6    if you were testifying in court.  Do you

7    understand?

8         A.    Yes.

9         Q.    Okay.  And as you can see, the deposition

10   here is being transcribed by a court reporter.

11   It's important that you answer audibly, that you

12   give, like, an oral answer to questions, which is

13   why I keep saying "do you understand," because the

14   court reporter can't record if you nod your head or

15   if you don't give an oral answer.

16             Do you understand that as well?

17        A.    Yes.

18        Q.    Okay.  So this deposition is also being

19   videotaped.  It doesn't change the need to answer

20   audibly.  You still have to give an oral answer.

21   We still need the written transcript.

22             Got it?

23        A.    Okay.

24        Q.    Okay.  To make it a little easier for the

25   court reporter, I'm going to try my best to wait

1   until you are finished before asking another

2   question or jumping in.  And I'd ask you to do the

3   same, to sort of wait until I'm done with my

4   question before responding.

5          Okay?

6       A.   Okay.

7       Q.   I'm going to ask questions.  You're going

8   to answer them.  You have to answer my questions,

9   you must answer them unless you're instructed not

10  to answer and you choose to follow that

11  instruction.

12         Do you understand?

13      A.   Yes.

14      Q.   Okay.  And you understood you have to

15  answer my questions unless your attorney instructs

16  you not to answer?

17      A.   Yes.

18      Q.   Okay.  It's important that we understand

19  each other to have this lengthy conversation.  If I

20  ask you a question and you don't understand, tell

21  me you don't understand.  I'll rephrase the

22  question.

23         Okay?

24      A.   Okay.

25      Q.   All right.  And unless you tell me that

1  you don't understand, I'm going to assume that you

2  do understand it.

3          Okay?  Is that fair?

4     A.   Okay.

5     Q.   All right.  If you need to take a break at

6  any time, just let me know.  The only thing I would

7  ask is not to take a break when I've asked you a

8  question, to answer the question before we take the

9  break.

10          Okay?

11     A.   Okay.

12     Q.   All right.  And if you realize at any time

13  during the deposition that you answered a previous

14  question in a way that wasn't accurate or complete,

15  please let me know so that we can get that

16  corrected on the record today if possible.

17          Okay?

18     A.   Okay.

19     Q.   All right.  Do you have any questions

20  about any instructions that I've sort of given you

21  here?

22     A.   No, I don't think so.

23     Q.   Okay.  And is there any reason that you

24  can't provide complete and accurate testimony here

25  today?

1     A.    As far as I know, there's none.

2     Q.    Are you taking any medications or other

3    drugs that might impact your ability to give

4    complete and accurate testimony?

5     A.    No.

6     Q.    Okay.  I have to ask that, yeah.

7          MR. TYSON:  And Ari, before we start,

8     do you want to reserve all objections

9     except as to form and responsiveness until

10     trial or first use?  Is that all right

11     with you?

12          MR. SAVITZKY:  Sure.

13          MR. TYSON:  And privilege, yeah.

14          MR. SAVITZKY:  Yeah.

15          MR. TYSON:  Obviously, yes.

16          MR. SAVITZKY:  Okay.

17          MR. TYSON:  Okay.

18   BY MR. SAVITZKY:

19     Q.    So Mr. Morgan, I'd like to turn first to

20    your background.  And I am handing you a document

21    to be marked, although it sounds like I can just

22    mark it myself, which is cool, right here.

23                         (Whereupon, Plaintiff's

24                          Exhibit 1 was marked for

25                          identification.)

1    BY MR. SAVITZKY:

2        Q.    This is Exhibit 1 from your January 23rd

3    report, and it's your C.V.  I'm going to give it to

4    you.

5        A.    Okay.

6            MR. SAVITZKY:  Can I give the witness

7        that copy?

8            THE REPORTER:  Yes.

9            MR. SAVITZKY:  Okay.  And here's one

10       for you.

11           MR. TYSON:  Thank you.

12   BY MR. SAVITZKY:

13       Q.    Okay.  And is this, in fact, your C.V.?

14       A.    Yes.

15       Q.    Okay.  Now, I want to look first on Page 2

16   here at education and talk a little bit about your

17   educational background.  You majored in history in

18   college?

19       A.    Yes.

20       Q.    When you were in college, did you do any

21   coursework in computer science?

22       A.    Yes.

23       Q.    What computer science classes did you

24   take?

25       A.    I took two programming classes that would

1  probably be classified as introductory computer

2  programming classes.  I took two graduate level

3  courses in artificial intelligence programming.

4     Q.  Did you do any coursework in geospatial

5  analysis?

6     A.  No.

7     Q.  Applied math?

8     A.  No.  I think the computer science classes

9  fulfilled a similar requirement to a mathematics

10  requirement.

11     Q.  Okay.  But other than, and you went to

12  Chicago, so perhaps you had a certain hard science

13  requirement that you were required to fulfill?

14     A.  Yes.  We were required to take a physical

15  science and a biological science.  I tested out of

16  the physical science requirement, and I took

17  several biology course.

18     Q.  Okay.  And so and just to be clear, other

19  than those computer science courses, did you take

20  any mathematics courses?

21     A.  No.

22     Q.  Okay.  And did you take any courses in

23  statistics?

24     A.  No.

25     Q.  Did you take any courses in G.I.S., or

1   geographical information systems?

2        A.    I didn't take courses in that, but I used

3   aspects of that in my work in college.

4        Q.    How did you use aspects of it in your work

5   in college?

6        A.    For my bachelor's thesis, I used maps as

7   part of my project, so I -- it was -- this was

8   before easy access to G.I.S. systems, so I used

9   hand-colored maps and worked with those.

10       Q.    So you didn't use any computer programs

11  for the thesis, but you used physical paper maps?

12       A.    Yes.  I used a lot of physical paper maps.

13       Q.    Okay.  Have you published any academic

14  papers?

15       A.    One of my papers in undergraduate was

16  published as part of compendium on the Illinois and

17  Michigan canal, but that's the only one that was

18  published in the academic setting.

19       Q.    And is this the one that's mentioned in

20  your C.V., the demographic study on La Salle,

21  Illinois that was published in The History of

22  Illinois and Michigan Canal, Volume Five?

23       A.    Yes.

24       Q.    Is that a peer reviewed publication?

25       A.    I don't think so.  This was for a course

1    on -- it was for -- let's see.  It was historical

2    geography.  So part of the course was we had to

3    make use of data and mapping as part of the course

4    requirements.

5        Q.   And just to be clear, is it -- is -- was

6    this -- were these volumes on the history of

7    Illinois peer reviewed?

8        A.   Again, I don't think so.  They -- the

9    professor that was in charge of the class compiled

10   those and published them.

11       Q.   Okay.  Do you -- and do you know what a

12   peer reviewed publication is?

13       A.   Yes.

14       Q.   Okay.  And moving on, anything else about

15   your academic background, other than what we've

16   talked about already, that gives you any special

17   skills or knowledge with respect to map drawing?

18       A.   Well, yes.  While I was in college, I --

19   in some of the time that I wasn't in school, like,

20   spring breaks, I worked for the State of Indiana --

21   well, it was for the minority in the House of

22   Representatives in Indiana.

23            I was in college in Chicago, and I would

24   travel to Indianapolis and work with them on

25   redistricting in 1991.

1      Q.   This is the minority in the Indiana House
2    of Representatives?
3      A.   Yes.
4      Q.   Was it the Republican Party minority?
5      A.   Yes.
6      Q.   Okay.  Anything else other than that term
7    time work for the Indiana House of Representatives
8    minority from your academic background that gives
9    you any special skills or knowledge in --
10     A.   Well --
11     Q.   -- the map --
12     A.   I did.
13     Q.   -- drawing world?
14     A.   I did mention that my bachelor's thesis
15   was on the net effects of gerrymandering and was
16   covering a time period from I think 1910 to 1930,
17   or 1900.
18     Q.   Anything else?
19     A.   1896 -- 18, sorry, 1896 to 1932.  So it
20   covered the 1900 redistricting, the 1910, and then
21   there was some discussion of 1920 but there wasn't
22   actually a reallocation of seats in 1920, and then
23   1932.  So I covered those.  And that was a
24   substantial research paper.
25     Q.   Anything else other than what we've talked

1    about already?

2        A.   And as I understand your question, no.

3        Q.   Okay.  And by the way, how did you end up

4    working for the Indiana House of Representatives

5    minority?

6        A.   My father was involved in politics.  And

7    he had Indiana as a client, so I worked with

8    several states through my father's firm.  And he

9    encouraged me to join him in his profession while I

10   was in college, and I decided to do that.

11            So I started working with him.  I'd also

12   worked in political and demographic research in the

13   summertime after high school.  Actually, while I

14   was in high school I interned at the Republican

15   National Committee, and I did a lot of work there

16   with maps.

17       Q.   Well, and I'm just looking at your -- I'm

18   still on Page 2 of your C.V. and looking at

19   employment.  And starting from the bottom, I see

20   that -- is that what you're referring to, research

21   analyst, Republican National Committee --

22       A.   Yes.

23       Q.   -- summer of 1988, '89?

24       A.   Yes.  That's correct.

25       Q.   Okay.  And then after that you were a

1   research analyst at Applied Research Coordinates?

2       A.   Yes.  That's the company that I referred

3   to that my father owned and operated.

4       Q.   Okay.  And then you worked for an

5   organization called G.O.P.A.C.?

6       A.   Yes.  That's correct.

7       Q.   And who hired you to G.O.P.A.C.?

8       A.   The hiring was Lisa Nelson.  She was the

9   executive director.  And I had worked with them,

10  and my father had worked with G.O.P.A.C., in the

11  late '80s, and then I got hired after the 1994

12  elections.

13          The outgoing chairman of G.O.P.A.C. was

14  Congressman Newt Gingrich.  And when he became

15  Speaker of the House of Representatives, his

16  replacement was Congressman John Shadegg from

17  Arizona.  And so in that transition time Lisa

18  Nelson, the executive director, hired me.

19      Q.   And G.O.P.A.C. is a Republican Party

20  organization?

21      A.   Yes.

22      Q.   And G.O.P.A.C. is dedicated to educating

23  and electing a new generation of Republican

24  leaders?

25      A.   I haven't been following them since I

1  left, so I don't know what their current motto and
2  status is.
3      Q.    Okay.  Would you say that's a fair
4  description of what G.O.P.A.C. does?
5      A.    I have no idea what they do now.  I'm not
6  associated with them now.
7      Q.    Okay.  Is that a fair description of what
8  they did when you were there?
9      A.    I would say in the past it would focus a
10  lot more on candidate education and training.  In
11  the case of G.O.P.A.C., the -- one way to describe
12  it is to build a farm team of candidates that could
13  run for higher office in the future.
14          Its founding was by Governor Pete DuPont
15  of Delaware.  And so when he founded this in the
16  late '70s, he felt that there was a need to get
17  more Republican candidates at lower offices, like
18  state legislative and county boards and things like
19  that.  So that was the initial mission of
20  G.O.P.A.C.
21          So during my time, you know, the
22  organization built on that.  And then there was a
23  lot of work with Congressman Newt Gingrich at that
24  time.  And so some of his ideas were shared through
25  this kind of candidate training to legislative

1    candidates.
2         Q.    And when you talk about candidate training
3    and education, is it fair to say the idea is to
4    educate and train candidates so that they'll be
5    successful, they'll succeed and win office?
6         A.    Yes.  And in fact, one of the manuals for
7    that was something called Flying Upside Down, which
8    tried -- this was developed by someone associated
9    with Newt Gingrich.
10             And the idea was to learn to use
11   incumbency creatively so that some of the
12   advantages of incumbency could be used in a
13   campaign against incumbents sometimes.
14             Because for the Republicans in that time,
15   they did not have substantial majorities around the
16   country.  They were building those.  And so they
17   needed to learn how to win elections in that space
18   where incumbents have a lot of advantage.
19        Q.    So I guess summing it up, it's fair to
20   say, then, that your job at G.O.P.A.C. was to help
21   Republican candidates win elections?
22        A.    Generally.  Although, because of the issue
23   of -- we now call these groups 527s, but G.O.P.A.C.
24   pre-dated that.  In the days of G.O.P.A.C., there
25   was an ability to work directly with federal

1    candidates before they had to separate in the

2    McCain-Feingold era.

3            So in those days, G.O.P.A.C. would work

4    with federal and local candidates.  And then later

5    there was a little more of a separation.  And

6    generally, it was a 527 organization as opposed to

7    a 501(c)(3) or (4).

8        Q.   Okay.  So when you were there, you could

9    work directly with candidates to help them win

10   elections?

11       A.   Yes.  And typically, G.O.P.A.C. would do

12   these candidate training seminars around the

13   country.  And G.O.P.A.C. would send trainers out,

14   and I would help coordinate the overall programs

15   for that.  We'd have dozens of candidate trainings

16   in an election cycle all over the country.

17       Q.   For Republican candidates?

18       A.   Yes.  And part of that was we would

19   encourage minority candidates to run for office.

20   And in particular, there was an effort to outreach

21   to minority candidates, which was important at the

22   time.  And I think that continued through my tenure

23   as well.

24       Q.   And just to be clear, encouraging them to

25   run as Republicans?

1      A.    Yes.  And in fact, sometimes there were

2  efforts to switch candidates from the Democratic

3  Party to the Republican Party.  And so sometimes I

4  would meet with Democrats and show them how they

5  could win as a Republican.

6           I switched a candidate myself in Alabama.

7  And then my father had switched probably several

8  dozen over the course of his career.

9      Q.    Okay.  You were at G.O.P.A.C. for eight

10  years?

11      A.    '95 to '99, I think.  Let's see.  Yeah,

12  and then I came back -- the first time I was the

13  national field director, and then later I came back

14  as executive director under Congressman J.C. Watts.

15      Q.    And when you weren't at G.O.P.A.C., you

16  were -- you had a consulting shop; is that right?

17      A.    Yes.  I worked with my father's company.

18  And then in 2006 I acquired the company from my

19  father, and I became president of Applied Research

20  Coordinates.

21      Q.    Okay.  And at Applied Research

22  Coordinates, you are hired by state legislators and

23  legislative caucuses to do mapping work?

24      A.    Not always.  There are campaign work that

25  I do.  I work with other interest groups sometimes.

1    I've spoken to groups like the National Conference

2    of State Legislators, American Legislative

3    Exchange.  So sometimes I would do speaking.

4            And you know, again, the clients are

5    primarily candidates for office, but sometimes I'll

6    have clients that are interest -- maybe you'd call

7    them interest groups, like the U.S. Chamber of

8    Commerce --

9        Q.    Okay.

10       A.    -- groups like that.

11       Q.    And part of the work you do at Applied

12   Research Coordinates is mapping and redistricting

13   work?

14       A.    Yes.

15       Q.    And is all of the mapping and

16   redistricting work that you've done at A.R.C. laid

17   out in your C.V. here?

18       A.    I think most of it is.  I tried to, you

19   know, indicate the states that I had worked in.

20       Q.    Okay.  Are there any that are missing from

21   your C.V.?

22       A.    I would have to look closely.  I think

23   most of it's here that I can recall.

24       Q.    Okay.  I mean, do you want to take a look

25   and make sure it's all there?

1      A.    I think the number that I usually use is

2    about 20 states that I've done redistricting work

3    in.  Let's see.  I've done -- I've not done

4    redistricting work in Maine or New Hampshire or

5    Vermont or Massachusetts.

6           I have done work in Rhode Island,

7    Connecticut, New York, New Jersey, Pennsylvania.

8    I've not done work in Delaware.  I've done work in

9    Virginia, North Carolina, South Carolina, Georgia,

10   Florida, Tennessee.  I've done work in Ohio,

11   Michigan, Indiana, Illinois, Wisconsin, Iowa,

12   Kansas, New Mexico.  I did a little bit of work in

13   Arizona.

14           I never worked it out to do California,

15   but I've been approached by a couple of people in

16   California.  The Kern County, which is Bakersfield,

17   they wanted me to get involved.

18           So those are the ones where I've had

19   clients.  I've drawn maps without a client in

20   Maryland just because I had the opportunity to look

21   at some data.

22      Q.    Just for fun?

23      A.    Yeah.  I would say that.  And I've looked

24   at, in a similar way in Kentucky.  I'm trying to

25   think.  I mean, that covers almost half the

1    country.

2         Q.   Let me ask you this.  Have you ever been

3    hired to draw a map by a Democratic Party

4    legislator or a caucus?

5         A.   Not directly.  But I have worked with

6    democratic caucuses as part of my duties.  A lot of

7    times in situations there'll be a negotiation or

8    I'll be assigned to work directly with Democrats on

9    something.

10             Like in North Carolina, there -- in 2001

11   there was a substantial pause in the redistricting

12   process.  And members of the Democratic Party were

13   kind of fractionalized, so I worked with some of

14   the Democrats there directly.

15             I've worked directly with Democrats in

16   Florida.  I -- many places I worked.  But in your

17   sense, you're asking where I -- was I hired by the

18   caucus.  No.

19        Q.   Okay.  So all the times that you were

20   hired to do mapping or districting work was by

21   Republican legislators or caucuses?

22        A.   No.

23        Q.   In what instances were you hired to do

24   mapping work by legislative entities or not

25   Republican affiliated?

1      A.    I worked with commissions in Pennsylvania,

2   Ohio.  I worked with commissions in Michigan,

3   Virginia.

4          And the mechanics are different in many

5   states.  So in that sense, for example, in

6   Michigan, I wasn't hired by the Republicans or the

7   Democrats.  I was hired by the Michigan Independent

8   Redistricting Commission.  And so in that sense I

9   wasn't working for legislators at all.

10      Q.    So you mentioned Ohio.  Who hired you in

11   Ohio?

12      A.    I worked for attorneys in that, so I'd

13   have to see how I can explain that.  It was an

14   attorney working with the Ohio commission.

15          MR. TYSON:  And Ari, there are going

16      to be some instances where Mr. Morgan was

17      a consulting expert that wasn't ever

18      disclosed in cases.

19          So as we're trying to explain where a

20      state he's worked in, but there may be the

21      specifics he can't talk about through his

22      role in those cases.  So.

23          MR. SAVITZKY:  Understood.

24   BY MR. SAVITZKY:

25      Q.    In Ohio did you work for Ray DiRossi?

1      A.    I worked with him.

2      Q.    Is that who hired you?

3      A.    No.

4      Q.    Were you hired by senate -- the senate

5  president Matthew Huffman?

6      A.    I worked for a law firm involved in that

7  matter.

8      Q.    Do you know what happened with those

9  districts in Ohio that you worked on?

10     A.    I assume they've been challenged in court.

11     Q.    Do you know what happened in that court

12  challenge?

13     A.    No.

14     Q.    Okay.  I want to talk about your expert

15  work.  And I believe that's also on Page 2 of your

16  C.V.  You have Expert Experience and Trial

17  Testimony.

18            On Page 2, and we'll start from the top of

19  that section if you don't mind, you say you were

20  recognized as a mapping expert by a state trial

21  court in New Mexico after the 2010 redistricting

22  there.

23            Do I have that right?

24     A.    Yes.

25     Q.    And that case was called Egolf against

1    Duran?

2        A.    Yes.   That's my understanding.   It was

3    called that when I was involved.

4        Q.    And you drew maps that were submitted to

5    the trial court in that case?

6        A.    Yes.   The trial was -- took quite a bit of

7    time, and there were many maps drawn and used

8    during the trial.

9        Q.    And you submitted some of the maps in that

10   case?

11       A.    Yes.

12       Q.    And you were working for Governor

13   Martinez?

14       A.    I think that's -- I mean, again, I was

15   working for the attorneys for Governor Martinez.

16       Q.    Okay.   You were working on behalf of

17   Governor Martinez?

18       A.    Yes.

19       Q.    Governor Martinez is a Republican?

20       A.    Yes.   At that time.   I think she was a

21   former Democrat.

22       Q.    Okay.   And you say here in your C.V. that

23   the state court adopted a house redistricting plan

24   principally drafted by you?

25       A.    Yes.   In that trial the map that I

1    principally drafted was adopted by the Court.  That

2    was in the house.  On the senate side there was a

3    compromise between the parties, and they I think

4    resolved the case in a compromise.

5         Q.   Okay.  Well, just focusing on that house

6    map, do you know if it ever went into effect?

7         A.   I know that portions of the map that I

8    drew went into effect, yes.

9         Q.   Do you know that portions of it did not go

10   into effect?

11        A.   Yes.

12        Q.   Do you know why they didn't go into

13   effect?

14        A.   I think there was a judicial appeal or

15   review, and they made some changes to the maps.

16        Q.   Do you know why they made those changes?

17        A.   I think there was a partisan element that

18   they were wanting to make changes to.

19        Q.   Can you say more about what do you mean "a

20   partisan element"?

21        A.   I think that they made changes to some

22   specific districts in the Albuquerque area that I

23   recall because they wanted to make them more

24   democratic, so they did.

25        Q.   And when you say "they," you mean --

1    A.    The courts.

2    Q.    -- the appellate courts in New Mexico?

3    A.    The whatever the jurisdiction was.  I

4    wasn't really involved in the case after that

5    initial trial.

6    Q.    So do you know what the New Mexico Supreme

7    Court said about the districts that we're talking

8    about?

9    A.    No.

10   Q.    Okay.  So that's New Mexico.  You

11   mentioned Virginia.  And Virginia is mentioned here

12   as well.  Filed expert reports and expert testimony

13   in Page against Board of Elections.  Testified in

14   trial in Bethune Hill and Vesilind.

15         Those are all Virginia cases?

16   A.    Yes.

17   Q.    Did you draw the state legislative maps in

18   Virginia after the 2011 census?

19   A.    I worked with the house of delegates, and

20   I worked with, primarily with Delegate Chris Jones,

21   who was the legislator who was tasked with

22   redistricting for the Virginia House of Delegates.

23   Q.    Did you help draft the plan that was

24   enacted for the state legislative districts?

25   A.    I clearly worked with Delegate Jones, and

 1    he ultimately was the sponsor and the delegate who

 2    carried the bill and got it enacted.

 3         Q.   Do you recall testifying that you helped

 4    draft the plan?

 5         A.   Yeah.  I did.  I helped draft with Chris

 6    Jones, yes.

 7         Q.   Let's talk about some of the court cases

 8    that you mention here about the 2011 Virginia maps.

 9    Do you remember what that Vesilind case that you

10    mention here is about?

11         A.   There were two or three cases.  I think

12    the Vesilind one might have been concerned with

13    compactness of districts in the state court, I

14    think.

15         Q.   That's right.  Yes.  And when you say

16    there was concern about compactness, what do you

17    mean?

18         A.   I think that was the reason for the

19    challenge.

20         Q.   They were -- the districts were challenged

21    as being insufficiently compact?

22         A.   I think that was the nature of the

23    challenge.

24         Q.   Okay.  Do you remember the districts in

25    that case that were challenged?

1     A.    I think there were many districts that

2  were challenged.  I don't remember the exact ones.

3  I remember two that were in the Richmond area in

4  Henrico County, District 72 and 73.  Those come to

5  mind.

6     Q.    District --

7     A.    But there were others.

8     Q.    District 72 -- one second.

9     A.    And I don't know, as I said, the total

10  number of districts, but I do specifically remember

11  District 72 and 73, in answer to your question.

12     Q.    And what do you recall about District 72?

13     A.    In my mind I think about District 72 and

14  73 as being together.  They were adjacent districts

15  in Henrico County.

16     Q.    Okay.  Do you remember how District 72 was

17  characterized?

18     A.    No.

19     Q.    Okay.  Do you remember it being called an

20  upside down U?

21     A.    That makes sense.

22     Q.    Do you remember it being called a toilet

23  bowl shape?

24     A.    If you want.  I mean, I -- there are other

25  descriptors that could be used.

1      Q.   So do you remember what happened with

2   those districts in that Vesilind case?

3      A.   I think the plan was upheld.

4      Q.   Okay.  You testified in the Bethune Hill

5   case?

6      A.   Yes.

7      Q.   That was in federal court?

8      A.   Yes.

9      Q.   And by the way, just backing up for a

10  second, do you remember how many districts in that

11  Vesilind case were at issue or challenged for being

12  compact --

13     A.   No.

14     Q.   -- or insufficiently compact?

15     A.   I don't remember the number of districts.

16  I do specifically remember 72 and 73 being focal

17  points of it.

18     Q.   And but were those the only ones or were

19  there others, too?

20     A.   I think there may have been others.  I

21  think this may have been a broad effort to

22  challenge compactness.

23     Q.   Okay.  So back to the Bethune Hill case,

24  that was also about the 2011 Virginia state

25  legislator redistricting?

1      A.    Yes.

2      Q.    And do you remember what happened in the

3   Bethune Hill case?

4      A.    Generally, yes.

5      Q.    What happened?

6      A.    There was a trial, and it was resolved.

7   And it was appealed, and the map was upheld in the

8   initial trial.  But because of a case out of

9   Alabama, the Supreme Court required a new trial.

10          And then at that later trial, the map was

11  overturned, and a special master was brought in to

12  draw a new map.

13     Q.    Do you remember your testimony in that

14  case?

15     A.    Not word for word, but I do remember

16  giving testimony in that case.

17     Q.    Do you remember generally what you

18  testified about?

19     A.    There was so much.  I -- generally, I

20  testified about the map drawing process that I was

21  involved in, things that I had direct knowledge

22  about.

23          I would also say it's fair to say that I

24  worked with the attorneys in that process in

25  addition to my testimony.

1      Q.   Do you remember how the trial court in

2   that case assessed your testimony?

3      A.   Not specifically.  But I think that they

4   did not find in favor of keeping the plan as it was

5   drawn.

6      Q.   Trial -- the trial court did not find in

7   favor of keeping the map as it was drawn?

8      A.   The second trial.

9      Q.   Okay.

10      A.   The first trial did.

11      Q.   Okay.  And the second -- but the trial

12   court eventually did not -- threw some of these

13   districts out; is that --

14      A.   That's my understanding.

15      Q.   Is that right?

16      A.   Yes.

17      Q.   But you don't recall how your testimony

18   was received?

19      A.   After I gave the testimony, I didn't have

20   a lot of interaction with the process after that.

21      Q.   Do you know whether the Court found you

22   credible or not credible?

23      A.   I think it's been brought to my attention

24   that they said it was not credible in certain

25   instances.

1      Q.   Okay.  So -- oh, and you mentioned you
2  worked with Chris Jones?
3      A.   Yes.
4      Q.   Is he a Republican?
5      A.   Yes.
6      Q.   Okay.
7      A.   He worked with the legislators of both
8  parties in drafting the plan.  That much I know.
9      Q.   Okay.  You also testified in the Page
10  against Virginia Board of Elections case?
11      A.   Yes.
12      Q.   Okay.  And do you remember what happened
13  in that case?
14      A.   That was about a congressional district.
15  And it was resolved, and they had a special master
16  draw new congressional districts.
17      Q.   Okay.  When you say it was resolved and
18  they had a special master draw it, does that mean
19  that the original district was struck down?
20      A.   Yes.  That's my understanding.  I didn't
21  have anything to do with the congressional drafting
22  process in Virginia in that cycle.
23      Q.   Okay.  But so you were an expert witness
24  in that case?
25      A.   Yes.

1      Q.    And you were an expert witness for the
2  State?
3      A.    Yes.
4      Q.    Defending the district?
5      A.    Yes.
6      Q.    That was struck down?
7      A.    I wrote a report for that, yes.
8      Q.    Okay.  And do you remember how the Court
9  in that case assessed your expert testimony?
10      A.    Again, once the case was resolved, you
11  know, I didn't have a lot to do with it after my
12  testimony.  So yeah, I think they didn't place a
13  lot of weight in my report, I guess.  That's my
14  understanding.
15      Q.    What are you basing that on?
16      A.    I think that was discussed in the
17  preliminary injunction hearing in this case.
18      Q.    So that's -- we talked about Egolf.  We
19  talked about Page, Vesilind and Bethune Hill.  Have
20  you testified in any other -- and I know you
21  testified in a P.I. hearing here.
22            Other than those, any other instances
23  where you testified in court about mapping-related
24  issues?
25      A.    Yes.  I testified in a North Carolina case

1  in 2007 that was about group quarters where -- this

2  was after the Stephenson cases.  I was testifying

3  in that, but it was an affidavit that I submitted.

4  And I don't know that it was in the trial, but I

5  submitted an affidavit there.

6      Q.    I'm sorry.

7      A.    In 2007.

8      Q.    And this case was about what exactly?

9      A.    So after the -- so the Stephenson cases, I

10 worked in North Carolina in 2001 and 2002.  And I

11 described a little bit of that how the

12 legislature -- legislative process broke down a

13 little bit, and there was a long period of -- it

14 was stalled, and I worked with legislators during

15 that time period.

16      After the plan was enacted, there were

17 lawsuits saying that the North Carolina legislature

18 had violated the Whole County Provision of the

19 North Carolina Constitution.  So there was a

20 challenge to that.  And ultimately, they changed

21 the way that redistricting was done in North

22 Carolina.

23      And so this idea of having county

24 groupings, it became very important to know the

25 population of the counties.  Well, it turned out

1    the census had an error in their counting of group

2    quarters, and they were effectively double counting

3    group quarters.

4           So if you took the corrected census data,

5    then the population figures would be incorrect.

6    And I wrote an affidavit to that effect showing

7    what the new population, the corrected census

8    populations would be and what effect that would

9    have on the maps.

10        Q.   So you --

11        A.   So I did that.

12        Q.   Okay.  And you didn't testify in court in

13   that case, though, did you?

14        A.   I don't think so.  I just, it's probably

15   best to say I don't remember testifying in court.

16   I think I may have just submitted the affidavit.

17        Q.   Okay.

18        A.   If there was a court appearance, it was

19   brief.  It was just along the lines of I submitted

20   this affidavit.

21        Q.   And this is in state court or federal

22   court?

23        A.   I don't remember.  It's 2007.

24        Q.   And is that on your résumé anywhere, on

25   your C.V. anywhere?

1      A.    No.  Because I didn't really -- like, in

2   this case I wouldn't consider it being an expert

3   report.  It was an affidavit about a fact.  I ran a

4   report and said, here are the results of the

5   report.

6      Q.    Okay.  Well, I mean, the section of your

7   C.V. says Expert Experience and Trial Testimony.

8   So --

9      A.    That's what I'm saying.

10      Q.    -- did you give testimony at the trial?

11      A.    I don't remember.  Like, I don't think it

12   was an actual trial.  I think I prepared the report

13   and they may have used it in the trial, but I don't

14   remember testifying.

15            I think, in my recollection, the first

16   testimony that I really did as an expert directly

17   was in the 2011 New Mexico case.

18      Q.    Uh-huh.

19      A.    I was deposed in North Carolina after the

20   2010 redistricting, which I was involved in.

21      Q.    Okay.  So other than Egolf, Page,

22   Vesilind, Bethune Hill, and then maybe this North

23   Carolina case, have you testified in court in any

24   other mapping-related cases?

25      A.    Yeah.  The two other ones that are here

1    are Gwinnett County and Fayette County in Georgia.

2         Q.   So again, did you testify in court in

3    those cases?

4         A.   In the Fayette County matter, I think

5    there was some court testimony.  I'd have to -- I'd

6    have to look at that.  I definitely filed a report.

7         Q.   I'm just looking at your C.V., and it says

8    "filed expert report."  Right?

9         A.   (Whereupon, there was no audible response

10   by the deponent.)

11        Q.   So it doesn't say testified at trial, so I

12   just want to be clear.  Was there trial testimony

13   or did you just file an expert report?

14        A.   I'd have to review that.  I don't know for

15   sure.

16        Q.   Okay.  You don't know whether you've

17   listed all the trial testimony or whether --

18        A.   I --

19        Q.   -- this is an accurate --

20        A.   I think --

21        Q.   -- representation of what you did --

22        A.   No, no.

23        Q.   -- in these cases?

24        A.   I think it's fairly -- it's fairly

25   comprehensive.  But I'd have -- I mean, there are

1      people here who probably know if I testified at

2      trial.  But I can't sitting here remember if it was

3      trial testimony or not.

4          Q.    The Fayette County case is from 2015?

5          A.    That sounds about right.

6          Q.    Gwinnett County case from 2018?

7          A.    Before that, I think.

8          Q.    And you don't remember as you sit here

9      whether you testified in a federal court in those

10     cases?

11         A.    I know not in Gwinnett.

12         Q.    Okay.

13         A.    That -- there were reports filed in that,

14     but I don't believe that -- it either didn't go to

15     trial or I wasn't called to testify in that.

16         Q.    Okay.  Well, just briefly talking about

17     those cases -- and let me ask again before we go

18     there.

19              Other than the examples we've talked about

20     so far, are there any other cases where you've

21     testified in court on a mapping-related issue?

22         A.    On a mapping-related issue?  I really

23     think that covers it.  I'm just a little unclear

24     about Fayette County and this other North Carolina

25     one in 2007.  I -- it was -- it was a different

1   circumstance.  I may have just done the affidavit

2   and not testified.

3       Q.   And why didn't you put the North Carolina

4   case on -- I mean, you know, you list some expert

5   reports here, but I don't see anything about this

6   North Carolina case in your C.V.

7       A.   Right.

8       Q.   So do you know why --

9       A.   Sure.

10      Q.   -- it didn't make it?

11      A.   Sure.  Because I think if you look at my

12  C.V., you'll see that the first one I mentioned is

13  the New Mexico situation.  And that was probably

14  the first time that I was acknowledged as an expert

15  directly.

16           The previous case I was a practitioner of

17  mapping; whereas, in the New Mexico case I was

18  recognized as an expert.

19      Q.   So just talking briefly about some of

20  those Georgia cases that we mentioned, it does say

21  here you submitted or you filed an expert report in

22  Georgia, N.A.A.C.P. against Gwinnett County.

23           Do you know -- is that right?

24      A.   Yes.

25      Q.   And do you know what the result was in

1   that case?

2       A.   I don't remember if the case went to

3   trial.  I feel like it was resolved by elections.

4   And then because of the results of the election,

5   the trial was not necessary, or they resolved it

6   without a trial.

7       Q.   And you do feel sure that you didn't

8   testify in that case in court?

9       A.   I haven't -- it -- I haven't thought about

10  it.  I mean, if I -- I just, with the Gwinnett

11  County case, I know I filed the reports, but I

12  don't remember if there was a trial component to it

13  or not.

14      Q.   Okay.  You mentioned the N.A.A.C.P.

15  against Fayette County.

16      A.   Yes.

17      Q.   Were you working on behalf of the

18  defendant in that case?

19      A.   Yes.

20      Q.   And were you working on behalf of the

21  defendant in the Gwinnett County case as well?

22      A.   Yes.

23      Q.   Were those Voting Rights Act cases?

24      A.   My understanding is that they were, yes.

25           And actually, since there's no question

1    here, can we take a break for a few minutes?

2         Q.    Sure.

3         A.    Okay.

4               THE VIDEOGRAPHER:  Off the video

5         record at 10:24 a.m.

6               (Whereupon, a discussion ensued

7          off the record.)

8               (Whereupon, there was a brief

9          recess.)

10              THE VIDEOGRAPHER:  Back on video

11        record at 10:32 a.m.

12   BY MR. SAVITZKY:

13        Q.    Okay.  So I believe we were talking about

14   some of those Georgia cases, and specifically about

15   the Fayette County case.  Do you remember what

16   happened?  Do you remember what the result was in

17   that case?

18        A.    I think it went to a special master to

19   draw single member districts in Fayette County.

20        Q.    So was the existing system of districts

21   that was challenged struck down?

22        A.    Well, there weren't districts.  I think it

23   was all at large.

24        Q.    Was the existing at-large system struck

25   down under the Voting Rights Act?

1      A.   It was struck down by the Court.  That's

2  my understanding, yes.

3      Q.   And if the -- you were -- and you were the

4  defense expert witness in that case?

5      A.   Yes.  I filed a report for them.

6      Q.   Have you ever been de -- other than the

7  cases that we've talked about already, have you

8  ever been deposed before?  I think you mentioned --

9  you started to mention one time.

10     A.   Yes.  I've been deposed several times,

11  yes.

12     Q.   How many times?

13     A.   I don't know a number.  I would say for

14  each of these cases I was probably deposed, and

15  then there were a couple others that were before

16  the 2011 that I mentioned and right after the 2011.

17          So I was deposed in Ohio, I think, yeah,

18  Ohio -- no.  Maybe -- I don't remember about Ohio.

19  I remember something from other depositions in Ohio

20  was brought into New Mexico, but I don't remember

21  if I was directly deposed in Ohio.

22          And then in -- I mentioned the North

23  Carolina deposition.  That was after the 2010

24  redistricting, so that would have been in probably

25  2012.

1           And I was deposed but I was not called to
2     testify either as an expert or as a fact witness in
3     North Carolina either by the defense or the
4     plaintiffs.
5           Q.   Do you recall any other times that you
6     were deposed?
7           A.   Outside of these cases that we've been
8     discussing, not off the top of my head here, no.
9           Q.   You mentioned being deposed in the Ohio --
10    in an Ohio case?
11          A.   I don't know that it was a deposition.  I
12    think that my -- what I'm conflating perhaps in my
13    mind is that information from another person's
14    deposition was brought into the New Mexico case.
15    There was some information that came out of Ohio
16    that the attorneys in New Mexico brought to my
17    attention.
18          Q.   So I'm just trying to understand.  Were
19    you deposed in a lawsuit involving districts in
20    Ohio at any point?
21          A.   I don't recall whether it was an actual
22    deposition.  I was involved in the 2011, 2012 Ohio
23    reapportionment board, and I was involved with the
24    Ohio reapportionment board in 2020 -- or 2021.
25          Q.   Okay.  And you don't recall whether you

1    sat for a deposition and plaintiff's counsel asked
2    you questions?
3         A.   As I sit here today, I don't remember
4    that.
5         Q.   To the extent that you maybe recall being
6    possibly deposed, do you remember what it was
7    about, what you would have been testifying about?
8         A.   Well, that was the thing that was odd, and
9    that's why I'm a little unclear about it.  I was a
10   technical expert for the commission, and I did not
11   draw maps.  So I was really helping them with
12   implementing the use of their software in Ohio.
13            And I think that information, once
14   disclosed, it seemed like it didn't have a lot of
15   value to the case, because I was a technical expert
16   on software use and not a map drawer.
17        Q.   Okay.  But you don't recall whether this
18   actually -- you actually were deposed about any of
19   this, this is sort of --
20        A.   I --
21        Q.   -- speculating or...
22        A.   As I said, I don't recall an actual
23   deposition.
24        Q.   Okay.  You mentioned North Carolina as
25   well.  Do you know, were you deposed in North

1   Carolina?

2       A.   Yes.  I was definitely deposed in North

3   Carolina after the 2011 redistricting.  I drew

4   portions of the state senate map.  And I was

5   deposed in that case and I was not called to

6   testify, either as -- for the plaintiffs or the

7   defendants or in any other capacity.

8       Q.   And do you remember what you testified

9   about in that deposition in North Carolina?

10      A.   I talked about drawing maps for the North

11  Carolina senate.

12      Q.   Do you remember anything more specific

13  about what you testified about in the deposition?

14      A.   No.  That was quite a while ago.

15      Q.   Okay.  So we talked about North Carolina,

16  maybe Ohio.  Any other depositions that you can

17  remember?

18      A.   I, as far as I know, that covers the ones

19  that I can recall right now.

20      Q.   Okay.  Let's talk about your knowledge or

21  your understanding of this case.  You understand

22  that this deposition that we're doing now relates

23  to litigation brought by Alpha Phi Alpha Fraternity

24  and others against the State of Georgia?

25      A.   Yes.

1      Q.   And you know, when I say plaintiffs, do
2   you understand who I'm talking about?
3      A.   Yes.
4      Q.   When did you first learn about this
5   litigation brought by the plaintiffs against the
6   State of Georgia, or I should say against the
7   Secretary of State's office?
8      A.   I would say maybe at the end of 2021.
9      Q.   And how did you learn about the case?
10     A.   The counsel here, Mr. Tyson, contacted me.
11     Q.   When did you first learn that you were
12  going to give a deposition in this case?
13     A.   I think it was probably at the end of
14  2021.
15     Q.   At the end of 2021 you learned you were
16  going to give a deposition?
17     A.   I think, I was contacted about it.  I
18  assumed that, if I had to do a report, I would also
19  have to do a deposition.  So in that sense it's
20  connected.
21     Q.   Okay.  When did you first learn that you
22  were going to be doing this deposition that we're
23  in right now?
24     A.   Sometime in January, I was given a window
25  of dates in February to respond to a deposition.

1      Q.   And how did you find out about that?

2      A.   Mr. Tyson sent me the information saying

3   that the dates would be from -- would be up until

4   February 17th, I think, which is next Friday, so

5   about a two-week window that I had to look at my

6   schedule for availability.

7      Q.   Okay.  And do you understand that you're

8   being proffered as an expert in this case?

9      A.   Yes.

10      Q.   What are you an expert in, in your

11   estimation?

12      A.   Map drawing and demographics generally is

13   what I'm recognized as an expert in.

14      Q.   What do you think makes you an expert?

15      A.   I have a lot of experience drawing maps.

16      Q.   Anything else?

17      A.   There's different aspects of that

18   experience that I could talk about.  But as a

19   general matter, it's the experience, the hands-on

20   experience that I have in map drawing.

21      Q.   Okay.  It's not -- I guess, you know, when

22   I ask anything else, I mean anything other than

23   your experience and what you've gained from

24   actually drawing, you know, whatever knowledge

25   you've gained from drawing maps, you know, that

1    qualify you as an expert.

2         A.    I don't think I understand the question.

3         Q.    Are you -- do you have any specialized

4    training in map drawing that you say -- that you

5    think makes you an expert?

6         A.    Yes.

7         Q.    What is the specialized training that you

8    have?

9         A.    I've worked with mapping software for 30

10   years.  I've trained with various types of G.I.S.

11   software.  I've had thousands of hours of

12   experience drawing maps in 20 states.

13            I don't know how else I could say that I

14   have experience in map drawing other than to point

15   to my experience.

16        Q.    100 percent.  And all -- I guess my

17   question is, other than your -- the experience of

18   being a map drawer, is there -- sometimes people

19   are experts because they have some external

20   accreditation or an advanced degree.

21            And you're not saying those -- that's why

22   you're an expert; right?

23        A.    I'm -- definitely have not followed a

24   career in academia, so I'm -- I graduated college

25   and I immediately went into drawing maps.  The day

1    I graduated college from Chicago, the next day I
2    was in Michigan in Lansing drawing maps.
3         Q.   Okay.  And do you know what the duties of
4    an expert in a federal case are?
5              MR. TYSON:  I'll just object to the
6         extent that calls for a legal conclusion.
7              You can answer if you know.
8              THE WITNESS:  I don't know the
9         specifics that the duties entail.  I hope
10        I would be informed if there's something
11        specific.
12   BY MR. SAVITZKY:
13        Q.   Do you think that an expert is supposed to
14   be objective?
15        A.   It would seem likely to me.
16        Q.   What do you mean "likely"?
17        A.   I mean, if you're asking for an expert,
18   being objective sounds like something that would be
19   part of that.
20        Q.   So you do think an expert should be
21   objective?
22        A.   Generally, yes.
23        Q.   Were you asked to write a report or
24   reports in this case?
25        A.   Yes.

1    Q.   Did you write a report that was submitted

2  on December 5th?

3    A.   Yes.

4    Q.   Did you write a report that was submitted

5  on January 23rd?

6    A.   I wrote more than one report.  But for

7  this case, yes.

8    Q.   For the -- understood there are many

9  reports.  But for purposes of my questions, I'm

10  referring to those two reports.

11    A.   Yes.

12    Q.   You understand that?

13    A.   Yes.

14    Q.   Okay.  Do your reports contain a complete

15  statement of all opinions you will express in this

16  case?

17    A.   I don't know.  I think in one of the

18  reports I specifically said that I would reserve

19  the right to revise my opinion, at least in the

20  preliminary injunction phase.

21    Q.   Setting aside the report that you

22  submitted in the preliminary injunction phase, and

23  understanding that you might update your report if

24  there's new information, do your reports, the

25  December 5th and the January 23rd report that we're

1   talking about, contain a complete statement of all

2   the opinions that you are going to express in this

3   case based on what you know now?

4       A.   I don't know how to answer that.  They

5   contain the opinions in the report.  And if I'm

6   asked questions about other things, I'm sure that

7   I'll have to try to answer those.

8       Q.   What do you mean if you're asked questions

9   about other things?

10      A.   Well, in -- part of this process in my

11  experience is that sometimes a judge or an attorney

12  in this process will ask me questions that are

13  beyond the scope of my report.  And generally

14  speaking, I try to answer those.

15      Q.   Have you formed any opinions about the

16  facts of this case that are not included in the

17  reports that you submitted?

18      A.   At this point I would say I don't have any

19  fully formed opinions that aren't in the report.

20      Q.   Do you have any inchoate opinions that you

21  plan to --

22      A.   Well --

23      Q.   -- crystalize later?

24      A.   Well, as, I mean, as more information

25  comes to light, it's possible that I could offer an

1    opinion on something related to something I've

2    already given an opinion on.

3        Q.   So setting aside the possibility that more

4    information will come to light, based on the

5    information that you've been provided and reviewed

6    thus far, do the reports that you have submitted

7    contain a complete statement of the opinions that

8    you have formed thus far?

9        A.   I think so.

10       Q.   Do they contain a complete statement of

11   the opinions that you can express -- that you will

12   express in this case based on what you know now?

13       A.   I think so.  I mean, again, with the idea

14   that there could be more information or information

15   comes out to look at something in a different

16   light, I surely could revise my opinions or offer

17   new ones.

18       Q.   I just want to make sure, setting aside

19   the possibility that there could be new information

20   that comes out, and just based on what information

21   you have now, does your report -- do these reports

22   that we're talking about contain a complete

23   statement of all the opinions that you're going to

24   express, assuming no new information comes out?

25       A.   Generally, yes.

1      Q.   And do your reports contain a complete
2   statement of the basis and reasons for the opinions
3   that you will express?
4      A.   I think so.
5      Q.   You think so?
6      A.   That was my answer.
7           MR. TYSON:  And Ari, maybe to help
8      here, you're referring specifically to
9      expert opinions, not any opinions somebody
10     might have about anything; right?
11          MR. SAVITZKY:  Yes.
12          MR. TYSON:  Yes.  Yeah.
13  BY MR. SAVITZKY:
14     Q.   Okay.  Is that a helpful clarification?
15     A.   Yes.
16     Q.   So do your reports, and again, setting
17  aside if other information comes out, but do your
18  reports contain a complete statement of the basis
19  and reasons for the expert opinions that you'll
20  express in this case?
21     A.   I think I answered that question.  Yes,
22  generally.
23     Q.   Do your reports set forth, and again, I'm
24  referring to the December 5th and January 23rd
25  reports in the Alpha Phi Alpha case, do your

1    reports set forth all of the facts or data that you

2    considered in forming your expert opinions in this

3    case?

4         A.   I believe so.  There were many reports

5    that were generated and included as appendices in

6    there, and I reference some of those reports.  And

7    they are -- the actual reports are in the expert

8    report, so they are part of the report as well.

9         Q.   Okay.  So without going into the -- I want

10   to talk about sort of preparing for the deposition

11   briefly.

12             Without going into the substance of any of

13   the conversations that you had with the attorneys

14   in the case, what did you do to prepare for this

15   deposition today?

16        A.   I reviewed my reports.  And I've looked at

17   the maps in this matter.

18        Q.   Did you meet with anyone?

19        A.   Just with the attorneys.

20        Q.   How many meetings did you have with the

21   attorneys?  And again, not getting into the

22   substance of any conversations with them.

23        A.   In preparation we had one meeting.

24        Q.   How long did the meeting last for?

25        A.   About three hours.

1     Q.   Did you speak to anyone -- and who was

2  that with?

3     A.   The two attorneys that are present here.

4     Q.   And did you speak to anyone other than

5  those attorneys to prepare for today's deposition?

6     A.   No.

7     Q.   Okay.  Did you review any documents?  And

8  you may have covered this already, but just to be

9  clear, did you review any documents to prepare for

10  this deposition today?

11     A.   I reviewed my reports.

12     Q.   Anything else?

13     A.   I think I may have looked at one of the

14  other expert reports, not the full report, but

15  information from it.

16     Q.   When you say "one of the other reports,"

17  which one?

18     A.   I looked at a report from Mr. Esselstyn in

19  a different case.

20     Q.   To prepare for this deposition?

21     A.   I guess I wanted to look at that, yes.

22     Q.   Okay.  So you looked at your December 5th

23  report, January 23rd report, Esselstyn report.  Do

24  you remember which Esselstyn report?

25     A.   The one that was, I think you might

1    characterize it as a rebuttal to my December 5th
2    report.
3         Q.   Okay.  And --
4         A.   Yeah.
5         Q.   Sorry.  Go ahead.
6         A.   No.  That's fine.
7         Q.   Other than those three reports, did you
8    review any other documents to prepare for today's
9    deposition?
10        A.   Again, I may have looked at some excerpts
11   from Mr. Cooper's reports.
12        Q.   Which ones?
13        A.   It would probably have been the 12/05
14   report.
15        Q.   And you say you may have?  Did you look
16   at?
17        A.   Again, the way I look at things is there's
18   a lot of information.  So for example, some of the
19   information in the Mr. Cooper's report is, in fact,
20   also in my report because it's the same plan that
21   I'm looking at.
22             So for example, if I look at Mr. Cooper's
23   drawing of a district, that's also in my report.
24   That's also in his report.
25        Q.   Do you remember which excerpts you looked

1    at?

2         A.    Mostly maps.

3         Q.    Okay.  But there are parts you didn't look

4    at?

5         A.    In preparing for this?

6         Q.    Yeah.

7         A.    Yeah.

8         Q.    Do you remember which parts you didn't

9    look at?

10        A.    No.

11        Q.    Silly question, I know.

12              Did you take any notes during any of the

13   meetings that you had to prepare for your

14   deposition today?

15        A.    No.

16        Q.    Did you take any notes during your review

17   of those reports and documents we talked about?

18        A.    No.

19        Q.    And just to button it up, other than

20   the -- your reports, your two reports we talked

21   about, the Esselstyn report, and excerpts of the

22   Cooper December report, do I have that right, did

23   you -- do I have that right, you reviewed those?

24        A.    Again, the information is in the Cooper

25   report and in my reports, too.  So it's difficult

1    to see that there's a big distinction.  The mapping

2    data and information is something I looked at.

3         Q.    Did you look at any other documents to

4    prepare for the deposition today?

5         A.    Not that I recall.

6         Q.    Did you bring any documents with you to

7    the deposition today?

8         A.    No.

9         Q.    Okay.  You want to talk about some

10   reports?

11        A.    Okay.

12        Q.    Let's start by talking about your December

13   5th, 2022 report.  And I'm going to mark it here

14   with our -- oh, wow.  Okay.  Thank you.

15                         (Whereupon, Plaintiff's

16                          Exhibit 2 was marked for

17                          identification.)

18   BY MR. SAVITZKY:

19        Q.    All right.  Let me hand you a copy here.

20   Is this your December 5th report?

21              (Whereupon, the document was

22         reviewed by the witness.)

23              THE WITNESS:  Yes.

24   BY MR. SAVITZKY:

25        Q.    Okay.  Okay.  Great.

1           And again, you submitted a December 5th
2     report and then a January 23rd report in this case;
3     right?
4           A.   In this case?  Yes.
5           Q.   And the January 23rd report is a response
6     or rebuttal to Bill Cooper's report; right?
7           A.   Generally, yes.
8           Q.   Okay.
9           A.   Yeah.
10          Q.   And that Cooper report that you respond to
11    in the January 23rd report was also submitted on
12    December 5th, the same day as you put your December
13    5th report in; right?
14          A.   Yes.
15          Q.   Okay.  So when were you asked to write
16    this December 5th report?
17          A.   The December 5th report?
18          Q.   Yeah.  The first report.
19          A.   Sometime at the -- like, maybe September
20    or August.  I mean, it was discussed as a
21    possibility.
22          Q.   So it was first discussed in September or
23    August?
24          A.   Yeah.
25          Q.   When did it crystalize into a directive to

1    write the report?

2         A.    Similar time frame.

3         Q.    Okay.  And when did you complete the

4    report?

5         A.    On the day, December 5th.

6         Q.    Okay.  When was it substantially complete?

7         A.    December 4th.

8         Q.    Okay.  So you wrote your December 5th

9    report before reviewing Bill Cooper's December 5th

10   report; right?

11        A.    Yes.

12        Q.    Your December 5th report doesn't contain

13   any analysis of Bill Cooper's December 5th report

14   or his maps from December 5th?

15        A.    It could not have.

16        Q.    It doesn't mention Bill Cooper's December

17   5th report?

18        A.    No.

19        Q.    Okay.  You wrote your December 5th report

20   before you were able to look at Bill Cooper's

21   December 5th illustrative maps?

22        A.    Yes.  I had other illustrative maps from

23   the preliminary injunction phase if I needed to

24   look at a map that was submitted.

25        Q.    Did you need to look at a map that was

1    submitted?

2        A.    It was available.  But I don't think for

3    the December 5th report it was -- it was not

4    something I relied upon.

5        Q.    Okay.  It was not something you relied

6    upon for the December 5th report?

7        A.    The preliminary injunction?  I had the

8    information.  I was involved in that preliminary

9    injunction phase, so I was aware of that.

10        Q.    You were just aware, the information's in

11    your head, but you didn't look at -- you didn't go

12    back and look at it for this report?

13        A.    I didn't say anything in the report

14    directly about the preliminary injunction that I

15    recall specifically, but I was aware of it.

16        Q.    Okay.  But you didn't -- you weren't able

17    to review the illustrative map submitted on

18    December 5th before submitting your December 5th

19    report?

20        A.    That's how time works, that's right.

21        Q.    Okay.  I understand.  I know the answers

22    may seem obvious, but it's important to answer --

23        A.    Okay.

24        Q.    -- the question.

25              And you don't compare the blind map that

1  you draw or that you discuss in your December 5th

2  report to the Cooper December 5th illustrative

3  maps, do you?

4      A.    In my December 5th report?  No.

5      Q.    So just to confirm, you don't rely on your

6  December 5th report to support any of the

7  conclusions you claim to reach later on in your

8  January 23rd report?

9      A.    I certainly was aware of the report that I

10  wrote in December.  And if I relied on it, I -- I

11  mean, I don't remember there being much in the

12  January 23rd report referencing my December 5th

13  report.

14      Q.    And in your December 5th report, you don't

15  conclude that the maps that you drew, the

16  illustrative maps that you drew, are evidence that

17  the maps that the State of Georgia adopted don't

18  comply with traditional districting principles, do

19  you?

20      A.    I don't understand.

21      Q.    You don't conclude in this December 5th

22  report that the maps that Georgia adopted in 2021

23  don't comply with traditional districting

24  principles, do you?

25      A.    I don't think that's in the report, but.

1      Q.   Is it in the report?  Do you conclude

2   that?

3      A.   I don't think so.  I mean, we can look at

4   the report, but I don't think that is in there.

5      Q.   Do you draw any conclusions in the

6   December 5th report about the 2021 enacted map?

7      A.   I'd have to look at the report.

8           (Whereupon, the document was

9       reviewed by the witness.)

10          THE WITNESS:  Okay.  Could you repeat

11      the question, please?

12  BY MR. SAVITZKY:

13      Q.   Yeah.  I said do you draw any conclusions

14  about the 2021 enacted map?

15      A.   Yes.

16      Q.   And where are they?

17      A.   They're at the end on Page 42.

18      Q.   What are your conclusions?

19      A.   It says that:

20          [As read]  "Drawing the

21       illustrative plan demonstrates a

22       tendency that racial considerations

23       had an effect on the composition and

24       district shapes in the enacted plans."

25  BY MR. SAVITZKY:

1      Q.    Do you draw any other conclusions about

2   the 2021 enacted map?

3      A.    They're not in my report.

4      Q.    Do you conclude that the 2021 enacted map

5   doesn't comply with traditional districting

6   principles?

7      A.    I didn't say that in my report.

8      Q.    And your report contains a complete

9   statement of all the opinions that you're

10  expressing based on the facts of the case as you

11  understand them today?

12     A.    I thought you were asking about the

13  January 23rd report when we discussed that earlier.

14     Q.    I was talking about both of them.

15     A.    Okay.  Well, in this report I did say that

16  I reserve the right to supplement my declaration.

17  So if there's a reason to, I believe I could.

18     Q.    So your report doesn't contain -- this

19  December 5th report does not contain a complete

20  statement of all the opinions that you're going to

21  express in this case?

22     A.    I didn't say that either.  I just said

23  that I, if I have additional opinions, I can give

24  them or, you know, I can supplement my existing

25  report.

1          MR. TYSON:  Could I help?  I think,

2     Ari, what you're asking is, is the

3     conclusion statement he just read, is that

4     the entirety of the opinions he's reaching

5     in the December 5th report, the expert

6     opinions he's reaching in the December 5th

7     report.

8          MR. SAVITZKY:  Uh-huh.

9          THE WITNESS:  That's what's in the

10    report.

11 BY MR. SAVITZKY:

12    Q.   And I will say the other piece of the

13 question is, are you planning to reach some other

14 conclusions or express other opinions other than

15 those that you have put in this report?

16    A.   I suppose it's possible.  But at this

17 time, this is the report, and the conclusion is

18 what it says and...

19    Q.   Okay.  And do you conclude in this

20 December 5th report that the maps that you drew

21 here, your illustrative maps, have any application

22 to the illustrative maps that were drawn by Bill

23 Cooper?

24    A.   As I mentioned, they don't have any direct

25 discussion of Mr. Cooper's maps.  But I think in

1   the report I discuss a process of map drawing which
2   can be applied to other circumstances.
3       Q.   Do you conclude in your December 5th
4   report that the illustrative maps that you drew are
5   evidence that the illustrative maps drawn by
6   Mr. Cooper don't comply with traditional
7   districting principles?
8       A.   That's not in the report.
9       Q.   So let's actually crack open this report
10  and take a look at it, starting with Paragraph 4
11  and 5.  Actually, we can go right to Paragraph 5.
12  You say you set out "to draw a blind plan that did
13  not consider race or incumbency or past
14  redistricting plans for Georgia."
15          Do I have that right?
16      A.   Yes.
17      Q.   Okay.  Did someone ask you to do that?
18      A.   I would say that I was asked to do
19  something like that.  I would say that, you know,
20  in order to make some comparisons, that I was asked
21  to draw a plan like that, yes.
22      Q.   Were you asked to draw a plan specifically
23  with those parameters in terms of not considering
24  those three things?
25      A.   That's what it ended up being.

1      Q.    Well, my question's a little different.

2      A.    Okay.

3      Q.    Understanding that's what happened, was

4   that what you were asked to do?

5      A.    Generally, yes.

6      Q.    Who asked you to do that?

7      A.    The attorneys in this case.

8      Q.    And is -- what specifically were you asked

9   to do?

10     A.    I was asked to draw a complete statewide

11   plan for both chambers.  And it's as I described in

12   the report.

13     Q.    And were there any other instructions

14   about the plan that you were supposed to produce?

15     A.    Not really.  It was left to me mostly to

16   draft the plan.

17     Q.    You say "not really"?

18     A.    No.

19     Q.    Okay.  What in your view is the purpose of

20   this exercise?

21     A.    I think --

22           MR. TYSON:  Just object to the extent

23       that calls for any attorney-client

24       privilege.

25           If you can answer non-privileged,

1      you're free to do that.

2   BY MR. SAVITZKY:

3      Q.   Yeah, without getting into any of the

4   conversations with your attorney, just in your view

5   sort of what is the purpose of this exercise?

6      A.   Okay.  The purpose of this exercise I

7   believe was to create a plan that was based on

8   those criteria, to draw a full and complete

9   statewide plan, and I -- and compare it to other

10  plans, in this case the enacted plan.

11     Q.   What do you think that exercise does --

12  what do you think that exercise shows?

13          In other words, when I say what's the

14  purpose, I mean what in your view do you think one

15  might learn from an exercise like that?

16     A.   I think there are two things that would

17  come to light.  One is that, generally speaking,

18  adhering to county boundaries in great detail and

19  trying to keep the county boundaries and locality

20  boundaries and not concerning with the racial

21  component of it, it ends up drawing districts that

22  are more compact in the enacted plan and other

23  plans in those areas with racial minority

24  populations.

25          And I think it also provides a direct

1    example of areas of high African-American
2    concentration and the naturally occurring
3    geographically compact districts that could be
4    created in those areas.
5         Q.   So you drew your blind plan by not
6    considering race or incumbency or past
7    redistricting plans for Georgia, and then you
8    compared your map to the 2021 enacted map and you,
9    you say you drew conclusions about the impact of
10   racial considerations on the enacted plans?
11        A.   Yes.  That's what I said in the report,
12   yes.
13        Q.   Did you draw any conclusions about the
14   impact of incumbency on the enacted plans?
15        A.   Not specifically.
16        Q.   Do you -- you agree that considering
17   incumbency had some impact on the 2021 enacted
18   plan?
19        A.   I believe so.
20        Q.   Did you draw any conclusions about the
21   impact of continuity with past redistricting plans
22   on the 2021 enacted plan?
23        A.   Not in this report, not directly.  But in
24   other reports I've discussed that.
25        Q.   Do you agree that considering past plans

1    and continuity with past plans had some impact on

2    the enacted 2021 plan?

3        A.   Yes.  I stated that in other reports.

4        Q.   So in coming to your conclusions about the

5    impact of racial considerations on the enacted

6    plans, how did you control for the other factors,

7    incumbency and continuity of the past plans, that

8    you also omitted from consideration?

9        A.   What do you mean?

10       Q.   How did you control -- when you drew

11   conclusions about the impact of racial

12   considerations, how did you separate the impact of

13   racial considerations from the impact of incumbency

14   or the impact of continuity with past plans, all of

15   which you omitted from consideration?

16       A.   Well, if I omitted them from

17   consideration, then I didn't consider them.

18       Q.   Right.  I guess my question is, you've

19   agreed that incumbency had some impact on the 2021

20   plans?

21       A.   Not in this report, but in other reports,

22   yes.

23       Q.   I mean, sitting here with me today, you

24   have just agreed to --

25       A.   I have --

1      Q.    -- that that's the case?

2      A.    -- a lot of knowledge about that, yes.

3      Q.    Yeah.  And you agreed that the 2021 --

4   that, excuse me, that continuity with previous

5   plans also has an impact?

6      A.    Sure.

7      Q.    So when you're assessing, quote, the

8   impact of racial considerations on the enacted

9   plans, how do you know why -- how do you know that

10  it's racial considerations and not some other

11  consideration?

12     A.    Well, in essence, this is a control.  I

13  looked at racial considerations in this part of the

14  report.

15     Q.    What do you mean you -- what do you mean

16  "this is a control"?

17     A.    I'm looking at racial considerations.  If

18  you want to have in another type of analysis, that

19  could be done.  I looked extensively at the

20  geography of the underlying population in other

21  maps, and in this one I didn't.  I drew without

22  looking at that.

23     Q.    So you didn't attempt to figure out how

24  many of the -- or what -- whether the im -- the

25  differences that you observed between your map and

1    the enacted map were due to incumbency or

2    continuity or racial considerations, as you called

3    them?

4        A.    That's what it states.  That's clearly

5    what I did.  I looked at the racial considerations.

6        Q.    Right.  I guess I'm trying to understand,

7    how did you look at the racial considerations if

8    you omitted not only race but also other factors

9    from your process?

10       A.    Okay.  Well, I think I detail this in the

11   report, but I started with this let's say a blank

12   state, the entire state.  In the report I explained

13   the redistricting process.

14             So I looked through the county

15   populations, and I observed that some counties have

16   approximately the correct number of population for

17   whole numbers of districts, and I drew compact

18   districts, generally speaking, in those counties.

19             I connected the districts in a way that

20   made sense to me.  I tried not to split counties

21   and voting precincts very much.  And after I did

22   that, then I looked at the racial data and I

23   analyzed it, and I said, what's been done here.

24             So I didn't look at racial considerations

25   at all while drawing the map.  But afterwards, I

1    did.

2          Q.    Okay.  That's very helpful.  Thank you.

3                So and just, and we'll get into your

4    process, but just on this point of sort of

5    controlling for variables, right, you also ended up

6    learning, you also, you backed in incumbency

7    information after you drew the map as well; right?

8          A.    In this report?

9          Q.    Yes.

10         A.    I'd have to see.

11         Q.    Did you not use an incumbent data layer

12   and figure out how many incumbents your

13   illustrative ended up pairing?

14         A.    I'd have to see if I did that.

15         Q.    I mean, you can look at Page 17 of your

16   report really quickly if you want to just see that

17   you, in fact, do compare --

18         A.    Okay.

19         Q.    -- paired incumbents.

20         A.    Thank you.

21                Yes.  I looked --

22         Q.    Okay.  Do you see that?

23         A.    -- to see the pairing of incumbents, I did

24   not look at the locations of incumbents while

25   drawing the maps.  So afterwards I looked at that.

1          Q.   Okay.  But you didn't sort of do
2     additional analysis to figure out how many or to
3     what extent the impacts that you say you observed
4     are based on consideration of incumbency?
5          A.   It's not in this report.
6          Q.   Okay.  And same question on continuity
7     with past plans, you didn't, you know, you didn't
8     try to figure out how much of the difference
9     between your plan and the enacted plan was based on
10    a, you know, desire to maintain continuity with
11    existing plans?
12         A.   Not directly.  I'm, obviously I'm aware of
13    the existing plan, but I didn't specifically set
14    out to tie it to the enacted plan or the previous
15    plan from 2011 or 2015.
16         Q.   Okay.  So you had one blind plan -- "blind
17    plan" is your term, but I will adopt it for
18    purposes of our conversation.
19         A.   Okay.
20         Q.   You did one plan for the house and one
21    plan for the senate.
22         A.   Yes.
23         Q.   Is that right?
24         A.   That's correct.
25         Q.   Did you do any other plans?

1      A.    No.

2      Q.    You just did one take and had what you

3  were looking for?

4      A.    I -- okay.  I would say that I completed

5  the plan, and then I went back and I checked my

6  work.  And in some cases, if there was an easy

7  opportunity to unsplit a precinct, I would do that.

8      Q.    Okay.

9      A.    So I made one final review, and I made a

10  few changes that, you know, there's -- sometimes

11  when a map drawer works, you can make a mistake.

12  And I tried to correct for that.

13          For example, in Mr. Cooper's plan, he has

14  a long census block that splits a precinct that is

15  following a water feature.  If I were talking to

16  him, I would probably ask him, did you intend to do

17  that?

18          I don't think he did.  That's my opinion.

19  But it's something that, if you reviewed it, you

20  might not make that one decision, because it's just

21  one census block that follows a river.

22      Q.    Okay.

23      A.    And it seems odd to split a precinct in

24  that way.

25      Q.    So just staying with your process, you

1    didn't -- well, did you one -- is it fair to say
2    that you did one draw and then one edit?
3         A.   Yes.   That's exactly what I did.
4         Q.   Okay.  And how long did it take you to
5    complete the process?
6         A.   Hours.  I mean, I --
7         Q.   From start to finish, blank slate to --
8         A.   Yeah.  I don't know.  I mean, I could go
9    back and look at the time that I spent on this, but
10   it's -- some of it goes very quickly when I can --
11   and I'll give you an example, which I did in my
12   report.
13             If I know that there's a whole number of
14   districts in a certain area and I'm going to just
15   draw a whole number in that county, I might not do
16   that first.  I'll come back to that and I'll spend
17   more time looking in detail at the counties and
18   looking at the towns within the counties and
19   drawing districts that make sense and are
20   geographically compact and also keep communities
21   together to the extent I can see it and identify
22   it.
23        Q.   Okay.  Just on that question, you said
24   "hours," how many hours do you think it took to
25   draw this -- these plans?

1      A.   I really don't know, because it was done
2   over a period of several weeks.  But I spent a lot
3   of hours doing it.  I can't give you a proper
4   number.
5      Q.   Ten hours?  40 hours?
6      A.   Somewhere between that.  Maybe 20.  I
7   mean, I can do plans quickly.  But I did take the
8   additional time to review it myself, and I made a
9   few changes after I had completed the plan.
10      Q.   So ballpark 20 for both plans?
11      A.   I think it was more time than that.  It
12   just depends.  Because there are different phases
13   in the plan.  Like, I would -- I wouldn't -- I
14   would stop when I reached a stopping point, which
15   is what I would advise my clients to do.
16           You know, you sometimes take a regional
17   approach, I'm going to draw certain districts this
18   way and then stop, take a break.  And that's what I
19   would do.
20      Q.   Okay.  So you -- 20, you think it's more
21   than 20?
22      A.   I really don't know.  I can speculate yes,
23   no, but I don't know.
24      Q.   Your best estimate?
25      A.   I really don't know.

1      Q.   Less than 40?

2      A.   For both plans?

3      Q.   Both plans.

4      A.   Probably.  Probably less than 40, but not

5  by a lot.  I mean, I spent some time on this.

6      Q.   And about how much of the time you

7  spend -- that you spent doing these is the initial

8  draw versus the editing?

9      A.   The initial draw was more time initially.

10  But then when I came back and made some

11  adjustments, I took due diligence and time to make

12  adjustments.

13           But it wasn't extensive.  It was really,

14  you know, probably 80 percent of the time was on

15  the first draw and maybe 20 percent of the time on

16  the edits.

17      Q.   Okay.

18      A.   I think that's a fair approach.  These are

19  just estimates.

20      Q.   All right.  And just I know -- you didn't

21  do any other sort of, you know, partial plans,

22  anything like that?

23      A.   No.

24      Q.   Just these two, just these illustrative

25  house and senate?

1      A.    Right.

2      Q.    Okay.  You say your plans did consider

3    other traditional districting principles.  You say:

4           [As read]  "This plan did consider

5          other traditional districting [sic]

6          principles."

7           Which principles are you referring to

8    there?

9      A.    Can you show me where I said that in the

10   report?

11     Q.    Just right in Paragraph 5, just right in

12   the middle in the fourth line of Paragraph 5.

13   We're back on Paragraph 5 of your report.

14          (Whereupon, the document was

15           reviewed by the witness.)

16          THE WITNESS:  So I identify that I

17      did not consider race or incumbency or

18      past redistricting plans.  So aside from

19      that, I considered other redistricting

20      principles.

21          It could be a number of things.

22      There are many people who have different

23      versions of what that can be, and we've

24      talked about some of them in my other

25      reports and also in this case generally.

1           But so compactness would be

2      something.  Respect for communities.  I

3      talk specifically about county splits.  I

4      talk about deviation.

5           In general, you know, I tried to keep

6      the deviation within the range that I

7      described, and there are some read tables

8      about that.

9           I think that covers generally some of

10     the things I looked at.  If I missed one,

11     then I could -- maybe I've considered that

12     as well, but.

13 BY MR. SAVITZKY:

14     Q.   And you said respect for communities?

15     A.   Uh-huh.

16     Q.   What do --

17     A.   Yes.

18     Q.   What do you mean by that?

19     A.   So let's take a case of a county that

20 subdivides evenly into, say, five districts.  I

21 wouldn't just draw the five districts with, you

22 know, just any composition.  I looked at the

23 communities underneath it.

24           So if there was a town, I generally would

25 keep the town whole.  If there were two larger

1    towns in a county, I would, you know, draw one

2    district around one town, one district around

3    another, and then I would fill in the remaining

4    districts outside.

5          So in that sense, I was looking at the

6    underlying geographic communities.  And sometimes

7    there would be cases where I would -- maybe I would

8    know that one county is associated with another

9    county --

10    Q.    Uh-huh.

11    A.    -- and I might do that.  And sometimes I

12    didn't do that, I went in a slightly different way.

13    Q.    Why is it important to consider

14    communities?

15    A.    Because that's often a traditional

16    redistricting factor.  There's a lot of discussion

17    about communities of interest, keeping communities

18    whole, keeping, again, geographic political

19    boundaries and following and respecting those

20    boundaries, rivers, counties, towns.

21    Q.    And how did you know that there were --

22    you've mentioned places, towns.  How did you know

23    that those were there?  You had a -- did you have a

24    data layer on that?

25    A.    Yes.  When I was looking below the level

1    of county, I could look at the place layers.

2        Q.    Okay.

3        A.    They have census places.

4              There are other features.  You know, there

5    were water features.  So for example, you know,

6    perhaps if I need to take population to finish a

7    district, maybe I wouldn't take an island.  I might

8    look to a different place.

9              Maybe it doesn't make sense to take a

10   single island out of an island chain.  Maybe I

11   wouldn't do that.  And that's not a town boundary,

12   it's just a geographical feature.

13       Q.    And when you say "respecting communities,"

14   did you, in drawing your illustrative maps for this

15   December 5th report, did you take any other actions

16   with re -- you know, for -- to respect communities

17   other than considering that data layer of places

18   and water features?

19       A.    Well, I -- we haven't talked about this

20   directly, but I have had a lot of experience in

21   Georgia, and I have some knowledge of Georgia

22   geography and places.

23             So it's not only what I can see on a map.

24   I can also make my own conclusions from my own

25   experience.

1      Q.    Can you say more about that?  What is

2   your -- what kind of background knowledge about

3   Georgia do you have as a map drawer?

4      A.    Okay.  As a map drawer, I worked on

5   legislative redistricting in Georgia in the 2000

6   cycle after the 2000 census.  I drew many, many

7   plans and portions of plans for state Senator Sonny

8   Perdue and also the house minority leader Lynn

9   Westmoreland in that time.

10          I drew many plans.  I stayed overnight in

11   the Georgia Capitol on one night because the work

12   was just overwhelming.  So yeah, I have a lot of

13   experience drawing maps.

14          I also have experience analyzing

15   elections.  I've had clients, I worked for

16   Congressman Kingston when he ran for the U.S.

17   Senate.  So I've had extensive experience in

18   Georgia elections in the past.

19      Q.    Well, I mean, just talking about the

20   background knowledge that you had in, you know, in

21   terms of respecting communities and being able to

22   do that, you know, you mentioned this layer of

23   places, but then, you know, if I understood you

24   correctly you were saying, well, you also had some

25   background knowledge about Georgia that allowed you

1    to make decisions in drawing your illustrative map
2    that respected communities.
3         A.   Sure.
4         Q.   And so I'm trying to get a sense of how
5    extensive that background knowledge is or what it
6    in -- it sounds like it includes election results,
7    you know, dif -- where different communities live.
8              What else?  What does it --
9         A.   Yeah.
10        Q.   -- include?
11        A.   I've, you know, again, I've worked in
12   elections in Georgia in the '90s, in the 2000s, in
13   the 2010 decade.  I've looked at demographic and
14   election results.  So I mean, I have a base of
15   knowledge about Georgia.
16             I've been to more than half of the
17   counties in Georgia, probably closer to 65,
18   70 percent --
19        Q.   Okay.
20        A.   -- at this time.
21        Q.   So when you say that your plan is blind,
22   what do you mean?
23        A.    I mean I didn't consider the racial
24   components.  I specifically turned off that data
25   and did not look at it.  And as I have mentioned, I

1     did not have the incumbent layer on, so I didn't

2     look at where incumbents were in drawing the plans.

3              And I would say that, you know, I

4     specifically say in the report I didn't consider

5     past redistricting plans.  I think that's a fair

6     assessment because, you know, I'm aware of the past

7     redistricting plans to some extent, but I didn't

8     try to align the districts based on that

9     information.

10             I didn't look at a district and say, well,

11    gee, this was 50 percent of the previous district,

12    and I'd rather it be 70 percent of the previous

13    district.  But I was aware that there was generally

14    a district in that area --

15        Q.   Okay.

16        A.   -- say, you know, Augusta or someplace

17    like that.

18        Q.   So you have the data turned off, but you

19    don't turn off your background knowledge of where

20    the districts, you know, where the previous

21    districts are.

22        A.   Well --

23        Q.   You can't?

24        A.   -- I do, I mean, in the sense that I don't

25    have the boundaries on.  So I'm not looking at

1    actual boundaries.

2              But again, I might generally know there's,

3    you know, about four districts in this area, so

4    whatever the legislature did and whatever I did is

5    going to have about four districts in an area.

6         Q.   You mentioned you're -- you know, been to

7    half the counties in Georgia and you have

8    significant sort of background knowledge and

9    awareness of Georgia's demographics.

10             Am I correctly characterizing what you

11   said?

12        A.   Yes.  When I met with the eight

13   congressmen in 2001 when they were drawing -- the

14   Republican congressmen when they were drawing

15   districts, they respected my opinions.

16        Q.   So you know sort of which areas have large

17   black populations?

18        A.   Generally, yes.

19        Q.   Okay.  And when you drew your map, did you

20   consider whether black voters would be able to

21   elect candidates of choice under the lines that you

22   drew?

23        A.   I didn't analyze that.  I specifically

24   treated every district the same way.  So I didn't

25   make any analysis in the areas where I knew there

1   was black population.  I applied the same process

2   that I did in areas where there -- I knew there was

3   not a lot of black population.

4        Q.   So you did not consider whether black

5   voters would be able to elect candidates of choice

6   in --

7        A.   Not --

8        Q.   -- those areas?

9        A.   Not in this report, no.

10       Q.   Have you ever used these, again, adopting

11  your term, blind parameters before in drawing an

12  illustrative map or in any map?

13       A.   I've seen them used before, yes.

14       Q.   Where have you seen them used?

15       A.   North Carolina, Arizona specifically.

16       Q.   In what context?

17       A.   In the early stages of map drawing,

18  there's a lot of maps that are done that pair

19  counties in a certain way.

20            Or in the case of Arizona, my

21  understanding is that the process begins with a map

22  drawn by map drawers that is then turned over to

23  the commission.

24            So somebody drew that plan and they turned

25  it over to the commission, and the commission

1    affirmatively amends this plan that was drawn by a

2    map drawer.

3         Q.   And have you ever used this technique --

4         A.   Yes.

5         Q.   -- before?

6              You have used it before?

7         A.   Yes.  I described North Carolina where I

8    would draw maps based on county groupings.

9         Q.   Well, I mean, have -- did -- have you ever

10   drawn a map that intentionally doesn't consider

11   racial demographics or incumbency or prior plans

12   and --

13        A.   Yes.

14        Q.   You have?  In North Carolina that's what

15   you did?

16        A.   Yes.

17        Q.   Okay.  What was that used for in North

18   Carolina?

19        A.   It was used to look at county groupings.

20   So we would look at matching the counties up in

21   certain ways.

22              And specifically in North Carolina, there

23   is a, I would say there's a hierarchy of sorts

24   where you would have to keep counties whole and

25   subdivide them or combine them in such a way that

1  you would have a minimum number of county

2  divisions.  And I did maps like that.

3      Q.   So you just did maps showing sort of ideal

4  number of districts per county, you know, in terms

5  of matching ideal population size to different

6  county populations?

7      A.   No.  I would fully form districts

8  underneath those as well.

9      Q.   Do you know what was done with them by the

10  folks you submitted them to?

11      A.   I believe the attorneys and the

12  stakeholders, legislators and other folks would

13  look at it and make adjustments.

14      Q.   Have you ever seen a plan like this

15  adopted into law by a legislative body?

16      A.   Yes.

17      Q.   You have?  When?

18      A.   I think something like this was done in

19  Iowa.

20      Q.   In Iowa?  Can you say more about that?

21      A.   My understanding is that the process in

22  Iowa, the state legislative staff drafts plans, and

23  then they turn them over to the legislature to

24  approve or not approve them.  And the legislature

25  may make changes, and then they have to resubmit

1  plans.

2      Q.   Are you saying that, in Iowa, a plan was

3  adopted that did not consider incumbency or racial

4  demographics or continuity with prior plans?

5      A.   I don't know, because I don't know what

6  the review process would be.  But I know that plans

7  were drawn that were very substantially based on

8  population.

9          And I, for example, remember one of the

10  things that was concerned is what they would call a

11  U-Haul test to see whether some submitted plan or

12  partial plan, how that would affect incumbents,

13  would they have to move, the U-Haul test.

14      Q.   Got it.

15          So and just to be clear, you don't know

16  whether this Iowa plan that you're referring to

17  actually did consider incumbency and racial

18  demographics and continuity with...

19      A.   I think that there may -- there probably

20  was a review process as well, so it may have

21  considered some of that.

22      Q.   Is this Iowa plan a plan that you worked

23  on?

24      A.   I worked on one in 2001.

25      Q.   Is the plan in -- from 2001 the one that

1    you're referring to when you suggest that there an

2    an Iowa districting map that didn't take into

3    account racial demographics or incumbency or

4    continuity with prior plans?

5         A.   I would say that they may have reviewed

6    additional factors.  But it was also, it was a plan

7    that was initially submitted by the legislative

8    staff, and then I drew plans based on that

9    information with changes.

10            So the plans that I drew were a different

11   grouping of legislative districts.  So I mean, I

12   drew some plans like that.

13        Q.   I guess I'm just trying to understand, you

14   drew some plans like that?

15        A.   Yeah.

16        Q.   What do you mean "like that"?

17        A.   That were based on the population

18   deviations a lot.  So for example, as I understand

19   it in Iowa, if the legislative staff produces a

20   plan, subsequent amended plans have to be lower in

21   deviation.  There has to be kind of a

22   population-related reason for changing it.

23            So for example, if the legislature came in

24   with a certain deviation and somebody else came in

25   with a plan that had a lower deviation, they might

1  favor the lower deviation as a reason to make

2  changes.

3      Q.   Okay.  I guess I'm just, I'm trying to

4  understand the basis for your suggestion that Iowa

5  adopted a legislative map that didn't consider

6  racial demographics or incumbency or continuity

7  with prior districts, just the basis of your -- of

8  that suggestion.

9      A.   I don't understand.  What's the question?

10     Q.   I'm asking you what you're basing that

11 suggestion on, that Iowa adopted a map that

12 followed parameters similar to your blind man.

13     A.   Well, I -- it probably was reviewed after,

14 you know, a -- maybe during the process, certainly

15 after the process for those other factors.  But in

16 the initial drafting, I don't know if they were

17 directly considering those while they were drafting

18 the plan.

19          You asked generally for examples where

20 this sort of exercise might have been put to use,

21 and I've given you three examples.

22     Q.   Yeah.  And in -- and you're not aware of

23 any case where a map like this has been drawn and

24 actually passed into law and used by a state?

25     A.   I don't know.  I would have to review a

1  state like Vermont.  Because in the case of Vermont

2  they have multi-member districts based on counties.

3  So in that case, it could be that a map like I'm

4  describing is exactly what Vermont has done.

5      Q.   All right.  Well, setting aside the

6  possible example of Vermont, you're not aware of

7  any instances where a state has adopted a map using

8  the process that you used to draw your blind map?

9      A.   I don't know directly that a state has

10 done that.

11     Q.   So do I understand correctly that your

12 method -- and let's move on to, let's look at

13 Paragraph 6.  We'll look at six, seven, eight on

14 Pages 3 and 4 of your report.  I want to talk about

15 how you analyzed the 2021 maps.

16          You loaded the block equivalency files, or

17 B.E.F.s as they're sometimes called, for each of

18 those plans into Maptitude, and along with a layer

19 for incumbency info, and then you ran off summary

20 information on the plans.

21          Is that -- do I have that right?

22     A.   Not quite.  The incumbency information was

23 not on a map layer.

24     Q.   Okay.  Where -- how -- where was it?

25     A.   It's contained as an Excel file and

1    attached to a report.

2        Q.   And it, I assume it's geocoded in some way

3    so that you can figure out which incumbents live in

4    which districts?

5        A.   Yes.

6        Q.   Okay.  So your method for analyzing 2021

7    enacted maps was to load the B.E.F.s and to run off

8    summary information reports on the districts; is

9    that right?

10       A.   I'm not sure I understand.  My method of

11   analyzing the enacted plan?

12       Q.   Yeah.  I guess I'm trying to understand

13   what reports or quantitative analysis you conducted

14   in order to analyze the enacted plan for purposes

15   of this December 5th report.

16       A.   Okay.  Well, I think it's fairly well

17   described in the report.

18       Q.   Okay.  Well, nevertheless, I'd like to go

19   over it here.

20       A.   Okay.

21       Q.   You created district summary files for the

22   2021 plans; is that right?

23       A.   Yes.

24       Q.   Did you create any other reports or

25   analyses?

1      A.   I don't believe I did.  But these other

2   reports were created in a previous report --

3   previous expert reports or the preliminary

4   injunction process.

5      Q.   When you say "these reports," what do you

6   mean?

7      A.   There was reports generated for the

8   preliminary injunction report that I did, so those

9   were also available.  I didn't necessarily append

10   those same reports here.

11      Q.   Okay.  And are those reports sort of

12   reports that are generated by Maptitude?

13      A.   Yes, generally.

14      Q.   And specifically what report -- what

15   Maptitude generated reports did you use to analyze

16   the 2021 enacted plans?

17             (Whereupon, the document was

18        reviewed by the witness.)

19             THE WITNESS:  So I would have used

20        the political jurisdiction split reports.

21        I'm looking on page -- chart one on

22        Page --

23   BY MR. SAVITZKY:

24      Q.   Uh-huh.

25      A.   -- 17.

1          Q.    Uh-huh.

2          A.    So the metrics that are in that chart were

3     produced using reports in Maptitude.

4          Q.    Okay.

5          A.    So for example, I would have had the

6     county split reports.  I would have had the

7     compactness reports for the plan so that I can show

8     the mean compactness.

9                I did the incumbent reports and I used

10    that information.  And then the -- there would be a

11    district summary report that includes racial data

12    that had the racial data component there.

13         Q.    Okay.

14         A.    So all those things are Maptitude reports.

15    And I would say that I didn't attach those specific

16    reports here because they had been previously run

17    in this case.

18                I didn't think it was necessary to do

19    that.  Perhaps I could have included them, but

20    they're also in other reports.

21         Q.    Okay.  And other than those reports that

22    we just talked about, are there any other reports

23    that you generated that you rely on in your

24    analysis for this December 5th report?

25         A.    I don't think so.  I think that covers the

1    reports.

2        Q.    Okay.  And just top of Page 4, last

3    sentence of Paragraph 6, you say:

4            "I was also given the

5         redistricting guidelines used by the

6         Georgia General Assembly during the

7         redistricting process."

8        A.    Yes.  I'd previously been given that

9    information.

10       Q.    I want to talk about those, but just one

11   other question about your process.  When you drew

12   the illustrative map, did you sort of do -- strike

13   that.

14           Did you do all of your analysis of the

15   2021 map before you moved on to the process of

16   drawing the illustrative map?

17       A.    I mean, not really.  I had those reports,

18   so that information was contained in the other

19   report, in the preliminary injunction reports

20   generally.

21       Q.    Okay.  So back to the redistricting

22   guidelines used by the Georgia General Assembly,

23   what did you do with those guidelines?

24       A.    I mean, I looked at them.  I didn't rely

25   on them substantially for drawing this plan, but I

1    had that available and I looked at it.

2        Q.    All right.  And when you say you didn't

3    rely on them substantially, what do you mean?

4        A.    Well, I wanted to get a sense of what the

5    deviation ranges were or what, you know, the

6    overall thrust of the redistricting guidelines

7    were, so I looked at them.

8        Q.    Okay.  I'm going to just mark as Exhibit

9    3 --

10            MR. SAVITZKY:  Can I snag this?

11            THE REPORTER:  Uh-huh.  Yes.

12    BY MR. SAVITZKY:

13        Q.    All right.  I'm going to mark as Exhibit 3

14    the guidelines here.

15                        (Whereupon, Plaintiff's

16                         Exhibit 3 was marked for

17                         identification.)

18            MR. SAVITZKY:  And here's a copy for

19        Mr. Tyson.

20            MR. TYSON:  Thank you.

21    BY MR. SAVITZKY:

22        Q.    And I just want to take a quick little

23    spin through this while we're discussing it.  And

24    I'll direct you to Page 2.  It says Redistricting

25    Plans.

1          Do you see that?

2     A.   Okay.

3     Q.   All right.  And I just want to ask, so

4  just going through them, did you consider whether

5  each legislative district, and I'm on number two,

6  whether the total population of each legislative

7  district was substantially equal as practicable?

8     A.   Generally, yes.

9     Q.   Okay.  Did you consider whether the

10  illustrative plan that you were developing complied

11  with Section 2 of the Voting Rights Act?

12     A.   I wasn't asked to make that analysis.

13     Q.   Is that a "no"?

14     A.   I don't know that I would be the person

15  determining that it would comply with Section 2 in

16  any event, so no.

17     Q.   So you -- okay.  You didn't consider it.

18          Did you consider whether the plan complied

19  with the U.S. and Georgia Constitutions, the

20  illustrative plan that you drew?

21     A.   I didn't make a determination on that.  I

22  don't know that I would be able to do that.

23     Q.   Did you attempt to do it or --

24     A.   No.

25     Q.   Okay.  You didn't attempt to consider

1    whether it complied with Section 2 of the Voting

2    Rights Act either?

3        A.   I don't think I would make that

4    determination, no.  And I did not.

5        Q.   Did you consider geographic contiguity?

6        A.   Generally, yes.

7        Q.   Did you consider boundaries of counties

8    and precincts?

9        A.   Yes.

10        Q.   Did you consider compactness?

11        A.   Yes.

12        Q.   Did you consider communities of interest?

13        A.   As I understood them, yes.

14        Q.   Okay.  Did you consider whether your plan

15    avoided unnecessary pairing of incumbents?

16        A.   No.

17        Q.   Okay.  We may refer to this again.  I

18    wouldn't --

19        A.   Okay.

20        Q.   -- let it go -- don't let it go too far

21    away.  But I think we can just put that to the side

22    for now.

23            So just looking back at your report and

24    the section at sort of Paragraphs 9 to 20 that

25    deals with the use of Maptitude software, we can

1    skip right ahead to Paragraph 15.  You state there

2    can be a great deal of information included in a

3    mapping software program.

4              Are you speaking generally there or are

5    you speaking specifically about the information

6    that you had in front of you when you were drawing

7    these illustrative maps?

8       A.   I think it's pretty clear I'm speaking

9    generally here.

10      Q.   Okay.  You mention state education funding

11   data.  Did you --

12      A.   Okay.

13      Q.   Did you have that data in front of you

14   when you were drawing this map?

15      A.   No.

16      Q.   You mentioned there were lawful houses in

17   a county or a ZIP Code.  You didn't have that

18   information, did you?

19      A.   No.  I thought that was an illustrative

20   example of something you could look at that's just

21   data you could attach to a geographic locality.

22      Q.   Okay.  And --

23      A.   Which is what the topic of this is.

24      Q.   Okay.  And I know I anticipate your

25   answer, but I have to ask anyway.  You mention

1    agriculture, agricultural or cultivated acres per

2    county.

3              You didn't have that data in front of you

4    either?

5         A.   No.  This is an example of things that you

6    could look at.  And in some cases, I've seen people

7    look at some of these information, some of this

8    information.

9         Q.   All right.  But you didn't have that

10   information in front --

11        A.   No.

12        Q.   -- of you?  Okay.

13             You say that, in the redistricting

14   context, you usually would have "population and

15   demographic data from the Census Bureau and in many

16   cases election and voter registration data as

17   well," at the end of that Paragraph 15.

18             Do I have that right?

19        A.   Yes.

20        Q.   Did you have population and demographic

21   data available to you in drawing your map?

22        A.   I had population data.

23        Q.   Okay.  Did you use the population and

24   demographic data?

25        A.   I used the population data.

1      Q.   Now, what about election and registration
2  data, did you have that?
3      A.   It was in a data set that I was initially
4  given that I identified, yes.
5      Q.   And so you did have election and
6  registration data?
7      A.   No.  I didn't use it.
8      Q.   Oh, okay.
9      A.   It was given to me.
10     Q.   It was given to you, but you didn't use it
11  in drawing your illustrative map?
12     A.   No.
13     Q.   Okay.  So what data did you use in drawing
14  your illustrative map?
15     A.   Most of the time it would have just been
16  population in terms of data.  And then there's
17  other things that are not numerical data.
18          For example, I looked at geographic
19  boundaries for mountain ranges and water features
20  and, you know, other things that are data but are
21  not numerical data.
22     Q.   All right.  So population data.  We have
23  geographic features like streams and the like.  Any
24  other data, you know, numerical or geospatial, that
25  you used in constructing your maps?

1         A.   I mean, again, I referred to the places in
2    the sense that I had the boundaries of the places.
3    And those are mostly geographic features.  We
4    talked earlier that I have some knowledge of
5    Georgia, so I have some understanding of the
6    populations.
7              But generally, the numerical data was
8    population-based.  And then you've also got the
9    drawing of districts, which gives you another data
10   set, which is compactness and also the deviation
11   ranges.
12        Q.   Okay.  And just staying with the data that
13   you used to draw the map, anything else other than
14   what we've talked about already?
15        A.   I don't think I missed anything.  But if I
16   did, I would, you know, be able to bring it back up
17   if it occurs to me.  But I don't think so.
18        Q.   Okay.  And you mentioned your knowledge of
19   the state of Georgia.  Can you describe how your
20   knowledge of the state of Georgia came into play as
21   you were drawing your illustrative maps?
22        A.   Sure.  You know, one of the examples would
23   be, say, in Chatham County, which is Savannah, I
24   drew a district that was principally composed of
25   the island areas of Chatham County, and I didn't

1    subdivide those island areas.

2            That's, from my understanding, that's kind

3    of a community of interest.  And so it wasn't

4    identified on the map other than these are islands.

5    And I drew a district that was based in there

6    instead of, you know, separating the islands and

7    drawing them further into the city of Savannah, for

8    example.

9        Q.   Any other examples that you can provide of

10   ways in which your knowledge of Georgia came into

11   play as you were drawing your illustrative map?

12       A.   Sure.  In northwest Georgia, I did look at

13   the mountain features.  And in some cases, I would

14   determine from my point of view that maybe this

15   area would belong better with that area and not

16   cross over a mountain range.

17       Q.   Any other examples?

18       A.   Well, I gave the example earlier where I

19   would look at, within a county, again, I maybe had

20   five seats or four seats and then there were two

21   principal towns in there, I would try to make

22   districts based on one on each town.

23            And I described some of that in the idea

24   of constituencies, which I addressed earlier in the

25   report, that the district -- in redistricting,

1    sometimes you can think in terms of constituencies,

2    like, you know, that's the Macon senate seat or,

3    you know, this is the Floyd senate seat, you know,

4    where you would attach a geographic identity to the

5    seat.  So I would do that.

6        Q.   It seems like a lot of these are sort of,

7    and maybe this is the nature of map drawing, that

8    these are sort of individualistic decisions that a

9    map drawer makes when they are putting a map

10   together.

11           Would you say that's fair?

12       A.   That can be fair to some extent.  I mean,

13   there are choices that are made a lot of times.

14   And the more people you involve in the process, the

15   more input you get.

16       Q.   But so as one person drawing an

17   illustrative map, that's -- you know, they are

18   going to -- they'll make the particular choices

19   they make, and a different map drawer can make a

20   different set of choice?

21       A.   Yeah.  For example, in Gwinnett County, I

22   drew the districts, like, for the house and to some

23   extent the senate that were based on some of the

24   geographic places within the county.

25           However, my experience in Georgia is that

1    the Georgia map drawers, the legislative map

2    drawers don't necessarily do that in Gwinnett

3    County.  They will sometimes follow a

4    transportation corridor instead of a place.

5            But I made the choice to follow the place

6    boundaries, and that was my choice.

7        Q.    So let's look at Paragraph 17 of your

8    report.  You say:

9            "In the redistricting process, map

10         drawers consider many factors when

11         drawing districts and must face

12         trade-offs when seeking to balance

13         conflicting considerations."

14           Do you still agree with that?

15       A.    Generally, yes.

16       Q.    You say that some of the factors that

17   might come into conflict and need to be balanced

18   could be population equality, following civic

19   boundaries, compactness, contiguity, incumbency and

20   preserving existing districts.

21           Is that -- do I have that right?

22       A.    Yes.

23       Q.    Still agree with that?

24       A.    Generally, yes.

25       Q.    And that balancing is maybe part and

1    parcel of the individualistic decisions that each

2    map drawer makes; right?

3         A.    I guess some of those trade-offs are made

4    in that way.  But as I said, if you have more

5    people involved, then it's not just the map drawer.

6    My experience is that it's actually rare for a map

7    drawer to carry a map through the entire process on

8    his own or his -- or her own.

9         Q.    Well, setting aside the particular

10   difficulties of the legislative and political

11   process, when it comes to the map drawer doing what

12   the map drawer, you know, does, part of what they

13   do is make their own individual determinations

14   about some of these trade-offs; is that right?

15        A.    Sometimes.  But in other cases, I think

16   that there would be discussions.

17              Like, for example, in Michigan, I drew the

18   maps, but I literally would ask or would put it up

19   to the commissioner, do you want to take this

20   voting precinct, do you want to split along this

21   axis, do you want to include this city and not that

22   city.

23              I wouldn't click a single button without

24   the commissioner saying, do it.

25        Q.    And some of those choices you're

1    presenting are you go one way, go the other, and

2    they're both sort of legitimate mapping decisions?

3         A.   Yeah.  And in the case of Michigan that

4    I'm describing, you know, as the commissioners

5    became more familiar with me, you know, I would

6    offer them a suggestion that works, and sometimes

7    they would just take that suggestion.

8              And it wasn't necessarily that they were

9    actively debating the merits of that.  They just

10   said, yeah, that looks good, let's do that.

11        Q.   So staying with this idea of trade-offs

12   for a minute, would it be right to say that one

13   example of a -- of such a trade-off is you could

14   have a civic boundary, like a county line or a town

15   line especially where the lines, the town line --

16   the municipal lines are really jagged, and a map

17   drawer might draw a district that's less compact in

18   order to respect those jagged town lines?

19        A.   That's possible.

20        Q.   Or a map drawer could make a different

21   choice and say, I'm going to split a precinct or a

22   town line or something because it's jagged and I

23   want to have a more compact district shape?

24        A.   Yeah.  I would say that's possible.  In

25   the case of Georgia, what I imagine is a lot of

1    times a voting precinct will go beyond the town
2    boundary.  So if you're just looking at towns, you
3    might see only the municipal boundary.  But a
4    voting district goes beyond the municipal boundary,
5    so you might follow the voting district.
6              So what I would say is sometimes you would
7    align with one set of boundaries, and in another
8    case you might align with a different set of
9    boundaries.
10   Q.   And these are all just sort of different
11   decisions that a map drawer makes, and they're all
12   defensible and legitimate but, you know, they're
13   just different ways to slice it?
14             MR. TYSON:  Object to form.
15             You can answer.
16             THE WITNESS:  Okay.
17             Could you restate that, please?
18   BY MR. SAVITZKY:
19   Q.   Sure.  Those different ways of approaching
20   precinct lines or municipal lines or where to draw,
21   those are all -- there's no right way to do it; is
22   that right?
23   A.   It depends on the circumstances.  And
24   again, in the case of North Carolina, there is a
25   right way to do it.  They're specific about how you

1    can split a county.

2         Q.   Okay.  But setting aside the example of

3    North Carolina, in a state that doesn't have that

4    specific instruction, there are different ways to

5    accomplish the districting task to draw lines

6    differently that may both be legitimate?

7         A.   I'm not sure I know what you mean by

8    "legitimate."  But in the common sense of the word,

9    I would say yes, there are choices that can be

10   made.

11        Q.   All right.  So just looking at another

12   example, so a map drawer might decide to split a

13   county because the county was split before and they

14   want to preserve continuity with the previous

15   district lines.

16             That could happen?

17        A.   I suppose that's possible.

18        Q.   Or they could make the alternative

19   trade-off, unify the county even though it means

20   there's a change in the district lines?

21        A.   Hypothetically speaking, sure.

22        Q.   And both of those would be in the common

23   sense of the word legitimate mapping choices?

24        A.   Sounds that way.

25        Q.   So you listed those factors on -- in

1    Paragraph 17 that you say map drawers need to

2    balance, the conflicting considerations, population

3    equality, following civic boundaries, compactness,

4    contiguity, incumbency, preserving existing

5    districts.

6            Your list doesn't include complying with

7    the Voting Rights Act.

8        A.    No, it doesn't.

9        Q.    Why not?

10       A.    I don't know that that's necessarily a

11   traditional redistricting criteria.  It's a

12   criteria in other contexts.

13       Q.    Well, I don't see you mention

14   traditional -- you say, "some of these factors are

15   referred to as traditional redistricting

16   principles," but you say many factors are

17   considered when balancing the different

18   considerations.

19           So I guess why not include the Voting

20   Rights Act as one of the factors that a map drawer

21   considers?

22       A.    Well, in this case I was specifically not

23   looking at race.  And my understanding is that, in

24   order to consider compliance with the Voting Rights

25   Act, Section 2 and other parts of it, you would

1    have to look at race.

2         Q.   Okay.  And you would agree that map

3    drawers do need or, you know, certainly those who

4    enact maps do need to comply with the Voting Rights

5    Act?

6         A.   That's my experience.  It's in effect in

7    all places of the United States that I'm aware of.

8    And there have been changes so that some

9    jurisdictions have more scrutiny than others.

10        Q.   So yes, map drawers need to comply with

11   the Voting Rights Act?

12        A.   I'm sorry.  The -- what did you ask

13   before?  I thought I answered that.

14        Q.   I just didn't -- I didn't quite get the

15   answer, so maybe I'm...

16        A.   I'm not sure.  I thought I answered that

17   question.

18        Q.   Okay.  So my -- the question is, do map

19   drawers need to follow the Voting Rights Act?  Do

20   they need to comply with the Voting Rights Act?

21        A.   Well, I would assume that an enacted plan

22   probably does.  But no, you don't have to.  You can

23   draw many different plans.  There are many

24   possibilities.

25              I've seen computer-generated maps where

1  they draw thousands of maps and, you know, I don't
2  know that those all comply with the voting dis --
3  the Voting Rights Act.
4      Q.   So your testimony is that a map drawer
5  doesn't need to follow the federal law?
6      A.   No.  That's not what I said.
7           MR. TYSON:  Object to form.
8  BY MR. SAVITZKY:
9      Q.   So a map drawer does need to follow the
10 federal law?
11     A.   I think what I said is that it's possible
12 that you could draw maps that might not be
13 interpreted as following federal law.
14     Q.   Understood.
15          And setting aside, you know, that one can
16 draw maps for whatever purpose, in the context of
17 drawing a map that's going to be sort of
18 potentially enacted or used by a state, would you
19 agree that a map drawer who's drawing a map needs
20 to consider compliance with federal laws as part of
21 the -- as one of the considerations that they're
22 thinking about?
23     A.   Generally, yes.  But I believe that there
24 would be a review process.
25     Q.   Okay.  And you agree that maintaining

1    communities of interest is another factor that map
2    drawers need to consider?
3         A.   My experience is that they do consider
4    communities of interest, yes.
5         Q.   Okay.  And you agree that map drawers need
6    to consider maintaining communities of interest?
7         A.   Generally, they would and should.  But
8    there's different weights that some people would
9    apply to those.  And the meanings of those terms
10   are often up for debate.
11        Q.   Okay.  So just moving on to Paragraph 18
12   of your report, you say:
13             "Counties, incorporated towns and
14        cities, as well as unincorporated
15        municipalities and voting districts
16        are examples of traditional
17        boundaries."
18             Do you treat those all the -- all those
19   boundaries the same, or do some of them have more
20   weight than others?
21        A.   It can be a variable.  I mean, I don't
22   know that you're giving weight to these.  It can
23   be -- it can vary from place to place.
24        Q.   Well, in just looking, if you'll pick up
25   what's marked as Exhibit 3, the Georgia legislative

1    redistricting guidelines, and go to Page 2, Number

2    Seven there, it says:

3              "The committee should consider the

4          boundaries of counties and precincts."

5         A.    I'm sorry.  Where is --

6         Q.    On Page 2, if you just flip.  There you

7    go.

8         A.    Here?

9         Q.    Number seven.

10        A.    Okay.

11        Q.    7 (a).

12        A.    Counties and precincts?

13        Q.    Yeah.

14        A.    Okay.

15        Q.    So it specifically enumerates counties and

16   precincts.

17        A.    Okay.

18        Q.    So when you thought about traditional

19   boundaries, did you distinguish between counties

20   and precincts and other traditional boundaries when

21   you were drawing your illustrative map?

22        A.    I mean, I would say that I definitely had

23   those -- that information available, counties and

24   precincts.  And I would say that, in my actual

25   drawing, I would look at the places and also the

1    voting precincts.

2         And I gave an example where maybe you

3    would follow the voting precincts in one case and

4    the municipal boundary in another case.

5         Q.   And just turning to Paragraph 18 of your

6    report, and it's just a quick glance at this

7    exhibit, we can -- we're not going to look at again

8    for at least a little bit, turning to Paragraph 18

9    of your report, you say:

10             "...communities in interest can

11        have many definitions.  Communities of

12        interest often include things based on

13        socio-economic factors; transportation

14        corridors; watersheds; mountain and

15        valley communities; urban, suburban

16        and rural areas; school attendance

17        zones."

18             Do you still agree with all that?

19        A.   Those are examples.

20        Q.   Okay.  How can socio-economic factors

21    create a community of interest?

22        A.   I just gave an example of that.  I mean,

23    you could have -- I think we talked earlier about

24    agricultural areas.  You could have, if you had

25    information on income levels, you could say, well,

1    this area has lower income than that area.

2         Q.    Okay.

3         A.    And I could give you an example, say, in

4    Arlington, Virginia where the housing stock is a

5    community of interest where you'll have a district

6    that is based primarily on, like, high-rise

7    apartments and condos and then a different district

8    that's primarily single family houses.

9              And in my experience in Arlington, they

10   wouldn't mix those very much.  They would have one

11   district that was primarily this older neighborhood

12   that were single family residences and a newer,

13   growing district of high-rise condos that had been

14   put up.

15             And those are some factors that you could

16   call those a community of interest, I suppose.  But

17   it's not clearly defined in every case.  And I'm

18   trying to make that point in the report.

19        Q.    It sounds like it's in the eye of the

20   beholder to some extent?

21        A.    In some extent.  But in other cases, the

22   guidelines or other input you get is pretty

23   specific.

24        Q.    When you say the other -- the input you

25   get, you mean from, like, a client or something?

1     A.    Yeah.   From a client or from the public or
2     from other sources.
3     Q.    You talk about transportation corridors.
4     How can transportation corridors be a community of
5     interest?
6     A.    Well, you know, the transportation
7     corridors can bind a community along a
8     transportation route.
9           In my -- I recall in New Jersey there was
10    some discussion about a particular transportation
11    corridor with counties, and somebody mentioned in a
12    meeting, well, you know, this is a transportation
13    corridor.
14          But when somebody else looked at the data
15    later, they said, actually, it's not, that what you
16    thought and you said doesn't bear up upon looking
17    at the data, that, in fact, the census data that
18    showed a connection between these counties was
19    stronger in a different orientation.
20          You know, so sometimes that happens.
21    Q.    Can historical connections between
22    communities or within communities constitute a
23    community of interest?
24    A.    Sounds like it, yes.
25    Q.    You mention "mountain and valley

1    communities."  What do you mean by that?

2        A.    Well, in my experience there are some

3    places where those geographic features are very

4    important.  In southwest Virginia, for example, the

5    count -- the precinct boundaries, the lifestyle

6    follows ridge and valley lines.

7             And you know, if you were to draw a

8    district that crossed over a mountain and connected

9    with some other location, it would have been

10   frowned upon.

11       Q.    Okay.  And just you mentioned "urban,

12   Suburban and rural areas."  Is that something that

13   you would sort of discern through population

14   density statistics or something like that?

15       A.    If you're going to look at statistics, you

16   could do that.  But there's also a lot of times

17   people will give you their opinion on whether they

18   think this area is urban or not.  And those

19   opinions in this context are probably as valid as

20   others.

21       Q.    So did you consider some of these

22   different communities of interest that you

23   mentioned here when you were drawing your

24   illustrative map?

25       A.    Yeah.  Some of them I would say, sure.

1      Q.   Did you consider population density?

2      A.   To the extent that I looked at some

3   information, a little bit.  I would say that, you

4   know, like, I could see sometimes if you have a

5   county that's lower population and there's a county

6   next door that's higher population, I can see the

7   density there.

8           And you can also look lower, like you're

9   saying, you could do a density map.  But I didn't

10  look at a density map, no.

11     Q.   You just, to the extent you considered it,

12  you just sort of visually...

13     A.   Visually, but also with experience.  And

14  I'll give you an example where, you know, again, if

15  you have, you know, four voting precincts, a voting

16  precinct is a way to estimate population sometimes.

17  So if I've only got four voting precincts, it's

18  probably not a high population.

19          If I have 35 voting precincts in an

20  adjacent county, it's probably higher density.

21  Because each voting precinct is generally about

22  2,000 registered voters or some number.  And I'm

23  sure some states have specific requirements about

24  how big a precinct can be.

25     Q.   Did you consider socio-economic

1   commonalities in drawing your illustrative maps?

2       A.   Only in the context of my personal

3   knowledge.

4       Q.   So you did consider your personal

5   knowledge of socio-economic commonalities in

6   Georgia?

7       A.   I would say just to a very light extent.

8   If I had a choice between A or B, I might go with A

9   because I think there might be a connection, a

10  better connection.

11      Q.   Can you think of any examples of that?

12      A.   Well, I mentioned the island community in

13  Savannah.  And from my point of view, I would say

14  that, you know, a downtown Savannah district that

15  goes out into the islands would be unusual.

16      Q.   Can you think of any examples in the

17  Atlanta metro area?

18      A.   In the Atlanta metro area?  Well, I would

19  say maybe an example like Spalding County, which is

20  in the south side of Atlanta, in terms of the

21  population, that was a little more than a house

22  district.  So to the extent that I could, I tried

23  to keep the county intact.

24          And if I don't have a question pending,

25  I'd suggest a break here.

1      Q.   Sure.

2      A.   Okay.

3           THE VIDEOGRAPHER:  Off the video

4      record at 12:11 p.m.

5           (Whereupon, a discussion ensued

6       off the record.)

7           (Whereupon, there was a luncheon

8       recess.)

9           (Whereupon, Ms. LaRoss did not

10      return to the deposition.)

11          THE VIDEOGRAPHER:  Back on the video

12      record at 12:53 p.m.

13   BY MR. SAVITZKY:

14      Q.   All right.  Hello again, Mr. Morgan.

15      A.   Hello.

16      Q.   So we were talking about some of the

17   different communities of interest definitions and

18   whether and how you considered them in your

19   illustrative map that you drew for the December 5th

20   report.

21          Did you consider socio-economic

22   commonalities when you created your illustrative

23   maps?

24      A.   Generally, I would say no.  These were

25   examples of what people may consider communities of

1   interest.

2        Q.   Okay.  Did you consider particular

3   community resources or needs?

4        A.   Not especially.  If I knew something, I

5   might have, but not especially.

6        Q.   Do you recall knowing anything about any

7   community resources or needs that you factored into

8   your illustrative map?

9        A.   No.  Not especially.

10       Q.   Did you consider transportation corridors?

11       A.   Yeah.  Sometimes I would say, you know, I

12  would have highway maps on and I could look at some

13  area.  It was something I would look at maybe if

14  there was an option to consider.

15            A lot of times it doesn't come into it

16  from the beginning, but it's something you would

17  look at in the process.

18       Q.   And outside of looking just at the maps

19  where highways are, did you conduct any other, you

20  know, analysis or research to find out about

21  particularly significant transportation corridors

22  in Georgia?

23       A.   I don't think so.

24       Q.   So to the extent you considered

25  transportation corridors, it was just sort of the

1    corridors that were visible on the map from the
2    roadways on the map?
3         A.    I think so.
4         Q.    Okay.  Did you consider school attendance
5    zones?
6         A.    Not in this drawing of maps.
7         Q.    Did you consider -- do you know what a
8    core-based statistical area is?
9         A.    I mean, from the census?
10        Q.    Yes.
11        A.    Yeah.  I've looked at some of those things
12   in the past.
13        Q.    And did you consider core-based
14   statistical areas in drawing your illustrative map?
15        A.    No.
16        Q.    Why not?
17        A.    Because I was generally looking at the
18   counties and the populations and things like that.
19        Q.    Did you consider regions, for example, the
20   state defined regional commissions?
21        A.    Not directly.
22        Q.    Did you consider anything that was said in
23   any of the public hearings that Georgia held
24   before -- or in connection with the redistricting
25   process?

1      A.    No.   I wasn't given information on the
2  public hearing process.
3      Q.    Okay.  So and just to summarize, in terms
4  of considering communities of interest, other than
5  looking at municipalities and places on the map and
6  whatever background knowledge you might have had,
7  were those the two ways that you considered
8  communities of interest?
9      A.    I mean, there were others that I
10 mentioned.  I mentioned mountains and other
11 geographical features that were not simply
12 municipalities.
13     Q.    Other than considering the features that
14 you could view on the map and whatever background
15 knowledge you were bringing to the table, were
16 there any other ways that you considered
17 communities of interest in constructing your
18 illustrative maps for the December 5th report?
19     A.    I would say it was mostly based on the
20 geography and the maps.
21     Q.    When you say "mostly" --
22     A.    Yes.
23     Q.    -- were there other things that you
24 considered other than the geography and your
25 background knowledge?

1       A.    I'm just allowing for the possibility that

2    I might have forgotten something.  But generally, I

3    would say it's as you described.

4       Q.    Okay.  Let's turn to Paragraph 19 of your

5    report.  And you say:

6            "Continuity of representation is a

7          traditional districting factor."

8            Is that right?

9       A.    Yes.  In my experience, that's often

10   talked about.

11      Q.    And you still agree with this statement,

12   continuity of district representation is a

13   traditional districting -- traditional

14   redistricting factor?

15      A.    Yes.

16      Q.    Okay.  Why is that a significant factor?

17      A.    Why?

18      Q.    Why?

19      A.    Well, there's several reasons.  I would

20   say that, in my experience, I think the public gets

21   used to dealing with a certain elected official.

22   So sometimes there's a public interest in keeping

23   things with the same official.

24            And sometimes that also is talking about

25   the same geography.  So that once a district is

1    established, you know, it can maybe have a life of

2    its own?  I don't know.  That's a generalization.

3             But it -- once something becomes

4    established in that way, people get used to it, and

5    they're used to dealing with the same

6    representatives.

7             So there is some benefit to the public in

8    keeping continuity of representation.

9        Q.   And so for that reason, and because it's a

10   traditional districting principle, continuity of

11   representation might affect the way that a map is

12   drawn, it might get balanced against some of those

13   other factors, and a map drawer might seek to

14   preserve continuity of representation?

15       A.   Yes.  And also not just the individual,

16   but the district itself.  There can be one and the

17   same or they can be separate.

18       Q.   So why did you consider to forgo

19   considering it altogether in drawing your

20   illustrative maps?

21       A.   In this sense I didn't want to look at the

22   incumbents in drawing the plan.  I suppose I could

23   have gone back and made adjustments and factored in

24   incumbents.  That might have been a second or third

25   step in the process.  But I didn't do that in this

1   case.

2        Q.   But why didn't you do it?

3        A.   I can't say as to why I didn't do it.  I,

4   I mean, I don't know that there was a reason for

5   not doing it.

6        Q.   You didn't consider something that you say

7   is a traditional redistricting principle, but you

8   had no reason to not consider it?

9        A.   I mean, not an explicit reason.  I, I

10  guess, like I said, I could have gone in and made

11  changes and maybe it would have changed district

12  boundaries in some places and maybe not in others,

13  or it would have been minor adjustments.

14            But I guess I was trying to keep things --

15  we talked about the idea of a control.  I was

16  trying to focus more on the racial components after

17  having drawn the plan and to compare it and see

18  what do we get, what, you know, what are the

19  districts if you look at it from this perspective.

20       Q.   But I guess, you know, usually, when we

21  talk about a control in an experiment, you usually

22  have one thing that you do differently; right?

23  That's the control is the one thing that's -- you

24  do two things the same and there's one thing that's

25  different; right?

1                 And so then we try to measure, you know,

2       what is the difference of including or not

3       including one factor.  But here you have this

4       traditional districting principle of continuity of

5       representation that you also didn't consider.  So

6       you have multiple things that are -- that could be

7       causing the differences that you claim to be

8       seeing.

9                 Do you understand?

10          A.    What's the question?

11          Q.    The question is, why did you decide to not

12      include other traditioning -- traditional

13      districting principles in your analysis if you were

14      trying to control for one factor?

15          A.    Well, I didn't really say I was trying to

16      control for one factor.  I'm just saying that, you

17      know, I was looking at that aspect of it, and I

18      didn't do it in this report.

19                I suppose I could do another report and

20      then factor in that next step.  I could go back and

21      make adjustments that were consistent with the plan

22      that I drew and just make some adjustments to

23      certainly take care of incumbents that are just,

24      like, one precinct out.

25                Maybe I would say I don't want to make

1    changes if it crosses a county boundary.  I could

2    say, well, I kept the county intact here, but as it

3    turns out, if I took this one precinct, then I

4    could unpair an incumbent.

5            So there's different levels of attention

6    you could give to that.  And I didn't do that in

7    this report, but I could in a subsequent report.

8        Q.   Okay.  Were you asked to not consider a

9    continuity of representation or was that your idea?

10       A.   I would say it ended up going in that

11   direction.  I don't know -- was it my idea?  I

12   mean, I think after I drew it, I think I had a plan

13   that made sense.

14       Q.   Okay.  So were you asked to not consider

15   it or did you suggest not considering it?

16       A.   I don't really know how to answer that.

17   Because I would say that, you know, it didn't end

18   up considering that directly, but then afterwards I

19   ran the incumbent report and I reported that in the

20   report.

21           So I have the effect of it in the sense

22   that I have the report statistic that shows how

23   many incumbents were paired.  But I didn't actively

24   look at the geographic location of the incumbents

25   while I was drawing the plan, not at all.

1          Q.    And a map drawer who was considering

2     continuity of representation as a traditional

3     districting factor would consider that when they're

4     drawing the map, not just afterward see how

5     different it is, they would consider it while

6     they're drawing; right?

7          A.    It depends on the circumstances.  There

8     are some cases where you're explicitly not looking

9     at representation.  Like, for example, in Michigan,

10    to even suggest that you look at the incumbent's

11    residence would have been frowned upon.  And so it

12    wasn't looked at until after the plan was done.

13         Q.    To be clear, I'm not asking about

14    incumbent's residence, I'm asking about continuity

15    of representation, right, continuity of the

16    district shapes?

17         A.    Well, as I said before, sometimes they can

18    be roughly the same thing, but other times not.

19    And like, you could have a situation where, say,

20    90 percent of a district is exactly the same

21    territory, but the incumbent doesn't live in the

22    district.

23              So you're asking two slightly different

24    things.  You're asking, like, what we might say

25    district core constituencies which, you know,

1    usually is expressed in some sort of calculation or

2    comparison to another plan or district and then the

3    incumbent residencies.

4            So yeah, that's something you can look at.

5       Q.   Right.  And so I guess my -- and what I'm

6    asking is, do you think that's something you can

7    look at?  And given that, indeed, you say it's a --

8    you say continuity of district representation is a

9    traditional districting factor, why didn't you look

10   at it here?

11      A.   I don't -- I mean, I've tried to explain.

12   It wasn't in this report.  Like, that was just -- I

13   was just focusing on drawing districts and

14   consistently following the same practice

15   throughout, and I didn't look at the incumbency.

16      Q.   Why don't you include it -- why don't you

17   include continuity of representation as something

18   to consider when drawing a blind map?  Is it

19   possible to draw a blind map?

20      A.   Well, you could.  But sometimes when you

21   talk about blindness, you're also talking about

22   blindness to incumbency.  You know --

23      Q.   And --

24      A.   -- that could be possible.

25      Q.   And is that what you're talking about here

1   when you did this blind map?

2      A.   Well, I identified at the beginning that I

3   did not take incumbency into consideration.

4      Q.   Okay.  Okay.  Let's look at Paragraph 20

5   of your report here.  You discuss a few different

6   measures of compactness.  And you mention Reock.

7   And you say:

8           "In this analysis I used the Reock

9       and Polsby-Popper compactness

10          tests..."

11          Are those the only measures of compactness

12   that one might use?

13     A.   No.

14     Q.   What are some of the other ones?

15     A.   There's, like, Convex Hull, there's

16   Length-Widths.  There's Perimeters.  There's a

17   Schwartzberg calculation.

18          You know, there's been others that take

19   into account, like, distance from the centroids of

20   populations.  You know, there's all sorts of things

21   that people have looked at.  There's a lot of, you

22   know, a lot of things.

23     Q.   So why did you only use Polsby-Popper and

24   Reock here?

25     A.   Well, in my experience, these are measures

1    that I've seen in court situations, and I think

2    they're commonly used.  Some of the other metrics

3    might be more arcane.

4         Q.   Now, do you report -- or do you look at

5    minimum or maximum compactness, minimum or maximum

6    Reock and Polsby-Popper scores?

7         A.   It's shown on the report.  So it's on the

8    reports that were produced for the previous

9    preliminary injunction for the enacted and I think

10   in these reports.

11              It's available also in the data of the

12   block assignment file that could be loaded and

13   looked at.

14        Q.   Do you think the minimum and maximum

15   compactness are important to consider when

16   assessing compactness?

17        A.   Minimum and maximum?  I'd say there's a

18   lot of attention given to the minimums in some

19   cases.

20        Q.   And do you think the minimum is a

21   significant consideration when assessing a plan's

22   compactness?

23        A.   In some context it could be.

24        Q.   Why?

25        A.   Because there could be a point at which

1    something is considered not to be compact.

2         Q.    What do you think is that point?

3         A.    I don't know.

4         Q.    What are some of the ways one might go

5    about trying to figure out what that point is?

6         A.    I don't know.  I think you could look at,

7    you know, shapes of district, or you could look at

8    maybe intentions, or you could have more

9    discussions about why a district was drawn the way

10   it was drawn.

11        Q.    But in terms of assessing the compactness

12   score, the idea is maybe there's a score that's so

13   low that the district is not appropriate; is that

14   what you're saying?

15        A.    I think that that could be tested.

16        Q.    What do you mean it could be tested?

17        A.    If someone thought districts were not

18   sufficiently compact in some legal context, one

19   could challenge that.

20        Q.    Do you have a view on the point at which

21   compactness is too low in terms of the balancing of

22   different factors when a district is too uncompact?

23        A.    I think sometimes you would say that, if

24   you see a district that's very low compared to many

25   districts or in an area, you might want to look at

1    it more carefully and ask more questions.

2        Q.   So just on the subject of compactness, we

3    were discussing previously the districts for

4    Virginia in 2011.

5            Do you remember that?

6        A.   Yeah.

7        Q.   And we were discussing that state court

8    case Vesilind, where the -- some of those districts

9    from the 2011 legislative maps were challenged as

10   being insufficiently compact.

11           Do you remember that?

12       A.   Yes.

13       Q.   And you were a witness in that case?

14       A.   Yes.

15       Q.   And the plaintiffs in that case argued

16   that the districts were so non-compact that they

17   were unconstitutional, I think; is that right?

18       A.   I believe that's what they argued.

19       Q.   Okay.  And when you testified in that

20   case, you testified that you were reviewing the

21   Polsby-Popper and Reock scores as you were drawing

22   the plan.

23           Do you recall that?

24       A.   I believe so.

25       Q.   And as I recall, the -- those -- the

1  Virginia Supreme Court ultimately upheld the

2  districts on that particular challenge.

3          Do you recall what happened in the case?

4      A.   I believe that's true.  They were upheld.

5      Q.   So and you mentioned when we were talking

6  about District 72 as one of the districts being

7  challenged as insufficiently compact?

8      A.   Yeah.  In my mind I just think of 72 and

9  73 as being connected, because they're side by

10  side.

11      Q.   Okay.  And I'm just going to mark here --

12  we're on four? -- Exhibit 4.

13                        (Whereupon, Plaintiff's

14                         Exhibit 4 was marked for

15                         identification.)

16  BY MR. SAVITZKY:

17      Q.   And this is just a copy of the Virginia

18  Supreme Court's decision.

19          MR. SAVITZKY:  And here's one for

20      Mr. Tyson.

21          MR. TYSON:  Thank you.

22  BY MR. SAVITZKY:

23      Q.   Okay.  And if you just look at that second

24  column, let's see, the very last sentence, this is

25  describing the background of the case, and they say

1   complaint sought a judgment that the following

2   districts -- against the following districts.  It

3   says house of delegates Districts 13, 22, 48, 72,

4   88.

5        A.    Okay.

6        Q.    Does that look right to you?

7        A.    Okay.

8        Q.    Okay.  And it says and senate Districts

9   19, 21, 28, 29, 30 and 37.

10       A.    Okay.

11       Q.    And then just a couple lines down, it says

12   the districts were established in HB 5005.  That

13   was the legislation that passed them.

14             Do you see that there?

15       A.    Yes.

16       Q.    Does that sound right to you?

17       A.    Yes.

18       Q.    All right.  And if we could just go to

19   Page 5 of this Exhibit 4 that we're on here, and

20   the last paragraph, the last full paragraph on that

21   page, you see, "Morgan testified"?

22       A.    Okay.

23       Q.    It says:

24             "Morgan testified that he worked

25         with Delegate Jones in the 2011

1          redistricting using the House Criteria

2          Resolution."

3               Is that -- do you recall that testimony?

4     A.    Yes, in general.

5     Q.    It says:

6               "He stated that compactness was

7          'implemented' in the 2011 plan because

8          they ran 'compactness reports' using

9          the Reock and Polsby-Popper

10         measures..."

11              Do you recall that testimony?

12    A.    Okay.

13    Q.    And it says:

14              "...and the compactness scores

15         'were within the acceptable range as

16         defined by the Jamerson and Wilkins

17         cases.'"

18              So that --

19    A.    Okay.

20    Q.    -- that's what you told the -- that's what

21    you -- that's what -- that was your testimony?

22    A.    Well, this is not quoting my testimony,

23    but it seems part of it is quoting my testimony,

24    yes.

25    Q.    So it's quoting you as saying that these

1    districts, the compactness scores for these

2    districts were within the acceptable range?

3        A.   Based on a specific case that we were

4    given information about.

5        Q.   Okay.  So based on understanding it's, you

6    know, it's in the context of Virginia, this was

7    within the acceptable range; is that right?

8        A.   That was my understanding.

9        Q.   All right.  Do you remember what the

10   Polsby-Popper and Reock scores were for these

11   districts?

12       A.   For these five house districts?  No, I

13   don't remember.

14       Q.   Okay.  I'm going to mark one more as

15   Exhibit 5.

16                        (Whereupon, Plaintiff's

17                         Exhibit 5 was marked for

18                         identification.)

19   BY MR. SAVITZKY:

20       Q.   These are the stipulations from that

21   Vesilind case.

22            MR. SAVITZKY:  And a copy for

23       Mr. Tyson.  Here you go.

24            MR. TYSON:  Thank you.

25   BY MR. SAVITZKY:

1   Q. And here you go.

2     All right.  And these are the stipulations

3 from the Vesilind case.  And I'm just going to ask

4 you to go to what's marked at the bottom of the

5 page as PDX 302.32.  It's Exhibit J8.

6     Just let me know when you're there.  It's

7 a compactness report for HB 5005 for the house

8 plan.

9   A. Is that -- that's at the back?

10   Q. Yes.

11   A. Okay.

12   Q. Yep.  There you go.

13   A. All right.

14   Q. So you see that?  Do you see that that's a

15 compactness report for the house plan?

16   A. Okay.

17   Q. And for those 2011 districts?

18   A. (Whereupon, there was no audible response

19 by the deponent.)

20   Q. And now, District 13, Reock point 16,

21 Polsby-Popper point 13; do I have that right?

22   A. Okay.

23   Q. Do I -- am I correctly reading this

24 Maptitude report?

25   A. On this page it says District 13 is Reock

1    point 16 and Polsby-Popper point 13.

2         Q.    And how about District 22?

3         A.    District 22 is Reock point two and

4    Polsby-Popper point 11.

5         Q.    And next page looking at District 48 --

6         A.    Okay.

7         Q.    -- how -- what's the Reock and Polsby on

8    that?

9         A.    It's point 18 and point 16.

10        Q.    And now District 72, which was the one

11   that you were talking about, what's the Reock and

12   Polsby on that?

13        A.    The Reock is point 26 and the

14   Polsby-Popper is point 08.

15        Q.    And how about District 88?

16        A.    District 88 is Reock point 28 and

17   Polsby-Popper point 13.

18        Q.    Okay.  And those were all within the

19   acceptable range?

20        A.    As I understood it at the time, yes.

21        Q.    Okay.  And just moving two more pages to

22   Exhibit J9.  Just flip one more page.  We're still

23   on what's marked as Exhibit 5.

24             And now it -- just looking at the top,

25   this is the compactness report for the senate plan?

1      A.    Okay.

2      Q.    Do you see that?

3      A.    Yes.

4      Q.    And now, could you give me the Reock and

5   Polsby for District 19?

6      A.    Reock is point 22, and the Polsby-Popper

7   is point 11.

8      Q.    And how about District 21?

9      A.    District 21 is point 21 for Reock and

10   point 14 for Polsby-Popper.

11      Q.    And how about 28?

12      A.    District 28 is point 15 for Reock and

13   point 08 for Polsby-Popper.

14      Q.    How about 29 and 30?

15      A.    29 is point 16 for Reock and point 10 for

16   Polsby-Popper.

17      Q.    And last one, how about 37?

18      A.    30 -- I didn't read -- did you want 29 and

19   30?

20      Q.    29 and 30, yes.

21      A.    Okay.  So 30 is point 21 and -- Reock and

22   point 10 in Polsby-Popper.  And then District 37 is

23   point 18 for Reock and point 10 for Polsby-Popper.

24      Q.    And those were all within the acceptable

25   range?

1      A.   Comparing to that case that was cited

2   there, yes.

3      Q.   Within the context of Virginia, those were

4   within the acceptable range you -- that's what you

5   testified?

6      A.   Again, yes, compared to that other case.

7      Q.   Okay.  And actually, before we -- just one

8   other thing.  What's the overall -- looking at the

9   average scores for the senate plan, do you see is

10  there a mean plan compactness?

11     A.   On the report?

12     Q.   Yeah.

13     A.   Yes.  And it looks like it's, there's --

14  the heading is below, but it appears to be point 27

15  on Reock as a mean --

16     Q.   Yep.

17     A.   -- and then point 16 on Polsby-Popper.

18     Q.   As a mean?

19     A.   Yes, as a mean.

20     Q.   Okay.  And that was within the acceptable

21  range?

22     A.   I don't know that it was applied to the

23  mean, but probably so.

24     Q.   Okay.  So let's look back at your report,

25  and we can turn to Paragraph 21 on Page 10.  We're

1   back on the report that is marked as --

2           MR. ZABEL:   Exhibit 2.

3   BY MR. SAVITZKY:

4       Q.   -- Exhibit 2.

5       A.   Okay.

6       Q.   And just about your process and as a

7   general matter, you know, understanding that the

8   districts are different sizes senate versus house,

9   did you follow the same general process for drawing

10  your illustrative maps in the -- with the senate

11  and the house maps?

12      A.   Generally, yes.

13      Q.   Were there any differences in the process?

14      A.   I would say with the senate there were

15  fewer districts, so I think there were -- there

16  were going to be more -- I think more whole

17  counties in southern Georgia that -- I think I

18  would say, in the case of southern Georgia, I spent

19  a little more time looking at county combinations

20  to see if there were some combinations of counties

21  that would allow for not splitting a county.

22           So in that sense, I probably gave a little

23  more attention to the senate in central and

24  southern Georgia.

25      Q.   Any other differences in terms of the

1    process that you used to create these maps between

2    the house and the senate?

3        A.   Well, the, I guess the flip side of that

4    is, with the smaller population for the house, I

5    probably had to split more voting precincts, and so

6    I probably spent a little more time looking at the

7    voting precincts.

8             The deviations would require probably more

9    splits, so there was just more time to consider in

10   the house in that way than the senate.

11       Q.   Any other differences in the process that

12   you used to draw the house map versus the senate

13   map in your illustratives?

14       A.   Nothing's coming to mind at the moment.

15       Q.   So looking at Paragraph 21, in order to

16   draw your illustrative map, you started by

17   determining ideal population size for a district;

18   right?

19       A.   I believe so.

20       Q.   And then you assigned, your next step was

21   to assign every county a number of seats per county

22   based on ideal population size?

23       A.   No.  That's not exactly part of the

24   mapping process.  It's a reference.  So when I

25   created that map, I would have that as a reference

1    and I would have that information.

2              So it's available, it's a reference, but I

3    didn't, for example, populate each county as its

4    own district.  Like, the -- in the process, when

5    you draw the districts, you want them to be close

6    to the ideal size, but.

7              Sometimes I did do that.  Like, I would

8    draw, if I knew that there were four senate

9    districts in a county, I might just draw those four

10   districts knowing that they're not districts, and I

11   would just draw that as a county grouping of one

12   county with four districts in it.

13             So think of it as like a holding place.

14   So I know there are four districts there.  I'm

15   probably not going to split that county.  But I

16   didn't actually draw the districts until later.  So

17   that's the process.

18             And I said something about that in the

19   report where I would identify a grouping and I'd

20   come back to it a little later.  I think that's a

21   fair description of process.

22        Q.   Okay.  And when you say "that map," you

23   mean the map on Page 12 of your report, this house

24   district ratios map and the corresponding one for

25   the senate?

1    A.   Yes.

2    Q.   Okay.  And looking at that you can see,

3  for example, Rockdale County, 1.57 house seats?

4    A.   Yes.

5    Q.   Newton County, 1.89 house seats?

6    A.   I have to look closely at that.  Is it two

7  or one?  I can't tell.

8         MR. TYSON:  One.

9         THE WITNESS:  Okay.  One.  I'll go

10      with one.

11  BY MR. SAVITZKY:

12    Q.   Walton County, 1.62?

13    A.   Okay.  Yeah.

14    Q.   Clayton County, five?

15    A.   Yes.

16    Q.   Henry County 4.04?

17    A.   Yes.

18    Q.   Okay.  So -- and I'm not going to go

19  through every county in Georgia, just to be clear.

20    A.   I mean, we could if you want.

21    Q.   We -- yes.

22         So in your process, when you see, you

23  know, Clayton County is five, are you -- you're --

24  that gives you confidence that you can have all

25  five districts located within Clayton County and

1    not split that county?

2        A.   Generally, yes.  You know, you have to

3    look at the fraction and see, like, for example, if

4    it's, you know, if it's 5.8, then that might be too

5    much.

6            But if it's 5.2 -- or five, sorry, 5.02,

7    then that probably falls within the population

8    tolerance, or 5.00.  So yeah, it could be done.

9        Q.   And you set out to draw districts within

10   counties, understanding that you didn't start the

11   drawing process when you were doing this, but you

12   set out to draw districts only within counties

13   wherever you could?

14       A.   Not wherever I could, but it was something

15   I acknowledged.  Like, I think, like, with this

16   map, I think it's very useful to have this kind of

17   information to get a good sense of where the

18   population centers are and then also just how many

19   districts that represents.

20           It's -- this map is a tool, and I think

21   it's a useful tool.

22       Q.   And it's a tool to tell you that some

23   counties can be subdivided evenly into districts

24   without population deviation?

25       A.   Sure.  And you know, it doesn't mean that

1      that's going to happen in every instance.  Like,
2      there could be an example of a county that is split
3      that has enough -- or less than a single district
4      but, you know, it could end up being split.
5           Q.   Would you say that the approach that you
6      took here prioritizes not splitting counties?
7           A.   Not necessarily.  I would say no.  Because
8      in some cases, I would end up splitting a county
9      where a county split was probably necessary and
10     there was a choice of one county or another, in
11     some cases two counties.
12               I don't say that it was -- it's not
13     prioritized completely, but definitely it was
14     something I would look at.  If I had a choice
15     between not splitting a county and splitting a
16     county, I would probably choose not to split it.
17          Q.   Did you have any other metrics like this
18     one, like this persons or districts per county
19     metric, that you used to guide your thinking at the
20     outset of your process?
21          A.   No.  Not really.
22          Q.   This was it?
23          A.   This was a -- I would say that looking at
24     the report and the flow of discussion in the
25     report, I'm trying to not only show the process

 1    that I used in this specific map, but in some cases
 2    I've generalized a process so that I acknowledge
 3    what is available.
 4             And again, these maps are tools, and I
 5    find them useful.  And when I have a client, I
 6    would very often suggest that they produce
 7    something like this so that they internalize the
 8    population of the states.
 9       Q.   Some other mapper could use some other
10    tools; right?
11       A.   Sure.
12       Q.   Another mapper could sort of -- could
13    start their process differently?
14       A.   I'm sure.
15       Q.   Maybe they could do this but, like, with
16    V.T.D.s, right, or with municipalities?
17       A.   I guess so.  It seems a little more
18    complicated, but yes.
19       Q.   Districts per municipality if you were
20    focusing on keeping municipalities and communities
21    whole, sort of --
22       A.   I think that would be a lot more
23    challenging, but I suppose that's possible.
24       Q.   Have you tried it before?
25       A.   In other states, when the geography meets

1    up and subdivides easier, then it's easier to look

2    at that.  But in the case of Georgia where you'll

3    have a place or a city that doesn't account for the

4    whole county, I think it's a little harder.

5              Because then you could have, okay, well,

6    if there's enough for 75 percent of the seat, so

7    then you could take all of that municipality and

8    then round it out with the surrounding territory

9    outside of it.  That's one possibility.

10             Or if it's two, you know, 2.0, you could

11   have it exactly as two seats, but then you'll get

12   into that other issue that you brought up earlier

13   where maybe the municipal boundary looks jagged.

14             And you might say, well, you know, I could

15   divide the city exactly in two, but it really

16   doesn't look like a district or, you know, it's too

17   jagged, and so you might be drawn away from

18   something like that.

19             So I mean, I suppose it's something you

20   could look at a list of municipalities, sure.

21        Q.   Okay.  Could you look at regions or, you

22   know, you could look at C.B.S.A.s or some other way

23   to try to group group areas and figure out

24   districts per grouping?

25        A.   Sure.  I would recommend doing something

1    like that sometimes.

2         Q.   Is there any requirement to start with

3    this sort of districts per county approach as

4    opposed to any other approach that we talked about?

5         A.   Not that I'm aware of.

6         Q.   That's -- it's the way that you decided to

7    draw your map?

8         A.   Yes.

9         Q.   So looking at Paragraph 23, you talk about

10   the deviation.  And that refers to the minimum or

11   maximum tolerable population for the district;

12   right?

13        A.   Yes.

14        Q.   And is that a hard limit that you set?

15        A.   I, well, I used plus negative 1.5,

16   positive 1.5.  I tried to fall within that range.

17        Q.   Does Georgia law require you to be within

18   that range?

19        A.   I don't know.

20        Q.   How did you pick that range?

21        A.   Well, I looked at the enacted plan, and I

22   saw that they were at negative 1.4 and positive

23   1.3, which I identify here, and I allowed for a

24   little more deviation up to the next step, so to

25   1.5.

1       Q.   Okay.  And is it fair to say that you
2   picked that plus or minus 1.5 percent deviation in
3   order to ensure that your map respects the
4   traditional districting factor of population
5   equality?
6       A.   No.  I mean, I picked that because it was
7   the next step up to just give a little more
8   variation.  I wasn't quite sure how this would all
9   turn out.
10      Q.   And --
11      A.    I mean, I suppose I could have gone and
12  done a higher deviation or a lower deviation, but I
13  picked that because it was close to the enacted
14  plan.
15      Q.   Would you say it's substantially similar
16  to the enacted plan?
17      A.    Seems like it.
18      Q.   And you viewed that level of that one --
19  that plus or minus 1.5 percent deviation as
20  sufficient to comply with the traditional factor of
21  population equality?
22      A.    I think so.
23      Q.   And is it fair to say that all that also
24  applies to your decision to do a plus or minus
25  1 percent deviation for the senate?

1        A.    I'd have to look at the report, but I
2    think it's roughly the same, yeah.
3        Q.    Are there any other differences that came
4    up when you considered the plus or minus 1 percent
5    deviation in the senate?
6        A.    I can't think of anything off the top of
7    my head.
8        Q.    You can take a minute if you want to.
9        A.    Okay.
10            (Whereupon, the document was
11          reviewed by the witness.)
12            THE WITNESS:  Yeah, the enacted plan
13          was negative 1.03 to positive point 98,
14          and I did plus or minus one.  It's very
15          similar.
16    BY MR. SAVITZKY:
17        Q.    So would you say that sort of your -- that
18    your answers for using that plus or minus
19    1.5 percent deviation in the house also applied to
20    your decision to do plus or minus 1 percent in the
21    senate?
22        A.    I would say that it's similar to the
23    enacted plan, so in that sense, yes.
24        Q.    And you viewed the plus or minus 1 percent
25    deviation in the senate as sufficient to comply

1    with the traditional districting principle of

2    population equality?

3          A.   Generally speaking, yes.

4          Q.   Is there some way in which you did not

5    view it as sufficient to comply with that

6    traditional districting principle?

7          A.   I mean, there could be reasons why other

8    more strict guidelines would be used.

9          Q.   But in this case in Georgia, you felt that

10   the plus or minus 1 percent deviation was

11   sufficient to respect the traditional districting

12   principle of population equality?

13         A.   That's what I chose for this illustrative

14   plan.  I don't know if there was some other

15   requirement.

16         Q.   I'm just asking you as a mapper who

17   applies the traditional districting principles if

18   you felt that that plus or minus one deviation that

19   you used for the senate was sufficient to comply

20   with the traditional principle of population

21   equality?

22         A.   In this circumstance, I think so.

23         Q.   In the circumstance of drawing a senate

24   map in Georgia?

25         A.   I think so.

1      Q.   Okay.  So you say, and now let's go to

2    Paragraph 24 on page -- still on Page 13, you say

3    you, quote, looked at the map layer for cities as

4    well as incorporated and unincorporated places in

5    order to provide additional context for communities

6    of interest.

7            Other than that map layer, did you

8    consider anything else to give context to

9    communities of interest?

10     A.   Yeah.  I mentioned that there were other

11    geographic features, like water boundaries.  I did

12    also reference Google Maps, which showed some of

13    the terrain features.  And that's something that

14    you can turn on and off as well.

15     Q.   When you say you referenced Google Maps,

16    how did you do that?

17     A.   It's part of the program.

18     Q.   You had Google -- you had a Google Maps

19    layer in Maptitude?

20     A.   It's available, yes.

21     Q.   Okay.  And again, other than this sort of

22    what you could visualize in Maptitude and your

23    background knowledge, did you do anything else to

24    provide additional context for communities of

25    interest?

1       A.    Not -- nothing's coming to mind at the

2   moment.

3       Q.    Okay.  And now, you say:

4             [As read]  "During the drawing

5          process, I did not use any racial

6          data, incumbency information or

7          boundaries of previous districts."

8             Meaning that you didn't have that

9   information sort of in Maptitude when you were

10  drawing; is that right?

11      A.    Right.

12      Q.    Is it your testimony that you were able to

13  block out the background knowledge that you have of

14  the racial make-up of different areas in Georgia

15  from your own mind when you were drawing this map?

16      A.    I don't think that's what I said earlier.

17      Q.    Okay.  So you were not able to, you have

18  that information, you're aware of it, it's there?

19      A.    In a general sense, I'm aware of some

20  areas.  But in a specific sense, I certainly don't

21  have it at the voting precinct level.  I have some

22  memory of some counties that have higher

23  concentrations of minority populations than others.

24      Q.    Okay.  And so when you say you didn't use

25  any racial data, that doesn't include the awareness

1    that you have of generally where communities are?

2         A.   I mean, I would say that's knowledge, not

3    necessarily data, if there's a distinction.

4         Q.   So you didn't use data, but you used

5    whatever knowledge you have?

6         A.   I mean, I know that southern DeKalb County

7    has got some highly concentrated African-American

8    population centers.  I know that.  But I didn't

9    draw a district boundary to take that into

10   consideration.

11        Q.   When you say you didn't draw a district

12   boundary to take it into consideration --

13        A.   Uh-huh.

14        Q.   -- meaning you understood what the effects

15   of drawing particular district boundaries would be

16   with respect to those areas?

17        A.   Actually, I didn't.  And that's what I

18   found fascinating about this.  Because you know,

19   doing it this way, you end up with districts -- or

20   I ended up with districts that were fairly compact.

21             And they were based on, you know, the

22   municipalities in some places and keeping the

23   communities as I saw them together.  And the racial

24   component, it was interesting to look at what that

25   ended up with.

1      Q.    Why was it interesting?

2      A.    Because I think there's a lot of

3   discussion about, okay, this is a high

4   concentration of African-American support and -- or

5   population concentration, and a lot of times you'll

6   see a district is drawn at some percentage, and

7   whatever number that is.

8           And then the adjacent districts, maybe

9   they fall off from that number.  Maybe there's,

10   like, a high concentration in the next ring, and

11   the next ring get lower and lower but are not a

12   majority district, for example.

13          I don't know.  I didn't know how that was

14   going to turn out, so I didn't draw with that in

15   mind.

16     Q.    Well, I understand you didn't -- just when

17   you say you didn't draw with it in mind, you were

18   aware that different counties, different areas

19   within counties had different racial make-ups?

20     A.    To some extent.  But I wasn't looking at

21   that.  And I think you'll see in the other report

22   from January 23rd, I have a theme on voting

23   precincts which has information with racial data,

24   and I definitely did not have that active for

25   drawing this plan.

1      Q.   Understood you didn't have the data.

2      A.   Yeah.

3      Q.   You just had the knowledge?

4      A.   Not necessarily.  It's not that specific.

5  I mean, I can say, like, I know that, in Cobb

6  County, Powder Springs is more racially mixed than,

7  say, the precincts in northern Cobb.

8           But I don't know what the specifics of

9  Powder Springs are.  I just remember that that's

10 one area that's kind of racially mixed and diverse.

11     Q.   You just have a general sense of --

12     A.   Yeah.

13     Q.   -- which area -- of the diversity and

14 population in --

15     A.   Yeah.

16     Q.   -- different areas?

17     A.   So Powder Springs I probably kept intact

18 in one district.  And like, when I saw a

19 municipality -- and, like, in Cobb County, you've

20 got Marietta, you've got Smyrna, and I tried to

21 keep them together.

22           In the case of Marietta, it's complicated

23 because there's the Dobbins Air Force Base.  So

24 you've got this big population center in Marietta.

25     Q.   So when you say the maps are blind, that

1  doesn't mean that they were drawn with no awareness

2  at all of the racial composition of different areas

3  in the state?

4      A.   I would say it's pretty low awareness.  I

5  mean, I know generally, like, north, south, east,

6  west.  And you know, when I look at something more

7  specifically, I can pinpoint and say, there's this

8  and there's that.

9          But in general, it's just general

10  knowledge.  I, you know, I -- like, I don't know

11  what the specifics of, say, Henry County is off the

12  top of my head.  I can look at it.  But when I was

13  drawing the plan, I wasn't looking and taking that

14  into consideration.

15      Q.   So moving to Paragraph 25, you say you

16  "started drawing some districts in the northwestern

17  Georgia."  Maybe that's my typo or yours.  I think

18  it's yours.

19      A.   I probably should have said region.

20      Q.   Sure.  In any case, and then you

21  "proceeded into the metro Atlanta area."  Why'd

22  you -- why did you start that way?

23      A.   That's where I started.

24      Q.   Someone could start somewhere else?

25      A.   Sure.

1      Q.   Why not start with Atlanta where you have

2   the greatest population density, you know,

3   greatest -- you know, largest counties, largest

4   numbers of counties per -- or districts per county?

5   Why not start there?

6      A.   It's not in a corner.

7      Q.   You want to start in a corner?

8      A.   Oftentimes people will start in a corner.

9      Q.   Why is that?

10     A.   Because you build out from a corner

11  sometimes.  You could do the opposite and start in

12  the center and build, like, concentric rings out

13  maybe.  But starting in a corner is something that

14  people often do.

15     Q.   Do you start in the corner because you

16  have fewer ripple effects?

17     A.   I've never heard it described that way.

18     Q.   Okay.  So start in the corner or start in

19  the center, two different ways of doing it?

20     A.   Yeah.  I guess that's one way to look at

21  it.

22     Q.   And you picked start in the corner?

23     A.   Yeah.

24     Q.   And you say:

25          [As read]  "Having looked at the

1          ratios of H.D.s per county, I was

2          aware that some counties could be

3          subdivided evenly into districts

4          within the population deviation (such

5          as Henry and Fayette)."

6          So you determined at the outset that you

7     were going to draw Henry and Fayette, for example,

8     districts only within the county lines?

9          A.   I didn't determine that at the outset.  I

10    knew it was possible to do it, and so I would see

11    where I was when I got there.  And I would hold

12    those aside saying, well, I can do it, maybe I

13    will, maybe I won't, but I did.

14         Q.   And then you say -- and you did in this

15    case?

16         A.   Yeah.

17         Q.   Okay.  So it's like a -- there's a

18    default, like a presumption that you will do that?

19         A.   It's -- well, again, I just acknowledged

20    that it's possible.  So that's when I -- I look at

21    the whole number idea, and that's one way to keep a

22    county split from happening is just to not split.

23         There may be a reason to split, you know,

24    something that's exactly an ideal district.

25         Q.   Okay.

1        A.   And I may have done that somewhere in this

2   plan.  I'd have to look in detail to see if that

3   was happen -- if that happened.

4        Q.   And then you say:

5             [As read]  "Other counties had a

6              little more population in a district,

7              so those could be kept relatively

8              intact while assigning surplus

9              population to a nearby seat."

10             So maybe you split it just once?

11        A.   Yeah.

12        Q.   Okay.  And then in terms of the order, you

13   say that you did northwest Georgia, Atlanta, then

14   you drew some districts in coastal Georgia,

15   southwest Georgia, central Georgia, completed metro

16   Atlanta, and then you did the rest of the state?

17        A.   Generally, that's what I ended up doing,

18   yes.

19        Q.   So you did met -- so metro Atlanta was

20   sort of last in this?

21        A.   Well, yes and no.  I mean, it was last in

22   the sense that I knew that these were larger

23   populations and you had a whole number of

24   districts, a lot of them in some of these larger

25   counties.  So there's more allowance with a larger

1   number of districts.

2          So if you have six -- let's say you have

3   ten districts, each one could be 1 percent over.

4   So you could have, you know, 10.1 percent pop -- or

5   you know, 10.5 percent, 10.6 percent or point

6   zero -- 5.06.

7      Q.   Are you familiar with the phenomenon -- or

8   with the term "ripple effects"?  I just used it

9   earlier but I should have asked you then.

10     A.   I mean, I hear people talk about it all

11  the time, but in this context you haven't defined

12  what you're asking me to opine about.

13     Q.   Are you familiar with the term "ripple

14  effects" in the mapping context?

15     A.   I think it's used in many different ways.

16     Q.   Do you use it?

17     A.   Yeah.  You can say that, if you make a

18  change in this area, it's going to affect something

19  else.  In that sense it could be a ripple effect.

20  But it's not only that.

21     Q.   Do you have a sense of what the ripple

22  effects were of starting your districts or doing

23  districts in northwest Georgia and southwest

24  Georgia and coastal Georgia and then coming back to

25  the metro area?

1      A.   I don't think there really would be one as

2   I describe it, because in the sense -- since I'm

3   looking at the whole population, I will have a

4   pretty good sense of how many total districts there

5   would be in the area that I was looking at.

6           So if I know that there are ten districts

7   in this area, then there's still going to be ten

8   districts there.  And if I borrow a little

9   population from that region to use in another

10  region, then it'll be slightly less than ten.

11     Q.   So in Paragraph 26, which is on Page 14,

12  you say you then, after completing your

13  illustrative plan, you looked at the enacted plan,

14  you renumbered the districts?

15     A.   Yes.

16     Q.   Just is that sort of eyeballing it,

17  basically?

18     A.   Yeah.  What I would do is, when you draw

19  the districts, you can pick any numbering system

20  you want.  You can do letters.  You can do names.

21  You have probably 12 to 15 characters you can use

22  to name a district.

23          So for example, if I was going to draw

24  Fayette County, I could do Fayette 1, Fayette 2.

25  And I could come back later and say that should be

1    renumbered as District 39 and District 40 or

2    something like that.

3         Q.   So -- okay.  Let's turn to the analysis

4    starting at Paragraph 27 on Page 16 of your report.

5    You say that, once your plan is done, you copied

6    the plan and then added in census racial data?

7         A.   Yes.

8         Q.   What does it mean to copy the plan?

9         A.   I made a copy of the plan.

10        Q.   Okay.

11        A.   So it was illustrative plan one, and then

12   I made a copy of illustrative plan one.

13        Q.   All right.  And then you ran a series of

14   reports on those metrics that are reflected in your

15   chart one?

16        A.   Yes.

17        Q.   You say you ran county splits, precinct

18   splits, compactness scores, paired incumbents,

19   number of majority black voting age percentage

20   black districts; is that right?

21        A.   Yes.

22        Q.   Did you do any other reports?

23        A.   I don't think so.

24        Q.   Okay.  Did you look at municipal splits?

25        A.   No.

1          Q.   Why not?

2          A.   I hadn't done that in any other report to

3     date.

4          Q.   You took the time to, you know -- well,

5     not took the time.  Strike that.

6               You looked at municipalities in order to

7     consider, you know, communities of interest, but

8     then you didn't look at municipal splits?

9          A.   No.  Definitely not.  And as I said

10    before, in the case of the municipal boundaries, in

11    some cases the voting districts were adhered to

12    more than the municipal boundaries.

13              So you know, if I had a circumstance where

14    I could use voting districts to contain a community

15    or to, you know, follow through on that identified

16    community, then I could do that, too.

17         Q.   Okay.  When you look at -- when you -- and

18    we're looking now at your chart one here on 17,

19    which appears to summarize the reports that you

20    ran, why do you look at these metrics?

21         A.   Which metrics?

22         Q.   Why do you look at the metrics that you

23    have reflected here in chart one?

24         A.   They're metrics I've looked at in

25    analyzing some of the other plans.  It seemed

1    appropriate to look at them here.

2        Q.   Is it fair to say that you look at them to

3    determine whether a plan -- or to assess whether a

4    plan is consistent with traditional districting

5    principles?

6        A.   These are metrics you can look at, and you

7    can look at it in that light, sure.

8        Q.   Do you use these metrics to form a view

9    about whether or not an overall plan is consistent

10   with traditional districting principles?

11       A.   I don't think it tells the whole story,

12   but these are metrics that are easy to run and easy

13   to display.

14       Q.   Do you have a view about whether Georgia's

15   2021 enacted plan is consistent with traditional

16   districting principles?

17       A.   It probably is from this point of view.  I

18   haven't done a thorough analysis on it.  I wasn't

19   asked to do that.

20       Q.   So in looking at chart one, you mention

21   county splits.  And is that total splits or just

22   the number of split counties?

23       A.   So in this context it's the number of

24   split counties.  You could have a county -- a

25   circumstance where a county is subdivided more than

1    once.  And in that sense, you could count it a
2    different way.  You could count number of divisions
3    of a county as opposed to just is it split or not
4    split.
5              And there's another question.  Like, how
6    do you handle the case of Fayette County?  Is
7    Fayette County split?  Well, there's two districts
8    in the plan that I drew that are entirely within
9    Fayette County.
10             So the county boundary is not split.  It's
11   just internally split into two pieces.  So one
12   district is north Fayette, one district south
13   Fayette.  Is it a split county?  I guess so.  But
14   it's just a slightly different way of looking at it
15   than if it was part of Fayette County and part of
16   another county.
17             So there's another -- you can look at it
18   another way, sure.
19        Q.   What does looking at overall county splits
20   tell you about a plan?
21        A.   It shows whether a plan is adhering to
22   county splits or is keeping that consistent, or you
23   look at how many times a county is split.  What
24   does it tell me?  It tells me that the map was
25   splitting more or less.  Different plans split more

1    or less counties.

2         Q.   But as someone who's evaluating a map,

3    what does it -- what does the number of county

4    splits tell you about that map?

5         A.   Well, if you are considering county splits

6    and precinct splits to some extent as keeping them

7    whole as a traditional factor, then if you have

8    more splits, it would seem to depart more from the

9    traditional criteria.

10        Q.   And you also -- next you have voting

11   precinct splits, also sometimes referred to as

12   V.T.D. splits.  What does that tell you about a

13   plan when you're assessing a plan?

14        A.   It can tell you a lot of information.  You

15   can look in more detail about how a voting precinct

16   was split.  Some people do that kind of analysis.

17   They'll say, well, how did you split these

18   precincts?

19             But at this level, it's just a top line

20   description of how many were split.  So it's just

21   another metric that you can provide for the entire

22   plan.

23        Q.   And the next two are mean compactness

24   Reock and mean compactness Polsby-Popper.  What do

25   looking at those mean compactness numbers tell you

1    about a plan?

2         A.    Well, again, it's just a top level single

3    number that you can look at and compare one plan to

4    another.  It doesn't tell every aspect of the plan,

5    but it's just, it's the top line metric that many

6    people will look at.

7         Q.    And looking, for example, at -- well, let

8    me strike that.

9              Do you view looking at mean compactness as

10   an important consideration in assessing a plan?

11        A.    I would say it's something I would look

12   at.  Because if -- it's a starting point.  So you

13   can look at it and then decide you want to look in

14   more detail.

15             For example, you could end up with a mean

16   but the distribution is very different.  Like, if

17   most of your districts are pretty close to that

18   mean, then most of your plan is going to be that

19   same compactness.  But you could have wild

20   variations and still have a different -- or you

21   know, similar mean.

22        Q.    I suppose that's why it's helpful to look

23   at min and max as well as mean?

24        A.    That's possible, yeah.  And those are

25   available in the reports in -- that I provided in

1    the other reports.

2        Q.   And you know, just looking at the mean

3    Reock, it's point 45 versus point 39.  Is that a

4    big difference?

5        A.   It's a point 06 difference.

6        Q.   Is that a significant, substantial

7    difference?

8        A.   I don't know.  I mean, the number of

9    compactness is a relative thing here, so it's --

10   one is more compact on the mean than the other.

11       Q.   But is it much more compact or just a

12   little bit more?

13       A.   I don't have a very easy way to discern

14   that.

15       Q.   I mean, I'm asking you as an expert in

16   mapping.

17       A.   Sure.  In this case it seems pretty

18   substantial if you take an average or the mean of

19   180 districts.  That seems like a -- the six point

20   difference, it's not point, but point 06

21   difference, it seems like something.

22       Q.   How about point 33 versus point 28 mean

23   Polsby-Popper?

24       A.   Yeah, that's point 05.  You know, I mean,

25   it's -- five, six are close to each other.  Is six

1    higher than five?  Yes.  You know, they're not that

2    far apart, but there is a difference.

3        Q.   Okay.  So still on chart one but

4    continuing down and looking at this paired

5    incumbents number, 74 paired incumbents --

6        A.   Yeah.

7        Q.   -- out of 180 total representatives; is

8    that right?

9        A.   Yeah.

10        Q.   So over a third of the legislature is

11    paired --

12        A.   Yeah.

13        Q.   -- in your map?

14        A.   That's right.

15        Q.   Seems like a lot more pairing.  74 versus

16    20 is a significant difference --

17        A.   Yes.

18        Q.   -- more than three times the number of

19    paired --

20        A.   Sure.

21        Q.   -- incumbents.

22             And next, looking at black majority

23    districts, we have a decrease of 14 out of 49.  So

24    that's a 30 percent decrease almost; is that right?

25        A.   Yeah.

1      Q.   But there are ten seats that are now 80 or

2   90 percent plus B.V.A.P.  When I say B.V.A.P., I

3   mean black voting age percentage.  So in the

4   enacted map, there are no seats that are over

5   80 percent B.V.A.P., and in yours there's ten of

6   them?

7      A.   Yes.

8      Q.   So your illustrative map concentrates the

9   black population into fewer black majority

10  districts that are more homogenously black?

11     A.   Based on your terminology as I understand

12  it, yes.

13     Q.   Would you say that your map complies with

14  the state guidelines that we talked about earlier,

15  the Georgia state guidelines?  I think they're

16  marked as --

17          MR. ZABEL:  Exhibit 3.

18  BY MR. SAVITZKY:

19     Q.   -- Exhibit 3.

20     A.   I didn't analyze that before, so I haven't

21  looked at that and considered that.

22     Q.   Okay.  As you sit here today, would you

23  say that it complies with these guidelines?

24     A.   I would have to look in more detail at it

25  point by point.

1      Q.   Recognizing that one requirement is that

2   all plans comply with Section 2 of the Voting

3   Rights Act, would you say that your plan complies

4   with the guidelines?

5           MR. TYSON:  I'll object to form.

6           THE WITNESS:  I don't know how to

7       determine compliance in that regard.

8   BY MR. SAVITZKY:

9      Q.   So let's look at Paragraph 28 here.  And

10   you have this region one analysis starting in

11   Paragraph 28.  You say:

12           "Region one consists primarily of

13        DeKalb, Clayton, Henry, Rockdale,

14        Newton and Walton Counties."

15           Can you describe, like, what are the exact

16   parameters of this region that you've defined here?

17      A.   I just defined it.

18      Q.   Well, you say primarily, so what do you

19   mean by "primarily"?

20      A.   Well, if you look at the next page,

21   there's a map, and most of the districts cover all

22   of the territory of DeKalb, Clayton, Henry, Newton,

23   Rockdale and Walton.

24      Q.   So is the region that you're talking about

25   defined by the districts that you selected?

1      A.   No.  Because I'm saying it's primarily.

2   It's primarily those counties.  And you'll see that

3   a little piece of Fulton is in one of those

4   districts.

5      Q.   Right.  I -- maybe I should rephrase the

6   question.  It -- when you talk about region one,

7   region one is just the area within the boundaries

8   of the districts that you selected; is that right?

9      A.   No.  Because I'm comparing this region

10   one, which is primarily DeKalb, Clayton, Henry,

11   Newton, Rockdale and Walton, and then I'm using a

12   similar region that's not exactly the same in

13   another comparison.  And I would say that --

14      Q.   Well, what's the difference between the

15   two regions?

16      A.   The difference is that, in the real world

17   example of these two plans, they do not follow the

18   county boundaries exactly.

19      Q.   I guess I just mean, in terms of the

20   specific area, when you talk about, like, here's

21   the mean compactness for this region, the region

22   isn't made up of counties, it's made up of

23   districts?

24      A.   In this sense it's made up of the portions

25   of those county populations that are in those

1    districts in the illustrative plan and the enacted

2    plan.  They're not -- it's not a direct overlap.

3    It clearly is --

4         Q.   Right.

5         A.   -- not, and nor was it intended to be.

6         Q.   Right.  Understood that your region one,

7    you have your illustrative plan region one and your

8    enacted plan region one, they're slightly

9    different.

10        A.   Yes.

11        Q.   And in both cases they're made up of a set

12   of districts that you selected.

13        A.   Okay.

14        Q.   Is that -- do I have it right?  I just

15   want to make sure I understand.

16        A.   It seems to be that way.  I mean, I said

17   it's primarily those counties.  And you'll see

18   that, in some cases, there's other cases, like

19   Gwinnett, in the enacted plan.

20        Q.   Right.  So in the enacted plan, there's a

21   little piece of Gwinnett that's in enacted District

22   111 and, therefore, it's included in your region?

23        A.   Yes.

24        Q.   So again, what I'm trying to make sure

25   is -- not primarily, but precisely, the precise

1   boundaries of these districts are defined by -- or

2   the precise boundaries of these regions are defined

3   by the districts that you selected?

4       A.   Well, I define them by the counties that

5   have the -- primarily those counties have those

6   populations.  There are some instances where the

7   districts go outside of those boundaries.

8       Q.   I guess I'm just -- you know, when we talk

9   about the compactness scores for the regions, what

10  you're doing there is you're taking the mean

11  compactness score of a set of districts that you

12  chose?

13      A.   Yes.

14      Q.   Okay.  So in that sense, the region is

15  comprised of a set of districts?

16      A.   Well, that's not how I identified it in

17  the report.

18      Q.   I understand.  But I'm trying to get to a

19  precise definition of what these regions are.

20      A.   Okay.  Well, I gave the definition that I

21  gave in my report.

22      Q.   Okay.  But looking at the images here,

23  would you say that the colored portions are -- this

24  is -- the colored districts here are your region

25  one for the illustrative?

1        A.    I would say that those are the districts

2    that are in the region that's defined primarily by

3    those counties.

4            And I would say that, for example, that

5    one district in -- that has a portion of Fulton

6    County, I suppose it would have been possible to

7    take out that portion of Fulton County, but then

8    that wouldn't be a complete district.

9        Q.    All right.  Okay.  I think I understand.

10           How did you choose the districts that

11   you've put in these regions?

12       A.    I looked at the counties that I chose, and

13   I looked at the districts that principally overlap

14   in those areas.

15       Q.    And how did you choose the counties that

16   you put in these regions?

17       A.    Those were the counties that I chose.  I

18   didn't choose them for a specific reason.

19       Q.    You just randomly selected counties?

20       A.    No, I didn't say they were randomly

21   selected.  I just said I didn't choose them for a

22   particular region.  They're clearly associated by

23   their proximity.

24       Q.    Okay.  But why not choose other counties

25   that are also proximate?

1      A.    I didn't.

2      Q.    But so on what basis did you select these

3   particular proximate counties?

4      A.    These were the areas that I was going to

5   compare.

6      Q.    Why were these the areas that you were

7   going to compare?

8      A.    These were the ones that I chose.  I --

9   this is the area.  There's differences between the

10   districts in terms of the shape of the districts.

11      Q.    I'm just trying to understand why you

12   focused on these particular counties and not any

13   other counties.

14      A.    Well, I tried to align the districts

15   between the two plans and in this county area,

16   these -- principally in these counties.

17      Q.    All right.  So you don't have a reason why

18   you chose these counties in particular?

19      A.    Not specifically.

20      Q.    Okay.  But you didn't select them

21   randomly?

22      A.    They're proximate, like you said and like

23   I said.

24      Q.    Why didn't you put Fayette County in

25   there?

1      A.    I could have, but I didn't.

2      Q.    Why not?

3      A.    I didn't do that.

4      Q.    Why not put Gwinnett County in there?

5      A.    It's a lot more districts to include.

6      Q.    So was your idea that these areas would

7   have roughly equal populations between the

8   illustrative and the enacted region ones?

9      A.    Not necessarily.  The counties have the

10  same population.  I don't know that the districts

11  do.  And I think I was pretty clear I was looking

12  at the districts in that same general area.

13          They don't align exactly, and they

14  wouldn't -- it wouldn't be likely to do that,

15  although it's possible, I suppose.

16     Q.    Is it supposed to be the same number of

17  districts?

18     A.    It's not always the same number of

19  districts.

20     Q.    Okay.

21     A.    I'm trying to look at the treatment of a

22  region.  I don't know.  I think in some cases it

23  was the same number of districts, in some cases it

24  wasn't.  But it's pretty close.  Visually it's

25  roughly the same area.

1      Q.    Okay.  So that's -- the reason why you

2   have 27 districts in one and 28 in the other is

3   because you're just trying to get a sense of the

4   region?

5      A.    It's in terms of coverage.  I mean, I

6   suppose I could add an additional district from one

7   into the other so that they're both 28, but I

8   didn't do that.

9      Q.    So if you had picked a different set of

10  counties, would the result of your analysis be

11  different?

12     A.    I don't know.  I didn't pick a different

13  set of counties.  I have no idea.

14     Q.    If you had put Gwinnett in, taken Clayton

15  out, I don't know, would it be a different result?

16     A.    I didn't do that.  I don't know.

17     Q.    So look at map four on Page 20.  You've

18  got a big chunk of Newton County not included?

19     A.    Yeah.

20     Q.    You've got chunks of Henry County that are

21  not included?

22     A.    Yeah.  There are two chunks of Henry that

23  are not included, that's correct.

24     Q.    Did you do any type of core constituency

25  analysis to determine the level of overlap between

1    the districts -- the group of districts that you

2    assessed for enacted region one and the group of

3    districts you assessed for illustrative region one?

4         A.    No.

5         Q.    Is there any empirical basis for choosing

6    this particular set of districts?

7         A.    Well, they cover pretty close to the same

8    geographic area.

9         Q.    So it's just rough, rough geographic area

10   in the counties you've selected?

11        A.    Well, let's see.  In this case all of

12   DeKalb County is accounted for, all of Clayton,

13   most of Henry, all of Rockdale.  In the case of the

14   enacted plan, all of Walton but not Newton and not

15   Henry.  And in the other case, it's only missing a

16   portion of Walton.

17             So it could be that, looking at the

18   illustrative plan and establishing that coverage,

19   and then looking at the enacted plan and looking at

20   the same relative coverage area, and those are the

21   districts that overlap.

22        Q.    Do you know the overall demographics of

23   the set of counties that you chose?

24        A.    In what sense?

25        Q.    Do you know the racial demographics of the

1    counties you chose?

2         A.   I have some knowledge of them, yeah.  I

3    would say that most of these have some black

4    population.  I suppose maybe not Walton it is not a

5    majority, but.  And I don't know if Newton is.  It

6    might be.  I'd have to look it up.

7         Q.   So looking back at Paragraph 28, you say

8    that the districts in region one look, I think you

9    say elongated, quote, elongated in the enacted map

10   compared to the ones in the illustrative.

11            Do I have that right?

12        A.   Yeah, that's what it says.

13        Q.   Do you -- are the districts enacted by the

14   State of Georgia not reasonably compact?

15        A.   I didn't say that in the report.

16        Q.   And that's not your conclusion?

17        A.   No, it's not my conclusion.

18        Q.   Okay.  So looking at Paragraph 29 on Page

19   20, you say:

20            "The contrast in compactness leads

21        one to ask why these maps of the

22        region are so different."

23            And by "the contrast," do you mean a mean

24   difference of point 04 Reock and point 05

25   Polsby-Popper?

1      A.    No.  I listed the individual compactness
2    scores of all of the districts.
3      Q.    Okay.  And that's what you're referring to
4    when you talk about the contrast in compactness?
5      A.    In general, yes.
6      Q.    And then you say "There may be many
7    causes" for why the regions are so different.  Do
8    you still agree with that?
9      A.    I'm sure there could be.
10     Q.    You mean -- do you mean that there may be
11   many causes for why -- well, sorry.  Strike that.
12          What are some of the many causes that
13   you're referring to here?
14     A.    I didn't identify them.
15     Q.    Are you able to identify them now?
16     A.    I didn't look at that in this report.
17     Q.    Could one of those causes be avoiding
18   pairing incumbents?
19     A.    I suppose.
20     Q.    Could one of those causes be retaining
21   district corridors and continuity of
22   representation?
23     A.    That's possible.
24     Q.    Could one of those causes be various
25   community of interest factors that weren't

1    considered?

2         A.    I suppose so.

3         Q.    Could one of those causes be constituent

4    feedback during the constituent sessions in the

5    redistricting process?

6         A.    That's possible, I suppose.

7         Q.    Could one of them be compliance with the

8    Voting Rights Act?

9         A.    I suppose that's possible.

10        Q.    Could one cause be the individual

11   balancing decisions of different map drawers?

12        A.    I suppose so.  There's many possibilities,

13   I'm sure.

14        Q.    So in Paragraph 30 starting on 22, you

15   say:

16             "Looking at some specific

17        districts shows that the compactness

18        of those districts is lowered by

19        apparent effort to create more

20        majority black districts."

21             And then you look at one set of districts,

22   you compare one set, your illustrative 90 versus

23   enacted house District 89.  And you say that the

24   enacted district is more elongated but your

25   district is more compact.

1          Do I have that assessment correct?

2     A.    Which one are we looking at?

3     Q.    Looking at your Paragraph 30 --

4     A.    Illustrative plan District 90 --

5     Q.    Uh-huh.

6     A.    -- and comparing it to enacted 89.

7     Q.    Yeah.

8     A.    Okay.

9     Q.    Why did you pick those two districts to

10 compare?

11    A.    I'm sorry.  I wasn't sure if you had asked

12 me a question.  You're asking me another question

13 before I answered the question.

14    Q.    Oh, I'm sorry.  Go ahead.

15    A.    Okay.  So is -- I'm having a little

16 trouble reading it.  It says 90, this grey one on

17 the illustrative plan.  Does that look right?

18        MR. TYSON:  Yes.

19        THE WITNESS:  Okay.  So that's in

20    southern DeKalb.  All right.

21 BY MR. SAVITZKY:

22    Q.    Uh-huh.

23    A.    And then we're looking at 89 in the

24 enacted?

25    Q.    Uh-huh.

1      A.    And which one is that?  That's the brown
2    colored one?
3           MR. TYSON:  Uh-huh.
4           THE WITNESS:  Okay.  Yeah.  Okay.
5      Yeah.
6    BY MR. SAVITZKY:
7      Q.    Why'd you compare those two districts?
8      A.    Because they're both in southern DeKalb.
9    And as I said, one is more elongated than the
10   other.
11     Q.    Okay.  But why not compare District 90 to
12   District 90?
13     A.    Well, District 90's not as elongated.
14   There's a contrast in the elongation between 90 and
15   91.
16     Q.    So you picked the contrast between 89 and
17   90 because you wanted to pick an elongated, more
18   elongated district in the enacted map?
19     A.    Well, it's visually apparent.  And so we
20   have the statistics here as well that one is more
21   elongated than the other.  I suppose you could pick
22   90, but I picked 90 and 89.
23     Q.    Did you do any other one-to-one comparison
24   in this analysis?
25     A.    I'd have to look.  I think so.

1      Q.   In your region one analysis?

2      A.   Not in the region one, no.

3      Q.   Okay.  And just looking, you know,

4  briefly -- actually, that's fine.

5      A.   Okay.  Can we take a break for a moment?

6      Q.   Sure.

7      A.   Okay.

8      Q.   This is a good place.

9           THE VIDEOGRAPHER:  Off the video

10      record at 2:12 p.m.

11           (Whereupon, a discussion ensued

12       off the record.)

13           (Whereupon, there was a brief

14       recess.)

15           THE VIDEOGRAPHER:  Back on the video

16      record at 2:23 p.m.

17  BY MR. SAVITZKY:

18      Q.   Hello again.

19           Staying on Paragraph 30 of your report,

20  and we're in your December 5th report here, and

21  towards the tail end of the paragraph, you say:

22           [As read]  "Looking at the

23       individual district data in the

24       region -- in region one, the house

25       enacted plan has more majority black

1           districts and they are less compact

2            than the districts in the house

3            illustrative plan."

4                Do I have that right?

5       A.    Yeah.

6       Q.    And you draw five fewer black majority

7   districts in this region?

8       A.    Probably.  And maybe I can count.  So this

9   is one, two, three, four, five, six, seven, eight,

10  nine, ten, 11, 12, 13, 14, 15 -- 17, 18, 19, 20.

11               Yeah, I think that's right.  It looks like

12  15 and five --

13      Q.    Okay.

14      A.    -- or 15 and 20 --

15      Q.    Uh-huh.

16      A.    -- I think.

17      Q.    So a 25 percent reduction in the number of

18  black majority districts in this area of the

19  Atlanta metro?

20      A.    If you look at it that way, sure.

21      Q.    And when you say that they are less

22  compact, do you mean the black majority districts

23  are less compact or all the districts in this area?

24  What are you referring to there?

25      A.    I think all of them.  I mean, I'd have to

1    look at them more carefully.  But I think if we

2    look at them all -- and then there's the average,

3    which is another way to express that a little bit.

4         Q.   You're referring to the mean compactness

5    scores that you report on Page 18 of your report?

6         A.   Yes.

7         Q.   So the reduction of five, the elimination

8    of five majority black districts, black majority

9    districts, and -- strike that.

10             The districts in your illustrative plan

11   one region are more compact by point 04 Reock and

12   point 05 Polsby-Popper?

13        A.   Oh, region one.  I'm sorry.  I was looking

14   at region two.

15             Yeah, it looks that way.  And that's as

16   the whole region, so that's including all of those

17   districts in that region.

18        Q.   Right.  And you only looked at -- you only

19   did one sort of one-to-one comparison?

20        A.   Yeah.  There was one example in that way,

21   yeah.

22        Q.   Of the two that you selected?

23        A.   Yeah.  We talked about that.

24        Q.   Yep.  So and then you conclude:

25             [As read]  "...the creation of

1              additional black majority districts in

2              region one led [sic] to lower

3              compactness scores in this region."

4                   What's the basis for your conclusion about

5        this causal effect?

6        A.    Well, as I described, the districts in the

7        enacted plan are more elongated, particularly in

8        DeKalb County, and also Rockdale for sure, and in

9        other areas as well.

10       Q.    And any other basis other than what you

11       just said for your conclusion?

12       A.    Well, there are the compactness scores,

13       and then there's the -- I'm looking at them

14       visually as well.

15       Q.    Well, I'm not asking whether they are less

16       compact.  I'm asking about your conclusion that the

17       creation of additional black majority districts led

18       to lower compactness scores.

19       A.    They're --

20       Q.    You're making a causal assertion, so I'm

21       asking what the basis is for the assertion about

22       cause.

23       A.    Okay.  I mean, that's what I said.  And it

24       appears that some of the districts in the enacted

25       plan are substantially lower on the black

1   population.  And so I would say that lowering the
2   concentration of black population in a district or
3   creating more districts -- and creating more
4   districts is a reason for that.
5        Q.   Well, I guess so are you saying the fact
6   that there are fewer black majority districts in
7   your illustrative plan means that the creation of
8   more districts must have caused differences in
9   compactness?
10       A.   Well, if you start with the illustrative
11  plan.  Which I followed a consistent methodology
12  through the entire map drawing process, and I've
13  created districts that are compact that are based
14  on communities of interest as I was able to define
15  them and show them.  I created those districts.
16            And then in the enacted plan, it's a
17  different set-up in that area.  And I would say
18  that, in the enacted plan, the districts that
19  were -- sorry, the areas that had very high
20  concentrations of black population in a district in
21  the illustrative plan are lower in their
22  percentages and there are more districts, more
23  black districts.
24       Q.   Any other basis for your causal connection
25  there other than what you've said already?

1      A.   Well, I provide the data for each district

2   here, so that's what I said in the report.

3      Q.   Okay.  I just want to look at your region

4   two analysis starting at Paragraph 31.  You say:

5           "Region two consists primarily of

6            Fulton, Douglas, Coweta, Fayette and

7            Spalding Counties."

8           Is that right?

9      A.   Yeah.  Coweta, Fayette, Spalding.

10     Q.   All right.  And so you basically are

11  looking at those counties and just picking

12  districts that lie within them and then comparing?

13     A.   Yes.

14     Q.   Okay.  I think I finally got -- I finally

15  got that.

16          Is there any empirical basis you have for

17  choosing this particular set of districts here?

18     A.   Well, again, these are the counties that

19  are associated with each other.  For example, in

20  the enacted plan you'll see that the district

21  crossed from Fulton into Douglas.  Right?  So in

22  the enacted plan, Douglas and Fulton are

23  intertwined.

24          And in my illustrative plan, that's not

25  the case.  Fulton, I don't have a district crossing

1    from Fulton into Douglas.  But in the enacted plan,

2    Douglas and Fulton are associated.

3            So I suppose I could have taken Douglas

4    out completely.  But then you would have these two

5    districts in the enacted plan, and again, I can't

6    quite read them, but it's the red district in

7    Fulton -- maybe that's, is it 65 on the enacted

8    plan on Page 26?

9        Q.   Yeah.

10       A.   And then I think it's 61 to the north

11   there.  So in the enacted plan, those counties are

12   clearly intertwined and associated.  And the same

13   thing is true here with Coweta where the enacted

14   plan has Fulton, Coweta in two different districts.

15   And then you also have Fayette to Coweta.

16           And then here in the illustrative plan,

17   again, I suppose I could have kept Fayette out of

18   it, but it's the interplay between the two plans.

19   So in the enacted plan, Fayette, Coweta are

20   associated, and Fulton and Douglas are associated,

21   so that's one of the reasons that I would associate

22   those.  They're connected.  They're intertwined.

23       Q.   Any other reasons why you picked this

24   particular set of counties?

25       A.    I think it had a similar number of

1   districts.  I mean, I think there were fewer in

2   this region than the previous region, but not by

3   much.

4        Q.   Did you do any core constituency analysis

5   to determine the precise overlap between the set of

6   districts in your illustrative region two and the

7   enacted region two?

8        A.   No.  I did not compare the core

9   constituency between these two plans, but I suppose

10  that's something that could be done.

11       Q.   So looking at Paragraph 32 of your report,

12  you again say, you say:

13            [As read]  "...the maps in region

14       two show a contrast between the

15       illustrative and the enacted plan with

16       respect to compactness."

17            Is that a fair statement of your

18  assessment of these two maps?

19       A.   I think that's pretty close to what I said

20  in the report, yes.

21       Q.   And then you say there may be many causes

22  for the differences one sees between the enacted

23  and the illustrative map that you draw; right?

24       A.   Yeah.

25       Q.   Could one of those causes be avoiding

1    pairing incumbents?

2        A.    I suppose so.

3        Q.    Could one of those causes be retaining

4    district cores and continuity of representation?

5        A.    In the -- this region one it was the case.

6    It's probably the case here, too, that it could be

7    that.

8        Q.    Could all of the different causes that we

9    mentioned, we talked about in region one, also be

10   the causes for the differences we see with respect

11   to region two on compactness?

12            I can list them if it's easier.

13       A.    No.  I'm just looking at the two maps.

14            (Whereupon, the document was

15         reviewed by the witness.)

16            THE WITNESS:  Yeah, it's just, it's

17        striking the visual contrast between

18        Fulton County in the illustrative plan and

19        the enacted plan especially.

20            But yeah, I think so.  I think that's

21        similar as we discussed in region one.

22   BY MR. SAVITZKY:

23       Q.    Okay.  Could one of the causes of the

24   differences be consideration of various communities

25   of interest factors?

1      A.    I suppose that's possible.

2      Q.    Could one be constituent feedback from the

3  redistricting process?

4      A.    I suppose that's possible.

5      Q.    Could one be V.R.A. compliance?

6      A.    I suppose that's possible.  And I think

7  that is covered in what I'm saying here, too, in

8  some sense.

9      Q.    What do you mean?  What sense?

10     A.    Well, you could say that there's racial

11 considerations, and V.R.A. compliance could be

12 linked.

13     Q.    How so?

14     A.    Well, you were saying that, if I was

15 drawing a plan that was race blind, and the enacted

16 plan seems to have taken race into consideration,

17 and those seem to be connected.

18     Q.    Could one cause for the differences we see

19 be -- in region two be the individual balancing

20 decisions of different map drawers?

21     A.    I suppose.

22     Q.    So then you say you looked at some

23 specific districts, and you looked at District 59

24 in the illustrative and the enacted plans on

25 page -- and this is Page 29, Paragraph 33.

1      A.    Uh-huh.

2      Q.    Did you look at any other individual

3   head-to-head comparisons or just District 59 for

4   region two?

5      A.    Well, I mean, there's a chart.  You can

6   look at them here.  They're all here.  I reported

7   the information on all of the districts that are in

8   the region as defined.

9      Q.    Did you discuss any other head-to-head

10   comparisons in your report?

11      A.    No.  The report verbally describes what's

12   in the table in one instance.

13      Q.    Do you know how much District 59 in your

14   illustrative map and District 59 in the enacted map

15   overlap with each other?

16      A.    In what sense?

17      Q.    Do you know what their geographic and

18   population overlap is?

19      A.    No.  I said I did not run the core

20   constituency comparisons.

21      Q.    Do you know whether they are the most

22   alike districts when it comes to core

23   constituencies, whether there's a better comparison

24   that could have been made?

25      A.    A better comparison?

1      Q.   One that more accurately reflects the
2   population.
3      A.   I'm not sure I understand.
4      Q.   My question is, is -- are 59 and 59 the
5   right comparators or is there another set of
6   comparators that overlap more tightly?
7      A.   There's 25 or 26 districts.  You can
8   compare any one of them.
9      Q.   In your view you can compare any of these
10  districts?
11     A.   No.  I chose ones that were in the same
12  general area.
13     Q.   You chose ones in the same general area
14  with --
15     A.   Same geographic area, yeah.  I, as I said,
16  I didn't run the constituency comparison reports.
17  I suppose I could have done that.
18     Q.   Okay.  Do you know whether enacted
19  District 59 was drawn the way it was in order to
20  avoid pairing incumbents?
21     A.   No.
22     Q.   Do you know how many incumbents you pair
23  in your map in Fulton County?
24     A.   No.
25     Q.   You say drawing a more compact district in

1    Fulton County "can yield a district with very high

2    black percentages."

3              Is it possible that one could draw a more

4    compact district in Fulton County with a B.V.A.P.,

5    or black voting age percentage, that's close to the

6    percentage in the enacted map?

7         A.    I'm sorry.   There are a lot of parts to

8    that question.   So could you repeat that, please?

9         Q.    You say drawing a more compact district in

10   Fulton County "can yield a district with very high

11   black percentages."

12        A.    Yes.   Okay.

13        Q.    Can drawing a more compact district in

14   Fulton County also yield a district that does not

15   have very high black percentages?

16        A.    Sure.   In the northern part of the county,

17   that's clearly the case.

18        Q.    And you say:

19              "The black percentage is lowered

20         only by elongating the district to

21         include lower concentrations of black

22         population."

23              When you say "only," "is lowered only by

24   elongating the district," what is your basis for

25   that, saying "only"?

1      A.   Well, without elongating the district, the

2   area around there is highly concentrated black

3   population, and it wouldn't be likely to be able to

4   draw a district that's compact in that area.

5      Q.   But you only drew this map; right?

6      A.   Yeah.

7      Q.   So you didn't draw other maps where you

8   tried to draw different district shapes and see

9   what the black voting age percentage in different

10  district shapes would be in the Fulton County area?

11     A.   Would you like me to do that?

12     Q.   I'm good.

13     A.   Okay.

14     Q.   But my question is, when you say "only,"

15  you don't know whether that's the only way to lower

16  the percentage population black in the districts,

17  do you?  How could you know?

18     A.   Well, I'm describing a process that seems

19  to be taking place here.

20     Q.   And your basis is just the one map that

21  you draw?

22     A.   Not necessarily.  It's not just the one

23  map that I'm drawing.  I mean, I've seen other maps

24  in this region that have similar composition.  When

25  we looked at the Democratic house plan, we looked

1    at some of the Cooper plans and the preliminary

2    injunction, I mean, I've seen other district

3    profiles in this area.

4         Q.   Did you look at those when you were

5    writing this report?

6         A.   I didn't need to.  I mean, I didn't look

7    at them specifically, no.

8         Q.   So when you say "only," your basis is --

9    your basis for saying the only way to do that, the

10   only way to lower the black percentage is by

11   elongating the district, your basis is the map that

12   you drew and your background knowledge of a few

13   other maps that you've seen?

14        A.   Let me find the part.  What paragraph are

15   we looking at?

16        Q.   Paragraph 33.

17        A.   Okay.

18        Q.   Last sentence.

19             (Whereupon, the document was

20        reviewed by the witness.)

21             THE WITNESS:  I mean, that seems to

22        be what's happening in this circumstance.

23        In my opinion, it looks like the enacted

24        plan is lowering the black percent by

25        elongating the district.

1    BY MR. SAVITZKY:

2        Q.   Elongating as compared to the district

3    that you drew in your map?

4        A.   Yeah.  Which is a basis for comparison.

5        Q.   That is -- that's the basis for your

6    conclusion?

7        A.   It's a basis for comparison, and I

8    compared it in this instance.

9        Q.   But in terms of the conclusion you draw,

10   it's the basis for your conclusion?

11       A.   Well, I mean, I'm sure other people, and

12   myself included, could draw more districts.  We

13   could do many different things.

14       Q.   I just mean in terms of the conclusion

15   you're drawing here, the basis for that conclusion

16   is the map that you drew and the contrast you're

17   drawing between the map that you drew and the

18   enacted map?

19       A.   In that area, in my opinion, it looks like

20   the only way to draw a lower black percentage --

21   and I don't mean like specifically lower.  I'm

22   saying -- I'm not saying, like, by a fraction of a

23   point.

24            In general, I'm saying that elongating

25   districts to connect lower concentrations of black

1   population is what's happening here in the enacted

2   plan.

3           I have a specific example of one district

4   here, but I have a long list of other districts

5   that are able -- you can compare.  In this region

6   in Fulton County, the districts are more elongated.

7       Q.   So just to be clear, the comparison that

8   you're drawing here between these districts is the

9   basis for your conclusion that the only way to

10  lower the black percentage of the districts here is

11  by elongating them?

12      A.   Well, again, I'm showing that this process

13  is happening here and that, in my opinion, by

14  elongate -- the black percentages are elong --

15  lowered by elongating the district.

16      Q.   Let's talk about your senate plan.  And

17  we'll go to Page 30.  Paragraph 35 is the start

18  there.  You describe a general approach to the

19  senate map that you drew.

20          Is it fair to say that you followed the

21  same process that you did with the house when you

22  drew your senate map?

23      A.   Generally, I think so.

24      Q.   Okay.  Were there any different

25  communities of interest factors that came into play

1    when you were drawing your illustrative senate map

2    that you didn't consider in drawing your

3    illustrative house map?

4         A.   Nothing's coming to mind at the moment.

5         Q.   Okay.  Now, let's move over to Page 36 and

6    chart eight.  And this summarizes the reports that

7    you ran on comparing your illustrative map to the

8    enacted map; is that right?

9         A.   Yes.

10        Q.   Okay.  Did you run the same reports as you

11   did with the house map?

12        A.   I believe so.

13        Q.   Did you run any additional reports for the

14   senate map that you didn't run for the house map?

15        A.   I don't think so.

16        Q.   Did you conduct any additional analysis of

17   the senate map that you didn't run for the house

18   map?

19        A.   I don't think so.

20        Q.   Okay.  Now, just going through it, looking

21   at the first category here, county splits,

22   that's --

23        A.   Yep.  Sorry.  May I ask a question here?

24   This is the written report.  Were there also

25   appendices to this?

1    Q.   Yeah.  You -- there are a number of

2    exhibits.

3    A.   Oh, okay.  Good.  I just -- because I see

4    that here in the text of the report I'm referring

5    to other exhibits, and I just didn't see them in

6    what you gave me.  So I just want to clarify --

7    Q.   They're in the boxes back there.

8    A.   But they do exist as --

9    Q.   Yes.

10   A.   Thank you.  I just wanted to clarify.

11   Q.   They made it --

12   A.   I thought they were in there.

13   Q.   They made it through the ether into our --

14   A.   Thank you.

15   Q.   -- possession.

16   A.   So you're just giving me the written

17   portion of my report?

18   Q.   We're looking at the -- at your written

19   report --

20   A.   Thank you.

21   Q.   -- right now.

22   A.   Okay.  That's helpful.

23   Q.   So looking at chart eight and looking at

24   county splits, senate enacted plan is 29 county

25   splits, your illustrative 21 county splits; is that

1    right?

2         A.    I believe so.

3         Q.    Is 29 county splits for a Georgia senate

4    plan consistent with traditional districting

5    principles?

6         A.    The number --

7         Q.    Uh-huh.

8         A.    -- of county splits.

9         Q.    Yeah.

10        A.    I hadn't analyzed that as a single number.

11        Q.    Okay.

12        A.    I'd have to look at it in more detail.

13        Q.    You have no view on that?

14        A.    Again, I hadn't looked at a single metric

15   in that way before.

16        Q.    Are you unsure of whether -- let me ask it

17   a different way.

18             Does the senate map adopted by the State

19   of Georgia in 2021 comply with traditional

20   districting principles?

21        A.    I wasn't asked to analyze that.

22        Q.    Do you have a view on that?

23        A.    As a starting point, I would assume that

24   it does.

25        Q.    Would you assume that 29 county splits is

1  within balance for the traditional districting

2  principles?

3      A.   Again, as I single number, I don't know

4  that that's determinative.

5      Q.   And going down the line on some of these,

6  you say 47 county splits versus 15 -- or excuse me,

7  precinct splits; is that right?

8      A.   Yes.

9      Q.   Is 47 a lot of precinct splits?

10     A.   In the context of a senate plan?  It's

11 higher than 15.  I don't know.  A single number, I

12 don't know how you would say.

13     Q.   Do you know how many precincts there are

14 in Georgia?

15     A.   Probably close to 3,000.

16     Q.   It's at 2,600, yeah.

17     A.   Okay.  That's a guess.

18     Q.   So is 47 a lot?

19     A.   Compared to 3,000?  It's a relatively

20 small number.  But again, it's, a lot of times,

21 it's about -- it's the edges of the districts is

22 where splits happen.  So with a larger district, it

23 seems less likely to need as many precinct splits.

24     Q.   Okay.  And mean compactness, point 04

25 difference in Reock?

1        A.    Yes.

2        Q.    Point 07 difference in Polsby-Popper?

3        A.    Yes.

4        Q.    Are those differences significant?

5        A.    They're just, they're relatively close in

6    this case in the point 04.  It's more with the

7    point 07.

8        Q.    17 paired incumbents versus four, so out

9    of 51 senators?

10       A.    56.

11       Q.    56?  So that's a large number of paired

12   incumbents?

13       A.    Sure.

14       Q.    You have three fewer black majority

15   districts overall; is that right?

16       A.    Yes.  That appears to be correct.

17       Q.    And two more districts that are over

18   90 percent black; is that right?

19       A.    Than the enacted plan, yes.

20       Q.    Now, you also looked at, let's move on to

21   Paragraph 42, you looked at the, what you call a

22   metro region, which you say "consists primarily of

23   Douglas, Fulton, Coweta, DeKalb, Clayton, Fayette,

24   Henry, Rockdale and Newton Counties."

25       A.    Okay.  Yeah.

1      Q.   Do you have that?

2      A.   That's what I have here.  I think that has

3   everything on the map.

4      Q.   Okay.  Now, why did you choose these

5   particular counties to define the metro region?

6      A.   Well, I believe in both the enacted and

7   the illustrative plan they're fairly well

8   associated with each other.

9      Q.   All right.  Well, why didn't you include

10  Gwinnett County or Cobb County in the Atlanta

11  metro?

12     A.   Well, so on the map on Page 38, Heard

13  County is not on that list, but it's included at

14  part of the district in the enacted plan District

15  28.

16          And I would say in this case, yeah, in

17  both the enacted and the illustrative plan,

18  Gwinnett County is self-contained, or at least in

19  this sense it's not associated with DeKalb or

20  Fulton.

21     Q.   In the enacted plan?  District 55 crosses

22  the boundary from Gwinnett to DeKalb.

23     A.   No, no.  I'm sorry.

24     Q.   So does --

25     A.   No, no, no.

1      Q.   So does 41.

2      A.   I'm sorry.

3      Q.   So does 40.

4      A.   I was skipping over that.  I apologize.

5      Q.   All right.

6      A.   Just a moment, please.

7      Q.   Sure, sure.

8      A.   Yeah.  Okay.  It has part of Gwinnett.

9   Okay.  Yeah, I see that now.  I think I was looking

10  at something else.  Yeah.  Okay.

11           Okay.  I'm sorry.  So to be clear, the

12  confusion is my map nine has the entire metro

13  region as an inset for the map eight.

14     Q.   Uh-huh.

15     A.   And then what I was comparing is that to

16  map -- the unlabeled maps senate illustrative metro

17  region and enacted metro region, which are

18  unnumbered, and I was comparing map nine to that.

19           And so they're the same, and I'm looking

20  going they're the same.  So I apologize for that.

21  It's clearly different maps.  I should be looking

22  at these two maps.

23     Q.   Yeah.

24     A.   So.

25     Q.   So we're talking about the maps on --

1      A.    No, no.

2      Q.    -- Pages 38 --

3      A.    So --

4      Q.    -- and 39 of --

5      A.    -- that --

6      Q.    -- your report.

7      A.    I was looking at completely different

8  things.  I'm sorry.

9      Q.    All good.

10      A.    Okay.  So in this sense, the illustrative

11  plan doesn't go into Gwinnett County or Cobb

12  County, but the enacted plan does.  So in this

13  case, yeah, you have two districts that go into

14  part of Cobb and then two districts that go into

15  part of Gwinnett.  And -- or sorry, three

16  districts, District 40 as well.

17      Q.    So why not include Gwinnett in your -- in

18  the counties you selected for the region?

19            I mean, I thought you had said the

20  criteria was, if you -- if it seemed to you that

21  they're related in the enacted plan, you know, if

22  there's cross-over, then you'll include it.

23            But we're seeing three senate districts

24  are crossing between Gwinnett and DeKalb, and you

25  didn't include Gwinnett in the Atlanta metro

1    region.

2         A.    Yeah, I would say one would have a

3    significant portion of Gwinnett, but 41 and 40 have

4    relatively small portions.  I suppose I could have

5    included one cap -- one additional district in

6    Gwinnett to complete the overlap.  That's possible.

7         Q.    When you say "one additional district," I

8    thought these regions are defined by counties, not

9    districts.

10        A.    Well, I mean, I said that they're

11   primarily consisting of these counties, and then

12   the districts are within those counties generally

13   or, you know, include those counties.

14        Q.    Is there any rule by which you determined

15   whether a county would be in your region or not in

16   your region?

17        A.    No.  There's not an established rule.  I'm

18   trying to have approximately the same geographic

19   areas.  And you're right to point out that District

20   55 has a portion of Gwinnett County, and I don't

21   have exactly that comparable area.

22             And you know, they're not one-to-one

23   comparisons.  Like, for example, in the enacted

24   metro, Fayette, this portion of Fayette County is

25   not included at all, but in the illustrative one, I

1    have all of Fayette in there.

2         Q.   And they're just --

3         A.   So --

4         Q.   Oh, sorry.  Go ahead.

5         A.   No.  I was just going to say that, you

6    know, there are definitely differences in between

7    the actual districts that are included in the

8    groupings.

9         Q.   And ultimately, you just decided which

10   districts and which counties to include in your --

11        A.   Well --

12        Q.   -- analysis?

13        A.   They cover very much the same area.  You

14   know, I think the one example you have there in

15   Gwinnett I think is -- you know, I could have

16   included an additional district in Gwinnett.  And

17   in that case, I probably would have included --

18        Q.   Well, you could have included Cobb, too;

19   right?

20        A.   -- District 9.

21             Yeah, I don't think so.  Because it's only

22   a port -- it's really a relatively small portion of

23   Cobb.

24        Q.   You have multiple senate districts in --

25        A.   Yeah, there're two, but they're relatively

1  small.  And I've got a portion of Fulton that's not

2  in the senate enacted.  And it's just a matter of

3  covering roughly the same area.

4           Like, for example, in the illustrative

5  plan I do have District 48, which is in the

6  northern part of Fulton County, but I don't have a

7  comparable district in the enacted plan in that

8  area.

9       Q.   In the end, these are the counties and the

10 districts that you chose?

11      A.   Yeah.  I mean, there's a logic to it.  You

12 know, like I said, I could have included one more

13 in Gwinnett or I could have included one more in

14 Fulton.

15          I think the number of districts is pretty

16 close.  Let's see if they're the same.  15?  Yeah,

17 there's 15 districts in both, and they're slightly

18 different combinations.  It's not exactly the same

19 territory, but it's comparable.

20      Q.   And if you had picked a different set of

21 districts, then it would have changed the mean

22 compactness score that you got for this set of

23 districts?

24      A.   I don't know.  I really don't know.  Until

25 you actually run it, you just don't know.  It could

1    be exactly the same.  It's not likely, but it's
2    possible.
3         Q.   It's unlikely that it would have been the
4    same, you're saying?
5         A.   I would agree with that, it's unlikely
6    because numbers will change.  When you have any
7    change in the numbers, it's likely to affect an
8    average.
9              But you just don't know until you run it.
10   Sometimes there's a surprise, wow, that was
11   surprising, it's exactly the same.
12        Q.   Did your sense of what the districts
13   looked like affect which ones you chose for your
14   regions?
15        A.   Not especially.  I mean, I kept the
16   associations and the grouping.  I didn't want to do
17   two separate regions for the met -- for the senate
18   plan where I did in the house plan.  It's the
19   number of districts.
20             I think in the house plan we had, like, 25
21   in each region, and here I've got ten in one
22   region.  So it's a consolidated region.  I suppose
23   I could have split it into two regions.
24        Q.   Did you choose regions based on where it
25   seemed like there were districts that looked

1  elongated?

2      A.   Not consciously.  But it's pretty clear

3  that that's the case when you look at Clayton,

4  Henry and Fulton in the enacted plan.

5      Q.   And we can't see in your maps the

6  districts that you didn't choose, so we don't know

7  what those districts look like?

8      A.   No, that's not true.  If you look on the

9  other page, I have an inset map on District 35 that

10  shows that.  And the exhibits, which I don't have

11  here, have all of the districts.  And I have a

12  statewide map that shows the districts.

13          And in particular, this map nine on Page

14  35 does show all the districts.  So hypothetically,

15  you could pick one more district or two or there's

16  many different possibilities.  So they're --

17      Q.   Now --

18      A.   -- they're clear on map nine.

19      Q.   Now, in looking at this region, you say

20  there's a "contrast between the senate illustrative

21  plan and the senate enacted plan" with respect to

22  compactness.

23          Do I have that right?

24      A.   If that's what I said, yes.

25      Q.   And again, you say there may be many

1    causes for this difference in compactness.

2        A.    Yes.  I did say that.

3        Q.    Can one of those causes be avoiding

4    pairing incumbents in the enacted plan?

5        A.    I suppose that's possible.

6        Q.    Could one of those causes be retaining

7    district cores and continuity of representation?

8        A.    I suppose that's possible.

9        Q.    Could one of those causes be complying

10   with the V.R.A.?

11       A.    I suppose that's possible.

12       Q.    Could one of those causes be communities

13   of interest factors?

14       A.    Yes, I suppose that's possible.  I would

15   say that, again, I would say that complying with

16   the V.R.A. can also be linked to what I described

17   as racial considerations.

18       Q.    Could one of those causes be constituent

19   feedback during the redistricting process?

20       A.    I suppose that's possible.

21       Q.    Looking ahead to Paragraph 46 -- actually,

22   just looking at Paragraph 44 briefly, you do a

23   comparison of specific districts, and you pick

24   District 55 in one plan versus the other plan.

25       A.    Okay.

1      Q.    Is that right?

2      A.    Yeah.

3      Q.    Okay.  Compactness score of 55 in your

4   plan is point 32 and point 34?

5      A.    Yeah.

6      Q.    Compactness of District 55 in the enacted

7   plan is point 34 and point 37?

8      A.    I wasn't comparing those, but okay.

9      Q.    You weren't comparing those?

10     A.    I think the one I'm pointing to here is

11  District 10 in the enacted plan.

12     Q.    Oh.  I'm sorry.  So you compared District

13  55 in the illustrative plan to District 10?

14     A.    Yeah.

15     Q.    Okay.

16     A.    And I said it's an -- they're both

17  anchored in southern DeKalb, and District 10 goes

18  south into Henry whereas District 55 is entirely in

19  southern DeKalb.  And that's a contrast.

20          And I think you can see that in the

21  enacted plan, southern DeKalb is parcelled out into

22  several districts.  Whereas, in the illustrative

23  plan it's basically in three.

24     Q.    Did you do any core constituency report to

25  determine which district most overlaps with

1  illustrative District 55 in your illustrative map?

2      A.   Boy, that, I think that would be a little

3  difficult.  Because it's so fractionalized in the

4  enacted plan.  I suppose one might be more than

5  another.

6      Q.   So District 55 in the enacted plan could

7  have more of the population of District 55 than the

8  illustrative plan?

9      A.   Yeah, I don't know.  It's really

10  fractionalized in the enacted plan.  I'd have to

11  look at that carefully.

12      Q.   And just --

13      A.   And I don't know that that's -- like,

14  which one do you pick?  It's hard to say.

15      Q.   Well, you picked the one with the lower

16  compactness scores, but District 55 in the enacted

17  plan actually has a higher Reock score than

18  District 55 in your illustrative plan; right?

19      A.   Yeah.  And I don't know that there's a

20  great deal of overlap, but maybe there is.

21          I mean, and again, it's so fractionalized

22  that, you know, if you were to take District 55 in

23  my illustrative plan, you know, you might have

24  20 percent in one and, you know, 25 percent in

25  another.

1          There's one, two, three, four -- five

2     districts probably, maybe six.  It could be split

3     six ways.  I mean, I'd really have to look at that.

4     And I don't know -- yeah, I think that's hard to

5     really figure out.

6          Q.   And you didn't run a core constituency

7     report to determine what were the appropriate

8     comparators to look at?

9          A.   Well, I don't know how you'd say

10    appropriate.  I mean, it's -- there's -- you can --

11    you've got all the data.  You can look at it as

12    well.

13          If you want to compare District 55 to

14    District 55, you can do that.  If you want to

15    compare District 55 to 44, you could.  There's some

16    overlap there.

17          Q.   Uh-huh.

18          A.   You could compare -- I -- you know, 41 in

19    the two plans is probably pretty similar.  But the

20    enacted plan really splits up that southern DeKalb

21    by a lot.

22          Q.   So looking at district -- or looking at

23    Paragraph 46, you say:

24          [As read]  "...the creation of an

25            additional black majority district in

1        the region led [sic] to lower

2        compactness scores in this region."

3              So first of all, in the region you looked

4    at there's one fewer black majority district;

5    right?

6        A.   It appears that way.

7        Q.   10 percent; right?

8        A.   Yeah.

9        Q.   What is your basis for saying that it was

10   the creation of an additional black majority

11   district in the region that led to lower

12   compactness scores in the region?

13       A.   Well, that's the opinion that I gave.

14       Q.   Right.  I'm asking for the basis of your

15   opinion.

16       A.   The basis is I looked at the enacted plan

17   and compared it to the illustrative plan that I

18   drew, and that's the conclusion that I drew.

19       Q.   Okay.  But depending on which individual

20   districts you look at, it could be that the

21   district with the lower black voting age percentage

22   has a better compactness score?

23       A.   I don't know.  I think you can see in the

24   enacted plan that southern DeKalb is fractionalized

25   among several districts.  Whereas, in the

1   illustrative plan it's contained in one district,

2   in 55 primarily.

3       Q.    Okay.  But if you look at District 55 in

4   both plans, District 55 in the enacted plan, which

5   includes part of southern DeKalb, has a higher

6   Reock score.  That's a -- it's more compact.

7       A.    Okay.

8       Q.    And it has a 66 percent black voting age

9   percentage.  Whereas, your less compact district

10  has a 93.7 percent.

11      A.    Yeah.

12      Q.    So when you say --

13      A.    It's --

14      Q.    -- the creation of an additional black

15  majority district leads to lower compactness

16  scores, or when you conclude that elongating or

17  making districts less compact is the way to lower

18  the percentage, the black voting age percentage of

19  a district, if you compare 55 and 55, the opposite

20  is true.

21      A.    Well, actually, if you look at the region,

22  it's pretty clear to me that elongating the

23  Districts 44, 10, 43, 55, they're all more

24  elongated than the relatively compact 42, 41 and

25  10.

1      Q.   So just looking at Paragraph 47, your
2    conclusion, you say:
3           "My review of the enacted house
4        and senate plans, combined with
5        drawing the blind illustrative plans,
6        demonstrates the tendency that racial
7        considerations had an effect on
8        district composition and district
9        shapes in the enacted plans."
10          How much of an effect did that -- did
11   these racial considerations that you --
12     A.   I'm sorry.
13     Q.   -- are discussing --
14     A.   Is that -- you said 47.  You mean 48?
15     Q.   Oh, sure.  I'm sorry.  It was 48.
16     A.   Okay.  I'm sorry.  Could you repeat that,
17   please?
18     Q.   Yes.  You say:
19          "My review of the enacted house
20        and senate plans, combined with
21        drawing the blind illustrative plans,
22        demonstrates the tendency that racial
23        considerations had an effect on
24        district composition and district
25        shapes in the enacted plans."

1      A.    Okay.

2      Q.    When you say "had an effect," how would

3  you quantify that effect?

4      A.    Well, I think I looked at that.  I was

5  saying, when you look at it and you look at them

6  visually, the enacted plan is more elongated in --

7  especially in southern DeKalb.  It's fractionalized

8  that area in southern DeKalb, and it's definitely

9  had an effect.

10          And I would also say that, when you look

11  at the compactness scores in the area, the

12  districts that are elongated tend to be less

13  compact than the ones that are re -- tighter,

14  closer to communities in DeKalb County.

15      Q.    Is the effect that you're saying you're

16  observing from racial considerations greater than

17  the effect of considering the incumbency?

18      A.    I think that would be difficult to show

19  either way.

20      Q.    Do you know whether it's greater or --

21      A.    I don't know how you would compare that.

22      Q.    Is the effect that you're claiming from

23  racial considerations greater than the effect of

24  considering district continuity and preserving

25  district cores?

1      A.   I don't know.  I think that would be
2   difficult to compare in that way.
3      Q.   Is the effect that you're claiming from
4   racial considerations greater than the effect of
5   considering communities of interest?
6      A.   I think so.
7      Q.   What's your basis for that --
8      A.   Well --
9      Q.   -- conclusion?
10      A.   -- I think that, when you look at southern
11   DeKalb, there's clearly a community in southern
12   DeKalb in that area.  And the, again, the enacted
13   plan fractionalizes that community.
14           So I would say in that case, it is more of
15   an effect than adhering to the community in
16   southern DeKalb.
17      Q.   So when you say there's clearly a
18   community, what are you referring to?
19      A.   I'm saying that there's a geographically
20   identifiable community in southern DeKalb, and it
21   approximates what I've drawn as District 55.
22      Q.   Okay.  On what basis is that community
23   geographically identifiable?
24      A.   I'd have to pull up the map to look at it.
25   But if you look, there are some communities,

1    municipalities in that area that are kept whole

2    here in the illustrative plan.

3        Q.   So backing out from the one particular

4    example of southern DeKalb, with respect to your

5    overall conclusion, which is about the enacted

6    house and senate plans, is the claimed effect that

7    you're seeing overall from racial considerations

8    greater than the effect from considering

9    communities of interest?

10       A.   I think that'd be hard to say overall.

11   But in this example in this case, I think so.

12       Q.   In the particular example from southern

13   DeKalb?

14       A.   Yeah, I think so.

15       Q.   But overall you can't say?

16       A.   I think it's difficult to compare those.

17       Q.   And understanding that there are -- strike

18   that.

19           Is the claimed effect from racial

20   considerations greater than the effect of

21   considering -- greater than the potential effect of

22   considering other communities of interest factors

23   that were not visible to you?

24       A.   Yeah, I don't know.  I mean, the greater

25   effect, I think that's difficult to discuss in that

1    way in, like, a numerical quantitative sense.

2        Q.   Is the claimed effect from racial

3    considerations greater than the effect of taking

4    into account constituent feedback from the

5    redistricting process?

6        A.   I think that would be difficult to

7    analyze, so I don't know.

8        Q.   Did you come to a conclusion about which

9    of these different factors had more or less of an

10   effect --

11       A.   No, I --

12       Q.   -- than the enacted?

13       A.   I didn't intend to discuss that, and I

14   don't think I did.  I said that the racial

15   considerations had an effect.  I think there's --

16   this clearly indicates there's a tendency and

17   there's an effect.

18       Q.   So your conclusion of an effect from

19   racial considerations is based on comparing the

20   maps enacted by the State of Georgia and the plan

21   that you put together?

22       A.   Yeah.  And what -- in reviewing the

23   enacted plans combined with drawing -- I think

24   having the plan, the illustrative plan that I drew

25   is useful as a comparison tool.

1          Q.    And just to confirm, did you -- you didn't

2     do any type of ensemble analysis here, did you?

3          A.    No.

4          Q.    You didn't do any computational analysis

5     where you systematically drew a large number of

6     districts and drew conclusions about a large number

7     of districts and their qualities?

8          A.    No.  I didn't intend to do that, and I

9     clearly did not do that in this report.

10          Q.    You didn't do any quantitative analysis of

11     whether your blind map is representative or typical

12     of anything?

13          A.    No.

14          Q.    Okay.  You don't know whether any aspect

15     of your map is statistically typical or not?

16          A.    No.

17          Q.    Do you have any empirical basis to say

18     whether any feature of your illustrative map is

19     representative of anything other than the

20     particular choices that you made in drawing it?

21          A.    I don't understand that question.

22          Q.    Do you have any empirical or quantitative

23     basis to say that the decisions that you made in

24     drawing your illustrative map are typical?

25          A.    Well, I followed a consistent process

1    throughout the drawing of the entire plan.  I

2    applied it equally to all areas of the state.  So

3    in that sense, that was the methodology that I

4    followed, and I applied that process to the entire

5    map.

6         Q.   Do you have any empirical basis to say

7    that your illustrative map is more representative

8    or typical of what one might see in a Georgia map

9    as opposed to the Cooper December 5th map?

10             MR. TYSON:  Object to form.

11             THE WITNESS:  Yeah, I don't quite

12        understand.  I didn't look at the Cooper

13        plan in this analysis.

14   BY MR. SAVITZKY:

15        Q.   Well, let's turn here and look at the

16   Cooper report, then.

17        A.   Okay.

18             MR. TYSON:  All right.  Could we mark

19        the exhibits to this report, too?  Just

20        because I know there was some discussion

21        about, like, what data was where on the

22        different regions.

23             And I think the exhibits have all the

24        data for all the districts in -- as part

25        of it.

1          MR. SAVITZKY:  Sure.

2          MR. TYSON:  So just for completeness,

3     could you --

4          MR. SAVITZKY:  Sure.

5          MR. TYSON:  -- mind marking those

6     just --

7          MR. SAVITZKY:  Sure.

8          MR. TYSON:  -- if we can do that?

9          And we can do that whenever, on a

10    break or something.  I just wanted to make

11    a point --

12         MR. SAVITZKY:  Okay.

13         MR. TYSON:  -- of that.

14         MR. SAVITZKY:  Why don't we take a

15    break now, because --

16         MR. TYSON:  Okay.

17         MR. SAVITZKY:  -- this is a little

18    stopping place and -- yeah?

19         MR. TYSON:  Sure.

20         THE VIDEOGRAPHER:  Okay.  Off the

21    video record at 3:12 p.m.

22         (Whereupon, a discussion ensued

23     off the record.)

24         (Whereupon, there was a brief

25     recess.)

1            THE VIDEOGRAPHER:  Back on the video

2       record at 3:27 p.m.

3            MR. TYSON:  And as we get started

4       back, I just want to make sure the

5       record's clear.  We've taken Exhibit 2 and

6       appended all of Mr. Morgan's exhibits to

7       that.  So Exhibit 2 is now a complete copy

8       of his report.

9            MR. SAVITZKY:  Great.

10            THE WITNESS:  Okay.  And that's the

11       one we were just looking at.  Excellent.

12            MR. SAVITZKY:  And we will in some

13       fashion append the exhibits associated

14       with the other expert reports that are

15       introduced as exhibits for this

16       deposition.

17            MR. TYSON:  Certainly.

18                      (Whereupon, Plaintiff's

19                       Exhibit 6 was marked for

20                       identification.)

21    BY MR. SAVITZKY:

22       Q.   Okay.  So Mr. Morgan, let's turn to your

23    other report.  This is the home stretch -- or this

24    is the last report we're talking about.  It's your

25    rebuttal report, or your responsive report.  I've

1    marked it as Exhibit 6, and so here's a copy.

2             And you know what, why don't we go ahead

3    and mark the Cooper -- oh, here we go.  Let's mark

4    Bill Cooper's report as well in case we refer to

5    that.  And we'll -- I'll mark it as Exhibit 7.

6                         (Whereupon, Plaintiff's

7                          Exhibit 7 was marked for

8                          identification.)

9    BY MR. SAVITZKY:

10       Q.   And here's a copy of that.  And keep it

11   there for now or --

12            MR. TYSON:  Might need it in a

13       minute.

14            MR. SAVITZKY:  Yeah.  I'll have a

15       copy.  And here's one for you, Bryan, as

16       well.

17            MR. TYSON:  Thank you.

18   BY MR. SAVITZKY:

19       Q.   Okay.  So before we turn to your analysis

20   of the Cooper maps, I just want to begin by

21   discussing your methodology and your process.  And

22   let's start at Paragraphs 5 and 6 of your report on

23   Pages 2 and 3.

24            And again, we are talking about the report

25   marked as Exhibit 6.  This is your January 23rd

1    report.  And Is that right that we're talking about

2    your January 23rd report in front of us?

3         A.    Yes.  That appears to be the case, yes.

4         Q.    Great.

5               And so looking at Paragraph 5, you say you

6    were:

7               "...asked to review the house of

8          representatives and state senate plans

9          considered and adopted by the Georgia

10         General Assembly and compare them to

11         the proposed house and senate plans

12         drawn by Mr. Cooper and offer opinions

13         regarding my analysis."

14              Do I have that right?

15        A.    Yeah.  That's what it says, yes.

16        Q.    So is it fair to say this is a comparative

17   analysis?

18        A.    Generally speaking, yes.

19        Q.    Was the comparison between the Cooper maps

20   and the enacted maps the only comparison that you

21   make in this report?

22        A.    I'm trying to think if I -- so I think I

23   have to say that I was also comparing the Cooper

24   12/05 plans to the Cooper preliminary injunction

25   plans in some ways.

1      Q.   Okay.

2      A.   So that's an additional comparison.  But I

3   think that's also covered in this statement,

4   because I didn't specify that these were the 12/05

5   plans.  So in this sense, it's both.

6      Q.   Okay.  And setting aside the preliminary

7   injunction plans that you may have also made some

8   comparisons to, are there any other plans that you

9   compared other than plans put together by Bill

10   Cooper that we just talked about and the 2021

11   Georgia enacted plan?

12      A.   I don't think so.  Again, generally I

13   don't think there's another plan that's involved.

14   I -- if there's something else in here that I

15   pulled in, I don't think it's -- I don't think so.

16      Q.   Okay.  And does this report that we're

17   looking at reflect all of your analysis that you

18   conducted?

19      A.   Yeah.  I mean, it's all in the report.  I

20   would say that, you know, there could be additional

21   along the same vein, but I included everything in

22   the report, I believe, yeah.

23      Q.   It's a complete statement of all of the

24   opinions you will express as an expert and the

25   basis and reasons for them?

1      A.   Again, subject to the impression that I've

2   given before that if there's new information that

3   might cause me to revise my analysis a little.

4      Q.   So setting aside the introduction of new

5   information, this report is a complete statement of

6   all of the opinions you'll express as an expert and

7   the basis and reasons for them?

8      A.   Generally, that's correct, yes.

9      Q.   Okay.  And are you basing your conclusions

10  here regarding the Cooper maps on anything other

11  than what you discuss in this report?

12     A.   I also would have to say, as an expert and

13  a map drawer, I have my own experience.  And I

14  would say that's something I draw into.  I don't

15  know that that's explicitly stated in the report,

16  but it's just who I am and the experience I bring.

17     Q.   Other than your background experience

18  and -- are there any other bases for your

19  conclusions regarding the Cooper maps other than

20  what's in this report?

21     A.   Again, generally I don't think there's

22  additional information, but do keep in mind I had

23  the additional reports.  We looked at length at my

24  12/05 report.  I don't think I cite to that here,

25  but I think it was something I had.  I've done

1    that.

2              And there was also the Cooper 12/05 report

3    and then the preliminary injunction stuff that we

4    have.  So I mean, there's other things in the case.

5    But as far as the report, generally, it's just

6    what's in the report as we've discussed.

7         Q.   Are you relying on your December 5th

8    report for the conclusions that you come to in this

9    report?

10        A.   I would say, generally, I'm not relying on

11   the report.  And I'm just allowing for the

12   possibility that, if there's something I said in

13   there in this report that did rely on it and I

14   don't remember that, maybe I did.

15             But I don't -- generally, that's not the

16   case.  I'm not generally rely on my 12/05 report.

17        Q.   Unless it's stated somewhere in here and

18   you're not recalling it right now, you didn't rely

19   on the -- your December 5th report in coming to any

20   of your conclusions about the Cooper maps in --

21        A.   Generally --

22        Q.   -- this report?

23        A.   -- that's correct.  Yes.

24        Q.   Okay.  And then looking at Paragraph 6 on

25   Page 3, you say:

1           [As read]  "As a result of this

2       analysis, my opinion is that the

3       Cooper 12/05 senate and house plans

4       are focused on race, prioritizing race

5       to the detriment of traditional

6       districting [sic] factors."

7           Would you say that's the conclusion of

8   your report?

9       A.   I think that this is a conclusion, you

10  know, from, the end of the report that's basically

11  brought up earlier in the report.  And so I would

12  say it's -- I don't know that it's word for word

13  the concluding paragraph, but it's generally the

14  conclusion that I have at the end.

15      Q.   Are there any other opinions or

16  conclusions that you are ex -- going to express as

17  an expert?

18      A.   And again, I'd have to look in detail at

19  the kind of concluding paragraphs here.  But in

20  general, I would say that this covers those

21  conclusions, I think.

22      Q.   When you say in that sentence, "the Cooper

23  12/05 senate and house plans," does that mean that

24  your conclusion is that the plans as a whole are

25  focused on race, prioritizing race to the detriment

1    of traditional districting factors?

2          A.    Well, I didn't specify that here.  But if

3    we look through the analysis, there's many pieces

4    to the analysis, so individual pieces support that

5    conclusion.

6              And so as a whole, yes, I think that's the

7    case.  It's, in that sense, it's a holistic

8    analysis.

9          Q.    What do you mean when you say that the

10   Cooper plans are focused on race?  What does that

11   mean?

12         A.    I -- I would say that there are many

13   examples that I discuss in my report that show that

14   race was a focus, very much so.

15         Q.    Does it mean something other than being

16   aware of race?

17         A.    Yeah, I think so.

18         Q.    What?  What does it mean other than being

19   aware of race?

20         A.    I would say that there are instances that

21   I discuss in the report where steps are taken in

22   the drawing of the plan that prioritize race, not

23   just being aware of it, that there are actions I

24   see that show that the focus of certain areas was a

25   racial focus.

1    Q.   Does it mean something other than
2    complying with the Voting Rights Act?
3    A.   I don't know that complying with the
4    Voting Rights Act is well defined here or -- I
5    don't know how to answer that.  Like, the
6    compliance is a separate question.  I think there
7    are many ways that could be considered compliance
8    in my experience.
9    Q.   Is your opinion that the Cooper plans are
10   too focused on race?
11   A.   When you say "too focused," there's sort
12   of an implicit comparison there to something, but
13   you haven't identified what that is.  So too
14   focused as compared to what?
15   Q.   Is it your opinion that the Cooper plans
16   are inappropriately focused on race?
17   A.   I think that there is -- yeah, there's a
18   real focus on race.  In some cases you could say
19   that it's inappropriate.
20        But you know, I don't know that I can say
21   that it's categorically across the board
22   inappropriate.  But I have many instances where I
23   discern a focus on race.
24   Q.   What evidence did you rely on to reach the
25   conclusion that the Cooper maps are focused on

1    race?

2        A.    Well, I have a whole report here that goes

3    through that.

4        Q.    So the types of evidence that you cite in

5    your report are the evidence you relied on for the

6    conclusion that the districts are focused -- or the

7    plans are focused on race?

8        A.    Yes.  In my analysis I relied upon the

9    Cooper plan as I had it in the assignment files and

10   comparing it to the enacted plan.

11       Q.    In your opinion, is the number of black

12   majority districts in the plans an indication of

13   whether they're focused on race?

14       A.    I think that's something to look at,

15   certainly.  And I think also that, as I go through

16   in detail in the report, the way in which the

17   Cooper plans differ from the enacted plans are

18   something I've noticed and pointed out.

19       Q.    Now, you say the Cooper maps prioritize

20   race to the detriment of traditional districting

21   factors.

22             How do you measure a detriment to the

23   traditional districting factors?

24       A.    Well, I think in the report I show

25   examples where some of the traditional factors are

1  compromised, and I have examples of that in the

2  report.

3      Q.   Are you basing your conclusion about a

4  detriment to the traditional districting factors on

5  anything other than your analysis of the maps in

6  the report?

7      A.   I think that's what we're looking at here

8  is the report that I produced, and the material

9  that I relied upon is what we discussed.

10     Q.   Do you define the traditional districting

11 factors in your report?

12     A.   I define some of them in the report, I

13 think.

14     Q.   What traditional districting factors did

15 you consider in the context of this report when

16 comparing the Cooper and enacted maps?

17     A.   I would have to find the portion of the

18 report that discusses some of those factors.

19     Q.   Do you have any recollection of the

20 traditional factors that you considered?

21     A.   I was just looking in my report to answer

22 your question.

23          (Whereupon, the document was

24      reviewed by the witness.)

25          THE WITNESS:  So here I mentioned:

1            [As read]  "...maintaining

2        communities and traditional

3        boundaries, compactness and deviation,

4        along with the manipulation of

5        boundaries...supports my opinions..."

6            And that's on Page 22, Paragraph 41.

7    BY MR. SAVITZKY:

8        Q.   Page 22, Paragraph 41?

9        A.   Yep.

10       Q.   "Maintaining communities and traditional

11   boundaries, compactness and deviation," okay.

12           Did you consider any other traditional

13   districting factors in doing your comparison here?

14       A.   Well, these are the ones that I'm

15   identifying in this concluding portion.  If -- I

16   would say I didn't specify anything else in this

17   portion of the report and probably not elsewhere.

18       Q.   So this would be all of the factors that

19   you, all of the traditional districting factors

20   that you considered in doing your comparison?

21       A.   Again, if there's something that I missed,

22   it's possible I may have mentioned something else

23   that's not explicitly stated here in this

24   paragraph.

25       Q.   All right.  But assuming you didn't

1  mention something else that's explicitly stated
2  somewhere else, the traditional redistricting
3  factors that you considered in doing your
4  comparison were maintaining communities and
5  traditional boundaries, compactness and deviation?
6      A.   Along with the boundaries, comparing the
7  districts.  I mean, I think that I'm trying to say
8  that the comparison of the enacted plan to the
9  Cooper plans is a significant part of that.
10          It's not that these factors are just
11  checked in isolation.  It's the comparison between
12  the two plans that provides information.
13      Q.   Okay.  And just, you know, we talked about
14  the traditional districting factors earlier, these
15  are factors that every mapper needs to be aware of
16  and balance as they're drawing a plan; is that a
17  fair statement?
18      A.   Yes.  Generally, that's correct.
19      Q.   All right.  And there are other factors
20  other than the ones that we just -- maintaining
21  communities, deviation, compactness, traditional
22  boundaries.
23          There are additional ones other than
24  those; right?
25      A.   I suppose there can be, yes.

1      Q.   But you didn't consider all of the

2   traditional districting factors?

3      A.   Well, again, I'm trying to say that I may

4   not have explicitly said them outside of that

5   para -- might not have explicitly said everything,

6   but it's possible that in the report I referred to

7   something else that's not explicitly stated in

8   Paragraph 41.

9      Q.   Okay.  So starting at Paragraph 7, back on

10  Page 3, you go through the process that you used.

11  In looking at Paragraph 8, you say you were:

12          "...given the block equivalency

13       files of the Cooper plans as well as

14       the block equivalency files of the

15       2021...plans and incumbent

16       databases..."

17          And that's what you used for the basis of

18  your analysis?

19      A.   Generally, that's correct.  And I also

20  mentioned the existing before 2020 house and senate

21  plans --

22      Q.   Right.

23      A.   -- and the incumbent information.

24      Q.   Right.  Now, did you review Bill Cooper's

25  December 5th written report as well --

1      A.   No.

2      Q.   -- or did you just analyze the B.E.F.s?

3      A.   I looked at the report a little bit, but

4   mostly I analyzed the block assignment files.

5      Q.   Would you say you read the whole report?

6      A.   Probably.  I skimmed it.  I didn't read it

7   in great detail.

8      Q.   So your opinions about the Cooper plan

9   were developed without really considering Cooper's

10  report and his description of how he drew the

11  plans?

12     A.   I didn't rely on that for this report.

13     Q.   Did you consider it?

14     A.   I may have considered portions of it, yes.

15     Q.   Okay.  Did you disagree with anything in

16  the Cooper report?

17     A.   I don't recall right here right now.  I

18  mean, if we want, we can look at it, but I don't

19  have a specific disagreement.  I have opinions

20  based on the plan that I analyzed.

21     Q.   And your opinions are based on analyzing

22  the B.E.F.s of the plan?

23     A.   Generally, yes.

24     Q.   Okay.  You also say that you did some

25  analysis of prior plans submitted by Mr. Cooper

1    from the preliminary injunction hearing?

2        A.    Yes.

3        Q.    Why did you consider those plans here?

4        A.    Well, the way I would describe it is,

5    during the preliminary injunction phase, Mr. Cooper

6    produced one plan that I analyzed in my preliminary

7    injunction report, but then he submitted a second

8    plan which I didn't analyze in the subsequent

9    report.  I don't know that there was an opportunity

10   for that.

11          So in this sense, I'm providing what I

12   would describe as maybe a limited analysis of the

13   preliminary injunction Part 2 report, if anything

14   just to have it discussed and know that what are

15   the changes from the preliminary injunction.

16          I thought that was a fair way to look at

17   this whole process is to see where things were in

18   the preliminary injunction.  And then since I never

19   made any recognition of the second preliminary

20   injunction plans, I wanted to at least acknowledge

21   that I looked at them.

22          There are differences between one and two.

23   But I'm assuming that two supersedes one, although

24   I don't know that it was explicitly stated.  And

25   then the Part 2 plan, I wanted to just have some of

1  the basic information of the preliminary injunction

2  plan for comparisons.  It's just part of the flow

3  of things.

4       Q.   Okay.  And is your ultimate opinion in

5  this January 23rd report as to the Cooper 12/05

6  maps based on any of your analysis of the

7  preliminary injunction maps?

8       A.   I could -- there may be a reference or two

9  to it in here.  It's not principally based on the

10  preliminary injunction plans.  But I just want to

11  acknowledge that I did run some reports that are

12  referenced in this.

13       Q.   Well, let's talk about the reports, and

14  let's look at Page 4, Paragraph 10.  You say:

15            "Using the Maptitude for

16       Redistricting software, I ran seven

17        reports for each 12/05 Cooper plan."

18            And then you list them out.

19       A.   Yeah.

20       Q.   And you -- can you just confirm that

21  your -- that list is accurate there?

22       A.   Compactness, districts and incumbents,

23  population summary, political subdivision splits,

24  plan components, core constituency compared to the

25  PI-2 plan -- and again, that's to just compare it

1  to the pre-existing plan -- core constituency to

2  the enacted.

3          I think I did that for each one.  That was

4  my intention, to have done that.

5      Q.   Did you run any other reports or

6  quantitative analysis of the 12/05 Cooper plan?

7      A.   Again, I don't think so, but I may have

8  reference -- I just want to, just to clarify here,

9  I may have referenced some things from the PI-2

10 plans.  Like, there may be a reference, but I think

11 I have all the reports that I ran.

12         And then what I would say is some of the

13 summary tables in here are essentially extracts

14 from the exhibits.  So if I have a chart, the chart

15 would be looking at pieces that are in the

16 appendices.  So in that sense, it's extracting a

17 portion of the data and putting it in the body of

18 the report.

19     Q.   Okay.  So does this list, and

20 understanding that they're replicated in full in

21 the exhibits and incorporating that into my

22 description of "this list," does this list comprise

23 all of the quantitative analysis that you conducted

24 for purposes of your report and for reaching your

25 conclusions about Cooper's maps?

1      A.    Yeah.  I'm, generally speaking, as a map
2   practitioner, I was looking at this from the
3   perspective of map drawer.  And so my analysis is
4   looking at it from a map drawing perspective, and
5   I'm trying to use the reports from the mapping
6   software.
7      Q.    And so just briefly the -- taking you
8   through each of these, the measures of the
9   compactness, what does that tells about the plans?
10      A.    It will show the compactness of each of
11   the districts in the plan, and it also gives you
12   what you discussed earlier, a minimum and maximum
13   and the mean for selected compactness metrics.
14      Q.    And districts and incumbents report?
15      A.    Yes, that's a standard report from
16   Maptitude which will just show which incumbents are
17   paired in a plan.
18      Q.    Okay.  Population summary report?
19      A.    Yes, in this case that will show, I
20   believe I had the district population and then some
21   demographic information for each district in the
22   plans.
23      Q.    Political subdivision splits?
24      A.    That shows the splits of the counties and
25   the voting precincts.

1        Q.   And you didn't run a municipality splits
2    comparison?
3        A.   No.
4        Q.   Even though municipalities are a classic
5    community of interest?
6            MR. TYSON:  Object to form.
7            THE WITNESS:  I didn't run that
8        report.
9    BY MR. SAVITZKY:
10       Q.   You didn't run a splits report on regions?
11       A.   I'm not aware of that.  It's certainly not
12   a standard report in Maptitude by any means.
13       Q.   Did you run a metro area or C.B.S.A.
14   splits report?
15       A.   No.
16       Q.   Okay.  Now, plan component report, what's
17   that?
18       A.   So --
19       Q.   What does that tell us?
20       A.   -- the plan component report will show, in
21   this case you can choose the level detail, and I
22   chose the county level of detail, so it shows the
23   portions from a county that are in a district.
24           So if -- let's say you have a district
25   that has portions of two counties, it'll show you

1  the portion in the district from each of those two
2  counties.  And that gives you a way to make
3  comparisons to some of these county split areas.
4       Q.   And core constituency report comparing the
5  PI-2 plan, is that just showing the changes between
6  the Cooper 12/05 plan and the Cooper PI-2 plan?
7       A.   Yes.  In this sense, because this will be
8  going probably to a court situation, I thought it
9  would be a useful point to show what the
10 differences are in something that's been previously
11 looked at, the PI-2 plan, and the 12/05 plan.
12      Q.   And the core constituency report compared
13 to the enacted, that shows the differences between
14 the Cooper illustrative and the 2021 enacted map?
15      A.   That's correct.
16      Q.   Okay.  Did you run a core constituency
17 report with the benchmark plan that existed in the
18 previous decade?
19      A.   So I think I may have.  And that's why I'm
20 saying I might have -- I'm trying -- that's why I'm
21 trying to say I don't know if it's here or if it's
22 in -- I don't think it's included in the reports,
23 I'm -- or the appendices.  I'd really have to look
24 at the appendices to see.
25      Q.   Where else would it be?

1      A.   Well, that's what I'm saying.  I think I

2   just need to see if it's in the appendices or not,

3   if I could.

4      Q.   That's okay.

5      A.   Okay.

6      Q.   You don't list core constituency

7   comparison to the benchmarks in this list of seven,

8   do you?

9      A.   Yeah.  That's right.  But I'm trying to

10  say that it might have been run.  Because I had the

11  prior plans, and it's something that could have

12  been done.

13     Q.   Okay.

14     A.   So that's why I'm saying I'm not sure if

15  it's in the appendices.  And if I can look, I can

16  check that.

17     Q.   So when comparing Cooper's maps to the

18  enacted maps, did you consider the redistricting

19  principles set out by the State of Georgia that we

20  previously talked about that have been marked as

21  Exhibit 2 --

22          MR. ZABEL:  Three.

23  BY MR. SAVITZKY:

24     Q.   -- 3?  Did you consider those?

25     A.   It's not in the report.

1      Q.   Okay.  And let's just, just a bit -- well,
2   actually, that's fine.
3           When we talked about your December 5th
4   report, you mentioned that communities of interest
5   can have many definitions; is that right?
6      A.   Yes.  I -- and again, in that report I was
7   talking in general terms about redistricting plans,
8   not as specific to these plans.
9      Q.   Okay.  Is your definition of communities
10  of interest the same when you talk about it in your
11  January 23rd report?
12     A.   I didn't -- I don't know that I talk about
13  communities of interest in the same way.  In the
14  12/05 report, I think I was using a longer list of
15  examples, and some of them might not have been
16  applicable to Georgia.
17          For example, I discussed the use of county
18  subdivisions, which are something that map drawers
19  use but are commonly not used in Georgia in my
20  experience.  So I identified that as something that
21  is of -- you know, something that's used in the
22  drawing process but less so in Georgia.
23     Q.   Did you evaluate communities of interest
24  in looking at the Cooper 12/05 reports -- Cooper
25  12/05 maps?  Excuse me.

1    A.    I think that, in some cases, the
2    communities of interest were looked at, yes.
3    Q.    Okay.  In what cases?
4    A.    I think that, when I was looking at
5    geographical areas, say the area of Griffin in
6    Spalding County or I talked about maybe
7    Milledgeville, places like that.
8    Q.    Did you do any quantitative analysis that
9    took into account communities of interest for
10   purposes of your comparison to the Cooper 12/05 and
11   enacted plans?
12   A.    Well, as we talked about earlier, I'm
13   doing this from a map drawing perspective, so it's
14   not really an academic analysis in that sense, so I
15   didn't have a quantitative analysis of that
16   information.
17   Q.    And you didn't run any Maptitude reports
18   that could assist you in making that determination?
19   A.    I ran many Maptitude reports.  Some of
20   them could be used to look at that.  And I probably
21   did in the sense that I'm looking at fractions of
22   districts when I looked at the county reports.
23        And sometimes I compare taking a portion
24   of the county that's in one district and, if you
25   put that portion in another district, here is the

1    effect of that.

2            So in that sense, I was looking at

3    communities that were from the Maptitude reports

4    but -- and again, it's -- this is from the

5    population -- or sorry, the plan component report.

6    So in that sense, that's part of the community

7    analysis.

8        Q.   So other than the plan component report,

9    did any of your other Maptitude reports lend

10   themselves to any consideration of communities of

11   interest?

12       A.   I would say that the subdivision splits

13   can be looked at in that way sometimes, yes.

14       Q.   Okay.  So other than counties as

15   communities of interest, did you look at any other

16   communities of interest by examining any of the

17   Maptitude reports that you ran?

18       A.   Yes.  I looked at the voting precinct

19   splits as well.

20       Q.   Okay.  So other than counties and voting

21   districts, did you consider any other communities

22   of interest through the examination of the

23   Maptitude reports that you ran?

24       A.   Well, again, in the report I might have

25   referred to something else, but it's probably

1    derivative of those reports.

2         Q.   Did you consider socio-economic factors in

3    comparing the two plans?

4         A.   No.  Not generally.

5         Q.   Do you disagree with any of the

6    assessments of socio-economic commonalities or

7    disparities that are set forth in Bill Cooper's

8    report?

9              MR. TYSON:  Object to form.

10             THE WITNESS:  I don't understand.

11   BY MR. SAVITZKY:

12        Q.   Did you read the portions of Bill Cooper's

13   report where he talks about socio-economic

14   commonalities between different areas in Georgia?

15        A.   I may have read through that, but I didn't

16   comment on that in my report, no.

17        Q.   Did you consider which map better complies

18   with the Voting Rights Act?

19        A.   I --

20             MR. TYSON:  Object to form.

21             THE WITNESS:  Sorry.  I wasn't

22        analyzing from that perspective in this

23        report.

24   BY MR. SAVITZKY:

25        Q.   All right.  So looking at your Paragraph

1    12, you say you:

2              "...created a series of maps

3          comparing the 12/05 plans and the

4          enacted plans."

5              Those show any-part black voting age

6    percentage at the V.T.D. level with certain

7    district lines overlaid.  How did you choose which

8    districts to include in the images that you have in

9    your report?

10       A.   In the most general terms, I probably

11   looked at areas that had a contrast that was

12   apparent in the most general form.

13              And other than that, I'd have to look at

14   the exhibits specifically to see if there's

15   something that I included that I didn't reference

16   in the report but is included in the exhibits.

17       Q.   And did you include all of the black

18   majority districts or just some?

19       A.   I'd have to look at the exhibits.  I don't

20   know that I included all of them.

21       Q.   Okay.  Was there any particular rule or --

22       A.   Well --

23       Q.   -- that you used to figure out which

24   districts you were going to run off images of?

25       A.    Well, I think I identified that there were

1    some districts that were exactly the same.  So if I
2    did a map of them, they would be exactly the same.
3    So in that sense, there's no comparison to make
4    because they're the same.
5        Q.   Okay.  So I want to get into the meat of
6    the report.  As we move into talking about the
7    specific regions and districts, I just want to
8    confirm what we have here is the complete analysis
9    of all the districts and regions that you are
10   relying on for your ultimate conclusions here.
11       A.   As far as I know, that's correct.  I'd
12   have -- again, I'd like to look at the exhibits to
13   confirm that if I have a chance.
14       Q.   Sure.  I mean, and to be clear I include,
15   you know, if there's some analysis that's in the,
16   you know, in the exhibits, then I understand.
17       A.   Well, in one sense, when you're talking
18   about creating the illustrative maps, you know,
19   that data is available in print-out format.
20            But the visual where I combine the
21   underlying voting district theme map and overlay
22   with districts, that's, you know, a different
23   visual.  So I have that in the appendix for many
24   districts, not all.
25       Q.   So -- understand.  And setting aside the

1      visuals, I know you include many visuals, and we

2      talked about that.  But just before we get into

3      your senate plan and house plan analysis where you

4      talk about some specific regions and districts, I

5      just want to confirm, there isn't some additional

6      analysis of some other regions or other districts

7      that you did but didn't include in this report as a

8      basis for your conclusions?

9          A.    No.

10         Q.    Okay.  Great.  So let's look at your state

11     senate plan analysis, which starts at Paragraph 13.

12             You say you tallied -- and I'm on Page 5.

13     You say you:

14             "...tallied the number of majority

15          black districts using any-part black

16          voting age population for each senate

17          plan."

18             And you provided the number of districts

19     in the percentage ranges using the any-part black

20     voting age population.  And I think that's

21     reflected, actually, on the next page.

22         A.    Yes.

23         Q.    Why is that percentage range important?

24     Why do you report that?

25         A.    Well, to the benefit of the Court, this

1   was the same breaks that were from the preliminary

2   injunction hearing.  So I wanted to be consistent,

3   and I used the same breaks here.

4       Q.   But why do you report the breaks?  What do

5   these breaks tell you?

6       A.   Well, they -- they're just every increment

7   of five except for one that's of -- well, two, I

8   guess, that's two and three at the numbers that are

9   closer to 50 percent.

10      Q.   Is there some conclusion that one might

11  draw from a district being 50 to 52 versus 60 to 65

12  versus over 75?

13           I mean, what -- I'm trying to understand

14  what conclusions one might draw from presenting the

15  data in this fashion.

16      A.   Well, I'm sure other analysis might

17  discuss some of that.  And I didn't discuss that in

18  this report.  But I'm just tallying the numbers for

19  those breaks.

20           I would say as you get closer to

21  50 percent, you know, it's easier to say that a

22  single change could affect something being a

23  majority or not being a majority.

24      Q.   Okay.  So and you find in Paragraph 14

25  that Cooper's map has 18 black majority senate

1 districts compared to 14 for the enacted plan; is

2 that right?

3     A.   Yes.  I believe that's true.

4     Q.   All right.  And on Paragraph 15, you say

5 the 12/05 senate map made many changes from the

6 PI-2 map from the previous preliminary injunction

7 phase senate map and it now has one fewer black

8 majority district.

9         Is that right?

10     A.   Yes.

11     Q.   And then in your chart one, you show that

12 there are three fewer districts in that 50 to

13 52 percent range?

14     A.   Yes.  That's correct.

15     Q.   So is the 12/05 map in your view less

16 focused on race than the PI-2 map?

17     A.   I didn't make that determination or

18 attempt to analyze that.

19     Q.   And as you sit here, can you express a

20 view on that?

21     A.   I didn't analyze it.  I didn't really

22 analyze the PI-2 map at all.  I only provided some,

23 as I said, limited information to allow comparison

24 between the 12/05 and the PI-2 maps.

25     Q.   Okay.  You compared the illustrative

1    senate plan to the enacted plan starting at, excuse

2    me, Paragraph 16 and chart two.  Let's talk about

3    your findings.

4             And am I right to think that chart two is

5    sort of summarizing those Maptitude reports that

6    you ran in comparing the 12/05 Cooper and the

7    enacted?

8        A.   Yes.  That's the intention.  These are,

9    like, the top line numbers from those reports

10   generally.

11       Q.   From the seven reports that we talked

12   about from Paragraph 10?

13       A.   Yes.  Some of this information is in one

14   report, some of it's in another, but here in the

15   table it's all together.

16       Q.   Great.

17            So looking at this comparison, you would

18   agree that the illustrative plan that Bill Cooper

19   drew has fewer county splits than the enacted plan;

20   right?

21       A.   I believe that's true.  That's what I

22   found.

23       Q.   And it has fewer voting precinct splits

24   than the enacted plan?

25       A.   Yes.

1      Q.   Okay.  Did you look at total splits as

2   well?

3      A.   No.  That would be something I could look

4   at with the data that I provided.  So I believe it

5   would be possible for me to take the data that's in

6   my exhibit and to count the number of county

7   divisions as opposed to splits.

8      Q.   Do you know which map is better on that

9   total splits metric?

10     A.   No.  But I could look that up or calculate

11  that.

12     Q.   Okay.  Well, actually, we already have the

13  Cooper map marked; right -- or the Cooper report

14  marked; right?  You should have that in front of

15  you.

16     A.   Okay.

17     Q.   If you could just turn very briefly to

18  Figure 21, Paragraph 116.  That's, here we go, Page

19  53.

20     A.   Okay.

21     Q.   And you see split counties, 29 versus 28,

22  same as you.  Total county splits, 60 versus 57.

23  So Cooper's map is also, it's three total splits

24  better?

25     A.   Yeah.  And I did discuss that in a portion

1  of my report.

2      Q.   Okay.  Okay.  And just while we're looking

3  at it, you can see Cooper also does run these

4  municipal splits and finds that the illustrative

5  senate plan splits fewer municipalities and keeps

6  more cities and towns whole.

7          Does that look right to you?

8      A.   It's in the report, and I don't have any

9  basis to question what Mr. Cooper wrote in this

10  report.  I did not run the report on my own.

11      Q.   Okay.  And would you agree that the Cooper

12  illustrative senate plan, just moving down from

13  splits to compactness, would you agree that the

14  Cooper illustrative senate plan is similarly

15  compact overall to the enacted plan?

16      A.   Do you have a reference in Cooper's

17  document or are we looking at my document?

18      Q.   We're -- I'm just looking at your chart

19  two on Page 7 right now.

20      A.   Yes.

21      Q.   You would agree they're similarly compact?

22      A.   Yes.

23      Q.   Point 43 versus point 42.

24      A.   I think I said that in my report.

25      Q.   Yeah.  Okay.  Did you consider minimum

1    compactness?

2        A.    That's in the report.  So it's in the

3    appendix, and that number is in the appendix.

4        Q.    All right.  And just for ease of

5    reference, we can look at Cooper's report again.

6    It's marked as seven, Exhibit 7.  And we can look

7    back at Page 53 and see the low or min score there.

8        A.    Okay.

9        Q.    Do you see it?

10       A.    Yeah.

11       Q.    And you see the min for the 21 plan is

12   point 17 Reock, point 13 Polsby.  Cooper is point

13   22 Reock, point 14 Polsby.  So better minimums as

14   well?

15       A.    Yeah.  Clearly.

16       Q.    All right.  So you agree Cooper is better

17   on that minimum compactness metric?

18            MR. TYSON:  Object to form.

19            THE WITNESS:  I'm sorry.  What do you

20       mean by "better"?

21   BY MR. SAVITZKY:

22       Q.    You would agree that the Cooper map is

23   more compact with respect to the minimum

24   compactness metric?

25       A.    Well, the numbers show that his plan is a

1  higher number than the enacted plan.

2      Q.   So is that a "yes"?

3      A.   The number is higher.

4      Q.   Indicating it's more compact?

5      A.   Indicating that, comparing the two

6  numbers, one is higher than the other.  So.

7      Q.   With respect to compactness?

8      A.   Yes.

9      Q.   So just moving down, paired incumbents,

10  looks like Cooper pairs six incumbents versus four

11  in the enacted.

12      A.   Okay.

13      Q.   And population deviation, Cooper's

14  deviation actually looks like it's a little

15  smaller, although you report the overall range is

16  the same?

17      A.   Yeah.

18      Q.   But it's actually, it looks like Cooper's

19  point 01 better, not -- they're both the same,

20  basically; right?

21      A.   The Maptitude reports show that

22  information.

23      Q.   Substantially equal in terms of that

24  population deviation; would you say --

25      A.   Yes.

1        Q.    -- that's right?

2        A.    That's right.

3        Q.    Okay.  All right.  So you, and you say,

4    and now looking at Paragraph 17, that the Cooper

5    plan aligns more closely to the enacted senate plan

6    than the PI-2 plan?

7        A.    Yes.  I thought that was an important

8    point to point out.  Even though I'm not discussing

9    the PI-2 plan very much, I thought it was important

10   to point that out.

11       Q.    But setting aside the PI-2 plan, it

12   actually aligns closely just with the senate

13   enacted plan, doesn't it?

14       A.    Yeah, I think there are some important

15   differences.

16       Q.    Well, it splits fewer counties.

17       A.    If -- I'm sorry.  I'm not -- you're asking

18   me a general question.  Referencing my whole

19   report, there are significant differences beyond

20   this top line analysis.

21       Q.    Right.  But with respect to the top line

22   analysis, which was the basis for your statement

23   here that we're talking about.

24       A.    I'm sorry.  Basis of what statement?

25       Q.    The statement that the Cooper 12/05 plan

1    aligns more closely with the enacted senate plan

2    than the Cooper PI-2 plan.

3         A.    Yes.  But I didn't say anything as to how

4    it aligns with the enacted plan.

5         Q.    Just looking at your chart two, would you

6    agree the Cooper senate plan is the same or better

7    than the enacted plan on all of the metrics that

8    you identify?

9              MR. TYSON:  Object to form.

10              THE WITNESS:  I, again, I don't quite

11         understand.  I show the information and

12         the comparisons we just went over in

13         detail.

14    BY MR. SAVITZKY:

15         Q.    Are there any metrics that you look at

16    here where the Cooper plan doesn't perform as well

17    as the illustrative plan --

18         A.    I --

19         Q.    -- or the, as the enacted plan?

20         A.    Yes.  There are the voting precinct

21    splits -- sorry, the compactness is better.  Yeah,

22    no, I'd say -- we talked about the deviation.  It

23    looks like they're all very similar.

24              And some numbers are higher than the

25    enacted plan, and most numbers are higher for the

1   compactness, lower for the splits, more for the

2   incumbents.

3        Q.   Okay.  And just to be clear for the

4   record, the Cooper plan is better on voting

5   district splits?

6             MR. TYSON:  Object to form.

7             THE WITNESS:  Again, the number is

8        higher on the enacted plan for splits and

9        lower on the Cooper plan for splits.

10  BY MR. SAVITZKY:

11       Q.   Got it.

12            So let's -- just hold one second.

13            And you say that 21 of the 56 districts in

14  the Cooper plan are identical to the enacted map?

15       A.   I believe that's correct.

16       Q.   And you say on Paragraph 18, moving along

17  to Page 8:

18            [As read]  "The Cooper 12/05

19        senate plan has 35 of 56 districts

20        drawn differently but still has mean

21        compacted scores close to the enacted

22        plan, with" mean compactness -- "with

23        the mean compactness score on Reock

24        higher and the mean compactness score

25        in Polsby lower."

1           But I think we already discussed you agree
2       those compactness scores are virtually identical?
3           A.    Yes.
4           Q.    Okay.  Now, let's look at your regional
5       analysis starting at Paragraph 19.  You did an
6       analysis of the metro region with respect to the
7       senate map, and you focus on a cluster of four
8       senate districts that you selected.
9           Is that -- do I have that right?
10          A.    Yes.  They're senate districts in the same
11      area, same region.
12          Q.    Uh-huh.  And just looking at Page 10 of
13      your report, can you confirm that the map on Page
14      10 is supposed to depict districts from the enacted
15      map?
16          A.    Just a moment.
17          Q.    And not to hide the ball, but I just --
18      because it says Cooper on top, but I'm pretty sure
19      that --
20          A.    Does it say it on both?
21          Q.    It says it on both.
22          A.    Okay.
23          Q.    And I think this is the enacted side --
24                MR. TYSON:  Yeah, the --
25      BY MR. SAVITZKY:

1          Q.    -- so I just want to be clear.

2              MR. TYSON:  Yeah.

3              THE WITNESS:  Okay.  So, so one

4        thing -- thank you.

5              So the way that these reports are

6        done, I have to manually create the

7        titles.  So if I didn't have the correct

8        title, there's an additional piece of

9        information that will tell you the

10       difference.

11             And that is that the enacted plan

12       maps in this series are dark blue and the

13       Cooper plans are purple.  So that will

14       also give you the information.

15             If the title is incorrect, I --

16   BY MR. SAVITZKY:

17       Q.    Okay.

18       A.    -- then the title is incorrect and I'm

19   still referring to what I'm referring to.

20       Q.    Mr. Morgan, I'm embarrassed to say so, but

21   I know these district shapes by heart at this

22   point.  So I can use that, too.

23       A.    Okay.  But the point is that there is an

24   additional piece of information there, which is the

25   coloration of the boundaries.

1      Q.   So just to be clear for the record, the

2   map on Page 10 is the enacted map and the map on

3   Page 12 is the Cooper map?

4      A.   Yes.  Thank you.

5      Q.   Got it.  Okay.

6           So is this cluster analysis -- I'm calling

7   it a cluster analysis if -- does that work for you

8   for me to call it that?

9      A.   If you'd like.

10      Q.   Okay.  Does this cluster analysis that you

11   do with these maps on Pages 10 and 12, is this the

12   only analysis of the Cooper senate map in the

13   Atlanta metro area that you conducted?

14      A.   I think there's some references in the

15   text of the report as well.

16      Q.   Okay.  Is this the only cluster of

17   districts that you looked at in this way?

18      A.   Well, I think a lot of the other

19   districts, as I said, were exactly the same.

20      Q.   What do you mean "exactly the same"?

21      A.   Well, for example, some of the districts

22   in Fulton County were exactly the same.

23      Q.   Okay.  So you compared enacted districts

24   10, 16, 34 and 44 with Cooper's senate districts

25   10, 16, 28 and 34; is that right?

1      A.   Yeah, I believe so.

2      Q.   Okay.  How did you pick those sets of

3  districts?

4      A.   Well, as we discussed in the 12/05 report

5  that I did, I took these districts from similar

6  geographic regions, comprised mostly of counties,

7  but they're not going to correspond exactly because

8  the plans don't correspond exactly.

9      Q.   And how did you pick this geographic area

10  to focus on?

11     A.   I would say, again, the counties are

12  mostly associated in the enacted plan.  So we've

13  got Clayton, it has Fayette, you know, DeKalb with

14  Clayton, you have DeKalb with Henry, and then you

15  have Fayette and Spalding.

16          And in the Cooper plan, you have slightly

17  different pairings but similar territory.  It's not

18  exact, but it's similar territory.

19     Q.   But I guess, I mean, why not look at a

20  cluster of districts, you know, in Newton and

21  Rockdale and Henry Counties?  You know, why pick

22  this set of counties and this, you know --

23     A.   Well --

24     Q.   -- piece of the metro area to look at?

25     A.   Sure.  So all of the data is available in

1    the appendix to the report, so it's possible to
2    look at any district you want to make a comparison
3    to.  But I chose this district because it does show
4    differences.  And I'm showing some differences in
5    the two plans.
6         Q.   Right.  I mean, you conducted a cluster
7    analysis examining the compactness of these
8    particular districts, which you didn't do for
9    other -- any other set of districts in the metro
10   area?
11        A.   In the metro area?  I don't think so.  I
12   mean, I talked about -- I think I talked about
13   another district in the metro area.  Yeah, I talked
14   about Spalding a little bit.
15        Q.   Did you run any analysis to determine how
16   much these groups of four districts overlap in a
17   core constituency analysis between the two?
18        A.   Well, I mean, the core constituency
19   analyses are included as an appendix in the report,
20   so that information is available.  But I didn't
21   highlight it or discuss it in the verbal part of
22   the report.
23        Q.   Do you know how much this set of districts
24   overlaps?
25        A.   No.  I didn't look at that specifically.

1    Again, I was picking these counties and looking at

2    districts that are generally in that area.

3        Q.   And when you look at these maps, we can

4    only see the district lines for the set of four

5    districts that you selected?

6        A.   In this map, that's correct.  However, in

7    the appendix, there are additional single districts

8    that we could look at.

9        Q.   When we look at these maps, we can't see

10   whether the lines of the surrounding districts are

11   more or less compact or split more or fewer

12   counties in one map or the other?

13       A.   There are four districts on this map in

14   the enacted and the Cooper plan.

15       Q.   Yeah.  So you're -- in this analysis, you

16   can only see the districts that you selected?

17       A.   Yes.

18       Q.   So let's turn to some of the districts

19   that you selected.  On the enacted map you've got

20   enacted District 10 you describe in Paragraph 21.

21   You say it's a 71.5 percent B.V.A.P. district.  And

22   you say it stretches for 25 miles across from

23   DeKalb, Henry County to the Spalding County line.

24          How do you measure those distances, by the

25   way?  How did you do that?

1          A.    In Maptitude there's a distance measuring

2     tool.  I made the measurement.  I put it in the

3     report.

4          Q.    Border to border?

5          A.    Yes.

6          Q.    Okay.  That's, like, the longest distance

7     is 25 miles?

8          A.    That's right.

9          Q.    Okay.  And then at Paragraph 22, you

10    describe District 44, 70.3 percent black district,

11    20 miles, again from DeKalb down to the Spalding

12    County line?

13         A.    Yes.

14         Q.    Okay.  District 34, the 69.5 percent black

15    district, 15 miles across, and you say it includes

16    parts of three counties?

17         A.    I did.  If I didn't get that correct, I

18    don't know.  Let me see.  In the enacted or in the

19    Cooper?

20         Q.    Enacted.  These are all enacted districts.

21         A.    Yes.  That's correct.

22         Q.    And then the last of the enacted districts

23    that you select --

24         A.    Oh, wait.  Wait, wait, wait.  I'm sorry.

25    Is it?  In the enacted --

1     Q.   I'm looking at, yeah, Paragraph 21 through

2  24, your description of the four districts that you

3  selected.

4     A.   Maybe it's only two.  I -- there's a --

5  it's two portions of Clayton County.  So if -- I

6  might have seen that as three.  So if it's, in

7  fact, two, then it's two.  But it's not --

8     Q.   Could there be, like, a little V.T.D. in

9  there from another district?

10     A.   I don't think so.  I think what I'm

11  seeing, if you look on the map on Page 10, it cuts

12  Clayton County -- or it has two different portions

13  of Clayton County.  So I may have inadvertently

14  listed that as another county, which I didn't

15  really intend to do.

16     Q.   Okay.  So then District 16 is your last

17  one.  You describe that at Paragraph 24 in your

18  report on Page 11.  You say it goes from

19  Fayetteville in Atlanta, in the Atlanta metro, all

20  the way out to Pike and Lamar Counties, stretching

21  for over 50 miles?

22     A.   That's right.

23     Q.   And that's a 22.7 percent B.V.A.P.

24  district?

25     A.   Yes.

1      Q.   And you describe District 16 as ex-urban.

2   What do you mean by that?

3      A.   It's primarily away from the more

4   populated areas of Atlanta metro.

5      Q.   Did you run any population density reports

6   to determine the population density of that area or

7   any regions within that area?

8      A.   No.  I'm familiar with that area.

9      Q.   So you picked a set of Atlanta metro

10  districts where there are three districts that are

11  approximately 70 percent black and one that's under

12  30 percent?

13     A.   Yes.  Those are the districts that are in

14  this map.

15     Q.   Okay.  In the enacted map, the portion of

16  northern Fayette County that has a higher black

17  population, just looking at your chart, is drawn

18  into a 70 percent black district combined with

19  Clayton County; is that right?

20     A.   The district is that, yes.

21     Q.   So in looking at your map on Page 10,

22  would you say that, under the enacted map, Fayette

23  County is being split along racial lines?

24     A.   I would say that -- and again, it's -- the

25  one precinct in Clayton I have to discount.  I

1 would say that most of the black population is in

2 the northern District 34, but there are looks like

3 two or three precincts that have some black

4 population that are not in that.

5 It's a north-south split. It also happens

6 to have most of the black population.

7 Q. So generally, yes, it is being split along

8 racial lines?

9 A. I don't know. It's north and south. It

10 also happens to be most of the black population is

11 in the north in the county, and it's in the

12 northern District 34.

13 Q. So and then looking at Paragraph 25, you

14 say:

15 [As read] "By contrast, the

16 Cooper 12/05 senate map [sic]

17 strategically cuts Clayton County in

18 three places to connect heavier

19 concentration of black voters with

20 whiter, more ex-urban population."

21 What's the basis for using the word

22 "strategically" there?

23 A. Because in this case it's split three

24 ways, and it's using the high concentration of

25 black population in the tail, the southern portion

1    of Clayton County, and pairing it with Fayette but

2    not Peachtree City, and then connecting all the way

3    down to the black population in Spalding County and

4    Griffin.

5         Q.    So your use of the word "strategically" is

6    just based on that's how it looks to you just

7    visually looking at the map?

8         A.    No.  I would say that I make a comparison

9    pointing out that you could put the balance of

10   Fayette County in that district and take out

11   Spalding and it would change the racial component,

12   and it would be less than 50 percent

13   African-American voting strength.

14            And so in that sense, it's necessary to

15   have a higher concentration of black population

16   from Clayton.  It's not really -- it's not going to

17   end up with a majority district without connecting

18   the portion of Fayette, the portion of Clayton and

19   Griffin.

20            And so I gave an example in the text of,

21   if you just made Fayette whole and swapped out

22   Fayette and Spalding, you would not have a majority

23   black district.

24            So in that sense, the Clayton portion has

25   a high concentration of black voters and it's

1    using -- it's being used strategically to create a

2    majority district.  And then I detail that in the

3    report.

4         Q.   So other than this point about the

5    Spalding and Fayette, swapping these pieces, and

6    your sort of visual just read, is that the basis

7    for your statement that -- I mean, your basis of

8    your -- is that the basis of the -- of your use of

9    the word "strategically"?

10        A.   Well, I mentioned also, that was one

11   example, District 28, and then you've got the

12   adjacent district that goes from northern Clayton

13   all the way down to the more white portions of

14   Spalding County.

15        Q.   That's a different district than --

16        A.   Yeah.

17        Q.   Okay.

18        A.   And that's what I'm saying, Clayton County

19   is parcelled out in that way.

20        Q.   So let's talk about the Cooper map

21   districts individually, then.  You say, and I'm

22   looking at -- still looking at Paragraph 25, you

23   say:

24             [As read]  "...Cooper S.D. 16 is

25        anchored in heavily blank northern

1           Clayton County" and "avoids the black

2           population in the tail of southern

3           Clayton County and stretches through

4           Henry County to pick up predominantly

5           white portions of Spalding County."

6                Is there, other than what we've talked

7      about already, is there any other basis for your

8      use of the word "strategically" there in

9      describing --

10      A.   Well, I talked about strategically

11      bypassing Clayton County, because it would be

12      pretty easy to just continue going down and picking

13      up precincts in Clayton County, but then it would

14      affect the black percentages of those districts.

15      Q.   Is there any quantitative basis for your

16      use of the word "strategically" there?

17      A.    I thought it was pretty clear from the

18      context what I'm saying.

19      Q.    So is that a "no," there's no quantitative

20      basis for it?

21      A.    Well, this is my opinion.  So I'm giving

22      my opinion.

23      Q.    Is your characterization supported by any

24      difference in compactness between the districts?

25      A.    Well, I think I point out that District 16

1   is more elongated here.  And I believe it was a
2   greater distance.
3       Q.   How does the compactness score for
4   District 16 compare to the compactness score for
5   District 44 in the enacted map?
6       A.   Is it in the report?  I think it is.  What
7   are you asking me to compare?
8       Q.   Illustrative 16 and enacted 44.
9       A.   Okay.  So illustrative 16 is point 26
10  Reock and point 19.  And then you want me to
11  compare it to which one, 40 -- 44?
12      Q.   Yep.
13      A.   It's point 28 -- no, that's ten.  It's
14  number 44.  Point 18 and point 19.
15      Q.   So the Cooper district is more compact?
16      A.   Well, on the compactness measure it is,
17  but it has -- the enacted one has a shorter
18  distance.
19      Q.   You talk about splitting Clayton County.
20  Don't both plans split Clayton County?
21      A.   Yes.
22      Q.   Doesn't Clayton County need to be split?
23      A.   Yes.  And in the enacted plan, it's split
24  one time into two districts.  In the Cooper plan,
25   it's split into three districts.

1      Q.   So it's one additional split of Clayton

2   County?

3      A.   Yes.

4      Q.   Do you know what the population of Clayton

5   County is?

6      A.   It's going to be enough for about 1.4

7   senate districts.  It's more than one senate

8   district.

9      Q.   When you compare these districts, did you

10  consider any differences in communities of

11  interest?

12     A.   I don't know that there's a community of

13  interest between northern Clayton County and

14  southern Spalding County.

15     Q.   Do you know, for example, if Fayetteville

16  is made whole in one or the other of these maps?

17     A.   I've been to Fayetteville, and I would

18  assume that Fayetteville is whole in the Cooper

19  map.  It appears to be on the map.

20     Q.   Would that be a reason to draw the map

21  more in the way that Cooper did?

22     A.   No.

23     Q.   That's your opinion?

24     A.   Yes.  I think there's more to it than that

25  by quite a bit.

1      Q.   So you mentioned Spalding County.

2      A.   I did.

3      Q.   Looking at Cooper's District 16, and you

4   said, oh, it -- you said it goes to pick up V.T.D.s

5   in eastern Spalding County.  Just looking at your

6   chart three on Page 14, looks like the total

7   population in District 16 Spalding County is 7,500

8   people; is that right?

9      A.   That's right.  And it's fairly white.

10     Q.   Is it 7,500?

11          MR. TYSON:  Total pop or black

12      population at 16?

13          THE WITNESS:  Yeah, the total --

14   BY MR. SAVITZKY:

15     Q.   Oh, 25,000.

16     A.   -- 25,000.

17          MR. TYSON:  Yeah.

18   BY MR. SAVITZKY:

19     Q.   25,000, right.  Yeah, that's right.

20   That's right.

21          THE WITNESS:  No, you're looking at

22      the black population --

23   BY MR. SAVITZKY:

24     Q.   That's right.

25     A.   -- at 7,500.

1     Q.   25 --

2     A.   It's 25,000.

3     Q.   All right.

4     A.   So it's roughly a third of Spalding

5  County.

6     Q.   But it's roughly 15 percent of a senate

7  district; right?

8     A.   Yes.

9     Q.   So looking at Paragraph 26, you describe

10  Cooper's district as being 22 miles north to south?

11     A.   Yes.

12     Q.   And enacted is 25 miles north to south?

13     A.   Yes.

14     Q.   So that one is less elongated?

15     A.   Which district, sorry?

16     Q.   District 10.

17     A.   Okay.  I'm sorry.  I -- could you repeat

18  the question?  Which two districts are we

19  comparing?

20     Q.   District 10.

21     A.   In which plan?

22     Q.   Cooper.  Paragraph 26.

23     A.   22 miles Cooper, yes.

24     Q.   Yeah.

25     A.   And then we're comparing that to which?

1      Q.   District 10 in the --

2      A.   In the enacted?

3      Q.   25 miles versus 22 miles for Cooper, so

4  Cooper's a little less elongated?

5      A.   In that measurement, yes.

6      Q.   And better compactness in Cooper's

7  district?

8      A.   Yes.

9      Q.   So and then Paragraph 27 -- and you don't

10  say that anything about that is strategic, do you?

11     A.   In what sense?

12     Q.   I mean, you just don't use the word

13  "strategic" or you don't say there's anything

14  strategic about the construction of Cooper's

15  District 10?

16     A.   No.  Because it's not bypassing anything,

17  and it's combining a relatively high concentration

18  of black population in DeKalb with relatively lower

19  but still substantial black population in Henry

20  County.

21          And then the chart on -- chart three on

22  Page 14 shows the composition of those fragments of

23  counties as well.

24     Q.   And moving on to Paragraph 27, you look at

25  Cooper District 20 -- 34, excuse me.  That's a --

1    noticeably less elongated, right, than enacted 34,

2    isn't it, much more compact?

3         A.    Yeah.  It's roughly the same part of

4    Fulton going into Clayton instead of Fulton going

5    into Fayette.

6         Q.    Okay.  It's ten miles versus 15 miles, so

7    smaller, and the compactness score is point

8    56/point four versus point 45/point 34?

9         A.    Yes.

10        Q.    And looking and now moving to Paragraph

11   28, you say:

12             "The construction of Cooper 12/05

13         S.D. 28 combines heavily black tail,"

14          there should be a "the" there --

15        A.    Thank you.

16        Q.    -- "of southern Clayton County

17         with part of Fayette County and part

18         of Spalding County.

19             [As read]  "The Cooper 12/05 plan

20          strategically utilizes the black

21          population in these three counties..."

22        A.    Yes.

23        Q.    Again, is there any quantitative basis for

24   this assertion that the black population is being

25   strategically utilized?

1     A.    Yes.   I looked at the plan components in
2     chart three, and I discussed how changing Spalding
3     and Fayette would have a different result.  And
4     that supports my conclusion that he's strategically
5     using the heavily black area of Clayton to make an
6     effective district.  But it's not enough because
7     you also have to go to Spalding and you have to go
8     to Griffin.
9     Q.    And other than that, is there any other
10    quantitative analysis that supports your
11    conclusion?
12    A.    I mean, the data is here.
13    Q.    So enacted Senate District 16, which is
14    the one that goes from Fayette down to Pike and
15    Lamar, and Cooper 28, which we're talking about
16    now, have the same Reock score, don't they?
17    A.    I assume so.
18    Q.    And enacted 16 stretches for 50 miles --
19    A.    Yeah, it does.
20    Q.    -- whereas, Cooper's is --
21    A.    And I would argue that --
22    Q.    -- 24 miles.
23    A.    And I would argue, and it is my opinion
24    that Pike, Lamar and Spalding are an identifiable
25    community, and then southern Fayette could be as

1    well.

2         Q.    Okay.

3         A.    Or as I described them, as ex-urban.

4         Q.    So you think that the enacted map does a

5    better job with communities of interest, but the

6    Cooper map draws a less elongated and more compact

7    or equally compact district?

8         A.    In that last specific example of District

9    28, you're substituting the Clayton County split

10   for Pike and Lamar, yeah.  And so it's not as great

11   a distance but, as I pointed out, it's very careful

12   in what population it includes and doesn't include.

13        Q.    So and just stepping back and looking at

14   the group of senate districts that you selected,

15   some of Cooper's are more compact and less

16   elongated than some of the ones in the enacted?

17        A.    Yeah.  That's right.

18        Q.    So just looking at your chart three on

19   Page 14, you say that -- or you say you looked at

20   the plan components for this set of four districts.

21   But it's actually a different group.  You include

22   District 39 here, which I guess is because you --

23   so I mean, I'm just trying to understand.

24             So this chart is a slightly different

25   point you're making, it doesn't directly relate to

1    the maps that we were just looking at?

2         A.    Yeah.   It is a little different.   So

3    again, we looked at those.   Some of this

4    information overlaps.   Like 34, 16 and 28, those

5    are the Cooper plans.   And then I've also added 39.

6    And that's where we're -- I'm talking about using

7    this chart to describe swapping out, basically

8    making Fayette whole.

9              And I describe what that would result in

10   if you made a swap of the 44,000 of Fayette that's

11   in a different district for the 44,000 in --

12   what's, sorry, what was -- Spalding.

13        Q.    So your point with this is that -- your

14   point with this chart is that Cooper -- is you say

15   Cooper could have replaced the Spalding County

16   portion of illustrative District 48 with the

17   balance of Fayette County?

18        A.    Yes.   And by doing that, it would reduce

19   the black population below majority, which I state

20   in the report.

21        Q.    Okay.   And in a plan that replaced the

22   Spalding County portion of District 28 with the

23   balance of Fayette County, what district would

24   the -- would that portion of Spalding County then

25   go into?

1     A.   I didn't look at that.

2     Q.   Could you just swap the two out?

3     A.   Well, I mean --

4     Q.   In other words, right now under the Cooper

5   plan --

6     A.   So technically, yes, you could.

7     Q.   You could.  So then you would have

8   District 39 would be non-contiguous?

9     A.   No.  I think if I look at this correctly,

10  Spalding and Coweta are contiguous.

11        Yeah.

12        MR. TYSON:  If you want to look at

13      Cooper's plan, it's 17A is where it would

14      show that.

15        MR. SAVITZKY:  Okay.

16        MR. TYSON:  Yeah.  On Page --

17        THE WITNESS:  So --

18        MR. TYSON:  -- 42.

19        THE WITNESS:  -- Coweta's the --

20        MR. SAVITZKY:  Okay.

21        THE WITNESS:  Coweta's the green

22      district --

23  BY MR. SAVITZKY:

24     Q.   And would --

25     A.   -- that's connected.

1     Q.   And would --

2     A.   Sorry.

3     Q.   -- both of those districts be within the

4  one, the plus or minus one population deviation?

5     A.   One would be, and one would have to be

6  adjusted with the boundary in Spalding, which could

7  be done with the other district that has part of

8  Spalding.

9     Q.   And then would that district be in

10  population?

11     A.   I'd have to look at it.  I wasn't doing --

12  I was basically making a one district comparison to

13  make the point that the -- if you kept Fayette

14  whole, it wouldn't be a majority black district.

15  It's necessary to have that portion of Spalding.

16     Q.   And you don't know whether that's the only

17  way to draw black majority districts in that

18  area --

19     A.   Of course --

20     Q.   -- are you?

21     A.   -- not.  I'm sure there's many different

22  ways.  I'm just, I'm commenting on the one that was

23  drawn --

24     Q.   Okay.

25     A.   -- in Mr. Cooper's plan.

1    Q.   So in Paragraph 30, you say:

2         "Looking at specific districts (as

3     above) demonstrates the racial focus

4     of the Cooper 12/05 plan in this

5     area."

6    A.   Yes.

7    Q.   And by "this area," you mean the metro

8    Atlanta area?

9    A.   I was looking at those specific districts

10   in that area.

11   Q.   Is there any other analysis in your report

12   that you contend demonstrates the racial focus of

13   the Cooper senate plan in the metro Atlanta area?

14   A.   I picked these specific examples and gave

15   these specific examples.  It's part of my overall

16   conclusion.

17   Q.   So there isn't any other analysis of the

18   same districts in the metro Atlanta area that --

19   A.   It's not written in the report.  And I did

20   run the other reports.  But I wrote about this as

21   an example.

22   Q.   But your report contains the basis and

23   reasons for all of the opinions that you're going

24   to offer in this case?

25   A.   Generally, yes.

1     Q.   And your report doesn't characterize any
2  of the other specific senate districts in the metro
3  Atlanta area as having a racial focus or being
4  strategically drawn?
5     A.   I didn't discuss them in specificity like
6  I did here.
7     Q.   Do you discuss them at all?
8     A.   I didn't discuss them in the report.  I
9  suppose I could have chosen more examples to look
10 at, but I didn't.
11    Q.   So staying on Paragraph 30, you say:
12         "The black percentage is lowered
13          only by elongating the district to
14          include lower concentrations of black
15          population."
16    A.   Yes.
17    Q.   [As read]  "This allows the black
18          population to be redistributed and to
19          create other black majority
20          districts."
21    A.   Yes.
22    Q.   When you say "by elongating the district,"
23 what is the district that you're referring to?
24    A.   Well, there's several districts that do
25 that.  But I would say 16 does that.  And

1    specifically, it is being elongated to get lower

2    concentrations of black population in Spalding

3    County into District 16 in the Cooper plan.

4         Q.   But other districts are less elongated

5    in -- among the four that you've chosen?

6         A.   Some are, some aren't.

7         Q.   Do you ever conclude in your report that

8    Cooper's districts in this area do not comport with

9    traditional districting principles?

10        A.   I don't know that I explicitly said that

11   in this area of the report.

12        Q.   Is that your opinion?

13        A.   I said in my opinion that there was a

14   focus on race to the detriment of these other

15   redistricting factors.

16        Q.   But you're not saying that the plans are

17   inconsistent with traditional districting

18   principles?

19        A.   I didn't say that.  I don't think I said

20   that anywhere in the report.  I said that it -- I

21   said what I said in the concluding statement, and

22   in Paragraph 6, that it's focused on race to the

23   detriment of those factors.

24        Q.   So you're not concluding that the

25   illustrative plans do not comport with traditional

1    districting principles?

2        A.    I --

3            MR. TYSON:  Object to form.

4            THE WITNESS:  I didn't say that

5        specifically.

6    BY MR. SAVITZKY:

7        Q.    And you're not saying it now?

8        A.    I wasn't asked to say that specifically.

9    I'm not saying it now.  If I looked -- I suppose I

10   could look at some more information, but I haven't

11   made that determination.

12       Q.    Okay.  Let's move on to the area that we

13   refer to as the eastern black belt area around

14   Augusta and to the west depicted on Pages 16 and 17

15   in some of the maps that you have here in your

16   report.  And you say on Paragraph 33:

17           "Senate District 22 in the enacted

18       plan is drawn entirely within Richmond

19       County.

20           "Enacted Senate District 22 has a

21       Reock compactness score of point 41

22       and a Polsby-Popper compactness score

23       of point 29, and the district is

24       56.5 percent black."

25           And then you next mention that:

1           "The balance of Richmond County is

2        placed in Senate District 23 along

3        with a portion of Columbia County and

4        nine whole counties.

5           [As read]  "Enacted Senate

6        District 23 has a Reock of point 37,

7        Polsby point 16, 35.84 percent black."

8      A.   Okay.

9      Q.   Now, looking at your map that you have

10   here on Page 17, this is the enacted, I believe --

11   oh, no, here we go.  Page 18 is the enacted map.

12           Enacted Senate District 23 is pretty long,

13   isn't it?

14      A.   Well, it's comprised of, most of them are

15   predominantly rural counties.  It has a lot of

16   them, yeah.

17      Q.   Do you know how long it is?

18      A.   I don't know if I measured it.  So I don't

19   know.

20      Q.   Taliaferro down to Screven and Emanuel

21   Counties?  Do you think the enacted Senate District

22   23 is consistent with traditional districting

23   principles?

24      A.   Generally, yes.  It has one split county

25   in Richmond and one split county in Columbia.

1      Q.   And it's long, but it's mostly whole

2   counties?

3      A.   Yeah.

4      Q.   All right.  And then on Paragraph 34, you

5   say:

6           [As read]  "In order to change the

7           racial make-up of senate Districts 22

8           and 23, the Cooper 12/05 senate plan

9           pushes part of Senate District 22 out

10          of Richmond County into McDuffie,

11          Warren and Glascock, taking in their

12          combined 40 percent black population,

13          which is" you say -- you say,

14          "relatively high in that area."

15     A.   I do say that, yes.

16     Q.   When you say "in order to change the

17   racial make-up," what do you mean?

18     A.   In order to create a majority black

19   district in District 23, it's necessary to take

20   higher concentrations of African-American voters

21   and population out of Richmond County and use that

22   to fill the quota for District 23.

23     Q.   And are you suggesting that the way that

24   Mr. Cooper constructed a black majority district in

25   this area is the only way that one can do that?

1      A.    No.   I've seen other ways they can do it,
2    and it's roughly the same process.
3      Q.    What do you mean "the same process"?
4      A.    I've seen a map in the other case where
5    the district population for District 22 goes into
6    Columbia County, taking the highest concentrations
7    of black population in Columbia County and putting
8    that -- combining that with Richmond, which has the
9    same effect of freeing up higher concentrations of
10    black population in Richmond County to round out
11    and get to 50 percent in the Senate District 23.
12          So even though Cooper's District 23 and
13    Esselstyn's district -- sorry, 22, Cooper's 22 and
14    Esselstyn's 22 have a different shape, their effect
15    is the same.
16      Q.    And you say the combined black population
17    of McDuffie, Warren and Glascock is relatively high
18    for the area.
19          Does Glascock have a B.V.A.P. of under
20    10 percent?
21      A.    Okay.  But I -- when you put the three of
22    them together, it's relatively high.
23      Q.    And you say:
24          "The plan strategically utilizes
25        the black population in those

1           counties..."
2                What's your basis for the assertion "the
3      plan strategically utilizes the black population"?
4           A.    Sure.  I thought I was pretty clear that
5      it's necessary to push the District 22 out of
6      Richmond County and use the area that is higher
7      black concentration as opposed to, say, pushing it
8      out of the county and taking the more -- the
9      precincts that are on the border of Richmond
10     County.
11               It's necessary to go all the way down to
12     the border of -- or all the way up to the border of
13     South Carolina and the city of Augusta and you --
14     that's necessary to get that high concentration.
15     It doesn't work without that.
16               And then, secondly, I discuss the
17     splitting of Wilkes County as well.
18          Q.    How is -- well, you say:
19               "By moving S.D. 22 into those
20          counties" --
21               By which I think you mean McDuffie and --
22          A.    Warren and --
23          Q.    -- Warren and Glascock.
24          A.    -- Glascock.  Correct.
25          Q.    -- "stronger concentrations of

1          black population in Richmond County

2           can be transferred into Senate

3          District 23."

4          A.    Yes.

5          Q.    So the black population is, quote, higher

6     concentration in McDuffie and Warren and Glascock,

7     but it's, quote, stronger concentration in

8     Richmond.

9                I'm just trying to understand, when you

10    call it strong, you call the black population

11    stronger concentration and higher concentration,

12    what's the difference between those two?

13         A.    I believe that the portion of Richmond

14    County that's in Senate District 23 is fairly

15    strong black percentage.

16         Q.    And also outside Richmond County?

17         A.    I'm sorry.  I don't understand.

18         Q.    It seems like there is also a higher or

19    stronger concentration of black population outside

20    of Richmond County and in some of the neighboring

21    counties?

22         A.    Those are relatively small counties.  As a

23    percentage basis, that's correct.  But if you'll

24    notice, I also showed a county map of this region

25    which shows the population of the counties and the

1   black percentages on a single map so that you can

2   compare that area county by county, and it has that

3   information on it.

4       Q.   Wouldn't another way of characterizing it

5   just be that the black population in this whole

6   region in and around Richmond County is numerous

7   and relatively concentrated?

8       A.   No, I don't agree with that.

9       Q.   Well, you described the black population

10  as higher concentration, stronger concentration in

11  a number of these counties.

12          Why is that an unfair characterization?

13      A.   Because I pointed out here in this case

14  that the Richmond County is fractionalized in such

15  a way that a higher concentration is added to those

16  other counties.

17          They're not that high on their own, and

18  it's necessary to have these pieces from

19  Milledgeville all the way to Augusta and things

20  like Wilkes County.

21      Q.   Well, we'll talk about that in a second.

22  But just to be clear, are you saying that the black

23  population in this area is not numerous and

24  concentrated?

25      A.   Well, it depends.  You're adding Baldwin

1    to the equation here.  And without the Augusta

2    piece, no, it's not.

3         Q.   Okay.  So you said that, and I'm looking

4    at Paragraph 35 now, you say:

5              "The construction of Senate

6          District 23" --

7              Just back up for a second.  You said

8    without the Augusta piece, it's not.  But given the

9    existence of Augusta, is the black population in

10   this area numerous and concentrated?

11        A.   So connecting the urban population of

12   Augusta to Milledgeville, I wouldn't say that's

13   compact.

14        Q.   Setting aside the particular shape of any

15   particular district and just thinking about the

16   demographics of the region in general, wouldn't it

17   be fair to say that the black population in this

18   area is numerous and concentrated?

19        A.   No.  I just said no to that question.

20        Q.   Okay.  So you say on Paragraph 35:

21             "The construction of Senate

22         District 23 in the Cooper 12/05 plan

23         splits Wilkes County, taking

24         substantially black population into

25         the district, and excluding the

1      predominantly white population."

2      A.    Yes.

3      Q.    And then looking at your Exhibit 6 --

4      A.    Sorry.  Looking at what?

5      Q.    Oh, we don't actually have the --

6            MR. SAVITZKY:  Or can we get the

7      Exhibit 6 for the Morgan report?  Thanks.

8  BY MR. SAVITZKY:

9      Q.    I can come back to it.

10     A.    Okay.

11     Q.    I'll come back to it.

12     A.    Okay.

13     Q.    Do you know how many people, what the

14  population is, that piece of Wilkes County is, in

15  Cooper Senate District 23?

16     A.    It's in the appendix to my report.

17     Q.    Okay.  So Cooper discusses the Wilkes

18  County split in his report and explains that he

19  used county commission and city lines; is that

20  right?

21     A.    I don't know.  If he says it, he says it.

22     Q.    I'll show it to you.  Page 20 -- Page 51

23  of the Cooper report.

24     A.    Page 51?

25     Q.    Yep.

1      A.   Okay.

2      Q.   So this is county -- is that -- does that

3   look right to you as county commission and city

4   lines?

5      A.   I don't know.  I see it looks like he has

6   the city of Washington.  Is that the dark black

7   line or is --

8      Q.   That's correct.

9      A.   Okay.  So it looks like he split

10  Washington along racial lines, split multiple

11  voting precincts in that area, taking the black

12  population out.

13           The non- -- the portions of the voting

14  precinct that are not in District 23 are

15  considerably less African-American in population.

16     Q.   They're also right on the border with

17  Taliaferro County?

18     A.   Not all of the precincts.

19     Q.   I mean, I think literally all the --

20     A.   That's not --

21     Q.   -- all the precincts in Wilkes --

22     A.   No.

23     Q.   -- almost all of them.

24     A.   That's not true.

25     Q.   And you say that:

1           "Senate District 23 connects

2        separate enclaves of population" --

3      A.    Yes.

4      Q.    -- "including Milledgeville in

5        Baldwin County, which measures a

6        hundred miles away from the eastern

7        part of the district..."

8      A.    Yes.

9      Q.    What do you mean by "enclaves"?

10     A.    I mean that there's a concentrated

11   population of African-Americans in Milledgeville,

12   and it's clearly defined.  You can see it from the

13   maps that I produced.

14          And then you can also see there's a little

15   bit of black population in Washington in Wilkes

16   County and then Augusta, and it's connecting those

17   three.

18     Q.    I mean, Hancock County is majority black,

19   isn't it?

20     A.    Yeah.  It's all in there.  And it's --

21   like, every precinct is majority black.

22     Q.    Washington, Warren, Jefferson County are

23   majority black?

24     A.    I'm not sure.  I don't think that's the

25   case.  If we reference my county map, we can look.

1      Q.    Go ahead.

2      A.    Sure.  I think some of them are and some

3    of them aren't.

4      Q.    I mean, just looking at your map on Page

5    16 --

6      A.    Burke --

7      Q.    -- Hancock County --

8      A.    Burke is not.  Jenkins is not.

9      Q.    But just talking about that you were --

10   you're talking about -- you describe Milledgeville

11   as an enclave.

12     A.    Yes, I do.

13     Q.    But Hancock and Washington and adjacent

14   counties are both majority black.

15     A.    Yes.

16     Q.    Right?

17     A.    Yes.

18     Q.    I guess I'm just wondering what the basis

19   is for your assertion that there are enclaves of

20   black population when a number of neighboring

21   counties are majority black.

22           I mean, isn't this just an area where

23   there's a large black population?

24     A.    No.  I point out that Milledgeville itself

25   has strong African-American concentration, but

1    Baldwin County is not a majority.

2        Q.    It's 43.3 percent black, Baldwin County?

3        A.    And that's not a majority.

4        Q.    That's true.  But there's a -- would you

5    disagree that there's a significant black

6    population in Baldwin County?

7        A.    It's less than a majority.  There's still

8    black population there.

9        Q.    Do you know which district is longer,

10   Cooper's 23 or enacted 23?

11       A.    No.  I reported on the Cooper district

12   stretching from Augusta to Twiggs.

13       Q.    Do you know if Cooper's district is longer

14   than the enacted, which stretches from Taliaferro

15   down to Screven and Emanuel?

16       A.    No, I didn't measure that.

17       Q.    Do you know which district is more

18   compact?

19       A.    I think it's reported in my report.

20       Q.    Which one's more compact?

21       A.    I'd have to look at it.  We're looking at

22   Senate District 23?

23       Q.    Correct.

24       A.    Okay.

25            MR. TYSON:  Might be in the exhibits.

1          THE WITNESS:  Yeah, it's in the

2      exhibits.  I guess I don't have it for 23.

3  BY MR. SAVITZKY:

4      Q.   Do you know that they have the same

5  compactness?

6      A.   I don't know that, but if you say so.

7  It's in the exhibit.

8      Q.   Do you have any objective basis for saying

9  that enacted 23 better comports with traditional

10  districting principles than Cooper 23?

11      A.   I'm sorry.  Could you repeat that, please?

12      Q.   Well, let me back up.  Does -- which

13  district splits more counties?

14      A.   The 23?

15      Q.   Uh-huh.

16      A.   The enacted 23 has Columbia and Richmond,

17  and the Cooper 23 has Richmond and Wilkes split.

18      Q.   Okay.  So --

19      A.   So it looks like the same number.

20      Q.   All right.  So --

21      A.   I didn't say they were different.

22      Q.   So same number of county splits, same

23  compactness, they're both long.  Is there any

24  objective basis to say that one does better in

25  terms of traditional districting principles than

1    the other?

2         A.    Absolutely.

3              MR. TYSON:  Object to form.

4              THE WITNESS:  In this case I've

5         pointed out that you have a split that has

6         the high concentrations of

7         African-Americans in Richmond County,

8         which is paired with Baldwin County,

9         Milledgeville, which is quite a distance

10        away.

11             And then, also, I point out the split

12        in Wilkes County, which follows racial

13        sorting.

14   BY MR. SAVITZKY:

15        Q.    Any other grounds to say that there's any

16   difference with respect to traditional districting

17   principles?

18        A.    Sure.  And that's why I showed District 22

19   and 23 in combination.  So you have -- in the

20   enacted plan you have District 22 entirely in

21   Richmond County, and then the Cooper District 22

22   goes outside of Richmond County and takes in

23   additional counties.

24        Q.    So let's look at page -- or Paragraph 36

25   and your discussion of various subdivision splits.

1    And you say that Cooper splits fewer counties in

2    the enacted map?

3         A.    Yes.  We established that earlier.

4         Q.    Right.  And you say that Cooper makes five

5    counties whole but introduces four new splits?

6         A.    Yes.

7         Q.    So overall fewer splits?

8         A.    Yes.

9         Q.    You say:

10               "The four new county splits are

11          attributable to the effort to create

12           new black majority seats..."

13        A.    Yes.

14        Q.    So what objective basis exists for saying

15   that the new splits are attributable to that

16   effort?

17        A.    I thought I detailed this quite a bit.  So

18   I mentioned Wilkes County, which takes the black

19   population and puts it into District 23.  I've

20   discussed Spalding County.

21               I would say that Rockdale, I mentioned

22   that Rockdale is split so that it can connect

23   through Rockdale County and split it so that it

24   can -- the districts in that region can connect to

25   more distant white population.

1              And then I would say Monroe is, and I
2      think I point this out in the report, Monroe is
3      split as a result of taking Baldwin out of the
4      other district in the area.  So the enacted senate
5      District 25 or Cooper Senate District 20 -- 44 --
6      I'm sorry.  Wait.  That's not right.
7              The enacted 25, yeah.  Maybe it is 44,
8      because there's a renumbering issue.  Yeah, I think
9      that's correct.  So I explicitly discuss that in
10     the report.
11         Q.    All right.  But those are, I mean, those
12     are your characterizations of what, you know,
13     what's happening in the map?
14         A.    They're based on data.  So.
15         Q.    So just you mentioned Rockdale and Senate
16     District 17, I believe.  And you say, and I think
17     this is at Paragraph 38, you say the four new --
18     excuse me.  You say in the Atlanta metro:
19              [As read]  "While Newton County is
20          made whole in the...senate plan, it's
21          then necessary to split Rockdale
22          County to allow Cooper 12/05 S.D. 17
23          to transit through Rockdale to connect
24          to population in Henry County."
25         A.    Yes.

1      Q.   So just to be clear, Newton County is

2    split in the enacted map and Cooper makes it whole?

3      A.   Yeah.  That's what I said.

4      Q.   Okay.  And so you agree that, in your

5    analysis -- or you agree that creating a black

6    majority district in Senate District 17 also fixes

7    that county split?

8      A.   It's exchanging Newton for Rockdale.  And

9    I point out that it's necessary because Rockdale is

10   a blocking county.  You can't reach the more

11   distant white population unless you make a split

12   there or have the more narrow connection through

13   different counties, such as Henry.

14     Q.   Is it possible that drawing Senate

15   District 17 as a more compact district that doesn't

16   extend from Henry County all the way out to Morgan

17   and Walton Counties, which is what happens in the

18   enacted map, also allows other counties to be

19   united, like Clarke and Jackson?

20     A.   I don't know.

21     Q.   You say that under Cooper's plan it's

22   "necessary to split Rockdale County"?

23     A.   That's what I said.

24     Q.   What's the basis for the statement that

25   the split is necessary?

1      A.   Because you can't reach the far distant

2   population unless you split Rockdale.  You could go

3   through Henry, but it's -- that's a choice that was

4   made in the Cooper plan.

5      Q.   By the way, you say "far distant."  Do you

6   know which district is longer, Cooper 17 or the

7   enacted 17?

8      A.   Oh, I'm guessing the enacted 17 is longer.

9   It's not connecting the same geographic areas.

10     Q.   Okay.

11     A.   It's outside of the area that Cooper's

12  plan connects.

13     Q.   Well, it's in Henry County.

14     A.   It's in Henry County --

15     Q.   And then --

16     A.   -- and other counties.

17     Q.   -- extends --

18     A.   Yes.  Yes, that's --

19     Q.   -- way out.

20     A.   -- right.

21          Sorry.  I need to take a break here or in

22  a minute.  I've got to get more water, please.

23     Q.   Okay.

24     A.   There's no question pending.

25     Q.   There's no question pending.  That's fine.

1    Go ahead.

2         A.    Okay.    Thank you.

3              THE VIDEOGRAPHER:    Off the video

4         record at 5:03 p.m.

5              (Whereupon, a discussion ensued

6          off the record.)

7              (Whereupon, there was a brief

8          recess.)

9              THE VIDEOGRAPHER:    Back on the video

10        record at 5:11 p.m.

11   BY MR. SAVITZKY:

12        Q.    Mr. Morgan, we were talking about Senate

13   District 17.    And by the way, if it's helpful, you

14   can look at the Cooper report, which I think is

15   Exhibit 7.    Pages 40 -- Pages 44 and 46 have images

16   of enacted and illustrative Senate District 17.

17              But you say it's necessary --

18              [As read]    "...It's then necessary

19         to split Rockdale County to allow

20         Cooper 17 to transit through Rockdale

21         County to connect to population in

22         Henry County."

23              What are you saying is being connected to

24   population in Henry County?    And in your report I'm

25   on Paragraph 38.

1      A.   Is that over here?

2      Q.   Uh-huh.

3           (Whereupon, the document was

4       reviewed by the witness.)

5           THE WITNESS:  Okay.  I'm sorry.

6      What's the question?

7  BY MR. SAVITZKY:

8      Q.   What -- when you report in Paragraph 38,

9  when you say it's necessary to split Rockdale in

10  order to allow Cooper illustrative 17 to transit

11  through Rockdale County to connect to population in

12  Henry County, what are you saying is being

13  connected to population in Henry County?

14      A.   The high concentrations of

15  African-American population in DeKalb County and

16  southern DeKalb.

17      Q.   Why is it necessary -- why would you say

18  it's necessary to do that when DeKalb and Henry

19  County share a border?

20      A.   Because the portion of Henry County that

21  is in District 10 is connect -- is -- in the Cooper

22  plan it's connected to District 10, and so you have

23  to connect through Rockdale to get to the southern

24  portion of Henry County.

25      Q.   But some other plan could draw another

1    district in that area that doesn't split Rockdale

2    County and, nevertheless, creates a new black

3    majority district?

4         A.    I didn't analyze some other plan, I

5    analyzed Mr. Cooper's plan.

6         Q.    Well, but when you say it's necessary, are

7    you -- what -- by it's necessary, do you just mean

8    that's what happens in Cooper's plan or do you mean

9    one must do that?

10        A.    I'm saying that's what happened in

11   Cooper's plan in the sense it's necessary, if you

12   don't have the connection made in that way, the

13   population -- the percentages don't work out.

14        Q.    And on what basis do you say the

15   percentages don't work out?

16        A.    I'd have to look at the -- I don't have it

17   in front of me, but the portions from my report of

18   the plan components have some information on that.

19        Q.    Did you do any analysis to suggest it's

20   not possible to draw a black majority district

21   that's based only in Henry and Rockdale County?

22        A.    No.  It's clearly possible to do that.

23   But he would have to alter the configuration of

24   District 10, for example, in Cooper's plan and some

25   others.

1      Q.   All right.  So it's not necessary to split
2   Rockdale County in order to draw a majority black
3   District 17 in this area?
4      A.   I said it is.  That's what I said in my
5   report.  It's necessary to split Rockdale County
6   because it blocks access to that southern portion
7   of Henry, which is what's connected to DeKalb
8   County.
9      Q.   Other than your statement in Paragraph 38
10  right here about splitting Rockdale County but
11  unifying Newton County, does your report include
12  any other analysis or opinions that are specific to
13  Cooper's illustrative District 17?
14     A.   Probably.  It's mentioned here.  So I
15  don't see anything else specifically.
16     Q.   Okay.  Do you have any reason to doubt --
17  and just looking at the Cooper report which is
18  marked as Exhibit 7 on Paragraph 105, he says as
19  the maps we were just looking at make clear,
20  "illustrative District 17 is much more compact than
21  the 2021 sprawling 2021 District 17."
22          Do you have any reason to doubt that
23  conclusion?
24     A.   I'm sorry.  Which one, the 20 --
25     Q.   Paragraph 105, last sentence, Cooper's

1    report.

2         A.    And I'm looking at the enacted one?

3         Q.    Just the sentence that he says:

4               "As Figure 17C and 17D make clear,

5           illustrative Senate District 17 is

6           much more compact than the sprawling

7           illustrative 2021 District 17."

8               Do you have any reason to doubt that

9    conclusion?

10        A.    I mean, if it's more compact, it's more

11   compact.

12        Q.    Much more compacted?

13        A.    Okay.

14        Q.    Do you have any reason to doubt that

15   conclusion?

16        A.    I don't have the compactness numbers, but

17   I believe that to be true.

18        Q.    So just, you know -- and backtracking very

19   briefly --

20        A.    Okay.

21        Q.    -- I'm going to mark as Exhibit 8 -- now,

22   I know we're eventually going to have these, but

23   just for our ease, I'll separately mark it so we

24   can look at it now.

25               Oh, I just marked this one.  It's not nice

1    looking.  I'll mark the nice one for you.

2                            (Whereupon, Plaintiff's

3                            Exhibit 8 was marked for

4                            identification.)

5    BY MR. SAVITZKY:

6        Q.    This is just the plan components from your

7    report --

8        A.    Okay.

9        Q.    -- here.  And I'm just looking at District

10   23.  We were talking about that Wilkes County

11   split?

12       A.    Okay.

13       Q.    And so if you just go to District 23 and

14   tell me when you're there.

15       A.    Okay.

16       Q.    And I'm just interested in knowing, in

17   District 23, what is the number of people in Wilkes

18   County that are put into illustrative District 23?

19       A.    It looks like it's 3,302.

20       Q.    3,300 people out of a senate district of

21   roughly 190,000?

22       A.    Yeah.  And it's a split county.  And I

23   pointed out that the black population is taken into

24   District 23.

25       Q.    Okay.  Do you have any reason to think

1  that it's not possible to draw a black majority

2  district by taking population from some other, you

3  know, adjacent area?

4       A.    Could be.  But what was done here is the

5  black population was taken out of Wilkes.

6       Q.    Do you know how many V.T.D.s were -- from

7  Wilkes are in illustrative District 23?

8       A.    I'd have to look.  I think it's four.

9       Q.    Was adding those V.T.D.s into District 23

10 necessary to bring it into population equality?

11      A.    Well, it really depends on how you look at

12 it.  Because it would be possible to exchange the

13 split of Wilkes County for a split of somewhere

14 else.

15      Q.    But if you just took those 3,300 people

16 out of Wilkes County, it would be out of population

17 for District 23; right?

18      A.    It doesn't mean you couldn't take

19 population from somewhere else.

20      Q.    But if you took them out, you'd be out of

21 population; right?

22      A.    That's because the outer boundaries of

23 District 23 and 22 are what they are.  And so

24 Cooper took a little piece of Wilkes County and

25 made an additional split that also split the black

1    population out.

2           And if you undid that split, then District

3    23 would be outside of the deviation that he set

4    out, and he would have to make an adjustment

5    somewhere else.  But that didn't happen, and I'm

6    commenting on what did happen.

7        Q.   Right.  And so doing so, in terms of what

8    did happen, going to Wilkes County was necessary in

9    order to come within the plus or minus one

10   population deviation?

11       A.   No.  He could have gone to another county

12   somewhere else.  It's not necessary to go to Wilkes

13   County.

14       Q.   I mean, in the same way that you use the

15   word "necessary" to talk about splitting Rockdale

16   County as that's what happened, it's similarly

17   necessary to come within population percentage of

18   23; is that a fair --

19       A.   No.  I disagree with that.

20       Q.   Okay.  So just returning to the discussion

21   of splits on Page 21 of your report, you say:

22           [As read]  "Spalding County is

23            split such that two-thirds of the

24            black population is placed in Cooper

25            District 28, keeping the district

1          [sic] above 50 percent."

2     A.    Yes.

3     Q.    But that portion of Spalding County is

4     under 50 percent black; right?

5     A.    Yeah.

6     Q.    So its inclusion decreased the black

7     voting age population of Cooper District 28?

8     A.    Yeah.  That's the point.

9     Q.    And you say that Monroe County -- well,

10     strike that.  We don't have to talk about that.

11          Let's go to Paragraph 39.  And you say on

12     Paragraph 39:

13          [As read]  "In the Cooper 12/05

14          senate plan, adjustments are made to

15          district boundaries to unsplit

16          counties in areas of the state with

17          less minority population to keep the

18          total number of splits similar to the

19          enacted plan."

20     A.    Yes.

21     Q.    Do you provide any examples of that in

22     your report?

23     A.    Yes.  On Page 21.

24     Q.    You mean the example of Rockdale and

25     Newton?

1      A.   No.  Clarke, Coffee, Columbia and Jackson

2   are made whole.  None of those are majority black.

3   There's some black population.

4           The counties that are split are Rockdale,

5   Wilkes, Spalding and Monroe.  And in particular,

6   Wilkes has got 40 percent black population, and

7   Spalding I talked about how it is split --

8      Q.   And --

9      A.   -- along racial lines.

10     Q.   -- is preserving traditional political

11  boundaries an important traditional districting

12  factor?

13     A.   Generally speaking, yes.

14     Q.   So it could also be fair to say that

15  Cooper united counties wherever possible because

16  doing so is an important traditional districting

17  factor?

18     A.   I don't know.  I'd say that -- and I

19  discuss a little bit more about this in the house

20  plan.  But here in the senate plan, I'm using this

21  higher level example with just these counties.

22     Q.   You conclude on paragraph -- in Paragraph

23  40:

24          [As read]  "Based on my analysis

25       of the Cooper 12/05 plan, the impact

1          of engineering more majority black

2          districts can be seen in the overall

3          metrics and differences..."

4              When you dis -- when you -- in terms of

5      the overall metrics, can it be seen in the overall

6      compactness score?

7      A.    No.  That's part of my point.  It's not in

8      the compactness score, it's in things like these

9      county splits.  It's a different set of county

10     splits, which is --

11     Q.    Well, you --

12     A.    -- part of my argument.

13     Q.    Well, you say it can be seen in the

14     overall plan metrics.

15     A.    Uh-huh.

16     Q.    Can it be seen in the overall plan metrics

17     with respect to compactness?

18     A.    The compactness scores are similar, and I

19     think that's very clearly by design.

20     Q.    Can it be seen in the overall plan metrics

21     with respect to V.T.D. and county splits?

22     A.    Yes.

23     Q.    How so?

24     A.    Because it's a different set of splits.

25     Q.    The total number of splits in the Cooper

1    plan is lower?

2        A.    Yeah.

3        Q.    So when you say "the overall plan

4    metrics," you mean looking at which counties are

5    split?

6        A.    Yes.

7        Q.    Can it be seen in the population

8    deviation?

9        A.    In the senate?  There are some aspects

10   that can be seen.  Like, you're discussing a Wilkes

11   County, and some of the districts in that area are

12   impacted by population deviation pressures and

13   other things.

14       Q.    Are there any other overall plan metrics

15   that you say indicate the impact of engineering

16   more majority black districts other than what we've

17   talked about already?

18       A.    I think I've covered it in my report and

19   what we've talked about.

20       Q.    And when you say that the impact is shown

21   by the differences from the enacted plan, the,

22   quote, differences from the enacted plan, are there

23   any differences that you're relying on for that

24   claim beyond what we've talked about already?

25       A.    I think there -- I -- there could be more

1    examples.  I didn't make an exhaustive list of

2    examples.  I picked some that I thought showed the

3    differences.  I could probably find another

4    example, so I don't want to limit myself if there

5    is another example.  But I did not put another

6    example in the report.

7         Q.    But your report is a complete statement of

8    the basis and reasons for all the expert opinions

9    you're giving in this case?

10        A.    Generally speaking, yes.  And I included

11   some specific examples in the report.

12        Q.    So then you say:

13             [As read]  "Further, my analysis

14          of the traditional redistricting

15          factors, maintaining communities and

16          traditional boundaries, compactness

17          and deviation, along with the

18          manipulation of the boundaries of the

19          new black districts, supports my

20          opinion that the Cooper 12/05 plan is

21          focused on race, prioritizing race to

22          the detriment of traditional

23          redistricting factors."

24             When you say, "my analysis of the

25   traditional redistricting factors," do you mean

1    anything other than the analysis we just covered?

2         A.   Generally, it's the analysis in this

3    report.

4         Q.   Okay.  When you say "maintaining

5    communities," is that -- are you referring to

6    communities of interest there?

7         A.   It can include communities of interest,

8    yes.

9         Q.   Well, what do you -- I just -- what do you

10   mean by "maintaining communities"?

11        A.   It says what it says.  I mean maintaining

12   communities.  That can also include communities of

13   interest.

14        Q.   What else could it mean?

15        A.   I suppose most communities could also be

16   considered communities of interest.  They're

17   relatively the same.  But it could be a little more

18   inclusive.  There could be something that's a

19   community but maybe it's not a community of

20   interest, I suppose.

21        Q.   And --

22        A.   It's more or less interchangeable.

23        Q.   How in your report did you analyze

24   maintaining communities?

25        A.   We talked about this.  I looked mostly at

1    the counties, the precincts, the municipal

2    boundaries, and other things like that.

3         Q.   Did you look at municipal boundaries?

4         A.   I looked at them in the sense that, when I

5    loaded the plan, I could look at some of those.  I

6    didn't count splits in those.

7         Q.   Okay.  And you didn't consider any other

8    aspects of maintaining communities other than the

9    ones that we just talked about?

10        A.   No.  My report focuses primarily on the

11   map drawing aspects.

12        Q.   Okay.  And by "compactness," you mean as

13   measured by the Polsby-Popper and Reock scores we

14   went over?

15        A.   No.  I mean compactness.  It can be

16   measured with compactness scores.  It could be

17   measured in other ways.

18        Q.   Are there any other ways that you measure

19   it in this report?

20        A.   Yes.  I showed the distance in some

21   districts.

22        Q.   Okay.  Anything other than distance and

23   Polsby-Popper and Reock?

24        A.   Those are the things that I reported on.

25        Q.   And when you say "deviation," you mean

1    population deviation?

2        A.    Yes.

3        Q.    Let's talk about your house maps.

4        A.    Okay.

5        Q.    Now we're really on the home stretch.

6    Famous last words, but --

7             MR. TYSON:  Uh-huh.

8    BY MR. SAVITZKY:

9        Q.    -- I just have to say it anyway.

10            MR. TYSON:  The judges say, whenever

11       a lawyer says just one more thing, your

12       Honor...

13   BY MR. SAVITZKY:

14       Q.    So Page 23, Paragraph 42, you say you

15   tallied the number of majority black districts

16   using B.V.A.P.  You provided the number of

17   districts, same sort of percentage range analysis.

18            Anything different about your analysis

19   here than your analysis on the senate side?

20       A.    Generally, no, in terms of tabulating the

21   number of districts.

22       Q.    Okay.  And you agree the illustrative

23   plans, the Cooper illustratives have 54 black

24   majority districts and the '21 plan has only 49

25   districts; is that right?

1      A.   That's what I have in the report, and I

2  believe that's correct.

3      Q.   By the way, do you know how many black

4  majority districts were in the benchmark house and

5  senate plans?

6      A.   I don't know that off the top of my head.

7      Q.   Okay.  Any reason to doubt Bill Cooper's

8  reporting of those numbers?

9      A.   I'm sure it could be verified if I load

10  the plan or if he says it in the report.

11      Q.   So let's look at Paragraph 45, and then --

12  and really at chart six, which is your reporting of

13  these metrics here.

14      A.   Okay.

15      Q.   And as with the chart that we looked at

16  for the senate, does this chart summarize the top

17  line statistics about the plans you're comparing,

18  enacted versus illustrative?

19      A.   Yes.

20      Q.   Okay.  And this chart, as with the senate,

21  reflects all of the Maptitude reports and analysis

22  that you ran?

23      A.   Generally, yes, these are extracts from

24  those summary reports.

25      Q.   This reflects all of the quantitative

1   analysis you performed?

2         A.   General -- yes, it generally does.

3         Q.   So based on your comparison, you agree

4   that the illustrative house plan has fewer county

5   splits --

6         A.   Yes.

7         Q.   -- in the house?

8              And you say that Cooper has nine more

9   V.T.D. splits?

10        A.   I think so.  That's what the report

11  showed, I think.

12        Q.   And just if you could crack open Exhibit

13  7, the Cooper report.  And we'll just turn to Page

14  85 where he reports county and V.T.D. splits.

15        A.   Okay.

16        Q.   And you can see he's reporting populated

17  V.T.D. splits only, and --

18        A.   Right.

19        Q.   -- he has it at 179 for the enacted and

20  179 for the illustrative.

21        A.   Okay.  Does he contend that there's a

22  difference between populated and non-populated

23  splits?

24        Q.   I mean, the difference is that some

25  V.T.D.s are populated and some are not, I suppose.

1          But my question is, do you have any reason
2     to doubt that report?
3          A.    I think that information is also in the
4     appendix to my report.
5          Q.    Okay.
6          A.    I think you can extract that information
7     from the maps two reports.
8          Q.    Looking at compactness, both are equally
9     compact; would you say that's right?
10         A.    Well, the scores differ on the
11    Polsby-Popper.
12         Q.    By point 01?
13         A.    Yep.
14         Q.    So they're substantially the same
15    compactness?
16         A.    Generally, yes.
17         Q.    Okay.  And you didn't look at minimum
18    compactness?
19         A.    It's in the appendix.
20         Q.    Okay.  Do you know which plan does better?
21         A.    No.
22         Q.    Just looking at Page 84 of Cooper's report
23    that's Exhibit 7 --
24         A.    Okay.
25         Q.    -- you can see -- do you see which plan

1    does better on minimum compactness?

2        A.    I would assume it's Cooper.

3        Q.    It is, but I'd for the record like you to

4    verify that.

5        A.    Okay.  For the record, let's see, the

6    illustrative house plan has a low of point 16 on

7    Reock and point 11 on Polsby-Popper.  Cooper is --

8    sorry.  That's Cooper.

9            Cooper plan is point 16 Reock, point 11

10   Polsby-Popper.  The enacted is point 12 Reock and

11   point 10 Polsby-Popper.

12       Q.    So Cooper's plans, Cooper's house plan is

13   more compact when looking at the minimum

14   compactness measure?

15       A.    Yes.

16       Q.    Okay.  So regarding number of paired

17   incumbents, we have 25 in the Cooper illustrative,

18   20 in the enacted?

19       A.    Yes.

20       Q.    And deviation ranges are similar; would

21   you say that's correct?

22       A.    The Cooper plan has a higher deviation

23   range.

24       Q.    But it's within that 1.5 percent number

25   that you chose for your 12/05 plan?

1      A.    Yes.

2      Q.    Okay.  So would you say that's sufficient

3  to comport with traditional districting principles,

4  being in that plus or minus 1.5 percent deviation

5  range?

6      A.    Generally.

7            MR. TYSON:  Object to form.

8            THE WITNESS:  Sorry.

9            MR. TYSON:  Sorry.

10           THE WITNESS:  Okay.  I answered most

11      of it.  I would say that let me clarify my

12      answer here.  It is the same deviation

13      range that I used in my illustrative plan.

14      In my experience, I have seen plans that

15      have this range of deviation before.

16  BY MR. SAVITZKY:

17      Q.    By the way, sometimes deviation can be

18  higher than that, right, 5 percent?

19      A.    It really depends where you are.  Not in

20  Nevada.

21      Q.    We are not in Nevada.

22      A.    No.

23      Q.    So did you look at any other metrics other

24  than these?

25      A.    The top line metrics?  No.  But I have all

1    the summary reports as described.

2         Q.   Okay.  And did you look at communities of

3    interest when you compared these two plans?

4         A.   I think there's some discussion of

5    communities of interest in the text of the report.

6         Q.   And did you consider socio-economic

7    factors in comparing the two plans?

8         A.   No.

9         Q.   Did you consider transportation corridors

10   in comparing the two plans?

11        A.   I -- sometimes I would look at the roads.

12   So to some extent.

13        Q.   Did you consider transportation corridors

14   beyond sort of looking at the roads on the map as

15   you were --

16        A.   Not really.

17        Q.   Did you actually take the maps out and

18   sort of visually look at, you know, toggle back and

19   forth and compare the two?

20        A.   Yes.

21        Q.   Okay.  And did you look at population

22   density in comparing the two plans?

23        A.   Not specifically.

24        Q.   Did you look at military areas and

25   universities in comparing the two plans?

1      A.    I'm aware of some of those areas in

2    Georgia.

3      Q.    But not sort of in a comprehensive

4    fashion?

5      A.    No.

6      Q.    Did you look at -- and you didn't run a

7    municipal splits report?

8      A.    No.

9      Q.    You didn't run a C.B.S.A. splits report?

10     A.    No.

11     Q.    Okay.  Well, let's look at chart seven and

12   Paragraph 47.  This is a compactness score summary.

13   It shows the compactness score of the newly created

14   majority black districts that Mr. Cooper identified

15   in his report and the compactness scores of the

16   corresponding -- of a district with a corresponding

17   district number in the 2021 plans.

18          Is that an accurate summary of what this

19   is showing?

20     A.    Yes.

21     Q.    And you say:

22          [As read]  "The Cooper 12/05 house

23       plan changes 93 districts to create

24        five new black majority districts."

25          To be clear, you're saying the Cooper map

1    makes changes to 93 districts compared to the
2    enacted plan and --
3        A.   I'm sorry.  I kind of got lost here for a
4    second.
5        Q.   Paragraph 47.  It's on the page before the
6    chart, so it's a little --
7        A.   Okay.  That's why I was confused.
8        Q.   Yeah.
9        A.   I'm sorry.  I thought I'd moved ahead.
10   Okay.
11       Q.   So you say the Cooper plan changes 93
12   districts --
13       A.   Yes.
14       Q.   -- to create five new black majority house
15   districts?
16       A.   Yes.
17       Q.   87 districts in the Cooper plan are
18   identical.
19       A.   Yes.
20       Q.   You say chart seven "shows the compactness
21   scores of the newly created majority black
22   districts" which Cooper identified "and the
23   compactness scores of the corresponding district
24   number..."
25            You don't contend that any of these

1    districts are outside the acceptable range of

2    compactness, do you?

3         A.    I didn't say that.

4              MR. TYSON:  Object to form.

5              THE WITNESS:  Sorry.  I didn't say

6         that in the report.

7    BY MR. SAVITZKY:

8         Q.    And you're not contending that now?

9         A.    I don't know that I have a standard to

10   measure that by.

11        Q.    So these districts are within the

12   acceptable range?

13        A.    I don't know.

14        Q.    Let's look at each district starting with

15   House District 74.

16        A.    Okay.

17        Q.    It's significantly more compact in the

18   illustrative, in Cooper's illustrative map; right?

19        A.    74?  Yes.

20        Q.    And District 117, next one.

21        A.    Those districts are the same on the Reock

22   score, and there's a difference on the

23   Polsby-Popper.

24        Q.    A difference of point 02?

25        A.    Yes.

1      Q.    So substantially the same compactness?

2      A.    Okay.

3      Q.    Would you agree with that?

4      A.    It's, yes, it's close.

5      Q.    And then for District 133, it looks like

6   the enacted plan District 133 is more compact.

7   That district is a different, a very -- a different

8   area from the illustrative map, isn't it?

9      A.    Probably.

10     Q.    Do you know what the overlap of those two

11  districts is?

12     A.    No.  I don't have it in front of me.

13     Q.    Okay.

14           MR. SAVITZKY:  Is this the -- that's

15     fine.  We don't need to...

16  BY MR. SAVITZKY:

17     Q.    Would you say that it makes sense to do a

18  comparison of two districts where there's only

19  40 percent overlap between the populations at deal?

20     A.    It can.  It depends on what the

21  circumstances are.  For example, when you were

22  talking about Senate District 55, what district to

23  compare that to, well, the -- that same area in my

24  illustrative 55 was fractionalized in the enacted

25  plan.  So which one do you compare it to?

1              I don't know what the highest percentage
2     is in that area.
3          Q.   And you didn't look at the core
4     constituency report -- core constituency, excuse
5     me, report to try to figure out what the best
6     comparator would be?
7          A.   I didn't.  And more to the point, in this
8     case when you say is 40 percent a good number, I
9     don't know.  It really depends on what the other
10    options are.
11         Q.   Is it possible that you could have a
12    situation where the districts are so different that
13    there isn't really a good comparator?
14         A.   Sometimes, sure.
15         Q.   Looking at District 145, the enacted plan
16    is a little better on Reock and the Cooper plan is
17    better on Polsby-Popper; is that right?
18         A.   Yes.
19         Q.   Okay.  And looking at 171, it's a little
20    bit more compact under the enacted plan?
21         A.   It's point 35 Reock in the enacted and
22    point 28 in the Cooper for Reock.  And
23    Polsby-Popper is point 37 in the enacted and point
24    two in the Cooper plan.
25         Q.   And did you look at the overlap between

1    House District 171 in the enacted map versus House
2    District 171 in the illustrative map?
3        A.   One of the districts he created was very
4    different, the -- I think the one that goes from
5    Thomasville down to Albany.
6        Q.   Very different from the configuration of
7    the map in the enacted?
8        A.   Yes.  And I think I discuss that in my
9    report.
10        Q.   So why does it make sense to do a
11    one-to-one comparison with a district with the same
12    number if the map is so different?
13        A.   Well, I provided this same table and this
14    same information in the preliminary injunction
15    phase, so I wanted to provide the same information
16    here.
17        Q.   But you're not claiming that all these
18    districts actually line up perfectly?
19        A.   Well, I identified that these are the
20    districts in the enacted plan and the same district
21    number in the Cooper plan.
22        Q.   But you're not claiming that these are the
23    best possible comparators or that it's appropriate
24    for there to be a one-to-one comparison?
25        A.   I -- there could be.  I don't know.  I

1    mean, I could go look at that.  But I didn't in
2    this table.
3        Q.    Right.  I mean, setting aside the fact
4    that there could be, you're not claiming that it's
5    actually appropriate to compare one to one for all
6    of these?
7        A.    I'm sorry.  I'm not sure I understand.
8        Q.    You're not saying that you -- you're not
9    saying that a one-to-one comparison between two
10   districts with the same district number is an
11   appropriate comparison?
12       A.    I'd have to discuss appropriate in this
13   context.  It could be that it is appropriate.
14   Like, for example, you said if it's 40 percent,
15   maybe that is the highest of the region and it is
16   appropriate given the choices.
17       Q.    But you're not --
18       A.    I don't --
19       Q.    -- you're not sure if it is?
20       A.    I don't know for sure.
21       Q.    But you included it because you did a
22   similar thing in the previous report?
23       A.    I think in some sense there was a
24   continuity from -- I assume that there was some
25   value in having the same districts reported in the

1    P.I. plans and this, so I included the same

2    information.

3         Q.   Okay.

4         A.   But all of the compactness scores are in

5    the reports.

6         Q.   So let's turn to Paragraph 48 and some of

7    these maps.  You look at metro area house

8    districts.  You look at a map shown which is called

9    a metro region.

10             And you have some maps on Pages 27, 29 and

11   30 of your report with V.T.D.s shaded by B.V.A.P.;

12   is that right?

13        A.   In general, yes.

14        Q.   All right.  You say:

15             [As read]  "Looking at the

16        specific districts will show the

17        compactness of the districts as

18        impacted by the efforts to create more

19        black majority districts."

20             When you say "impacted," what do you mean?

21        A.   Where is that in the report?

22        Q.   In Paragraph 50.  I'm sorry.  You say:

23             "...the compactness of the

24        districts is impacted by the efforts

25        to create more majority black

1          districts."

2          A.    Okay.

3          Q.    And when you say "impacted," what do you

4     mean?

5          A.    There's an effect on it.

6          Q.    Just an effect?  How is it -- how is that

7     effect determined or measured?

8          A.    We'd have to look at the specifics.  So I

9     looked at some specific districts, and I discuss

10    them in the report.

11         Q.    Okay.  Is it fair to say that the way that

12    you're claiming that compactness is impacted is

13    based on the length of the districts and the

14    compactness scores?

15         A.    Generally, I think that's what I'm talking

16    about.

17         Q.    Anything else?

18         A.    Generally, that covers it.

19         Q.    Okay.  Let's look at some of the specific

20    districts that you talk about.  It looks like you

21    picked a cluster of house districts in the enacted

22    and the Cooper maps, 69, 73, 74, 77.  And those are

23    listed on chart eight on Page 31.

24         A.    Yes.

25         Q.    I have that right?

1      A.    Yes.

2      Q.    Okay.  Did you conduct any other district

3   specific analysis of any other districts in the

4   metro Atlanta area other than your look at these

5   four?

6      A.    I mean, I looked at some compactness

7   scores, I looked at some other districts, and I

8   chose this as an example.

9      Q.    Is there some other analysis like this

10   that you didn't include in the report?

11      A.    No.  This is the example.  I -- the -- I

12   guess one of the problems that comes up sometimes

13   is, in the Cooper report, his district

14   configurations don't nest well with the enacted

15   plan; whereas, in the Esselstyn report, there'll be

16   four districts, and everything around it is exactly

17   the same as the enacted district.

18           So it's fairly easy to see where

19   Esselstyn's report addresses these four districts

20   and reconfigures them and has the effect that he is

21   wanting to do.  But in Cooper, it doesn't match as

22   closely to the enacted plan as Esselstyn does in

23   some cases.

24      Q.    What does that have to do with the

25   districts that you chose to analyze with respect to

1    Cooper's report?

2         A.   Well, I'm just pointing out that, in

3    Esselstyn, there might be four districts and every

4    district adjacent to them is the same as the

5    enacted plan.  So it's just changing four districts

6    and reconfiguring them internally.

7              And Cooper doesn't quite do that the same

8    way.  And that's one of the reasons why some of the

9    overlaps aren't as congruent.

10        Q.   Well, why did you pick these four

11   districts to look at?

12        A.   It's in the same geographic area.  It's --

13        Q.   Why did you pick this geographic area?

14        A.   -- Clayton, Fayette and Spalding.

15        Q.   Why not analyze any of the other

16   neighboring districts in Fayette or Clayton or

17   Spalding?

18        A.   Well, I do have some comments about other

19   districts.  I just don't have them on the map.  I

20   think I talk more about Spalding in Paragraph 56.

21   That's not on the map.

22        Q.   But you didn't include them in your

23   cluster to do your mean compactness analysis?

24        A.   No.  I talked about them in Paragraph 56.

25        Q.   So if you included other districts, the

1    mean compactness would have changed?

2         A.   I don't know.  I assume so.  We discussed

3    this earlier.  It's possible and likely that it

4    would change, but I don't know how it would change.

5         Q.   So if you did a different analysis, the

6    mean compactness for Cooper's districts could be

7    better and the mean compactness for the enacted

8    could be worse?

9         A.   I have no idea.  This is the analysis that

10   I provided in the report.

11        Q.   Based on the districts that you chose?

12        A.   Yes.  That are in the same geographic

13   area.

14        Q.   Along with other districts that are also

15   in that area that you didn't choose?

16        A.   I chose these districts, and I discuss

17   them in some detail in the report.

18        Q.   And when you picked these districts, did

19   you run a core constituencies analysis to determine

20   how much they overlapped between the illustrative

21   and the...

22        A.   It's available in the appendices.  It's

23   not in the text portion of the report.

24        Q.   Do you know how much of enacted District

25   77 actually overlaps with District 77 in the Cooper

 1    map?

 2         A.    Probably not very much.  It doesn't look

 3    like very much overlaps.

 4         Q.    But you decided to do a head to head on

 5    them anyway?

 6         A.    I wouldn't describe it as a head to head.

 7    In some extent that's why I picked this grouping of

 8    four, because it's in the same general region.

 9              So even though 77 may not have exactly the

10    same, and certainly not exactly the same, but a lot

11    of the same territory, as a group they cover a lot

12    of the same territory.

13         Q.    So just looking at Paragraphs 51 and 52 of

14    your report, you've got one district in north

15    Clayton, one in Fulton and Fayette, one in Fayette

16    and Coweta, one in Fayette and Spalding and Henry

17    for the enacted plan.

18              Does that sound about right?

19         A.    Yeah.  That's what it shows.

20         Q.    And then just turning to Paragraph 53,

21    which is still on this page, you say:

22              [As read]  "In the Cooper 12/05

23           plan, the engineering of a new black

24           majority district is accomplished by

25           elongating the districts to connect

1      Clayton and Fulton to more white areas

2       of Fayette and Spalding."

3      A.    Yes.

4      Q.    When you say "elongating the districts,"

5   what are you talking about?

6      A.    I mean the districts are stretched out.

7   Like, District 77 in the Cooper plan goes from

8   Clayton all the way down to the southern part of

9   Fayette, and then the other district next door goes

10   from Fulton through Fayetteville all the way down

11   to Peachtree City.

12      Q.    Now, just looking at your chart seven --

13   chart seven?  Look at chart eight.

14      A.    Okay.

15      Q.    I meant to say chart eight there.  Looking

16   at chart eight, Cooper's 74, which I think is the

17   new black majority district, is much more compact.

18      A.    Yes.

19      Q.    Reock --

20      A.    On those metrics, I think.  I'm on 74?

21   Let's see.  The enacted house 74 is --

22      Q.    So --

23      A.    -- point 63, and Cooper is point five.  So

24   I guess not.

25      Q.    I think there's an error in this report.

1      A.    Okay.

2      Q.    The mean compactness is reported

3  correctly, but the district specific scores are

4  switched.

5      A.    Okay.  Then it's, I assume it's correct in

6  the appendix, and I would be happy to make a

7  correction if you'd like.

8            Can we identify which ones, if you know

9  what they are?  Or I can look them up later.

10      Q.    Excuse me?

11      A.    Is it possible to identify them if you

12  know or --

13      Q.    I think it's just the columns are

14  switched.

15      A.    Oh.  Sorry.

16      Q.    So it's just the individual Reock and

17  Polsbys are switched for the Cooper and the

18  enacted, but the mean is reported.

19      A.    Okay.  I'm sorry.

20      Q.    It took me a minute to figure it out, but.

21      A.    All right.

22      Q.    But we got there.

23      A.    We -- I don't -- I can make an adjustment

24  or provide the information as needed.

25      Q.    So setting that aside for the moment,

1    Cooper didn't elongate District 74; right?

2         A.    I don't think I said that.

3         Q.    Cooper made 74 more compact?

4         A.    In general, yes.

5         Q.    Now, looking at Paragraph 54 of your

6    report, you say Cooper's District 79 and 77 are

7    elongated, connecting with more distant white

8    population?

9         A.    Yes.

10        Q.    And you do a plan component analysis which

11   you say shows that Fulton and Clayton, the Fulton

12   and Clayton portions of the district are majority

13   black, but the Fayette portions are around

14   35 percent black; is that right?

15        A.    I believe so, from the plan component

16   report.

17        Q.    So but enacted District 69, and you can

18   see it on the map here, Page 29, also goes from

19   Fulton County into Fayette, doesn't it?

20        A.    It does, yes.  It doesn't go to Peachtree

21   City, though.

22        Q.    Almost.

23        A.    But it doesn't.

24        Q.    But it stretches pretty far into Fayette?

25        A.    Yes.  And what I'm saying is that it goes

1    to Peachtree City to lower the population and allow
2    it to be used somewhere else.
3         Q.    This is the enacted plan?
4         A.    Huh?
5         Q.    The -- I'm looking at enacted 69 here.
6         A.    Right.  And I'm looking at Cooper 69,
7    which goes down to Peachtree City and takes that
8    population in and frees up other population to be
9    used somewhere else.
10        Q.    Did you run a plan components analysis of
11   the enacted map?
12        A.    I think so.  I don't -- it's not included
13   in this report, but I think it's included in
14   another report.
15        Q.    Uh-huh.  Isn't the enacted map also
16   joining areas with higher black populations in
17   Fulton County to compare to blue whiter areas in
18   Fayette?
19        A.    It doesn't go quite as far as these
20   districts in the Cooper plan.  And again, you
21   mentioned District 69.
22        Q.    But it is also doing that?
23        A.    In some cases it does things like that.
24        Q.    Doesn't that sort of make sense because
25   this is a diverse area of the Atlanta metro?

1      A.   If you say so.  I mean, it makes some

2   sense.

3      Q.   So let's turn to chart eight.  We were

4   just looking at it briefly using these compactness

5   scores.  Are any of these compactness scores

6   outside of the acceptable range?

7           MR. TYSON:  Object to form.

8           THE WITNESS:  I'm not sure what an

9       acceptable range is in this case.

10  BY MR. SAVITZKY:

11     Q.   To the extent that you can discern it, are

12  any of them outside of the acceptable range?

13          MR. TYSON:  Object to form.

14          THE WITNESS:  I don't have a standard

15      to measure what's acceptable exactly.

16  BY MR. SAVITZKY:

17     Q.   Mean Polsby-Popper scores here is off by

18  point 01; is that right?

19     A.   I don't know.  I -- if you're saying that

20  this data is incorrect, then I don't know what we

21  are looking at.  You're saying the means are

22  correct as they appear in the chart?

23     Q.   That's my understanding, yeah.

24     A.   Okay.  If -- then assuming that that's

25  correct, then there's a difference of point 01 in

1    Polsby-Popper for this area, that's correct.
2         Q.   And actually, having con -- having
3    recalculated the means by hand --
4         A.   Yeah.
5         Q.   -- to confirm what was going on, would it
6    surprise you to learn that it's actually a
7    difference of point 005 rounded up to point
8    one [sic]?
9         A.   No, it doesn't surprise me.  I mean, these
10   are two digits, and they're reported as such.
11        Q.   So point 005 difference is basically
12   identical mean Polsby-Popper scores for these set
13   of districts?
14        A.   You're changing the number.  But assuming
15   that's correct, okay.
16        Q.   You would agree with as -- you know,
17   assuming, assuming I'm right that it's actually a
18   point 005 difference --
19        A.   Yeah.
20        Q.   -- in mean?
21        A.   They're clearly very close.
22        Q.   Okay.  And again, you don't know what the
23   results of this mean compactness analysis would be
24   if you had chosen a different set of districts in
25   the same general area?

1      A.   House districts in the same general area,

2   that's right.

3      Q.   So looking at Paragraph 56, you have a

4   line about Cooper's District 117.  You say:

5           [As read]  "Spalding County has a

6           population of 67,000, it's 33 percent

7           black.  The population of Spalding is

8           about 13 more -- 13 percent more than

9           the population of a house district."

10          You say:

11          [As read]  "...The Cooper plan

12          splits Spalding County such that the

13          high concentrations of black

14          population is included in 117."

15          And then you say:

16          [As read]  "Having separated the

17          black population in Griffin from the

18          rest of Spalding, the district

19          connects two populous majority black

20          voting precincts in Henry County..."

21          Do I have that right?

22      A.   Yes.

23      Q.   Is only the black population in Griffin

24   included in H.D. 117 or is all of Griffin included?

25      A.   The black and white population of Griffin

1    is included.

2         Q.   And are the V.T.D.s in northern Spalding

3    County also included?

4         A.   I'd have to look at the map.  I believe

5    so.

6         Q.   Do you know which district is more

7    compact, Cooper's 117 or the illustrative 117?

8         A.   Could you ask that again, please?  I don't

9    think you meant to say that.

10        Q.   Do you know which -- whether Cooper's

11   District 117 or -- excuse me, whether the

12   illustrative 117 or the enacted 117 is more

13   compact?

14        A.   I could look that up.  It's in the

15   appendix.

16        Q.   How many times is Spalding County split in

17   the Cooper -- how many more times is Spalding

18   County split in the illustrative map as opposed to

19   the enacted map?

20        A.   I don't have that in front of me.

21        Q.   Is Spalding County split in the enacted

22   map?

23        A.   I -- it has to be.  So to some extent,

24   it's split, yes.

25        Q.   Okay.  And if you're going to split

1    Spalding County and you're going to keep Griffin

2    whole, then one side of the split is going to have

3    most of the black population of Spalding County;

4    right?

5        A.   It's hard to describe that.  You could

6    split it multiple times.  There's many different

7    ways to do this.  And then what I'm contending is

8    that he took the black population out of Spalding

9    County and connected it to Henry County to create a

10   majority seat.

11       Q.   Well, Henry County is an adjacent county.

12   But my question is, if you're trying to split

13   Spalding County as few times as possible and you're

14   trying to keep Griffin, the county seat and a major

15   community, just whole, then one of the split pieces

16   is going to have most of the black population of

17   Spalding County; right?

18              MR. TYSON:  Object to form.

19              THE WITNESS:  I'd have to look at

20       that more carefully.

21   BY MR. SAVITZKY:

22       Q.   I mean, you say the black population in

23   Griffin is the main concentration of black

24   population in Spalding County?

25       A.   Yes.  That appears to be so.  That's what

1    I believe.

2        Q.   So whichever part of a split in Spalding

3    County has Griffin is going to have most of the

4    black population?

5        A.   Probably.

6        Q.   And you didn't consider that in assessing

7    whether the county split that Mr. Cooper draw -- or

8    drew was appropriate?

9        A.   I reported on what I saw, and I drew some

10   conclusions from it.

11       Q.   So let's look at Paragraph 58 and turn to

12   the discussion of the black belt sort of area.  You

13   sort of pick out ten districts in this region to

14   examine.

15            Why did you pick these districts?

16       A.   They cover roughly the same area.  And I

17   think in particular I have a discussion of county

18   splits with regard to District 128 in Cooper's

19   plan.

20       Q.   Did you run the core constituencies

21   analysis to determine how much of the area in your

22   region and the area in the illustrative overlapped?

23       A.   I didn't run a core constituency.  The --

24   those numbers are in the appendix.

25       Q.   Did you conduct any compactness analysis

1    of the districts in this area?

2         A.   That's in the reports.  It's all there.

3         Q.   But you're not contending that the com --

4    that there's some -- that the districts in the

5    Cooper map are less compact or there's some

6    detriment to compactness?

7         A.   I think there is, I mean, specifically

8    with 128.

9         Q.   Well, specifically with 128 --

10        A.   Compared to, say, District 155 in the

11   enacted plan.

12        Q.   I mean, do you discuss the compactness

13   scores of the districts in this area at all in your

14   report?

15        A.   I don't think so.  I think I'm looking at

16   a different aspect here regarding the county

17   splits.

18        Q.   Okay.  You say that District 33 -- 133 has

19   a number of V.T.D. splits in Baldwin County?

20        A.   Yes.

21        Q.   That's on Paragraph 61.

22        A.   Yes.

23        Q.   Is that due to the shape of Milledgeville

24   and the V.T.D.s around Milledgeville?

25        A.   No.

1      Q.   Why?  Why do you say that it's not?

2      A.   Because when you look at it closely in

3   that area, the areas of African-American

4   concentration are taken into one district and

5   excluded from the other.  It doesn't follow the

6   municipal boundary that I recall precisely.

7      Q.   Did you look at the municipal boundary and

8   the V.T.D. boundaries in the Milledgeville area

9   when you were drafting your report?

10     A.   Yes.

11     Q.   Did you look at the portion of the Cooper

12   report where he discusses the boundaries in

13   Milledgeville?

14     A.   No.

15     Q.   Let's look at Paragraph 64, now we're

16   really zooming, discussing the southwest Georgia

17   area.  You say:

18          "Of the six districts in this

19       region" --

20          You selected six districts in this region

21   to look at; is that right?

22     A.   Yes.

23     Q.   And you say:

24          "One is entirely within Dougherty

25       County.  Another combines part of

1          Dougherty with eight whole
2          counties..."
3              Do you know there's a majority black
4     senate district in this area?
5         A.   I believe so, yes.
6         Q.   Population of a senate district is just a
7     little more than three house districts?
8         A.   That sounds right.
9         Q.   Doesn't that sort of necessarily mean that
10    there could be another black majority house
11    district in the area?
12        A.   Not necessary --
13             MR. TYSON:  Object to form.
14             THE WITNESS:  Sorry.  Not
15          necessarily.
16    BY MR. SAVITZKY:
17        Q.   But it means there could be?
18        A.   I don't know.  You'd have to look at other
19    things to consider.
20        Q.   You say:
21             [As read]  "In order to create an
22          additional majority black district in
23          the southwest region, Cooper 12/05
24          plan splits Colquitt and Lee
25          Counties..."?

1      A.    Yes.  Colquitt County and Lee County are
2   split.
3      Q.    Are either of those split in Cooper's
4   District 171?
5      A.    I don't think they're in that region.
6      Q.    So what's the basis for your saying that
7   the Cooper plan splits them in order to create
8   majority black District 171?
9      A.    Well, earlier dis -- you discussed ripple
10  effects, and this is an example where that's the
11  case.
12          So in order to grab the population from
13  Thomasville and connect it up to Albany, you then
14  take the enacted district, which is adjacent in
15  Worth County which has part of Dougherty County,
16  and then that district pushes down into Colquitt.
17          So basically, if you think about it,
18  you're basically taking the population out of
19  Thomasville, and you have to do something to
20  equalize for that.  And then Lee's effectively the
21  same sort of thing.
22          They're all related to the Thomasville
23  district.
24      Q.    Are you contending that those splits are
25  necessary or just that that's what Cooper did?

1        A.    That's what happened.  And therefore, in

2    this instance, the creation of that district

3    resulted in those counties being split.

4        Q.    Do you know whether, overall, there are

5    more county splits in this region under one plan or

6    the other?

7        A.    I could look at that.  I haven't looked at

8    that.  We can look at the charts.

9        Q.    Other than what we have discussed here and

10   what's in your report, do you have any other

11   analysis to support your conclusions about District

12   171?

13       A.    Yes.  I think I discuss a little bit about

14   Thomas -- Thomasville, Thomas County.  So District

15   171 connects 50 miles north to Albany, and I just

16   think it's unusual to connect Thomasville there.

17       Q.    Did you consider transportation corridors

18   in comparing the two districts?

19       A.    It just seems like a very odd connection

20   to connect those two to me in my experience.

21       Q.    What's your basis for saying it's an odd

22   connection?

23       A.    Well, I've been to Thomasville, and I

24   think it's closer to Tallahassee than it is to

25   Albany.  And I think it doesn't really associate

1    with Albany very much.

2         Q.   But you didn't consider transportation

3    corridors or socio-economic factors?

4         A.   You asked my opinion.  I gave my opinion.

5         Q.   I'm just asking what the basis for your

6    opinion is.

7         A.   I gave that basis.

8         Q.   Which is your personal experience going to

9    Thomasville?

10        A.   I've been to Thomasville.  I've been to

11   Albany.  And yes, I'm familiar with that area.

12        Q.   And we're almost done.  Coming back to

13   Paragraph 67, you say:

14             "As the above analysis

15          demonstrates, the compactness of the

16          districts is impacted by the effort to

17          create more majority black districts."

18             Do you do any analysis in this report, I

19   understand it's in the exhibits, but is there any

20   analysis of compactness of the districts overall in

21   this area in your report?

22        A.   I didn't write about it in the text of the

23   report.

24        Q.   And when you come to that conclusion, are

25   you referring to anything other than what you've

1    already described with respect to these districts?

2         A.   It's based on the information in the

3    report.

4         Q.   Okay.  Let's look at Paragraphs 68 and

5    show -- and 69 and this image here.  Just very

6    quickly, you show an image of, I guess, northern

7    Georgia?

8         A.   Yes.

9         Q.   You depict a group of ten house districts

10   in north Georgia?

11        A.   Yes.

12        Q.   And you say the districts in the Cooper

13   12/05 house plan are drawn in such a way so that

14   they only split three precincts and Gordon County

15   is made whole?

16        A.   That's correct.  Although, he trades an

17   additional split in Floyd County to make Gordon

18   County whole.  So if you measure it by Cooper's

19   metrics, it's the same number of county divisions,

20   I believe.

21        Q.   Isn't eliminating split counties and

22   V.T.D.s a good thing?

23             MR. TYSON:  I'll object to form.

24             THE WITNESS:  I don't know that I'd

25        qualify it as "good."  It's something that

1      people do.

2  BY MR. SAVITZKY:

3      Q.    You talked about ripple effects extending

4  from Thomasville to Lee County.  Is it possible

5  that there were also ripple effects from the metro

6  Atlanta area that reached to this area?

7      A.    Absolutely not.

8      Q.    It's im -- you're saying it's impossible?

9      A.    I'm saying that I looked at this -- I

10 chose those different districts specifically to

11 compare them to the enacted plan.  They're exactly

12 the same outer boundary.  They have different

13 internal divisions.

14            And I'm making the point that the way

15 Cooper did it resulted in netting forward and

16 having fewer county divisions, fewer voting

17 precincts.

18            And otherwise, it has no impact on any

19 other district, so why wouldn't he have kept them

20 the same as the enacted plan?  And I contend that

21 he's doing that to allow him to split in other

22 areas.

23      Q.    Isn't uniting counties a traditional

24 districting factor?

25      A.    Well, it differs from the enacted plan,

1   and it didn't have to.

2           MR. TYSON:  I think we're --

3   BY MR. SAVITZKY:

4       Q.   Well?

5           MR. TYSON:  -- about at the

6       seven-hour mark.

7           MR. SAVITZKY:  I just have a -- I

8       literally have two more, one -- one and a

9       half more pages.  We're really almost

10      done.

11          MR. TYSON:  Five more minutes?

12          MR. SAVITZKY:  I think.  I think we

13      can do it.

14          MR. TYSON:  Okay.

15          MR. SAVITZKY:  Ten max.  I'll go

16      quick.

17  BY MR. SAVITZKY:

18      Q.   So and this is -- anyway, discussing these

19  splits, so let's say Cooper didn't make these

20  changes, right, didn't make the Gordon County

21  change?

22      A.   Right.  He's have an additional county

23  split.

24      Q.   And it would --

25      A.   That additional --

1       Q.    -- be 29 to 29?

2       A.    Yeah.

3       Q.    So he'd still be meeting the enacted plan?

4       A.    That's my point.  I'm contending that he's

5    teaching to the test, that the metrics that you're

6    looking at are deliberately -- he's trying to match

7    the metrics or beat the metrics of the enacted

8    plan, and this is one of the ways he does it.

9       Q.    Well, I guess it's the one way that you

10   point out.  And even if it didn't happen, the

11   Cooper plan would still do just as well in the

12   metric that we're talking about?

13      A.    There are other areas where this happened.

14   We mentioned the other counties that were unsplit.

15      Q.    Well, this is the only one that you do an

16   analysis like this for; is that right?

17      A.    Oh, yes.  This one I thought was very easy

18   to show in this way, because the districts are

19   exactly the same boundary, and they have no impact

20   on any of the majority black districts, and they

21   have no impact in any other districts outside this

22   region.  So they don't have a ripple effect in any

23   way.

24      Q.    Given the minor change in the number of

25   counties and V.T.D.s in this one example that you

1    identify, what's the basis for saying that the

2    differences between the plans are being masked?

3            MR. TYSON:  Object to form.

4            THE WITNESS:  Well, I chose the

5        words, and that's my opinion.

6    BY MR. SAVITZKY:

7        Q.    Okay.  Looking at Paragraph 75, you say:

8            [As read]  "The enacted house plan

9         splits 69 counties and the Cooper plan

10        splits 68..."

11       A.    Yes.

12       Q.    And to be clear, you say in 75, you say

13   Cooper senate plan.  You mean Cooper house plan.

14       A.    Yes.

15       Q.    Right?

16       A.    Thank you.

17       Q.    All right.  So again, even if you discount

18   Gordon County, it's still the same number of county

19   splits?

20       A.    The number of total splits are what they

21   are.

22       Q.    And you say, Paragraph 77 -- we'll move

23   past these charts, and I think we're in your

24   conclusion, conclusory paragraph here.  You say:

25            "Based on my analysis of the

1           Cooper 12/05 house plan, the impact of

2           engineering more majority black

3           districts can be seen in the overall

4           plan metrics and the differences from

5           the enacted plan."

6                Now, where in the overall plan metrics can

7      these differences be seen?

8           A.   I pointed out the county splits, and

9      that's the chart on the previous page.

10          Q.   So as with the senate, when you say

11     "overall plan metrics," you mean the differences in

12     the particular counties, not the overall number?

13          A.   I can -- yeah, in that sense.

14          Q.   Okay.  When you say that the impact is

15     shown by the differences from the enacted plan, are

16     there any differences that you're basing your

17     conclusions on other than the ones that we have

18     talked about here?

19          A.   Yes.  There are other instances where some

20     counties were split that have very little impact on

21     other areas of the state.  So I picked the

22     northwest Georgia where I could see that here's an

23     example of how to get to that.

24                So some of these Cooper districts were

25     exactly the same as the enacted, but some were,

1    like, 90 percent of the enacted.  They're, like,

2    really close.  And so I looked at those a little

3    more carefully.

4              And I could see, well, these are some

5    changes that are made, and these changes result in

6    fewer precinct splits and then allows precinct

7    splitting in other areas and county splitting in

8    other areas.  So that's part of what I mean by that

9    statement.

10       Q.   And other than that, are there any other

11   differences from the enacted plan beyond the ones

12   that we have talked about already that you're

13   relying on for the conclusions that you draw in

14   this report?

15       A.   To simplify things, I'll say it's

16   generally what's in the report.  If there's

17   something else, there are other examples that I

18   could extract from the tables in the appendix.  But

19   for purposes of discussion now, I think it's

20   generally contained in the written text of the

21   report.

22       Q.   And then you say:

23              [As read]  "...my analysis of the

24          traditional" district --

25          "redistricting factors, maintaining

1           communities, traditional boundaries,

2           compactness and deviation, along with

3           the manipulation of the boundaries in

4           the new districts, supports my opinion

5           that the 12/05 Cooper plan -- house

6           plan is focused on race, prioritizing

7           race to the detriment of traditional

8           districting [sic] factors."

9           When you say "my analysis of the

10    traditional redistricting factors," do you mean

11    anything other than what we've talked about

12    already, the factors that we've discussed already?

13         A.   Generally, that's what I mean.  And again,

14    I just gave an example where, excuse me, in the

15    case of, say, Milledgeville or in the case of

16    Spalding and Griffin -- Griffin and Spalding, where

17    the black community is taken out, it's the same

18    thing with Thomasville where the white population

19    is excluded and the enclaves are connected across

20    some distance, like, again, from Thomasville to

21    Albany.

22         So I -- that's something I'm looking at as

23    well.

24         Q.   Other than that, do you mean -- when you

25    say "my analysis of the traditional redistricting

1    factors," do you mean anything other than the

2    analysis that we've gone over already?

3        A.    Generally, I mean the analysis we've gone

4    over, yes.

5        Q.    And when you say "maintaining communities

6    and traditional boundaries, compactness and

7    deviation," are those the traditional redistricting

8    factors that you analyzed for this report?

9        A.    Primarily.  And again, if there's

10   something that could be extended from that, maybe

11   there's something more to be said.  But generally,

12   it's what's here, yes.

13       Q.    And you didn't consider any other

14   traditional districting factors?

15       A.    No.  Not in this report.

16       Q.    And when you say the Cooper plan "is

17   focused on race," is there any basis for that

18   conclusion other than the analysis that we've

19   talked about today?

20       A.    Well, in the analysis we've talked about,

21   there's several different ways that show a focus on

22   race.  And I mentioned how the unsplitting of

23   counties in one area allows for the splitting in

24   other areas.

25            I've talked about how some of the

1   districts are drawn with different enclaves

2   separated by distances and they're joined together.

3          I've talked about how districts are

4   elongated to reach white population to free up

5   black population to put into another district.

6          So I've looked at all of that, and I've

7   given examples of those types of occurrences in the

8   Cooper plan -- plans.

9       Q.   And so other than those examples that

10  you've given, is there any other basis for your

11  conclusion that the Cooper plan is focused on race?

12      A.   I think that covers it.  I talked about

13  the slightly different techniques, these things

14  that I pointed out.

15      Q.   Sorry.  Just techniques?

16      A.   Of working with the population and drawing

17  more majority black districts in a certain way.

18          MR. SAVITZKY:  I think I'm finished.

19      Yeah.

20          THE WITNESS:  Okay.

21          MR. TYSON:  I don't have any

22      questions.

23          THE VIDEOGRAPHER:  Okay.  This is the

24      end of the deposition.  Off the video

25      record at 6:16 p.m.

1          (Whereupon, a discussion ensued

2      off the record.)

3          (Whereupon, the reading and

4      signing of the deposition by the

5      witness was reserved.)

6                          - - -

7          (Witness excused.)

8                          - - -

9          (Whereupon, the deposition

10     concluded at 6:20 p.m.)

11                     --oOo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          VERITEXT LEGAL SOLUTIONS
2          FIRM CERTIFICATE AND DISCLOSURE
3
4          Veritext represents that the foregoing
   transcript as produced by our Production
5  Coordinators, Georgia Certified Notaries, is a
   true, correct and complete transcript of the
6  colloquies, questions and answers as submitted by
   the certified court reporter in this case.
7
8          Veritext further represents that the
   attached exhibits, if any, are a true, correct and
   complete copy as submitted by the certified
9  reporter, attorneys or witness in this case;
10         And that the exhibits were handled and
   produced exclusively through our Production
11 Coordinators, Georgia Certified Notaries.  Copies
   of notarized production certificates related to
12 this proceeding are available upon request to
   litsup-ga@veritext.com.
13
14         Veritext is not taking this deposition
   under any relationship that is prohibited by OCGA
   15-14-37(a) and (b).  Case-specific discounts are
15 automatically applied to all parties at such time
   as any party receives a discount.  Ancillary
16 services such as calendar and financial reports are
   available to all parties upon request.
17
18
19
20
21
22
23
24
25

1    R E P O R T E R   C E R T I F I C A T E
2    STATE OF GEORGIA )
     COBB COUNTY      )
3

4         I, Debra M. Druzisky, a Certified Court
     Reporter in and for the State of Georgia, do hereby
5    certify:
          That prior to being examined, the witness
6    named in the foregoing deposition was by me duly
     sworn to testify to the truth, the whole truth, and
7    nothing but the truth;
          That said deposition was taken before me
8    at the time and place set forth and was taken down
     by me in shorthand and thereafter reduced to
9    computerized transcription under my direction and
     supervision.  And I hereby certify the foregoing
10   deposition is a full, true and correct transcript
     of my shorthand notes so taken.
11        Review of the transcript was requested.
     If requested, any changes made by the deponent and
12   provided to the reporter during the period allowed
     are appended hereto.
13        I further certify that I am not of kin or
     counsel to the parties in the case, and I am not in
14   the regular employ of counsel for any of the said
     parties, nor am I in any way financially interested
15   in the result of said case.
          IN WITNESS WHEREOF, I have hereunto
16   subscribed my name this 23rd day of February, 2023.
17
18
19

20   _____
                         Debra M. Druzisky
21                       Georgia CCR-B-1848
22
23
24
25

```
 1        R E P O R T E R   D I S C L O S U R E
 2   DISTRICT COURT   )   DEPOSITION OF
     NORTHERN DISTRICT)   JOHN B. MORGAN
 3   ATLANTA DIVISION )
 4            Pursuant to Article 10.B of the Rules and
     Regulations of the Board of Court Reporting of the
 5   Judicial Council of Georgia, I make the following
     disclosure:
 6            I am a Georgia Certified Court Reporter.
     I am here as a representative of Veritext Legal
 7   Solutions.
 8            Veritext Legal Solutions was contacted by
     the offices of Wilmer Hale to provide court
     reporting services for this deposition.  Veritext
 9   Legal Solutions will not be taking this deposition
     under any contract that is prohibited by O.C.G.A.
10   9-11-28 (c).
11            Veritext Legal Solutions has no contract
     or agreement to provide court reporting services
     with any party to the case, or any reporter or
12   reporting agency from whom a referral might have
     been made to cover the deposition.
13            Veritext Legal Solutions will charge its
     usual and customary rates to all parties in the
14   case, and a financial discount will not be given to
     any party in this litigation.
15
16
17            Debra M. Druzisky
              Georgia CCR-B-1848
18
19
20
21
22
23
24
25
```

1   BRYAN P. TYSON, Esq.

2   btyson@taylorenglish.com

3                           February 20, 2023

4   RE: ALPHA PHI ALPHA FRATERNITY, et al. v. RAFFENSPERGER

5       2/9/2023, John B. Morgan (#5705844)

6       The above-referenced transcript is available for

7   review.

8       Within the applicable timeframe, the witness should

9   read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12      The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  cs-ny@veritext.com.

16

17      Return completed errata within 30 days from

18  receipt of testimony.

19      If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22                  Yours,

23                  Veritext Legal Solutions

24

25

1  **ALPHA PHI ALPHA FRATERNITY, et al. v. RAFFENSPERGER**

2  **2/9/2023 - John B. Morgan (#5705844)**

3                 **E R R A T A   S H E E T**

4  **PAGE_____ LINE_____ CHANGE_____**

5  **_____**

6  **REASON_____**

7  **PAGE_____ LINE_____ CHANGE_____**

8  **_____**

9  **REASON_____**

10 **PAGE_____ LINE_____ CHANGE_____**

11 **_____**

12 **REASON_____**

13 **PAGE_____ LINE_____ CHANGE_____**

14 **_____**

15 **REASON_____**

16 **PAGE_____ LINE_____ CHANGE_____**

17 **_____**

18 **REASON_____**

19 **PAGE_____ LINE_____ CHANGE_____**

20 **_____**

21 **REASON_____**

22

23 **_____    _____**

24 **John B. Morgan                    Date**

25

1  ALPHA PHI ALPHA FRATERNITY, et al. v. RAFFENSPERGER

2  2/9/2023 - John B. Morgan (#5705844)

3                    ACKNOWLEDGEMENT OF DEPONENT

4      I, John B. Morgan, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____    _____

12  John B. Morgan                       Date

13  *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

| 0 | | | |
|---|---|---|---|

**005** 365:7,11,18
**01** 275:19
343:12 364:18
364:25
**02** 349:24
**04** 191:24
198:11 216:24
217:6
**05** 179:24
191:24 198:12
**05337** 1:5
**06** 179:5,20
**07** 217:2,7
**08** 147:14
148:13

| 1 | | | |
|---|---|---|---|

**1** 3:8,10 11:24
12:2 159:25
160:4,20,24
161:10 171:3
172:24
**1-23-23** 3:20
**1.03** 160:13
**1.3** 158:23
**1.4** 158:22
293:6
**1.5** 158:15
159:2,19
160:19 344:24
345:4
**1.5.** 158:16,25
**1.57** 153:3
**1.62** 153:12

**1.89** 153:5
**10** 148:15,22,23
149:25 227:11
227:13,17
230:7 231:23
231:25 256:14
271:12 279:12
279:14 281:2
281:11,24,25
284:20 286:11
287:21 295:16
295:20 296:1
296:15 309:20
326:21,22
327:24 344:11
**10.1** 171:4
**10.5** 171:5
**10.6** 171:5
**10.b** 389:4
**100** 52:16
**10004** 2:4
**10007** 2:9
**102** 3:13
**105** 328:18,25
**10:24** 45:5
**10:32** 45:11
**11** 3:10 147:4
148:7 197:10
286:18 344:7,9
**111** 184:22
**116** 272:18
**117** 349:20
366:4,14,24
367:7,7,11,12
367:12

**12** 152:23
172:21 197:10
266:1 281:3,11
344:10
**12-5-22** 3:11,22
**12/05** 60:13
242:24 243:4
244:24 245:2
245:16 246:3
246:23 256:5
256:17 257:6
260:6,11
262:14,24,25
263:10 266:3
270:5,15,24
271:6 276:25
278:18 282:4
288:16 297:12
297:19 303:4
308:8 313:22
322:22 333:13
334:25 337:20
344:25 347:22
359:22 372:23
376:13 381:1
383:5
**125** 2:4
**128** 369:18
370:8,9
**12:11** 127:4
**12:53** 127:12
**13** 143:3
146:20,21,25
147:1,17 162:2
197:10 268:11

**274:12 366:8,8**
**13053** 388:19
389:16
**133** 350:5,6
370:18
**14** 148:10
172:11 180:23
197:10 269:24
270:1 274:13
294:6 296:22
299:19
**142** 3:16
**145** 3:18
351:15
**15** 105:1
106:17 148:12
172:21 197:10
197:12,14
216:6,11
223:16,17
270:4 285:15
295:6 297:6
**15-14-37**
387:14
**155** 370:10
**16** 146:20
147:1,9 148:15
149:17 173:4
271:2 281:24
281:25 286:16
287:1 290:24
291:25 292:4,8
292:9 294:3,7
294:12 298:13
298:18 300:4

304:25 305:3
306:14 307:7
317:5 344:6,9
**1600** 1:22 2:15
**17** 77:15 99:25
111:7 116:1
174:18 197:10
217:8 274:12
276:4 306:14
307:10 322:16
322:22 323:6
323:15 324:6,7
324:8 325:13
325:16,20
326:10 328:3
328:13,20,21
329:5,7
**171** 351:19
352:1,2 373:4
373:8 374:12
374:15
**179** 342:19,20
**17a** 301:13
**17c** 329:4
**17d** 329:4
**17th** 51:4
**18** 16:19
119:11 121:5,8
147:9 148:23
197:10 198:5
269:25 278:16
292:14 307:11
**180** 179:19
180:7

**1848** 1:25
388:21 389:17
**1896** 16:19,19
**18th** 2:4
**19** 131:4 143:9
148:5 197:10
279:5 292:10
292:14
**190,000** 330:21
**1900** 16:17,20
**1910** 16:16,20
**1920** 16:21,22
**1930** 16:16
**1932** 16:19,23
**1988** 17:23
**1991** 15:25
**1994** 18:11
**1:21** 1:5

**2**

**2** 3:11 12:15
17:18 27:15,18
62:16 102:24
103:11,15
104:1 116:25
120:1,6 150:2
150:4 172:24
182:2 240:5,7
241:23 255:13
255:25 256:25
257:9 260:5,6
260:11 261:21
270:6,16,22,24
276:6,9,11
277:2

**2,000** 125:22
**2,600** 216:16
**2.0** 157:10
**2/9/2023** 390:5
391:2 392:2
**20** 24:2 52:12
81:6,10,20,21
82:15 104:24
138:4 180:16
189:17 191:19
197:10,14
228:24 285:11
296:25 314:22
322:5 328:24
344:18 390:3
392:15
**200** 1:22 2:15
**2000** 87:5,6
**2000s** 88:12
**2001** 25:10
38:10 90:13
94:24,25
**2002** 38:10
**2006** 22:18
**2007** 38:1,7
39:23 42:25
**2010** 27:21
40:20 46:23
88:13
**2011** 30:18
31:8 33:24
40:17 46:16,16
47:22 49:3
78:15 141:4,9
143:25 144:7

146:17
**2012** 46:25
47:22
**2015** 42:4
78:15
**2018** 42:6
**2020** 47:24
253:20
**2021** 47:24
50:8,14,15
66:22 67:6,14
68:2,4 73:8,17
73:22 74:2,19
75:3 97:15
98:6,22 99:16
101:15 175:15
215:19 243:10
253:15 260:14
328:21,21
329:7 347:17
**2021-2022** 3:13
**2022** 62:13
**2023** 1:19 5:3
388:16 390:3
**21** 143:9 148:8
148:9,9,21
149:25 151:15
214:25 272:18
274:11 278:13
284:20 286:1
332:21 333:23
340:24
**212** 2:5,10
**22** 143:3 147:2
147:3 148:6

193:14 251:6,8
274:13 285:9
295:10,23
296:3 306:17
306:20 308:7,9
309:5,13,13,14
310:5,19
320:18,20,21
331:23
**22.7** 286:23
**23** 158:9 307:2
307:6,12,22
308:8,19,22
309:11,12
311:3,14 313:6
313:22 314:15
315:14 316:1
318:10,10,22
319:2,9,10,14
319:16,17
320:19 321:19
330:10,13,17
330:18,24
331:7,9,17,23
332:3,18
340:14
**230-8800** 2:10
**23rd** 12:2 54:5
54:25 57:24
59:23 63:2,5
63:11 66:8,12
68:13 165:22
241:25 242:2
256:5 262:11
388:16

**24** 162:2 286:2
286:17 298:22
**240** 3:20
**241** 3:22
**25** 167:15
197:17 207:7
224:20 228:24
284:22 285:7
288:13 290:22
295:1,12 296:3
322:5,7 344:17
**25,000** 294:15
294:16,19
295:2
**250** 2:9
**26** 147:13
172:11 202:8
207:7 292:9
295:9,22
**27** 149:14
173:4 189:2
296:9,24
354:10
**28** 143:9
147:16 148:11
148:12 179:22
182:9,11 189:2
189:7 191:7
218:15 272:21
281:25 290:11
292:13 297:11
297:13 298:15
299:9 300:4,22
332:25 333:7
351:22

**29** 143:9
148:14,15,18
148:20 191:18
205:25 214:24
215:3,25
272:21 306:23
354:10 362:18
379:1,1
**2:12** 196:10
**2:23** 196:16

|  3  |
|-----|

**3** 3:13 21:7
97:14 102:9,13
102:16 119:25
181:17,19
241:23 245:25
253:10 261:24
**3,000** 216:15,19
**3,300** 330:20
331:15
**3,302** 330:19
**30** 52:9 143:9
148:14,18,19
148:20,21
180:24 193:14
194:3 196:19
212:17 287:12
303:1 304:11
354:11 390:17
**302.32.** 146:5
**30339** 2:15
**31** 201:4
355:23
**32** 203:11
227:4

**33** 179:22
205:25 210:16
306:16 366:6
370:18
**330** 4:3
**336-7249** 2:16
**34** 227:4,7
281:24,25
285:14 288:2
288:12 296:25
297:1,8 300:4
308:4
**35** 125:19
212:17 225:9
225:14 278:19
313:4,20
351:21 362:14
**35.84** 307:7
**36** 213:5
320:24
**37** 143:9
148:17,22
227:7 307:6
351:23
**38** 218:12
220:2 322:17
325:25 326:8
328:9
**39** 173:1 179:3
220:4 299:22
300:5 301:8
333:11,12
**3:12** 239:21
**3:27** 240:2

| **4** | | | |
|---|---|---|---|
| **4** 3:16 21:7 70:10 97:14 101:2 142:12 142:14 143:19 256:14 | **46** 226:21 229:23 325:15 | **51** 217:9 314:22,24 359:13 | **5:11** 325:10 |
| **4.04** 153:16 | **47** 216:6,9,18 232:1,14 347:12 348:5 | **52** 269:11 270:13 359:13 | **5th** 54:2,25 57:24 59:22 60:1 62:13,20 63:1,12,13,16 63:17 64:5,8,9 64:12,13,14,17 64:19,21 65:3 65:6,18,18 66:1,2,4,6,12 66:14,21 67:6 68:19 69:5,6 69:20 70:3 86:15 98:15 100:24 127:19 130:18 196:20 238:9 245:7,19 253:25 262:3 |
| **40** 81:5 82:1,4 173:1 219:3 220:16 221:3 292:11 308:12 325:15 334:6 334:23 350:19 351:8 353:14 | **48** 143:3 147:5 223:5 232:14 232:15 300:16 354:6 | **527** 21:6 | |
| | **49** 180:23 340:24 | **527s** 20:23 | |
| **41** 219:1 221:3 229:18 231:24 251:6,8 253:8 306:21 | **4th** 64:7 | **53** 272:19 274:7 359:20 | |
| | **5** | **54** 340:23 362:5 | |
| **42** 67:17 217:21 231:24 273:23 301:18 340:14 | **5** 3:18 70:11,11 83:11,12,13 143:19 145:15 145:17 147:23 241:22 242:5 268:12 345:18 | **549-2500** 2:5 | |
| | | **55** 218:21 221:20 226:24 227:3,6,13,18 228:1,6,7,16,18 228:22 229:13 229:14,15 231:2,3,4,19,19 231:23 234:21 350:22,24 | |
| **43** 231:23 273:23 | **5-31-18** 3:16 | | |
| **43.3** 318:2 | **5.00.** 154:8 | | **6** |
| **44** 226:22 229:15 231:23 281:24 285:10 292:5,8,11,14 322:5,7 325:15 | **5.02** 154:6 | | **6** 3:20 97:13 101:3 240:19 241:1,22,25 245:24 305:22 314:3,7 |
| | **5.06.** 171:6 | **56** 217:10,11 278:13,19 297:8 357:20 357:24 366:3 | |
| | **5.2** 154:6 | | |
| | **5.8** 154:4 | | |
| | **50** 89:11 269:9 269:11,21 270:12 286:21 289:12 298:18 309:11 333:1,4 354:22 374:15 | **56.5** 306:24 | **60** 269:11 272:22 |
| **44,000** 300:10 300:11 | | **57** 272:22 | **61** 202:10 370:21 |
| | | **5705844** 390:5 391:2 392:2 | **62** 3:11 |
| **45** 179:3 297:8 341:11 | **5005** 143:12 146:7 | **58** 369:11 | **63** 360:23 |
| | **501** 21:7 | **59** 205:23 206:3,13,14 207:4,4,19 | **64** 371:15 |
| | | **5:03** 325:4 | **65** 88:17 202:7 269:11 |
| | | | **66** 231:8 |

**67** 375:13

**67,000** 366:6

**678** 2:16

**68** 376:4
380:10

**69** 355:22
362:17 363:5,6
363:21 376:5
380:9

**69.5** 285:14

**6:16** 385:25

**6:20** 386:10

---

**7**

**7** 2:8 3:4,22
120:11 241:5,7
253:9 273:19
274:6 325:15
328:18 342:13
343:23

**7,500** 294:7,10
294:25

**70** 88:18 89:12
287:11,18

**70.3** 285:10

**70s** 19:16

**71.5** 284:21

**72** 32:4,8,11,12
32:13,16 33:16
142:6,8 143:3
147:10

**73** 32:4,11,14
33:16 142:9
355:22

**7323** 7:20

---

**74** 180:5,15
349:15,19
355:22 360:16
360:20,21
362:1,3

**75** 157:6
269:12 380:7
380:12

**77** 355:22
358:25,25
359:9 360:7
362:6 380:22

**79** 362:6

---

**8**

**8** 4:3 253:11
278:17 329:21
330:3

**80** 82:14 181:1
181:5

**80s** 18:11

**84** 343:22

**85** 342:14

**87** 348:17

**88** 143:4
147:15,16

**89** 17:23
193:23 194:6
194:23 195:16
195:22

---

**9**

**9** 1:19 104:24
222:20

**9-11-28** 389:10

---

**90** 136:20
181:2 193:22
194:4,16
195:11,12,14
195:17,22,22
217:18 382:1

**90's** 195:13

**90s** 88:12

**91** 195:15

**93** 347:23
348:1,11

**93.7** 231:10

**95** 22:11

**98** 160:13

**99** 22:11

**9:40** 1:20

**9:41** 5:2

**9th** 5:3

---

**a**

**a.c.l.u.** 7:9

**a.m.** 1:20 5:2
45:5,11

**a.m.e.** 7:13

**a.r.c.** 23:16

**abha** 2:19 6:14

**ability** 11:3
20:25

**able** 64:20
65:16 87:21
90:20 91:5
103:22 108:16
163:12,17
192:15 200:14
209:3 212:5

---

**above** 3:12,21
3:23 303:3
333:1 375:14
390:6 392:7

**absolutely**
320:2 377:7

**academia**
52:24

**academic** 14:13
14:18 15:15
16:8 263:14

**acceptable**
144:15 145:2,7
147:19 148:24
149:4,20 349:1
349:12 364:6,9
364:12,15

**access** 14:8
328:6

**accomplish**
115:5

**accomplished**
359:24

**account** 95:3
138:19 157:3
236:4 263:9

**accounted**
190:12

**accreditation**
52:20

**accuracy** 8:2
390:9

**accurate** 10:14
10:24 11:4
41:19 256:21

347:18
**accurately**
207:1
**acknowledge**
156:2 255:20
256:11
**acknowledged**
43:14 154:15
169:19
**acknowledge...**
392:3
**acknowledg...**
390:12
**aclu.org** 2:5
**acquired** 22:18
**acres** 106:1
**act** 44:23 45:25
103:11 104:2
116:7,20,25
117:5,11,19,20
118:3 182:3
193:8 248:2,4
265:18
**action** 3:12,21
3:23
**actions** 86:15
247:23
**active** 165:24
**actively** 113:9
135:23
**actual** 40:12
47:21 48:22
58:7 90:1
120:24 222:7

**actually** 16:22
17:13 44:25
48:18,18 51:24
70:9,11 94:17
96:24 112:6
123:15 149:7
152:16 164:17
196:4 223:25
226:21 228:17
231:21 262:2
268:21 272:12
275:14,18
276:12 299:21
314:5 346:17
352:18 353:5
358:25 365:2,6
365:17
**add** 189:6
**added** 173:6
300:5 312:15
**adding** 312:25
331:9
**addition** 34:25
**additional**
68:23 78:2
81:8 95:6
162:5,24 189:6
199:1,17
213:13,16
221:5,7 222:16
229:25 230:10
231:14 243:2
243:20 244:22
244:23 252:23
268:5 280:8,24

284:7 293:1
320:23 331:25
372:22 376:17
378:22,25
**additions** 392:6
**address** 7:18
**addressed**
109:24
**addresses**
356:19
**adhered** 174:11
**adhering** 72:18
176:21 234:15
**adjacent** 32:14
125:20 165:8
290:12 317:13
331:3 357:4
368:11 373:14
**adjusted** 302:6
**adjustment**
332:4 361:23
**adjustments**
82:11,12 93:13
132:23 133:13
134:21,22
333:14
**adopt** 78:17
**adopted** 28:23
29:1 66:17,22
93:15 94:3
96:5,11 97:7
215:18 242:9
**adopting** 91:10
**advanced**
52:20

**advantage**
20:18
**advantages**
20:12
**advise** 81:15
**affect** 94:12
132:11 171:18
224:7,13
269:22 291:14
**affidavit** 38:3,5
39:6,16,20
40:3 43:1
**affiliated** 25:25
**affirmatively**
92:1
**african** 1:6
73:1 164:7
165:4 289:13
308:20 315:15
316:11 317:25
320:7 326:15
371:3
**afterward**
136:4
**age** 173:19
181:3 208:5
209:9 230:21
231:8,18 266:5
268:16,20
333:7
**agency** 389:12
**ago** 49:14
**agree** 5:10
73:16,25
111:14,23

117:2 118:19
118:25 119:5
121:18 131:11
192:8 224:5
271:18 273:11
273:13,21
274:16,22
277:6 279:1
312:8 323:4,5
340:22 342:3
350:3 365:16
**agreed** 74:19
74:24 75:3
**agreement**
389:11
**agricultural**
106:1 121:24
**agriculture**
106:1
**ahead** 60:5
105:1 194:14
222:4 226:21
241:2 317:1
325:1 348:9
**air** 166:23
**al** 5:14 390:4
391:1 392:1
**alabama** 22:6
34:9
**albany** 352:5
373:13 374:15
374:25 375:1
375:11 383:21
**albuquerque**
29:22

**align** 89:8
114:7,8 187:14
188:13
**aligns** 276:5,12
277:1,4
**alike** 206:22
**allotted** 390:20
**allow** 150:21
270:23 322:22
325:19 326:10
363:1 377:21
**allowance**
170:25
**allowed** 87:25
158:23 388:12
**allowing** 131:1
245:11
**allows** 304:17
323:18 382:6
384:23
**alpha** 1:3,3
5:14,14 7:10
7:10,12,12
49:23,23 57:25
57:25 390:4,4
391:1,1 392:1
392:1
**alter** 327:23
**alternative**
115:18
**altogether**
132:19
**amended** 95:20
**amends** 92:1

**american** 2:3
6:3 23:2 73:1
164:7 165:4
289:13 308:20
315:15 317:25
326:15 371:3
**americans**
316:11 320:7
**analyses** 98:25
283:19
**analysis** 13:5
64:13 75:18
78:2 90:25
98:13 100:24
101:14 103:12
128:20 134:13
138:8 173:3
175:18 177:16
182:10 189:10
189:25 195:24
196:1 201:4
203:4 213:16
222:12 237:2,4
237:10 238:13
241:19 242:13
242:17 243:17
244:3 246:2
247:3,4,8
249:8 250:5
253:18 254:25
255:12 256:6
257:6,23 258:3
263:8,14,15
264:7 267:8,15
268:3,6,11

269:16 276:20
276:22 279:5,6
281:6,7,10,12
283:7,15,17
284:15 298:10
303:11,17
323:5 327:19
328:12 334:24
337:13,24
338:1,2 340:17
340:18,19
341:21 342:1
356:3,9 357:23
358:5,9,19
362:10 363:10
365:23 369:21
369:25 374:11
375:14,18,20
379:16 380:25
382:23 383:9
383:25 384:2,3
384:18,20
**analyst** 17:21
18:1
**analyze** 90:23
98:14 99:15
181:20 215:21
236:7 254:2
255:8 270:18
270:21,22
327:4 338:23
356:25 357:15
**analyzed** 76:23
97:15 215:10
254:4,20 255:6

327:5 384:8

**analyzing**
87:14 98:6,11
174:25 254:21
265:22

**anchored**
227:17 290:25

**ancillary**
387:15

**answer** 8:11,12
8:15,19,20 9:8
9:8,9,10,15,16
10:8 32:11
53:7 55:4,7,14
57:6 65:22
71:25 105:25
114:15 117:15
135:16 248:5
250:21 345:12

**answered**
10:13 57:21
117:13,16
194:13 345:10

**answers** 7:24
65:21 160:18
387:6

**anticipate**
105:24

**anyway** 105:25
340:9 359:5
378:18

**apart** 180:2

**apartments**
122:7

**apologize** 219:4
219:20

**apparent**
193:19 195:19
266:12

**appeal** 29:14

**appealed** 34:7

**appear** 364:22

**appearance**
6:20 39:18

**appearances**
2:1

**appears** 149:14
174:19 199:24
217:16 230:6
242:3 293:19
368:25

**appellate** 30:2

**append** 99:9
240:13

**appended**
240:6 388:12
392:7

**appendices**
58:5 213:25
257:16 260:23
260:24 261:2
261:15 358:22

**appendix**
267:23 274:3,3
283:1,19 284:7
314:16 343:4
343:19 361:6
367:15 369:24
382:18

**applicable**
262:16 390:8

**application**
69:21

**applied** 13:7
18:1 22:19,21
23:11 70:2
91:1 149:22
160:19 238:2,4
387:15

**applies** 159:24
161:17

**apply** 119:9

**approach**
81:17 82:18
155:5 158:3,4
212:18

**approached**
24:15

**approaching**
114:19

**appropriate**
140:13 175:1
229:7,10
352:23 353:5
353:11,12,13
353:16 369:8

**approve** 93:24
93:24

**approximately**
76:16 221:18
287:11

**approximates**
234:21

**arcane** 139:3

**area** 29:22 32:3
80:14 89:14
90:3,5 109:15
109:15 122:1,1
124:18 126:17
126:18 128:13
129:8 140:25
166:10,13
167:21 171:18
171:25 172:5,7
183:7,20 187:9
187:15 188:12
188:25 190:8,9
190:20 197:18
197:23 200:17
207:12,13,15
209:2,4,10
210:3 211:19
221:21 222:13
223:3,8 233:8
233:11 234:12
235:1 259:13
263:5 279:11
281:13 282:9
282:24 283:10
283:11,13
284:2 287:6,7
287:8 298:5
302:18 303:5,7
303:8,10,13,18
304:3 305:8,11
306:12,13
308:14,25
309:18 310:6

312:2,23
313:10,18
315:11 317:22
322:4 324:11
327:1 328:3
331:3 336:11
350:8,23 351:2
354:7 356:4
357:12,13
358:13,15
363:25 365:1
365:25 366:1
369:12,16,21
369:22 370:1
370:13 371:3,8
371:17 372:4
372:11 375:11
375:21 377:6,6
384:23
**areas** 72:23
73:1,4 90:16
90:25 91:2,8
108:25 109:1
121:16,24
124:12 129:14
157:23 163:14
163:20 164:16
165:18 166:16
167:2 186:14
187:4,6 188:6
199:9 200:19
221:19 238:2
247:24 260:3
263:5 265:14
266:11 287:4

324:9 333:16
346:24 347:1
360:1 363:16
363:17 371:3
377:22 379:13
381:21 382:7,8
384:24
**argue** 298:21
298:23
**argued** 141:15
141:18
**argument**
335:12
**ari** 2:3 6:2 7:8
11:7 26:15
57:7 69:2
**arizona** 18:17
24:13 91:15,20
**arlington** 122:4
122:9
**article** 389:4
**artificial** 13:3
**asavitzky** 2:5
**aside** 54:21
56:3,18 57:17
83:18 97:5
112:9 115:2
118:15 169:12
243:6 244:4
267:25 276:11
313:14 353:3
361:25
**asked** 10:7 48:1
53:23 55:6,8
63:15 70:18,20

70:22 71:4,6,8
71:10 96:19
103:12 135:8
135:14 171:9
175:19 194:11
215:21 242:7
306:8 375:4
**asking** 9:1
25:17 53:17
68:12 69:2
96:10 136:13
136:14,23,24
137:6 161:16
171:12 179:15
194:12 199:15
199:16,21
230:14 276:17
292:7 375:5
**aspect** 134:17
178:4 237:14
370:16
**aspects** 14:3,4
51:17 336:9
339:8,11
**assembly** 101:6
101:22 242:10
**assertion**
199:20,21
297:24 310:2
317:19
**assess** 175:3
**assessed** 35:2
37:9 190:2,3
**assessing** 75:7
139:16,21

140:11 177:13
178:10 369:6
**assessment**
89:6 194:1
203:18
**assessments**
265:6
**assign** 151:21
**assigned** 25:8
151:20
**assigning** 170:8
**assignment**
139:12 249:9
254:4
**assist** 263:18
**associate**
202:21 374:25
**associated** 19:6
20:8 85:8
186:22 201:19
202:2,12,20,20
218:8,19
240:13 282:12
**associations**
224:16
**assume** 10:1
27:10 98:2
117:21 215:23
215:25 293:18
298:17 344:2
353:24 358:2
361:5
**assumed** 50:18
**assuming** 56:24
251:25 255:23

364:24 365:14
365:17,17
**atlanta** 1:2,23
2:15 5:17,19
126:17,18,20
167:21 168:1
170:13,16,19
197:19 218:10
220:25 281:13
286:19,19
287:4,9 303:8
303:13,18
304:3 322:18
356:4 363:25
377:6 389:3
**attach** 100:15
105:21 110:4
**attached** 98:1
387:8 390:11
**attempt** 75:23
103:23,25
270:18
**attendance**
121:16 129:4
**attention** 35:23
47:17 135:5
139:18 150:23
**attorney** 6:15
7:8 9:15 26:14
55:11 71:23
72:4 390:13
**attorneys** 26:12
28:15 34:24
47:16 58:13,19
58:21 59:3,5

71:7 93:11
387:9
**attributable**
321:11,15
**audible** 41:9
146:18
**audibly** 8:11,20
**audio** 5:8
**august** 63:20
63:23
**augusta** 89:16
306:14 310:13
312:19 313:1,8
313:9,12
316:16 318:12
**automatically**
387:15
**availability**
51:6
**available** 65:2
99:9 102:1
106:21 120:23
139:11 152:2
156:3 162:20
178:25 267:19
282:25 283:20
358:22 387:12
387:16 390:6
**average** 149:9
179:18 198:2
224:8
**avoid** 207:20
**avoided** 104:15
**avoiding**
192:17 203:25

226:3
**avoids** 291:1
**aware** 65:9,10
65:15 66:9
78:12 89:6,13
96:22 97:6
117:7 158:5
163:18,19
165:18 169:2
247:16,19,23
252:15 259:11
347:1
**awareness** 90:9
163:25 167:1,4
**axis** 112:21

**b**

**b** 1:17,25 3:3
3:10,12,20 7:1
126:8 387:14
388:21 389:2
389:17 390:5
391:2,24 392:2
392:4,12
**b.e.f.s** 97:17
98:7 254:2,22
**b.v.a.p.** 181:2,2
181:5 208:4
284:21 286:23
309:19 340:16
354:11
**bachelor's** 14:6
16:14
**back** 22:12,13
33:23 45:10
65:12 79:5

80:9,16 82:10
83:13 101:21
104:23 108:16
127:11 132:23
134:20 146:9
149:24 150:1
152:20 171:24
172:25 191:7
196:15 214:7
240:1,4 253:9
274:7 299:13
313:7 314:9,11
319:12 325:9
346:18 375:12
**backed** 77:6
**background**
11:20 12:17
15:15 16:8
87:2,20,25
88:5 89:19
90:8 130:6,14
130:25 142:25
162:23 163:13
210:12 244:17
**backing** 33:9
235:3
**backtracking**
329:18
**bailey** 1:8 7:13
**bakersfield**
24:16
**balance** 111:12
116:2 216:1
252:16 289:9
300:17,23

307:1
**balanced**
  111:17 132:12
**balancing**
  111:25 116:17
  140:21 193:11
  205:19
**baldwin** 312:25
  316:5 318:1,2
  318:6 320:8
  322:3 370:19
**ball** 279:17
**ballpark** 81:10
**base** 88:14
  166:23
**based** 55:3 56:4
  56:12,20 68:10
  72:7 78:4,9
  89:8 92:8 94:7
  95:8,17 97:2
  108:8 109:5,22
  110:23 121:12
  122:6 129:8,13
  130:19 145:3,5
  151:22 164:21
  181:11 200:13
  224:24 236:19
  254:20,21
  256:6,9 289:6
  322:14 327:21
  334:24 342:3
  355:13 358:11
  376:2 380:25
**bases** 244:18

**basic** 256:1
**basically**
  172:17 201:10
  227:23 246:10
  275:20 300:7
  302:12 365:11
  373:17,18
**basing** 37:15
  96:10 244:9
  250:3 381:16
**basis** 57:2,18
  96:4,7 187:2
  190:5 199:4,10
  199:21 200:24
  201:16 208:24
  209:20 210:8,9
  210:11 211:4,5
  211:7,10,15
  212:9 230:9,14
  230:16 234:7
  234:22 237:17
  237:23 238:6
  243:25 244:7
  253:17 268:8
  273:9 276:22
  276:24 288:21
  290:6,7,8
  291:7,15,20
  297:23 303:22
  310:2 311:23
  317:18 319:8
  319:24 321:14
  323:24 327:14
  337:8 373:6
  374:21 375:5,7

380:1 384:17
  385:10
**bear** 123:16
**beat** 379:7
**beginning**
  128:16 138:2
**begins** 91:21
**behalf** 1:4 2:2
  2:12 28:16
  44:17,20
**beholder**
  122:20
**believe** 6:16
  27:15 42:14
  45:13 58:4
  68:17 72:7
  73:19 93:11
  99:1 118:23
  141:18,24
  142:4 151:19
  213:12 215:2
  218:6 243:22
  258:20 270:3
  271:21 272:4
  278:15 282:1
  292:1 307:10
  311:13 322:16
  329:17 341:2
  362:15 367:4
  369:1 372:5
  376:20
**belong** 109:15
**belt** 306:13
  369:12

**benchmark**
  260:17 341:4
**benchmarks**
  261:7
**benefit** 132:7
  268:25
**bennett** 7:17
**best** 8:25 39:15
  81:24 351:5
  352:23
**bethune** 30:14
  33:4,23 34:3
  37:19 40:22
**better** 109:15
  126:10 206:23
  206:25 230:22
  265:17 272:8
  272:24 274:13
  274:16,20
  275:19 277:6
  277:21 278:4
  296:6 299:5
  319:9,24
  343:20 344:1
  351:16,17
  358:7
**beyond** 55:13
  114:1,4 276:19
  336:24 346:14
  382:11
**big** 62:1 125:24
  166:24 179:4
  189:18
**bill** 31:2 63:6
  64:9,13,16,20

69:22 241:4
243:9 253:24
265:7,12
271:18 341:7
**bind** 123:7
**biological**
13:15
**biology** 13:17
**bit** 12:16 24:12
28:6 38:11,13
121:8 125:3
179:12 198:3
254:3 262:1
283:14 293:25
316:15 321:17
334:19 351:20
374:13
**black** 90:17,20
91:1,3,4
173:19,20
180:22 181:3,9
181:9,10 191:3
193:20 196:25
197:6,18,22
198:8,8 199:1
199:17,25
200:2,6,20,23
208:2,5,11,15
208:19,21
209:2,9,16
210:10,24
211:20,25
212:10,14
217:14,18
229:25 230:4

230:10,21
231:8,14,18
249:11 266:5
266:17 268:15
268:15,19
269:25 270:7
285:10,14
287:11,16,18
288:1,3,6,10,19
288:25 289:3
289:15,23,25
291:1,14
294:11,22
296:18,19
297:13,20,24
298:5 300:19
302:14,17
304:12,14,17
304:19 305:2
306:13,24
307:7 308:12
308:18,24
309:7,10,16,25
310:3,7 311:1
311:5,10,15,19
312:1,5,9,22
313:9,17,24
315:6,11
316:15,18,21
316:23 317:14
317:20,21,23
318:2,5,8
321:12,18
323:5 327:2,20
328:2 330:23

331:1,5,25
332:24 333:4,6
334:2,3,6
335:1 336:16
337:19 340:15
340:23 341:3
347:14,24
348:14,21
354:19,25
359:23 360:17
362:13,14
363:16 366:7
366:13,17,19
366:23,25
368:3,8,16,22
368:23 369:4
369:12 372:3
372:10,22
373:8 375:17
379:20 381:2
383:17 385:5
385:17
**blank** 76:11
80:7 290:25
**blind** 65:25
70:12 73:5
78:16,16 88:21
91:11 96:12
97:8 137:18,19
138:1 166:25
205:15 232:5
232:21 237:11
**blindness**
137:21,22

**block** 79:14,21
97:16 139:12
163:13 253:12
253:14 254:4
**blocking**
323:10
**blocks** 328:6
**blue** 280:12
363:17
**board** 3:16,18
30:13 36:10
47:23,24
248:21 389:4
**boards** 19:18
**body** 93:15
257:17
**border** 285:4,4
310:9,12,12
315:16 326:19
**borrow** 172:8
**bottom** 17:19
146:4
**boundaries**
72:18,19,20
85:19,20 89:25
90:1 104:7
107:19 108:2
111:6,19 114:7
114:9 116:3
119:17,19
120:4,19,20
124:5 133:12
162:11 163:7
164:15 174:10
174:12 183:7

183:18 185:1,2
185:7 251:3,5
251:11 252:5,6
252:22 280:25
331:22 333:15
334:11 337:16
337:18 339:2,3
371:8,12 383:1
383:3 384:6
**boundary**
86:11 113:14
114:2,3,4
121:4 135:1
157:13 164:9
164:12 176:10
218:22 302:6
371:6,7 377:12
379:19
**bowl** 32:23
**boxes** 214:7
**boy** 228:2
**boyd** 2:20 6:19
6:20
**brad** 1:12 5:15
**break** 10:5,7,9
45:1 81:18
126:25 196:5
239:10,15
324:21
**breaks** 15:20
269:1,3,4,5,19
**brief** 39:19
45:8 196:13
239:24 325:7

**briefly** 7:24
42:16 43:19
58:11 196:4
226:22 258:7
272:17 329:19
364:4
**bring** 62:6
108:16 244:16
331:10
**bringing**
130:15
**broad** 2:4
33:21
**broke** 38:12
**brought** 34:11
35:23 46:20
47:14,16 49:23
50:5 157:12
246:11
**brown** 1:8 7:14
195:1
**bryan** 2:13,14
6:7,10,23
241:15 390:1
**btyson** 2:16
390:2
**build** 19:12
168:10,12
**building** 20:16
**built** 19:22
**bureau** 106:15
**burke** 317:6,8
**button** 61:19
112:23

**bypassing**
291:11 296:16

**c**

**c** 21:7 388:1,1
389:1,10
**c.b.s.a.** 259:13
347:9
**c.b.s.a.s** 157:22
**c.v.** 12:3,13
14:20 17:18
23:17,21 27:16
28:22 39:25
40:7 41:7 43:6
43:12
**calculate**
272:10
**calculation**
137:1 138:17
**calendar**
387:16
**california**
24:14,16
**call** 20:23 23:7
94:10 122:16
217:21 281:8
311:10,10
**called** 18:5 20:7
27:25 28:3
32:19,22 42:15
47:1 49:5 76:2
97:17 354:8
**calling** 281:6
**calls** 53:6 71:23
**campaign**
20:13 22:24

**canal** 14:17,22
**candidate**
19:10,25 20:2
21:12,15 22:6
**candidates**
19:12,17 20:1
20:4,21 21:1,4
21:9,17,19,21
22:2 23:5
90:21 91:5
**cap** 221:5
**capacity** 1:12
49:7
**capitol** 87:11
**captioned** 3:12
3:21,23
**care** 134:23
**career** 22:8
52:24
**careful** 299:11
**carefully** 141:1
198:1 228:11
368:20 382:3
**carolina** 24:9,9
25:10 37:25
38:10,17,19,22
40:19,23 42:24
43:3,6 46:23
47:3 48:24
49:1,3,9,11,15
91:15 92:7,14
92:18,22
114:24 115:3
310:13

**carried** 31:2
**carry** 112:7
**case** 1:5 6:17
  6:17,18,22
  19:11 27:25
  28:5,10 29:4
  30:4 31:9,25
  33:2,5,11,23
  34:3,8,14,16
  35:2 36:10,13
  36:24 37:9,10
  37:17,25 38:8
  39:13 40:2,17
  40:23 42:4,6
  43:4,6,16,17
  44:1,2,8,11,18
  44:21 45:15,17
  46:4 47:10,14
  48:15 49:5,21
  50:9,12 51:8
  53:4,24 54:7
  54:16 55:3,16
  56:12 57:20,25
  58:3,14 59:19
  63:2,4 68:10
  68:21 71:7
  72:10 75:1
  83:25 84:19
  91:20 96:23
  97:1,3 100:17
  113:3,25 114:8
  114:24 116:22
  121:3,4 122:17
  133:1 141:8,13
  141:15,20

  142:3,25 145:3
  145:21 146:3
  149:1,6 150:18
  157:2 161:9
  166:22 167:20
  169:15 174:10
  176:6 179:17
  190:11,13,15
  201:25 204:5,6
  208:17 217:6
  218:16 220:13
  222:17 225:3
  234:14 235:11
  241:4 242:3
  245:4,16 247:7
  258:19 259:21
  288:23 303:24
  309:4 312:13
  316:25 320:4
  337:9 351:8
  364:9 373:11
  383:15,15
  387:6,9,14
  388:13,15
  389:11,14
**cases** 26:18,22
  30:15 31:7,11
  38:2,9 40:24
  41:3,23 42:10
  42:17,20 43:20
  44:23 45:14
  46:7,14 47:7
  79:6 85:7
  106:6,16
  109:13 112:15

  122:21 136:8
  139:19 144:17
  155:8,11 156:1
  174:11 184:11
  184:18,18
  188:22,23
  248:18 263:1,3
  356:23 363:23
**categorically**
  248:21
**category**
  213:21
**caucus** 25:4,18
**caucuses** 22:23
  25:6,21
**causal** 199:5,20
  200:24
**cause** 193:10
  199:22 205:18
  244:3
**caused** 200:8
**causes** 192:7,11
  192:12,17,20
  192:24 193:3
  203:21,25
  204:3,8,10,23
  226:1,3,6,9,12
  226:18
**causing** 134:7
**ccr** 1:25 388:21
  389:17
**census** 30:18
  39:1,4,7 79:14
  79:21 86:3
  87:6 106:15

  123:17 129:9
  173:6
**center** 2:8
  166:24 168:12
  168:19
**centers** 154:18
  164:8
**central** 150:23
  170:15
**centroids**
  138:19
**certain** 13:12
  35:24 80:14
  81:17 91:19
  92:21 95:24
  131:21 247:24
  266:6 385:17
**certainly** 66:9
  96:14 117:3
  134:23 163:20
  240:17 249:15
  259:11 359:10
**certificate**
  387:2
**certificates**
  387:11
**certified** 387:5
  387:6,8,11
  388:4 389:6
**certify** 388:5,9
  388:13
**chain** 86:10
**chairman**
  18:13

**challenge** 27:12
31:19,23 33:22
38:20 140:19
142:2
**challenged**
27:10 31:20,25
32:2 33:11
45:21 141:9
142:7
**challenging**
156:23
**chamber** 23:7
**chambers**
71:11
**chance** 267:13
**change** 8:19
115:20 171:18
224:6,7 269:22
289:11 308:6
308:16 358:4,4
378:21 379:24
391:4,7,10,13
391:16,19
**changed** 38:20
133:11 223:21
358:1
**changes** 29:15
29:16,18,21
79:10 81:9
93:25 95:9
96:2 117:8
133:11 135:1
255:15 260:5
270:5 347:23
348:1,11

378:20 382:5,5
388:11 390:10
392:6
**changing** 95:22
298:2 357:5
365:14
**characterizati...**
291:23 312:12
**characterizati...**
322:12
**characterize**
60:1 304:1
**characterized**
32:17
**characterizing**
90:10 312:4
**characters**
172:21
**charge** 15:9
389:13
**chart** 99:21
100:2 173:15
174:18,23
175:20 180:3
206:5 213:6
214:23 257:14
257:14 270:11
271:2,4 273:18
277:5 287:17
294:6 296:21
296:21 298:2
299:18,24
300:7,14
341:12,15,16
341:20 347:11

348:6,20
355:23 360:12
360:13,13,15
360:16 364:3
364:22 381:9
**charts** 374:8
380:23
**chatham**
108:23,25
**check** 261:16
**checked** 79:5
252:11
**chicago** 13:12
15:23 53:1
**choice** 90:21
91:5 110:20
111:5,6 113:21
126:8 155:10
155:14 324:3
**choices** 110:13
110:18 112:25
115:9,23
237:20 353:16
**choose** 9:10
155:16 186:10
186:15,18,21
186:24 218:4
224:24 225:6
259:21 266:7
358:15
**choosing** 190:5
201:17
**chose** 161:13
185:12 186:12
186:17 187:8

187:18 190:23
191:1 207:11
207:13 223:10
224:13 259:22
283:3 344:25
356:8,25
358:11,16
377:10 380:4
**chosen** 304:9
305:5 365:24
**chris** 30:20
31:5 36:2
**chunk** 189:18
**chunks** 189:20
189:22
**church** 1:6 7:13
**circle** 1:22 2:15
**circumstance**
43:1 161:22,23
174:13 175:25
210:22
**circumstances**
70:2 114:23
136:7 350:21
**cite** 244:24
249:4
**cited** 149:1
**cities** 119:14
162:3 273:6
**city** 109:7
112:21,22
157:3,15 289:2
310:13 314:19
315:3,6 360:11
362:21 363:1,7

civic 111:18
113:14 116:3
civil 2:3 6:3
claim 66:7
134:7 336:24
claimed 235:6
235:19 236:2
claiming
233:22 234:3
352:17,22
353:4 355:12
clarification
57:14
clarify 214:6,10
257:8 345:11
clarke 323:19
334:1
class 15:9
classes 12:23
12:25 13:2,8
classic 259:4
classified 13:1
clayton 153:14
153:23,25
182:13,22
183:10 189:14
190:12 217:23
225:3 282:13
282:14 286:5
286:12,13
287:19,25
288:17 289:1
289:16,18,24
290:12,18
291:1,3,11,13

292:19,20,22
293:1,4,13
297:4,16 298:5
299:9 357:14
357:16 359:15
360:1,8 362:11
362:12
clear 13:18
15:5 21:24
41:12 59:9
94:15 105:8
136:13 153:19
188:11 212:7
219:11 225:2
225:18 231:22
240:5 267:14
278:3 280:1
281:1 291:17
310:4 312:22
323:1 328:19
329:4 347:25
380:12
clearly 30:25
76:4 122:17
184:3 186:22
202:12 208:17
219:21 234:11
234:17 236:16
237:9 274:15
316:12 327:22
335:19 365:21
click 112:23
client 17:7
24:19 71:23
122:25 123:1

156:5
clients 23:4,6
24:19 81:15
87:15
close 152:5
159:13 178:17
179:25 188:24
190:7 203:19
208:5 216:15
217:5 223:16
278:21 350:4
365:21 382:2
closely 23:22
153:6 276:5,12
277:1 356:22
371:2
closer 88:17
233:14 269:9
269:20 374:24
cluster 279:7
281:6,7,10,16
282:20 283:6
355:21 357:23
coastal 170:14
171:24
cobb 166:5,7
166:19 218:10
220:11,14
222:18,23
388:2
code 105:17
coffee 334:1
college 12:18
12:20 14:3,5
15:18,23 17:10

52:24 53:1
colloquies
387:6
coloration
280:25
colored 14:9
185:23,24
195:2
colquitt 372:24
373:1,16
columbia 307:3
307:25 309:6,7
319:16 334:1
column 142:24
columns
361:13
com 370:3
combination
320:19
combinations
150:19,20
223:18
combine 92:25
267:20
combined
232:4,20
236:23 287:18
308:12 309:16
combines
297:13 371:25
combining
296:17 309:8
come 32:4 56:4
72:17 80:16
111:17 128:15

152:20 172:25
236:8 245:8
314:9,11 332:9
332:17 375:24
**comes** 55:25
56:15,20,24
57:17 112:11
206:22 356:12
**coming** 74:4
151:14 163:1
171:24 213:4
245:19 375:12
**comment**
265:16
**commenting**
302:22 332:6
**comments**
357:18
**commerce** 23:8
**commission**
26:8,14 48:10
91:23,25,25
314:19 315:3
**commissioner**
112:19,24
**commissioners**
113:4
**commissions**
26:1,2 129:20
**committee** 3:15
17:15,21 120:3
**common** 115:8
115:22
**commonalities**
126:1,5 127:22

265:6,14
**commonly**
139:2 262:19
**communities**
80:20 84:2,14
84:23 85:6,14
85:17,17 86:13
86:16 87:21
88:2,7 104:12
119:1,4,6
121:10,11,15
123:22,22
124:1,22
127:17,25
130:4,8,17
156:20 162:5,9
162:24 164:1
164:23 174:7
200:14 204:24
212:25 226:12
233:14 234:5
234:25 235:9
235:22 251:2
251:10 252:4
252:21 262:4,9
262:13,23
263:2,9 264:3
264:10,15,16
264:21 293:10
299:5 337:15
338:5,6,7,10,12
338:12,15,16
338:24 339:8
346:2,5 383:1
384:5

**community**
109:3 121:21
122:5,16 123:4
123:7,23
126:12 128:3,7
174:14,16
192:25 234:11
234:13,15,18
234:20,22
259:5 264:6
293:12 298:25
338:19,19
368:15 383:17
**compact** 31:21
33:12,14 72:22
73:3 76:17
80:20 113:17
113:23 140:1
140:18 141:10
141:16 142:7
164:20 179:10
179:11 191:14
193:25 197:1
197:22,23
198:11 199:16
200:13 207:25
208:4,9,13
209:4 231:6,9
231:17,24
233:13 273:15
273:21 274:23
275:4 284:11
292:15 297:2
299:6,7,15
313:13 318:18

318:20 323:15
328:20 329:6
329:10,11
343:9 344:13
349:17 350:6
351:20 360:17
362:3 367:7,13
370:5
**compacted**
278:21 329:12
**compactness**
31:13,16 33:22
84:1 100:7,8
104:10 108:10
111:19 116:3
138:6,9,11
139:5,15,16,22
140:11,21
141:2 144:6,8
144:14 145:1
146:7,15
147:25 149:10
173:18 177:23
177:24,25
178:9,19 179:9
183:21 185:9
185:11 191:20
192:1,4 193:17
198:4 199:3,12
199:18 200:9
203:16 204:11
216:24 223:22
225:22 226:1
227:3,6 228:16
230:2,12,22

231:15 233:11
251:3,11 252:5
252:21 256:22
258:9,10,13
273:13 274:1
274:17,24
275:7 277:21
278:1,22,23,24
279:2 283:7
291:24 292:3,4
292:16 296:6
297:7 306:21
306:22 319:5
319:23 329:16
335:6,8,17,18
337:16 339:12
339:15,16
343:8,15,18
344:1,14
347:12,13,15
348:20,23
349:2 350:1
354:4,17,23
355:12,14
356:6 357:23
358:1,6,7
361:2 364:4,5
365:23 369:25
370:6,12
375:15,20
383:2 384:6
**company** 18:2
22:17,18
**comparable**
221:21 223:7

223:19
**comparative**
242:16
**comparator**
351:6,13
**comparators**
207:5,6 229:8
352:23
**compare** 65:25
72:9 77:17
133:17 178:3
187:5,7 193:22
194:10 195:7
195:11 203:8
207:8,9 212:5
229:13,15,18
231:19 233:21
234:2 235:16
242:10 256:25
263:23 292:4,7
292:11 293:9
312:2 346:19
350:23,25
353:5 363:17
377:11
**compared** 73:8
140:24 149:6
191:10 211:2,8
216:19 227:12
230:17 243:9
248:14 256:24
260:12 270:1
270:25 281:23
346:3 348:1
370:10

**comparing**
149:1 183:9
194:6 201:12
213:7 219:15
219:18 227:8,9
236:19 242:23
249:10 250:16
252:6 260:4
261:17 265:3
266:3 271:6
275:5 295:19
295:25 341:17
346:7,10,22,25
374:18
**comparison**
137:2 183:13
195:23 198:19
206:23,25
207:16 211:4,7
212:7 226:23
236:25 242:19
242:20 243:2
248:12 251:13
251:20 252:4,8
252:11 259:2
261:7 263:10
267:3 270:23
271:17 283:2
289:8 302:12
342:3 350:18
352:11,24
353:9,11
**comparisons**
70:20 206:3,10
206:20 221:23

243:8 256:2
260:3 277:12
**compendium**
14:16
**compiled** 15:9
**complaint**
143:1
**complete** 10:14
10:24 11:4
54:14 55:1
56:7,10,22
57:1,18 64:3,6
68:8,19 71:10
72:8 80:5
186:8 221:6
240:7 243:23
244:5 267:8
337:7 387:5,8
392:8
**completed** 79:4
81:9 170:15
390:17
**completely**
155:13 202:4
220:7
**completeness**
239:2
**completing**
172:12
**compliance**
116:24 118:20
182:7 193:7
205:5,11 248:6
248:7

**complicated**
156:18 166:22
**complied**
103:10,18
104:1
**complies**
181:13,23
182:3 265:17
**comply** 66:18
66:23 68:5
70:6 103:15
117:4,10,20
118:2 159:20
160:25 161:5
161:19 182:2
215:19
**complying**
116:6 226:9,15
248:2,3
**component**
44:12 72:21
100:12 164:24
259:16,20
264:5,8 289:11
362:10,15
**components**
4:3 88:24
133:16 256:24
298:1 299:20
327:18 330:6
363:10
**comport** 305:8
305:25 345:3
**comports** 319:9

**composed**
108:24
**composition**
67:23 84:22
167:2 209:24
232:8,24
296:22
**comprehensive**
41:25 347:3
**comprise**
257:22
**comprised**
185:15 282:6
307:14
**compromise**
29:3,4
**compromised**
250:1
**computational**
237:4
**computer**
12:21,23 13:1
13:8,19 14:10
117:25
**computerized**
388:9
**con** 365:2
**concentrated**
164:7 209:2
312:7,24
313:10,18
316:10
**concentrates**
181:8

**concentration**
73:2 165:4,5
165:10 200:2
288:19,24
289:15,25
296:17 310:7
310:14 311:6,7
311:11,11,19
312:10,10,15
317:25 368:23
371:4
**concentrations**
163:23 200:20
208:21 211:25
304:14 305:2
308:20 309:6,9
310:25 320:6
326:14 366:13
**concentric**
168:12
**concern** 31:16
**concerned**
31:12 94:10
**concerning**
72:20
**conclude** 66:15
66:21 67:1
68:4 69:19
70:3 198:24
231:16 305:7
334:22
**concluded**
386:10
**concluding**
246:13,19

251:15 305:21
305:24
**conclusion** 53:6
69:3,17 191:16
191:17 199:4
199:11,16
211:6,9,10,14
211:15 212:9
230:18 232:2
234:9 235:5
236:8,18 246:7
246:9,14,24
247:5 248:25
249:6 250:3
269:10 298:4
298:11 303:16
328:23 329:9
329:15 375:24
380:24 384:18
385:11
**conclusions**
66:7 67:5,13
67:18 68:1
69:14 73:9,13
73:20 74:4,11
86:24 237:6
244:9,19 245:8
245:20 246:16
246:21 257:25
267:10 268:8
269:14 369:10
374:11 381:17
382:13
**conclusory**
380:24

**condos** 122:7
  122:13
**conduct** 128:19
  213:16 356:2
  369:25
**conducted**
  98:13 243:18
  257:23 281:13
  283:6
**conference**
  23:1
**confidence**
  153:24
**configuration**
  327:23 352:6
**configurations**
  356:14
**confirm** 66:5
  237:1 256:20
  267:8,13 268:5
  279:13 365:5
**conflating**
  47:12
**conflict** 111:17
**conflicting**
  111:13 116:2
**confused** 348:7
**confusion**
  219:12
**congressional**
  3:14 36:14,16
  36:21
**congressman**
  18:14,16 19:23
  22:14 87:16

**congressmen**
  90:13,14
**congruent**
  357:9
**connect** 211:25
  288:18 321:22
  321:24 322:23
  325:21 326:11
  326:21,23
  359:25 373:13
  374:16,20
**connected**
  50:20 76:19
  124:8 142:9
  202:22 205:17
  301:25 325:23
  326:13,22
  328:7 368:9
  383:19
**connecticut**
  24:7
**connecting**
  289:2,17
  313:11 316:16
  324:9 362:7
**connection**
  123:18 126:9
  126:10 129:24
  200:24 323:12
  327:12 374:19
  374:22
**connections**
  123:21
**connects** 316:1
  324:12 366:19

374:15
**consciously**
  225:2
**consider** 40:2
  70:13 74:17
  83:2,4,17
  85:13 88:23
  89:4 90:20
  91:4 92:10
  94:3,17 96:5
  103:4,9,17,18
  103:25 104:5,7
  104:10,12,14
  111:10 116:24
  118:20 119:2,3
  119:6 120:3
  124:21 125:1
  125:25 126:4
  127:21,25
  128:2,10,14
  129:4,7,13,19
  129:22 132:18
  133:6,8 134:5
  135:8,14 136:3
  136:5 137:18
  139:15 151:9
  162:8 174:7
  213:2 250:15
  251:12 253:1
  254:13 255:3
  261:18,24
  264:21 265:2
  265:17 273:25
  293:10 339:7
  346:6,9,13

369:6 372:19
  374:17 375:2
  384:13
**considerably**
  315:15
**consideration**
  74:8,15,17
  75:11 78:4
  138:3 139:21
  164:10,12
  167:14 178:10
  204:24 205:16
  264:10
**considerations**
  67:22 73:10
  74:5,12,13
  75:8,10,13,17
  76:2,5,7,24
  111:13 116:2
  116:18 118:21
  205:11 226:17
  232:7,11,23
  233:16,23
  234:4 235:7,20
  236:3,15,19
**considered**
  58:2 83:19
  84:11 94:21
  116:17 125:11
  127:18 128:24
  130:7,16,24
  140:1 160:4
  181:21 193:1
  242:9 248:7
  250:20 251:20

252:3 254:14
338:16
**considering**
70:23 73:6,16
73:25 86:17
96:17 130:4,13
132:19 135:15
135:18 136:1
177:5 233:17
233:24 234:5
235:8,21,22
254:9
**considers**
116:21
**consistent**
134:21 175:4,9
175:15 176:22
200:11 215:4
237:25 269:2
307:22
**consistently**
137:14
**consisting**
221:11
**consists** 182:12
201:5 217:22
**consolidated**
6:16 224:22
**constituencies**
109:24 110:1
136:25 206:23
358:19 369:20
**constituency**
189:24 203:4,9
206:20 207:16

227:24 229:6
256:24 257:1
260:4,12,16
261:6 283:17
283:18 351:4,4
369:23
**constituent**
193:3,4 205:2
226:18 236:4
**constitute**
123:22
**constitution**
38:19
**constitutions**
103:19
**constructed**
308:24
**constructing**
107:25 130:17
**construction**
296:14 297:12
313:5,21
**consulting**
22:16 26:17
**contacted**
50:10,17 389:7
**contain** 54:14
55:1,5 56:7,10
56:22 57:1,18
64:12 68:18,19
174:14
**contained**
97:25 101:18
218:18 231:1
382:20

**contains** 68:8
303:22
**contend** 303:12
342:21 348:25
377:20
**contending**
349:8 368:7
370:3 373:24
379:4
**context** 91:16
106:14 118:16
124:19 126:2
139:23 140:18
145:6 149:3
162:5,8,24
171:11,14
175:23 216:10
250:15 291:18
353:13
**contexts** 116:12
**contiguity**
104:5 111:19
116:4
**contiguous**
301:8,10
**continue** 5:9
291:12
**continued** 4:1
21:22
**continuing**
180:4
**continuity**
73:21 74:1,7
74:14 75:4
76:2 78:6,10

94:4,18 95:4
96:6 115:14
131:6,12 132:8
132:10,14
134:4 135:9
136:2,14,15
137:8,17
192:21 204:4
226:7 233:24
353:24
**contract** 389:9
389:10
**contrast** 191:20
191:23 192:4
195:14,16
203:14 204:17
211:16 225:20
227:19 266:11
288:15
**control** 74:6,10
75:12,16
133:15,21,23
134:14,16
**controlling**
77:5
**conversation**
9:19 78:18
**conversations**
5:6 58:13,22
72:4
**convex** 138:15
**cool** 11:22
**cooper** 3:22
61:22,24 63:10
66:2 69:23

70:6 210:1
238:9,12,16
241:3,20
242:12,19,23
242:24 243:10
244:10,19
245:2,20 246:3
246:22 247:10
248:9,15,25
249:9,17,19
250:16 252:9
253:13 254:8
254:16,25
255:5 256:5,17
257:6 260:6,6
260:14 262:24
262:24 263:10
271:6,18
272:13,13
273:3,9,11,14
274:12,16,22
275:10 276:4
276:25 277:2,6
277:16 278:4,9
278:14,18
279:18 280:13
281:3,12
282:16 284:14
285:19 288:16
290:20,24
292:15,24
293:18,21
295:22,23
296:3,25
297:12,19

298:15 299:6
300:5,14,15
301:4 303:4,13
305:3 308:8,24
313:22 314:15
314:17,23
318:11 319:10
319:17 320:21
321:1,4 322:5
322:22 323:2
324:4,6 325:14
325:20 326:10
326:21 328:17
331:24 332:24
333:7,13
334:15,25
335:25 337:20
340:23 342:8
342:13 344:2,7
344:8,9,17,22
347:14,22,25
348:11,17,22
351:16,22,24
352:21 355:22
356:13,21
357:7 358:25
359:22 360:7
360:23 361:17
362:1,3 363:6
363:20 366:11
367:17 369:7
370:5 371:11
372:23 373:7
373:25 376:12
377:15 378:19

379:11 380:9
380:13,13
381:1,24 383:5
384:16 385:8
385:11
**cooper's** 60:11
60:19,22 63:6
64:9,13,16,20
69:25 79:13
241:4 253:24
254:9 257:25
261:17 265:7
265:12 269:25
272:23 273:16
274:5 275:13
275:18 281:24
294:3 295:10
296:4,6,14
298:20 299:15
301:13 302:25
305:8 309:12
309:13 318:10
318:13 323:21
324:11 327:5,8
327:11,24
328:13,25
341:7 343:22
344:12,12
349:18 357:1
358:6 360:16
362:6 366:4
367:7,10
369:18 373:3
376:18

**coordinate**
21:14
**coordinates**
18:1 22:20,22
23:12
**coordinators**
387:5,11
**copied** 173:5
**copies** 387:11
390:14
**copy** 12:7
62:19 102:18
142:17 145:22
173:8,9,12
240:7 241:1,10
241:15 387:8
**core** 129:8,13
136:25 189:24
203:4,8 206:19
206:22 227:24
229:6 256:24
257:1 260:4,12
260:16 261:6
283:17,18
351:3,4 358:19
369:20,23
**cores** 204:4
226:7 233:25
**corner** 168:6,7
168:8,10,13,15
168:18,22
**correct** 17:24
18:6 76:16
78:24 79:12
189:23 194:1

217:16 244:8
245:23 252:18
253:19 260:15
267:11 270:14
278:15 280:7
284:6 285:17
285:21 310:24
311:23 315:8
318:23 322:9
341:2 344:21
361:5 364:22
364:25 365:1
365:15 376:16
387:5,8 388:10
392:8
**corrected** 10:16
39:4,7
**correction**
361:7
**corrections**
392:6
**correctly** 87:24
90:10 97:11
146:23 301:9
361:3
**correspond**
282:7,8
**corresponding**
152:24 347:16
347:16 348:23
**corridor** 111:4
123:11,13
**corridors**
121:14 123:3,4
123:7 128:10

128:21,25
129:1 192:21
346:9,13
374:17 375:3
**council** 389:5
**counsel** 2:1
5:13,24 48:1
50:10 388:13
388:14 390:14
**count** 124:5
176:1,2 197:8
272:6 339:6
**counties** 38:25
76:15,18,20
80:17,18 85:20
88:17 90:7
91:19 92:20,24
97:2 104:7
119:13 120:4
120:12,15,19
120:23 123:11
123:18 129:18
150:17,20
154:10,12,23
155:6,11
163:22 165:18
165:19 168:3,4
169:2 170:5,25
175:22,24
177:1 182:14
183:2,22
184:17 185:4,5
186:3,12,15,17
186:19,24
187:3,12,13,16

187:18 188:9
189:10,13
190:10,23
191:1 201:7,11
201:18 202:11
202:24 217:24
218:5 220:18
221:8,11,12,13
222:10 223:9
258:24 259:25
260:2 264:14
264:20 272:21
276:16 282:6
282:11,21,22
284:1,12
285:16 286:20
296:23 297:21
307:4,15,21
308:2 310:1,20
311:21,22,25
312:11,16
317:14,21
319:13 320:23
321:1,5 323:13
323:17,18
324:16 333:16
334:4,15,21
336:4 339:1
372:2,25 374:3
376:21 377:23
379:14,25
380:9 381:12
381:20 384:23
**counting** 39:1,2

**country** 20:16
21:13,16 25:1
**county** 19:18
24:16 32:4,15
38:18,23 41:1
41:1,4 42:4,6
42:24 43:22
44:11,15,21
45:15,19 72:18
72:19 76:14
80:15 84:3,19
85:1,8,9 86:1
92:8,19 93:1,4
93:6 100:6
105:17 106:2
108:23,25
109:19 110:21
110:24 111:3
113:14 115:1
115:13,13,19
125:5,5,20
126:19,23
135:1,2 150:19
150:21 151:21
151:21 152:3,9
152:11,12,15
153:3,5,12,14
153:16,19,23
153:25 154:1
155:2,8,9,10,15
155:16,18
157:4 158:3
164:6 166:6,19
167:11 168:4
169:1,8,22

172:24 173:17
175:21,24,25
176:3,6,7,9,10
176:13,15,16
176:19,22,23
177:3,5 183:18
183:25 186:6,7
187:15,24
188:4 189:18
189:20 190:12
199:8 204:18
207:23 208:1,4
208:10,14,16
209:10 212:6
213:21 214:24
214:24,25
215:3,8,25
216:6 218:10
218:10,13,18
220:11,12
221:15,20,24
223:6 233:14
259:22,23
260:3 262:17
263:6,22,24
271:19 272:6
272:22 281:22
284:23,23
285:12 286:5
286:12,13,14
287:16,19,23
288:11,17
289:1,3,10
290:14,18
291:1,3,4,5,11

291:13 292:19
292:20,22
293:2,5,13,14
294:1,5,7
295:5 296:20
297:16,17,18
299:9 300:15
300:17,22,23
300:24 305:3
306:19 307:1,3
307:24,25
308:10,21
309:6,7,10
310:6,8,10,17
311:1,14,16,20
311:24 312:2,2
312:6,14,20
313:23 314:14
314:18,19
315:2,3,17
316:5,16,18,22
316:25 317:7
318:1,2,6
319:22 320:7,8
320:12,21,22
321:10,18,20
321:23 322:19
322:22,24
323:1,7,10,16
323:22 324:13
324:14 325:19
325:21,22,24
326:11,12,13
326:15,19,20
326:24 327:2

327:21 328:2,5
328:8,10,11
330:10,18,22
331:13,16,24
332:8,11,13,16
332:22 333:3,9
335:9,9,21
336:11 342:4
342:14 362:19
363:17 366:5
366:12,20
367:3,16,18,21
368:1,3,9,9,11
368:11,13,14
368:17,24
369:3,7,17
370:16,19
371:25 373:1,1
373:15,15
374:5,14
376:14,17,18
376:19 377:4
377:16 378:20
378:22 380:18
380:18 381:8
382:7 388:2
**couple** 24:15
46:15 143:11
**course** 13:17
14:25 15:2,3
22:8 302:19
**courses** 13:3,19
13:20,22,25
14:2

**coursework**
12:21 13:4
**court** 1:1 5:16
5:22 6:1 8:6,10
8:14,25 27:10
27:11,21 28:5
28:23 29:1
30:7 31:7,13
33:7 34:9 35:1
35:6,12,21
37:8,23 39:12
39:15,18,21,22
40:23 41:2,5
42:9,21 44:8
46:1 139:1
141:7 142:1
260:8 268:25
387:6 388:4
389:2,4,6,8,11
**court's** 142:18
**courts** 30:1,2
**cover** 182:21
190:7 222:13
359:11 369:16
389:12
**coverage** 189:5
190:18,20
**covered** 16:20
16:23 59:8
205:7 243:3
336:18 338:1
**covering** 16:16
223:3
**covers** 24:25
42:23 49:18

84:9 100:25
246:20 355:18
385:12
**coweta** 201:6,9
202:13,14,15
202:19 217:23
301:10 359:16
**coweta's**
301:19,21
**crack** 70:9
342:12
**create** 72:7
98:24 121:21
151:1 193:19
280:6 290:1
304:19 308:18
321:11 347:23
348:14 354:18
354:25 368:9
372:21 373:7
375:17
**created** 73:4
98:21 99:2
127:22 151:25
200:13,15
266:2 347:13
348:21 352:3
**creates** 327:2
**creating** 200:3
200:3 267:18
323:5
**creation** 198:25
199:17 200:7
229:24 230:10
231:14 374:2

**creatively**
20:11
**credible** 35:22
35:22,24
**criteria** 72:8
116:11,12
144:1 177:9
220:20
**cross** 109:16
220:22
**crossed** 124:8
201:21
**crosses** 135:1
218:21
**crossing** 201:25
220:24
**crystalize**
55:23 63:25
**cs** 390:15
**cultivated**
106:1
**current** 19:1
**curriculum**
3:10
**customary**
389:13
**cuts** 286:11
288:17
**cv** 1:5
**cycle** 21:16
36:22 87:6

**d**

**d** 389:1
**dark** 280:12
315:6

**data** 15:3 24:21
39:4 58:1 62:2
76:22 77:11
85:24 86:17
88:24 89:18
100:11,12
105:11,13,21
106:3,15,16,21
106:22,24,25
107:2,3,6,13,16
107:17,20,21
107:22,24
108:7,9,12
123:14,17,17
139:11 163:6
163:25 164:3,4
165:23 166:1
173:6 196:23
201:1 229:11
238:21,24
257:17 267:19
269:15 272:4,5
282:25 298:12
322:14 364:20
**databases**
253:16
**date** 174:3
391:24 392:12
**dated** 20:24
**dates** 50:25
51:3
**david** 2:20 6:19
**day** 52:25 53:1
63:12 64:5
388:16 392:15

**days** 20:24 21:3
390:17
**de** 46:6
**deal** 105:2
228:20 350:19
**dealing** 131:21
132:5
**deals** 104:25
**debate** 119:10
**debating** 113:9
**debra** 1:25 5:22
388:4,20
389:17
**decade** 88:13
260:18
**december** 54:2
54:25 57:24
59:22 60:1
61:22 62:12,20
63:1,12,12,16
63:17 64:5,7,8
64:9,12,13,14
64:16,19,21
65:3,6,18,18
66:1,2,4,6,10
66:12,14,21
67:6 68:19
69:5,6,20 70:3
86:15 98:15
100:24 127:19
130:18 196:20
238:9 245:7,19
253:25 262:3
**decide** 115:12
134:11 178:13

decided 17:10
158:6 222:9
359:4
decision 79:20
142:18 159:24
160:20
decisions 88:1
110:8 112:1
113:2 114:11
193:11 205:20
237:23
declaration
3:22 68:16
declare 392:4
decrease
180:23,24
decreased
333:6
dedicated
18:22
deemed 392:6
default 169:18
defendant 1:14
2:12 44:18,21
defendants 6:9
6:24 49:7
defending 37:4
defense 46:4
47:3
defensible
114:12
define 185:4
200:14 218:5
250:10,12

defined 122:17
129:20 144:16
171:11 182:16
182:17,25
185:1,2 186:2
206:8 221:8
248:4 316:12
definitely 41:6
49:2 52:23
120:22 155:13
165:24 174:9
222:6 233:8
definition
185:19,20
262:9
definitions
121:11 127:17
262:5
degree 52:20
dekalb 164:6
182:13,22
183:10 190:12
194:20 195:8
199:8 217:23
218:19,22
220:24 227:17
227:19,21
229:20 230:24
231:5 233:7,8
233:14 234:11
234:12,16,20
235:4,13
282:13,14
284:23 285:11
296:18 326:15

326:16,18
328:7
delaware 19:15
24:8
delegate 30:20
30:25 31:1
143:25
delegates 30:19
30:22 143:3
deliberately
379:6
democrat 28:21
democratic
22:2 25:3,6,12
29:24 209:25
democrats 22:4
25:8,14,15
26:7
demographic
14:20 17:12
88:13 106:15
106:20,24
258:21
demographics
51:12 90:9
92:11 94:4,18
95:3 96:6
190:22,25
313:16
demonstrates
67:21 232:6,22
303:3,12
375:15
density 124:14
125:1,7,9,10,20

168:2 287:5,6
346:22
depart 177:8
depending
230:19
depends 81:12
114:23 136:7
312:25 331:11
345:19 350:20
351:9
depict 279:14
376:9
depicted
306:14
deponent 41:10
146:19 388:11
390:13 392:3
deposed 40:19
46:8,10,14,17
46:21 47:1,6,9
47:19 48:6,18
48:25 49:2,5
deposing
390:13
deposition 1:17
5:12,18 8:9,18
10:13 46:23
47:11,14,22
48:1,23 49:9
49:13,22 50:12
50:16,19,22,25
58:10,15 59:5
59:10,20 60:9
61:14 62:4,7
127:10 240:16

385:24 386:4,9
387:13 388:6,7
388:10 389:2,8
389:9,12
**depositions**
46:19 49:16
**derivative**
265:1
**describe** 19:11
108:19 172:2
182:15 212:18
255:4,12
284:20 285:10
286:17 287:1
295:9 300:7,9
317:10 359:6
368:5
**described**
38:11 71:11
84:7 92:7
98:17 109:23
131:3 168:17
199:6 226:16
299:3 312:9
346:1 376:1
**describes**
206:11
**describing** 97:4
113:4 142:25
209:18 291:9
**description** 3:9
4:2 19:4,7
152:21 177:20
254:10 257:22
286:2

**descriptors**
32:25
**design** 335:19
**desire** 78:10
**detail** 4:3 72:18
76:10 80:17
170:2 177:15
178:14 181:24
215:12 246:18
249:16 254:7
259:21,22
277:13 290:2
358:17
**detailed** 321:17
**determination**
103:21 104:4
263:18 270:17
306:11
**determinations**
112:13
**determinative**
216:4
**determine**
109:14 169:9
175:3 182:7
189:25 203:5
227:25 229:7
283:15 287:6
358:19 369:21
**determined**
169:6 221:14
355:7
**determining**
103:15 151:17

**detriment**
246:5,25
249:20,22
250:4 305:14
305:23 337:22
370:6 383:7
**developed** 20:8
254:9
**developing**
103:10
**deviation** 84:4
84:6 95:21,24
95:25 96:1
102:5 108:10
154:24 158:10
158:24 159:2
159:12,12,19
159:25 160:5
160:19,25
161:10,18
169:4 251:3,11
252:5,21
275:13,14,24
277:22 302:4
332:3,10 336:8
336:12 337:17
339:25 340:1
344:20,22
345:4,12,15,17
383:2 384:7
**deviations**
95:18 151:8
**diane** 2:13 6:8
**dif** 88:7

**differ** 249:17
343:10
**difference** 78:8
134:2 179:4,5
179:7,20,21
180:2,16
183:14,16
191:24 216:25
217:2 226:1
280:10 291:24
311:12 320:16
342:22,24
349:22,24
364:25 365:7
365:11,18
**differences**
75:25 134:7
150:13,25
151:11 160:3
187:9 200:8
203:22 204:10
204:24 205:18
217:4 222:6
255:22 260:10
260:13 276:15
276:19 283:4,4
293:10 335:3
336:21,22,23
337:3 380:2
381:4,7,11,15
381:16 382:11
**different** 26:4
42:25 51:17
56:15 59:19
71:1 81:12

83:22 85:12
86:8 88:7 93:5
95:10 110:19
110:20 113:20
114:8,10,13,19
115:4 116:17
117:23 119:8
122:7 123:19
124:22 127:17
133:25 135:5
136:5,23 138:5
140:22 150:8
163:14 165:18
165:18,19
166:16 167:2
168:19 171:15
176:2,14,25
178:16,20
184:9 189:9,11
189:12,15
191:22 192:7
193:11 200:17
202:14 204:8
205:20 209:8,9
211:13 212:24
215:17 219:21
220:7 223:18
223:20 225:16
236:9 238:22
265:14 267:22
282:17 286:12
290:15 298:3
299:21,24
300:2,11
302:21 309:14

319:21 323:13
335:9,24
340:18 350:7,7
351:12 352:4,6
352:12 358:5
365:24 368:6
370:16 377:10
377:12 384:21
385:1,13
**differently**
115:6 133:22
156:13 278:20
**differs** 377:25
**difficult** 61:25
228:3 233:18
234:2 235:16
235:25 236:6
**difficulties**
112:10
**digits** 365:10
**diligence** 82:11
**direct** 34:21
69:24 72:25
102:24 184:2
**direction**
135:11 388:9
**directive** 63:25
**directly** 20:25
21:9 25:5,8,14
25:15 40:16
43:15 46:21
65:14 73:23
78:12 86:20
96:17 97:9
129:21 135:18

299:25
**director** 18:9
18:18 22:13,14
**dirossi** 26:25
**dis** 118:2 335:4
373:9
**disagree**
254:15 265:5
318:5 332:19
**disagreement**
254:19
**discern** 124:13
179:13 248:23
364:11
**disclosed** 26:18
48:14
**disclosure**
387:2 389:5
**discount**
287:25 380:17
387:15 389:14
**discounts**
387:14
**discuss** 66:1
70:1 138:5
206:9 235:25
236:13 244:11
247:13,21
269:17,17
272:25 283:21
304:5,7,8
310:16 322:9
334:19 352:8
353:12 355:9
358:16 370:12

374:13
**discussed** 37:16
63:20,22 68:13
73:24 204:21
245:6 250:9
255:14 258:12
262:17 279:1
282:4 298:2
321:20 358:2
373:9 374:9
383:12
**discusses**
250:18 314:17
371:12
**discussing** 47:8
102:23 141:3,7
232:13 241:21
276:8 336:10
371:16 378:18
**discussion**
16:21 45:6
69:25 85:16
123:10 127:5
155:24 165:3
196:11 238:20
239:22 320:25
325:5 332:20
346:4 369:12
369:17 382:19
386:1
**discussions**
112:16 140:9
**disparities**
265:7

**display** 175:13
**distance** 138:19
285:1,6 292:2
292:18 299:11
320:9 339:20
339:22 383:20
**distances**
284:24 385:2
**distant** 321:25
323:11 324:1,5
362:7
**distinction** 62:1
164:3
**distinguish**
120:19
**distribution**
178:16
**district** 1:1,1,5
5:16,17 7:12
32:4,6,8,11,12
32:13,16 36:14
36:19 37:4
60:23 67:24
85:2,2 86:7
89:10,11,13,14
90:24 98:21
100:11 103:5,7
108:24 109:5
109:25 113:17
113:23 114:4,5
115:15,20
122:5,7,11,13
124:8 126:14
126:22 131:12
131:25 132:16

133:11 136:16
136:20,22,25
137:2,8 140:7
140:9,13,22,24
142:6 146:20
146:25 147:2,3
147:5,10,15,16
148:5,8,9,12,22
151:17 152:4
152:24 155:3
157:16 158:11
164:9,11,15
165:6,12
166:18 169:24
170:6 172:22
173:1,1 176:12
176:12 184:21
186:5,8 189:6
192:21 193:23
193:24,25
194:4 195:11
195:12,13,18
196:23 200:2
200:20 201:1
201:20,25
202:6 204:4
205:23 206:3
206:13,14
207:19,25
208:1,4,9,10,13
208:14,20,24
209:1,4,8,10
210:2,11,25
211:2 212:3,15
216:22 218:14

218:14,21
220:16 221:5,7
221:19 222:16
222:20 223:5,7
225:9,15 226:7
226:24 227:6
227:11,12,13
227:17,18,25
228:1,6,7,16,18
228:22 229:13
229:14,15,22
229:25 230:4
230:11,21
231:1,3,4,9,15
231:19 232:8,8
232:24,24
233:24,25
234:21 258:20
258:21 259:23
259:24 260:1
263:24,25
266:7 267:21
269:11 270:8
278:5 280:21
283:2,3,13
284:4,20,21
285:10,10,14
285:15 286:9
286:16,24
287:1,18,20
288:2,12
289:10,17,23
290:2,11,12,15
291:25 292:4,5
292:15 293:8

294:3,7 295:7
295:10,15,16
295:20 296:1,7
296:15,25
298:6,13 299:7
299:8,22
300:11,16,22
300:23 301:8
301:22 302:7,9
302:12,14
304:13,22,23
305:3 306:17
306:20,23
307:2,6,12,21
308:9,19,19,22
308:24 309:5,5
309:11,12,13
310:5 311:3,14
313:6,15,22,25
314:15 315:14
316:1,7 318:9
318:11,13,17
318:22 319:13
320:18,20,21
321:19 322:4,5
322:5,16 323:6
323:6,15,15
324:6 325:13
325:16 326:21
326:22 327:1,3
327:20,24
328:3,13,20,21
329:5,7 330:9
330:13,17,18
330:20,24

| | | | |
|---|---|---|---|
| 331:2,7,9,17,23 | 161:1,6,11,17 | 140:25 141:3,8 | 193:17,18,20 |
| 332:2,25,25 | 175:4,10,16 | 141:16 142:2,6 | 193:21 194:9 |
| 333:7,15 | 215:4,20 216:1 | 143:2,2,3,8,12 | 195:7 197:1,2 |
| 347:16,17 | 246:6 247:1 | 145:1,2,11,12 | 197:7,18,22,23 |
| 348:23 349:14 | 249:20,23 | 146:17 150:8 | 198:8,9,10,17 |
| 349:15,20 | 250:4,10,14 | 150:15 152:5,9 | 199:1,6,17,24 |
| 350:5,6,7,22,22 | 251:13,19 | 152:10,10,12 | 200:3,4,6,8,13 |
| 351:15 352:1,2 | 252:14 253:2 | 152:14,16 | 200:15,18,22 |
| 352:11,20 | 305:9,17 306:1 | 153:25 154:9 | 200:23 201:12 |
| 353:10 356:2 | 307:22 319:10 | 154:12,19,23 | 201:17 202:5 |
| 356:13,17 | 319:25 320:16 | 155:18 156:19 | 202:14 203:1,6 |
| 357:4 358:24 | 334:11,16 | 157:24 158:3 | 205:23 206:7 |
| 358:25 359:14 | 345:3 377:24 | 163:7 164:19 | 206:22 207:7 |
| 359:24 360:7,9 | 383:8 384:14 | 164:20 165:8 | 207:10 209:16 |
| 360:17 361:3 | **districts** 27:9 | 167:16 168:4 | 211:12,25 |
| 362:1,6,12,17 | 29:22 30:7,24 | 169:3,8 170:14 | 212:4,6,8,10 |
| 363:21 366:4,9 | 31:13,20,24 | 170:24 171:1,3 | 216:21 217:15 |
| 366:18 367:6 | 32:1,10,14 | 171:22,23 | 217:17 220:13 |
| 367:11 369:18 | 33:2,10,15 | 172:4,6,8,14,19 | 220:14,16,23 |
| 370:10,18 | 35:13 36:16 | 173:20 174:11 | 221:9,12 222:7 |
| 371:4 372:4,6 | 45:19,20,22 | 174:14 176:7 | 222:10,24 |
| 372:11,22 | 47:19 72:21 | 178:17 179:19 | 223:10,15,17 |
| 373:4,8,14,16 | 73:3 76:17,18 | 180:23 181:10 | 223:21,23 |
| 373:23 374:2 | 76:19 80:14,19 | 182:21,25 | 224:12,19,25 |
| 374:11,14 | 81:17 84:20,21 | 183:4,8,23 | 225:6,7,11,12 |
| 377:19 382:24 | 85:4 89:8,20 | 184:1,12 185:1 | 225:14 226:23 |
| 385:5 389:2,2 | 89:21 90:3,5 | 185:3,7,11,15 | 227:22 229:2 |
| **districting** | 90:15 93:4,7 | 185:24 186:1 | 230:20,25 |
| 25:20 66:18,23 | 95:11 96:7 | 186:10,13 | 231:17,23 |
| 68:5 70:7 83:3 | 97:2 98:4,8 | 187:10,10,14 | 233:12 237:6,7 |
| 83:5 95:2 | 108:9 109:22 | 188:5,10,12,17 | 238:24 249:6 |
| 115:5 131:7,13 | 110:22 111:11 | 188:19,23 | 249:12 252:7 |
| 132:10 134:4 | 111:20 116:5 | 189:2 190:1,1 | 256:22 258:11 |
| 134:13 136:3 | 119:15 133:19 | 190:3,6,21 | 258:14 263:22 |
| 137:9 159:4 | 137:13 140:17 | 191:8,13 192:2 | 264:21 266:8 |

266:18,24
267:1,7,9,22,24
268:4,6,15,18
270:1,12
278:13,19
279:8,10,14
281:17,19,21
281:23,24
282:3,5,20
283:8,9,16,23
284:2,5,7,10,13
284:16,18
285:20,22
286:2 287:10
287:10,13
290:21 291:14
291:24 292:24
292:25 293:7,9
295:18 299:14
299:20 302:3
302:17 303:2,9
303:18 304:2
304:20,24
305:4,8 308:7
321:24 335:2
336:11,16
337:19 339:21
340:15,17,21
340:24,25
341:4 347:14
347:23,24
348:1,12,15,17
348:22 349:1
349:11,21
350:11,18

351:12 352:3
352:18,20
353:10,25
354:8,16,17,19
354:24 355:1,9
355:13,20,21
356:3,7,16,19
356:25 357:3,5
357:11,16,19
357:25 358:6
358:11,14,16
358:18 359:25
360:4,6 363:20
365:13,24
366:1 369:13
369:15 370:1,4
370:13 371:18
371:20 372:7
374:18 375:16
375:17,20
376:1,9,12
377:10 379:18
379:20,21
381:3,24 383:4
385:1,3,17
**diverse**  166:10
363:25
**diversity**
166:13
**divide**  157:15
**division**  1:2
5:17 389:3
**divisions**  93:2
176:2 272:7
376:19 377:13

377:16
**dobbins**  166:23
**document**
11:20 62:21
67:8 83:14
99:17 160:10
204:14 210:19
250:23 273:17
273:17 326:3
**documents**
59:7,9 60:8
61:17 62:3,6
**doing**  49:22
50:22 81:3
82:7 112:11
133:5 154:11
157:25 164:19
168:19 170:17
171:22 185:10
251:13,20
252:3 263:13
300:18 302:11
332:7 334:16
363:22 377:21
**door**  125:6
360:9
**double**  39:2
**doubt**  328:16
328:22 329:8
329:14 341:7
343:2
**dougherty**
371:24 372:1
373:15

**douglas**  201:6
201:21,22
202:1,2,3,20
217:23
**downtown**
126:14
**dozen**  22:8
**dozens**  21:15
**draft**  30:23
31:4,5 71:16
**drafted**  28:24
29:1
**drafting**  36:8
36:21 96:16,17
371:9
**drafts**  93:22
**draw**  25:3
30:17 34:12
36:16,18 45:19
48:11 66:1
67:5,13 68:1
70:12,21,22
71:10 72:8
73:13,20 80:2
80:15,25 81:17
82:8,9,15
84:21 85:1
92:8 97:8
108:13 113:17
114:20 115:5
117:23 118:1
118:12,16
124:7 137:19
151:12,16
152:5,8,9,11,16

154:9,12 158:7
164:9,11
165:14,17
169:7 172:18
172:23 197:6
203:23 208:3
209:4,7,8,21
211:9,12,20
244:14 269:11
269:14 293:20
302:17 326:25
327:20 328:2
331:1 369:7
382:13
**drawer** 48:16
52:18 79:11
87:3,4 92:2
110:9,19 112:2
112:5,7,11,12
113:17,20
114:11 115:12
116:20 118:4,9
118:19 132:13
136:1 244:13
258:3
**drawers** 91:22
111:1,2,10
116:1 117:3,10
117:19 119:2,5
193:11 205:20
262:18
**drawing** 15:17
16:13 34:20
49:10 51:12,15
51:20,24,25

52:4,12,14,25
53:2 60:23
67:20 70:1
72:21 76:25
77:25 80:19
86:14 87:13
88:1 89:2
90:13,14 91:11
91:17 101:16
101:25 105:6
105:14 106:21
107:11,13
108:9,21 109:7
109:11 110:7
110:16 111:11
118:17,19
120:21,25
124:23 126:1
129:6,14
132:19,22
135:25 136:4,6
137:13,18
141:21 150:9
154:11 161:23
163:4,10,15
164:15 165:25
167:13,16
200:12 205:15
207:25 208:9
208:13 209:23
211:15,17
212:8 213:1,2
232:5,21
236:23 237:20
237:24 238:1

247:22 252:16
258:4 262:22
263:13 323:14
339:11 385:16
**drawn** 24:19
28:7 35:5,7
69:22 70:5
91:22 92:1,10
94:7 96:23
132:12 133:17
140:9,10
157:17 165:6
167:1 207:19
234:21 242:12
278:20 287:17
302:23 304:4
306:18 376:13
385:1
**draws** 299:6
**drew** 28:4 29:8
49:3 66:15,16
69:20 70:4
73:5,9 74:10
75:21 76:17
77:7 87:6,10
90:19,22 91:24
95:8,10,12,14
101:11 103:20
108:24 109:5
110:22 112:17
127:19 134:22
135:12 170:14
176:8 209:5
210:12 211:3
211:16,17

212:19,22
230:18,18
236:24 237:5,6
254:10 271:19
369:8,9
**drugs** 11:3
**druzisky** 1:25
5:22 388:4,20
389:17
**due** 76:1 82:11
370:23
**duly** 7:2 388:6
**duma** 2:14
**dupont** 19:14
**duran** 28:1
**duties** 25:6
53:3,9

---

**e**

**e** 7:20 388:1,1,1
388:1 389:1,1
389:1 391:3,3
391:3
**earlier** 68:13
108:4 109:18
109:24 121:23
157:12 163:16
171:9 181:14
246:11 252:14
258:12 263:12
321:3 358:3
373:9
**early** 91:17
**ease** 274:4
329:23

**easier** 8:24
157:1,1 204:12
269:21
**east** 167:5
**eastern** 294:5
306:13 316:6
**easy** 14:8 79:6
175:12,12
179:13 291:12
356:18 379:17
**economic**
121:13,20
125:25 126:5
127:21 265:2,6
265:13 346:6
375:3
**edges** 216:21
**edit** 80:2
**editing** 82:8
**edits** 82:16
**educate** 20:4
**educating**
18:22
**education**
12:16 19:10
20:3 105:10
**educational**
12:17
**effect** 8:5 29:6
29:8,10,13
39:6,8 67:23
117:6 135:21
171:19 199:5
232:7,10,23
233:2,3,9,15,17

233:22,23
234:3,4,15
235:6,8,19,20
235:21,25
236:2,3,10,15
236:17,18
264:1 309:9,14
355:5,6,7
356:20 379:22
**effective** 298:6
**effectively** 39:2
373:20
**effects** 16:15
164:14 168:16
171:8,14,22
373:10 377:3,5
**effort** 21:20
33:21 193:19
321:11,16
375:16
**efforts** 22:2
354:18,24
**egolf** 27:25
37:18 40:21
**eight** 22:9
90:12 97:13
197:9 213:6
214:23 219:13
355:23 360:13
360:15,16
364:3 372:1
**either** 42:14
47:2,3 49:6
68:22 104:2
106:4 233:19

373:3
**elect** 90:21 91:5
**elected** 131:21
**electing** 18:23
**election** 21:16
44:4 88:6,14
106:16 107:1,5
**elections** 3:17
3:19 18:12
20:17,21 21:10
30:13 36:10
44:3 87:15,18
88:12
**element** 29:17
29:20
**eliminating**
376:21
**elimination**
198:7
**elong** 212:14
**elongate**
212:14 362:1
**elongated**
191:9,9 193:24
195:9,13,17,18
195:21 199:7
212:6 225:1
231:24 233:6
233:12 292:1
295:14 296:4
297:1 299:6,16
305:1,4 362:7
385:4
**elongating**
208:20,24

209:1 210:11
210:25 211:2
211:24 212:11
212:15 231:16
231:22 304:13
304:22 359:25
360:4
**elongation**
195:14
**emanuel**
307:20 318:15
**embarrassed**
280:20
**empirical** 190:5
201:16 237:17
237:22 238:6
**employ** 388:14
**employment**
17:19
**enact** 117:4
**enacted** 30:24
31:2 38:16
67:6,14,24
68:2,4 72:10
72:22 73:8,10
73:14,17,22
74:2,5 75:8
76:1 78:9,14
98:7,11,14
99:16 117:21
118:18 139:9
158:21 159:13
159:16 160:12
160:23 172:13
175:15 181:4

184:1,8,19,20
184:21 188:8
190:2,14,19
191:9,13
193:23,24
194:6,24
195:18 196:25
199:7,24
200:16,18
201:20,22
202:1,5,7,11,13
202:19 203:7
203:15,22
204:19 205:15
205:24 206:14
207:18 208:6
210:23 211:18
212:1 213:8
214:24 217:19
218:6,14,17,21
219:17 220:12
220:21 221:23
223:2,7 225:4
225:21 226:4
227:6,11,21
228:4,6,10,16
229:20 230:16
230:24 231:4
232:3,9,19,25
233:6 234:12
235:5 236:12
236:20,23
242:20 243:11
249:10,17
250:16 252:8

257:2 260:13
260:14 261:18
263:11 266:4
270:1 271:1,7
271:19,24
273:15 275:1
275:11 276:5
276:13 277:1,4
277:7,19,25
278:8,14,21
279:14,23
280:11 281:2
281:23 282:12
284:14,19,20
285:18,20,20
285:22,25
287:15,22
292:5,8,17,23
295:12 296:2
297:1 298:13
298:18 299:4
299:16 306:17
306:20 307:5
307:10,11,12
307:21 318:10
318:14 319:9
319:16 320:20
321:2 322:4,7
323:2,18 324:7
324:8 325:16
329:2 333:19
336:21,22
341:18 342:19
344:10,18
348:2 350:6,24

351:15,20,21
351:23 352:1,7
352:20 355:21
356:14,17,22
357:5 358:7,24
359:17 360:21
361:18 362:17
363:3,5,11,15
367:12,19,21
370:11 373:14
377:11,20,25
379:3,7 380:8
381:5,15,25
382:1,11
**enclave** 317:11
**enclaves** 316:2
316:9 317:19
383:19 385:1
**encourage**
21:19
**encouraged**
17:9
**encouraging**
21:24
**ended** 70:25
77:5,13 135:10
164:20,25
170:17
**ends** 72:21
**engineering**
335:1 336:15
359:23 381:2
**english** 2:14
5:19 6:9

**ensemble** 237:2
**ensued** 45:6
127:5 196:11
239:22 325:5
386:1
**ensure** 159:3
**entail** 53:9
**entire** 76:12
112:7 177:21
200:12 219:12
238:1,4
**entirely** 176:8
227:18 306:18
320:20 371:24
**entirety** 69:4
**entities** 25:24
**enumerates**
120:15
**episcopal** 1:6
**equal** 103:7
188:7 275:23
**equality** 111:18
116:3 159:5,21
161:2,12,21
331:10
**equalize** 373:20
**equally** 238:2
299:7 343:8
**equation** 313:1
**equivalency**
97:16 253:12
253:14
**era** 21:2
**eric** 1:7 7:13

**errata** 390:11
390:13,17
**error** 39:1
360:25
**especially**
113:15 128:4,5
128:9 204:19
224:15 233:7
**esq** 2:3,7,13,13
2:14,19,20
390:1
**esselstyn** 59:18
59:23,24 61:21
356:15,22
357:3
**esselstyn's**
309:13,14
356:19
**essence** 75:12
**essentially**
257:13
**established**
132:1,4 143:12
221:17 321:3
**establishing**
190:18
**estimate** 81:24
125:16
**estimates** 82:19
**estimation**
51:11
**et** 5:14 390:4
391:1 392:1
**ether** 214:13

**evaluate**
262:23
**evaluating**
177:2
**evenly** 84:20
154:23 169:3
**event** 103:16
**eventually**
35:12 329:22
**evidence** 66:16
70:5 248:24
249:4,5
**ex** 246:16 287:1
288:20 299:3
**exact** 32:2
182:15 282:18
**exactly** 38:8
80:3 97:4
136:20 151:23
157:11,15
169:24 183:12
183:18 188:13
221:21 223:18
224:1,11 267:1
267:2 281:19
281:20,22
282:7,8 356:16
359:9,10
364:15 377:11
379:19 381:25
**examination**
3:1 7:4 264:22
**examine**
369:14

**examined** 7:2
388:5
**examining**
264:16 283:7
**example** 26:5
60:18,22 73:1
79:13 80:11
86:5 94:9
95:18,23 97:6
100:5 105:20
106:5 107:18
109:8,18
110:21 112:17
113:13 115:2
115:12 121:2
121:22 122:3
124:4 125:14
126:19 129:19
136:9 152:3
153:3 154:3
155:2 165:12
169:7 172:23
178:7,15
183:17 186:4
198:20 201:19
212:3 221:23
222:14 223:4
235:4,11,12
262:17 281:21
289:20 290:11
293:15 299:8
303:21 327:24
333:24 334:21
337:4,5,6
350:21 353:14

356:8,11
373:10 379:25
381:23 383:14
**examples** 42:19
96:19,21
108:22 109:9
109:17 119:16
121:19 126:11
126:16 127:25
247:13 249:25
250:1 262:15
303:14,15
304:9 333:21
337:1,2,11
382:17 385:7,9
**excel** 97:25
**excellent**
240:11
**except** 11:9
269:7
**excerpts** 60:10
60:25 61:21
**exchange** 23:3
331:12
**exchanging**
323:8
**excluded** 371:5
383:19
**excluding**
313:25
**exclusively**
387:10
**excuse** 75:4
216:6 262:25
271:1 296:25

322:18 351:4
361:10 367:11
383:14
**excused** 386:7
**executive** 18:9
18:18 22:14
**exercise** 71:20
72:5,6,11,12,15
96:20
**exhaustive**
337:1
**exhibit** 3:10,11
3:13,16,18,20
3:22 4:3 11:24
12:2 62:16
102:8,13,16
119:25 121:7
142:12,14
143:19 145:15
145:17 146:5
147:22,23
150:2,4 181:17
181:19 240:5,7
240:19 241:1,5
241:7,25
261:21 272:6
274:6 314:3,7
319:7 325:15
328:18 329:21
330:3 342:12
343:23
**exhibits** 3:8 4:1
214:2,5 225:10
238:19,23
240:6,13,15

257:14,21
266:14,16,19
267:12,16
318:25 319:2
375:19 387:8
387:10
**exist** 214:8
**existed** 260:17
**existence** 313:9
**existing** 45:20
45:24 68:24
78:11,13
111:20 116:4
253:20 257:1
**exists** 321:14
**experience**
27:16 40:7
51:15,18,19,20
51:23 52:12,14
52:15,17 55:11
86:20,25 87:13
87:14,17
110:25 112:6
117:6 119:3
122:9 124:2
125:13 131:9
131:20 138:25
244:13,16,17
248:8 262:20
345:14 374:20
375:8
**experiment**
133:21
**expert** 3:11,20
26:17 27:14,16

27:20 30:12,12
36:23 37:1,9
40:2,7,16 41:8
41:13 43:4,14
43:18,21 46:4
47:2 48:10,15
51:8,10,13,14
52:1,5,22 53:4
53:13,17,20
57:9,19 58:2,7
59:14 69:5
99:3 179:15
240:14 243:24
244:6,12
246:17 337:8
**experts** 52:19
**explain** 26:13
26:19 137:11
**explained**
76:12
**explains** 314:18
**explicit** 133:9
**explicitly** 136:8
244:15 251:23
252:1 253:4,5
253:7 255:24
305:10 322:9
**express** 54:15
55:2 56:11,12
56:24 57:3,20
68:21 69:14
198:3 243:24
244:6 246:16
270:19

**expressed**
137:1
**expressing**
68:10
**extend** 323:16
**extended**
384:10
**extending**
377:3
**extends** 324:17
**extensive** 82:13
87:17 88:5
**extensively**
75:19
**extent** 48:5
53:6 71:22
78:3 80:21
89:7 110:12,23
122:20,21
125:2,11 126:7
126:22 128:24
165:20 177:6
346:12 359:7
364:11 367:23
**external** 52:19
**extract** 343:6
382:18
**extracting**
257:16
**extracts** 257:13
341:23
**eye** 122:19
**eyeballing**
172:16

**f**

**f** 2:14 388:1
**face** 111:11
**fact** 12:13 20:6
22:1 40:3 47:2
60:19 77:17
123:17 200:5
286:7 353:3
**factor** 85:16
119:1 131:7,14
131:16 134:3
134:14,16,20
136:3 137:9
159:4,20 177:7
334:12,17
377:24
**factored** 128:7
132:23
**factors** 74:6
76:8 95:6
96:15 111:10
111:16 115:25
116:14,16,20
121:13,20
122:15 132:13
140:22 192:25
204:25 212:25
226:13 235:22
236:9 246:6
247:1 249:21
249:23,25
250:4,11,14,18
250:20 251:13
251:18,19
252:3,10,14,15

252:19 253:2
265:2 305:15
305:23 337:15
337:23,25
346:7 375:3
382:25 383:8
383:10,12
384:1,8,14
**facts** 55:16
58:1 68:10
**fails** 390:19
**fair** 10:3 19:3,7
20:3,19 34:23
80:1 82:18
89:5 110:11,12
152:21 159:1
159:23 175:2
203:17 212:20
242:16 252:17
255:16 313:17
332:18 334:14
355:11
**fairly** 41:24,24
98:16 164:20
218:7 294:9
311:14 356:18
**fall** 158:16
165:9
**falls** 154:7
**familiar** 113:5
171:7,13 287:8
375:11
**family** 122:8,12
**famous** 340:6

**far** 11:1 42:20
49:18 56:6,8
104:20 180:2
245:5 267:11
324:1,5 362:24
363:19
**farm** 19:12
**fascinating**
164:18
**fashion** 240:13
269:15 347:4
**father** 17:6
18:3,10 22:7
22:19
**father's** 17:8
22:17
**favor** 35:4,7
96:1
**fayette** 41:1,4
42:4,24 44:15
45:15,19 169:5
169:7 172:24
172:24,24
176:6,7,9,12,13
176:15 187:24
201:6,9 202:15
202:17,19
217:23 221:24
221:24 222:1
282:13,15
287:16,22
289:1,10,18,21
289:22 290:5
297:5,17 298:3
298:14,25

300:8,10,17,23
302:13 357:14
357:16 359:15
359:15,16
360:2,9 362:13
362:19,24
363:18
**fayetteville**
286:19 293:15
293:17,18
360:10
**feature** 79:15
86:12 237:18
**features** 86:4,5
86:18 107:19
107:23 108:3
109:13 124:3
130:11,13
162:11,13
**february** 1:19
5:3 50:25 51:4
388:16 390:3
**federal** 20:25
21:4 33:7
39:21 42:9
53:4 118:5,10
118:13,20
**feedback** 193:4
205:2 226:19
236:4
**feel** 44:3,7
**feingold** 21:2
**felt** 19:16 161:9
161:18

**fewer** 150:15
168:16 181:9
197:6 200:6
203:1 217:14
230:4 270:7,12
271:19,23
273:5 276:16
284:11 321:1,7
342:4 377:16
377:16 382:6
**field** 22:13
**figure** 75:23
77:12 78:2,8
98:3 140:5
157:23 229:5
266:23 272:18
329:4 351:5
361:20
**figures** 39:5
**file** 41:13 97:25
139:12
**filed** 5:15 30:12
41:6,8 42:13
43:21 44:11
46:5
**files** 97:16
98:21 249:9
253:13,14
254:4
**fill** 85:3 308:22
**final** 79:9
**finally** 201:14
201:14
**financial**
387:16 389:14

**financially**
388:14
**find** 35:4,6 51:1
128:20 156:5
210:14 250:17
269:24 337:3
**findings** 271:3
**finds** 273:4
**fine** 60:6 196:4
262:2 324:25
350:15
**finish** 80:7 86:6
**finished** 9:1
385:18
**firm** 5:23 6:11
17:8 27:6
387:2
**first** 7:2 11:10
11:19 12:15
22:12 35:10
40:15 43:12,14
50:4,11,21
63:18,22 80:16
82:15 213:21
230:3
**five** 14:22
84:20,21
109:20 145:12
153:14,23,25
154:6 179:25
180:1 197:6,9
197:12 198:7,8
229:1 269:7
321:4 347:24
348:14 360:23

378:11
**fixes** 323:6
**flip** 120:6
147:22 151:3
**floor** 2:4
**florida** 24:10
25:16
**flow** 155:24
256:2
**floyd** 110:3
376:17
**flying** 20:7
**focal** 33:16
**focus** 19:9
133:16 247:14
247:24,25
248:18,23
279:7 282:10
303:3,12 304:3
305:14 384:21
**focused** 187:12
246:4,25
247:10 248:10
248:11,14,16
248:25 249:6,7
249:13 270:16
305:22 337:21
383:6 384:17
385:11
**focuses** 339:10
**focusing** 29:5
137:13 156:20
**folks** 93:10,12
**follow** 9:10
111:3,5 114:5

117:19 118:5,9
121:3 150:9
174:15 183:17
371:5
**followed** 52:23
96:12 200:11
212:20 237:25
238:4
**following** 18:25
79:15 85:19
111:18 116:3
118:13 137:14
143:1,2 389:5
**follows** 7:3
79:21 124:6
320:12
**force** 166:23
**foregoing**
387:4 388:6,9
392:5
**forgo** 132:18
**forgotten** 131:2
**form** 11:9 93:7
114:14 118:7
175:8 182:5
238:10 259:6
265:9,20
266:12 274:18
277:9 278:6
306:3 320:3
345:7 349:4
364:7,13
368:18 372:13
376:23 380:3

format 267:19
formed 55:15
  55:19 56:8
former 28:21
forming 58:2
forth 57:23
  58:1 265:7
  346:19 388:8
forward 377:15
found 35:21
  164:18 271:22
founded 19:15
founding 19:14
four 90:3,5
  109:20 125:15
  125:17 142:12
  152:8,9,12,14
  189:17 197:9
  217:8 229:1
  275:10 279:7
  283:16 284:4
  284:13 286:2
  297:8 299:20
  305:5 321:5,10
  322:17 331:8
  356:5,16,19
  357:3,5,10
  359:8
fourth 83:12
fraction 154:3
  211:22
fractionalized
  25:13 228:3,10
  228:21 230:24
  233:7 312:14

350:24
fractionalizes
  234:13
fractions
  263:21
fragments
  296:22
frame 64:2
fraternity 1:3
  5:14 7:11,12
  49:23 390:4
  391:1 392:1
free 72:1 385:4
freeing 309:9
frees 363:8
friday 51:4
front 105:6,13
  106:3,10 242:2
  272:14 327:17
  350:12 367:20
frowned
  124:10 136:11
fulfill 13:13
fulfilled 13:9
full 7:15 59:14
  72:8 143:20
  257:20 388:10
fully 55:19 93:7
fulton 183:3
  186:5,7 201:6
  201:21,22,25
  202:1,2,7,14,20
  204:18 207:23
  208:1,4,10,14
  209:10 212:6

217:23 218:20
223:1,6,14
225:4 281:22
297:4,4 359:15
360:1,10
362:11,11,19
363:17
fun 24:22
funding 105:10
further 109:7
  337:13 387:7
  388:13
future 19:13

g

g 7:17
g.i.s. 13:25 14:8
  52:10
g.o.p.a.c. 18:5,7
  18:10,13,19,22
  19:4,11,20
  20:20,23,24
  21:3,11,13
  22:9,15
ga 387:12
gained 51:23
  51:25
gee 89:11
general 51:19
  84:5 101:6,22
  144:4 150:7,9
  163:19 166:11
  167:9,9 188:12
  192:5 207:12
  207:13 211:24
  212:18 242:10

246:20 262:7
266:10,12
276:18 313:16
342:2 354:13
359:8 362:4
365:25 366:1
generalization
  132:2
generalized
  156:2
generally 20:22
  21:6 34:4,17
  34:19 51:12
  53:22 55:13
  56:25 57:22
  63:7 71:5
  72:17 76:18
  83:25 84:9,24
  89:13 90:2,18
  96:19 99:13
  101:20 103:8
  104:6 105:4,9
  108:7 111:15
  111:24 118:23
  119:7 125:21
  127:24 129:17
  131:2 150:12
  154:2 161:3
  164:1 167:5
  170:17 212:23
  221:12 242:18
  243:12 244:8
  244:21 245:5
  245:10,15,16
  245:21 246:13

252:18 253:19
254:23 258:1
265:4 271:10
284:2 288:7
303:25 307:24
334:13 337:10
338:2 340:20
341:23 342:2
343:16 345:6
355:15,18
382:16,20
383:13 384:3
384:11
**generated** 58:5
99:7,12,15
100:23 117:25
**generation**
18:23
**geocoded** 98:2
**geographic**
85:6,18 104:5
105:21 107:18
107:23 108:3
110:4,24 124:3
135:24 162:11
190:8,9 206:17
207:15 221:18
282:6,9 324:9
357:12,13
358:12
**geographical**
14:1 86:12
130:11 263:5
**geographically**
73:3 80:20

234:19,23
**geography** 15:2
75:20 86:22
130:20,24
131:25 156:25
**georgia** 1:1,5,7
1:13,23 2:15
3:15 5:17,19
24:9 41:1
43:20,22 45:14
49:24 50:6
66:17,22 70:14
73:7 86:21,21
87:3,5,11,18,25
88:12,15,17
90:7 101:6,22
103:19 108:5
108:19,20
109:10,12
110:25 111:1
113:25 119:25
126:6 128:22
129:23 150:17
150:18,24
153:19 157:2
158:17 161:9
161:24 163:14
167:17 170:13
170:14,15,15
171:23,24,24
181:15 191:14
215:3,19
216:14 236:20
238:8 242:9
243:11 261:19

262:16,19,22
265:14 347:2
371:16 376:7
376:10 381:22
387:5,11 388:2
388:4,21 389:5
389:6,17
**georgia's** 90:9
175:14
**geospatial** 13:4
107:24
**gerrymanderi...**
16:15
**getting** 58:21
72:3
**gingrich** 18:14
19:23 20:9
**give** 8:12,15,20
11:3 12:3,6
40:10 50:12,16
68:23 80:11
81:3 122:3
124:17 125:14
135:6 148:4
159:7 162:8
280:14
**given** 10:20
50:24 56:2
96:21 101:4,8
107:4,9,10
130:1 137:7
139:18 145:4
244:2 253:12
313:8 353:16
379:24 385:7

385:10 389:14
392:9
**gives** 15:16
16:8 108:9
153:24 258:11
260:2
**giving** 34:16
119:22 214:16
291:21 337:9
**glance** 121:6
**glascock**
308:11 309:17
309:19 310:23
310:24 311:6
**glenn** 1:8 7:13
**go** 5:10 7:24
29:9,12 42:14
42:17 60:5
65:11 70:11
80:8 98:18
104:20,20
113:1,1 114:1
120:1,7 126:8
134:20 140:4
143:18 145:23
146:1,4,12
153:9,18 162:1
185:7 194:14
212:17 220:11
220:13,14
222:4 241:2,3
249:15 253:10
272:18 298:7,7
300:25 307:11
310:11 317:1

324:2 325:1
330:13 332:12
333:11 353:1
362:20 363:19
378:15
**goes** 80:10
114:4 126:15
227:17 249:2
286:18 290:12
294:4 298:14
309:5 320:22
352:4 360:7,9
362:18,25
363:7
**going** 7:25 8:25
9:7,7 10:1 12:3
26:15 50:12,16
50:22 55:2
56:23 58:9,12
62:13 68:20
80:14 81:17
90:5 102:8,13
103:4 110:18
113:21 118:17
121:7 124:15
135:10 142:11
145:14 146:3
150:16 152:15
153:18 155:1
165:14 169:7
171:18 172:7
172:23 178:18
187:4,7 213:20
216:5 219:20
222:5 246:16

260:8 266:24
282:7 289:16
291:12 293:6
297:4,4 303:23
329:21,22
332:8 365:5
367:25 368:1,2
368:16 369:3
375:8
**good** 6:7 7:6,7
113:10 154:17
172:4 196:8
209:12 214:3
220:9 351:8,13
376:22,25
**google** 162:12
162:15,18,18
**gordon** 376:14
376:17 378:20
380:18
**governor** 19:14
28:12,15,17,19
**grab** 373:12
**graduate** 13:2
**graduated**
52:24 53:1
**grant** 6:18
**great** 62:25
72:18 105:2
228:20 240:9
242:4 254:7
268:10 271:16
299:10
**greater** 233:16
233:20,23

234:4 235:8,20
235:21,24
236:3 292:2
**greatest** 168:2
168:3
**green** 301:21
**greenwich** 2:9
**grey** 194:16
**griffin** 263:5
289:4,19 298:8
366:17,23,24
366:25 368:1
368:14,23
369:3 383:16
383:16
**ground** 7:24
**grounds** 320:15
**group** 38:1
39:1,3 157:23
157:23 190:1,2
299:14,21
359:11 376:9
**grouping** 95:11
152:11,19
157:24 224:16
359:7
**groupings**
38:24 92:8,19
222:8
**groups** 20:23
22:25 23:1,7
23:10 283:16
**growing** 122:13
**guess** 20:19
37:13 51:21

52:16 59:21
74:18 76:6
95:13 96:3
98:12 112:3
116:19 133:10
133:14,20
137:5 151:3
156:17 168:20
176:13 183:19
185:8 200:5
216:17 269:8
282:19 299:22
317:18 319:2
356:12 360:24
376:6 379:9
**guessing** 324:8
**guide** 155:19
**guidelines** 3:13
101:5,22,23
102:6,14 120:1
122:22 161:8
181:14,15,23
182:4
**gwinnett** 41:1
42:6,11 43:22
44:10,21
110:21 111:2
184:19,21
188:4 189:14
218:10,18,22
219:8 220:11
220:15,17,24
220:25 221:3,6
221:20 222:15
222:16 223:13

| h | happens | help 20:20 21:9 | high 17:13,14 |
|---|---------|-----------------|---------------|
| **h** 391:3 | 123:20 288:5 | 21:14 30:23 | 73:1 122:6,13 |
| **h.d.** 366:24 | 288:10 323:17 | 57:7 69:1 | 125:18 165:3 |
| **h.d.s** 169:1 | 327:8 | **helped** 31:3,5 | 165:10 200:19 |
| **hale** 2:8 6:6 | **happy** 361:6 | **helpful** 57:14 | 208:1,10,15 |
| 389:8 | **hard** 13:12 | 77:2 178:22 | 288:24 289:25 |
| **half** 24:25 | 158:14 228:14 | 214:22 325:13 | 296:17 308:14 |
| 88:16 90:7 | 229:4 235:10 | **helping** 48:11 | 309:17,22 |
| 378:9 | 368:5 | **henrico** 32:4,15 | 310:14 312:17 |
| **hampshire** | **harder** 157:4 | **henry** 153:16 | 320:6 326:14 |
| 24:4 | **haul** 94:11,13 | 167:11 169:5,7 | 366:13 |
| **hancock** | **hb** 143:12 | 182:13,22 | **higher** 19:13 |
| 316:18 317:7 | 146:7 | 183:10 189:20 | 125:6,20 |
| 317:13 | **head** 8:14 47:8 | 189:22 190:13 | 159:12 163:22 |
| **hand** 14:9 | 65:11 160:7 | 190:15 217:24 | 180:1 216:11 |
| 62:19 365:3 | 167:12 206:3,3 | 225:4 227:18 | 228:17 231:5 |
| **handing** 11:20 | 206:9,9 341:6 | 282:14,21 | 275:1,3,6 |
| **handle** 176:6 | 359:4,4,6,6 | 284:23 291:4 | 277:24,25 |
| **handled** 387:10 | **heading** 149:14 | 296:19 322:24 | 278:8,24 |
| **hands** 51:19 | **hear** 171:10 | 323:13,16 | 287:16 289:15 |
| **happen** 115:16 | **heard** 168:17 | 324:3,13,14 | 308:20 309:9 |
| 155:1 170:3 | 218:12 | 325:22,24 | 310:6 311:5,11 |
| 216:22 332:5,6 | **hearing** 37:17 | 326:12,13,18 | 311:18 312:10 |
| 332:8 379:10 | 37:21 130:2 | 326:20,24 | 312:15 334:21 |
| **happened** 27:8 | 255:1 269:2 | 327:21 328:7 | 344:22 345:18 |
| 27:11 33:1 | **hearings** | 359:16 366:20 | 363:16 |
| 34:2,5 36:12 | 129:23 | 368:9,11 | **highest** 309:6 |
| 45:16 71:3 | **heart** 280:21 | **hereto** 388:12 | 351:1 353:15 |
| 142:3 170:3 | **heavier** 288:18 | 392:7 | **highlight** |
| 327:10 332:16 | **heavily** 290:25 | **hereunto** | 283:21 |
| 374:1 379:13 | 297:13 298:5 | 388:15 | **highly** 164:7 |
| **happening** | **held** 129:23 | **hide** 279:17 | 209:2 |
| 169:22 210:22 | **hello** 127:14,15 | **hierarchy** | **highway** |
| 212:1,13 | 196:18 | 92:23 | 128:12 |
| 322:13 | | | |

**highways**
128:19
**hill** 30:14 33:4
33:23 34:3
37:19 40:22
**hired** 18:7,11
18:18 22:22
25:3,17,20,23
26:6,7,10 27:2
27:4
**hiring** 18:8
**historical** 15:1
123:21
**history** 12:17
14:21 15:6
**hold** 169:11
278:12
**holding** 152:13
**holistic** 247:7
**home** 240:23
340:5
**homogenously**
181:10
**honor** 340:12
**hope** 53:9
**hour** 378:6
**hours** 52:11
58:25 80:6,24
80:24 81:3,5,5
**house** 3:14
15:21 16:1,7
17:4 18:15
28:23 29:2,5
30:19,22 78:20
82:25 87:8

110:22 126:21
143:3 144:1
145:12 146:7
146:15 150:8
150:11 151:2,4
151:10,12
152:23 153:3,5
160:19 193:23
196:24 197:2
209:25 212:21
213:3,11,14,17
224:18,20
232:3,19 235:6
242:7,11 246:3
246:23 253:20
268:3 334:19
340:3 341:4
342:4,7 344:6
344:12 347:22
348:14 349:15
352:1,1 354:7
355:21 360:21
366:1,9 372:7
372:10 376:9
376:13 380:8
380:13 381:1
383:5
**houses** 105:16
122:8
**housing** 122:4
**huffman** 27:5
**huh** 40:18 69:8
84:15 85:10
99:24 100:1
102:11 164:13

194:5,22,25
195:3 197:15
206:1 215:7
219:14 229:17
279:12 319:15
326:2 335:15
340:7 363:4,15
**hull** 138:15
**hundred** 316:6
**hypothetically**
115:21 225:14

**i**

**idea** 19:5 20:3
20:10 38:23
56:13 109:23
113:11 133:15
135:9,11
140:12 169:21
188:6 189:13
358:9
**ideal** 93:3,5
151:17,22
152:6 169:24
**ideas** 19:24
**identical**
278:14 279:2
348:18 365:12
**identifiable**
234:20,23
298:24
**identification**
11:25 62:17
102:17 142:15
145:18 240:20
241:8 330:4

**identified**
107:4 109:4
138:2 174:15
185:16 248:13
262:20 266:25
347:14 348:22
352:19
**identify** 80:21
83:16 152:19
158:23 192:14
192:15 277:8
361:8,11 380:1
**identifying**
251:15
**identity** 110:4
**illinois** 14:16
14:21,22 15:7
24:11
**illustrative**
64:21,22 65:17
66:2,16 67:21
69:21,22 70:4
70:5 77:13
82:24 86:14
88:1 91:12
101:12,16
103:10,20
105:7,19
107:11,14
108:21 109:11
110:17 120:21
124:24 126:1
127:19,22
128:8 129:14
130:18 132:20

150:10 151:16
161:13 172:13
173:11,12
181:8 184:1,7
185:25 188:8
190:3,18
191:10 193:22
194:4,17 197:3
198:10 200:7
200:10,21
201:24 202:16
203:6,15,23
204:18 205:24
206:14 213:1,3
213:7 214:25
218:7,17
219:16 220:10
221:25 223:4
225:20 227:13
227:22 228:1,1
228:8,18,23
230:17 231:1
232:5,21 235:2
236:24 237:18
237:24 238:7
260:14 267:18
270:25 271:18
273:4,12,14
277:17 292:8,9
300:16 305:25
325:16 326:10
328:13,20
329:5,7 330:18
331:7 340:22
341:18 342:4

342:20 344:6
344:17 345:13
349:18,18
350:8,24 352:2
358:20 367:7
367:12,18
369:22
**illustratives**
151:13 340:23
**image** 376:5,6
**images** 185:22
266:8,24
325:15
**imagine** 113:25
**immediately**
52:25
**impact** 11:3
73:9,14,17,21
74:1,5,11,12,13
74:14,19 75:5
75:8 334:25
336:15,20
377:18 379:19
379:21 381:1
381:14,20
**impacted**
336:12 354:18
354:20,24
355:3,12
375:16
**impacts** 78:3
**implemented**
144:7
**implementing**
48:12

**implicit** 248:12
**important** 8:11
9:18 21:21
38:24 65:22
85:13 124:4
139:15 178:10
268:23 276:7,9
276:14 334:11
334:16
**impossible**
377:8
**impression**
244:1
**inadvertently**
286:13
**inappropriate**
248:19,22
**inappropriately**
248:16
**inchoate** 55:20
**include** 88:10
112:21 116:6
116:19 121:12
134:12 137:16
137:17 163:25
188:5 208:21
218:9 220:17
220:22,25
221:13 222:10
266:8,17
267:14 268:1,7
299:12,21
304:14 328:11
338:7,12
356:10 357:22

**included** 55:16
58:5 100:19
105:2 184:22
189:18,21,23
211:12 218:13
221:5,25 222:7
222:16,17,18
223:12,13
243:21 260:22
266:15,16,20
283:19 337:10
353:21 354:1
357:25 363:12
363:13 366:14
366:24,24
367:1,3
**includes** 88:6
100:11 231:5
285:15 299:12
**including** 134:2
134:3 198:16
316:4
**inclusion** 333:6
**inclusive**
338:18
**income** 121:25
122:1
**inconsistent**
305:17
**incorporated**
119:13 162:4
**incorporating**
257:21
**incorrect** 39:5
280:15,18

364:20
**increment**
269:6
**incumbency**
20:11,12 70:13
73:6,14,17
74:7,13,19
76:1 77:6 78:4
83:17 92:11
94:3,17 95:3
96:6 97:19,22
111:19 116:4
137:15,22
138:3 163:6
233:17
**incumbent**
77:11 89:1
100:9 135:4,19
136:21 137:3
253:15,23
**incumbent's**
136:10,14
**incumbents**
20:13,18 77:12
77:19,23,24
89:2 94:12
98:3 104:15
132:22,24
134:23 135:23
135:24 173:18
180:5,5,21
192:18 204:1
207:20,22
217:8,12 226:4
256:22 258:14

258:16 275:9
275:10 278:2
344:17
**independent**
26:7
**index** 3:1,8 4:1
**indiana** 15:20
15:22 16:1,7
17:4,7 24:11
**indianapolis**
15:24
**indicate** 23:19
336:15
**indicates**
236:16
**indicating**
275:4,5
**indication**
249:12
**individual**
112:13 132:15
192:1 193:10
196:23 205:19
206:2 230:19
247:4 361:16
**individualistic**
110:8 112:1
**individually**
290:21
**info** 97:19
**information**
14:1 47:13,15
48:13 51:2
54:24 55:24
56:4,5,14,14,19

56:20,24 57:17
59:15 60:18,19
61:24 62:2
65:8 77:7 89:9
95:9 97:20,22
98:8 100:10
101:9,18 105:2
105:5,18 106:7
106:8,10
120:23 121:25
125:3 130:1
145:4 152:1
154:17 163:6,9
163:18 165:23
177:14 206:7
244:2,5,22
252:12 253:23
256:1 258:21
263:16 270:23
271:13 275:22
277:11 280:9
280:14,24
283:20 300:4
306:10 312:3
327:18 343:3,6
352:14,15
354:2 361:24
376:2
**information's**
65:10
**informed** 53:10
**initial** 19:19
30:5 34:8 82:7
82:9 96:16

**initially** 82:9
95:7 107:3
**injunction**
37:17 54:20,22
64:23 65:7,9
65:14 99:4,8
101:19 139:9
210:2 242:24
243:7 245:3
255:1,5,7,13,15
255:18,20
256:1,7,10
269:2 270:6
352:14
**input** 110:15
122:22,24
**inset** 219:13
225:9
**instance** 155:1
206:12 211:8
374:2
**instances** 25:23
26:16 35:25
37:22 97:7
185:6 247:20
248:22 381:19
**instructed** 9:9
**instruction**
9:11 115:4
**instructions**
10:20 71:13
**instructs** 9:15
**insufficiently**
31:21 33:14
141:10 142:7

**intact** 126:23
135:2 166:17
170:8
**intelligence**
13:3
**intend** 79:16
236:13 237:8
286:15
**intended** 184:5
**intention** 257:4
271:8
**intentionally**
92:10
**intentions**
140:8
**interaction**
35:20
**interchangea...**
338:22
**interest** 22:25
23:6,7 85:17
104:12 109:3
119:1,4,6
121:10,12,21
122:5,16 123:5
123:23 124:22
127:17 128:1
130:4,8,17
131:22 162:6,9
162:25 174:7
192:25 200:14
204:25 212:25
226:13 234:5
235:9,22 259:5
262:4,10,13,23

263:2,9 264:11
264:15,16,22
293:11,13
299:5 338:6,7
338:13,16,20
346:3,5
**interested**
330:16 388:14
**interesting**
164:24 165:1
**internal** 377:13
**internalize**
156:7
**internally**
176:11 357:6
**interned** 17:14
**interplay**
202:18
**interpreted**
118:13
**intertwined**
201:23 202:12
202:22
**introduce** 5:25
6:13
**introduced**
240:15
**introduces**
321:5
**introduction**
244:4
**introductory**
13:1
**involve** 110:14

**involved** 17:6
24:17 27:6
28:3 30:4
34:21 40:20
47:22,23 65:8
112:5 243:13
**involving** 47:19
**inzer** 7:20
**iowa** 24:11
93:19,20,22
94:2,16,22
95:2,19 96:4
96:11
**island** 24:6
86:7,10,10
108:25 109:1
126:12
**islands** 109:4,6
126:15
**isolation**
252:11
**issue** 20:22
33:11 42:21,22
157:12 322:8
**issues** 37:24
**it'll** 172:10
259:25

**j**

**j.c.** 22:14
**j8** 146:5
**j9** 147:22
**jackson** 323:19
334:1
**jacoutot** 2:14
6:10,23,23

**jagged** 113:16
113:18,22
157:13,17
**jamerson**
144:16
**janice** 1:9 7:14
**january** 12:2
50:24 54:5,25
57:24 59:23
63:2,5,11 66:8
66:12 68:13
165:22 241:25
242:2 256:5
262:11
**jefferson**
316:22
**jenkins** 317:8
**jersey** 24:7
123:9
**job** 20:20 299:5
**joe** 2:7 6:5
**joe.zabel** 2:10
**john** 1:17 3:3
3:10,11,20
5:12 6:25 7:1
7:17 18:16
389:2 390:5
391:2,24 392:2
392:4,12
**join** 17:9
**joined** 6:10
385:2
**joining** 363:16
**jones** 30:20,25
31:6 36:2

143:25
**judge** 55:11
**judges** 340:10
**judgment**
143:1
**judicial** 29:14
389:5
**jumping** 9:2
**jurisdiction**
30:3 99:20
**jurisdictions**
117:9

**k**

**kansas** 24:12
**katie** 1:8 7:13
**keep** 8:13 72:19
80:20 84:5,25
92:24 126:23
133:14 166:21
169:21 241:10
244:22 333:17
368:1,14
**keeping** 35:4,7
85:17,18
131:22 132:8
156:20 164:22
176:22 177:6
332:25
**keeps** 273:5
**kentucky** 24:24
**kept** 135:2
166:17 170:7
202:17 224:15
235:1 302:13
377:19

**kern** 24:16
**khanna** 2:19
6:14,14
**kin** 388:13
**kind** 19:25
25:13 87:2
95:21 109:2
154:16 166:10
177:16 246:19
348:3
**kingston** 87:16
**knew** 90:25
91:2 128:4
152:8 169:10
170:22
**know** 10:6,15
11:1 15:11
19:1,21 23:4
23:19 27:8,11
29:6,7,9,12,16
30:6 32:9
35:21 36:8
37:11,20 38:4
38:24 41:14,16
42:1,11 43:4,8
43:23,25 44:11
46:13 47:11
48:25 49:18
50:1 51:21,24
51:25 52:13
53:3,7,8 54:17
55:3,4 56:12
61:11 65:21
68:24 70:19
75:9,9 78:7,10

79:10 80:8,13
81:1,16,22,23
81:25 82:14,20
82:21 84:5,22
85:1,8,21,22
86:4,5,16
87:20,22,23
88:7,11 89:3,6
89:16,20 90:2
90:3,6,16 93:4
93:9 94:5,5,6
94:15 96:14,16
96:25 97:9
102:5 103:14
103:22 105:24
107:20,24
108:16,22
109:6 110:2,3
110:3,17
112:12 113:4,5
114:12 115:7
116:10 117:3
118:1,2,15
119:22 123:6
123:12,20
124:7 125:4,14
125:15 126:14
128:11,20
129:7 132:1,2
133:4,18,20
134:1,17
135:11,16,17
136:25 137:22
138:18,20,22
140:3,6,7

145:6 146:6
149:22 150:7
152:14 153:23
154:2,4,25
155:4 157:10
157:14,16,22
158:19 161:14
164:6,8,18,21
165:13,13
166:5,8 167:5
167:6,10,10
168:2,3 169:23
171:4,5 172:6
174:4,7,13,15
178:21 179:2,8
179:24 180:1
182:6 185:8
188:10,22
189:12,15,16
190:22,25
191:5 196:3
206:13,17,21
207:18,22
209:15,17
216:3,11,12,13
220:21 221:13
221:22 222:6
222:14,15
223:12,24,24
223:25 224:9
225:6 228:9,13
228:19,22,23
228:24 229:4,9
229:18 230:23
233:20,21

234:1 235:24
236:7 237:14
238:20 241:2
243:20 244:15
246:10,12
248:3,5,20,20
252:13 255:9
255:14,24
260:21 262:12
262:21 266:20
267:11,15,16
267:18,22
268:1 269:21
272:8 280:21
282:13,20,21
282:22 283:23
285:18 288:9
293:4,12,15
302:16 305:10
307:17,18,19
314:13,21
315:5 318:9,13
318:17 319:4,6
322:12 323:20
324:6 329:18
329:22 331:3,6
334:18 341:3,6
343:20 346:18
349:9,13
350:10 351:1,9
352:25 353:20
358:2,4,24
361:8,12
364:19,20
365:16,22

367:6,10 372:3
372:18 374:4
376:24
**knowing** 128:6
152:10 330:16
**knowledge**
15:17 16:9
34:21 49:20
51:24 75:2
86:21 87:2,20
87:25 88:5,15
89:19 90:8
108:4,18,20
109:10 126:3,5
130:6,15,25
162:23 163:13
164:2,5 166:3
167:10 191:2
210:12

**l**

**l** 389:1
**la** 14:20
**laid** 23:16
**lamar** 286:20
298:15,24
299:10
**lansing** 53:2
**large** 45:23,24
90:16 217:11
237:5,6 317:23
**larger** 84:25
170:22,24,25
216:22
**largest** 168:3,3

**laross** 2:13 6:8
127:9
**late** 18:11
19:16
**law** 27:6 93:15
96:24 118:5,10
118:13 158:17
**lawful** 105:16
**laws** 118:20
**lawsuit** 47:19
**lawsuits** 38:17
**lawyer** 340:11
**layer** 77:11
85:24 86:17
87:22 89:1
97:18,23 162:3
162:7,19
**layers** 86:1
**leader** 87:8
**leaders** 18:24
**leads** 191:20
231:15
**learn** 20:10,17
50:4,9,11,21
72:15 365:6
**learned** 50:15
**learning** 77:6
**led** 199:2,17
230:1,11
**lee** 372:24
373:1 377:4
**lee's** 373:20
**left** 19:1 71:15
**legal** 53:6
140:18 387:1

389:6,7,9,10,13
390:23
**legislation**
143:13
**legislative** 3:14
19:18,25 22:23
23:2 25:24
30:17,24 38:12
87:5 93:15,22
95:7,11,19
96:5 103:5,6
111:1 112:10
119:25 141:9
**legislator** 25:4
30:21 33:25
**legislators**
22:22 23:2
25:21 26:9
36:7 38:14
93:12
**legislature**
38:12,17 90:4
93:23,24 95:23
180:10
**legitimate**
113:2 114:12
115:6,8,23
**lend** 264:9
**length** 138:16
244:23 355:13
**lengthy** 9:19
**leo** 2:19 5:20
**letters** 172:20
**level** 13:2 85:25
159:18 163:21

177:19 178:2
189:25 259:21
259:22 266:6
334:21
**levels** 121:25
135:5
**liberties** 2:3 6:3
**lie** 201:12
**life** 132:1
**lifestyle** 124:5
**light** 55:25 56:4
56:16 72:17
126:7 175:7
**likely** 53:15,16
188:14 209:3
216:23 224:1,7
358:3
**limit** 158:14
337:4
**limited** 255:12
270:23
**line** 83:12
113:14,15,15
113:22 177:19
178:5 216:5
271:9 276:20
276:21 284:23
285:12 315:7
341:17 345:25
352:18 366:4
391:4,7,10,13
391:16,19
**lines** 39:19
90:21 113:15
113:16,18

114:20,20
115:5,15,20
124:6 143:11
169:8 266:7
284:4,10
287:23 288:8
314:19 315:4
315:10 334:9
**linked** 205:12
226:16
**lisa** 18:8,17
**list** 43:4 116:6
157:20 204:12
212:4 218:13
256:18,21
257:19,22,22
261:6,7 262:14
337:1
**listed** 41:17
115:25 192:1
286:14 355:23
**literally** 112:18
315:19 378:8
**litigation** 49:23
50:5 389:14
**litsup** 387:12
**little** 8:24 12:16
21:5 24:12
38:11,13 42:23
48:9 71:1
102:22 121:8
125:3 126:21
150:19,22
151:6 152:20
156:17 157:4

158:24 159:7
170:6 172:8
179:12 183:3
184:21 194:15
198:3 228:2
239:17 244:3
254:3 275:14
283:14 286:8
296:4 300:2
316:14 331:24
334:19 338:17
348:6 351:16
351:19 372:7
374:13 381:20
382:2
**live** 88:7 98:3
136:21
**load** 98:7 341:9
**loaded** 97:16
139:12 339:5
**local** 21:4
**locality** 72:19
105:21
**located** 153:25
**location** 5:18
124:9 135:24
**locations** 77:24
**logic** 223:11
**long** 38:13
58:24 79:14
80:4 212:4
307:12,17
308:1 319:23
**longer** 262:14
318:9,13 324:6

324:8
**longest** 285:6
**look** 12:15
23:22,24 24:20
41:6 43:11
51:5 56:15
59:21 60:15,17
60:22 61:3,9
62:3 64:20,24
64:25 65:11,12
67:3,7 70:10
76:7,24 77:15
77:24 80:9
86:1,8 88:25
89:2,10 92:19
92:20 93:13
97:12,13
105:20 106:6,7
109:12,19
111:7 117:1
120:25 121:7
124:15 125:8
125:10 128:12
128:13,17
132:21 133:19
135:24 136:10
137:4,7,9,15
138:4 139:4
140:6,7,25
142:23 143:6
149:24 153:6
154:3 155:14
157:1,16,20,21
157:22 160:1
164:24 167:6

167:12 168:20
169:20 170:2
173:24 174:8
174:17,20,22
175:1,2,6,7
176:17,23
177:15 178:3,6
178:11,13,13
178:22 181:24
182:9,20
188:21 189:17
191:6,8 192:16
193:21 194:17
195:25 197:20
198:1,2 201:3
206:2,6 210:4
210:6 215:12
225:3,7,8
228:11 229:3,8
229:11 230:20
231:3,21 233:5
233:5,10
234:10,24,25
238:12,15
246:18 247:3
249:14 254:18
255:16 256:14
260:23 261:15
263:20 264:15
266:13,19
267:12 268:10
272:1,3,10
273:7 274:5,6
277:15 279:4
282:19,24

283:2,25 284:3
284:8,9 286:11
296:24 301:1,9
301:12 302:11
304:9 306:10
315:3 316:25
318:21 320:24
325:14 327:16
329:24 331:8
331:11 339:3,5
341:11 343:17
345:23 346:2
346:11,18,21
346:24 347:6
347:11 349:14
351:3,25 353:1
354:7,8 355:8
355:19 356:4
357:11 359:2
360:13 361:9
367:4,14
368:19 369:11
371:2,7,11,15
371:21 372:18
374:7,8 376:4
**looked**   24:23
58:16 59:13,18
59:22 60:10,25
62:2 75:13,19
76:5,14,22
77:21,25 84:10
84:22 88:13
101:24 102:1,7
107:18 123:14
125:2 129:11

136:12 138:21
139:13 158:21
162:3 168:25
172:13 174:6
174:24 181:21
186:12,13
198:18 205:22
205:23 209:25
209:25 215:14
217:20,21
224:13,25
230:3,16 233:4
244:23 254:3
255:21 260:11
263:2,22
264:13,18
266:11 281:17
298:1 299:19
300:3 306:9
338:25 339:4
341:15 355:9
356:6,7 374:7
377:9 382:2
385:6
**looking**   17:17
17:18 41:7
60:21 75:17,22
79:3 80:17,18
85:5,25 89:25
99:21 104:23
114:2 115:11
116:23 119:24
123:16 128:18
129:17 130:5
134:17 136:8

147:5,24 149:8
150:19 151:6
151:15 153:2
155:23 158:9
165:20 167:13
172:3,5 174:18
175:20 176:14
176:19 177:25
178:7,9 179:2
180:4,22
185:22 188:11
190:17,19,19
191:7,18
193:16 194:2,3
194:23 196:3
196:22 198:13
199:13 201:11
203:11 204:13
210:15 213:20
214:18,23,23
219:9,19,21
220:7 225:19
226:21,22
229:22,22
232:1 240:11
242:5 243:17
245:24 250:7
250:21 253:11
257:15 258:2,4
262:24 263:4
263:21 264:2
265:25 271:17
273:2,17,18
276:4 277:5
279:12 284:1

286:1 287:17
287:21 288:13
289:7 290:22
290:22 294:3,5
294:21 295:9
297:10 299:13
299:18 300:1
303:2,9 307:9
313:3 314:3,4
317:4 318:21
328:17,19
329:2 330:1,9
336:4 343:8,22
344:13 346:14
351:15,19
354:15 359:13
360:12,15
362:5 363:5,6
364:4,21 366:3
370:15 379:6
380:7 383:22
**looks** 113:10
149:13 157:13
197:11 198:15
210:23 211:19
275:10,14,18
277:23 288:2
289:6 294:6
315:5,9 319:19
330:19 350:5
355:20
**lost** 348:3
**lot** 14:12 17:15
19:10,23 20:18
25:6 35:20

37:11,13 48:14
51:15 60:18
75:2 81:2 82:5
85:16 86:20
87:12 91:3,18
95:18 110:6,13
113:25 124:16
128:15 138:21
138:22 139:18
156:22 165:2,5
170:24 177:14
180:15 188:5
208:7 216:9,18
216:20 229:21
281:18 307:15
359:10,11
**low** 140:13,21
140:24 167:4
274:7 344:6
**lower** 19:17
95:20,25 96:1
122:1 125:5,8
159:12 165:11
165:11 199:2
199:18,25
200:21 208:21
209:15 210:10
211:20,21,25
212:10 228:15
230:1,11,21
231:15,17
278:1,9,25
296:18 304:14
305:1 336:1
363:1

**lowered** 193:18
208:19,23
212:15 304:12
**lowering** 200:1
210:24
**luncheon** 127:7
**lynn** 87:8

**m**

**m** 1:25 7:17
388:4,20
389:17
**macon** 110:2
**made** 29:15,16
29:21 76:20
79:9,9 81:8
82:10 110:13
111:5 112:3
115:10 132:23
133:10 135:13
173:9,12
183:22,22,24
184:11 206:24
214:11,13
237:20,23
243:7 255:19
270:5 285:2
289:21 293:16
300:10 306:11
322:20 324:4
327:12 331:25
333:14 334:2
362:3 376:15
382:5 388:11
389:12 392:5

**main** 368:23
**maine** 24:4
**maintain** 78:10
**maintaining**
118:25 119:6
251:1,10 252:4
252:20 337:15
338:4,10,11,24
339:8 382:25
384:5
**major** 368:14
**majored** 12:17
**majorities**
20:15
**majority**
165:12 173:19
180:22 181:9
191:5 193:20
196:25 197:6
197:18,22
198:8,8 199:1
199:17 200:6
217:14 229:25
230:4,10
231:15 249:12
266:18 268:14
269:23,23,25
270:8 289:17
289:22 290:2
300:19 302:14
302:17 304:19
308:18,24
316:18,21,23
317:14,21
318:1,3,7

321:12 323:6
327:3,20 328:2
331:1 334:2
335:1 336:16
340:15,24
341:4 347:14
347:24 348:14
348:21 354:19
354:25 359:24
360:17 362:12
366:19 368:10
372:3,10,22
373:8 375:17
379:20 381:2
385:17
**make** 8:24 15:3
23:25 29:18,23
43:10 56:18
70:20 79:11,20
80:19 82:11
86:9,24 88:1
90:25 93:13,25
96:1 103:12,21
104:3 109:21
110:18,19,19
112:13 113:20
115:18 122:18
134:21,22,25
163:14 165:19
171:17 184:15
184:24 239:10
240:4 242:21
260:2 267:3
270:17 283:2
289:8 298:5

302:13 308:7
308:17 323:11
328:19 329:4
332:4 337:1
352:10 361:6
361:23 363:24
376:17 378:19
378:20 389:5
**makes** 32:21
51:14 52:5
110:9 112:2
114:11 321:4
323:2 348:1
350:17 364:1
**making** 6:20
199:20 231:17
263:18 299:25
300:8 302:12
377:14
**man** 96:12
**manipulation**
251:4 337:18
383:3
**manually** 280:6
**manuals** 20:6
**map** 15:17
16:11 25:3
28:25 29:6,7
34:7,10,12,20
35:7 48:16
49:4 51:12,20
52:4,14,18
64:24,25 65:17
65:25 67:6,14
68:2,4 70:1

73:8,8 75:25
76:1,25 77:7
79:11 86:23
87:3,4 88:1
90:19 91:12,12
91:17,21,22
92:2,10 95:2
96:5,11,23
97:3,7,8,23
101:12,15,16
105:14 106:21
107:11,14
108:13 109:4
109:11 110:7,9
110:9,17,19
111:1,1,9
112:2,5,6,7,11
112:12 113:16
113:20 114:11
115:12 116:1
116:20 117:2
117:10,18
118:4,9,17,19
118:19 119:1,5
120:21 124:24
125:9,10
127:19 128:8
129:1,2,14
130:5,14
132:11,13
136:1,4 137:18
137:19 138:1
151:12,13,16
151:25 152:22
152:23,24

154:16,20
156:1 158:7
159:3 161:24
162:3,7 163:15
176:24 177:2,4
180:13 181:4,8
181:13 182:21
189:17 191:9
193:11 195:18
200:12 203:23
205:20 206:14
206:14 207:23
208:6 209:5,20
209:23 210:11
211:3,16,17,18
212:19,22
213:1,3,7,8,11
213:14,14,17
213:18 215:18
218:3,12
219:12,13,16
219:18 225:9
225:12,13,18
228:1 234:24
237:11,15,18
237:24 238:5,7
238:8,9 244:13
258:1,3,4
260:14 262:18
263:13 265:17
267:2,21
269:25 270:5,6
270:7,15,16,22
272:8,13,23
274:22 278:14

279:7,13,15
281:2,2,2,3,12
284:6,12,13,19
286:11 287:14
287:15,21,22
288:16 289:7
290:20 292:5
293:19,19,20
299:4,6 307:9
307:11 309:4
311:24 312:1
316:25 317:4
321:2 322:13
323:2,18
339:11 346:14
347:25 349:18
350:8 352:1,2
352:7,12 354:8
357:19,21
359:1 362:18
363:11,15
367:4,18,19,22
370:5
**mapper** 156:9
156:12 161:16
252:15
**mapping** 15:3
22:23 23:12,15
25:20,24 27:20
37:23 40:24
42:21,22 43:17
52:9 62:1
105:3 113:2
115:23 151:24
171:14 179:16

258:5
**maps** 14:6,9,11
14:12 17:16
24:19 28:4,7,9
29:15 30:17
31:8 39:9
48:11 49:10
51:15,25 52:12
52:25 53:2
58:17 61:2
64:14,21,22
66:3,15,16,17
66:22 69:20,21
69:22,25 70:4
70:5 75:21
77:25 86:14
87:13 91:18
92:8 93:2,3
97:15 98:7
105:7 107:25
108:21 112:18
117:4,25 118:1
118:12,16
126:1 127:23
128:12,18
129:6 130:18
130:20 132:20
141:9 150:10
150:11 151:1
156:4 162:12
162:15,18
166:25 191:21
203:13,18
204:13 209:7
209:23 210:13

219:16,21,22
219:25 225:5
236:20 241:20
242:19,20
244:10,19
245:20 248:25
249:19 250:5
250:16 256:6,7
257:25 261:17
261:18 262:25
266:2 267:18
270:24 280:12
281:11 284:3,9
293:16 300:1
306:15 316:13
328:19 340:3
343:7 346:17
354:7,10
355:22
**maptitude**
97:18 99:12,15
100:3,14
104:25 146:24
162:19,22
163:9 256:15
258:16 259:12
263:17,19
264:3,9,17,23
271:5 275:21
285:1 341:21
**marietta**
166:20,22,24
**mark** 11:22
62:13 102:8,13
142:11 145:14

238:18 241:3,3
241:5 329:21
329:23 330:1
378:6
**marked** 11:21
11:24 62:16
102:16 119:25
142:14 145:17
146:4 147:23
150:1 181:16
240:19 241:1,7
241:25 261:20
272:13,14
274:6 328:18
329:25 330:3
**marking** 239:5
**martinez** 28:13
28:15,17,19
**maryland**
24:20
**masked** 380:2
**massachusetts**
24:5
**master** 34:11
36:15,18 45:18
**match** 356:21
379:6
**matching** 92:20
93:5
**material** 250:8
**math** 13:7
**mathematics**
13:9,20
**matter** 5:13
7:10 27:7 41:4

51:19 58:17
150:7 223:2
**matthew** 27:5
**max** 178:23
378:15
**maximum**
139:5,5,14,17
158:11 258:12
**mccain** 21:2
**mcduffie**
308:10 309:17
310:21 311:6
**mean** 23:24
24:25 28:14
29:19,25 31:17
32:24 36:18
40:6 41:25
43:4 44:10
51:22 53:16,17
55:8,24 56:13
63:20 66:11
67:3 72:14
74:9,23 75:15
75:15 77:15
80:6,8 81:7
82:5 84:18
87:19 88:14,22
88:23 89:24
92:9 95:11,16
99:6 100:8
101:17,24
102:3 108:1
110:12 115:7
119:21 120:22
121:22 122:25

124:1 129:9
130:9 133:4,9
135:12 137:11
140:16 149:10
149:15,18,19
149:23 152:23
153:20 154:25
157:19 159:6
159:11 161:7
164:2,6 166:5
167:1,5 170:21
171:10 173:8
177:23,24,25
178:9,15,18,21
178:23 179:2,8
179:10,15,18
179:22,24
181:3 182:19
183:19,21
184:16 185:10
189:5 191:23
191:23 192:10
192:10 197:22
197:25 198:4
199:23 203:1
205:9 206:5
209:23 210:2,6
210:21 211:11
211:14,21
216:24 220:19
221:10 223:11
223:21 224:15
228:21 229:3
229:10 232:14
235:24 243:19

245:4 246:23
247:9,11,15,18
248:1 252:7
254:18 258:13
267:14 269:13
274:20 278:20
278:22,23,24
281:20 282:19
283:6,12,18
287:2 290:7
296:12 298:12
299:23 301:3
303:7 308:17
309:3 310:21
315:19 316:9
316:10,18
317:4,22
322:11 327:7,8
329:10 331:18
332:14 333:24
336:4 337:25
338:10,11,14
339:12,15,25
342:24 353:1,3
354:20 355:4
356:6 357:23
358:1,6,7
360:6 361:2,18
364:1,17 365:9
365:12,20,23
368:22 370:7
370:12 372:9
380:13 381:11
382:8 383:10
383:13,24

384:1,3
**meaning** 8:1
163:8 164:14
**meanings**
119:9
**means** 115:19
200:7 259:12
364:21 365:3
372:17
**meant** 360:15
367:9
**measure** 134:1
249:22 284:24
292:16 318:16
339:18 344:14
349:10 364:15
376:18
**measured**
307:18 339:13
339:16,17
355:7
**measurement**
285:2 296:5
**measures** 138:6
138:11,25
144:10 258:8
316:5
**measuring**
285:1
**meat** 267:5
**mechanics** 26:4
**media** 5:11
**medications**
11:2

**meet** 22:4
58:18
**meeting** 58:23
58:24 123:12
379:3
**meetings** 58:20
61:13
**meets** 156:25
**member** 45:19
97:2
**members** 1:4
25:12
**memory** 163:22
**mention** 16:14
31:8,10 46:9
64:16 105:10
105:25 116:13
123:25 138:6
175:20 252:1
306:25
**mentioned**
14:19 26:10
30:11,11 36:1
43:12,20 44:14
46:8,16,22
47:9 48:24
69:24 85:22
87:22 88:25
90:6 105:16
108:18 123:11
124:11,23
126:12 130:10
130:10 142:5
162:10 204:9
250:25 251:22

253:20 262:4
290:10 294:1
321:18,21
322:15 328:14
363:21 379:14
384:22
**merits** 113:9
**met** 90:12
170:19 224:17
**method** 97:12
98:6,10
**methodist** 1:6
**methodology**
200:11 238:3
241:21
**metric** 155:19
177:21 178:5
215:14 272:9
274:17,24
379:12
**metrics** 100:2
139:2 155:17
173:14 174:20
174:21,22,24
175:6,8,12
258:13 277:7
277:15 335:3,5
335:14,16,20
336:4,14
341:13 345:23
345:25 360:20
376:19 379:5,7
379:7 381:4,6
381:11

**metro** 126:17
126:18 167:21
170:15,19
171:25 197:19
217:22 218:5
218:11 219:12
219:16,17
220:25 221:24
259:13 279:6
281:13 282:24
283:9,11,13
286:19 287:4,9
303:7,13,18
304:2 322:18
354:7,9 356:4
363:25 377:5
**mexico** 24:12
27:21 30:2,6
30:10 40:17
43:13,17 46:20
47:14,16
**michigan** 14:17
14:22 24:11
26:2,6,7 53:2
112:17 113:3
136:9
**microphones**
5:4
**middle** 83:12
**mileman** 2:19
5:20
**miles** 284:22
285:7,11,15
286:21 295:10
295:12,23

296:3,3 297:6
297:6 298:18
298:22 316:6
374:15
**military** 346:24
**milledgeville**
263:7 312:19
313:12 316:4
316:11 317:10
317:24 320:9
370:23,24
371:8,13
383:15
**min** 178:23
274:7,11
**mind** 27:19
32:5,13 47:13
142:8 151:14
163:1,15
165:15,17
213:4 239:5
244:22
**minimum** 93:1
139:5,5,14,17
139:20 158:10
258:12 273:25
274:17,23
343:17 344:1
344:13
**minimums**
139:18 274:13
**minor** 133:13
379:24
**minority** 15:21
16:1,4,8 17:5

21:19,21 72:23
87:8 163:23
333:17
**minus** 159:2,19
159:24 160:4
160:14,18,20
160:24 161:10
161:18 302:4
332:9 345:4
**minute** 113:12
160:8 241:13
324:22 361:20
**minutes** 45:1
378:11
**missed** 84:10
108:15 251:21
**missing** 23:20
190:15
**mission** 19:19
**mistake** 79:11
**mix** 122:10
**mixed** 166:6,10
**moment** 151:14
163:2 196:5
213:4 219:6
279:16 361:25
**monroe** 322:1,2
333:9 334:5
**morgan** 1:17
3:3,10,12,20
5:12 6:25 7:1,6
7:17 11:19
26:16 127:14
143:21,24
240:22 280:20

314:7 323:16
325:12 389:2
390:5 391:2,24
392:2,4,12
**morgan's** 240:6
**morning** 5:1
6:7 7:6,7
**motto** 19:1
**mountain**
107:19 109:13
109:16 121:14
123:25 124:8
**mountains**
130:10
**move** 94:13
97:12 213:5
217:20 267:6
306:12 380:22
**moved** 101:15
348:9
**moving** 15:14
119:11 147:21
167:15 273:12
275:9 278:16
296:24 297:10
310:19
**multi** 97:2
**multiple** 134:6
222:24 315:10
368:6
**municipal**
113:16 114:3,4
114:20 121:4
157:13 173:24
174:8,10,12

273:4 339:1,3
347:7 371:6,7
**municipalities**
119:15 130:5
130:12 156:16
156:20 157:20
164:22 174:6
235:1 259:4
273:5
**municipality**
156:19 157:7
166:19 259:1
**mute** 5:6

**n**

**n** 7:17,20
**n.a.a.c.p.** 43:22
44:14
**name** 3:2 5:20
7:15,16 172:22
388:16
**name's** 7:8
**named** 388:6
**names** 172:20
**narrow** 323:12
**national** 17:15
17:21 22:13
23:1
**naturally** 73:2
**nature** 31:22
110:7
**nearby** 170:9
**necessarily**
99:9 111:2
113:8 116:10
155:7 164:3

166:4 188:9
209:22 372:9
372:15
**necessary** 44:5
100:18 155:9
289:14 302:15
308:19 310:5
310:11,14
312:18 322:21
323:9,22,25
325:17,18
326:9,17,18
327:6,7,11
328:1,5 331:10
332:8,12,15,17
372:12 373:25
392:6
**need** 8:19,21
10:5 19:16
64:25 86:6
111:17 116:1
117:3,4,10,19
117:20 118:5,9
119:2,5 210:6
216:23 241:12
261:2 292:22
324:21 350:15
**needed** 20:17
64:23 361:24
**needs** 118:19
128:3,7 252:15
**negative**
158:15,22
160:13

**negotiation**
  25:7
**neighborhood**
  122:11
**neighboring**
  311:20 317:20
  357:16
**nelson** 18:8,18
**nest** 356:14
**net** 16:15
**netting** 377:15
**nevada** 345:20
  345:21
**never** 24:14
  168:17 255:18
**nevertheless**
  98:18 327:2
**new** 2:4,4,9,9
  18:23 24:4,7,7
  24:12 27:21
  30:2,6,10 34:9
  34:12 36:16
  39:7 40:17
  43:13,17 46:20
  47:14,16 54:24
  56:17,19,24
  123:9 244:2,4
  321:5,10,12,15
  322:17 327:2
  337:19 347:24
  348:14 359:23
  360:17 383:4
**newer** 122:12
**newly** 347:13
  348:21

**newt** 18:14
  19:23 20:9
**newton** 153:5
  182:14,22
  183:11 189:18
  190:14 191:5
  217:24 282:20
  322:19 323:1,8
  328:11 333:25
**nice** 329:25
  330:1
**night** 87:11
**nine** 197:10
  219:12,18
  225:13,18
  307:4 342:8
**nod** 8:14
**non** 71:25
  141:16 301:8
  315:13 342:22
**nonprofit** 1:4,7
**north** 24:9
  25:10 37:25
  38:10,17,19,21
  40:19,22 42:24
  43:3,6 46:22
  47:3 48:24,25
  49:2,9,10,15
  91:15 92:7,14
  92:17,22
  114:24 115:3
  167:5 176:12
  202:10 288:5,9
  288:11 295:10
  295:12 359:14

  374:15 376:10
**northern** 1:1
  5:16 166:7
  208:16 223:6
  287:16 288:2
  288:12 290:12
  290:25 293:13
  367:2 376:6
  389:2
**northwest**
  109:12 170:13
  171:23 381:22
**northwestern**
  167:16
**notaries** 387:5
  387:11
**notarized**
  387:11
**notary** 392:13
  392:19
**note** 5:4 390:10
**noted** 392:7
**notes** 61:12,16
  388:10
**nothing's**
  151:14 163:1
  213:4
**notice** 311:24
**noticeably**
  297:1
**noticed** 249:18
**number** 24:1
  32:10 33:15
  46:13 76:16
  80:13,15 81:4

  83:21 93:1,4
  103:5 120:1,9
  125:22 151:21
  165:7,9 169:21
  170:23 171:1
  173:19 175:22
  175:23 176:2
  177:3 178:3
  179:8 180:5,18
  188:16,18,23
  197:17 202:25
  214:1 215:6,10
  216:3,11,20
  217:11 223:15
  224:19 237:5,6
  249:11 268:14
  268:18 272:6
  274:3 275:1,3
  278:7 292:14
  312:11 317:20
  319:19,22
  330:17 333:18
  335:25 340:15
  340:16,21
  344:16,24
  347:17 348:24
  351:8 352:12
  352:21 353:10
  365:14 370:19
  376:19 379:24
  380:18,20
  381:12
**numbering**
  172:19

numbers 76:17
168:4 177:25
224:6,7 269:8
269:18 271:9
274:25 275:6
277:24,25
329:16 341:8
369:24
numerical
107:17,21,24
108:7 236:1
numerous
312:6,23
313:10,18
ny 390:15

**o**

o 7:17 388:1
389:1,1
o.c.g.a. 389:9
oath 7:25 8:5
object 53:5
71:22 114:14
118:7 182:5
238:10 259:6
265:9,20
274:18 277:9
278:6 306:3
320:3 345:7
349:4 364:7,13
368:18 372:13
376:23 380:3
objections 11:8
objective 53:14
53:18,21 319:8
319:24 321:14

observed 75:25
76:15 78:3
observing 6:21
233:16
obvious 65:22
obviously
11:15 78:12
occurrences
385:7
occurring 73:2
occurs 108:17
ocga 387:14
odd 48:8 79:23
374:19,21
offer 55:25
56:16 113:6
242:12 303:24
office 19:13
20:5 21:19
23:5 50:7
offices 19:17
389:8
official 1:12
131:21,23
offs 111:12
112:3,14
113:11
oftentimes
168:8
oh 36:1 62:14
107:8 194:14
198:13 214:3
222:4 227:12
232:15 241:3
285:24 294:4

294:15 307:11
314:5 324:8
329:25 361:15
379:17
ohio 24:10 26:2
26:10,11,14,25
27:9 46:17,18
46:18,19,21
47:9,10,15,20
47:22,24 48:12
49:16
okay 8:9,18,23
8:24 9:5,6,14
9:18,23,24
10:3,4,10,11,17
10:18,23 11:6
11:16,17 12:5
12:9,13,15
13:11,18,22
14:13 15:11,14
16:6 17:3,25
18:4 19:3,7
21:8 22:9,21
23:9,20,24
25:19 27:14
28:16,22 29:5
30:10 31:24
32:16,19 33:4
33:23 35:9,11
36:1,6,9,12,17
36:23 37:8
39:12,17 40:6
40:21 41:16
42:12,16 44:14
45:3,13 47:25

48:17,24 49:15
49:20 50:21
51:7,21 53:3
54:14 57:14
58:9 59:7,22
60:3 61:3 62:9
62:11,14,25,25
63:8,15 64:3,6
64:8,19 65:5
65:16,21,23
67:10 68:15
69:19 70:17
71:2,19 72:6
76:10 77:2,18
77:22 78:1,6
78:16,19 79:4
79:8,22 80:4
80:23 81:20
82:17 83:2
86:2 87:4
88:19 89:15
90:19 92:17
96:3 97:24
98:6,16,18,20
99:11 100:4,13
100:21 101:2
101:21 102:8
103:2,9,17,25
104:14,17,19
105:10,12,22
105:24 106:12
106:23 107:8
107:13 108:12
108:18 114:16
115:2 117:2,18

118:25 119:5
119:11 120:10
120:14,17
121:20 122:2
124:11 127:2
128:2 129:4
130:3 131:4,16
135:8,14 138:4
138:4 141:19
142:11,23
143:5,7,8,10,22
144:12,19
145:5,14
146:11,16,22
147:6,18,21
148:1,21 149:7
149:20,24
150:5 152:22
153:2,9,13,18
157:5,21 159:1
160:9 162:1,21
163:3,17,24
165:3 168:18
169:17,25
170:12 173:3
173:10,24
174:17 180:3
181:22 184:13
185:14,20,22
186:9,24
187:20 188:20
189:1 191:18
192:3 194:8,15
194:19 195:4,4
195:11 196:3,5

196:7 197:13
199:23 201:3
201:14 204:23
207:18 208:12
209:13 210:17
212:24 213:5
213:10,20
214:3,22
215:11 216:17
216:24 217:25
218:4 219:8,9
219:10,11
220:10 226:25
227:3,8,15
230:19 231:3,7
232:16 233:1
234:22 237:14
238:17 239:12
239:16,20
240:10,22
241:19 243:1,6
243:16 244:9
245:24 251:11
252:13 253:9
254:15,24
256:4 257:19
258:18 259:16
260:16 261:4,5
261:13 262:1,9
263:3 264:14
264:20 266:21
267:5 268:10
269:24 270:25
272:1,12,16,20
273:2,2,11,25

274:8 275:12
276:3 278:3
279:4,22 280:3
280:17,23
281:5,10,16,23
282:2 285:6,9
285:14 286:16
287:15 290:17
292:9 295:17
297:6 299:2
300:21 301:15
301:20 302:24
306:12 307:8
309:21 313:3
313:20 314:10
314:12,17
315:1,9 318:24
319:18 323:4
324:10,23
325:2 326:5
328:16 329:13
329:20 330:8
330:12,15,25
332:20 338:4
339:7,12,22
340:4,22 341:7
341:14,20
342:15,21
343:5,17,20,24
344:5,16 345:2
345:10 346:2
346:21 347:11
348:7,10
349:16 350:2
350:13 351:19

354:3 355:2,11
355:19 356:2
360:14 361:1,5
361:19 364:24
365:15,22
367:25 370:18
376:4 378:14
380:7 381:14
385:20,23
**older**   122:11
**omitted**   74:8,15
74:16 76:8
**once**   37:10
48:13 131:25
132:3 170:10
173:5 176:1
**one's**   318:20
**ones**   24:18 32:2
33:18 40:25
49:18 56:17
60:12 138:14
187:8 188:8
191:10 207:11
207:13 224:13
233:13 251:14
252:20,23
299:16 339:9
361:8 381:17
382:11
**ooo**   2:21
386:11
**open**   70:9
342:12
**operated**   18:3

opine 171:12
opinion 54:19
  56:1,2 79:18
  124:17 210:23
  211:19 212:13
  230:13,15
  246:2 248:9,15
  249:11 256:4
  291:21,22
  293:23 298:23
  305:12,13
  337:20 375:4,4
  375:6 380:5
  383:4
opinions 54:15
  55:2,5,15,19,20
  56:7,11,16,23
  57:2,9,9,19
  58:2 68:9,20
  68:23 69:4,6
  69:14 90:15
  124:19 242:12
  243:24 244:6
  246:15 251:5
  254:8,19,21
  303:23 328:12
  337:8
opportunity
  24:20 79:7
  255:9
opposed 21:6
  158:4 176:3
  238:9 272:7
  310:7 367:18

opposite
  168:11 231:19
option 128:14
options 351:10
oral 8:12,15,20
order 70:20
  98:14 113:18
  116:24 151:15
  159:3 162:5
  170:12 174:6
  207:19 308:6
  308:16,18
  326:10 328:2
  332:9 372:21
  373:7,12
organization
  1:4,7 18:5,20
  19:22 21:6
orientation
  123:19
original 36:19
outer 331:22
  377:12
outgoing 18:13
outreach 21:20
outset 155:20
  169:6,9
outside 47:7
  85:4 128:18
  157:9 185:7
  253:4 311:16
  311:19 320:22
  324:11 332:3
  349:1 364:6,12
  379:21

overall 21:14
  102:6 149:8
  175:9 176:19
  190:22 217:15
  235:5,7,10,15
  273:15 275:15
  303:15 321:7
  335:2,5,5,14,16
  335:20 336:3
  336:14 374:4
  375:20 381:3,6
  381:11,12
overlaid 266:7
overlap 184:2
  186:13 189:25
  190:21 203:5
  206:15,18
  207:6 221:6
  228:20 229:16
  283:16 350:10
  350:19 351:25
overlapped
  358:20 369:22
overlaps
  227:25 283:24
  300:4 357:9
  358:25 359:3
overlay 267:21
overnight
  87:10
overturned
  34:11
overwhelming
  87:12

own 86:24,24
  112:8,8,13
  132:2 152:4
  163:15 244:13
  273:10 312:17
owned 18:3

**p**

p 2:13 388:1
  389:1 390:1
p.i. 37:21 354:1
p.m. 127:4,12
  196:10,16
  239:21 240:2
  325:4,10
  385:25 386:10
page 3:2,9 4:2
  12:15 17:18
  27:15,18 30:13
  36:9 37:19
  40:21 67:17
  77:15 99:21,22
  101:2 102:24
  120:1,6 143:19
  143:21 146:5
  146:25 147:5
  147:22 149:25
  152:23 162:2,2
  172:11 173:4
  182:20 189:17
  191:18 198:5
  202:8 205:25
  205:25 212:17
  213:5 218:12
  225:9,13
  245:25 251:6,8

253:10 256:14
268:12,21
272:18 273:19
274:7 278:17
279:12,13
281:2,3 286:11
286:18 287:21
294:6 296:22
299:19 301:16
307:10,11
314:22,22,24
317:4 320:24
332:21 333:23
340:14 342:13
343:22 348:5
355:23 359:21
362:18 381:9
391:4,7,10,13
391:16,19
**pages** 97:14
147:21 220:2
241:23 281:11
306:14 325:15
325:15 354:10
378:9
**pair** 91:18
207:22
**paired** 77:19
135:23 173:18
180:4,5,11,19
217:8,11
258:17 275:9
320:8 344:16
**pairing** 77:13
77:23 104:15

180:15 192:18
204:1 207:20
226:4 289:1
**pairings** 282:17
**pairs** 275:10
**paper** 14:11,12
16:24
**papers** 14:14
14:15
**para** 253:5
**paragraph**
70:10,11 83:11
83:12,13 97:13
101:3 105:1
106:17 111:7
116:1 119:11
121:5,8 131:4
138:4 143:20
143:20 149:25
151:15 158:9
162:2 167:15
172:11 173:4
182:9,11 191:7
191:18 193:14
194:3 196:19
196:21 201:4
203:11 205:25
210:14,16
212:17 217:21
226:21,22
229:23 232:1
242:5 245:24
246:13 251:6,8
251:24 253:8,9
253:11 256:14

265:25 268:11
269:24 270:4
271:2,12
272:18 276:4
278:16 279:5
284:20 285:9
286:1,17
288:13 290:22
295:9,22 296:9
296:24 297:10
303:1 304:11
305:22 306:16
308:4 313:4,20
320:24 322:17
325:25 326:8
328:9,18,25
333:11,12
334:22,22
340:14 341:11
347:12 348:5
354:6,22
357:20,24
359:20 362:5
366:3 369:11
370:21 371:15
375:13 380:7
380:22,24
**paragraphs**
104:24 241:22
246:19 359:13
376:4
**parameters**
70:23 91:11
96:12 182:16

**parcel** 112:1
**parcelled**
227:21 290:19
**parkwood** 1:22
2:15
**part** 14:7,16
15:2,3 21:18
23:11 25:6
53:19 55:10
58:8 75:13
111:25 112:12
118:20 144:23
151:23 162:17
176:15,15
208:16 210:14
218:14 219:8
220:14,15
223:6 231:5
238:24 252:9
255:13,25
256:2 264:6
266:5 268:15
268:19 283:21
297:3,17,17
302:7 303:15
308:9 316:7
335:7,12 360:8
369:2 371:25
373:15 382:8
**partial** 82:21
94:12
**particular**
21:20 110:18
112:9 123:10
128:2 142:2

164:15 186:22
187:3,12,18
190:6 201:17
202:24 218:5
225:13 235:3
235:12 237:20
266:21 283:8
313:14,15
334:5 369:17
381:12
**particularly**
128:21 199:7
**parties** 5:9 29:3
36:8 387:15,16
388:13,14
389:13
**partisan** 29:17
29:20
**parts** 61:3,8
116:25 208:7
285:16
**party** 16:4
18:19 22:3,3
25:3,12 387:15
389:11,14
**passed** 96:24
143:13
**past** 19:9 70:13
73:6,21,25
74:1,7,14 78:7
83:18 87:18
89:5,6 129:12
380:23
**pause** 25:11

**pdx** 146:5
**peachtree**
289:2 360:11
362:20 363:1,7
**peer** 14:24 15:7
15:12
**pendergrass**
6:17
**pending** 126:24
324:24,25
**pennsylvania**
24:7 26:1
**people** 24:15
42:1 52:18
83:22 106:6
110:14 112:5
119:8 124:17
127:25 132:4
138:21 168:8
168:14 171:10
177:16 178:6
211:11 294:8
314:13 330:17
330:20 331:15
377:1
**percent** 52:16
82:14,15 88:18
89:11,12
136:20 157:6
159:2,19,25
160:4,19,20,24
161:10 171:3,4
171:5,5 180:24
181:2,5 197:17
210:24 217:18

228:24,24
230:7 231:8,10
269:9,21
270:13 284:21
285:10,14
286:23 287:11
287:12,18
289:12 295:6
306:24 307:7
308:12 309:11
309:20 318:2
333:1,4 334:6
344:24 345:4
345:18 350:19
351:8 353:14
362:14 366:6,8
382:1
**percentage**
165:6 173:19
181:3 208:5,6
208:19 209:9
209:16 210:10
211:20 212:10
230:21 231:9
231:18,18
266:6 268:19
268:23 304:12
311:15,23
332:17 340:17
351:1
**percentages**
200:22 208:2
208:11,15
212:14 291:14
312:1 327:13

327:15
**perdue** 87:8
**perfectly**
352:18
**perform** 277:16
**performed**
342:1
**perimeters**
138:16
**period** 16:16
38:13,15 81:2
388:12
**person** 103:14
110:16
**person's** 47:13
**personal** 126:2
126:4 375:8
**persons** 155:18
**perspective**
133:19 258:3,4
263:13 265:22
**pete** 19:14
**phase** 54:20,22
64:23 65:9
255:5 270:7
352:15
**phases** 81:12
**phenomenon**
171:7
**phi** 1:3 5:14
7:10,12 49:23
57:25 390:4
391:1 392:1
**phil** 1:8 7:13

**phones** 5:7
**physical** 13:14
  13:16 14:11,12
**pi** 256:25 257:9
  260:5,6,11
  270:6,16,22,24
  276:6,9,11
  277:2
**pick** 5:5 119:24
  158:20 172:19
  189:12 194:9
  195:17,21
  225:15 226:23
  228:14 282:2,9
  282:21 291:4
  294:4 357:10
  357:13 369:13
  369:15
**picked** 159:2,6
  159:13 168:22
  189:9 195:16
  195:22 202:23
  223:20 228:15
  287:9 303:14
  337:2 355:21
  358:18 359:7
  381:21
**picking** 201:11
  284:1 291:12
**piece** 69:12
  183:3 184:21
  280:8,24
  282:24 313:2,8
  314:14 331:24

**pieces** 176:11
  247:3,4 257:15
  290:5 312:18
  368:15
**pike** 286:20
  298:14,24
  299:10
**pinpoint** 167:7
**place** 5:9 7:18
  37:12 86:1,8
  111:4,5 119:23
  119:23 152:13
  157:3 196:8
  209:19 239:18
  388:8
**placed** 307:2
  332:24
**places** 25:16
  85:22 86:3,17
  86:22 87:23
  108:1,2 110:24
  117:7 120:25
  124:3 130:5
  133:12 162:4
  164:22 263:7
  288:18
**plaintiff** 5:13
**plaintiff's** 4:1
  11:23 48:1
  62:15 102:15
  142:13 145:16
  240:18 241:6
  330:2
**plaintiffs** 1:10
  1:18 2:2 6:4,6

6:15,21 7:10
47:4 49:6 50:1
50:5 141:15
**plan** 4:3 28:23
  30:23 31:4
  33:3 35:4 36:8
  38:16 55:21
  60:20 67:21
  70:12,21,22
  71:11,14,16
  72:7,9,10,22
  73:5,18,22
  74:2 78:9,9,13
  78:14,15,16,17
  78:20,21 79:5
  79:13 81:9,13
  83:4 88:21
  91:24 92:1
  93:14 94:2,11
  94:12,16,22,22
  94:25 95:6,20
  95:25 96:18
  98:11,14 100:7
  101:25 103:10
  103:18,20
  104:14 117:21
  132:22 133:17
  134:21 135:12
  135:25 136:12
  137:2 141:22
  144:7 146:8,15
  147:25 149:9
  149:10 158:21
  159:14,16
  160:12,23

161:14 165:25
167:13 170:2
172:13,13
173:5,6,8,9,11
173:12 175:3,4
175:9,15 176:8
176:20,21
177:13,13,22
178:1,3,4,10,18
182:3 184:1,2
184:7,8,19,20
190:14,18,19
194:4,17
196:25 197:3
198:10 199:7
199:25 200:7
200:11,16,18
200:21 201:20
201:22,24
202:1,5,8,11,14
202:16,19
203:15 204:18
204:19 205:15
205:16 209:25
210:24 212:2
212:16 214:24
215:4 216:10
217:19 218:7
218:14,17,21
220:11,12,21
223:5,7 224:18
224:18,20
225:4,21,21
226:4,24,24
227:4,7,11,13

227:21,23
228:4,6,8,10,17
228:18,23
229:20 230:16
230:17,24
231:1,4 233:6
234:13 235:2
236:20,24,24
238:1,13
243:11,13
247:22 249:9
249:10 252:8
252:16 254:8
254:20,22
255:6,8,25
256:2,17,24,25
257:1,6 258:11
258:17 259:16
259:20 260:5,6
260:6,11,11,17
264:5,8 268:3
268:3,11,17
270:1 271:1,1
271:18,19,24
273:5,12,14,15
274:11,25
275:1 276:5,5
276:6,9,11,13
276:25 277:1,2
277:4,6,7,16,17
277:19,25
278:4,8,9,14,19
278:22 280:11
282:12,16
284:14 292:23

292:24 295:21
297:19 298:1
299:20 300:21
301:5,13
302:25 303:4
303:13 305:3
306:18 308:8
309:24 310:3
313:22 320:20
322:20 323:21
324:4,12
326:22,25
327:4,5,8,11,18
327:24 330:6
333:14,19
334:20,20,25
335:14,16,20
336:1,3,14,21
336:22 337:20
339:5 340:24
341:10 342:4
343:20,25
344:6,9,12,22
344:25 345:13
347:23 348:2
348:11,17
350:6,25
351:15,16,20
351:24 352:20
352:21 356:15
356:22 357:5
359:17,23
360:7 362:10
362:15 363:3
363:10,20

366:11 369:19
370:11 372:24
373:7 374:5
376:13 377:11
377:20,25
379:3,8,11
380:8,9,13,13
381:1,4,5,6,11
381:15 382:11
383:5,6 384:16
385:8,11
**plan's** 139:21
**planning** 69:13
**plans** 67:24
70:14 72:10,23
73:7,10,14,21
73:25 74:1,6,7
74:14,20 75:5
75:9 78:7,11
78:25 80:25
81:7,10 82:2,3
82:21 83:2,18
87:7,7,10 89:2
89:5,7 92:11
93:22 94:1,4,6
95:4,8,10,12,14
95:20 97:18,20
98:22 99:16
102:25 117:23
174:25 176:25
182:2 183:17
187:15 202:18
203:9 205:24
210:1 229:19
231:4 232:4,5

232:9,20,21,25
235:6 236:23
242:8,11,24,25
243:5,7,8,9
246:3,23,24
247:10 248:9
248:15 249:7
249:12,17,17
252:9,12
253:13,15,21
254:11,25
255:3,20
256:10 257:10
258:9,22
261:11 262:7,8
263:11 265:3
266:3,4 280:13
282:8 283:5
292:20 300:5
305:16,25
340:23 341:5
341:17 344:12
345:14 346:3,7
346:10,22,25
347:17 354:1
380:2 385:8
**play** 108:20
109:11 212:25
**please** 5:4,6,24
6:13 10:15
67:11 114:17
208:8 219:6
232:17 319:11
324:22 367:8

plus 158:15
159:2,19,24
160:4,14,18,20
160:24 161:10
161:18 181:2
302:4 332:9
345:4
point 47:20
52:14 55:18
77:4 81:14
109:14 122:18
126:13 139:25
140:2,5,20
146:20,21
147:1,1,3,4,9,9
147:13,14,16
147:17 148:6,7
148:9,10,12,13
148:15,15,21
148:22,23,23
149:14,17
160:13 171:5
175:17 178:12
179:3,3,5,19,20
179:20,22,22
179:24 181:25
181:25 191:24
191:24 198:11
198:12 211:23
215:23 216:24
217:2,6,7
221:19 227:4,4
227:7,7 239:11
260:9 273:23
273:23 274:12

274:12,12,13
275:19 276:8,8
276:10 280:22
280:23 290:4
291:25 292:9
292:10,13,14
292:14 297:7,8
297:8,8 299:25
300:13,14
302:13 306:21
306:23 307:6,7
317:24 320:11
322:2 323:9
333:8 335:7
343:12 344:6,7
344:9,9,10,11
349:24 351:7
351:21,22,23
351:23 360:23
360:23 364:18
364:25 365:7,7
365:11,18
377:14 379:4
379:10
pointed 249:18
299:11 312:13
320:5 330:23
381:8 385:14
pointing
227:10 289:9
357:2
points 33:17
political 17:12
85:18 99:20
112:10 256:23

258:23 334:10
politics 17:6
polsby 138:9
138:23 139:6
141:21 144:9
145:10 146:21
147:1,4,7,12,14
147:17 148:5,6
148:10,13,16
148:22,23
149:17 177:24
179:23 191:25
198:12 217:2
274:12,13
278:25 306:22
307:7 339:13
339:23 343:11
344:7,10,11
349:23 351:17
351:23 364:17
365:1,12
polsbys 361:17
pop 171:4
294:11
popper 138:9
138:23 139:6
141:21 144:9
145:10 146:21
147:1,4,14,17
148:6,10,13,16
148:22,23
149:17 177:24
179:23 191:25
198:12 217:2
306:22 339:13

339:23 343:11
344:7,10,11
349:23 351:17
351:23 364:17
365:1,12
populate 152:3
populated
287:4 342:16
342:22,22,25
population 4:3
38:25 39:5,7
75:20 76:16
86:6 91:1,3
93:5 94:8
95:17,22 103:6
106:14,20,22
106:23,25
107:16,22
108:8 111:18
116:2 124:13
125:1,5,6,16,18
126:21 151:4
151:17,22
154:7,18,24
156:8 158:11
159:4,21 161:2
161:12,20
164:8 165:5
166:14,24
168:2 169:4
170:6,9 172:3
172:9 181:9
188:10 191:4
200:1,2,20
206:18 207:2

208:22 209:3
209:16 212:1
228:7 256:23
258:18,20
264:5 268:16
268:20 275:13
275:24 287:5,6
287:17 288:1,4
288:6,10,20,25
289:3,15 291:2
293:4 294:7,12
294:22 296:18
296:19 297:21
297:24 299:12
300:19 302:4
302:10 304:15
304:18 305:2
308:12,21
309:5,7,10,16
309:25 310:3
311:1,5,10,19
311:25 312:5,9
312:23 313:9
313:11,17,24
314:1,14
315:12,15
316:2,11,15
317:20,23
318:6,8 321:19
321:25 322:24
323:11 324:2
325:21,24
326:11,13,15
327:13 330:23
331:2,5,10,16

331:19,21
332:1,10,17,24
333:7,17 334:3
334:6 336:7,12
340:1 346:21
362:8 363:1,8
363:8 366:6,7
366:9,14,17,23
366:25 368:3,8
368:16,22,24
369:4 372:6
373:12,18
383:18 385:4,5
385:16
**populations**
39:8 72:24
76:15 90:17
93:6 108:6
129:18 138:20
163:23 170:23
183:25 185:6
188:7 350:19
363:16
**populous**
366:19
**port** 222:22
**portion** 186:5,7
190:16 214:17
221:3,20,24
222:22 223:1
250:17 251:15
251:17 257:17
260:1 263:23
263:25 272:25
287:15 288:25

289:18,18,24
300:16,22,24
302:15 307:3
311:13 326:20
326:24 328:6
333:3 358:23
371:11
**portions** 29:7,9
49:4 87:7
183:24 185:23
221:4 254:14
259:23,25
265:12 286:5
286:12 290:13
291:5 315:13
327:17 362:12
362:13
**positive** 158:16
158:22 160:13
**possession**
214:15
**possibilities**
117:24 193:12
225:16
**possibility** 56:3
56:19 63:21
131:1 157:9
245:12
**possible** 10:16
55:25 69:16
97:6 113:19,24
115:17 118:11
137:19,24
156:23 169:10
169:20 178:24

186:6 188:15
192:23 193:6,9
205:1,4,6
208:3 221:6
224:2 226:5,8
226:11,14,20
251:22 253:6
272:5 283:1
323:14 327:20
327:22 331:1
331:12 334:15
351:11 352:23
358:3 361:11
368:13 377:4
**possibly** 48:6
**potential**
235:21
**potentially**
118:18
**powder** 166:6,9
166:17
**practicable**
103:7
**practice** 137:14
**practitioner**
43:16 258:2
**pre** 20:24 257:1
**precinct** 79:7
79:14,23
112:20 113:21
114:1,20 124:5
125:16,21,24
134:24 135:3
163:21 173:17
177:6,11,15

216:7,9,23
264:18 271:23
277:20 287:25
315:14 316:21
382:6,6
**precincts** 76:21
104:8 120:4,12
120:16,20,24
121:1,3 125:15
125:17,19
151:5,7 165:23
166:7 177:18
216:13 258:25
288:3 291:13
310:9 315:11
315:18,21
339:1 366:20
376:14 377:17
**precise** 184:25
185:2,19 203:5
**precisely**
184:25 371:6
**predominantly**
291:4 307:15
314:1
**preliminary**
37:17 54:20,22
64:23 65:7,8
65:14 99:3,8
101:19 139:9
210:1 242:24
243:6 245:3
255:1,5,6,13,15
255:18,19
256:1,7,10

269:1 270:6
352:14
**preparation**
58:23
**prepare** 58:14
59:5,9,20 60:8
61:13 62:4
**prepared** 40:12
**preparing**
58:10 61:5
**present** 2:18
5:24 59:3
**presenting**
113:1 269:14
**preserve**
115:14 132:14
**preserving**
111:20 116:4
233:24 334:10
**president** 22:19
27:5
**pressures**
336:12
**presumption**
169:18
**pretty** 105:8
122:22 167:4
172:4 178:17
179:17 188:11
188:24 190:7
203:19 223:15
225:2 229:19
231:22 279:18
291:12,17
307:12 310:4

362:24
**previous** 10:13
43:16 75:4
78:14 89:11,12
89:20 99:2,3
115:14 139:8
163:7 203:2
260:18 270:6
353:22 381:9
**previously**
100:16 101:8
141:3 260:10
261:20
**primarily** 23:5
30:20 122:6,8
122:11 182:12
182:18,19
183:1,2,10
184:17,25
185:5 186:2
201:5 217:22
221:11 231:2
287:3 339:10
384:9
**principal**
109:21
**principally**
28:24 29:1
108:24 186:13
187:16 256:9
**principle**
132:10 133:7
134:4 161:1,6
161:12,20

**principles**
66:18,24 68:6
70:7 83:3,6,7
83:20 116:16
134:13 161:17
175:5,10,16
215:5,20 216:2
261:19 305:9
305:18 306:1
307:23 319:10
319:25 320:17
345:3
**print** 3:16
267:19
**prior** 92:11
94:4 95:4 96:7
254:25 261:11
388:5
**prioritize**
247:22 249:19
**prioritized**
155:13
**prioritizes**
155:6
**prioritizing**
246:4,25
337:21 383:6
**private** 5:6
**privilege** 11:13
71:24
**privileged**
71:25
**probably** 13:1
22:7 39:14
42:1 43:13

46:14,24 50:13
60:13 79:16
82:4,4,14
88:17 94:19
96:13 117:22
124:19 125:18
125:20 149:23
150:22 151:5,6
151:8 152:15
154:7 155:9,16
166:17 167:19
172:21 175:17
197:8 204:6
216:15 222:17
229:2,19
251:17 254:6
260:8 263:20
264:25 266:10
328:14 337:3
350:9 359:2
369:5
**problems**
356:12
**proceeded**
167:21
**proceeding**
387:12
**process** 25:12
34:20,24 35:20
36:22 38:12
55:10,12 70:1
76:9,13 77:4
79:25 80:5
91:1,21 93:21
94:6,20 96:14

96:15 97:8
99:4 101:7,11
101:15 110:14
111:9 112:7,11
118:24 128:17
129:25 130:2
132:25 150:6,9
150:13 151:1
151:11,24
152:4,17,21
153:22 154:11
155:20,25
156:2,13 163:5
193:5 200:12
205:3 209:18
212:12,21
226:19 236:5
237:25 238:4
241:21 253:10
255:17 262:22
309:2,3
**produce** 71:14
156:6
**produced**
100:3 139:8
250:8 255:6
316:13 387:4
387:10
**produces** 95:19
**production**
387:4,10,11
**profession** 17:9
**professor** 15:9
**proffered** 51:8

**profiles** 210:3
**program** 105:3
162:17
**programming**
12:25 13:2,3
**programs**
14:10 21:14
**prohibited**
387:14 389:9
**project** 14:7
**proper** 81:3
**proposed**
242:11
**provide** 10:24
109:9 162:5,24
177:21 201:1
333:21 352:15
361:24 389:8
389:11
**provided** 56:5
178:25 268:18
270:22 272:4
340:16 352:13
358:10 388:12
**provides** 72:25
252:12
**providing**
255:11
**provision** 38:18
**proximate**
186:25 187:3
187:22
**proximity**
186:23

**public** 123:1
129:23 130:2
131:20,22
132:7 392:19
**publication**
14:24 15:12
**published**
14:13,16,18,21
15:10
**pull** 234:24
**pulled** 243:15
**purple** 280:13
**purpose** 71:19
72:5,6,14
118:16
**purposes** 54:9
78:18 98:14
257:24 263:10
382:19
**pursuant** 389:4
**push** 310:5
**pushes** 308:9
373:16
**pushing** 310:7
**put** 43:3 63:12
69:15 96:20
104:21 112:18
122:14 186:11
186:16 187:24
188:4 189:14
236:21 243:9
263:25 285:2
289:9 309:21
330:18 337:5
385:5

| | | | |
|---|---|---|---|
| **puts** 321:19 | 276:18 295:18 | 116:23 117:1 | 315:10 320:12 |
| **putting** 110:9 | 313:19 324:24 | 205:15,16 | 334:9 |
| 257:17 309:7 | 324:25 326:6 | 246:4,4,25,25 | **racially** 166:6 |
| **q** | 343:1 368:12 | 247:10,14,16 | 166:10 |
| **qualify** 52:1 | **question's** 71:1 | 247:19,22 | **raffensperger** |
| 376:25 | **questions** 8:12 | 248:10,16,18 | 1:12 5:15 7:11 |
| **qualities** 237:7 | 9:7,8,15 10:19 | 248:23 249:1,7 | 390:4 391:1 |
| **quantify** 233:3 | 48:2 54:9 55:6 | 249:13,20 | 392:1 |
| **quantitative** | 55:8,12 141:1 | 270:16 305:14 | **ran** 40:3 87:16 |
| 98:13 236:1 | 385:22 387:6 | 305:22 337:21 | 97:19 135:19 |
| 237:10,22 | **quick** 102:22 | 337:21 383:6,7 | 144:8 173:13 |
| 257:6,23 263:8 | 121:6 378:16 | 384:17,22 | 173:17 174:20 |
| 263:15 291:15 | **quickly** 77:16 | 385:11 | 213:7 256:16 |
| 291:19 297:23 | 80:10 81:7 | **racial** 67:22 | 257:11 263:19 |
| 298:10 341:25 | 376:6 | 72:20,23 73:10 | 264:17,23 |
| **quarters** 38:1 | **quite** 28:6 | 74:5,11,13 | 271:6 341:22 |
| 39:2,3 | 49:14 97:22 | 75:8,10,13,17 | **randomly** |
| **question** 9:2,4 | 117:14 159:8 | 76:2,5,7,22,24 | 186:19,20 |
| 9:20,22 10:8,8 | 202:6 238:11 | 88:23 92:11 | 187:21 |
| 10:14 17:2 | 277:10 293:25 | 94:3,17 95:3 | **range** 84:6 |
| 32:11 44:25 | 320:9 321:17 | 96:6 100:11,12 | 109:16 144:15 |
| 52:2,17 57:21 | 357:7 363:19 | 133:16 163:5 | 145:2,7 147:19 |
| 61:11 65:24 | **quota** 308:22 | 163:14,25 | 148:25 149:4 |
| 67:11 69:13 | **quote** 75:7 | 164:23 165:19 | 149:21 158:16 |
| 74:18 78:6 | 162:3 191:9 | 165:23 167:2 | 158:18,20 |
| 80:23 96:9 | 311:5,7 336:22 | 173:6 190:25 | 268:23 270:13 |
| 101:11 117:17 | **quoting** 144:22 | 205:10 226:17 | 275:15 340:17 |
| 117:18 126:24 | 144:23,25 | 232:6,11,22 | 344:23 345:5 |
| 134:10,11 | **r** | 233:16,23 | 345:13,15 |
| 176:5 183:6 | **r** 7:17,20 388:1 | 234:4 235:7,19 | 349:1,12 364:6 |
| 194:12,12,13 | 388:1,1,1 | 236:2,14,19 | 364:9,12 |
| 207:4 208:8 | 389:1,1,1,1 | 247:25 287:23 | **ranges** 102:5 |
| 209:14 213:23 | 391:3,3 | 288:8 289:11 | 107:19 108:11 |
| 237:21 248:6 | **race** 70:13 73:6 | 303:3,12 304:3 | 268:19 344:20 |
| 250:22 273:9 | 76:8 83:17 | 308:7,17 | |

**rare** 112:6
**rates** 389:13
**rather** 89:12
**ratios** 152:24
   169:1
**ray** 26:25
**reach** 66:7
   69:13 248:24
   323:10 324:1
   385:4
**reached** 81:14
   377:6
**reaching** 69:4,6
   257:24
**read** 67:20 69:3
   83:4 84:7
   148:18 163:4
   168:25 170:5
   196:22 198:25
   202:6 203:13
   229:24 246:1
   251:1 254:5,6
   265:12,15
   278:18 288:15
   290:6,24
   297:19 304:17
   307:5 308:6
   322:19 325:18
   332:22 333:13
   334:24 337:13
   347:22 354:15
   359:22 366:5
   366:11,16
   372:21 380:8
   382:23 390:9

392:5
**reading** 146:23
   194:16 386:3
**real** 183:16
   248:18
**realize** 10:12
**reallocation**
   16:22
**really** 30:4 40:1
   40:16 42:22
   48:11 71:15,17
   77:16 81:1,22
   81:25 82:13
   101:17 113:16
   134:15 135:16
   155:21 157:15
   172:1 222:22
   223:24 228:9
   229:3,5,20
   254:9 260:23
   263:14 270:21
   286:15 289:16
   331:11 340:5
   341:12 345:19
   346:16 351:9
   351:13 371:16
   374:25 378:9
   382:2
**reapportionm...**
   3:14 47:23,24
**reason** 10:23
   31:18 68:17
   95:22 96:1
   132:9 133:4,8
   133:9 169:23

186:18 187:17
   189:1 200:4
   293:20 328:16
   328:22 329:8
   329:14 330:25
   341:7 343:1
   390:11 391:6,9
   391:12,15,18
   391:21
**reasonably**
   191:14
**reasons** 57:2,19
   131:19 161:7
   202:21,23
   243:25 244:7
   303:23 337:8
   357:8
**rebuttal** 60:1
   63:6 240:25
**recalculated**
   365:3
**recall** 23:23
   29:23 31:3
   32:12 35:17
   47:5,21,25
   48:5,17,22
   49:19 62:5
   65:15 123:9
   128:6 141:23
   141:25 142:3
   144:3,11
   254:17 371:6
**recalling**
   245:18

**receipt** 390:18
**received** 35:18
**receives** 387:15
**recess** 45:9
   127:8 196:14
   239:25 325:8
**recognition**
   255:19
**recognized**
   27:20 43:18
   51:13
**recognizing**
   182:1
**recollection**
   40:15 250:19
**recommend**
   157:25
**reconfigures**
   356:20
**reconfiguring**
   357:6
**record** 5:2,10
   7:16 8:14
   10:16 45:5,7
   45:11 127:4,6
   127:12 196:10
   196:12,16
   239:21,23
   240:2 278:4
   281:1 325:4,6
   325:10 344:3,5
   385:25 386:2
**record's** 240:5
**recorded** 5:12

recording 5:8
red 202:6
redistributed
  304:18
redistricting
  15:25 16:20
  23:12,16 24:2
  24:4 25:11
  26:8 27:21
  28:23 30:22
  33:25 38:21
  40:20 46:24
  49:3 70:14
  73:7,21 76:13
  83:18,19 85:16
  87:5 89:5,7
  101:5,7,21
  102:6,24
  106:13 109:25
  111:9 116:11
  116:15 120:1
  129:24 131:14
  133:7 144:1
  193:5 205:3
  226:19 236:5
  252:2 256:16
  261:18 262:7
  305:15 337:14
  337:23,25
  382:25 383:10
  383:25 384:7
reduce 300:18
reduced 388:8
reduction
  197:17 198:7

refer 104:17
  241:4 306:13
reference 58:6
  151:24,25
  152:2 162:12
  256:8 257:8,10
  266:15 273:16
  274:5 316:25
referenced
  162:15 256:12
  257:9 390:6
references
  281:14
referencing
  66:12 276:18
referral 389:12
referred 18:2
  108:1 116:15
  177:11 253:6
  264:25
referring 17:20
  54:10 57:8,24
  83:7 94:16
  95:1 192:3,13
  197:24 198:4
  214:4 234:18
  280:19,19
  304:23 338:5
  375:25
refers 158:10
reflect 243:17
reflected
  173:14 174:23
  268:21

reflects 207:1
  341:21,25
regard 182:7
  369:18
regarding
  242:13 244:10
  244:19 344:16
  370:16
region 167:19
  172:9,10
  182:10,12,16
  182:24 183:6,7
  183:9,12,21,21
  184:6,7,8,22
  185:14,24
  186:2,22 188:8
  188:22 189:4
  190:2,3 191:8
  191:22 196:1,2
  196:24,24
  197:7 198:11
  198:13,14,16
  198:17 199:2,3
  201:3,5 203:2
  203:2,6,7,13
  204:5,9,11,21
  205:19 206:4,8
  209:24 212:5
  217:22 218:5
  219:13,17,17
  220:18 221:1
  221:15,16
  224:21,22,22
  225:19 230:1,2
  230:3,11,12

231:21 279:6
  279:11 311:24
  312:6 313:16
  321:24 353:15
  354:9 359:8
  369:13,22
  371:19,20
  372:23 373:5
  374:5 379:22
regional 81:16
  129:20 279:4
regions 129:19
  157:21 183:15
  185:2,9,19
  186:11,16
  192:7 221:8
  224:14,17,23
  224:24 238:22
  259:10 267:7,9
  268:4,6 282:6
  287:7
registered
  125:22
registration
  106:16 107:1,6
regular 388:14
regulations
  389:4
relate 299:25
related 6:17,22
  37:23 40:24
  42:21,22 56:1
  95:22 220:21
  373:22 387:11

**relates** 49:22
**relationship**
  387:14
**relative** 179:9
  190:20
**relatively** 170:7
  216:19 217:5
  221:4 222:22
  222:25 231:24
  296:17,18
  308:14 309:17
  309:22 311:22
  312:7 338:17
**relied** 65:4,5
  66:10 249:5,8
  250:9
**rely** 66:5
  100:23 101:24
  102:3 245:13
  245:16,18
  248:24 254:12
**relying** 245:7
  245:10 267:10
  336:23 382:13
**remaining** 85:3
**remember** 31:9
  31:24 32:2,3
  32:10,16,19,22
  33:1,10,15,16
  34:2,13,15,17
  35:1 36:12
  37:8 39:15,23
  40:11,14 42:2
  42:8 44:2,12
  45:15,16 46:18

46:19,20 48:3
48:6 49:8,12
49:17 59:24
60:25 61:8
66:11 94:9
141:5,11 145:9
145:13 166:9
245:14
**renumbered**
  172:14 173:1
**renumbering**
  322:8
**reock** 138:6,8
  138:24 139:6
  141:21 144:9
  145:10 146:20
  146:25 147:3,7
  147:11,13,16
  148:4,6,9,12,15
  148:21,23
  149:15 177:24
  179:3 191:24
  198:11 216:25
  228:17 231:6
  274:12,13
  278:23 292:10
  298:16 306:21
  307:6 339:13
  339:23 344:7,9
  344:10 349:21
  351:16,21,22
  360:19 361:16
**repeat** 67:10
  208:8 232:16
  295:17 319:11

**rephrase** 9:21
  183:5
**replaced**
  300:15,21
**replacement**
  18:16
**replicated**
  257:20
**report** 3:11,20
  4:3 12:3 37:7
  37:13 40:3,4,5
  40:12 41:6,8
  41:13 43:21
  46:5 50:18
  53:23 54:1,4,6
  54:21,23,25
  55:5,13,19
  56:21 58:8,8
  59:14,18,23,23
  59:23,24 60:2
  60:14,19,20,23
  60:24 61:21,22
  61:25 62:13,20
  63:2,2,5,6,10
  63:11,13,16,17
  63:18 64:1,4,9
  64:10,12,13,17
  64:19 65:3,6
  65:12,13,19
  66:2,4,6,8,9,12
  66:13,14,22,25
  67:1,4,6,7 68:3
  68:7,8,13,15,18
  68:19,25 69:5
  69:7,10,15,17

69:20 70:1,4,8
70:9 71:12
73:11,23 74:21
75:14 76:11,12
77:8,16 78:5
80:12 83:10,13
86:15 89:4
91:9 97:14
98:1,15,17
99:2,8,14
100:11,24
101:19 104:23
109:25 111:8
119:12 121:6,9
122:18 127:20
130:18 131:5
134:18,19
135:7,7,19,20
135:22 137:12
138:5 139:4,7
146:7,15,24
147:25 149:11
149:24 150:1
152:19,23
155:24,25
160:1 165:21
173:4 174:2
185:17,21
191:15 192:16
196:19,20
198:5,5 201:2
203:11,20
206:10,11
210:5 213:24
214:4,17,19

| | | | |
|---|---|---|---|
| 220:6 227:24 | 273:10,10,24 | 359:14 360:25 | 61:20,20,25 |
| 229:7 237:9 | 274:2,5 275:15 | 362:6,16 | 62:10 73:24 |
| 238:16,19 | 276:19 279:13 | 363:13,14 | 74:3,21 83:25 |
| 240:8,23,24,25 | 281:15 282:4 | 370:14 371:9 | 98:8,13,24 |
| 240:25 241:4 | 283:1,19,22 | 371:12 374:10 | 99:2,3,5,7,10 |
| 241:22,24 | 285:3 286:18 | 375:18,21,23 | 99:11,12,15,20 |
| 242:1,2,21 | 290:3 292:6 | 376:3 382:14 | 100:3,6,7,9,14 |
| 243:16,19,22 | 300:20 303:11 | 382:16,21 | 100:16,20,21 |
| 244:5,11,15,20 | 303:19,22 | 384:8,15 | 100:22 101:1 |
| 244:24 245:2,5 | 304:1,8 305:7 | **reported**  1:25 | 101:17,19 |
| 245:6,8,9,11,13 | 305:11,20 | 135:19 206:6 | 139:8,10 144:8 |
| 245:16,19,22 | 306:16 314:7 | 318:11,19 | 173:14,22 |
| 246:8,10,11 | 314:16,18,23 | 339:24 353:25 | 174:19 178:25 |
| 247:13,21 | 318:19 322:2 | 361:2,18 | 179:1 207:16 |
| 249:2,5,16,24 | 322:10 325:14 | 365:10 369:9 | 213:6,10,13 |
| 250:2,6,8,11,12 | 325:24 326:8 | **reporter**  5:22 | 240:14 244:23 |
| 250:15,18,21 | 327:17 328:5 | 6:1 8:10,14,25 | 256:11,13,17 |
| 251:17 253:6 | 328:11,17 | 12:8 102:11 | 257:5,11 258:5 |
| 253:25 254:3,5 | 329:1 330:7 | 387:6,9 388:4 | 260:22 262:24 |
| 254:10,12,16 | 332:21 333:22 | 388:12 389:6 | 263:17,19,22 |
| 255:7,9,13 | 336:18 337:6,7 | 389:11 | 264:3,9,17,23 |
| 256:5 257:18 | 337:11 338:3 | **reporting** | 265:1 271:5,9 |
| 257:24 258:14 | 338:23 339:10 | 341:8,12 | 271:11 275:21 |
| 258:15,18 | 339:19 341:1 | 342:16 389:4,8 | 280:5 287:5 |
| 259:8,10,12,14 | 341:10 342:10 | 389:11,12 | 303:20 341:21 |
| 259:16,20 | 342:13 343:2,4 | **reports**  30:12 | 341:24 342:14 |
| 260:4,12,17 | 343:22 346:5 | 42:13 43:5 | 343:7 346:1 |
| 261:25 262:4,6 | 347:7,9,15 | 44:11 53:24 | 354:5 370:2 |
| 262:11,14 | 349:6 351:4,5 | 54:9,10,14,18 | 387:16 |
| 264:5,8,24 | 352:9 353:22 | 54:24 55:17 | **represent**  6:21 |
| 265:8,13,16,23 | 354:11,21 | 56:6,21 57:1 | 7:9,11 |
| 266:9,16 267:6 | 355:10 356:10 | 57:16,18,23,25 | **representation** |
| 268:7,24 269:4 | 356:13,15,19 | 58:1,4,6,7,16 | 41:21 131:6,12 |
| 269:18 271:14 | 357:1 358:10 | 59:11,14,16 | 132:8,11,14 |
| 272:13 273:1,8 | 358:17,23 | 60:7,11 61:17 | 134:5 135:9 |

136:2,9,15
137:8,17
192:22 204:4
226:7
**representative**
237:11,19
238:7 389:6
**representatives**
15:22 16:2,7
17:4 18:15
132:6 180:7
242:8
**representing**
5:20 6:4,6,24
**represents**
154:19 387:4,7
**republican**
16:4 17:14,21
18:19,23 19:17
20:21 21:17
22:3,5 25:21
25:25 28:19
36:4 90:14
**republicans**
20:14 21:25
26:6
**request** 387:12
387:16
**requested**
388:11,11
**require** 151:8
158:17
**required** 13:13
13:14 34:9
392:13

**requirement**
13:9,10,13,16
158:2 161:15
182:1
**requirements**
15:4 125:23
**research** 16:24
17:12,20 18:1
18:1 22:19,21
23:12 128:20
**reserve** 11:8
54:18 68:16
**reserved** 386:5
**residence**
136:11,14
**residences**
122:12
**residencies**
137:3
**residing** 1:5
**resolution**
144:2
**resolved** 29:4
34:6 36:15,17
37:10 44:3,5
**resources**
128:3,7
**respect** 15:17
84:2,14 86:16
113:18 161:11
164:16 203:16
204:10 225:21
235:4 274:23
275:7 276:21
279:6 320:16

335:17,21
356:25 376:1
**respected** 88:2
90:15
**respecting**
85:19 86:13
87:21
**respects** 159:3
**respond** 50:25
63:10
**responding** 9:4
**response** 41:9
63:5 146:18
**responsive**
240:25
**responsiveness**
11:9
**rest** 170:16
366:18
**restate** 114:17
**resubmit** 93:25
**result** 43:25
45:16 189:10
189:15 246:1
298:3 300:9
322:3 382:5
388:15
**resulted** 374:3
377:15
**results** 40:4
44:4 88:6,14
365:23
**retaining**
192:20 204:3
226:6

**return** 127:10
390:13,17
**returning**
332:20
**review** 29:15
41:14 59:7,9
60:8 61:16
65:17 79:9
81:8 94:6,20
96:25 118:24
232:3,19 242:7
253:24 388:11
390:7
**reviewed** 14:24
15:7,12 56:5
58:16 59:11
61:23 62:22
67:9 79:19
83:15 95:5
96:13 99:18
160:11 204:15
210:20 250:24
326:4
**reviewing** 64:9
141:20 236:22
**revise** 54:19
56:16 244:3
**rhode** 24:6
**richmond** 32:3
306:18 307:1
307:25 308:10
308:21 309:8
309:10 310:6,9
311:1,8,13,16
311:20 312:6

312:14 319:16
319:17 320:7
320:21,22
**ridge** 124:6
**right** 7:6 9:25
10:5,12,19
11:10,22 22:16
27:23 31:15
35:15 41:8
42:5 43:7,23
46:16 49:19
50:23 52:22
54:19 57:10
61:22,23 62:19
63:3,6,13
64:10 65:20
68:16 70:11,15
74:18 76:6
77:5,7 78:23
82:20 83:1,11
83:11 97:5,21
98:9,22 102:2
102:13 103:3
105:1 106:9,18
107:22 111:21
112:2,14
113:12 114:21
114:22,25
115:11 127:14
131:8 133:22
133:25 136:6
136:15 137:5
141:17 143:6
143:16,18
145:7,9 146:2

146:13,21
151:18 156:10
156:16 158:12
163:10,11
173:13,20
180:8,14,24
183:5,8 184:4
184:6,14,20
186:9 187:17
191:11 194:17
194:20 197:4
197:11 198:18
201:8,10,21
203:23 207:5
209:5 213:8
214:21 215:1
216:7 217:15
217:18 218:9
219:5 221:19
222:19 225:23
227:1 228:18
230:5,7,14
238:18 242:1
242:14 245:18
251:25 252:19
252:24 253:22
253:24 254:17
254:17 261:9
262:5 265:25
270:2,4,9
271:4,20
272:13,14
273:7,19 274:4
274:16 275:20
276:1,2,3,21

279:9 281:25
283:6 285:8
286:22 287:19
294:8,9,19,19
294:20,24
295:3,7 297:1
299:17 301:4
308:4 314:20
315:3,16
317:16 319:20
321:4 322:6,11
324:20 328:1
328:10 331:17
331:21 332:7
333:4 340:25
342:18 343:9
345:18 349:18
351:17 353:3
354:12,14
355:25 359:18
361:21 362:1
362:14 363:6
364:18 365:17
366:2,21 368:4
368:17 371:21
372:8 378:20
378:22 379:16
380:15,17
**rights** 44:23
45:25 103:11
104:2 116:7,20
116:24 117:4
117:11,19,20
118:3 182:3
193:8 248:2,4

265:18
**ring** 165:10,11
**rings** 168:12
**ripple** 168:16
171:8,13,19,21
373:9 377:3,5
379:22
**rise** 122:6,13
**river** 79:21
**rivers** 85:20
**roads** 346:11
346:14
**roadways**
129:2
**rockdale** 153:3
182:13,23
183:11 190:13
199:8 217:24
282:21 321:21
321:22,23
322:15,21,23
323:8,9,22
324:2 325:19
325:20 326:9
326:11,23
327:1,21 328:2
328:5,10
332:15 333:24
334:4
**role** 26:22
**rollins** 2:20
6:19,20
**room** 6:8
**rough** 190:9,9

roughly 136:18
160:2 188:7,25
223:3 295:4,6
297:3 309:2
330:21 369:16
round 157:8
309:10
rounded 365:7
route 123:8
rule 221:14,17
266:21
rules 7:24
389:4
run 19:13
21:19,25 98:7
100:16 175:12
206:19 207:16
213:10,13,14
213:17 223:25
224:9 229:6
256:11 257:5
259:1,7,10,13
260:16 261:10
263:17 266:24
273:3,10
283:15 287:5
303:20 347:6,9
358:19 363:10
369:20,23
rural 121:16
124:12 307:15
résumé 39:24

s

s 3:22 389:1,1
391:3
s.d. 290:24
297:13 310:19
322:22
salle 14:20
sat 48:1
savannah
108:23 109:7
126:13,14
savitzky 2:3 3:4
6:2,2 7:5,8
11:12,14,16,18
12:1,6,9,12
26:23,24 45:12
53:12 57:11,13
62:18,24 67:12
67:25 69:8,11
72:2 84:13
99:23 102:10
102:12,18,21
114:18 118:8
127:13 142:16
142:19,22
145:19,22,25
150:3 153:11
160:16 181:18
182:8 194:21
195:6 196:17
204:22 211:1
238:14 239:1,4
239:7,12,14,17
240:9,12,21
241:9,14,18

251:7 259:9
261:23 265:11
265:24 274:21
277:14 278:10
279:25 280:16
294:14,18,23
301:15,20,23
306:6 314:6,8
319:3 320:14
325:11 326:7
330:5 340:8,13
345:16 349:7
350:14,16
364:10,16
368:21 372:16
377:2 378:3,7
378:12,15,17
380:6 385:18
saw 158:22
164:23 166:18
369:9
saying 8:13
38:17 40:9
51:2 52:21
87:24 94:2
112:24 125:9
134:16 140:14
144:25 169:12
183:1 200:5
205:7,14
208:25 210:9
211:22,22,24
224:4 230:9
233:5,15
234:19 260:20

261:1,14
290:18 291:18
305:16 306:7,9
312:22 319:8
321:14 325:23
326:12 327:10
347:25 353:8,9
362:25 364:19
364:21 373:6
374:21 377:8,9
380:1
says 40:7 41:7
67:19 69:18
102:24 120:2
143:3,8,11,23
144:5,13
146:25 191:12
194:16 242:15
279:18,21
314:21,21
328:18 329:3
338:11,11
340:11 341:10
schedule 51:6
school 15:19
17:13,14
121:16 129:4
schwartzberg
138:17
science 12:21
12:23 13:8,12
13:15,15,16,19
scj 1:5
scope 55:13

**score** 140:12,12
185:11 223:22
227:3 228:17
230:22 231:6
274:7 278:23
278:24 292:3,4
297:7 298:16
306:21,22
335:6,8 347:12
347:13 349:22
**scores** 139:6
141:21 144:14
145:1,10 149:9
173:18 185:9
192:2 198:5
199:3,12,18
228:16 230:2
230:12 231:16
233:11 278:21
279:2 335:18
339:13,16
343:10 347:15
348:21,23
354:4 355:14
356:7 361:3
364:5,5,17
365:12 370:13
**screven** 307:20
318:15
**scrutiny** 117:9
**seat** 110:2,3,5
157:6 170:9
368:10,14
**seats** 16:22
109:20,20

151:21 153:3,5
157:11 181:1,4
321:12
**second** 32:8
33:10 35:8,11
132:24 142:23
255:7,19
278:12 312:21
313:7 348:4
**secondly**
310:16
**secretary** 1:13
50:7
**section** 27:19
40:6 103:11,15
104:1,24
116:25 182:2
**see** 8:9 15:1
17:19 22:11
24:3 26:13
43:5,12 62:1
77:10,14,16,22
77:23 80:21
86:23 94:11
103:1 114:3
116:13 125:4,6
133:17 136:4
140:24 142:24
143:14,21
146:14,14
148:2 149:9
150:20 153:2
153:22 154:3
165:6,21
169:10 170:2

183:2 184:17
190:11 201:20
204:10 205:18
209:8 214:3,5
219:9 223:16
225:5 227:20
230:23 238:8
247:24 255:17
260:24 261:2
266:14 272:21
273:3 274:7,9
274:11 284:4,9
284:16 285:18
315:5 316:12
316:14 328:15
342:16 343:25
343:25 344:5
356:18 360:21
362:18 381:22
382:4
**seeing** 134:8
220:23 235:7
286:11
**seek** 132:13
**seeking** 111:12
**seem** 53:15
65:22 177:8
205:17
**seemed** 48:14
174:25 220:20
224:25
**seems** 79:23
110:6 144:23
156:17 159:17
179:17,19,21

180:15 184:16
205:16 209:18
210:21 216:23
311:18 374:19
**seen** 91:13,14
93:14 106:6
117:25 139:1
209:23 210:2
210:13 286:6
309:1,4 335:2
335:5,13,16,20
336:7,10
345:14 381:3,7
**sees** 203:22
**select** 187:2,20
285:23
**selected** 182:25
183:8 184:12
185:3 186:19
186:21 190:10
198:22 220:18
258:13 279:8
284:5,16,19
286:3 299:14
371:20
**self** 218:18
**seminars** 21:12
**senate** 27:4,4
29:2 49:4,11
78:21 82:25
87:17 110:2,3
110:23 143:8
147:25 149:9
150:8,10,14,23
151:2,10,12

152:8,25
159:25 160:5
160:21,25
161:19,23
212:16,19,22
213:1,14,17
214:24 215:3
215:18 216:10
219:16 220:23
222:24 223:2
224:17 225:20
225:21 232:4
232:20 235:6
242:8,11 246:3
246:23 253:20
268:3,11,16
269:25 270:5,7
271:1 273:5,12
273:14 276:5
276:12 277:1,6
278:19 279:7,8
279:10 281:12
281:24 288:16
293:7,7 295:6
298:13 299:14
303:13 304:2
306:17,20
307:2,5,12,21
308:7,8,9
309:11 311:2
311:14 313:5
313:21 314:15
316:1 318:22
322:4,5,15,20
323:6,14

325:12,16
329:5 330:20
333:14 334:20
336:9 340:19
341:5,16,20
350:22 372:4,6
380:13 381:10
**senator** 87:7
**senators** 217:9
**send** 21:13
**sense** 25:17
26:5,8 32:21
50:19 76:20
80:19 85:5
86:9 88:4
89:24 102:4
108:2 115:8,23
132:21 135:13
135:21 150:22
154:17 160:23
163:19,20
166:11 170:22
171:19,21
172:2,4 176:1
183:24 185:14
189:3 190:24
205:8,9 206:16
218:19 220:10
224:12 236:1
238:3 243:5
247:7 255:11
257:16 260:7
263:14,21
264:2,6 267:3
267:17 289:14

289:24 296:11
327:11 339:4
350:17 352:10
353:23 363:24
364:2 381:13
**sensitive** 5:5
**sent** 51:2
390:14
**sentence** 101:3
142:24 210:18
246:22 328:25
329:3
**separate** 21:1
74:12 132:17
224:17 248:6
316:2
**separated**
366:16 385:2
**separately**
329:23
**separating**
109:6
**separation** 21:5
**september**
63:19,22
**series** 173:13
266:2 280:12
**services** 387:16
389:8,11
**sessions** 193:4
**set** 57:23 58:1
70:12 78:13
107:3 108:10
110:20 114:7,8
154:9,12

158:14 184:11
185:11,15
189:9,13 190:6
190:23 193:21
193:22 200:17
201:17 202:24
203:5 207:5
223:20,22
261:19 265:7
282:22 283:9
283:23 284:4
287:9 299:20
332:3 335:9,24
365:12,24
388:8
**sets** 282:2
**setting** 14:18
54:21 56:3,18
57:16 97:5
112:9 115:2
118:15 243:6
244:4 267:25
276:11 313:14
353:3 361:25
**seven** 97:13
120:2,9 197:9
256:16 261:7
271:11 274:6
347:11 348:20
360:12,13
378:6
**several** 13:17
17:8 22:7
46:10 81:2
131:19 227:22

230:25 304:24
384:21
**shaded** 354:11
**shadegg** 18:16
**shape** 32:23
113:23 187:10
309:14 313:14
370:23
**shapes** 67:24
136:16 140:7
209:8,10 232:9
232:25 280:21
**share** 326:19
**shared** 19:24
**sheet** 390:11
**shop** 22:16
**shorter** 292:17
**shorthand**
388:8,10
**show** 22:4 83:9
100:7 155:25
200:15 203:14
225:14 233:18
247:13,24
249:24 258:10
258:16,19
259:20,25
260:9 266:5
270:11 274:25
275:21 277:11
283:3 301:14
314:22 354:16
376:5,6 379:18
384:21

**showed** 123:18
162:12 311:24
320:18 337:2
339:20 342:11
**showing** 39:6
93:3 212:12
260:5 283:4
347:19
**shown** 139:7
336:20 354:8
381:15
**shows** 72:12
135:22 176:21
193:17 225:10
225:12 258:24
259:22 260:13
296:22 311:25
347:13 348:20
359:19 362:11
**sic** 83:5 199:2
230:1 246:6
288:16 333:1
365:8 383:8
**side** 29:2
104:21 126:20
142:9,10 151:3
279:23 340:19
368:2
**sign** 390:12
**signature**
388:19 389:16
**signed** 390:20
**significant** 90:8
128:21 131:16
139:21 179:6

180:16 217:4
221:3 252:9
276:19 318:5
**significantly**
349:17
**signing** 386:4
**silly** 61:11
**similar** 13:9
24:24 64:2
96:12 159:15
160:15,22
178:21 183:12
202:25 204:21
209:24 229:19
277:23 282:5
282:17,18
333:18 335:18
344:20 353:22
**similarly**
273:14,21
332:16
**simplify** 382:15
**simply** 130:11
**single** 45:19
86:10 112:23
122:8,12 155:3
178:2 215:10
215:14 216:3
216:11 269:22
284:7 312:1
**sit** 42:8 48:3
181:22 270:19
**sitting** 42:2
74:23

**situation** 43:13
136:19 260:8
351:12
**situations** 25:7
139:1
**six** 97:13 171:2
179:19,25,25
197:9 229:2,3
275:10 341:12
371:18,20
**sixth** 1:5 7:12
**size** 93:5
151:17,22
152:6
**sizes** 150:8
**skills** 15:17
16:9
**skimmed** 254:6
**skip** 105:1
**skipping** 219:4
**slate** 80:7
**slice** 114:13
**slightly** 85:12
136:23 172:10
176:14 184:8
223:17 282:16
299:24 385:13
**small** 216:20
221:4 222:22
223:1 311:22
**smaller** 151:4
275:15 297:7
**smyrna** 166:20
**snag** 102:10

**socio** 121:13,20
  125:25 126:5
  127:21 265:2,6
  265:13 346:6
  375:3
**software** 48:12
  48:16 52:9,11
  104:25 105:3
  256:16 258:6
**solutions** 387:1
  389:7,7,9,10,13
  390:23
**somebody** 57:9
  91:24 95:24
  123:11,14
**someplace**
  89:16
**sonny** 87:7
**sorry** 16:19
  38:6 60:5
  117:12 120:5
  154:6 192:11
  194:11,14
  198:13 200:19
  208:7 213:23
  218:23 219:2
  219:11 220:8
  220:15 222:4
  227:12 232:12
  232:15,16
  264:5 265:21
  274:19 276:17
  276:24 277:21
  285:24 295:15
  295:17 300:12

302:2 309:13
  311:17 314:4
  319:11 322:6
  324:21 326:5
  328:24 344:8
  345:8,9 348:3
  348:9 349:5
  353:7 354:22
  361:15,19
  372:14 385:15
**sort** 9:3 10:20
  48:19 58:10
  72:5 77:4 78:1
  82:21 90:8,16
  93:3 96:20
  99:11 101:12
  104:24 110:6,8
  113:2 114:10
  118:17 124:13
  125:12 128:25
  137:1 156:12
  156:21 158:3
  160:17 162:21
  163:9 170:20
  172:16 198:19
  248:11 271:5
  290:6 340:17
  346:14,18
  347:3 363:24
  369:12,13
  372:9 373:21
**sorting** 320:13
**sorts** 92:23
  138:20

**sought** 143:1
**sound** 143:16
  359:18
**sounds** 11:21
  42:5 53:18
  88:6 115:24
  122:19 123:24
  372:8
**sources** 123:2
**south** 24:9
  126:20 167:5
  176:12 227:18
  288:5,9 295:10
  295:12 310:13
**southern**
  150:17,18,24
  164:6 194:20
  195:8 227:17
  227:19,21
  229:20 230:24
  231:5 233:7,8
  234:10,11,16
  234:20 235:4
  235:12 288:25
  291:2 293:14
  297:16 298:25
  326:16,23
  328:6 360:8
**southwest**
  124:4 170:15
  171:23 371:16
  372:23
**space** 20:17
**spalding**
  126:19 201:7,9

263:6 282:15
  283:14 284:23
  285:11 289:3
  289:11,22
  290:5,14 291:5
  293:14 294:1,5
  294:7 295:4
  297:18 298:2,7
  298:24 300:12
  300:15,22,24
  301:10 302:6,8
  302:15 305:2
  321:20 332:22
  333:3 334:5,7
  357:14,17,20
  359:16 360:2
  366:5,7,12,18
  367:2,16,17,21
  368:1,3,8,13,17
  368:24 369:2
  383:16,16
**speak** 59:1,4
**speaker** 18:15
**speaking** 23:3
  55:14 72:17
  76:18 105:4,5
  105:8 115:21
  161:3 242:18
  258:1 334:13
  337:10
**special** 15:16
  16:9 34:11
  36:15,18 45:18
**specialized**
  52:3,7

**specific** 29:22
49:12 53:11
100:15 114:25
115:4 122:23
125:23 145:3
156:1 163:20
166:4 183:20
186:18 193:16
205:23 212:3
226:23 254:19
262:8 267:7
268:4 299:8
303:2,9,14,15
304:2 328:12
337:11 354:16
355:9,19 356:3
361:3 387:14
**specifically**
32:10 33:16
35:3 45:14
54:18 57:8
65:15 70:22
71:8 73:15
78:13 84:3
88:24 89:4
90:23 91:15
92:22 99:14
105:5 116:22
120:15 167:7
187:19 210:7
211:21 266:14
283:25 305:1
306:5,8 328:15
346:23 370:7,9
377:10

**specificity**
304:5
**specifics** 26:21
53:9 166:8
167:11 355:8
**specify** 243:4
247:2 251:16
**speculate** 81:22
**speculating**
48:21
**spell** 7:16
**spend** 80:16
82:7
**spent** 80:9 81:2
82:5,7 150:18
151:6
**spin** 102:23
**split** 76:20
79:23 99:20
100:6 112:20
113:21 115:1
115:12,13
151:5 152:15
154:1 155:2,4
155:9,16
169:22,22,23
170:10 175:22
175:24 176:3,4
176:7,10,11,13
176:23,25
177:16,17,20
224:23 229:2
260:3 272:21
284:11 287:23
288:5,7,23

292:20,22,23
292:25 293:1
299:9 307:24
307:25 314:18
315:9,10
319:17 320:5
320:11 321:22
321:23 322:3
322:21 323:2,7
323:11,22,25
324:2 325:19
326:9 327:1
328:1,5 330:11
330:22 331:13
331:13,25,25
332:2,23 334:4
334:7 336:5
367:16,18,21
367:24,25
368:2,6,12,15
369:2,7 373:2
373:3 374:3
376:14,17,21
377:21 378:23
381:20
**splits** 79:14
84:3 151:9
173:17,18,24
174:8 175:21
175:21 176:19
176:22 177:4,5
177:6,8,11,12
213:21 214:24
214:25,25
215:3,8,25

216:6,7,9,22,23
229:20 256:23
258:23,24
259:1,10,14
264:12,19
271:19,23
272:1,7,9,22,23
273:4,5,13
276:16 277:21
278:1,5,8,9
313:23 319:13
319:22 320:25
321:1,5,7,10,15
332:21 333:18
335:9,10,21,24
335:25 339:6
342:5,9,14,17
342:23 347:7,9
366:12 369:18
370:17,19
372:24 373:7
373:24 374:5
378:19 380:9
380:10,19,20
381:8 382:6
**splitting** 150:21
155:6,8,15,15
176:25 292:19
310:17 328:10
332:15 382:7,7
384:23
**spoken** 23:1
**sponsor** 31:1
**sprawling**
328:21 329:6

spring 15:20
springfield
  7:21
springs 166:6,9
  166:17
staff 93:22 95:8
  95:19
stages 91:17
stakeholders
  93:12
stalled 38:14
standard
  258:15 259:12
  349:9 364:14
start 11:7
  27:18 62:12
  80:7 154:10
  156:13 158:2
  167:22,24
  168:1,5,7,8,11
  168:15,18,18
  168:22 200:10
  212:17 241:22
started 7:23
  17:11 46:9
  76:11 151:16
  167:16,23
  240:3
starting 17:19
  70:10 168:13
  171:22 173:4
  178:12 182:10
  193:14 201:4
  215:23 253:9
  271:1 279:5

349:14
starts 268:11
state 1:13 3:16
  3:18 6:24 7:15
  15:20 19:18
  22:22 23:2
  26:20 27:20
  28:23 30:17,24
  31:13 33:24
  37:2 39:21
  49:4,24 50:6
  66:17 76:12,12
  87:7 93:22
  96:24 97:1,7,9
  105:1,10
  108:19,20
  115:3 118:18
  129:20 141:7
  167:3 170:16
  181:14,15
  191:14 215:18
  236:20 238:2
  242:8 261:19
  268:10 300:19
  333:16 381:21
  388:2,4
state's 50:7
stated 74:3
  144:6 244:15
  245:17 251:23
  252:1 253:7
  255:24
statement
  54:15 55:1
  56:7,10,23

57:2,18 68:9
  68:20 69:3
  131:11 203:17
  243:3,23 244:5
  252:17 276:22
  276:24,25
  290:7 305:21
  323:24 328:9
  337:7 382:9
states 1:1 17:8
  23:19 24:2
  26:5 52:12
  76:4 117:7
  125:23 156:8
  156:25
statewide 71:10
  72:9 225:12
statistic 135:22
statistical
  129:8,14
statistically
  237:15
statistics 13:23
  124:14,15
  195:20 341:17
status 19:2
stayed 87:10
staying 79:25
  108:12 113:11
  196:19 304:11
step 132:25
  134:20 151:20
  158:24 159:7
stephenson
  38:2,9

stepping
  299:13
steps 247:21
stewart 1:9
  7:14
stipulations
  3:18 145:20
  146:2
stock 122:4
stop 81:14,18
stopping 81:14
  239:18
story 175:11
strategic
  296:10,13,14
strategically
  288:17,22
  289:5 290:1,9
  291:8,10,16
  297:20,25
  298:4 304:4
  309:24 310:3
streams 107:23
street 2:4,9
  7:20,21
strength
  289:13
stretch 240:23
  340:5
stretched 360:6
stretches
  284:22 291:3
  298:18 318:14
  362:24

stretching
  286:20 318:12
strict  161:8
strike  101:12
  174:5 178:8
  192:11 198:9
  235:17 333:10
striking  204:17
strong  311:10
  311:15 317:25
stronger
  123:19 310:25
  311:7,11,19
  312:10
struck  36:19
  37:6 45:21,24
  46:1
study  14:20
stuff  245:3
subdivide
  92:25 109:1
subdivided
  154:23 169:3
  175:25
subdivides
  84:20 157:1
subdivision
  256:23 258:23
  264:12 320:25
subdivisions
  262:18
subject  141:2
  244:1
submitted  28:4
  28:9 38:3,5

39:16,19 43:21
  54:1,4,22
  55:17 56:6
  63:1,11 64:24
  65:1,17 93:10
  94:11 95:7
  254:25 255:7
  387:6,8
submitting
  65:18
subscribed
  388:16 392:14
subsequent
  95:20 135:7
  255:8
substance
  58:12,22
substantial
  16:24 20:15
  25:11 179:6,18
  296:19
substantially
  64:6 94:7
  101:25 102:3
  103:7 159:15
  199:25 275:23
  313:24 343:14
  350:1
substituting
  299:9
suburban
  121:15 124:12
succeed  20:5
successful  20:5

sufficient
  159:20 160:25
  161:5,11,19
  345:2
sufficiently
  140:18
suggest  95:1
  126:25 135:15
  136:10 156:6
  327:19
suggesting
  308:23
suggestion  96:4
  96:8,11 113:6
  113:7
suite  1:22 2:15
summarize
  130:3 174:19
  341:16
summarizes
  213:6
summarizing
  271:5
summary  97:19
  98:8,21 100:11
  256:23 257:13
  258:18 341:24
  346:1 347:12
  347:18
summer  17:23
summertime
  17:13
summing  20:19
supersedes
  255:23

supervision
  388:9
supplement
  68:16,24
support  66:6
  165:4 247:4
  374:11
supported
  291:23
supports  251:5
  298:4,10
  337:19 383:4
suppose  69:16
  115:17 122:16
  132:22 134:19
  156:23 157:19
  159:11 178:22
  186:6 188:15
  189:6 191:4
  192:19 193:2,6
  193:9,12
  195:21 202:3
  202:17 203:9
  204:2 205:1,4
  205:6,21
  207:17 221:4
  224:22 226:5,8
  226:11,14,20
  228:4 252:25
  304:9 306:9
  338:15,20
  342:25
supposed  53:13
  71:14 188:16
  279:14

**supreme** 30:6
34:9 142:1,18
**sure** 7:17 11:12
23:25 41:15
43:9,11 44:7
45:2 55:6
56:18 75:6
88:3 98:10
108:22 109:12
114:19 115:7
115:21 117:16
124:25 125:23
127:1 154:25
156:11,14
157:20,25
159:8 167:20
167:25 175:7
176:18 179:17
180:20 184:15
184:24 192:9
193:13 194:11
196:6 197:20
199:8 207:3
208:16 211:11
217:13 219:7,7
232:15 239:1,4
239:7,19 240:4
261:14 267:14
269:16 279:18
282:25 302:21
310:4 316:24
317:2 320:18
341:9 351:14
353:7,19,20
364:8

**surely** 56:16
**surplus** 170:8
**surprise** 224:10
365:6,9
**surprising**
224:11
**surrounding**
157:8 284:10
**swap** 300:10
301:2
**swapped**
289:21
**swapping**
290:5 300:7
**swear** 6:1
**swearing** 8:1
**switch** 22:2
**switched** 22:6,7
361:4,14,17
**sworn** 7:2,25
388:6 392:14
**synopsis** 3:17
**system** 45:20
45:24 172:19
**systematically**
237:5
**systems** 14:1,8

**t**

**t** 1:7 388:1,1,1
389:1 391:3,3
**table** 130:15
206:12 271:15
352:13 353:2
**tables** 84:7
257:13 382:18

**tabulating**
340:20
**tail** 196:21
288:25 291:2
297:13
**take** 5:9 10:5,7
10:8 12:24
13:14,19,22,25
14:2 23:24
45:1 61:12,16
70:10 79:2
80:4 81:7,16
81:18 84:19
86:6,7,9,15
95:2 102:22
112:19 113:7
134:23 138:3
138:18 157:7
160:8 164:9,12
179:18 186:7
196:5 228:22
239:14 272:5
289:10 308:19
324:21 331:18
346:17 373:14
**taken** 1:18 5:12
189:14 202:3
205:16 240:5
247:21 330:23
331:5 371:4
383:17 388:7,8
388:10
**takes** 320:22
321:18 363:7

**taliaferro**
307:20 315:17
318:14
**talk** 12:16 20:2
26:21 27:14
31:7 49:20
51:18 58:10
62:9 84:3,4
97:14 101:10
123:3 133:21
137:21 158:9
171:10 183:6
183:20 185:8
192:4 212:16
256:13 262:10
262:12 268:4
271:2 290:20
292:19 312:21
332:15 333:10
340:3 355:20
357:20
**talked** 15:16
16:25 37:18,19
42:19 46:7
49:10,15 61:17
61:20 83:24
86:19 100:22
108:4,14
121:23 131:10
133:15 158:4
181:14 198:23
204:9 243:10
252:13 261:20
262:3 263:6,12
268:2 271:11

277:22 283:12
283:12,13
291:6,10 334:7
336:17,19,24
338:25 339:9
357:24 377:3
381:18 382:12
383:11 384:19
384:20,25
385:3,12
**talking** 30:7
42:16 43:19
45:13 50:2
55:1 56:22
62:12 68:14
79:15 87:19
127:16 131:24
137:21,25
142:5 147:11
182:24 219:25
240:24 241:24
242:1 262:7
267:6,17
276:23 298:15
300:6 317:9,10
325:12 330:10
350:22 355:15
360:5 379:12
**talks** 265:13
**tallahassee**
374:24
**tallied** 268:12
268:14 340:15
**tallying** 269:18

**task** 115:5
**tasked** 30:21
**taylor** 2:14
5:18 6:9
**taylorenglish...**
2:16 390:2
**teaching** 379:5
**team** 19:12
**technical** 48:10
48:15
**technically**
301:6
**technique** 92:3
**techniques**
385:13,15
**tell** 9:20,25
153:7 154:22
176:20,24
177:4,12,14,25
178:4 259:19
269:5 280:9
330:14
**tells** 175:11
176:24 258:9
**ten** 81:5 171:3
172:6,7,10
181:1,5 197:10
224:21 292:13
297:6 369:13
376:9 378:15
**tend** 233:12
**tendency** 67:22
232:6,22
236:16

**tennessee** 24:10
**tenure** 21:22
**term** 16:6
78:17 91:11
171:8,13
**terminology**
181:11
**terms** 70:23
87:21 93:4
107:16 110:1
119:9 126:20
130:3 140:11
140:21 150:25
170:12 183:19
187:10 189:5
211:9,14 262:7
266:10 275:23
319:25 332:7
335:4 340:20
**terrain** 162:13
**territory**
136:21 157:8
182:22 223:19
282:17,18
359:11,12
**test** 94:11,13
379:5
**tested** 13:15
140:15,16
**testified** 7:3
30:13 33:4
34:18,20 36:9
37:20,21,23,25
40:23 41:11
42:1,9,21 43:2

49:8,13 141:19
141:20 143:21
143:24 149:5
**testify** 39:12
41:2 42:15
44:8 47:2 49:6
388:6
**testifying** 8:6
31:3 38:2
39:15 40:14
48:7
**testimony**
10:24 11:4
27:17 30:12
34:13,16,25
35:2,17,19
37:9,12 40:7
40:10,16 41:5
41:12,17 42:3
118:4 144:3,11
144:21,22,23
163:12 390:9
390:18 392:8
**tests** 138:10
**text** 214:4
281:15 289:20
346:5 358:23
375:22 382:20
**thank** 7:22
12:11 62:14
77:2,20 102:20
142:21 145:24
214:10,14,20
241:17 280:4
281:4 297:15

325:2 380:16
**thanks** 314:7
**that'd** 235:10
**theme** 165:22
267:21
**thesis** 14:6,11
16:14
**thing** 10:6 48:8
133:22,23,24
136:18 149:8
179:9 202:13
280:4 340:11
353:22 373:21
376:22 383:18
**things** 19:18
34:21 55:6,9
60:17 70:24
72:16 83:21
84:10 94:10
100:14 106:5
107:17,20
121:12 129:11
129:18 130:23
131:23 133:14
133:24 134:6
136:24 138:20
138:22 211:13
220:8 245:4
255:17 256:3
257:9 312:19
335:8 336:13
339:2,24
363:23 372:19
382:15 385:13

**think** 10:22
13:8 14:25
15:8 16:16
21:22 22:11
23:18,22 24:1
24:25 28:14,20
29:3,14,17,21
31:11,14,18,22
32:1,13 33:3
33:20,21 35:3
35:23 37:12,16
39:14,16 40:11
40:12,15 41:4
41:20,24 42:7
42:23 43:11
45:18,22 46:8
46:17 47:12
48:13 50:13,17
51:4,14 52:2,5
53:13,20 54:17
56:9,13 57:4,5
57:21 59:13,25
65:2 66:25
67:3,4 69:1,25
71:21 72:11,12
72:14,16,25
76:10 79:18
80:24 81:11,20
82:18 84:9
89:5 93:18
94:19 98:16
100:18,25,25
104:3,21 105:8
108:15,17
110:1 112:15

118:11 121:23
124:18 126:9
126:11,16
128:23 129:3
131:20 135:12
135:12 137:6
139:1,9,14,20
140:2,6,15,23
141:17 142:8
150:15,16,17
152:13,20
154:15,16,20
156:22 157:4
159:22 160:2,6
161:22,25
163:16 165:2
165:21 167:17
171:15 172:1
173:23 175:11
181:15 186:9
188:11,22
191:8 195:25
197:11,16,25
198:1 201:14
202:10,25
203:1,19
204:20,20
205:6 212:23
213:15,19
218:2 219:9
222:14,15,21
223:15 224:20
227:10,20
228:2 229:4
230:23 233:4

233:18 234:1,6
234:10 235:10
235:11,14,16
235:25 236:6
236:14,15,23
238:23 242:22
242:22 243:3
243:12,13,15
243:15 244:21
244:24,25
246:9,21 247:6
247:17 248:6
248:17 249:14
249:15,24
250:7,13 252:7
257:3,7,10
260:19,22
261:1 262:14
263:1,4 266:25
268:20 271:4
273:24 276:14
279:1,23
281:14,18
283:11,12
286:10,10
291:25 292:6
293:24 299:4
301:9 305:19
307:21 310:21
315:19 316:24
317:2 318:19
322:2,8,16
325:14 330:25
331:8 335:19
336:18,25

342:10,11
343:3,6 346:4
352:4,8 353:23
355:15 357:20
360:16,20,25
361:13 362:2
363:12,13
367:9 369:17
370:7,15,15
373:5,17
374:13,16,24
374:25 378:2
378:12,12
380:23 382:19
385:12,18
**thinking**
118:22 155:19
313:15
**third** 132:24
180:10 295:4
**thirds** 332:23
**thomas** 374:14
374:14
**thomasville**
352:5 373:13
373:19,22
374:14,16,23
375:9,10 377:4
383:18,20
**thorough**
175:18
**thought** 44:9
68:12 105:19
117:13,16
120:18 123:16

140:17 214:12
220:19 221:8
255:16 260:8
276:7,9 291:17
310:4 321:17
337:2 348:9
379:17
**thousands**
52:11 118:1
**three** 31:11
58:25 60:7
70:24 96:21
180:18 197:9
217:14 220:15
220:23 227:23
229:1 261:22
269:8 270:12
272:23 285:16
286:6 287:10
288:3,18,23
292:25 294:6
296:21 297:21
298:2 299:18
309:21 316:17
372:7 376:14
**threw** 35:12
**thrust** 102:6
**thursday** 5:3
**tie** 78:14
**tighter** 233:13
**tightly** 207:6
**time** 5:7 7:22
10:6,12 15:19
16:7,16 18:17
19:21,24 20:14

21:22 22:12
28:7,20 38:15
43:14 46:9
64:2 65:20
69:17 80:9,17
81:8,11 82:5,6
82:9,11,14,15
87:9 88:20
107:15 147:20
150:19 151:6,9
171:11 174:4,5
292:24 387:15
388:8 390:19
**timeframe**
390:8
**times** 25:7,19
46:10,12 47:5
110:13 114:1
124:16 128:15
136:18 165:5
176:23 180:18
216:20 367:16
367:17 368:6
368:13
**title** 280:8,15
280:18
**titles** 280:7
**today** 7:23
10:16,25 48:3
58:15 59:10
61:14 62:4,7
68:11 74:23
181:22 384:19
**today's** 59:5
60:8

**together** 32:14
80:21 110:10
164:23 166:21
236:21 243:9
271:15 309:22
385:2
**toggle** 346:18
**toilet** 32:22
**told** 144:20
**tolerable**
158:11
**tolerance** 154:8
**took** 8:5 12:25
13:2,16 28:6
39:4 80:24
82:11 135:3
155:6 174:4,5
263:9 282:5
331:15,20,24
361:20 368:8
**tool** 154:20,21
154:22 236:25
285:2
**tools** 156:4,10
**top** 27:18 47:8
101:2 147:24
160:6 167:12
177:19 178:2,5
271:9 276:20
276:21 279:18
341:6,16
345:25
**topic** 105:23
**total** 32:9 103:6
172:4 175:21

180:7 272:1,9
272:22,23
294:6,11,13
333:18 335:25
380:20
**towards** 196:21
**town** 84:24,25
85:2 86:11
109:22 113:14
113:15,18,22
114:1
**towns** 80:18
85:1,20,22
109:21 114:2
119:13 273:6
**trade** 2:8
111:12 112:3
112:14 113:11
113:13 115:19
**trades** 376:16
**traditional**
66:18,23 68:5
70:6 83:3,5
85:15 116:11
116:14,15
119:16 120:18
120:20 131:7
131:13,13
132:10 133:7
134:4,12 136:2
137:9 159:4,20
161:1,6,11,17
161:20 175:4
175:10,15
177:7,9 215:4

215:19 216:1
246:5 247:1
249:20,23,25
250:4,10,14,20
251:2,10,12,19
252:2,5,14,21
253:2 305:9,17
305:25 307:22
319:9,25
320:16 334:10
334:11,16
337:14,16,22
337:25 345:3
377:23 382:24
383:1,7,10,25
384:6,7,14
**traditioning**
134:12
**train** 20:4
**trained** 52:10
**trainers** 21:13
**training** 19:10
19:25 20:2
21:12 52:4,7
**trainings** 21:15
**transcribed**
8:10
**transcript** 8:21
387:4,5 388:10
388:11 390:6
390:20 392:5,8
**transcription**
388:9
**transferred**
311:2

**transit** 322:23
325:20 326:10
**transition**
18:17
**transportation**
111:4 121:13
123:3,4,6,8,10
123:12 128:10
128:21,25
346:9,13
374:17 375:2
**travel** 15:24
**treat** 119:18
**treated** 90:24
**treatment**
188:21
**trial** 11:10
27:16,20 28:5
28:6,8,25 30:5
30:14 34:6,8,9
34:10 35:1,6,6
35:8,10,11
38:4 40:7,10
40:12,13 41:11
41:12,17 42:2
42:3,15 44:3,5
44:6,12
**tried** 20:8
23:18 76:20
79:12 84:5
126:22 137:11
156:24 158:16
166:20 187:14
209:8

**trouble** 194:16
**true** 142:4
202:13 225:8
231:20 270:3
271:21 315:24
318:4 329:17
387:5,8 388:10
392:8
**truth** 388:6,6,7
**truthfulness**
8:1
**try** 8:25 55:7
55:14 78:8
89:8 109:21
134:1 157:23
351:5
**trying** 24:24
26:19 47:18
72:19 76:6
88:4 95:13
96:3 98:12
122:18 133:14
133:16 134:14
134:15 140:5
155:25 184:24
185:18 187:11
188:21 189:3
221:18 242:22
252:7 253:3
258:5 260:20
260:21 261:9
269:13 299:23
311:9 368:12
368:14 379:6

| | | | u |
|---|---|---|---|

turn 11:19
89:19 93:23
131:4 149:25
159:9 162:14
165:14 173:3
238:15 240:22
241:19 272:17
284:18 342:13
354:6 364:3
369:11
turned 38:25
88:24 89:18
91:22,24
turning 121:5,8
359:20
turns 135:3
twiggs 318:12
two 12:25 13:2
31:11 32:3
40:25 51:5
54:10 59:3
61:20 72:16
82:24 84:25
103:5 109:20
130:7 133:24
136:23 147:3
147:21 153:6
155:11 157:10
157:11,15
168:19 176:7
176:11 177:23
183:15,17
187:15 189:22
194:9 195:7
197:9 198:14

198:22 201:4,5
202:4,14,18
203:6,7,9,14,18
204:11,13
205:19 206:4
217:17 219:22
220:13,14
222:25 224:17
224:23 225:15
229:1,19
252:12 255:22
255:23 256:8
259:25 260:1
265:3 269:7,8
271:2,4 273:19
275:5 277:5
283:5,17 286:4
286:5,7,7,12
288:3 292:24
295:18 301:2
311:12 332:23
343:7 346:3,7
346:10,19,22
346:25 350:10
350:18 351:24
353:9 365:10
366:19 374:18
374:20 378:8
type 75:18
189:24 237:2
types 52:10
249:4 385:7
typical 237:11
237:15,24
238:8

typically 21:11
typo 167:17
tyson 2:13 6:7
6:8 11:7,13,15
11:17 12:11
26:15 50:10
51:2 53:5 57:7
57:12 69:1
71:22 102:19
102:20 114:14
118:7 142:20
142:21 145:23
145:24 153:8
182:5 194:18
195:3 238:10
238:18 239:2,5
239:8,13,16,19
240:3,17
241:12,17
259:6 265:9,20
274:18 277:9
278:6 279:24
280:2 294:11
294:17 301:12
301:16,18
306:3 318:25
320:3 340:7,10
345:7,9 349:4
364:7,13
368:18 372:13
376:23 378:2,5
378:11,14
380:3 385:21
390:1

**u**

u 32:20 94:11
94:13 389:1
u.s. 5:16 23:7
87:16 103:19
uh 40:18 69:8
84:15 85:10
99:24 100:1
102:11 164:13
194:5,22,25
195:3 197:15
206:1 215:7
219:14 229:17
279:12 319:15
326:2 335:15
340:7 363:15
ultimate 256:4
267:10
ultimately 31:1
38:20 142:1
222:9
unclear 42:23
48:9
uncompact
140:22
unconstitutio...
141:17
under 7:25
22:14 45:25
90:21 287:11
287:22 301:4
309:19 323:21
333:4 351:20
374:5 387:14
388:9 389:9

**undergraduate**
 14:15
**underlying**
 75:20 85:6
 267:21
**underneath**
 84:23 93:8
**understand** 8:3
 8:7,13,16 9:12
 9:18,20,21
 10:1,2 17:2
 47:18 49:21
 50:2 51:7 52:2
 54:12 65:21
 66:20 68:11
 76:6 95:13,18
 96:4,9 97:11
 98:10,12 134:9
 165:16 181:11
 184:15 185:18
 186:9 187:11
 207:3 237:21
 238:12 265:10
 267:16,25
 269:13 277:11
 299:23 311:9
 311:17 353:7
 375:19
**understanding**
 28:2 35:14
 36:20 37:14
 44:24 46:2
 49:21 54:23
 71:3 91:21
 93:21 108:5

 109:2 116:23
 145:5,8 150:7
 154:10 235:17
 257:20 364:23
**understood**
 9:14 26:23
 54:8 87:23
 104:13 118:14
 147:20 164:14
 166:1 184:6
**undid** 332:2
**unfair** 312:12
**unify** 115:19
**unifying**
 328:11
**unincorporated**
 119:14 162:4
**union** 2:3 6:3
**unit** 5:11
**united** 1:1
 117:7 323:19
 334:15
**uniting** 377:23
**universities**
 346:25
**unlabeled**
 219:16
**unnecessary**
 104:15
**unnumbered**
 219:18
**unpair** 135:4
**unsplit** 79:7
 333:15 379:14

**unsplitting**
 384:22
**unsure** 215:16
**unusual** 126:15
 374:16
**update** 54:23
**upheld** 33:3
 34:7 142:1,4
**ups** 165:19
**upside** 20:7
 32:20
**urban** 121:15
 124:11,18
 287:1 288:20
 299:3 313:11
**use** 11:10 14:4
 14:10 15:3
 20:10 24:1
 48:12,16 77:11
 96:20 99:15
 104:25 106:23
 107:7,10,13
 138:12,23
 156:9 163:5,24
 164:4 171:16
 172:9,21
 174:14 175:8
 258:5 262:17
 262:19 280:22
 289:5 290:8
 291:8,16
 296:12 308:21
 310:6 332:14
**used** 14:2,6,8
 14:11,12 20:12

 28:7 32:25
 40:13 91:10,13
 91:14 92:3,6
 92:17,19 96:24
 97:8 99:19
 100:9 101:5,22
 106:25 107:25
 108:13 118:18
 131:21 132:4,5
 138:8 139:2
 151:1,12
 155:19 156:1
 158:15 161:8
 161:19 164:4
 171:8,15
 253:10,17
 262:19,21
 263:20 266:23
 269:3 290:1
 314:19 345:13
 363:2,9 390:20
**useful** 154:16
 154:21 156:5
 236:25 260:9
**using** 97:7
 100:3 144:1,8
 160:18 183:11
 256:15 262:14
 268:15,19
 288:21,24
 290:1 298:5
 300:6 334:20
 340:16 364:4
**usual** 389:13

**usually** 24:1
106:14 133:20
133:21 137:1
**utilized** 297:25
**utilizes** 297:20
309:24 310:3

**v**

**v** 3:16,18 390:4
391:1 392:1
**v.r.a.** 205:5,11
226:10,16
**v.t.d.** 177:12
266:6 286:8
335:21 342:9
342:14,17
370:19 371:8
**v.t.d.s** 156:16
294:4 331:6,9
342:25 354:11
367:2 370:24
376:22 379:25
**valid** 124:19
**valley** 121:15
123:25 124:6
**value** 48:15
353:25
**variable** 119:21
**variables** 77:5
**variation** 159:8
**variations**
178:20
**various** 52:10
192:24 204:24
320:25

**vary** 119:23
**vein** 243:21
**verbal** 283:21
**verbally** 206:11
**verified** 341:9
**verify** 344:4
390:9
**veritext** 5:21,23
387:1,4,7,13
389:6,7,8,10,13
390:14,23
**veritext.com.**
387:12 390:15
**vermont** 24:5
97:1,1,4,6
**versions** 83:23
**versus** 5:15
82:8 150:8
151:12 179:3
179:22 180:15
193:22 216:6
217:8 226:24
269:11,12
272:21,22
273:23 275:10
296:3 297:6,8
341:18 352:1
**vesilind** 3:16
3:18 30:14
31:9,12 33:2
33:11 37:19
40:22 141:8
145:21 146:3
**video** 5:2,8,11
45:4,10 127:3

127:11 196:9
196:15 239:21
240:1 325:3,9
385:24
**videographer**
2:19 5:1,21
6:12 45:4,10
127:3,11 196:9
196:15 239:20
240:1 325:3,9
385:23
**videotaped**
1:17 8:19
**view** 71:19 72:4
72:14 109:14
126:13 130:14
140:20 161:5
175:8,14,17
178:9 207:9
215:13,22
270:15,20
**viewed** 159:18
160:24
**violated** 38:18
**virginia** 3:16
3:18 7:21 24:9
26:3 30:11,11
30:15,18,22
31:8 33:24
36:10,22 122:4
124:4 141:4
142:1,17 145:6
149:3
**virtually** 279:2

**visible** 129:1
235:23
**visual** 204:17
267:20,23
290:6
**visualize**
162:22
**visually** 125:12
125:13 188:24
195:19 199:14
233:6 289:7
346:18
**visuals** 268:1,1
**vitae** 3:10
**volume** 14:22
**volumes** 15:6
**voter** 106:16
**voters** 90:20
91:5 125:22
288:19 289:25
308:20
**voting** 44:23
45:25 76:21
103:11 104:1
112:20 114:1,4
114:5 116:7,19
116:24 117:4
117:11,19,20
118:2,3 119:15
121:1,3 125:15
125:15,17,19
125:21 151:5,7
163:21 165:22
173:19 174:11
174:14 177:10

177:15 181:3
182:2 193:8
208:5 209:9
230:21 231:8
231:18 248:2,4
258:25 264:18
264:20 265:18
266:5 267:21
268:16,20
271:23 277:20
278:4 289:13
315:11,13
333:7 366:20
377:16
**vs** 1:11

**w**

**wait** 8:25 9:3
285:24,24,24
285:24 322:6
**walton** 153:12
182:14,23
183:11 190:14
190:16 191:4
323:17
**want** 7:23 11:8
12:15 23:24
27:14 32:24
41:12 56:18
58:9 62:9
75:18 77:16
97:14 101:10
102:22 103:3
112:19,20,21
113:23 115:14
132:21 134:25

140:25 148:18
152:5 153:20
160:8 168:7
172:20 178:13
184:15 201:3
214:6 224:16
229:13,14
240:4 241:20
254:18 256:10
257:8 267:5,7
268:5 280:1
283:2 292:10
301:12 337:4
**wanted** 24:17
29:23 59:21
102:4 195:17
214:10 239:10
255:20,25
269:2 352:15
**wanting** 29:18
356:21
**warren** 308:11
309:17 310:22
310:23 311:6
316:22
**washington**
315:6,10
316:15,22
317:13
**water** 79:15
86:5,18 107:19
162:11 324:22
**watersheds**
121:14

**watts** 22:14
**way** 10:14 17:3
19:11 24:24
33:9 38:21
60:17 76:19
79:24 81:18
85:12 90:24
91:19 92:25
98:2 112:4
113:1 114:21
114:25 115:24
125:16 132:4
132:11 140:9
151:10 157:22
158:6 161:4
164:19 167:22
168:17,20
169:21 176:2
176:14,18
179:13 184:16
197:20 198:3
198:15,20
207:19 209:15
210:9,10
211:20 212:9
215:15,17
230:6 231:17
233:19 234:2
236:1 249:16
255:4,16 260:2
262:13 264:13
280:5 281:17
284:25 286:20
289:2 290:13
290:19 293:21

302:17 308:23
308:25 310:11
310:12 312:4
312:15,19
323:16 324:5
324:19 325:13
327:12 332:14
341:3 345:17
355:11 357:8
360:8,10
376:13 377:14
379:9,18,23
385:17 388:14
**ways** 92:21
109:10 114:13
114:19 115:4
130:7,16 140:4
168:19 171:15
229:3 242:25
248:7 288:24
302:22 309:1
339:17,18
368:7 379:8
384:21
**we've** 15:15
16:25 42:19
46:7 47:7
83:23 108:14
240:5 245:6
282:12 291:6
336:16,19,24
383:11,12
384:2,3,18,20
**week** 51:5

weeks 81:2
weight 37:13
  119:20,22
weights 119:8
went 13:11
  29:6,8 44:2
  45:18 52:25
  79:5 85:12
  277:12 339:14
west 167:6
  306:14
westlaw 3:16
westmoreland
  87:9
whereof 388:15
whichever
  369:2
whispering 5:5
white 290:13
  291:5 294:9
  314:1 321:25
  323:11 360:1
  362:7 366:25
  383:18 385:4
whiter 288:20
  363:17
why'd 167:21
  195:7
widths 138:16
wild 178:19
wilkes 310:17
  312:20 313:23
  314:14,17
  315:21 316:15
  319:17 320:12

321:18 330:10
330:17 331:5,7
331:13,16,24
332:8,12 334:5
334:6 336:10
wilkins 144:16
william 3:22
wilmer 2:8 6:5
  389:8
wilmerhale.c...
  2:10
win 20:5,17,21
  21:9 22:5
window 50:24
  51:5
wisconsin
  24:11
witness 3:2 6:1
  6:25 12:6
  36:23 37:1
  46:4 47:2 53:8
  62:22,23 67:9
  67:10 69:9
  83:15,16 99:18
  99:19 114:16
  141:13 153:9
  160:11,12
  182:6 194:19
  195:4 204:15
  204:16 210:20
  210:21 238:11
  240:10 250:24
  250:25 259:7
  265:10,21
  274:19 277:10

278:7 280:3
294:13,21
301:17,19,21
306:4 319:1
320:4 326:4,5
345:8,10 349:5
364:8,14
368:19 372:14
376:24 380:4
385:20 386:5,7
387:9 388:5,15
390:8,10,12,19
wondering
  317:18
woods 1:8 7:13
word 34:15,15
  115:8,23
  246:12,12
  288:21 289:5
  290:9 291:8,16
  296:12 332:15
words 72:13
  301:4 340:6
  380:5
work 7:19 14:3
  14:4 15:24
  16:7 17:15
  19:23 20:25
  21:3,9 22:23
  22:24,25 23:11
  23:13,16 24:2
  24:4,6,8,8,10
  24:12 25:8,20
  25:24 26:25
  27:15 79:6

87:11 281:7
310:15 327:13
327:15
worked 14:9
  15:20 17:7,12
  18:4,9,10
  22:17 23:19
  24:14 25:5,13
  25:15,16 26:1
  26:2,12,20
  27:1,6,9 30:19
  30:20,25 34:24
  36:2,7 38:10
  38:14 52:9
  87:4,15 88:11
  94:22,24
  143:24
working 17:4
  17:11 26:9,14
  28:12,15,16
  44:17,20
  385:16
works 65:20
  79:11 113:6
world 2:8
  16:13 183:16
worse 358:8
worth 373:15
wow 62:14
  224:10
write 53:23
  54:1,4 63:15
  64:1 375:22
writing 210:5

**written** 8:21
213:24 214:16
214:18 253:25
303:19 382:20
**wrote** 37:7 39:6
54:6 64:8,19
66:10 273:9
303:20

**y**

**yeah** 11:6,13,14
22:11 24:23
31:5 37:12
40:25 46:17
57:12 60:4
61:6,7 63:9,18
63:24 67:13
72:3 75:3 80:8
87:12 88:9
95:15 96:22
98:12 110:21
113:3,10,24
120:13 123:1
124:25 128:11
129:11 137:4
141:6 142:8
149:12 153:13
154:8 160:2,12
162:10 166:2
166:12,15
168:20,23
169:16 170:11
171:17 172:18
178:24 179:24
180:6,9,12,25
189:19,22

191:2,12 194:7
195:4,5 197:5
197:11 198:15
198:20,21,23
201:9 202:9
203:24 204:16
204:20 207:15
209:6 211:4
214:1 215:9
216:16 217:25
218:16 219:8,9
219:10,23
220:13 221:2
222:21,25
223:11,16
227:2,5,14
228:9,19 229:4
230:8 231:11
235:14,24
236:22 238:11
239:18 241:14
242:15 243:19
243:22 247:17
248:17 256:19
258:1 261:9
272:25 273:25
274:10,15
275:17 276:14
277:21 279:24
280:2 282:1
283:13 284:15
286:1 290:16
294:13,17,19
295:24 297:3
298:19 299:10

299:17 300:2
301:11,16
307:16 308:3
316:20 319:1
322:7,8 323:3
330:22 333:5,8
336:2 348:8
359:19 364:23
365:4,19 379:2
381:13 385:19
**years** 22:10
52:10
**yep** 146:12
149:16 198:24
213:23 251:9
292:12 314:25
343:13
**yield** 208:1,10
208:14
**york** 2:4,4,9,9
24:7

**z**

**z** 7:20
**zabel** 2:7 6:5,5
150:2 181:17
261:22
**zero** 171:6
**zip** 105:17
**zones** 121:17
129:5
**zoom** 6:10,13
**zooming**
371:16

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 1

J. Morgan

**EXHIBIT- 1**

2/9/2023

# JOHN B. MORGAN
*Curriculum Vitae*

**Redistricting Background and Experience**

- Performed redistricting work in 20 states, in the areas of map drawing, problem-solving and redistricting software operation.
- Performed demographic and election analysis work in 40 states, for both statewide and legislative candidates

*2021-2022     Redistricting Cycle*
- Mapping expert for Michigan Independent Citizens Redistricting Commission
- Mapping expert for Virginia Redistricting Commission
- Mapping expert for New Jersey Congressional Redistricting Commission
- Mapping expert for New Jersey Legislative Redistricting Commission
- Staff analyst for New Mexico Senate Republican caucus – Dec. 2021 special session
- Mapping consultant to Indiana State Senate Republican caucus
- Mapping consultant to redistricting commissioners in Atlantic County, New Jersey
- Drafted county commission districts for Sampson County, North Carolina
- Drafted wards for town of Brownsburg, Indiana

*2011-2012     Redistricting Cycle*
- Served as a consultant for:
    - Connecticut Redistricting Commission
    - Ohio Reapportionment Board
    - New Jersey Legislative Redistricting Commission
    - New Jersey Congressional Redistricting Commission
    - Pennsylvania Legislative Reapportionment Commission
- Drafted Wake County, North Carolina school board districts
- Drafted county commission districts in Sampson and Craven counties in North Carolina and Atlantic County in New Jersey
- Worked with redistricting commissions in Atlantic and Essex counties, New Jersey.
- Worked on statewide congressional, legislative, and local plans in the following states: Connecticut, Indiana, Kansas, Missouri, New Jersey, New Mexico, North Carolina, Ohio, Pennsylvania, South Carolina, and Virginia
- Plans drafted by Morgan adopted in whole or part by the following states: Connecticut, Indiana, New Jersey, New Mexico, North Carolina, South Carolina, Virginia.

*2001-2002     Redistricting Cycle*
- Worked on statewide congressional and legislative redistricting plans in the following states: Florida, Georgia, Indiana, Iowa, New Jersey, North Carolina, Pennsylvania, Rhode Island, and Virginia.
- Dealt with redistricting issues as a member of the Majority Leader's legislative staff in Virginia House of Delegates. Drafted alternate plans for use by the minority parties in

1

Rhode Island. Drafted alternate plans for use by legislative leadership in considering plans drawn by redistricting commission staff in Iowa.

*1991-1992   Redistricting Cycle*
- Worked on statewide congressional and legislative redistricting plans in the following states: Florida, Illinois, Indiana, Michigan, New Jersey, New York, Pennsylvania, Wisconsin.
- Focused primarily on Voting Rights Act issues with Black, Hispanic and Asian communities.
- Federal court incorporated portion of legislative plan drafted in part by Morgan for Wisconsin into final decree, finding the configuration superior to other plans in its treatment of minority voters.

*Expert Experience and Trial Testimony*
- Recognized as an expert in demographics and redistricting in *Egolf v. Duran*, New Mexico First Judicial District Court, Case No. D-101-CV-2011-02942, which dealt with New Mexico's legislative plans.
- In *Egolf v. Duran*, the Court adopted a House redistricting plan principally drafted by Morgan.
- Filed expert reports in *Georgia State Conference of NAACP v. Fayette County Board of Commissioners.*
- Filed expert reports and expert testimony in *Page v. Board of Elections,* Eastern District of Virginia; provided expert testimony at trial.
- Testified at trial in *Bethune Hill v. Virginia Board of Elections* and *Vesilind v. Virginia Board of Elections.*
- Filed expert report in *Georgia NAACP v. Gwinnett County.*
- Filed expert reports and expert testimony *Alpha Phi Alpha v. Raffensperger; Grant v. Raffensperger; and Pendergrass v. Raffensperger*

## Education
- Bachelor of Arts degree in History from the University of Chicago
- Graduated with honors.
- Bachelor's Honors thesis on "The Net Effects of Gerrymandering 1896-1932."
- Demographic study on LaSalle, Illinois was published in *The History of the Illinois and Michigan Canal, Volume Five.*

## Employment
- President of Applied Research Coordinates, a consulting firm specializing in political and demographic analysis and its application to elections and redistricting, 2007 to present
- Redistricting consultant for many legislatures and commissions:  1991, 2001, 2011, 2021
- Executive Director, GOPAC (Hon. J.C. Watts, Chairman), 2004-2007
- Vice-President of Applied Research Coordinates, 1999-2004
- National Field Director, GOPAC (Rep. John Shadegg, Chairman) 1995-1999
- Research Analyst, Applied Research Coordinates 1991-1995
- Research Analyst, Republican National Committee 1988-1989, summer

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., *et al.*, | |
| *Plaintiffs*, | CIVIL ACTION FILE NO. 1:21-CV-05337-SCJ |
| v. | |
| BRAD RAFFENSPERGER, | |
| *Defendant.* | |
| ANNIE LOIS GRANT, *et al.*, | |
| *Plaintiffs*, | CIVIL ACTION FILE NO. 1:22-CV-00122-SCJ |
| v. | |
| BRAD RAFFENSPERGER, *et al.*, | |
| *Defendants.* | |
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.* | |
| *Plaintiffs*, | Case No. 1:21-CV-5338-ELB-SCJ-SDG |
| v. | |
| STATE OF GEORGIA, *et al.,* | |
| *Defendants.* | |

J. Morgan
**EXHIBIT- 2**
2/9/2023

## EXPERT REPORT OF JOHN B. MORGAN

Pursuant to 28 U.S.C. § 1746, Federal Rule 26 (a)(2)(B), and Federal Rules of Evidence 702 and 703, I, JOHN B. MORGAN, make the following declaration:

## INTRODUCTION

1.      My name is John B. Morgan. I am over the age of 21 years, and I am under no legal disability which would prevent me from giving this declaration. If called to testify, I would testify under oath to these facts and opinions.

2.      I hold a B.A. in History from the University of Chicago. As detailed in my CV, attached as Exhibit 1, I have extensive experience over many years in the field of redistricting. I have worked on redistricting plans in the redistricting efforts following the 1990 Census, the 2000 Census, the 2010 Census and the 2020 Census. I have testified as an expert witness on demographics and redistricting.

3.      I am being compensated at a rate of $325 per hour for my services in this case.

4.      The redistricting geographic information system (GIS) software package used for this analysis is Maptitude for Redistricting 2021 from Caliper Corporation. The redistricting software was loaded with the census PL94-171 data from the Census Bureau and the census geography for Georgia. I was also provided with election data files used by the Georgia General Assembly during the

2

redistricting process. The full suite of census geography was available, including counties, places, voting districts, water bodies, and roads, as well as census blocks, which are the lowest level of geography for which the Census Bureau reports population counts. Census blocks are generally bounded by visible features, such as roads, streams, and railroads and they can range in size from a city block in urban and suburban areas to many square miles in rural areas.

## SCOPE AND DATA

5.    I have been asked to review the House of Representatives and State Senate plans considered and adopted by the Georgia General Assembly. I was asked to draw a "blind" plan that did not consider race or incumbency or past redistricting plans for Georgia. This plan did consider other traditional redistricting principles. Using my expertise, I proceeded to draw a plan for the House and then a plan for the Senate. I then compared the illustrative plans to the enacted plans and drew conclusions about the impact of racial considerations on the enacted plans.

6.    In preparing this analysis, I was given the block-equivalency files of the 2021 adopted plans and incumbent databases used by the Georgia General Assembly during the redistricting process. The incumbent databases list the address locations and districts of the Representatives and Senators serving prior to the 2022 elections under the existing House (2015-enacted) and Senate (2014-enacted) plans.

3

I was also given the redistricting guidelines used by the Georgia General Assembly during the redistricting process.

7.     I loaded the 2021 House and 2021 Senate plans enacted by the Georgia General Assembly into the Maptitude for Redistricting software using the block-equivalency files provided.  I loaded the incumbent databases provided.

8.     Using the Maptitude for Redistricting software, I created district summary files for the 2021 adopted plans.  These summary files listed information for each district such as: the deviation from ideal district size, total population, and percentages for black population, any-part Black voting age population.

## REDISTRICTING PROCESS AND SOFTWARE

9.     The mapping software is a significant tool in the redistricting process.  How does the geographic information system (GIS) software work to help the map drawer?  At its core, there is a geographic hierarchy and a corresponding data hierarchy.  It can be said that the data is attached to geographic units.  Starting with a state, the state is subdivided into non-overlapping geographic units of counties (or parishes, in Louisiana and boroughs in Alaska).  In some states, counties are subdivided into non-overlapping geographic units of townships or municipalities.  (This type of subdivision of counties is typical in New England, mid-Atlantic and

midwestern states.)  The federal government, via the Bureau of the Census, generally adopts the state-established boundaries for counties, parishes, and boroughs.

10.    Below the level of the county there are towns, townships, and cities - these county subdivisions are generally referred to by the Census Bureau using the term minor civil division (MCD).  (The Census Bureau also generally adopts state-established boundaries for incorporated and unincorporated places, which might not fit into the hierarchy.)  Where the state does not have these county subdivisions, the Census Bureau generally establishes a county subdivision (MCD) for the state.  The Census Bureau establishes the boundaries of smaller units such as census tracts, census block groups and census blocks.

11.    Thus, the Census Bureau creates a complete geographic hierarchy coverage of each state, which can be envisioned this way:

state > county > MCD > census tract > census block group > census block

However, multiple hierarchies can be established within a state for different administrative needs such as schools, taxing authorities, voting, transportation, environmental concerns, etc.

12.    Here is school hierarchy concept:

*State > county > high school attendance area > intermediate school attendance area > elementary school attendance area*

13.    Here is an election administration hierarchy concept:

*State > county > voting precinct > voter*

14.    In my experience, the practical hierarchy for redistricting in Georgia is:

*State > county > voting precinct > census block*

15.    While there are in fact county subdivisions in Georgia, these are not commonly used in Georgia redistricting in my experience. Each feature of the hierarchy carries data along with it. The data can include a great deal of information. It could be economic – state funding for education purposes, business related – the number of Waffle House restaurants in a county or zip code, or perhaps agricultural – cultivated acres within a county. In the case of redistricting, the data attached to the layers is primarily population and demographic data from the Census Bureau and in many cases election and voter registration data as well.

16.    In a GIS redistricting program, the geographic features within the hierarchy as well as other geographic features are displayed as layers on a map. The map layers are like stacked transparencies for use on an old-style overhead projector (such as might be used to show the various bodily systems – vascular, muscular, skeletal, etc.). The 159 counties in Georgia are a simple example of a map layer. Below the level of the county there are the voting precincts, which is a layer on the map. There are layers for interstate highways, for railroads, streets and roads, for

rivers and water areas, Native American tribal lands, school attendance areas and census blocks. In the current era, additional layers can be used such as topographic and hydrographic features as well as practical information such as Google maps and Google satellite maps. Residency data can be included as layers, such as incumbent addresses. Map drawers will display various pieces of information from those layers as they work to create redistricting maps.

17. In the redistricting process, map drawers consider many factors when drawing districts and must face trade-offs when seeking to balance conflicting considerations. In my experience, some of these factors are referred to as traditional redistricting principles, such as population equality, following civic boundaries, compactness and contiguity, incumbency and preserving existing districts. In his ruling in the *Alpha Phi Alpha* and *Grant* cases, Judge Jones recognized some of these traditional redistricting principles: "maintaining communities of interest and traditional boundaries, geographical compactness, contiguity, and protection of incumbents." (Page 55)

18. Counties, incorporated towns and cities, as well as unincorporated municipalities and voting precincts are examples of traditional boundaries. In my experience, communities of interest can have many definitions. Communities of interest often include things based on socio-economic factors, transportation

corridors, watersheds, mountain and valley communities, urban, suburban and rural areas, and school attendance zones. Geographic features can also define some communities of interest, such as the Okefenokee swamp, coastal Georgia, and the Appalachian Mountains. Communities of interest can include military areas like Fort Benning in Columbus and university areas like the University of Georgia in Athens.

19. In my experience, protecting incumbents, including preserving cores of districts is a traditional redistricting principle. Continuity of district representation is a traditional redistricting factor. Voters and residents establish relationships with their elected representatives. In the House of Burgesses, in the colony of Virginia, Thomas Jefferson was the delegate from Albemarle County. Today, the member elected from that county could be said to hold Thomas Jefferson's seat in the Virginia House of Delegates. A significant root of representative democracy is the concept of a constituency– where a representative is elected from a geographic area to represent constituents. In my experience, some legislators and members of the public refer to geography when talking about districts, such as the Macon seat, Savannah senate seat, the Conyers seat, the Statesboro seat, etc. New England states such as Vermont and Massachusetts still name their legislative seats after their

constituencies – the Addison Senate District, the Washington Senate District, the Cape and Islands District, 3rd Essex District, etc.

20. It may be easy to look at a district shape and say that it looks compact. This occurs when district shapes approximate idealized geometric shapes like circles, squares, and ovals, while also having few or no branches or tendrils projecting out. Most compactness tests compare one shape to another. A redistricting program usually provides several compactness tests within the software. In this analysis, I used to the Reock and Polsby-Popper compactness tests, which are commonly used in my experience and are available in the Maptitude for Redistricting software. The Maptitude for Redistricting User's Manual 2021 defines the compactness tests as follows:

*Reock Test*

*The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact. The Reock test computes one number for each district and the minimum, maximum, mean and standard*

*deviation for the plan. See [Reock 1961] and [Young 1988]. – Maptitude for*

*Redistricting user's manual 2021*

   *Polsby-Popper Test*

   *The Polsby-Popper test computes the ratio of the district area to the*

*area of a circle with the same perimeter: 4πArea/(Perimeter2). The measure*

*is always between 0 and 1, with 1 being the most compact. The Polsby-Popper*

*test computes one number for each district and the minimum, maximum, mean*

*and standard deviation for the plan. See [Cox 1929], [Polsby and Popper*

*1991], and [Niemi, Grofman, Carlucci, and Hofeller 1990].*

**HOUSE ILLUSTRATIVE PLAN**

   21.   To start the districting process, I looked at population distribution

across Georgia. The 2020 census shows that total population for Georgia is

10,711,908.  Looking at the situation for the House first, the number of single-

member house districts in Georgia is 180.  Dividing the total census population

(10,711,908) by the number of house districts (180) yields 59,510.6.  Rounding up,

the ideal population for a Georgia House district is 59,511.

   22.   To better understand the distribution of the population within Georgia,

the population for each county was displayed on a county map in the Maptitude

redistricting program as well as displayed on a spreadsheet.  The Georgia county

with the highest 2020 census population is Fulton County at 1,066,710 people and the county with the lowest population is Taliaferro County with 1,559 people. Dividing the county populations by the ideal district size (59,511) yields the ratio of state house seats per county. Using this method, the ratio of house seats in the largest county, Fulton County is 17.92 and the ratio of house seats in the smallest county, Taliaferro County is 0.03. Fulton County has population enough for almost 18 state house seats and Taliaferro County is three one-hundredths of a single state house seat.

## Map 1 - House district ratios

House district ratios by county 2021



23.     The enacted state house plan has a relative deviation of -1.40% to +1.34% of the ideal population. For purposes of drafting the House Illustrative Plan, I used an overall deviation range of -1.50% to +1.50%.

24.     To provide additional context for communities of interest, I looked at the map layer for cities as well as incorporated and unincorporated places. I attempted to balance keeping counties and voting districts whole and drawing compact districts with the necessity of staying within the population deviation. During the drawing process, I did not use any racial data, incumbency information or the boundaries of the previous districts.

25.     I started drawing some districts in the northwestern Georgia then proceeded into the metro Atlanta area. Having looked at the ratios of the HDs per county, I was aware that some counties could be subdivided evenly into districts within the population deviation (such as Henry and Fayette). Other counties, (such as Walker or Spalding) had a little more population than a House district, so those counties could be kept relatively intact while assigning the surplus population to a nearby seat. I drew some districts in coastal Georgia, southwest Georgia, then central Georgia and completed the districts in metro Atlanta and the rest of the state.

26. After completing the House Illustrative Plan, I looked at the House Enacted Plan and re-numbered the districts in the House Illustrative Plan, such that the district numbers would be similar to the House Enacted Plan.

## Map 2 - House Illustrative Plan

House Illustrative - Statewide



15

**Map 3 Metro Atlanta inset of House Illustrative Plan**



## HOUSE PLAN ANALYSIS

27.    After completing the House Illustrative Plan, I copied the plan and added in the census racial data. I ran a series of reports to compare the House Illustrative Plan and the House Enacted Plan on several metrics. Those metrics included - county splits, voting precinct splits, compactness scores, paired

incumbents and the number of majority 18+AP Black districts. Copies of these reports for House plans are attached as exhibits to this report.

**Chart 1- House Illustrative Plan and House Enacted Plan comparisons**

| Plan metrics | House Ilustr. | House Enacted |
|---|---|---|
| County splits | 54 | 69 |
| Voting precinct splits | 106 | 184 |
| Mean compactness - Reock | 0.45 | 0.39 |
| Mean compactness - Polsby Popper | 0.33 | 0.28 |
| # Paired incumbents | 74 | 20 |
| # Seats majority 18+_AP_Blk% | 35 | 49 |
| # Seats 18+_AP_Blk% is: over 90% | 6 | 0 |
| # Seats 18+_AP_Blk% is: 80% to 90% | 4 | 0 |
| # Seats 18+_AP_Blk% is: 70% to 80% | 5 | 11 |
| # Seats 18+_AP_Blk% is: 60% to 70% | 9 | 15 |
| # Seats 18+_AP_Blk% is: 50% to 60% | 11 | 23 |

*House Region 1 Analysis*

28. For further analysis, I looked at two regions of roughly similar geography to compare the House Illustrative Plan to the House Enacted Plan. Region 1 consists primarily of DeKalb, Clayton, Henry, Rockdale, Newton, and Walton counties. Below are maps of the House districts in region 1 for both the

House Illustrative Plan and the House Enacted Plan. Looking at the districts in the House Illustrative Plan, the districts look compact and only cross county lines in a limited way. By contrast, looking at the districts in the House Enacted Plan, the districts look elongated, and they cross county lines in a number of places. For example, in the House Illustrative Plan only one district crosses out of DeKalb County, whereas in the House Enacted Plan, seven districts cross out of DeKalb County. A review of the mean compactness scores for this region confirms what is visible to the eye. The mean compactness scores for districts in region 1 show that the House Illustrative Plan is more compact as a whole than the House Enacted Plan in this region.

**Chart 2 – Mean compactness scores in House region 1**

| Region 1 compactness scores | House Ilustr. | House Enacted |
|---|---|---|
| Mean compactness - Reock | 0.42 | 0.38 |
| Mean compactness - Polsby Popper | 0.33 | 0.27 |

18

**Map 3– House Illustrative Plan region 1**



**Map 4– House Enacted Plan region 1**



29.     The contrast in compactness leads one to ask why these maps of the region are so different. While there may be many causes, reviewing the compactness of the districts along with the 18+AP Black percentages allows for an analysis of the impact of racial considerations. Below is the data for the House Illustrative Districts and the House Enacted Districts in region 1.

**Chart 3 – Districts in House Illustrative Plan region 1**

| District | [% Black] | [% 18+_AP_Blk] | Reock | Polsby-Popper |
|---|---|---|---|---|
| 052 | 11.8% | 13.9% | 0.43 | 0.38 |
| 075 | 64.7% | 66.2% | 0.52 | 0.36 |
| 076 | 69.0% | 71.3% | 0.52 | 0.41 |
| 077 | 60.5% | 62.6% | 0.42 | 0.35 |
| 078 | 77.1% | 78.9% | 0.3 | 0.21 |
| 079 | 77.9% | 80.7% | 0.56 | 0.36 |
| 080 | 13.6% | 16.1% | 0.43 | 0.25 |
| 081 | 34.9% | 36.6% | 0.39 | 0.41 |
| 082 | 12.6% | 14.7% | 0.36 | 0.37 |
| 083 | 12.1% | 14.6% | 0.38 | 0.36 |
| 084 | 34.9% | 37.6% | 0.37 | 0.23 |
| 085 | 36.5% | 36.3% | 0.54 | 0.36 |
| 086 | 66.2% | 67.9% | 0.44 | 0.31 |
| 087 | 88.3% | 91.3% | 0.38 | 0.28 |
| 088 | 83.4% | 86.0% | 0.41 | 0.39 |
| 089 | 75.7% | 76.6% | 0.42 | 0.39 |
| 090 | 92.2% | 94.9% | 0.4 | 0.4 |
| 091 | 42.2% | 43.1% | 0.21 | 0.18 |
| 092 | 91.7% | 94.3% | 0.51 | 0.37 |
| 093 | 57.4% | 58.2% | 0.47 | 0.2 |
| 095 | 43.5% | 43.5% | 0.32 | 0.3 |
| 112 | 17.2% | 17.4% | 0.59 | 0.42 |
| 113 | 55.4% | 55.9% | 0.47 | 0.41 |
| 114 | 35.9% | 36.9% | 0.37 | 0.22 |
| 115 | 57.0% | 57.4% | 0.45 | 0.38 |
| 116 | 58.9% | 59.8% | 0.49 | 0.37 |
| 117 | 38.2% | 38.8% | 0.26 | 0.24 |

**Chart 4 – Districts in House Enacted Plan region 1**

| District | [% Black] | [% 18+_AP_Blk] | Reock | Polsby-Popper |
|----------|-----------|----------------|-------|---------------|
| 052 | 13.9% | 16.0% | 0.48 | 0.35 |
| 075 | 72.3% | 74.4% | 0.42 | 0.28 |
| 076 | 65.0% | 67.2% | 0.53 | 0.51 |
| 077 | 73.4% | 76.1% | 0.4 | 0.21 |
| 078 | 70.3% | 71.6% | 0.21 | 0.19 |
| 079 | 69.1% | 71.6% | 0.5 | 0.21 |
| 080 | 12.0% | 14.2% | 0.38 | 0.42 |
| 081 | 19.1% | 21.8% | 0.47 | 0.4 |
| 082 | 14.7% | 16.8% | 0.49 | 0.3 |
| 083 | 12.5% | 15.1% | 0.34 | 0.36 |
| 084 | 70.5% | 73.7% | 0.25 | 0.2 |
| 085 | 60.9% | 62.7% | 0.36 | 0.32 |
| 086 | 72.4% | 75.1% | 0.17 | 0.17 |
| 087 | 70.9% | 73.1% | 0.26 | 0.24 |
| 088 | 61.4% | 63.4% | 0.26 | 0.2 |
| 089 | 60.3% | 62.5% | 0.14 | 0.1 |
| 090 | 57.7% | 58.5% | 0.36 | 0.29 |
| 091 | 68.6% | 70.0% | 0.45 | 0.2 |
| 092 | 68.3% | 68.8% | 0.36 | 0.2 |
| 093 | 64.0% | 65.4% | 0.26 | 0.11 |
| 094 | 66.8% | 69.0% | 0.31 | 0.15 |
| 095 | 65.9% | 67.2% | 0.44 | 0.25 |
| 111 | 22.1% | 22.3% | 0.33 | 0.29 |
| 112 | 19.1% | 19.2% | 0.62 | 0.52 |
| 113 | 58.3% | 59.5% | 0.5 | 0.32 |
| 115 | 52.1% | 52.1% | 0.44 | 0.23 |
| 116 | 57.6% | 58.1% | 0.41 | 0.28 |
| 117 | 36.4% | 36.6% | 0.41 | 0.28 |

30.     Looking at some specific districts shows that the compactness of the those districts is lowered by apparent efforts to create more majority black districts.

22

In the House Illustrative Plan, District 090 is in southern DeKalb County. This district has a Reock compactness score of .4 and a Polsby-Popper compactness score of .4 and the district is 94.9% 18+AP Black. In the House Enacted Plan, a comparable district in the region is District 089, in southern DeKalb County. This district has a Reock compactness score of .14 and a Polsby-Popper compactness score of .1 and the district is 62.5% 18+AP Black. This demonstrates that drawing a more compact district in southern DeKalb County yields a very high black percentage. The black percentage is lowered only by elongating the district to include lower concentrations of black population. This allows the black population to be redistributed and to create other majority black districts. Looking at the individual district data in region 1, the House Enacted Plan has more majority black districts and they are less compact than the districts in the House Illustrative Plan. In my opinion, the creation of additional black majority districts in region 1 lead to lower compactness scores in this region.

*House Region 2 Analysis*

31.    I analyzed another region of roughly similar geography to compare the House illustrative plan to the House enacted plan. Region 2 consists primarily of Fulton, Douglas, Coweta, Fayette, and Spalding counties. Region 2 maps of the House districts for both the House Illustrative Plan and the House Enacted Plan are

below. Similar to region 1, the districts in region 2 of the House Illustrative Plan look compact and only cross county lines in a limited way. However, the districts in the House Enacted Plan look elongated and they cross county lines in many places. For example, in the House Illustrative Plan, two districts cross out of Fulton County, whereas in the House Enacted Plan, nine districts cross out of Fulton County. The mean compactness scores for districts in region 2 confirm that the House Illustrative Plan is more compact as a whole than the House Enacted Plan in region 2.

**Chart 5 – Mean compactness scores in House region 2**

| Region 2 compactness scores | House Ilustr. | House Enacted |
|---|---|---|
| Mean compactness - Reock | 0.47 | 0.32 |
| Mean compactness - Polsby Popper | 0.35 | 0.23 |

24

**Map 5– House Illustrative Plan region 2**



## Map 6– House Enacted Plan region 2



32.     Similar to House region 1, the maps in region 2 show a contrast between the House Illustrative Plan and the House Enacted Plan. Likewise, while there may be many causes, the compactness of the districts along with the 18+AP Black percentages allows for an analysis of the impact of racial considerations.  Below is the data for the House Illustrative Plan districts and the House Enacted Plan districts in region 2.

**Chart 6 – Districts in House Illustrative Plan region 2**

| District | [% Black] | [% 18+_AP_Blk] | Reock | Polsby-Popper |
|---|---|---|---|---|
| 038 | 56.1% | 57.3% | 0.46 | 0.29 |
| 047 | 9.7% | 11.1% | 0.5 | 0.21 |
| 048 | 10.1% | 11.4% | 0.49 | 0.18 |
| 049 | 9.6% | 10.9% | 0.51 | 0.23 |
| 050 | 11.2% | 12.3% | 0.41 | 0.37 |
| 051 | 13.2% | 14.5% | 0.42 | 0.31 |
| 053 | 25.0% | 26.5% | 0.33 | 0.25 |
| 054 | 10.5% | 12.7% | 0.62 | 0.5 |
| 055 | 26.0% | 29.0% | 0.43 | 0.36 |
| 056 | 16.2% | 18.5% | 0.44 | 0.51 |
| 057 | 13.3% | 15.2% | 0.43 | 0.49 |
| 058 | 39.3% | 40.1% | 0.57 | 0.32 |
| 059 | 86.9% | 88.6% | 0.41 | 0.36 |
| 060 | 89.8% | 92.1% | 0.7 | 0.43 |
| 061 | 93.3% | 95.6% | 0.42 | 0.27 |
| 062 | 79.5% | 81.6% | 0.46 | 0.26 |
| 063 | 63.7% | 63.8% | 0.46 | 0.49 |
| 064 | 40.5% | 41.0% | 0.46 | 0.36 |
| 065 | 28.8% | 28.5% | 0.54 | 0.44 |
| 066 | 53.4% | 53.9% | 0.4 | 0.31 |
| 067 | 77.4% | 78.6% | 0.46 | 0.47 |

| | | | | |
|---|---|---|---|---|
| 068 | 90.6% | 92.9% | 0.48 | 0.36 |
| 069 | 41.2% | 42.1% | 0.53 | 0.44 |
| 073 | 10.0% | 10.9% | 0.54 | 0.38 |
| 074 | 8.6% | 9.3% | 0.35 | 0.27 |
| 134 | 36.5% | 35.4% | 0.48 | 0.33 |

**Chart 7 – Districts in House Enacted Plan region 2**

| District | [% Black] | [% 18+_AP_Blk] | Reock | Polsby-Popper |
|---|---|---|---|---|
| 025 | 5.1% | 5.9% | 0.39 | 0.31 |
| 047 | 9.6% | 10.7% | 0.29 | 0.21 |
| 048 | 10.4% | 11.8% | 0.34 | 0.19 |
| 049 | 7.3% | 8.4% | 0.3 | 0.15 |
| 050 | 11.3% | 12.4% | 0.42 | 0.46 |
| 051 | 22.4% | 23.7% | 0.54 | 0.36 |
| 053 | 12.6% | 14.5% | 0.16 | 0.14 |
| 054 | 13.3% | 15.5% | 0.37 | 0.45 |
| 055 | 55.0% | 55.4% | 0.18 | 0.16 |
| 056 | 46.9% | 45.5% | 0.26 | 0.23 |
| 057 | 15.9% | 18.1% | 0.57 | 0.59 |
| 058 | 63.7% | 63.0% | 0.13 | 0.13 |
| 059 | 70.3% | 70.1% | 0.12 | 0.11 |
| 060 | 62.3% | 63.9% | 0.19 | 0.15 |
| 061 | 72.3% | 74.3% | 0.25 | 0.2 |
| 062 | 70.9% | 72.3% | 0.16 | 0.1 |
| 063 | 68.6% | 69.3% | 0.16 | 0.14 |
| 064 | 29.9% | 30.7% | 0.37 | 0.36 |
| 065 | 60.7% | 62.0% | 0.46 | 0.17 |
| 066 | 52.9% | 53.4% | 0.36 | 0.25 |
| 067 | 57.7% | 58.9% | 0.36 | 0.12 |
| 068 | 55.2% | 55.8% | 0.32 | 0.17 |
| 069 | 62.6% | 63.6% | 0.4 | 0.25 |
| 070 | 28.0% | 27.8% | 0.45 | 0.23 |
| 073 | 11.5% | 12.1% | 0.28 | 0.2 |
| 074 | 25.5% | 25.5% | 0.5 | 0.25 |

33.    Looking at some specific districts shows that the compactness of the districts is impacted by the efforts to create more majority black districts. In the House Illustrative Plan, District 059 is in Fulton County, just north of East Point. This district has a Reock compactness score of .41 and a Polsby-Popper compactness score of .36 and the district is 88.6% 18+AP Black. In the House Enacted Plan, a comparable district in the region is District 059, in Fulton County, stretching from north of East Point to just south of Midtown. This district has a Reock compactness score of .12 and a Polsby-Popper compactness score of .11 and the district is 70.1% 18+AP Black. This demonstrates that drawing a more compact district in Fulton County can yield a district with very high black percentages. The black percentage is lowered only by elongating the district to include lower concentrations of black population. This allows the black population to be redistributed and to create other majority black districts.

34.    Looking at the individual district data in region 2, the House Enacted plan has more majority black districts and they are less compact than the districts in the House Illustrative Plan. In my opinion, the creation of additional black majority districts in region 2 lead to lower compactness scores in this region.

## SENATE ILLUSTRATIVE PLAN

35.    The 2020 census shows that total population for Georgia is 10,711,908. Looking at the situation for the Senate the number of single-member senate districts in Georgia is 56.  Dividing the total census population (10,711,908) by the number of senate districts (56) yields 191,284.1.  Rounding down, the ideal population for a Georgia Senate district is 191,284.

36.    I used the same general process for drawing the Senate Illustrative Plan as I did to draw the House Illustrative Plan.  Dividing the county populations by the ideal district size (191,284) yields the ratio of state senate seats per county.  Using this method, the ratio of senate seats in the largest county, Fulton County is 5.58 and the ratio of senate seats in the smallest county, Taliaferro County is 0.01.  Fulton County has population enough for just over 5 and a half state senate seats and Taliaferro County is one one-hundredths of a single state senate seat.

## Map 7 - Senate district ratios

Senate district ratios by county 2021



37. The Senate Enacted Plan has a relative deviation of -1.03% to + 0.98% of the ideal population. For purposes of drafting the Senate Illustrative Plan, I used an overall deviation range of -1.0% to +1.0%.

38. Like the process used for drawing the House Illustrative Plan, I looked at the map layer for cities as well as incorporated and unincorporated places and I attempted to balance keeping counties and voting districts whole and drawing compact districts with the necessity of staying within the population deviation. During the drawing process, I did not use any racial data, incumbency information or the boundaries of the previous districts.

39. I started drawing some districts in southern and southwestern Georgia then proceeded to coastal and central Georgia. Having looked at the ratios of the SDs per county, I was aware that some counties could be subdivided evenly into districts within the population deviation (such as DeKalb and Cobb). Other counties (such as Richmond and Muskogee) had a little more population than a Senate district, so those counties could be kept relatively intact while assigning the surplus population to a nearby seat. I drew districts in metro Atlanta, northwest Georgia, then completed the districts around metro Atlanta and the remainder of the state.

40.    After completing the Senate Illustrative Plan, I looked at the Senate Enacted Plan and re-numbered the districts in the Senate Illustrative Plan, such that the district numbers would be similar to the Senate Enacted Plan.

## Map 8 - Senate Illustrative Plan

Senate Illustrative - Statewide



**Map 9 - Metro Atlanta inset of Senate Illustrative Plan**



## SENATE PLAN ANALYSIS

41.     After completing the Senate Illustrative Plan, I copied the plan and added in the Census racial data. I ran a series of reports to compare the Senate Illustrative Plan and the Senate Enacted Plan on several metrics. Those metrics included - county splits, voting precinct splits, compactness scores, paired

35

incumbents, and the number of majority 18+AP Black districts. Copies of these

reports for Senate plans are attached as exhibits to this report.

**Chart 8- Senate Illustrative Plan and Senate Enacted Plan comparisons**

| Plan metrics | Senate Ilustr. | Senate Enacted |
|---|---|---|
| County splits | 21 | 29 |
| Voting precinct splits | 15 | 47 |
| Mean compactness - Reock | 0.46 | 0.42 |
| Mean compactness - Polsby Popper | 0.36 | 0.29 |
| # Paired incumbents | 17 | 4 |
| # Seats majority 18+_AP_Blk% | 11 | 14 |
| # Seats 18+_AP_Blk% is over 90% | 2 | 0 |
| # Seats 18+_AP_Blk% is: 80% to 90% | 0 | 0 |
| # Seats 18+_AP_Blk% is: 70% to 80% | 1 | 3 |
| # Seats 18+_AP_Blk% is: 60% to 70% | 3 | 6 |
| # Seats 18+_AP_Blk% is: 50% to 60% | 5 | 5 |

*Senate Metro Region Analysis*

42.     Similar to the analysis for the House plans, I looked a region of roughly

similar geography to compare the Senate Illustrative Plan to the Senate Enacted Plan.

The senate metro region consists primarily of Douglas, Fulton, Coweta, DeKalb,

Clayton, Fayette, Henry, Rockdale, and Newton counties.  Below are maps of the

Senate districts in the senate metro region for both the Senate Illustrative Plan and the Senate Enacted Plan. Looking at the districts in the Senate Illustrative Plan, the districts look compact and only cross county lines in a limited way. By contrast, looking at the districts in the Senate Enacted Plan, the districts look elongated, and they cross county lines in a number of places. For example, in the Senate Illustrative Plan, the DeKalb senate districts are entirely contained within DeKalb County, whereas in the Senate Enacted Plan, six districts cross out of DeKalb County. A review of the mean compactness scores for this senate metro region confirms what is visible to the eye. The mean compactness scores for districts in senate metro region show that Senate Illustrative Plan is more compact as a whole the Senate Enacted Plan in this region.

**Chart 9 – Mean compactness scores in the senate metro region**

| Sen Metro Region compactness scores | Senate Ilustr. | Senate Enacted |
|---|---|---|
| Mean compactness - Reock | 0.42 | 0.39 |
| Mean compactness - Polsby Popper | 0.37 | 0.26 |

**Map – Senate illustrative Metro Region**



**Map – Senate enacted Metro Region**



43.     Like the analysis for the House regions, the maps for the senate metro

region show a contrast between the Senate Illustrative Plan and the Senate Enacted

Plan. While there may be many causes, reviewing the compactness of the districts

along with the 18+AP Black percentages allows for an analysis of the impact of

racial considerations.  Below is the data for the Senate Illustrative Districts and the

Senate Enacted Districts in the senate metro region.

**Chart 10 – Districts in the Senate Illustrative Plan senate metro region**

| District | [% Black] | [% 18+_AP_Blk] | Reock | Polsby-Popper |
|----------|-----------|----------------|-------|---------------|
| 006 | 19.9% | 21.6% | 0.33 | 0.45 |
| 010 | 51.6% | 52.2% | 0.38 | 0.27 |
| 014 | 15.6% | 17.5% | 0.32 | 0.23 |
| 028 | 15.2% | 15.8% | 0.37 | 0.34 |
| 034 | 55.0% | 56.0% | 0.49 | 0.36 |
| 035 | 59.3% | 60.2% | 0.58 | 0.41 |
| 036 | 68.4% | 69.8% | 0.42 | 0.37 |
| 039 | 89.7% | 92.0% | 0.47 | 0.45 |
| 040 | 13.9% | 16.4% | 0.54 | 0.46 |
| 041 | 59.3% | 60.9% | 0.39 | 0.35 |
| 042 | 39.1% | 40.8% | 0.45 | 0.42 |
| 043 | 55.0% | 55.8% | 0.47 | 0.33 |
| 044 | 68.1% | 70.5% | 0.59 | 0.52 |
| 048 | 10.2% | 11.5% | 0.31 | 0.28 |
| 055 | 90.9% | 93.7% | 0.32 | 0.34 |

**Chart 11 – Districts in the Senate Enacted Plan senate metro region**

| District | [% Black] | [% 18+_AP_Blk] | Reock | Polsby-Popper |
|----------|-----------|----------------|-------|---------------|
| 006 | 21.9% | 23.9% | 0.41 | 0.24 |
| 010 | 69.7% | 71.5% | 0.28 | 0.23 |
| 014 | 17.2% | 19.0% | 0.27 | 0.24 |
| 028 | 19.1% | 19.5% | 0.45 | 0.25 |
| 034 | 67.5% | 69.5% | 0.45 | 0.34 |
| 035 | 70.6% | 71.9% | 0.47 | 0.26 |
| 036 | 51.9% | 51.3% | 0.32 | 0.3 |
| 038 | 63.4% | 65.3% | 0.36 | 0.21 |
| 039 | 61.0% | 60.7% | 0.17 | 0.13 |
| 040 | 16.8% | 19.2% | 0.51 | 0.34 |
| 041 | 61.0% | 62.6% | 0.51 | 0.3 |
| 042 | 28.5% | 30.8% | 0.48 | 0.32 |

| 043 | 63.4% | 64.3% | 0.64 | 0.35 |
| 044 | 69.9% | 71.3% | 0.18 | 0.19 |
| 055 | 63.9% | 66.0% | 0.34 | 0.27 |

44.    Looking at some specific districts shows that the compactness of the districts is impacted by the efforts to create more majority black districts. In the Senate Illustrative Plan, District 055 is in southern DeKalb County. This district has a Reock compactness score of .32 and a Polsby-Popper compactness score of .34 and the district is 93.7% 18+AP Black. In the enacted plan, a comparable district in the region is District 010, in southern DeKalb County and Henry County. This district has a Reock compactness score of .28 and a Polsby-Popper compactness score of .23 and the district is 71.5% 18+AP Black. This demonstrates that drawing a more compact district in southern DeKalb County yields a very high black percentage. The black percentage is lowered only by elongating the district to include lower concentrations of black population. This allows the black population to be redistributed and to create other majority black districts.

45.    Looking at another district in the region, In the Senate Illustrative Plan, District 039 is in Fulton County. This district has a Reock compactness score of .47 and a Polsby-Popper compactness score of .45 and the district is 92.0% 18+AP Black. In the enacted plan, a comparable district in the region is District 039, in

Fulton County. This district has a Reock compactness score of .17 and a Polsby-Popper compactness score of .13 and the district is 60.7% 18+AP Black. This demonstrates that drawing a more compact district in Fulton County can yield a very high black percentage. The black percentage is lowered only by elongating the district to include lower concentrations of black population. This allows the black population to be redistributed and to create other majority black districts.

46. Looking at the individual district data in the senate metro region, the Senate Enacted Plan has more majority black districts and they are less compact than the districts in the Senate Illustrative Plan. In my opinion, the creation of an additional black majority district in the region lead to lower compactness scores in this region.

**CONCLUSION**

47. As described above, I reviewed the enacted House and Senate plans and I drew a "blind" plan that did not consider race or incumbency or past redistricting plans for Georgia, while still considering traditional redistricting principles.

48. My review of the enacted house and senate plans combined with drawing the blind illustrative plans demonstrates the tendency that racial considerations had an effect on district composition and district shapes in the enacted plans.

I reserve the right to continue to supplement my declaration **based on** additional facts, testimony, and/or materials.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct according to the best of my knowledge, information, and belief.

This 5th day of December, 2022.

JOHN B. MORGAN

**Exhibit 1**

# JOHN B. MORGAN
### *Curriculum Vitae*

## Redistricting Background and Experience

- Performed redistricting work in 20 states, in the areas of map drawing, problem-solving and redistricting software operation.
- Performed demographic and election analysis work in 40 states, for both statewide and legislative candidates

*2021-2022     Redistricting Cycle*
- Mapping expert for Michigan Independent Citizens Redistricting Commission
- Mapping expert for Virginia Redistricting Commission
- Mapping expert for New Jersey Congressional Redistricting Commission
- Mapping expert for New Jersey Legislative Redistricting Commission
- Staff analyst for New Mexico Senate Republican caucus – Dec. 2021 special session
- Mapping consultant to Indiana State Senate Republican caucus
- Mapping consultant to redistricting commissioners in Atlantic County, New Jersey
- Drafted county commission districts for Sampson County, North Carolina
- Drafted wards for town of Brownsburg, Indiana

*2011-2012     Redistricting Cycle*
- Served as a consultant for:
  - Connecticut Redistricting Commission
  - Ohio Reapportionment Board
  - New Jersey Legislative Redistricting Commission
  - New Jersey Congressional Redistricting Commission
  - Pennsylvania Legislative Reapportionment Commission
- Drafted Wake County, North Carolina school board districts
- Drafted county commission districts in Sampson and Craven counties in North Carolina and Atlantic County in New Jersey
- Worked with redistricting commissions in Atlantic and Essex counties, New Jersey.
- Worked on statewide congressional, legislative, and local plans in the following states: Connecticut, Indiana, Kansas, Missouri, New Jersey, New Mexico, North Carolina, Ohio, Pennsylvania, South Carolina, and Virginia
- Plans drafted by Morgan adopted in whole or part by the following states:  Connecticut, Indiana, New Jersey, New Mexico, North Carolina, South Carolina, Virginia.

*2001-2002     Redistricting Cycle*
- Worked on statewide congressional and legislative redistricting plans in the following states: Florida, Georgia, Indiana, Iowa, New Jersey, North Carolina, Pennsylvania, Rhode Island, and Virginia.
- Dealt with redistricting issues as a member of the Majority Leader's legislative staff in Virginia House of Delegates.  Drafted alternate plans for use by the minority parties in

Rhode Island. Drafted alternate plans for use by legislative leadership in considering plans drawn by redistricting commission staff in Iowa.

*1991-1992    Redistricting Cycle*
- Worked on statewide congressional and legislative redistricting plans in the following states: Florida, Illinois, Indiana, Michigan, New Jersey, New York, Pennsylvania, Wisconsin.
- Focused primarily on Voting Rights Act issues with Black, Hispanic and Asian communities.
- Federal court incorporated portion of legislative plan drafted in part by Morgan for Wisconsin into final decree, finding the configuration superior to other plans in its treatment of minority voters.

*Expert Experience and Trial Testimony*
- Recognized as an expert in demographics and redistricting in *Egolf v. Duran*, New Mexico First Judicial District Court, Case No. D-101-CV-2011-02942, which dealt with New Mexico's legislative plans.
- In *Egolf v. Duran*, the Court adopted a House redistricting plan principally drafted by Morgan.
- Filed expert reports in *Georgia State Conference of NAACP v. Fayette County Board of Commissioners*.
- Filed expert reports and expert testimony in *Page v. Board of Elections,* Eastern District of Virginia; provided expert testimony at trial.
- Testified at trial in *Bethune Hill v. Virginia Board of Elections* and *Vesilind v. Virginia Board of Elections*.
- Filed expert report in *Georgia NAACP v. Gwinnett County*.
- Filed expert reports and expert testimony *Alpha Phi Alpha v. Raffensperger; Grant v. Raffensperger; and Pendergrass v. Raffensperger*

**Education**
- Bachelor of Arts degree in History from the University of Chicago
- Graduated with honors.
- Bachelor's Honors thesis on "The Net Effects of Gerrymandering 1896-1932."
- Demographic study on LaSalle, Illinois was published in *The History of the Illinois and Michigan Canal, Volume Five.*

**Employment**
- President of Applied Research Coordinates, a consulting firm specializing in political and demographic analysis and its application to elections and redistricting, 2007 to present
- Redistricting consultant for many legislatures and commissions: 1991, 2001, 2011, 2021
- Executive Director, GOPAC (Hon. J.C. Watts, Chairman), 2004-2007
- Vice-President of Applied Research Coordinates, 1999-2004
- National Field Director, GOPAC (Rep. John Shadegg, Chairman) 1995-1999
- Research Analyst, Applied Research Coordinates 1991-1995
- Research Analyst, Republican National Committee 1988-1989, summer

**Exhibit 2**

# Population Summary

## Population Summary

GA_House2021

| District | Population | Deviation | % Devn. | [% 18+_AP_Blk] | [% Black] |
|----------|-----------|-----------|---------|----------------|-----------|
| 001 | 59,666 | 155 | 0.26% | 4.2% | 3.94% |
| 002 | 59,773 | 262 | 0.44% | 3.15% | 2.68% |
| 003 | 60,199 | 688 | 1.16% | 3.35% | 2.9% |
| 004 | 59,070 | -441 | -0.74% | 5.38% | 4.41% |
| 005 | 58,837 | -674 | -1.13% | 4.6% | 3.88% |
| 006 | 59,712 | 201 | 0.34% | 1.51% | 1.07% |
| 007 | 59,081 | -430 | -0.72% | 0.62% | 0.4% |
| 008 | 59,244 | -267 | -0.45% | 1.43% | 1.16% |
| 009 | 59,474 | -37 | -0.06% | 1.57% | 1.05% |
| 010 | 59,519 | 8 | 0.01% | 3.73% | 3.03% |
| 011 | 58,792 | -719 | -1.21% | 1.85% | 1.61% |
| 012 | 59,300 | -211 | -0.35% | 9.68% | 8.68% |
| 013 | 59,150 | -361 | -0.61% | 19.18% | 18.92% |
| 014 | 59,135 | -376 | -0.63% | 6.85% | 5.98% |
| 015 | 59,213 | -298 | -0.50% | 14.19% | 13.85% |
| 016 | 59,402 | -109 | -0.18% | 11.69% | 11.36% |
| 017 | 59,120 | -391 | -0.66% | 23.02% | 22.54% |
| 018 | 59,335 | -176 | -0.30% | 7.98% | 7.19% |
| 019 | 58,955 | -556 | -0.93% | 24.15% | 23.95% |
| 020 | 60,107 | 596 | 1.00% | 9.25% | 8.34% |
| 021 | 59,529 | 18 | 0.03% | 5.06% | 4.37% |
| 022 | 59,460 | -51 | -0.09% | 15.1% | 14.31% |
| 023 | 59,048 | -463 | -0.78% | 6.5% | 5.81% |
| 024 | 59,011 | -500 | -0.84% | 7% | 6.14% |
| 025 | 59,414 | -97 | -0.16% | 5.9% | 5.06% |
| 026 | 59,248 | -263 | -0.44% | 4.01% | 3.41% |

## Population Summary

### Population Summary

GA_House2021

| District | Population | Deviation | % Devn. | [% 18+_AP_Blk] | [% Black] |
|----------|-----------|-----------|---------|----------------|-----------|
| 027 | 58,795 | -716 | -1.20% | 3.69% | 3.31% |
| 028 | 58,972 | -539 | -0.91% | 3.93% | 3.49% |
| 029 | 59,200 | -311 | -0.52% | 13.59% | 12.45% |
| 030 | 59,266 | -245 | -0.41% | 8.1% | 7.56% |
| 031 | 59,901 | 390 | 0.66% | 7.57% | 6.83% |
| 032 | 59,145 | -366 | -0.62% | 7.96% | 7.33% |
| 033 | 59,187 | -324 | -0.54% | 11.2% | 11.02% |
| 034 | 59,875 | 364 | 0.61% | 15.67% | 14.73% |
| 035 | 59,889 | 378 | 0.64% | 28.4% | 27.13% |
| 036 | 59,994 | 483 | 0.81% | 16.98% | 16.26% |
| 037 | 59,176 | -335 | -0.56% | 28.18% | 26.57% |
| 038 | 59,317 | -194 | -0.33% | 54.23% | 53.68% |
| 039 | 59,381 | -130 | -0.22% | 55.29% | 52.84% |
| 040 | 59,044 | -467 | -0.78% | 32.98% | 31.39% |
| 041 | 60,122 | 611 | 1.03% | 39.35% | 37% |
| 042 | 59,620 | 109 | 0.18% | 33.7% | 31.87% |
| 043 | 59,464 | -47 | -0.08% | 26.53% | 24.83% |
| 044 | 60,002 | 491 | 0.83% | 12.05% | 11.23% |
| 045 | 59,738 | 227 | 0.38% | 5.28% | 4.24% |
| 046 | 59,108 | -403 | -0.68% | 8.07% | 6.93% |
| 047 | 59,126 | -385 | -0.65% | 10.72% | 9.59% |
| 048 | 59,003 | -508 | -0.85% | 11.79% | 10.38% |
| 049 | 59,153 | -358 | -0.60% | 8.42% | 7.33% |
| 050 | 59,523 | 12 | 0.02% | 12.4% | 11.3% |
| 051 | 58,952 | -559 | -0.94% | 23.68% | 22.42% |
| 052 | 59,811 | 300 | 0.50% | 15.99% | 13.94% |

## Population Summary

### Population Summary

| District | Population | Deviation | % Devn. | [% 18+_AP_Blk] | [% Black] |
|---|---|---|---|---|---|
| 053 | 59,953 | 442 | 0.74% | 14.53% | 12.59% |
| 054 | 60,083 | 572 | 0.96% | 15.47% | 13.25% |
| 055 | 59,971 | 460 | 0.77% | 55.38% | 55.03% |
| 056 | 58,929 | -582 | -0.98% | 45.48% | 46.85% |
| 057 | 59,969 | 458 | 0.77% | 18.06% | 15.89% |
| 058 | 59,057 | -454 | -0.76% | 63.04% | 63.71% |
| 059 | 59,434 | -77 | -0.13% | 70.09% | 70.27% |
| 060 | 59,709 | 198 | 0.33% | 63.88% | 62.26% |
| 061 | 59,302 | -209 | -0.35% | 74.29% | 72.27% |
| 062 | 59,450 | -61 | -0.10% | 72.26% | 70.86% |
| 063 | 59,381 | -130 | -0.22% | 69.33% | 68.64% |
| 064 | 58,986 | -525 | -0.88% | 30.72% | 29.91% |
| 065 | 59,464 | -47 | -0.08% | 61.98% | 60.74% |
| 066 | 59,047 | -464 | -0.78% | 53.41% | 52.9% |
| 067 | 59,135 | -376 | -0.63% | 58.92% | 57.71% |
| 068 | 59,477 | -34 | -0.06% | 55.75% | 55.2% |
| 069 | 58,682 | -829 | -1.39% | 63.56% | 62.55% |
| 070 | 59,121 | -390 | -0.66% | 27.83% | 27.99% |
| 071 | 59,538 | 27 | 0.05% | 19.92% | 19.16% |
| 072 | 59,660 | 149 | 0.25% | 20.86% | 19.64% |
| 073 | 60,036 | 525 | 0.88% | 12.11% | 11.47% |
| 074 | 58,956 | -555 | -0.93% | 25.52% | 25.53% |
| 075 | 59,743 | 232 | 0.39% | 74.4% | 72.26% |
| 076 | 59,759 | 248 | 0.42% | 67.23% | 64.99% |
| 077 | 59,242 | -269 | -0.45% | 76.13% | 73.39% |
| 078 | 59,044 | -467 | -0.78% | 71.58% | 70.32% |

# Population Summary

## Population Summary

GA_House2021

| District | Population | Deviation | % Devn. | [% 18+_AP_Blk] | [% Black] |
|----------|-----------|-----------|---------|----------------|-----------|
| 079 | 59,500 | -11 | -0.02% | 71.59% | 69.08% |
| 080 | 59,461 | -50 | -0.08% | 14.18% | 12% |
| 081 | 59,007 | -504 | -0.85% | 21.83% | 19.09% |
| 082 | 59,724 | 213 | 0.36% | 16.83% | 14.66% |
| 083 | 59,416 | -95 | -0.16% | 15.12% | 12.45% |
| 084 | 59,862 | 351 | 0.59% | 73.66% | 70.46% |
| 085 | 59,373 | -138 | -0.23% | 62.71% | 60.9% |
| 086 | 59,205 | -306 | -0.51% | 75.05% | 72.44% |
| 087 | 59,709 | 198 | 0.33% | 73.08% | 70.92% |
| 088 | 59,689 | 178 | 0.30% | 63.35% | 61.41% |
| 089 | 59,866 | 355 | 0.60% | 62.54% | 60.27% |
| 090 | 59,812 | 301 | 0.51% | 58.49% | 57.69% |
| 091 | 60,050 | 539 | 0.91% | 70.04% | 68.63% |
| 092 | 60,273 | 762 | 1.28% | 68.79% | 68.31% |
| 093 | 60,118 | 607 | 1.02% | 65.36% | 64.04% |
| 094 | 59,211 | -300 | -0.50% | 69.04% | 66.81% |
| 095 | 60,030 | 519 | 0.87% | 67.15% | 65.91% |
| 096 | 59,515 | 4 | 0.01% | 23% | 21.31% |
| 097 | 59,072 | -439 | -0.74% | 26.77% | 25.79% |
| 098 | 59,998 | 487 | 0.82% | 23.25% | 20.23% |
| 099 | 59,850 | 339 | 0.57% | 14.71% | 13.8% |
| 100 | 60,030 | 519 | 0.87% | 10.01% | 9.19% |
| 101 | 59,938 | 427 | 0.72% | 24.19% | 22.9% |
| 102 | 58,959 | -552 | -0.93% | 37.62% | 37.16% |
| 103 | 60,197 | 686 | 1.15% | 16.79% | 15.52% |
| 104 | 59,362 | -149 | -0.25% | 17.03% | 15.96% |

# Population Summary

## Population Summary

GA_House2021

| District | Population | Deviation | % Devn. | [% 18+_AP_Blk] | [% Black] |
|----------|-----------|-----------|---------|----------------|-----------|
| 105 | 59,344 | -167 | -0.28% | 29.05% | 28.45% |
| 106 | 59,112 | -399 | -0.67% | 36.27% | 36.27% |
| 107 | 59,702 | 191 | 0.32% | 29.63% | 28.16% |
| 108 | 59,577 | 66 | 0.11% | 18.35% | 17.71% |
| 109 | 59,630 | 119 | 0.20% | 32.51% | 30.16% |
| 110 | 59,951 | 440 | 0.74% | 47.19% | 46.58% |
| 111 | 60,009 | 498 | 0.84% | 22.29% | 22.08% |
| 112 | 59,349 | -162 | -0.27% | 19.21% | 19.06% |
| 113 | 60,053 | 542 | 0.91% | 59.53% | 58.29% |
| 114 | 59,867 | 356 | 0.60% | 24.74% | 24.16% |
| 115 | 60,174 | 663 | 1.11% | 52.13% | 52.13% |
| 116 | 59,913 | 402 | 0.68% | 58.12% | 57.58% |
| 117 | 60,130 | 619 | 1.04% | 36.61% | 36.43% |
| 118 | 59,987 | 476 | 0.80% | 23.6% | 22.72% |
| 119 | 58,947 | -564 | -0.95% | 13.49% | 12.73% |
| 120 | 58,982 | -529 | -0.89% | 14.28% | 13.65% |
| 121 | 59,127 | -384 | -0.65% | 9.56% | 8.8% |
| 122 | 59,632 | 121 | 0.20% | 28.42% | 30.85% |
| 123 | 59,282 | -229 | -0.38% | 24.28% | 23.91% |
| 124 | 59,221 | -290 | -0.49% | 25.58% | 26.18% |
| 125 | 60,137 | 626 | 1.05% | 23.68% | 22.24% |
| 126 | 59,260 | -251 | -0.42% | 54.47% | 54.3% |
| 127 | 58,678 | -833 | -1.40% | 18.52% | 17.46% |
| 128 | 58,864 | -647 | -1.09% | 50.41% | 51.11% |
| 129 | 58,829 | -682 | -1.15% | 54.87% | 55.5% |
| 130 | 59,203 | -308 | -0.52% | 59.91% | 60.84% |

# Population Summary

## Population Summary

GA_House2021

| District | Population | Deviation | % Devn. | [% 18+_AP_Blk] | [% Black] |
|----------|-----------|-----------|---------|----------------|-----------|
| 131 | 58,890 | -621 | -1.04% | 17.62% | 16.38% |
| 132 | 59,142 | -369 | -0.62% | 52.34% | 52.48% |
| 133 | 59,202 | -309 | -0.52% | 36.76% | 37.23% |
| 134 | 59,396 | -115 | -0.19% | 33.57% | 34.39% |
| 135 | 60,063 | 552 | 0.93% | 23.75% | 22.95% |
| 136 | 59,298 | -213 | -0.36% | 28.67% | 28.15% |
| 137 | 59,551 | 40 | 0.07% | 52.13% | 51.92% |
| 138 | 58,912 | -599 | -1.01% | 19.32% | 18.92% |
| 139 | 59,010 | -501 | -0.84% | 20.27% | 19.63% |
| 140 | 59,294 | -217 | -0.36% | 57.63% | 56.56% |
| 141 | 59,019 | -492 | -0.83% | 57.46% | 55.6% |
| 142 | 59,608 | 97 | 0.16% | 59.52% | 61.09% |
| 143 | 59,469 | -42 | -0.07% | 60.79% | 62% |
| 144 | 59,232 | -279 | -0.47% | 29.32% | 29.49% |
| 145 | 59,863 | 352 | 0.59% | 35.67% | 36% |
| 146 | 60,203 | 692 | 1.16% | 27.61% | 27.04% |
| 147 | 59,178 | -333 | -0.56% | 30.12% | 29.91% |
| 148 | 59,984 | 473 | 0.79% | 34.02% | 34.09% |
| 149 | 58,893 | -618 | -1.04% | 32.15% | 31.8% |
| 150 | 59,276 | -235 | -0.39% | 53.56% | 53.5% |
| 151 | 60,059 | 548 | 0.92% | 42.41% | 42.45% |
| 152 | 60,134 | 623 | 1.05% | 26.06% | 25.98% |
| 153 | 59,299 | -212 | -0.36% | 67.95% | 69.44% |
| 154 | 59,994 | 483 | 0.81% | 54.82% | 55.77% |
| 155 | 58,759 | -752 | -1.26% | 35.85% | 36.36% |
| 156 | 59,444 | -67 | -0.11% | 30.25% | 29.97% |

## Population Summary

### Population Summary

GA_House2021

| District | Population | Deviation | % Devn. | [% 18+_AP_Blk] | [% Black] |
|---|---|---|---|---|---|
| 157 | 59,957 | 446 | 0.75% | 24.67% | 23.82% |
| 158 | 59,440 | -71 | -0.12% | 31.19% | 31.67% |
| 159 | 59,895 | 384 | 0.65% | 24.5% | 24.02% |
| 160 | 59,935 | 424 | 0.71% | 22.6% | 22.04% |
| 161 | 60,097 | 586 | 0.98% | 27.14% | 26.27% |
| 162 | 60,308 | 797 | 1.34% | 43.73% | 43.95% |
| 163 | 60,123 | 612 | 1.03% | 45.49% | 46.54% |
| 164 | 60,101 | 590 | 0.99% | 23.47% | 22.55% |
| 165 | 59,978 | 467 | 0.78% | 50.33% | 52.86% |
| 166 | 60,242 | 731 | 1.23% | 5.67% | 5.04% |
| 167 | 59,493 | -18 | -0.03% | 22.28% | 21.4% |
| 168 | 60,147 | 636 | 1.07% | 46.26% | 44.49% |
| 169 | 59,138 | -373 | -0.63% | 29.04% | 29.04% |
| 170 | 60,116 | 605 | 1.02% | 24.22% | 24.56% |
| 171 | 59,237 | -274 | -0.46% | 39.6% | 40% |
| 172 | 59,961 | 450 | 0.76% | 23.32% | 23.41% |
| 173 | 59,743 | 232 | 0.39% | 36.27% | 36.4% |
| 174 | 59,852 | 341 | 0.57% | 17.37% | 17.42% |
| 175 | 59,993 | 482 | 0.81% | 24.17% | 23.98% |
| 176 | 59,470 | -41 | -0.07% | 22.68% | 21.96% |
| 177 | 59,992 | 481 | 0.81% | 53.88% | 55.26% |
| 178 | 59,877 | 366 | 0.62% | 14.79% | 14.59% |
| 179 | 59,356 | -155 | -0.26% | 27.03% | 28.66% |
| 180 | 59,412 | -99 | -0.17% | 18.21% | 17.31% |

Total Population: 10,711,908

# Population Summary

## Population Summary

GA_House2021

| District | Population | Deviation | % Devn. | [% 18+_AP_Blk] | [% Black] |
|----------|-----------|-----------|---------|----------------|-----------|
| Ideal District Population: | 59,511 | | | | |

**Summary Statistics:**

| | |
|---|---|
| Population Range: | 58,678 to 60,308 |
| Ratio Range: | 0.03 |
| Absolute Range: | -833 to 797 |
| Absolute Overall Range: | 1630 |
| Relative Range: | -1.40% to 1.34% |
| Relative Overall Range: | 2.74% |
| Absolute Mean Deviation: | 363.71 |
| Relative Mean Deviation: | 0.61% |
| Standard Deviation: | 417.67 |

**Maptitude**
For Redistricting

**Exhibit 3**

# Political Subdivision Splits Between Districts

## Political Subdivision Splits Between Districts                    GA_House2021

Number of subdivisions not split:

| | |
|---|---|
| County | 90 |
| Voting District | 2,514 |

Number of subdivisions split into more than one district:

| | |
|---|---|
| County | 69 |
| Voting District | 184 |

Number of splits involving no population:

| | |
|---|---|
| County | 0 |
| Voting District | 16 |

## Split Counts

*County*

Cases where an area is split among 2 Districts: 34
Cases where an area is split among 3 Districts: 9
Cases where an area is split among 4 Districts: 12
Cases where an area is split among 5 Districts: 4
Cases where an area is split among 6 Districts: 3
Cases where an area is split among 7 Districts: 2
Cases where an area is split among 9 Districts: 1
Cases where an area is split among 14 Districts: 1
Cases where an area is split among 17 Districts: 1
Cases where an area is split among 21 Districts: 1
Cases where an area is split among 22 Districts: 1

*Voting District*

Cases where an area is split among 2 Districts: 175
Cases where an area is split among 3 Districts: 10

| County | Voting District | District | Population |
|---|---|---|---|
| *Split   Counties:* | | | |
| Appling GA | | 157 | 12,825 |
| Appling GA | | 178 | 5,619 |

# Political Subdivision Splits Between Districts

## Political Subdivision Splits Between Districts

| | | GA_House2021 |
|---|---|---|
| Baldwin GA | 128 | 5,158 |
| Baldwin GA | 133 | 38,641 |
| Barrow GA | 104 | 24,245 |
| Barrow GA | 119 | 54,736 |
| Barrow GA | 120 | 4,524 |
| Bartow GA | 014 | 49,688 |
| Bartow GA | 015 | 59,213 |
| Bartow GA | 148 | 5,115 |
| Ben Hill GA | 156 | 12,079 |
| Ben Hill GA | 142 | 59,608 |
| Bibb GA | 143 | 59,469 |
| Bibb GA | 144 | 33,948 |
| Bibb GA | 145 | 4,321 |
| Bryan GA | 160 | 11,008 |
| Bryan GA | 164 | 21,420 |
| Bryan GA | 166 | 12,310 |
| Bulloch GA | 158 | 19,285 |
| Bulloch GA | 159 | 12,887 |
| Bulloch GA | 160 | 48,927 |
| Carroll GA | 018 | 18,789 |
| Carroll GA | 070 | 2,854 |
| Carroll GA | 071 | 59,538 |
| Carroll GA | 072 | 37,967 |
| Catoosa GA | 002 | 7,673 |
| Catoosa GA | 003 | 60,199 |
| Chatham GA | 161 | 28,269 |
| Chatham GA | 162 | 60,308 |
| Chatham GA | 163 | 60,123 |
| Chatham GA | 164 | 38,681 |
| Chatham GA | 165 | 59,978 |
| Chatham GA | 166 | 47,932 |

# Political Subdivision Splits Between Districts

## Political Subdivision Splits Between Districts

| | | GA_House2021 |
|---|---|---|
| Cherokee GA | 011 | 6,557 |
| Cherokee GA | 014 | 9,447 |
| Cherokee GA | 020 | 60,107 |
| Cherokee GA | 021 | 59,529 |
| Cherokee GA | 022 | 30,874 |
| Cherokee GA | 023 | 59,048 |
| Cherokee GA | 044 | 21,989 |
| Cherokee GA | 046 | 15,178 |
| Cherokee GA | 047 | 3,891 |
| Clarke GA | 120 | 30,095 |
| Clarke GA | 121 | 26,478 |
| Clarke GA | 122 | 59,632 |
| Clarke GA | 124 | 12,466 |
| Clayton GA | 075 | 59,743 |
| Clayton GA | 076 | 59,759 |
| Clayton GA | 077 | 59,242 |
| Clayton GA | 078 | 55,197 |
| Clayton GA | 079 | 59,500 |
| Clayton GA | 116 | 4,154 |
| Cobb GA | 022 | 28,586 |
| Cobb GA | 034 | 59,875 |
| Cobb GA | 035 | 59,889 |
| Cobb GA | 036 | 59,994 |
| Cobb GA | 037 | 59,176 |
| Cobb GA | 038 | 59,317 |
| Cobb GA | 039 | 59,381 |
| Cobb GA | 040 | 59,044 |
| Cobb GA | 041 | 60,122 |
| Cobb GA | 042 | 59,620 |
| Cobb GA | 043 | 59,464 |
| Cobb GA | 044 | 38,013 |

# Political Subdivision Splits Between Districts

## Political Subdivision Splits Between Districts

| | | GA_House2021 |
|---|---|---|
| Cobb GA | 045 | 59,738 |
| Cobb GA | 046 | 43,930 |
| Coffee GA | 169 | 33,736 |
| Coffee GA | 176 | 9,356 |
| Columbia GA | 123 | 2,205 |
| Columbia GA | 125 | 55,389 |
| Columbia GA | 127 | 39,526 |
| Columbia GA | 131 | 58,890 |
| Cook GA | 170 | 7,342 |
| Cook GA | 172 | 9,887 |
| Coweta GA | 065 | 13,008 |
| Coweta GA | 067 | 17,272 |
| Coweta GA | 070 | 56,267 |
| Coweta GA | 073 | 31,608 |
| Coweta GA | 136 | 28,003 |
| Dawson GA | 007 | 2,409 |
| Dawson GA | 009 | 24,389 |
| DeKalb GA | 052 | 28,300 |
| DeKalb GA | 080 | 59,461 |
| DeKalb GA | 081 | 59,007 |
| DeKalb GA | 082 | 59,724 |
| DeKalb GA | 083 | 59,416 |
| DeKalb GA | 084 | 59,862 |
| DeKalb GA | 085 | 59,373 |
| DeKalb GA | 086 | 59,205 |
| DeKalb GA | 087 | 59,709 |
| DeKalb GA | 088 | 47,844 |
| DeKalb GA | 089 | 59,866 |
| DeKalb GA | 090 | 59,812 |
| DeKalb GA | 091 | 19,700 |
| DeKalb GA | 092 | 15,607 |

# Political Subdivision Splits Between Districts

## Political Subdivision Splits Between Districts

|  |  | GA_House2021 |
|---|---|---|
| Dekalb GA | 093 | 11,690 |
| Dekalb GA | 094 | 31,207 |
| Dekalb GA | 095 | 14,599 |
| Dougherty GA | 151 | 6,268 |
| Dougherty GA | 152 | 6,187 |
| Dougherty GA | 153 | 59,299 |
| Dougherty GA | 154 | 14,036 |
| Douglas GA | 061 | 30,206 |
| Douglas GA | 064 | 35,576 |
| Douglas GA | 065 | 19,408 |
| Douglas GA | 066 | 59,047 |
| Effingham GA | 159 | 32,941 |
| Effingham GA | 161 | 31,828 |
| Fayette GA | 068 | 29,719 |
| Fayette GA | 069 | 37,303 |
| Fayette GA | 073 | 28,428 |
| Fayette GA | 074 | 23,744 |
| Floyd GA | 005 | 5,099 |
| Floyd GA | 012 | 34,335 |
| Floyd GA | 013 | 59,150 |
| Forsyth GA | 011 | 19,019 |
| Forsyth GA | 024 | 59,011 |
| Forsyth GA | 025 | 46,134 |
| Forsyth GA | 026 | 59,248 |
| Forsyth GA | 028 | 50,864 |
| Forsyth GA | 100 | 17,007 |
| Fulton GA | 025 | 13,280 |
| Fulton GA | 047 | 55,235 |
| Fulton GA | 048 | 43,976 |
| Fulton GA | 049 | 59,153 |
| Fulton GA | 050 | 59,523 |

# Political Subdivision Splits Between Districts

## Political Subdivision Splits Between Districts

| | | GA_House2021 |
|---|---|---|
| Fulton GA | 051 | 58,952 |
| Fulton GA | 052 | 31,511 |
| Fulton GA | 053 | 59,953 |
| Fulton GA | 054 | 60,083 |
| Fulton GA | 055 | 59,971 |
| Fulton GA | 056 | 58,929 |
| Fulton GA | 057 | 59,969 |
| Fulton GA | 058 | 59,057 |
| Fulton GA | 059 | 59,434 |
| Fulton GA | 060 | 59,709 |
| Fulton GA | 061 | 29,096 |
| Fulton GA | 062 | 59,450 |
| Fulton GA | 063 | 59,381 |
| Fulton GA | 065 | 27,048 |
| Fulton GA | 067 | 41,863 |
| Fulton GA | 068 | 29,758 |
| Fulton GA | 069 | 21,379 |
| Glynn GA | 167 | 20,499 |
| Glynn GA | 179 | 59,356 |
| Glynn GA | 180 | 4,644 |
| Gordon GA | 005 | 53,738 |
| Gordon GA | 006 | 3,806 |
| Grady GA | 171 | 8,115 |
| Grady GA | 173 | 18,121 |
| Gwinnett GA | 030 | 8,620 |
| Gwinnett GA | 048 | 15,027 |
| Gwinnett GA | 088 | 11,845 |
| Gwinnett GA | 094 | 28,004 |
| Gwinnett GA | 095 | 34,221 |
| Gwinnett GA | 096 | 59,515 |
| Gwinnett GA | 097 | 59,072 |

# Political Subdivision Splits Between Districts

## Political Subdivision Splits Between Districts

| | | GA_House2021 |
|---|---|---|
| Gwinnett GA | 098 | 59,998 |
| Gwinnett GA | 099 | 59,850 |
| Gwinnett GA | 100 | 35,204 |
| Gwinnett GA | 101 | 59,938 |
| Gwinnett GA | 102 | 58,959 |
| Gwinnett GA | 103 | 51,691 |
| Gwinnett GA | 104 | 35,117 |
| Gwinnett GA | 105 | 59,344 |
| Gwinnett GA | 106 | 59,112 |
| Gwinnett GA | 107 | 59,702 |
| Gwinnett GA | 108 | 59,577 |
| Gwinnett GA | 109 | 59,630 |
| Gwinnett GA | 110 | 59,951 |
| Gwinnett GA | 111 | 22,685 |
| Habersham GA | 010 | 42,636 |
| Habersham GA | 032 | 3,395 |
| Hall GA | 027 | 54,508 |
| Hall GA | 028 | 8,108 |
| Hall GA | 029 | 59,200 |
| Hall GA | 030 | 50,646 |
| Hall GA | 031 | 14,349 |
| Hall GA | 100 | 7,819 |
| Hall GA | 103 | 8,506 |
| Harris GA | 138 | 21,634 |
| Harris GA | 139 | 13,034 |
| Henry GA | 074 | 18,397 |
| Henry GA | 078 | 3,847 |
| Henry GA | 091 | 35,569 |
| Henry GA | 115 | 60,174 |
| Henry GA | 116 | 55,759 |
| Henry GA | 117 | 54,737 |

# Political Subdivision Splits Between Districts

## Political Subdivision Splits Between Districts

| | | GA_House2021 |
|---|---|---|
| Henry GA | 118 | 12,229 |
| Houston GA | 145 | 28,132 |
| Houston GA | 146 | 60,203 |
| Houston GA | 147 | 59,178 |
| Houston GA | 148 | 16,120 |
| Jackson GA | 031 | 45,552 |
| Jackson GA | 032 | 10,931 |
| Jackson GA | 119 | 4,211 |
| Jackson GA | 120 | 15,213 |
| Jasper GA | 114 | 2,855 |
| Jasper GA | 118 | 11,733 |
| Jones GA | 133 | 20,561 |
| Jones GA | 144 | 7,786 |
| Lamar GA | 134 | 5,026 |
| Lamar GA | 135 | 13,474 |
| Liberty GA | 167 | 5,109 |
| Liberty GA | 168 | 60,147 |
| Lowndes GA | 174 | 9,770 |
| Lowndes GA | 175 | 43,692 |
| Lowndes GA | 176 | 4,797 |
| Lowndes GA | 177 | 59,992 |
| Lumpkin GA | 009 | 29,201 |
| Lumpkin GA | 027 | 4,287 |
| Madison GA | 033 | 9,935 |
| Madison GA | 123 | 20,185 |
| McDuffie GA | 125 | 4,748 |
| McDuffie GA | 128 | 16,884 |
| Meriwether GA | 136 | 13,382 |
| Meriwether GA | 137 | 7,231 |
| Monroe GA | 134 | 9,272 |
| Monroe GA | 144 | 17,498 |

# Political Subdivision Splits Between Districts

## Political Subdivision Splits Between Districts

| | | GA_House2021 |
|---|---|---|
| Monroe GA | 145 | 1,187 |
| Muscogee GA | 137 | 30,443 |
| Muscogee GA | 138 | 12,190 |
| Muscogee GA | 139 | 45,976 |
| Muscogee GA | 140 | 59,294 |
| Muscogee GA | 141 | 59,019 |
| Newton GA | 093 | 15,515 |
| Newton GA | 113 | 60,053 |
| Newton GA | 114 | 36,915 |
| Oconee GA | 120 | 9,150 |
| Oconee GA | 121 | 32,649 |
| Paulding GA | 016 | 16,549 |
| Paulding GA | 017 | 59,120 |
| Paulding GA | 018 | 10,627 |
| Paulding GA | 019 | 58,955 |
| Paulding GA | 064 | 23,410 |
| Peach GA | 145 | 14,093 |
| Peach GA | 150 | 13,888 |
| Putnam GA | 118 | 10,591 |
| Putnam GA | 124 | 11,456 |
| Richmond GA | 126 | 25,990 |
| Richmond GA | 127 | 19,152 |
| Richmond GA | 129 | 58,829 |
| Richmond GA | 130 | 59,203 |
| Richmond GA | 132 | 43,433 |
| Rockdale GA | 091 | 4,781 |
| Rockdale GA | 092 | 44,666 |
| Rockdale GA | 093 | 32,913 |
| Rockdale GA | 095 | 11,210 |
| Spalding GA | 074 | 16,815 |
| Spalding GA | 117 | 5,393 |

# Political Subdivision Splits Between Districts

## Political Subdivision Splits Between Districts

| | | GA_House2021 |
|---|---|---|
| Spalding GA | 134 | 45,098 |
| Sumter GA | 150 | 14,282 |
| Sumter GA | 151 | 15,334 |
| Tattnall GA | 156 | 1,263 |
| Tattnall GA | 157 | 21,579 |
| Telfair GA | 149 | 9,486 |
| Telfair GA | 156 | 2,991 |
| Thomas GA | 172 | 4,176 |
| Thomas GA | 173 | 41,622 |
| Tift GA | 169 | 6,730 |
| Tift GA | 170 | 34,614 |
| Troup GA | 072 | 10,281 |
| Troup GA | 136 | 17,913 |
| Troup GA | 137 | 16,144 |
| Troup GA | 138 | 25,088 |
| Walker GA | 001 | 43,415 |
| Walker GA | 002 | 24,239 |
| Walton GA | 111 | 37,324 |
| Walton GA | 112 | 59,349 |
| Ware GA | 174 | 9,097 |
| Ware GA | 176 | 27,154 |
| Wayne GA | 167 | 6,742 |
| Wayne GA | 178 | 23,402 |
| White GA | 008 | 22,119 |
| White GA | 009 | 5,884 |
| Whitfield GA | 002 | 27,861 |
| Whitfield GA | 004 | 59,070 |
| Whitfield GA | 006 | 15,933 |

*Split VTDs:*

| | | |
|---|---|---|
| Barrow GA | 104 | 1,708 |
| Barrow GA | 119 | 8,060 |

## Political Subdivision Splits Between Districts

### Political Subdivision Splits Between Districts

| | | | GA_House2021 |
|---|---|---|---|
| Bartow GA | CASSVILLE | 014 | 15,558 |
| Bartow GA | CASSVILLE | 015 | 1,047 |
| Bartow GA | WHITE | 014 | 3,335 |
| Bartow GA | WHITE | 015 | 211 |
| Ben Hill GA | WEST | 148 | 5,115 |
| Ben Hill GA | WEST | 156 | 5,229 |
| Bibb GA | HOWARD 1 | 142 | 2,326 |
| Bibb GA | HOWARD 1 | 144 | 3,617 |
| Bibb GA | HOWARD 2 | 142 | 2,369 |
| Bibb GA | HOWARD 2 | 144 | 3,076 |
| Bibb GA | HOWARD 3 | 142 | 0 |
| Bibb GA | HOWARD 3 | 144 | 12,654 |
| Bibb GA | WARRIOR 2 | 142 | 4,426 |
| Bibb GA | WARRIOR 2 | 145 | 852 |
| Bryan GA | DANIELSIDING | 164 | 1,268 |
| Bryan GA | DANIELSIDING | 166 | 1,741 |
| Bryan GA | HWY 144 EAST | 164 | 4,552 |
| Bryan GA | HWY 144 EAST | 166 | 4,707 |
| Bryan GA | J.F.GREGORY PARK | 164 | 3,489 |
| Bryan GA | J.F.GREGORY PARK | 166 | 144 |
| Bulloch GA | CHURCH | 158 | 3,764 |
| Bulloch GA | CHURCH | 159 | 5,869 |
| Carroll GA | BONNER | 071 | 410 |
| Carroll GA | BONNER | 072 | 5,554 |
| Chatham GA | CRUSADER COMMUNITY CENTER | 162 | 2,134 |
| Chatham GA | CRUSADER COMMUNITY CENTER | 166 | 1,493 |
| Chatham GA | GEORGETOWN ELEMENTAR | 164 | 5,562 |

# Political Subdivision Splits Between Districts

## Political Subdivision Splits Between Districts

| | | | GA_House2021 |
|---|---|---|---|
| Chatham GA | GEORGETOWN ELEMENTAR | 166 | 0 |
| Chatham GA | GRACE UNITED METHODIST CHURCH | 163 | 2,064 |
| Chatham GA | GRACE UNITED METHODIST CHURCH | 165 | 397 |
| Chatham GA | ROTHWELL BAPTIST CHURCH | 161 | 5,335 |
| Chatham GA | ROTHWELL BAPTIST CHURCH | 164 | 4,987 |
| Chatham GA | THE LIGHT CHURCH | 162 | 1,177 |
| Chatham GA | THE LIGHT CHURCH | 163 | 1,109 |
| Chatham GA | WINDSOR FOREST BAPTIST CHURCH SCHOOL | 163 | 785 |
| Chatham GA | WINDSOR FOREST BAPTIST CHURCH SCHOOL | 166 | 1,890 |
| Cherokee GA | CARMEL | 020 | 5,626 |
| Cherokee GA | CARMEL | 022 | 1,222 |
| Cherokee GA | CARMEL | 044 | 0 |
| Cherokee GA | FREEHOME | 021 | 3,200 |
| Cherokee GA | FREEHOME | 047 | 3,891 |
| Cherokee GA | HOLLY SPRINGS | 021 | 2,250 |
| Cherokee GA | HOLLY SPRINGS | 023 | 2,578 |
| Clarke GA | 1A | 122 | 2,758 |
| Clarke GA | 1A | 124 | 2,286 |
| Clarke GA | 4B | 121 | 7,082 |
| Clarke GA | 4B | 122 | 5,589 |
| Clarke GA | 7C | 120 | 1,922 |
| Clarke GA | 7C | 121 | 3,184 |
| Clayton GA | LOVEJOY 1 | 075 | 5,018 |

# Political Subdivision Splits Between Districts

## Political Subdivision Splits Between Districts

| | | | GA_House2021 |
|---|---|---|---|
| Clayton GA | LOVEJOY 1 | 078 | 601 |
| Clayton GA | LOVEJOY 3 | 078 | 9,099 |
| Clayton GA | LOVEJOY 3 | 116 | 4,154 |
| Clayton GA | MORROW 4 | 076 | 1,911 |
| Clayton GA | MORROW 4 | 078 | 1,316 |
| Cobb GA | Acworth 1B | 035 | 7,322 |
| Cobb GA | Acworth 1B | 036 | 142 |
| Cobb GA | Baker 01 | 022 | 5,226 |
| Cobb GA | Baker 01 | 035 | 1,996 |
| Cobb GA | Bells Ferry 03 | 022 | 4,918 |
| Cobb GA | Bells Ferry 03 | 044 | 3,763 |
| Cobb GA | Dobbins 01 | 042 | 11,055 |
| Cobb GA | Dobbins 01 | 043 | 2,346 |
| Cobb GA | Elizabeth 01 | 034 | 700 |
| Cobb GA | Elizabeth 01 | 037 | 5,170 |
| Cobb GA | Elizabeth 04 | 037 | 2,031 |
| Cobb GA | Elizabeth 04 | 043 | 2,387 |
| Cobb GA | Kennesaw 1A | 022 | 599 |
| Cobb GA | Kennesaw 1A | 035 | 3,844 |
| Cobb GA | Kennesaw 3A | 022 | 0 |
| Cobb GA | Kennesaw 3A | 034 | 871 |
| Cobb GA | Kennesaw 3A | 035 | 8,631 |
| Cobb GA | Lassiter 01 | 044 | 2,121 |
| Cobb GA | Lassiter 01 | 046 | 2,600 |
| Cobb GA | Lindley 01 | 039 | 5,678 |
| Cobb GA | Lindley 01 | 040 | 582 |
| Cobb GA | Mableton 01 | 038 | 1,589 |
| Cobb GA | Mableton 01 | 039 | 5,513 |
| Cobb GA | Mableton 02 | 038 | 256 |
| Cobb GA | Mableton 02 | 039 | 5,427 |
| Cobb GA | Marietta 1A | 037 | 3,349 |

# Political Subdivision Splits Between Districts

## Political Subdivision Splits Between Districts

| | | | GA_House2021 |
|---|---|---|---|
| Cobb GA | Marietta 1A | 043 | 6,645 |
| Cobb GA | Marietta 2A | 034 | 1,664 |
| Cobb GA | Marietta 2A | 037 | 811 |
| Cobb GA | Marietta 5A | 037 | 2,877 |
| Cobb GA | Marietta 5A | 043 | 1,457 |
| Cobb GA | Marietta 6A | 037 | 1,532 |
| Cobb GA | Marietta 6A | 043 | 3,022 |
| Cobb GA | Marietta 7A | 042 | 1,494 |
| Cobb GA | Marietta 7A | 043 | 5,417 |
| Cobb GA | North Cobb 01 | 035 | 2,611 |
| Cobb GA | North Cobb 01 | 036 | 559 |
| Cobb GA | Norton Park 01 | 041 | 1,955 |
| Cobb GA | Norton Park 01 | 042 | 5,846 |
| Cobb GA | Oregon 03 | 037 | 6,683 |
| Cobb GA | Oregon 03 | 041 | 6,305 |
| Cobb GA | Pine Mountain 02 | 034 | 3,976 |
| Cobb GA | Pine Mountain 02 | 035 | 0 |
| Cobb GA | Smyrna 1A | 040 | 1,292 |
| Cobb GA | Smyrna 1A | 042 | 5,341 |
| Cobb GA | Smyrna 4A | 040 | 6,599 |
| Cobb GA | Smyrna 4A | 042 | 1,609 |
| Cobb GA | Smyrna 7A | 039 | 905 |
| Cobb GA | Smyrna 7A | 040 | 7,690 |
| Coffee GA | DOUGLAS | 169 | 19,642 |
| Coffee GA | DOUGLAS | 176 | 8,929 |
| Columbia GA | PATRIOTS PARK | 125 | 326 |
| Columbia GA | PATRIOTS PARK | 131 | 5,958 |
| Coweta GA | JEFFERSON PARKWAY | 070 | 12,590 |
| Coweta GA | JEFFERSON PARKWAY | 073 | 1,521 |
| DeKalb GA | Cedar Grove Middle | 089 | 2,204 |
| DeKalb GA | Cedar Grove Middle | 090 | 316 |