devised is one that can only be applied to nonvoting rights districts." He stated that those considerations "are not present in any of the [C]hallenged [D]istricts except for House District 72," which shares a small border with a VRA district in the Enacted Plan, but not in Alternative Plan 1.

Dr. McDonald acknowledged that there was "no universal measure of what constitutes the best measure for compact districts," and that "[i]n the social science community, there's no threshold for when a district is compact or noncompact" using these measures. He stated that a difference of 0.01 or 0.02 in compactness scores, and even a difference of 0.03, was not "a large difference." On cross-examination, he conceded that he had not previously used or published the predominance test, and was not aware of another expert, court opinion, or state using the "predominance test" that he used to develop degradation percentages regarding compactness of the legislative districts.

B. *Stipulations*

The parties stipulated to the number of counties, cities, and precincts split in the 2001 and 2011 redistricting plans, as well as in Alternative Plans 1 and 2 developed by Dr. McDonald. They stipulated to the compactness scores for the 2001 and 2011 redistricting plans, as well as the scores for the districts in Dr. **438** McDonald's Alternative Plans 1 and 2. They also stipulated to the Reock, Polsby-Popper, and Schwartzberg compactness **745** scores of the districts challenged in *Jamerson v. Womack*, 244 Va. 506, 423 S.E.2d 180 (1992), and *Wilkins v. West*, 264 Va. 447, 571 S.E.2d 100 (2002), because the scores were not reported in those opinions. Based on these scores as stipulated, the lowest Reock score in the relevant legislative districts was 0.12 in *Jamerson* and 0.16 in *Wilkins*, and the lowest Polsby-Popper score in both cases was 0.10. For the Challenged Districts, the lowest Reock score was 0.15 (SD 28), and the lowest Polsby-Popper score was 0.08 (SD 28 and HD 72). The Reock scores of all of the Challenged Districts exceeded the minimum score in *Jamerson*, and the Polsby-Popper scores of nine of the eleven Challenged Districts exceeded the minimum score in *Jamerson* and *Wilkins*.

The parties also stipulated to documents submitted by the Attorney General of Virginia to the Department of Justice for preclearance under the VRA, which used the Reock, Polsby-Popper, and Schwartzberg measures, and to the Criteria Resolutions adopted by the House and the Senate of Virginia (Senate) (collectively, General Assembly or legislature) Privileges and Elections Committees regarding the 2011

redistricting. The Criteria Resolutions listed six criteria used to draw the districts in the 2011 Plan.[5]

**439** Additionally, the parties stipulated to letters from Governor Robert F. McDonnell regarding his veto of the original 2011 redistricting plan, H.B. 5001, and his signing of H.B. 5005, Va. Gen. Assem. (Spec. Sess. 2011), which established the 2011 Plan.[6]

C. *Motion to Strike*

At the conclusion of the Challengers' evidence, the Board and the House moved to strike, on the grounds that the Challengers failed to present evidence to support their claims that compactness was ignored and that the Challenged Districts were not compact. Instead, the Challengers only presented "their new compactness test and the alternative maps that it's based on." They argued that the Challengers' evidence showed that compactness was considered, and that the "legislature's judgment of the relative degree of compactness required, when reconciling multiple concerns of apportionment, is fairly debatable." The Challengers responded that their evidence showed that the districts were not constitutionally compact because discretionary factors predominated over the **746** constitutional requirement of compactness. The court denied the motions to strike.

D. *Evidence Presented by the Board and the House*

The Board presented evidence concerning the Senate districts from the 2011 Plan, and the House presented evidence concerning the House districts from the 2011 Plan. The Board moved into evidence floor speeches from several Senators during the 2011 redistricting process. The Senators stated that H.B. 5001 "meets all federal and state legal requirements," and that "all districts are contiguous and compact in accordance with the constitution of Virginia as interpreted by the Virginia Supreme Court in the cases **440** of *Jamerson v. Womack* and *Wilkins v. West*." Senators also made similar comments regarding H.B. 5005 and the Enacted Plan. Senator Jeremy S. McPike (Senator McPike) of the 29th Senate District testified that it was not hard for him to travel around his district, and that, during the campaign, the "shape or geographic extent of [his] district" did not cause any problem in communicating with constituents because "[m]ost of it's social media now."

Dr. M.V. "Trey" Hood, III (Dr. Hood) testified as an expert for the Board. He stated that there was no consensus on

the best measure of compactness or a threshold for when a district was not compact, and that the different scores "measure compactness in different ways," but he does not average different types of compactness scores. Dr. Hood stated that there was a decrease in the average compactness scores overall from the 2001 plan to the 2011 Plan, but the decline in compactness did not "on its face, mean that these districts are necessarily uncompact."

Dr. Hood listed among his "criticisms" of Dr. McDonald's approach that he should have compared the whole redistricting plan to other plans, rather than compare district-to-district, because the districts "are not drawn in isolation from one another" and because the districts in the alternative plans and the 2011 Plan did not exactly overlap geographically, so "sometimes it's not easy to compare one district from one plan to another district from another plan." His "criticisms" also included that Dr. McDonald should not have averaged compactness scores, and that there "could be" another Alternative Plan 1, although neither he nor anyone else had proposed such a plan. [7] Dr. Hood also had "questions about how this [the predominance test] would actually be implemented if it was ever put in place," because there would be "a fight" in the legislature over drawing alternative plans, because there is "no best way" to "completely maximiz[e] compactness." Also, he claimed Dr. McDonald did not account for how the legislature would attempt to balance all of the factors involved in redistricting.

The House then presented its evidence. Delegate Chris Jones (Delegate Jones) testified that he was the chief patron of the 2011 redistricting legislation in the House, and he was also an architect *441 of the 2001 redistricting plan. He stated that there was a "very similar" increase in population in both the 2000 census that informed the 2001 plan (a "13 or 14 percent population increase") and the 2010 census that informed the 2011 Plan ("about a 13 percent increase in population"). He explained that he thought the districts in the 2011 Plan were more compact than those in the 2001 plan. For example, even though the compactness scores showed that HD 13 was less compact in 2011 than it was in 2001, he explained that, "[f]rom [my] perspective," it was more compact in 2011, because both the population and geographic area of the district were reduced, and "because of the ease of going back and forth between the districts."

Delegate Jones stated that the House hired John Morgan (Morgan) and Dale Oldham (Oldham) to assist in the 2011 redistricting, and explained the criteria he used in the map

drawing process, including equal population, the VRA, and communities of interest. He stated that he did not believe that the VRA districts could be treated differently in terms of being compact and contiguous as required by the Constitution of Virginia.

**747 Delegate Jones testified that he believed that the 2011 Plan complied with the Criteria Resolutions regarding priority of constitutional considerations over discretionary factors. He stated that priority was given to state constitutional criteria, and that, "if there was an actual conflict between compactness and [discretionary criteria]," compactness prevailed.

On cross examination, Delegate Jones testified that, during the 2011 redistricting process, he would draw a map, and Oldham and Morgan "would look at the compactness and contiguity scores" with Reock and Polsby-Popper measures. He said that he "was confident that the map that I had drawn, the districts that were there that were contained within, met the criteria for compactness and contiguity per" *Wilkins* and *Jamerson*.

Delegate Jones asserted that the criteria of compactness was "never subordinated," because the "top three criteria [the federal Constitution, Constitution of Virginia, and the VRA] always were met within the range established by *Wilkins*." He stated that "my assumption is that when we ran the plans, that if a score was better than [the score] that was affirmed by the Supreme Court [in *Jamerson* and *Wilkins*], then we would ... be in a good state," but *442 he "did not bother myself with that information. I was more drawing the districts." The court clarified that Delegate Jones was "assuming there was some numerical score from those compactness tests, and you just relied on counsel to tell you that you were meeting them."

Morgan testified that he worked with Delegate Jones in the 2011 redistricting using the House Criteria Resolution. He stated that compactness was "implemented" in the 2011 Plan because they ran "compactness reports" using the Reock and Polsby-Popper measures, and the compactness scores "were within the acceptable range as defined by the *Jamerson* and *Wilkins* cases." He stated that compactness was not ignored or given pro forma consideration, but that it was "looked at during the process" in 2011.

Dr. Thomas B. Hofeller (Dr. Hofeller) testified as an expert in redistricting who had been in the fields of redistricting and census information for nearly 50 years, and had drawn or advised the drawing of hundreds of redistricting maps

in "almost all the states." He compiled the minimum and maximum compactness scores for all of the districts in Virginia's 1991, 2001, and 2011 plans, and stated that "*Jamerson* and *Wilkins* spoke to ... the minimum scores of the districts that [ ] complied with the compactness criteria in the state constitution. So it forms a floor. You can characterize it as a floor."

Dr. Hofeller stated that he did not think that Dr. McDonald's test is "a proper and useful way to determine compliance" with the compactness requirement. He stated that Dr. McDonald's test was done six years after the redistricting, so his report "could have never related to the processes of one [redistricting] unfolding." He also opined that Dr. McDonald "kind of snatched complexity out of the jaws of simplicity here with regard to what the General Assembly was trying to do," which was to "pick[ ] out a standard by which they felt they were compliant with the constitutional requirement for compactness, and that was the floor that was established in *Jamerson* and *Wilkins*." He noted that Dr. McDonald's test was not peer reviewed. He also stated: "I think that the elimination of the minority districts is inappropriate," because there was a "rather subjective treatment" by Dr. McDonald to draw the alternative districts around the existing VRA districts.

**\*443** On cross examination, Dr. Hofeller acknowledged that Alternative Plans 1 and 2 were not presented as plans that the legislature should adopt. He acknowledged that Dr. McDonald did not purport to create a bright line test, and that neither Dr. McDonald nor anyone else had created a bright line score for compactness. He agreed that the constitutions trump "[w]hatever else the legislature ... chooses to add to that [which] is within its discretion."

After the close of the evidence, the court overruled a previously filed motion *in limine* regarding Dr. McDonald's testimony.[8] The **\*\*748** circuit court stated that it would consider the predominance test and Dr. McDonald's conclusions. The court noted that it disagreed with Dr. Hofeller's assertion "that the Supreme Court of Virginia has ever established a constitutionally required minimum compactness score for measuring the priority given to compactness in drawing legislative districts." The court also stated that the standard expressed in *Wilkins* and *Jamerson* "requires that if the evidence offered by both sides of the case would lead reasonable and objective persons to reach different conclusions, then the legislative determination is 'fairly debatable' and must be upheld." The circuit court

determined that the legislative determination regarding the compactness of the Challenged Districts was fairly debatable and upheld the constitutional validity of the Challenged Districts.

## ANALYSIS

The Challengers assert that the circuit court erred in finding that the evidence presented to it was sufficient to support its conclusion that the constitutionality of the General Assembly's redistricting decision regarding each of the Challenged Districts was fairly debatable. In other words, the Challengers claim that the evidence they presented to the circuit court established that the General Assembly subordinated the required criterion of compactness to discretionary criteria, and that such evidence proved that no objective and reasonable person could conclude that the Challenged Districts were not in violation of the compactness requirement of Article II, § 6 of the Constitution of Virginia. We disagree.

**\*444** Article II, § 6 of the Constitution of Virginia provides that electoral districts are "established by the General Assembly." The exercise of that power clearly encompasses the drawing of legislative districts. As recited above, the districts in the General Assembly's 2011 Plan were codified in Code § 24.2-303.3 and Code § 24.2-304.03.

Established principles govern our determination whether the General Assembly has adhered to the Constitution in exercising its legislative power. Redistricting legislation is subject to "the principles applicable to our review of legislative determinations." *Wilkins*, 264 Va. at 462, 571 S.E.2d at 108. The first such principle is that every law enacted by the General Assembly "is entitled to a strong presumption of validity and will be invalidated by the courts only if it clearly violates a constitutional provision." *Id.* (citation and internal quotation marks omitted); *City of Newport News v. Elizabeth City Cty.*, 189 Va. 825, 839, 55 S.E.2d 56, 64 (1949).

The party challenging an enactment has the burden of proving that the statute is unconstitutional, and every reasonable doubt regarding the constitutionality of a legislative enactment must be resolved in favor of its validity. *Marshall v. Northern Va. Transp. Authority*, 275 Va. 419, 428, 657 S.E.2d 71, 75 (2008); *Hess v. Snyder Hunt Corp.*, 240 Va. 49, 53, 392 S.E.2d 817, 820 (1990). *See Blue Cross of Virginia*

813 S.E.2d 739

v. *Commonwealth*, 221 Va. 349, 358-59, 269 S.E.2d 827, 832-33 (1980); *see also In re Phillips*, 265 Va. 81, 85-86, 574 S.E.2d 270, 272 (2003). Further, in determining the constitutionality of a General Assembly enactment, we must give the Constitution a liberal construction in favor of sustaining the enactment in question, if practicable. *Marshall*, 275 Va. at 428, 657 S.E.2d at 75; *Heublein, Inc. v. Department of Alcoholic Beverage Control*, 237 Va. 192, 195, 376 S.E.2d 77, 78 (1989).

