# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., et al., | |
| *Plaintiffs,* | |
| v. | CASE NO. 1:21-CV-05337-SCJ |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, | |
| *Defendant.* | |

## PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

Plaintiffs Alpha Phi Alpha Fraternity Inc., Sixth District of the African Methodist Episcopal Church ("AME Church"), Eric T. Woods, Katie Bailey Glenn, Phil Brown, and Janice Stewart (collectively, "Plaintiffs") pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1 respectfully submit this statement of additional material facts.

1.    The town halls held by the Georgia House and Senate Committees about the redistricting process all occurred in the summer of 2021, before full U.S. Census data was released in September 2021.  Dep. of Bonnie Rich [Dkt. 227] ("Rich Dep.") 175:10-23.

2.     According to the Chair of the State House Redistricting Committee, U.S. Census data is important for drawing districts because it is used to determine where the population growth and retraction are, and "guides" how maps are drawn. Rich Dep. 185:10-18.

3.     At the 2021 town halls, legislators did not answer questions from Georgia residents.  Rich Dep. 182:2-5.

4.     No town halls were held in three of metro Atlanta's most populous counties—Gwinnett, Cobb, and DeKalb counties.  Dep. of Jan Jones [Dkt. 241] ("J. Jones Dep.") 64:10-65:20.

5.     Despite receiving requests to provide information about the redistricting process in languages other than English, the House and Senate Redistricting Committees decided not to accommodate those requests.  Rich Dep. 182:6-183:3.  Redistricting information was published only in English.  *Id.* 183:21-23.

6.     It was clear during the redistricting process that the majority Republican party was not willing to entertain input on the drawing of the maps from members of the minority Democratic Party.  Dep. of Derrick Jackson [Dkt. 228] ("D. Jackson Dep.") 20:9-22:12.

7.     Representative Derrick Jackson (D), who represents HD 64, decided

not to meet with the chair of the State House Redistricting Committee regarding the maps because he felt that doing so would be "futile." D. Jackson Dep. 20:21-21:5.

8.     The Chair of the State House Redistricting Committee testified that discussions she had with constituents and advocate groups did not affect her existing views about the Georgia House maps because she believed those people to be "very liberal" and "very partisan." Rich Dep. 163:11-164:2.

9.     The State Senate redistricting bill (SB 1EX) was passed by the House Legislative and Congressional Reapportionment Committee along racial and party lines; the only two members who voted against it are Black and members of the Democratic Party. J. Jones Dep. 207:5-209:3.

10.     The State House redistricting bill (HB 1EX) was passed by the House Legislative and Congressional Reapportionment Committee along racial and party lines; the five representatives who voted against it are all Black and members of the Democratic Party. J. Jones Dep. 210:9-211:10.

11.     Less than two weeks after the maps were released on November 2, 2021, the Georgia General Assembly passed SB 1EX on November 15, 2021 and passed HB 1EX on November 12, 2021. Ex. A, Georgia General Assembly – SB 1EX, https://www.legis.ga.gov/legislation/60894; Ex. B, Georgia General

Assembly – HB 1EX, https://www.legis.ga.gov/legislation/60897.  Both maps

were passed largely on a party-line vote.  Ex. C, Georgia General Assembly – SB

1EX Senate Vote; Ex. D, Georgia General Assembly – SB 1EX House Vote; Ex.

E, Georgia General Assembly – HB 1EX Senate Vote; Ex. F, Georgia General

Assembly – HB 1EX House Vote.

12.     Governor Kemp waited approximately 40 days after the maps were

passed, until December 30, 2021, to sign the maps into law.  Exs. A-B.

13.     Not a single Black legislator voted in favor of the enacted Senate or

House maps.  Exs. C-F.

14.     Bishop Reginald Jackson of Plaintiff AME Church described how

"[a]dvocating for the right to vote, regardless of candidate or party, and

encouraging the AME Church's eligible members to vote have been priorities of

the Church."  Declaration of Reginald Jackson [Dkt. 216-1, Ex. 4] ("R. Jackson

Decl.") ¶ 5.

15.     Plaintiff AME Church encourages members to become educated on

issues that are of particular importance to the Black community so that voters can

cast a ballot by "determin[ing] what was best for them."  Dep. of Reginald Jackson

[Dkt. 216] ("R. Jackson Dep.") 43:19-20.

16.     For example, Bishop Jackson testified how "[h]ospitals closing down

became a concern" for Plaintiff AME Church "because you have a lot of people, particularly in the black community, [whose] only access to health care is the emergency room at the hospital." R. Jackson Dep. 43:5-8. This was especially important for members in the Atlanta area who are served by only one hospital with acute care, Grady Memorial Hospital. *Id.* 43:8-12.

17.    Plaintiff Phil Brown also testified that there were "many" needs of the Black community that differ from the needs of White voters. Dep. of Phil Brown [Dkt. 219] ("Brown Dep.") 67:18.

18.    Plaintiff Brown described the lack of responsiveness of government officials in his community of Wrens, Georgia, noting that "for years, the black community has been overlooked when it comes to city, state, and county money." Brown Dep. 67:21-23.

19.    Plaintiff Eric Woods testified that the needs of the minority community in Georgia differ from the needs of White residents in the areas of health care, education, and the lack of food distribution sites in certain areas. Dep. of Eric Woods [Dkt. 217] ("Woods Dep.") 53:8-55:3.

20.    Representative Derrick Jackson testified that Georgia's Black community has needs that are different from those of White Georgians in the areas of healthcare, wages, housing and affordability. D. Jackson Dep. 49:12-50:6.

21.     Representative Jackson testified that in his experience in the legislature, Republican legislators only pay "lip service" to the unique needs of Black Georgians and vote along party lines on such issues, such as maternal and infant mortality.  D. Jackson Dep. 49:12-52:3.

22.     Bishop Jackson testified that Senator Max Burns, representing a "predominantly African American" district in the Augusta area, "doesn't represent the interest of the black voters."  R. Jackson Dep. 86:3-18, 120:9-15.

23.     Representative Erick Allen testified that the Black community in Georgia experiences differences and disparities in the delivery of healthcare services and education.  Dep. of Erick Allen [Dkt. 240] ("Allen Dep.") 40:23-41:19.

24.     Representative Allen further testified that Republican colleagues in the legislature to whom he explained the different needs of the Black community were not receptive.  Allen Dep. 41:20-42:24.

**Demographic Change in Georgia**

25.     Between 2000 to 2020, the any-part Black[1] population in Georgia increased by 1,144,721, from 2,393,425 to 3,538,146, an increase of over 47%.

---

[1] As used herein, "any-part Black," "Black." or "AP Black" refer to persons who are single-race Black or persons of two or more races and some part Black, including Hispanic Black.  Cooper Report ¶ 7 n.1.

Report of William Cooper Pt. 1 [Dkt. 237-1] ("Cooper Report Pt. 1") ¶ 50, Fig. 5.
During that period, the share of the state population that is Black increased from
29.24% to 33.03%. *Id.*

28. During that same period of time, the White population in Georgia
increased by 233,495. Cooper Report Pt. 1 ¶ 50, Fig. 5.

27. The ideal population size for a State Senate district in Georgia is
191,284 people. Cooper Report Pt. 1 ¶ 14 n.6. The ideal population size for a
State House district in Georgia is 59,511 people. *Id.*

28. 1,144,721 people is almost the population of six entire State Senate
districts (exactly 5.98 Senate Districts). 1,144,721 people is more than the
population of 19 entire State House districts. Cooper Report Pt. 1 ¶ 14 n.6.

29. Between 2010 and 2020, the any-part Black population in Georgia
increased by 484,048, from 3,054,098 to 3,538,146, an increase of more than 15%.
Cooper Report Pt. 1 ¶ 50, Fig. 5. During that period, the share of the state
population that is Black increased from 31.53% to 33.03%. *Id.*

30. 484,848 people is the equivalent of more than 2.5 entire State Senate
districts (exactly 2.53 Senate Districts). Cooper Report Pt. 1 ¶ 14 n.6. 484,848
people is the equivalent of more than eight entire State House districts. *Id.*

31. During that same period of time, the White population in Georgia

decreased by 51,764.  Cooper Report Pt. 1 ¶ 50, Fig. 5.

32.     Between 2000 and 2020, the any-part Black population in the Metro Atlanta region of Georgia increased by 938,006, from 1,248,809 to 2,186,815, an increase of more than 75%.  Cooper Report Pt. 1 ¶ 51, Fig. 6.  During that period, the share of population in the Metro Atlanta region that is Black increased from 29.29% to 35.91%.  *Id.*

33.     938,006 people is the equivalent of nearly five entire State Senate districts (exactly 4.90 Senate Districts).  Cooper Report Pt. 1 ¶ 14 n.6.  938,006 people is the equivalent of more than 15 State House districts.  *Id.*

34.     During that same period of time, the White population in the Metro Atlanta region increased by 85,726.  Cooper Report Pt. 1 ¶ 51, Fig. 6.

