# EXHIBIT P

Page 1

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF GEORGIA
 2                   ATLANTA DIVISION
 3   ALPHA PHI ALPHA           )
     FRATERNITY, INC., a       )
 4   nonprofit organization on )
     behalf of members         )
 5   residing in Georgia;      ) CASE NO.
     SIXTH DISTRICT OF THE     ) 1:21-CV-05337-SCJ
 6   AFRICAN METHODIST         )
     EPISCOPAL CHURCH, a       )
 7   Georgia nonprofit         )
     organization; ERIC T.     )
 8   WOODS; KATIE BAILEY       )
     GLENN; PHIL BROWN and     )
 9   JANICE STEWART,           )
                               )
10       Plaintiffs,           )
                               )
11   vs.                       )
                               )
12   BRAD RAFFENSPERGER, in    )
     his official capacity as  )
13   Secretary of State of     )
     Georgia,                  )
14                             )
         Defendant.            )
15

16

17       VIDEOTAPED DEPOSITION OF JOHN B. MORGAN
18              (Taken by Plaintiffs)
19              February 9, 2023
20                  9:40 a.m.
21
22                  Suite 200
              1600 Parkwood Circle
23              Atlanta, Georgia
24
25   Reported by:   Debra M. Druzisky, CCR-B-1848
```

```
1                  APPEARANCES OF COUNSEL
2   On behalf of the Plaintiffs:
3        ARI SAVITZKY, Esq.
         American Civil Liberties Union
4        125 Broad Street, 18th Floor
         New York, New York  10004
5        (212) 549-2500
         asavitzky@aclu.org
6
         -and-
7
         JOE ZABEL, Esq.
8        Wilmer Hale
         7 World Trade Center
9        250 Greenwich Street
         New York, New York  10007
10       (212)  230-8800
         joe.zabel@wilmerhale.com
11
12  On behalf of the Defendant:
13       BRYAN P. TYSON, Esq.
         DIANE LAROSS, Esq.
14       BRYAN F. JACOUTOT, Esq.
         Taylor English Duma
15       1600 Parkwood Circle, Suite 200
         Atlanta, Georgia  30339
16       (678) 336-7249
         btyson@taylorenglish.com
17
18  Also Present:
19       Leo Mileman, videographer
         Abha Khanna, Esq.
20       David Rollins-Boyd, Esq.
21                      --oOo--
22
23
24
25
```

Page 3

1                    INDEX TO EXAMINATION
2     Witness Name:                              Page
3     JOHN B. MORGAN
4        By Mr. Savitzky                          7
5
6
7
8                     INDEX TO 1 EXHIBITS
9       No.                Description           Page
10    Exhibit 1    Curriculum vitae of John B.    11
                   Morgan.
11
      Exhibit 2    12-5-22, Expert report of John  62
12                 B. Morgan re: The
                   above-captioned action.
13
      Exhibit 3    2021-2022 Guidelines for the   102
14                 House Legislative and
                   Congressional Reapportionment
15                 Committee re: Georgia.
16    Exhibit 4    5-31-18, Westlaw print-out re:  142
                   Vesilind v. Virginia State Board
17                 of Elections synopsis.
18    Exhibit 5    Stipulations re: Vesilind v.    145
                   Virginia State Board of
19                 Elections.
20    Exhibit 6    1-23-23, Expert Report of John  240
                   B. Morgan re: The
21                 above-captioned action.
22    Exhibit 7    12-5-22, Declaration of William 241
                   S. Cooper re: The
23                 above-captioned action.
24
25

1    INDEX TO PLAINTIFF'S EXHIBITS (Continued.)

2    No.                Description                Page

3  Exhibit 8    Plan components with Population    330
              Detail report.

4                        - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   the report I discuss a process of map drawing which

2   can be applied to other circumstances.

3          Q.   Do you conclude in your December 5th

4   report that the illustrative maps that you drew are

5   evidence that the illustrative maps drawn by

6   Mr. Cooper don't comply with traditional

7   districting principles?

8          A.   That's not in the report.

9          Q.   So let's actually crack open this report

10  and take a look at it, starting with Paragraph 4

11  and 5.  Actually, we can go right to Paragraph 5.

12  You say you set out "to draw a blind plan that did

13  not consider race or incumbency or past

14  redistricting plans for Georgia."

15              Do I have that right?

16         A.   Yes.

17         Q.   Okay.  Did someone ask you to do that?

18         A.   I would say that I was asked to do

19  something like that.  I would say that, you know,

20  in order to make some comparisons, that I was asked

21  to draw a plan like that, yes.

22         Q.   Were you asked to draw a plan specifically

23  with those parameters in terms of not considering

24  those three things?

25         A.   That's what it ended up being.

Page 90

1    actual boundaries.

2              But again, I might generally know there's,

3    you know, about four districts in this area, so

4    whatever the legislature did and whatever I did is

5    going to have about four districts in an area.

6        Q.    You mentioned you're -- you know, been to

7    half the counties in Georgia and you have

8    significant sort of background knowledge and

9    awareness of Georgia's demographics.

10             Am I correctly characterizing what you

11   said?

12       A.    Yes.  When I met with the eight

13   congressmen in 2001 when they were drawing -- the

14   Republican congressmen when they were drawing

15   districts, they respected my opinions.

16       Q.    So you know sort of which areas have large

17   black populations?

18       A.    Generally, yes.

19       Q.    Okay.  And when you drew your map, did you

20   consider whether black voters would be able to

21   elect candidates of choice under the lines that you

22   drew?

23       A.    I didn't analyze that.  I specifically

24   treated every district the same way.  So I didn't

25   make any analysis in the areas where I knew there

