# EXHIBIT Q

Page 1

1            UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                 ATLANTA DIVISION
3
4    ALPHI PHI ALPHA FRATERNITY, INC,,
     a nonprofit organization on
5    behalf of members residing in
     Georgia; SIXTH DISTRICT OF THE
6    AFRICAN METHODIST EPISCOPAL
     CHURCH, a Georgia nonprofit
7    organization; ERIC T. WOODS;
     KATIE BAILEY GLENN; PHIL BROWN;
8    JANICE STEWART,
9            Plaintiffs,
10    vs.                    CASE NO. 1:21-CV-05337-SCJ
11
     BRAD RAFFENSPERGER, in his
12   official capacity as Secretary
     of Georgia,
13
             Defendant.
14
15
16
            DEPOSITION of WILLIAM S. COOPER
17
                February 10, 2023
18
                    9:00 a.m.
19
             Tayor English Duma, LLP
20
        1600 Parkwood Circle, Suite 200
21
             Atlanta, GA  30339
22
             Lucy C. Rateau, CCR, RPR
23
24
25

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 33

1    don't want to lose it and have to start all over

2    again.

3         Q.  Do you have your Maptitude software set to

4    save a backup after a certain number of changes you

5    make?

6         A.  No.

7         Q.  So unless you affirmatively create backup

8    of a map, there's no prior versioning of that map on

9    your Maptitude system?

10        A.  Yeah, there's no automatic backup.  I think

11   it automatically backs up if you exit the program

12   altogether.  But I don't have it set to back up

13   something every 10 minutes or so.  I just back up

14   whenever I feel the need to.  And usually the actual

15   names of the backups make no sense to anybody else

16   because some days I'm just using a time and other

17   days something else.

18        Q.  So in creating the various illustrative

19   plans for this case is it fair to say that your goal

20   was to create additional majority Black districts

21   above those created by the Georgia legislature on

22   its plans for the House and Senate?

23        A.  Well, the goal was to determine whether it

24   would be possible within the constraints of

25   traditional redistricting principles.  And I

Page 34

1    determined that it unequivocally is possible.

2        Q.  Are the majority Black districts you've

3    created in the illustrative plans in your December

4    5th report the highest number of majority Black

5    districts you've created in any draft?

6        A.  Yeah, I did not try to -- in some cases I

7    do hypothetical plans just to make the point that

8    more districts could have been drawn or you could

9    have made it five points higher or something.  I

10   don't think I drew -- I believe in the first two

11   plans for the preliminary injunction one or two

12   districts were sort of organically majority Black.

13   So I just had, I believe, one less Senate district

14   that is majority Black in this particular

15   plaintiff's plan than the earlier ones.

16       Q.  So you mentioned drawing hypothetical

17   plans.  Do you recall creating any hypothetical

18   plans for Georgia with more majority Black districts

19   above your preliminary injunction plans?

20       A.  No, I didn't do that in this case.  I've

21   had enough of drawing plans in Georgia.  It's one

22   thing to do hypotheticals for a County Commission or

23   something.

24       Q.  So it's correct then that your preliminary

25   injunction plan contained the most Black districts

Case 1:21-cv-05337-SCJ    Document 246-17    Filed 04/19/23    Page 5 of 54
William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 41

1    plan?

2         A.  I don't think there's a metric that would

3    necessarily identify that, other than perhaps one

4    could look at a legislative plan and make an

5    assessment that a plan was disproportionately

6    weighted towards one race or another, so perhaps in

7    that sense.

8         Q.  So in your view if the goal of a map drawer

9    is to draw the maximum number of majority black

10   districts on a plan, that plan wouldn't necessarily

11   be drawn predominantly based on race?

12              MR. SAVITZKY:  I'm just going to object

13         to the extent it calls for a legal conclusion.

14         You can answer if you're able to do so.

15        A.  Could you repeat the question?

16   BY MR. TYSON:

17        Q.  Sure.  You talked about the different ways

18   you would see race predominating in a plan, like the

19   ways that you could look at that.  And my question

20   was if the map drawer's goal is to draw the maximum

21   number of majority black districts on a plan, in

22   your view would race predominate in the creation of

23   that district plan?

24        A.  Well, not necessarily.  I mean that's sort

25   of an open-ended question.  I really can't say.

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 42

1    Normally you would not go into a situation where you
2    were drawing to draw the maximum number of majority
3    Black or majority Latino districts.  If you were to
4    do that you would likely run into conflict with some
5    of the other traditional redistricting principles.
6        Q.  And you mentioned earlier the Cynthia
7    McKinney district in the 1990 cycle in Georgia.  Are
8    you familiar with the term "max Black" from the 1990
9    cycle?
10       A.  I've heard that term used.  I've never used
11   it and thought it was a stupid term to use from the
12   outset.  I remember seeing the I-85 North Carolina
13   district.  I still have a clear memory of seeing
14   that standing next to the director of the ACLU in
15   Virginia, and we were both just shaking our head.  I
16   mean that's just -- that's as close to insanity as
17   one could get in redistricting.
18       Q.  And it was your belief that a district like
19   that I-85 district in North Carolina didn't comply
20   with traditional redistricting principle?
21       A.  Absolutely.  And I said as much at the time
22   in a public setting at Norfolk State like in May of
23   1991 on some time like that.
24       Q.  Do you ever use the term "proportionality"
25   in any of your work related to Section 2 of the

Page 47

1    report, right?

2         A.  Right, no other opinions.

3         Q.  Thank you.

4              So let's turn back to paragraph number

5    seven in what you were asked to do in the case, and

6    then we'll get into the meat of this.  But can you

7    describe generally the methodology you used to

8    determine if Gingles prong one was met in this case

9    for the House and Senate plans?

10        A.  Yes.  I draw drafts of state-wide

11   legislative plans and analyze the demographics and

12   the geography and determine where and how one might

13   create additional districts, additional majority

14   Black districts while also adhering to traditional

15   redistricting principles.

16        Q.  So where do you begin with your process

17   then?  Do you start with drawing the map?  Do you

18   start with demographic analysis?  Where does your

19   methodology start for determining Gingles prong one?

20        A.  Well, I look at the enacted plan.  I look

21   at demographic change since the 2000 census.  I look

22   at the previous plans, the benchmark plan.  I look

23   at other geographies unrelated to the legislative

24   redistricting, like the planning districts in the

25   state and metropolitan statistical areas.  So I'm

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 48

1    looking at various factors all along the way.

2        Q.   And in terms of looking at those

3    metropolitan statistical areas or other regional

4    items, do you look at those after you've drawn a

5    plan or before you draw a plan?

6        A.   Before.

7        Q.   And after you've reviewed all those

8    different data points, is that when you commence

9    drawing the redistricting plans?

10       A.   Yes.  Obviously, you can spend more time, a

11   lot of time looking at MSAs and other regions, but

12   I'm certainly aware of those regions as I'm drawing

13   the plans.

14       Q.   If you would look with me at paragraph

15   number 10 of your report.  You state that the

16   illustrative plans comply with traditional

17   redistricting principles.  Do you see that?

