IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| ALPHA PHI ALPHA FRATERNITY, INC., et al., | | CIVIL ACTION CASE |
| Plaintiffs, | | No. 1:21-CV-5337-SCJ |
| v. | | |
| BRAD RAFFENSPERGER, | | |
| Defendant. | | |

## ORDER

This matter appears before the Court on Secretary of State Raffensperger's Motion for Summary Judgment. Doc. No. [230]. [1] Plaintiffs responded in opposition (Doc. No. [244]), and the Secretary replied in support of his Motion (Doc. No. [252]). On May 18, 2023, the Court heard argument on the Motion. Doc. No. [257]. Following the Supreme Court's ruling in

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

Allen v. Milligan, 599 U.S. --, 143 S. Ct. 1487 (2023), the Parties submitted supplemental briefing. Doc. Nos. [262]; [263].

Defendant's Motion for Summary Judgment is now ripe for review. The inquiry into a vote dilution claim must involve a "comprehensive, not limited canvassing of relevant facts." Johnson v. De Grandy, 512 U.S. 997, 1011 (1994). The Court has thoroughly analyzed the Parties' Statements of Material Facts, the Record, and the Parties' arguments and ultimately determines that the Motion must be **DENIED**. Material questions of fact remain as to all aspects of Plaintiffs' claims, and the Court cannot rule for Defendant without making factual determinations, weighing evidence, and assessing the credibility of the experts. Unlike on a motion for a preliminary injunction, these determinations are impermissible on a motion for summary judgment.

\* \* \* \* \*

"The political franchise of voting . . . is regarded as a fundamental political right, because [it is] preservative of all other rights." Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886). The Supreme Court's "paramount concern has remained an individual and personal right—the right to an equal vote." Gaffney v. Cummings, 412 U.S. 772, 781 (1973) (Brennan, J., concurring). And the

2

"[p]assage of the Voting Rights Act of 1965 was an important step in the struggle to end discriminatory treatment of minorities who seek to exercise one of the most fundamental rights of [American] citizens: the right to vote." Bartlett v. Strickland, 556 U.S. 1, 10 (2009).

In the intervening 58 years since the passage of the Voting Rights Act ("VRA") and 37 years since its most substantive amendment, that law has ensured that minority voters have an equal opportunity to participate in elections and elect candidates of their choice. Specifically, Section 2 was enacted to forbid, in all 50 States, any "standard, practice, or procedure . . . imposed or applied . . . to deny or abridge the right of any citizen of the United States to vote on account of race or color." Shelby Cnty. v. Holder, 570 U.S. 529, 536 (2013). As Chief Justice Roberts opined a decade ago, "Section 2 applies nationwide [and] is permanent . . . ." Id. at 537.

Approximately 17 months ago, the Court presided over a preliminary injunction hearing—coordinated with two related cases[2]—where various

---

[2] Coakley Pendergrass, et al. v. Brad Raffensperger, et. al., No. 1:21-cv-5339, Doc. Nos. [90]–[95] (N.D. Ga. Feb. 7, 2022) ("Pendergrass"); Annie Lois Grant, et al. v. Brad Raffensperger, et al., No. 1:22-cv-122, Doc. Nos. [84]–[89] (N.D. Ga. Feb. 7, 2022) ("Grant").

Plaintiffs challenged Georgia's congressional, State Senate, and State House of Representative maps, which had been enacted in 2022 following the 2020 Decennial Census. Doc. Nos. [126]–[131]. During the six-day hearing, the Court heard from various fact and expert witnesses about whether the enacted Georgia maps violated Section 2 of the VRA. After carefully weighing the evidence and determining the credibility of the expert witnesses, the Court denied Plaintiffs' Motion for a Preliminary Injunction in all three cases because it was too close to the scheduled primary elections to implement any changes to Georgia's electoral maps. Alpha Phi Alpha Fraternity, Inc. v. Raffensperger, 587 F. Supp. 3d 1222, 1326–27 (N.D. Ga. 2022). However, the Court also found that Plaintiffs in the coordinated cases had a substantial likelihood of success in proving that Georgia violated Section 2 of the VRA by failing to draw a majority-Black congressional District in the western Atlanta metropolitan area, two additional majority-Black State Senate Districts in the southeastern Atlanta metro area, and two additional majority-Black House Districts in the Atlanta metro area and one in southwestern Georgia. Id. at 1320.

4

The Court begins this Order with a brief overview of the legal developments since the Court issued its order addressing the preliminary injunction motions.

In January of 2022, minority voters in Alabama challenged Alabama's congressional maps. Singleton v. Merrill, 582 F. Supp. 3d 924 (N.D. Ala. 2022). A three-judge court held a preliminary injunction hearing regarding whether the legislature should have drawn a second majority-minority district in Alabama. Id. The three-judge court ruled that Plaintiffs had a substantial likelihood of success in proving that Alabama's congressional map violated Section 2 of the VRA and issued a preliminary injunction, ordering the legislature to redraw the congressional map with a second majority-Black district. Id. at 1026. Alabama moved for a stay of the injunction. Merrill v. Milligan, 142 S. Ct. 879 (2022).[3] The Supreme Court, without opinion, granted the stay. Id. Concurring in the stay, Justice Kavanaugh opined that the three-judge court should have abstained from granting the injunction because it was too close to Alabama's primary election

_____

[3] The Allen case was initially filed under the caption Merrill v. Milligan. On January 26, 2023, the State moved to remove the secretary of state (John H. Merrill) from the action and substitute his successor (Wes Allen). See Notification Regarding Substitution of Party Pursuant to S. Ct. R. 35.3, Allen v. Milligan, 143 S. Ct. 1487 (2023), (No. 21-1086).

date. Id. at 879–82. In other words, Alabama would be forced to change its primary election date to effectuate the injunction. Id. at 880–81. And, under Purcell v. Gonzalez, 549 U.S. 1 (2006), federal courts should abstain from making rulings that would force the State to change its election procedures. Id. Specifically, "[l]ate judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others. It is one thing for a State on its own to toy with its election laws close to a State's elections." Id. at 881. The Supreme Court also *sua sponte* converted the motion to stay into a writ of certiorari, which it granted and added the case to its October 2022 term. Id. at 879.

Following briefing and oral argument, on June 8, 2023, the Supreme Court ruled on whether Black Alabama voters proved that they had a substantial likelihood of success in showing that Alabama's congressional map diluted the Black population's vote in Alabama's Black belt region. Allen, 143 S. Ct. 1487. A majority of the Court found the State should have drawn a second majority-Black district. Id. Chief Justice Roberts delivered the opinion of the Court, a 5-4 decision, affirming the three-judge court's order finding that Plaintiffs had a substantial likelihood of success in proving that Alabama's

current congressional map violated Section 2 of the VRA. Id. at 1504. In the majority opinion, the Chief Justice left the Thornburg v. Gingles, 478 U.S. 30 (1986) test virtually untouched:

> Gingles has governed our Voting Rights Act jurisprudence since it was decided 37 years ago. Congress has never disturbed our understanding of § 2 as Gingles construed it. And we have applied Gingles in one § 2 case after another, to different kinds of electoral systems and to different jurisdictions in States all over the country.

Id. Thus, when asked to create a new, race-neutral test for deciding whether an electoral map violates Section 2 of the VRA, the majority of the Justices declined to do so. Id. at 1510–12. The plurality opinion [4] states that "Alabama's [race-neutral] approach fares poorly" when "operat[ing] in practice" "which further counsels against [ ] adopting it." Id. at 1510. Specifically, the plurality notes that "Section 2 itself 'demands consideration of race.' The question whether

---

[4] "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." Marks v. United States, 430 U.S. 188, 193 (1977) (cleaned up). But see Horton v. Zant, 941 F.2d 1449, 1464 n.32 (11th Cir. 1991) ("[P]lurality opinions are not binding on [the Eleventh Circuit]; however, they are persuasive authority."). Part III-B-1 of Allen is not the Court's holding; rather it is the Court's reasoning for rejecting a part of Alabama's proposed test. Thus, the Allen majority's holding is binding.

additional majority-*minority* districts can be drawn, after all, involves a 'quintessentially race-conscious calculations.'" Id. (emphasis in original) (citing Abbott v. Perez, 585 U.S. at ---, 138 S. Ct. 2305, 2315 (2018); De Grandy, 512 U.S. at 1020). Thus, a race-neutral approach for determining a Section 2 violation is not consistent with the text of the statute. Second, the majority declined to add a "condition [that] . . . would . . . requir[e] that plaintiffs demonstrate, at the totality of the circumstances stage, that the State's enacted plan contains fewer majority-minority districts than the race-neutral benchmark." Id. at 1512. Finally, the majority declined to require Plaintiffs to prove that "race-neutral alternatives" to the State's enacted plan "c[ould] be explained *only* by race" because it conflicted with the "precedents and the legislative compromise struck in the 1982 amendments[, which] clearly rejected treating discriminatory intent as a requirement for liability under § 2." Id. at 1514.

Justice Kavanaugh's concurrence likewise rejected Alabama's attempt to create a new Section 2 vote dilution test. He reasoned that under the doctrine of statutory *stare decisis*, "'the Court has ordinarily left the updating or correction of erroneous statutory precedents to the legislative process.'" Id. at 1517 (Kavanaugh, J., concurring) (quoting Ramos v. Louisiana, 140 S. Ct. 1390, 1413

(2020)). He also rejected that the <u>Gingles</u> test requires that the number of majority-minority[5] districts be proportional to the minority population because under that formulation, "States would be forced to group together geographically dispersed minority voters into unusually shaped districts," which is not the test.[6] <u>Id.</u> at 1518. Finally, Justice Kavanaugh refused to address the constitutional question of whether Section 2 should continue to extend into the future because it was not raised before the Court.[7] <u>Id.</u> at 1519.

