# ATTACHMENT C-1

1. ***Pendergrass* Plaintiffs' Outline of the Case**

Plaintiffs contend that the Georgia General Assembly's enacted redistricting plan for Georgia's congressional districts ("SB 2EX") unlawfully dilutes Black voting strength in violation of Section 2 of the Voting Rights Act (VRA).

Between 2010 and 2020, Georgia's Black population grew by 484,048 people, accounting for 47.26% of the state's overall population gain. In the metropolitan Atlanta region in particular, the Black population has increased by over 900,000 people in the last 20 years.

Despite these striking demographic changes, the enacted congressional plan fails to reflect the growth in Georgia's Black population. Instead, the enacted congressional plan packs Black voters in the western Atlanta metro area in the supermajority-Black Thirteenth Congressional District and cracks Black voters into other districts that stretch into the western and northern reaches of the state. The Black population is sufficiently large and geographically compact such that the General Assembly could have drawn, consistent with traditional redistricting principles, at least one additional majority-Black congressional district.

Voting is also highly racially polarized statewide; Black voters are politically cohesive, and white voters cohesively oppose Black-preferred candidates. In both statewide and localized contests, the white majority usually votes as a bloc to defeat the candidates preferred by Black voters in the focus area.

In light of Georgia's legacy of racial discrimination against its Black population, the subordination of their political power, and the ongoing, cumulative effects of that legacy, the state's enacted congressional map will prevent Black Georgians from participating equally in the political process. Therefore, SB 2 EX dilutes the voting strength of Black voters in violation of Section 2 of the VRA.

2. **Relevant Statutes and Case Law**

Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). This includes the

> manipulation of district lines [to] dilute the voting strength of politically cohesive minority group members, whether by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door.

*Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994). Section 2 claims "turn[ ] on the presence of discriminatory effects, not discriminatory intent." *Allen v. Milligan*, 143 S. Ct. 1487, 1507 (2023).

To prevail on their Section 2 claim, Plaintiffs must show that (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986).

Once Plaintiffs have made this threshold showing, the Court must then examine "the totality of circumstances"—including the Senate Factors, which are the nine factors identified in the U.S. Senate report that accompanied the 1982 amendments to the VRA—to determine whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 43–44; PI Order 29–32 (describing Senate Factors).