# ATTACHMENT C-3

1. ***Alpha Phi Alpha* Plaintiffs' Factual Statement**

Since 2000, Georgia's Black population has increased by over 1.1 million people, now representing one-third of the state's total population. In metro Atlanta in particular, the Black population has increased by over 900,000 people in the last 20 years, while the Black population in the state's historic Black Belt has also grown relative to the white population and become increasingly concentrated. However, despite these striking demographic changes, the numbers of majority-Black State Senate and House districts have barely changed. There have been no majority-Black State Senate districts added and just two majority-Black House districts added since the prior redistricting plans. There is also a substantial gap between the number of Black Georgians living in majority-Black districts and the number of white Georgians living in majority-white districts—a further indicator that the number of majority-Black districts is disproportionately low and that Black voting strength is being unlawfully diluted.

The new State Senate and House plans enacted by the General Assembly in 2021 constitute textbook violations of the VRA. In a number of areas across the State, including in Metro Atlanta and portions of the Black Belt (which extends from

Augusta to Southwest Georgia), the Black population is sufficiently large and geographically compact such that the General Assembly could have drawn, consistent with traditional redistricting principles, at least three additional majority-Black State Senate districts, and at least five majority-Black House districts—but did not do so.

Voting is highly racially polarized in these areas and statewide, such that Black-preferred candidates typically lose to white preferred candidates except in majority-Black legislative districts. Black and white voters are politically cohesive. And in both statewide and localized contests, the white majority usually votes as a bloc to defeat the candidates preferred by Black voters unless districts are drawn to provide Black voters with opportunities to elect candidates of their choice.

In light of Georgia's legacy of racial discrimination against its Black population, the subordination of their political power, and the ongoing, cumulative effects of that legacy, among other factors, the state's maps will prevent Black Georgians from participating equally in the political process. Therefore, SB 1EX and HB 1EX dilute the political strength of Black voters in violation of Section 2 of the VRA.

## 2. Relevant Authority

Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). This includes the

> manipulation of district lines [to] dilute the voting strength of politically cohesive minority group members, whether by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door.

*Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994). Section 2 claims "turn[ ] on the presence of discriminatory effects, not discriminatory intent." *Allen v. Milligan*, 143 S. Ct. 1487, 1507 (2023); *see also* Dkt. 268 at 45-46 (Order Denying Summary Judgment).

To prevail on their Section 2 claims, Plaintiffs must show that (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). "[T]he second and third *Gingles* preconditions do not require Plaintiffs to prove that

race is the cause of the minority group's political cohesion or racial bloc voting." Dkt. 268 at 44 (Order Denying Summary Judgment).

Once Plaintiffs have made this threshold showing, the Court must then examine "the totality of circumstances"—including the Senate Factors, which are the nine factors identified in the U.S. Senate report that accompanied the 1982 amendments to the VRA—to determine whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 43–44; PI Order 29–32 (describing Senate Factors).