# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC. et al., | CIVIL ACTION FILE NO. 1:21-CV-5337-SCJ |
| Plaintiffs, | |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, | |
| Defendant. | |
| COAKLEY PENDERGRASS et al., | CIVIL ACTION FILE NO. 1:21-CV-5339-SCJ |
| Plaintiffs, | |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, et al., | |
| Defendants. | |
| ANNIE LOIS GRANT et al., | CIVIL ACTION FILE NO. 1:22-CV-122-SCJ |
| Plaintiffs, | |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, et al., | |
| Defendants. | |

## PRETRIAL ORDER

1.

There are no motions or other matters pending for consideration by the Court except as noted:

**By Plaintiffs and Defendants**: Other than any pretrial motions which may be filed pursuant to the Court's scheduling order, there are no pending motions in this case.

2.

All discovery has been completed, unless otherwise noted, and the Court will not consider any further motions to compel discovery. (Refer to LR 37.1B). Provided there is no resulting delay in readiness for trial, the parties shall, however, be permitted to take the depositions of any persons for the preservation of evidence and for use at trial.

**By Plaintiffs and Defendants**: All discovery has been completed in this case.

3.

Unless otherwise noted, the names of the parties as shown in the caption to this Order and the capacity in which they appear are correct and complete, and there is no question by any party as to the misjoinder or non-joinder of any parties.

**By Plaintiffs**: There are no issues regarding the names of the parties and joinder.

**By Defendants:** The parties are properly named in the caption of this Order.

4.

Unless otherwise noted, there is no question as to the jurisdiction of the court; jurisdiction is based upon the following code sections. (When there are multiple claims, list each claim and its jurisdictional basis separately.)

1

**By Plaintiffs:**  There is no question regarding this Court's jurisdiction. This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1357.

**By Defendants:** Defendants assert that this Court lacks jurisdiction over Plaintiffs' Voting Rights Act claims because (1) the claims must be heard by a three-judge court pursuant to 28 U.S.C. § 2284 and (2) Section 2 of the Voting Rights Act does not permit an action to be filed by private parties. This Court would otherwise have jurisdiction pursuant to 52 U.S.C. §10301 and 28 U.S.C. § 1331.

5.

The following individually-named attorneys are hereby designated as lead counsel for the parties:

*Pendergrass* and *Grant* **Plaintiffs:** Abha Khanna, Joyce Gist Lewis

*Alpha Phi Alpha* **Plaintiffs**: Sophia Lin Lakin, Rahul Garabadu, and Debo Adegbile

**Defendants:** Bryan P. Tyson, Bryan Jacoutot

6.

Normally, the plaintiff is entitled to open and close arguments to the jury. (Refer to LR39.3(B)(2)(b)). State below the reasons, if any, why the plaintiffs should not be permitted to open arguments to the jury.

**By Plaintiffs and Defendants:** This case will not be tried before a jury. Plaintiffs request the opportunity to present opening and closing arguments to the Court.

7.

The captioned case shall be tried (_____) to a jury or (__X__) to the court without a jury, or (_____) the right to trial by jury is disputed.

2

8.

State whether the parties request that the trial to a jury be bifurcated, i.e. that the same jury consider separately issues such as liability and damages. State briefly the reasons why trial should or should not be bifurcated.

**Plaintiffs' and Defendants' Statement:** This case will be tried to the court and the parties do not request a bifurcated trial.

9.

Because this case will be tried to the Court, the parties have not attached a list of questions for the Court to propound to the jury concerning their legal qualifications to serve.

10.

Because this case will be tried to the Court, the parties have not attached a list of questions for the Court to propound to jurors on voir dire examination.

11.

Because this case will be tried to the Court, the parties have no voir dire questions or corresponding objections.

12.

Because this case will be tried to the Court, the parties are not requesting any strikes.

13.

State whether there is any pending related litigation. Describe briefly, including style and civil action number.

Five related cases challenging the redistricting plans enacted in 2021 by the Georgia General Assembly remain pending:

- *Alpha Phi Alpha Fraternity, Inc. et al. v. Raffensperger*, No. 1:21-cv-05337-SCJ;
- *Pendergrass et al. v. Raffensperger et al.*, No. 1:21-cv-05339-SCJ;

- *Grant et al. v. Raffensperger et al.*, No. 1:22-cv-00122-SCJ;
- *Common Cause v. Raffensperger*, No. 1:22-cv-00090-ELB-SCJ-SDG; and
- *Georgia State Conference of the NAACP v. Georgia*, No 1:21-cv-05338-ELB-SCJ-SDG.

14.

Attached hereto as Attachment "C-1" for the *Pendergrass* Plaintiffs, Attachment "C-2" for the *Grant* Plaintiffs, and Attachment "C-3" for the *Alpha Phi Alpha* Plaintiffs are the Plaintiffs' outlines of their cases, including succinct factual summaries of Plaintiffs' causes of action.

15.

Attached hereto as Attachment "D" is Defendants' outline of the case which includes a succinct factual summary of all general, special, and affirmative defenses relied upon.

16.

Attached hereto as Attachment "E" are the facts stipulated by the parties. No further evidence will be required as to the facts contained in the stipulation and the stipulation may be read into evidence at the beginning of the trial or at such other time as is appropriate in the trial of the case. It is the duty of counsel to cooperate fully with each other to identify all undisputed facts. A refusal to do so may result in the imposition of sanctions upon the noncooperating counsel.

17.

The legal issues to be tried are as follows:

**By Plaintiffs:**

A.    Whether the failure to create an additional congressional district in the western Atlanta metropolitan area in which Black voters have the opportunity to elect candidates of their choice violates Section 2 of the VRA. (*Pendergrass*)

B.    Whether the failure to create additional State Senate districts in the Atlanta metropolitan area and Black Belt in which Black voters have the opportunity

to elect candidates of their choice violates Section 2 of the VRA. (*Alpha Phi Alpha* and *Grant*)

C.      Whether the failure to create additional State House districts in the Atlanta metropolitan area and Black Belt in which Black voters have the opportunity to elect candidates of their choice violates Section 2 of the VRA. (*Alpha Phi Alpha* and *Grant*)

D.      The nature and extent of appropriate remedial relief should the Court conclude the Plaintiffs have established liability on one or more of their Section 2 claims in *Pendergrass*, *Alpha Phi Alpha*, and/or *Grant*.

**By Defendants:**

A.      Whether Georgia's 2021 congressional districting plan results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color because the political processes leading to nomination or election in Georgia are not equally open to participation by Black voters, in that Black voters have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. (*Pendergrass*)

B.      Whether Georgia's 2021 State Senate districting plan results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color because the political processes leading to nomination or election in Georgia are not equally open to participation by Black voters, in that Black voters have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. (*Alpha Phi Alpha* and *Grant*)

C.      Whether Georgia's 2021 State House of Representatives districting plan results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color because the political processes leading to nomination or election in Georgia are not equally open to participation by Black

5

voters, in that Black voters have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. (*Alpha Phi Alpha* and *Grant*)

18.

Attached hereto as Attachment "F-1" for the *Pendergrass* Plaintiffs, Attachment "F-2" for the *Grant* Plaintiffs, Attachment "F-3" for the *Alpha Phi Alpha* Plaintiffs, and Attachment "F-4" for the Defendants is a list of all the witnesses and their addresses for each party. The list must designate the witnesses whom the party will have present at trial and those witnesses whom the party may have present at trial. Expert (any witness who might express an opinion under Rule 702), impeachment, and rebuttal witnesses whose use as a witness can be reasonably anticipated must be included. Each party shall also attach to the list a reasonable specific summary of the expected testimony of each expert witness.

All of the other parties may rely upon a representation by a designated party that a witness will be present unless notice to the contrary is given fourteen (14) days prior to trial to allow the other party(s) to subpoena the witness or to obtain the witness' testimony by other means.

Witnesses who are not included on the witness list (including expert, impeachment and rebuttal witnesses whose use should have been reasonably anticipated) will not be permitted to testify, unless expressly authorized by court order based upon a showing that the failure to comply was justified.

19.

To facilitate coordination across the *Alpha Phi Alpha*, *Grant* and *Pendergrass* cases, and permit additional time to streamline the presentation of evidence, the parties have stipulated and this Court has ordered that exhibit lists will be exchanged by all parties and filed with the Court no later than July 31, 2023, and objections to the same will be provided no later than August 4, 2023. *Alpha Phi Alpha* [Doc. 269], *Grant* [Doc. 230], *Pendergrass* [Doc. 216].

20.

To facilitate coordination across the *Alpha Phi Alpha*, *Grant* and *Pendergrass* cases, and permit additional time to streamline the presentation of evidence, the parties have stipulated and this Court has ordered that deposition designations will be exchanged by all parties and filed with the Court no later than July 31, 2023, and objections to the same will be provided no later than August 4, 2023. *Alpha Phi Alpha* [Doc. 269], *Grant* [Doc. 230], *Pendergrass* [Doc. 216].

21.

Given the extensive briefing and the Court's familiarity with these cases, the parties have elected to forgo filing trial briefs at this time unless requested by the Court.

22.

Because this case will not be tried to a jury, the parties do not intend to submit requests for charge.

23.

Because this case will not be tried to a jury, the parties are not proposing a special verdict form.

24.

Unless otherwise authorized by the Court, arguments in all jury cases shall be limited to one-half hour for each side. Should any party desire any additional time for argument, the request should be noted (and explained) herein.

**Plaintiffs' and Defendants' Statement:** Given the complexities and fact-intensive nature of the issues in these cases, the parties request that the *Pendergrass*, *Grant*, and *Alpha Phi Alpha* plaintiffs each receive 30 minutes for opening arguments and 60 minutes for closing arguments. The parties further request that the Defendants receive 60 minutes for opening arguments and 90 minutes for closing arguments.

7

25.

Counsel will file proposed findings of fact and conclusions of law not later than September 25, 2023, as set forth in the Second Amended Scheduling Orders in each case, unless this date is modified by subsequent Court order.

26.

Pursuant to LR 16.3, lead counsel and persons possessing settlement authority to bind the parties have discussed in good faith the possibility of settlement of this case. The court (__) has or (X) has not discussed settlement of this case with counsel. It appears at this time that there is:

(_____) A good possibility of settlement.
(_____) Some possibility of settlement.
(_____) Little possibility of settlement.
(__X__) No possibility of settlement.

27.

Unless otherwise noted, the Court will not consider this case for a special setting, and it will be scheduled by the clerk in accordance with the normal practice of the court.

28.

The *Pendergrass, Grant*, and *Alpha Phi Alpha* Plaintiffs estimate that it will require __5.5__ days to present their evidence. The Defendants estimate that it will require 3.5 days to present their evidence. It is estimated that the total trial time is nine (9) days.

29.

IT IS HEREBY ORDERED that the above constitutes the pretrial order for the above captioned case (___) submitted by stipulation of the parties or (**X**) approved by the court after conference with the parties.

IT IS FURTHER ORDERED that the foregoing, including the attachments thereto, constitutes the pretrial order in the above case and that it supersedes the pleadings which are hereby amended to conform hereto and that this pretrial order shall not be amended except by Order of the court to prevent manifest injustice. Any attempt to reserve a right to amend or add to any part of the pretrial order after the pretrial order has been filed shall be invalid and of no effect and shall not be binding upon any party or the court, unless specifically authorized in writing by the court.

IT IS SO ORDERED this ___15th___ day of ___August___,
2023.

___Steve C. Jones___
UNITED STATES DISTRICT JUDGE

9

Each of the undersigned counsel for the parties hereby consents to entry of the foregoing pretrial order, which has been prepared in accordance with the form pretrial order adopted by this court.


_s/Abha Khanna_____          _s/Bryan Tyson_____
Counsel for *Pendergrass* Plaintiffs            Counsel for Defendants


_s/Abha Khanna_____
Counsel for *Grant* Plaintiffs


_s/Rahul Garabadu_____
Counsel for *Alpha Phi Alpha* Plaintiffs

10

**ATTACHMENT C-1**

**1.** *Pendergrass* **Plaintiffs' Outline of the Case**

Plaintiffs contend that the Georgia General Assembly's enacted redistricting plan for Georgia's congressional districts ("SB 2EX") unlawfully dilutes Black voting strength in violation of Section 2 of the Voting Rights Act (VRA).