Here, we are only concerned with the compactness requirement stated in Article II, § 6 of the Constitution of Virginia. Article II, § 6 of the Constitution of Virginia provides that legislative districts "shall be composed of contiguous and compact territory." The Challengers allege that the Challenged Districts were clearly drawn in violation of the compactness requirement in Article II, § 6.

Compactness is a somewhat abstract concept. Determining compactness does not admit to a bright line approach in determining **\*445** whether a legislative district is, in fact, compact. As attested to by the Challengers' expert, Dr. McDonald, social scientists have developed at least 50 different methods of measuring compactness. The proliferation of measures does not provide clarity. It does **\*\*749** exactly the opposite. In the social science community, there is no universal definition or consensus as to what constitutes the best measure for compact districts.

In addition to statistical compactness measures, the record demonstrates that policymakers and citizens define compactness in a variety of ways. Delegate Jones testified to his spatial and political assessment of compactness, which included consideration of geographic size, ease of travel and representation, and communities of interest. Also, in vetoing the initial redistricting bill (H.B. 5001), Governor McDonnell linked compactness not only to statistical compactness scores but also to the number of localities split between districts and to "a plain visual examination of the districts."

In *Wilkins* and *Jamerson*, we have held that courts must "give proper deference to the wide discretion accorded the General Assembly in its value judgment of the relative degree of compactness required when reconciling the multiple concerns of [redistricting]." *Jamerson*, 244 Va. at 517, 423 S.E.2d at 186. We have stated that redistricting is, in a sense, political. *Id.* at 510, 423 S.E.2d at 182. Thus, giving the General Assembly the opportunity to determine the relative level of compactness in the first instance places the decision, of what degree of compactness best serves local needs, with the institution best informed to make that decision.

Although whether a voting district is "compact" is justiciable, it is a question of "fact" triggering the "fairly debatable" standard. *See Jamerson*, 244 Va. at 509-10, 423 S.E.2d at 182.

> When the constitutionality of a statute depends on facts, the determination of those facts by the legislature can be set aside if it is clearly erroneous, arbitrary, or wholly unwarranted. If the *evidence offered in support of the facts in issue would lead objective and reasonable persons to reach different conclusions, the legislative determination is considered fairly debatable* and such a determination must be upheld by the courts.

**\*446** *Wilkins*, 264 Va. at 462, 571 S.E.2d at 108 (emphasis added).

Specifically,

> if the validity of the legislature's reconciliation of various criteria is fairly debatable and not clearly erroneous, arbitrary, or wholly unwarranted, neither the court below nor this Court can conclude that the resulting electoral district fails to comply with the compactness and contiguous requirements of Article II, § 6.

*Id.* at 463, 571 S.E.2d at 108.

Accordingly, our decisions in *Jamerson* and *Wilkins* do not vest the judiciary with authority to establish a standard of compactness in the first instance; rather, our role is to "review legislative determinations of fact" regarding compactness to ensure that they are not "clearly erroneous, arbitrary, or wholly unwarranted." *Jamerson*, 244 Va. at 510, 423 S.E.2d at 182. Thus, our precedent requires our courts to

813 S.E.2d 739

give the General Assembly deference and wide discretion in determining compactness of legislative districts. However, the judiciary has the authority and obligation to intervene when an abuse of that discretion is shown by a grave, palpable, and unreasonable deviation from the principles fixed by the Constitution. *Id.* at 510, 423 S.E.2d at 182. In considering the validity of a redistricting statute, we have said that "when fair-minded men[,] from an examination of the [redistricting,] can entertain no reasonable doubt that there is a grave, unnecessary, and unreasonable [error], the Constitution has been violated and it is the duty of the court to so declare." *Id.* (citation, alteration and internal quotation marks omitted).

In addition, as an appellate court, we also "must give proper deference" to a circuit court's resolution of disputed facts, if supported by credible evidence. We must consider the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to the parties who prevailed before the circuit court. *Jamerson,* 244 Va. at 517, 423 S.E.2d at 186.

The Challengers had the initial burden to show "probative evidence of unreasonableness," and the legislature could respond to that showing with evidence that its actions **750 were reasonable. *See* *447 *Board of Supervisors v. Jackson,* 221 Va. 328, 333, 269 S.E.2d 381, 384-85 (1980). At that point, "[i]f such evidence of reasonableness is sufficient to make the issue fairly debatable, the legislative action must be sustained." *Id.* at 333, 269 S.E.2d at 385. Thus, the key question that must be answered in resolving this appeal is simply whether the legislature's determination, that the Challenged Districts are in fact compact, is fairly debatable. If so, the circuit court's judgment must be affirmed.

In support of their claim, the Challengers presented Dr. McDonald's expert testimony. He testified about a predominance test that he devised for this litigation. Applying his test, Dr. McDonald concluded that the composite district compactness scores (using the Reock and Polsby-Popper measures) of each of the Challenged Districts had been "degraded" by more than 50 percent from the compactness score of an alternative district drawn to be as compact as possible, without consideration of any discretionary criteria. Based upon the results of his test, he opined that the General Assembly subordinated the constitutional requirement that the districts be compact to other discretionary considerations in drawing the Challenged Districts. The Challengers rely upon that opinion as their evidence that the Challenged

Districts are clearly in violation of the compactness requirement expressed in Article II, § 6.

The Challengers' theory that Dr. McDonald's testimony clearly proves there was a violation of the compactness requirement in Article II, § 6 faces several challenges. Notably, it is based upon the measure of a requirement, predominance, that is not found in our Constitution, and it does not account for the discretionary factors the legislature balances when drawing districts; it relies on measurements (statistical scores) that do not have a universally accepted meaning; and the test devised by Dr. McDonald is novel and unproven.

First, Dr. McDonald's approach assumes that evaluating compactness involves considering whether discretionary factors predominated over other factors. This assumption has no support in the text of the Constitution nor from precedents in Virginia law. To the contrary, our Court has previously stated that "any purpose that may underlie the design of an electoral district, while relevant to challenges under other portions of the Constitution *448 of Virginia ... is not determinative in a challenge based on Article II, § 6." *Wilkins,* 264 Va. at 462, 571 S.E.2d at 108. Instead, "[d]eterminations of contiguity and compactness, as we said in *Jamerson,* are limited to consideration of the district from a spatial perspective, taking into consideration the other facts that a legislative body must balance in designing a district." *Wilkins,* 264 Va. at 462, 571 S.E.2d at 108. The proper inquiry is whether the resultant district is, in fact, compact. In making that determination, our precedent has recognized that "traditional [discretionary] redistricting elements not contained in the statute ... are also legitimate legislative considerations." *Id.* at 464, 571 S.E.2d at 109. Where there is evidence that the General Assembly considered the constitutional requirement of compactness in reconciling the different demands upon it in drawing legislative districts, deference is given to the General Assembly in its value judgment as to the relative degree of compactness required. *Jamerson,* 244 Va. at 517, 423 S.E.2d at 186.

It is also important to note that, contrary to a core premise in Dr. McDonald's test, the Constitution of Virginia does not require districts to be as compact as possible. [9] Article II, § 6 simply requires that districts "shall be ... compact." *See, e.g., Wilkins,* 264 Va. at 466, 571 S.E.2d at 110 (observing that "nothing in this record indicates that the District is repugnant to the constitutional principles of compact and contiguous electoral districts," even though the

813 S.E.2d 739

district was "far from the most compact district"). As the Board observed, the compactness requirement is not based on the same type of objective comparative inquiry as the equal population requirement.

Second, Dr. McDonald's approach depended solely on calculations of relative compactness using several common compactness score measures. It is undisputed that there is no accepted **\*449** bright-line test or score in the social sciences for when a district can no longer be considered "compact." Dr. McDonald acknowledged that there is "no universal definition of what constitutes the best measure for compact districts," and that "[i]n the social science community, there's no threshold for when a district is compact or noncompact." Our decisions in *Jamerson* and *Wilkins* do not purport to adopt a bright-line standard; indeed, those opinions do not even recount the compactness scores of the districts upheld therein. However, the record indicates that the districts challenged in this case all have Reock scores exceeding the lowest score for a district upheld in *Jamerson* and within 0.01 of the lowest score upheld in *Wilkins*. Nine of the Challenged Districts have Polsby-Popper scores greater than or equal to the lowest score for districts upheld in *Jamerson* and *Wilkins*. Two of the Challenged Districts (HD 72 and SD 28) have Polsby-Popper scores which are 0.02 below the lowest score for a district upheld in those cases. However, Dr. McDonald agreed that a 0.02 difference is not "a large difference" and generally is not meaningful. Thus, compactness scores for the Challenged Districts were at least approximately the same or greater than the scores of districts previously found to be constitutionally compact.

Third, Dr. McDonald's predominance test was admittedly novel and created for this case. He conceded that the predominance test had not previously been used or published, and he was not aware of any other expert, court opinion or state using the "predominance test" that he used to develop degradation percentages regarding compactness of the legislative districts. Dr. McDonald admitted that the entire question the new test purports to answer—whether other redistricting criteria predominated over compactness—"is not a question that I've ever seen in any legal or scholarly writings that are out there." Consequently, the predominance test has no supporting basis in social science scholarship or redistricting case law.

As noted above, the standard applicable at trial is highly deferential to the government, even after a challenger meets his *prima facie* burden.[10] The government need only

present "some **\*450** evidence of reasonableness," and the evidence need not establish the government's position by a "preponderance of the evidence;" it is enough if "the evidence offered in support of the opposing views would lead objective and reasonable persons to reach different conclusions." *Ames v. Town of Painter*, 239 Va. 343, 348, 389 S.E.2d 702, 704 (1990) (citation and internal quotation marks omitted).

The Board and the House countered the Challengers' case with extensive evidence that the Challenged Districts were reasonable, including testimony and statements from the individuals who crafted the 2011 Plan and experts who disagreed with and challenged Dr. McDonald's opinions regarding compactness. For purposes of this appeal, that evidence is viewed in the light most **\*\*752** favorable to the Board and the House, the prevailing parties at trial.

The evidence produced by the House and the Board showed that compactness was considered by the General Assembly during the redistricting. Both the House and the Senate adopted criteria for the 2011 redistricting that included "compact and contiguous" districts under Article II, § 6 and consistent with *Wilkins* and *Jamerson*. Several of the floor speeches and other exhibits introduced into the record mentioned compactness. Morgan and Delegate Jones testified that they checked the compactness scores of districts as they were creating the 2011 Plan against scores of the districts approved in *Wilkins* and *Jamerson*. At trial, the defense presented testimony from two experts about the 2011 redistricting and compactness—Dr. Hood regarding the Senate districts, and Dr. Hofeller regarding the House districts. Both experts agreed that all of the Challenged Districts were sufficiently compact.

Both experts also cast doubt upon the validity of Dr. McDonald's predominance test. Dr. Hofeller testified that the predominance test was not a proper and useful way to assess compliance with the compactness requirement. He faulted the test's lack of foundation, noting that it lacked peer review, exposure, supporting **\*451** research, and use during an actual redistricting. Dr. Hofeller also testified that the low level of overlap between the enacted and alternative districts meant the new test compared apples to oranges. He questioned the complexity added by the new test and whether it could be applied within Virginia's compressed redistricting timeframe. Lastly, he opined that excluding VRA districts from its application cast doubt on the validity of the predominance test, because there "needs to be one redistricting standard for all the districts."

Vesilind v. Virginia State Board of Elections, 295 Va. 427 (2018)

813 S.E.2d 739

Dr. Hood opined that any compactness test should be able to be applied to all the districts in a plan, and noted that the Challengers' new test admittedly could not be applied to approximately 50 percent of the Senate districts, because those districts were either governed by the VRA or bordered VRA districts. Dr. Hood also opined that the new test's averaging of different compactness scores for a district was not a typical or recommended practice. Indeed, Dr. McDonald admitted that he could not recall having averaged a district's compactness scores before, and admitted that averaging could mask results on particular scores.

The circuit court accepted all the evidence from both sides and, after weighing it, concluded that reasonable minds would disagree as to whether the Challenged Districts are sufficiently compact. Taken together, the evidence presented by the Challengers and that presented on behalf of the House and the Board was sufficient to establish that the constitutional validity of the Challenged Districts under the compactness requirement was fairly debatable.