35.     Between 2010 and 2020, the any-part Black population in the Metro Atlanta region of Georgia increased by 409,927 from 1,776,888 to 2,186,815, an increase more than 23%.  Cooper Report Pt. 1 ¶ 51, Fig. 6.  During that period, the share of the population in the Metro Atlanta region that is Black increased from 33.61% of the population to 35.91% of the population.  *Id.*

36.     409,927 people is the equivalent of more than two entire State Senate districts or more than six entire State House districts.  Cooper Report Pt. 1 ¶ 14 n.6.

37.     During that same period of time, the White population in the Metro

Atlanta region decreased by 22,736.  Cooper Report Pt. 1 ¶ 51, Fig. 6.

38.    Black Belt counties in and around the Augusta area have experienced a slight overall population increase since 2000, from 321,998 to 325,164 in 2020. Cooper Report Pt. 1 ¶ 58, Fig. 8.

39.    During that same period of time, the Black population in Black Belt counties in and around the Augusta area increased by 14,480, from 163,310 to 177,610.  Cooper Report Pt. 1 ¶ 58, Fig. 8.

40.    During that same period of time, the White population in Black Belt counties in and around the Augusta area decreased by 22,755, from 146,870 to 124,115.  Cooper Report Pt. 1 ¶ 58, Fig. 8.

41.    Thus, the Black population became more concentrated in the last two decades Black Belt counties in and around the Augusta area.  Cooper Report Pt. 1 ¶ 58, Fig. 8.

42.    Counties in the Western Black Belt area have experienced a slight overall population decrease since 2000, from 214,686 to 190,819 in 2020.  Cooper Report Pt. 1 ¶ 61, Fig. 9.

43.    During that same period of time, the Black population in the Western Black Belt area decreased by 3,165, from 118,786 to 115,621, from 55.33% to 60.59% of the population in the area.  Cooper Report Pt. 1 ¶ 61, Fig. 9.

44.     During that same period of time, the White population in the Western Black Belt area decreased by 26,393, from 90,946 to 64,553, from 42.36% to 33.83% of the population.  Cooper Report Pt. 1 ¶ 61, Fig. 9.

45.     Thus, the Black population became more concentrated in the last two decades in the Western Black Belt area.  Cooper Report Pt. 1 ¶ 61, Fig. 9.

46.     Between 2000 and 2020, the any-part Black population in the 5-county south Metro Atlanta area (Fayette, Henry, Spalding, Newton, and Rockdale Counties) increased by 220,665, from 74,249 to 294,914, which is nearly 300%.  Cooper Report Pt. 1 ¶ 55, Fig. 7.  During that period, the share of population in 5-county south Metro Atlanta that is Black increased from 18.51% to 46.57%.  *Id.*

47.     During that same period of time, the Black population in Fayette County increased by 16,642, from 7,086 to 23,728.  Report of William Cooper Pt. 2 [Dkt. 237-2] ("Cooper Report Pt. 2") Ex. G-4.

48.     During that same period of time, the Black population in Henry County increased by 77,792, from 11,865 to 89,657.  Cooper Report Pt. 2 Ex. G-4.

49.     During that same period of time, the Black population in Spalding County increased by 5,544, from 11,967 to 17,511.  Cooper Report Pt. 2 Ex. G-4.

50.     During that same period of time, the Black population in Newton County increased by 31,205, from 9,228 to 40,433.  Cooper Report Pt. 2 Ex. G-4.

51.     During that same period of time, the Black population in Rockdale County increased by 33,554, from 8,381 to 41,935.  Cooper Report Pt. 2 Ex. G-4.

52.     During that same period of time, the White population in the 5-county south Metro Atlanta decreased by 42,987, from 305,779 to 262,792.  Cooper Report Pt. 1 ¶ 55, Fig. 7.

53.     Between 2010 and 2020, the any-part Black population in the 5-county south Metro Atlanta area (Fayette, Henry, Spalding, Newton, and Rockdale Counties) increased by 89,488, from 205,426 to 294,914, which is more than 43%.  Cooper Report Pt. 1 ¶ 55, Fig. 7.  During that period, the share of population in 5-county south Metro Atlanta that is Black increased from 36.7% to 46.57%.  *Id.*

54.     The 2021 Enacted Plan has 14 Black-majority Senate Districts, compared to 14 in the 2014 Plan, and 13 in the 2006 Plan.  Cooper Report Pt. 1 ¶ 70, Fig. 11.

55.     The 2021 Enacted Plan has 49 majority-Black House districts compared to 47 in the 2015 plan, and 45 in the 2006 plan.  Cooper Report Pt. 1 ¶ 132, Fig. 23.

56.     The 2021 Enacted Plan has 10 majority-Black Senate districts in the Metro Atlanta region compared to 10 in the 2014 Plan, and 10 in the 2006 Plan.  Cooper Report Pt. 1 ¶ 70, Fig. 11.

57.    The 2021 Enacted Plan has 33 majority-Black House districts in the Metro Atlanta region compared to 31 in the 2015 Plan, and 30 in the 2006 Plan. Cooper Report Pt. 1 ¶ 132, Fig. 23.

58.    In the 2021 Enacted Plan as well as prior plans, Black voters are more likely to be placed in a White-majority Senate district than White voters are to be in a Black majority Senate district.  Cooper Report Pt. 1 ¶ 71, Fig. 12.  Under the 2021 enacted plan, 52.45% of Black voters are in Black-majority Senate districts and 80.54% of White voters are in White-majority Senate districts.  *Id.*

59.    In the 2021 Enacted Plan as well as prior plans, Black voters are more likely to be placed in a White-majority House district than White voters are to be in in a Black-majority House district.  Cooper Report Pt. 1 ¶ 134, Fig. 24.  Under the 2021 Enacted Plan, 51.65% of Black voters are in Black-majority House districts and 76.16% of White voters are in White-majority Senate districts.  *Id.*

60.    In areas where there is racially-polarized voting, Black voters in White-majority districts will usually be unable to elect candidates of choice.  *See, e.g.*, Report of Lisa Handley [Dkt. 222, Ex. 3] ("Handley Report") 9-10 (Black voters "are very unlikely to be able to elect their preferred candidates to the Georgia state legislature" absent a majority or near-majority Black population in the district); Dep. of John Alford [Dkt. 229] ("Alford Dep.") 91:9-18 (it "may well

be the case" that "the candidate preferred by the majority of white voters generally win state legislative elections in districts without a majority Black voting age population"), 112:13-113:13; *see also* Dep. of John Morgan [Dkt. 236] ("Morgan Dep.") 90:19-91:3 (noting that Mr. Morgan did not analyze whether Black voters could elect candidates of their choice).

**Mr. Cooper's Illustrative Plans**

61.    William Cooper prepared his illustrative Senate and House maps using *Maptitude for Redistricting*, a GIS software package commonly used by many local and state governing bodies for redistricting and other types of demographic analysis.  Cooper Report Pt. 2 Ex. B ¶ 2.

62.    Mr. Cooper used geographic boundary files created from the U.S. Census 1990-2020 Topologically Integrated Geographic Encoding and Referencing (TIGER) files.  Cooper Report Pt. 2 Ex. B ¶ 3.  He used population data from the 1990-2020 PL 94-171 data files published by the U.S. Census Bureau, which contains basic race and ethnicity data on the total population and voting-age population found in units of Census geography, including states, counties, municipalities, townships, reservations, school districts, census tracts, census block groups, precincts (called voting districts or "VTDs" by the Census Bureau) and census blocks.  *Id.* ¶ 4.

63.    Mr. Cooper also used incumbent addresses that he obtained from attorneys for the plaintiffs. Cooper Report Pt. 2 Ex. B ¶ 6.

64.    Mr. Cooper used shapefiles for the current and historical Georgia legislative plans available on the Legislative and Congressional Reapportionment Office's website, and he obtained for the House, Senate, and Congressional plans in effect during the early 2000's from the American Redistricting Project.  Cooper Report Pt. 2 Ex. B ¶¶ 7-8.

65.    In creating his illustrative plans, Mr. Cooper sought "to determine whether [creating additional majority Black districts above those created by the Georgia legislature] would be possible within the constraints of traditional districting principles."  Dep. of William Cooper [Dkt. 221] ("Cooper Dep.") 33:18-34:1; *see also* Cooper Report Pt. 1 ¶ 10.

66.    Before he began drawing his illustrative plans, Mr. Cooper began by looking at the enacted plan, the demographic change since the 2000 census, the previous plans, the benchmark plans, and other geographies unrelated to the legislative redistricting, including planning districts in the state and metropolitan statistical areas.  Cooper Dep. 47:20-48:1.

67.    Based on county-level demographics, Mr. Cooper identified two larger areas in the state with substantial Black populations:  Metropolitan Atlanta,

and the Black Belt, which runs roughly from Augusta to Southwest Georgia.