```
                                        Page 91
1    was black population.  I applied the same process

2    that I did in areas where there -- I knew there was

3    not a lot of black population.

4         Q.   So you did not consider whether black

5    voters would be able to elect candidates of choice

6    in --

7         A.   Not --

8         Q.   -- those areas?

9         A.   Not in this report, no.

10        Q.   Have you ever used these, again, adopting

11   your term, blind parameters before in drawing an

12   illustrative map or in any map?

13        A.   I've seen them used before, yes.

14        Q.   Where have you seen them used?

15        A.   North Carolina, Arizona specifically.

16        Q.   In what context?

17        A.   In the early stages of map drawing,

18   there's a lot of maps that are done that pair

19   counties in a certain way.

20             Or in the case of Arizona, my

21   understanding is that the process begins with a map

22   drawn by map drawers that is then turned over to

23   the commission.

24             So somebody drew that plan and they turned

25   it over to the commission, and the commission
```

Page 127

1      Q.    Sure.

2      A.    Okay.

3            THE VIDEOGRAPHER:  Off the video

4      record at 12:11 p.m.

5            (Whereupon, a discussion ensued

6       off the record.)

7            (Whereupon, there was a luncheon

8       recess.)

9            (Whereupon, Ms. LaRoss did not

10      return to the deposition.)

11           THE VIDEOGRAPHER:  Back on the video

12      record at 12:53 p.m.

13   BY MR. SAVITZKY:

14      Q.    All right.  Hello again, Mr. Morgan.

15      A.    Hello.

16      Q.    So we were talking about some of the

17   different communities of interest definitions and

18   whether and how you considered them in your

19   illustrative map that you drew for the December 5th

20   report.

21           Did you consider socio-economic

22   commonalities when you created your illustrative

23   maps?

24      A.    Generally, I would say no.  These were

25   examples of what people may consider communities of

1      A.    No.   I wasn't given information on the

2    public hearing process.

3      Q.    Okay.  So and just to summarize, in terms

4    of considering communities of interest, other than

5    looking at municipalities and places on the map and

6    whatever background knowledge you might have had,

7    were those the two ways that you considered

8    communities of interest?

9      A.    I mean, there were others that I

10   mentioned.  I mentioned mountains and other

11   geographical features that were not simply

12   municipalities.

13     Q.    Other than considering the features that

14   you could view on the map and whatever background

15   knowledge you were bringing to the table, were

16   there any other ways that you considered

17   communities of interest in constructing your

18   illustrative maps for the December 5th report?

19     A.    I would say it was mostly based on the

20   geography and the maps.

21     Q.    When you say "mostly" --

22     A.    Yes.

23     Q.    -- were there other things that you

24   considered other than the geography and your

25   background knowledge?

1      Q.    Recognizing that one requirement is that
2   all plans comply with Section 2 of the Voting
3   Rights Act, would you say that your plan complies
4   with the guidelines?
5           MR. TYSON:  I'll object to form.
6           THE WITNESS:  I don't know how to
7       determine compliance in that regard.
8   BY MR. SAVITZKY:
9      Q.    So let's look at Paragraph 28 here.  And
10  you have this region one analysis starting in
11  Paragraph 28.  You say:
12          "Region one consists primarily of
13       DeKalb, Clayton, Henry, Rockdale,
14       Newton and Walton Counties."
15          Can you describe, like, what are the exact
16  parameters of this region that you've defined here?
17     A.    I just defined it.
18     Q.    Well, you say primarily, so what do you
19  mean by "primarily"?
20     A.    Well, if you look at the next page,
21  there's a map, and most of the districts cover all
22  of the territory of DeKalb, Clayton, Henry, Newton,
23  Rockdale and Walton.
24     Q.    So is the region that you're talking about
25  defined by the districts that you selected?

1    the districts -- the group of districts that you

2    assessed for enacted region one and the group of

3    districts you assessed for illustrative region one?

4        A.    No.

5        Q.    Is there any empirical basis for choosing

6    this particular set of districts?

7        A.    Well, they cover pretty close to the same

8    geographic area.

9        Q.    So it's just rough, rough geographic area

10   in the counties you've selected?

11       A.    Well, let's see.  In this case all of

12   DeKalb County is accounted for, all of Clayton,

13   most of Henry, all of Rockdale.  In the case of the

14   enacted plan, all of Walton but not Newton and not

15   Henry.  And in the other case, it's only missing a

16   portion of Walton.

17            So it could be that, looking at the

18   illustrative plan and establishing that coverage,

19   and then looking at the enacted plan and looking at

20   the same relative coverage area, and those are the

21   districts that overlap.

22       Q.    Do you know the overall demographics of

23   the set of counties that you chose?

24       A.    In what sense?

25       Q.    Do you know the racial demographics of the

Page 192

1        A.    No.   I listed the individual compactness

2    scores of all of the districts.

3        Q.    Okay.   And that's what you're referring to

4    when you talk about the contrast in compactness?

5        A.    In general, yes.

6        Q.    And then you say "There may be many

7    causes" for why the regions are so different.   Do

8    you still agree with that?

9        A.    I'm sure there could be.

10       Q.    You mean -- do you mean that there may be

11   many causes for why -- well, sorry.   Strike that.

12            What are some of the many causes that

13   you're referring to here?

14       A.    I didn't identify them.

15       Q.    Are you able to identify them now?

16       A.    I didn't look at that in this report.

17       Q.    Could one of those causes be avoiding

18   pairing incumbents?

19       A.    I suppose.

20       Q.    Could one of those causes be retaining

21   district corridors and continuity of

22   representation?

23       A.    That's possible.

24       Q.    Could one of those causes be various

25   community of interest factors that weren't