18       A.   Yes.

19       Q.   And you list out some different traditional

20   redistricting principles.  Are the items in

21   paragraph 10 all of the traditional redistricting

22   principles that you comply with in the drawing of

23   plans or are there others?

24       A.   Usually in the background there is the

25   incumbent factor, not exactly a redistricting

Page 49

1    principle, but once you try to avoid pairing

2    incumbents to the extent one can.

3         Q.  Is maintaining the core of an existing

4    district a traditional redistricting principle?

5         A.  I don't believe it is.  It was not

6    mentioned in the discussion of guidelines for

7    redistricting that the state of Georgia published on

8    the website.  And I just recently did a review, a

9    quick review of states that have core retention

10   mentioned as a factor to consider.  And I think

11   there's 17 states that do that nationwide.  And

12   Georgia would not be one of them, I don't think,

13   unless I'm misunderstanding something.

14        Q.  So did you obtain or make the list of

15   traditional redistricting principles in paragraph 10

16   based on the Georgia general assembly guidelines or

17   based on your knowledge as a map drawer?

18        A.  Based on my knowledge.  And what I'm saying

19   here does not appear to conflict in any way with

20   what the state of Georgia laid out in their brief

21   discussion of guidelines.

22        Q.  So then I just want to make sure I

23   understand for district cores then.  Is maintaining

24   district cores a traditional principle generally for

25   you as a map drawer even if it's not specifically

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 50

1    for Georgia?

2        A.  Well, it's something to consider.  I'm not

3    tossing it out as not being something that's worth

4    taking into consideration.

5        Q.  And so it's worth taking into consideration

6    like taking incumbent pairing into consideration?

7        A.  Yes, although the state of Georgia in the

8    guidelines published on the website I believe does

9    specifically mention the incumbent issue.  I don't

10   see anything about core retention.  And core

11   retention is really problematic in some ways in a

12   state like Georgia that's growing so fast.

13   Districts are going to change, right.

14       Q.  I see you don't mention transportation

15   corridors in paragraph 10 as a traditional

16   principle.  Is maintaining transportation corridors

17   a traditional principle of redistricting?

18       A.  Well, it's part of communities of interest,

19   right.  It's a factor to consider.

20       Q.  So you would put transportation corridors

21   under communities of interest?

22       A.  Yes, I think you could.

23       Q.  I also don't see where you specifically

24   reference maintaining existing jurisdictional

25   boundaries like counties and precincts.  Is that a

William S. Cooper                            February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 51

1    traditional principle of redistricting?

2        A.  It would fall under the category of

3    communities of interest in my opinion.  You could

4    also perhaps set that out as a separate traditional

5    redistricting principle perhaps.

6        Q.  And I see you don't include compliance with

7    the Voting Rights Act as a traditional principle.

8    Is that also a traditional principle of

9    redistricting?

10       A.  Yes, it is.  And the state of Georgia has

11   clearly made that one of the guideline principles as

12   set forth on the website.

13       Q.  Is there a reason why, if it's a

14   traditional principle, why you didn't include it in

15   paragraph 10?

16       A.  I did.  Non-dilution of minority voting

17   strength I think would be compliance of the Voting

18   Rights Act.

19       Q.  So it's your testimony that non-dilution of

20   minority voting strength in compliance with the

21   Voting Rights Act is the same interchangeable

22   terminology?

23       A.  Well, I'm not a lawyer.  One reason that I

24   probably didn't just spell out compliance with the

25   Voting Rights Act is because I'm not a lawyer.

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 53

1    statistician like you said to make some of those
2    calls?
3        A.  Well, a statistician, lawyers, judges.  I'm
4    not going to say definitely that one thing I've done
5    is fully comply with the Voting Rights Act.
6        Q.  So you would rely on counsel, other people
7    before you would say for sure a map complied with
8    the Voting Rights Act?
9        A.  Well, I don't think I can really say that.
10   I'm not a lawyer.
11       Q.  Let's talk about some of these
12   specifically.  You talk about the traditional
13   redistricting principle of compactness.  How do you
14   go about complying with the traditional principle of
15   compactness when you're drawing an illustrative
16   plan?
17       A.  I attempt to put together districts that
18   are reasonably shaped, easy to understand, and
19   lately I also consider compactness scores.
20       Q.  Do you use compactness scores when you're
21   drawing a plan or after you've finished drawing a
22   plan?
23       A.  Both.
24       Q.  So you will run a compactness report while
25   you're drawing a plan, or do you have it displayed

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 60

1    part of my declaration.

2        Q.  And you can also display with labels the

3    racial makeup of particular pieces of geography,

4    right?

5        A.  Well, you can, yes.

6        Q.  And you can also put little graphs on

7    various pieces of geography to show the racial

8    makeup, right?

9        A.  I can.  I don't do that, but you could.

10        Q.  And that was going to be my next question.

11    When you were drawing the illustrative plans, at any

12    point did you have a display from Maptitude that

13    showed you the racial makeup of particular precincts

14    on the map?

15        A.  Well, you know, I sometimes utilize little

16    dots to show where the precincts are that are say 30

17    percent or over Black.  So that was sometimes

18    present on the screen as I was drawing a plan.

19        Q.  And when that was present on the screen you

20    were able to know where 30 percent or higher Black

21    population existed in a particular precinct?

22        A.  Not within the precinct, just the precinct

23    itself.

24        Q.  So the whole precinct had a concentration

25    of Black voters greater than 30 percent?

Page 61

1          A.  Yes.

2          Q.  Did you ever have any features of Maptitude

3     that displayed racial data about census blocks when

4     you were, for example, dividing a precinct when

5     drawing the illustrative plans?

6          A.  I don't specifically recall.  I sort of

7     think I did not.  I did sometimes go down to block

8     level and look at total population, because Georgia

9     has very tight deviation standards so that you can't

10    go more than plus or minus one percent.  And so

11    sometimes that gets a little tricky if you're trying

12    to avoid splitting a county or something and maybe

13    you could look at another option and by examining

14    what the total population is, get a handle on

15    whether or not you could stay within one percent.

16         Q.  But you do not recall ever turning on

17    racial information for census blocks when you were

18    dividing a precinct in drawing the illustrative

19    plans?

20         A.  I don't have a specific recollection, but I

21    probably did at some point.  I mean I can't really

22    single out where that happened or when it happened.

23         Q.  So in looking at the way you divided

24    precincts, if they were divided along racial lines,

25    is it possible that you had racial information

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 63

1    plans?

2         A.  Well, I was not referencing it very often,

3    if at all.  But I mean I produced a table in my

4    declaration showing what the breakdown is for the

5    Black population, Black counties.

6         Q.  Before you began drawing the illustrative

7    plans in your report did you turn on any features of

8    Maptitude that showed you the racial makeup of

9    counties or precincts to look at before you began

10   drawing?

11        A.  It was probably simultaneous.  I mean, as I

12   say, I was aware of the overall Black population

13   percentage in precincts for most of the work I did,

14   just whether or not it was a precinct that was over

15   or under 30 percent.