_____

[5] The Court takes judicial notice that the parties in <u>Grant</u>, Doc. No. [192], ¶ 58 agree that "[m]ap-drawers distinguish 'majority-minority' from 'majority-Black.' Majority-minority districts have a majority of non-white and Latino voters, while majority-Black districts are districts where Black voters as a single race category constitute a majority of a district." The Court clarifies that as a legal term of art, majority-minority districts and opportunity districts can refer to districts where a single-minority group makes up the majority of a particular district. <u>See</u> <u>Allen</u>, 148 S. Ct. at 1506–1514 (using the term majority-minority districts to describe districts where the Black population, alone, exceeded 50% of the proposed district); <u>Abbott</u>, 138 S. Ct. at 2315 ("[i]n a series of cases tracing back to <u>Gingles</u>, we have interpreted this standard to mean that, under certain circumstance, States must draw 'opportunity' districts in which minority groups form 'effective majorit[ies].'") (cleaned up). Thus, when the Court uses the term majority-minority districts it encompasses majority-Black districts.

[6] Justice Kavanaugh also rejected Alabama's suggestion for reliance on a race-blind computer simulation to prove a Section 2 violation because intentional discrimination is not the test under the VRA. <u>Allen</u>, 142 S. Ct. at 1518.

[7] Justice Kavanaugh made this point in response to Justice Thomas's dissent. <u>Allen</u>, 143 S. Ct. 1519. Justice Thomas wrote that "the amended § 2 lacks any such salutary limiting principles; it is unbounded in time, place, and subject matter, and its

In summary, the majority of the Supreme Court Justices held that Section 2 jurisprudence, in its current formulation, continues to be the law. And all five Justices in the majority rejected Alabama's request to create a new vote dilution test.

With this history in mind, the Court now enters the following Order on Defendant's Motion for Summary Judgment (Doc. No. [230]).[8]

---

districting-related commands have no nexus to any likely constitutional wrongs . . . . Such a statute 'cannot be considered remedial, preventative legislation,' and the race-based redistricting it would command cannot be upheld under the Constitution." Id. at 1544 (Thomas, J. dissenting) (citing City of Boerne v. Flores, 521 U.S. 507, 532 (1997)).

[8] Following Allen, the Supreme Court summarily dismissed another Section 2 redistricting case, Ardoin v. Robinson, No. 22-30333, as a writ of certiorari improvidently granted. Doc. No. [264], 8. Plaintiffs argue that the dismissal supported Plaintiffs' supplemental response. Id. at 3. Defendant argues that the dismissal offers no precedential value. Doc. No. [267]. The Court takes judicial notice that the Supreme Court dismissed Ardoin as improvidently granted. The Court also finds that the dismissal has no precedential value and neither supports nor undermines Plaintiffs' position.

## I.       BACKGROUND[9]

On December 30, 2021, Plaintiffs Alpha Phi Alpha Fraternity, Inc., Sixth

District of the African Methodist Episcopal Church, Eric Woods, Katie Bailey

Glenn, Phil Brown, and Janice Stewart filed the instant Section 2 of the VRA claim

against Defendant. Doc. No. [1].[10] Plaintiffs seek injunctive relief against the

enacted legislative plans (SB 1EX and HB 1EX, collectively "Enacted Plans").

Doc. No. [141], ¶¶ 3, 58. As stated above, the Court held a preliminary injunction

hearing on Plaintiffs' initial Complaint. Doc. Nos. [126]–[131]. The Court

ultimately denied Plaintiffs' motion because, in light of the upcoming primaries,

_____

[9]  The Court derives the following facts from the Parties' submissions (Doc. Nos. [230-1];
[231]; [245]; [246]; [252]; [253]) and the Record. Pursuant to Local Rule 56.1(B), when a
fact is undisputed, the Court includes the fact. For the disputed facts, the Court reviews
the Record to determine if a dispute exists and, if so, whether the dispute is material. If
the dispute is not material, the Court cites the fact and the opposing party's response.
Where the dispute is material and the opposing party's response reflects the Record
more accurately, the Court modifies the proposed fact and cites the Record. The Court
also rules on objections to proposed facts and excludes immaterial facts, those stated as
an issue or legal conclusion, those not supported by a citation to evidence, or those that
the Record citation fails to support. Finally, where appropriate, the Court includes facts
drawn from its review of the Record.

To the extent that any party has filed specific objections to the facts cited in this
Order, the Court has overruled said objection by the inclusion of the fact in this Order
(or otherwise specified the purpose for which the Court considered the fact).

[10]  Plaintiffs amended their Complaint following the Court's Preliminary Injunction
Order. Doc. No. [141].

the balance of harms and public interest weighed in favor of denying the preliminary injunction. Alpha Phi Alpha, 587 F. Supp. 3d at 1324–27. Nevertheless, the Court also found that the Plaintiffs were likely to succeed on the merits of their claim regarding the creation of an additional House district in southwestern Georgia. Id. at 1294–1302.[11]

In 2020, the United States Census Bureau conducted the Decennial Census. The 2020 Census results were released in September 2021. Doc. No. [246], ¶ 1. The Census data reflected that Georgia's Black population[12] increased by 484,048 between 2010 and 2020, and the share of the state-wide Black population increased from 31.53% to 33.03%. Doc. No. [231-1] ("Cooper Rep."), ¶ 41, fig. 2. Between 2000 and 2020, the any-part Black population in the metro Atlanta

---

[11]  As noted in its Preliminary Injunction Order, the Court did not offer any ruling on Plaintiffs' challenged metro Atlanta Senate and House districts because the Court found that the Grant Plaintiffs were likely to succeed on their challenged districts in similar areas of the State. Alpha Phi Alpha, 587 F. Supp. 3d at 1267–68.

[12]  The Court uses the any-part Black or any-part Black voting age population ("APBVAP") for purposes of determining numerosity. "[I]t is proper to look at *all* individuals who identify themselves as [B]lack in their census responses, even if they "self-identify as both [B]lack and a member of another minority group," because the inquiry involved "an examination of only one minority group's effective exercise of the electoral franchise." Georgia v. Ashcroft, 539 U.S. 461, 473 n.1 (2003), superseded by statute in other part, Ala. Legis. Black Caucus v. Alabama, 575 U.S. 254, 276–77 (2015).

region increased by 938,006 from 1,248,809 to 2,186,815, an increase of more than 75%. Doc. No. [246] ¶ 32.[13]

The Enacted Plans were passed by the House Legislative and Congressional Reapportionment Committee along racial and party lines. Id. at ¶¶ 9, 10. Two weeks later, they were passed by the General Assembly, largely on

_____

[13]  Defendant objected to this fact stating that "[t]he fact does not comply with LR 56.1(B)(1) because it is not separately numbered." Doc. No. [253], ¶ 11. Local Rule 56.1(B)(1) provides:

> A movant for summary judgment shall include with the motion and brief a separate, concise, numbered statement of the material facts to which the movant contends there is no genuine issue to be tried. Each material fact must be numbered separately and supported by a citation to evidence proving such fact. The Court will not consider any fact: (a) not supported by a citation to evidence (including page or paragraph number); (b) supported by a citation to a pleading rather than to evidence; (c) stated as an issue or legal conclusion; or (d) set out only in the brief and not in the movant's statement of undisputed facts.

LR 56.1(B)(1),(3) NDGa. For purposes of this case, under the Court's inherent authority, all objections to Plaintiff's Statement of Material Facts on the basis that the factual assertions were not separately numbered are overruled. The Court has reviewed all objections and finds that Plaintiffs have followed the spirit, if not the letter, of the Local Rule in all instances.

Defendant also objected on the basis that the level of growth is immaterial. The Court overrules the objection. The Court finds that the location of the Black population and its growth is relevant to totality of the circumstances inquiry.

party lines. Id. at ¶ 11. On December 30, 2021, Governor Kemp signed Sthe Enacted Plans into law. Id. at ¶ 12.

Plaintiffs have submitted illustrative State Senate and House of Representative plans (the "Illustrative Plans") to the Court that create three additional majority-Black Senate districts—one in the eastern Black Belt and two in south metro Atlanta ("Proposed Senate Districts"). Id. at ¶ 204. Plaintiffs also proposed five additional majority-Black House Districts—two in south metro Atlanta, one in the eastern Black Belt, one in the western Black Belt, and one in metro Macon ("Proposed House Districts"). Id.[14]

The core of the instant Motion for Summary Judgment is whether the Record contains sufficient evidence to show that the Enacted Plans diluted the strength of Black voters in the Proposed Districts in violation of Section 2. The Illustrative Plans purport to show that additional majority-Black districts could have been drawn in the above-listed areas. Id. Defendant, in essence, argues that the Illustrative Plans are not sufficiently compact to support a Section 2 violation. Doc. No. [230-1], 16–18.

---

[14] The Proposed Senate Districts and Proposed House Districts are collectively referred to as the "Proposed Districts."

14

Plaintiffs have also submitted evidence of racial polarization in voting. It is undisputed that "[i]n the seven areas of Georgia that Plaintiffs' expert, Dr. Handley, analyzed, she found that, in statewide elections, 'the average percentage of Black vote for the 16 Black-preferred candidates is 96.1%.'" Doc. No. [246], ¶ 166. And, "[i]n [the] 54 state legislative[] [districts] that Dr. Handley analyzed, over 90% of Black voters supported their Black candidates." Id. ¶ 168. Meanwhile, "[i]n the seven areas of Georgia that Dr. Handley analyzed, she found that, in statewide elections, the average percentage of White vote for the[] 16 Black-preferred candidates . . . is 11.2%." Id. ¶ 167. (internal citations omitted). Additionally, Senator Kennedy, the Chairman of the Senate Committee on Reapportionment and Redistricting, stated that "we do have racially polarized voting in Georgia." Id. ¶ 174. Defendant does not contest the veracity of Dr. Handley's findings; rather, he argues that this evidence can be equally attributable to partisan preferences, which is not actionable under Section 2. Doc. No. [230-1], 18–32.