Between 2010 and 2020, Georgia's Black population grew by 484,048 people, accounting for 47.26% of the state's overall population gain. In the metropolitan Atlanta region in particular, the Black population has increased by over 900,000 people in the last 20 years.

Despite these striking demographic changes, the enacted congressional plan fails to reflect the growth in Georgia's Black population. Instead, the enacted congressional plan packs Black voters in the western Atlanta metro area in the supermajority-Black Thirteenth Congressional District and cracks Black voters into other districts that stretch into the western and northern reaches of the state. The Black population is sufficiently large and geographically compact such that the General Assembly could have drawn, consistent with traditional redistricting principles, at least one additional majority-Black congressional district.

11

Voting is also highly racially polarized statewide; Black voters are politically cohesive, and white voters cohesively oppose Black-preferred candidates. In both statewide and localized contests, the white majority usually votes as a bloc to defeat the candidates preferred by Black voters in the focus area.

In light of Georgia's legacy of racial discrimination against its Black population, the subordination of their political power, and the ongoing, cumulative effects of that legacy, the state's enacted congressional map will prevent Black Georgians from participating equally in the political process. Therefore, SB 2 EX dilutes the voting strength of Black voters in violation of Section 2 of the VRA.

## 2. Relevant Statutes and Case Law

Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). This includes the

> manipulation of district lines [to] dilute the voting strength of politically cohesive minority group members, whether by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door.

*Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994). Section 2 claims "turn[ ] on the presence of discriminatory effects, not discriminatory intent." *Allen v. Milligan*, 143 S. Ct. 1487, 1507 (2023).

To prevail on their Section 2 claim, Plaintiffs must show that (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986).

Once Plaintiffs have made this threshold showing, the Court must then examine "the totality of circumstances"—including the Senate Factors, which are the nine factors identified in the U.S. Senate report that accompanied the 1982 amendments to the VRA—to determine whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 43–44; PI Order 29–32 (describing Senate Factors).

13

**ATTACHMENT C-2**

1. *Grant* **Plaintiffs' Outline of the Case**

Plaintiffs contend that the Georgia General Assembly's enacted redistricting plans for the Georgia State Senate ("SB 1EX") and the Georgia House of Representatives ("HB 1EX") unlawfully dilute Black voting strength in violation of Section 2 of the Voting Rights Act (VRA). Between 2010 and 2020, Georgia's Black population grew by 484,048 people, accounting for 47.26% of the state's overall population gain. In the metropolitan Atlanta region in particular, the Black population has increased by over 900,000 people in the last 20 years.

Despite these striking demographic changes, the enacted State Senate and House plans fail to reflect the growth in Georgia's Black population. Instead, the enacted plans unnecessarily pack Black Georgians together in some communities and break up areas with large, cohesive Black populations in others. In these areas, the Black population is sufficiently large and geographically compact such that the General Assembly could have drawn, consistent with traditional redistricting principles, at least three additional majority-Black State Senate districts, and at least five majority-Black House districts.

Voting is also highly racially polarized statewide; Black voters are politically cohesive, and white voters cohesively oppose Black-preferred candidates. In both statewide and localized contests, the white majority usually votes as a bloc to defeat the candidates preferred by Black voters in the focus area.

In light of Georgia's legacy of racial discrimination against its Black population, the subordination of their political power, and the ongoing, cumulative effects of that legacy, the state's enacted State Senate and House maps will prevent Black Georgians from participating equally in the political process. Therefore, SB 1 EX and HB 1 EX dilute the voting strength of Black voters in violation of Section 2 of the VRA.

### 2. Relevant Statutes and Case Law

Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). This includes the

> manipulation of district lines [to] dilute the voting strength of politically cohesive minority group members, whether by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door.

*Johnson v. De Grandy*, <u>512 U.S. 997, 1007</u> (1994). Section 2 claims "turn[ ] on the presence of discriminatory effects, not discriminatory intent." *Allen v. Milligan*, <u>143 S. Ct. 1487, 1507</u> (2023).

To prevail on their Section 2 claims, Plaintiffs must show that (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, <u>478 U.S. 30, 50</u>–51 (1986).

Once Plaintiffs have made this threshold showing, the Court must then examine "the totality of circumstances"—including the Senate Factors, which are the nine factors identified in the U.S. Senate report that accompanied the 1982 amendments to the VRA—to determine whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. <u>52 U.S.C. § 10301(b)</u>; *see also Gingles*, <u>478 U.S. at 43</u>–44; PI Order 29–32 (describing Senate Factors).

## ATTACHMENT C-3

1. *Alpha Phi Alpha* **Plaintiffs' Factual Statement**

Since 2000, Georgia's Black population has increased by over 1.1 million people, now representing one-third of the state's total population.  In metro Atlanta in particular, the Black population has increased by over 900,000 people in the last 20 years, while the Black population in the state's historic Black Belt has also grown relative to the white population and become increasingly concentrated.  However, despite these striking demographic changes, the numbers of majority-Black State Senate and House districts have barely changed.  There have been no majority-Black State Senate districts added and just two majority-Black House districts added since the prior redistricting plans.  There is also a substantial gap between the number of Black Georgians living in majority-Black districts and the number of white Georgians living in majority-white districts—a further indicator that the number of majority-Black districts is disproportionately low and that Black voting strength is being unlawfully diluted.

The new State Senate and House plans enacted by the General Assembly in 2021 constitute textbook violations of the VRA.  In a number of areas across the State, including in Metro Atlanta and portions of the Black Belt (which extends from

Augusta to Southwest Georgia), the Black population is sufficiently large and geographically compact such that the General Assembly could have drawn, consistent with traditional redistricting principles, at least three additional majority-Black State Senate districts, and at least five majority-Black House districts—but did not do so.

Voting is highly racially polarized in these areas and statewide, such that Black-preferred candidates typically lose to white preferred candidates except in majority-Black legislative districts. Black and white voters are politically cohesive. And in both statewide and localized contests, the white majority usually votes as a bloc to defeat the candidates preferred by Black voters unless districts are drawn to provide Black voters with opportunities to elect candidates of their choice.

In light of Georgia's legacy of racial discrimination against its Black population, the subordination of their political power, and the ongoing, cumulative effects of that legacy, among other factors, the state's maps will prevent Black Georgians from participating equally in the political process. Therefore, SB 1EX and HB 1EX dilute the political strength of Black voters in violation of Section 2 of the VRA.

## 2.  Relevant Authority

Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). This includes the

> manipulation of district lines [to] dilute the voting strength of politically cohesive minority group members, whether by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door.

*Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994). Section 2 claims "turn[ ] on the presence of discriminatory effects, not discriminatory intent." *Allen v. Milligan*, 143 S. Ct. 1487, 1507 (2023); *see also* Dkt. 268 at 45–46 (Order Denying Summary Judgment).

To prevail on their Section 2 claims, Plaintiffs must show that (1) the minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group "is politically cohesive"; and (3) "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). "[T]he second and third *Gingles* preconditions do not require Plaintiffs to prove that

19

race is the cause of the minority group's political cohesion or racial bloc voting." Dkt. 268 at 44 (Order Denying Summary Judgment).

Once Plaintiffs have made this threshold showing, the Court must then examine "the totality of circumstances"—including the Senate Factors, which are the nine factors identified in the U.S. Senate report that accompanied the 1982 amendments to the VRA—to determine whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation" by members of the minority group. 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 43–44; PI Order 29–32 (describing Senate Factors).

## ATTACHMENT D

### I.   Defendants' succinct factual statement and affirmative defenses.

#### A.  Alpha Phi Alpha

Plaintiffs filed this case on December 30, 2021, seeking injunctive relief regarding the State's 2021 State Senate and State House of Representatives redistricting plans under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. [APA Doc. 1]. Specifically, Plaintiffs claim that three additional majority-Black State Senate districts and five additional majority-Black State House districts should have been drawn by the Georgia General Assembly. Plaintiffs also claim that voting is racially polarized in Georgia and that the totality of the circumstances demonstrate that the redistricting plans result in a denial or abridgement of the rights of Black voters to vote on account of race or color.

Defendants assert that, even if this Court has jurisdiction to hear this case, Plaintiffs have not presented sufficient evidence to support their claims. Specifically, Defendants assert that Plaintiffs' illustrative plans were drawn primarily based on race and thus cannot be used to show additional districts the legislature should have drawn. Further, Defendants assert that Plaintiffs have improperly defined racially polarized voting as only requiring race-based bloc voting in which a white majority

21

voting bloc usually defeats the candidate preferred by a Black minority voting bloc. (*See,* Attachment C-3). This definition represents only half the inquiry, as Plaintiffs still must adduce evidence that this voter behavior is occurring "at least plausibly on account of race," *Allen v. Milligan*, 216 L. Ed. 2d 60, 75 (2023), in order to establish *racially* polarized voting as distinct from less insidious voting patterns that are not prohibited by the Voting Rights Act, like *partisan* polarized voting. Defendants also assert that voting in Georgia is equally open to all voters, regardless of race, as demonstrated by the success of candidates of choice of Black voters, the high voter turnout of voters of all races, and the lack of barriers to opportunities to participate in the political process.

Further, Defendants assert that finding for Plaintiffs requires interpreting the Voting Rights Act in a way that calls its constitutionality into question, because the Voting Rights Act's inherently race-based remedies are not justified by present conditions and are not congruent and proportional to the exercise of congressional power under the Fourteenth and Fifteenth Amendments.

Affirmative Defense: Plaintiffs lack constitutional standing to bring this action.

Affirmative Defense: Plaintiffs lack statutory standing to bring this action.

Affirmative Defense: Plaintiffs' federal claims are barred by the Eleventh Amendment to the U.S. Constitution.

Affirmative Defense: Plaintiffs' claims are barred by sovereign immunity.

Affirmative Defense: Plaintiffs' claims are barred because Section 2 of the Voting Rights Act provides no private right of action.

Affirmative Defense: Plaintiffs' claims are barred because they should be heard by a three-judge panel.

Affirmative Defense: To grant the relief Plaintiffs seek, the Court must interpret the Voting Rights Act in a way that violates the U.S. Constitution.

**B. *Grant***

Plaintiffs filed this case on January 11, 2022, seeking injunctive relief regarding the State's 2021 State Senate and State House of Representatives redistricting plans under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. [Grant Doc. 1]. Specifically, Plaintiffs claim that three additional majority-Black State Senate districts and five additional majority-Black State House districts should have been drawn by the Georgia General Assembly. Plaintiffs also claim that voting is racially polarized in Georgia and that the totality of the circumstances demonstrate

that the redistricting plans result in a denial or abridgement of the rights of Black voters to vote on account of race or color.

Defendants assert that, even if this Court has jurisdiction to hear this case, Plaintiffs have not presented sufficient evidence to support their claims. Specifically, Defendants assert that Plaintiffs' illustrative plans were drawn primarily based on race and thus cannot be used to show additional districts the legislature should have drawn. Further, Defendants assert that Plaintiffs have improperly defined racially polarized voting as only requiring race-based bloc voting in which a white majority voting bloc usually defeats the candidate preferred by a Black minority voting bloc. (*See,* Attachment C-2, *supra*). This definition represents only half the inquiry, as Plaintiffs still must adduce evidence that this voter behavior is occurring "at least plausibly on account of race," *Allen v. Milligan*, 216 L. Ed. 2d 60, 75 (2023), in order to establish *racially* polarized voting as distinct from less insidious voting patterns that are not prohibited by the Voting Rights Act, like *partisan* polarized voting. Defendants also assert that voting in Georgia is equally open to all voters, regardless of race, as demonstrated by the statewide success of candidates of choice of Black voters, the high voter turnout of voters of all races, and the lack of barriers to opportunities to participate in the political process.

24

Further, Defendants assert that finding for Plaintiffs requires interpreting the Voting Rights Act in a way that calls its constitutionality into question, because the Voting Rights Act's inherently race-based remedies are not justified by present conditions and are not congruent and proportional to the exercise of congressional power under the Fourteenth and Fifteenth Amendments.