The circuit court was not required to accept the opinion of Dr. McDonald as being true or accurate. Also, even if the circuit court accepted the correctness of Dr. McDonald's opinion that his test measured the effect of discretionary criteria upon compactness, the circuit court was not bound to accept the Challengers' theory that proof that the General Assembly subordinated the criterion of compactness to discretionary criteria *per se* resulted in a clear violation of the compactness requirement expressed in Article II, § 6.

The test that Dr. McDonald based his opinion upon was created for the purpose of this litigation and had never been used by **\*452** anyone before to measure "predominance" and "degradation." It is based upon measures of compactness and creates a rule regarding it although the creator of the test concedes that there is no consensus on how to measure compactness and there is no bright line demonstrating when a district is compact and when it is not. Further, it is undisputed that the compactness of the Challenged Districts is approximately equivalent to or better than that of districts upheld in the past, as measured by widely used compactness scores. Moreover, the Challengers offered no direct evidence that the legislature ignored compactness,

or any other evidence, other than Dr. McDonald's opinion based upon statistical compactness scores, as a basis for their assertion that the Challenged **\*\*753** Districts violated the compactness requirement.

Further, there was evidence that the legislature attempted to reconcile discretionary considerations with the acknowledged requirement in Article II, § 6 that the districts be compact. The legislature's efforts to ensure that the compactness scores of the districts in the 2011 Plan remained largely at or above the scores of the districts approved by this Court in *Jamerson* and *Wilkins*, while not dispositive, are evidence that could lead reasonable people to find that the Challenged Districts were constitutionally compact. Even if the districts in the 2011 Plan were not as compact as they could have been, as we have explained above, that is not what our Constitution requires. Our Constitution speaks to the result of the redistricting process, and mandates that districts be compact in the end. It does not attempt to curtail the legislative process that creates the end result. Nor does it require that compactness be given priority over other considerations, much less establish a standard to determine whether the legislature gave proper priority to compactness. Thus, there is evidence to support the ruling that the determination of the General Assembly regarding compactness of the Challenged Districts is fairly debatable, and not clearly erroneous, arbitrary, or wholly unwarranted, and we must uphold the legislature's decision to draw the Challenged Districts as it did.

CONCLUSION

The circuit court did not err in concluding that evidence was presented at trial that would "lead reasonable and objective **\*453** people to differ" regarding the compactness of the Challenged Districts, and declaring the constitutional validity of the Challenged Districts under the fairly debatable standard applied to determinations made by the legislature. Accordingly, we will affirm the judgment of the circuit court.

*Affirmed.*

**All Citations**

295 Va. 427, 813 S.E.2d 739

Vesilind v. Virginia State Board of Elections, 295 Va. 427 (2018)

813 S.E.2d 739

## Footnotes

1    After the 2011 redistricting, the Supreme Court of the United States ruled that preclearance by the Department of Justice under Section 5 of the VRA is no longer determined by the coverage formula in Section 4(b) of the VRA. *Shelby County v. Holder*, 570 U.S. 529, 556-57, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013).

2    By order dated March 23, 2018, the Hon. M. Kirkland Cox, current Speaker of the Virginia House of Delegates, was substituted for the Hon. William J. Howell as an appellee in this appeal.

3    The Reock, Polsby-Popper and Schwartzberg tests are three different statistical calculations used by the social science community to measure the compactness of legislative districts. According to Dr. McDonald, the Polsby-Popper score "is a perimeter measure that compares the area of a district to the area of a circle with the same perimeter." The Reock score "is an area or dispersion measure that compares the area of a district to the area of the small circle that can be drawn around the district." The Schwartzberg measure "is a perimeter-based measure that uses a simplified version of the district's perimeter that is designed to smooth [out] the jaggedness in the perimeter of a district that may be caused by natural geography such as rivers or coast lines or sometimes the map drawer's choices." The Schwartzberg measure "then compares the simplified perimeter of the district to the perimeter of the circle with the same area as the original district." The Reock and Polsby-Popper measures range from 0 to 1, with 1 being the most compact. The Schwartzberg measure initially results in scores that increase from 1, but Dr. McDonald converted those scores to result in scores that are in the same range of 0 to 1, with 1 representing the most compact form. Dr. McDonald acknowledged that there are approximately 50 such measures developed and used by social scientists.

4    Dr. McDonald initially used a composite score of all three measures, but later he focused on composite scores based only on the Reock and Polsby-Popper measures, because those were the measures used by the legislature.

5    Criteria I was that the "population of each district shall be as nearly equal to the population of every other district as practicable," within "plus-or-minus two percent" for the Senate and "plus-or-minus one percent" for the House, and Criteria II was to draw the districts in accordance with the VRA.

    Criteria III stated, in relevant part: "Districts shall be contiguous and compact in accordance with the Constitution of Virginia as interpreted by the Virginia Supreme Court in the cases of [*Jamerson*] and [*Wilkins*]." Criteria IV required that "[a]ll districts shall be single-member districts," and Criteria V stated: "Districts shall be based on legislative consideration of the varied factors that can create or contribute to communities of interest," which "may include ... economic factors, social factors, cultural factors, geographic features, governmental jurisdictions and service delivery areas, political beliefs, voting trends, and incumbency considerations." Criteria VI stated the rules of priority:

> All of the foregoing criteria shall be considered in the [redistricting] process, but population equality among districts and compliance with federal and state constitutional requirements and the Voting Rights Act of 1965 *shall be given priority* in the event of conflict among the criteria. Where the application of any of the foregoing criteria may cause a violation of applicable federal or state law, there may be such deviation from the criteria as is necessary, but no more than is necessary, to avoid such violation.

    (Emphasis added.)

6    Governor McDonnell vetoed H.B. 5001, noting, among other concerns, that "it is apparent that districts proposed in the Senate plan are not compact, as required in the Constitution of Virginia," and that "[u]sing the most commonly recognized tools of compactness scoring, the Reock and Polsby-Popper methods, the plan adopted by the Senate has less compact districts than the existing House or Senate districts or other

plans that have been proposed." In a statement marking his signature of H.B. 5005, the Governor noted that the revised "plan retains more geographic and municipal boundaries, contains districts that are somewhat more compact, and passed the Senate on a strong bipartisan vote." The Governor acknowledged that "[w]hile additional improvements in measures of compactness and preservation of communities of interest would have been ideal, and no plan is perfect, the Constitution of Virginia tasks the General Assembly with drawing lines ...."

7    Dr. McDonald acknowledged that he could not say that Alternative Plan 1 was "the most compact map," and agreed that "Alternative Plan 1 is an ideal, not the ideal compactness plan for all purposes and all possibilities."

8    The ruling of the circuit court on the motion *in limine* to exclude Dr. McDonald's testimony is the subject of an assignment of cross-error filed in this appeal. However, we need not address that assignment of cross-error in resolving this case.

9    Unlike Virginia's general requirement that districts be "compact," other states provide specific standards for compactness, either by controlling the process of redistricting or the maps drawn as a result. For example, in Arizona, an independent redistricting commission begins the mapping process by creating "districts of equal population in a grid-like pattern across the state," and then making adjustments "as necessary to accommodate" enumerated goals, including that districts "shall be geographically compact and contiguous to the extent practicable." Ariz. Const. art. IV, pt. 2, § 1. Colorado requires that "[e]ach district shall be as compact in area as possible and the aggregate linear distance of all district boundaries shall be as short as possible." Colo. Const. art. V, § 47.

10    The Challengers assert that the circuit court found their *prima facie* burden of proof was met based upon the court's denial of the House and Board's motions to strike. However, at that stage of the trial, the Challengers enjoyed "all reasonable inferences drawn from the evidence in the light most favorable" to them. *Izadpanah v. Boeing Joint Venture*, 243 Va. 81, 82, 412 S.E.2d 708, 709 (1992). The presumption in the Challengers' favor, however, does not carry beyond that procedural stage, and they bore the burden at trial with no benefit of the doubt. Thus, prevailing on the motions to strike did not mean that the Challengers carried any burden relevant to the court's decision after trial on the merits. *See Kiddell v. Labowitz*, 284 Va. 611, 621 n.3, 733 S.E.2d 622, 627 n.3 (2012) (explaining that denial of a motion to strike was not a finding that the non-moving party met its substantive burden).

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

| | | |
|---|---|---|
| **RIMA FORD VESILIND,** *et al.* | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | **Case No. CL15003886** |
| | ) | |
| **VIRGINIA STATE BOARD OF ELECTIONS,** | ) | |
| *et al.* | ) | |
| **Defendants.** | ) | |

### STIPULATIONS

For trial, motions, and all other proper uses and purposes in the above-styled case, the parties, by counsel, stipulate as follows. Anything not expressly stipulated or waived is reserved.

1.      The parties stipulate to the authenticity of the population (including voting age populations) and racial data provided by the U.S. Census Bureau in P.L. 94-171, with the Bureau's subsequent correction of total population and a limited number of population subgroups concerning two census blocks in the Norfolk area for which the geocodes were incorrect. As this data does not appear in a traditional paginated form, the parties agree that it may be used at trial in a variety of formats such as charts or maps created from this data.

2.      The parties stipulate to the authenticity of the Shape (.shp) or Block Assignment (.txt) files found on the Division of Legislative Services website: http://redistricting.dls.virginia.gov/2010/RedistrictingPlans.aspx.

3.      The parties stipulate to the authenticity of the election return data made publicly available by the Virginia Department of Elections on http://www.elections.virginia.gov/. As this data does not appear in a traditional paginated form, the parties agree that it may be used at trial in a variety of formats such as charts or maps created from this data to the extent relevant to the court's consideration of any redistricting plan pertinent to this case.

4.      The parties stipulate to the Reock, Polsby-Popper, and unadjusted Schwartzberg scores for the benchmark plan using 2000 census geography and for the enacted plans and Plaintiffs' Alternative Plans 1 & 2 using 2010 census geography, as generated in the Maptitude for Redistricting software's standard compactness report, copies of which are attached to this stipulation as Exhibits J2, J3, J4, J5, J6, J7, J8, and J9.

5.      The parties stipulate that Exhibit J10 (OAG01094-01119) is a true and accurate copy of tables and figures submitted into evidence in *Wilkins v. West* (which was captioned *West v. Gilmore* when before the Salem Circuit Court). The parties further stipulate that Exhibit J11 summarizes the Reock (Dispersion Compactness) and Polsby-Popper (Perimeter Compactness)



J. Morgan

**EXHIBIT- 5**

2/9/2023

scores from Exhibit J10 (OAG01094-01119) for the districts at issue in *Jamerson v. Womack*, 244 Va. 506, 423 S.E.2d 180 (1992), and *Wilkins v. West*, 264 Va. 447, 571 S.E.2d 100 (2002).

6.     The parties stipulate that the maps of each challenged district attached as Exhibits J12 (house) and J13 (senate), which have been generated through the Maptitude for Redistricting software, accurately reflect each district under the benchmark (using 2010 census geography) and enacted plans.

7.     The parties stipulate that the maps attached as Exhibits J14 and J15 which have been generated through the Maptitude for Redistricting software, accurately reflect Plaintiffs' Alternative Plans 1 and 2.

8.     The parties stipulate to the authenticity of the videos of House and Senate Floor debates on all redistricting bills in 2011 as provided in discovery by the OAG via hand-delivery on February 1, 2016 and contained in thirty-two (32) CD/DVDs (OAG 00244-245).

9.     The parties stipulate to the authenticity of the transcripts and summaries of House and Senate P&E Committee meetings and floor debates in 2011 as provided in discovery (OAG 00207-450).

10.     The parties stipulate to the authenticity of the Criteria Resolutions adopted by House and Senate P&E Committees in 2011 as provided in discovery (OAG 00944-945 and VAHOD0005838-5839).

11.     The parties stipulate to the authenticity of Gov. McDonnell's Veto letter (VAHOD0000444-446) and letter upon signing the redistricting legislation (VAHOD0002279-2281).

12.     The parties stipulate to the authenticity of Division of Legislative Services Reports for each submitted plan listed at http://redistricting.dls.virginia.gov/2010/RedistrictingPlans.aspx#21,list.     For example: http://redistricting.dls.virginia.gov/2010/Data/house%20plans/hb5005_passed_042811_houseplan/hb5005_passed_042811_houseplan.pdf.

13.     The parties stipulate to the authenticity of those preclearance documents submitted by OAG to DOJ set forth in the attached Index.

14.     The parties stipulate to the authenticity of Drawing the Line, the DLS papers on redistricting in Virginia (DLS0000002-29 & DLS0000030-41).