Cooper Report Pt. 1 ¶¶ 18-24, 25-35; Cooper Dep. 76:9-16, 77:2-8, 83:25-84:5.

68.    Mr. Cooper then identified four regions within those larger areas on

which to focus his inquiry into whether it was possible to draw additional Black-

majority legislative districts.  Cooper Dep. 210:21-211:2.  Each region consisted of

a group of counties.  Cooper Report Pt. 1 ¶¶ 25-35.  The regions on which Mr.

Cooper focused were South Metro Atlanta, the Eastern Black Belt, the Macon

Metro, and the Western Black Belt.  *Id.*

69.    Mr. Cooper also considered the state-defined regional planning

districts as part of his approach in identifying particular regional areas of focus.

*See* Cooper Dep. 83:25-84:7; Cooper Report Pt. 1 ¶¶ 26-27, 30, 34, 38, 54, 119 &

Ex. AA-3; Cooper Report Pt. 2 Ex. M-3; Report of William Cooper Pt. 3 [Dkt.

237-3] ("Cooper Report Pt. 3") Ex. O-3; Report of William Cooper Pt. 4 [Dkt.

237-4] ("Cooper Report Pt. 4") Ex. Z-3.

70.    Region A consists of the South Metropolitan Atlanta area, a cluster of

"suburban/exurban counties in a significantly Black, racially diverse, and

geographically compact region that has emerged over the past quarter of a

century—specifically, the counties of Fayette, Spalding, Henry, Rockdale, and

Newton."  Cooper Report Pt. 1 ¶ 21.

71.     Region B consists of the Eastern Black Belt, which consists of "urban Black Belt Richmond County (Augusta) plus a group of rural Black Belt counties in a geographically compact area." Cooper Report Pt. 1 ¶ 25. "All of the Region B counties are part of the Central Savannah River Area Regional Commission." *Id.* ¶ 26.

72.     Region C consists of the Western Black Belt, "urban Black Belt Dougherty County (Albany) plus a group of southwest Georgia rural Black Belt counties in a geographically compact area." Cooper Report Pt. 1 ¶ 30. "Region C encompasses part of the Southwest Georgia and Valley River Area Regional Commission areas." Cooper Report Pt. 1 ¶ 30 & Cooper Report Pt. 2 Ex. F.

73.     Region D, Metropolitan Macon, is "a seven-county region in Middle Georgia defined by the combined MSAs of Macon-Bibb and Warner Robins." Cooper Report Pt. 1 ¶ 33 & Cooper Report Pt. 2 Ex. F. "[T]hese seven MSA counties form the core of the Middle Georgia Regional Commission." Cooper Report Pt. 1 ¶ 34.

74.     Mr. Cooper "did not think of [the regional areas] as being hard boundaries." Cooper Dep. 210:16-18. Rather, he used those regions as "guidelines" "in the background" to help focus his inquiry. *Id.* 97:13-15.

75.     With respect to drawing district lines for the Illustrative Plans, Mr.

Cooper considered traditional districting principles, including "population equality, compactness, contiguity, respect for communities of interest, and the non-dilution of minority voting strength." Cooper Report Pt. 1 ¶ 10.

76.    Mr. Cooper also considered the Guidelines that the Georgia House Legislative and Congressional Reapportionment Committee used, including that "[e]ach legislative district of the General Assembly should be drawn to achieve a total population that is substantially equal as practicable"; that "[a]ll plans adopted by the Committee will comply with Section 2 of the Voting Rights Act of 1965, as amended"; that "[a]ll plans adopted by the Committee will comply with the United States and Georgia Constitutions"; that "[d]istricts shall be composed of contiguous geography"; that "[d]istricts that connect on a single point are not contiguous"; that "[n]o multi-member districts shall be drawn on any legislative redistricting plan"; that "[t]he boundaries of counties and precincts," "compactness," and "[c]ommunities of interest" be considered; and that "[e]fforts should be made to avoid the unnecessary pairing of incumbents." Cooper Dep. 37:2-6, 49:3-50:13; *see also* Ex. G, 2021-2022 Guidelines for the House Legislative and Congressional Reappointment Committee, https://www.house.ga.gov/Documents/CommitteeDocuments/2021/Legislative_an d_Congressional_Reapportionment/2021-

2022%20House%20Reapportionment%20Committee%20Guidelines.pdf.

77.     Mr. Cooper testified that when he draws maps—including the Illustrative Plans—he "attempt[s] to put together districts that are reasonably shaped, easy to understand, and . . . compact[]."  Cooper Dep. 53:17-19.

78.     In drawing the Illustrative Plans, Mr. Cooper "made every effort to avoid splitting" counties and voting districts.  Cooper Dep. 210:7-8; *see also id.* 203:19-25; Cooper Report Pt. 1 ¶ 11 (The "illustrative plans are drawn to follow, to the extent possible, county and VTD boundaries.").

79.     In drawing the Illustrative Plans, Mr. Cooper sought to avoid county splits, MSA splits, regional commission splits, CBSA splits, and municipalities splits.  *See* Cooper Dep. 157:5-21; *see also id.* 156:2-7; 210:7-11.

80.     Where splits were necessary to comply with the strict deviation standards or other districting principles, Mr. Cooper "generally used whole 2020 Census VTDs as sub-county components.  Where VTDs are split, [he] followed census block boundaries that are aligned with roads, natural features, census block groups, municipal boundaries, and/or current county commission districts." Cooper Report Pt. 1 ¶ 11.

81.     In drawing the Illustrative Plans, Mr. Cooper also noticed areas outside of his areas of focus where he could avoid splitting counties while

protecting incumbents, and so he avoided those splits.  Cooper Dep. 204:21-25.

82.    The opportunity to "fix" those splits as compared to the enacted map may have been opened up by "ripple effects" from the other changes Mr. Cooper made in the areas of focus.  Cooper Dep. 216:9-15.

83.    In drawing the Illustrative Plans, Mr. Cooper stayed within particular population deviation limits.  For the Senate Plan, Mr. Cooper used a 1% population deviation limit for each district (i.e., no district is more than 1% away from ideal population size).  *See* Cooper Report Pt. 1 ¶ 111.  For the House Plan, he used a 1.5% population deviation limit for each district.  *Id.* ¶ 184.

84.    Those deviation limitations are "very tight" compared to many other states, where up to five percent is acceptable.  Cooper Dep. 61:6-15, 121:20-122:7. *See also* Morgan Dep. 345:17-20.

85.    Because of the tight population deviation standard employed in Georgia, it is sometimes necessary to split counties and precincts to meet those requirements.  Dep. of Gina Wright [Dkt. 225] ("Wright Dep.") 141:24-142:2 ("[S]ometimes you need to split precincts in order to meet deviation requirements.").

86.    With respect to maintaining communities of interest, Mr. Cooper in drawing the Illustrative Plans took into account "transportation corridors,"

"maintaining existing jurisdictional boundaries like counties and precincts,"

"municipalities," "core-based statistical areas," "regional commissions,"

"socioeconomic connections or commonalities," and "historical or cultural

connections."  Cooper Dep. 50:14-51:5; 207:9-208:17; *see also* Wright Dep.

247:7-249:12; Morgan Dep. 127:16-130:20.

87.    In addition to those traditional districting principles, Mr. Cooper

sought to "avoid pairing incumbents" to the extent possible.  Cooper Dep. 48:24-

49:2.

88.    In drawing the Illustrative Plans, Mr. Cooper "sometimes" used a

*Maptitude* feature that displayed "dots" to indicate precincts with a Black voting

age population of 30 percent or higher.  Cooper Dep. 60:15-16.  That feature only

indicated whether the precinct as a whole had a Black voting age population higher

than 30 percent, and it did not identify the concentration of Black population

within the precinct.  *Id.* 60:15-61:1.

89.    Mr. Cooper used that feature to "identif[y] more or less where the

Black [or the minority] population lives."  Cooper Dep. 63:16-21.

90.    Mr. Cooper did not use partisan data or election results in his creation

of the Illustrative Plans.  Cooper Dep. 68:17-20.

91.    When asked whether he prioritized race over other traditional

20

districting considerations in drawing his Illustrative Plans, Mr. Cooper testified, "absolutely not."  Cooper Dep. 221:4-7.

92.    Mr. Cooper did not seek to maximize the number of Black-majority districts in his Illustrative Plans, testifying that doing so would likely run afoul of traditional districting principles.  Cooper Dep. 41:17-42:5.

93.    Defendant's expert agreed that Mr. Cooper's Illustrative Plan performs similarly to the Enacted Plan with respect to compactness, splits, and other quantifiable metrics—in his words, the metrics are "all very similar." Morgan Dep. 277:15-23.