Page 193

1    considered?

2        A.    I suppose so.

3        Q.    Could one of those causes be constituent

4    feedback during the constituent sessions in the

5    redistricting process?

6        A.    That's possible, I suppose.

7        Q.    Could one of them be compliance with the

8    Voting Rights Act?

9        A.    I suppose that's possible.

10       Q.    Could one cause be the individual

11   balancing decisions of different map drawers?

12       A.    I suppose so.   There's many possibilities,

13   I'm sure.

14       Q.    So in Paragraph 30 starting on 22, you

15   say:

16            "Looking at some specific

17        districts shows that the compactness

18        of those districts is lowered by

19        apparent effort to create more

20        majority black districts."

21            And then you look at one set of districts,

22   you compare one set, your illustrative 90 versus

23   enacted house District 89.  And you say that the

24   enacted district is more elongated but your

25   district is more compact.

1    districts.  I mean, I think there were fewer in

2    this region than the previous region, but not by

3    much.

4        Q.   Did you do any core constituency analysis

5    to determine the precise overlap between the set of

6    districts in your illustrative region two and the

7    enacted region two?

8        A.   No.  I did not compare the core

9    constituency between these two plans, but I suppose

10   that's something that could be done.

11       Q.   So looking at Paragraph 32 of your report,

12   you again say, you say:

13            [As read]  "...the maps in region

14        two show a contrast between the

15        illustrative and the enacted plan with

16        respect to compactness."

17            Is that a fair statement of your

18   assessment of these two maps?

19       A.   I think that's pretty close to what I said

20   in the report, yes.

21       Q.   And then you say there may be many causes

22   for the differences one sees between the enacted

23   and the illustrative map that you draw; right?

24       A.   Yeah.

25       Q.   Could one of those causes be avoiding

1       A.    Uh-huh.

2       Q.    Did you look at any other individual

3   head-to-head comparisons or just District 59 for

4   region two?

5       A.    Well, I mean, there's a chart.  You can

6   look at them here.  They're all here.  I reported

7   the information on all of the districts that are in

8   the region as defined.

9       Q.    Did you discuss any other head-to-head

10  comparisons in your report?

11      A.    No.  The report verbally describes what's

12  in the table in one instance.

13      Q.    Do you know how much District 59 in your

14  illustrative map and District 59 in the enacted map

15  overlap with each other?

16      A.    In what sense?

17      Q.    Do you know what their geographic and

18  population overlap is?

19      A.    No.  I said I did not run the core

20  constituency comparisons.

21      Q.    Do you know whether they are the most

22  alike districts when it comes to core

23  constituencies, whether there's a better comparison

24  that could have been made?

25      A.    A better comparison?

1      Q.   One that more accurately reflects the
2   population.
3      A.   I'm not sure I understand.
4      Q.   My question is, is -- are 59 and 59 the
5   right comparators or is there another set of
6   comparators that overlap more tightly?
7      A.   There's 25 or 26 districts.  You can
8   compare any one of them.
9      Q.   In your view you can compare any of these
10  districts?
11     A.   No.  I chose ones that were in the same
12  general area.
13     Q.   You chose ones in the same general area
14  with --
15     A.   Same geographic area, yeah.  I, as I said,
16  I didn't run the constituency comparison reports.
17  I suppose I could have done that.
18     Q.   Okay.  Do you know whether enacted
19  District 59 was drawn the way it was in order to
20  avoid pairing incumbents?
21     A.   No.
22     Q.   Do you know how many incumbents you pair
23  in your map in Fulton County?
24     A.   No.
25     Q.   You say drawing a more compact district in

1      Q.    Is that right?

2      A.    Yeah.

3      Q.    Okay.  Compactness score of 55 in your

4    plan is point 32 and point 34?

5      A.    Yeah.

6      Q.    Compactness of District 55 in the enacted

7    plan is point 34 and point 37?

8      A.    I wasn't comparing those, but okay.

9      Q.    You weren't comparing those?

10      A.    I think the one I'm pointing to here is

11    District 10 in the enacted plan.

12      Q.    Oh.  I'm sorry.  So you compared District

13    55 in the illustrative plan to District 10?

14      A.    Yeah.

15      Q.    Okay.

16      A.    And I said it's an -- they're both

17    anchored in southern DeKalb, and District 10 goes

18    south into Henry whereas District 55 is entirely in

19    southern DeKalb.  And that's a contrast.

20            And I think you can see that in the

21    enacted plan, southern DeKalb is parcelled out into

22    several districts.  Whereas, in the illustrative

23    plan it's basically in three.

24      Q.    Did you do any core constituency report to

25    determine which district most overlaps with

1    illustrative District 55 in your illustrative map?

2         A.    Boy, that, I think that would be a little

3    difficult.  Because it's so fractionalized in the

4    enacted plan.  I suppose one might be more than

5    another.

6         Q.    So District 55 in the enacted plan could

7    have more of the population of District 55 than the

8    illustrative plan?

9         A.    Yeah, I don't know.  It's really

10   fractionalized in the enacted plan.  I'd have to

11   look at that carefully.

12        Q.    And just --

13        A.    And I don't know that that's -- like,

14   which one do you pick?  It's hard to say.

15        Q.    Well, you picked the one with the lower

16   compactness scores, but District 55 in the enacted

17   plan actually has a higher Reock score than

18   District 55 in your illustrative plan; right?

19        A.    Yeah.  And I don't know that there's a

20   great deal of overlap, but maybe there is.

21              I mean, and again, it's so fractionalized

22   that, you know, if you were to take District 55 in

23   my illustrative plan, you know, you might have

24   20 percent in one and, you know, 25 percent in

25   another.

                                        Page 236

1    way in, like, a numerical quantitative sense.

2         Q.   Is the claimed effect from racial