16        Q.  Is there a particular reason why you chose

17   30 percent Black population for a precinct to

18   display?

19        A.  That's just something I've usually done.

20   It identifies more or less where the Black

21   population lives or the minority population.

22        Q.  Let's go to paragraph 12.  I just had one

23   question on page six in paragraph 12.  You reference

24   a potential database of incumbent address

25   information filed in the November 2022 general

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 76

1     hypothetical, that if every one of these additional

2     Black individuals that's arrived or been born, I

3     guess, since 2010 moved equally over every census

4     block in the state of Georgia, you wouldn't be able

5     to create additional majority Black districts based

6     on that population growth alone, right?

7          A.   If they scattered across all of Georgia, of

8     course not.  But they've honed in on metro Atlanta.

9          Q.   So then you move into a discussion -- going

10    to paragraph 18 on page 10 -- of areas that you

11    focused on that has substantial Black population.

12    And there are two of them.  One is the metro Atlanta

13    counties in the Atlanta metropolitan statistical

14    area, or MSA, and the other is Georgia's Black Belt,

15    right?

16         A.   Yes.

17         Q.   So let's take a look at each of those.  I'm

18    going to hand you what I'll mark as Exhibit 7, which

19    is Exhibit C from your report that's referenced

20    there in paragraph 18.

21                   (Exhibit 7 marked.)

22         Q.   And is this the map of MSAs in Georgia that

23    you utilized when discussing the Atlanta MSA?

24         A.   Yes.  This is official U.S. Census Bureau

25    map dated January 1, 2020 based on March 2020

Page 77

1    delineation lines.

2         Q.  Now you say that the Atlanta MSA has

3    substantial Black population in your report, right?

4         A.  Yes.

5         Q.  And you're not saying that every county

6    contained in the Atlanta MSA has substantial Black

7    population, right?

8         A.  No.

9         Q.  So when you were conducting your review of

10   the Atlanta MSA did you review the entirety of the

11   MSA or only parts of it?

12        A.  Well, I looked at both.  I looked at -- I

13   believe my demographic section in this declaration

14   looks at the MSA as well as the five south metro

15   Atlanta counties that I focused on.

16        Q.  How did you determine to focus on the five

17   counties in the Atlanta MSA that you focused on?

18        A.  Well, I was very familiar with Fayette as a

19   result of the lawsuit in 2012.  I was very familiar

20   with Gwinnett as a result of the lawsuit in 2017.

21   And, also, I was familiar to a certain extent with

22   Henry as a result of the House district lawsuit that

23   was filed in 2017.  So that part of metro Atlanta

24   was relatively familiar to me.  And I had looked at

25   population estimates over the course of a decade and

William S. Cooper                          February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 83

1        Q.  Did you have a particular method by which
2    you excluded counties that the GBPI found were part
3    of the Black Belt and that you did not find to be
4    part of the Black Belt?
5        A.  No.  This was included as, I thought, a
6    very informative report that was hot off the press
7    at the time.  It was only a year or so old, year and
8    a half.  So I thought that was pertinent
9    information, and for that reason I included it.
10       Q.  So it's fair to say then that this report
11   illustrates your opinions about the Black Belt as
12   opposed to you using it to form your opinions about
13   the Black Belt?
14       A.  Well, both.
15       Q.  So if you used this report to help form
16   your opinions about the Black Belt, I guess I come
17   back to my earlier question, how did you choose
18   which areas not to include as part of the Black Belt
19   in your analysis in your report?
20       A.  I didn't -- I don't exactly understand the
21   question.  I mean as they make clear at outset,
22   there is no uniform definition for the Black Belt,
23   so I'm speaking in very general terms when I refer
24   to eastern Black Belt and western Black Belt.
25       Q.  Let's move to next paragraph 20 of your

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 84

1    report.  And you discuss you narrowed your focus to

2    four regions within those larger areas.  And I'm

3    assuming those larger areas are the Atlanta MSA and

4    the contemporary Black Belt, right?

5        A.  Yes, although I was also aware of the

6    regional planning district boundaries.  So those

7    regions also factored into my approach.

8        Q.  And you only looked at three regions in

9    your preliminary injunction report, right?

10       A.  Well, that's true.  As I've indicated, upon

11   further investigation and reflection I reassessed

12   and drew a third House district in the Macon/Bibb

13   MSA that actually is kind of metropolitan Macon/Bibb

14   and it's expanded to include Peach and Houston,

15   which is a separate MSA.

16       Q.  So let's move to Region A.  Region A you

17   defined as south metro Atlanta, right?

18       A.  Yes.

19       Q.  And you identify that as the counties of

20   Fayette, Spalding, Henry, Rockdale and Newton

21   counties, right?

22       A.  Right.

23       Q.  How did you go about selecting these five

24   counties as Region A?

25       A.  They are in south metro Atlanta and they

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

1          A.  I was looking at county level data.  So it

2     just seemed to me that Columbia County didn't really

3     fit into the prospects of creating another majority

4     Black district.

5          Q.  So then I guess the answer to my question

6     is yes, you could have chosen other counties, but

7     just chose not to based on your assessment of the

8     population there, right?

9          A.  Yeah, to a certain extent, right.  But I

10    did not rule in or rule out any county and still

11    haven't.  Maybe there is a way to include Lincoln

12    County.  I don't think so, but maybe there is.

13         Q.  So your regions then are just kind of the

14    guidelines that you used as you were drafting plans?

15         A.  Right, just in the background, right.

16         Q.  Mr. Cooper, I'm about to move to the

17    section beginning with census data.  Are you still

18    good?  Do you want to take a short five-minute

19    break?

20         A.  No.  I'm fine.  Or whatever.  I'm in no

21    rush.  I'm here until Tuesday.

22         Q.  We can keep plowing ahead.

23            Let's turn to page 19 of your report,

24    Figure 2.  So in Figure 2 you would agree that the

25    increase in Georgia's Black population, as measured

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 122

1      House and Senate district, as is the case in other
2      states.  And if you did that, of course, you would
3      probably split fewer counties, and it might be
4      easier to go through the redistricting process.  But
5      that's neither here nor there in this case.  I'm
6      taking your range at plus or minus one percent for
7      Senate districts to be the rule.
8          Q.  So just to look at Figure 16 and Figure 17,
9      you see the orange District 34 on Figure 16 includes
10     north Fayette and part of Clayton County, and that's
11     District 34 on the enacted plan.  Do you see that?
12         A.  Yes.
13         Q.  And on your illustrative Senate 28, that
14     portion of north Fayette is now in the new 28,
15     right?
16         A.  Right.
17         Q.  So District 34 changes between the enacted
18     plan and the illustrative plan, correct?
19         A.  A good point.  You've identified where 34
20     is.  Right.
21         Q.  And so it's your testimony that District 34
22     is not packed on the illustrative plan and is packed
23     on the enacted plan?
24         A.  Yeah.  You can't just look at percentages
25     and jump to a conclusion one way or the other.  It's

Case 1:21-cv-05337-SCJ   Document 246-17   Filed 04/19/23   Page 22 of 54
William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 126

1   primarily.