The Court held a hearing on the Motions (and the motions in the related cases) on May 18, 2023. Doc. No. [257]. The Parties each submitted supplemental briefing following the Supreme Court's opinion in Allen. Doc. Nos. [262], [263].

15

After having the benefit of full briefing and argument on these motions, the Court now resolves Defendant's Motion.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute is genuine if the evidence allows a reasonable jury to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party meets its burden merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S.

16

at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the non-moving party. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by showing specific facts of a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court should resolve all reasonable doubts in the nonmovant's favor. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000). When the record could not lead a rational trier of fact to find for the non-moving party, there is no genuine dispute for trial. Fitzpatrick, 2 F.3d at 1115 (citations omitted).

17

### III.      ANALYSIS

The Court finds that Defendant has not shown that he is entitled to judgment as a matter of law as it relates to the three <u>Gingles</u> preconditions.[15] Section 2 of the VRA provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That

---

[15] While the Court denies Defendant's Motion for Summary Judgment, the Parties may still stipulate to the numerous undisputed facts for purposes of trial. <u>Cf. also</u> Fed. R. Civ. P. 65(a)(2) ("[E]vidence that is received on the [preliminary injunction] motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial.").

> nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301(a)–(b).

"Voting rights cases are inherently fact intensive[.]" <u>Nipper v. Smith</u>, 39 F.3d 1494, 1498 (11th Cir. 1994). This is especially true in:

> [S]ection 2 vote dilution claims alleging that, due to the operation of a challenged voting scheme, minority voters are denied an equal opportunity to participate in the political process and to elect representatives of their choice. In such cases, courts must conduct a "searching practical evaluation of the 'past and present reality'" of the electoral system's operation.

<u>Id.</u> (quoting <u>Gingles</u>, 478 U.S. at 45). "[B]ecause a claim of voting dilution must be evaluated with a functional, rather than a formalistic, view of the political process, the Supreme Court has emphasized the importance of "'an intensely local appraisal of the design and impact' of the electoral structure, practice, or procedure at issue." <u>Id.</u> (quoting <u>Gingles</u>, 478 U.S. at 79); <u>see also</u> <u>Rogers v. Lodge</u>, 458 U.S. at 613, 621 (1982). It is this intensely local appraisal and the fact-intensive nature of vote dilution cases that lead the Court to conclude that this case must proceed to trial.

19

In order to prevail on a Section 2 claim, Plaintiffs must satisfy three "preconditions." Gingles, 478 U.S. at 50. First, the "minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district . . . ." Wisc. Legis. v. Wisc. Elections Comm'n, 595 U.S. ---, 142 S. Ct. 1245, 1248 (2022) (per curiam) (citing Gingles, 478 U.S. at 50–51).[16] "Second, the minority group must be able to show that it is politically cohesive." Gingles, 478 U.S. at 51. And third, "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." Id. Finally, a plaintiff who demonstrates the three preconditions must also show, under the "totality of circumstances," that the political process is not "equally open" to minority voters (using the Senate Factors). Id. at 45–46; see also id. at 36–38 (identifying several

_____

[16]  In supplemental briefing, Defendant "agree[s] with how Justice Alito proposes to address [racial predominance]." Doc. No. [263], 11. That is, Defendant argues that a "plaintiff must 'show at the outset that such a[n additional majority-minority] district can be created without making race the predominant factor in its creation.'" Id. at 11 (alteration in original) (quoting Allen, 143 S. Ct. at 1551 (Alito, J., dissenting)). To the extent that Defendant argues that Plaintiffs have to show, as part of the first Gingles precondition, that race did not predominate the drawing of the Illustrative Plans, the Court agrees. The Court, however, declines to adopt the test as defined in Justice Alito's dissent in toto.

factors relevant to the totality of circumstances inquiry, including "the extent of any history of official discrimination in the state . . . that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process").

### A.    First *Gingles* Precondition

Under the first <u>Gingles</u> precondition, Plaintiffs must prove that the minority group exceeds 50% in the challenged area and that the minority group is sufficiently compact to draw a reasonably configured district. <u>Wisc. Legis.</u>, 142 S. Ct. at 1248. "A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact." <u>Allen</u>, 143 S. Ct. at 1503 (citing <u>Ala. Legis. Black Caucus</u>, 575 U.S. at 272). To determine whether Plaintiffs have met the numerosity and compactness requirements, the Court must evaluate the specific challenged district and not the state as a whole. <u>Cf.</u> <u>Ala. Legis. Black Caucus</u>, 575 U.S. at 268 ("[T]he District

21

Court's analysis of racial gerrymandering of the State, [under [the Equal Protection Clause], 'as a whole' was legally erroneous.").[17]

### 1.    *Racial Predominance*

First, the Court rejects Defendant's argument that Plaintiffs' expert, Mr. Cooper's use of racial shading alone is fatal to Plaintiffs' claim. Defendant argues that the Legislature could not have used racial shading when it drew the Enacted Plans; therefore, Plaintiffs are also precluded from using racial shading when drawing Illustrative Plans. Doc. No. [230-1], 16–17. Defendant also argues that race *per se* predominates if an expert uses racial shading. See Doc. No. [263], 7 ("If the Legislature had used racial shading, did not use political data, and drew without reviewing any public comments, it would be accused of racial gerrymandering.").[18]

_____

[17]  Although Alabama Legislative Black Caucus concerned constitutional redistricting challenges, the Supreme Court applied its analysis to a Section 2 challenge in Allen. Allen, 143 S. Ct. at 1503, 1519.

[18]  Whether Defendant is accused of racial gerrymandering or if the Enacted Plans is, in fact, gerrymandered, constitute two different inquiries. The Supreme Court acknowledged that a State's awareness of race when it draws its districts is not *per se* racial gerrymandering. "[W]e have assumed that compliance with the VRA may justify the consideration of race in a way that would not otherwise be allowed . . . complying with the VRA is a compelling state interest, and that a State's consideration of race in

Precedent directs this Court to evaluate whether race impermissibly *predominated* the drawing of the Illustrative Plans or whether the Illustrative Plans are simply race-conscious. "The contention that mapmakers must be entirely 'blind' to race has no footing in our § 2 case law. The line that we have long drawn is between consciousness and predominance." Allen, 143 S. Ct. at 1512 (plurality). Defendant's argument, however, conflicts with this existing precedent. See Davis v. Chiles, 139 F.3d 1414, 1425–26 (11th Cir. 1998) (finding clear error in the district court's finding of racial predominance based on an expert's testimony that he was asked to draw additional majority-minority districts in an area with a high concentration of Black citizens).

The Court finds that it would need to make both fact and credibility determinations before it can decide whether race predominated the creation of the Proposed Districts. In this regard, Mr. Cooper testified that race did not predominate when he drew the Proposed Districts. Mr. Cooper testified that, at

---

making a districting decision is narrowly tailored and thus satisfies strict scrutiny." Abbott v. Perez, 585 U.S.---, 138 S. Ct. 2305, 2315 (2018). "[T]he legislature always is *aware* of race when it draws district lines . . . . That sort of race consciousness does not lead inevitably to impermissible race discrimination." Shaw v. Reno, 509 U.S. 630, 646 (1993). Thus, because the State is not prohibited from reviewing racial demographics and considering race when it draws its legislative maps, neither is Plaintiffs' expert.

times, he "utilize[d] little dots to show where the precincts are that are say 30 percent or over Black." Doc. No. [221] ("Cooper Dep. Tr."), Tr. 60:15–18. Mr. Cooper also testified that he complied with traditional redistricting principles when he drew the Illustrative Plans. Id. 47:10–15. His expert report states that "[t]he illustrative plans comply with traditional redistricting principles, including population equality, compactness, contiguity, respect for communities of interest, and the non-dilution of minority voting strength." Cooper Rep., ¶ 10. Additionally, it is undisputed that Mr. Cooper considered the same guidelines that the Georgia House Legislative and Congressional Reapportionment Committee used. Doc. No. [246], ¶ 76.

There is Record evidence that Mr. Cooper was both aware of race when he drew the Illustrative Plans and that he took additional factors into consideration when drawing them. As the Eleventh Circuit stated in Davis:

> precedent[] *require[s]* plaintiffs to show that it would be possible to design an electoral district, consistent with traditional districting principles, in which minority voters could successfully elect a minority candidate. To penalize Davis, as the district court has done, for attempting to make the very showing [required] . . . would be to make it impossible, as a matter of law, for any plaintiff to bring a successful Section Two action.

139 F.3d at 1425. Thus, Mr. Cooper's awareness of race, in conjunction with his evaluation of traditional redistricting principles, is consistent with Eleventh Circuit precedent.[19]

Mr. Cooper's awareness of race is distinguishable from Miller v. Johnson, 515 U.S. 900, 919 (1995), where the Supreme Court analyzed congressional districts in which there was "powerful evidence" that "every [objective districting] factor that could realistically be subordinated to racial tinkering in fact suffered that fate." (alteration in original) (quoting Johnson v. Miller, 864 F. Supp. 1354, 1384 (S.D. Ga. 1994)). In Miller, there was evidence that under the former preclearance regime, the DOJ rejected Georgia's congressional plan because there were not enough majority-minority districts. Miller, 515 U.S. at 906–07. During the preclearance process, a DOJ line attorney testified that he

_____

[19] Plaintiffs contend:

> the record on which the Supreme Court premised its holding, in [Allen] was similar to the record here. There, as here plaintiffs' illustrative maps included plans drawn by Mr. Cooper . . . . There, as here, Mr. Cooper's plans meet or beat the enacted plans with respect to objective metrics . . . . There, as here, plaintiffs were able to point to factors in addition to race that supported the illustrative plans.