Affirmative Defense: Plaintiffs lack constitutional standing to bring this action.

Affirmative Defense: Plaintiffs lack statutory standing to bring this action.

Affirmative Defense: Plaintiffs' federal claims are barred by the Eleventh Amendment to the U.S. Constitution.

Affirmative Defense: Plaintiffs' claims are barred by sovereign immunity.

Affirmative Defense: Plaintiffs' claims are barred because Section 2 of the Voting Rights Act provides no private right of action.

Affirmative Defense: Plaintiffs' claims are barred because they should be heard by a three-judge panel.

Affirmative Defense: To grant the relief Plaintiffs seek, the Court must interpret the Voting Rights Act in a way that violates the U.S. Constitution.

### C. *Pendergrass*

Plaintiffs filed this case on December 30, 2021, seeking injunctive relief regarding the State's 2021 congressional redistricting plan under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. [Pendergrass Doc. 1]. Specifically, Plaintiffs claim that one additional majority-Black congressional district should have been drawn by the Georgia General Assembly. Plaintiffs also claim that voting is racially polarized in Georgia and that the totality of the circumstances demonstrate that the congressional redistricting plan results in a denial or abridgement of the rights of Black voters to vote on account of race or color.

Defendants assert that, even if this Court has jurisdiction to hear this case, Plaintiffs have not presented sufficient evidence to support their claims. Specifically, Defendants assert that Plaintiffs' illustrative plan was drawn primarily based on race and thus cannot be used to show an additional district the legislature should have drawn. Further, Defendants assert that Plaintiffs have improperly defined racially polarized voting as only requiring race-based bloc voting in which a white majority voting bloc usually defeats the candidate preferred by a Black minority voting bloc. (*See,* Attachment C-1). This definition represents only half the inquiry, as Plaintiffs still must adduce evidence that this voter behavior is occurring "at least plausibly on

26

account of race," *Allen v. Milligan*, <u>216 L. Ed. 2d 60, 75</u> (2023), in order to establish *racially* polarized voting as distinct from less insidious voting patterns that are not prohibited by the Voting Rights Act, like *partisan* polarized voting. Defendants also assert that voting in Georgia is equally open to all voters, regardless of race, as demonstrated by the statewide success of candidates of choice of Black voters, the high voter turnout of voters of all races, and the lack of barriers to opportunities to participate in the political process.

Further, Defendants assert that finding for Plaintiffs requires interpreting the Voting Rights Act in a way that calls its constitutionality into question, because the Voting Rights Act's inherently race-based remedies are not justified by present conditions and are not congruent and proportional to the exercise of congressional power under the Fourteenth and Fifteenth Amendments.

Affirmative Defense: Plaintiffs lack constitutional standing to bring this action.

Affirmative Defense: Plaintiffs lack statutory standing to bring this action.

Affirmative Defense: Plaintiffs' federal claims are barred by the Eleventh Amendment to the U.S. Constitution.

Affirmative Defense: Plaintiffs' claims are barred by sovereign immunity.

Affirmative Defense: Plaintiffs' claims are barred because Section 2 of the Voting Rights Act provides no private right of action.

Affirmative Defense: Plaintiffs' claims are barred because they should be heard by a three-judge panel.

Affirmative Defense: To grant the relief Plaintiffs seek, the Court must interpret the Voting Rights Act in a way that violates the U.S. Constitution.

## II.   All relevant rules, regulations, statutes, ordinances, and illustrative case law relied upon as creating a defense in these lawsuits.

1.  *African Am. Voting Rights Legal Def. Fund v. Villa*, 54 F.3d 1345 (8th Cir. 1995)
2.  *Ala. State Conference of the NAACP v. Alabama*, No. 2:16-CV-731-WKW [WO], 2020 U.S. Dist. LEXIS 18938 (M.D. Ala. Feb. 5, 2020)
3.  *Ala. State Conference of the NAACP v. Alabama*, 949 F.3d 647 (11th Cir. 2020)
4.  *Alden v. Maine*, 527 U.S. 706, 715, 119 S. Ct. 2240 (1999)
5.  *Allen v. Milligan*, Case No. 21-1086, 2023 WL 3872517 (U.S. June 8, 2023)
6.  *Alltel Commc'ns, Inc. v. City of Macon*, 345 F.3d 1219 (11th Cir. 2003)
7.  *Alpha Phi Alpha Fraternity v. Raffensperger*, 587 F. Supp. 3d 1222 (N.D. Ga. 2022)
8.  *Ark. State Conference NAACP v. Ark. Bd. of Apportionment*, No. 4:21-cv-01239-LPR, 2022 U.S. Dist. LEXIS 29037 (E.D. Ark. Feb. 17, 2022)
9.  *Baird v. Indianapolis*, 976 F.2d 357 (7th Cir. 1992)
10.  *Bartlett v. Strickland*, 556 U.S. 1 (2009)
11.  *Bolden v. Mobile*, 423 F. Supp. 384, 388 (S.D. Ala. 1976)
12.  *Bolden v. Mobile*, 571 F.2d 238, 243 (5th Cir. 1978)
13.  *Brnovich v. Democratic Nat'l Committee*, 141 S.Ct. 2321 (2021)
14.  *Brooks v. Miller*, 58 F.3d 1230 (11th Cir. 1998)

15.   *Brown v. Jacobsen*, 590 F. Supp. 3d 1273 (D. Mont. 2022)
16.   *Burton v. City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999)
17.   *Bush v. Vera*, 517 U.S. 952, 977 (1996)
18.   *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)
19.   *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)
20.   *City of Boerne v. Flores*, 521 U.S. 507 (1997)
21.   *City of Mobile v. Bolden,* 446 U.S. 55 (1980)
22.   *Curling v. Raffensperger*, 50 F.4th 1114 (11th Cir. 2022)
23.   *Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998)
24.   *Earl Old Person v. Brown*, 312 F.3d 1036 (9th Cir. 2002)
25.   *Fairley v. Hattiesburg Miss.*, 662 F. App'x 291 (5th Cir. 2016)
26.   *Franklin v. Massachusetts*, 505 U.S. 788 (1992)
27.   *GA. State Conference of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336 (11th Cir. 2005)
28.   *Gill v. Whitford,* 138 S. Ct. 1916 (2018)
29.   *Greater Birmingham Ministries v. Sec'y of Ala*., 992 F. 3d 1299 (11th Cir. 2021)
30.   *Growe v. Emison,* 507 U.S. 25, 40 (1993)
31.   *Gonzalez v. City of Aurora*, 535 F.3d 594 (7th Cir. 2008)
32.   *Goosby v. Town Bd.*, 180 F.3d (2d Cir. 1999)
33.   *Gregory v. Ashcroft*, 501 U.S. 452 (1991)
34.   *Holder v. Hall*, 512 U.S. 874 (1994)
35.   *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193 (11th Cir. 2020)
36.   *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018)
37.   *Johnson v. Bd. of Regents*, 263 F.3d 1234 (11th Cir. 2001)
38.   *Johnson v. De Grandy*, 512 U.S. 997 (1994)
39.   *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335 (11th Cir. 2000)
40.   *Johnson v. Governor of Fla.*, 405 F.3d 1314 (11th Cir. 2005)
41.   *Johnson v. Hamrick*, 296 F.3d 1065 (11th Cir. 2002)
42.   *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000)
43.   *La. State Conference of the NAACP v. Louisiana*, 490 F. Supp. 3d 982 (M.D. La. 2020)
44.   *Lance v. Coffman*, 549 U. S. 437 (2007)
45.   *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993)

29

46. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006)

47. *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F. 4th 905 (11th Cir. 2023)

48. *Lewis v. Alamance County, N.C.*, 99 F.3d 600 (4th Cir. 1996)

49. *Lewis v. Governor of Ala.*, 944 F. 3d 1287 (11th Cir. 2019)

50. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)

51. *Marion v. DeKalb County, Ga.* 821 F. Supp. 685 (N.D. Ga. 1993)

52. *Merrill v. Milligan*, 142 S.Ct. 879 (2022)

53. *Miller v. Johnson*, 515 U.S. 900 (1995)

54. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)

55. *Negron v. City of Miami Beach, Fla*., 113 F.3d 1563 (11th Cir. 1997)

56. *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994)

57. *Purcell v. Gonzalez*, 549 U.S. 1 (2006)

58. *Raines v. Byrd*, 521 U.S. 811 (1997)

59. *Repub. Nat'l Comm. v. Dem. Nat'l Comm*., 140 S. Ct. 1205 (2020)

60. *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019)

61. *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26 (1976)

62. *Singleton v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022)

63. *Solomon v. Liberty Cty.*, 899 F.2d 1012 (11th Cir. 1990)

64. *Solomon v. Liberty Cty. Comm'rs*, 221 F. 3d 1218 (11th Cir. 2000)

65. *Southern Christian Leadership Conference v. Sessions*, 56 F.3d 1281 (11th Cir. 1995)

66. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016)

67. *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326 (11th Cir. 1999)

68. *Thornburg v. Gingles*, 478 U.S. 30 (1986)

69. *United Jewish Organizations, Inc. v. Carey*, 430 U.S. 144 (1977)

70. *United States v. Chemical Foundation, Inc.*, 272 U.S. 1 (1926)

71. *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546 (11th Cir. 1984)

72. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982)

73. *Vecinos De Barrio Uno v. City of Holyoke*, 72 F.3d 973 (1st Cir. 1995)

74. *Voinovich v. Quilter*, 507 U.S. 146 (1993)

75. *Warth v. Seldin*, 422 U.S. 490 (1975)

76. *Whitcomb v. Chavis*, 403 U.S. 124 (1971)

77. *White v. Regester*, 412 U.S. 755 (1983)

78.   *Wood v. Raffensperger*, <u>981 F.3d 1307, 1313</u> (11th Ci<u>r. 2020)</u>

<u>79.</u>   *Wright v. Sumter Cty. Bd. of Elections & Registration*, <u>301 F. Supp. 3d</u> <u>1297</u> (M.D. Ga. 2018)

80.   <u>O.C.G.A § 21-2-31</u>

<u>81.</u>   <u>O.C.G.A. § 21-2-153</u>

<u>82.</u>   <u>52 U.S.C. § 10301</u>

83.   <u>Fed. R. Evid. 401</u>

84.   <u>Fed. R. Evid. 403</u>

85.   <u>Fed. R. Evid. 602</u>

86.   <u>Fed. R. Evid. 801</u>

87.   <u>Fed. R. Evid. 803</u>

88.   <u>Fed. R. Evid. 807</u>

89.   <u>Fed. R. Evid. 901</u>

90.   <u>U.S. Const. Art. I</u>, Sec. III, Para. 2

91.   <u>U.S. Const. Amendment XIV</u>

<u>92.</u>   <u>U.S. Const. Amendment XV</u>

# ATTACHMENT E

## Joint Stipulated Facts for Trial

I.      **Parties**

      **A.**    *Pendergrass* **Plaintiffs**

            **1.**    **Coakley Pendergrass**

1.      Plaintiff Coakley Pendergrass is Black.

2.      Plaintiff Coakley Pendergrass resides in Cobb County, Georgia.

3.      Under the enacted congressional plan, Plaintiff Coakley Pendergrass resides and is a registered voter in Congressional District 11.

            **2.  Triana Arnold James**

4.      Plaintiff Triana Arnold James is Black.

5.      Plaintiff Triana Arnold James resides in Douglas County, Georgia.

6.      Under the enacted congressional plan, Plaintiff Triana Arnold James resides and is a registered voter in Congressional District 3.

            **3.  Elliott Hennington**

7.      Plaintiff Elliott Hennington is Black.

8.      Plaintiff Elliott Hennington resides in Cobb County, Georgia.

9.     Under the enacted congressional plan, Plaintiff Elliott Hennington resides and is a registered voter in Congressional District 14.

### 4. Robert Richards

10.    Plaintiff Robert Richards is Black.

11.    Plaintiff Robert Richards resides in Cobb County, Georgia.

12.    Under the enacted congressional plan, Plaintiff Robert Richards resides and is a registered voter in Congressional District 14.