15.     The parties stipulate that the deposition and trial transcripts of Delegate Chris Jones, Christopher Marston and John Morgan and the trial transcripts of Dr. Hood and Dr. Hofeller from *Golden Bethune-Hill et al. v. Va. State Bd. of Elections et al.*, E.D. Va. case no. 3:14-cv-00852, are authentic and accurately reflect their testimony as transcribed by the court reporter.

16.     The parties stipulate to the authenticity of the media-related documents produced in discovery with the Bates numbers OAG 00451-728; VAHOD0003924, 5954-5961, and 6120-6441.

17.     The parties stipulate to the authenticity of the County/City splits and precinct splits as noted in Maptitude reports for the benchmark plan using 2000 census geography, and for the enacted plan and Plaintiffs' Alternate Plans 1 & 2 using 2010 census geography, copies of which are attached to this stipulation as Exhibits J16, J17, J18, J19, J20, J21, J22, and J23.

18.     The parties stipulate that the DLS compiled Incumbent Addresses and DLS0000498 and DLS0000505 are authentic copies of that compilation.

PDX-302.3

Respectfully submitted,

Wyatt B. Durrette, Jr. (VSB No. 04719)
Debbie G. Seidel (VSB No. 23124)
Christine A. Williams (VSB No. 47074)
DURRETTECRUMP PLC
1111 East Main Street, 16th Floor
Richmond, VA 23219
Telephone: (804) 775-6900
Facsimile: (804) 775-6911
wdurrette@durrettecrump.com
cwilliams@durrettecrump.com

*Counsel to Plaintiffs*

PDX-302.4

Respectfully submitted,

Mark Herring
Cynthia E. Hudson
John W. Daniel
Heather H. Lockerman (VSB No. 65535)
Joshua D. Heslinga (VSB No. 73036)
Anna T. Birkenheier (VSB No. 86035)
OFFICE OF THE ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-3847
  hlockerman@oag.state.va.us
  jheslinga@oag.state.va.us
  abirkenheier@oag.state.va.us

*Counsel for the Defendants, the State Board of Elections and its members (James B. Alcorn, Clara Belle Wheeler, and Singleton B. McAllister) in their official capacities, the Department of Elections, and Commissioner of Elections Edgardo Cortés in his official capacity*

5

Respectfully submitted,

Katherine L. McKnight (VSB No. 81482)
E. Mark Braden (*pro hac vice*)
Richard B. Raile (VSB No. 84340)
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036
Telephone: (202)861-1500
Facsimile: (202)861-1783
kmcknight@bakerlaw.com
mbraden@bakerlaw.com
rraile@bakerlaw.com

*Counsel to the Virginia House of Delegates*
*and Virginia House of Delegates Speaker*
*William J. Howell*

6

VIRGINIA:

## IN THE CIRCUIT COURT FOR THE CITY OF RICHMOND

| | | |
|---|---|---|
| RIMA FORD VESILIND, *et al.* | ) | |
| **Plaintiffs** | ) | |
| v. | ) | Case No. CL15003886 |
| | ) | |
| VIRGINIA STATE BOARD OF ELECTIONS, *et al.* | ) | |
| **Defendants.** | ) | |

## INDEX OF 1/29 OAG PRODUCTION BY BATES NUMBER

**Folder – 2011_HOUSE_SENATE_NOTEBOOK_1_ATT_1_7**

| Bates Number | File Name |
|---|---|
| OAG 00844 | Letter_to_Hon_E_Duncan_Getchell_Jr_from_Thomas_E_Perez |
| OAG 00845 – OAG 00846 | Introduction |
| OAG 00847 – OAG 00852 | Index |
| OAG 00853 – OAG 00860 | Summary |
| OAG 00861 – OAG 00879 | Att_1_Chapter_1_2011_VA_Acts_of_Assembly |
| OAG 00880 – OAG 00892 | Att_2_S_Sections_24.2_303.1_24.2_303.2. |
| OAG 00893 – OAG 00910 | Att_2_H_Sections_24.2_304.01_24.2_304.02 |
| OAG 00911 – OAG 00925 | Att_3_S_Statement_of_the_Change |
| OAG 00926 – OAG 00942 | Att_3_H_Statement_of_the_Change |
| OAG 00943 – OAG 00947 | Att_4_S_P_and_E_Committee_Resolution_1 |
| OAG 00948 – OAG 00952 | Att_4_H_P_and_E_Committee_Resolution_1 |
| OAG 00953 – OAG 00988 | Att_5_S_Stmt_of_Anticip_Minority_Impact |
| OAG 00989 – OAG 01024 | Att_5_H_Stmt_of_Anticip_Minority_Impact |
| OAG 01025 – OAG 01046 | Att_6_Stmt_of_Past_or_Pending_Litigation |
| OAG 01047 – OAG 01052 | Att_7_Current_Senate_Districts |
| OAG 01053 – OAG 01060 | Att_7_Current_House_Districts |
| OAG 01061 – OAG 01065 | Misc_Documents |

**Folder – 2011_HOUSE_SENATE_NOTEBOOK_2_ATT_7_9**

| | |
|---|---|
| OAG 00739 – OAG 00750 | Att_7_HB_5005_passed_Senate |
| OAG 00751 – OAG 00762 | Att_7_HB_5005_passed_House |
| OAG 00763 – OAG 00770 | Att_7_SB_5001_J_Howell_4_3_11 |
| OAG 00771 – OAG 00782 | Att_7_HB_5001_Senate_Committee_Subst |
| OAG 00783 – OAG 00790 | Att_7_SB_5002_W_and_M_Senate_Plan |
| OAG 00791 – OAG 00802 | Att_7_HB_5002_U_of_R_House_Plan |
| OAG 00803 – OAG 00810 | Att_7_J_Howell_SB_Plan |
| OAG 00811 – OAG 00818 | Att_7_J_Howell_SB_Plan_3_30_11 |
| OAG 00819 – OAG 00826 | Att_7_Watkins_Committee_Substitute |
| OAG 00827 – OAG 00834 | Att_7_Watkins_SB |
| OAG 00835 – OAG 00836 | Att_8_S_Minority_Candidates_2001_2010 |
| OAG 00837 – OAG 00841 | Att_8_H_Minority_Candidates_2001_2010 |
| OAG 00842 – OAG 00843 | Att_9_Census_2010_Pop_Count_Explanation |

**Folder – 2011_HOUSE_SENATE_NOTEBOOK_5_ATT_11_15**

| OAG 00451 – OAG 00728 | Att_12_Media_Coverage |
|---|---|
| OAG 00729 – OAG 00736 | Att_13_Public_Hearing_Notices |
| OAG 00737 – OAG 00738 | Att_14_Summ_of_Dates_Plans_were_Published |

**Folder – 2011_HOUSE_SENATE_NOTEBOOK_6_ATT_15**

| OAG 00326 – OAG 00332 | Att_15H_9_8_10_Roanoke_Hrg_Summ |
|---|---|
| OAG 00333 – OAG 00340 | Att_15H_9_8_10_Roanoke_Hrg_Summ |
| OAG 00341 – OAG 00347 | Att_15H_10_5_10_Fairfax_Hrg_Summ |
| OAG 00348 – OAG 00350 | Att_15H_10_18_10_Danville_Hrg_Summ |
| OAG 00351 – OAG 00355 | Att_15S_10_27_10_Roanoke_Hrg_Summ |
| OAG 00356 – OAG 00363 | Att_15S_11_4_10_Herndon_Hrg_Summ |
| OAG 00364 – OAG 00373 | Att_15S_12_2_10_Portsmouth_Hrg_Summ |
| OAG 00374 – OAG 00377 | Att_15H_12_6_10_Fredericksburg_Hrg_Summ |
| OAG 00378 – OAG 00388 | Att_15_Jt_12_17_10_Richmond_Hrg_Summ |
| OAG 00389 – OAG 00392 | Att_15H_12_17_10_Richmond_Summ |
| OAG 00393 – OAG 00399 | Att_15_Jt_2_23_11_Richmond_Hrg_Summ |
| OAG 00400 – OAG 00409 | Att_15_Jt_3_31_11_Hampton_Hrg_Summ |
| OAG 00410 – OAG 00414 | Att_15_Jt_3_31_11_Leesburg_Hrg_Summ |
| OAG 00415 – OAG 00420 | Att_15_Jt_3_31_11_Roanoke_Hrg_Summ |
| OAG 00421 – OAG 00424 | Att_15_Jt_4_2_11_Verona_Hrg_Summ |
| OAG 00425 – OAG 00430 | Att_15_Jt_4_2_11_Fairfax_Hrg_Summ |
| OAG 00431 – OAG 00435 | Att_15_Jt_4_2_11_Abingdon_Hrg_Summ |
| OAG 00436 – OAG 00440 | Att_15_Jt_4_2_11_Danville_Hrg_Summ |
| OAG 00441 – OAG 00450 | Att_15_Jt_4_4_11_Richmond_Hrg_Summ |

**Folder – 2011_HOUSE_SENATE_NOTEBOOK_7_ATT_15_17**

| OAG 00001 – OAG 00188 | Att_15_Public_Communications |
|---|---|
| OAG 00189 – OAG 00198 | Att_16S_Online_Comments_to_Plans |
| OAG 00199 – OAG 00206 | Att_16H_Online_Comments_to_Plans |

**Folder – 2011_HOUSE_SENATE_NOTEBOOK_8_ATT_17_18**

| OAG 00207 – OAG 00212 | Att_17_Jt_4_11_11_Jt_Committee |
|---|---|
| OAG 00213 – OAG 00220 | Att_17S_3_25_11_P_E_Mtg_Summary |
| OAG 00221 – OAG 00229 | Att_17H_3_25_11_P_E_Mtg_Summary |
| OAG 00230 – OAG 00235 | Att_17S_4_5_11_P_E_Mtg_Summary |
| OAG 00236 – OAG 00238 | Att_17H_4_18_11_P_E_Mtg_Summary |
| OAG 00239 – OAG 00241 | Att_17S_4_28_11_P_E_Mtg_Summary |
| OAG 00242 – OAG 00243 | Att_17_Jt_4_11_11_Conf_Comm_Mtg_Summ |
| OAG 00244 – OAG 00245 | Att_17_DVDs_of_Floor_Debates |
| OAG 00246 – OAG 00247 | Att_17S_2_27_11_Floor_Summary |
| OAG 00248 – OAG 00249 | Att_17S_4_4_11_Floor_Summary |
| OAG 00250 – OAG 00251 | Att_17S_4_5_11_Floor_Summary |
| OAG 00252 – OAG 00261 | Att_17S_4_7_11_Floor_Summary |
| OAG 00262 – OAG 00263 | Att_17S_4_7_11_Floor_Summary |
| OAG 00264 – OAG 00265 | Att_17S_4_12_11_Floor_Summary |

PDX-302.8

| | |
|---|---|
| OAG 00266 – OAG 00267 | Att_17S_4_18_11_Floor_Summary |
| OAG 00268 – OAG 00269 | Att_17S_4_25_11_Floor_Summary |
| OAG 00270 – OAG 00272 | Att_17S_4_28_11_Floor_Summary |
| OAG 00273 – OAG 00275 | Att_17H_2_27_11_Floor_Summary |
| OAG 00276 – OAG 00280 | Att_17H_4_4_11_Floor_Summary |
| OAG 00281 – OAG 00301 | Att_17H_4_5_11_Floor_Summary |
| OAG 00302 – OAG 00304 | Att_17H_4_6_11_Floor_Summary |
| OAG 00305 – OAG 00306 | Att_17H_4_7_11_Floor_Summary |
| OAG 00307 – OAG 00309 | Att_17H_4_11_11_Floor_Summary |
| OAG 00310 – OAG 00311 | Att_17H_4_18_11_Floor_Summary |
| OAG 00312 – OAG 00316 | Att_17H_4_25_11_Floor_Summary |
| OAG 00317 – OAG 00321 | Att_17H_4_27_11_Floor_Summary |
| OAG 00322 – OAG 00323 | Att_17H_4_28_11_Floor_Summary |
| OAG 00324 – OAG 00325 | Att_18_Press_Release |

3

Exhibit J2

PDX-302.10

Exhibit J8

PDX-302.31

| Plan Name: | HB 5005 House |
| Plan Type: | |
| Date: | 12/15/2016 |
| Time: | 5:02:28PM |
| Administrator: | |