94.    The mean compactness scores for the Illustrative Senate Plan and 2021 Enacted Plan using the Reock and Polsby-Popper measures are "virtually identical."  *See* Morgan Dep. 278:16-279:3 (noting that the mean compactness scores are "virtually identical").

95.    Mr. Cooper's Illustrative State Senate Plan has a mean Reock score that is 0.1 points higher than the 2021 Enacted Plan, and a mean Polsby-Popper score that is 0.1 points lower.  Cooper Report Pt. 1 ¶ 114, Fig. 20.

96.    Mr. Cooper's Illustrative State House Plan has the same mean Reock score as the 2021 Enacted Plan, and a mean Polsby-Popper score that is 0.01 lower than the 2021 Enacted Plan.  Cooper Report Pt. 1 ¶ 186, Fig. 36.

97.     Mr. Cooper's Illustrative State Senate Plan has higher minimum Reock and Polsby-Popper scores (i.e., the compactness of the *least* compact district) than the 2021 Enacted Plan.  Cooper Report Pt. 1 ¶ 114, Fig. 20.

98.     Mr. Cooper's Illustrative State House Plan has higher minimum Reock and Polsby-Popper scores than the 2021 Enacted Plan.  Cooper Report Pt. 1 ¶ 186, Fig. 36.

99.     Mr. Cooper's Illustrative State Senate Plan has fewer split counties than the 2021 Enacted Plan.  Cooper Report Pt. 1 ¶ 116, Fig. 21.

100.    Mr. Cooper's Illustrative State Senate Plan has fewer total county splits than the 2021 Enacted Senate plan.   Cooper Report Pt. 1 ¶ 116, Fig. 21.

101.    Mr. Cooper's Illustrative State Senate Plan has fewer 2020 VTD splits than the 2021 Enacted Senate plan.  Cooper Report Pt. 1 ¶ 116, Fig. 21.

102.    Mr. Cooper's Illustrative State Senate Plan has fewer total city/town splits than the 2021 Enacted Senate plan.  Cooper Report Pt. 1 ¶ 116, Fig. 21.

103.    Mr. Cooper's Illustrative State Senate plan keeps more single- and multi-county whole city/towns intact than the 2021 Enacted Senate plan.  Cooper Report Pt. 1 ¶ 116, Fig. 21.

104.    Mr. Cooper's Illustrative State Senate Plan has fewer Regional Commission Splits than the Enacted Senate Plan.  Cooper Report Pt. 1 ¶ 119, Fig.

22.

105.   Mr. Cooper's Illustrative State Senate Plan has fewer Core-Based Statistical Area ("CBSA") Splits than the Enacted Senate Plan.  Cooper Report Pt. 1 ¶ 119, Fig. 22.

106.   Mr. Cooper's Illustrative State House Plan has fewer split counties than the Enacted House Plan.  Cooper Report Pt. 1 ¶ 189, Fig. 37.

107.   Mr. Cooper's Illustrative State House Plan has the same number of total county splits as the Enacted House Plan.  Cooper Report Pt. 1 ¶ 189, Fig. 37.

108.   Mr. Cooper's Illustrative State House Plan has the same number of 2020 VTD splits as the Enacted House Plan.  Cooper Report Pt. 1 ¶ 189, Fig. 37.

109.   Mr. Cooper's Illustrative State House Plan keeps more single-county whole city/towns intact than the Enacted House Plan.  Cooper Report Pt. 1 ¶ 189, Fig. 37.

110.   Mr. Cooper's Illustrative State House Plan has fewer Regional Commission Splits than the Enacted House Plan.  Cooper Report Pt. 1 ¶ 192, Fig. 38.

111.   Mr. Cooper's Illustrative State Senate Plan stays within a 1% population deviation limit for each district.  Cooper Report Pt. 1 ¶ 111. Specifically, Mr. Cooper's deviation relative range is -1.00% to 1.00% and the

Enacted Plan's is -1.03% to 0.98%. Report of John Morgan [Dkt. 236-2]

("Morgan Report.") ¶ 16, Chart 2. According to Mr. Morgan, this is within the

acceptable range to comport with traditional redistricting principles. Morgan Dep.

344:20-345:6.

112.    Mr. Cooper's illustrative State House Plan stays within a 1.5%

population deviation limit for each district. Cooper Report Pt. 1 ¶ 184.

Specifically, Mr. Cooper's deviation relative range is -1.49% to 1.49% and the

Enacted Plan's is -1.40% to 1.34%. Morgan Report ¶ 45, Chart 6. According to

Mr. Morgan, this is within the acceptable range to comport with traditional

redistricting principles. Morgan Dep. 344:20-345:6.

## Senate District 17 ("SD 17")

113.    Gina Wright testified that the idea behind SD 17 in the 2021 Enacted

Plan was to make it a Republican district. *See* Wright Dep. 178:10-11 ("I think the

idea was to draw a Republican District.").

114.    Ms. Wright testified that enacted SD 17 is "jagged" and less compact

than other districts. Wright Dep. 195:8-12 (noting that the Enacted SD 17 has "a

bit of a jagged appearance, [and] is not as compact as other districts…").

115.    Enacted SD 17 unites very different communities, connecting

communities in Henry County in suburban Atlanta with rural areas that are

socioeconomically distinct, for example with respect to educational attainment. Cooper Report Pt. 1 ¶ 128.

116.    Mr. Cooper's Illustrative SD 17 is "much more compact than the sprawling" enacted SD 17.  Cooper Report Pt. 1 ¶ 105, Fig. 17D.

117.    Mr. Cooper's Illustrative SD 17 results in a configuration that keeps Newton County whole, whereas the 2021 Enacted Plan splits Newton County. *Compare* Cooper Report Pt. 1 ¶ 106 Fig. 17E, *with* Fig. 17F.

118.    Mr. Cooper identified grouping more suburban areas together as one reason for the configuration of Illustrative SD 17.  Cooper Dep. 139:14-19 ("[A:] But you will agree that Morgan County is rather rural as well, right?  [Q:] I would consider Spalding and Morgan to be pretty rural counties. [A:] But Henry County would be ex-urban and suburban.").

119.    Mr. Cooper also identified shared socioeconomic characteristics, such as similar levels of educational attainment between residents of Henry, Rockdale, and Dekalb Counties, as one reason for the configuration of Illustrative SD 17. Cooper Report Pt. 1 ¶ 127 ("The counties within Illustrative Senate District 17 share socioeconomic characteristics that make them similar to one another. For example, the counties that comprise Illustrative Senate District 17 are similar when educational attainment rates among Black residents are compared across the

counties.  A significant proportion of Black residents in Henry, Rockdale, and Dekalb Counties have received a bachelor's degree or higher (34.5%, 29.2%, and 29.2% respectively).").

### Senate District 23 ("SD 23")

120.    Illustrative SD 23 is equally compact to Enacted SD 23 with respect to the Reock and Polsby-Popper measurements of compactness.  *Compare* Cooper Report Pt. 4 Ex. S-1 (Illustrative SD 23 Reock: .37 Polsby Popper: .16), *with* Ex. S-3 (enacted SD 23 Reock: .37 Polsby Popper: .16).

121.    Illustrative SD 23 splits the same number of counties as Enacted SD 23.  *Compare* Cooper Report Pt. 1 Fig. 18, *with* Fig. 19A.

122.    Mr. Cooper identified grouping counties in the historical Black Belt together as one reason for the configuration of Illustrative SD 23.  Cooper Dep. 144:20-24. ("[Q:] So in looking back at Figure 19A in illustrative Senate District 23, what is the community of interest between Richmond County and Twiggs County? [A:] Both counties are part of the Black Belt.").  Mr. Cooper explained that, while there is no single definition of the Black Belt, he relied on the designation of the Georgia Budget and Policy Institute, which is based on historical data of enslaved labor, current enrollments of Black students, and current enrollments of students living in poverty.  Cooper Report Pt. 1 ¶ 18, Fig. 1.

26

123.    Mr. Cooper also identified shared socioeconomic characteristics, such as poverty rates, as one reason for the configuration of Illustrative SD 23.  For example, a significant proportion of Black residents across Illustrative SD 23 have incomes that fall below the poverty line (ranging from 20.1% of the Black population to 38.4% of the Black population).  Cooper Report Pt. 1 ¶ 129 ("The counties within Illustrative Senate District 23 also share certain socioeconomic characteristics that make them similar to one another.  For example, a significant proportion of Black residents across the Illustrative Senate District 23 counties had incomes that fell below the poverty line (ranging from 20.1% of the Black population to 38.4% of the Black population)".).

124.    Mr. Cooper identified staying within population deviation limits as one reason for the configuration of Illustrative SD 23.  Cooper Dep. 143:8-17 ("[Q:] So you've separated in this plan Hancock and Warren Counties.  Are there differences between those counties that led you to separate them? [A:] Well, they're separated, but it's conceivable they could be put in district – one could be put in 23.  It's not dramatically different.  So it would fit into District 23.  But to do so would have created an issue with one person, one vote, I think.  It would also not have been quite as reasonably shaped."); *id.* 185:8-14 ("[Q:] But you would agree that Washington was divided on the Senate plan, the illustrative Senate plan?