3    considerations greater than the effect of taking

4    into account constituent feedback from the

5    redistricting process?

6         A.   I think that would be difficult to

7    analyze, so I don't know.

8         Q.   Did you come to a conclusion about which

9    of these different factors had more or less of an

10   effect --

11        A.   No, I --

12        Q.   -- than the enacted?

13        A.   I didn't intend to discuss that, and I

14   don't think I did.  I said that the racial

15   considerations had an effect.  I think there's --

16   this clearly indicates there's a tendency and

17   there's an effect.

18        Q.   So your conclusion of an effect from

19   racial considerations is based on comparing the

20   maps enacted by the State of Georgia and the plan

21   that you put together?

22        A.   Yeah.  And what -- in reviewing the

23   enacted plans combined with drawing -- I think

24   having the plan, the illustrative plan that I drew

25   is useful as a comparison tool.

1    of traditional districting factors?

2        A.    Well, I didn't specify that here.  But if

3    we look through the analysis, there's many pieces

4    to the analysis, so individual pieces support that

5    conclusion.

6            And so as a whole, yes, I think that's the

7    case.  It's, in that sense, it's a holistic

8    analysis.

9        Q.    What do you mean when you say that the

10   Cooper plans are focused on race?  What does that

11   mean?

12       A.    I -- I would say that there are many

13   examples that I discuss in my report that show that

14   race was a focus, very much so.

15       Q.    Does it mean something other than being

16   aware of race?

17       A.    Yeah, I think so.

18       Q.    What?  What does it mean other than being

19   aware of race?

20       A.    I would say that there are instances that

21   I discuss in the report where steps are taken in

22   the drawing of the plan that prioritize race, not

23   just being aware of it, that there are actions I

24   see that show that the focus of certain areas was a

25   racial focus.

1      Q.   Does it mean something other than

2    complying with the Voting Rights Act?

3      A.   I don't know that complying with the

4    Voting Rights Act is well defined here or -- I

5    don't know how to answer that.  Like, the

6    compliance is a separate question.  I think there

7    are many ways that could be considered compliance

8    in my experience.

9      Q.   Is your opinion that the Cooper plans are

10   too focused on race?

11     A.   When you say "too focused," there's sort

12   of an implicit comparison there to something, but

13   you haven't identified what that is.  So too

14   focused as compared to what?

15     Q.    Is it your opinion that the Cooper plans

16   are inappropriately focused on race?

17     A.   I think that there is -- yeah, there's a

18   real focus on race.  In some cases you could say

19   that it's inappropriate.

20           But you know, I don't know that I can say

21   that it's categorically across the board

22   inappropriate.  But I have many instances where I

23   discern a focus on race.

24     Q.   What evidence did you rely on to reach the

25   conclusion that the Cooper maps are focused on

Page 254

1    A.    No.

2    Q.    -- or did you just analyze the B.E.F.s?

3    A.    I looked at the report a little bit, but

4  mostly I analyzed the block assignment files.

5    Q.    Would you say you read the whole report?

6    A.    Probably.  I skimmed it.  I didn't read it

7  in great detail.

8    Q.    So your opinions about the Cooper plan

9  were developed without really considering Cooper's

10  report and his description of how he drew the

11  plans?

12    A.    I didn't rely on that for this report.

13    Q.    Did you consider it?

14    A.    I may have considered portions of it, yes.

15    Q.    Okay.  Did you disagree with anything in

16  the Cooper report?

17    A.    I don't recall right here right now.  I

18  mean, if we want, we can look at it, but I don't

19  have a specific disagreement.  I have opinions

20  based on the plan that I analyzed.

21    Q.    And your opinions are based on analyzing

22  the B.E.F.s of the plan?

23    A.    Generally, yes.

24    Q.    Okay.  You also say that you did some

25  analysis of prior plans submitted by Mr. Cooper

Page 261

1        A.    Well, that's what I'm saying.  I think I
2    just need to see if it's in the appendices or not,
3    if I could.
4        Q.    That's okay.
5        A.    Okay.
6        Q.    You don't list core constituency
7    comparison to the benchmarks in this list of seven,
8    do you?
9        A.    Yeah.  That's right.  But I'm trying to
10   say that it might have been run.  Because I had the
11   prior plans, and it's something that could have
12   been done.
13       Q.    Okay.
14       A.    So that's why I'm saying I'm not sure if
15   it's in the appendices.  And if I can look, I can
16   check that.
17       Q.    So when comparing Cooper's maps to the
18   enacted maps, did you consider the redistricting
19   principles set out by the State of Georgia that we
20   previously talked about that have been marked as
21   Exhibit 2 --
22            MR. ZABEL:  Three.
23   BY MR. SAVITZKY:
24       Q.    -- 3?  Did you consider those?
25       A.    It's not in the report.

1    aligns more closely with the enacted senate plan

2    than the Cooper PI-2 plan.

3         A.   Yes.  But I didn't say anything as to how

4    it aligns with the enacted plan.

5         Q.   Just looking at your chart two, would you

6    agree the Cooper senate plan is the same or better

7    than the enacted plan on all of the metrics that

8    you identify?

9              MR. TYSON:  Object to form.

10             THE WITNESS:  I, again, I don't quite

11        understand.  I show the information and

12        the comparisons we just went over in

13        detail.

14   BY MR. SAVITZKY:

15        Q.   Are there any metrics that you look at

16   here where the Cooper plan doesn't perform as well

17   as the illustrative plan --

18        A.   I --

19        Q.   -- or the, as the enacted plan?

20        A.   Yes.  There are the voting precinct

21   splits -- sorry, the compactness is better.  Yeah,

22   no, I'd say -- we talked about the deviation.  It

23   looks like they're all very similar.

24             And some numbers are higher than the

25   enacted plan, and most numbers are higher for the

                                        Page 278

1    compactness, lower for the splits, more for the

2    incumbents.

3        Q.   Okay.  And just to be clear for the