2        Q.  And so getting back to the question I asked

3   before we located those maps, in paragraph 101,

4   where is the surrounding Black population you were

5   uncracking that had previously been drawn into 2021

6   Senate District 16?

7        A.  Well, the Black population that had

8   previously been drawn into Senate District 16 was in

9   the majority Black city of Griffin for one place and

10  parts of Fayette County and areas to the north of

11  Griffin and Spalding County.

12       Q.  And paragraph 101 specifically references

13  Senate District 16.  So it's your testimony that

14  that is the Griffin population and some population

15  in Fayette County?

16       A.  I'm looking at the enacted plan, which does

17  not include Griffin or any of the Black population

18  on the eastern border of Fayette County except in

19  the northeast corner in a majority Black district,

20  which I've done with Senate District 28, along with

21  part of Clayton County.  And District 16 encompasses

22  all of Spalding County.  It's a majority white

23  district.  So you have all the Black population in

24  Spalding County is in a majority white district.

25       Q.  Thank you.  So for your illustrative

Page 127

```
 1    District 28, what connections are there between the
 2    Black communities in Spalding County and the Black
 3    communities in Clayton County?
 4         A.   They're very close geographically.   And I
 5    would expect that the Black community in Griffin
 6    area is perhaps a little bit older.   It's a smaller
 7    town.   It's not as urban but certainly there are
 8    connections.   I mean it's almost no distance at all
 9    between Griffin and southern Clayton County.
10         Q.   So in creating illustrative District 28
11    what traditional redistricting principles did you
12    apply to its creation?
13         A.   I tried to keep voting district precincts
14    whole and was able to combine communities that
15    clearly have connections, because they're right next
16    door to one another, into a majority Black district
17    that includes Fayetteville and southern Clayton
18    County and the majority Black city of Griffin in
19    Spalding County.
20         Q.   Is there a community of interest between
21    southern Fayette County and Clayton County?
22         A.   Southern Fayette County is a little more
23    rural.   Clayton County is more urbanized, so there
24    is that factor.   But, again, those districts were
25    packed with Black voters.   And I think that the
```

Page 130

1    though, in the tables.  We just kind of reviewed

2    them a moment ago.

3          Q.  I believe you testified earlier you are

4    familiar with the demographics of Fayette County,

5    right?

6          A.  Well, just generally speaking because of my

7    involvement in the Fayette County lawsuit back in

8    the early part of the decade, the one that stretched

9    into 2014, 2015 actually.

10         Q.  On this plan, your illustrative 16 also

11   runs from northern Clayton County down into the very

12   southern part of Spalding County, right?

13         A.  It does.

14         Q.  Did you identify a community of interest

15   between northern Clayton County and the rural part

16   of Spalding County that you've included in it?

17         A.  Again, it is my belief that the

18   African-American community in Clayton County, even

19   though it's somewhat more urbanized, would not mind

20   being in a second majority Black senate district in

21   Clayton, Henry and Griffin County.  Henry is

22   suburban, and so it fits well with either one of

23   those two.  It's an in-between area.

24              I mean you've got lots of vertical

25   districts in your plan.  This is not particularly

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 132

1      Lamar as rural counties?

2            A.  I would say they're ex-urban.  They're part

3      of the Atlanta MSA, so the Census Bureau determines

4      their commonalities there that place them in the

5      same MSA as downtown Atlanta.

6            Q.  And then your split of Griffin on

7      illustrative 28 is along the city boundaries; is

8      that correct?

9            A.  I believe so.  No problem with that, is

10     there?

11           Q.  Do you know if that corresponds to the

12     voting precincts in Spalding County?

13           A.  I would have to check the table.  But I

14     think that if you're splitting along municipal

15     lines, even though it's important to be aware of

16     VTDs and precincts, they do change.  They're

17     constantly changing in Georgia.  So I don't know

18     right off the top of my head whether there is a

19     split of the VTD or not.  Can we check?  We can look

20     and see.  I'm sort of curious now.

21           Q.  You can't really tell on the map either.

22           A.  Well, let's check.

23           Q.  Okay, where would we check?

24           A.  What is the plan components of the

25     illustrative Senate plan?

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

1      Q.  Is that Exhibit 02 that we had --

2      A.  Isn't it broken out by VTD?

3              MR. TYSON:  Let's go off the record for

4        just a second.

5              (Off the record).

6   BY MR. TYSON:

7      Q.  Mr. Cooper, during the break we just

8   confirmed that I don't think either of us believe

9   there is a split of a precinct in this Griffin area,

10  that there may be a precinct split in a different

11  part of Spalding County.

12     A.  And it could relate strictly to staying

13  within the plus or minus one percent.  I don't know

14  that to be a fact, but perhaps that is the reason.

15     Q.  So let's go to District 17.  So your

16  discussion on that begins on page 43.  From the

17  bottom of 44 over to the top of 45 in paragraph 103

18  you criticize enacted 17 for splitting multiple

19  counties as it extends out to Morgan County.  Do you

20  see that?

21     A.  It extends out to Morgan and up to

22  Walton in kind of a circular fashion.

23     Q.  And you also criticize in here Districts 10

24  and 43 for being districts that are packed, right?

25     A.  Where do you see that?  I don't doubt that

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 139

1          A.  Is it?  I would have to check.

2          Q.  I'll hand you what's marked as Exhibit 7,

3     which is Exhibit C.  Walton and Morgan Counties are

4     also in the Atlanta MSA, right?

5          A.  Yes.

6          Q.  And so enacted District 17 still stays

7     within the Atlanta MSA even though it includes

8     Walton and Morgan Counties, right?

9          A.  Yes.  Do you have a bigger -- I need to

10     look at enacted District 17 though.

11          Q.  Page 44, Figure 17C will show you the

12     borders of it.

13          A.  Okay.  That's still in Atlanta MSA, okay,

14     as is 17, as I've drawn it.  But you will agree that

15     Morgan County is rather rural as well, right?

16          Q.  I would consider Spalding and Morgan to be

17     pretty rural counties.

18          A.  But Henry County would be ex-urban and

19     suburban.

20                    MR. TYSON:  Why don't we go off the

21          record for just a second.

22                    (Recess 12:38 p.m. - 1:17 p.m.)

23          Q.  Mr. Cooper, we're going to turn next to

24     Senate District 23.  And before we get to 23, on

25     Figure 18 on page 49, Senate District 22 is wholly

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

1    splits.

2         Q.  But you would agree that District 23 does

3    cross regional commission boundaries, right?

4         A.  It does.  But it's also adding in districts

5    that have been identified as part of the Black Belt,

6    Baldwin and Twiggs specifically and probably

7    Wilkinson, too.

8         Q.  So you've separated in this plan Hancock

9    and Warren Counties.  Are there differences between

10   those counties that led you to separate them?