Doc. No. [262], 9–10. These determinations require weighing and evaluating facts in a manner inappropriate for summary judgment.

25

took "[a] map of the State of Georgia shaded for race, shaded by minority concentration, and overla[id] the districts that were drawn by the State of Georgia and [saw] how well those lines adequately reflected black voting strength.'" Id. at 925 (quoting Johnson, 864 F. Supp. at 1362 n.4) (cleaned up). Georgia's representatives testified that they redrew the offending district to comply with DOJ's preclearance determination. Miller, 515 U.S. at 924–25. The Supreme Court found a Fourteenth Amendment violation and expressly rejected DOJ's "maximization policy" that was the basis for drawing the districts in Miller. Id. at 926–27.

Having the benefit of a fully developed trial record, factual findings, and credibility determinations, the Supreme Court found that race predominated the drawing of the district in Miller. At the present stage of this case, Record evidence indicates that Mr. Cooper had access to and was aware of racial demographics, but Mr. Cooper also testified that race did not predominate the drawing of the Proposed Districts and that he considered traditional redistricting principles. Because being aware of racial demographics is not *per se* impermissible, and Mr. Cooper testified to complying with traditional redistricting principles when drawing the Proposed Districts, any determination that race predominated turns

26

on Mr. Cooper's credibility. <u>Davis</u>, 139 F.3d at 1425. Because the Court is evaluating a motion for summary judgment where such credibility determinations are inappropriate, the Court cannot grant Defendant's Motion.

### 2. *Compactness*[20]

Second, there is Record evidence about the compactness of the minority population in the Proposed Districts. "Under § 2 . . . the compactness inquiry considers 'the compactness of the minority population, not . . . the compactness of the contested district.'" <u>League of United Latin Am. Citizens v. Perry</u>, 548 U.S. 399, 408 (2006) ("<u>LULAC</u>") (quoting <u>Bush v. Vera</u>, 517 U.S. 952, 997 (1996)). A district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact. <u>Id.</u> (quoting <u>Vera</u>, 517 U.S. at 979).

Defendant argues that "Plaintiffs have presented no evidence of the geographic compactness of the Black community in the proposed new districts aside from the fact that they are drawn." Doc. No. [230-1], 17. The Court

---

[20] In order to satisfy the first <u>Gingles</u> precondition, a plaintiff has to prove both that the minority population exceeds 50% in the affected area and that the minority population is compact. <u>Wisc. Legis.</u>, 142 S. Ct. at 1248. Defendant has not challenged the numerosity requirement; rather, his arguments all relate to the compactness of the Proposed Districts. Doc. No. [230-1], 16–18. Therefore, the Court will evaluate only the Proposed Districts' compactness.

disagrees. As discussed below, there is Record evidence that the APBVAP in the Proposed Districts is comparatively as compact as the Enacted Plans. The relevant factors for compactness under the first <u>Gingles</u> precondition include population equality, contiguity, empirical compactness scores of the Illustrative District, the eyeball test for irregularities and contiguity, respect for political subdivisions, and uniting communities of interest. <u>See</u> <u>Reynolds</u>, 377 U.S. at 598 (population equality); <u>LULAC</u>, 548 U.S. at 433 (communities of interest); <u>Vera</u>, 517 U.S. at 959–60 (contiguity, eyeball test); <u>Cooper v. Harris</u>, 581 U.S. 285, 291, 312 (2017) (political subdivisions, partisan advantage, empirical compactness measures).

### a)   Objective compactness metrics

There is evidence in the Record the Illustrative Senate Districts have a maximum population deviation of 1%, and the Illustrative House Districts have a maximum population deviation of 1.5%. Doc. No. [246], ¶ 83.[21] Defendant does

---

[21] Defendant substantively objected to this statement of fact because "Mr. Cooper testified that the population deviations he used on the House plan was [sic] higher than that of the enacted plan." Doc. No. [253], ¶ 83. Upon review of the citation to the Record, Mr. Cooper's deposition testimony does not contradict the statement that he limited population deviation to 1.5% for the Illustrative House Districts; rather, it simply states

not argue that Mr. Cooper's Illustrative Plans fail to comply with the contiguity requirement. Finally, Mr. Cooper's Report details the comparative compactness scores [22] between the Enacted Plans' districts and the Proposed Districts. [23]

_____

that the Illustrative Plan has a "slightly higher" population deviation than the Enacted House Plan. Cooper Dep. Tr. 200:7–11. Throughout his deposition, Mr. Cooper testified that he used a population deviation cap of 1.5% for the House plan. See id. 62:2–7; 73:1–4. Accordingly, the Court overrules the objection to the statement that all Illustrative House Districts have a maximum population deviation of 1.5%.

[22] Mr. Cooper utilized the Reock test and Polsby-Popper test to assess the numerical compactness of his districts. "The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact." Alpha Phi Alpha, 587 F. Supp. 3d at 1275 n.24. "The Polsby-Popper test computes the ratio of the district area to the area of a circle with the same perimeter: $4\pi\text{Area}/(\text{Perimeter}^2)$. The measure is always between 0 and 1, with 1 being the most compact." Id. at n.26.

[23] Enacted SD-17 has a Reock score of 0.35 and a Polsby-Popper score of 0.17; Illustrative SD-17 has a Reock score of 0.37 and a Polsby-Popper score of 0.17; Enacted SD-23 has a Reock score of 0.37 and a Polsby-Popper score of 0.16; Illustrative SD-23 has a Reock score of 0.37 and a Polsby-Popper score of 0.16; Enacted SD-28 has a Reock score of 0.45 and a Polsby-Popper score of 0.25; Illustrative SD-28 has a Reock score of 0.37 and a Polsby-Popper score of 0.18; Enacted HD-74 has a Reock score of 0.50 and a Polsby-Popper score of 0.25; Illustrative HD-74 has a Reock score of 0.63 and a Polsby-Popper score of 0.36; Enacted HD-117 has a Reock score of 0.41 and a Polsby-Popper score of 0.28; Illustrative HD-117 has a Reock score of 0.41 and a Polsby-Popper score of 0.26; Enacted HD-133 has a Reock score of 0.55 and a Polsby-Popper score of 0.42; Illustrative HD-133 has a Reock score of 0.26 and a Polsby-Popper score of 0.20; Enacted HD-145 has a Reock score of 0.38 and a Polsby-Popper score of 0.19; Illustrative HD-145 has a Reock score of 0.25 and a

Therefore, the Court finds that there is evidence in the Record about the compactness of the Proposed Districts. A determination on whether the Proposed Districts are, in fact, compact cannot be decided as a matter of law; it is a question of fact that the Court must determine after a trial.

Despite this evidence, Defendant advances arguments challenging the relative compactness of Mr. Cooper's Proposed Districts in comparison to the Enacted Plans. Doc. No. [263], 8–11. Defendant argues that "Mr. Cooper's illustrative plans[,] in this case[,] are thus categorically different than the plans in Allen. They split more counties, have higher deviations, and have features that are unexplainable on grounds other than race." Id. at 10. The Court acknowledges that the Illustrative Plans differ from those in Allen. However, precedent makes clear that questions about redistricting under Section 2 are "'intensely local appraisal[s] of the design and impact' of the contested electoral mechanisms." Gingles, 478 U.S. at 79 (quoting Rogers, 458 U.S. at 621–22). The three-judge court in Allen concluded that the proposed district satisfied the first

_____

Polsby-Popper score of 0.22; Enacted HD-171 has a Reock score of 0.35 and a Polsby-Popper score of 0.37; Illustrative HD-171 has a Reock score of 0.28 and a Polsby-Popper score of 0.20. Doc. Nos. [231-3], 6–7, 20–21; [231-4], 154–58, 163–67.

<u>Gingles</u> precondition after it evaluated facts and made credibility determinations. <u>Allen</u>, 143 S. Ct. at 1504. At this stage, the Court cannot make a finding of fact that the Proposed Districts are not compact.

### b)   <u>Eyeball test</u>

The eyeball test is commonly utilized to determine if a district is compact or not. <u>See</u> <u>Allen</u>, 143 S. Ct. at 1528 n.10  (quoting  <u>Singleton</u>, 582 F. Supp. 3d at 1011) (crediting the district court's findings that the illustrative maps were compact because they did not contain "tentacles, appendages, bizarre shapes or any other obvious irregularities"). The use of any "eyeball test" to assess irregularities, however, is necessarily a matter for the factfinder. <u>See</u> <u>Ala. State Conf. of NAACP v. Alabama</u>, 612 F Supp. 3d 1232, 1266 (M.D. Ala. 2020); <u>Comm. for a Fair and Balanced Map v. Ill. State Bd. of Elections</u>, 835 F. Supp. 2d 563, 570 (N.D. Ill. 2011). Thus, questions of fact remain that cannot be resolved on summary judgment.

### c)   <u>Respect for political subdivisions</u>

There is a material dispute of fact as to whether Mr. Cooper respected existing political subdivisions. Plaintiffs assert, and Defendant disputes, that "[i]n drawing the Illustrative Plans, Mr. Cooper 'made every effort to avoid

31

splitting' counties and voting districts." Doc. No. [246], ¶ 78; Doc. No. [253], ¶ 78. Mr. Cooper's Report states that the Illustrative Senate Plan contained 57 total County splits and 38 VTD[24] splits compared to the Enacted Plan, which had 65 total County splits and 86 VTD splits. Cooper Rep., 53, fig. 21. Mr. Cooper's Report also states that the total number of county and VTD splits is identical between the Illustrative House and Enacted House Plans. Id. at 86, fig. 37. The Court finds that the determination of whether Mr. Cooper respected political subdivisions goes both to disputes of fact and  a credibility, which cannot be made on summary judgment stage.