### 5. Jens Rueckert

13.    Plaintiff Jens Rueckert is Black.

14.    Plaintiff Jens Rueckert resides in Cobb County, Georgia.

15.    Under the enacted congressional plan, Plaintiff Jens Rueckert resides and is a registered voter in Congressional District 14.

### 6. Ojuan Glaze

16.    Plaintiff Ojuan Glaze is Black.

17.    Plaintiff Ojuan Glaze resides in Douglas County, Georgia.

18.    Under the enacted congressional plan, Plaintiff Ojuan Glaze resides and is a registered voter in Congressional District 13.

## B.   *Grant* Plaintiffs

### 1.  Annie Lois Grant

19.    Plaintiff Annie Lois Grant is Black.

20.    Plaintiff Annie Lois Grant resides in Union Point, Georgia.

Under the enacted legislative plans, Plaintiff Annie Lois Grant resides in and

is a registered voter in Senate District 24 and House District 124.

### 2.  Quentin T. Howell

21.    Plaintiff Quentin T. Howell is Black.

22.    Plaintiff Quentin T. Howell resides in Milledgeville, Georgia.

23.    Under the enacted legislative plans, Plaintiff Quentin T. Howell resides

in and is a registered voter in Senate District 25 and House District 133.

### 3.  Elroy Tolbert

24.    Plaintiff Elroy Tolbert is Black.

25.    Plaintiff Elroy Tolbert resides in Macon, Georgia.

26.    Under the enacted legislative plans, Plaintiff Elroy Tolbert resides in

and is a registered voter in Senate District 18 and House District 144.

### 4.  Triana Arnold James

27.    Plaintiff Triana Arnold James is Black.

28.     Plaintiff Triana Arnold James resides in Villa Rica, Georgia.

29.     Under the enacted legislative plans, Plaintiff Triana Arnold James resides in and is a registered voter in Senate District 30 and House District 64.

### 5.  Eunice Sykes

30.     Plaintiff Eunice Sykes is Black.

31.     Plaintiff Eunice Sykes resides in Locust Grove, Georgia.

32.     Under the enacted legislative plans, Plaintiff Eunice Sykes resides in and is a registered voter in Senate District 25 and House District 117.

### 6.  Elbert Solomon

33.     Plaintiff Elbert Solomon is Black.

34.     Plaintiff Elbert Solomon resides in Griffin, Georgia.

35.     Under the enacted legislative plans, Plaintiff Elbert Solomon resides in Senate District 16 and House District 117.

### 7.  Dexter Wimbish

36.     Plaintiff Dexter Wimbish is Black.

37.     Plaintiff Dexter Wimbish resides in Griffin, Georgia.

38.     Under the enacted legislative plans, Plaintiff Dexter Wimbish resides in Senate District 16 and House District 74.

### 8. Garrett Reynolds

39.    Plaintiff Garrett Reynolds is Black.

40.    Plaintiff Garrett Reynolds resides in Tyrone, Georgia.

41.    Under the enacted legislative plans, Plaintiff Garrett Reynolds resides in Senate District 16 and House District 68.

### 9. Jacqueline Faye Arbuthnot

42.    Plaintiff Jacqueline Faye Arbuthnot is Black.

43.    Plaintiff Jacqueline Faye Arbuthnot resides in Powder Springs, Georgia.

44.    Under the enacted legislative plans, Plaintiff Jacqueline Faye Arbuthnot resides in Senate District 31 and House District 64.

### 10. Jacquelyn Bush

45.    Plaintiff Jacquelyn Bush is Black.

46.    Plaintiff Jacquelyn Bush resides in Fayetteville, Georgia.

47.    Under the enacted legislative plans, Plaintiff Jacquelyn Bush resides in Senate District 16 and House District 74.

### 11. Mary Nell Conner

48.    Plaintiff Mary Nell Conner is Black.

49.     Plaintiff Mary Nell Conner resides in Henry County, Georgia.

50.     Under the enacted legislative plans, Plaintiff Mary Nell Conner resides in Senate District 25 and House District 117.

### C.     *Alpha Phi Alpha* Plaintiffs

#### 1.  Alpha Phi Alpha Fraternity Inc.

51.     Plaintiff Alpha Phi Alpha Fraternity Inc. is the first intercollegiate Greek-letter fraternity established for Black Men.

52.     Alpha Phi Alpha Fraternity Inc. has thousands of members in Georgia, including Black Georgians who are registered voters who live in Senate Districts 16, 17, and 23 under the 2021 Senate Plan, as well as in House Districts 74, 114, 117, 128, 133, 134, 145, 171, and 173 under the 2021 House Plan.

53.     Alpha Phi Alpha Fraternity Inc. has long made political participation for its members and Black Americans an organizational priority, including through programs to raise political awareness, register voters, and empower Black communities.

54.     Harry Mays is a member of Alpha Phi Alpha Fraternity Inc.

55.     Harry Mays resides in House District 117 under the State's 2021 House Plan.

56.     Under the *Alpha Phi Alpha* Plaintiffs' illustrative maps, Harry Mays would reside in a new majority Black House District.

## 2. Sixth District of the African Methodist Episcopal Church

57.     Plaintiff Sixth District of the African Methodist Episcopal Church is a nonprofit religious organization.

58.     The Sixth District is one of twenty districts of the African Methodist Episcopal Church and covers the entirety of the State of Georgia.

59.     Plaintiff Sixth District of the African Methodist Episcopal Church has more than 500 member-churches in Georgia.

60.     Member-churches of Plaintiff Sixth District of the African Methodist Episcopal Church have tens of thousands of members across Georgia.

61.     Plaintiff Sixth District of the African Methodist Episcopal Church has churches located in Senate Districts 16, 17, and 23 under the 2021 Senate Plan as well as in House Districts 74, 114, 117, 128, 133, 134, 145, 171, and 173 under the 2021 House Plan.

62.     Plaintiff Sixth District of the African Methodist Episcopal Church has long made encouraging and supporting civic participation among its members a core aspect of its work, including through programs to register voters, transporting

38

churchgoers to polling locations, hosting "Get Out the Vote" efforts, and providing food, water, encouragement, and assistance to voters waiting in lines at polling locations.

63.     Plaintiff Phil S. Brown is a member of the Lofton Circuit African Methodist Episcopal Church in Wrens, Georgia.

64.     Plaintiff Janice Stewart is a member of the Saint Peter African Methodist Episcopal Church in Camilla, Georgia.

### 3.  Eric T. Woods

65.     Plaintiff Eric T. Woods is a Black citizen of the United States and the State of Georgia.

66.     Plaintiff Eric T. Woods is a resident of Tyrone, Georgia in Fayette County.

67.     Plaintiff Eric T. Woods has been a registered voter at his current address since 2011.

68.     Plaintiff Eric T. Woods resides in State Senate District 16, which is not majority Black, under the 2021 Senate Plan.

69.     Under the *Alpha Phi Alpha* Plaintiffs' illustrative state Senate map drawn by Mr. Cooper, Plaintiff Eric T. Woods would reside in a new majority Black Senate District, Illustrative Senate District 28.

### 4.  Katie Bailey Glenn

70.     Plaintiff Katie Bailey Glenn is a Black citizen of the United States and the State of Georgia.

71.     Plaintiff Katie Bailey Glenn is a resident of McDonough, Georgia in Henry County.

72.     Plaintiff Katie Bailey Glenn has been a registered voter at her current address for approximately 50 years.

73.     Plaintiff Katie Bailey Glenn resides in State Senate District 17, which is not majority Black, under the State's 2021 Senate Plan.

74.     Under the *Alpha Phi Alpha* Plaintiffs' illustrative state Senate map, drawn by Mr. Cooper, Plaintiff Katie Bailey Glenn would reside in a new majority-Black Senate District, Illustrative Senate District 17.

### 5.  Phil S. Brown

75.     Plaintiff Phil S. Brown is a Black citizen of the United States and the State of Georgia.

76.     Plaintiff Phil S. Brown is a resident of Wrens, Georgia in Jefferson County.

77.     Plaintiff Phil S. Brown has been a registered voter at his current address for years.

78.     Plaintiff Phil S. Brown resides in State Senate District 23, which is not majority Black, under the State's 2021 Senate Plan.

79.     Under the *Alpha Phi Alpha* Plaintiffs' illustrative state Senate map, drawn by Mr. Cooper, Plaintiff Phil S. Brown would reside in a new majority Black Senate District, Illustrative Senate District 23.

### 6.  Janice Stewart

80.     Plaintiff Janice Stewart is a Black citizen of the United States and the State of Georgia.

81.     Plaintiff Janice Stewart is a resident of Thomasville, Georgia in Thomas County.

82.     Plaintiff Janice Stewart has been a registered voter at her current address for years.

83.     Plaintiff Janice Stewart resides in State House District 173, which is not majority Black, under the State's 2021 House Plan.

84.     Under the *Alpha Phi Alpha* Plaintiffs' illustrative state House map, drawn by Mr. Cooper, Plaintiff Janice Stewart would reside in a new majority Black House District, Illustrative House District 171.

**D.     Defendants**

**1.      Brad Raffensperger**

85.     Defendant Brad Raffensperger is the Georgia Secretary of State and is named in his official capacity.

**2.  Sara Tindall Ghazal**

86.     Defendant Sara Tindall Ghazal is a member of the State Election Board and is named in her official capacity in the *Grant* and *Pendergrass* cases.

**3.  Janice Johnston**

87.     Defendant Janice Johnston is a member of the State Election Board and is named in her official capacity in the *Grant* and *Pendergrass* cases.

**4.  Edward Lindsey**

88.     Defendant Edward Lindsey is a member of the State Election Board and is named in his official capacity in the *Grant* and *Pendergrass* cases.

### 5. Matthew Mashburn

89.    Defendant Matthew Mashburn is a member of the State Election Board and is named in his official capacity in the *Grant* and *Pendergrass* cases.

### 6. William S. Duffey, Jr.

90.    Defendant William S. Duffey, Jr. is chair of the State Election Board and is named in his official capacity in the *Grant* and *Pendergrass* cases.

## II.    2020 Census

91.    The U.S. Census Bureau releases data to the states after each census for use in redistricting. This data includes population and demographic information for each census block.

92.    The Census Bureau provided redistricting data to Georgia on August 21, 2021.

### A.    Statewide Population Growth

93.    From 2010 to 2020, Georgia's population grew by over 1 million people to 10.71 million, up 10.57% percent from 2010.

94.    As a result of this population growth, the state retained 14 seats in the U.S. House of Representatives.

43

95.     Between 2010 and 2020, Georgia's Any-Part Black (defined throughout these Stipulations as Any Part or AP Black, meaning the combined total of persons who are single-race Black and persons of two or more races and some part Black, including Hispanic Black) population increased by 484,048 people since 2010.

96.     Between 2010 and 2020, 47.26% of the state's overall population gain was attributable to AP Black population growth.

97.     Georgia's AP Black population, as a share of the overall statewide population, increased between 2010 and 2020, from 31.53% in 2010 to 33.03% in 2020.

98.     As a matter of total population, AP Black Georgians comprise the largest minority population in the state, at 33.03%.

99.     From 2010 to 2020, Georgia's white population decreased by 51,764.

100.    Between 2000 to 2020, the AP Black population in Georgia increased by 1,144,721, from 2,393,425 to 3,538,146.

101.    Between 2000 to 2020, the white population in Georgia increased by 233,495.

102. Georgia's AP Black population has increased in absolute and percentage terms since 1990, from about 27% in 1990 to 33.03% in 2020. Over the same time period, the percentage of the population identifying as non-Hispanic white has dropped from 70% to 50.06%.

103. Since 1990, the AP Black population has more than doubled: from 1.75 million to 3.54 million.

104. Georgia has a total voting-age population of 8,220,274, of whom 2,607,986 (31.73%) are AP Black and 2,488,419 (30.27%) are single-race Black.

105. The total estimated citizen voting-age population in Georgia in 2019 was 33.87% AP Black and 32.9% single-race Black. The total estimated citizen voting-age population in 2021 was 33.3% AP Black and 31.4% single-race Black.