## Measures of Compactness
12/15/2016

| Sum | N/A | N/A | N/A |
|---|---|---|---|
| Min | 0.14 | 1.28 | 0.08 |
| Max | 0.62 | 3.35 | 0.55 |
| Mean | 0.36 | 2.00 | 0.24 |
| Std. Dev. | 0.12 | 0.35 | 0.09 |

| DISTRICT | Reock | Schwartzberg | Polsby-Popper |
|---|---|---|---|
| 1 | 0.26 | 1.69 | 0.30 |
| 2 | 0.30 | 2.17 | 0.18 |
| 3 | 0.28 | 1.84 | 0.21 |
| 4 | 0.49 | 1.97 | 0.20 |
| 5 | 0.19 | 2.29 | 0.17 |
| 6 | 0.27 | 1.82 | 0.26 |
| 7 | 0.50 | 1.81 | 0.25 |
| 8 | 0.47 | 1.83 | 0.26 |
| 9 | 0.35 | 1.83 | 0.24 |
| 10 | 0.23 | 2.16 | 0.18 |
| 11 | 0.59 | 1.80 | 0.26 |
| 12 | 0.39 | 1.95 | 0.22 |
| 13 | 0.16 | 2.53 | 0.13 |
| 14 | 0.24 | 2.34 | 0.16 |
| 15 | 0.55 | 1.52 | 0.34 |
| 16 | 0.36 | 2.11 | 0.18 |
| 17 | 0.25 | 2.95 | 0.09 |
| 18 | 0.62 | 1.92 | 0.24 |
| 19 | 0.43 | 2.09 | 0.17 |
| 20 | 0.27 | 2.28 | 0.15 |
| 21 | 0.42 | 1.74 | 0.31 |
| 22 | 0.20 | 2.59 | 0.11 |
| 23 | 0.26 | 2.25 | 0.15 |
| 24 | 0.44 | 1.78 | 0.25 |
| 25 | 0.26 | 2.14 | 0.18 |
| 26 | 0.46 | 1.57 | 0.36 |
| 27 | 0.35 | 1.92 | 0.25 |
| 28 | 0.39 | 1.82 | 0.26 |
| 29 | 0.36 | 1.98 | 0.21 |
| 30 | 0.53 | 1.49 | 0.36 |
| 31 | 0.38 | 2.11 | 0.19 |
| 32 | 0.46 | 1.64 | 0.31 |
| 33 | 0.33 | 1.89 | 0.23 |
| 34 | 0.24 | 1.91 | 0.22 |
| 35 | 0.20 | 2.11 | 0.19 |
| 36 | 0.43 | 1.66 | 0.30 |
| 37 | 0.18 | 2.24 | 0.18 |
| 38 | 0.62 | 1.44 | 0.45 |
| 39 | 0.35 | 2.16 | 0.19 |
| 40 | 0.26 | 2.20 | 0.17 |

## EXHIBIT J8

1

Plan Name:    HB 5005 House                Administrator:
Plan Type:                                 User:

| DISTRICT | Reock | Schwartzberg | Polsby-Popper |
|---|---|---|---|
| 41 | 0.36 | 1.72 | 0.32 |
| 42 | 0.35 | 2.09 | 0.20 |
| 43 | 0.22 | 2.10 | 0.21 |
| 44 | 0.43 | 1.69 | 0.32 |
| 45 | 0.29 | 1.81 | 0.26 |
| 46 | 0.52 | 1.28 | 0.55 |
| 47 | 0.41 | 1.73 | 0.33 |
| 48 | 0.18 | 2.24 | 0.16 |
| 49 | 0.24 | 2.35 | 0.16 |
| 50 | 0.46 | 1.62 | 0.34 |
| 51 | 0.24 | 2.15 | 0.18 |
| 52 | 0.23 | 1.92 | 0.25 |
| 53 | 0.46 | 1.69 | 0.34 |
| 54 | 0.47 | 1.89 | 0.25 |
| 55 | 0.57 | 1.69 | 0.28 |
| 56 | 0.34 | 1.99 | 0.22 |
| 57 | 0.45 | 1.47 | 0.41 |
| 58 | 0.32 | 2.11 | 0.19 |
| 59 | 0.30 | 1.98 | 0.21 |
| 60 | 0.38 | 1.62 | 0.31 |
| 61 | 0.32 | 2.21 | 0.17 |
| 62 | 0.36 | 2.55 | 0.13 |
| 63 | 0.25 | 2.31 | 0.16 |
| 64 | 0.37 | 2.37 | 0.16 |
| 65 | 0.37 | 1.82 | 0.27 |
| 66 | 0.31 | 1.79 | 0.27 |
| 67 | 0.32 | 1.84 | 0.25 |
| 68 | 0.36 | 1.97 | 0.25 |
| 69 | 0.52 | 1.68 | 0.34 |
| 70 | 0.40 | 2.19 | 0.19 |
| 71 | 0.33 | 1.99 | 0.24 |
| 72 | 0.26 | 3.35 | 0.08 |
| 73 | 0.39 | 2.51 | 0.15 |
| 74 | 0.16 | 2.26 | 0.12 |
| 75 | 0.41 | 2.14 | 0.19 |
| 76 | 0.48 | 2.37 | 0.17 |
| 77 | 0.19 | 2.49 | 0.15 |
| 78 | 0.46 | 1.65 | 0.35 |
| 79 | 0.45 | 1.84 | 0.26 |
| 80 | 0.26 | 2.92 | 0.11 |
| 81 | 0.40 | 2.01 | 0.23 |
| 82 | 0.57 | 1.48 | 0.45 |
| 83 | 0.52 | 1.69 | 0.34 |
| 84 | 0.44 | 1.89 | 0.26 |
| 85 | 0.40 | 1.98 | 0.24 |
| 86 | 0.35 | 1.98 | 0.25 |
| 87 | 0.22 | 2.30 | 0.17 |
| 88 | 0.28 | 2.56 | 0.13 |
| 89 | 0.40 | 2.21 | 0.20 |
| 90 | 0.46 | 2.17 | 0.20 |
| 91 | 0.60 | 1.45 | 0.47 |
| 92 | 0.34 | 1.89 | 0.26 |
| 93 | 0.22 | 2.42 | 0.16 |
| 94 | 0.35 | 1.57 | 0.38 |
| 95 | 0.14 | 2.61 | 0.14 |
| 96 | 0.20 | 2.19 | 0.17 |

**EXHIBIT J8**

2

| Plan Name: | HB 5005 House | | Administrator: | | |
| Plan Type: | | | User: | | |

| DISTRICT | Reock | Schwartzberg | Polsby-Popper |
| --- | --- | --- | --- |
| 97 | 0.43 | 1.73 | 0.21 |
| 98 | 0.28 | 1.78 | 0.26 |
| 99 | 0.27 | 1.97 | 0.21 |
| 100 | 0.28 | 1.56 | 0.37 |

**EXHIBIT J8**

3

PDX-302.34

Exhibit J9

PDX-302.35

Plan Name:    HB 5005 Senate
Plan Type:
Date:    12/15/2016
Time:    5:20:30PM
Administrator:

## Measures of Compactness
12/15/2016

| Sum | N/A | N/A | N/A |
|---|---|---|---|
| Min | 0.14 | 1.52 | 0.08 |
| Max | 0.46 | 3.23 | 0.39 |
| Mean | 0.27 | 2.38 | 0.16 |
| Std. Dev. | 0.08 | 0.39 | 0.06 |

| DISTRICT | Reock | Schwartzberg | Polsby-Popper |
|---|---|---|---|
| 1 | 0.16 | 2.44 | 0.16 |
| 2 | 0.23 | 2.47 | 0.15 |
| 3 | 0.29 | 2.57 | 0.11 |
| 4 | 0.33 | 2.09 | 0.18 |
| 5 | 0.36 | 2.37 | 0.17 |
| 6 | 0.30 | 1.74 | 0.30 |
| 7 | 0.32 | 2.01 | 0.24 |
| 8 | 0.30 | 1.52 | 0.39 |
| 9 | 0.19 | 2.50 | 0.11 |
| 10 | 0.30 | 2.62 | 0.13 |
| 11 | 0.36 | 2.06 | 0.20 |
| 12 | 0.46 | 1.89 | 0.23 |
| 13 | 0.31 | 2.18 | 0.17 |
| 14 | 0.24 | 2.64 | 0.13 |
| 15 | 0.23 | 2.71 | 0.12 |
| 16 | 0.31 | 2.93 | 0.10 |
| 17 | 0.38 | 2.22 | 0.17 |
| 18 | 0.31 | 2.62 | 0.13 |
| 19 | 0.22 | 2.66 | 0.11 |
| 20 | 0.20 | 2.72 | 0.12 |
| 21 | 0.21 | 2.54 | 0.14 |
| 22 | 0.35 | 2.16 | 0.18 |
| 23 | 0.32 | 2.20 | 0.17 |
| 24 | 0.23 | 2.27 | 0.15 |
| 25 | 0.30 | 2.27 | 0.15 |
| 26 | 0.43 | 1.70 | 0.28 |
| 27 | 0.25 | 1.99 | 0.20 |
| 28 | 0.15 | 3.23 | 0.08 |
| 29 | 0.16 | 2.99 | 0.10 |
| 30 | 0.21 | 2.81 | 0.10 |
| 31 | 0.17 | 2.28 | 0.16 |
| 32 | 0.25 | 2.30 | 0.17 |
| 33 | 0.26 | 2.50 | 0.15 |
| 34 | 0.31 | 2.31 | 0.16 |
| 35 | 0.42 | 1.99 | 0.24 |
| 36 | 0.21 | 3.08 | 0.09 |
| 37 | 0.18 | 3.02 | 0.10 |
| 38 | 0.21 | 2.27 | 0.15 |
| 39 | 0.32 | 2.13 | 0.20 |
| 40 | 0.14 | 2.39 | 0.15 |

## EXHIBIT J9

1

PDX-302.36

Plan Name:    HB 5005 Senate          Administrator:
Plan Type:                             User:

| DISTRICT | Reock | Schwartzberg | Polsby-Popper |
|----------|-------|--------------|---------------|

**EXHIBIT J9**

PDX-302.37

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ALPHA PHI ALPHA FRATERNITY
INC., *et al.*,

     *Plaintiffs*,

v.

BRAD RAFFENSPERGER,

     *Defendant*.

CIVIL ACTION

FILE NO. 1:21-CV-05337-SCJ

## EXPERT REPORT OF JOHN B. MORGAN

Pursuant to 28 U.S.C. § 1746, Fed. R. Civ. P. 26, and F.R.E. 702 and 703, I, JOHN B. MORGAN, make the following declaration:

1.    My name is John B. Morgan. I am over the age of 21 years, and I am under no legal disability which would prevent me from giving this declaration. If called to testify, I would testify under oath to these facts.

2.    I hold a B.A. in History from the University of Chicago. As detailed in my CV, attached as Exhibit 1, I have extensive experience over many years in the field of redistricting. I have worked on redistricting plans in the redistricting efforts following the 1990 Census, the 2000 Census, the 2010 Census and the 2020 Census. I have testified as an expert witness in demographics and redistricting.

J. Morgan
**EXHIBIT- 6**
2/9/2023

3.     I am being compensated at a rate of $325 per hour for my services in this case.

4.     The redistricting geographic information system (GIS) software package used for this analysis is Maptitude for Redistricting 2021 from Caliper Corporation.  The redistricting software was loaded with the census PL94-171 data from the Census Bureau and the census geography for Georgia.  I was also provided with election data files used by the Georgia General Assembly during the redistricting process.  The full suite of census geography was available, including counties, places, voting districts, water bodies, and roads, as well as census blocks, which are the lowest level of geography for which the Census Bureau reports population counts.  Census blocks are generally bounded by visible features, such as roads, streams, and railroads and they can range in size from a city block in urban and suburban areas to many square miles in rural areas.

5.     I have been asked to review the House of Representatives and State Senate plans considered and adopted by the Georgia General Assembly and compare them to the proposed House and Senate plans drawn by Mr. Cooper and offer opinions regarding my analysis.

2

6.     As a result of this analysis my opinion is that the Cooper 1205 Senate and House plans are focused on race, prioritizing race to the detriment of traditional redistricting factors.

### Data utilized for analysis

7.     Two House and two Senate plan were submitted for a preliminary injunction hearing, earlier in this case (I am designating these as PI1 and PI2 plans). Mr. Cooper submitted an additional House and Senate plan in his expert report in this case on December 5, 2022 (I am designating these as 1205 plans).

8.     In preparing this analysis, I was given the block-equivalency files of the Cooper plans as well as the block-equivalency files of the 2021 adopted plans and incumbent databases used by the Georgia General Assembly during the redistricting process. The incumbent databases list the address locations and districts of the Representatives and Senators serving under the existing House (2015-enacted) and Senate (2014-enacted) plans prior to the election of 2022. I was also given information on incumbents who were not intending to run for re-election to their current offices in 2022.