27

[A:] I believe it was in the Senate plan, right -- again, quite possibly due to the

need to stay within plus or minus one percent in that district or one of the adjoining

districts.").

125.    Mr. Cooper identified increasing district compactness as one reason

for the configuration of Illustrative SD 23.  Cooper Dep. 143:8-17 ("[Q:] So

you've separated in this plan Hancock and Warren Counties.  Are there differences

between those counties that led you to separate them? [A:] Well, they're separated,

but it's conceivable they could be put in district – one could be put in 23.  It's not

dramatically different.  So it would fit into District 23.  But to do so would have

created an issue with one person, one vote, I think.  It would also not have been

quite as reasonably shaped.").

126.    Mr. Cooper identified following existing municipal and precinct lines

as the as one reason for his line-drawing decisions within Wilkes County in

configuring Illustrative SD 23.  Cooper Report Pt. 1 ¶ 109 ("Illustrative Senate

District 23 divides Wilkes County along current administrative boundaries,

following county commission lines (green) north into the City of Washington

where it follows the western city limits of Washington before returning to east-

west commission boundaries in the center of the city."); Cooper Dep. 143:18-23

("[Q:] In your division of Wilkes County, I believe you said is along County

Commission boundaries; is that right? [A:] That's correct.  I just followed the boundaries established by Wilkes County as recently as this time last year."); *id.* 144:4-8 ("Let me back up.  It does not divide -- the illustrative District 23 follows commission lines except that once it reaches the town of Washington on the southwest side it just follows the town boundaries.").

**<u>Senate District 28 ("SD 28")</u>**

127.    Enacted SD 16 is significantly longer than Illustrative SD 28 (50 miles vs. 24 miles).  *See* Morgan Report ¶¶ 24, 29.

128.    Enacted SD 16 stretches from the border with Fulton County in Atlanta all the way to the border of Upson County.  *See* Cooper Report Pt. 1 ¶ 96, Fig. 16.

129.    Enacted SD 16 unites very different communities, connecting communities in suburban Atlanta such as Fayetteville with rural areas that are socioeconomically distinct, for example with respect to labor force participation. Cooper Report Pt. 1 ¶ 126 ("By comparison, the labor force participation rates for Black residents in Pike and Lamar Counties (which are contained within 2021 Senate District 16 along with Spalding County and part of Fayette County) are lower than the counties contained within Illustrative Senate District 28. The Black labor force participation rates in Pike and Lamar Counties are 51.3% and 48.0%

respectively.").

130.   Mr. Cooper identified shared socioeconomic characteristics, such as labor force participation, as one basis for connecting Fayette, Spaulding, and Clayton counties in Illustrative SD 28.  Cooper Report Pt. 1 ¶ 125 ("For example, the counties within Illustrative Senate District 28 share socioeconomic characteristics that make them similar to one another.  A relatively high proportion of Black residents are in the labor force in Fayette, Spalding, and Clayton Counties (64.3%, 58.2%, and 69.5% respectively).").

131.   Mr. Cooper identified connecting geographically proximate communities as one reason for the configuration of Illustrative SD 28.  Cooper Dep. 126:25-127:9 ("[Q:] So for your illustrative District 28, what connections are there between the Black communities in Spalding County and the Black communities in Clayton County? [A:] They're very close geographically.  And I would expect that the Black community in Griffin area is perhaps a little bit older.  It's a smaller town.  It's not as urban but certainly there are connections.  I mean it's almost no distance at all between Griffin and southern Clayton County."); *see also id.* 127:10-19 ("[Q:] So in creating illustrative District 28 what traditional redistricting principles did you apply to its creation? [A:] I tried to keep voting district precincts whole and was able to combine communities that clearly have

connections, because they're right next door to one another, into a majority Black

district that includes Fayetteville and southern Clayton County and the majority

Black city of Griffin in Spalding County.").

132. Mr. Cooper identified connecting suburban and exurban Metro area

communities as one reason for the configuration of Illustrative SD 28. Cooper

Dep. 130:14-23 ("[Q:] Did you identify a community of interest between northern

Clayton County and the rural part of Spalding County that you've included in it?

[A:] Again, it is my belief that the African-American community in Clayton

County, even though it's somewhat more urbanized, would not mind being in a

second majority Black senate district in Clayton, Henry and Griffin County. Henry

is suburban, and so it fits well with either one of those two. It's an in-between

area."); *id*. 131:3-10 ("[Q:] And you would agree that both District 28 and District

16 on the illustrative plan connect more urban population with more rural

population, right? [A:] Or ex-urban, yeah. The extreme southern part of Spalding

County is getting more rural. That's just going to happen. I mean these are Senate

districts.").

133. Mr. Cooper identified trying to "keep voting district precincts whole"

as one reason for the configuration of Illustrative SD 28. Cooper Dep. 127:10-19

("[Q:] So in creating illustrative District 28 what traditional redistricting principles

did you apply to its creation? [A:] I tried to keep voting district precincts whole and was able to combine communities that clearly have connections, because they're right next door to one another, into a majority Black district that includes Fayetteville and southern Clayton County and the majority Black city of Griffin in Spalding County.").

134.    Mr. Cooper identified avoiding a split of Griffin, the largest city and county seat of Spalding County, as one reason for the configuration of Illustrative SD 28.  Cooper Dep. 132:6-133:14 ("[Q:] And then your split of Griffin on illustrative 28 is along the city boundaries; is that correct? [A:] I believe so.  No problem with that, is there? [Q:] Do you know if that corresponds to the voting precincts in Spalding County? [A:] I would have to check the table.  But I think that if you're splitting along municipal lines, even though it's important to be aware of VTDs and precincts, they do change.  They're constantly changing in Georgia.  So I don't know right off the top of my head whether there is a split of the VTD or not.  Can we check?  We can look and see.  I'm sort of curious now. [Q:] You can't really tell on the map either. [A:] Well, let's check. [Q:] Okay, where would we check? [A:] What is the plan components of the illustrative Senate plan? [Q:] Is that Exhibit 02 that we had -- [A:] Isn't it broken out by VTD? MR. TYSON:  Let's go off the record for just a second. (Off the record). BY MR.

TYSON: [Q:] Mr. Cooper, during the break we just confirmed that I don't think either of us believe there is a split of a precinct in this Griffin area, that there may be a precinct split in a different part of Spalding County. [A:] And it could relate strictly to staying within the plus or minus one percent. I don't know that to be a fact, but perhaps that is the reason."); Cooper Report Pt. 1 ¶ 100 & Fig. 17B.

### House District 74 ("HD 74")

135.   Illustrative HD 74 is more compact than Enacted HD 74. Morgan Report ¶ 47, Chart 7.

136.   Mr. Cooper identified shared socioeconomic characteristics, such as labor force participation, as one basis for connecting Henry, Spaulding, and Clayton counties in Illustrative HD 74. For example, a similar portion of Black residents in Henry, Spalding, and Clayton Counties are in the labor force (71.0%, 58.2%, and 69.5% respectively). Cooper Report Pt. 1 ¶ 198 ("For example, Illustrative House District 74 includes parts of Henry, Spalding, and Clayton Counties and Illustrative House District 117 includes parts of Henry and Spalding Counties. The counties within Illustrative House Districts 74 and 117 share socioeconomic characteristics that make them similar to one another. As one example, and as noted *supra* with respect to Illustrative Senate District 28, a similar proportion of Black residents in Henry, Spalding, and Clayton Counties are

in the labor force (71.0%, 58.2%, and 69.5% respectively).").

137.   Mr. Cooper identified connecting suburban communities as one reason for the configuration of the districts around Illustrative HD 74.  Cooper Dep. 178:14-179:12 ("[Q:] You would agree that illustrative Districts 68, 69 and 77 both connect more urban population with more rural population, right? [A:] Not so much.  I mean it's pretty urbanized there from Fayetteville north.  Once you go further south, yes, but that's not as densely populated.  So the rural population would be a minority in 77 and 69.  I know there are probably people who live in Atlanta who would think that Fayetteville is rural. But I mean it is a town, it's urbanized. [Q:] So your testimony is in 68, 69 and 77 there is probably some rural population but it's a small group at the bottom of those districts? [A:] Yeah.  I think it would be a minority of the population in the districts, I believe.  But I'm just talking off the top of my head, and I am not looking at block-level data and not able to really give you a definitive answer as to where the exact dividing line would be between urban and rural with 77, 69 and 68, other than the further south you go the more rural it would get.  Although, it's still very suburban, frankly.  It's overwhelmingly suburban until you get down to around Woolsey probably, and maybe that's more rural.").