4    record, the Cooper plan is better on voting

5    district splits?

6            MR. TYSON:  Object to form.

7            THE WITNESS:  Again, the number is

8        higher on the enacted plan for splits and

9        lower on the Cooper plan for splits.

10   BY MR. SAVITZKY:

11       Q.   Got it.

12           So let's -- just hold one second.

13           And you say that 21 of the 56 districts in

14   the Cooper plan are identical to the enacted map?

15       A.   I believe that's correct.

16       Q.   And you say on Paragraph 18, moving along

17   to Page 8:

18           [As read]  "The Cooper 12/05

19        senate plan has 35 of 56 districts

20        drawn differently but still has mean

21        compacted scores close to the enacted

22        plan, with" mean compactness -- "with

23        the mean compactness score on Reock

24        higher and the mean compactness score

25        in Polsby lower."

1          But I think we already discussed you agree

2    those compactness scores are virtually identical?

3          A.    Yes.

4          Q.    Okay.  Now, let's look at your regional

5    analysis starting at Paragraph 19.  You did an

6    analysis of the metro region with respect to the

7    senate map, and you focus on a cluster of four

8    senate districts that you selected.

9          Is that -- do I have that right?

10         A.    Yes.  They're senate districts in the same

11   area, same region.

12         Q.    Uh-huh.  And just looking at Page 10 of

13   your report, can you confirm that the map on Page

14   10 is supposed to depict districts from the enacted

15   map?

16         A.    Just a moment.

17         Q.    And not to hide the ball, but I just --

18   because it says Cooper on top, but I'm pretty sure

19   that --

20         A.    Does it say it on both?

21         Q.    It says it on both.

22         A.    Okay.

23         Q.    And I think this is the enacted side --

24               MR. TYSON:  Yeah, the --

25   BY MR. SAVITZKY:

1    the appendix to the report, so it's possible to

2    look at any district you want to make a comparison

3    to.  But I chose this district because it does show

4    differences.  And I'm showing some differences in

5    the two plans.

6        Q.   Right.  I mean, you conducted a cluster

7    analysis examining the compactness of these

8    particular districts, which you didn't do for

9    other -- any other set of districts in the metro

10   area?

11       A.   In the metro area?  I don't think so.  I

12   mean, I talked about -- I think I talked about

13   another district in the metro area.  Yeah, I talked

14   about Spalding a little bit.

15       Q.   Did you run any analysis to determine how

16   much these groups of four districts overlap in a

17   core constituency analysis between the two?

18       A.   Well, I mean, the core constituency

19   analyses are included as an appendix in the report,

20   so that information is available.  But I didn't

21   highlight it or discuss it in the verbal part of

22   the report.

23       Q.   Do you know how much this set of districts

24   overlaps?

25       A.   No.  I didn't look at that specifically.

1    Again, I was picking these counties and looking at

2    districts that are generally in that area.

3         Q.   And when you look at these maps, we can

4    only see the district lines for the set of four

5    districts that you selected?

6         A.   In this map, that's correct.  However, in

7    the appendix, there are additional single districts

8    that we could look at.

9         Q.   When we look at these maps, we can't see

10   whether the lines of the surrounding districts are

11   more or less compact or split more or fewer

12   counties in one map or the other?

13        A.   There are four districts on this map in

14   the enacted and the Cooper plan.

15        Q.   Yeah.  So you're -- in this analysis, you

16   can only see the districts that you selected?

17        A.   Yes.

18        Q.   So let's turn to some of the districts

19   that you selected.  On the enacted map you've got

20   enacted District 10 you describe in Paragraph 21.

21   You say it's a 71.5 percent B.V.A.P. district.  And

22   you say it stretches for 25 miles across from

23   DeKalb, Henry County to the Spalding County line.

24             How do you measure those distances, by the

25   way?  How did you do that?

1    specifically, it is being elongated to get lower

2    concentrations of black population in Spalding

3    County into District 16 in the Cooper plan.

4        Q.    But other districts are less elongated

5    in -- among the four that you've chosen?

6        A.    Some are, some aren't.

7        Q.    Do you ever conclude in your report that

8    Cooper's districts in this area do not comport with

9    traditional districting principles?

10       A.    I don't know that I explicitly said that

11   in this area of the report.

12       Q.    Is that your opinion?

13       A.    I said in my opinion that there was a

14   focus on race to the detriment of these other

15   redistricting factors.

16       Q.    But you're not saying that the plans are

17   inconsistent with traditional districting

18   principles?

19       A.    I didn't say that.  I don't think I said

20   that anywhere in the report.  I said that it -- I

21   said what I said in the concluding statement, and

22   in Paragraph 6, that it's focused on race to the

23   detriment of those factors.

24       Q.    So you're not concluding that the

25   illustrative plans do not comport with traditional

Page 344

1    does better on minimum compactness?

2        A.    I would assume it's Cooper.

3        Q.    It is, but I'd for the record like you to

4    verify that.

5        A.    Okay.  For the record, let's see, the

6    illustrative house plan has a low of point 16 on

7    Reock and point 11 on Polsby-Popper.  Cooper is --

8    sorry.  That's Cooper.

9            Cooper plan is point 16 Reock, point 11

10   Polsby-Popper.  The enacted is point 12 Reock and

11   point 10 Polsby-Popper.

12       Q.    So Cooper's plans, Cooper's house plan is

13   more compact when looking at the minimum

14   compactness measure?

15       A.    Yes.

16       Q.    Okay.  So regarding number of paired

17   incumbents, we have 25 in the Cooper illustrative,

18   20 in the enacted?

19       A.    Yes.

20       Q.    And deviation ranges are similar; would

21   you say that's correct?

22       A.    The Cooper plan has a higher deviation

23   range.

24       Q.    But it's within that 1.5 percent number

25   that you chose for your 12/05 plan?