11        A.  Well, they're separated, but it's

12   conceivable they could be put in district -- one

13   could be put in 23.  It's not dramatically

14   different.  So it would fit into District 23.  But

15   to do so would have created an issue with one

16   person, one vote, I think.  It would also not have

17   been quite as reasonably shaped.

18        Q.  In your division of Wilkes County, I

19   believe you said is along County Commission

20   boundaries; is that right?

21        A.  That's correct.  I just followed the

22   boundaries established by Wilkes County as recently

23   as this time last year.

24        Q.  And you would agree that that split divided

25   the city of Washington, Georgia, right?

Page 144

1          A.  It did.  It did, between two different

2    commission districts.

3          Q.  Looking at Figure 19B on page 51 --

4          A.  Let me back up.  It does not divide -- the

5    illustrative District 23 follows commission lines

6    except that once it reaches the town of Washington

7    on the southwest side it just follows the town

8    boundaries.  So it's not like people aren't going to

9    be able to figure out which district they're in.

10         Q.  And so you didn't follow the commission

11   boundaries on that western side of Washington, but

12   you followed the city boundaries in the split?

13         A.  Yes.  They're more permanent probably than

14   commission boundaries -- although annexations are

15   common in Georgia, so that may not hold.

16         Q.  Do you know the racial impact of following

17   the boundary line you followed in the split of the

18   city of Washington?

19         A.  Not off the top of my head, no.

20         Q.  So in looking back at Figure 19A in

21   illustrative Senate District 23, what is the

22   community of interest between Richmond County and

23   Twiggs County?

24         A.  Both counties are part of the Black Belt.

25   Richmond County, of course, is a consolidated city,

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 150

1     and I did.

2         Q.  So you made a change to the enacted plan in

3     Clark County on your illustrative plan with the goal

4     of making the counties whole but unrelated to the

5     creation of the new Black majority district?

6         A.  I think so.  I don't think deviation would

7     come into play there.  The shape of the districts

8     comes into play, so there could have been any number

9     of factors.  And certainly you could maintain that

10    all of my illustrative districts, the Plaintiffs'

11    plan, and split Clark County should you wish to do

12    so.  That can be done.

13        Q.  So staying with the same area, making

14    Jackson County whole was also not part of the effort

15    to create Senate Districts 17, 23 or 28 as majority

16    Black districts, right?

17        A.  That is true.

18        Q.  And Coffee County down in south Georgia,

19    you making it whole was not related to your efforts

20    to make Senate District 17, 23 or 28 majority Black,

21    right?

22        A.  Probably not.  Again, there is a ripple

23    effect with these Senate districts, and deviation is

24    in play.  And I'm also worried about, in some

25    instances, protecting the incumbents because I've

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 156

```
 1    looked at municipal splits.
 2         Q.  Actually, let me do it this way.  Aside
 3    from county splits, municipal splits, regional
 4    commission splits and CBSA splits, did you look at
 5    any other jurisdictional splits when you were
 6    working on this report?
 7         A.  Yes.  Municipalities.
 8         Q.  And I was excluding municipalities.
 9         A.  Oh, I'm sorry.  Okay.  Well, the VTDs.  The
10    illustrative plan has fewer VTDs.
11         Q.  Let me ask a better question.  Is there any
12    jurisdictional split analysis you conducted
13    comparing the illustrative plan to the enacted plan
14    that you did not include the results of in your
15    report.
16         A.  I don't think so, maybe because I couldn't
17    think of another angle to take into consideration.
18         Q.  Going to paragraph 121.  We're on the home
19    stretch of the Senate plan here.
20              You say that the illustrative plan modifies
21    35 of the 56 districts in the enacted plan.
22    Correct?
23         A.  Correct.
24         Q.  And that's more than half of all the
25    districts, right?
```

Page 157

1        A.   Correct; however, you can still maintain

2    these illustrative districts that I've drawn that

3    are new majority Black districts with fewer

4    modifications to the enacted plan districts.  It

5    would, however, result in more splits in some of the

6    other counties involved.  So there's a trade-off

7    there.  I opted for looking at this in terms of pure

8    traditional redistricting principles, and that would

9    be not to worry so much about core retention and

10   think more about county splits and MSA splits and

11   regional commission splits which are more permanent.

12       Q.   So it's correct that you have not created a

13   plan that includes majority Blacks in Districts 17,

14   23 and 28 that modifies fewer districts than 35,

15   right?

16       A.   At some point I did, but it also had more

17   county splits.  And so I made a decision to reduce

18   the county splits at the expense of maintaining what

19   are often just ephemeral enacted plan districts that

20   you guys changed even in mid decade, like you did in

21   2015 and 2014.  So they are very volatile in terms

22   of their lines, whereas county lines in Georgia and

23   even the regional commission lines are unlikely to

24   change.

25       Q.   In paragraph 122, the illustrative plan has

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 175

1    goes down into Griffin; is that right?
2         A.   Right, which is a majority Black city.
3         Q.   And in the process, the city of Locust
4    Grove looks like it's divided on the illustrative
5    plan; is that right?
6         A.   Locust Grove is split, right.
7         Q.   Would it be correct to say that you used
8    Black population from enacted District 116 when you
9    extended -- I'm sorry.  Hang on.
10             House District 117 is a new majority Black
11   district, right?
12        A.   What about it?
13        Q.   Is a new majority Black district, right?
14        A.   It is, yes.
15        Q.   What was the basis for connecting part of
16   the city of Locust Grove with part of Griffin?
17        A.   By and large probably one person, one vote.
18   It was a clear -- there was a clear dividing line
19   there at the precinct level I'm pretty sure.
20        Q.   And so the only connection between Locust
21   Grove and Griffin you can identify is one necessary
22   to get one person, one vote?
23        A.   Well, there are -- I mean Locust Grove is a
24   stone's throw from the Spalding County line,
25   metaphorically speaking anyway.  So there are

William S. Cooper                           February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 176

1    connections, of course.

2         Q.   What are some of those connections?

3         A.   They are ex-urban and in some places rural.

4    I've driven through Locust Grove.  It's a pretty

5    town.  There are obvious connections.  The two towns

6    are very close.  Griffin and Locust Grove are not

7    far apart at all.

8         Q.   So the geographic proximity would be the

9    primary basis for connecting them?

10        A.   That would be one basis.

11        Q.   What are others?

12        A.   Others would be the opportunity to create a

13   new majority Black district in an area that is

14   growing in terms of Black population but not seeing

15   a commensurate increase in majority Black districts

16   over the past 15 years.

17        Q.   And District 117 as configured divides the

18   city of Griffin as well, right?

19        A.   Part of Griffin is taken out of House

20   District 117.  Again, I think it's probably the

21   precinct level.  But basically it's following the

22   main highway there, State Route 16 I think it is.

23        Q.   And in the geography of House Defendant 117

24   between Locust Grove and Griffin, you would agree

25   there's intervening rural white population, right?