### d)   <u>Communities of interest</u>

Defendant also argues that Mr. Cooper could identify practically nothing beyond race of the voters in a number of his districts that united them . . . ." Doc. No. [230-1], 18. Defendant disputes that "[w]ith respect to maintaining communities of interest, Mr. Cooper in drawing the Illustrative Plans took into account 'transportation corridors,' 'maintaining existing jurisdictional boundaries like counties and precincts,' 'municipalities,' 'core-based statistical

---

[24] "'VTD' is a Census Bureau term meaning 'voting tabulation district.' VTDs generally correspond to precincts." Cooper Rep., ¶ 11 n.4.

areas,' 'regional commissions,' 'socioeconomic connections or commonalities,' and 'historical or cultural connections.'" Doc. No. [246], ¶ 86.

The case law is not clear about what constitutes a community of interest. In <u>LULAC</u>, the Supreme Court noted, "[w]hile no precise rule has emerged governing § 2 compactness, the 'inquiry should take into account traditional redistricting principles such as maintaining communities of interest and traditional boundaries.'" <u>LULAC</u>, 548 U.S. at 433 (quoting <u>Abrams v. Johnson</u>, 521 U.S. 74, 92 (1992)). The Court went on to reason that "in some cases members of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity." <u>Id.</u> at 435 (citing <u>Abrams</u>, 521 U.S. at 111–12 (Breyer, J., dissenting)). However, race being the only uniting factor between Latino communities that are 300 miles apart, without more, was not a sufficient compactness finding under Section 2. <u>Id.</u> "The mathematical possibility of a racial bloc does not make a district compact." <u>Id.</u>[25]

_____

[25] Factors that have been considered by Courts in the past include: socio-economic status, education, employment and health. <u>LULAC</u>, 548 U.S. at 433 (quoting the district court's decision). Other considerations may included shared media sources, public transportation infrastructure, schools, and places of worship. <u>Vera</u>, 514 U.S. at 964.

Although a definitive test has not emerged, it is abundantly clear that the determinations about communities of interest are questions of fact. Most recently, in Allen, the Court credited the district court's factual finding that Alabama's Black Belt could be a community of interest. Allen, 143 S. Ct. at 1505 (quoting Singleton, 582 F. Supp. 3d at 1015) ("The District Court understandably found [State witness's testimony about a community of interest] insufficient to sustain Alabama's 'overdrawn argument that there can be no legitimate reason to split' the Gulf Coast region."). Conversely, the Court in LULAC emphasized that the district court needed and failed to make a factual finding about the compactness of the challenged district. LULAC, 548 U.S. at 433–35. Without the benefit of trial evidence or the ability to weigh the Record evidence, the Court clearly cannot heed the Supreme Court's guidance in making these necessary factual determinations.

### 3. *Proposed Remedy*

Finally, Defendant argues that he is entitled to summary judgment because the Illustrative Plans cannot be ordered as remedies. Doc. No. [230-1], 17. "In short, if a plaintiff cannot show that the plan used to demonstrate the first prong can also be a proper remedy, then the plaintiff has not shown compliance with

the first prong of <u>Gingles</u>." <u>Id.</u> In his reply brief, Defendant clarified that "Plaintiffs cannot point to evidence that justifies Mr. Cooper's racial focus and racial splits in the creation of those plans." Doc. No. [252], 6. For these arguments, in particular, Defendant relies on the Eleventh Circuit's <u>Nipper</u> decision.

In <u>Nipper</u>, the Eleventh Circuit held that "the first threshold factor of <u>Gingles</u> [ ] require[s] that there must be a remedy within the confines of the state's judicial model that does not undermine the administration of justice." 39 F.3d at 1531 (plurality opinion). The Eleventh Circuit later clarified that "[t]his requirement simply serves 'to establish that the minority has the potential to elect a representative of its own choice from some single-member district.'" <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1199 (11th Cir. 1999) (quoting <u>Nipper</u>, 39 F.3d at 1530). Additionally, "[i]f a minority cannot establish that an alternate election scheme exists that would provide better access to the political process, then the challenged voting practice is not responsible for the claimed injury." <u>Id</u>; <u>see also</u> <u>Brooks v. Miller</u>, 158 F.3d 1230, 1239 (11th Cir. 1998) ("[I]f the plaintiffs in a § 2 case cannot show the existence of an adequate alternative electoral system under which the minority group's rights will be protected, then the case ends on the first prerequisite.").

35

Under Nipper, the question of remedy relies on whether the alternate scheme is a "workable remedy within the confines of the state's system of government." 39 F.3d at 1533. For example, in Wright v. Sumter County Board of Elections and Registration, 979 F.3d 1282, 1304 (11th Cir. 2020), the Eleventh Circuit found that the first Gingles precondition had been met because the special master's maps showed that at least three majority-black districts could have been drawn in that area; thus, "a meaningful remedy was available."

As the Court already addressed above, neither Supreme Court nor Eleventh Circuit precedent requires that Plaintiffs' Illustrative Plans be drawn race-blind or that the Illustrative Plans be race-neutral. See supra, III(A)(1). In fact, the Supreme Court recently rejected Alabama's argument to do just that. Allen, 143 S. Ct. at 1512 (plurality opinion), 1518 (Kavanaugh, J., concurring). And the Eleventh Circuit has long held that the first Gingles precondition specifically requires that Plaintiffs take race into consideration. Davis, 139 F.3d at 1425–26. As such, the Court rejects Defendant's argument that the Illustrative Plans do not satisfy Nipper's remedial requirement because Mr. Cooper considered race when drawing them.

### 4.    Conclusion

Summary judgment on the first <u>Gingles</u> precondition is inappropriate because questions of fact remain regarding the compactness of the Proposed Districts. There is Record evidence that Mr. Cooper was aware of race when he drew his Proposed Districts but that he also evaluated traditional districting principles. There is also Record evidence about the comparative compactness scores between the Illustrative Plans and the Enacted Plans. Finally, Mr. Cooper testified that he attempted to respect communities of interest when he drew his Illustrative Plans. This evidence is sufficient to create genuine issues of material fact regarding whether Plaintiffs have satisfied the first <u>Gingles</u> precondition.[26] Accordingly, Defendant's Motion for Summary Judgment as to the first <u>Gingles</u> precondition is denied.

---

[26] Defendant also argues that the mapping experts in the case *sub judice* and <u>Grant</u> drew their legislative districts in different areas, which shows that Plaintiffs failed to meet their burden under the first <u>Gingles</u> precondition. Doc. No. [230-1], 14. Although the Court held a coordinated preliminary injunction hearing for <u>Alpha Phi Alpha</u> and <u>Grant</u>, and will conduct a coordinated trial with these two cases, these two cases function independently of one another. Meaning that Plaintiffs in both <u>Alpha Phi Alpha</u> and <u>Grant</u> have independent burdens of proof for each of the <u>Gingles</u> preconditions and on the totality of the circumstances (Senate Factors). Accordingly, the Court finds that the fact that the two map experts drew their proposed districts in different places is not fatal to Plaintiffs' claims in either <u>Alpha Phi Alpha</u> or <u>Grant</u>.

### B.      Second and Third *Gingles* Preconditions

Likewise, the Court denies Defendant's Motion for Summary Judgment as to the second and third Gingles preconditions. The second Gingles precondition requires the Plaintiffs to show that "the minority group . . . is politically cohesive." Gingles, 478 U.S. at 51. The third Gingles precondition requires the Plaintiffs to show that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate." Id.

Defendant argues that there is not sufficient Record evidence of "legally significant racially polarized voting." Doc. No. [230-1], 18. First, Defendant makes a purely legal argument that Plaintiffs, at the Gingles preconditions phase, must prove that political cohesion and racial bloc voting exist because of race and are not equally attributable to partisan preferences. Id. at 19–29. Second, Defendant argues that the evidence in the Record evidence highlights partisan differences among voters and not racial bloc voting. Id. at 30–32.

#### 1.      *Required Showing at the Second and Third Gingles Preconditions*

As the Court ruled in its Preliminary Injunction Order, the second and third Gingles preconditions require only the Plaintiffs show that majority-voter

political cohesion and racial bloc voting exists, not the reason for its existence. Alpha Phi Alpha, 587 F. Supp. 3d at 1303. ("The Court concludes as a matter of law that, to satisfy the second Gingles precondition, Plaintiffs need not prove that causes of racial polarization, just its existence."); id. at 1312 ("[T]he third precondition involves the same evaluation as to the voting preferences of the majority groups as the second precondition does for the majority group . . . ").

Defendant still advances purely legal arguments that Plaintiffs must prove that race, not partisanship, explains racial bloc voting and minority vioter political cohesion under the second and third Giungles preconditions. Doc. No. [230-1], 19–30. First, Defnedant argues that precedent requires the Court to determine whether race is the cause of the vote dilution. Id. at 22–27. Second, Defendant argues that failing to show tha trace and partisanship caused racial bloc voting makes Section 2 not congruent and proportiuonal to the Fifteenth Amendment (i.e., the constitutional authority supporting Section 2 of the VRA). Id. at 27–29. Third, Defnedant argues that Plaintiffs must show the racial group's voting patterns in relation to the race of the candidate. Doc. Nos. [260] ("Hearing Tr.") Tr. 87:25–88:7; [263], 19–20. Finally, Defendant argues that the holdings in Mobile v. Bolden, 446 U.S. 55 (1980) and Whitcomb v. Chavis,

39

403 U.S. 124 (1971) require the Court to evaluate the causes of the racial polarization at the precondition phase of the trial. Doc. No. [263], 13–19.

a)   **Cause of race-based voting at the second and third *Gingles* preconditions**

As for the first argument—that "th[e] Court should require proof of racial bloc voting as part of the third <u>Gingles</u> factor" (Doc. No. [230-1], 27)—Defendant argues that the Court should be able to decide this at the <u>Gingles</u> preconditions phase, rather than at the totality of the circumstances (*i.e.*, Senate Factors) phase, because "the analysis is ultimately the same." <u>Id.</u> The Court disagrees. Precedent establishes that evaluating the reasons behind racial bloc voting and minority political cohesion is inappropriate at the <u>Gingles</u> preconditions phase.