**B.  Metro Atlanta**

106. The Atlanta Metropolitan Statistical Area ("MSA") consists of the following 29 counties: Barrow, Bartow, Butts, Carroll, Cherokee, Clayton, Cobb, Coweta, Dawson, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Haralson, Heard, Henry, Jasper, Lamar, Meriwether, Morgan, Newton, Paulding, Pickens, Pike, Rockdale, Spalding, and Walton.

107.   The population gain in counties in the Atlanta MSA between 2010 and 2020 amounted to 803,087 persons and the AP Black population gain in counties in the Atlanta MSA between 2010 and 2020 amounted to 409,927.

108.   According to the 2000 Census, the population of counties in the current Atlanta MSA area was 29.29% AP Black, increasing to 33.61% in 2010, and 35.91% in 2020.

109.   The AP Black population of counties in the current Atlanta MSA has grown from 1,248,809 in 2000 to 2,186,815 in 2020—an increase of 938,006 people.

110.   According to the 2020 census, the counties in the Atlanta MSA have a total voting-age population of 4,654,322 persons, of whom 1,622,469 (34.86%) are AP Black.

111.   The Atlanta Regional Commission ("ARC") includes 11 core counties: Cherokee, Clayton, Cobb, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Henry, and Rockdale.

112.   Between 2010 and 2020, the non-Hispanic white population in the counties in the Atlanta MSA decreased by 22,736 persons.

**C.    South Metro Atlanta Area**

113.    The southern portion of the Metro Atlanta area contains the following five counties: Fayette, Spalding, Henry, Rockdale, and Newton.

114.    In 2000, 18.51% of the population in the five-county Fayette-Spalding-Henry-Rockdale-Newton area was AP Black.  By 2010, the AP Black population in that area more than doubled to reach 36.70% of the overall population.  It then grew to 46.57% by 2020.

115.    Between 2000 and 2020, the AP Black population in the five-county Fayette-Spalding-Henry-Rockdale-Newton area quadrupled, from 74,249 to 294,914.

116.    Senate Districts 34 and 44 are adjacent to Senate District 16 under the 2021 Senate Plan.

117.    Senate Districts 10, 16, 25, 43, and 46 are adjacent to Senate District 17 under the 2021 Senate Plan.

**D.    The Black Belt**

118.    The Black Belt refers to an area that runs across the southeastern United States. Counties in the Black Belt region often have significant Black populations as

47

a share of total population, and share a history of, among other things, antebellum slavery and plantation agriculture.

119.   In Georgia, the Black Belt runs across the middle of the State, roughly from Augusta to Southwest Georgia.

120.   The following counties in the region around Augusta are at least 40% AP Black: Jenkins, Burke, Richmond, Jefferson, McDuffie, Wilkes, Taliaferro, Warren, Washington, and Hancock Counties.

121.   Jenkins, Burke, Richmond, Jefferson, McDuffie, Wilkes, Taliaferro, Warren, Washington, and Hancock Counties have experienced a slight overall population increase since 2000, from 321,998 to 325,164 in 2020.

122.   During that same period of time, the AP Black population in Jenkins, Burke, Richmond, Jefferson, McDuffie, Wilkes, Taliaferro, Warren, Washington, and Hancock Counties increased by 14,480, from 163,310 (50.66%) to 177,610 (54.62%).

123.   During that same period of time, the white population in Jenkins, Burke, Richmond, Jefferson, McDuffie, Wilkes, Taliaferro, Warren, Washington, and Hancock Counties decreased by 22,755 from 146,870 (45.61%) to 124,115 (38.17%).

124.   The Macon–Warner Robins–Fort Valley Combined Statistical Area consists of the following counties: Twiggs, Macon-Bibb, Jones, Monroe, Crawford, Houston, and Peach.

125.   The total population of Twiggs, Macon-Bibb, Jones, Monroe, Crawford, Houston, and Peach has increased from 356,801 in 2000 to 425,416 in 2020.

126.   During that same period of time, the AP Black population in Twiggs, Macon-Bibb, Jones, Monroe, Crawford, Houston, and Peach Counties increased from 131,627 (36.89%) to 177,269 (to 41.67%).

127.   During that same period of time, the white population in Metropolitan Macon decreased from 211,927 (59.40%) to 208,498 (49.01%).

128.   The following counties in Southwest Georgia are at least 40% AP Black: Sumter, Webster, Stewart, Quitman, Clay, Randolph, Terrell, Calhoun, Dougherty, Early, Baker, and Mitchell Counties.

129.   Senate District 12 ("SD12") under 2021 State Senate Plan includes all or part of the following counties: Sumter, Webster, Stewart, Quitman, Clay, Randolph, Terrell, Calhoun, Dougherty, Early, Miller, Baker, and Mitchell Counties.

130.   From 2000 to 2020, the overall population in Sumter, Webster, Stewart, Quitman, Clay, Randolph, Terrell, Calhoun, Dougherty, Early, Miller, Baker, and Mitchell Counties decreased from 214,686 to 190,819.

131.   During that same period of time, the AP Black population in Sumter, Webster, Stewart, Quitman, Clay, Randolph, Terrell, Calhoun, Dougherty, Early, Miller, Baker, and Mitchell Counties decreased by 3,165 from 118,786 (55.33%) to 115,621 (60.6%).

132.   During that same period of time, the white population in Sumter, Webster, Stewart, Quitman, Clay, Randolph, Terrell, Calhoun, Dougherty, Early, Miller, Baker, and Mitchell Counties decreased by 26,393, from 90,946 (42.36%) to 64,553 (33.83%).

133.   The county-level demographic information based on 2000, 2010, and 2020 Census data set forth in exhibits G-1, G-2, and G-3 of the December 5, 2022 Report of William Cooper [*Alpha Phi Alpha* Dkt. No. 231-1] are not disputed.

## III.   The 2021 Redistricting Process

134.   The House Legislative and Congressional Reapportionment Committee adopted the guidelines filed as *Alpha Phi Alpha* Dkt. No. 39-17 prior to the public release of the redistricting plans.

135.   The Senate Reapportionment and Redistricting Committee adopted the guidelines filed as *Alpha Phi Alpha* Dkt. No. 39-18 prior to the public release of the redistricting plans.

136.   The Georgia General Assembly held nine in-person and two virtual joint public hearing committee meetings on redistricting beginning on June 15, 2021, to gather input from voters.

137.   The joint redistricting committees released an educational video about the redistricting process at their June 15, 2021 meeting.

138.   The General Assembly created an online portal for voters to offer comments on redistricting plans and received more than 1,000 comments from voters in at least 86 counties.

139.   All of the public town hall meetings convened by the State's Redistricting Committees were held during June and July 2021.

140.   On August 21, 2021, the Census Bureau released the detailed population counts that Georgia used to redraw districts.

141.   The joint committees held a meeting to hear from interested groups on August 30, 2021.

142.   The National Conference of State Legislatures, American Civil Liberties Union of Georgia, Common Cause, Fair Districts GA, the Democratic Party of Georgia, and Asian-Americans Advancing Justice – Atlanta presented at the August 30, 2021 joint meeting.

143.   The 2021 Senate and House Plans were first released on November 2, 2021.

144.   The General Assembly's special session to consider the draft Senate and House Plans (and other specified topics) began on November 3, 2021.

145.   After the special session convened, the House and Senate redistricting committees held multiple meetings prior to voting on proposed redistricting plans.

146.   The House and Senate redistricting committees received public comment on the proposed maps during committee meetings held in the special session.

147.   On November 12, 2021, the General Assembly passed the 2021 Senate and House Plans.

148.   On November 22, 2021, the General Assembly passed the 2021 congressional redistricting plan.

149.   Governor Kemp signed the 2021 Senate, House, and Congressional Plans into law on December 30, 2021.

150.   No Democratic members of the General Assembly voted in favor of the 2021 Congressional, Senate, or House plans.

151.   No Black legislator in the General Assembly voted in favor of the 2021 Congressional, Senate, or House plans.

152.   The 2021 Congressional, Senate, and House Plans were used in the 2022 elections.

## IV.   Timing of Redistricting

153.   A newly redrawn State Senate map signed into law on April 11, 2002 was used in the primary election on August 20, 2002 and general election on November 5, 2002.

154.   Newly redrawn State Senate and State House maps approved by a court on March 25, 2004 were used in the primary election on July 20, 2004 and general election on November 2, 2004.

155.   During the 2022 redistricting cycle, the Secretary of State's office informed county election officials that the last day to make redistricting changes in then-operative ElectioNet system was February 18, 2022.

156.   Not all counties completed the redistricting process prior to the February 18, 2022 deadline set by the Secretary of State's office.

157.   The Georgia Registered Voter Information System (GaRVIS) reduces the minimum time for a county to enter and exit the redistricting module of the system from four days to as little as 24 hours.

158.   GaRVIS improves on the technical processing performance of Georgia's prior voter information system in terms of the system's responsiveness to user updates.

## V.   Adopted Plan Statistics

159.   There are 14 Congressional districts in the State's 2021 Congressional Plan.

160.   The previous 2012 Congressional Plan contained 4 AP Black voting age population majority Congressional districts at the time it was enacted.

161.   The previous 2012 Congressional Plan contained 4 AP Black voting age population majority Congressional districts using 2020 Census data.

162.   The State's 2021 Congressional Plan contains three Black-majority Congressional districts fully within the 29-County Atlanta MSA.

163.   The previous 2012 Congressional Plan contained three Black-majority Congressional districts fully within the 29-County Atlanta MSA.

164.   The 2021 Congressional Plan splits 15 counties.

165.   The prior 2012 Congressional Plan split 16 counties.

166.   The 2021 Enacted Congressional Plan Statistics set forth in exhibits G and K-1 of the December 5, 2022 Report of William Cooper [*Pendergrass* Dkt. Nos. 174-1, 174-2] are not disputed.

167.   The 2012 Benchmark Congressional Plan Statistics set forth in exhibits E and F of the December 5, 2022 Report of William Cooper [*Pendergrass* Dkt. No. 174-1] are not disputed.

168.   The Compactness Reports for the 2021 Enacted Congressional Plan and Benchmark 2012 Congressional Plan, as set forth in exhibits L-3 and L-2 of the December 5, 2022 Report of William Cooper [*Pendergrass* Dkt. No. 174-2] are not disputed.

169.   The County Population Components Report for the 2021 Enacted Congressional Plan, as set forth in exhibit K-3 of the December 5, 2022 Report of William Cooper [*Pendergrass* Dkt. No. 174-2] is not disputed.

170.   The Political Subdivision Split Reports for the 2021 Enacted Congressional Plan, as set forth in exhibits M-3 and M-6 of the December 5, 2022 Report of William Cooper [*Pendergrass* <u>Dkt. No. 174-2</u>] are not disputed.

171.   The Political Subdivision Split Reports for the 2012 Benchmark Plan, as set forth in exhibits M-2 and M-5 of the December 5, 2022 Report of William Cooper [*Pendergrass* <u>Dkt. No. 174-2</u>] are not disputed.

172.   There are 56 Senate districts in the State's 2021 Senate Plan.

173.   The previous (2014) Senate plan contained 15 majority-Black Senate districts at the time it was enacted.

174.   The 2014 Senate plan contained 13 majority-Black districts using 2020 Census data, plus a 14th district with a Black voting age population of 49.76%.

175.   The 2021 State Senate Plan did not pair any incumbents who were running for reelection in 2022.

176.   The State's 2021 Senate Plan contains 10 Black-majority Senate districts fully within the 29-County Atlanta MSA.

177.   The previous 2014 Senate Plan contained 10 Black-majority Senate districts fully within the 29-County Atlanta MSA.

178.   The 2006 Senate Plan that was in place prior to the 2014 Senate Plan contained 10 Black-majority Senate districts fully within the 29-County Atlanta MSA, using 2010 Census data.