9.     I loaded the 2021 House and 2021 Senate plans enacted by the Georgia General Assembly into the Maptitude for Redistricting software using the block-equivalency files provided. I loaded the Cooper PI1 and PI 2 House and Senate

3

plans and the 1205 Cooper House and Senate plans into the Maptitude for Redistricting software using the block-equivalency files provided.  I loaded the prior House (2015-enacted) and Senate (2014-enacted) plans into the Maptitude for Redistricting software using files provided with software.  I loaded the associated incumbent databases provided.

10.   Using the Maptitude for Redistricting software, I ran seven reports for each 1205 Cooper plan:

1- Measures of compactness report,

2- Districts & incumbents report,

3- Population summary report,

4- Political subdivision splits report,

5- Plan component report,

6- Core constituency report compared to PI2 plan,

7- Core constituency report compared to Enacted 2021 plan.

11.   Each report is included in the exhibits to this report as Exhibits 2-15.  I previously created these reports for the enacted plans that are included in my December 5, 2022 expert report.  I also created population summary reports for the PI plans.

12.     I also created a series of maps comparing the 1205 plans and the enacted plans.  These maps show a theme of AP-Black % on the voting districts and overlays of selected districts in the enacted plans and the 1205 plans for comparison.  Each of these Senate maps us included in the exhibits of this report as Exhibits 16-40 and each of these House maps is included as Exhibits 41-62.

## State Senate Plan Analysis

13.     Using the Population summary reports, I tallied the number of majority-Black districts using any-part Black voting age population (18+ AP-Black) for each Senate plan.  The chart below shows the total number of majority-Black districts in the 2021 adopted Senate plan, the Cooper 1205 Senate plan and the Cooper PI2 Senate plan, as well as the number of districts in the percentage ranges using the any-part Black voting age population.

**Chart 1: Number of Majority-Black Senate Districts**

| | Majority-Black Senate Districts | | |
|---|---|---|---|
| **% AP Black VAP** | **2021 Adopted Plan** | **APA Cooper Illustrative 1205** | **APA Cooper Illustrative2 PI** |
| Over 75% | 0 | 1 | 1 |
| 70% to 75% | 3 | 0 | 0 |
| 65% to 70% | 3 | 1 | 1 |
| 60% to 65% | 3 | 4 | 2 |
| 55% to 60% | 3 | 3 | 3 |
| 52% to 55% | 1 | 4 | 4 |
| 50% to 52% | 1 | 5 | 8 |
| | | | |
| Total # Districts | 14 | 18 | 19 |

14.    The 2021 adopted Senate plan includes 14 majority-Black districts, the Cooper 1205 Senate plan includes 18 majority-Black districts, and the Cooper PI2 Senate plan has 19 majority-Black districts.

15.    The Core Constituency report comparing the Cooper Senate 1205 plan to the Cooper Senate PI2 plan (Ex. 7) shows that there are changes affecting many districts. The Senate plan drafted by Mr. Cooper (1205) has only one district (SD10) that is exactly the same as the plan submitted previously for the preliminary injunction hearing in this case (Cooper PI2).  Including SD10, there are 17 districts that share over 90% of the same territory as a district in the Cooper PI2 plan and 27 districts that share over 80% the same territory as a district in the Cooper PI2 plan.

6

There are many differences between the Cooper 1205 Senate plan and the Cooper PI2 Senate plan – with all the changes, one result is that the new Cooper 1205 Senate plan has one less majority-Black district than the PI2 plan.

16.    Looking more closely at the Cooper 1205 Senate plan, below is a chart that summarizes top-line statistics about the plan and compares them to the enacted plan.

**Chart 2: Cooper 1205 Senate and Enacted Senate Plan comparisons**

| Plan metrics | Cooper Senate 1205 | Enacted Senate |
|---|---|---|
| County splits | 28 | 29 |
| Voting precinct splits | 43 | 47 |
| Mean compactness - Reock | 0.43 | 0.42 |
| Mean compactness - Polsby Popper | 0.28 | 0.29 |
| # Paired incumbents | 6 | 4 |
| # Seats majority 18+_AP_Blk% | 18 | 14 |
| Deviation relative range | -1.00% to 1.00% | -1.03% to +0.98% |
| Deviation overall range | 2.01% | 2.01% |

17.    The changes from the Cooper PI2 plan to the Cooper 1205 Senate plan appears to align the 1205 Senate plan more closely to the enacted Senate plan than to the Cooper PI2 plan.  In addition to the overall plan metrics in the chart above,

7

the Core constituency report (Ex. 8) shows that the Cooper 1205 Senate plan has 21 districts that are exactly the same as the enacted Senate plan.

18.     The Cooper 1205 Senate plan has 35 of 56 districts drawn differently, but still has mean compactness scores close to the enacted plan, with the mean compactness score on the Reock test higher and the mean compactness score on the Polsby-Popper test lower.  The Cooper 1205 Senate plan changes 35 districts to create four new Black-majority Senate districts.

19.     Below is a map showing the Metro region with a theme of AP-Black % on the voting districts, as well as maps of four districts in the Enacted Senate plan and four districts in the Cooper 1205 Senate plan.

8



20.    Voting districts themed in red have an AP-Black % of greater than 65% and voting districts themed in yellow have an AP-Black % of 50% to 65%.  Voting districts themed in green have an AP-Black % of 35% to 50%; light blue have an AP-Black % of 20% to 35%; and darker blue have an AP-Black % of less than 20%.



21.   Looking at four districts in the Metro area south of Atlanta, Senate District 10 in the enacted plan is anchored in heavily Black southern DeKalb County (Stonecrest area) and follows the western boundary of Henry County down to its southern border with Spalding County. This district has a Reock compactness score of 0.28 and a Polsby-Popper compactness score of 0.23 and the district is 71.46% 18+AP Black. It is comprised of parts of two counties and measures 25 miles from north to south.

22.   Senate District 44 in the enacted plan is anchored in heavily Black southern DeKalb County (Gresham Park area) and follows the eastern boundary of Clayton County including its southern "tail." This district has a Reock compactness score of 0.18 and a Polsby-Popper compactness score of 0.19 and the district is 71.3% 18+AP Black. It is comprised of parts of two counties and measures 20 miles from north to south.

23.   Senate District 34 in the enacted plan is anchored in heavily Black northern Clayton County and combines with the northern portion of Fayette County and one voting precinct in Clayton County.   This district has a Reock compactness score of 0.45 and a Polsby-Popper compactness score of 0.34 and the district is 69.5% 18+AP Black. It is comprised of parts of three counties and measures 15 miles from north to south.

24.   Senate District 16 in the enacted plan is an ex-urban district that takes the balance of Fayette County and combines it with the whole counties of Spalding, Pike and Lamar to the south.   This district has a Reock compactness score of 0.37 and a Polsby-Popper compactness score of 0.31 and the district is 22.7% 18+AP Black. It is comprised of three whole counties as well as part of one county and measures 50 miles from north to south.

11



25.    By contrast, the Cooper 1205 Senate plan strategically cuts Clayton County in three places to connect heavier concentration of Black voters with whiter, more ex-urban population.  The construction of Cooper 1205 SD 16 is anchored in heavily Black northern Clayton County, strategically avoids the Black population in the "tail" of southern Clayton County and stretches through Henry County to pick up predominantly white portions of Spalding County.  This district has a Reock compactness score of 0.26, a Polsby-Popper compactness score of 0.19 and the

12

district is 56.5% 18+AP Black.  It is comprised of parts of three counties and measures 34 miles from north to south.

26.     The construction of Cooper 1205 SD 10 is anchored in heavily Black southern DeKalb County, (Gresham Park area) and combines with northern Henry County.  This district has a Reock compactness score of 0.32, a Polsby-Popper compactness score of 0.25 and the district is 69.8% 18+AP Black.  It is comprised of parts of two counties and measures 22 miles from north to south.

27.     The construction of Cooper 1205 SD 34 combines heavily Black Fulton County with heavily Black northern Clayton County.  This district has a Reock compactness score of 0.56, a Polsby-Popper compactness score of 0.4 and the district is 77.8% 18+AP Black.  It is comprised of parts of two counties and measures 10 miles from north to south.

28.     The construction of Cooper 1205 SD 28 combines heavily Black tail of southern Clayton County with part of Fayette County and part of Spalding County. The Cooper 1205 Senate plan strategically utilizes the Black population in these three counties in SD 28.  Below is a summary chart of the Plan Component Report (appendix) in this area.

**Chart 3: Cooper 1205– SDs 34, 16, 28, 39 – plan components**

| COUNTY | | District 034 Total Pop. | AP_Blk | District 016 Total Pop. | AP_Blk | District 028 Total Pop. | AP_Blk | District 039 Total Pop. | AP_Blk |
|---|---|---|---|---|---|---|---|---|---|
| Clayton | Total: | 139632 | 100,905 | 84393 | 58,581 | 73570 | 56,865 | | |
| | | | 72.3% | | 69.4% | | 77.3% | | |
| | Voting Age | 102302 | 73,720 | 63302 | 43,544 | 54974 | 41,590 | | |
| | | | 72.1% | | 68.8% | | 75.7% | | |
| Fayette | Total: | | | | | 74742 | 27,910 | 44452 | 4,166 |
| | | | | | | | 37.3% | | 9.4% |
| | Voting Age | | | | | 58345 | 20,819 | 33453 | 2,909 |
| | | | | | | | 35.7% | | 8.7% |
| Spalding | Total: | | | 25726 | 7,534 | 41580 | 16,988 | | |
| | | | | | 29.3% | | 40.9% | | |
| | Voting Age | | | 20366 | 5,466 | 31757 | 12,045 | | |
| | | | | | 26.8% | | 37.9% | | |
| Fulton | Total: | 52788 | 49,181 | | | | | | |
| | | | 93.2% | | | | | | |
| | Voting Age | 39253 | 36,464 | | | | | | |
| | | | 92.9% | | | | | | |
| Coweta | Total: | | | | | | | 146158 | 28,289 |
| | | | | | | | | | 19.4% |
| | Voting Age | | | | | | | 111155 | 20,196 |
| | | | | | | | | | 18.2% |
| Henry | Total: | | | 79973 | 44,877 | | | | |
| | | | | | 56.1% | | | | |
| | Voting Age | | | 59467 | 31,887 | | | | |
| | | | | | 53.6% | | | | |
| | DISTRICT TOTALS | District 034 | | District 016 | | District 028 | | District 039 | |
| | | 192420 | 150,086 | 190092 | 110,992 | 189892 | 101,763 | 190610 | 32,455 |
| | | | 78.0% | | 58.4% | | 53.6% | | 17.0% |
| | | 141555 | 110,184 | 143135 | 80,897 | 145076 | 74,454 | 144608 | 23,105 |
| | | | 77.8% | | 56.5% | | 51.3% | | 16.0% |

29.     The Plan Component Report (Ex. 6) shows the Spalding County portion of Cooper 1205 SD 28 has a population of 41,580 and is 38% 18+ AP-Black.  The balance of Fayette County portion of SD 39 has a population of 44,452 and is 8.7% is 18+ AP-Black.  Replacing the Spalding County portion of SD 28 with the balance of Fayette County would make Fayette County whole but would drop the 18+ AP-

14

Black below 50% to 44.5% 18+ AP-Black. The construction of Cooper 1205 Senate District 28 strategically bypasses Peachtree City in Fayette County, to ensure that the district remains slightly above 50% AP Black. SD 28 instead splits off Peachtree City in Fayette County to make room to include most of the Black population in Spalding County into SD 28, which is necessary to reach the 50% 18+ AP-Black. Cooper 1205 SD 28 has a Reock compactness score of 0.37, a Polsby-Popper compactness score of 0.18 and the district is 51.3% 18+AP Black. It is comprised of parts of three counties and measures 24 miles from north to south.

30.     Looking at specific districts (as above) demonstrates the racial focus of the Cooper 1205 plan in this area. The Black percentage is lowered only by elongating the district to include lower concentrations of Black population. This allows the Black population to be redistributed and to create other majority Black districts.

31.     Below is a map showing Augusta and the East Central region with a theme of AP-Black % on the counties. The map shows that Richmond County (Augusta) has a majority of AP-Black population. At over 200,000 in population, Richmond County has more than enough population for a Senate district. The map also shows some majority AP-Black population counties, which are not very

15

populous, to the west of Augusta – Washington, Jefferson, Hancock, Warren and Taliaferro.