## House District 117 ("HD 117")

138.   Mr. Cooper identified shared socioeconomic characteristics, such as labor force participation, as one basis for connecting Henry and Spaulding Counties in Illustrative HD 117.  Cooper Report Pt. 1 ¶ 198 ("For example, Illustrative House District 74 includes parts of Henry, Spalding, and Clayton Counties and Illustrative House District 117 includes parts of Henry and Spalding Counties.  The counties within Illustrative House Districts 74 and 117 share socioeconomic characteristics that make them similar to one another.  As one example, and as noted *supra* with respect to Illustrative Senate District 28, a similar proportion of Black residents in Henry, Spalding, and Clayton counties are in the labor force (71.0%, 58.2%, and 69.5% respectively).").

139.   Mr. Cooper identified connecting geographically proximate communities as one reason for the configuration of Illustrative HD 117.  Cooper Dep. 175:23-176:7 ("[A:] I mean Locust Grove is a stone's throw from the Spalding County line, metaphorically speaking anyway.  So there are connections, of course. [Q:] What are some of those connections? [A:] They are ex-urban and in some places rural. I've driven through Locust Grove.  It's a pretty town.  There are obvious connections.  The two towns are very close.  Griffin and Locust Grove are not far apart at all."); *id*. 217:9-24 ("[Q:] Just to clarify for the record, you

mentioned that there were commonalities between the communities of Locust Grove and Griffin.  Was proximity one of those? [A:] Well, that's what I was trying to say, yes. It's not far from one to the other.  Regardless of your race, they're close. [Q:] And was the character of those communities in terms of being suburban or ex-urban versus urban a commonality that you identified? [A:] I think so.  They're both small towns, so they're certainly ex-urban. [Q:] In your view did those commonalities support uniting those communities in a compact district? [A:] I see no reason why you can't.").

140.    Mr. Cooper identified adhering to population deviation requirements as one reason for connecting Locust Grove and Griffin.  Cooper Dep. 175:15-19 ("[Q:] What was the basis for connecting part of the city of Locust Grove with part of Griffin? [A:] By and large probably one person, one vote.  It was a clear -- there was a clear dividing line there at the precinct level I'm pretty sure.").  Mr. Cooper also identified following precinct lines as one reason for the configuration of Illustrative HD 117.  *Id.*

141.    Mr. Cooper identified connecting exurban communities as one reason for the configuration of Illustrative HD 117.  Cooper Dep. 176:2-7 ("[Q:] What are some of those connections? [A:] They are ex-urban and in some places rural. I've driven through Locust Grove.  It's a pretty town.  There are obvious connections.

36

The two towns are very close.  Griffin and Locust Grove are not far apart at all.");

*id*. 217:9-20 ("[Q:] Just to clarify for the record, you mentioned that there were

commonalities between the communities of Locust Grove and Griffin.  Was

proximity one of those? [A:] Well, that's what I was trying to say, yes. It's not far

from one to the other.  Regardless of your race, they're close. [Q:] And was the

character of those communities in terms of being suburban or ex-urban versus

urban a commonality that you identified? [A:] I think so.  They're both small

towns, so they're certainly ex-urban.").

143.    Mr. Cooper identified following transportation corridors and precinct

lines in configuring Illustrative HD 117.  Cooper Dep. 176:17-22 ("[Q:] And

District 117 as configured divides the city of Griffin as well, right? [A:] Part of

Griffin is taken out of House District 117.  Again, I think it's probably the precinct

level.  But basically it's following the main highway there, State Route 16 I think it

is.").

## House District 133 ("HD 133")

143.    Mr. Cooper identified connecting counties in the historical Black Belt

together as one reason for the configuration of Illustrative HD 133.  Cooper Report

Pt. 1 ¶ 174 ("To recap, the Illustrative Plan draws six majority-Black House

districts in the Eastern Black Belt—House Districts 124, 125, 126, 127, 128, and

133—where there are just five in the 2021 Plan."); *id.* ¶ 199 ("In addition to being

part of the eastern Black Belt region as discussed *supra*, counties within Illustrative

House District 133 share socioeconomic characteristics that make them similar to

one another.").

144.    Mr. Cooper also identified shared socioeconomic characteristics, such

as similar levels of education in the counties within the configuration of Illustrative

HD 133.  Cooper Report Pt. 1 ¶ 199 ("For example, a comparatively low

proportion of Black residents in Illustrative District 133 counties have received a

bachelor's degree or higher (ranging from 5.7% to 12.7% of the Black population

ages 25 and over).").

145.    Mr. Cooper identified protecting incumbents as a factor he considered

when configuring the districts around Illustrative HD 133.  Cooper Dep. 187:10-19

("[Q:] And the adjustments to 128 were necessary to create the additional majority

Black District 133? [A:] There may be ways to reconsider how 128 is drawn.

Again, I wanted to avoid pairing incumbents.  It's not a traditional redistricting

principle per se, but it seems to be so important -- and I don't off the top of my

head know exactly where the incumbent lives in 128, but that was a factor I'm

sure."); *id.* 188:12-18 ("[Q:] But you don't know sitting here today whether

incumbency was the reason for the shape of House District 128? [A:] I'm sure it

was a factor.  What I don't know is whether I could have overcome that with some other configuration."); *id.* 183:8-12 ("[Q:] And you would agree that the split of District 133 in Milledgeville does split the city into two different districts, right? [A:] Right.  I think there's an incumbent who lives somewhere in all this as well.").

146.    Mr. Cooper identified following municipal boundaries as a factor he considered when configuring Illustrative HD 133.  Cooper Dep. 186:1-16 ("[Q:] Going back a page just to the overview of House District 133 on Figure 31.  Just go back one page to look at the overall view.  What is the geographically compact Black community contained in House District 133? [A:] It is found in Hancock County, Taliaferro County, Warren County, part of Wilkes.  Wilkinson is majority white but still a significant Black population and a significant Black population in Baldwin County.  So it's slightly elongated, but it's easy to follow.  It's following county boundaries basically except for the area in Baldwin where I made a Herculean effort to follow municipal boundaries; and Wilkes, which is following County Commission lines that were just established last winter.").

147.    Mr. Cooper identified following local county commission lines as a factor he considered when configuring Illustrative HD 133. Cooper Dep. 186:1-16 ("[Q:] Going back a page just to the overview of House District 133 on Figure 31. Just go back one page to look at the overall view. What is the geographically

compact Black community contained in House District 133? [A:] It is found in

Hancock County, Taliaferro County, Warren County, part of Wilkes.  Wilkinson is

majority white but still a significant Black population and a significant Black

population in Baldwin County.  So it's slightly elongated, but it's easy to follow.

It's following county boundaries basically except for the area in Baldwin where I

made a Herculean effort to follow municipal boundaries; and Wilkes, which is

following County Commission lines that were just established last winter.").

## House District 145 ("HD 145")

148.    Mr. Cooper identified geographic proximity as one basis for

connecting communities in Illustrative HD 145.  Cooper Report Pt. 1 ¶ 201

("Illustrative House District 145 is in Macon-Bibb County and Monroe County.

About 91% of all persons and 96% of Black persons in Illustrative House District

145 are Macon-Bibb residents.  With the creation of a third Macon-centric district,

Black voters in the consolidated city would potentially have a stronger voice in the

State House to address shared socio-economic issues.  For example, one-third of

the Black population and nearly half (47.5%) of Black children in Macon-Bibb live

in poverty.  By contrast, 11.6% of the White population in Macon-Bibb and 14.1%

of White children in live in poverty.").  Mr. Cooper also identified shared

socioeconomic characteristics, such as similar levels of education in the counties

within the configuration of Illustrative HD 145.  *Id.*

149.    Mr. Cooper identified connecting communities within the Macon metropolitan statistical area as one reason for the configuration of Illustrative HD 145.  Cooper Dep. 197:22-198:6 ("[Q:] So can you walk me through what downtown Macon has in common with this piece of Forsyth County over towards Upson County in District 145? [A:] It's in the Macon/Bibb MSA.  And there is some Black population in that precinct, but I believe it's a majority white precinct. But that was mainly because I had to make sure that the deviation was within plus or minus one percent.  Ninety percent plus of the population in 145 under the illustrative plan lives Macon/Bibb.").

150.    Mr. Cooper identified adhering to population deviation requirements as one reason for the configuration of Illustrative HD 145.  Cooper Dep. 197:22-198:6 ("[Q:] So can you walk me through what downtown Macon has in common with this piece of Forsyth County over towards Upson County in District 145? [A:] It's in the Macon/Bibb MSA.  And there is some Black population in that precinct, but I believe it's a majority white precinct.  But that was mainly because I had to make sure that the deviation was within plus or minus one percent. Ninety percent plus of the population in 145 under the illustrative plan lives Macon/Bibb.").