```
                                        Page 345
 1      A.   Yes.
 2      Q.   Okay.  So would you say that's sufficient
 3   to comport with traditional districting principles,
 4   being in that plus or minus 1.5 percent deviation
 5   range?
 6      A.   Generally.
 7           MR. TYSON:  Object to form.
 8           THE WITNESS:  Sorry.
 9           MR. TYSON:  Sorry.
10           THE WITNESS:  Okay.  I answered most
11      of it.  I would say that let me clarify my
12      answer here.  It is the same deviation
13      range that I used in my illustrative plan.
14      In my experience, I have seen plans that
15      have this range of deviation before.
16   BY MR. SAVITZKY:
17      Q.   By the way, sometimes deviation can be
18   higher than that, right, 5 percent?
19      A.   It really depends where you are.  Not in
20   Nevada.
21      Q.   We are not in Nevada.
22      A.   No.
23      Q.   So did you look at any other metrics other
24   than these?
25      A.   The top line metrics?  No.  But I have all
```

Page 350

1      Q.   So substantially the same compactness?

2      A.   Okay.

3      Q.   Would you agree with that?

4      A.   It's, yes, it's close.

5      Q.   And then for District 133, it looks like

6   the enacted plan District 133 is more compact.

7   That district is a different, a very -- a different

8   area from the illustrative map, isn't it?

9      A.   Probably.

10      Q.   Do you know what the overlap of those two

11   districts is?

12      A.   No.  I don't have it in front of me.

13      Q.   Okay.

14           MR. SAVITZKY:  Is this the -- that's

15      fine.  We don't need to...

16   BY MR. SAVITZKY:

17      Q.   Would you say that it makes sense to do a

18   comparison of two districts where there's only

19   40 percent overlap between the populations at deal?

20      A.   It can.  It depends on what the

21   circumstances are.  For example, when you were

22   talking about Senate District 55, what district to

23   compare that to, well, the -- that same area in my

24   illustrative 55 was fractionalized in the enacted

25   plan.  So which one do you compare it to?

Page 351