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 178

```
 1    see a problem.  They're lovely districts.
 2         Q.  And for Fayette County, you would agree
 3    that the southern part of illustrative District 69
 4    and the southern part of illustrative District 77
 5    are in more heavily white areas and rural areas of
 6    Fayette County, right?
 7         A.  Yes.  The part of -- the area that's south
 8    of the city of Fayetteville is probably majority
 9    white.  But I've not -- again, you seem to be very
10    focused on the race of people at one point or
11    another within a district, and I just am not that
12    concerned about getting to that level of detail when
13    I'm drawing a plan.
14         Q.  You would agree that illustrative Districts
15    68, 69 and 77 both connect more urban population
16    with more rural population, right?
17         A.  Not so much.  I mean it's pretty urbanized
18    there from Fayetteville north.  Once you go further
19    south, yes, but that's not as densely populated.  So
20    the rural population would be a minority in 77 and
21    69.  I know there are probably people who live in
22    Atlanta who would think that Fayetteville is rural.
23    But I mean it is a town, it's urbanized.
24         Q.  So your testimony is in 68, 69 and 77 there
25    is probably some rural population but it's a small
```

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 179

1       group at the bottom of those districts?

2           A.  Yeah.  I think it would be a minority of

3       the population in the districts, I believe.  But I'm

4       just talking off the top of my head, and I am not

5       looking at block-level data and not able to really

6       give you a definitive answer as to where the exact

7       dividing line would be between urban and rural with

8       77, 69 and 68, other than the further south you go

9       the more rural it would get.  Although, it's still

10      very suburban, frankly.  It's overwhelmingly

11      suburban until you get down to around Woolsey

12      probably, and maybe that's more rural.

13          Q.  So let's move next to the eastern Black

14      Belt area.  And here you indicate that you have

15      drawn a new majority Black district, which is

16      District 133; is that right?

17          A.  Yes.

18          Q.  To do that, according to paragraph 169, you

19      unpacked, as I read it, 128, 129, 130, 131 and 132,

20      correct?

21          A.  Yes.

22          Q.  Do you have your population summary report

23      for the illustrative plan handy?

24          A.  I do.  Oh, you mean just the percentage?

25          Q.  Yes.

Case 1:21-cv-05337-SCJ    Document 246-17    Filed 04/19/23    Page 37 of 54
William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 186

1    Q.  Going back a page just to the overview of

2    House District 133 on Figure 31.  Just go back one

3    page to look at the overall view.

4         What is the geographically compact Black

5    community contained in House District 133?

6    A.  It is found in Hancock County, Taliaferro

7    County, Warren County, part of Wilkes.  Wilkinson is

8    majority white but still a significant Black

9    population and a significant Black population in

10   Baldwin County.  So it's slightly elongated, but

11   it's easy to follow.  It's following county

12   boundaries basically except for the area in Baldwin

13   where I made a Herculean effort to follow municipal

14   boundaries; and Wilkes, which is following County

15   Commission lines that were just established last

16   winter.  So I don't see how this could possibly be

17   considered to not follow traditional redistricting

18   principles.

19   Q.  And in the creation of House District 133

20   you also had to move the boundaries for House

21   District 128, right?

22   A.  I would have to go back and look at the

23   enacted plan.  What figure is that?

24   Q.  So Figure 30 and 31 on --

25   A.  Wait.  I guess I do have the enacted plan.

William S. Cooper                              February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 187

1    Okay.

2         Q.   And so on the illustrative plan, House

3    District 128 splits four counties, right, Burke,

4    Jefferson, Johnson and Lawrence?

5         A.   Yes, it would split four counties, I

6    believe.

7         Q.   Do you know if that's the most counties any

8    single House district splits on their plan?

9         A.   I think that might be.

10        Q.   And the adjustments to 128 were necessary

11   to create the additional majority Black District

12   133?

13        A.   There may be ways to reconsider how 128 is

14   drawn.  Again, I wanted to avoid pairing incumbents.

15   It's not a traditional redistricting principle per

16   se, but it seems to be so important -- and I don't

17   off the top of my head know exactly where the

18   incumbent lives in 128, but that was a factor I'm

19   sure.

20        Q.   And House District 126 also splits four

21   counties, right, Screven, Burke, Jefferson and

22   Richmond?

23        A.   It does split those counties, right.

24        Q.   And in the enacted plan, in this same area,

25   Screven, Burke, Jefferson, Johnson, Lawrence were

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 189

```
 1          A.  Yes.
 2          Q.  And you describe illustrative District 171
 3    as along the Highway 19 corridor, right?
 4          A.  Yes, it follows Highway 19.
 5          Q.  What is the community of interest that
 6    connects --
 7          A.  US Highway 19.
 8          Q.  US Highway 19.
 9              What is the community of interest that
10    connects Albany and Thomasville, Georgia?
11          A.  Well, they're not very far apart.  And
12    there is a Senate district down there that would
13    include all of 171 except for the Thomasville part.
14    So the state is determined, the legislature is also
15    determined that that area is okay to draw into a
16    single Senate district.  So the only thing I've
17    really done is add a little extension into Thomas
18    County in Thomasville to what they have already
19    identified is an area where a Senate district can be
20    drawn.
21          Q.  So the community of interest you identify
22    as the enacted Senate district, and then Thomas
23    County is adjacent to that?
24          A.  Yes.
25          Q.  Any other --
```

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 193

1        A.  No, I have not.

2        Q.  So it's --

3        A.  But I do know that US Highway 19 is.

4        Q.  And so it's fair to say you didn't utilize

5    this particular document when you were creating

6    illustrative 117, right?

7        A.  Well, it just shows that there is, present

8    day -- although 2014 is no longer present day, but

9    it's certainly the modern era -- a study and an

10   interest in maintaining the historic route between

11   Albany and Thomasville.  It shows there is a

12   connection there between the governments.

13       Q.  We can set that document aside.

14           Looking back at page 78, Figure 32, on the

15   enacted plan there's one House district that's

16   wholly within Dougherty County, District 153, right?

17       A.  Right.

18       Q.  And on the illustrative plan on page 80,

19   the next page, Figure 33, there's now no longer one

20   district that is wholly within Dougherty County,

21   correct?

22       A.  That is correct; however, the illustrative

23   plan splits Dougherty County three ways, and the

24   enacted plan splits it four ways.  So there's that.