The <u>Gingles</u> plurality concluded, "the reasons [B]lack and white voters vote differently have no relevance to the central inquiry of § 2. By contrast, the correlation between race of voter and the selection of certain candidates is crucial to the inquiry." <u>Gingles</u>, 478 U.S. at 63. Only three other Justices joined this portion of Justice Brennan's opinion. However, four other Justices likewise found that the reasons for minority political cohesion and racial bloc voting are not relevant in establishing the <u>Gingles</u> preconditions. Justice O'Connor wrote:

> [i]nsofar as statistical evidence of divergent racial voting patterns is admitted solely to establish that the minority group is politically cohesive and to assess its prospects for electoral success, I agree that defendants cannot rebut this showing by offering evidence that the divergent racial voting patterns may be explained in part by causes other than race, such as an underlying divergence in the interests of minority and white voters.

Gingles, 478 U.S. at 100 (O'Connor, J., concurring). Justice White was the only Justice to suggest that the Court should consider the candidate's race in addition to the voter's race at the Gingles precondition phase. Id. at 83 (White, J., concurring).

Although only a plurality of the Justices signed onto Justice Brennan's analysis regarding proof of racial bloc voting and minority voter cohesion, all but one Justice agreed that the reasons that Black voters and white voters vote differently are irrelevant to proving the existence of the second and third Gingles preconditions. Thus, the second and third Gingles preconditions can be established by the mere existence of minority group political cohesion and majority voter racial bloc voting. See Chisom v. Roemer, 501 U.S. 380, 404 (1991) ("Congress made clear that a violation of § 2 could be established by proof of discriminatory results alone.").

41

Most recently, the Supreme Court confirmed that the Section 2 analysis is an effects test. "[F]or the last four decades, this Court and the lower federal courts have repeatedly applied the effects test of § 2 as interpreted in Gingles and, under certain circumstances, have authorized race-based redistricting as a remedy for state districting maps that violate § 2." Allen, 143 S. Ct. at 1516. Although Justice Brennan's language regarding the "effects test" in Gingles, is a part of the plurality, the Supreme Court, in Allen, made clear that Section 2 requires Plaintiffs to prove only the effects of racially polarized voting and minority voter political cohesion at the Gingles preconditions phase and not its causes. Id.

Eleventh Circuit precedent also supports the conclusion that Plaintiffs are not required to prove that race caused racial bloc voting or minority voter cohesion to satisfy the second and third Gingles preconditions. Judge Tjoflat's plurality opinion in Nipper explained:

> Proof of the second and third Gingles factors— demonstrating racially polarized bloc voting that enables the white majority usually to defeat the minority's preferred candidate—is circumstantial evidence of racial bias operating through the electoral system to deny minority voters equal access to the political process.

39 F.3d at 1254 (plurality opinion). Nipper, at the Gingles preconditions, did not require the plaintiffs to prove that race was the cause of the second and third

42

<u>Gingles</u> preconditions or disprove tother race-neutral reasons to account for the polarization. Rather, Judge Tjoflat went on to opine that "[t]he defendant may rebut the plaintiff's evidence by demonstrating the absence of racial bias in the voting community; for example, by showing that the community's voting patterns can be best explained by other, non-racial circumstances." <u>Id.</u>

Following <u>Nipper</u>, the Eleventh Circuit clarified the appropriate test for finding a Section 2 violation. First, the plaintiff:

> must, at a minimum, establish the three now-familiar <u>Gingles</u> factors . . . . Proof of these three factors does not end the inquiry, however . . . . This is because it is entirely possible that bloc voting (as defined by <u>Gingles</u>) could exist, but that such bloc voting would not result in a diminution of minority opportunity to participate in the political process and elect representatives of the minority group's choice . . . . To aid courts in investigating a plaintiff's section 2 claims, the <u>Gingles</u> court identified other factors that may, in the "totality of the circumstances," support a claim of racial vote dilution.

<u>Solomon v. Liberty Cnty. Comm'rs</u>, 221 F.3d 1218, 1225 (11th Cir. 2000). Thus, it is firmly established in both Supreme Court and Eleventh Circuit precedent that

Plaintiffs do not have to prove the causes of polarized voting at the preconditions phase of a Section 2 claim.[27]

In summary, eight Supreme Court Justices agreed that the second and third Gingles preconditions do not require Plaintiffs to prove that race is the cause of the minority group's political cohesion or racial bloc voting. In Allen, the Supreme Court confirmed that Section 2 is an effects test. Allen, 143 S. Ct. at 1516–17. Following Gingles, the Eleventh Circuit in both Nipper and again in Solomon confirmed that the question of potential reasons for vote dilution is relevant to the totality of the circumstances phase of the case, not in regard to the Gingles preconditions.[28]

_____

[27] Defendant also argues that the Eleventh Circuit in Greater Birmingham Ministries v. Secretary of State for State of Alabama, 992 F.3d 1299, 1329-30 (11th Cir. 2021) created a causation requirement as a part of the second and third Gingles preconditions. Doc. No. [230-1], 22. The quoted portion of Greater Birmingham discusses causation, however, the language is found in the totality of the circumstances analysis and discussion of the ultimate burden of proof, not in the preconditions portion of the opinion. 992 F.3d at 1329-30 (noting plaintiffs "ma[d]e no mention of the three 'necessary preconditions' and they 'ma[d]e no attempt to articulate the existence of . . . 'minority cohesion or bloc voting, and majority bloc voting.'") Id. at 1332. Accordingly, the Court finds that Greater Birmingham is not instructive as to Plaintiffs' burden for establishing the Gingles preconditions.

[28] The Court further rejects Defendant's efforts to distinguish the aforementioned binding authority with citations to non-binding cases. Defendant first cites Vecinos De

To be clear, Defendant's partisanship argument may be relevant to whether the political process is equally open to minority voters, but it is not dispositive. At no point do Plaintiffs have the *burden* of proving the causes behind a lack of equal opportunity to participate in the political process. Allen,

_____

Barrio Uno v. City of Holyoke, 72 F.3d 973, 983 (1st Cir. 1995). Doc. No. [230-1], 26. In Uno, however, the First Circuit, likewise, did not require plaintiffs to disprove partisanship as a part of the Gingles preconditions. Uno, 72 F.3d at 983. It held that "the second and third preconditions are designed to assay whether racial cleavages in voting patterns exist and, if so, whether those cleavages are deep enough to defeat minority-preferred candidates time and again." Id. Once these preconditions are proven, they "give rise to an inference that racial bias is operating through the medium of the targeted electoral structure to impair minority political opportunities." Id.

Defendant also cites to a non-binding Fifth Circuit case. Doc. No. [230-1], 25–26 (citing League of United Latin American Citizens v. Clements, 999 F.2d 831, 855 (5th Cir. 1993)). In Clements, the Fifth Circuit took an opposite approach, finding it "difficult to see how the record in this case could possibly support a finding of liability" when "Plaintiffs [had] not even attempted to establish proof of racial bloc voting by demonstrating that race, not . . . partisan affiliation, is the predominant determinant of political preference." Clements, 999 F.2d at 855 (quotations omitted). The Fourth Circuit has rejected the Fifth Circuit's approach. United States v. Charleston Cnty., 365 F.3d 341, 347–48 (4th Cir. 2004)("[T]he approach most faithful to the Supreme Court's case law 'is one that treats causation as irrelevant in the inquiry into the three Gingles preconditions, but relevant in the totality of circumstances inquiry.'") (quoting Lewis v. Alamance Cnty., 99 F.3d 600, 615–16 n.12 (4th Cir. 1996)).

Given the Court's interpretation of the Supreme Court's statements on the matter and the Eleventh Circuit's binding precedent, the Court agrees with the Fourth Circuit. Thus, the Court reserves the question of whether partisanship or race is the driving force behind the differences in racial voting patterns for the totality of the circumstances inquiry, not at the analysis of the Gingles preconditions.

45

143 S. Ct. at 1507 ("[W]e have reiterated that § 2 turns on the presence of discriminatory effects, not discriminatory intent."); see also id. ("[T]he <u>Gingles</u> test helps determine whether th[e] possibility . . . that the State's map has a disparate effect on account of race . . . is reality by looking to the polarized voting preference and frequency of racially discriminatory actions taken by the State, past and present.").