179.   There are 180 House districts in the State's 2021 House Plan.

180.   The previous (2015) House plan contained 47 majority-Black House districts at the time it was enacted.

181.   The 2015 State House plan contained 47 majority-Black districts using 2020 Census Data.

182.   The 2021 State House Plan paired four sets of incumbents who were running for reelection in 2022.

183.   The State's 2021 House Plan contains 33 Black-majority House districts fully within the 29-County Atlanta MSA.

184.   The previous 2015 House plan contained 31 Black-majority Senate districts fully within the 29-County Atlanta MSA.

185.   The 2006 House plan that was in place prior to the 2015 House Plan contained 30 Black-majority Senate districts fully within the 29-County Atlanta MSA, using 2010 Census data.

186.   The 2021 Enacted Senate Plan Statistics, 2021 Enacted House Plan Statistics, 2014 Benchmark Senate Plan Statistics, and 2015 Benchmark House Plan Statistics set forth respectively in exhibits L and M-1, Y and Z-1, I-1 and J-1, and V-1 and W-1 of the December 5, 2022 Report of William Cooper [*Alpha Phi Alpha* Dkt. Nos. 231-1, 231-3] are not disputed.

187.   The County Population Components Reports for the 2021 Enacted Senate and Enacted House Plans set forth respectively in exhibits M-2 and Z-2 of the December 5, 2022 Report of William Cooper [*Alpha Phi Alpha* Dkt. Nos. 231-1, 231-3] are not disputed.

188.   The Political Subdivision Split Reports for the 2021 Enacted Senate Plan, 2021 Enacted House Plan, Benchmark 2014 Senate Plan, and Benchmark 2015 House Plan, as set forth respectively in exhibits T-3 and T-6, AH-1, AH-3 AH-5, T-2 and T-4, and AH-2, AH-4, and AH-6 of the December 5, 2022 Report of William Cooper [*Alpha Phi Alpha* Dkt. Nos. 231-1, 231-3, 231-4, 231-5], are not disputed.

189.   The Compactness Reports for the 2021 Enacted Senate Plan, 2021 Enacted House Plan, Benchmark 2014 Senate Plan, and Benchmark 2015 House Plan, as set forth respectively in exhibits S-1, S-3, AG-1, AG-3, S-2, and AG-2 of

the December 5, 2022 Report of William Cooper [*Alpha Phi Alpha* Dkt. Nos. 231-3, 231-4] are not disputed.

## VI.   *Gingles* Preconditions

### E.   Mr. Cooper's Illustrative Congressional Plan

190.   Plaintiffs' mapping expert, William S. Cooper, prepared an illustrative congressional plan with an additional majority-Black congressional district (illustrative Congressional District 6) anchored in the western Atlanta metropolitan area.

191.   Mr. Cooper's illustrative Congressional District 6 has an AP Black population of 396,891 people, or 51.87% of the district's population.

192.   Mr. Cooper's illustrative Congressional District 6 has an AP BVAP of 50.23%.

193.   Plaintiffs' racially polarized voting expert, voting expert, Dr. Maxwell Palmer, analyzed the performance of Black-preferred candidates in general elections in Mr. Cooper's illustrative Congressional District 6.

194.   In all cases where Dr. Palmer analyzed the performance of Black-preferred candidates related to illustrative Congressional District 6, the Black-preferred candidate was a Democrat.

195.   In each of the 31 statewide races from 2012 through 2021, the Black-preferred candidate won a larger share of the vote in Mr. Cooper's illustrative Congressional District 6, with an average of 66.1%.

196.   In the 31 statewide races from 2012 through 2021, the Black-preferred candidate also won a larger share of the vote in Mr. Cooper's illustrative Congressional District 13 (the only district from which Mr. Cooper's illustrative Congressional District 6 was drawn that previously performed for Black-preferred candidates), with an average of 62.3%.

197.   Population deviations in Mr. Cooper's illustrative plan are limited to plus-or-minus one person from the ideal district population of 765,136.

198.   The districts in Mr. Cooper's illustrative congressional plan are contiguous.

199.   The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact.

200.   The Polsby-Popper test computes the ratio of each district area to the area of a circle with the same perimeter. The measure is always between 0 and 1, with 1 being the most compact.

201.   The Reock score for Mr. Cooper's illustrative Congressional District 6 is 0.45.

202.   The average Reock score of the enacted congressional plan is 0.44.

203.   The Reock score of the enacted Congressional District 6 is 0.42.

204.   The Polsby-Popper score for Mr. Cooper's illustrative Congressional District 6 is 0.27.

205.   The average Polsby-Popper score of the enacted congressional plan is 0.27.

206.   The Polsby-Popper score of the enacted Congressional District 6 is 0.20.

207.   The Compactness Report for Mr. Cooper's Congressional Plan, as set forth in exhibit L-1 of the December 5, 2022 Report of William Cooper [*Pendergrass* Dkt. Nos. 174-2] is not disputed.

208.   The Illustrative Congressional Plan statistics set forth in exhibit I-1 of the December 5, 2022 Report of William Cooper [*Pendergrass* Dkt. No. 174-1] are not disputed.

209.   The County Population Components Report for Mr. Cooper's Illustrative Congressional Plan, as set forth in exhibits I-3 of the December 5, 2022 Report of William Cooper [*Pendergrass* Dkt. Nos. 174-1,174-2] is not disputed.

210.   The Political Subdivision Split Reports for Mr. Cooper's Illustrative Congressional Plan, as set forth in exhibits M-1 and M-4 of the December 5, 2022 Report of William Cooper [*Pendergrass* Dkt. Nos. 174-2] are not disputed.

211.   Both Mr. Cooper's illustrative congressional plan and the enacted plan split 15 counties.

212.   Mr. Cooper's illustrative plan leaves six of the 14 districts in the enacted plan unchanged: Congressional Districts 1, 2, 5, 7, 8, and 12.

213.   Districts 2, 5, and 7 elected Black Democratic members of Congress in the 2022 elections.

214.   Dr. Palmer conducted a racially polarized voting analysis of enacted Congressional Districts 3, 6, 11, 13, and 14, both as a region (the "focus area") and individually.

215.   In all cases where Dr. Palmer analyzed the performance of Black-preferred candidates related enacted Congressional Districts 3, 6, 11, 13, and 14, both as a region (the "focus area") and individually, the Black-preferred candidate was a Democrat.

216.   In all cases where Dr. Palmer analyzed the performance of Black-preferred candidates related enacted Congressional Districts 3, 6, 11, 13, and 14, both as a region (the "focus area") and individually, the white-preferred candidate was a Republican.

217.   Dr. Palmer employed a statistical method called ecological inference ("EI") to derive estimates of the percentages of Black and white voters in the focus area that voted for each candidate in 40 statewide general elections between 2012 and 2022.

218.   Black voters in Georgia are extremely cohesive, with a clear candidate of choice in all 40 general elections Dr. Palmer examined.

219.   On average, across the focus area, Black voters supported their candidates of choice with 98.4% of the vote in the 40 general elections Dr. Palmer examined.

220.   Black voters are also extremely cohesive in the general election of each congressional district that comprises the focus area, with a clear candidate of choice in all 40 general elections Dr. Palmer examined.

221.   On average, in the 40 general elections Dr. Palmer examined, Black voters supported their candidates of choice in general elections with 97.2% of the vote in Congressional District 3, 93.3% in Congressional District 6, 96.1% in Congressional District 11, 99.0% in Congressional District 13, and 95.8% in Congressional District 14.

222.   White voters in Georgia are highly cohesive in voting in opposition to the Black-preferred candidate in every general election Dr. Palmer examined.

223.   On average, across the focus area, white voters supported Black-preferred candidates in general elections with only 12.4% of the vote, and in no general election that Dr. Palmer examined did this estimate exceed 17%.

224.   On average, in the 40 general elections Dr. Palmer examined, white voters supported Black-preferred candidates with 6.7% of the vote in Congressional District 3, 20.2% in Congressional District 6, 16.1% in Congressional District 11, 15.5% in Congressional District 13, and 10.3% in Congressional District 14.

225.   Across the focus area, white-preferred candidates won the majority of the vote in all 40 general elections Dr. Palmer examined in Congressional Districts 3, 6, 11, and 14.

226.   Only in the majority-Black Congressional District 13 did the Black-preferred candidate win a larger share of the vote in the 40 general elections Dr. Palmer examined.

227.   The endogenous election results from the 2022 general election showed that Black-preferred candidates were defeated in Congressional Districts 3, 6, 11, and 14.

### F. Mr. Esselstyn's Illustrative State Senate and House Plans (*Grant*)

228.   Georgia's Black population is sufficiently numerous to allow for the creation of three additional majority-Black State Senate districts.

229.   Georgia's Black population is sufficiently numerous to allow for the creation of five additional majority-Black State House districts.

230.   Plaintiffs' mapping expert, Blakeman B. Esselstyn, drew illustrative State Senate and House maps that include three additional majority-Black State Senate districts and five additional majority-Black House districts.

231.   Mr. Esselstyn's illustrative State Senate plan includes three additional majority-Black State Senate districts compared to the enacted plan, for a total of 17 out of 56 districts.

232.   Specifically, Senate Districts 23, 25, and 28 are not majority-Black in the enacted plan but are majority-Black in the illustrative plan.

233.   The additional majority-Black State Senate district 23 includes all of Burke, Glascock, Hancock, Jefferson, Screven, Taliaferro, Warren, and Washington Counties and parts of Baldwin, Greene, McDuffie, Augusta-Richmond, and Wilkes Counties.

234.   Mr. Esselstyn's illustrative Senate District 23 has a Black voting-age population ("BVAP") of 51.06 percent.

235.   The additional majority-Black State Senate district 25 is composed of portions of Clayton and Henry Counties.

236.   Mr. Esselstyn's illustrative Senate District 25 has an AP BVAP of 58.93%.

237.   The additional majority-Black State Senate district 28 is composed of portions of Clayton, Coweta, Fayette, and Fulton Counties.

238.   Mr. Esselstyn's illustrative Senate District 28 has an AP BVAP of 57.28%.

239.   Mr. Esselstyn's illustrative House plan includes five additional majority-Black House districts compared to the enacted plan, for a total of 54 out of 180 districts.

240.   House Districts 64, 74, 117, 145, and 149 are not majority-Black in the enacted plan but are majority-Black in the illustrative plan.

241.   The additional majority-Black House district 64 is composed of portions of Douglas, Fulton, and Paulding Counties.

242.   Mr. Esselstyn's illustrative House District 64 has an AP BVAP of 50.24%.

243.   The additional majority-Black House districts 74 and 117 are composed of portions of Clayton, Fayette, and Henry Counties.

244.   Mr. Esselstyn's illustrative House District 74 has an AP BVAP of 53.94%.

245.   Mr. Esselstyn's illustrative House District 117 has an AP BVAP of 51.56%.

246.   Two additional majority-Black House districts 145 and 149 are composed of portions of Baldwin, Macon-Bibb, and Houston Counties, as well as all of Twiggs and Wilkinson Counties.

247.   Mr. Esselstyn's illustrative House District 145 has an AP BVAP of 50.38%.

248.   Mr. Esselstyn's illustrative House District 149 has an AP BVAP of 51.53%.

249.   The Illustrative State Senate and Senate House Plan statistics set forth respectively in Attachments E and J of the December 5, 2022 Report of Blakeman B. Esselstyn [*Grant* Dkt. No. 191-1] are not disputed.

250.   The Compactness Reports for Mr. Esselstyn's Illustrative State Senate and Senate House Plans, as set forth respectively in Attachments H and L of the December 5, 2022 Report of Blakeman B. Esselstyn [*Grant* Dkt. No. 191-1] are not disputed.

251.   The Political Subdivision Split Reports for Mr. Esselstyn's Illustrative State Senate and Senate House Plans, as set forth respectively in Attachments H and L of the December 5, 2022 Report of Blakeman B. Esselstyn [*Grant* Dkt. No. 191-1] are not disputed.

252.   The County Population Components Report for Mr. Esselstyn's Illustrative State Senate and Senate House Plans, as set forth respectively in Attachment C of the December 5, 2022 Report of Blakeman B. Esselstyn [*Grant Dkt. No. 191-1*] is not disputed.

253.   Plaintiffs' racially polarized voting expert, Dr. Maxwell Palmer, analyzed the performance of Black-preferred candidates in Mr. Esselstyn's illustrative State Senate and House plans.