32.    A similarly themed map on the voting districts shows concentrations of Black population in the region.

16



33.     Senate District 22 in the enacted plan is drawn entirely within Richmond County. Enacted Senate District 22 has a Reock compactness score of 0.41 and a Polsby-Popper compactness score of 0.29 and the district is 56.5% 18+AP Black.  In the enacted plan, the balance of Richmond County is placed in Senate District 23 along with a portion of Columbia County and nine whole counties. Enacted Senate District 23 has a Reock compactness score of 0.37 and a Polsby-Popper compactness score of 0.16 and the district is 35.48% 18+AP Black.

17



34.    In order to change the racial makeup of Senate Districts 22 and 23, the

Cooper 1205 Senate plan pushes part of SD 22 out of Richmond County into

McDuffie, Warren and Glascock counties, taking in their combined 40% Black

population, which is relatively high in that area.  The plan strategically utilizes the

Black population in those counties, selecting higher concentration AP-Black

population in order to keep SD 22 above 50% 18+AP Black population.  By moving

18

SD 22 into in those counties, stronger concentrations of Black population in Richmond County can be transferred into Senate District 23.



35.     The construction of Senate District 23 in the Cooper 1205 Senate plan splits Wilkes County, taking substantially Black population into the district, and excluding the predominantly white population (Ex. 6.)  Senate District 23 connects separate enclaves of Black population, including Milledgeville in Baldwin County,

which measures more than 100 miles away from the eastern part of the district in

Augusta.

36.   The chart below compares the split counties in both the Enacted Senate

and Cooper 1205 Senate plans as well as some demographic data for those counties.

The enacted Senate plan splits 29 counties and the Cooper 1205 Senate plan splits

28 counties.  Both plans split the same 24 counties.

**Chart 4: County splits Enacted Sen vs Cooper Sen 1205**

| County | Population | AP Blk | AP Blk % | 18+ Pop | 18+ AP Blk | 18+ AP Blk % | Split in Enacted Sen | Split in Cooper Sen 1205 |
|---|---|---|---|---|---|---|---|---|
| Barrow | 83,505 | 11,907 | 14.3% | 62,195 | 8,222 | 13.2% | X | X |
| Bartow | 108,901 | 13,395 | 12.3% | 83,570 | 9,377 | 11.2% | X | X |
| Bibb | 157,346 | 88,865 | 56.5% | 120,902 | 64,270 | 53.2% | X | X |
| Chatham | 295,291 | 115,458 | 39.1% | 234,715 | 85,178 | 36.3% | X | X |
| Cherokee | 266,620 | 21,687 | 8.1% | 202,928 | 14,976 | 7.4% | X | X |
| Clayton | 297,595 | 216,351 | 72.7% | 220,578 | 158,854 | 72.0% | X | X |
| Cobb | 766,149 | 223,116 | 29.1% | 591,848 | 166,141 | 28.1% | X | X |
| DeKalb | 764,382 | 407,451 | 53.3% | 595,276 | 314,230 | 52.8% | X | X |
| Douglas | 144,237 | 74,260 | 51.5% | 108,428 | 53,377 | 49.2% | X | X |
| Fayette | 119,194 | 32,076 | 26.9% | 91,798 | 23,728 | 25.8% | X | X |
| Floyd | 98,584 | 15,606 | 15.8% | 76,295 | 11,064 | 14.5% | X | X |
| Forsyth | 251,283 | 13,222 | 5.3% | 181,193 | 8,751 | 4.8% | X | X |
| Fulton | 1,066,710 | 477,624 | 44.8% | 847,182 | 368,635 | 43.5% | X | X |
| Gordon | 57,544 | 2,919 | 5.1% | 43,500 | 1,939 | 4.5% | X | X |
| Gwinnett | 957,062 | 287,687 | 30.1% | 709,484 | 202,762 | 28.6% | X | X |
| Hall | 203,136 | 17,006 | 8.4% | 153,844 | 12,094 | 7.9% | X | X |
| Henry | 240,712 | 125,211 | 52.0% | 179,973 | 89,657 | 49.8% | X | X |
| Houston | 163,633 | 56,520 | 34.5% | 122,118 | 39,605 | 32.4% | X | X |
| Muscogee | 206,922 | 102,212 | 49.4% | 157,052 | 74,301 | 47.3% | X | X |
| Paulding | 168,661 | 41,296 | 24.5% | 123,998 | 28,164 | 22.7% | X | X |
| Richmond | 206,607 | 119,970 | 58.1% | 160,899 | 87,930 | 54.6% | X | X |
| Walton | 96,673 | 18,804 | 19.5% | 73,098 | 13,165 | 18.0% | X | X |

| County | Population | AP Blk | AP Blk % | 18+ Pop | 18+ AP Blk | 18+ AP Blk % | Split in Enacted Sen | Split in Cooper Sen 1205 |
|---|---|---|---|---|---|---|---|---|
| Ware | 36,251 | 11,421 | 31.5% | 27,788 | 8,226 | 29.6% | X | X |
| White | 28,003 | 721 | 2.6% | 22,482 | 484 | 2.2% | X | X |
| Clarke | 128,671 | 33,672 | 26.2% | 106,830 | 24,776 | 23.2% | X | |
| Coffee | 43,092 | 12,575 | 29.2% | 32,419 | 9,191 | 28.4% | X | |
| Columbia | 156,010 | 32,516 | 20.8% | 114,823 | 22,273 | 19.4% | X | |
| Jackson | 75,907 | 6,148 | 8.1% | 56,451 | 4,268 | 7.6% | X | |
| Newton | 112,483 | 55,901 | 49.7% | 84,748 | 40,433 | 47.7% | X | |
| Monroe | 27,957 | 6,444 | 23.0% | 21,913 | 5,068 | 23.1% | | X |
| Rockdale | 93,570 | 57,204 | 61.1% | 71,503 | 41,935 | 58.6% | | X |
| Spalding | 67,306 | 24,522 | 36.4% | 52,123 | 17,511 | 33.6% | | X |
| Wilkes | 9,565 | 3,989 | 41.7% | 7,651 | 3,071 | 40.1% | | X |
| **TOTAL** | | | | | | | 29 | 28 |

37.    In comparison to the Enacted Senate plan, the Cooper 1205 Senate plan makes five counties whole (Clarke, Coffee, Columbia, Jackson, and Newton counties) and introduces four new county splits (Monroe, Rockdale, Spalding, and Wilkes counties).

38.    The four new county splits are attributable to the effort to create new Black majority seats in the Cooper 1205 Senate plan.   The Plan Component report in the (Ex. 6) shows the population and select demographic data for each county portion in a district.  While Newton County is made whole in the Cooper 1205 Senate plan, it is then necessary to split Rockdale County to allow Cooper 1205 SD 17 to transit through Rockdale County to connect to population in Henry County. Spalding County is split such that the two-thirds of the 18+ AP-Black population in

21

Spalding County is placed in Cooper 1205 SD 28, keeping the % 18+ AP-Black population above 50%. Monroe County is split as a result of taking Baldwin County out of the principal district in the area (Enacted SD 25 / Cooper 1205 SD 44). While Columbia County is made whole in the Cooper 1205 Senate plan, Wilkes County is split such that the portion in Cooper 1205 SD 23 is 70% 18+ AP-Black and the portion out of Cooper 1205 SD 23 is 25% 18+ AP-Black, a move that significantly contributes to keeping district barely above 50% 18+ AP-Black.

39.     In the Cooper 1205 Senate plan, adjustments are made to the district boundaries to unsplit counties in areas of the state with less minority population to keep the total number of splits similar to the enacted Senate plan.

40.     Based on my analysis of the Cooper 1205 Senate plan, the impact of engineering more majority Black districts can be seen in the overall plan metrics and the differences from the enacted plan.

41.     Further, my analysis of the traditional redistricting factors – maintaining communities and traditional boundaries, compactness, and deviation – along with the manipulation of the boundaries of the new AP-Black districts, supports my opinion that the Cooper 1205 Senate plan is focused on race, prioritizing race to the detriment of traditional redistricting factors.

22

**State House Plan Analysis**

42.    Using the Population summary reports, I tallied the number of majority-Black districts using any-part Black voting age population for each House plan.  The chart below shows the total number of majority-Black districts in the 2021 adopted House plan, the Cooper 1205 House plan and the Cooper PI2 House plan, as well as the number of districts in the percentage ranges using the any-part Black voting age population.

**Chart 5: Number of Majority-Black House Districts**

| Majority-Black House Districts | | | |
|---|---|---|---|
| **% AP Black VAP** | **2021 Adopted Plan** | **APA Cooper Illustrative 1205** | **Cooper Illustrative2 PI** |
| Over 75% | 2 | 1 | 5 |
| 70% to 75% | 9 | 7 | 4 |
| 65% to 70% | 7 | 8 | 5 |
| 60% to 65% | 8 | 9 | 7 |
| 55% to 60% | 11 | 12 | 15 |
| 52% to 55% | 10 | 13 | 5 |
| 50% to 52% | 2 | 4 | 13 |
| | | | |
| Total # Districts | 49 | 54 | 54 |

43.    The 2021 adopted House plan includes 49 majority-Black districts, the Cooper 1205 House plan includes 54 majority-Black districts, and the Cooper PI2 House plan has 54 majority-Black districts.

23

44.     The Core Constituency report comparing the Cooper House 1205 plan to the Cooper House PI2 plan (Ex. 14) shows that there are changes affecting many districts. The House plan drafted by Mr. Cooper (1205) has only two districts (HD 003 and HD 154) out of 180 that are exactly the same as the plan submitted previously for the preliminary injunction hearing in this case (Cooper House PI2). Including HD 003 and HD 154, there are only 16 out of 180 districts that share over 90% of the same territory as a district in the Cooper PI2 House plan and only 32 districts out of 180 that share over 80% of the same territory as a district in the Cooper PI2 House plan.   There are many differences between the Cooper 1205 House plan and the Cooper PI2 House plan – but even with all the changes, one result is that the stays the same – the new Cooper 1205 House plan has the same number of majority-Black districts as the Cooper PI2 House plan.

45.     Looking more closely at the Cooper 1205 House plan, below is a chart that summarizes top-line statistics about the plan and compares them to the enacted plan.

**Chart 6: Cooper 1205 House and Enacted House Plan comparisons**

| Plan metrics | Cooper House 1205 | Enacted House |
|---|---|---|
| County splits | 68 | 69 |
| Voting precinct splits | 193 | 184 |
| Mean compactness - Reock | 0.39 | 0.39 |
| Mean compactness - Polsby Popper | 0.27 | 0.28 |
| # Paired incumbents | 25 | 20 |
| # Seats majority 18+_AP_Blk% | 54 | 49 |
| Deviation relative range | -1.49% to 1.49% | -1.40% to 1.34% |
| Deviation overall range | 2.98% | 2.74% |

46.     The Cooper 1205 House plan uses a deviation range that is slightly larger in range than the 2021 Enacted House plan.

47.     The mean compactness scores on the Cooper 1205 House plan and the 2021 enacted House plan are similar.  The Cooper 1205 House plan changes 93 districts from the enacted plan to create five new Black-majority house districts.  The chart below shows the compactness scores of the newly created majority-Black districts which Mr. Cooper identified in his report and the compactness scores of the corresponding district number in the 2021 adopted plans.

25

**Chart 7: Compactness score summary**

| New Black-Majority District | Enacted Plan Reock | Cooper 1205 Plan Reock | Enacted Plan Polsby-Popper | Cooper 1205Plan Polsby-Popper |
|---|---|---|---|---|
| House 74 | 0.5 | **0.63** | 0.25 | **0.36** |
| House 117 | 0.41 | 0.41 | **0.28** | 0.26 |
| House 133 | **0.55** | 0.26 | **0.42** | 0.2 |
| House 145 | **0.38** | 0.25 | 0.19 | **0.22** |
| House 171 | **0.35** | 0.28 | **0.37** | 0.2 |

48.    Below is a map showing the Metro region with a theme of AP-Black %

on the voting districts, as well as maps of a group of house districts in the Enacted

House and the Cooper 1205 House plan.



49.     As shown in the Senate plan analysis, the voting districts themed in red have an AP-Black % of greater than 65% and voting districts themed in yellow have an AP-Black % of 50% to 65%.  Voting districts themed in green have an AP-Black % of 35% to 50%; light blue have an AP-Black % of 20% to 35%; and darker blue have an AP-Black % of less than 20%.

50.     Looking at specific districts will show that the compactness of the districts is impacted by the efforts to create more majority Black districts.  The Black

27

percentage is lowered only by elongating the district to include lower concentrations of Black population.  This allows the Black population to be redistributed and to create other majority Black districts.