151.    Mr. Cooper identified preserving regional commission boundaries as

one reason for the configuration of Illustrative HD 145.  Cooper Dep. 198:24-

199:4 ("[A:] So the middle Georgia commission includes Bibb, Houston, Peach,

Pulaski, and going further north, Crawford, Monroe, Jones, Putnam, Baldwin,

Wilkinson, Twiggs.  So I'm staying entirely within the middle Georgia

commission with House District 145.").

### House District 171 ("HD 171")

152.    The Illustrative House Plan in the area around HD 171 reduces county

splits in Dougherty County.  Cooper Dep. 193:18-25 ("[Q:] And on the illustrative

plan on page 80, the next page, Figure 33, there's now no longer one district that is

wholly within Dougherty County, correct? [A:] That is correct; however, the

illustrative plan splits Dougherty County three ways, and the enacted plan splits it

four ways.  So there's that.  Why is that, I wonder.").

153.    Mr. Cooper identified historic US Highway 19 as a historic

transportation corridor connecting the surrounding communities within the district

as one reason for the configuration of Illustrative HD 171.  Cooper Dep. 189:2-7

("[Q:] And you describe illustrative District 171 as along the Highway 19 corridor,

right? [A:] Yes, it follows Highway 19. [Q:] What is the community of interest that

connects – [A:] US Highway 19."); *id.* 191:22-192:5 ("[Q:] So after you drew the

district you were hunting around looking for information about Highway 19 and

what it connected; is that fair to say? [A:] I did look at that. I mean I knew that Highway 19 was, in a sense, a historical highway. US highways of that vintage with a 19 on it go way back in time, so it's not like there haven't been transportation connections between Thomasville and Albany since the 1930s."); *id.* 193:7-12 ("[A:] Well, it just shows that there is, present day -- although 2014 is no longer present day, but it's certainly the modern era -- a study and an interest in maintaining the historic route between Albany and Thomasville. It shows there is a connection there between the governments.").

154. Mr. Cooper identified connecting counties in the historical Black Belt together as one reason for the configuration of Illustrative HD 171. Cooper Dep. 217:25-218:8 ("[Q:] And now looking at pages 78, starting at 78, you discussed with Mr. Tyson the illustrative District 171, and specifically you were discussing connections between Albany and Thomasville. You mentioned the Georgia Budget and Policy Institute designation of counties as being in the Black Belt. Did you consider that a connection between Albany and Thomasville? [A:] Yes.").

155. Mr. Cooper also identified shared socioeconomic characteristics, such as similar levels of poverty in Dougherty, Thomas, and Mitchell Counties, as one reason for the configuration of Illustrative HD 171. Cooper Dep. 218:21-219:6 ("[Q:] And just looking at paragraph 200 of your report, the socioeconomic

analysis, you note Dougherty, Thomas and Mitchell counties all have comparatively high Black poverty rates. [A:] Yes. [Q:] Do you view that as a connection between those areas as well? [A:] Yes. [Q:] Do you think those connections support connecting those areas in the district? [A:] Absolutely."); Cooper Report Pt. 1 ¶ 200.

156.    Mr. Cooper also identified consistency with prior district shapes as one reason for the configuration of Illustrative HD 171.  Cooper Dep. 190:1-14 ("[A:] I've been through Thomasville and actually driven through -- I can't say that right -- Albany.  But I do not -- I just cannot imagine that those two towns are so different that they could not be placed in a single House district.  And I would just point you to the plan that the state adopted in 2015 that stretched from -- not House District 171 but the plan stretched from Albany … all the way down to Seminole County.  So it's a much longer distance.  It's majority white as it cuts through Miller County.  But in terms of being elongated and travel time, certainly less of a connection there than it would be between Thomasville and Albany.").

157.    The Illustrative Plan makes Clark County whole in order to adhere to traditional redistricting principles.  Cooper Dep. 150:2-12 ("[Q:] So you made a change to the enacted plan in Clark County on your illustrative plan with the goal of making the counties whole but unrelated to the creation of the new Black

majority district? [A:] I think so. I don't think deviation would come into play there. The shape of the districts comes into play, so there could have been any number of factors. And certainly you could maintain that all of my illustrative districts, the Plaintiffs' plan, and split Clark County should you wish to do so. That can be done.").

**Mr. Morgan's Analysis**

158.   Defendant's mapping expert, Mr. John Morgan, does not opine that Mr. Cooper's Illustrative Plans do not comply with traditional districting principles. Morgan Dep. 70:3-8 ("[Q:] Do you conclude in your December 5th report that the illustrative maps that you drew are evidence that the illustrative maps drawn by Mr. Cooper don't comply with traditional districting principles? [A:] That's not in the report."); *id.* 305:16-20 ("[Q:] But you're not saying that the plans are inconsistent with traditional districting principles? [A:] I didn't say that. I don't think I said that anywhere in the report.").

159.   When comparing Mr. Cooper's Illustrative Plans to the Enacted Maps, Mr. Morgan's report did not explicitly consider the redistricting principles set out by the State of Georgia. Morgan Dep. 261:17-25. ("[Q:] So when comparing Cooper's maps to the enacted maps, did you consider the redistricting principles set out by the State of Georgia . . . . [A:] It's not in the report.").

160.    Mr. Morgan admitted there could be many different reasons why the districts in two plans could appear very different, including avoiding pairing incumbents, retaining district cores and continuity of representation, various communities-of-interest factors, constituent feedback, compliance with the Voting Rights Act, as well as the individual balancing decisions of different map drawers. Morgan Dep. 192:6-193:13.

161.    Mr. Morgan admitted that it would be difficult to analyze if the effect on a district from racial considerations is stronger than other districting considerations.  *E.g.*, Morgan Dep. 236:2-7 ("[Q:] Is the claimed effect from racial considerations greater than the effect of taking into account constituent feedback from the redistricting process? [A:] I think that would be difficult to analyze, so I don't know.").

162.    Mr. Morgan offered no opinion about whether Mr. Cooper's consideration of race in drawing the Illustrative Plans involved anything more than complying with the Voting Rights Act.  Morgan Dep. 247:18-248:8.

163.    Mr. Morgan's opinions about Mr. Cooper's plans were developed without relying on Mr. Cooper's report and his description of how he drew the plans.  Morgan Dep. 254:8-12 ("[Q:] So your opinions about the Cooper plan were developed without really considering Cooper's report and his description of how

he drew the plans? [A:] I didn't rely on that for this report.").

164.    Mr. Morgan chose to compare the districts that highlight differences in compactness without considering in his reports how much those districts overlap with one another or whether they are even located in the same regions of the state. Morgan Dep. 182:9-190:2; 203:4-10; 206:13-207:17; 227:24-228:25; 283:15-284:2; 350:10-351:14; 351:25-354:5; 358:18-359:12; 369:20-370:17.

**Racially Polarized Voting in Georgia**

165.    Dr. Lisa Handley employed three different statistical techniques to estimate vote choices by race: homogeneous precinct analysis, ecological regression, and ecological inference (including a more recently developed version of ecological inference that she labeled "EI RxC").  Handley Report 2-4.

166.    In the seven areas of Georgia that Plaintiffs' expert, Dr. Handley, analyzed, she found that, in statewide elections, "the average percentage of Black vote for the 16 Black-preferred candidates is 96.1%."  Handley Report 9.

167.    In the seven areas of Georgia that Dr. Handley analyzed, she found that, in statewide elections, "the average percentage of White vote for the[] 16 Black-preferred candidates . . . is 11.2%."  Handley Report 9.

168.    In 54 state legislatives that Dr. Handley analyzed, over 90% of Black voters supported their preferred Black candidates.  Handley Report 9.  Those

candidates received, "on average, 10.1% of the White vote."  Handley Report 9.

169.    Dr. John Alford, Defendant's expert, stated that in all general elections examined by Dr. Handley, Black voter support for a candidate "exceeded 90 percent."  Report of John Alford [Dkt. 229, Ex. 2] ("Alford Report") 7.

170.    Dr. Alford testified that "very high level of cohesion" exists among both Black and White voters in the areas challenged in the litigation.  Alford Dep. 88:8-89:19.

171.    Dr. Alford acknowledged "extremely cohesive Black support" for their preferred candidates.  Alford Dep. 90:3-12.

172.    Dr. Alford testified that Black voters in Georgia are "politically cohesive" and "very cohesive."  Alford Dep., *Pendergrass v. Raffensperger*, No. 1:21-cv-05339 [Dkt. 158] 37:13-15; PI Hr'g Tr. (Feb. 11, 2022, AM) [Dkt. 110] 154:15-17.

173.    Dr. Alford testified that Black and White voters are "supporting different candidates," that "voting is polarized," and that "[t]his is what polarization looks like when, you know, 90 percent of . . . one group goes one way and 90 percent goes the other."  Alford Dep. 112:10-113:13.