```
 1              I don't know what the highest percentage
 2     is in that area.
 3         Q.   And you didn't look at the core
 4     constituency report -- core constituency, excuse
 5     me, report to try to figure out what the best
 6     comparator would be?
 7         A.   I didn't.  And more to the point, in this
 8     case when you say is 40 percent a good number, I
 9     don't know.  It really depends on what the other
10     options are.
11         Q.   Is it possible that you could have a
12     situation where the districts are so different that
13     there isn't really a good comparator?
14         A.   Sometimes, sure.
15         Q.   Looking at District 145, the enacted plan
16     is a little better on Reock and the Cooper plan is
17     better on Polsby-Popper; is that right?
18         A.   Yes.
19         Q.   Okay.  And looking at 171, it's a little
20     bit more compact under the enacted plan?
21         A.   It's point 35 Reock in the enacted and
22     point 28 in the Cooper for Reock.  And
23     Polsby-Popper is point 37 in the enacted and point
24     two in the Cooper plan.
25         Q.   And did you look at the overlap between
```

Page 354

1    P.I. plans and this, so I included the same

2    information.

3        Q.    Okay.

4        A.    But all of the compactness scores are in

5    the reports.

6        Q.    So let's turn to Paragraph 48 and some of

7    these maps.  You look at metro area house

8    districts.  You look at a map shown which is called

9    a metro region.

10            And you have some maps on Pages 27, 29 and

11    30 of your report with V.T.D.s shaded by B.V.A.P.;

12    is that right?

13       A.    In general, yes.

14       Q.    All right.  You say:

15            [As read]  "Looking at the

16        specific districts will show the

17        compactness of the districts as

18        impacted by the efforts to create more

19        black majority districts."

20            When you say "impacted," what do you mean?

21       A.    Where is that in the report?

22       Q.    In Paragraph 50.  I'm sorry.  You say:

23            "...the compactness of the

24        districts is impacted by the efforts

25        to create more majority black