25   Why is that, I wonder.

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 197

1    Black population into 145.
2         Q.  And show you extended District 143 further
3    north into Macon -- into Bibb County but also
4    further south into Twiggs County, right?
5         A.  Yes.
6         Q.  And then you extended District 142 south
7    out of Bibb County into north Houston County,
8    correct?
9         A.  Yes.
10        Q.  And then that freed up enough Black
11   population for you to extend 145 out into Monroe
12   County starting in downtown Macon, right?
13        A.  Yes.
14        Q.  And so, unlike the enacted plan which has
15   two districts wholly within Bibb County, the
16   illustrative plan has no districts that are wholly
17   within Bibb County, right?
18        A.  That is true.
19        Q.  And District 145, as you've configured it,
20   is only 50.2 percent AP Black VAP, right?
21        A.  That's correct.
22        Q.  So can you walk me through what downtown
23   Macon has in common with this piece of Forsyth
24   County over towards Upson County in District 145?
25        A.  It's in the Macon/Bibb MSA.  And there is

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 198

1    some Black population in that precinct, but I
2    believe it's a majority white precinct.  But that
3    was mainly because I had to make sure that the
4    deviation was within plus or minus one percent.
5    Ninety percent plus of the population in 145 under
6    the illustrative plan lives Macon/Bibb.
7         Q.  And you would agree that District 142
8    extends out of Macon/Bibb County MSA into the Warner
9    Robins MSA, right?
10        A.  Right, which has a significant Black
11   population.
12        Q.  So unlike 145 where it's the same MSA, 142
13   crosses MSAs?
14        A.  That is true.  But it's part of the
15   consolidated Warner Robins, Macon consolidated
16   statistical area, because they're adjacent, right
17   next to one another.  Metropolitan Macon -- actually
18   -- I'm looking for the commission map.
19        Q.  This?
20        A.  No.
21             MR. SAVITZKY:  For the record, I'm
22        handing him Exhibit 10.
23             MR. TYSON:  Thank you.
24        A.  So the middle Georgia commission includes
25   Bibb, Houston, Peach, Pulaski, and going further

Case 1:21-cv-05337-SCJ    Document 246-17    Filed 04/19/23    Page 43 of 54
William S. Cooper                              February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 199

1    north, Crawford, Monroe, Jones, Putnam, Baldwin,

2    Wilkinson, Twiggs.  So I'm staying entirely within

3    the middle Georgia commission with House District

4    145.

5        Q.  And Baldwin County is in that middle

6    district commission, too, right?

7        A.  That's true.

8        Q.  The House District 142 is 52.51 percent AP

9    Black VAP.  Did you analyze how much of the

10   population in 142 is the Air Force base in Houston

11   County?

12       A.  I did not.  I know you came after me for

13   putting the Air Force base in the original Senate

14   District 23, I believe, so I took care of it there.

15   But they can vote.  They're citizens, right?  Most

16   military personnel are citizens, so why not.

17       Q.  Is it your understanding that military

18   personnel in Georgia tend to be registered to vote

19   in Georgia?

20       A.  I don't know the percentage of voters on

21   the military base who are registered, no.

22       Q.  Let's move to the supplemental plan

23   information.  Mr. Cooper, going to paragraph 184,

24   you indicate that you stayed within a one and a half

25   percent, plus or minus, population deviation limits,

William S. Cooper                February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 203

1          A.  Yes.  And so what?  Why does that matter?

2     I'm happy to bring Dawson back into a single county.

3          Q.  I guess what I'm trying to get to is you,

4     in paragraphs 189 and 190 talk about having fewer

5     county splits in the enacted plan.  But that's only

6     because you unsplit some counties in parts of the

7     state far away from where you added new majority

8     Black districts, right?

9          A.  To a certain extent.  But why does that

10    matter?  I've produced a plan that splits fewer

11    counties.  So if that's an important metric, and it

12    is, then the illustrative plan based on split

13    counties and county splits and VTD splits is

14    basically on par with the enacted plan.

15         Q.  But it's only on par with the enacted plan

16    if counties in north Georgia unrelated to the

17    creation of new majority Black districts are unsplit

18    in the drawing process, right?

19         A.  Well, the thing is, is this ripple effect

20    that does begin to be a factor, along with

21    incumbents.  So it was apparent to me that I could

22    avoid splitting a couple of counties up there while

23    protecting incumbents.  So, yes, I avoided splitting

24    them.  And because of that we have split fewer

25    counties.

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

1          Q.   So when you made Gordon County whole, it's
2     your testimony that that was in part from the ripple
3     effect of making changes?
4          A.   It could have been.  I honestly don't
5     recall.  I may not have even done it with the
6     knowledge that I was unsplitting the enacted plan
7     split in Gordon County.  It's a small county, nice
8     rectangular county, and it may have just happened.
9          Q.   We can set Mr. Morgan's report aside.
10    Turning to page 86, paragraph 192, you have the
11    split report for the CBSAs, and the illustrative
12    plan and the enacted plan are the same in terms of
13    CBSAs that are whole, right?
14         A.   Right.
15         Q.   And the illustrative plan splits slightly
16    more CBSAs than the enacted plan on your CBSA splits
17    column, right?
18         A.   That's correct, it splits four more, so I
19    guess roughly two percent more.
20         Q.   And for the Senate, was there any other
21    geographic wholeness analysis you did that is not
22    reported in this report?
23         A.   Well, you didn't mention regional
24    commission splits.  The illustrative House plan has
25    223 discrete splits for regional commissions, and

Page 207

1      Thank you for your time today.  That's all the

2      questions I have.  Mr. Savitzky has some questions

3      for you, so I'll hand you off to him.

4                  MR. SAVITZKY:  Thanks.  And, yes, just a

5            few.  I'm not going to keep us here too much

6            longer.

7                           EXAMINATION

8      BY MR. SAVITZKY:

9          Q.  Let's turn back to paragraph 10 of your

10     report, page five.  So you were talking to Mr. Tyson

11     about the traditional redistricting principles that

12     are mentioned here in paragraph 10.  And we talked

13     specifically about respecting communities of

14     interest.  Are municipalities an example of a

15     community of interest in your view?

16         A.  Well, yes, they can be.  But they're not

17     the be all and end all because municipalities can

18     have a long history of being racially segregated, so

19     there would be other factors that one would have to

20     take into consideration because you want to respect

21     other kinds of communities of interest, like

22     neighborhoods and history.

23         Q.  So could core-based statistical areas also

24     be a community of interest that one might consider?

25         A.  Yes.

William S. Cooper                              February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 208

1          Q.   Could regional commissions be a type of
2     community of interest that one might consider?
3          A.   Absolutely.  If one were to draw a plan for
4     the state legislature I would think that you would
5     look at those maps in the process of drawing the
6     plans.
7          Q.   Could transportation corridors be a
8     community of interest that one might consider?
9          A.   Well, yes.  That's one of the key
10    components of determining what counties are in an
11    MSA, transportation factors.
12         Q.   And could socioeconomic connections or
13    commonalities form a community of interest?
14         A.   Absolutely.
15         Q.   And could historical or cultural
16    connections form a community of interest?
17         A.   Unquestionably.
18         Q.   You mentioned at one point the shared
19    history that Black Americans have.  Would you agree
20    that at times Black communities in different areas
21    of a state may also have difference sets of
22    interests that are unrelated to that broader shared
23    history?
24         A.   Well, yes, but they all have that broader
25    shared district which connects African-Americans in

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 210

1    county and VTD boundaries; is that right?

2        A.  Yes.

3        Q.  And are you addressing here the

4    illustrative plan's compliance with the traditional

5    districting principle of following political

6    subdivision lines?