### b) **Congruence and proportionality: Fifteenth Amendment**

Second, Defendant argues that "[i]f Section 2 were interpreted in a way that [P]laintiffs can establish racial bloc voting merely by showing the minority and majority vote differently, it would not fit within th[e] constitutional bounds . . . of the Fifteenth Amendment." Doc. No. [230-1], 28. Section 2 of the VRA provides:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

52 U.S.C. § 10301(a).

46

"[U]nder the analysis set forth by the statutory text and embraced by the Supreme Court in <u>Chisom</u> and [the Eleventh Circuit] in <u>Johnson</u>, [courts] must consider whether the challenged law results in a denial or abridgment of the right to vote on account of race or color." <u>Greater Birmingham</u>, 992 F.3d at 1329 (citing <u>Chisom</u>, 501 U.S. at 403–04; <u>Johnson v. Governor of Fla.</u>, 405 F.3d 1214, 1227 (11th Cir. 2005)). The Court's "analysis turns on whether, based on the totality of the circumstances, the challenged law violates Section 2(a) because it deprives minority voters of an equal opportunity to participate in the electoral process *and* to elect representatives of their choice." <u>Id.</u>

For this inquiry, the Court must "ask whether the totality of facts . . . showed that the new scheme would deny minority voters equal political opportunity." <u>De Grandy</u>, 512 U.S. at 1013–14. And according to the Eleventh Circuit, "[t]o be actionable, a deprivation of the minority group's right to equal participation in the political process must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause." <u>Solomon</u>, 221 F.3d at 1225 (quoting <u>Nipper</u>, 39 F.3d at 1515 (Tjoflat, C.J., plurality).

Thus, the Court finds that the question of whether the racial bloc voting is on account of race or on account of race-neutral reasons—*i.e.*, partisanship—is relevant at the totality of the circumstances phase of the inquiry. The current formulation of the <u>Gingles</u> test is congruent with and proportional to the Fifteenth Amendment.[29] Consistent with the Fifteenth Amendment, the Court must determine, at the totality of the circumstances phases, whether the past and present realities result in a lack of an equal opportunity for minorities to participate in the electoral process on account of race. And to be successful on their Section 2 claim, Plaintiffs bear the ultimate burden of proving that they satisfied the three <u>Gingles</u> preconditions *and* that, under the totality of circumstances, the Enacted Plans have the effect of abridging minority voters' equal opportunity to vote on account of race.

### c)  <u>Race of the candidate</u>

Third, at the hearing on the Motion for Summary Judgment and in his supplemental briefing, Defendant advanced the argument that, as part of the

---

[29] "The right of the citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV.

48

second and third <u>Gingles</u> preconditions, Plaintiffs must show that the race of the candidate changed voters' behavior. Doc. No. [263], 19–20; Hearing Tr. 87:25–88:7 ("I think that the inference [of] . . . <u>Gingles</u> 2 and 3 . . . only arises once you've met the burden, once you've come forward with the evidence. And the submission we're looking at here is, we have no evidence that voter behavior changes in the slightest based on the race of the candidates.").

The Court finds that an inquiry into voter preferences as it relates to the race of the candidate is not necessary to prove the second and third <u>Gingles</u> preconditions. The Supreme Court in <u>De Grandy</u> expressly disclaimed Defendant's proposed test:

> The assumption that majority-minority districts elect only minority representatives, or that majority-white districts elect only white representatives, is false as an empirical matter. And on a more fundamental level, the assumption reflects the demeaning notion that members of the defined racial groups ascribe to certain minority views that must be different from those of other citizens.

512 U.S. at 1027. And, again in <u>LULAC</u>, the Supreme Court affirmed a finding that Texas's Congressional District 23 violated Section 2, even though Texas intentionally created a district that would elect a Latino representative:

> To begin the <u>Gingles</u> analysis, it is evident that the second and third <u>Gingles</u> preconditions—cohesion

49

> among the minority group and bloc voting among the
> majority population—are present in District 23. The
> District Court found "racially polarized voting" in south
> and west Texas, and indeed "throughout the State." The
> polarization in District 23 was especially severe: 92% of
> Latinos voted against Bonilla in 2002, while 88% of non-
> Latinos voted for him. Furthermore, the projected results
> in new District 23 show that the Anglo citizen voting-age
> majority will often, if not always, prevent Latinos from
> electing the candidate of their choice in the district. For
> all these reasons, appellants demonstrated sufficient
> minority cohesion and majority bloc voting to meet the
> second and third Gingles requirements.

LULAC, 548 U.S. at 427 (plurality opinion) (citations omitted).[30] In LULAC, the

plurality found that it was "evident" the plaintiffs successfully proved the

second and third Gingles preconditions because 92% of Latinx voters voted

against Bonilla, even though Congressman Bonilla is Latino. Session v. Perry,

298 F. Supp. 2d 451, 488 (E.D. Tex. 2004). If plaintiffs were required to prove that

white voters did not vote for Latinx candidates and that Latinx voters voted for

Latinx candidates, then the second and third Gingles preconditions would not

---

[30] The Court notes that only two Justices—Justice Kennedy and Justice Breyer—joined this portion of the LULAC opinion. However, none of the concurrences or dissents discuss the second or third Gingles preconditions. See generally, LULAC, 548 U.S. 399.

50

have been "evidently" met in LULAC. In fact, the plaintiffs in LULAC would not have been able to prove the second and third Gingles preconditions.

Similarly, the Eleventh Circuit has concluded that it is not clear error to give greater weight to elections involving black candidates but cautioned, "[w]e do not mean to imply that district courts *should* give elections involving [B]lack candidates more weight; rather, we merely note that in light of existing case law district courts may do so without committing clear error." Johnson v. Hamrick, 196 F.3d 1216, 1221–22 (11th Cir. 1999). In fact, the Eleventh Circuit went on to clarify "[w]e point out, however, that this Court 'will not automatically assume that the [B]lack community can only be satisfied by [B]lack candidates.'" Id. at 1222 n.6 (quoting Askew v. City of Rome, 127 F.3d 1355, 1378 (11th Cir. 1997)).

Accordingly, the Court rejects Defendant's arguments that the second and third Gingles preconditions require Plaintiffs to produce evidence that voter preferences changed based upon the race of the candidate. As the Supreme Court noted, that assumption is false as an empirical matter. And, as the Eleventh Circuit noted, courts cannot automatically assume that the Black community, as a whole, will be satisfied with any Black candidate. Thus, the

Court finds that the requirement urged by Defendant is incorrect as a matter of law.

### d)      Precedential arguments following *Allen*

Finally, Defendant argues that the <u>Allen</u> majority's treatment of <u>Bolden</u> requires that the Court determine the causes of racial polarization. Doc. No. [263], 13–19. Defendant begins this argument by stating, "[t]he majority opinion does not provide much direct guidance for lower courts on plaintiff's evidentiary burden in satisfying the third <u>Gingles</u> precondition because that precondition was not squarely at issue in <u>Allen</u>." <u>Id.</u> at 11. Defendant goes on to point out that "the Supreme Court did not offer any additional clarity on [the third <u>Gingles</u> precondition] because there was 'no reason to disturb the District Court's careful factual findings, which are subject to clear error review *and have gone unchallenged by Alabama in any event.*'" <u>Id.</u> at 17 (citing <u>Allen</u>, 143 S. Ct. at 1506). Despite these caveats, Defendant also argues that the majority opinion reaffirmed the causation test from <u>Bolden</u>.

The majority opinion, in its historical background section, discusses the 115 years of history between the passage of the Fifteenth Amendment and the 1982 amendments to the Voting Rights Act. <u>Allen</u>, 143 S. Ct. at 1498–1501. The

52

majority's treatment of Bolden can be described only as a summation of the holding, the resulting backlash, the congressional debates, and the ultimate passage of the 1982 amendments to the VRA. Id. At no other point in the majority opinion does Chief Justice Roberts discuss the viability of any precedent that came out of Bolden.[31] In fact, the Gingles plurality expressly rejected the test that Defendant is proposing:

> Finally, we reject the suggestion that racially polarized voting refers only to white bloc voting which is caused by white voters' *racial hostility* toward black candidates. To accept this theory would frustrate the goals Congress sought to achieve by repudiating the intent test of Mobile v. Bolden . . . and would prevent minority voters who have clearly been denied an opportunity to elect representatives of their choice from establishing a critical element of a vote dilution claim.

Gingles, 478 U.S. at 70–71 (citation omitted).

---

[31] Bolden was overruled when Congress passed the 1982 Amendments to the VRA. See Gingles, 478 U.S. at 35 ("The amendment was largely a response to this Court's plurality opinion in [Bolden] . . . Congress substantially revised § 2 to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test' . . . .").

53

The Court finds reading the majority opinion's citation to <u>Bolden</u> as a reversion to the pre-<u>Gingles</u> frameworks a bridge too far. [32] The Court understands that Defendant disagrees with the Court's reading of the effects test outlined by the plurality in <u>Gingles</u>; however, as the case law stands today and as noted in detail above, the Court finds that Plaintiffs do not have to prove that race is the cause of majority-bloc voting at the preconditions phase. As Defendant noted, <u>Allen</u> did not disturb the case law regarding the third <u>Gingles</u>

---

[32] Defendant argues that <u>Allen</u> also restores the precedent from <u>Whitcomb</u>. Doc. No. [263], 13–16. On an initial note, neither the <u>Allen</u> majority, nor any of the concurrences or dissents, cite to or mention <u>Whitcomb</u>. Second, the sentence cited by Defendant, "[t]he third precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts a distinctive minority vote at least plausibly on account of race'" does not create a causation requirement. Doc. No. [263], 16 (citing <u>Allen</u>, 143 S. Ct. at 1507). The majority opinion defines:

> 'on account of race or color' to mean 'with respect to' race or color, and not to connote any required purpose of racial discrimination.' . . . A district is not equally open, in other words, when minority voters face—unlike their majority peers—bloc voting along racial lines, arising against the backdrop of substantial racial discrimination within the State, that renders a minority vote unequal to a vote by a nonminority voter.

<u>Allen</u>, 143 S. Ct. at 1507. The Court understands this to mean that at the preconditions phase, Plaintiffs have to prove the existence of racial bloc voting and at the totality of the circumstances phase, Plaintiffs have to show both past and present racial discrimination in Georgia that results in the voting process not being equally open to minority voters.

precondition. Rather, at the preconditions phase, Plaintiffs need only prove the existence of polarized voting by minority voters and bloc voting by majority voters, and then at the totality of the circumstances phase, the Court may evaluate the causes.