254.   In all cases where Dr. Palmer analyzed the performance of Black-preferred candidates related to Mr. Esselstyn's illustrative State Senate and State House plans, the Black-preferred candidate was a Democrat.

255.   Black-preferred candidates would have won all 31 statewide general elections between 2012 and 2020 in Mr. Esselstyn's illustrative House Districts 64, 74, and 149 and illustrative Senate Districts 23, 25, and 28.

256.   In illustrative House District 117, the Black-preferred candidate would have won all 19 general elections since 2018.

257.   In illustrative House District 145, the Black-preferred candidate would have won all 19 general elections since 2018, and 27 of the 31 general elections overall.

258.   The districts in Mr. Esselstyn's illustrative Senate and House plans are contiguous.

259.   The Reock test is an area-based measure that compares each district to a circle, which is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact.

260.   The Polsby-Popper test computes the ratio of each district area to the area of a circle with the same perimeter. The measure is always between 0 and 1, with 1 being the most compact.

261.   Mr. Esselstyn's illustrative plans leave 34 of 56 Senate districts and 155 of 180 House districts in the enacted plan unchanged.

262.   Dr. Palmer conducted racially polarized voting analyses across five different focus areas, comprising the districts from which Mr. Esselstyn's additional majority-Black legislative districts were drawn.

263.   In all cases where Dr. Palmer conducted racial polarized voting analyses across five different focus areas, the Black-preferred candidate was a Democrat.

264.   Dr. Palmer examined the following areas of the enacted House plan: House Districts 133, 142, 143, 145, 147, and 149, which include Bleckley, Crawford, Dodge, Twiggs, and Wilkinson counties and parts of Baldwin, Bibb, Houston, Jones, Monroe, Peach, and Telfair counties; House Districts 69, 74, 75, 78, 115, and 117, which include parts of Clayton, Fayette, Fulton, Henry, and Spalding counties; and House Districts 61 and 64, which include parts of Douglas, Fulton, and Paulding counties.

265.   Dr. Palmer examined the following areas of the enacted State Senate plan: Senate Districts 22, 23, 24, 25, and 26, which include Baldwin, Burke, Butts, Columbia, Elbert, Emanuel, Glascock, Greene, Hancock, Hart, Jasper, Jefferson, Jenkins, Johnson, Jones, Lincoln, Mcduffie, Oglethorpe, Putnam, Richmond, Screven, Taliaferro, Twiggs, Warren, Washington, Wilkes, and Wilkinson counties and parts of Bibb, Henry, and Houston counties; and Senate Districts 10, 16, 17, 25, 28, 34, 35, 39, and 44, which include Baldwin, Butts, Clayton, Coweta, Fayette, Heard, Jasper, Jones, Lamar, Morgan, Pike, Putnam, and Spalding counties and parts of Bibb, DeKalb, Douglas, Fulton, Henry, Newton, and Walton counties.

266.   Dr. Palmer employed a statistical method called Ecological Inference ("EI") to derive estimates of the percentages of Black and white voters in the focus

71

areas that voted for each candidate in 40 statewide general elections between 2012 and 2022.

267.   In all cases where Dr. Palmer used EI across the focus areas, the Black-preferred candidate was a Democrat.

268.   Across the five focus areas, Black voters are extremely cohesive, with a clear candidate of choice in all 40 general elections Dr. Palmer examined.

269.   On average, across the five focus areas, Black voters supported their candidates of choice with 98.5% of the vote in the 40 general elections Dr. Palmer examined.

270.   Black voters are also cohesive in each of the districts that comprise the focus areas and contain 15 or more precincts, with an average estimated level of support for Black-preferred candidates of at least 92.5%.

271.   White voters in the focus areas are highly cohesive in voting in opposition to Black-preferred candidates.

272.   On average, white voters supported Black-preferred candidates in general elections with only 8.3% of the vote, and white voters in the focus areas supported Black-preferred candidates with a maximum of 17.7 percent of the vote.

273.   Black-preferred candidates win almost every general election in the Black-majority districts that comprise the focus areas but lose almost every election in the non-Black-majority districts.

274.   The endogenous election results from the 2022 general election show that Black-preferred State Senate and House candidates were defeated in every majority-white district and elected in every majority-Black district in the focus areas.

### G. Mr. Cooper's Illustrative State Senate and House Plans (*Alpha Phi Alpha*)

275.   Georgia's Black population is sufficiently numerous to allow for the creation of three additional majority-Black State Senate districts.

276.   Georgia's Black population is sufficiently numerous to allow for the creation of five additional majority-Black State House districts.

277.   The ideal population size for a State Senate district is 191,284.

278.   The ideal population size for a State House district is 59,511.

279.   *Alpha Phi Alpha* Plaintiffs' mapping expert, William Cooper, drew illustrative State Senate and House maps that include at least three additional majority-Black State Senate districts and at least five additional majority-Black House districts.

280.   Mr. Cooper's Illustrative State Senate Plan includes three additional majority-Black State Senate districts compared to the enacted plan, for a total of at least 17 out of 56 districts.

281.   Specifically, Senate Districts 17, 23, and 28 are not majority-Black in the enacted plan but are majority-Black in the illustrative state Senate plan.

282.   Senate Districts 17, 23, and 28 each elected white Republicans in the 2022 general election.

283.   Illustrative majority-Black State Senate district 28 is composed of adjacent portions of Fayette, Clayton, and Spalding Counties.

284.   Illustrative majority-Black State Senate district 17 is composed of adjacent portions of Henry, Rockdale, and Dekalb Counties.

285.   Illustrative majority-Black State Senate district 23 includes all of Baldwin, Burke, Glascock, Hancock, Jefferson, Jenkins, McDuffie, Taliaferro, Twiggs, Warren, Washington, and Wilkinson Counties and parts of Augusta-Richmond, and Wilkes Counties.

286.   Mr. Cooper's illustrative House plan includes five additional majority-Black House districts compared to the enacted plan, for a total of at least 54 out of 180 districts.

74

287.   House Districts 74, 117, 133, 145, and 171 are not majority-Black in the enacted plan but are majority-Black in the illustrative plan.

288.   House Districts 74, 117, 133, 145, and 171 each elected white Republicans in the 2022 general election.

289.   Illustrative majority-Black House district 74 is composed of portions of Clayton, Henry, and Spalding Counties.

290.   Illustrative majority-Black House district 117 is composed of portions of Henry and Spalding Counties.

291.   Illustrative majority-Black House district 133 is composed of Wilkinson, Hancock, Warren, Taliaferro, and portions of Baldwin and Wilkes Counties.

292.   Illustrative majority-Black House district 145 is composed of portions of Macon-Bibb and Houston Counties.

293.   Illustrative majority-Black House district 171 is composed of Mitchell County and portions of Dougherty and Thomas Counties.

294.   Mr. Cooper prepared his illustrative Senate and House maps using Maptitude for Redistricting, a GIS software package commonly used by many local and state governing bodies for redistricting and other types of demographic analysis.

295.  Mr. Cooper had access to geographic boundary files created from the U.S. Census 1990-2020 Topologically Integrated Geographic Encoding and Referencing (TIGER) files.

296.  Mr. Cooper had access to population data from the 1990-2020 PL 94-171 data files published by the U.S. Census Bureau, which contains basic race and ethnicity data on the total population and voting-age population found in units of Census geography, including states, counties, municipalities, townships, reservations, school districts, census tracts, census block groups, precincts (called voting districts or "VTDs" by the Census Bureau) and census blocks.

297.  Mr. Cooper also had access to incumbent addresses that he obtained from attorneys for the plaintiffs.

298.  Mr. Cooper had access to shapefiles for the current and historical Georgia legislative plans available on the Legislative and Congressional Reapportionment Office's website, and he obtained for the House, Senate, and Congressional plans in effect during the early 2000's from the American Redistricting Project.

299.   Mr. Cooper had access to the same guidelines that the Georgia House Legislative and Congressional Reapportionment Committee used in drawing his illustrative plans.

300.   All of the districts in Mr. Cooper's illustrative plans are contiguous.

301.   The Cooper Illustrative Senate Plan districts have a deviation relative range of -1.00% to 1.00%., compared to a range of -1.03% to 0.98%. for the 2021 Senate Plan.

302.   The Cooper Illustrative State House Districts have a deviation relative range of -1.49% to 1.49%, compared to a range of -1.40% to 1.34% for the 2021 House Plan.

303.   The Illustrative Senate Plan Statistics and Illustrative House Plan Statistics set forth respectively in exhibits O-1 and AA-1 of the December 5, 2022 Report of William Cooper [*Alpha Phi Alpha* Dkt. Nos. 231-2, 231-4] are not disputed.

304.   The County Population Components Reports for Mr. Cooper's Illustrative Senate and Illustrative House Plans, set forth respectively in exhibits O-2 and AA-2 of the December 5, 2022 Report of William Cooper [*Alpha Phi Alpha* Dkt. Nos. 231-2, 231-4], are not disputed.

305.   The Political Subdivision Split Reports for Mr. Cooper's Illustrative Senate and Illustrative House Plans, as set forth respectively in exhibits AH-1 and AH-4 of the December 5, 2022 Report of William Cooper [*Alpha Phi Alpha* Dkt. Nos. 231-1, 231-4], are not disputed.

306.   The Compactness Reports for Mr. Cooper's Illustrative Senate and Illustrative House Plans, as set forth respectively in exhibits S-1 and AG-1 of the December 5, 2022 Report of William Cooper [*Alpha Phi Alpha* Dkt. Nos. 231-3, 231-4], are not disputed.

307.   Dr. Lisa Handley analyzed voting patterns by race in seven areas of Georgia where Mr. Cooper's illustrative State Senate and House plans create more majority Black voting age population (BVAP) districts than the adopted State Senate and House plans.

308.   Dr. Handley employed three different statistical techniques to estimate vote choices by race: homogeneous precinct analysis, ecological regression, and ecological inference (including a more recently developed version of ecological inference that she labeled "EI RxC").

78

309.   The first area Dr. Handley analyzed encompasses Mr. Cooper's Illustrative State Senate Districts 10, 17, and 43; adopted State Senate Districts 10, 17, and 43; and Dekalb, Henry, Morgan, Newton, Rockdale, and Walton counties.

310.   The second area encompasses Mr. Cooper's Illustrative State Senate Districts 16, 28, 34, and 39; adopted State Senate Districts 16, 28, 34, and 44; and Clayton, Coweta, Douglas, Fayette, Heard, Henry, Lamar, Pike, and Spalding counties.

311.   The third area encompasses Mr. Cooper's Illustrative State Senate Districts 22, 23, 26, and 44; adopted State Senate Districts 22, 23, 25, and 26; and Baldwin, Bibb, Burke, Butts, Columbia, Emanuel, Glascock, Hancock, Henry, Houston, Jasper, Jefferson, Jenkins, Johnson, Jones, Lamar, McDuffie, Monroe, Morgan, Putnam, Richmond, Screven, Taliaferro, Twiggs, Walton, Warren, Washington, Wilkes, and Wilkinson counties.

312.   The fourth area encompasses Mr. Cooper's Illustrative State House Districts 74, 75, 78, 115, 116, 117, 118, 134, and 135; adopted State House Districts 74, 75, 78, 115, 116, 117, 118, 134, and 135; and Butts, Clayton, Fayette, Henry, Jasper, Lamar, Monroe, Pike, Putnam, Spalding, and Upson counties.

313.   The fifth area encompasses Mr. Cooper's Illustrative State House Districts 128, 133, 144, and 155; adopted State House Districts 128, 133, 149, and 155; and Baldwin, Bibb, Bleckley, Dodge, Glascock, Hancock, Jefferson, Johnson, Jones, Laurens, McDuffie, Taliaferro, Telfair, Twiggs, Warren, Washington, Wilkes, and Wilkinson counties.

314.   The sixth area encompasses Mr. Cooper's Illustrative State House Districts 152, 153, 171, 172, and 173; adopted State House Districts 152, 153, 171, 172, and 173; and Colquitt, Cook, Decatur, Dougherty, Grady, Lee, Mitchell, Seminole, Stewart, Terrell, Thomas, Tift, Webster, and Worth counties.