51.     In the enacted House plan, House District 77 is entirely within Clayton County, in the heavily Black northern part of the county.  Enacted House District 69 is anchored in heavily Black southern Fulton County and includes northeast and central Fayette County, which the Plan Component Report (Ex. 13) shows is 47% 18+ AP-Black.  Enacted House District 73 is centered on Peachtree City in Fayette County and includes part of Coweta County to the west.

28



52.    Enacted House District 74 is comprised of southern Fayette County, eastern Spalding and two voting precincts of Henry County.

53.    In the Cooper 1205 House plan, the engineering of a new majority Black district is accomplished by elongating the districts to connect to Clayton and Fulton counties to more white areas of Fayette and Spalding Counties.



54.    Cooper 1205 House District 69 is anchored in heavily Black southern Fulton County and follows a narrow path through central Fayette County to Peachtree City, which the Plan Component Report (Ex. 13) shows is only 34% 18+ AP-Black.   By elongating the district and connecting with more distant white population, the 18+ AP-Black is lowered, and Black population can be strategically used in districts elsewhere.   Cooper 1205 House District 77 takes a similar narrow path through Fayette County, connecting the predominantly white population which

30

the Plan Component Report (Ex. 13) shows is only 36% 18+ AP-Black to heavily Black Clayton County. These two elongated districts absorb white population and displace the area of enacted HD 74. The Cooper 1205 District 74 takes the "tail" of heavily Black southern Clayton County combining it with two Henry County voting precincts and two Spalding County voting precincts.

55. The data in the chart below shows that the configuration of these four districts in the Cooper House plan lowers the mean compactness score as compared with the configuration of the districts in the Enacted House plan.

**Chart 8: Compactness scores in four House districts**

| District | Enacted House | | | | Cooper House 1205 | | | |
|---|---|---|---|---|---|---|---|---|
| | % Devn. | Reock | Polsby-Popper | % 18+ AP Blk | % Devn. | Reock | Polsby-Popper | % 18+ AP Blk |
| 069 | -1.39 | 0.23 | 0.17 | 63.56% | 1.49 | 0.4 | 0.25 | 54.97% |
| 073 | 0.88 | 0.27 | 0.18 | 12.11% | 1.14 | 0.28 | 0.2 | 11.29% |
| 074 | -0.93 | 0.63 | 0.36 | 25.52% | 0.78 | 0.5 | 0.25 | 61.49% |
| 077 | -0.45 | 0.19 | 0.18 | 76.13% | -1.29 | 0.4 | 0.21 | 66.26% |
| | | | | | | | | |
| Mean Compactness | | 0.40 | 0.23 | | | 0.33 | 0.22 | |

56. Spalding County has a population of 67,306 and is 33.6% 18+ AP-Black. The population of Spalding County is about 13% more than the population of a House district (59,511). The 18+ AP-Black population is not sufficiently numerous to create district that is over 50% 18+ AP-Black within Spalding County.

The Plan Component report (Ex. 13) shows that in the Cooper 1205 House plan splits Spalding County such that the high concentrations of Black population is included in HD 117, and predominantly white population is excluded from HD 117. Having separated the Black population in Griffin from the rest of Spalding County, the district then connects to two populous majority-Black voting precincts in Henry County to yield a district that is 54.64% 18+ AP-Black.

57.    Below is a map showing Augusta and the East Central region with a theme of AP-Black % on the voting districts.



58.     Looking at the ten districts in this region, the enacted plan has five

majority 18+AP Black districts in this region.  Two majority-Black districts (HDs

129 and 130) are entirely within Richmond County.  Two additional majority-Black

districts are HD 132, which includes all of Jefferson County as well as a portion of

Richmond County and HD 126, which includes all of Jenkins and Burke counties as

well as a portion of Richmond County.  The fifth majority-Black district in the

enacted plan in this region is HD128, which includes all of Washington, Hancock,

Warren and Glascock counties as well as portions of McDuffie and Baldwin counties.



59.    In order to create an additional majority 18+AP-Black district in this area, the Cooper 1205 House plan fractures seven rural counties: Screven, Burke, Jefferson, Johnson, Laurens, Oglethorpe and Wilkes.   In the Cooper 1205 plan, HD 126 is anchored in heavily Black areas of Richmond County then combines all of Glascock County with fragments of Jefferson, Burke and Screven counties.  District

34

126 has four split counties, which is the highest number split counties in a single district in the Cooper 1205 House plan. The Plan Component report (Ex. 13) shows that Screven County is split such that the high concentrations of Black population is included in HD126, and predominantly white population is excluded. By including the additional Black population from the Screven County fragment, HD 126 can split off Black population from Burke and Jefferson counties to use those fragments in another district.



60. The Cooper 1205 House plan breaks apart the established majority-Black HD 128 in the enacted plan. The Cooper 1205 House plan strategically utilizes the Black population in the split county fragments of Burke, Jefferson, and Johnson, spinning one district (HD 128) to the south to pick-up Black population from Dublin out of Laurens County. The resulting new HD 128 has four split counties, which is the highest number of split counties in a single district in the Cooper 1205 plan.

61. Another district (HD 133) sprawls to the north to pick-up Black population from Milledgeville out of Baldwin County and connect it to another split county, Wilkes County, which makes the district stretch 90 miles from South to North. The Plan Component Report (Ex. 13) shows that Wilkes County is split such that the Black population is sorted into HD 133 and the white population is sorted into HD 123. Introducing the split of Wilkes County in HD 133, makes adjacent HD 123 also split another county, Oglethorpe County. By introducing two new county splits into HD123, it also has four split counties, the highest of number split counties in the Cooper 1205 plan. (The only other district in the Cooper 1205 plan to have four split counties is HD 002 in Northwest Georgia.)

62. In the Cooper 1205 plan, HD 133 has the most split voting precincts of any district in the plan, at nine split voting precincts. The split voting precincts in

36

Baldwin County sort the population along racial lines, such that higher concentrations of Black population are included in HD 133 and lower concentrations are outside the district.

63.   Below is a map showing Southwest Georgia region with a theme of AP-Black % on the voting districts.



64.     Of the six districts in this region, the enacted plan has two majority 18+AP Black districts.  One district is entirely within Dougherty County.  Another combines part of Dougherty County with eight whole counties to the west, including three counties which are majority-18+AP Black and three more which are over 40% 18+AP Black.



65.     In order to create an additional majority 18+AP-Black district in the Southwest region, the Cooper 1205 House plan splits Colquitt and Lee counties and

strategically utilizes Black population in Albany to connect to distant enclaves of additional Black population, such as Thomasville in Thomas County.



66.    Thomas County has a population of 45,798 and is 35.2% 18+ AP-Black.  Thomas County up about three-quarters of a House district (ideal HD = 59,511).  The 18+ AP-Black population is not sufficiently numerous to create district that is over 50% 18+ AP-Black that includes all of Thomas County.  Combining

Thomas County with additional adjacent population will not yield a majority Black district.  The Plan Component Report (Ex. 13) shows that the Cooper 1205 plan splits Thomas County, separating the Black population from the white population, assigning the Black population to HD 171.  This district 171 then connects over 50 miles north to combine with the Black population from Albany in Dougherty County.

67.    As the above analysis demonstrates, the compactness of the districts is impacted by the efforts to create more majority Black districts.   The Black percentage is lowered only by elongating the district to include lower concentrations of Black population.  This allows the Black population to be redistributed and to create other majority Black districts.

68.    Below is a map showing the Northwest Georgia region with a theme of AP-Black % on the voting districts, as well as maps of a group of 10 house districts (1-6, and 12-15) in the Enacted House and the Cooper 1205 House plan.

40



69.   The map shows that this geographic area has very little Black population.

70.   In the both the enacted House plan and the Cooper 1205 House plan, Districts 1-6 and 12-15 are in Northwest Georgia comprised of Dade, Walker, Catoosa, Whitfield, Murray, Chattooga, Floyd, Gordon, and Bartow counties as well as three voting precincts of Cherokee County.  In the enacted plan, Gordon County

41

is split between HD 004 and HD 005, but Gordon County is not split in the Cooper 1205 House plan.



71.    As a group, these 10 districts cover the same geographic area in both plans, but the internal district boundaries are different.   The treatment of the districts in this area looks similar, but there are subtle differences.



72.     The districts in the Cooper 1205 House plan are drawn in such a way that there are only three split voting precincts (including one affecting zero population) and Gordon County is made whole.

73.     The Political Subdivision Splits report (Ex. 12) shows the split voting precincts in the Cooper 1205 House plan and the Enacted House plan. The chart below shows summarizes the split voting precincts in this Northwest region of 10 districts for the Enacted House plan and the Cooper 1205 House plan.  The districts

in this area do not have any majority Black districts, nor do they overlap with any areas containing majority Black districts.

**Chart 9: Split comparisons in Northwest Georgia**

| County | Voting District | Enacted House | | Cooper House 1205 | |
|---|---|---|---|---|---|
| | | District | Population | District | Population |
| Whitfield | 2A | 002 | 3864 | Not Split | |
| Whitfield | PLEASANT GROVE | 002 | 6210 | Not Split | |
| Whitfield | 2A | 004 | 1000 | Not Split | |
| Whitfield | PLEASANT GROVE | 006 | 2122 | Not Split | |
| Whitfield | VARNELL | Not Split | | 004 | 7389 |
| Whitfield | VARNELL | Not Split | | 006 | 712 |
| Floyd | ALTO PARK | 012 | 1576 | Not Split | |
| Floyd | MT ALTO NORTH | 012 | 1080 | Not Split | |
| Floyd | ALTO PARK | 013 | 3847 | Not Split | |
| Floyd | MT ALTO NORTH | 013 | 4509 | Not Split | |
| Bartow | CASSVILLE | 014 | 15558 | 014 | 15581 |
| Bartow | WHITE | 014 | 3335 | 014 | 3546 |
| Bartow | CASSVILLE | 015 | 1047 | 015 | 1024 |
| Bartow | WHITE | 015 | 211 | 015 | 0 |
| | | | | | |
| Gordon | | 005 | 53738 | Not Split | |
| Gordon | | 006 | 3806 | Not Split | |
| | | | | | |
| TOTALS | | 6 split vtds | | 2 split vtds | |
| | | 0 (no pop) split vtd | | 1 (no pop) split vtd | |
| | | | | | |
| | | 1 split county | | 0 split counties | |

74.     The enacted House plan splits six voting precincts and one county in this region, while the Cooper 1205 House plan splits only three voting precincts and no counties in this region.  Rather than draw these 10 districts the same as the enacted House plan, the Cooper 1205 House plan makes many changes in this area such that

the number of overall county and voting precinct splits is reduced.  In the Cooper
1205 House plan, there is a pattern of making adjustments to the district boundaries
to unsplit counties and unsplit voting precincts in areas of the state with little
minority population, such that the net effect is to keep the total number of splits
similar to the enacted House plan.  Making these changes in areas of the state with
little minority population masks the differences between the enacted plan and the
Cooper 1205 plan.

75.    The chart below compares the split counties in both the Enacted House
and Cooper 1205 House plans as well as some demographic data for those counties.
The enacted House plan splits 69 counties and the Cooper 1205 Senate plan splits
68 counties.  Both plans split the same 58 counties.

**Chart 10: County splits Enacted HD vs APA Cooper 1205**

| Name | Population | AP Blk | AP Blk % | 18+ Pop | 18+ AP Blk | 18+ AP Blk % | Split in Enacted House | Split in Cooper House 1205 |
|---|---|---|---|---|---|---|---|---|
| Baldwin | 43,799 | 18,985 | 43.3% | 35,732 | 14,515 | 40.6% | x | x |
| Barrow | 83,505 | 11,907 | 14.3% | 62,195 | 8,222 | 13.2% | x | x |
| Bartow | 108,901 | 13,395 | 12.3% | 83,570 | 9,377 | 11.2% | x | x |
| Bibb | 157,346 | 88,865 | 56.5% | 120,902 | 64,270 | 53.2% | x | x |
| Bryan | 44,738 | 7,463 | 16.7% | 31,828 | 5,025 | 15.8% | x | x |
| Bulloch | 81,099 | 24,375 | 30.1% | 64,494 | 18,220 | 28.3% | x | x |
| Carroll | 119,148 | 24,618 | 20.7% | 90,996 | 17,827 | 19.6% | x | x |
| Catoosa | 67,872 | 2,642 | 3.9% | 52,448 | 1,684 | 3.2% | x | x |
| Chatham | 295,291 | 115,458 | 39.1% | 234,715 | 85,178 | 36.3% | x | x |
| Cherokee | 266,620 | 21,687 | 8.1% | 202,928 | 14,976 | 7.4% | x | x |
| Clarke | 128,671 | 33,672 | 26.2% | 106,830 | 24,776 | 23.2% | x | x |