174.    Senator John F. Kennedy, Chairman of the Senate Committee on Reapportionment and Redistricting, stated that "we do have racially polarized

voting in Georgia" during a November 4, 2021 Committee meeting. *See* Nov. 4, 2021 Meeting of Senate Committee on Reapportionment & Redistricting, Hr'g on S.B. 1EX, 2021 Leg., 1st Special Sess. (2021) (statement of Senator John F. Kennedy, chairman, S. Comm. Reapp. & Redis. at 1:00:44–1:01:01), https://www.youtube.com/watch?v=RhQ7ua0db9U.

175.    Of the 54 state legislative races that Dr. Handley examined, "[a]ll but one of the successful Black state legislative candidates" were elected from majority-Black districts.  Handley Report 9-10.  The one exception came from a district where neither Black nor White voters made up a majority of the voting age population. *Id.* at 9-10 & n.16.

176.    Dr. Handley found that Black legislative candidates preferred by Black voters almost always lose outside of Black-majority districts in the races she examined, and that Black voters "are very unlikely to be able to elect their preferred candidates to the Georgia state legislature" absent a majority or near-majority Black population in the district.  Handley Report 9-10.

177.    In the seven areas in Georgia that Dr. Handley analyzed, she found that White voters "consistently bloc vote to defeat the candidates supported by Black voters."  Handley Report 31.

178.    Dr. Alford testified that it "may well be the case" that "the candidate

preferred by the majority of white voters generally win state legislative elections in districts without a majority of Black voting age population." Alford Dep. 91:9-18.

179.   Dr. Handley testified during the preliminary injunction hearing that analysis of primaries provides "evidence of what happens when party is removed." PI Hr'g Tr. (Feb. 10, 2022, AM) [Dkt. 109] 100:13-16; Dep. of Lisa Handley [Dkt. 222] ("Handley Dep.") 33:21-25; 34:1-14.

180.   Dr. Alford testified in his deposition that primaries eliminate the variable of party when addressing voting behavior. Alford Dep. 186:4-7.

181.   Dr. Alford testified in his deposition that his analysis cannot establish causation and therefore does not prove that partisanship is responsible for the polarized voting patterns in Georgia. *E.g.*, Alford Dep. 50:12-18; 122:6-11.

182.   Dr. Alford concluded that Plaintiffs' evidence does not establish racial polarization, because "Black voter support [is] in the same high range for white Democratic candidates as it is for Black Democratic candidates." Alford Report 4. Dr. Alford does not explain why he believes that Black voter support for Black Democratic candidates must be higher than Black voter support for White Democratic candidates in order for racial polarization to exist. *See, e.g.*, Alford Report 4.

183.   Dr. Handley analyzed 11 recent Democratic primary elections in the

50

seven areas of Georgia and found that the majority were racially polarized. Handley Report 9-10.

184.   Dr. Alford did not conduct an affirmative analysis with respect to voting patterns, except for his analysis of one Republican primary in one area of Georgia.  Alford Report 8-9.

185.   Dr. Alford was aware that courts prefer analyses that rely on more than one election, but nevertheless declined to provide more data points to the court.  *See* Alford Dep. 188:22-189:5.

186.   Dr. Alford does not dispute that race may be one of the reasons why voters are aligned with a particular political party.  Alford Dep. 193:6-9.

187.   Dr. Jason Ward found that in Georgia, Black and White voters have traded party preferences, with race playing a "crucial role in that political realignment."  Report of Jason Ward [Dkt. 242-6] ("Ward Report") 1, 13, 17-18, 22.

188.   Dr. Ward found that there was a dramatic increase in Black voter registration alignment with the Democratic Party, due to the "national party's increasing support for civil rights."  Ward Report 17-18.

189.   Dr. Ward found that attitudes towards Black voters and civil rights caused political power in Georgia to shift during the second half of the Twentieth

Century "from an all-white Democratic Party to an overwhelmingly white Republican party over the course of a few decades." Ward Report 17-18.

190.   According to Dr. Ward, the impacts of the Republican Party's decision to prioritize expanding White support over Black support "at a fraught moment in Georgia's political history, had significant consequences for the racially polarized partisan alignment that continues to the present." Ward Report 17-18.

191.   Dr. Ward found that "race has played a crucial role" in determining Georgia voters' partisan alignment, and that "race has been the most consistent predictor of partisan preference in Georgia" since the Civil War. Ward Report 1, 22.

192.   Dr. Ward found that, over time, "race is a more consistent predictor [of party] than socioeconomic status or educational level." Dep. of Jason Ward [Dkt. 242] ("Ward Dep.") 77:20-78:6.

193.   Dr. Adrienne Jones testified that one could "probably" "rule out partisanship as a factor" underlying "turnout" and the "lack of success of Black candidates" in the state of Georgia because "the partisanship balance of the state has shifted over time" and "[c]hallenges for Black voters have persisted." Dep. of Adrienne Jones [Dkt. 239] ("A. Jones Dep.") A. Jones Dep. 170:5-172:13.

194.   Dr. Ward provided evidence of recent examples of racial appeals,

which included those focused on Confederate monuments, immigration policies, and attacking Georgia's urban areas.  Ward Report 23.

195.   Dr. Ward found evidence of racial appeals such as "conflat[ing] Black voting with urban politics, the welfare state, federal intervention, and electoral corruption."  Ward Report 1.

196.   A Republican gubernatorial candidate referred to critics of voter ID measures as "ghetto grandmothers who didn't have birth certificates."  Ward Report 23.

197.   A DeKalb County representative opposed voting at locations "dominated by African American shoppers" and "near several large African American mega churches."  Ward Report 23.

198.   A Republican presidential candidate made unsubstantiated claims about minority districts being "crime infested" and engaged in falsification of electoral ballots.  Ward Report 23.

199.   Campaign themes have also been racialized, including messaging that promotes "fears of white decline," in response to increasing racial diversification in the state.  Ward Report 23.  For instance, a gubernatorial candidate made the protection of a 1,700-foot-high Confederate monument one of the "key issues" of his campaign, using rhetoric of imperiled White heritage.  Ward Report 23.

200.   Dr. Jones provided evidence of racial appeals, which she found "show that racial appeals and commentary—both explicit and subtle—continue to play an important role in political campaigns in Georgia."  Report of Adrienne Jones Pt. 2 [Ex. 239-8] ("Jones Report Pt. 2") 37-44 ("Both Explicit and Subtle Racial Appeals Continue to Play a Central Role in Political Campaigns in Georgia."); A. Jones Dep. 172:8-13.

201.   A robo-call referred to Stacey Abrams as a "Negress" and "a poor man's Aunt Jemima" during her gubernatorial campaign.  Jones Report Pt. 2 38.

202.   A Republican candidate, David Perdue, argued that she was "demeaning her own race" and "ain't from here," while Senator Raphael Warnock faced ad campaigns that darkened his skin color.  Jones Report Pt. 2 38-40.

203.   In 2020, a Republican congressional candidate in Georgia, who later prevailed, referred to Black people as the Democratic Party's "slaves."  Jones Report Pt. 2 42-43.

204.   The Illustrative Plans draw three additional majority Black districts in the State Senate Plan (two in South Metro Atlanta and one in the Eastern Black Belt) and five additional majority Black districts in the State House Plan (two in South Metro Atlanta, one in the Eastern Black Belt, one in the Western Black Belt, and one in metropolitan Macon).  Cooper Report Pt. 1 ¶ 9.

Respectfully submitted this 19th day of April, 2023.

By: /s/*Rahul Garabadu*

Rahul Garabadu (Bar 553777)
*rgarabadu@acluga.org*
Cory Isaacson (Bar 983797)
Caitlin F. May (Bar 602081)
ACLU FOUNDATION OF GEORGIA,
   INC.
P.O. Box 570738
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060


/s/*Debo Adegbile**

Debo Adegbile*
*debo.adegbile@wilmerhale.com*
Robert Boone*
Alex W. Miller*
Cassandra Mitchell*
Maura Douglas*
Juan M. Ruiz Toro*
Joseph D. Zabel*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888


Charlotte Geaghan-Breiner*
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306

/s/*Sophia Lin Lakin*

Sophia Lin Lakin*
*slakin@aclu.org*
Ari J. Savitzky*
Ming Cheung*
Kelsey A. Miller*
Jennesa Calvo-Friedman*
ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539


George P. Varghese*
Denise Tsai*
Tae Kim*
WILMER CUTLER PICKERING HALE
   AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000


Ed Williams*
De'Ericka Aiken*
Ayana Williams*
Sonika R. Data*
WILMER CUTLER PICKERING HALE
   AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Telephone: (650) 858-6000 (t)
Facsimile: (650) 858-6100 (f)

Anuj Dixit*
Marisa A. DiGiuseppe*
WILMER CUTLER PICKERING HALE
  AND DORR LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Counsel for Plaintiffs*
*Admitted *pro hac vice*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, using a font type of Times New Roman and a point size of 14.

*/s/ Rahul Garabadu*