```
                                            Page 358
 1   mean compactness would have changed?
 2        A.   I don't know.  I assume so.  We discussed
 3   this earlier.  It's possible and likely that it
 4   would change, but I don't know how it would change.
 5        Q.   So if you did a different analysis, the
 6   mean compactness for Cooper's districts could be
 7   better and the mean compactness for the enacted
 8   could be worse?
 9        A.   I have no idea.  This is the analysis that
10   I provided in the report.
11        Q.   Based on the districts that you chose?
12        A.   Yes.  That are in the same geographic
13   area.
14        Q.   Along with other districts that are also
15   in that area that you didn't choose?
16        A.   I chose these districts, and I discuss
17   them in some detail in the report.
18        Q.   And when you picked these districts, did
19   you run a core constituencies analysis to determine
20   how much they overlapped between the illustrative
21   and the...
22        A.   It's available in the appendices.  It's
23   not in the text portion of the report.
24        Q.   Do you know how much of enacted District
25   77 actually overlaps with District 77 in the Cooper
```

                                              Page 359

1    map?

2         A.    Probably not very much.  It doesn't look

3    like very much overlaps.

4         Q.    But you decided to do a head to head on

5    them anyway?

6         A.    I wouldn't describe it as a head to head.

7    In some extent that's why I picked this grouping of

8    four, because it's in the same general region.

9              So even though 77 may not have exactly the

10   same, and certainly not exactly the same, but a lot

11   of the same territory, as a group they cover a lot

12   of the same territory.

13        Q.    So just looking at Paragraphs 51 and 52 of

14   your report, you've got one district in north

15   Clayton, one in Fulton and Fayette, one in Fayette

16   and Coweta, one in Fayette and Spalding and Henry

17   for the enacted plan.

18              Does that sound about right?

19        A.    Yeah.  That's what it shows.

20        Q.    And then just turning to Paragraph 53,

21   which is still on this page, you say:

22              [As read]  "In the Cooper 12/05

23         plan, the engineering of a new black

24         majority district is accomplished by

25         elongating the districts to connect

Page 369

1    I believe.

2        Q.    So whichever part of a split in Spalding

3    County has Griffin is going to have most of the

4    black population?

5        A.    Probably.

6        Q.    And you didn't consider that in assessing

7    whether the county split that Mr. Cooper draw -- or

8    drew was appropriate?

9        A.    I reported on what I saw, and I drew some

10   conclusions from it.

11       Q.    So let's look at Paragraph 58 and turn to

12   the discussion of the black belt sort of area.  You

13   sort of pick out ten districts in this region to

14   examine.

15            Why did you pick these districts?

16       A.    They cover roughly the same area.  And I

17   think in particular I have a discussion of county

18   splits with regard to District 128 in Cooper's

19   plan.

20       Q.    Did you run the core constituencies

21   analysis to determine how much of the area in your

22   region and the area in the illustrative overlapped?

23       A.    I didn't run a core constituency.  The --

24   those numbers are in the appendix.

25       Q.    Did you conduct any compactness analysis

Page 370

1   of the districts in this area?

2        A.   That's in the reports.  It's all there.

3        Q.   But you're not contending that the com --

4   that there's some -- that the districts in the

5   Cooper map are less compact or there's some

6   detriment to compactness?

7        A.   I think there is, I mean, specifically

8   with 128.

9        Q.   Well, specifically with 128 --

10       A.   Compared to, say, District 155 in the

11  enacted plan.

12       Q.   I mean, do you discuss the compactness

13  scores of the districts in this area at all in your

14  report?

15       A.   I don't think so.  I think I'm looking at

16  a different aspect here regarding the county

17  splits.

18       Q.   Okay.  You say that District 33 -- 133 has

19  a number of V.T.D. splits in Baldwin County?

20       A.   Yes.

21       Q.   That's on Paragraph 61.

22       A.   Yes.

23       Q.   Is that due to the shape of Milledgeville

24  and the V.T.D.s around Milledgeville?

25       A.   No.