7        A.  Yes, because I made every effort to avoid

8    splitting VTDs and, in fact, most plans -- the

9    Senate plan is superior in terms of VTD splits

10   compared to the enacted plan.  And the House plan is

11   the same.

12       Q.  So just moving on, we talked some about the

13   regions that you looked at, Regions A, B, C and D.

14   Would you say that those regions were hard

15   boundaries that you applied in drawing districts?

16       A.  No.  I just developed regional areas at the

17   outset and did not think of them as being hard

18   boundaries, just boundaries that I could rely upon

19   to examine whether or not a majority Black district

20   could be created in or around those regions.

21       Q.  So would it be fair to say -- and maybe I'm

22   just restating what you just said -- but would it be

23   fair to say that those regions sort of focused your

24   inquiry at the outset into whether it was possible

25   to draw additional Black majority Districts?

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 211

1        A.  Right.  Those were the regions that I

2   looked at -- or the set of counties, initially.

3        Q.  Turning to paragraph 30, just to clarify

4   for the record, are the boundaries of Region C that

5   you identified the boundaries of Senate District 12?

6        A.  Yes.

7        Q.  So when you see that shape on some of the

8   maps of the regions we talked about, that's just

9   saying District 12, right?

10        A.  Right.

11        Q.  Now I just want to look at --

12        A.  Enacted Senate District 12.

13        Q.  Enacted Senate District 12.  Thank you.

14            Just looking at -- starting at page 24.

15   Just for the record I want to get the increase in

16   population for some of these areas.  I know you

17   talked to Mr. Tyson about percentage increase.

18   Starting with page 24, so starting just with the

19   Atlanta MSA -- and looking at page 24, Figure 6 in

20   your report -- what is the total increase

21   population, Black population in the Atlanta metro

22   over the last decade?

23        A.  It's up by over -- almost 500,000 people.

24   The numbers is here in one of my paragraphs here, is

25   it not?  It's up from 1.8 million to almost 2.2

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 216

1    page 60 of your report, Figure 24.  Just looking at

2    that chart, does what we just talked about, about

3    the purpose of this comparison between Black voters

4    in majority Black districts versus white voters in

5    majority white district, is that also true for this

6    chart with respect to those metrics for the House

7    side of things?

8         A.  Yes.

9         Q.  Just to clarify, you discussed with Mr.

10   Tyson some changes in the Senate plan that united

11   Clark, Jackson and Coffee counties.  Is it possible

12   that ripple effects from the other changes that you

13   made opened the possibility of uniting those

14   counties in your illustrative map?

15        A.  Yes.

16        Q.  And just looking at Figure 29A and turning

17   to specific districts, this is your illustrative

18   2021 -- sorry.

19        A.  I've got it now.

20             MR. TYSON:  29A --

21             MR. SAVITZKY:  It's mislabeled.

22        A.  Wait.  There are two 29As, aren't there.

23             MR. TYSON:  I believe the second 29A on

24        page 71 is actually 29B, because this is the

25        configuration of the illustrative plan, not the

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 217

 1            enacted plan.
 2        A.   That is confusing.
 3   BY MR. SAVITZKY
 4        Q.   So looking at what should be labeled 29B,
 5   the map on page 71 of your report.
 6        A.   It does have in the legend -- and I was
 7   really looking at the legend during the deposition.
 8   It does show that that's the illustrative plan.
 9        Q.   Just to clarify for the record, you
10   mentioned that there were commonalities between the
11   communities of Locust Grove and Griffin.  Was
12   proximity one of those?
13        A.   Well, that's what I was trying to say, yes.
14   It's not far from one to the other.  Regardless of
15   your race, they're close.
16        Q.   And was the character of those communities
17   in terms of being suburban or ex-urban versus urban
18   a commonality that you identified?
19        A.   I think so.  They're both small towns, so
20   they're certainly ex-urban.
21        Q.   In your view did those commonalities
22   support uniting those communities in a compact
23   district?
24        A.   I see no reason why you can't.
25        Q.   And now looking at pages 78, starting at

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 218

1    78, you discussed with Mr. Tyson the illustrative
2    District 171, and specifically you were discussing
3    connections between Albany and Thomasville.  You
4    mentioned the Georgia Budget and Policy Institute
5    designation of counties as being in the Black Belt.
6    Did you consider that a connection between Albany
7    and Thomasville?
8            A.  Yes.
9            Q.  You mentioned the relevant proximity to one
10   another --
11           A.  Yes.  Highway 19.
12           Q.  You mentioned Highway 19, that connection
13   as well?
14           A.  Yes.
15           Q.  In just looking at Exhibit 10, the Regional
16   Commissions, do you view the placement of those
17   counties in Regional Commissions is a connection
18   that they share as well?
19           A.  They're both in southwest Georgia Regional
20   Commission, exactly.
21           Q.  And just looking at paragraph 200 of your
22   report, the socioeconomic analysis, you note
23   Dougherty, Thomas and Mitchell counties all have
24   comparatively high Black poverty rates.
25           A.  Yes.

William S. Cooper                    February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 219

1        Q.  Do you view that as a connection between

2    those areas as well?

3        A.  Yes.

4        Q.  Do you think those connections support

5    connecting those areas in the district?

6        A.  Absolutely.

7        Q.  You spoke to Mr. Tyson about plans being on

8    par with respect to splits.  If your plan had one or

9    two more county splits would you still conclude that

10   they're basically on par with one another?

11           MR. TYSON:  Object to the form.

12       A.  Yes.  I'm giving them the benefit of the

13   doubt.  We have one less split county in the Senate

14   plan and one less in the House plan.  So I'm still

15   saying they're on par.

16       Q.  But if your plan had one more than the

17   illustrative plan, would they still be -- I think

18   your words were basically on par?

19           MR. TYSON:  Object to the form.

20       A.  Yes.

21   BY MR. SAVITZKY:

22       Q.  If your plan had one or two more county

23   splits than the enacted plan, would you still be

24   confident that your plan is consistent with

25   traditional districting principles?

William S. Cooper                        February 10, 2023
Alpha Phi Alpha Fraternity, Inc. v. Raffensperger,

Page 221

1    imagine that an algorithm might be able to produce a

2    plan -- that may be crazy -- and someone could do

3    something from that, I don't know.

4        Q.  Mr. Cooper, did you prioritize race over

5    other traditional districting considerations in

6    drawing your illustrative map?

7        A.  Absolutely not.

8            MR. SAVITZKY:  That's all.

9                FURTHER EXAMINATION

10   BY MR. TYSON:

11       Q.  I have a few questions in response to that.

12   Mr. Cooper, Mr. Savitzky asked you about what

13   different things could form communities of interest.

14   Do you recall that?

15       A.  Yes.

16       Q.  Could cores of existing districts also form

17   a community of interest?

18       A.  If there were cores maybe that extend

19   beyond a handful of years, perhaps under certain

20   circumstances, sure.

21       Q.  And you considered the boundaries of Senate

22   District 12 to be a community of interest in a

23   region, didn't you?

24       A.  I did in the sense that it's a district

25   that you had enacted as part of your Senate plan.