*  *  *  *  *  *

In summary, the Court finds that as a matter of law, to satisfy the second and third <u>Gingles</u> preconditions, Plaintiffs have to show (1) the existence of minority voter political cohesion and (2) that the majority votes as a bloc and usually defeats the minority voters' candidate of choice. As a part of these preconditions, Plaintiffs do not have to prove that race is the cause of voting differences between minority and majority voting blocs, nor must Plaintiffs disprove that other race-neutral reasons, such as partisanship, cause or are equally plausible explanations of racial bloc voting. The Court rejects Defendant's arguments to the contrary.

### 2.    *Record Evidence of Racial Bloc Voting*

Turning to the Record evidence, the Court finds that there is sufficient Record evidence of both minority voter political cohesion and majority racial bloc voting to defeat Defendant's Motion for Summary Judgment.

Defendant argues that "the only thing Plaintiffs' expert has shown in her data is that Black Georgians vote cohesively for Democrats." Doc. No. [230-1], 31. And, "Plaintiffs' evidence of racial polarization is, in reality, nothing more than evidence of partisan polarization where a majority of voters support one party and a minority of voters support another party." Id. Finally, "all the Court has before it is evidence establishing that party, rather than race, explains the 'diverge[nt]' voting patterns at issue . . . Plaintiffs' failure to offer any other evidence ends this case." Id. at 32 (alteration in original). As stated above, Plaintiffs do not have to prove the causes of racial bloc voting to satisfy the second and third Gingles preconditions.

A defendant is entitled to summary judgment when it "shows that there is no genuine dispute as a material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The defendant can meet this burden in one of two ways: (1) no disagreement about a material fact or (2) "pointing out to the district court—that there is an absence of evidence to support [an essential element of] the [plaintiffs'] case." Celotex Corp., 477 U.S. at 325.

The Court finds that there is sufficient evidence in the Record from which a factfinder could determine that the minority population is politically cohesive.

56

Defendant admitted for purposes of the Summary Judgment Motion that "[i]n the seven areas of Georgia that Plaintiffs' expert, Dr. Handley, analyzed, she found that, in statewide elections, 'the average percentage of Black vote for the 16 Black-preferred candidates is 96.1%.'" Doc. No. [253], ¶ 166. Defendant did not dispute the substance of Plaintiffs' statement that "[i]n the 54 state legislative[] [districts] that Dr. Handley analyzed, over 90% of Black voters supported their . . . Black candidates." Id. ¶ 168. Defendant admits that his expert "stated that in all general elections examined by Dr. Handley, Black voter support for a candidate 'exceeded 90 percent.'" Id. ¶ 169. And "Dr. Alford acknowledged 'extremely cohesive Black support' for their preferred candidates in [general elections]." Id. ¶ 171. Accordingly, the Court finds that the testimony of both Plaintiffs' expert and Defendant's expert provide sufficient evidence that Black voters are politically cohesive to defeat Defendant's Motion for Summary Judgment as to the second Gingles precondition.

Similarly, the Court finds that there is sufficient Record evidence from which a factfinder could determine that the white majority sufficiently votes as a bloc to defeat the minority voters' candidate of choice. Defendant admitted that "[i]n the seven areas of Georgia that Dr. Handley analyzed, she found that, in

statewide elections, 'the average percentage of White vote for the[] 16 Black-preferred candidates . . . is 11.2%.'" Id. ¶ 167. Defendant did not substantively object to the statement that Black preferred candidates "received, 'on average, 10.1% of the White vote.'" Id. ¶ 168. Defendant's expert testified "that Black and White voters are 'supporting different candidates,' that 'voting is polarized,' and that '[t]his is what polarization looks like when, you know, 90 percent of . . . one group goes one way and 90 percent goes the other.'" Id. ¶ 173 (alteration in original). In addition, Senator Kennedy stated that "we do have racially polarized voting in Georgia." Id. ¶ 174.

The Court finds that the expert testimony, coupled with Senator Kennedy's statement, provide sufficient Record evidence from which a factfinder could determine that white voters typically vote as a bloc to defeat the Black preferred candidate. Accordingly, the Court finds that this evidence is sufficient to defeat Defendant's Motion for Summary Judgment as to the second and third Gingles precondition.

### 3. *Temporal Limitations*

Defendant argues that there are potential temporal limitations to the longevity of Section 2. Doc. No. [263], 19–21. Defendant's argument that the

current trend on Section 2 cases transitioning away from preferences based on the race of the candidate is undercut by <u>Gingles.</u> <u>Id.</u> As the Court noted above, eight of the nine Justices agreed when the test was created that the race of the candidate was not relevant at the <u>Gingles</u> preconditions phase of the inquiry. <u>See</u> <u>supra</u> Section III(B)(1)(c). Additionally, the Eleventh Circuit and Supreme Court's more recent jurisprudence has expressly rejected a reliance on the race of the candidate as dispositive when evaluating a potential Section 2 violation. <u>See id.</u> Thus, the Court finds this temporal argument unavailing.

Defendant also argues that "Justice Kavanaugh's concurring opinion—the *fifth* vote—makes abundantly clear that the constitutionality of the law is not at all settled into the future." Doc. No. [263], 20. In <u>Allen</u>, Justice Kavanaugh opined:

> Justice [Thomas] notes, however, that even if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future . . . . But Alabama did not raise that temporal argument in this Court, and therefore I would not consider it at this time.

143 S. Ct. at 1519. The Court finds this argument also unavailing. As the precedent currently stands, in June of 2023, five Justices agreed that the <u>Gingles</u> framework remains and affirmed the <u>Allen</u> three-judge court's decision, finding

that Alabama violated Section 2 of the VRA. Although the two dissenting opinions raised arguments about the constitutionality of the <u>Gingles</u> framework, none of them stated that Section 2 of the Voting Rights Act should be deemed unconstitutional. <u>See</u> <u>generally</u> <u>Allen</u>, 143 S. Ct. at 1519–48 (Thomas, J., dissenting); <u>id.</u> at 1548–57 (Alito, J., dissenting). In accordance with the majority opinion, the Court rejects Defendant's temporal argument. The Court finds that Plaintiffs may move forward with their Section 2 claims.

### 4.   Conclusion

To summarize the foregoing analysis on the second and third <u>Gingles</u> preconditions in this case: the Court finds that, under current jurisprudence, the preconditions require Plaintiffs to show (1) political cohesion amongst minority voters, and (2) that the white majority typically votes as a bloc to defeat the Black preferred candidate. The second and third <u>Gingles</u> preconditions do not require Plaintiffs to establish that race is the cause of bloc voting or disprove that race-neutral factors caused the bloc voting.

The Court also finds that Plaintiffs pointed to sufficient evidence in the Record of the existence of both minority voter cohesion and racial bloc voting to defeat Defendant's Motion for Summary Judgment as to the second and third

<u>Gingles</u> preconditions. Accordingly, Defendant's Motion for Summary Judgment on the second and third <u>Gingles</u> preconditions is denied.[33]

\* \* \* \* \*

The Court **DENIES** Defendant's Motion for Summary Judgment. Section 2 challenges to legislative maps require "'an intensely local appraisal of the design and impact' of the electoral structure, practice, or procedure at issue." <u>Nipper</u>, 39 F.3d at 1498 (quoting <u>Gingles</u>, 478 U.S. at 79; <u>Rogers</u>, 458 U.S. at 621). The Court cannot conduct this analysis on a motion for summary judgment. Accordingly, the Court denies Defendant's Motion for Summary Judgment as to all three <u>Gingles</u> preconditions.

_____

[33] Defendant's supplemental brief discusses the totality of the circumstances. Doc. No. [263], 21–22. Unlike in <u>Pendergrass</u>, Doc. Nos. [173]; [175], and <u>Grant</u>, Doc. Nos. [189]; [190], the <u>Alpha Phi Alpha</u> Plaintiffs did not move for summary judgment on their claims. Additionally, Defendant did not move for summary judgment in this case on the totality of the circumstances (*i.e.*, Senate Factors). Defendant's supplemental brief in this case is similar to those filed in <u>Grant</u> and <u>Pendergrass</u>. <u>Compare</u> Doc. No. [263] <u>with</u> <u>Pendergrass</u>, Doc. No. [214], <u>Grant</u>, Doc. No. [228]. Thus, the Court assumes that this portion of the supplemental brief is a vestige of the briefs in those cases. Because the Parties did not fully brief the issue of the totality of the circumstances or provide factual assertions on the issue in their statements of fact, the Court will not address the Senate Factors here.

Although the Court does not engage in an analysis of the Senate Factors in this Order, the Court does discuss them in detail in the Court's Order on the Motions for Summary Judgment in <u>Pendergrass</u>.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion for Summary Judgment. Doc. No. [230]. As the Court noted consistently throughout this Order, there are material disputes of fact and credibility determinations that foreclose the award of summary judgment to Defendant. Additionally, given the gravity and importance of the right to an equal vote for all American citizens, the Court will engage in a thorough and sifting review of the evidence that the Parties will present in this case at a trial.

Accordingly, the case will proceed to a coordinated trial with Coakley Pendergrass, et al. v. Brad Raffensperger, et al., No. 1:21-cv-5339-SCJ, and Annie Lois Grant, et al. v. Brad Raffensperger, et al., No. 1:22-cv-122-SCJ. The Second Amended Scheduling Order shall govern the forthcoming proceedings. Doc. No. [261].

**IT IS SO ORDERED** this 17th day of July, 2023.

**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

62