315.   The seventh area encompasses Mr. Cooper's Illustrative State House Districts 142, 143, and 145; adopted State House Districts 142, 143, and 145; and Bibb, Crawford, Houston, Peach, and Twiggs counties.

316.   Dr. Handley analyzed voting patterns by race in 16 recent statewide general and run-off elections from 2016 to 2022 in these seven areas.

317.   The 16 statewide general elections include the 2022 general election contests for U.S. Senate, Governor, Commissioners of Agriculture, Insurance, and Labor, and the School Superintendent; the 2021 runoff for U.S. Senate (Special) and Public Service Commission District 4; the 2020 general elections for U.S. Senate

(Special); the Public Service Commission Districts 1 and 4; and the 2018 general election contests for Governor, Commissioner of Insurance and School Superintendent; the 2021 runoff for U.S. Senate and November 2020 general election for U.S. Senate.

318.   Fourteen of the recent statewide general and general runoff elections Dr. Handley analyzed involved Black candidates.

319.   In all cases where Dr. Handley analyzed voting patterns in these seven areas in 16 recent statewide general and run-off elections from 2016 to 2022, the Black-preferred candidate was a Democrat.

320.   In these 16 recent statewide general and general runoff elections from 2016-2022, Black voters were highly cohesive in their support for their preferred candidate.

321.   In these 16 recent statewide general and general runoff elections from 2016-2022, the average percentage of Black vote for the 16 Black-preferred candidates in the analyzed areas of interest was 96.1%.

322.   In the same 16 recent statewide general and general runoff elections from 2016-2022, the average percentage of white vote for the 16 Black preferred candidates in the analyzed areas of interest was 11.2%.

323.   The highest average white vote for any of the 16 Black preferred candidates in the statewide elections Dr. Handley analyzed in the areas of interest was 14.4% for US Senator Raphael Warnock in his 2022 general election bid for re-election against Herschel Walker.

324.   Dr. Handley also analyzed 54 recent biracial state legislative general elections in the seven areas of interest.

325.   In all cases where Dr. Handley analyzed voting patterns in 54 recent biracial state legislative general elections in the seven areas of interest, the Black-preferred candidate was a Democrat.

326.   In these 54 state legislative general elections, Black voters were highly cohesive in their support for their preferred candidates.

327.   In these 54 state legislative general elections, an average of 97.4% of Black voters supported their preferred Black state senate candidates and 91.5% supported their preferred Black state house candidate.

328.   In the same 54 state legislative elections, an average of 10.1% of white voters supported the Black-preferred Black state senate candidates and 9.8% supported the Black-preferred Black state house candidates.

82

329.   In the same 54 state legislative elections, all but one of the successful Black state legislative candidates were elected from majority Black districts; the one exception was elected from a district that was majority minority in composition.

330.   In the seven areas of interest, Black voters were very cohesive in supporting their preferred candidates in general elections for statewide offices.

331.   In the seven areas of interest, Black preferred candidates in general elections for statewide offices were Democrats.

332.   In the seven areas of interest, white voters were very cohesive in supporting their preferred candidates in general elections for statewide offices.

333.   In the seven areas of interest that Dr. Handley analyzed, white preferred candidates in general elections for statewide offices were Republicans.

334.   In the seven areas of interest, large majorities of white and Black voters supported different candidates in general elections for statewide offices.

335.   In the seven areas of interest, Black voters exhibit cohesive support for a single candidate in state legislative general elections.

336.   In the seven areas of interest, white voters exhibit cohesive support for a single candidate in state legislative general elections.

337. In the seven areas of interest, Black and white voters supported different candidates in state legislative general elections.

338. In the seven areas of interest, Black voters cohesively support Black candidates in biracial general elections.

339. In the seven areas of interest, white voters cohesively support white candidates in biracial general elections.

340. Biracial general elections do not include candidates of the same race, such as the Warnock-Walker race.

341. In the seven areas of interest, white voters cohesively supported Black candidates who are Republicans in the two general elections in which such candidates received the Republican party nomination.

## VII. Totality of Circumstances

342. According to Census estimates, the unemployment rate among Black Georgians is 8.7 percent and the unemployment rate among white Georgians is 4.4 percent.

343. According to Census estimates, 32.2% of white Georgian households report an annual income above $100,000.

344.   According to Census estimates, the rate of Black Georgians living below the poverty line is 21.5% and the rate of white Georgians living below the poverty line is 10.1%.

345.   According to Census estimates, the rate of Black Georgians receiving SNAP benefits is 22.7% and the rate of white Georgians receiving SNAP benefits is 7.7%.

346.   According to Census estimates, 13.3% of Black adults in Georgia lack a high school diploma and 9.4% of white adults in Georgia lack a high school diploma.

347.   According to Census estimates, 35% of white Georgians over the age of 25 have obtained a bachelor's degree or higher, and 24% of Black Georgians over the age of 25 have obtained a bachelor's degree.

348.   The Georgia Legislative Black Caucus has 14 members in the Georgia State Senate and 41 members in the Georgia House of Representatives.

349.   Georgia has had 77 governors, none of whom has been Black.

350.   Senator Raphael Warnock is the first Black Georgian to serve Georgia in the U.S. Senate after more than 230 years of white senators.

351.    More than 1.8 million voters participated in the Georgia 2022 General Primary Election for both parties.

352.    Sen. Raphael Warnock received the highest number of votes in the statewide elections for U.S. Senate in the 2020 special election, the 2021 special election runoff, the 2022 general election, and the 2022 general election runoff.

353.    President Joe Biden received the highest number of votes in the 2020 presidential election in Georgia.

354.    Sen. Jon Ossoff finished second in the 2020 general election, but won the 2021 general election runoff for a six-year term in the U.S. Senate.

355.    Sen. Raphael Warnock received 1,946,117 votes in the 2022 general election, while Herschel Walker received 1,908,442 votes.

356.    Governor Brian Kemp received 2,111,572 votes in the 2022 general election, while Stacey Abrams received 1,813,673 votes.

357.    Sen. Raphael Warnock received 1,820,633 votes in the 2022 general election runoff, while Herschel Walker received 1,721,244 votes.

358.    President Biden, Sen. Ossoff, and Sen. Warnock are all candidates of choice of Black voters in Georgia.

359.   The following five Black individuals serve in Congress from Georgia congressional districts: Congressman Sanford Bishop, Congressman Hank Johnson, Congresswoman Nikema Williams, Congresswoman Lucy McBath, Congressman David Scott.

360.   51.9% of Georgia's voting-eligible population voted in the November 2022 election.

361.   Four Black individuals have been elected to statewide partisan office in Georgia since Reconstruction: Michael Thurmond, Thurbert Baker, David Burgess, and Raphael Warnock.

362.   The following Black individuals have been elected to statewide nonpartisan offices in Georgia since Reconstruction: Robert Benham, Leah Ward-Sears, Harold Melton, Verda Colvin, John Ruffin, Clarence Cooper, Herbert Phipps, Yvette Miller, Clyde Reese.

**ATTACHMENT F–1**

***Pendergrass* Plaintiffs' Witness List**

The *Pendergrass* Plaintiffs anticipate that the following witnesses will testify

at trial:

| Witness | Previously Filed Report(s)/Declaration(s) |
|---|---|
| William S. Cooper | ECF Nos. 174-1, 174-2 |
| Dr. Maxwell Palmer | ECF Nos. 174-3, 174-4 |
| Dr. Orville Vernon Burton | ECF No. 174-5 |
| Dr. Loren Collingwood | ECF No. 174-6 |

The *Pendergrass* Plaintiffs anticipate that the following witnesses may testify

at trial:

| Witness | Previously Filed Report(s)/Declaration(s) |
|---|---|
| Dave Worley | N/A |
| Coakley Pendergrass | ECF No. 201-1 |
| Triana Arnold James | ECF No. 201-2 |
| Elliott Hennington | ECF No. 201-3 |
| Robert Richards | ECF No. 201-4 |
| Jens Rueckert | ECF No. 201-5 |
| Ojuan Glaze | ECF No. 201-6 |
| Former Rep. Erick Allen | N/A |

| Rep. Derrick Jackson | N/A |
| Former Sen. Jason Carter | N/A |

## ATTACHMENT F–2

### *Grant* Plaintiffs' Witness List

The *Grant* Plaintiffs anticipate that the following witnesses will testify at trial:

| Witness | Previously Filed Report(s)/Declaration(s) |
|---|---|
| Blakeman Esselstyn | ECF No. 191-1 |
| Dr. Maxwell Palmer | ECF Nos. 191-2, 191-3 |
| Dr. Orville Vernon Burton | ECF No. 191-4 |
| Dr. Loren Collingwood | ECF No. 191-5 |

The *Grant* Plaintiffs anticipate that the following witnesses may testify at trial:

| Witness | Previously Filed Report(s)/Declaration(s) |
|---|---|
| Dave Worley | N/A |
| Annie Lois Grant | ECF No. 218-1 |
| Quentin T. Howell | ECF No. 218-2 |
| Elroy Tolbert | ECF No. 218-3 |
| Garrett Reynolds | ECF No. 218-8 |
| Triana Arnold James | ECF No. 218-4 |
| Eunice Sykes | ECF No. 218-5 |
| Elbert Solomon | ECF No. 218-6 |
| Dexter Wimbish | ECF No. 218-7 |
| Jacqueline Faye Arbuthnot | ECF No. 218-9 |
| Jacquelyn Bush | ECF No. 218-10 |

| | |
|---|---|
| Mary Nell Conner | N/A |
| Former Rep. Erick Allen | N/A |
| Rep. Derrick Jackson | N/A |
| Former Sen. Jason Carter | N/A |
| Marion Warren | N/A |
| Dr. Diane Evans | N/A |
| Fenika Miller | N/A |

## ATTACHMENT F–3

### *Alpha Phi Alpha* Plaintiffs' Witness List

The *Alpha Phi Alpha* Plaintiffs anticipate that the following witnesses will testify at trial:

| Witness | Previously Filed Report(s)/Declaration(s) |
|---|---|
| William S. Cooper | ECF No. 237-1 |
| Dr. Lisa Handley | ECF No. 222 at 183-214 |
| Dr. Adrienne Jones | ECF No. 239-7 |
| Dr. Traci Burch | Not previously filed |
| Dr. Jason Morgan Ward | ECF Nos. 242-6 |
| Sherman Lofton Jr. | ECF No. 26-15; 39-15; 70-2 |
| Bishop Reginald Jackson | ECF No. 26-16; 39-16; 70-1 |

The *Alpha Phi Alpha* Plaintiffs anticipate that the following witnesses may testify at trial:

| Witness | Previously Filed Report(s)/Declaration(s) |
|---|---|
| Eric T. Woods | ECF No. 26-14; 39-14 |
| Katie Bailey Glenn | ECF No. 26-11; 39-11 |
| Phil Brown | ECF No. 26-12; 39-12 |
| Janice Stewart | ECF No. 26-13; 39-13 |
| Former Rep. Erick Allen | N/A |

| | |
|---|---|
| Rep. Derrick Jackson | N/A |
| Former Sen. Jason Carter | N/A |
| Marion Warren | N/A |
| Dr. Diane Williams | N/A |
| Fenika Miller | N/A |
| Dave Worley | N/A |

## ATTACHMENT F–4

### Defendants' Witness List

Defendants anticipate that the following witnesses will testify at trial:

| Witness | Previously Filed Report(s)/Declaration(s) |
|---------|-------------------------------------------|
| John Morgan | December 5, 2022 report in *Grant* and *Alpha Phi Alpha*; January 23, 2023 report in all cases |
| Dr. John Alford | February 6, 2023 report in all cases |
| Ms. Gina Wright | Testifying as a fact witness |
| Blake Evans, Gabriel Sterling, or Ryan Germany | As representative of Secretary of State's office |

Defendants anticipate that the following witnesses may testify at trial:

| Witness | Previously Filed Report(s)/Declaration(s) |
|---------|-------------------------------------------|
| Sen. John Kennedy | N/A |
| Rep. Bonnie Rich | N/A |
| Lynn Bailey | Testifying as a fact witness |