IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., et al.,<br> Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia,<br> Defendant. | CIVIL ACTION FILE<br><br>No. 1:21-CV-05337-SCJ |
| COAKLEY PENDERGRASS et al.,<br> Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER et al.,<br> Defendants. | CIVIL ACTION FILE<br><br>No. 1:21-CV-05339-SCJ |
| ANNIE LOIS GRANT et al.,<br> Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER et al.,<br> Defendants. | CIVIL ACTION FILE<br><br>No. 1:22-CV-00122-SCJ<br><br><br>OPINION AND MEMORANDUM OF DECISION |

# TABLE OF CONTENTS

**OPINION AND MEMORANDUM OF DECISION** .......................................................8

**I.     FINDINGS OF FACT** .................................................................................**10**

    A.   PROCEDURAL HISTORY..................................................................13

         1.   Initial Filings .......................................................................13
         2.   Preliminary Injunction.......................................................15
         3.   Discovery and Summary Judgment ...................................18
         4.   Trial.....................................................................................19
         5.   Post-Trial Proceedings .......................................................21

    B.   THE NAMED PARTIES...................................................................21

         1.   Alpha Phi Alpha Plaintiffs .................................................21

             a)   Alpha Phi Alpha Fraternity, Inc. .........................21
             b)   Sixth District African Methodist Episcopal Church ........................22
             c)   Individually-named Plaintiffs in the APA case.................................23

         2.   Pendergrass Plaintiffs ........................................................23
          3.   Grant Plaintiffs ..................................................................24
         4.   Defendants..........................................................................26

             a)   Brad Raffensperger................................................26
             b)   The State Election Board .......................................27

    C.   HISTORY OF RACE AND VOTING IN GEORGIA...................................30
    D.   GEORGIA'S CHANGING DEMOGRAPHICS.........................................32

         1.   Georgia's Total Population .................................................32
          2.   Metro Atlanta......................................................................34
          3.   The Black Belt....................................................................37

             a)   Eastern Black Belt Region ....................................38
             b)   Metro-Macon Region.............................................39
             c)   Southwestern Georgia Region ...............................40

    E.   GEORGIA 2021 ENACTED PLANS...................................................40

         1.   The 2021 Redistricting Process ..........................................40

             a)   Legislative activities .............................................40

b) Map drawing process ........................................................44

2. Enacted Plan Statistics ............................................................47

a) Congressional Plan ...........................................................47

(1) 2012 Congressional plan ........................................47
(2) Enacted Congressional Plan ..................................50

b) State Senate Plan .............................................................52
c) State House Plan ..............................................................56

F. ILLUSTRATIVE PLANS ......................................................................61

1. Credibility Determinations ......................................................61

a) Mr. William S. Cooper .....................................................61
b) Mr. Blakeman B. Esselstyn .............................................65
c) Mr. John B. Morgan .........................................................67
d) Dr. Maxwell Palmer.........................................................72
e) Dr. Lisa Handley ..............................................................73
f) Dr. John Alford ................................................................76

**2.** Illustrative Congressional Plan .................................................78

a) First *Gingles* Precondition ................................................78

(1) Mr. Cooper's process in drawing the maps ...............78
**(2)** Illustrative Congressional Plan ..................................81

b) Second and Third *Gingles* Preconditions..........................93

3. Cooper Legislative Plans .........................................................95

a) Mr. Cooper's process in drawing the maps .....................95
b) Cooper Senate Plan...........................................................98

(1) Empirical measures .................................................99
(2) Core retention .......................................................104
(3) Incumbent pairing..................................................105
(4) Racial considerations ............................................105

c) Cooper House Plan..........................................................107

(1) Empirical measures ...............................................108
(2) Core retention .......................................................113

3

(3)    Incumbent pairings ...........................................114
(4)    Racial considerations .....................................114

4.    Esselstyn Legislative Plans ....................................115

a)    Mr. Esselstyn's map drawing process ...........115
b)    Esselstyn Senate Plan ................................117

(1)    Empirical measures ......................................118
(2)    Core retention ..............................................126
(3)    Incumbent Pairings ......................................127
(4)    Racial Considerations ...................................128

c)    Esselstyn House Plan ..................................132

(1)    Empirical measures ......................................133
(2)    Core retention ..............................................141
(3)    Incumbent Pairings ......................................141
(4)    Racial Considerations ...................................142

G.    SECOND AND THIRD *GINGLES* PRECONDITIONS ...........142

1.    Pendergrass: Dr. Palmer's methodology .................142
2.    Alpha Phi Alpha: Dr. Handley's methodology ......145
3.    Grant: Dr. Palmer's methodology .........................151

H.    GEORGIA'S HISTORY OF VOTING AND RECENT ELECTORAL DEVELOPMENTS155

1.    Credibility Determinations ....................................155

a)    Dr. Orville Vernon Burton.............................156
b)    Dr. Loren Collingwood ................................158
c)    Dr. Adrienne Jones ......................................159
d)    Dr. Traci Burch ...........................................161
e)    Dr. Jason Morgan Ward ...............................163

2.    Analysis......................................................164

II.    **CONCLUSIONS OF LAW**..........................................**164**

A.    JURISDICTIONAL CONSIDERATIONS...........................164

1.    Constitutional Standing......................................165

a)    Claims by the Sixth District AME .................166
b)    Claims against the SEB.................................168

4

    2.    Statutory Standing.................................................................170

B.    LEGAL STANDARDS..................................................................171

    1.    First Gingles Precondition....................................................171
    2.    Second and Third Gingles Precondition ...............................172
    3.    Totality of the Circumstances: Senate Factors......................172

C.    CONGRESSIONAL DISTRICT......................................................173

    1.    First Gingles Precondition....................................................173

        a)    Numerosity ................................................................174
        b)    Compactness.............................................................179

    2.    Second Gingles Precondition................................................201
    3.    Third Gingles Precondition...................................................205
    4.    Totality of the Circumstances ..............................................209

        a)    Totality of circumstances inquiry .................................210
        b)    Senate Factor One and Three .............................213
        c)    Senate Factor Two....................................................233
        d)    Senate Factor Five....................................................242
        e)    Senate Factor Six......................................................250
        f)    Senate Factor Seven .................................................252
        g)    Senate Factor Eights .................................................258
        h)    Senate Factor Nine ...................................................260
        i)    Proportionality .........................................................262
        j)    Demographic Changes ..............................................270

    5.    Conclusions of Law.............................................................272

D.    LEGISLATIVE DISTRICTS .........................................................274

    1.    First Gingles Precondition....................................................275

        a)    Racial predominance ..................................................275
        b)    Metro Atlanta region..................................................277

            (1)    Alpha Phi Alpha...............................................277
            (2)    Grant ...............................................................309

        c)    Eastern Black Belt region .............................................346

            (1)    Alpha Phi Alpha...............................................346

(2)    Grant: Esselstyn SD-23 ...................................................364

d)    Macon-Bibb region ........................................................375

(1)    Alpha Phi Alpha: Cooper HD-145................................375
(2)    Grant ..............................................................................382

e)    Southwest Georgia region .............................................396

(1)    Alpha Phi Alpha: Cooper HD-171................................396

2.    Second Gingles Precondition.............................................408

a)    Alpha Phi Alpha ............................................................408
b)    Grant ..............................................................................413

3.    Third Gingles Precondition................................................417

a)    Alpha Phi Alpha ............................................................417
b)    Grant ..............................................................................420

4.    Totality of the Circumstances ...........................................426

a)    Alpha Phi Alpha ............................................................429

(1)    Totality of circumstances inquiry ...............................429
(2)    Senate Factors One and Three....................................430
(3)    Senate Factor Two........................................................451
(4)    Senate Factor Five........................................................458
(5)    Senate Factor Six..........................................................465
(6)    Senate Factor Seven......................................................467
(7)    Senate Factor Eight.......................................................472
(8)    Senate Factor Nine........................................................475
(9)    Proportionality .............................................................477
(10)  Conclusions of law .......................................................480

**b)    Grant**..............................................................................482

(1)    Totality of circumstances inquiry ...............................482
(2)    Senate Factor Two........................................................486
(3)    Senate Factor Nine........................................................489
(4)    Proportionality .............................................................491
(5)    Conclusions of Law......................................................492

E.    INJUNCTION FACTORS ...............................................................493

1.    Irreparable Harm and Inadequate Remedies at Law ............................494
2.    Balance of Hardships and Public Interest ...................................................495

F.    AFFIRMATIVE DEFENSES ...................................................................................500

1.    Eleventh Amendment Immunity and Sovereign Immunity .................501
2.    Section 2 Private Right of Action ................................................................506
3.    28 U.S.C. § 2284: Three-Judge Court.........................................................507
4.    Section 2's Constitutionality ........................................................................508

G.    REMEDY .............................................................................................................508

III.    CONCLUSION .............................................................................................................511

7

## <u>OPINION AND MEMORANDUM OF DECISION</u>

The right to vote "is regarded as a fundamental political right, because [it is] preservative of all rights." <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 370 (1886).

> The voting rights act has proven the most successful civil rights statute in the history of the nation because it has reflected the overwhelming consensus in this nation that the most fundamental civil right of all citizens-- the right to vote-- must be preserved at whatever cost and through whatever commitment required of the federal government.

S. REP. 97-417, 111, 1982 U.S.C.C.A.N. 177, 282. This past summer, Chief Justice Roberts confirmed that "the essence of a § 2 claim . . . [is] where an electoral structure operates to minimize or cancel out minority voters' ability to elect their preferred candidates. Such a risk is greatest where minority and majority voters consistently prefer different candidates and where minority voters are submerged in a majority voting population that regularly defeat[s] their choices." <u>Allen v. Milligan</u>, 599 U.S. 1, 17–18 (2023) (citing <u>Thornburg v. Gingles</u>, 478 U.S. at 30, 47–49 (1986)) (cleaned up).

In the three cases before the Court,[1] each set of Plaintiffs argues that their voting rights have been violated by the redistricting plans recently adopted by the State of Georgia in the wake of the 2020 Census. The Court thus approaches these cases "with caution, bearing in mind that these circumstances involve 'one of the most fundamental rights of . . . citizens: the right to vote.'" Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 775 F.3d 1336, 1345 (11th Cir. 2015) (citations omitted).

After conducting a thorough and sifting review of the evidence in this case, the Court finds that the State of Georgia violated the Voting Rights Act when it enacted its congressional and legislative maps. The Court commends Georgia for the great strides that it has made to increase the political opportunities of Black voters in the 58 years since the passage of the Voting Rights Act of 1965. Despite these great gains, the Court determines that in certain areas of the State, the political process is not equally open to Black voters. For example, in the past

---

[1] In the interest of judicial economy, and to avoid confusion, the Court issues a single order that will be filed by the Clerk in each of the above-stated cases. Although the Court issues a single order, the Court has evaluated the merits of each case independently and reached its conclusions as follows.

decade, all of Georgia's population growth was attributable to the minority population, however, the number of majority-Black congressional and legislative districts remained the same.[2] In light of this fact and in conjunction with all of the evidence and testimony in this case, the Court determines that Georgia's congressional and legislative maps violate Section 2 of the Voting Rights Act and enjoins their use in any future elections.

## I.   FINDINGS OF FACT

Having considered the evidence at trial, the Parties' presentations (pursuant to Federal Rule of Civil Procedure 52(c)), and closing arguments, this Court makes the following findings of fact. [3]

---

[2] This finding in no way requires that the number of majority-Black congressional or legislative district be proportionate to the Black population.

[3] The Court has used the term "findings of fact" for simplicity's sake, but the Court notes that some of the foregoing findings are also conclusions of law. Similarly, the "conclusions of law" section contains some findings of fact.

The Court divides it discussion of the factual findings into four parts. First, the Court explains the procedural history of the three cases and describes the named Parties. Second, the Court considers the history of race and voting in Georgia and its changing demographics. Third, the Court explains its findings of fact about the creation of the 2021 congressional, Senate, and House districting plans based on the testimony and evidence introduced at a coordinated trial of these actions. Fourth, the Court sets forth its findings regarding the Illustrative Plans.

For reference, the following citations are used for support for each of the findings below:

| Citation[4] | Document Type |
|---|---|
| APA Doc. No. [ ] | Docket entry from Alpha Phi Alpha |
| Grant Doc. No. [ ] | Docket entry from Grant |
| Pendergrass Doc. No. [ ] | Docket entry from Pendergrass |

---

[4] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

11

| Tr. | Transcript of the trial hearing held September 5–14, 2023 in all three cases.[5] |
| --- | --- |
| PI Tr. | APA Doc. Nos. [106]–[117]; Pendergrass Doc. Nos. [73]–[85]; Grant Doc. Nos. [68]–[79] |
| DX | Defendants' Exhibits |
| APAX | Alpha Phi Alpha Plaintiffs' Exhibits |
| GX | Grant Plaintiffs' Exhibits |
| PX | Pendergrass Plaintiffs' Exhibits |
| JX | Joint Exhibits |
| Stip. | Stipulations filed at APA Doc. No. [280], Attach. E.; Grant Doc. No. [243], Attach. E.; Pendergrass Doc. No. [231], Attach. E. |
| Jud. Not. | Court's Order taking judicial notice at APA Doc. No. [284], Grant Doc. No. [246], Pendergrass Doc. No. [234] |

---

[5] The Court cites to the Official Certified Hearing Transcript for the Trial provided by the court reporter. This transcript has not yet been filed on the docket.

A.    **Procedural History**

### 1. *Initial Filings*

On December 30, 2021, Plaintiffs in the Alpha Phi Alpha case filed their Complaint against Brad Raffensperger, in his official capacity as Secretary of State of Georgia. APA Doc. No. [1]. On that same date, Plaintiffs in the Pendergrass case filed their Complaint against Raffensperger and the members of the State Election Board (the "SEB"). Pendergrass Doc. No. [1]. On January 11, 2022, Plaintiffs in the Grant case filed their Complaint against Raffensperger and the SEB. Grant Doc. No. [1]. All three Complaints alleged violations of Section 2 of the Voting Rights Act, as amended 52 U.S.C. § 10301.

On January 7, 2022, Plaintiffs in Alpha Phi Alpha Plaintiffs filed their Motion for a Preliminary Injunction. APA Doc. Nos. [26], [39]. [6] Pendergrass Plaintiffs filed their Motion for a Preliminary Injunction on January 12, 2022 (Pendergrass Doc. No. [32]) and the following day, the Grant Plaintiffs filed their Motion for Preliminary Injunction (Grant Doc. No. [19]).

───────────────────

[6] Alpha Phi Alpha Plaintiffs filed a *renewed* Motion for Preliminary Injunction on January 13, 2023. Doc. No. [39].

13

On January 14, 2022, Defendant Raffensperger filed his Motion to Dismiss the Alpha Phi Alpha Complaint (APA Doc. No. [43]) and Defendants Raffensperger and the State Election Board members filed their Motions to Dismiss the Pendergrass and Grant Complaints (Pendergrass Doc. No. [38], Grant Doc. No. [23]). Defendants' motions primarily advanced two arguments: (1) Section 2 did not create a private right of action, therefore, Plaintiffs could not bring their claims and (2) 28 U.S.C. § 2284(a) required the Alpha Phi Alpha and Grant Plaintiffs' claims be heard by a three-judge court. Id. The Parties then briefed the Motions to Dismiss and for Preliminary Injunction on an expedited basis (APA Doc. Nos. [45]–[47], [58], [59], Pendergrass Doc. Nos. [39], [40], [44], [45], Grant Doc. Nos. [24]–[25], [35], [37]).

The Court denied Defendants' Motions to Dismiss. APA Doc. No. [65], Pendergrass Doc. No. [50], Grant Doc. No. [43]. The Court concluded that the text of Section 2284 does not require a plaintiff to request a three-judge court for purely statutory challenges to the apportionment of congressional districts and statewide legislative bodies. Id. The Court further concluded that Plaintiffs could assert their claims because, for the past forty-five years, the Supreme Court and

14

lower courts have allowed private individuals to assert challenges under Section 2 of the Voting Rights Act. Id.

### 2. Preliminary Injunction

After denying the motions to dismiss, in February 2022, the Court convened a coordinated hearing on the motions for preliminary injunction. APA Doc. No. [127], Pendergrass Doc. No. [90], Grant Doc. No. [84].

On the first day of the preliminary injunction hearing, the United States Supreme Court granted the State of Alabama's motion to stay a three-judge district court's order granting a preliminary injunction in favor of a challenge to Alabama's congressional map under Section 2. Merrill v. Milligan, 142 S. Ct. 879 (2022). The Supreme Court then accepted certiorari and placed the case on its October 2022 term calendar. Id. Justice Kavanaugh, joined by Justice Alito, wrote separately to concur in the stay. See generally id. at 879–82. In his concurrence, Justice Kavanaugh first emphasized that the stay was not a ruling on the merits, but followed Supreme Court election-law precedent that established that federal courts generally "should not enjoin state election laws in the period close to an election." Id. at 879 (citing Purcell v. Gonzalez, 549 U.S. 1 (2006)) (per curiam)).

15

The Court allowed the Parties in the cases *sub judice* to submit briefing and oral argument on the effect of the Milligan stay order. APA Doc. Nos. [97], [127]–[131], Pendergrass Doc. Nos. [65], [91]–[95], Grant Doc. Nos. [59], [85]–[89]. The Court thereafter decided to proceed with the preliminary injunction hearing. Over the course of the six-day preliminary injunction hearing—February 7 through February 14, 2022—the Court admitted various pieces of evidence and heard testimony from a variety of expert and fact witnesses. Id.

On February 28, 2022, the Court issued its Preliminary Injunction Order. The Court found a substantial likelihood of success on the merits in that additional majority-Black districts should have been drawn. The General Assembly should have drawn an additional majority-Black congressional district in the west-metro Atlanta (Pendergrass Plaintiffs); two additional majority-Black State Senate districts in south-metro Atlanta (Grant); two additional majority-Black State House districts in the south-metro Atlanta (Grant), and one additional majority-Black State House district in southwestern Georgia (Alpha Phi Alpha). Alpha Phi Alpha Fraternity, Inc. v. Raffensperger, 587 F. Supp. 3d 1222, 1243–320

(N.D. Ga. 2022).[7] In light of the Supreme Court's decision to stay the <u>Milligan</u> case, the Court ultimately denied the preliminary injunction finding that the balance of harms and public interest weighed against granting the injunction. <u>Id.</u> at 1321–27. Specifically, the Court found based upon the evidence presented that "the public interest of the State of Georgia would be significantly undermined by altering the election calendar and unwinding the electoral process" as of the date of its ruling. <u>Id.</u> at 1324.

Pursuant to Federal Rule of Civil Procedure 65(a)(2), certain evidence that was received on the preliminary injunction motions (in a format admissible at trial) has become a part of the trial record.

---

[7] The Court did not find it necessary to rule on the substantial likelihood of success as to the <u>Alpha Phi Alpha</u> Plaintiffs' Illustrative Senate Districts 17 and 28 and Illustrative House Districts 73, 110, and 111. <u>Alpha Phi Alpha Fraternity</u>, 587 F. Supp. 3d at 1267–68. The Court also did "not find that the <u>Grant</u> and <u>Alpha Phi Alpha</u> Plaintiffs ha[d] established that they have a substantial likelihood of succeeding on the merits of their claims that a third State Senate District should have been drawn in the Eastern Black Belt or that additional House Districts should have been drawn in the western Atlanta metropolitan area, central Georgia, or in the Eastern Black Belt." <u>Id.</u> at 1271 n.23.

### 3. *Discovery and Summary Judgment*

Following the preliminary injunction hearing, all Plaintiffs amended their complaints and engaged in a nine-month discovery period. APA Doc. Nos. [133], [141], Pendergrass Doc. Nos. [96], [120], Grant Doc. No. [90], [96]. Following discovery, Defendants filed Motions for Summary Judgment in all three cases. APA Doc. No. [230], Pendergrass Doc. No. [175], Grant Doc. No. [190]. The Pendergrass and Grant Plaintiffs also filed Motions for Summary Judgment. Pendergrass Doc. No. [173], Grant Doc. No. [189]. On May 18, 2023, the Court heard argument on the pending motions. APA Doc. No. [260], Pendergrass Doc. No. [209], Grant Doc. No. [224]. At the conclusion of the hearing, the Court informed the Parties that it would not rule on the motions for summary judgment until after the Supreme Court issued its opinion for the Allen case.

On June 8, 2023, the Supreme Court issued a 5-4 decision in Allen, 599 U.S. 1, affirming the three-judge court's Grant of the preliminary injunction.[8] Chief

_____

[8] The procedural history for the Allen case shows that the case name changed from Merrill v. Milligan to Allen v. Milligan based upon the expiration of the term of Alabama's Secretary of State and the swearing in of the successor.

Justice Roberts, writing for the majority, upheld the existing three-part framework developed in <u>Gingles</u>, 478 U.S. at 30 and found under a clear error review that the three-judge district court did not err in finding a substantial likelihood of success on a Section 2 violation. <u>Id.</u>[9]

Following the Supreme Court's <u>Allen</u> decision, the Parties provided supplemental briefing. <u>APA</u> Doc. Nos. [263], [264], <u>Pendergrass</u> Doc. Nos. [212], [214], <u>Grant</u> Doc. Nos. [227], [228]. The Court then denied all pending motions for summary judgment. <u>APA</u> Doc. No. [268], <u>Pendergrass</u> Doc. No. [215], <u>Grant</u> Doc. No. [229]. In all three cases, the Court found that issues of fact and credibility remained on all three <u>Gingles</u> preconditions as well as the totality of the circumstances. <u>Id.</u>

### 4. Trial

The Parties then proceeded to trial on the merits of Plaintiffs' claims and Defendants' affirmative defenses. Although the Court did not consolidate the three cases, at the trial, the Court heard all three cases at once (utilizing

---

[9] For a thorough discussion of the Supreme Court's <u>Allen</u> decision, <u>see</u> <u>APA</u> Doc. No. [268].

19

coordinated hearing procedures). For the sake of clarity, the Court required the Parties to clearly state on the Record which testimony and which pieces of evidence were attributed to which case. <u>APA</u> Doc. No. [286], <u>Pendergrass</u> Doc. No. [236], <u>Grant</u> Doc. No. [248]. Over the course of the eight-day trial—spanning from September 5, 2023 through September 14, 2023—the Court heard from 20 live witnesses and accepted testimony from 22 witnesses via deposition (<u>APA</u> Doc. No. [292], <u>Pendergrass</u> Doc. No. [243], <u>Grant</u> Doc. No. [254]).

At the conclusion of all three Plaintiffs' presentations of evidence, Defendants moved for Judgment on Partial Findings of Fact pursuant to Federal Rule of Civil Procedure 52(c). <u>APA</u> Doc. No. [305], <u>Pendergrass</u> Doc. No. [255], <u>Grant</u> Doc. No. [264]. The Court verbally denied the motion. <u>APA</u> Doc. No. [306], <u>Pendergrass</u> Doc. No. [257], <u>Grant</u> Doc. No. [266]. Defendants then proceeded to present their case-in-chief. The Court heard closing arguments and took the matter under advisement. <u>APA</u> Doc. No. [308], <u>Pendergrass</u> Doc. No. [259], <u>Grant</u> Doc. No. [268].

20

### 5. *Post-Trial Proceedings*

Following the trial, all Parties submitted proposed findings of fact and conclusions of law for the Court's consideration. <u>APA</u> Doc. Nos. [317], [318], <u>Pendergrass</u> Doc. Nos. [268], [269], <u>Grant</u> Doc. Nos. [277], [278].[10] The Court has adopted and rejected portions of the Parties' submissions.

**B.**   **The Named Parties**

**1.**   ***Alpha Phi Alpha* Plaintiffs**

**a)**   **Alpha Phi Alpha Fraternity, Inc.**

Alpha Phi Alpha Fraternity, Inc. is the first intercollegiate Greek-letter fraternity established for Black men. Stip. ¶ 51. Alpha Phi Alpha has programs to raise political awareness, register voters, and empower Black communities. Stip. ¶ 53. Alpha Phi Alpha has thousands of members throughout Georgia. Stip. ¶ 52.

---

[10] Under the Local Rules, counsel are "directed to submit a statement of proposed Findings of Fact and Conclusions of Law in nonjury cases." LR 16.4(B)(25), NDGa. The Court does not view these proposals as evidence or post-trial briefs. To the extent that any Party raised an argument in their Proposed Findings of Fact and Conclusions of Law that was not raised in the Pretrial Order or at trial, that argument will be disregarded.

Under the Enacted Legislative Plans, Alpha Phi Alpha has members who live in State Senate Districts 16, 17, and 23 and State House Districts 74, 114, 117, 128, 133, 134, 145, 171, and 173. Id. Harry Mays is a member of Alpha Phi Alpha Fraternity, Inc. Doc. No. [94], at 2 ¶ 4; Stip. ¶ 54. Mr. Mays resides in House District 117 under the State's 2021 House Plan, and under Plaintiffs' illustrative maps would reside in a new majority-Black House District. Id. ¶¶ 55–56.

### b)   Sixth District African Methodist Episcopal Church

The Sixth District of the African Methodist Episcopal Church ("Sixth District AME") is a nonprofit religious organization. Stip. ¶ 57. The Sixth District AME is one of twenty districts of the AME Church and covers all of Georgia. Stip. ¶ 58. One of its core tenets is encouraging and supporting civic participation among its members through voter registration, transporting churchgoers to the polls, hosting "Get Out the Vote" efforts, and providing food, water and encouragement to people waiting in lines at the polls. Stip. ¶ 62.

Under the Enacted Legislative Plans, member-churches of the Sixth District AME are located in State Senate Districts 16, 17, and 23 and State House Districts 74, 114, 117, 128, 133, 134, 145, 171, and 173. Stip. ¶ 61. Plaintiff Phil S. Brown is a

member of the Lofton Circuit AME Church in Wrens, Georgia, and Plaintiff Janice Stewart is a member of the Saint Peter AME Church in Camilla, Georgia. Stip. ¶¶ 63–64.

### c)  Individually-named Plaintiffs in the APA case

Eric T. Woods is a Black resident of Tyrone, Georgia. Stip. ¶¶ 65, 66. Under the Enacted Legislative Plans, Mr. Woods is a registered voter in State Senate District 16. Stip. ¶¶ 67, 68. Katie Bailey Glenn is a Black resident of McDonough, Georgia. Stip. ¶¶ 70, 71. Under the Enacted Legislative Plans, Ms. Bailey is a registered voter in State Senate District 17. Stip. ¶¶ 72, 73. Phil S. Brown is a Black resident of Wrens, Georgia. Stip. ¶¶ 75, 76. Under the Enacted Legislative Plans, Mr. Brown is a registered voter in State Senate District 23. Stip. ¶¶ 77, 78. Janice Stewart is a Black resident of Thomasville, Georgia. Stip. ¶¶ 80, 81. Under the Enacted Legislative Plans, Ms. Stewart is a registered voter in State House District 173. Stip. ¶¶ 82, 83.

### 2.  _Pendergrass_ Plaintiffs

Coakley Pendergrass is a Black resident of Cobb County, Georgia. Stip. ¶¶ 1, 2. Under the Enacted Congressional Plan, Mr. Coakley is a registered voter in Congressional District 11. Stip. ¶ 3. Triana Arnold is a Black resident of

23

Douglas County, Georgia. Stip. ¶¶ 4, 5. Under the Enacted Congressional Plan, Ms. Arnold is a registered voter in Congressional District 3. Stip. ¶ 6. Elliott Hennington is a Black resident of Cobb County, Georgia. Stip. ¶¶ 7, 8. Under the Enacted Congressional Plan, Mr. Hennington is a registered voter in Congressional District 14. Stip. ¶ 9. Robert Richards is a Black resident of Cobb County, Georgia. Stip. ¶¶ 10, 11. Under the Enacted Congressional Plan, he is a registered voter in Congressional District 14. Stip. ¶ 12. Jens Rueckert is a Black resident of Cobb County, Georgia. Stip. ¶¶ 13, 14. Under the Enacted Congressional Plan, Mr. Rueckert is a registered voter in Congressional District 14. Stip. ¶ 15. Ojuan Glaze is a Black resident of Douglas County, Georgia. Stip. ¶¶ 16, 17. Under the Enacted Congressional Plan, Mr. Glaze is a registered voter in Congressional District 13. Stip. ¶ 18.

### 3. _Grant_ Plaintiffs

Annie Lois Grant is a Black resident of Union Point, Georgia. Stip. ¶¶ 19, 20. Under the Enacted Legislative Plans, Ms. Grant is a registered voter in State Senate District 24 and State House District 124. Stip. ¶ 20. Quentin T. Howell is a Black resident of Milledgeville, Georgia. Stip. ¶¶ 21, 22. Under the Enacted

Legislative Plans, Mr. Howell is a registered voter in State Senate District 25 and State House District 133. Stip. ¶ 23. Elroy Tolbert is a Black resident of Macon, Georgia. Stip. ¶¶ 24, 25. Under the Enacted Legislative Plans, Mr. Tolbert is a registered voter in State Senate District 18 and State House District 144. Stip. ¶ 26. Triana Arnold James is a Black resident of Villa Rica, Georgia. Stip. ¶¶ 27, 28. Under the Enacted Legislative Plans, Ms. James is a registered voter in State Senate District 30 and State House District 64. Stip. ¶ 29. Eunice Sykes is a Black resident of Locust Grove, Georgia. Stip. ¶¶ 30, 31. Under the Enacted Legislative Plans, Ms. Sykes is a registered voter in State Senate District 25 and State House District 117. Stip. ¶ 33. Elbert Solomon is a Black resident of Griffin, Georgia. Stip. ¶¶ 33, 34. Under the Enacted Legislative Plans, Mr. Solomon is a registered voter in State Senate District 16 and State House District 117. Stip. ¶ 35.

Dexter Wimbish is a Black resident of Griffin, Georgia. Stip. ¶¶ 36, 37. Under the Enacted Legislative Plans, Mr. Wimbish is a registered voter in State Senate District 16 and State House District 74. Stip. ¶ 38. Garrett Reynolds is a Black resident of Tyrone, Georgia. Stip. ¶¶ 39, 40. Under the Enacted Legislative Plans, Mr. Reynolds is a registered voter in State Senate District 16 and State

25

House District 68. Stip. ¶ 41. Jacqueline Faye Arbuthnot is a Black resident of Powder Springs, Georgia. Stip.  ¶¶ 42, 43. Under the Enacted Legislative Plans, Ms. Arbuthnot is a registered voter in State Senate District 31 and State House District 64. Stip. ¶ 44. Jacquelyn Bush is a Black resident of Fayetteville, Georgia. Stip.  ¶¶ 45, 46. Under the Enacted Legislative Plans, Ms. Bush is a registered voter in State Senate District 16 and State House District 74. Stip. ¶ 47. Mary Nell Conner is a Black resident of Henry County, Georgia. Stip.  ¶¶ 48, 49. Under the Enacted Legislative Plans, Ms. Conner is a registered voter in State Senate District 25 and State House District 117. Stip. ¶ 50.

### 4.   *Defendants*

#### a)   **Brad Raffensperger**

Brad Raffensperger is the Georgia Secretary of State. Stip. ¶ 85. The Secretary of State is a constitutional officer elected by Georgia voters every four years. Ga. Const. Art. 5, § 3, par. 1. Under Georgia law, the Secretary of State is required:

> (1) [t]o determine the forms of nomination petitions, ballots, and other forms;
> . . . .

26

(6) [t]o receive from the superintendent the returns of primaries and elections and to canvass and compute the votes cast for candidates and upon questions;

. . . .

(13) [t]o prepare and furnish information for citizens on voter registration and voting; and

. . . .

 (15) [t]o develop, program, building, and review ballots for use by counties and municipalities on voting systems in use in the state.

O.C.G.A. § 21-2-50(a).

### b)   The State Election Board[11]

The State Election Board ("SEB") was created by legislation codified in the Georgia's Election Code, O.C.G.A. § 21-2-30(a). It consists of five members, including a representative of each of the two major political parties. Id. § 21-2-

---

[11] The Court notes for the record that Defendant Raffensperger is sued in his official capacity in all three lawsuits, the members of the SEB are sued in their official capacities in Pendergrass and Grant. As will be discussed below, the Court finds that the Pendergrass and Grant Plaintiffs did not introduce any evidence about the SEB's ability to redress their injuries or that the injury is traceable to it. Thus, the Court ultimately finds that the Pendergrass and Grant Plaintiffs lack standing to sue the SEB. See Section II(A)(1)(b) infra. However, throughout this Opinion and Memorandum, the Court will collectively refer to all Defendants, even though the SEB is ultimately dismissed and was not sued by the Alpha Phi Alpha Plaintiffs. However, any relief will be directed to Secretary of State Raffensperger.

27

30(c). Sarah Tindall Ghazal, Janice Johnston, Edward Lindsey, and Matthew Mashburn serve as members of the SEB. Stip.  ¶¶ 86–89. [12]

Under Georgia law, moreover, the SEB has a statutory duty to "formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(2). Georgia law also tasks the SEB with "investigat[ing] or authoriz[ing] the Secretary of State to investigate, when necessary or advisable[,] the administration of primary and election laws and frauds and irregularities in primaries and elections and to report violations of the primary and election laws either to the Attorney General or the appropriate district attorney . . . ." Id. § 21-2-31(5). Furthermore, the SEB is "vested with the power to issue orders, after the completion of appropriate proceedings, directing compliance with [the Election

_____

[12] Defendants have filed a notice indicating that on September 1, 2023, the Honorable William S. Duffey, Jr., stepped down as a chair of the State Election Board. Pendergrass Doc. No. [270], Grant Doc. No. [279]. Because Duffey was sued in his official capacity, this resignation does not abate the action, but does lead to Duffey being terminated as a named-party under the applicable rules of civil procedure. See Fed. R. Civ. P. 21; 25(d).

Code] or prohibiting the actual or threatened commission of any conduct constituting a violation . . . . " Id. § 21-2-33.1(a).

Additionally, Georgia law tasks the SEB with oversight authority over the counties. See O.C.G.A. § 21-2-31(1) ("It shall be the duty of the [SEB] . . . [t]o promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections[.]"); id. at § 21-2-31(2) ("[t]o formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections"); id. at § 21-2-31(5) ("[t]o investigate, or authorize the Secretary of State to investigate, when necessary or advisable the administration of primary and election laws and frauds and irregularities in primaries and elections and to report violations of the primary and election laws either to the Attorney General or the appropriate district attorney who shall be responsible for further investigation and prosecution.").

### C.   History of Race and Voting in Georgia

In 1965, Congress passed the Voting Rights Act ("VRA"). While the VRA has been amended several times, as originally adopted, Section 2 prohibited practices that denied or abridged the right to vote "on account of" race or color. See Allen, 599 U.S. at 11 n.1 (citing 42 U.S.C. § 1973 (1970 ed.)).

The Act was amended in 1982. Id. at 11. Section 4 of the VRA (the "coverage formula") determined which jurisdictions were "covered" and were required to submit new voting procedures or practices for prior approval ("preclearance") by the Department of Justice or a district court panel of three judges, pursuant to Section 5. See James D. Wascher, Recognizing the 50th Anniversary of the Voting Rights Act, Fed. Law., May 2015, at 41 (hereinafter, "Wascher"). The VRA thus "employed extraordinary measures to address an extraordinary problem." Shelby Cnty. v. Holder, 570 U.S. 529, 534 (2013). Georgia was a covered jurisdiction because in the 1960s and early 1970s, the whole state had low voter registration or turnout and maintained tests or devices as prerequisites to voting (i.e., poll taxes, literacy tests, and grandfathering rules). Id. at 536–37 (28 C.F.R. pt. 51, App. (2012)).

30

During Georgia's last redistricting cycle in 2011, which was subject to preclearance under Section 5 of the Voting Rights Act, the Department of Justice ("DOJ") precleared Georgia's proposed State Senate, State House, and Congressional Plans. See Jud. Not.[13]

Following those determinations, in 2013, the Supreme Court held that the coverage formula was no longer constitutional because it had not been reformulated since 1975. Shelby Cnty., 570 U.S. at 538, 556–57. As a result, the State of Georgia is no longer a covered jurisdiction and is no longer required to send district plans or any proposed voting practices or procedural changes to the DOJ for preclearance. The 2020 redistricting cycle is the first in which Georgia was not required to seek preclearance before adopting its new congressional and legislative plans.

_____

[13] The precleared plans were utilized in the 2012 election and will hereinafter be referred to as the "2012 Plans."

31

### D.   Georgia's Changing Demographics

#### 1. *Georgia's Total Population*

Between 2000 and 2010, Georgia's population increased by a little over 1.5 million people (from 8,186,453 to 9,687,653), which marked a population growth rate of 18.34%. PX 1, fig.3. The growth of the minority population accounted for approximately 14.85% of this growth rate, the Any-Part Black ("AP Black") [14] population alone accounted for 8.07%, and the white population accounted for approximately 3.48% of Georgia's growth rate. Id. During this time, the minority population increased by 1,215,941 people and had a growth rate of 34.66%. PX 1, fig.3. The AP Black population increased by 660,673 people and had a growth rate of 27.60%. Id. Meanwhile, Georgia's white population grew by 285,259 people and had a growth rate of 5.56%. Id. Following the 2010 Census, as a result of population growth, Georgia was apportioned a 14th Congressional

---

[14] "AP Black" is defined as the combined total of all persons who are single-race Black and persons who are two or more races and one of them is Black. Stip. ¶ 95. "[I]t is proper to look at *all* individuals who identify themselves as [B]lack" in their census responses, even if they "self-identify as both [B]lack and a member of another minority group," because the inquiry involved is "an examination of only one minority group's effective exercise of the electoral franchise." Georgia v. Ashcroft, 539 U.S. 461, 473 n.1 (2003).

District. Stip. ¶ 94. During this time, the growth of the minority population outpaced the white population by approximately 6 times and the Black population outpaced the white population by approximately 5 times.

In 2020, the United States Census Bureau conducted the 2020 Census. The Census results were provided to Georgia on August 21, 2021. Stip. ¶ 92. Between 2010 and 2020 Georgia's total population increased by over a million people to 10,711,908, which marked a population growth rate of 10.57%. Id. ¶ 93; PX 1, fig.3; Tr. 718:4–6. The growth of the minority population accounted for approximately 11.11% of this growth rate, the AP Black population alone accounted for 5.00%, and the white population accounted for approximately -0.53% of Georgia's growth rate. Id. Meaning, all of Georgia's population growth during the past decade is attributable to the growth of the minority population. PX 1 ¶ 14, fig.1, Tr. 718:7–15. During this time, the minority population increased by 1,076,019 people and had a growth rate of 25.18%. PX 1, fig.3. The AP Black population increased by 484,048 people and had a growth rate of 15.85%. Id. Meanwhile, Georgia's white population decreased by 51,764 people and had a negative growth rate of –0.9%. Id. Over the past two decades, Georgia's Black and

33

minority populations continued to have a double-digit rate of growth; whereas, in the last decade, the white population has begun to decline in Georgia.

In total numbers, Georgia's AP Black population increased by 484,048 people since 2010. Stip. ¶ 95; PX 1 ¶ 14, fig.3. Between 2010 and 2020 the AP Black population accounted for 47.26% of Georgia's total population growth. Stip. ¶¶ 96, 102; PX 1 ¶ 14 & fig.1. And the proportion of the AP Black population overall increased from 31.53% to 33.03% over the same period. Stip. ¶ 102; PX 1 ¶ 16. Meanwhile, Georgia's single-race white population decreased by 51,764 people and makes up 50.06% of Georgia's population, which is a razor thin majority of Georgia's population. Stip. ¶¶ 99, 102. Georgia's minority population now totals 49.94%. PX 1 ¶ 14 & fig.1.

### 2. Metro Atlanta

The Atlanta Metropolitan Statistical Area ("Atlanta MSA") [15] had a population growth of 803,087 persons between 2010 and 2020, which accounts

---

[15] The Atlanta MSA consists of the following 29 counties: Barrow, Bartow, Butts, Carroll, Cherokee, Clayton, Cobb, Coweta, Dawson, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Haralson, Heard, Henry, Jasper, Lamar, Meriwether, Morgan, Newton,

for approximately 78.41% of Georgia's total population growth. Stip. ¶ 107; PX . 1 ¶ 14 & fig.1; id. ¶ 30 & fig.5. The AP Black population accounted for 409,927 of those persons, which amounts to 51.04% of the population growth in Atlanta and 40.02% of Georgia's population growth. Id. The AP Black population is 35.91% of the Atlanta MSA, which was an increase from 33.61% in 2010. Stip. ¶ 108. The AP Black population accounts for 34.86% of the Atlanta MSA's total voting age population. Stip. ¶ 110.

According to the 2020 Census, the Atlanta MSA has a total voting-age population of 4,654,322 persons, of whom 1,622,469 (34.86%) are AP Black. Stip. ¶ 110. The non-Hispanic white voting-age population is 4,342,333 (52.1%). PX 1 ¶ 31 & fig.6. And, the 11 ARC counties account for more than half (54.7%) of the statewide Black population. PX 1 ¶ 28.

Based on the 2020 Census, the combined Black population in Cobb, Fulton, Douglas, and Fayette Counties is 807,076 persons, more than necessary to

---

Paulding, Pickens, Pike, Rockdale, Spalding, and Walton. Stip. ¶ 106. The Atlanta Regional Commission ("ARC") is comprised of 11 core counties within the Atlanta MSA: Cherokee, Clayton, Cobb, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, Henry, and Rockdale. Stip. ¶ 111.

constitute an entirely AP Black congressional district[16]—or a majority in two congressional districts. PX 1 ¶ 42 & fig.8. The population is 100,000 people more than needed to constitute an entirely AP Black Senate district[17] in this area, and nearly 5 entirely AP Black House Districts.[18] More than half (53.27%) of the total population increase in these four counties since 2010 can be attributed to the increase in the Black population. PX 1 ¶ 43.

The southeastern metro-Atlanta area has experienced similar growth patterns. In 2000, 18.51% of the population in the five-county Fayette-Spalding-Henry-Rockdale-Newton area was Black. Stip. ¶ 114; APAX 1, 25 & fig.7. By 2010, the Black population in that area more than doubled to reach 36.70% of the overall population, then grew to 46.57% in 2020. Id. Between 2000 and 2020, the Black population in this five-county South Metro Atlanta area quadrupled, from 74,249 to 294,914. Stip. ¶ 115. This area is now plurality Black. APAX 1, 25 & fig.7. Fayette and Spalding Counties have seen Black population increases of 54.5%

---

[16] The ideal population size of a congressional district is 765,136 people. Stip. ¶ 197.

[17] The ideal population size for a Senate district is 191,284 people. Stip. ¶ 277

[18] The ideal population size for a House district is 59,511 people. Stip. ¶ 278.

and 18.7%, respectively, since 2010. APAX 1, at 40 ¶ 97. Henry County's Black population has increased by 39.3% in the last decade, and Henry County is now plurality Black. Id. ¶ 102. As Mr. Cooper explained, in the 1990s, Henry County was not even "10 percent Black" but the county has "change[d] over time." Tr. 116:17–18.

Meanwhile, under the 2000 Census, the population in the 29-county Atlanta MSA was 60.42% non-Hispanic white, decreased to 50.78% in 2010, and decreased further to 43.71% in 2020. PX 1 ¶ 25 & fig.4. Between 2010 and 2020, the non-Hispanic white population in the Atlanta MSA decreased by 22,736 persons. Stip. ¶ 112; PX 1 ¶ 25 & fig.4; Tr. 721:19–23.

### 3. The Black Belt

The Black Belt refers to an area that runs across the southeastern United States. Stip. ¶ 118. The Black Belt, is in part, characterized by significant Black populations and a shared history of antebellum slavery and plantation agriculture. Id. Georgia's portion of the Black Belt runs across the middle of the State between Augusta and Southwest Georgia. Stip. ¶ 119. Unlike, the Atlanta MSA, it is not comprised of a specific set of whole counties.

37

### a)  Eastern Black Belt Region

The Georgia Department of Community Affairs ("GDCA") has prepared regional commission maps, including of the Central Savannah River Area region. APAX 1, 13 ¶ 26; id. at 118-119, Ex. F. The Central Savannah River Area Counties include: Jenkins, Burke, Richmond, Jefferson, McDuffie, Wilkes, Taliaferro, Glascock, Warren, Washington, and Hancock. Ten of these 11 contiguous counties—excluding Glascock—are identified as part of Georgia's Black Belt by the Georgia Budget and Policy Institute. APAX 1, 13–14 ¶ 27; DX 22, at 20–25; Stip.   ¶¶ 120–123. Mr. Cooper defined this set of 11 counties as part of the "Eastern Black Belt." APAX 1 ¶ 24. These same counties are consistent with Mr. Esselstyn's understanding of the eastern portion of the Black Belt. GX 1 ¶ 19 & fig.1.

According to Mr. Cooper's analysis, between 2000 and 2020, the total population in the Eastern Black Belt has remained relatively constant. APAX 1 ¶ 58 & fig.8. And, at least 40% of these eleven counties are AP Black and over the past two decades, their share of the population increased from 50.66% to 54.62%. Stip.   ¶¶ 120, 122. Meanwhile, the white population decreased from 45.61% to

38

38.17% of the population over the same period. Stip. ¶ 123. In other words, the Black population in this area has become more concentrated over time, and now comprises a majority.

### b)  <u>Metro-Macon Region</u>

Metropolitan Macon is a seven-county region in Middle Georgia defined by the combined Metropolitan Statistical Areas ("MSAs") of Macon-Bibb and Warner Robins. Stip. ¶ 124; APAX 1, at 15–16 ¶ 33. The Macon-Bibb MSA includes the counties of Twiggs, Macon-Bibb, Jones, Monroe, and Crawford. Stip. ¶ 124; APAX 1, at 16 n.14. The adjacent Warner Robins MSA encompasses Houston and Peach Counties. Stip. ¶ 124; APAX 1, 16 n.14. Three of the Macon-area counties are "identified as part of Georgia's Black Belt"—Macon, Bibb, Peach, and Twiggs, encompassing about 59% of the Black population (177,269) in the seven-county region. APAX 1, 29; GX 1 ¶ 19 & fig.1. Between 2000 and 2020, the AP Black population increased from 36.89% to 41.67% of the Macon MSA. Stip. ¶ 126. Meanwhile, the white population decreased from 59.40% to 49.10% of the Macon MSA. Stip. ¶ 127.

### c)      Southwestern Georgia Region

The relevant counties in southwest Georgia include: Sumpter, Webster, Stewart, Quitman, Clay, Randolph, Terrell, Calhoun, Dougherty, Early, Baker, and Mitchell. Stip.   ¶¶ 128–132. Twelve of the thirteen counties in Senate District 12—all but Miller County—are identified by the Georgia Budget and Policy Institute as Black Belt counties. APAX 1, 15 ¶ 32; DX 22, at 20–25. At least 40% of this region is AP Black, and all but Miller County is at least 40% AP Black. Stip. ¶ 128. Between 2000 and 2020, the population decreased in this area from 214,686 to 190,819 (11.12%). Stip. ¶ 130. While the AP Black and white populations have decreased over the past two decades, the share of the AP Black population increased from 55.33% to 60.6%, and the white population decreased from 42.36% to 33.83%. Stip.  ¶¶ 131, 132.

### E.     Georgia 2021 Enacted Plans

#### 1.   The 2021 Redistricting Process

##### a)  Legislative activities

In the wake of the COVID-19 pandemic, the Georgia General Assembly underwent the constitutionally required process of redistricting. Article One, Section 2, Clause 3 of the United States Constitution provides:

40

"Representatives . . . shall be apportioned among the several States which may be included within the Union, according to their respective Numbers . . . . The actual Enumeration shall be made . . . every [ ] Term of ten Years, in such Manner as they shall by Law direct." U.S. Const. art. I, §2, cl. 3.

In 2021 and prior to the public release of the redistricting plans, the House Legislative and Congressional Reapportionment and Senate Reapportionment and Redistricting Committees adopted guidelines. Stip.  ¶¶ 134, 135. The general principles for drafting plans for the House Legislative and Congressional Reapportionment Committee are as follows:

41

### III.   REDISTRICTING PLANS

#### A.   GENERAL PRINCIPLES FOR DRAFTING PLANS

1. Each congressional district should be drawn with a total population of plus or minus one person from the ideal district size.

2. Each legislative district of the General Assembly should be drawn to achieve a total population that is substantially equal as practicable, considering the principles listed below.

3. All plans adopted by the Committee will comply with Section 2 of the Voting Rights Act of 1965, as amended.

4. All plans adopted by the Committee will comply with the United States and Georgia Constitutions.

5. Districts shall be composed of contiguous geography. Districts that connect on a single point are not contiguous.

6. No multi-member districts shall be drawn on any legislative redistricting plan.

7. The Committee should consider:

   a. The boundaries of counties and precincts;

   b. Compactness; and

   c. Communities of interest.

8. Efforts should be made to avoid the unnecessary pairing of incumbents.

9. The identifying of these criteria is not intended to limit the consideration of any other principles or factors that the Committee deems appropriate.

Stip. ¶ 134; JX 2, 3. The general principles for drafting plans for the Senate Reapportionment and Redistricting Committee are as follows:

42

III.   **REDISTRICTING PLANS**

    A.   **GENERAL PRINCIPLES FOR DRAFTING PLANS**

        1.   Each congressional district should be drawn with a total population of plus or minus one person from the ideal district size.

        2.   Each legislative district of the General Assembly should be drawn to achieve a total population that is substantially equal as practicable, considering the principles listed below.

        3.   All plans adopted by the Committee will comply with Section 2 of the Voting Rights Act of 1965, as amended.

        4.   All plans adopted by the Committee will comply with the United States and Georgia Constitutions.

        5.   Districts shall be composed of contiguous geography. Districts that connect on a single point are not contiguous.

        6.   No multi-member districts shall be drawn on any legislative redistricting plan.

        7.   The Committee should consider:

            a.   The boundaries of counties and precincts;

            b.   Compactness; and

            c.   Communities of interest.

        8.   Efforts should be made to avoid the unnecessary pairing of incumbents.

        9.   The identifying of these criteria is not intended to limit the consideration of any other principles or factors that the Committee deems appropriate.

Stip. ¶ 135; JX 1, 3.

43

The redistricting process consisted of the following actions. Beginning on June 15, 2021 and between June and July of 2021, the Georgia General Assembly held nine in-person and two virtual joint public hearing committees on redistricting. Stip. ¶ 136. The joint redistricting committee released educational videos about the redistricting process. Stip. ¶ 137. The Georgia General Assembly created an online portal and received 1,000 comments from voters in 86 counties. Stip. ¶ 138.

On August 21, 2021, the Census Bureau released its detailed population data gathered from its 2020 canvassing efforts. Stip. ¶ 140. On August 30, 2021, the General Assembly's joint redistricting committees held a meeting with interest groups. Stip. ¶ 141. The National Conference of State Legislatures, American Civil Liberties Union of Georgia, Common Cause, Fair Districts GA, the Democratic Party of Georgia, and Asian-Americans Advancing Justice–Atlanta presented at the August 30, 2021 joint meeting. Stip. ¶ 142.

### b)  <u>Map drawing process</u>

Gina Wright, the Executive Director of the Georgia General Assembly's Office of Legislative and Congressional Reapportionment, testified at trial that

44

she drew Georgia's redistricting plans for Congress, State Senate, and State House in 2021. Tr. 1605:14–16. As a fact witness, the Court found Ms. Wright to be highly credible in her knowledge about Georgia's map drawing process. The Court also found Ms. Wright's testimony about various areas of the state to be credible and reliable.

Ms. Wright testified that generally she began drafting the new legislative plans by using blank maps, rather than starting from the existing plans. Tr. 1622:11–17; 1642:7–14. She then put the ideal population size, using the Census population, into the blank map. Tr. 1622:11–13. At times, she layered the new maps with the former map to see if she retained core districts. Tr. 1607:8–1621:18–22. Ms. Wright used the eyeball test and did not look at compactness scores when she drew the congressional and legislative districts. Tr. 1610:3–1611:12.

Once she drew the blind map, she gave the map to the chairmen of the House Legislative and Congressional Reapportionment and Senate Reapportionment and Redistricting Committees. Tr. 1623:4–6. Ms. Wright then made adjustments as requested by Senator Kennedy, chairman of the Senate

45

Reapportionment and Redistricting Committee, Representative Bonnie Rich, a former member of the House Reapportionment and Redistricting Committee, and other members, if requested. Tr. 1626:10–1627:1; 1641: 24–1642:1. Ms. Wright also incorporated the information she received from the public hearings when drawing the plans. Tr. 1627:2–13.

The Congressional map was drawn in a slightly different manner. Instead of starting with a blank map, Ms. Wright testified that the chairman asked her to draw a benchmark map that had a more specific framework than the State legislative plans. Tr. 1666:5–11. There was no testimony or further explanation about the specific framework that was requested to go into the benchmark map.

The Proposed 2021 Senate and House Plans were first released on November 2, 2021. Stip. ¶ 143. Following their release, the joint redistricting committees received public comment on the proposed maps. Stip. ¶ 146. On November 3, 2021, the General Assembly convened a special session, in part, to consider the proposed Senate and House Plans. Stip. ¶ 144. The House and Senate redistricting committees held multiple meetings during the special session. Stip. ¶ 145. During this time, the House and Senate redistricting committees

received public comment on the draft plans during their committee meetings. Stip. ¶ 146.

On November 12, 2021, the General Assembly passed the 2021 Senate and House Plans (SB 1EX and HB 1EX, respectively) (collectively, the "Enacted Legislative Plans," individually, the "Enacted Senate Plan" and "Enacted House Plan"). Stip. ¶ 147. On November 22, 2021, the General Assembly passed the 2021 Congressional Redistricting Plan (the "Enacted Congressional Plan"). Stip. ¶ 148. No Democratic members of the General Assembly or Black representatives voted in favor of the 2021 Enacted Congressional, Enacted Senate, or Enacted House Plans (collectively "the Enacted Plans"). Stip. ¶¶ 150, 151. On December 30, 2021, Governor Kemp signed the Enacted Plans into law. Stip. ¶ 149. The Enacted Plans were used in the 2022 Elections. Stip. ¶ 152.

### 2. *Enacted Plan Statistics*

#### a) <u>Congressional Plan</u>

##### (1) *2012 Congressional plan*

The 2012 Congressional Plan was precleared under Section 5 of the VRA by the DOJ. <u>See</u> Jud. Not.; <u>see also</u> Attorney General Press Release, https://law.georgia.gov/press-releases/2011-12-23/justice-approves-georgias-

redistricting-plans; Charles Bullock, <u>The History of Redistricting in Georgia</u>, 52 Ga. L. Rev. 1057, 1097–98 (Summer 2018).

Pursuant to the population increase shown in the 2010 Census results, for the first time, Georgia was apportioned an additional seat in the U.S. House of Representatives, making Georgia's U.S. House of Representative delegation a total of 14 members. <u>See</u> United States Census Bureau, Historical Apportionment Data (1910-2020), https://www.census.gov/data/tables/time-series/dec/apportionment-data-text.html (last visited Sept. 15, 2023).[19]

The 2012 Congressional Plan contained four districts where the AP Black Voting Age Population ("AP BVAP") was in the majority. Stip. ¶ 160. Three of those districts were located within the Atlanta MSA. Stip. ¶ 162. The 2012 Congressional Plan split 16 counties. Stip. ¶ 165. The average Reock Score[20] for

_____

[19] The Court takes judicial notice of the Decennial Census data. <u>See</u> <u>United States v. Phillips</u>, 287 F.3d 1053, 1055 n.1 (11th Cir. 2002) (citing <u>Hollis v. Davis</u>, 941 F.2d 1471, 1474 (11th Cir. 1991) and <u>Moore v. Comfed Savings Bank</u>, 908 F.2d 834, 841 n.4 (11th Cir. 1990)) (taking judicial notice of the United States Census Bureau's 1990 census figures); <u>Grant</u> Doc. No. [229], at 9 n.10 (taking judicial notice of 2020 U.S. Census figures).

[20] "The Reock test is an area-based measure that compares each district to a circle, which

the 2012 Congressional Plan is 0.45 and the average Polsby-Popper Score[21] is 0.26.

Stip. ¶ 168; PX 1, Ex. L-2.

| District[22] | 2012 Congressional Plan Reock Score | 2012 Congressional Plan Polsby-Popper Score |
|:---:|:---:|:---:|
| 1 | 0.40 | 0.23 |
| *2 | 0.44 | 0.31 |
| 3 | 0.55 | 0.28 |
| *4 | 0.54 | 0.27 |
| *5 | 0.52 | 0.37 |
| 6 | 0.49 | 0.27 |
| 7 | 0.45 | 0.26 |
| 8 | 0.33 | 0.16 |
| 9 | 0.36 | 0.30 |
| 10 | 0.52 | 0.27 |
| 11 | 0.50 | 0.28 |
| 12 | 0.41 | 0.19 |
| *13 | 0.38 | 0.16 |
| 14 | 0.45 | 0.31 |
| **Mean** | **0.45** | **0.26** |
| **Max:** | **0.55** | **0.37** |
| **Min:** | **0.33** | **0.16** |

―――――――――――――――

is considered to be the most compact shape possible. For each district, the Reock test computes the ratio of the area of the district to the area of the minimum enclosing circle for the district. The measure is always between 0 and 1, with 1 being the most compact." Alpha Phi Alpha Fraternity, 587 F. Supp. 3d at 1275 n.24 (citation omitted).

[21] "The Polsby-Popper test computes the ratio of the district area to the area of a circle with the same perimeter: $4\pi Area/(Perimeter^2)$. The measure is always between 0 and 1, with 1 being the most compact." Id. at 1275 n.26.

[22] The asterisk (*) denotes a majority AP Black district. Stip.  ¶¶ 166, 167; Pendergrass Doc. Nos. [174-1], 61; [174-2], 25, 69.

49

### (2)   *Enacted Congressional Plan*

Pursuant to the 2020 Census, Georgia was apportioned 14 seats in the U.S. House of Representatives. Stip. ¶ 94. A colorized version of the Enacted Congressional Plan was introduced into evidence at trial and is below.



PX 1, Ex. G.

The Enacted Congressional Plan contains four districts where the non-Hispanic Department of Justice Black citizen voting age population ("NH DOJ BCVAP") [23] is in the majority—CD-2 (50.001%), CD-4 (58.46%), CD-5 (52.35%), and CD-13 (67.05%). Stip. ¶ 161; PX 1 ¶ 53 & fig.11. The AP BVAP, however, only exceeds 50% in 2 districts CD-4 (54.54%) and CD-13 (66.75%). The AP BVAP of CD-2 is 49.29% and CD-5 is 49.60%. PX 1, Ex. K-1. All but one of those districts is contained in the Atlanta MSA. Stip. ¶ 166; PX 1, Ex. J-2. The Enacted Congressional Plan splits 15 counties. Stip. ¶ 164. It also split 46 VTDs.[24] PX 1 ¶ 81. The average Reock Score for the 2021 Congressional Plan is 0.44 and the average Polsby-Popper Score is 0.27. Stip. ¶ 168; PX 1, Ex. L-3.

A table that shows the Reock and Polsby score comparisons is as follows:

_____

[23] The "NH DOJ Black CVAP" category includes voting age citizens who are either NH single-race Black or NH Black and White. An "Any Part Black CVAP" category that would include Black Hispanics cannot be calculated from the 5-Year ACS Census Bureau Special Tabulation." PX 1 ¶ 57 n.10.

[24] "'VTD' is a Census Bureau term meaning 'voting tabulation district.' VTDs generally correspond to precincts." PX 1 ¶ 11 n.4.

| District[25] | 2021 Congressional Plan Reock Score | 2021 Congressional Plan Polsby-Popper Score |
|---|---|---|
| 1 | 0.46 | 0.29 |
| *2 | 0.46 | 0.27 |
| 3 | 0.46 | 0.28 |
| *4 | 0.31 | 0.25 |
| *5 | 0.51 | 0.32 |
| 6 | 0.42 | 0.20 |
| 7 | 0.50 | 0.39 |
| 8 | 0.34 | 0.21 |
| 9 | 0.38 | 0.25 |
| 10 | 0.56 | 0.28 |
| 11 | 0.48 | 0.21 |
| 12 | 0.50 | 0.28 |
| *13 | 0.38 | 0.16 |
| 14 | 0.43 | 0.37 |
| **Mean** | **0.44** | **0.27** |
| **Max:** | **0.56** | **0.39** |
| **Min:** | **0.31** | **0.16** |

PX 1, Ex. L-3.

**b)      State Senate Plan**

Under Georgia law, "[t]here shall be 56 members of the Senate. The General Assembly shall by general law divide the state into 56 Senate districts

_____

[25] The asterisk (*) denotes a majority AP Black district.

52

which shall be composed of a portion of a county or counties or a combination thereof and shall be represented by one Senator elected only by the electors of such district." O.C.G.A. § 28-2-2; <u>see also</u> Ga. Const. art. III, § 2, ¶ I. The ideal population for a Senate district in 191,284 people. Stip. ¶ 277.

Below is the Enacted Senate Plan:



APAX 1, Ex. L.

Under the Enacted Senate Plan, the greatest population deviation is ±1.03%. Id. The average population deviation is 0.53%. Id. The Enacted Senate Plan split 29 counties. APAX 1 ¶ 116; fig.21. It also split 40 VTDs. Id. The Enacted Senate Plan did not pair any incumbents who were running for reelection. Stip. ¶ 175.

The Enacted Senate Plan contains 14 Senate districts where the ABVAP is the majority of the population, ten of the districts are fully within the Atlanta MSA. Stip.  ¶¶ 176, 186; APAX 1, Ex. M-1. This is a reduction of one majority-Black district in the Senate Plan as a whole. Stip.  ¶¶ 173, 177 (indicating that the 2014 Senate Plan contained 15 majority-Black Senate Districts with 10 wholly within the Atlanta MSA). The following is a Table depicting the majority AP Black districts and the percentage of the districts that is AP BVAP.

| District | % AP BVAP |
|---|---|
| 10 | 71.46 |
| 12 | 57.97 |
| 15 | 54.00 |
| 22 | 56.50 |
| 26 | 56.99 |
| 34 | 69.54 |
| 35 | 71.90 |
| 36 | 51.34 |
| 38 | 65.30 |
| 39 | 60.70 |
| 41 | 62.61 |
| 43 | 64.33 |
| 44 | 71.34 |
| 55 | 65.97 |

APAX 1, M-1.

The Enacted Senate Plan has an average Reock score of 0.43 and Polsby-Popper Score of 0.27. Stip. 189; APAX 1, Ex. S-2. The maximum and minimum Reock scores are 0.68 and 0.14. Id. The maximum and minimum Polsby-Popper scores are 0.62 and 0.11. Id. The compactness scores for the majority-Black districts are as follows:

55

| Districts | Reock Score | Polsby-Popper Score |
|---|---|---|
| 10 | 0.37 | 0.27 |
| 12 | 0.53 | 0.28 |
| 15 | 0.56 | 0.33 |
| 22 | 0.39 | 0.34 |
| 26 | 0.47 | 0.21 |
| 34 | 0.40 | 0.32 |
| 35 | 0.42 | 0.18 |
| 36 | 0.25 | 0.28 |
| 38 | 0.47 | 0.21 |
| 39 | 0.14 | 0.11 |
| 41 | 0.31 | 0.21 |
| 43 | 0.56 | 0.27 |
| 44 | 0.19 | 0.18 |
| 55 | 0.25 | 0.23 |

APAX 1, S-2.

### c)   State House Plan

Under Georgia law, "[t]here shall be 180 members of the House of Representatives." O.C.G.A. § 28-2-1(a)(1); see also Ga. Const. art. III, § 2, ¶ I. The Georgia Code further provides that: "[t]he General Assembly by general law shall divide the state into 180 representative districts which shall consist of either a portion of a county or a county or counties or any combination thereof and shall be represented by one Representative elected only by the electors of such district." O.C.G.A. § 28-2-1 (a)(1)–(2); Stip. ¶ 179. The ideal population for a House district in 59,511. Stip. ¶ 278.

56

Below is the Enacted House Plan:



APAX 1, Ex. Y.

Under the Enacted Plan, the greatest population deviation of any district is ±1.40%. Stip. ¶ 186; APAX 1, 116. The Enacted House Plan contains 49 House districts where the ABVAP is the majority of the population. Stip. ¶ 186; APAX

57

1, Ex. Z-1. Thirty-three of these districts are fully within the Atlanta MSA. Stip.

¶ 186; APAX 1, Exs. C,Y. This results in an addition of two majority-Black House

districts overall and two in the Atlanta MSA. Stip.  ¶¶ 180, 183. The Enacted

House Plan split 69 Counties. APAX 1 ¶ 189; fig.37. It also split 179 VTDs. <u>Id.</u> The

Enacted House Plan paired four sets of incumbents who ran for reelection in 2022.

Stip. ¶ 182.

The following is a Table depicting the majority AP Black districts and the

percentage of the districts that is AP BVAP.

| District | %AP Black | District | %AP Black |
|---|---|---|---|
| 38 | 54.23 | 90 | 58.49 |
| 39 | 55.29 | 91 | 70.04 |
| 55 | 55.38 | 92 | 68.79 |
| 58 | 63.04 | 93 | 65.36 |
| 59 | 70.09 | 94 | 69.04 |
| 60 | 63.88 | 95 | 67.15 |
| 61 | 74.29 | 113 | 59.53 |
| 62 | 72.26 | 115 | 52.13 |
| 63 | 69.33 | 116 | 58.12 |
| 65 | 61.98 | 126 | 54.47 |
| 66 | 53.41 | 128 | 50.41 |
| 67 | 58.92 | 129 | 54.87 |
| 68 | 55.75 | 130 | 59.91 |
| 69 | 63.56 | 132 | 52.34 |
| 75 | 74.40 | 137 | 52.13 |
| 76 | 67.23 | 140 | 57.63 |
| 77 | 76.13 | 141 | 57.46 |
| 78 | 71.58 | 142 | 59.52 |
| 79 | 71.59 | 143 | 60.79 |
| 84 | 73.66 | 150 | 53.56 |
| 85 | 62.71 | 153 | 67.95 |
| 86 | 75.05 | 154 | 54.82 |
| 87 | 73.08 | 165 | 50.33 |
| 88 | 63.35 | 177 | 53.88 |
| 89 | 62.54 | | |

APAX 1, Z-1.

The Enacted House Plan has an average Reock score of 0.39 and Polsby-Popper Score of 0.28. Stip. ¶ 189; APAX 1, AG-2. The maximum and minimum

59

Reock scores are 0.66 and 0.12. Id. The maximum and minimum Polsby-Popper scores are 0.59 and 0.10. Id. The compactness scores for the majority-Black districts are as follows:

| District | Reock Score | Polsby-Popper Score | District | Reock Score | Polsby-Popper Score |
|---|---|---|---|---|---|
| 38 | 0.59 | 0.58 | 90 | 0.36 | 0.29 |
| 39 | 0.59 | 0.40 | 91 | 0.45 | 0.20 |
| 55 | 0.18 | 0.16 | 92 | 0.36 | 0.20 |
| 58 | 0.13 | 0.13 | 93 | 0.26 | 0.11 |
| 59 | 0.12 | 0.11 | 94 | 0.31 | 0.15 |
| 60 | 0.19 | 0.15 | 95 | 0.44 | 0.25 |
| 61 | 0.25 | 0.20 | 113 | 0.50 | 0.32 |
| 62 | 0.16 | 0.10 | 115 | 0.44 | 0.23 |
| 63 | 0.16 | 0.14 | 116 | 0.41 | 0.28 |
| 65 | 0.46 | 0.17 | 126 | 0.52 | 0.41 |
| 66 | 0.36 | 0.25 | 128 | 0.60 | 0.32 |
| 67 | 0.36 | 0.12 | 129 | 0.48 | 0.25 |
| 68 | 0.32 | 0.17 | 130 | 0.51 | 0.25 |
| 69 | 0.40 | 0.25 | 132 | 0.27 | 0.30 |
| 75 | 0.42 | 0.28 | 137 | 0.33 | 0.16 |
| 76 | 0.53 | 0.51 | 140 | 0.29 | 0.19 |
| 77 | 0.40 | 0.21 | 141 | 0.26 | 0.20 |
| 78 | 0.21 | 0.19 | 142 | 0.35 | 0.23 |
| 79 | 050 | 0.21 | 143 | 0.50 | 0.30 |
| 84 | 0.25 | 0.20 | 150 | 0.44 | 0.28 |
| 85 | 0.36 | 0.32 | 153 | 0.30 | 0.30 |
| 86 | 0.17 | 0.17 | 154 | 0.41 | 0.33 |
| 87 | 0.26 | 0.24 | 165 | 0.23 | 0.16 |
| 88 | 0.26 | 0.20 | 177 | 0.43 | 0.34 |
| 89 | 0.14 | 0.10 | | | |

60

Stip. ¶¶ 186, 189; APAX 1, Ex. S-3.

### F.    Illustrative Plans

#### 1. Credibility Determinations

The Court makes the following credibility determinations as it relates to the Gingles preconditions experts.

##### a) Mr. William S. Cooper

Both the Alpha Phi Alpha and the Pendergrass Plaintiffs engaged Mr. Cooper as an expert. APAX 1, PX 1. The Court qualified Mr. Cooper as an expert in redistricting demographics and use of Census data. Tr. 65:21–24, 67:10–11; 715:8–10, 717:3–4. Mr. Cooper earned his Bachelor of Arts in economics from Davidson College. APAX 1, Ex. A. Since the late 1980s, Mr. Cooper has testified as an expert trial witness on redistricting and demographics in federal courts in about 55 voting rights cases. Tr. 62:11–14; see also APAX 1, Ex. A. Over 25 of the cases led to changes in local election district plans and five resulted in changes to statewide legislative boundaries. APAX 1, Ex. A; see Rural West Tennessee African-American Affairs Council, Inc. v. McWherter, 877 F. Supp. 1096 (W.D. Tenn. 1995); Old Person v. Brown, 182 F. Supp. 2d 1002 (D. Mont. 2002); Bone Shirt v. Hazeltine, 336 F. Supp. 2d 976 (D.S.D. 2004); Alabama

61

Legislative Black Caucus v. Alabama, 231 F. Supp. 3d 1026 (M.D. Ala. 2017); and

Thomas v. Reeves, 3:18-CV-441-CWR-FKB, 2021 WL 517038 (S.D. Miss. Feb. 11,

2021).

In Georgia alone, Mr. Cooper has testified as an expert on redistricting and

demographics in four other federal cases: Cofield v. City of LaGrange, 969 F.

Supp. 749 (N.D. Ga. 1997); Love v. Cox, No. CV 679-037, 1992 WL 96307 (S.D. Ga.

Apr. 23, 1992); Askew v. City of Rome, 127 F.3d 1355 (11th Cir. 1997); Woodard

v. Mayor and City Council of Lumber City, 676 F. Supp. 255 (S.D. Ga. 1987).

Mr. Cooper also filed expert declarations or depositions in the following Georgia

federal cases: Dwight v. Kemp, No. 1:18-cv-2869 (N.D. Ga. 2018); Georgia State

Conference of the NAACP v. Gwinnett County, No. 1:16-cv-02852-AT (N.D. Ga.

2016); Georgia State Conference of the NAACP v. Fayette County, 950 F. Supp.

2d 1294 (N.D. Ga. 2013); Knighton v. Dougherty County, No. 1:02-CV-130-

2(WLS) (M.D. Ga. 2002); Johnson v. Miller, 864 F. Supp. 1354 (S.D. Ga. 1994); Jones

v. Cook County, 7:94cv73 (M.D Ga. 1994). APAX 1, Ex. A.

Following the 2020 Decennial Census, three local governments adopted

commission level plans that Mr. Cooper drafted. Id. And Jefferson County,

62

Alabama, adopted his proposed school board plans. Id. Mr. Cooper testified in seven redistricting trials or preliminary injunction hearings in 2022, including in these Actions. Id. In one of those cases, the Supreme Court affirmed the district court's finding that his congressional maps were sufficient to show a substantial likelihood of success on the first Gingles precondition. Allen, 599 U.S. at 12–24.

Finally, Mr. Cooper was qualified as a redistricting and demographics expert at the preliminary injunction hearing. Alpha Phi Alpha Fraternity, 587 F. Supp. 3d at 1244. This Court found that "Mr. Cooper's testimony [was] highly credible . . . [and] that his methods and conclusions [we]re highly reliable, and ultimately that his work as an expert on the first Gingles precondition [wa]s helpful to the Court." Id. at 1244–45.

Mr. Cooper spent around six hours on the stand testifying as to his Illustrative Plans, including over three hours of cross-examination. On voir dire, Defense counsel questioned Mr. Cooper about his involvement in a 2012 Alabama redistricting case in which the three-judge court there stated in a 2017 memorandum of opinion and order that "plaintiffs' mapmakers came dangerously close to admitting that race predominated in at least some of the

63

districts in their plans." <u>Ala. Legis. Black Caucus</u>, 231 F. Supp. 3d 1026 at 1046. Nevertheless, the three-judge court also "credit[ed] much of [Mr.] Cooper's testimony" in an earlier 2013 opinion. <u>Ala. Legis. Black Caucus v. Alabama</u>, 989 F. Supp. 2d 1227, 1271–72 (M.D. Ala. 2013), <u>rev'd on other grounds</u>, <u>Ala. Legis. Black Caucus v. Alabama</u>, 575 U.S. 254 (2015).

During Mr. Cooper's time on the stand, the Court was able to question and observe Mr. Cooper closely. Throughout his reports and hours of live testimony, his opinions were clear, consistent, and forthright, and he had no difficulty articulating the bases for his districting decisions. He was also forthright with the Court when discussing the characteristics of his illustrative plans and admitted that while the illustrative plans were acceptable for the first <u>Gingles</u> precondition, there would be other ways to draw maps at the remedial stage. <u>E.g.</u>, Tr. 235:24–25.

Having reviewed Mr. Cooper's expert report and evaluating his trial testimony, the Court again finds that Mr. Cooper is highly credible. Mr. Cooper has spent the majority of his career drawing maps for redistricting and demographic purposes, and he has accumulated extensive expertise (more so

than any other expert qualified in redistricting demographics in this case) in redistricting litigation, particularly in Georgia.

### b)   Mr. Blakeman B. Esselstyn

The Grant Plaintiffs proffered and the Court qualified Mr. Esselstyn as an expert in redistricting, demography, and geographic information systems. Tr. 464:2–5, 466:19–20. Mr. Esselstyn earned his Bachelor's degree in geology & geophysics and international studies from Yale University and a master's degree in computer and information technology from University of Pennsylvania. GX 1 ¶ 5. Mr. Esselstyn is the founder and principal of a consultancy called Mapfigure Consulting, which provides expert services in the areas of redistricting, demographics, and geographic information systems (GIS). Id. ¶ 1. He has served as a consulting expert in four redistricting cases. Id. ¶ 3. Mr. Esselstyn has developed 16 redistricting plans that have been enacted for use in elections by jurisdictions at various levels of government. Id. ¶ 4.

Mr. Esselstyn was a testifying expert witness in the following cases: Jensen v. City of Asheville, (N.C. Super. 2009); Hall v. City of Asheville, (No. 05CV53804, 2007 WL 9210091 (N.C. Super. June 17, 2007); and Arnold v. City of Asheville,

Buncombe Cnty., No. 02CV53945 (N.C. Super. Nov. 20, 2003). GX 1, Attach. A. On *voir dire*, Mr. Esselstyn acknowledged that he has never drawn a statewide map that was used in an election and that he has never drawn a map for any jurisdiction in Georgia. Tr. 465:20–25.

Following the 2020 Decennial Census, Mr. Esselstyn has been consulted as an expert for the plaintiffs in League of United Latin American Citizens v. Abbott, 3:21-CV-00259-DCG-JES-JVB (W.D. Tex. Oct. 18, 2021) and Rivera v. Schwab, 315 Kan. 877, 512 P.3d 168 (2022). GX 1, Attach. A.

Mr. Esselstyn was qualified as a redistricting and demographics expert at the preliminary injunction hearing. Alpha Phi Alpha Fraternity, 587 F. Supp. 3d at 1245-46. This Court found that "Mr. Esselstyn's testimony [was] highly credible . . . [and] that his methods and conclusions [we]re highly reliable, and ultimately that his work as an expert on the first Gingles precondition [wa]s helpful to the Court." Id. at 1246.

Having reviewed Mr. Esselstyn's expert report and evaluating his trial testimony, the Court again finds that Mr. Esselstyn is highly credible. The Court does note that Mr. Esselstyn was less forthcoming on cross-examination in the

66

trial than he was during the preliminary injunction hearing. However, the Court finds that Mr. Esselstyn's explanations were internally consistent and did not falter. Accordingly, the Court will give great weight to Mr. Esselstyn's testimony.

### c) **Mr. John B. Morgan**

Defendant proffered and the Court qualified Mr. Morgan as its expert in redistricting and the analysis of demographic data in all three cases. Tr. 1748:8–11, 15–16. Mr. Morgan earned his Bachelor of Arts in history from the University of Chicago. DX 1 ¶ 2. Mr. Morgan worked on redistricting plans in the redistricting efforts and testified about demographics and redistricting following the 1990, 2000, 2010, and 2020 Censuses. Id. Over the course of his career, Mr. Morgan worked on statewide congressional and legislative redistrict plans in the following states: Connecticut, Florida, Georgia, Indiana, Iowa, Kansas, Michigan, Missouri, New Jersey, New Mexico, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Virginia, and Wisconsin. DX 1. His plans have been adopted in whole or in part by various jurisdictions. Id.

Before this case, Mr. Morgan has provided expert reports and/or testified in seven cases. Id. (citing Egolf v. Duran, D-101-CV-2011-02, 2011 WL 12523985

(N.M. Dist. Dec. 28, 2011); <u>Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs</u>, 952 F. Supp. 2d 1360 (N.D. Ga. 2013); <u>Page v. Va. Bd. of Elections</u>, 3:13CV678, 2015 WL 3604029 (E.D. Va. June 5, 2015); <u>Bethune-Hill v. Va. Bd. of Elections</u>, 114 F. Supp. 3d 323 (E.D. Va. 2015); <u>Vesilind v. Va. Bd. of Elecions</u>, 813 S.E.2d 739 (2018); and <u>Georgia State Conf. of the NAACP v. Gwinnet Cnty. Bd. of Elec.</u>).[26]

Although Mr. Morgan has an extensive background in redistricting, the Court finds that other courts, including this one, have called Mr. Morgan's credibility into doubt. <u>Alpha Phi Alpha Fraternity</u>, 587 F. Supp. 3d at 1247–48. Although, this Court's ultimate determination as to Mr. Morgan's credibility is not dependent on the determinations made by its sister courts, or by its determinations in the preliminary injunction hearing, the Court gives great weight to the determinations made in those cases.

In 2011, Mr. Morgan assisted Virginia with drawing its House of Delegates maps; and in that case, "[Mr.] Morgan testified . . . that he played a substantial

---

[26] Mr. Morgan's report does not provide a full citation for the <u>NAACP</u> case.

role in constructing the 2011 plan, which role included his use of the Maptitude software to draw district lines." <u>Bethune-Hill v. Virginia State Bd. of Elections</u>, 326 F. Supp. 3d 128, 151 (E.D. Va. 2018). Ultimately, a three-judge court found that 11 of the House of Delegates districts were racial gerrymanders. Feb. 11, 2022, Afternoon PI Tr. 184:1–6; <u>see also</u> <u>Bethune-Hill</u>, 326 F. Supp. 3d at 137, 181.

Mr. Morgan served as both a fact and expert witness in <u>Bethune-Hill</u>. That court ultimately found that Mr. Morgan's testimony was not credible. That court found that "Morgan's testimony was wholly lacking in credibility. Th[is] adverse credibility finding [ ] [is] not limited to particular assertions of [this] witness [ ], but instead wholly undermine[s] the content of . . . Morgan's testimony." <u>Bethune-Hill</u>, 326 F. Supp. 3d at 174; Tr. 2101:7–2102:10; 2109:17–2110:7. Specifically, "Morgan testified in considerable detail about his reasons for drawing dozens of lines covering all 11 challenged districts, including purportedly race-neutral explanations for several boundaries that appeared facially suspicious." <u>Bethune-Hill</u>, 326 F. Supp.3d at 151. That court found: "Morgan's contention, that the precision with which these splits divided white and black areas was mere happenstance, simply is not credible." <u>Id.</u> "[W]e

69

conclude that Morgan did not present credible testimony, and we decline to consider it in our predominance analysis." Id. at 152.

Mr. Morgan also served as a testifying expert in Page v. Virginia State Bd. of Elections, No. 3:13CV678, 2015 WL 3604029 (E.D. Va. June 5, 2015). Tr. 2108:24–2109:11. That court found "Mr. Morgan, contends that the majority-white populations excluded . . . were predominately Republican . . . . The evidence at trial, however, revealed that Mr. Morgan's analysis was based upon several pieces of mistaken data, a critical error . . . Mr. Morgan's coding mistakes were significant to the outcome of his analysis[.]" Page, 2015 WL 3604029, at *15 n.25; Tr. 2108:24–2109:11. Mr. Morgan explained that his error was caused because the attorneys asked him to produce an additional exhibit on the day of trial. Tr. 2109:12–16.

Additionally, in Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, Mr. Morgan testified as an expert for the defense opposite Mr. Cooper, who testified as an expert for the plaintiffs. 950 F. Supp. 2d 1294, 1310–11 (N.D. Ga. 2013). In granting the motion for summary judgment, that court found that the plaintiffs successfully asserted a vote dilution claim. Id. at 1326.

70

Finally, Mr. Morgan admitted that he drew some plans for the 2011 North Carolina State Senate Maps. Tr. 2097:3–7. Ultimately, 28 districts in North Carolina's 2011 State House and Senate redistricting plans were struck down as racial gerrymanders. Feb. 11, 2022, Afternoon PI Tr. 183:14–19; see also Covington v. North Carolina, 316 F.R.D. 117 (M.D.N.C. 2016), aff'd North Carolina v. Covington, 581 U.S.1015, (2017).

At the preliminary injunction hearing in the cases *sub judice*, the Court found that "Mr. Morgan's testimony lack[ed] credibility, and the Court assign[ed] little weight to his testimony." Alpha Phi Alpha Fraternity, 587 F. Supp. 3d at 1247–48. During the course of his testimony, Mr. Morgan was impeached about reading Mr. Cooper's reports before preparing his expert report and he offered contradictory testimony when he testified that he watched Mr. Cooper testify and then later testified that he was viewing exhibits for the first time, even though they were in Mr. Cooper's report and they were displayed during Mr. Cooper's testimony. Tr. 1959:5–1961:8; 2037:2–7.

Having observed Mr. Morgan's testimony and demeanor during the course of the trial, the Court again assigns less weight to his testimony.

71

### d)      Dr. Maxwell Palmer

The <u>Grant</u> and <u>Pendergrass</u> Plaintiffs proffered and the Court qualified Dr. Palmer as an expert in redistricting and data analysis. Tr. 396:11–14, 397:8–9. Dr. Palmer earned his Bachelor of Arts in mathematics and government and legal studies from Bowdoin College. PX 2, 20. Dr. Palmer also earned his master's and doctorate in political science from Harvard University. <u>Id.</u> Dr. Palmer currently serves as an associate professor at Boston University in the political science department, where he has been teaching since 2014. <u>Id.</u> Dr. Palmer has extensively published academic articles and books on a variety of topics, including gerrymandering and redistricting. <u>Id.</u> at 20–22.

Outside of this case, Dr. Palmer has offered consulting or expert testimony in the following cases: <u>Bethune-Hill v. Virginia</u>, 3:14-cv-00852-REP-AWA-BMK (E.D. Va. 2017); <u>Thomas v. Bryant</u>, 3:18-CV-411-CWR-FKB (S.D. Miss. 2018); <u>Chestnut v. Merrill</u>, 2:18-cv-00907-KOB (N.D. Ala. 2019); <u>Dwight v. Raffensperger</u>, 1:18-cv-2869-RWS (N.D. Ga. 2018); <u>Bruni v. Hughs</u>, 5:20-cv-35 (S.D. Tex. 2020); <u>Caster v. Merrill</u>, 2:21-cv-1536-AMM (N.D. Ala. 2021); <u>Galmon v. Ardoin</u>, 3:22-cv-214-SDD-SDJ (M.D. La. 2022). <u>Id.</u> at 27–28.

72

In the preliminary injunction hearing, in the cases *sub judice*, Dr. Palmer testified as an expert witness for the <u>Grant</u> and <u>Pendergrass</u> Plaintiffs. The Court "f[ound] that his methods and conclusions [we]re highly reliable, and ultimately that his work as an expert on the second and third <u>Gingles</u> preconditions [wa]s helpful to the Court." <u>Alpha Phi Alpha Fraternity</u>, 587 F. Supp. 3d at 1304.

Having reviewed Dr. Palmer's demeanor and his testimony, Dr. Palmer's testimony was internally consistent, and he maintained a calm demeanor throughout. The Court deems Dr. Palmer to be highly credible and his testimony is extremely helpful to the Court. Thus, the Court assigns great weight to his testimony.

### e)   <u>Dr. Lisa Handley</u>

The <u>Alpha Phi Alpha</u> Plaintiffs proffered and the Court qualified Dr. Handley as an expert in racial polarization analysis, minority vote dilution, and redistricting. Tr. 856:16–19, 861:11–12. Dr. Handley earned her doctorate in political science from George Washington University. APAX 5, 47. Dr. Handley serves as the president and co-founder of Frontier International Electoral

Consulting LLC. Id. Dr. Handley has extensively published academic articles and books on a variety of topics, including gerrymandering and redistricting. Id.

Since 2000, Dr. Handley has served as a consultant and expert witness for the following jurisdictions: Alaska, Arizona, Colorado, Connecticut, Florida, Kansas, Louisiana, Massachusetts, Maryland, Michigan, New Mexico, New York, and Rhode Island. Id. She has also served as a redistricting consultant for the ACLU and provided expert testimony in an Ohio partisan gerrymander challenge, Lawyers Committee for Civil Rights under Law in challenges to judicial elections in Texas and Alabama, the Department of Justice in Section 2 and Section 5 cases. Id.

Other than this case, Dr. Handley has been a testifying expert in the following cases: In re: 2011 Redistricting Cases, No.4FA-11-2209CI (Alaska Super. 2013); Texas v. U.S., 11-1303 (TBG-RMC-BAH) (D.D.C. 2011); Jeffers v. Beebe, 2:12CV00016 JLH (E.D. Ark. 2012); Perry v. Perez, SA-11-CV0360 (W.D. Tex. 2011); Lopez v. Abbott, 2:16-CV-303 (S.D. Tex. 2016); Alabama State Conf. of the NAACP v. Alabama, 2:16-CV-731-WKW (M.D. Ala. 2020); U.S. v. Eastpointe, 4:17-cv-10079 (E.D. Mich. 2017); New York v. U.S. Dep't of Commerce, 18-CV-

74

2921 (JMF), 18-CV-5025 (JMF) (S.D.N.Y. 2018); <u>Ohio Phillip Randolph Inst. v. Householder</u>, 1:18-cv-357 (S.D. Ohio 2018); <u>League of Women Voters of Ohio</u>, 2021-1449 (Ohio 2021); <u>League of Women Voters of Ohio v. Ohio Redistricting Comm'n</u>, 2021-1193 (Ohio 2021); <u>Ark. State Conf. of the NAACP v. Ark. Bd. of Apportionment</u>, 4:21-cv-1239-LPR (E.D. Ark. 2021). <u>Id.</u>

In the preliminary injunction hearing, in the cases *sub judice*, Dr. Handley testified as an expert witness for the <u>Grant</u> and <u>Pendergrass</u> Plaintiffs. The Court found that Dr. Handley's testimony was truthful and reliable. <u>Alpha Phi Alpha</u>, 597 F. Supp. 3d at 1309.

At the trial, Dr. Handley's methodology and conclusions about the existence of polarization were relatively unchallenged by Defendant. [27] Accordingly, the Court will rely on the findings in her report.

_____

[27] In <u>Alabama State Conference of the NAACP</u>, the court stated that "the parameters for the elections [Dr. Handley] chose — only statewide elections with a black candidate running against a white candidate — exclude other relevant elections, thereby diminishing the credibility of her conclusions." <u>Ala. State Conf. of Nat'l Ass'n for Advancement of Colored People v. Alabama</u>, 612 F. Supp. 3d 1232, 1274 (M.D. Ala. 2020); Tr. 857:4–859:16. The Court agrees that Dr. Handley's dataset may limit the applicability and breadth of her conclusions, as Dr. Alford himself indicated. Tr. 2199.

### f)  Dr. John Alford

Defendants proffered and the Court qualified Dr. Alford as an expert on the second and third <u>Gingles</u> preconditions and Senate Factor Two. Tr. 2132:19–21, 2133:1. Dr. Alford earned his Bachelor of Science and Master of Public Administration from the University of Houston. DX 8, App. 1. He also achieved his masters and doctorate in political science from the University of Iowa. <u>Id.</u> Dr. Alford is a professor at Rice University of and has been teaching there since 1985. <u>Id.</u> Dr. Alford was an assistant professor at the University of Georgia between 1981 and 1985. <u>Id.</u> Dr. Alford has published academic articles and books on a variety of topics including voting. <u>Id.</u>

Dr. Alford has worked with local governments on districting plans and on VRA cases. <u>Id.</u> He has provided expert reports and testified as an expert witness in a variety of court cases. <u>Id.</u> Sister courts have found that Dr. Alford's methodology was unreliable. <u>See</u> <u>Lopez v. Abbott</u>, 339 F. Supp. 3d 589, 610 (S.D.

---

The scope of Dr. Handley's conclusions, however, is a question for the Court's analysis on the <u>Gingles</u> 2 and 3 preconditions and not a question of Dr. Handley's credibility as an expert witness. Accordingly, the Court relies on the findings in her report as they have been largely unchallenged by Defendants.

Tex. 2018) (crediting Dr. Handley's testimony over Dr. Alford's because "Dr. Alford's testimony . . . focused on issues other than the ethnicity of the voters and their preferred candidates—which are the issues relevant to bloc voting"); Texas v. U.S., 887 F. Supp. 2d 133, 146–47 (D.D.C. 2012), vacated on other grounds, 570 U.S. 928 (2013) (critiquing Dr. Alford's approach because he used an analysis that "lies outside accepted academic norms among redistricting experts[,]" and the Court, instead, relied heavily on Dr. Handley's testimony), vacated on other grounds, 570 U.S. 928 (2013).

In the preliminary injunction hearing, in the cases *sub judice*, the Court found that Dr. Alford was credible, however "his conclusions were not reached through methodologically sound means and were therefore speculative and unreliable." Alpha Phi Alpha Fraternity, Inc, 587 F. Supp. 3 at 1305–06.

The Court again finds that Dr. Alford was highly credible. However, Dr. Alford's testimony primarily relates to partisan polarization and not racial polarization. Accordingly, the Court will give little weight to Dr. Alford's testimony with respect to the Gingles preconditions because it does not effectively address that inquiry. The Court will give greater weight to

77

Dr. Alford's testimony with respect to Senate Factor Two, because there it is appropriate to inquire about the non-racial reasons explaining racially polarized voting.

### 2.   *Illustrative Congressional Plan*

#### a)   <u>First *Gingles* Precondition</u>

Based on Georgia's demographics, Mr. Cooper concluded that "[t]he Black population in metro Atlanta is sufficiently numerous and geographically compact to allow for the creation of an additional majority-Black congressional district anchored in Cobb, Douglas, and Fulton Counties (CD-6 in the illustrative plan) consistent with traditional redistricting principles." PX 1 ¶ 10; <u>see also</u> <u>id.</u> ¶¶ 42, 86. Defendants' mapping expert Mr. Morgan agreed that his report "offers no opinion to dispute" this conclusion. Tr. 1954:1–12. Mr. Cooper drew an illustrative congressional plan (the "Illustrative Congressional Plan") that includes an additional majority-Black congressional district ("Illustrative CD-6") anchored in west-metro Atlanta. Stip. ¶ 190; PX 1 ¶ 55 & fig.12; Tr. 717:14–23.

##### (1)   *Mr. Cooper's process in drawing the maps*

At the preliminary injunction hearing, he testified that he was not asked to either "draw as many majority black districts as possible" or "draw every

78

conceivable way of drawing an additional majority black district." Feb. 7, 2022, Morning PI Tr. 98:17–24. And if in his expert opinion an additional majority-Black district could not have been drawn, Mr. Cooper testified that he would have reported that to counsel, as he has "done [] in other cases." Id. 98:25–99:24.

Mr. Cooper, in his report, declared that he analyzed population and geographic data from the Decennial Census and the American Community Survey ("ACS"). PX 1, Ex. B. He also used the geographic information system software package called Maptitude for Redistricting ("Maptitude") and the geographic boundary files in Maptitude (created by the U.S. Census). Id. He evaluated incumbent addresses, Georgia's current and historical legislative plans, Georgia's 2000 House, Senate, and Congressional Plans. Id. The Court notes that Mr. Cooper was able to review the Enacted Congressional Plan's compactness scores when he was drawing his Illustrative Congressional Plans. Id.

When he began drawing the Illustrative Congressional Plan, for trial, he testified that he started by using the plan he drew from the preliminary injunction. Tr. 727: 20–23. He then stated that some of the map stayed very similar, but when drawing his proposed Illustrative CD-6 he made specific changes

because "some concerns were raised about going further north into Acworth. And so for that reason, I'm taking local knowledge into account, I changed the district a bit to push the district in Cobb County further south." Tr. 729: 4–7. He clarified that the local knowledge that he took into account was that of Ms. Wright. Id. at 13–16.

Mr. Cooper also testified that he considers race when creating an illustrative plan that would satisfy the first Gingles precondition because "[t]hat's part of the inquiry." Tr. 725:16–25. Specifically, when drawing the Illustrative Congressional Plan, Mr. Cooper displayed dots showing him where precincts with more than 30% Black population were located. Tr. 789:25–790:10, 823:25–824:7. Mr. Cooper explained that he "need[s] to show that the district would be over 50 percent Black voting age population, while adhering to traditional redistricting principles." Id.; see also Feb. 7, 2022, Morning PI Tr. 48:4–15 (Mr. Cooper testifying at the preliminary injunction hearing that race "is something that one does consider as part of traditional redistricting principles" because "you have to be cognizant of race in order to develop a plan that respects communities of interest, as well as complying with the Voting Rights Act[,]

80

because one of the key tenets of traditional redistricting principles is the importance of not diluting the minority vote").

Mr. Cooper testified that race did not predominate in his drawing of the Illustrative Congressional Plan because he merely considered it along with the traditional redistricting principles that he was "constantly balancing." Tr. 726:11–727:16. Indeed, Mr. Cooper explained that "in drafting this plan, [he] . . . attempted to balance all of the traditional redistricting principles so that no one principle predominates." Tr. 822:19–24.

Mr. Cooper testified that he did not have election return data available to him when drawing the Illustrative Congressional Plan and that he did not review any public testimony from Georgia voters as part of the process for preparing the Illustrative Congressional Plan. Tr. 524:24–25, 819:13–15.

### (2) *Illustrative Congressional Plan*

#### (a) <u>Empirical Measures</u>

The Illustrative Congressional Plan contains an additional majority-Black congressional district in west-metro Atlanta.

81



PX 1, 82.

*i)      numerosity*

Illustrative CD-6 is 50.23% AP BVAP. PX 1 ¶ 73 & fig.14. Under all metrics, the Black voting age population of Illustrative CD-6 exceeded 50%. Id.

**Figure 14**
**BVAP and BCVAP Comparison: Illustrative Plan and 2021 Plan**

| District* | Illustrative Plan | | | | 2021 Plan | | |
|---|---|---|---|---|---|---|---|
| | % BVAP | % NH BCVAP | % NH DOJ BCVAP | | % BVAP | % NH BCVAP | % NH DOJ BCVAP |
| 1 | 28.17% | 29.16% | 29.67% | | 28.17% | 29.16% | 29.67% |
| 2 | 49.29% | 49.55% | 50.001% | | 49.29% | 49.55% | 50.001% |
| 3 | 20.47% | 19.64% | 20.02% | | 23.32% | 22.53% | 22.86% |
| 4 | 52.77% | 55.62% | 56.37% | | 54.52% | 57.71% | 58.46% |
| 5 | 49.60% | 51.64% | 52.35% | | 49.60% | 51.64% | 52.35% |
| 6 | 50.23% | 50.18% | 50.98% | | 9.91% | 9.72% | 10.26% |
| 7 | 29.82% | 31.88% | 32.44% | | 29.82% | 31.88% | 32.44% |
| 8 | 30.04% | 30.46% | 30.76% | | 30.04% | 30.46% | 30.76% |
| 9 | 11.66% | 11.29% | 11.74% | | 10.42% | 10.03% | 10.34% |
| 10 | 14.31% | 15.09% | 15.39% | | 22.60% | 22.11% | 22.56% |
| 11 | 13.67% | 12.91% | 13.48% | | 17.95% | 17.57% | 18.30% |
| 12 | 36.72% | 36.60% | 37.19% | | 36.72% | 36.60% | 37.19% |
| 13 | 51.13% | 49.64% | 50.34% | | 66.75% | 66.36% | 67.05% |
| 14 | 5.17% | 4.80% | 5.19% | | 14.28% | 13.19% | 13.71% |

*Bold font identifies districts that are changed from the 2021 Plan configuration.

PX 1 ¶ 73 & fig.14.

*ii)      population equality and contiguity*

It is undisputed that the population in all districts in the Illustrative Congressional Plan is plus-or-minus one person from the ideal district

population of 765,136. Stip. ¶ 197. It is also undisputed that all districts in the Illustrative Congressional Plan are contiguous. Stip. ¶ 198.

### iii) Compactness scores

The Illustrative Congressional Plan has comparable, or slightly better, compactness scores as compared to the Enacted Congressional Plan. The mean Reock score for the Illustrative Congressional Plan is 0.43 and is 0.44 on the Enacted Plan. PX 1 ¶ 79 & fig.13. The mean Polsby-Popper scores are identical at 0.27. Id. Mr. Morgan does not dispute that the enacted and the illustrative plans have similar mean Reock scores and identical mean Polsby-Popper scores. Tr. 1948:22–1949:5. Accordingly, the Court finds that the Illustrative Congressional Plan is comparably as compact as the Enacted Congressional Plan.

With respect to the majority-Black districts, the Court finds that the Illustrative Congressional Plan scores generally fared better or were equal to the Enacted Congressional Plan.

84

| | | Illustrative Plan | | Enacted Plan | | |
|---|---|---|---|---|---|---|
| PX | Districts | Reock | Polsby-Popper | Reock | Polsby-Popper | 1, |
| Exs. | 001 | 0.46 | 0.29 | 0.46 | 0.29 | L-1, |
| L-3. | 002* | 0.46 | 0.27 | 0.46 | 0.27 | |
| | 003 | 0.39 | 0.24 | 0.46 | 0.28 | |
| | 004* | 0.28 | 0.22 | 0.31 | 0.25 | |
| | 005* | 0.51 | 0.32 | 0.51 | 0.32 | |
| | **006**[28] | **0.45** | **0.27** | **0.42** | **0.20** | |
| | 007 | 0.50 | 0.39 | 0.50 | 0.39 | |
| | 008 | 0.34 | 0.21 | 0.34 | 0.21 | |
| | 009 | 0.40 | 0.32 | 0.38 | 0.25 | |
| | 010 | 0.40 | 0.18 | 0.56 | 0.28 | |
| | 011 | 0.40 | 0.19 | 0.48 | 0.21 | |
| | 012 | 0.50 | 0.28 | 0.50 | 0.28 | |
| | 013* | 0.44 | 0.29 | 0.38 | 0.16 | |
| | 014 | 0.48 | 0.34 | 0.43 | 0.37 | |
| | **Mean:** | **0.43** | **0.27** | **0.44** | **0.27** | |
| | **Max:** | **0.51** | **0.39** | **0.51** | **0.39** | |
| | **Min:** | **0.28** | **0.18** | **0.31** | **0.16** | |

Mr. Morgan's report's compactness measures are identical to Mr. Cooper's. DX 4

¶ 22, chart 2. The districts that immediately surround Illustrative CD-6 are,

———————————

[28] The bolded data is for the proposed additional majority-Black district that is not a majority-Black district in the Enacted Congressional Plan. And any district that has an asterisk (*) is a majority-Black district.

85

Illustrative CD-3, 5, 11, and 13. PX 1, Ex. H-2. Of the surrounding districts Illustrative and Enacted CD-5 have identical compactness scores, Illustrative CD-3 and 11 fare worse on both compactness measures than Enacted CD-3 and 11, and Illustrative CD-13 fares better on both compactness measures than Enacted CD-13. The Court notes that CD-5 and 13 are majority-Black districts on both the Enacted and Illustrative Congressional Plans, whereas CD-3 and CD-11 are majority-white districts. PX 1, Ex. H-2. Thus, the Court finds that Mr. Cooper lowered the compactness scores in neighboring majority-white districts when he drew the Illustrative Congressional Plan.

The Court concludes that the Illustrative Congressional Plan is comparably as compact as the Enacted Congressional Plan. The Illustrative Congressional Plan fares worse on the Reock measure by 0.01 points and had an identical Polsby-Popper score. PX 1, Exs. L-1, L-3. The Court finds that overall, the Plans are equivalently compact. With respect to the majority-Black districts, the Court finds that two of the districts (CD-2, and 5) have identical compactness scores, Illustrative CD-4 fares worse on both compactness scores by 0.03 points, Illustrative CD-13 fares better on the Reock score by 0.06 points and Polsby-

86

Popper by 0.13 points. Id. Finally, Illustrative CD-6 fares better on Reock by 0.03 points and 0.07 on Polsby-Popper. Id. The Court finds that that, generally, the majority-Black districts are equivalently, if not slightly more compact than the Enacted Congressional majority-Black districts.

### iv)    political subdivision splits

The Illustrative Congressional Plan splits the same number of counties as the Enacted Plan, but has fewer unique county splits, VTD splits, city and town splits, and unique cities and town splits. PX 1 ¶ 81 & fig.14.

**Figure 14**
**County, VTD, and Municipal Splits: Illustrative Plan, 2012 Benchmark, and 2021 Plan (All Districts)**

|  | Split Counties* | County Splits* | 2020 VTD Splits* | Split Cities/ Towns# | City/ Town Splits* |
|---|---|---|---|---|---|
| **Illustrative Plan** | 15 | 18 | 43 | 37 | 78 |
| **2012 Benchmark Plan** | 16 | 22 | 43 | 40 | 85 |
| **2021 Plan** | 15 | 21 | 46 | 43 | 91 |

*Excludes unpopulated areas
#Out of 531 municipalities (calculated by subtracting the number of whole cities in the Maptitude report from 531)

PX 1 ¶ 81 & fig.14.

Neither Defendants nor their experts have meaningfully suggested that the Illustrative Congressional Plan fails to respect city, town, and county lines. The

87

Court notes that, as with compactness, Mr. Cooper was able to evaluate the Enacted Congressional Plans political subdivision splits when he drew his Illustrative Congressional Plan. PX 1, Ex. B. Accordingly, the Court finds that the Illustrative Congressional Plan respected more political subdivisions than the Enacted Congressional Plan.

### *v)* *findings of fact*

In sum, the Court finds that the Illustrative Congressional Plan meets or exceeds the Enacted Congressional Plan on compactness scores and political subdivision splits. The Illustrative Congressional Plan and the Enacted Congressional Plan have identical Polsby-Popper scores and the Illustrative Congressional Plan is 0.01 less compact on Reock than the Enacted Plan. PX 1 ¶ 79 & fig.13.

### (b)   <u>Core retention</u>

The Court also finds that the Illustrative Congressional Plan retained many of the cores of the districts in the Enacted Congressional Plan. The General Assembly did not enumerate core retention as a redistricting principle. JX 2. And Ms. Wright testified that when she draws the new Plans, she starts with a blank map and not from the existing Congressional Plan.

88

> Generally, I like to create the new ideal size with the new census population that we have in the state. I plug that into a blank map. And then I just work with the data to create new districts. I don't usually start from the old and try to change it, I start blank, because that way I feel like it's easier for me to build a map rather than try to just move pieces that are already there.
>
> I do use the existing district layer if I need to as a reference, to see if I'm retaining core districts and things like that. But I build that map out just as a balanced map population-wise first as a draft and a blind map to start with.

Tr. 1622:11–22.

Although not a requirement, the Court finds that the Illustrative Congressional Plan does retain the majority of the core districts of the Enacted Congressional Plan. DX 4, Ex. 7. Pursuant to the data provided by Mr. Morgan, the Court finds that approximately 74.6% of individual's district are unchanged from the Enacted Congressional Plan and the Illustrative Congressional Plan. Id.; Tr. 1944:22–1945:13; PX 1 ¶ 13. In other words, only 25.4% of Georgians would be affected if the General Assembly were to enact the Illustrative Congressional Plan. The following is a table derived from the data in Mr. Morgan's report and that exemplifies the number of individuals who remain in the same district under the

89

Illustrative Congressional Plan. As an initial note, the population size of each congressional district is either 765,137 or 765,136 persons. Stip. ¶ 197.

| District | # of individuals whose district is unchanged |
|---|---|
| 001 | 765,137 |
| 002 | 765,137 |
| 003 | 528,200 |
| 004 | 736,485 |
| 005 | 765,137 |
| 006 | 19,006 |
| 007 | 765,137 |
| 008 | 765,136 |
| 009 | 403,191 |
| 010 | 488,385 |
| 011 | 372,724 |
| 012 | 765,136 |
| 013 | 374,470 |
| 014 | 475,707 |

DX 4, Ex. 7.

As the chart shows, in six of the district, no voter is impacted by the Illustrative Congressional Plan's changes (Illustrative CD-1, CD-2, CD-5, CD-7, CD-8, CD-12). And of the remaining eight changed districts, in only three of those districts (Illustrative CD-6, CD-11, and CD-13) does more than half of the population have a changed district. Illustrative CD-6 is the new majority-minority district and CD-11 and CD-13 are two districts that immediately

90

surround Illustrative CD-6. Accordingly, the Court finds that Illustrative Congressional Plan, does respect district cores from the Enacted Congressional Plan.

### (c)   <u>Racial predominance</u>

The Court further concludes that Mr. Cooper did not subordinate traditional districting principles in favor of racial considerations. Mr. Cooper was asked "to determine whether the African American population in Georgia is 'sufficiently large and geographically compact' to allow for the creation of an additional majority-Black congressional district in the Atlanta metropolitan area." PX 1 ¶ 8 (footnotes omitted); Tr. 717:14–17. At the preliminary injunction hearing, he testified that he was <u>not</u> asked to either "draw as many majority black districts as possible" or "draw every conceivable way of drawing an additional majority black district." Feb. 7, 2022, Morning PI Tr. 98:17–24. And if in his expert opinion an additional majority-Black district could not have been drawn, Mr. Cooper testified that he would have reported that to counsel, as he has "done [] in other cases." <u>Id.</u> 98:25–99:24.

91

Mr. Cooper testified that he considers race when creating an illustrative plan that would satisfy the first <u>Gingles</u> precondition because "[t]hat's part of the inquiry." Tr. 725:16–25. Mr. Cooper explained that he "need[s] to show that the district would be over 50 percent Black voting age population, while adhering to traditional redistricting principles." <u>Id.;</u> <u>see also</u> Feb. 7, 2022, Morning PI Tr. 48:4–15 (Mr. Cooper testifying at the preliminary injunction hearing that race "is something that one does consider as part of traditional redistricting principles" because "you have to be cognizant of race in order to develop a plan that respects communities of interest, as well as complying with the Voting Rights Act[,] because one of the key tenets of traditional redistricting principles is the importance of not diluting the minority vote").

Mr. Cooper testified that race did not predominate in his drawing of the Illustrative Congressional Plan because he merely considered it along with the traditional redistricting principles that he was "constantly balancing." Tr. 726:11–727:16. Indeed, Mr. Cooper explained that "in drafting this plan, [he] . . . attempted to balance all of the traditional redistricting principles so that no one principle predominates." Tr. 822:19–24. Defendants' expert does not even

contend that race predominated in the Illustrative Congressional Plan. Tr. 1952:23–1953:17; see generally DX 4.

The Court finds that race did not predominate in the drawing of the Illustrative Congressional Plan.

### b)   Second and Third *Gingles* Preconditions

The Court finds that that the minority group within Illustrative CD-6 is politically cohesive. Both Pendergrass Plaintiffs' expert, Dr. Palmer, and Defendants' expert, Dr. Alford, testified that ecological inference ("EI") is a reliable method for conducting the second and third Gingles preconditions analyses. "Q. Dr. Alford, you agree that . . . the method of ecological inference Dr. Palmer applied is the best available method for estimating voting behavior by race; correct? A. Correct." Tr. 2250:12–16; "Q. Do scholars and experts regularly use EI to examine racially polarized voting? A. Yes?" Tr. 401: 7–9. EI "estimates group-level preferences based on aggregate data." PX 2 ¶ 13. The data analyzed under EI also includes confidence intervals, which measure the uncertainty of results. Id. at n. 12. "Larger confidence intervals reflect a higher

degree of uncertainty in the estimates, while smaller confidence intervals reflect less uncertainty." Id.

Dr. Palmer conducted a racially-polarized voting analysis of Enacted CD-3, 6, 11, 13, and 14, both as a region (the "congressional focus area") and individually. Stip. ¶ 214; PX 2 ¶ 7; Tr. 413:18–414:5.



Figure 1: Map of the Focus Area

PX 2 ¶ 11 & fig.1.

Dr. Palmer evaluated Black and white voters' choices in the congressional focus area for each candidate in 40 statewide elections between 2012 and 2022.

94

Stip. ¶ 217; PX 2 ¶¶ 13, 15. Dr. Palmer's EI analysis relied on precinct-level election results and voter turnout by race, as compiled by the State of Georgia. PX 2 ¶ 11; Tr. 403:2–13.

Dr. Palmer first examined each racial group's support for each candidate to determine if members of the group voted cohesively in support of a single candidate in each election. PX 2 ¶ 14. If a significant majority of the group supported a single candidate, he then identified that candidate as the group's candidate of choice. Id. Dr. Palmer next compared the preferences of white voters to the preferences of Black voters. Id. He concludes that racially polarized voting existed when he found that Black voters and white voters support different candidates. Id.

### 3. *Cooper Legislative Plans*

#### a)  **Mr. Cooper's process in drawing the maps**

Mr. Cooper submitted an illustrative State Senate plan (the "Cooper Senate Plan") and an illustrative State House plan (the "Cooper House Plan") (collectively, the "Cooper Legislative Plans") as a part of his expert report. APAX 1 ¶ 85 & fig.5; ¶ 151 & fig.27. When Mr. Cooper was retained as an expert, he was asked "to determine whether the African-American population in Georgia is

'sufficiently large and geographically compact' to allow for the creation, consistent with traditional redistricting principles, of additional majority-Black Senate and House districts[.]" APAX 1 ¶ 7; Tr. 67:23-68:1. At the preliminary injunction hearing, he testified that he was not asked to either "draw as many majority black districts as possible" or "draw every conceivable way of drawing an additional majority black district." Feb. 7, 2022, Morning PI Tr. 98:17–24. And if in his expert opinion an additional majority-Black district could not have been drawn, Mr. Cooper testified that he would have reported that to counsel, as he has "done [] in other cases." Id. 98:25–99:24.

Mr. Cooper, in his report, declared that he analyzed population and geographic data from the Decennial Census and the ACS. APAX 1, Ex. B. He also used Maptitude and its geographic boundary files (created by the U.S. Census). Id. He evaluated incumbent addresses, Georgia's current and historical legislative plans, Georgia's 2000s House, Senate, and Congressional Plans. Id. The Court notes that Mr. Cooper was able to review the Enacted Legislative Plan's compactness scores when he was drawing the Cooper Legislative Plans. APAX 1, Ex. B ¶ 7.

96

Mr. Cooper specifically testified in detail about how he followed the criteria in Georgia's districting guidelines when drawing the Cooper Legislative Plans. See, e.g., Tr. 89:15-91:9. Mr. Cooper testified that, with respect to Cooper Legislative Plans, he balanced all of the traditional redistricting principles, and that they "all went into the mix as I was drawing the [I]llustrative [P]lan." Tr. 90:16-19. He confirmed that he "balanced the traditional districting principles in drawing [the] illustrative districts," (Id. at 168:19-22), and he testified that none of the factors predominated over any others. Id. at 90:16-19; see also Id. at 107:18-20 ("Q. Mr. Cooper, did any factors get more weight than others when you were drawing your [I]llustrative [P]lans? A. I don't believe so."); Tr. 367:5-7 ("you really do have to balance, balance, balance. That's the name of the game.").

Traditional redistricting principles, that he considered, include population equality, compactness, contiguity, respect for political subdivision lines like counties and voting tabulation districts ("VTDs," otherwise known as precincts), respect for communities of interest, and non-dilution of minority voting strength. See, e.g., Tr. 90:2-91:9. Mr. Cooper also testified that avoiding pairing incumbents

is a consideration that he takes into account, consistent with Georgia's adopted districting guidelines. <u>See, e.g.</u>, <u>Id.</u> 128:5-7, 166:25:167:8, 225:15-24.

### b) <u>Cooper Senate Plan</u>

The Cooper Senate Plan contains three additional majority-Black Senate Districts, two in south-metro Atlanta and one in the Eastern Black Belt, anchored in and around Augusta.



APAX 1 ¶ 85 & fig.15.

98

### (1)    *Empirical measures*

### (a)    <u>numerosity</u>

The AP BVAP population for the additional districts are as follows: Cooper SD-17 is 62.55%, SD-23 is 50.21%, SD-28 is 51.32%. APAX 1, Ex. O-1. All of Cooper's proposed illustrative Senate districts exceed 50% as do the districts that are majority-Black under the Enacted Senate Plan.

| District | AP BVAP | District | AP BVAP |
|----------|---------|----------|---------|
| 010 | 69.76% | 028* | 51.32% |
| 012 | 57.97% | 033 | 52.60% |
| 015 | 54.00% | 034 | 77.84% |
| 016 | 56.52% | 035 | 60.80% |
| 017* | 62.55% | 036 | 51.34% |
| 020 | 60.44% | 038 | 54.25% |
| 022 | 50.36% | 041 | 64.57% |
| 023* | 50.21% | 043 | 57.97% |
| 026 | 52.81% | 055 | 51.22% |

(*) denotes a new majority-Black district

APAX 1, Ex. O-1.

### (b)   population equality and contiguity

It is undisputed that the population deviation for the Cooper Senate Plan is ±1.00% from the ideal district population size of 191,284 people. Stip. ¶¶ 277, 301. This is lower than the Enacted Senate Plan, which has a deviation range of -1.03% to +0.98%. Stip. ¶ 301. It is also undisputed that all districts in the Cooper Senate Plan are contiguous. Stip. ¶ 300.

### (c)   compactness

The Court finds that the Cooper Senate Plan and the Enacted Senate Plan, on the whole, are comparable. Mr. Cooper explained, the Cooper Legislative Plans "matched or beat the State's plans on … compactness measures[.]" Tr. 109:2-4. Mr. Cooper concluded that "[o]n balance, the Illustrative Senate Plan and 2021 Senate Plan score about the same on the widely referenced Reock and Polsby-Popper measures. If anything, the Illustrative Plan scores better inasmuch as its least compact district by Reock scores [0].22, compared to [0].17 for the 2021 Senate Plan." APAX 1 ¶ 114.

Mr. Cooper's expert report provided detailed compactness measures for the Enacted Senate Plan as follows:

**Compactness Scores**
**Illustrative Senate Plan and 2014 Benchmark and 2021 Senate Plans**

| | Reock | | | Polsby-Popper | |
|---|---|---|---|---|---|
| | Mean | Low | | Mean | Low |
| **Illustrative Senate Plan** | .43 | .22 | | .28 | .14 |
| **2014 Benchmark Senate Plan** | .43 | .14 | | .27 | .11 |
| **2021 Senate Plan** | .42 | .17 | | .29 | .13 |

APAX 1 ¶ 114 & fig.20.

Dr. Morgan, Defendant's mapping expert, concluded that the Cooper Senate Plan "still has mean compactness scores close to the enacted plan, with the mean compactness score on the Reock test higher and the mean compactness score on the Polsby-Popper test lower." DX 2 ¶ 18.

The Court concludes that the Cooper Senate Plan is more compact than the Enacted Senate Plan on Reock by 0.01 points and less compact by 0.01 on Polsby-Popper. Id. Consistent with both Defendants' and the Alpha Phi Alpha Plaintiffs' experts, the Court finds that the compactness scores of the two plans are "similar." Accordingly, the Court finds that the Cooper and Enacted Senate Plans are comparably compact with respect to the average and minimum scores.

With respect to the majority-Black districts, the Court finds that the additional majority-Black districts are all more compact than the least compact

101

district in the Enacted Senate Plan. The following table is derived from the data contained in Exhibits S-1 and S-3:

| | Enacted Districts | | | Illustrative Districts | |
|---|---|---|---|---|---|
| Districts | Reock | Polsby-Popper | Districts | Reock | Polsby-Popper |
| 017 | 0.35 | 0.17 | 017 | 0.37 | 0.17 |
| 023 | 0.37 | 0.16 | 023 | 0.37 | 0.16 |
| 016[29] | 0.37 | 0.31 | 028 | 0.37 | 0.18 |

APAX 1, Exs. S-1, S-3.

The Court finds that generally, the majority-Black Senate districts performed identically to their corollary Enacted Senate Plan district, with the exception of Cooper SD-28, which has a lower Polsby-Popper score by 0.13 points. However, none of the compactness measures are below the least compact district's measures on the Enacted Senate Plan, in part because Cooper's Enacted Senate Plan's has a higher minimum compactness score than the Enacted Senate Plan. APAX 1 ¶ 114.

---

[29] Mr. Cooper testified that Cooper SD-28 correlates with Enacted SD-16. APAX 1 ¶ 99.

102

In sum, the Court finds that on the empirical compactness measures, the majority-Black districts in the Cooper Senate Plan are nearly identical to the compactness scores on the Enacted Senate Plan.

### (d)   political subdivision splits

The Cooper Senate Plan splits fewer political subdivisions than the Enacted Senate Plan and performs better across all metrics. APAX 1 ¶ 116 & fig.21.

**County and VTD Splits/Whole Municipalities –**
**Illustrative Plan versus 2014 Benchmark and 2021 Senate Plans**

| | Split Counties | Total County Splits* | 2020 VTD Splits* | Single-County Whole City/Towns (478)# | Single and Multi County Whole City/ Towns (531#) | Total City/ Town Splits* |
|---|---|---|---|---|---|---|
| Illustrative Senate | 28 | 57 | 38 | 437 | 464 | 166 |
| 2014 Benchmark | 38 | 65 | 86 | 422 | 448 | 198 |
| 2021 Senate | 29 | 60 | 40 | 434 | 463 | 169 |

*Populated splits only
# Higher is better

Id.

Neither Defendants nor their experts have meaningfully suggested that the Cooper Senate Plan fails to respect city, town, and county lines. Accordingly, the

Court finds that the Cooper Senate Plan respected more political subdivisions than the Enacted Senate Plan.

### (e)    findings of fact on empirical measures

In sum, the Court finds that the Cooper Senate Plan meets or exceeds the Enacted Senate Plan on population equality, compactness scores, and political subdivision splits. The Cooper Senate Plan's Reock score beats the Enacted Senate Plan's Reock score by 0.01 and the Enacted Senate Plan's Polsby-Popper score beats the Cooper Senate Plan's Polsby-Popper score by the same amount. APAX 1 ¶ 114 & fig.20. The Court thus finds that the compactness scores between the two plans are virtually identical.

### (2)    Core retention

The Court also finds that the Cooper Senate Plan retained many of the cores of the districts in the Enacted Senate Plan. Georgia's Reapportionment Guidelines do not identify preservation of existing district cores as a "General Principles for Drafting Plans." See JX 1, JX2. The Cooper Senate Plan kept 21 Senate districts the same as the Enacted Senate Plan. DX 2 ¶ 17. And, if the General Assembly were to enact the Cooper Senate Plan, 82% of the Georgia

population would remain in the same district in the Enacted Senate Plan. Tr. 88:13-18.

### (3)   *Incumbent pairing*

Georgia's redistricting guidelines provide that "efforts should be made to avoid unnecessary incumbent pairings." JX 1, 3; JX 2, 2. He testified that also sought to avoid incumbent pairings. Tr. 236:1-2. He used official incumbent address information that defense counsel provided in January 2022 and another potential database of incumbent address information that followed the November 2022 General Election. APAX 1 ¶ 12. Mr. Cooper testified, as he was drawing the Cooper Legislative Plans, "always in the back of my mind [I] was trying to avoid pairing incumbents." Tr. 236:1-2. The Cooper Senate Plan pairs six incumbents. The Enacted Senate Plan pairs four incumbents. DX 2 ¶ 16 & chart 2. The Court finds that two additional pairs of incumbents are paired under the Cooper Senate Plan than in the Enacted Senate Plan.

### (4)   *Racial considerations*

Georgia's redistricting guidelines provide all plans must "comply with Section 2 of the Voting Rights Act[,] as amended." JX 1, at 3; JX 2, at 3. Mr. Cooper testified that non-dilution of minority voting strength means that "as you're

105

drawing a plan, you should make a point of not excluding the Black population in some areas where you might be able to draw a minority Black district or split one somehow or another into districts that don't necessarily have sufficient minority population to elect a candidate of choice or to overconcentrate Black voters in a single district when they could have been placed in two districts and perhaps have an opportunity in two districts instead of just one." Tr. 92:14-23.

Mr. Cooper testified that for purposes of non-dilution, "you have to at least be aware of where the minority population lives." Tr. 92:14-15. However, Mr. Cooper testified that while race is "out there and [he's] aware of it, . . . it didn't control how [the Illustrative Plans] were drawn." Tr. 108:7-11. He stated that he did not aim to draw any maximum or minimum number of Black-majority districts. Tr. 112:11-14; see also Tr. 197:23-24 ("My goal was not to draw the maximum number of majority Black districts"). When asked whether he was "trying to maximize the number of Black majority districts when [he] drew the [I]llustrative [P]lans?" Mr. Cooper responded, "Not at all." Tr. 358:9-12.

Mr. Cooper testified that when he draws maps, he sometimes uses "a little dot for precincts that are 30 percent or greater Black." Tr. 200:11-15. He testified

106

that he did not always use that feature. Tr. 93:23-94:2. Mr. Cooper repeatedly testified that "race did not predominate" in his drawing of the Illustrative Plans. Tr. 93:1, 108:4-11, 108:23-109:5, 168:15-18. When asked by the Court if race predominated, Mr. Cooper responded, "No. Because I also had to take into account these other factors, population equality, avoiding county splits, avoiding splitting municipalities. So it's out there and I'm aware of it, but it didn't control how these districts were drawn. Id. at 108:4-11.

Particularly in light of Mr. Cooper's extensive experience and his testimony regarding the process he used in this case and his balancing of the various considerations, the Court finds that race did not predominate over the other traditional redistricting principles when he drew the Cooper Legislative Plans.

### c)    <u>Cooper House Plan</u>

The Cooper House Plan contains five additional majority-Black House Districts, two in south-metro Atlanta, one in the Eastern Black Belt, anchored in and around Augusta, one in and around Macon-Bibb, and one in southwest Georgia.

107



Illustrative House – New Majority-Black Districts –74, 117, 133, 145, and 171

APAX 1 ¶ 151 & fig.27.

### (1)   *Empirical measures*

#### (a)   numerosity

The AP BVAP population for the additional districts are as follows: Cooper HD-74 is 61.49%, HD-117 is 54.64%, HD-133 is 51.97%, HD-145 is 50.20%, and HD-171 is 58.06%. APAX 1, Ex. AA-1. All of the districts in the Cooper House

108

Plan exceed 50% as do the districts that are majority-Black under the Enacted House Plan. Id.

### (b)   population equality and contiguity

It is undisputed that the population deviations in all districts in the Cooper House Plan are within ±1.49% of the ideal district population size of 59,511 people. Stip. ¶¶ 278, 302. This is higher than the Enacted House Plan, which has a deviation range of -1.40% to +1.34%. Stip. ¶ 302. It is also undisputed that all districts in the Cooper House Plan are contiguous. Stip. ¶ 300.

### (c)   compactness

The Court finds that the Cooper House Plan and the Enacted House Plan, on the whole, are comparable. Mr. Cooper explained, the Cooper Legislative Plans "matched or beat the State's plans on … compactness measures[.]" Tr. 109:2-4. Mr. Cooper concluded that "[o]n balance, the Illustrative House Plan and 2021 Senate Plan score about the same on the widely referenced Reock and Polsby-Popper measures. If anything, the Illustrative Plan scores better inasmuch as its least compact district by Reock scores [0].16, compared to [0].12 for the 2021 House Plan." APAX 1 ¶ 187.

109

Mr. Cooper's expert report provided detailed compactness measures for the Enacted Senate Plan as follows:

**Compactness Scores**
**Illustrative House Plan versus**
**2015 Benchmark and 2021 House Plans**

|  | Reock | | | Polsby-Popper | |
|---|---|---|---|---|---|
|  | Mean | Low | | Mean | Low |
| **Illustrative House Plan** | .39 | .16 | | .27 | .11 |
| **2015 Benchmark House Plan** | .39 | .13 | | .27 | .09 |
| **2021 House Plan** | .39 | .12 | | .28 | .10 |

APAX 1 ¶ 187 & fig.36.

Dr. Morgan, Defendant's mapping expert, concluded that the average compactness scores in the Cooper House Plan and the Enacted House Plan "are similar." DX 2 ¶ 47.

The Court concludes that the Cooper and Enacted House Plans have identical Reock scores, but the Cooper House Plan is less compact by 0.01 on Polsby-Popper. Id. Consistent with both Defendants' and the Alpha Phi Alpha Plaintiffs' experts, the Court finds that the compactness scores of the two plans are "similar." Accordingly, the Court finds that the Cooper and Enacted House Plans are comparably compact, with respect to the average and minimum scores.

110

With respect to the additional majority-Black districts, the Court finds that those districts are all more compact than the least compact district in the Enacted House Plan. The following table is derived from the data contained in Exhibits AG-1 and AG-2:

| | Enacted Districts | | Illustrative Districts | |
|---|---|---|---|---|
| Districts | Reock | Polsby-Popper | Reock | Polsby-Popper |
| 074 | 0.50 | 0.25 | 0.63 | 0.36 |
| 117 | 0.41 | 0.28 | 0.41 | 0.26 |
| 133 | 0.55 | 0.42 | 0.26 | 0.20 |
| 145 | 0.38 | 0.19 | 0.25 | 0.22 |
| 171 | 0.35 | 0.37 | 0.28 | 0.20 |

APAX 1, Exs. AG-1, AG-2.

The Court finds that in the south metro-Atlanta districts, the majority-Black districts in the Cooper House Plan are comparable. For example, Cooper HD-74 beats Enacted HD-74 by 0.13 on Reock and 0.11 on Polsby-Popper. The Court finds that for the districts outside of Atlanta, the majority-Black districts in the Cooper House Plan generally fared worse than the Enacted House Plan's

111

majority-Black districts, with the exception of Cooper HD-145's Polsby-Popper score which is 0.03 more compact than Enacted HD-145. However, none of the compactness scores are below the least compact district's scores on the Enacted House Plan. APAX 1 ¶ 187 & fig.36.

### (d)    political subdivisions

The Cooper House Plan's political splits are comparable to the Enacted House Plan's. APAX 1 ¶ 189 & fig.37. The Cooper House Plan splits one less county. The plans have the same numbers of unique county and VTD splits. Id. The chart below depicts the total findings on political subdivision splits:

**County and VTD splits/Whole Municipalities**
**Illustrative House Plan versus**
**2015 Benchmark and 2021 House Plans**

|  | Split Counties | Total County Splits* | 2020 VTD Splits* | Single-County Whole City/Towns (478)# | Single and Multi County Whole City/Towns (538)# | Total City/Town Splits* |
|---|---|---|---|---|---|---|
| **Illustrative House** | 68 | 209 | 179 | 393 | 402 | 361 |
| **2015 Benchmark** | 73 | 215 | 268 | 381 | 402 | 378 |
| **2021 House** | 69 | 209 | 179 | 384 | 412 | 344 |

*Populated splits only
# Higher is better

Id.

112

Neither Defendant, nor his experts have meaningfully suggested that the Cooper House Plan fails to respect city, town, and county lines. Accordingly, the Court finds that the Cooper House Plan has comparable political subdivision splits to the Enacted House Plan.

(e)     **findings of fact on the empirical measures**

In sum, the Court finds that the Cooper House Plan is comparable to the Enacted House Plan on population equality, compactness scores, and political subdivision splits.

### (2)     *Core retention*

The Court also finds that the Cooper House Plan retained many of the cores of the districts in the Enacted House Plan. Georgia's Reapportionment Guidelines do not identify as a traditional districting principle the goal to preserve existing district cores among "General Principles for Drafting Plans." See JX 1, JX2. The Cooper House Plan kept 87 House districts the same as the Enacted House Plan. DX 2 ¶ 47. If the General Assembly were to enact the Cooper House Plan, 86% of the Georgia population would remain in the same district in the Enacted House Plan. Tr. 88:13-18.

113

### (3)   Incumbent pairings

Georgia's redistricting guidelines provide that "efforts should be made to avoid unnecessary incumbent pairings." JX 1, at 3; JX 2, at 3. Mr. Cooper testified that he also sought to avoid incumbent pairings. Tr. 236:1-2. Mr. Cooper used official incumbent address information that defense counsel provided in January 2022 and another potential database of incumbent address information that followed the November 2022 General Election. APAX 1 ¶ 12. Mr. Cooper testified that as he was drawing the Illustrative Plans, "always in the back of my mind [I] was trying to avoid pairing incumbents." Tr. 236:1-2. Cooper House Plans pairs 25 incumbents. The Enacted House Plan pairs 20 incumbents. Id. at 25. Mr. Cooper paired five more incumbents than the Enacted House Plan.

### (4)   Racial considerations

The evidence regarding Mr. Cooper's racial considerations when drawing the Cooper House Plan is identical to the evidence regarding the drawing of the Cooper Senate Plan. Accordingly, the Court incorporates by reference its analysis of the Mr. Cooper's racial consideration in the Cooper Senate Plan here. See Section I(F)(3)(b)(4) *supra*.

114

#### 4. *Esselstyn Legislative Plans*

##### a) <u>Mr. Esselstyn's map drawing process</u>

As a part of his expert report, Mr. Esselstyn submitted an illustrative State Senate Plan ("Esselstyn Senate Plan") and an illustrative State House Plan ("Esselstyn House Plan") (collectively the "Esselstyn Legislative Plans"). Mr. Esselstyn testified that he was asked whether "the Black population in Georgia is sufficiently large and geographically compact to allow for the creation of additional majority Black districts in the legislative maps relative to the enacted maps while adhering to traditional redistricting principles." Tr. 467: 11–15. To accomplish this inquiry, Mr. Esselstyn used data from the Census Bureau's website, the Georgia General Assembly's Legislative Congressional Reapportionment Office's website, and the Georgia General Assembly's Reapportionment Committees Guidelines. <u>Id.</u>  ¶¶ 1–2. Mr. Esselstyn also drew upon his knowledge as a geologist for determining where "fall line cities" were located in Georgia. Tr. 529:12–530:1. Mr. Esselstyn did not have any political data or election return information available when drawing the illustrative plans. Tr. 524:19–25. He also did not review any public comments provided by Georgians at public hearings until after he drew his preliminary injunction plans,

and the Esselstyn Legislative Plans are very similar to his preliminary injunction plans. Tr. 530:2–8.

For the physical process of drawing his illustrative plans, Mr. Esselstyn primarily used the mapping software Maptitude, the same software used by the Georgia General Assembly. GX 2, Attach. B ¶ 4. Through Maptitude, he was able to import Census Bureau data files and the Enacted Legislative Plans. Id.

Maptitude shows statistics for the districts, such as compactness and population deviation. Id. Maptitude allows the map drawer to shade the map for racial demographics. Tr. 521:13–19. Mr. Esselstyn testified that "[a]t times" he would use the racial information to "inform decisions that he made about which parts of districts went in and out of a particular district." Tr. 522:19–25. But, he stated that he did not always have it on when drawing the Esselstyn Legislative Plans. Tr. 587:18–24. He testified that the racial information "would have been one factor that [he] was considering in addition to other factors." Tr. 522:24–25. Mr. Esselstyn testified that in determining where particular communities were located, he primarily relied on visible features that were displayed in the Maptitude software. Tr. 528:23–529:2.

116

### b) <u>Esselstyn Senate Plan</u>

Analyzing these demographics and the Enacted Senate Plan, Mr. Esselstyn concluded that "[i]t is possible to create three additional majority-Black districts in the State Senate plan . . . in accordance with traditional redistricting principles." GX 1 ¶ 13; Tr. 468:2–4. Two in south-metro Atlanta and one in the Eastern Black Belt. GX 1 ¶ 13. Meaning, the Esselstyn Senate Plan has 17 majority-Black State Senate districts using the AP BVAP metric. Stip. ¶ 231; GX 1 ¶ 27.



Figure 4: Map of majority-Black districts in the illustrative State Senate plan.

GX 1 ¶ 27 & fig.4.

### (1)   *Empirical measures*

#### (a)   <u>numerosity</u>

The Esselstyn Senate Plan contains 17 majority-Black districts. GX 1 ¶ 27 & tbl. 1. The AP BVAP in all 17 districts exceed 50 percent. <u>Id.</u> Of the additional

**Table 1: Illustrative Senate plan majority-Black districts with BVAP percentages.**

| District | BVAP% | District | BVAP% | District | BVAP% |
|---|---|---|---|---|---|
| 10 | 61.10% | 26 | 52.84% | 39 | 60.21% |
| 12 | 57.97% | 28 | 57.28% | 41 | 62.61% |
| 15 | 54.00% | 34 | 58.97% | 43 | 58.52% |
| 22 | 50.84% | 35 | 54.05% | 44 | 71.52% |
| 23 | 51.06% | 36 | 51.34% | 55 | 65.97% |
| 25 | 58.93% | 38 | 66.36% | | |

majority-Black districts, the majority-Black population is 51.06%, 58.93%, and 57.28% respectively. <u>Id.</u>

118

**(b)** <u>**population equality and contiguity**</u>

It is undisputed that the districts in the Esselstyn Senate Plan are all contiguous. Stip. ¶ 258.

The overall deviation range on the Enacted Senate Plan is higher than the overall deviation range on the Enacted Senate Plan. Tr. 527:11–15; DX 3, Chart 3. However, the Court finds that the Esselstyn Senate Plan complies with the General Assembly's population equality guidelines. Under the General Assembly's redistricting guidelines "[e]ach legislative district of the General Assembly shall be drawn to achieve a total population that is substantially equal as practicable, considering the principles listed below." JX 2, 2.

Under the Esselstyn Senate Plan, all districts have a population deviation between ±1 and 2%, with most within ±1%. GX 1 ¶ 34. The district with the greatest deviation is + 1.90% and the district contains 194,919 — 3,635 persons more than the ideal population. GX 1, Attach. E. The average population deviation in Esselstyn's Senate Plan is ±0.67%. <u>Id.</u> The Court finds that on average, Mr. Esselstyn's Senate Plan complies with the General Assembly's guideline on population equality.

### (c)   **Compactness scores**

The Court finds that the Esselstyn Senate Plan and the Enacted Senate Plan, on the whole, are comparable. Mr. Esselstyn reported the average compactness scores for both the Enacted and Esselstyn Legislative Plans using five measures—Reock, Schwartzberg[30], Polsby-Popper, Area/Convex Hull[31], and Number of Cut Edges[32]. GX 1  ¶¶ 36, 57 & tbls.2, 6; <u>see also</u> Tr. 475:18–476:18 (Mr. Esselstyn's testimony describing common measures of compactness).

---

[30] The Schwartzberg test is a perimeter-based measure that compares a simplified version of each district to a circle, which is considered to be the most compact shape possible. For each district, the Schwartzberg test computes the ratio of the perimeter of the simplified version of the district to the perimeter of a circle with the same area as the original district. This measure is usually greater than or equal to 1, with 1 being the most compact. GX 1, Attach. G.

[31] The Area/Convex Hull test computes the ratio of the district area to the area of the convex hull of the district (minimum convex polygon which completely contains the district). The measure is always between 0 and 1, with 1 being the most compact. GX 1, Attach. G.

[32] The Cut Edges test counts the number of edges removed ("cut") from the adjacency (dual) graph of the base layer to define the districting plan. The adjacency graph is defined by creating a node for each base layer area. An edge is added between two nodes if the two corresponding base layer areas are adjacent—which is to say, they share a common linear boundary. If such a boundary forms part of the district boundary, then its corresponding edge is cut by the plan. The measure is a single number for the plan. A smaller number implies a more compact plan. GX 1, Attach. G.

120

Mr. Esselstyn concluded that the average compactness measures for the Enacted and Esselstyn Senate Plans "are almost identical." GX 1 ¶ 36 & tbl.2; see also Id. at 79–91 (Mr. Esselstyn's expert report providing detailed compactness measures for Enacted and Esselstyn Senate Plans); Tr. 485:19–21 (Mr. Esselstyn's testimony describing compliance with compactness principle). Mr. Morgan agreed that the mean compactness scores were "very close." Tr. 1843:19–1844:2. Mr. Esselstyn reported those measures as follows:

**Table 2: Compactness measures for enacted and illustrative State Senate plans.**

|  | Reock (average) | Schwartzberg (average) | Polsby-Popper (average) | Area/Convex Hull (average) | Number of Cut Edges |
|---|---|---|---|---|---|
| Enacted | 0.42 | 1.75 | 0.29 | 0.76 | 11,005 |
| Illustrative | 0.41 | 1.76 | 0.28 | 0.75 | 11,003 |

GX 1 ¶ 36 & tbl. 2.

The Court concludes that the Esselstyn Senate Plan fares worse than the Enacted Senate Plan by 0.01 points on four of the five measures and has 2 fewer cut edges than the Enacted Senate Plan. Id. Consistent with both Defendants' and the Grant Plaintiffs' experts, the Court finds that the compactness scores of the

121

two plans are "very close." Accordingly, the Court finds that the Esselstyn and Enacted Senate Plans are comparably compact.

The following chart is derived from the data in attachment H to Mr. Esselstyn's report and depicts the compactness scores for the minority-Black districts in the Enacted and Esselstyn Senate Plans.

| District | Enacted Senate Plan | | Esselstyn Senate Plan | |
|---|---|---|---|---|
| | Reock | Polsby-Popper | Reock | Polsby-Popper |
| 010 | 0.28 | 0.23 | 0.25 | 0.19 |
| 012 | 0.62 | 0.39 | 0.62 | 0.39 |
| 015 | 0.57 | 0.32 | 0.57 | 0.32 |
| 022 | 0.41 | 0.29 | 0.33 | 0.32 |
| 023* | 0.37 | 0.16 | 0.34 | 0.17 |
| 025* | 0.39 | 0.24 | 0.57 | 0.34 |
| 026 | 0.47 | 0.20 | 0.44 | 0.25 |
| 028* | 0.45 | 0.25 | 0.38 | 0.19 |
| 034 | 0.45 | 0.34 | 0.31 | 0.21 |
| 035 | 0.47 | 0.26 | 0.59 | 0.42 |
| 036 | 0.32 | 0.30 | 0.32 | 0.30 |
| 038 | 0.36 | 0.21 | 0.37 | 0.20 |
| 039 | 0.17 | 0.13 | 0.18 | 0.13 |
| 041 | 0.51 | 0.30 | 0.51 | 0.30 |
| 043 | 0.64 | 0.35 | 0.49 | 0.25 |
| 044 | 0.18 | 0.19 | 0.33 | 0.24 |
| 045 | 0.35 | 0.30 | 0.35 | 0.30 |
| **Mean:** | **0.41** | **0.26** | **0.41** | **0.27** |
| **Max:** | **0.64** | **0.39** | **0.62** | **0.42** |
| **Min:** | **0.17** | **0.13** | **0.18** | **0.13** |

asterisk (*) denotes a new majority-Black district

122

With respect to the majority-Black districts, the Court finds that the Esselstyn Senate Plan is equivalent if not better than the Enacted Senate Plan. On average, the two plans have identical Reock scores and the Esselstyn Senate Plan fares 0.01 better on the Polsby-Popper measure. GX 1, Attach. H.

With respect to the maximum and minimum scores, the Enacted Senate Plan has a district that is 0.02 better on Reock than the most compact district in the Esselstyn Senate Plan. Id. Conversely, on the Polsby-Popper measure, the Esselstyn Senate Plan's most compact district is 0.03 points more compact than the most compact district in the Enacted Senate Plan. Id. The least compact districts in both plans have identical Polsby-Popper scores and the Esselstyn Senate Plan's least compact district is more compact by 0.01 points. Id.

Finally, on the Reock measure, five of the majority-Black districts have identical scores, five districts are more compact in the Esselstyn Senate Plan, and seven districts are more compact in the Enacted Senate Plan. Id. On the Polsby-Popper measure, six of the majority-Black districts have identical scores, six

123

districts are more compact in the Esselstyn Senate Plan, and five are more compact on the Enacted Senate Plan.

In sum, the Court finds that on the empirical compactness measures, the majority-Black districts in the Enacted and Esselstyn Senate Plans are comparably compact.

### (d)   political subdivisions

The Court finds that on the whole, the Esselstyn Senate Plan's political subdivision splits are comparable to the Enacted Senate Plan's. The Esselstyn Senate Plan splits more counties and VTDs than the Enacted Senate Plan. Tr. 528:1–5; DX 3, Chart 3. Mr. Esselstyn noted that he split fewer counties than in the 2014 Georgia Legislative Plans. Tr. 487:15–21; GX 1 ¶ 40 & tabl.4. He reported the splits in the enacted and illustrative State Senate maps as follows:

**Table 4: Political subdivision splits for enacted and illustrative State Senate plans.**

|              | Intact Counties | Split Counties | Split VTDs |
| ------------ | --------------- | -------------- | ---------- |
| Enacted      | 130             | 29             | 47         |
| Illustrative | 125             | 34             | 49         |

GX 1, ¶ 40 & tbl.4.

124

Mr. Esselstyn concluded that "[w]hile the creation of three additional majority-Black State Senate districts involved the division of additional counties and VTDs, the differences are marginal." GX 1 ¶ 40 & tbl.4; see also Id. at 92–103 (Mr. Esselstyn's expert report providing political subdivision splits for enacted and illustrative State Senate maps); Tr. 487:8–14 (Mr. Esselstyn's testimony that the number of political subdivision splits in the illustrative and enacted Senate plans are "very similar").

Mr. Morgan's report confirms that the Esselstyn Senate Plan split the same counties as the Enacted Senate Plan. See DX 3 ¶ 35. Mr. Morgan also conceded that the ways in which the Esselstyn Senate Plan splits counties, at times, affected fewer people because he split smaller counties and united some of the bigger counties. See Tr. 1887:21–1891:1. Out of 2,698 VTDs statewide, only 49 are split in Esselstyn Senate Plan, and in only 18 of Georgia's 159 counties. Doc. No. GX 1 ¶ 40 & tbl.4; Mr. Esselstyn's report included a histogram depicting the VTD splits in the Esselstyn Senate Plan by county:

125



Figure 10: VTD splits in illustrative State Senate plan by county.

GX 1 ¶ 40 & fig.10.

**(e)** **findings of fact on the empirical measures**

In sum, the Court finds that the Esselstyn Senate Plan has greater population deviations than the Enacted Senate Plan; however, the Esselstyn Senate Plan has comparable compactness scores and political subdivision splits.

*(2)* *Core retention*

The General Assembly Guidelines did not include maintaining existing State Senate district cores. JX 1, JX 2. Similarly, Ms. Wright testified that when drafting the Enacted Senate Plan, she starts with a blank map and builds out from

126

there. Tr. 1622:11–17; 1642:7–14. She does not start by using the most recent State Senate map. Id. Although not an enumerated guideline, the Court finds that the Esselstyn Senate Plan respects the core districts of the Enacted Senate Plan. Mr. Esselstyn used the Enacted Senate Plan as a starting point, and many of the districts are the same. Only 22 districts were modified, leaving the other 34 unchanged. Stip. ¶ 261; GX 1 ¶ 26; Tr. 485:3–5. As Mr. Morgan's report confirms, nearly 90% of Georgia's population would remain in their same numbered State Senate district under the Esselstyn Senate Plan. DX 3, Ex. 7. The Court finds that the Esselstyn Senate Plan retained the majority of the core districts from the Enacted Senate Plan.

### (3)   Incumbent Pairings

Based on the record, the Court concludes that the Esselstyn Senate Plan complies with the districting criterion of avoiding unnecessary pairings of incumbents. See JX1, JX2. At the preliminary injunction hearing, Mr. Esselstyn submitted an illustrative State Senate plan that he created without knowledge of incumbent addresses. GX 1 ¶ 42; Tr. 479:23–480:21. That plan paired two incumbents in the State Senate.

The Esselstyn Senate Plan, submitted at trial, pairs fewer incumbents than Mr. Esselstyn's initial plans. Currently, no incumbent State Senators are paired. GX 1 ¶ 42; Tr. 480:18–21.

Accordingly, the Court finds that Esselstyn Senate Plan respects the traditional redistricting principle of avoiding pairing incumbents because it paired no incumbents.

#### (4)    *Racial Considerations*

The Court further concludes that Mr. Esselstyn did not subordinate traditional districting principles in favor of race-conscious considerations. Mr. Esselstyn was asked "to determine whether there are areas in the State of Georgia where the Black population is 'sufficiently large and geographically compact' to enable the creation of additional majority-Black legislative districts relative to the number of such districts provided in the enacted State Senate and State House of Representatives redistricting plans from 2021." GX 1 ¶ 9 (footnote omitted); see also Tr. 467:8–15 (Mr. Esselstyn's testimony confirming what he was asked to do in this case). Mr. Esselstyn testified that he was not asked to

maximize the number of majority-Black districts in the Enacted Legislative Plans. Feb. 9, 2022, Afternoon PI Tr. 150:23–25.

Mr. Esselstyn testified that it was necessary for him to consider race as part of his analysis because "the <u>Gingles</u> 1 precondition is looking at whether majority Black districts can be created. And in order to understand whether districts are majority Black, one has to be able to look at statistics for those districts." Tr. 471:9–17. <u>See</u> Feb. 9, 2022, Afternoon PI Tr. 155:15–156:2. (Mr. Esselstyn testifying that, under Section 2, "the key metric is whether a district has a majority of the Any Part Black population. So that means it has to be over 50 percent. And that means looking at a column of numbers in order to determine, to assess whether a district has that characteristic. You have to look at the numbers that measure the percentage of the population is Black.").

Mr. Esselstyn emphasized that he took other considerations into account as well when drawing his illustrative plans, including population equality, compliance with the federal and Georgia constitutions, contiguity, and other traditional districting principles. Tr. 471:18–472:14.; <u>Id.</u> at 522:5–14 ("I'm constantly looking at the shape of the district, what it does for population

129

equality, . . . political subdivisions, communities of interest, incumbents, all that. So while yes, at times [race] would have been used to inform a decision, it was one of a number of factors.").

Mr. Esselstyn confirmed that race did not predominate when he drew the Esselstyn Legislative Plans. Tr. 472:15–20. Although Mr. Morgan concluded that Mr. Esselstyn's changes from the Enacted Senate Plan indicate that he prioritized race, the Court does not credit Mr. Morgan's analysis or conclusions for several reasons.

First, Mr. Morgan conceded that he did not examine the extent to which Mr. Esselstyn's changes were designed to satisfy traditional districting criteria like avoiding the unnecessary pairing of incumbents and preserving communities of interest. Tr. 1897:11–1899:3, 1923:21–1924:16. Mr. Morgan's overarching conclusion about the prioritization of race over other factors is difficult to square with his failure to actually examine all of the relevant factors Mr. Esselstyn stated he considered in drawing his illustrative plans.

Second, Mr. Morgan's analysis is methodologically inconsistent. For instance, the text of his expert report, which purports to compare the district in

130

the Enacted and Esselstyn Senate Plans, contains compactness scores for the enacted districts but makes no mention of the compactness scores for the corresponding illustrative districts. Tr. 1854:5–12.

Third, Mr. Morgan's analysis of the new majority-Black districts is incomplete. The text of Mr. Morgan's expert report provides no description or analysis whatsoever of Esselstyn SD-25, SD-28, HD-64, HD-117, HD-145 or HD-149. Tr. 1846:10–1847:6; Tr. 1896:21–23, 1922:22–25, 1923:1–15.

Fourth, Mr. Morgan's conclusion regarding the role of race seems to fault the Esselstyn Legislative Plans for taking the same approach as the Enacted Legislative Plans. Specifically, Mr. Morgan criticizes Esselstyn Legislative Plans for "elongating" various districts when creating new majority-Black districts, e.g., Tr. 1811:25–1812:18, but conceded that the Enacted Legislative Plans do the same thing. Tr. 1927:4–1928:25. Ms. Wright also agreed that several districts in the Enacted Legislative Plans, including EnactedSD-10, SD-44, HD-36, and HD-60, are "elongated." Tr. 1702:3–1704:1.

For these reasons, the Court is not persuaded by Mr. Morgan's testimony and conclusions that race predominated when Mr. Esselstyn drew the Esselstyn

131

Legislative Plans. The Court finds that Mr. Esselstyn consistently testified that race did not predominate when he drew his plans. Rather, he made efforts to balance traditional redistricting principles when he made districting decisions. Thus, the Court finds that race did not predominate in the drawing of the Esselstyn Legislative Plans.

### c)      **Esselstyn House Plan**

Mr. Esselstyn concluded that it was possible to drawn five additional majority-Black House districts in accordance with traditional redistricting principles. GX 1 ¶ 13.



Figure 13: Map of majority-Black districts in the illustrative House plan.

GX 1 ¶ 48 & fig.13.

### (1)   *Empirical measures*

#### (a)   <u>numerosity</u>

Esselstyn'sThe Esselstyn House Plan contains 54 majority-Black districts. GX 1 ¶ 48 & tbl. 5. The AP BVAP in all of these districts exceed 50 percent. <u>Id.</u> The majority-Black population in the majority-Black districts is 50.24%, 53.94%, 51.56%, 50.38%, and 51.53% respectively. <u>Id.</u>

133

**Table 5: Illustrative House plan majority-Black districts with BVAP percentages.**

| District | BVAP% | District | BVAP% | District | BVAP% | District | BVAP% |
|---|---|---|---|---|---|---|---|
| 38 | 54.23% | 69 | 62.73% | 91 | 60.01% | 137 | 52.13% |
| 39 | 55.29% | 74 | 53.94% | 92 | 68.79% | 140 | 57.63% |
| 55 | 55.38% | 75 | 66.89% | 93 | 65.36% | 141 | 57.46% |
| 58 | 63.04% | 76 | 67.23% | 94 | 69.04% | 142 | 50.14% |
| 59 | 70.09% | 77 | 76.13% | 95 | 67.15% | 143 | 50.64% |
| 60 | 63.88% | 78 | 51.03% | 113 | 59.53% | 145 | 50.38% |
| 61 | 53.49% | 79 | 71.59% | 115 | 53.77% | 149 | 51.53% |
| 62 | 72.26% | 84 | 73.66% | 116 | 51.95% | 150 | 53.56% |
| 63 | 69.33% | 85 | 62.71% | 117 | 51.56% | 153 | 67.95% |
| 64 | 50.24% | 86 | 75.05% | 126 | 54.47% | 154 | 54.82% |
| 65 | 63.34% | 87 | 73.08% | 128 | 50.41% | 165 | 50.33% |
| 66 | 53.88% | 88 | 63.35% | 129 | 54.87% | 177 | 53.88% |
| 67 | 58.92% | 89 | 62.54% | 130 | 59.91% | | |
| 68 | 55.75% | 90 | 58.49% | 132 | 52.34% | | |

GX 1 ¶ 48 & tbl. 5.

### (b)     population equality and contiguity

It is undisputed that the districts in the Esselstyn House Plan are all contiguous. Stip. ¶ 258.

The Esselstyn House Plan's overall population deviation is higher than the deviation range in the Enacted House Plan's. Tr. 527:11–15; DX 3, Chart 3. However, the Court finds that the Esselstyn House Plan complies with the General Assembly's population equality guidelines. Under the General Assembly's redistricting guidelines state that "[e]ach legislative district of the

134

General Assembly shall be drawn to achieve a total population that is substantially equal as practicable, considering the principles listed below." JX 2, 2.

Under the Esselstyn House Plan, all districts have a population deviation between -1.94% and +1.91%, with a mean deviation of +0.64%. GX 1, Attach. J. The district with the greatest deviation is +1.91% and the district contains 58,358 people—1,153 persons less than the ideal population. GX 1, Attach. J. Comparatively, the Enacted House Plan has a population deviation range of -1.40 to +1.34%. GX 1, Attach. I. The Court finds that the Esselstyn House Plan has a greater deviation range than the Enacted House Plan, and on average, Mr. Esselstyn's House Plan complies with the General Assembly's guideline on population equality.

### (c)  compactness scores

The Court finds that the Esselstyn House Plan and the Enacted House Plan, on the whole, are comparable. Mr. Esselstyn reported the average compactness scores for both the Enacted and Esselstyn House Plans using five measures—Reock, Schwartzberg, Polsby-Popper, Area/Convex Hull, and Number of Cut

135

Edges. GX 1   ¶¶ 36, 57 & tbls.2, 6; <u>see also</u> Tr. 475:18–476:18 (Mr. Esselstyn's testimony describing common measures of compactness).

Mr. Esselstyn further concluded that the average compactness measures for the Enacted and Esselstyn House Plans "are almost identical, if not identical." GX 1 ¶ 57 & tbl. 6; <u>see also</u> <u>Id.</u> at 135–65 (Mr. Esselstyn's expert report providing detailed compactness measures for enacted and illustrative House maps); Tr. 492:17–22 (Mr. Esselstyn's testimony describing compliance with compactness principle). Mr. Esselstyn reported those measures as follows:

**Table 6: Compactness measures for enacted and illustrative House plans.**

|  | Reock (average) | Schwartzberg (average) | Polsby-Popper (average) | Area/Convex Hull (average) | Number of Cut Edges |
|---|---|---|---|---|---|
| Enacted | 0.39 | 1.80 | 0.28 | 0.72 | 22,020 |
| Illustrative | 0.39 | 1.81 | 0.28 | 0.72 | 22,359 |

GX 1 ¶ 57 & tbl.6.

Mr. Morgan characterized the overall compactness scores of the Enacted and Esselstyn House Plans as "similar." DX 3 ¶ 50. The Court concludes that the Esselstyn House Plan is identical on Reock, Polsby-Popper, and Area/Convex

136

Hull. Id. On the Schwartzberg measure, the Enacted Plan is 0.01 more compact and the Enacted House Plan cut 339 fewer edges. GX 1 ¶ 57 & tbl.6

Consistent with both Defendants' and the Grant Plaintiffs' experts, the Court finds that the compactness scores of the two plans are "similar." Accordingly, the Court finds that the Esselstyn and Enacted House Plans are comparably compact. With respect to the maximum and minimum scores, the most compact district in the Enacted House Plan has a Reock score of 0.66 and the least compact district has a Reock Score of 0.12. GX 1, Attach. L. And on the Polsby-Popper measures, the most compact district has a score of 0.59 and the least compact district has a score of 0.10.The Esselstyn House Plan has the same metrics. Id.

With respect to the additional majority-Black districts, the Court finds that the additional majority-Black districts compactness scores all exceed 0.12 on Reock and 0.10 on Polsby-Popper, which are the lowest compactness scores in the Enacted House Plan. Id.

However, generally, the Court finds that the majority-Black House districts performed worse than the districts in the Enacted House Plan. However, none of

137

the compactness measures are below the least compact district's measures on the Enacted House Plan. The following table is derived from the data contained in attachment L to GX 1:

|  | Enacted House Plan | | Illustrative House Plan | |
|---|---|---|---|---|
| Districts | Reock | Polsby-Popper | Reock | Polsby-Popper |
| 064 | 0.37 | 0.36 | 0.22 | 0.22 |
| 074 | 0.50 | 0.25 | 0.30 | 0.19 |
| 117 | 0.41 | 0.28 | 0.40 | 0.33 |
| 145 | 0.38 | 0.19 | 0.34 | 0.21 |
| 149 | 0.32 | 0.22 | 0.46 | 0.28 |

In sum, the Court finds that on the empirical compactness measures, the majority-Black districts in the Esselstyn House Plan fall within the compactness score range of the Enacted House Plan.

### (d)   political subdivisions

The Court finds that on the whole, the Esselstyn House Plan's political subdivision splits are comparable to the Enacted House Plan's. The Enacted House Plan splits more counties and precincts than the Enacted House Plan. Tr. 528:1–5; DX 3, Chart 3.

138

Mr. Esselstyn concluded that "[w]hile the creation of three additional majority-Black State House districts involved the division of additional counties and VTDs, the differences are marginal." GX 1 ¶ 39 & tbl.4; see also Id. at 92–103 (Mr. Esselstyn's expert report providing political subdivision splits for the Enacted and Esselstyn House Plans); Tr. 487:8–14 (Mr. Esselstyn's testimony that the number of political subdivision splits in the Esselstyn and Enacted House Plans are "very similar"). He reported the splits in the Enacted and Esselstyn House Plans as follows:

**Table 8: Political subdivision splits for enacted and illustrative House plans.**

|  | Intact Counties | Split Counties | Split VTDs |
|---|---|---|---|
| Enacted | 90 | 69 | 185 |
| Illustrative | 89 | 70 | 186 |

GX 1 ¶ 59 & tbl. 8.

The Esselstyn House Plan splits one more county and VTD than the Enacted House Plan. Notably, out of 2,698 VTDs statewide, only 186 are split in Esselstyn House Plan, and in only 45 of Georgia's 159 counties. GX 1 ¶ 59 & tbl.8; Tr. 494:16–495:3. Mr. Morgan also found that the ways in which the Esselstyn House Plan splits counties, at times, fewer people are affected because he split

139

smaller counties and united some of the bigger counties. See Tr. 1887:21–1891:1.

Mr. Esselstyn's report included a histogram depicting the VTD splits in the

Esselstyn House Plan by county:

**Figure 18: VTD splits in illustrative State House plan by county.**



GX 1 ¶ 59 & fig.18.

> **(e)**   **findings of fact on the empirical measures**

In sum, the Court finds that the Esselstyn House Plan has a greater range

of population deviations than the Enacted House Plan; however, the Esselstyn

House Plan has comparable compactness scores and political subdivision splits.

140

### (2)    Core retention

The General Assembly Guidelines did not include maintaining existing State House district cores. JX 1, JX 2. Similarly, Ms. Wright testified that when drafting the Enacted House Plan, she starts with a blank map and builds out from there. 1622:11–17; 1642:7–14. She does not start by using the most recent State House map. Id. Although not an enumerated guideline, the Court finds that the Esselstyn House Plan respects the core districts of the Enacted House Plan. Mr. Esselstyn used the Enacted House Plan as a starting point and many of the districts are the same. Only 25 districts were modified, leaving the other 155 unchanged. Stip. ¶ 261; GX 1 ¶ 47; DX 3, Ex. 14. As Mr. Morgan's report confirms, nearly 94% of Georgia's population would remain in their same numbered State House district under the Esselstyn House Plan. DX 3, Ex. 7. The Court finds that the Esselstyn House Plan retained the majority of the core districts from the Enacted House Plan.

### (3)    Incumbent Pairings

Based on the record, the Court concludes that the Esselstyn House Plan complies with the districting criterion of avoiding unnecessary pairings of incumbents. See JX1, JX2. Mr. Esselstyn's preliminary injunction State House

plan was created without knowledge of incumbent addresses and paired 16 incumbents in the State House. GX 1 ¶ 61; Tr. 479:23–480:21.

The Esselstyn House Plan, submitted in his December 2022 expert report, pairs fewer incumbents than Mr. Esselstyn's initial plans. The Esselstyn House Plan would pair a total of eight incumbents in the same districts—the same number of incumbents that the Enacted House Plan paired in the same districts. GX 1 ¶ 61; Tr. 480:14–21.

Accordingly, the Court finds that the Esselstyn House Plan pairs the same number of incumbents as the Enacted House Plan; therefore, it complies with the traditional redistricting principle of avoiding pairing incumbents.

### (4)    Racial Considerations

The evidence regarding the Esselstyn Senate and House Plans was identical. Accordingly, the Court incorporates its racial predominance analysis from the Esselstyn Senate Plan Section. See Section I(H)(4)(b)(4) *supra*.

### G.    Second and Third *Gingles* Preconditions

#### 1.    *Pendergrass*: Dr. Palmer's methodology

Dr. Palmer who served as Pendergrass and Grant Plaintiffs' experts, evaluated the Black population's cohesion and white voter bloc voting using EI.

142

PX 2, GX 2. Both Dr. Palmer and Defendants' expert, Dr. Alford, testified that ecological inference ("EI") is a reliable method for conducting the second and third <u>Gingles</u> preconditions analyses. "Q. Dr. Alford, you agree that . . . the method of ecological inference Dr. Palmer applied is the best available method for estimating voting behavior by race; correct? A. Correct." Tr. 2250:12–16; "Q. Do scholars and experts regularly use EI to examine racially polarized voting? A. Yes?" Tr. 401: 7–9. EI "estimates group-level preferences based on aggregate data." PX 2 ¶ 13. The data analyzed under EI also includes confidence intervals, which measure the uncertainty of results. <u>Id.</u> at n. 12.

Dr. Palmer conducted a racially polarized voting analysis of Enacted CD-3, 6, 11, 13, and 14, both as a region (the "congressional focus area") and individually. Stip. ¶ 214; PX 2 ¶ 7; Tr. 413:18–414:5.

143



Figure 1: Map of the Focus Area

PX 2 ¶ 11 & fig.1.

Dr. Palmer evaluated Black and white voters' choices in the congressional

focus area that voted for each candidate in 40 statewide elections between 2012

144

and 2022. Stip. ¶ 217; PX 2 ¶¶ 13, 15. Dr. Palmer's EI analysis relied on precinct-level election results and voter turnout by race, as compiled by the State of Georgia. PX 2 ¶ 11; Tr. 403:2–13.

Dr. Palmer first examined each racial group's support for each candidate to determine if members of the group voted cohesively in support of a single candidate in each election. PX 2 ¶ 14. If a significant majority of the group supported a single candidate, he then identified that candidate as the group's candidate of choice. Id. Dr. Palmer next compared the preferences of white voters to the preferences of Black voters. Id. He concluded that evidence of racially polarized voting is found when Black voters and white voters support different candidates. Id.

### 2.   *Alpha Phi Alpha: Dr. Handley's methodology*

Dr. Handley, Alpha Phi Alpha's expert, analyzed voting patterns by race in seven areas of Georgia where the Cooper Legislative Plans created additional majority-Black districts. Tr. 861:21-25; APAX 5, 2; Stip. ¶ 307. As part of that analysis, she considered whether Black voters had the opportunity to elect

145

candidates of their choice in these areas under the Cooper Legislative Plans as compared to the Enacted Legislative Plans. See Tr. 862:22-863:5; APAX 5, 2, 12.

Dr. Handley stated that these seven areas in Georgia are where "districts that offered Black voters opportunities to elect their candidates of choice could have been drawn and were not drawn when you compare the illustrative to the adopted plan." Tr. 861:21-25. Dr. Handley named these seven areas the Eastern Atlanta Metro Region, the Southern Atlanta Metro Region, East Central Georgia with Augusta, the Southeastern Atlanta Metro Region, Central Georgia, Southwest Georgia, and the Macon Region. See APAX 5, 8-9; Tr. 869:13-25.

The first area Dr. Handley analyzed—the Eastern Atlanta Metro Region—encompasses Cooper SD-10, SD-17, SD-43 and Enacted SD-10, SD-17, SD-43 ( DeKalb, Henry, Morgan, Newton, Rockdale, and Walton Counties). Stip. ¶ 309; APAX 5, 8, 17-18. The second area—the Southern Atlanta Metro Region—encompasses Cooper SD-16, SD-28, SD-34, and SD-39 and Enacted SD-16, SD-28, SD-34, and SD-44 (Clayton, Coweta, Douglas, Fayette, Heard, Henry, Lamar, Pike, and Spalding Counties). Stip. ¶ 310; APAX 5, 8, 19-20.

146

The third area—the East Central Georgia Region—encompasses Cooper SD-22, SD-23, SD-26, and SD-44 and Enacted SD-22, SD-23, SD-25, and SD-26 (Baldwin, Bibb, Burke, Butts, Columbia, Emanuel, Glascock, Hancock, Henry, Houston, Jasper, Jefferson, Jenkins, Johnson, Jones, Lamar, McDuffie, Monroe, Morgan, Putnam, Richmond, Screven, Taliaferro, Twiggs, Walton, Warren, Washington, Wilkes, and Wilkinson Counties). Stip. ¶ 311; APAX 5, 9, 21-22. The fourth area—Southeastern Atlanta Metro Region—encompasses Cooper HD-74, HD-75, HD-78, HD-115, HD-116, HD-117, HD-118, HD-134, and HD-135 and Enacted HD-74, HD-75, HD-78, HD-115, HD-116, HD-117, HD-118, HD-134, and HD-135 (Butts, Clayton, Fayette, Henry, Jasper, Lamar, Monroe, Pike, Putnam, Spalding, and Upson Counties). Stip. ¶ 312; APAX 5, 9, 23-24. The fifth area—Central Georgia—encompasses Cooper HD-128, HD-133, HD-144, and HD-155 and Enacted HD-128, HD-133, HD-149, and HD-155 (Baldwin, Bibb, Bleckley, Dodge, Glascock, Hancock, Jefferson, Johnson, Jones, Laurens, McDuffie, Taliaferro, Telfair, Twiggs, Warren, Washington, Wilkes, and Wilkinson Counties). Stip. ¶ 313; APAX 5, 9, 26-27.

147

The sixth area—Southwest Georgia—encompasses Cooper HD-152, HD-153, HD-171, HD-172, and HD-173 and Enacted HD-152, HD-153, HD-171, HD-172, and HD-173 (Colquitt, Cook, Decatur, Dougherty, Grady, Lee, Mitchell, Seminole, Stewart, Terrell, Thomas, Tift, Webster, and Worth Counties). Stip. ¶ 314; APAX 5, 9, 28-29. The seventh area—the Macon Region—encompasses Cooper HD-142, HD-143, and HD-145 and Enacted HD-142, HD-143, and HD-145 (Bibb, Crawford, Houston, Peach, and Twiggs Counties). Stip. ¶ 315; APAX 5, 9, 30-31.

Dr. Handley employed three commonly used, well-accepted statistical methods to conduct her racially polarized voting analysis: homogeneous precinct

analysis,[33] ecological regression[34], and EI.[35] Tr. 864:17-21, 868:10-12; APAX 5, 3-4;

Stip. ¶ 308. With these three statistical methods, she calculated estimates of the

percentage of Black and white voters who voted for candidates in recent

statewide general elections and State legislative general elections in the seven

areas. Tr. 863:21-864:25, 862:22-863:5. Dr. Handley uses homogeneous precinct

analysis and ecological regression to check the estimates produced by EI.

Tr. 868:7-9. When "they all come up with very similar estimates," Dr. Handley

testified that she can be confident in those estimates. Id.

---

[33] Homogeneous precinct analysis and ecological regression have been used for approximately 40 years. Tr. 864:17-20. These analytic tools were employed by the plaintiffs' expert in Gingles and were accepted by the Supreme Court. APAX 5, 4; Gingles, 478 U.S. at 52–53, 80.

[34] Ecological regression (ER), uses information from all precincts, not simply the homogeneous ones, to derive estimates of the voting behavior of minorities and whites. If there is a strong linear relationship across precincts between the percentage of minorities and the percentage of votes cast for a given candidate, this relationship can be used to estimate the percentage of minority voters supporting the candidate. APAX 5, 3.

[35] Dr. Handley used two forms of EI called "King's EI" and "EI RxC." Tr. 873:18-21. APAX 5, 4-5. Defendant's expert, Dr. John Alford, agrees that EI RxC is "the best of the statistical methods for estimating voting behaviors." Tr. 2215:23-25.

149

Dr. Alford has "no concerns with [Dr. Handley's] use of EI RxC in her most recent [December 23, 2022] report." Tr. 2216:1-3. He "[does not] question her ability," and agrees that "her new report, most recent report, relies on methods that . . . are acceptable." Id. at 2220:21, 2216:13-17. Dr. Alford has "no concerns about the data that went into Dr. Handley's statistical analysis in this case[.]" Tr. 2221:5-7.

Dr. Handley evaluated 16 recent (2016-2022) general and runoff statewide elections, including for U.S. Senate, Governor, School Superintendent, Public Service Commission, and Commissioners of Agriculture, Insurance, and Labor. APAX 5, 6; Stip.   ¶¶ 316-317. She also looked at 54 recent (2016-2022) State legislative elections in the areas of interest, including 16 State Senate contests and 38 State House contests. Tr. 890:2-12; APAX 5, at 7-8; Stip. ¶ 324. All 2022 State legislative contests in the Enacted Legislative Plans identified as districts of interest were analyzed, even if the contest did not include at least one Black candidate. APAX 5, at 7-8. In addition, because there has only been one set of State legislative elections (2022) under the Enacted Plans, Dr. Handley also analyzed biracial State legislative elections conducted between 2016 and 2020 in

150

the State legislative districts under the previous State House and State Senate plans that are located within the seven areas of interest. Id.

Dr. Handley also examined 11 statewide Democratic primaries. Tr. 879:25-880:2. She examined those because "we have a two-part election system here and you have to make it through the Democratic primary to make it into the general election" and, in some jurisdictions, primaries are the operative barrier for Black-preferred candidates, so Dr. Handley "would always look at both." Id. at 892:22-893:8. With regard to the areas of interest in this litigation, Dr. Handley concluded that the Democratic primaries were "not a barrier" for Black-preferred candidates to win elections, and Dr. Handley rested her opinions of racially polarized voting in the areas of interest on the general elections. Id. at 894:13-22. Dr. Handley did not evaluate whether Democratic primaries are the barrier to electing Black-preferred candidates outside the areas of interest. Id. at 894:23-895:1.

### 3. _Grant_: Dr. Palmer's methodology

Dr. Palmer, who served as the Pendergrass Plaintiffs' expert on political cohesion and voter polarization also served as the Grant Plaintiffs' expert.

151

Dr. Palmer used the same EI method as that used in <u>Pendergrass</u>. Tr. 418:21–25. Dr. Palmer conducted a racially polarized voting analysis of five different legislative focus areas. Stip. ¶ 262; GX 2 ¶ 10; Tr. 403:21–404:5. His EI analysis relied on precinct-level election results and voter turnout by race, as compiled by the State of Georgia. GX 2 ¶ 13; Tr. 403:2–13. Dr. Palmer analyzed two focus areas for the Enacted Senate Plan.

In the Black Belt, Dr. Palmer evaluated Enacted SD-22, SD-23, SD-24, SD-25, and SD-26 ("Palmer's senate Black Belt focus area"). These districts include Baldwin, Burke, Butts, Columbia, Elbert, Emanuel, Glascock, Greene, Hancock, Hart, Jasper, Jefferson, Jenkins, Johnson, Jones, Lincoln, Mcduffie, Oglethorpe, Putnam, Richmond, Screven, Taliaferro, Twiggs, Warren, Washington, Wilkes, and Wilkinson Counties and parts of Bibb, Henry, and Houston Counties. Tr. 403:21–404:5; GX 2 ¶ 12; Stip. ¶ 265. In south-metro Atlanta Dr. Palmer evaluated Enacted SD-10, SD-16, SD-17, SD-25, SD-28, SD-34, SD-35, SD-39, and SD-44. These districts include Baldwin, Butts, Clayton, Coweta, Fayette, Heard, Jasper, Jones, Lamar, Morgan, Pike, Putnam, and Spalding Counties and parts of

152

Bibb, DeKalb, Douglas, Fulton, Henry, Newton, and Walton Counties. Tr. 403:21–404:5; GX 2 ¶ 12; Stip. ¶ 265.



GX 2 ¶ 12 & fig.1.

Dr. Palmer analyzed three focus areas for the State House Plan. In the Black Belt, Dr. Palmer evaluated Enacted HD-133, HD-142, HD-143, HD-145, HD-147, and HD-149. These districts include Bleckley, Crawford, Dodge, Twiggs, and Wilkinson Counties and parts of Baldwin, Bibb, Houston, Jones, Monroe, Peach, and Telfair Counties. Tr. 403:21–404:5; GX 2 ¶ 11; Stip. ¶ 264. In south-metro

Atlanta, Dr. Palmer evaluated Enacted HD-69, HD-74, HD-75, HD-78, HD-115, and HD-117. These districts include parts of Clayton, Fayette, Fulton, Henry, and Spalding Counties. Tr. 403:21–404:5; GX 2 ¶ 11; Stip. ¶ 264. Finally, in west-metro Atlanta, Dr. Palmer evaluated Enacted HD-61 and HD-64. These districts include parts of Douglas, Fulton, and Paulding Counties. Tr. 403:21–404:5; GX 2 ¶ 11; Stip. ¶ 264.



GX 2 ¶ 12 & fig.1.

Dr. Palmer first examined each racial group's support for each candidate to determine if members of the group voted cohesively in support of a single candidate in each election. GX 2 ¶ 16. If a significant majority of the group supported a single candidate, he then identified that candidate as the group's candidate of choice. Id. Dr. Palmer next compared the preferences of white voters to the preferences of Black voters. Id. He concluded that there was evidence of racially polarized voting when he found that Black voters and white voters support different candidates. Id. Defendants' expert, Dr. Alford, did not contest Dr. Palmer's methodology. Tr. 2145:23–2146:1, 2215:17–25.

**H.** **Georgia's History of Voting and Recent Electoral Developments**

### 1. Credibility Determinations

The Court makes the following credibility determinations as it relates to the experts on the Senate Factors.

a)      **Dr. Orville Vernon Burton**

The <u>Grant</u> and <u>Pendergrass</u> Plaintiffs[36] proffered and the Court qualified Dr. Burton as an expert on history of race discrimination and voting. Tr. 1419:14–17, 1424:8–9. Dr. Burton earned his undergraduate degree from Furman University in 1969 and his doctorate in American history from Princeton University in 1976. PX 4, 5. Dr. Burton has taught American history at various universities since 1971. <u>Id.</u> Currently, he serves as the Judge Matthew J. Perry Distinguished Professor of History and Professor of Global Black Studies, Sociology and Anthropology, and Computer Science at Clemson University. <u>Id.</u> at 6. Dr. Burton is the author or editor of more than 20 books and 300 articles. <u>Id.</u> Dr. Burton has received numerous awards based on his research. <u>Id.</u>

Dr. Burton also has connections to the state of Georgia. He was born in Madison County, Georgia and is a recognized authority on Morehouse College's

_____

[36] The Parties consented to allow Dr. Burton's trial testimony, the portions of his report that were directly referenced in the trial, and PX 14, GX 15, DX 107 to apply across all three cases. Tr. 1464:10–23, 1505:11–1506:1.

former President Dr. Benjamin E. Mays. He has also written a book about an area in South Carolina that has strong ties to the city of Augusta, Georgia. Id. 6.

Dr. Burton has been retained as an expert witness and consultant in numerous voting rights case over the past forty years. Id. 7. Specifically, he was qualified as an expert on social and economic status, discrimination, historical intent in voting rights cases, and group voting behavior. Id. His testimony has been accepted and relied upon by various federal courts. Id. 7–8.

At the preliminary injunction, the Court found "Dr. Burton to be highly credible. His historical analysis was thorough and methodologically sound" and his "conclusions [were found] to be reliable." Alpha Phi Alpha Fraternity, 587 F. Supp. 3d at 1315. Having observed Dr. Burton's demeanor and testimony, the Court finds that Dr. Burton's testimony is highly credible. Dr. Burton answered all questions on direct-examination and cross-examination thoroughly. Dr. Burton engaged in an extensive colloquy with the Court on the history of voting and race that expounded upon information that was in his report. Accordingly, the Court finds that his testimony is highly credible and extremely

helpful to the Court. Thus, the Court will assign great weight to Dr. Burton's testimony.

### b)     Dr. Loren Collingwood

The Grant and Pendergrass Plaintiffs proffered and the Court qualified Dr. Collingwood as an expert in political science, applied statistics, and demography. Tr. 671:18–21, 673:5–7. Dr. Collingwood received his Bachelor of Arts from California State University, Chico in 2002 and his Ph.D. in political science with a concentration in political methodology and applied statistics from the University of Washington in 2012. PX 5, 2. Currently, he serves as an associate professor of political science at the University of New Mexico. Id. Previously, he was an associate professor of political science and co-director of civic engagement at the Center for Social Innovation at the University of California, Riverside. Id. He has published two books, 39 articles, and nearly a dozen book chapters on sanctuary cities, race/ethnic politics, election administration, and racially polarized voting. Id. Dr. Collingwood has served as an expert witness in seven redistricting cases. Id. He has also served as an expert witness in three other voting related cases. Id.

158

In the preliminary injunction order, the Court found that Dr. Collingwood was "qualified to opine as an expert on demographics and political science. The Court f[ound] Dr. Collingwood to be credible, his analysis methodologically sound, and his conclusions reliable." <u>Alpha Phi Alpha Fraternity</u>, 587 F. Supp. 3d at 1318.

Having observed Dr. Collingwood's demeanor and testimony, the Court finds that his testimony was internally consistent and he was able to thoroughly answer questions on direct and cross examination. Thus, the Court finds Dr. Collingwood to be highly credible and will assign great weight to his testimony.

### c)   **Dr. Adrienne Jones**

The <u>Alpha Phi Alpha</u> Plaintiffs [37] proffered and the Court qualified Dr. Jones as an expert in history of voting rights, voting-related discrimination, race and politics, and Black political development, but not various sections of the

---

[37] The Parties consented to allow Dr. Jones's trial testimony, the portions of her report that were directly referenced in the trial, and APAX 31, 266, DX 59 to apply across all three cases. Tr. 1244:10–1245:8, 1504:18–1505:10.

Civil Rights Act. Tr. 1149:8–11, 1158:2–5.Dr. Adrienne Jones received her Bachelor of Arts in Modern Culture and Media (Semiotics) from Brown University, her Juris Doctor from the University of California at Berkley, her Masters and Ph.D. in political science from City University of New York Graduate Center. APAX 2, 4. Currently, Dr. Jones is an assistant professor of political science at Morehouse College in Atlanta, Georgia where she teaches political science and also serves as the Pre-Law Director. Id. at 4. Dr. Jones has written a doctoral dissertation and two peer-reviewed articles on the Voting Rights Act. Id. She is currently writing a book on the VRA. Id.

In addition to this case, Dr. Jones served as an expert witness in Fair Fight Action v. Raffensperger, 634 F. Supp. 3d. 1128 (N.D. Ga. 2022), which was decided by this Court. In Fair Fight, the Court credited Dr. Jones's testimony as it related to the historical backdrop pertinent to Section 2 of the VRA. Id. at 1171. The Court gave less weight to the testimony regarding matters that occurred after 1990 and present voting practices. Id.

Having observed Dr. Jones's demeanor and testimony, the Court finds that her testimony was internally consistent and she was able to thoroughly answer

160

questions on direct and cross examination that relate to the topics that she was qualified. The Court notes that on *voir dire*, Dr. Jones's testimony regarding various aspects of the Civil Rights Act were inconsistent with current law. Accordingly, the Court assigns little to no weight to testimony about the legal requirements under the Civil Right Act, to which Dr. Jones was not qualified as an expert. As to the portions of Dr. Jones's testimony for which she was qualified to testify, the Court finds it highly credible and will assign great weight to that testimony.

### d)      Dr. Traci Burch

The Alpha Phi Alpha Plaintiffs proffered and the Court qualified Dr. Burch as an expert on in political science, political participation and barriers to voting. Tr. 1041:25-1042:2, 1046:9-13. Dr. Burch has been an associate professor of political science at Northwestern University and a research professor at the American Bar Foundation since 2007. Tr. 1035:4-9. Dr. Burch received her Ph.D. in government and social policy from Harvard University, and her undergraduate degree in politics from Princeton University. Tr. 1034:19-1035:3.

Dr. Burch has published numerous peer-reviewed publications and a book on political participation, including publications focusing on Georgia, and she teaches several courses related to voting and political participation. Tr. 1036:12-18, 1037:15-1038:2. Dr. Burch has received several prizes and awards, including national prizes, for her book and her dissertation. Tr. 1037:2-14. She has served as a peer reviewer for flagship scholarly journals in her field of political science. Tr. 1036:19-24. Dr. Burch's research and writing involves conducting data analysis on voter registration files and voter turnout data. Tr. 1038:8-1039:1.

Dr. Burch has previously testified as an expert in six other cases, including voting rights cases where she offered expert testimony relating to a Senate Factor or the Arlington Heights framework. Tr. 1039:4-1040:23. Dr. Burch was qualified to serve as an expert in all of the cases in which she has testified. Tr. 1040:24-1041:1.

In preparing her report, Dr. Burch relied on sources and methodologies that are consistent with her work as a political scientist. Tr. 1047:23-1048:9; APAX 6, at 4. The Court finds Dr. Burch credible, her methodology sound, and her

162

conclusions reliable. Accordingly, the Court credits Dr. Burch's testimony and conclusions.

### e)      Dr. Jason Morgan Ward

The Alpha Phi Alpha Plaintiffs proffered and the Court qualified Dr. Ward as an expert in the history of Georgia and the history of racial politics in Georgia. Tr. 1333:17-19, 1335: 3-7. Dr. Ward has been a professor of history and at Emory University since 2018. Tr. 1331:1-4. He received his Ph.D., M.Phil, and M.A. in history from Yale University, and his undergraduate degree in history with honors from Duke University. Tr. 1330:17-19. Dr. Ward wrote his dissertation on civil rights and racial politics during the mid-20th century. Tr. 1330:20-24.

Dr. Ward has published numerous peer-reviewed publications and two books about the history of racial politics and violence in the South, including Georgia. Tr. 1332:17-1333:10; APAX 4, at 28-29. Dr. Ward has taught courses on the history of the modern United States, civil rights, race and politics, political violence and extremism, including courses that cover the history of racial politics in Georgia. Tr. 1331:2 — 1332:16.

163

In preparing his report, Dr. Ward relied on sources and methodologies that he would typically employ as a historian undertaking a historical analysis. Tr. 1335:17-1336:3. The Court finds Dr. Ward credible, his methodology for historical analysis sound, and his conclusions reliable. Accordingly, the Court credits Dr. Ward's testimony and conclusions.

### 2. *Analysis*

Given the widely overlapping nature of the evidence adduced in the three different cases and to avoid confusion about what evidence applies to which case, the Court will address its factual findings as they relate to the Senate Factors and the totality of the circumstances below in the conclusion of law section.

## II.   CONCLUSIONS OF LAW

### A.   <u>Jurisdictional Considerations</u>

In the Pretrial Order, Defendants raised affirmative defenses regarding constitutional and statutory standing. <u>APA</u> Doc. No. [280] at 23; <u>Grant</u> Doc. No. [243], 26; <u>Pendergrass</u> Doc. No. [231], 28. The Court now addresses these affirmative defenses and determines that, with the exception of claims against the SEB, Plaintiffs in all three cases have standing to bring these suits.

164

### 1.   *Constitutional Standing*

Article III of the United States Constitution limits the courts to hearing actual "Cases" and "Controversies." U.S. Const. art. III, § 2; see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 559–60 (1992). Overall, the standing requirement arising out of Article III seeks to uphold separation-of-powers principles and "to prevent the judicial process from being used to usurp the powers of the political branches." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013) (citations omitted).

> To establish standing, a plaintiff must show three things:
>
> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan, 504 U.S. at 560–61 (internal quotations, citations, and alterations omitted).

The standing challenges specifically identified by Defendant are as to (1) claims

by Plaintiff Sixth District AME (in <u>Alpha Phi Alpha</u>), and (2) claims against Defendant SEB (in <u>Grant</u> and <u>Pendergrass</u>).

### a)    <u>Claims by the Sixth District AME</u>

An organization may establish injury by invoking "associational standing," which is established by proof that the organization's members "would otherwise have standing to sue in their own right[.]" <u>Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.</u>, 528 U.S. 167, 181 (2000). The Parties stipulate that the Sixth District AME has more than 500 member-churches in Georgia and that the member-churches of the Sixth District AME have tens of thousands of members across Georgia. Stip. ¶¶ 59–60. Sixth District AME specifically has churches located in Enacted SD- 16, SD-17, and SD-23 as well as in Enacted HD-74, HD-114, HD-117, HD-128, HD-1h33, HD-134, HD-145, HD-171, and HD-173. Stip. ¶¶ 61.

While the Defendant presented no argument on the associational standing issue by motion or at trial, it did propose the following conclusion of law after conclusion of the trial:

> This Court determines that Plaintiff Sixth District of the African Methodist Episcopal Church does not have

166

> associational standing because it has not established that
> it has individual members who are voters impacted by
> the enacted redistricting plans, but rather its
> membership consists of member churches. Churches do
> not vote and thus cannot have an injury for the district in
> which the churches reside.

APA Doc. No. [317] ¶ 147. However, in that same filing, Defendant conceded that

Alpha Phi Alpha (as a named Plaintiff) has associational standing and that the

individual plaintiffs have standing as to the districts in which they reside. Id. ¶

145. Therefore, as a jurisdictional matter, it is unnecessary for the court to

determine whether Sixth District AME h has standing. See Vill. of Arlington

Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 n.9 (1977) ("Because of the

presence of this plaintiff [who has demonstrated standing], we need not consider

whether the other individual and corporate plaintiffs have standing to maintain

the suit."); Am. Civil Liberties Union of Ga. v. Rabun Cnty. Chamber of Comm.,

Inc., 698 F.2d 1098, 1108–09 (11th Cir. 1983) ("Because we have determined that

at least these two individuals have met the requirements of Article III, it is

unnecessary for us to consider the standing of the other plaintiffs in this action.");

see also Town of Chester v. Laroe Estates, Inc., 581 U.S. 433, 439 (2017) ("At least

167

one plaintiff must have standing to seek each form of relief requested in the complaint.").

Here, it is unchallenged that the individual plaintiffs and <u>Alpha Phi Alpha</u> have constitutional standing to challenge the districts at issue in this suit. <u>Alpha Phi Alpha</u> Defendant's single proposed conclusion of law regarding applicability of associational standing to the final plaintiff, Sixth District AME, thereby is insufficient for the Court to further consider Defendant's affirmative defense as to this one plaintiff.

### b) <u>Claims against the SEB</u>

In moving for summary judgment, the <u>Grant</u> and <u>Pendergrass</u> Defendants argued that the <u>Grant</u> and <u>Pendergrass</u> Plaintiffs' injuries are not fairly traceable to or redressable by the SEB. <u>Grant</u> Doc. No. [190-1], 17-19; <u>Pendergrass</u> Doc. No. [175-1], 12-14. In denying the Motions for Summary Judgment, the Court acknowledged that <u>Pendergrass</u> and <u>Grants</u> Plaintiffs failed to adduce facts to support a finding of traceability of their injuries to the SEB. Nevertheless, when taking all inferences in the light most favorable to the <u>Pendergrass</u> and <u>Grant</u> Plaintiffs as nonmovants, the Court found that the broad language of the Georgia

168

statutes delineating the SEB's duties and roles in elections was sufficient to allow them to proceed to trial against the SEB. <u>Grant</u> Doc. No. [229], 28; <u>Pendergrass</u> Doc. No. [215], 26.

At trial, despite bearing the burden of proof and the Court's prompting in the summary judgement orders, <u>Pendergrass</u> and <u>Grant</u> Plaintiffs presented no evidence from which the Court could conclude that their injuries are traceable to the SEB.[38] Therefore, the Court concludes that the <u>Grant</u> and <u>Pendergrass</u> Plaintiffs lack standing to raise their claims against the SEB.[39]

_____

[38] Unlike reliance on the standing of at least one other plaintiff to find that all named Plaintiffs in <u>Alpha Phi Alpha</u> have standing, there is no authority to support reliance on standing against one named defendant to support standing as to other defendants. Therefore, the Court's reasoning with regarding to claims by Sixth District AME in <u>Alpha Phi Alpha</u> does not apply to claims brought against SEB in <u>Grant</u> and <u>Pendergrass</u>.

[39] Because the Secretary of State is a named defendant in both <u>Grant</u> and <u>Pendergrass</u>, the absence of standing with regard to claims against the SEB does not alter the relief available to Plaintiffs. The Secretary of State is responsible for administering the elections, therefore, the Court can "enjoin the holding of elections pursuant to the [Enacted] plan . . . and subsequently require elections to be conducted pursuant to a [legal] apportionment system . . . ." <u>Larios v. Perdue</u>, 306 F. Supp. 2d 1190, 1199 (N.D. Ga. 2003).

### 2. *Statutory Standing*

The question of statutory standing turns on whether the "statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." <u>Warth v. Seldin</u>, 422 U.S. 490, 500 (1975). The Supreme Court has clarified that the term "statutory standing" is "misleading, since the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case." <u>Lexmark Int'l, Inc. v. Static Control Components, Inc.</u>, 572 U.S. 118, 128 n.4 (2014) (cleaned up). Under <u>Lexmark</u>, the question is whether the plaintiff "has a cause of action under the statute." <u>Id.</u> at 128. The Court went on to explain that "a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." <u>Id.</u> at 129 (cleaned up).

In the cases before the Court, Defendants have done nothing more than assert an affirmative defense that Plaintiffs' lack statutory standing. Because the question of statutory standing is not jurisdictional, the Court has no obligation to

delve into the issue without benefit of argument or evidence from Defendants. Moreover, the Court has already determined that a private right of action under Section 2 exists. See APA Doc. No. [65], 31–34; Grant Doc. No. [43], 30–33; Pendergrass Doc. No. [50], 17–20; see also Allen, 599 U.S. Ct. at 41 (affirming a preliminary injunction order, Singleton v. Merrill, 582 F. Supp. 3d 924,1031–32 (N.D. Ala. 2022), which analyzed whether Section 2 provided a private right of action). Therefore, the Court has no difficulty concluding that Defendants have failed to carry their burden of establishing their affirmative defense based on statutory standing and rejects this affirmative defense.

### B.   Legal Standards

#### 1.   First *Gingles* Precondition

Under the first Gingles precondition, Plaintiffs must prove that the minority group exceeds 50% in the challenged area and that the minority group is sufficiently compact to draw a reasonably configured district. Wisc. Legis. v. Wisc. Elections Comm'n, 595 U.S. 398, 400, (2022). Ct. "A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact." Allen, 599 U.S. at 18 (citing Ala. Legis. Black Caucus, 575 U.S. at 272). To determine whether Plaintiffs have met

171

the numerosity and compactness requirements, the Court must evaluate the specific challenged district and not the state as a whole. Cf. Ala. Legis. Black Caucus, 575 U.S. at 268 ("[T]he District Court's analysis of racial gerrymandering of the State, [under [the Equal Protection Clause], 'as a whole' was legally erroneous.").[40]

### 2.      *Second and Third Gingles Precondition*

The second Gingles precondition requires the Plaintiffs to show that "the minority group . . . is politically cohesive." Gingles, 478 U.S. at 51. The third Gingles precondition requires the Plaintiffs to show that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate." Id.

### 3.      *Totality of the Circumstances: Senate Factors*

In a Section 2 case, after evaluating the Gingles preconditions, the final assessment to determine whether vote dilution has actually occurred requires

---

[40] Although Alabama Legislative Black Caucus concerned constitutional redistricting challenges, the Supreme Court applied its analysis to a Section 2 challenge in Allen. Allen, 143 S. Ct. at 1503, 1519.

172

"assess[ing] the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors." <u>Gingles</u>, 478 U.S. at 44 (citations omitted). To do so, the Court looks at the VRA's 1982 Amendments' Senate Report, which specifies the factors relevant for a Section 2 analysis. "The totality of circumstances inquiry recognizes that application of the <u>Gingles</u> factors is 'peculiarly dependent upon the facts of each case.'" <u>Allen</u>, 599 U.S. at 19 (quoting <u>Gingles</u>, 478 U.S. at 79). The totality of the circumstances' inquiry is fact intensive and requires weighing and balancing various facts and factors, which is generally inappropriate on summary judgment. <u>See</u> <u>Rose v. Raffensperger</u>, 1:20-cv-2921-SDG, 2022 WL 670080, at *2 (N.D. Ga. Mar. 7, 2022) ("[T]he Court . . . cannot appropriately evaluate the totality of the circumstances before trial.").

### C.   <u>Congressional District</u>

The Court finds that <u>Pendergrass</u> Plaintiffs successfully carried their burden in establishing that an additional majority-minority congressional district could be drawn in the west-metro Atlanta.

#### 1.   *First <u>Gingles</u> Precondition*

<u>Pendergrass</u> Plaintiffs have proven that they meet the first <u>Gingles</u> precondition. The first <u>Gingles</u> precondition requires plaintiffs to prove that the

173

"minority group [is] sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." Wisc. Legis., 595 U.S. at 402 (per curiam) (citing Gingles, 478 U.S. at 50–51). "A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact." Allen, 599 U.S. at 18 (citing Ala. Legis. Black Caucus v. Alabama, 575 U.S., 254, 272 (2015). The first Gingles precondition focuses on the "need[] to establish that the minority [group] has the potential to elect a representative of [their] own choice in some single-member district. Growe v. Emison, 507 U.S. 25, 40 (1993).

### a)   Numerosity

First, Pendergrass Plaintiffs have shown, both at the preliminary injunction and trial that Georgia's Black population is sufficiently large to constitute a majority in an additional congressional district in west-metro Atlanta. "[A] party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." Bartlett v. Strickland, 556 U.S. 1, 20 (2009).

174

Mr. Cooper drew an illustrative plan that contains an additional majority-Black congressional district in west-metro Atlanta that balanced traditional redistricting criteria. Mr. Cooper submitted a similarly configured district at the preliminary injunction. DX 154. The Court instantly discusses both configurations for the purpose of showing that the population in this area of the State is sufficiently numerous because a majority-Black congressional district can be drawn in more than one way, contrary to Defendants submissions. See Feb. 7, 2022, Morning PI Tr. 21:5:8 ("[W]hile these are illustrative plans, the way they are configured are so tight in terms of population, there's not really a whole lot of different ways to configure[.]"); Tr. 1806:2–19 (Mr. Morgan discussing that various districts in the Illustrative Plans are barely over 50% and took population from existing majority-Black districts to achieve the numerosity requirement). Illustrative CD-6 submitted both at the preliminary injunction hearing and at the trial (which was configured in Mr. Cooper's December 5, 2022 Report) have an AP BVAP of 50.23%. Stip. ¶ 192; DX 20, 51 fig.9; PX 1, 73, fig.14.

**Figure 9**
**BVAP and BCVAP Comparison in the Eight Modified Districts:**
**Illustrative Plan and 2021 Plan**

| District | Illustrative Plan | | | 2021 Plan | |
|---|---|---|---|---|---|
| | % BVAP | % NH BCVAP | | % BVAP | % NH BCVAP |
| 03 | 20.92% | 20.40% | | 23.32% | 22.82% |
| 04 | **52.40%** | **55.48%** | | **54.52%** | **58.04%** |
| 06 | **50.23%** | **50.69%** | | **9.91%** | **10.00%** |
| 09 | 11.66% | 11.66% | | 10.42% | 10.38% |
| 10 | 14.31% | 15.38% | | 22.60% | 22.56% |
| 11 | 13.27% | 13.30% | | 17.95% | 18.09% |
| 13 | **51.40%** | **50.05%** | | **66.75%** | **66.88%** |
| 14 | 5.17% | 5.14% | | 14.28% | 13.38% |

DX 154 ¶ 51 fig.9 (preliminary injunction).

**Figure 14**
**BVAP and BCVAP Comparison: Illustrative Plan and 2021 Plan**

| District* | Illustrative Plan | | | | 2021 Plan | | |
|---|---|---|---|---|---|---|---|
| | % BVAP | % NH BCVAP | % NH DOJ BCVAP | | % BVAP | % NH BCVAP | % NH DOJ BCVAP |
| 1 | 28.17% | 29.16% | 29.67% | | 28.17% | 29.16% | 29.67% |
| 2 | 49.29% | 49.55% | 50.001% | | 49.29% | 49.55% | 50.001% |
| 3 | 20.47% | 19.64% | 20.02% | | 23.32% | 22.53% | 22.86% |
| 4 | **52.77%** | **55.62%** | **56.37%** | | **54.52%** | **57.71%** | **58.46%** |
| 5 | 49.60% | 51.64% | 52.35% | | 49.60% | 51.64% | 52.35% |
| 6 | **50.23%** | **50.18%** | **50.98%** | | **9.91%** | **9.72%** | **10.26%** |
| 7 | 29.82% | 31.88% | 32.44% | | 29.82% | 31.88% | 32.44% |
| 8 | 30.04% | 30.46% | 30.76% | | 30.04% | 30.46% | 30.76% |
| 9 | 11.66% | 11.29% | 11.74% | | 10.42% | 10.03% | 10.34% |
| 10 | 14.31% | 15.09% | 15.39% | | 22.60% | 22.11% | 22.56% |
| 11 | 13.67% | 12.91% | 13.48% | | 17.95% | 17.57% | 18.30% |
| 12 | 36.72% | 36.60% | 37.19% | | 36.72% | 36.60% | 37.19% |
| 13 | **51.13%** | **49.64%** | **50.34%** | | **66.75%** | **66.36%** | **67.05%** |
| 14 | 5.17% | 4.80% | 5.19% | | 14.28% | 13.19% | 13.71% |

*Bold font identifies districts that are changed from the 2021 Plan configuration.

176

PX 1 ¶ 73 fig, 14 (trial plan).

The fact that Mr. Cooper has now successfully created two districts in this area exceeding 50% BVAP (one for the preliminary injunction hearing and one for the trial) despite changing the boundaries of the illustrative district, [41] supports that the Black voting age population is sufficiently numerous in this area. Compare DX 20 ¶ 51, fig.9 (BVAP is 50.23%), with PX 1 ¶ 73, fig.14 (BVAP is 50.23%).

---

[41] Although both maps are similar, the primary differences between the two configurations of Illustrative CD-6 are that in the preliminary injunction map, (1) Illustrative CD-6 did not keep Douglas County whole and (2) the southeastern part of the district reached into Fayetteville. Compare DX 154, Ex. K, with PX 1, Ex. I-2.



DX 154, Ex. K (preliminary injunction).



PX 1, I-2 (trial).

178

Accordingly, the Court concludes that Plaintiffs have shown that Georgia's Black population is large enough to constitute a majority in an additional congressional district in west-metro Atlanta.

### b)   Compactness

The Court further concludes that Pendergrass Plaintiffs have shown that Georgia's Black population in west-metro Atlanta is geographically compact to comprise a majority of the voting age population in an additional congressional district. Under the compactness requirement of the first Gingles precondition, plaintiffs must show that it is "possible to design an electoral district[] consistent with traditional redistricting principles[.]" Davis v. Chiles, 139 F.3d 1414, 1425 (11th Cir. 1998). The compactness inquiry "refers to the compactness of the minority population, not . . . the compactness of the contested district." League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 433 (2006) (hereinafter "LULAC") (citing Bush v. Vera, 517 U.S. 952, 997 (1996)).

"A district that reaches out to grab small and apparently isolated minority communities' is not reasonably compact." Id. (citing Vera, 517 U.S. at 979). The relevant factors for compactness under the first Gingles precondition include:

179

population equality, contiguity, empirical compactness scores, the eyeball test for irregularities and contiguity, respect for political subdivisions, and uniting communities of interest. See Wesberry v. Sanders, 376 U.S. 1, 18 (1964) (population equality); LULAC, 548 U.S. at 433 (communities of interest); Vera, 517 U.S. at 959-60 (contiguity, eyeball test); Cooper v. Harris, 581 U.S. 285, 291, 312 (2017) (political subdivisions, partisan advantage, empirical compactness measures).

### (1)    *Empirical measures*

#### (a)    population equality

Article I § 2 of the Constitution "requires congressional districts to achieve population equality 'as nearly as is practicable.'" Abrams v. Johnson, 521 U.S. 74, 98 (1997) (quoting Wesberry, 376 U.S. at 7–8). This standard requires a mapmaker to "make a good-faith effort to achieve precise mathematical equality." Karcher v. Daggett, 462 U.S. 725, 730 (1983) (internal quotation marks omitted) (quoting Kirkpatrick v. Preisler, 394 U.S. 526, 530-31 (1969)). A congressional plan achieves population equality when its districts are plus or minus one person. See Alpha Phi Alpha Fraternity, 587 F. Supp. 3d at 1258 (finding that "Mr. Cooper's Illustrative Congressional Map complies with the one-person, one-vote principle"

180

where he testified that "the districts are plus or minus one person" (internal quotation marks omitted)). It is undisputed that Mr. Cooper's Illustrative Plan meets the population equality requirement and that the population deviations are limited to plus or minus one person from the ideal district population of 765,136. Stip. ¶ 197. Accordingly, the Court concludes that the Illustrative Congressional Plan achieves population equality.

### (b)   contiguity

Similarly, an illustrative district should not disregard traditional redistricting principles, such as contiguity. Allen, 599 U.S. at 18. A district is contiguous when it consists of "a single connected piece." Lopez, 339 F. Supp. 3d at 607. As it is undisputed (Stip. ¶ 198), the Court concludes that all the districts in the Illustrative Congressional Plan are contiguous.

### (c)   compactness scores

The Court also finds that the Illustrative CD-6 is sufficiently compact using empirical measures. One way in which courts assess the compactness of the districts in an illustrative plan is by relying on "widely acceptable tests to determine compactness scores," including "the Polsby-Popper measure and the Reock indicator," Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections,

835 F. Supp. 2d 563, 570 (N.D. Ill. 2011). Mr. Cooper's Illustrative Congressional plan compares favorably on the empirical compactness scores to the Enacted Congressional Plan. The mean Reock score for the Illustrative Congressional Plan is 0.43 and is 0.44 on the Enacted Congressional Plan. PX 1, ¶ 79, fig.13. The mean Polsby-Popper score for the Illustrative Congressional Plan is 0.27 and the Enacted Congressional Plan is 0.27. Id. The Illustrative and Enacted Congressional Plans have identical Polsby-Popper scores and the Enacted Congressional Plan is 0.01 more compact using the Reock metric. Defendants' rebuttal mapping expert, Mr. Morgan, does not dispute that the Enacted and the Illustrative Congressional Plans have similar mean Reock scores and identical mean Polsby-Popper scores. Tr. 1948:22–1949:5. Accordingly, the Court finds that the Illustrative Congressional Plan is comparably as compact as the Enacted Congressional Plan.

With respect to the majority-Black districts, the Court finds that the Illustrative Congressional Plan compactness scores generally fared better or were equal to the Enacted Congressional Plan.

|  | Illustrative Plan | | Enacted Plan | |
| --- | --- | --- | --- | --- |
| Districts | Reock | Polsby-Popper | Reock | Polsby-Popper |
| 004 | 0.28 | 0.22 | 0.31 | 0.25 |
| 005 | 0.51 | 0.32 | 0.51 | 0.32 |
| **006***| **0.45** | **0.27** | **0.42** | **0.20** |
| 013 | 0.44 | 0.29 | 0.38 | 0.16 |

The asterisk (*) denotes the additional majority-Black district.

PX 1, Exs. L-1, L-3. Mr. Morgan's report's compactness measures are identical to Mr. Coopers. DX 4 ¶ 22 & chart 2.

The Court finds that Illustrative CD-6, the challenged district, is 0.03 more compact on Reock and 0.07 more compact on Polsby-Popper. The Court finds that Plaintiffs have sufficiently shown that the Illustrative CD-6 is slightly more compact, on empirical measures than the Enacted CD-6.[42]

_____

[42] Additionally, the Court finds that Illustrative CD-13 is 0.06 more compact on Reock and 0.13 more compact on Polsby-Popper than Enacted CD-13. Illustrative CD-5 and Enacted CD-5 have identical compactness scores and Enacted CD-4 is 0.03 more compact than Illustrative CD-4 on both compactness measures. Thus, the challenged

### (d)   political subdivisions

The Court also finds that Illustrative CD-6 "respected existing political subdivisions, such as counties, cities, and towns." Allen, 599 U.S. at 20. Illustrative CD-6 splits the same number of counties as the Enacted Plan, but has fewer county, VTD, and city and town split. PX 1 ¶ 81 & fig.14.

**Figure 14**
**County, VTD, and Municipal Splits: Illustrative Plan, 2012 Benchmark, and 2021 Plan (All Districts)**

|  | Split Counties* | County Splits* | 2020 VTD Splits* | Split Cities/ Towns# | City/ Town Splits* |
|---|---|---|---|---|---|
| Illustrative Plan | 15 | 18 | 43 | 37 | 78 |
| 2012 Benchmark Plan | 16 | 22 | 43 | 40 | 85 |
| 2021 Plan | 15 | 21 | 46 | 43 | 91 |

*Excludes unpopulated areas
#Out of 531 municipalities (calculated by subtracting the number of whole cities in the Maptitude report from 531)

PX 1 ¶ 81, fig.14.

––––––––––––––––––

district, and the other majority-Black districts are comparably compact if not more compact than the Enacted majority-Black congressional districts.

184

Neither Defendants nor their experts have meaningfully suggested that the Illustrative Congressional Plan fails to respect city, town, and county lines. Accordingly, the Court finds that the Illustrative Congressional Plan respected more political subdivisions than the Enacted Congressional Plan.

### (2)   *Eyeball test*

The Court finds that Illustrative CD-6 is also visually compact. The eyeball test is commonly utilized to determine if a district is compact or not. See Allen, 599 U.S. at 60 n.10 (quoting Singleton, 582 F. Supp. 3d at 1011) (crediting the district court's findings that the illustrative maps were compact because they did not contain "tentacles, appendages, bizarre shapes or any other obvious irregularities"); Vera, 517 U.S. at 960 (crediting the district court's finding that the challenged district passed the eyeball test and was visually compact); Ala. State Conf. of NAACP v. Alabama, 612 F.Supp.3d at 1265 ("District 1 is contiguous and also passes the eyeball test for geographical compactness."); Comm. for a Fair & Balanced Map, 835 F. Supp. 2d at 571 (three-judge court) (stating that the district "passe[d] muster under the 'eyeball' test for compactness").

185

The Court finds that Illustrative CD-6 passes the eyeball test.



PX 1, Ex. I-2 (trial).

The district includes all of Douglas County, and portions of southern Fulton and southern Cobb Counties. Defendants' mapping expert, Mr. Morgan, does not dispute the visual compactness of Illustrative CD-6, nor did he testify about the district's visual compactness. DX 4. Unlike at the preliminary injunction, where there was questioning regarding the "fingers" into Fayetteville and Kennesaw to "pick-up" Black population, Illustrative CD-6 no longer reaches into Fayetteville. Doc. No. [73] 82:21–83:1, 86:6–12. At the trial, Defendants

186

elicited no testimony or questions about "fingers" branching off of Illustrative CD-6.

The Court finds that the district does not have any tentacles or appendages. Illustrative CD-6 is about 40 miles from top to bottom (Tr. 835:19–20), is contained in a relatively small area of the state and is completely within the metro-Atlanta counties. Accordingly, it lacks any similarities to the map in <u>Miller</u>, which spanned from metro Atlanta to Augusta, or <u>LULAC</u>, which stretched 300 miles along the southern border of Texas. <u>Miller v. Johnson</u>, 515 U.S. 900, 909 (1995); <u>LULAC</u>, 548 U.S. at 424. Thus, the Court finds that Illustrative CD-6 is visually compact.

### (3)   *Communities of interest*

The Court also concludes Illustrative CD-6 respects communities of interest. A district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact. <u>Vera</u>, 517 U.S. at 979. Plaintiffs "may not 'assum[e] from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls.'" <u>LULAC</u>, 548 U.S. at 433 (quoting <u>Miller</u>, 515 U.S. at 920; <u>Shaw v. Reno</u>, 509 U.S.

187

630, 647 (1993)). <u>LULAC</u> instructs district courts to account for "the characteristics, needs, and interests" of the minority community in the contested area. <u>Id.</u> at 434.

There is no bright line test for determining whether a district combines communities with common interests or disparate communities. Ms. Wright, the General Assembly's map drawer testified that "[c]ommunities of interest are very hard to measure." Tr. 1617:8. They could include, "a school attendance zone, . . . an incorporated city or town, . . . share[d] resources[,] . . . the same water authority[,] . . . a religious community that attends one facility." <u>Id.</u> at 1617:12–1618:22. <u>LULAC</u> provides some guidance on what courts should consider. "[R]ural and urban communities[ ] could share similar interests and therefore form a compact district if the areas are in reasonably close proximity." 548 U.S. at 435. However, when "the only common index is race" this is not a Section 2 remedy. <u>Id.</u> In <u>LULAC</u>, the Supreme Court held that the challenged district did not contain a community of interest because the district court found an enormous geographical distance separated one portion of the district from the other and the minority communities in the district had disparate needs and interests. <u>Id.</u>

188

In this case, the Court finds that there is sufficient evidence that Illustrative CD-6 is made up of communities of interest and does not combine disparate minority communities. Mr. Cooper testified that when he draws districts he "ha[s] to look at communities of interest." Tr. 726:19. He stated that he respects communities of interest because he "look[s] at political subdivisions, particularly towns and cities, and tr[ies] to keep those areas all together in one--in one district." Tr. 740:13–15. Specifically for Illustrative CD-6, he looked at the federally described 29-county Atlanta MSA and the Georgia defined 11-county core Atlanta area. Tr. 741:18–742:1. He further concluded that Illustrative CD-6 is a community of interest because it is wholly contained in suburban Atlanta. Tr. 799:2–7.

Pendergrass Plaintiffs also submitted the testimonial evidence of former General Assembly members Mr. Allen and Mr. Carter. The Court credits this testimony with respect to communities of interest. Both witnesses have served as representatives of metro Atlanta communities and Mr. Allen's former district is within Illustrative CD-6.

189

Mr. Allen, a former member of the Georgia House of Representatives and a Smyrna resident, agreed that his neighbors, the Black residents of Illustrative CD-6, face the same transportation-related challenges, specifically involving "access, congestion, [and] infrastructure." Tr. 1009:9–13. He testified that "[a]s a resident of this area," he knows that these communities rely on the same interstates. Id. at 1009:4–8. Residents of these areas attend some of the same places of worship. Id. at 1009:17–22. Mr. Allen also explained that the residents of Illustrative CD-6 share an interest in receiving services from Grady Hospital, the only Level One Trauma Center in Metro Atlanta. Id. at 1019:24–1020:3.

Former Georgia State Senator and candidate for Governor Jason Carter also testified that Illustrative CD-6 constitutes a community of interest. He stated that all areas of the district can be described as suburbs of Atlanta. Tr. 966:11–19. He testified that all parts of the district are within a 20-to-40-minute drive of downtown Atlanta, without traffic. Tr. 967:22–968:5. It is an area that is growing and increasingly diversifying. Tr. 967:13–17. The individuals in the area use similar roadways and are impacted by Atlanta traffic patterns. Tr. 966:22–967:10.

Finally, he testified that the Chattahoochee river runs through the middle of the district.

Neither Defendants' experts nor Ms. Wright provided testimony disputing that Illustrative CD-6 unites communities of interest. The Court finds that Illustrative CD-6 combines areas of suburban metro Atlanta. The communities are relatively close in proximity. They share traffic concerns and have a common waterway. The Court finds that Illustrative CD-6 does not combine disparate minority communities, like the challenged district in LULAC (which stretched across 300 miles on the Texas border) or in Miller (which spanned from Augusta to Atlanta). Accordingly, the Court finds that Illustrative CD-6 respects the traditional districting principles of maintaining communities of interest.

### *(4)* *Core retention*

Although not a typical traditional redistricting principle, the Court also finds that the Illustrative Congressional Plan retained many of the cores of the districts in the Enacted Congressional Plan. The Supreme Court recently called into question the importance of core retention for Section 2 Plaintiffs. "[T]his Court has never held that a State's adherence to a previously used districting plan

191

can defeat a § 2 claim. If that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan." <u>Allen</u>, 599 U.S. at 22. Additionally, Ms. Wright testified that when she draws the new Plans, she starts with a blank map and not from the existing congressional plan, and then "work[s] with the data to create new districts." Tr. 1622:11–17. Ms. Wright admitted to using the existing district "as a reference" for other measures, such as retaining core districts. Tr. 1622:18–20.

To the extent that core retention is relevant as a traditional redistricting principle, the Court finds that the Illustrative Congressional Plan retains a majority of the population's districts. <u>See generally</u> DX 4. Pursuant to the data provided by Mr. Morgan, the Court finds that approximately 74.6% of voters would have the same congressional district as they do under the Enacted Congressional Plan. <u>Id.</u> In other words, only 25.4% of Georgians would be affected if Illustrative CD-6 were enacted into law. The following is a table is derived from the data in Mr. Morgan's Report and that exemplifies the number

of individuals who remain in the same district under the Illustrative Congressional Plan.

| District | # of individuals whose district is unchanged |
|---|---|
| 001 | 765,137* |
| 002 | 765,137* |
| 003 | 528,200 |
| 004 | 736,485 |
| 005 | 765,137* |
| 006 | 19,006 |
| 007 | 765,137* |
| 008 | 765,136* |
| 009 | 403,191 |
| 010 | 488,385 |
| 011 | 372,724 |
| 012 | 765,136* |
| 013 | 374,470 |
| 014 | 475,707 |

The asterisk (*) denotes a district unchanged on the illustrative map

DX 4, Ex. 7.

The ideal population size of a congressional district is 765,136 (plus or minus one person). As the chart above shows, six of the districts remain unchanged (Illustrative CD-1, CD-2, CD-5, CD-7, CD-8, CD-12). In the eight

193

changed districts, only three districts (Illustrative CD-6, CD-11, and CD-13) change more than half of the population's congressional district. These changes logically follow from the fact that Illustrative CD-6 is the new majority-minority district and CD-11 and CD-13 are two districts immediately surrounding it. Accordingly, the Court finds that the Illustrative Congressional Plan substantially retains the Enacted Congressional Plan's district cores.

### (5)   Racial considerations

Finally, the Court concludes that race did not predominate in the drawing of the Illustrative Congressional Plan. Allen recognized that "[t]he question whether additional majority-*minority* districts can be drawn . . . involves a 'quintessentially race-conscious calculus.'" 599 U.S. at 31 (plurality opinion) (quoting Johnson v. De Grandy, 512 U.S. 997, 1020 (1994)). Consequently, "[t]he contention that mapmakers must be entirely 'blind' to race has no footing in our § 2 case law. The line that we have long since drawn is between consciousness and predominance." Id. at 33 (plurality opinion). Race does not predominate when a mapmaker "adhere[s] . . . to traditional redistricting criteria," testifies that "race was not the predominant factor motivating his design process," and

194

explains that he never sought to "maximize the number of majority-minority" districts. Davis, 139 F.3d at 1426; see also id. at 1425–26 (finding clear error with the district court's finding of racial predominance based on an expert's testimony that he was asked to draw additional majority-minority districts in an area with a high concentration of Black citizens).

During Defendants' cross-examination of Mr. Cooper, questions were asked about whether race predominated when drawing the Illustrative Congressional Districts. Tr. 786:23–787:6. Mr. Cooper testified that he considered race among other traditional redistricting principles, balancing all considerations and did not allow any of them to predominate or subordinate the others. On this point, Mr. Cooper's testimony is well summarized by the following:

> I'm constantly balancing the traditional redistricting principles, which would include population equality, which must be plus or minus one or so in most states. I'm looking at the compactness of the district. The district has to be contiguous, it has to be connected with all parts. I have to look at communities of interest. I have to look at political subdivisions and try to keep those whole. And that's sort of subsumed under communities of interest. And, finally, also I have to be cognizant of avoiding the dilution of the minority voting source.

Tr. 726:14–23.

195

As the Court noted above, Mr. Cooper's testimony was highly credible. Mr. Cooper expressly disclaimed that race predominated the drawing of any district, let alone Illustrative CD-6. Tr. 1744–2129; PX 1. It does not appear from the face of the Illustrative Congressional Plan that race predominated its creation. Compare PX 1, Ex. I-2 (creating an additional majority-minority district that is wholly contained within four counties), with Miller, 512 U.S. at 108–09 (a district that stretched from Augusta, Georgia to Atlanta, Georgia). The Court finds that the evidence shows that Mr. Cooper was aware of race when he drew the Illustrative Congressional Plan, but that race did not predominate the configuration of its districts. Accordingly, the Court finds that the Pendergrass Plaintiffs have sufficiently proven that race did not predominate over the drawing of the Illustrative Congressional Plan, or Illustrative CD-6.

### (6)    *Possible remedy*

In Nipper, the Eleventh Circuit held that "the first threshold factor of Gingles [ ] require[s] that there must be a remedy within the confines of the state's judicial model that does not undermine the administration of justice." Nipper v. Smith, 39 F.3d 1494, 1531 (11th Cir. 1994). The Eleventh Circuit later clarified that

"[t]his requirement simply serves 'to establish that the minority has the potential to elect a representative of its own choice from some single-member district.'" Burton v. City of Belle Glade, 178 F.3d 1175, 1199 (11th Cir. 1999) (quoting Nipper, 39 F.3d at 1530). Additionally, "[i]f a minority cannot establish that an alternate election scheme exists that would provide better access to the political process, then the challenged voting practice is not responsible for the claimed injury." Id.; see also Brooks v. Miller, 158 F.3d 1230, 1239 (11th Cir. 1998) (holding that "[i]f the plaintiffs in a § 2 case cannot show the existence of an adequate alternative electoral system under which the minority group's rights will be protected, then the case ends on the first prerequisite").

Under Nipper, the question of remedy depends on whether the alternate scheme is a "workable remedy within the confines of the state's system of government." Nipper, 39 F.3d at 1533. For example, in Wright v. Sumter Cnty. Bd. of Elections and Registration, 979 F.3d 1282, 1304 (11th Cir. 2020), the Eleventh Circuit found that the first Gingles precondition had been met because the special master's maps showed that at least three majority-Black districts could have been drawn in that area, meaning "that a meaningful remedy was available."

197

The Court has already determined that there is Record evidence that the minority population in Illustrative CD-6 is sufficiently compact. As is stated above, the Court finds that Mr. Cooper's Illustrative Congressional Plans, both from the preliminary injunction hearing and the trial, prove it is possible to draw an additional majority-Black congressional district in west-metro Atlanta. PX 1, I-2, DX 154, Ex. K. The Illustrative Congressional Plan achieves population equality and each district is plus or minus one person. PX 1 ¶ 48. All of the districts are contiguous. Stip. ¶ 198. The Illustrative Congressional Plan is comparably as compact as the Enacted Plan. PX 1 ¶ 81 & fig.14. Visually speaking, Illustrative CD-6 is compact and does not contain any tentacles or appendages. See Section II(D)(2)(b)(3) *supra*. The Illustrative Congressional Plan unites communities of interest. See Section II(D)(2)(b)(4) *supra*. The Illustrative Congressional Plan leaves approximately 75% of the Enacted Plan intact. DX 4 at 48–50; Tr. 1945:10–13. And there is substantial, unrebutted, evidence and testimony that race did not predominate the creation of the Illustrative Congressional Plan. Tr. 726:14–23.

Furthermore, Mr. Cooper testified that he used the General Assembly's guidelines to inform his decisions when drawing the Illustrative Congressional Plan. Tr. 818:18–20. Thus, the Court finds that the General Assembly could implement the Illustrative Congressional Plan, because Mr. Cooper used the legislative guidelines.

To the extent, that Defendants have argued that the General Assembly would have been barred from implementing this map because it impermissibly took race into consideration, the Supreme Court recently rejected this proposition. Allen, 599 U.S. at 1512 (plurality opinion), 1518. The Eleventh Circuit, moreover, has long held that the first Gingles precondition specifically requires that Plaintiffs' proposed maps consider race.[43] Davis, 139 F.3d at 1425–26.

---

[43] Additionally, the Supreme Court has stated that upon showing of racial predominance, the state must "satisfy strict scrutiny" by demonstrating that the race-based plan "is narrowly tailored to achieve a compelling interest"). In this context, narrow tailoring does not "require an exact connection between the means and ends of redistricting," but rather just "'good reasons' to draft a district in which race predominated over traditional districting criteria." Ala. Legis. Black Caucus, 231 F. Supp. 3d at 1064 (quoting Ala. Legis. Black Caucus, 575 U.S. at 278). Miller, 515 U.S. at 920. The U.S. Supreme Court has "assume[d], without deciding, that . . . complying with the Voting Rights Act was compelling." Bethune-Hill v. Va. State Bd. of Elections, 580

Here, the Court found that race did not predominate the drawing of the Illustrative Congressional Plan and therefore, the State could implement it without violating the Constitution. Accordingly, the Court finds that the Illustrative Congressional Plan satisfies <u>Nipper</u>'s remedial requirement.

### (7)   *Conclusions of law*

In sum, the Court concludes that the Illustrative Congressional Plan meets or exceeds the Enacted Congressional Plan on all empirical measures. Accordingly, the Court finds that on the objective comparable measures, the Illustrative Congressional Plan is as compact as the Enacted Congressional Plan. The Court also finds that the Illustrative Congressional Plan is compact on the eyeball test, respects communities of interest, and retains the majority of the cores from the Enacted Congressional Plan. Finally, the Court finds that the Enacted Congressional Plan could be enacted as a possible remedy because it complies with traditional redistricting principles and race did not predominate in its

_____

U.S. 178, 193 (2017). Indeed, the redistricting guidelines adopted by the General Assembly confirm that Georgia understands compliance with the Voting Rights Act to be a compelling state interest. <u>See</u> JX1–2.

creation. Accordingly, the Pendergrass Plaintiffs carried their burden in showing that the minority community in west-metro Atlanta is sufficiently large and compact to warrant drawing an additional majority-Black district. Accordingly, the Court finds that Pendergrass Plaintiffs have successfully proven the first Gingles precondition.

### 2.    Second *Gingles* Precondition

The Court turns to the second and third Gingles preconditions. As the Court examined more thoroughly in its Order on the Pendergrass Motions for Summary Judgment (Pendergrass, Doc. No. [215], 48–65), to satisfy the second and third Gingles preconditions, plaintiffs must show (1) the existence of minority voter political cohesion and (2) that the majority votes as a bloc, usually to defeat the minority voter's candidate of choice. As a part of these preconditions, plaintiffs do not have to prove that race is the sole or predominant cause of the voting difference between the minority and majority voting blocs, nor must plaintiffs disprove that other race-neutral reasons, such as partisanship, are causing the racial bloc voting.

201

The second Gingles precondition requires plaintiffs to show that "the minority group . . . is politically cohesive." Gingles. 478 U.S. at 51. "The second [precondition], concern[s] the political cohesiveness of the minority group [and] shows that a representative of its choice would in fact be elected." Allen, 599 U.S. at 19. Plaintiffs can establish minority cohesiveness by showing that "a significant number of minority group members usually vote for the same candidates." Solomon v. Liberty Cnty., 899 F.2d 1012, 1019 (11th Cir. 1990) (Kravitch, J., specially concurring); see also Gingles, 478 U.S. at 56 ("A showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim, and, consequently, establishes minority bloc voting within the context of § 2." (internal citations omitted)). The Court finds that Pendergrass Plaintiffs have successfully proven that the minority group in the challenged area is politically cohesive.

Courts generally rely on statistical analyses to estimate the proportion of each racial group that voted for each candidate. See, e.g., Gingles, 478 U.S. at 52–54; Nipper, 39 F.3d at 1505 n.20. Courts have recognized ecological inference

202

("EI") as an appropriate analysis for determining whether a plaintiff has satisfied the second and third <u>Gingles</u> preconditions. <u>See, e.g.</u>, <u>Rose v. Raffensperger</u>, 584 F. Supp. 3d 1278, 1294 (N.D. Ga. 2022); <u>Patino v. City of Pasadena</u>, 230 F. Supp. 3d 667, 691 (S.D. Tex. 2017); <u>Benavidez v. City of Irving</u>, 638 F. Supp. 2d 709, 723–24 (N.D. Tex. 2009); <u>Bone Shirt</u>, 336 F. Supp. 2d at 1003, <u>aff'd</u> 461 F.3d 1011 (8th Cir. 2006). Both Drs. Palmer and Alford testified that EI is a reliable method for conducting the second and third <u>Gingles</u>' preconditions analyses. Tr. 2250:12–16; 401: 7–9.

   <u>Pendergrass</u> Plaintiffs polarization expert, Dr. Palmer, concluded that in the 40 statewide general elections examined, in both the congressional focus area (i.e., Enacted CD-3, 6, 11, 13, and 14) and each congressional district, Black voters had clearly identifiable candidates of choice. Stip. ¶¶ 218, 220–21; PX 2 ¶ 16, tbl.1 & figs.2–3, 5; Tr. 414:25–416:13, 417:16–418:4. On average, Black voters supported their candidates of choice with 98.4% of the vote. Stip. ¶ 219; PX 2 ¶¶ 7,16. Defendants' rebuttal expert on racially polarized voting, Dr. John Alford, does not dispute Dr. Palmer's conclusions as to the second <u>Gingles</u> precondition. DX 8, 3; Tr. 2250:12–2251:9. Additionally, the Parties stipulated that "Black voters in

Georgia are extremely cohesive, with a clear candidate of choice in all 40 general elections Dr. Palmer examined." Stip. ¶ 218.

The Court finds that the second Gingles precondition is satisfied here because Black voters in Georgia are extremely politically cohesive. See 478 U.S. at 49. "Bloc voting by blacks tends to prove that the [B]lack community is politically cohesive, that is, it shows that [B]lacks prefer certain candidates whom they could elect in a single-member, [B]lack majority district." Id. at 68. Dr. Palmer's analysis clearly demonstrates high levels of cohesiveness among Black Georgians in supporting their preferred candidates, both across the congressional focus area and in the individual districts that comprise it. In Allen, the Supreme Court credited the lower court's finding of "very strong" Black voter cohesion in Alabama, with an average of 92.3%. 599 U.S. at 22. Here in Georgia, Black voter cohesion is even stronger, with an average of 98.4%.[44] Stip. ¶¶ 218–19.

---

[44] The record evidence does not dispute, and even reiterates, conclusions made in prior cases about political cohesion among Black Georgians. See, e.g., Wright, 301 F. Supp. 3d at 1313 (noting that, in ten elections for Sumter County Board of Education with Black candidates, "the overwhelming majority of African Americans voted for the same

204

Accordingly, the Court finds that <u>Pendergrass</u> Plaintiffs have successful carried their burden and proven that Black voters in the challenged area are politically cohesive.

### 3. Third *Gingles* Precondition

The third <u>Gingles</u> precondition requires plaintiffs demonstrate that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." <u>Gingles</u>, 478 U.S. at 51. "[A] white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." <u>Id.</u> at 56. This precondition "establishes that the challenged districting thwarts a distinctive minority vote at least plausibly on account of race." <u>Allen</u>, 599 U.S. at 19 (cleaned up) (quoting <u>Growe</u>, 507 U.S. at 40). No specific threshold percentage is required to demonstrate bloc voting. <u>Gingles</u>, 478 U.S. at 56 ("The amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to

---

candidate"); <u>Lowery v. Deal</u>, 850 F. Supp. 2d 1326, 1329 (N.D. Ga. 2012) ("Black voters in Fulton and DeKalb counties have demonstrated a cohesive political identity by consistently supporting [B]lack candidates.").

205

elect representatives of their choice . . . will vary from district to district." (citation omitted)).

Pendergrass Plaintiffs' polarization expert, Dr. Palmer, demonstrated (and the Parties have stipulated) that white voters in the congressional focus area usually vote as a bloc to defeat Black-preferred candidates. Stip. ¶¶ 222–227. In each congressional district examined and in the focus area as a whole, white voters had clearly identifiable candidates of choice for every election examined. Id. ¶ 223; PX 2 ¶ 17 & figs.2–4; Tr. 414:25–416:13, 417:16–418:4. In the 40 statewide general elections examined, white voters were highly cohesive in voting in opposition to the Black candidate of choice. Stip. ¶ 222. On average, Dr. Palmer found that white voters supported Black-preferred candidates with an average of just 12.4% of the vote. Id. ¶ 223. In other words, white voters on average supported their preferred candidates with an estimated vote share of 87.6%.[45]

---

[45] The Court notes that the Black preferred candidate in all of the examined races was the Democrat candidate and the white -preferred candidate was a Republican. Stip. ¶¶ 194, 215–16. The Court finds that the inquiry into whether partisanship is the motivating factor behind the polarization is not relevant to the Gingles precondition inquiry, but may be relevant to the overall totality of the circumstances. See Section II(D)(4)(b), infra.

206

Overall, Dr. Palmer found "strong evidence of racially polarized voting across the focus area" as a whole and in each individual congressional district he examined. PX 2 ¶¶ 7, 19; Tr. 398:17–21, 418:5–8. As a result of this racially polarized voting, candidates preferred by Black voters in the focus area have generally been unable to win elections outside of majority-Black districts. Tr. 419:11–420:2. Excluding the majority-Black Congressional District 13, white bloc voting defeated Black-preferred candidates in all 40 elections in the focus area that Dr. Palmer examined. Stip. ¶¶ 225, 227; PX 2 ¶ 22. Defendants have offered no evidence suggesting that this is no longer the case. To the contrary, just as with the second <u>Gingles</u> precondition, the parties have stipulated to satisfaction of the third <u>Gingles</u> precondition. Stip. ¶ 225.

The Court concludes that Dr. Palmer's analysis demonstrates high levels of white bloc voting in the congressional focus area and in the individual districts that comprise it. The Court also finds that candidates preferred by Black voters are almost always defeated by white bloc voting except in those areas where they form a majority. The evidence of polarization is stronger in this case than it was in <u>Allen</u>: in Georgia, only 12.4% of white voters support Black-preferred

candidates, whereas in Alabama 15.4% of white voters supported Black-preferred candidates. <u>Allen</u>, 599 U.S. at 22. There the Supreme Court affirmed that there was "very clear" evidence of racially polarized voting. <u>Id.</u> Thus, this Court likewise finds "very clear" evidence of racially polarized voting in the challenged district. [46] Accordingly, the Court concludes that <u>Pendergrass</u> Plaintiffs' evidence demonstrates that white voters vote in opposition to and typically defeat Black preferred candidates and thus <u>Pendergrass</u> Plaintiffs have carried their burden as to the third <u>Gingles</u> precondition.

* * * *

---

[46] Again, the evidence in this case does not dispute, and even reiterates, conclusions made in prior cases about racially polarized voting. <u>See, e.g.</u>, <u>Fair Fight Action</u>, 634 F. Supp. 3d at 1247 (finding racial polarization in Georgia voting); <u>Whitest v. Crisp Cnty. Bd. of Educ.</u>, No. 1:17-CV-109 LAG, 2021 WL 4483802, at *3 (M.D. Ga. Aug. 20, 2021) ("African Americans in Crisp County are politically cohesive in elections for members of the Board of Education, but the white majority votes sufficiently as a bloc to enable it to defeat the candidates preferred by Black voters in elections for members of the Board of Education."); <u>Wright</u>, 301 F. Supp. 3d at 1317 (finding that "[t]he third <u>Gingles</u> factor is satisfied" after concluding that "there can be no doubt black and white voters consistently prefer different candidates" and that "white voters are usually able to the defeat the candidate preferred by African Americans").

208

The Court concludes that the Pendergrass Plaintiffs have carried their burden in proving the three Gingles preconditions. Accordingly, the Court now turns to the totality of the circumstances inquiry.

### 4.   *Totality of the Circumstances*

The Court must determine whether Georgia's political process is equally open to the affected Black voters. Wright, 979 F.3d at 1288 ("[I]n the words of the Supreme Court, the district court is required to determine, after reviewing the 'totality of the circumstances' and, 'based upon a searching practical evaluation of the past and present reality, whether the political process is equally open to minority voters.'" (quoting Gingles, 478 U.S. at 79)); Solomon v. Liberty Cnty. Com'rs, 166 F.3d 1135, 1148 (11th Cir. 1999), vacated 206 F.3d 1054 (acknowledging that the Third, Fifth, and Tenth Circuits have found it to be "unusual" or "rare" if a plaintiff can establish the Gingles preconditions, but fail to establish a Section 2 violation on the totality of the circumstances (quoting Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ., 4 F.3d 1103, 1135 (3d Cir. 1993); Sanchez v. Colorado, 97 F.3d 1303, 1322 (10th Cir. 1996)) (citing Clark v. Calhoun Cnty., 21 F.3d 92, 97 (5th Cir. 1994)).

209

a)  **Totality of circumstances inquiry: purpose and framework**

For a Section 2 violation to be found, the Court must conduct "an intensely local appraisal" of the electoral mechanism at issue, as well as a "searching practical evaluation of the 'past and present reality.'" Allen, 599 U.S. at 19 (citing Gingles, 478 U.S. at 79). The purpose of this appraisal is to determine the "essential inquiry" of a Section 2 case, which is "whether the political process is *equally open* to minority voters." Ga. State Conf. of the NAACP, 775 F.3d at 1342 (emphasis added) (quoting Gingles, 478 U.S. at 79). Put differently, the totality of the circumstances inquiry ensures that violations of Section 2 may only be found when "members of the protected class have *less opportunity* to participate in the political process." Chisom v. Roemer, 501 U.S. 380, 397 (1991) (emphasis added).

Over the last fifty years Georgia has become increasingly more politically open to Black voters and in recent elections Black candidates have enjoyed success—five of Georgia's representatives to the United States House of Representatives and one of its Senators are Black. Although the Court commends the progress that Georgia has made since 1965, when weighing the Senate Factors, the Court finds that the Enacted Congressional Plan dilutes Black voting power

210

in west-metro Atlanta. The Enacted Congressional Plan in west metro-Atlanta has resulted in Black voters having less of an opportunity to participate equally in the political process than white voters. Gingles, 478 U.S. at 79; Chisom, 501 U.S. at 397. The whole of the evidence shows that the political process is not currently *equally* to Black Georgians in west-metro Atlanta—Black voters still suffer from *less* opportunity to partake in the political process in the area than white voters. Thus, given the consideration of the factors named *infra*, the Court determines that the totality of the circumstances inquiry supports finding a Section 2 violation in this case and that an additional majority-minority congressional district must be drawn in the western-metro Atlanta area.

Turning to the legal framework guiding the totality of the circumstances inquiry: the totality inquiry focuses on a number of non-comprehensive and non-exclusive Senate Factors. Ga. State Conf. of the NAACP, 775 F.3d at 1342. The Senate Factors include: (1) "the history of voting-related discrimination in the State or political subdivision"; (2) "the extent to which voting in the elections of the State or political subdivision is racially polarized"; (3) "the extent to which the State or political subdivision has used voting practices or procedures that

tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting"; (4) "the exclusion of members of the minority group from the candidate slating processes"; (5) "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process"; (6) "the use of overt or subtle racial appeals in political campaigns"; and (7) "the extent to which members of the minority group have been elected to public office in the jurisdiction." <u>Gingles</u>, 478 U.S. at 44–45. Furthermore, "[t]he [Senate] Report notes also that evidence demonstrating [8] that elected officials are unresponsive to the particularized needs of the members of the minority group and [9] that the policy underlying the State's . . . use of the contested practice or structure is tenuous may have probative value." <u>Gingles</u>, 478 U.S. at 45.

The Court now will consider and weigh each of these factors in addition to the proportionality of Black citizens to majority-Black districts and the State's changing demographics. Again, the Court ultimately concludes that the totality

of the circumstances' inquiry weighs in favor of finding a Section 2 violation in

the <u>Pendergrass</u> Plaintiffs' case.[47]

> **b)**   **Senate Factor One and Three: historical evidence of discrimination and State's use of voting procedures enhancing opportunity to discriminate**

The Court first turns to Georgia electoral practices, both past and present,

that bear on discrimination against Black voters under Senate Factors One and

Three.[48] Senate Factor One focuses on "the extent of any history of official

discrimination in the state . . . that touched the right of the members of the

minority group to register, to vote, or otherwise to participate in the democratic

process[.]" <u>Gingles</u>, 478 U.S. at 36-37. Senate Factor Three "considers 'the extent

to which the State or political subdivision has used voting practices or procedures

---

[47] Although Dr. Jones was solely retained as an expert in the <u>Alpha Phi Alpha</u> case, the Court notes that at the trial, the Parties consented to adopt the testimony of Dr. Jones into the <u>Pendergrass</u> Plaintiffs' case-in-chief. Tr. 1244:10–1245:8, 1589:3–1591:21. Thus, the Court may rely on Dr. Jones's trial testimony any portions of her report that were directly referenced at trial.

[48] The Court considers both Senate Factors One and Three together because there is significant overlap in the trial evidence for the two factors. <u>Cf., e.g.</u>, <u>Singleton</u>, 582 F. Supp. 3d at 1020, <u>aff'd sub nom</u>. <u>Allen</u>, 599 U.S. 1 (considering Senate Factors One, Three, and Five together).

that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting.'" Wright, 979 F.3d at 1295 (quoting Gingles, 478 U.S. at 44–45).

The Court finds that Pendergrass Plaintiffs have shown evidence of both past and present history in Georgia that the State's voting practices disproportionately affect Black voters. Per guidance from binding authorities, the Court is careful in this analysis to assess both past *and present* efforts that have caused a disproportionate impact on Black voters. Indeed, "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." Greater Birmingham Ministries v. Sec'y of State for Ala., 992 F.3d 1299, 1325 (11th Cir. 2021) (quoting Mobile v. Bolden, 446 U.S. 55, 74 (1980)); see also Abbott v. Perez, 585 U.S. ––––, 138 S. Ct. 2305, 2324 (2018) (explaining that "the presumption of legislative good faith [is] not changed by a finding of past discrimination").

While present evidence of disproportionate impact is necessary, the Court's reading of recent decisions is that past discrimination and

214

disproportionate effects cannot be overlooked. To be sure, the Supreme Court recently opined that Section 2 looks at both the *past* and present realities of Georgia's electoral mechanism by recounting Alabama's history of past discrimination from the Reconstruction Era. Allen, 599 U.S. at 19; see also id. at 14 ("For the first 115 years following Reconstruction, the State of Alabama elected no [B]lack Representatives to Congress."). In the wake of the Allen decision, Chief Judge Pryor recently clarified that "[p]ast discrimination *is relevant*" even if it is "one evidentiary source" that is "not to be overweighed." League of Women Voters of Fla. Inc. v. Fla. Sec'y of State, 81 F.4th 1328, 1332 (11th Cir. 2023) (Pryor, C.J., concurring in denial of rehearing en banc) (emphasis added) (quoting Abbott, 138 S. Ct. at 2325); see also id. ("Allen cited the 'extensive history of repugnant racial and voting-related discrimination' in Alabama as relevant to whether the political process today is 'equally open' to minority voters." (quoting Allen, 599 U.S. at 22)). Accordingly, the Court takes these cues from both recent Supreme Court and Eleventh Circuit jurisprudence and evaluates Georgia's practices of discrimination *past and present* as relevant evidence in the totality of the circumstances inquiry.

215

### *(1)   Historical evidence of discrimination broadly*

"Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception." Wright, 301 F. Supp. 3d at 1310 (citation omitted). "African-Americans have in the past been subject to legal and cultural segregation in Georgia[.]" Cofield, 969 F. Supp. at 767. "Black residents did not enjoy the right to vote until Reconstruction. Moreover, early in this century, Georgia passed a constitutional amendment establishing a literacy test, poll tax, property ownership requirement, and a good-character test for voting. This act was accurately called the 'Disfranchisement Act.' Such devices that limited black participation in elections continued into the 1950s." Id.

In this case, one of Pendergrass Plaintiffs' expert witnesses opined that "[t]hroughout the history of the state of Georgia, voting rights have followed a pattern where after periods of increased nonwhite voter registration and turnout, the state has passed legislation, and often used extralegal means, to

216

disenfranchise minority voters." PX 4, 10; Tr. 1428:3–24. Another expert witness testified, Georgia has "used basically every expedient . . . associated with Jim Crow to prevent Black voters from voting in the state of Georgia." Tr. 1161:20–1162:11.

During the trial, Defendants stipulated "up until 1990 we had historical discrimination in Georgia." Tr. 1524:14–15. Thus, the unrebutted testimony and the extensive accounts of Georgia's history of discrimination in Pendergrass Plaintiffs' expert reports demonstrate that Georgia's discriminatory history—including in voting procedures— spans from the end of the Civil War onward and have uncontrovertibly burdened Black Georgians. See, e.g, Tr. 1429:11–21.

### (2)    *Georgia practice from the passage of the VRA to 2000*

Congress enacted the Voting Rights Act of 1965 to address these discriminatory practices. One of the Voting Rights Act's provisions was the preclearance requirement that prohibited certain jurisdictions with well-documented practices of discrimination—including Georgia—from making

217

changes to their voting laws without approval from the federal government. PX 4, 36; Tr. 1436:11–1437:6.

The Voting Rights Act, however, "did not translate to instant success" for Black political participation. PX 4, 36. Among states subject to preclearance in their entirety, Georgia ranked second only to Alabama in the disparity in voter registration between its Black and white citizens by 1976. Id.; Tr. 1437:10–1438:3. These continued disparities following the VRA were at least caused because "Georgia resisted the Voting Rights Act . . . [and] for a period, it refused to comply[.]" Tr. 1163:9–1164:1. For example, a study found that local jurisdictions in Georgia and Mississippi "went ahead with election changes despite a pending preclearance request." PX 4, 39. Even still, from 1965 to 1981, the Department of Justice objected to more than 200 changes submitted by Georgia, more than any other state in the country. Id.

Georgia's history of discrimination against Black voters did not end in 1981. When the VRA was reauthorized in 1982, the Senate Report specifically cited to Georgia's discriminatory practices that diminished the voting power of Black

218

voters. S. Rep. 97-417, at 10, 13 (1982). During the 1990 redistricting cycle, twice the DOJ rejected the State's reapportionment plans. PX 4, 42.

During the process of reauthorization of the Voting Rights Act in 2006, Georgia legislators "took a leadership position in challenging the reauthorization of the [A]ct." Tr. 1164:2–17. As Dr. Jones reminds us, "Georgia's resistance to the VRA is consistent with its history of resisting the expansion of voting rights to Black citizens at every turn." APAX 2, 9. Even following the 2000 Census, the district court in the District of Columbia refused to preclear the General Assembly's Senate plan because the court found "the presence of racially polarized voting" and that "the State ha[d] failed to demonstrate by a preponderance of the evidence that the reapportionment plan for the State Senate will not have a retrogressive effect." Georgia v. Ashcroft, 195 F. Supp. 2d 25, 94 (D.D.C. 2002), affirmed by King v. Georgia, 537 U.S. 1100 (2003).

### (3) More recent voting practices with a disproportionate impact on Black voters

The Court concludes that Pendergrass Plaintiffs submitted evidence about more recent practices in Georgia which disproportionately impact Black voters and have resulted in a discriminatory effect. These practices include polling place

219

closures, voter purges, and the Exact Match requirement. Pendergrass Plaintiffs'

also continually rely on the Georgia's General Assembly passage of SB 202

following the 2020 presidential election as evidence of recent and present

discrimination disproportionally affecting Black voters.[49]

Following Shelby County and the end of pre-clearance, the U.S.

Commission on Civil Rights, found that Georgia had adopted five of the most

common restrictions that impose roadblocks to the franchise for minority voters:

(1) voter ID laws, (2) proof of citizenship requirements, (3) voter purges, (4) cuts

in early voting[50], and (5) widespread polling place closures. PX 4, 48–49 (citing

---

[49] On the Record, Dr. Burton clearly stated and the Court would like to reiterate, this Order, in no way states or implies that the General Assembly or Georgia Republicans are racist. Tr. 1473:18–1474:9. As articulated by Dr. Burton, "[n]o. I'm not saying that the legislature is [racist]—I am saying that some of the legislation that comes out has a disparity—it affects Black citizens differently than white citizens to the disadvantage of Black citizens, but I am not saying that they are racist. But the effect has a disparate impact among whites and Blacks and other minorities." Tr. 1474:4–9. Section 2 of the VRA does not require the Court to find that the General Assembly passed the challenged maps to discriminate against Black voters, or that the General Assembly is racist in any way. Nothing in this Order should be construed to indicate otherwise.

[50] While it may have been true at the time of this report that Georgia had made cuts to early voting, the Court acknowledges Mr. Germany's trial testimony was that SB 202 increased early voting opportunities by adding two mandatory Saturdays and expressly permitted counties to hold early voting on Sundays, at their discretion. Tr. 2269:9–21.

220

U.S. Commission on Civil Rights, <u>An Assessment of Minority Voting Rights Access in the United States: 2018 Statutory Enforcement Report</u> (Washington, 2018), 369). No other State has engaged in all five practices. PX 4, 49.

The Court ultimately weighs the evidence submitted and determines that the present evidence of Georgia's voting practices show they had a disproportionately negative impact on Black voters. The Court proceeds by assessing <u>Pendergrass</u> Plaintiffs' evidence of (a) Georgia's practice of closing polling places, (b) Georgia's Exact Match requirement and purging of its registration lists, (c) the General Assembly's passage of SB 202, and (d) the State's rebuttal evidence of open and fair election procedures.[51] The Court finally (e) renders its conclusion of law on this Senate Factor.

---

[51] The Court may evaluate statewide evidence to determine whether Black voters have an equal opportunity in the election process. <u>LULAC</u>, 548 U.S. at 438 (2006) ("[S]everal of the [ ] factors in the totality of circumstances have been characterized with reference to the State as a whole."); <u>see also</u> <u>Allen</u>, 599 U.S. at 22 (crediting the three-judge court's findings of lack of equal openness with respect to statewide evidence (citing <u>Singleton</u>, 582 F. Supp. 3d at 1018–1024); <u>Gingles</u>, 478 U.S. at 80 (crediting district court's findings of lack of equal opportunity that was supported by statewide evidence (citing <u>Gingles v. Edmisten</u>, 590 F. Supp. 345, 359–75 (E.D.N.C. 1984)).

221

**(a)**     <u>**polling place closures**</u>

The Court finds that there is compelling evidence that Georgia's recent closure of numerous polling places disproportionately impacts Black voters. In the wake of the Supreme Court's decision in <u>Shelby County</u>, "'dozens of polling places' were 'closed, consolidated, or moved.'" PX 4, 49 (citing Kristina Torres, "Cost-Cutting Raises Voter Access Fears," Atlanta Journal Constitution, (Oct. 13, 2016); Kristina Torres, "State Monitored For Voting Rights Issues," Atlanta Journal Constitution, (Jun. 20, 2016)).

By 2019, the Leadership Conference Education Fund determined that Georgia had closed over 200 polling locations since June of 2012, despite the significant growth in Georgia's population. PX 4, 50. "A 2020 study found that 'about two-thirds of the polling places that had to stay open late for the June primary to accommodate waiting voters were in majority-Black neighborhoods, even though they made up only about one-third of the state's polling places.'" <u>Id.</u> (citing Stephen Fowler, "Why Do Nonwhite Georgia Voters Have to Wait in Line for Hours? Their Numbers Have Soared, and Their Polling Places Have Dwindled,"          ProPublica,          https://www.propublica.org/article/why-do-

222

nonwhite-georgia-voters-have-to-wait-in-line-for-hours-their-numbers-have-soared-and-their-polling-places-have-dwindled, (Oct. 17, 2020)).

Specifically, in the challenged area (i.e., around Illustrative CD-6), "[i]n 2020, the nine counties in metro Atlanta that had nearly half of the registered voters (and the majority of the Black voters in the state)[, but] had only 38% of the state's polling places." PX 4, 51 (citing Fowler, "Why Do Nonwhite Georgia Voters Have to Wait in Line for Hours?"). In 2020, Union City, which is within Illustrative CD-6 and has a Black voting age population of 88%, had wait times as long as five hours. PX 4, 51 (citing Mark Niesse and Nick Thieme, "Fewer Polls Cut Voter Turnout Across Georgia," Atlanta Journal Constitution (Dec. 15, 2009); Fowler, "Why Do Nonwhite Georgia Voters Have to Wait in Line for Hours?").

At trial, Dr. Burton testified about his findings as to polling place closures and his conclusion that they disproportionately impacted Black voters. Tr. 1432:21–25; 1441:2–21. These conclusions were not raised on cross examination. Tr. 1465:6–1494:14.

The Court concludes that <u>Pendergrass</u> Plaintiffs' evidence of polling place closures—and, notably, in west-metro Atlanta where <u>Pendergrass</u> Plaintiffs

223

propose Illustrative CD-6 be drawn as an additional majority-minority district—is recent evidence of a voting practice with a disproportionate impact on Black voters.

**(b)** <u>**exact match and registration list purges**</u>

<u>Pendergrass</u> Plaintiffs' evidence also shows Georgia's voting practices include roadblocks to the voting efforts of minority voters in the form of the Exact Match system and the State's purging of voter registration lists. PX 4, 49–51 (citing U.S. Commission on Civil Rights, <u>An Assessment of Minority Voting Rights Access in the United States: 2018 Statutory Enforcement Report</u> (Washington, 2018), 369).

These practices, however, have been determined in prior decisions by the Court to *not* be illegal under federal law. The prior decisions upholding the Exact Match requirement and registration list purges certainly impact the weight to afford these voting practices. However, in this case, the evidence shows— without contradicting the prior legal determinations—that these practices have a *disproportionate effect* on Black voters for purposes of the instant totality of the circumstances inquiry. Specifically, when these prior decisions are considered in

224

the light of the legal frameworks at issue, the Court finds that these practices can be used as evidentiary support of a disproportionate discriminatory impact on Black voters in Georgia without contradicting or minimizing the prior decisions upholding Georgia's laws.

Specifically, Georgia's Exact Match procedure was determined to not violate VRA's Section 2 because when the burden on voters, the disparate impact, and the State's interest in preventing fraud were considered together, the weighing of these considerations counseled against finding a violation. Fair Fight Action, 634 F. Supp. 3d at 1246. The Exact Match decision in Fair Fight relied on the Brnovich decision and emphasized that "the modest burdens allegedly imposed by [the Exact Match law], the small size of the disparate impact [on Georgia voters as a whole], and the State's justifications" did not support a Section 2 violation. Id. at 1245 (citing Brnovich v. Democratic Nat'l Comm., 594 U.S. ----, 141 S. Ct. 2321, 2346 (2021)). Even without a Section 2 violation, however, the Court found that the Exact Match requirement disproportionately impacted Black voters given that: Black voters were a smaller portion of the electorate but as of January 2020, 69.4% of individuals flagged as "missing identification

225

required" were African American, and 31.6% of the voters flagged for pending citizenship 31.6% were African American, whereas white voters only accounted for 20.9%. Fair Fight Action, 634 F. Supp. 3d at 1160, 1162; Tr. 1283:3–10. The Court's decision in Fair Fight itself acknowledged that the Exact Match practice in Georgia has a *discriminatory impact* on Black voters—the inquiry specifically at issue here. When the Court considers Fair Fight's determination in the light of the Civil Rights' Commission's report that generally Exact Match practices are a roadblock to minority voters, the Court concludes that this modern practice in Georgia supports that Georgia's modern voting practices have a discriminatory effect on Black voters.

The same Fair Fight case also resolved on summary judgment (in favor of the State) claims that purges of voter registration lists violated the Constitution. Fair Fight Action, Inc. v. Raffensperger, No. 18-cv-5391, 2021 WL 9553856 (N.D. Ga. Mar. 31, 2021). The Anderson-Burdick framework governed this summary judgment resolution and notably did not require any showing or determination of racial discrimination. Id. Instead, the Court's task was to balance the voter's burden with the State's interest in complying with federal law (i.e., the National

226

Voter Registration Act). 2021 WL 9553856, *at 15–18. The Court's weighing of these considerations does not instantly preclude a finding that Georgia's voter purges have a disproportionate impact on Black voters for purposes of the totality of the circumstances inquiry here. This is especially the case in the light of the expert evidence that these voter purges have minimized the "electoral influence of minority voters and particularly of Black Georgians." PX 4, 2. Thus, the Court finds that, while not illegal under <u>Anderson-Burdick</u>, the voter purges provide some evidence of modern practices with disproportionate discriminatory impact on Black voters in Georgia.

Accordingly, while the Court is cognizant of the prior decisions upholding the Exact Match and registration list purges in Georgia, the Court still finds that these voting practices are *some* evidence indicating a disproportionate impact on Black voters.

### (c)     <u>SB 202's disparate impact</u>

The <u>Pendergrass</u> Plaintiffs also cite to Georgia's passage of SB 202 as evidence of modern discrimination. The General Assembly passed SB 202 following the 2020 Presidential election. PX 4, 53–56; Tr. 1474:10–1481:1. A

227

challenge to SB 202 is pending in the Northern District of Georgia and has not been resolved at the time the Court enters this Order.[52] In re SB 202, 1:21-mi-55555 (N.D. Ga. Dec. 23, 2021). The Court acknowledges that the evidence presented in that case is not presently before this Court.[53] Given this pending challenge to SB 202, the Court proceeds cautiously in an effort of judicial restraint, which counsels against the Court preemptively making any findings that could lead to inconsistent rulings or implicate the ultimate determination of the legality of SB 202.

_____

[52] The Court notes that on October 11, 2023, the district court hearing the case ruled on a pending motion for preliminary injunction that involves Section 2 and constitutional challenges to several provisions in SB 202. In re SB 202, 1:21-mi-55555, ECF No. 686 (N.D. Ga. Oct. 11, 2023). The court denied the plaintiffs motions for preliminary injunction and found that there was not a substantial likelihood of success on the merits of any of their claims. Id. at 61. No rulings in that case are binding on this Court. McGinley v. Houston, 361 F.3d 1328, 1331 (11th Cir. 2004) ("[A] a district judge's decision neither binds another district judge nor binds him"). However, the Court is cautious in its discussion of SB 202 to avoid inconsistent rulings and creating confusion.

[53] To be abundantly clear, this Court does not have a challenge to SB 202 before it. Plaintiffs' experts have provided evidence regarding potential motivations behind SB 202 and the impact that its passage had on Black voters. APAX 2; PX 4; GX 4. And Defendants provided counter evidence. See Tr. 2261–2307 (testimony of Ryan Germany). The Court evaluates solely the evidence adduced in this case.

228

With these qualifications in mind, the Court cannot ignore that evidence on SB 202 has been presented by the Plaintiffs as proof of present discriminatory practices in Georgia's treatment of Black voters. PX 4, 53–55, Tr. 1474:10–1481:1.[54] Defendants likewise provided rebuttal testimony. See generally Tr. 2261–2307. The Court, treading cautiously, tethers its findings regarding SB 202 to the testimony and evidence provided by Pendergrass Plaintiffs' experts *for purposes of the totality of the circumstances inquiry on the Senate Factors*. Namely, the Court considers the passage of SB 202, once again, as some evidence of practices with a disproportionate impact on Black voters. This determination is made with the conclusion of Dr. Burton, Pendergrass Plaintiffs' expert, in mind: "[t]he history of Georgia demonstrates a clear pattern" (PX 4, 4), where "periods of increased nonwhite voter registration and turnout" have been followed by the state

---

[54] Drs. Burton and Jones concluded that certain portions of SB 202 have an actual or perceived negative impact on Black voters. See Tr. 1185:17–1186:16 (Dr. Jones opining that Black voters increased use of absentee ballots and their use of drop boxes correlated with the passage of SB 202); Tr. 1445: 1–25 (Dr. Burton opining that certain provisions of SB 202 were put in place because of the gains made by Black voters in the electorate).

[passing] legislation" to deter minority voters. PX 4, 10. Dr. Burton specifically cites the passage of SB 202 as evidence of this pattern. PX 4, 10.

Accordingly, the Court considers SB 202 as evidence of a current manifestation of a historical pattern that following an election, the General Assembly responsively passes voting laws that disproportionately impact Black voters in Georgia.

### (4)   *Defendant's rebuttal evidence*

The Court now turns to Defendants' rebuttal evidence. To begin, Defendants submit no rebuttal expert or report to Dr. Burton's report and testimony. Tr. 1425:8–16. In fact, Defendants do not affirmatively rebut the aforementioned evidence with their own evidence. Instead, Defendants cross-examined Dr. Jones on the prior legal determinations that the Exact Match and list maintenance procedures utilized by Georgia. Tr. 1251:16–19. As the Court has already determined, it considers these prior judicial decisions as part of its weighing of this evidence. It also has assessed the basis for these prior decisions and has determined that it is not inconsistent with these prior rulings to now find that these voting practices have a discriminatory impact on Black voters for

230

purposes of the instant totality of the circumstances. See Section II(C)(4)(b)(3)(b) *supra*.

Defendants also, through lay witness testimony, submitted that Georgia has implemented legislation to make it easier for all voters to participate.[55] In favor of Defendants on these factors, the Court considers Mr. Germany's testimony about SB 202 indicates that the motive for passing the law was to alleviate stress on the electoral system and increase voter confidence. Tr. 2265:5–23. Moreover, SB 202, among other things, expanded the number of early voting days in Georgia. Tr. 1476:7–9. There's evidence that Georgia employs no-excuse absentee voting (Tr. 1476:10–13), automatic voter registration through the Department of Driver Services (Tr. 2263:12–20) and voters to register the vote using both paper registration and online voter registration (Tr. 2263:14–23).

---

[55] The Court notes that on cross-examination Mr. Germany explained that SB 202 received numerous complaints; however, he is unable to quantify whether those complaints primarily came from Black voters because the Secretary of State's Office does not analyze the impact of the legislation on particular categories of voters—i.e., white voters v. Black voters. In his opinion, that analysis is not helpful to the overall goal to "make it easy for everyone, regardless of race." Tr. 2283:2–2285:5.

Georgia offers free, state-issued, identification cards that voters can use to satisfy Georgia's photo ID laws. Tr. 2264:15–22.

Additionally, the Court has also been presented with additional evidence that immediately prior to Shelby County, the DOJ precleared Georgia's 2011 Congressional Plan. Tr. 1471:14–17. Moreover, following the passage of SB 202, Georgia experienced record voter turnout in the 2022 midterm election cycle. Tr. 1480:3–9.

### (5)   Conclusion on Senate Factors One and Three

In sum, the majority of the evidence before the Court shows that Georgia has a long history of discrimination against Black voters. This history has persisted in the wake of the VRA and even into the present through various voting practices that disproportionately effect Black voters. Pendergrass Plaintiffs have provided concrete recent examples of the discriminatory impact of recent Georgia practices, some specifically in the challenged area of Illustrative CD-6.

Defendants have submitted some recent evidence of Georgia increasing the access and availability of voting. The evidence even shows that *overall* voter

turnout has increased in the most recent national election.[56] These efforts are commendable, and the Court is encouraged by these developments. In the Court's view, however, it is insufficient rebuttal evidence. Thereby, *in toto*, the Court concludes that Georgia has a history—uncontrovertibly in the past, and extending into the present—of voting practices that disproportionately impact Black voters. Thus, Senate Factors One and Three, on the whole, weigh in favor of finding a Section 2 violation.

### c)      Senate Factor Two: racial polarization

The second Senate Factor assesses "the extent to which voting in the elections of the State or political subdivision is racially polarized." Wright, 979 F.3d at 1305 (quoting LULAC, 548 U.S. at 426). As indicated in the Pendergrass Summary Judgment Order (Doc. No. [215], 97), polarization is a factor to be considered in the totality of circumstances inquiry, in addition to the second and third Gingles preconditions. Pursuant to persuasive authority, the

_____

[56] As discussed in greater detail, *infra*, Black voter turnout rate decreased by 15 points from the 2020 election cycle to the 2022 election cycle and recorded the lowest voter turnout rate in a decade. See Section II(D)(4)(e)(1) *infra*.

233

Court finds that when a Defendant has raised a race-neutral reason for the polarization, the Court must look beyond the straight empirical conclusions of polarization. See Nipper, 39 F.3d at 1524 (plurality opinion) (finding that Defendants may rebut evidence of polarization by showing racial bias is based on nonracial circumstances); Uno v. City of Holyoke, 72 F.3d 973, 983 (1st Cir. 1995) (stating that an inference of racial polarization "will endure *unless* and *until* the defendant adduces credible evidence tending to prove the detected voting patterns can most logically be explained by factors unconnected to the intersection of race with the electoral system.").

Defendants have consistently argued that partisanship is a race-neutral explanation for polarization of voters in Georgia. See, e.g., Tr. 2410:18–2411:14. In an intentional discrimination context, the Eleventh Circuit cautioned courts "against conflating discrimination on the basis of party affiliation on the basis of race . . . . [e]vidence of *race-based* discrimination is necessary to establish a constitutional violation." League of Women Voters of Fla. Inc. v. Fla. Sec'y of State, 66 F.4th 905, 924 (11th Cir. 2023) (emphasis in original) (citing Brnovich, 141 S. Ct. at 2349). However, Chief Justice Roberts recently confirmed that a

234

Section 2 violation "occurs where an 'electoral structure operates to minimize or cancel out' minority voters' 'ability to elect their preferred candidates.' Such as risk is greatest 'where minority and majority voters consistently prefer different candidates' and where minority voters are submerged in a majority voting population that 'regularly defeat[s]' their choices." <u>Allen</u>, 599 U.S. at 1, 17–18.

The Court acknowledges that whether voter polarization is on account of partisanship and race is a difficult issue to disentangle. During an extended colloquy with the Court, Dr. Alford testified that "voting behavior is complicated" and that in his view democracy is about "voting for a person that follows their philosophy or they think is going to respond to their needs." Tr. 2182:4–5; 2183:4–8. He went on to clarify that party identity and affiliation is exceptionally strong this country and starts at a young age. Tr. 2183:8–2184:6.

Dr. Alford concluded that, from the empirical evidence presented by <u>Pendergrass</u> Plaintiffs, one cannot causally determine whether the data is best explained by party affiliation or racial polarization. He specifically testified that:

> [T]he kind of data that we use here, which is, you know ecological and highly abstract data, cannot demonstrate cohesion in sort of its natural form.

> Much of the work on things like individual-level surveys, exit polls, et cetera, also make it very difficult in a non-experimental setting to demonstrate causation. It really takes an experimental setting. So there is some work done in experimental settings, but this is not an area of inquiry that is—scientific causation in the social sciences is very difficult to establish. This is not an area where there has been any work that's established that.

Tr. 2226:7–18.

The Court is not in a position to resolve the global question of what causes voter behavior. Such question is empirically driven, and one in which the expert political scientists and statisticians did not agree. The Court can, however, assess the *evidence* of polarization presented at trial. In doing so, the Court determines that the Pendergrass Plaintiffs shown sufficient evidence of racial polarization in Georgia voting.

The Pendergrass Plaintiffs present Dr. Palmer's report, indicating strong evidence of racial polarization in voting. PX 2; see also Section II(C)(2)–(3) *supra*. Plaintiffs also offered testimony about the strong connection between race and partisanship as it currently exists in Georgia. Tr. 424:5–8 (affirming that "race and party cannot be separated for the purpose of [Dr. Palmer's] racial polarization analysis"); 1460:11–15 ("[O]ne party is highly supporting . . . issues that are most

236

important to minorities, particularly African Americans. And another party is not getting a good grade on how they're voting for them."); PX 4, 74 (indicating the "opposing positions that member's of Georgia's Democratic and Republican parties take on issues inexplicably linked to race.").

Defendants also argued that there must be evidence that voter's change their behavior based on the candidate to show that the polarization is race-based. Tr. 2409:25–2410:9. The Court finds that this is not a necessary precondition to determining whether voting is polarized on account of race. Race of a candidate is not dispositive for a polarization inquiry. DeGrandy, 512 U.S. at 1027 ("The assumption that majority-minority districts elect only minority representatives, or that majority-white districts elect only white representatives, is false as an empirical matter. And on a more fundamental level, the assumption reflects the demeaning notion that members of the defined racial groups ascribe to certain minority views that must be different from those of other citizens." (citation omitted)). The Court, however, finds that an assessment of the success of Black candidates in reference to different percentages of white voters, is good evidence that partisanship is not the best logical explanation of racial voting patterns in

237

Georgia. Cf. Johnson v. Hamrick, 196 F.3d 1216, 1221–22 (11th Cir. 1999) ("We do not mean to imply that district courts *should* give elections involving [B]lack candidates more weight; rather, we merely note that in light of existing case law district courts may do so without committing clear error.").

Assuming *arguendo* that evidence of voter behavior in relation to the race of the candidate were required, Pendergrass Plaintiffs have provided evidence showing racial polarization based on the race of the candidate. Pendergrass Plaintiffs offer the expert opinions and testimony of Dr. Burton, who assessed the success of Black candidates in the light of the percentage of white voters in the district.

The following chart showcases his findings:

238

Winning Candidates in 2020 in Georgia House of Representatives

| Percentage white registered voters in district | White Republicans[197] | Black Democrats | White Democrats |
|---|---|---|---|
| Under 40% | 0 | 48 | 7 |
| 40–46.2% | 1 | 3 | 2 |
| 46.2–54.9 | 11 | 1 | 6 |
| 55–62.4% | 23 | 0 | 5 |
| Over 62.4% | 68 | 0 | O |

Winning Candidates in 2020 in Georgia State Senate

| Percentage white registered voters in district | White Republicans | Black Democrats | White Democrats |
|---|---|---|---|
| Under 47% | 0 | 16 | 1 |
| 47–54.9% | 3 | 0 | 3 |
| Over 55% | 51 | 0 | 0 |

PX 4, 56 (footnote content omitted).

There is a meaningful difference in Black candidate success depending on the percentage of white voters in a district. When the white voter percentage is lowest, Black Democratic candidates have the most success. However, as the percentage of white voters increases, Black elected officials decreased. Id. And, when the white voter percentage reaches 47% (for the State Senate) or 55% (for

239

the State House) of the electorate no Black candidates are elected, even though white Democrats do achieve some success. PX 4, 56. These findings are consistent with Dr. Palmer's unrebutted findings about the challenged districts: Black voters voted for the same candidate, on average, 98.4% of the time and white voters voted for a different candidate, on average, 87.6% of the time. Stip. ¶ 223.

In contrast to <u>Pendergrass</u> Plaintiffs' evidence, Defendants' expert, Dr. Alford, rendered only descriptive conclusions based on Dr. Palmer's data set and, most importantly, did not offer additional support for a conclusion that voter behavior was caused by partisanship rather than race. DX 8. To be sure, Defendants did not offer any further evidence—quantitative or qualitative—in support of their theory that partisanship, not race, is controlling voting patterns in Georgia.

While the Court acknowledges that the Black preferred candidate was the Democrat in all elections reviewed, the Court also finds that there is not sufficient evidence to show that Black people myopically vote for the Democrat candidate. The Court specifically asked Dr. Alford, "[a]re you saying that whites folks will vote for Republicans just because they're Republicans, and Blacks folks will vote

240

for Democrats just because they're Democrat?" Tr. 2180:23–25. Dr. Alford responded by answering, "I've spent a lifetime trying to understand voting behavior and, I would never say something as simple as that. It's much more complicated than that." Tr. 2181:1–3. The Court agrees that it is too simple to find that partisanship is the moving force behind a Black voter's choice of candidate. The history provided to the Court shows the complicated history between the current Republican Party and Black citizens. See Tr. 1444:23–1448:21 (explaining the history of politics in Georgia, and nationwide, as it relates to race and partisan affiliation).

Finally, even Defendant's expert agreed that candidate choices and Black political alignment with the Democratic party is not just based on the party label.

> The Court: So could it be said that voters are not necessarily voting for the party; they're voting for a person that follows their philosophy or they think is going to respond to their needs?
>
> [Dr. Alford]: That's -- with my view, that's what democracy is about. That's what's going on. It is the case that in the United States, unlike in most other democracies, party identity is also really important, that we identify with a party.

Tr. 2183:4–12. Given all the evidence before the Court, the Court finds that there is significant evidence that "minority and majority voters consistently prefer different candidates", and because "minority voters are submerged into a majority voting population that 'regularly defeat[s]' their choice," Georgia's "electoral structure operates to minimize or cancel out' [Black] voters' 'ability to elect their preferred candidates.'" <u>Allen</u>, 559 U.S. at 17–18.

In light of the foregoing evidence, the Court finds that Senate Factor Two weighs heavily in favor of finding a Section 2 violation.

### d)   Senate Factor Five:[57] socioeconomic disparities

Senate Factor Five considers socioeconomic disparities between Black and white voters and these disparities' impact on Black voter participation. The Eleventh Circuit recognized in binding precedent that "disproportionate educational, employment, income level, and living conditions arising from past discrimination tend to depress minority political participation.'" <u>Wright</u>, 979 F.3d

---

[57] Senate Factor 4—a history of candidate slating for congressional elections—is not at issue because Georgia's congressional elections do not use a slating process. Doc. No. [173-1], 32; <u>see also</u> <u>Alpha Phi Alpha Fraternity</u>, 587 F. Supp. 3d at 1317.

at 1294 (quoting United States v. Marengo Cnty. Comm'n, 731 F.2d 1546, 1568 (1984)). "Where these conditions are shown, and where the level of [B]lack participation is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." Id. (quoting Marengo Cnty., 731 F.2d at 1568-69); United States v. Dallas Cnty. Comm'n, 739 F.2d 1529, 1537 (11th Cir. 1984) ("Once lower socio-economic status of [B]lacks has been shown, there is no need to show the causal link of this lower status on political participation.")).

### (1)   *Black voter participation*

The Court finds that, as a quantitative matter, Black voters participate less than white voters in Georgia's elections. Pendergrass Plaintiffs' expert, Dr. Collingwood, in evaluating Black and white voter turnout used the data from the Secretary of State's website, which records the actual number of registrations and votes cast by racial group. Tr. 684:2–10.

Dr. Collingwood's data shows that in the 2022 election cycle Black voters had a 45% turnout rate and white voters had a 58.3% turnout rate—a 13.3% gap. PX 6, 8. The 2020 election recorded similar results, where Black voter turnout was

243

60% and white voter turnout was 72.6%, a 12.6% difference. <u>Id.</u> By contrast in 2018 Black voter turnout was 53.9% and white voter turnout was 62.2%, which is only a 8.3% difference and 2012, which recorded the smallest gap, Black voters turned out at 72.6% and white voters turned out at 75.7%. <u>Id.</u> Using the precinct specific data, in 2020 white voters had a higher turnout in 79.2% of precincts and in 2022 that increased to 81.0%. PX 6, 14. Based on this data, Dr. Collingwood concluded that overall Black voter turnout has decreased over the last 6–8 years. <u>Id.</u>; Tr. 684:23–25.

Specifically, in the challenged district, Dr. Collingwood found that in the 2020 election, the percentage of Black voter turnout did not exceed the percentage of white voter turnout in any county.[58] In the counties affected most by the Illustrative Congressional Plan (Cobb, Fulton, Douglas, and Fayette), the percentage of white voter turnout exceeded the percentage of Black voter turnout. <u>Id.</u>; PX 6, 16.

---

[58] In 2022 the percentage of Black voter turnout slightly exceeded white turnout in Clayton, Henry, and Rockdale counties. PX 6, 16.

In addition to voter turnout rates, Dr. Collingwood provided statistical evidence that white voters had higher participation rates in the political process outside of casting a ballot more than Black voters. White voters had higher participation than Black voters in attending local political meeting (5.92% of white voters, 3.51% Black voters); putting up political signs (17.95% white voters, 6.46% Black voters), working for a candidate's campaign (3.65% white voters, 1.84% Black voters); contacting a public official (21.01% white voters, 8.84% Black voters), and donating money to political campaigns (24.36% white voters, 13.63% Black voters). PX 6, 36–37, tbls. 4–6, 8, 9; Tr. 700:6–701:20, 702:8–24. Some of these metrics present relatively comparable white voter participation and Black voter participation (i.e., attending local political meetings, working for political campaigns). Dr. Collingwood testified that under ordinary methods, these close percentages still are statistically significant.[59] Tr. 700:11–15. The Court credits Dr. Collingwood's conclusions and finds that white voters tend to engage more with the political process than Black voters across various metrics.

_____

[59] Defendants did not rebut these findings regarding Black voter participation in the political process.

245

Defendants did not put forth rebuttal evidence contesting that Black voter participation in the political process was lower than white voters. Defendants also did not challenge or rebut the accuracy of Dr. Collingwood's findings on voter turnout, but rather questioned whether they were sufficient to prove lower percentages of Black voter participation. Tr. 695:5–13; 700:6–704:10. Defendants argue that voter turnout depends on voter mobilization, which can be explained largely by the candidates on the ballot. See Tr. at 694:9–696:13. At the trial, Defendants questioned Dr. Collingwood about the significance of particular Black candidates appearing on the ballot—i.e., President Obama in 2012 and Stacy Abrams in 2018. Tr. 695:5–21. Dr. Collingwood agreed that the particular candidate on the ballot could have some effect. Tr. 695:5–21.

The Court understands Defendants argument to be that voter turnout is not suppressed because Black voters are actively *choosing not* to vote, unless an "exciting" candidate is running for office. To prove this point, Defendants cited to discrete elections of Black candidates where voter turnout was high for both

246

Black and white voters.[60] However, Defendants provide no empirical evidence to support this conclusion; rather, the only evidence on this point is a hypothetical question asked to Pendergrass Plaintiffs' expert. The Court is not persuaded by this argument.

Even assuming that Defendants' theory of voter mobilization could be a valid legal argument rebutting statistical evidence of suppressed Black voter turnout, Defendants submitted little-to-no evidence connecting lower Black voter turnout to a lack of motivation to vote. Some nonempirical testimonial evidence on cross examination that the candidates on a ballot impact voter turnout is insufficient to rebut the expert statistical evidence presented by Pendergrass Plaintiffs that Black voter turnout is, on the whole and across elections,

_____

[60] To the extent that Defendants rely on the 2012 presidential election and the 2018 gubernatorial election because of the race of the candidate, the Court determines that the whole of the evidence does not support that the race of the candidate explains voter turnout. Specifically, in 2020, where the disparity in voter turnout was 12.6%, Senator Warnock was running for the U.S. Senate and became the first Black Senator in Georgia's history. Jud. Not., 11. Similarly, in 2022, where the disparity in voter turnout was 13.3%, Stacey Abrams ran for Governor and Senator Warnock ran against Herschel Walker for U.S. Senate. Id. In both of the 2020 election contests, Black candidates were at the top of the ballot, like in the 2012 and the 2018 elections, but turnout gap was greater than in the preceding election.

247

disproportionately lower than white voter turnout, and that Black voters participate less in the political process than white voters. Thus, the Court concludes that <u>Pendergrass</u> Plaintiffs submitted evidence that Black Georgians participate in the political process, both generally and in voter turnout, less than white voters.

### (2)   *Socio-economic disparities*

The Court also concludes that there is sufficient evidence in the Record to show disproportionate educational, employment, income level, and living conditions arising from past discrimination. Census estimates provide: the unemployment rate among Black Georgians (8.7%) is nearly double that of white Georgians (4.4%); white households are twice as likely as Black households to report an annual income above $100,000; Black Georgians are more than twice as likely—and Black children, in particular, are more than three times as likely—to live below the poverty line; Black Georgians are nearly three times more likely than white Georgians to receive SNAP benefits; Black adults are more likely than white adults to lack a high school diploma (13.3% as compared to 9.4%); 35% of white Georgians over the age of 25 have obtained a bachelor's degree or higher,

compared to only 24% of Black Georgians over the age of 25. PX 6, 4 & tbl.1; Stip.

¶ 342–347. Additionally, Black Georgians are more likely to report a disability

than white Georgians (11.8% compared to 10.9%) and are more likely to lack

health insurance (18.9% compared to 14.2%, among 19-to-64-year-olds). PX 6 at

4. Defendant did not meaningfully contest this evidence. Thereby, the Court

concludes that this evidence is more than sufficient to show socioeconomic

disparities exist between Black and white Georgians.

### (3)    *Conclusion on Senate Factor Five*

Under binding precedent, Pendergrass Plaintiffs have proven that rates of

Black voter political participation are depressed as compared to white voters

participation. The aforementioned evidence also shows that Black Georgians

suffer from significant socioeconomic disparities, including educational

attainment, unemployment rates, income levels, and healthcare access. When

both of these showings have been made, the law does not require a causal link be

proven between the socioeconomic status and Black voter participation. Wright,

979 F.3d at 1294 (citing Marengo Cnty. Comm'n, 731 F.2d at 1568).[61] Accordingly, the Court concludes that the socioeconomic evidence and the lower rates of Black voter participation support a finding that Senate Factor Five weighs heavily in favor of a Section 2 violation.

### e)    Senate Factor Six: racial appeals in Georgia's political campaigns

Senate Factor Six "asks whether political campaigns in the area are characterized by subtle or overt racial appeals." Wright, 979 F.3d at 1296 (quoting Gingles, 478 U.S. at 45). Courts have continually affirmed district courts' findings of "overt and blatant" as well as "subtle and furtive" racial appeals. Gingles, 478 U.S. at 40; see also Allen, 599 U.S. at 22–23. However, in the Alabama district court proceedings, which preceded the Allen appeal, the trial court had assigned less weight to the evidence of racial appeals because the plaintiffs had only shown three examples of racial appeals in recent campaigns, but did not submit

---

[61] While not required as a matter of law, as a matter of social science, Dr. Collingwood's report indicates that the academic literature "demonstrates a strong and consistent link between socioeconomic status [ ] and voter turnout." PX 6, 7. He describes this link in terms of resources causally driving behavior. Id. At trial, Dr. Collingwood also testified to the same. Tr. 688:15–689:3.

"any systematic or statistical evaluation of the extent to which political campaigns are *characterized* by racial appeals" and thus the court could not evaluate if these appeals "occur frequently, regularly, occasionally, or rarely." Singleton, 582 F. Supp. 3d at 1024.

Similarly here, the Court finds that there is evidence of isolated racial appeals in recent Georgia statewide campaigns.[62] However, there is no evidence for the Court to determine if these appeals *characterize* political campaigns in Georgia. Thus, while Pendergrass Plaintiffs submitted at least six instances[63] in

---

[62] None of the evidence of racial appeals occurred in congressional races.

[63] Pendergrass Plaintiffs have provided evidence of six racial appeals used in recent Georgia elections across the past few election cycles:

In the 2018 gubernatorial election, then-Secretary of State Kemp, (now twice-elected Governor) used a social media campaign to associate Stacey Abrams with the Black Panther Party and ran a commercial advertisement where he discussed rounding up illegal immigrants in his pickup truck. PX 4, 67; Tr. 1364:12–16.

In the 2020 U.S. Senatorial election, then-Senator Kelly Loeffler ran an ad against "a dangerous Raphael Warnock," whose skin had been darkened, and who was also associated with communism, protests, and civil unrest. Tr. 1193:19–1195:5; APAX 31; APAX 2, 39.

In 2022, during the senatorial race between Senator Warnock and Herschel Walker, Mr. Walker ran an advertisement that aimed to distinguish "between the Black candidate and himself" as the Republican candidate, in order to "associate himself with

251

recent elections where racial appeals were invoked—which is some evidence of political campaigns being characterized by racial appeals—the Court cannot meaningfully evaluate whether these appeals "occur frequently, regularly, occasionally, or rarely" and thereby does not afford great weight to this factor. Singleton, 582 F. Supp. 3d at 1024.

### f)   Senate Factor Seven: minority candidate success

Senate Factor Seven "focuses on 'the extent to which members of the minority group have been elected to public office in the jurisdiction.'" Wright, 979 F.3d at 1295 (quoting LULAC, 548 U.S. at 426). Unlike the second and third Gingles preconditions, the Court now must specifically look at the success of *Black* candidates, not just the success of Black preferred candidates. Assessing the

_____

the white voter [and] mak[e] the Black candidate look menacing and problematic . . . ." Tr. 1198:1–1199:10; APAX 2, 43–44.

Also in 2022, in the Republican primary for governor, former Senator David Purdue stated in an interview, that Abrams was "demeaning her own race" and should "go back where she came from." PX 4, 70 (citing Ewan Palmer, "David Perdue Doubles Down on 'Racist' Stacey Abrams Remarks in TV Interview," Newsweek, (May 24, 2022), https://www.newsweek.com/david-perdue-racist-stacey-abrams-go-back-georgia-1709429.). Later, in the general gubernatorial election, Governor Kemp darkened Abrams's face in ads and repeatedly attacked Abrams in the general election as "upset and mad," evoking the trope and dog whistle of the "angry Black Woman." PX 4, 70.

results of Georgia's recent elections, the Court finds that Black candidates have achieved little success, particularly in majority-white districts.

As a population, Black Georgians have historically been and continue to be underrepresented by Black elected officials across Georgia's statewide offices. Georgia has never elected a Black governor (Stip. ¶ 349) and Black candidates have otherwise only had isolated success in statewide partisan elections in the last 30-years. Specifically, in 2000, David Burgess was elected Public Service Commissioner, in 2002 and 2006 Mike Thurmond was elected to Labor Commissioner, and in 1998, 2002, and 2006 Thurbert Baker was elected Georgia Attorney General.[64] Stip. ¶361. Most recently, after 230 years of exclusively white Senators, Senator Raphael Warnock was twice elected to U.S. Senate and in his most recent election he defeated a Black candidate. Jud. Not., 11. Finally, nine

---

[64] The Court takes judicial notice of the elections that each candidate successfully won. See Scott v. Garlock, 2:18-cv-981-WKW-WC, 2019 WL 4200400, at *3 n. 4 (M.D. Ala. July 31, 2019) (taking judicial notice of the publicly filed election results).

Black individuals have been elected to statewide nonpartisan office in Georgia.[65] Stip. ¶ 362.

In Georgia's congressional elections, only 12 Black candidates have ever been elected to the Congress. Tr. 1201:1–5. Five Black individuals serve in the United States House of Representatives from Georgia's current congressional districts. Stip. ¶ 359. Four of these Black congresspersons are elected in majority-Black districts. PX 1, K-1. The other Black Representative, Congresswoman Lucy

---

[65] The Court takes judicial notice of the following election results. Justice Robert Benham was elected to Georgia Court of Appeals in 1984 and was re-elected to the Georgia Supreme Court Justice five times following his 1989 appointment until his 2020 retirement. Justice Leah Ward-Sears was re-elected to the Georgia Supreme Court after her appointment in 1992 and served until her retirement in 2009. Justice Harold Melton was re-elected to the Georgia Supreme Court following his appointment in 2005 and served until his retirement in 2021. Justice Verda Colvin was appointed to the Georgia Supreme Court in 2021 and was re-elected in 2022. Judge John Ruffin was re-elected to the Georgia Court of Appeals following his appointment in 1994 and served until his retirement in 2008. Judge Clarence Cooper served as a judge on the Georgia Court of Appeals from 1990 until 1994 when he was appointed to the Northern District of Georgia. Judge Herbert Phipps was appointed to the Georgia Court of Appeals in 1999 and was re-elected twice before his retirement in 2016. Judge Yvette Miller was appointed to the Georgia Court of Appeal is 1999, has been re-elected since and continues to serve in this role. Judge Clyde Reese was appointed to the Georgia Court of Appeals in 2016 and was re-elected in 2018, where he served until his death in 2022.

McBath, represents Congressional District 7, which is a majority-minority district where the white voting age population is 32.78%.[66] PX 1, Ex. G.

In State legislative districts, the Georgia Legislative Black Caucus has only 14 members in the Georgia State Senate (25%) and 41 members in the Georgia House of Representatives (less than 23%).[67] Stip. ¶ 348. As shown Section II(C)(4)(f) *supra*, <u>Pendergrass</u> Plaintiffs' expert, Dr. Burton, submits a chart showing that in the 2020 and 2022 legislative elections, Black candidates had little-to-no success when they did not make up the majority of a district.[68] Specifically, Black candidates in the 2020 legislative elections did not have any success when they did not make up at least 45.1% of a House District or 53.8% of a Senate District.

---

[66] Congresswoman McBath first defeated white candidate Karen Handel in the 2018 Congressional District 6 election, in a district that had a white voting age population of 58.11%. Jud. Not., pp. 9–11; Stip. ¶ 167; PX 1, 64, Ex. F.

[67] The Enacted Senate Plan contains 14 majority-Black districts. Stip. ¶ 186; APAX 1, M-1. The Enacted House Plan contains 49 majority-Black districts. Stip. ¶¶ 183, 186, APAX 1, Z-1.

[68] The Court notes that Erick Allen was elected to Georgia House District 40 in 2018 and re-elected in 2020. Tr. 1012:2–12. House district 40 was not a majority-Black district in 2018 or 2020. <u>Id.</u>

Winning Candidates in 2020 in Georgia House of Representatives

| Percentage white registered voters in district | White Republicans[197] | Black Democrats | White Democrats |
|---|---|---|---|
| Under 40% | 0 | 48 | 7 |
| 40–46.2% | 1 | 3 | 2 |
| 46.2–54.9 | 11 | 1 | 6 |
| 55–62.4% | 23 | 0 | 5 |
| Over 62.4% | 68 | 0 | O |

Winning Candidates in 2020 in Georgia State Senate

| Percentage white registered voters in district | White Republicans | Black Democrats | White Democrats |
|---|---|---|---|
| Under 47% | 0 | 16 | 1 |
| 47–54.9% | 3 | 0 | 3 |
| Over 55% | 51 | 0 | 0 |

PX 4, 56.

Although the Court finds that Black candidates have achieved some success in statewide elections following 2000, the Court nonetheless finds that this factor weighs heavily in favor of Pendergrass Plaintiffs. The Supreme Court in Gingles, when discussing the success of a select few Black candidates, cautioned courts in conflating the success of few as dispositive. Gingles, 478 U.S.

256

at 76 ("Nothing in the statute or its legislative history prohibited the court from viewing with some caution black candidates' success in the 1982 election, and from deciding on the basis of all the relevant circumstances to accord greater weight to blacks' relative lack of success over the course of several recent elections.").

In short, since Reconstruction, Georgia has only elected *four* Black candidates in statewide partisan elections: Mike Thurmond, Thurbert Baker, David Burgess, and Raphael Warnock. Stip. ¶ 361. For statewide non-partisan elections, Georgia has elected nine successful Black candidates: Robert Benham, Leah Ward-Sears, Harold Melton, Verda Colvin, John Ruffin, Clarence Cooper, Herbert Phipps, Yvette Miller, Clyde Reese. Stip. ¶ 362. Georgia has sent twelve successful Black candidates to the U.S. House of Representatives. Tr. 1201:1–5. Currently, the Georgia Legislative Black Caucus has 55 members in the Georgia General Assembly (of 236 total members). Stip. ¶ 348.

The Court concludes that these isolated successes of Black candidates show that the Black population is underrepresented in Georgia's statewide elected offices. This conclusion is even stronger in majority-white districts.

To be sure, Dr. Burton acknowledged, that some academic scholarship indicates "the future electoral prospects of African American statewide nominees in growth states such as Georgia are indeed promising." Tr. 1470:2–24. The Court is likewise hopeful about the prospects of increased enfranchisement of all voters and for the potential success of minority candidates in Georgia. However, Dr. Burton also emphasized that, specifically in Georgia, dating back to Reconstruction, "when these things happen, then you get more legislation from whichever party is in power that works to sort of disenfranchise or at least dilute or make the vote count less." Tr. 1470:12–24. The optimism about Georgia's future elections does not rebut the contrary evidence of the present lack of success of Black candidates; accordingly, the Court finds that Senate Factor Seven weighs heavily in favor of finding a Section 2 violation.

### g) Senate Factor Eight: responsiveness to Black residents

Senate Factor Eight considers whether elected officials are responsive to the particularized needs of Black voters. A lack of responsiveness is "evidence that minorities have insufficient political influence to ensure that their desires are considered by those in power." Marengo Cnty. Comm'n, 731 F.2d at 1572. The

258

Eleventh Circuit noted that "although a showing of unresponsiveness might have some probative value a showing of responsiveness would have very little." Id. Pendergrass Plaintiffs' expert, Dr. Collingwood, discussed the existence of significant socioeconomic disparities between Black and white Georgians, which he concluded contributed to the lower rates at which Blacks engage their elected representatives. PX 5, 34, 37. He further explained, "such clear disadvantages in healthcare, economics, and education" demonstrates that "the political system is relatively unresponsive to Black Georgians." Id. at 4; see also id. at 7 ("If the [political] system did respond, we would expect to see fewer gaps in both health and economic indicators and a reduction in voter turnout gaps."); Tr. 675:14–24. Dr. Collingwood also testified that lower Black voter turnout "typically means that elected officials as a whole are going to be less responsive to you" and thus perpetuates "these same gaps [i]n [] economic, health, [and] educational outcomes." Tr. 690:2–20.

The Court finds that the arguments regarding socioeconomic disparities are not particularly helpful in determining whether Georgia's elected officials are responsive to Black Georgians. At the trial, a number of Pendergrass Plaintiffs'

259

lay witnesses testified about socioeconomic issues affecting Black voters, but also admitted that these issues are not exclusive to the Black population. Tr. 657:23–658:4; 1014:16–1015:4, 1016:1–8, 1016:18–24, 1016:25–1017:8; 639:24-640:25.

Ultimately, there is an absence of evidence regarding the level of responsiveness of Georgia's elected representatives to Black voters and white voters. Due to the lack of evidence, the Court finds that Senate Factor Eight does not weigh in favor of finding a Section 2 violation. See Greater Birmingham Ministries, 992 F.3d at 1334 (finding that failure to consider amendments to a particular piece of legislation does not show that legislatures were unresponsive to the needs of minority voters).

### h)    Senate Factor Nine: justification for the Enacted Congressional Plan

The Court considers Defendants' justification for the Enacted Congressional Plan and finds that this factor weighs in favor of Defendants and thus weights against finding a Section 2 violation. The "final Senate Factor considers whether the policy underlying Georgia's use of the voting standard, practice, or procedure at issue is 'tenuous.'" Rose v. Raffensperger, 619 F. Supp. 3d 1241, 1267 (N.D.2022) (quoting Senate Report at 29, 1982 USCCAN 207).

"Under our cases, the States retain a flexibility that federal courts enforcing § 2 lack . . . deference is due to their reasonable fears of, and to their reasonable efforts to avoid, § 2 liability." <u>Vera</u>, 517 U.S. at 978.

At the trial, Ms. Wright testified that the Enacted Congressional Plan began with the creation of a blank map that largely balanced population that then could be modified based on input from legislators. Tr. 1665:2–1666:14. Ms. Wright also relied on information obtained from the public hearings on redistricting. Tr. 1668:24–1670:5. Political performance was an important consideration in the design of the Enacted Congressional Plan. Tr. 1668:20–23. In Enacted CD-6 specifically, Ms. Wright emphasized and explained that the four-way split of Cobb Count was because Cobb County was better able to handle a split of a congressional district than a smaller nearby county. Tr. 1671:5–1672:4. She further testified that the inclusion of parts of west Cobb County in Enacted CD-14 was because of population and political considerations, namely putting a democratic area into District 14 instead of District 11 (which was more political competitive). Tr. 1673:6–1674:2.

The Court finds that Defendants' evidence that the Enacted Congressional Plan was drawn to further partisan goals is a sufficient, non-tenuous justification for this Senate Factor. The Supreme Court has held that partisan gerrymandering is outside of the reach of the federal courts and "[f]ederal judges have no license to reallocate political power between the two major political parties, with no plausible <u>Grant</u> of authority in the Constitution, and no legal standards to limit and direct their decisions." <u>Rucho v. Common Cause</u>, 588 U.S. ----, 139 S. Ct. 2484, 2507 (2019). Accordingly, the Court finds that Defendants' justification, supported by Ms. Wright's testimony, that the General Assembly drew the congressional plan to capitalize on a partisan advantage is sufficient for Senate Factor Nine to not weigh in favor of a Section 2 violation.[69]

### i)   **Proportionality**

Finally, Defendants argued that Georgia's Black congressional delegation is proportional to Georgia's Black voting age population, which shows that

---

[69] Consistent with the operative legal standards, this factor must be accorded less weight to Senate Factor Nine in a Section 2 case given that Section 2 is an effects test and that a legislatures' intent in drawing map is irrelevant.

Georgia's political process is equally open to Black voters. Tr. 52:16–17; 2392:12–2393:1. However, <u>De Grandy</u>, the Supreme Court expressly rejected proportionality as a safe harbor for Section 2 violations. <u>De Grandy</u>, 512 U.S. at 1017–18 ("Proportionality . . . would thus be a safe harbor for any districting scheme. The safety would be in derogation of the statutory text and its considered purpose, however, and of the ideal that the Voting Right Act of 1965 attempts to foster."). <u>De Grandy</u> did find, however, that proportionality is helpful in determining the "apparent[]" political effectiveness, based solely on an analysis of district makeups. <u>Id.</u> at 1014.

According to the 2020 Census population statistics,[70] under the Enacted Congressional Plan, four of Georgia's U.S. House Congressional districts are

---

[70] The Parties have stipulated to the data for the 2021 Enacted Plan contained in Dr. Cooper's report at Exhibit K-1. <u>See</u> PX 1, Exs. K-1. Exhibit K-1 reflects the 2020 Census population statistics. PX 1 ¶¶ 38, 62. The Court notes that under the various data sets, the number of majority-Black districts fluctuates between 2 and 4 districts. Using the NH DOJ CVAP and total AP Black numbers there are four majority-Black districts. PX 1, Exs. G, K-1. However, using the AP BVAP percentages only two districts are majority-Black CD-4 (54.52%), CD-13 (66.75%). PX 1, Ex. K-1. Enacted CD-2 has an AP BVAP of 49.29% and CD-5 has an AP BVAP of 49.60%. <u>Id.</u>

majority-Black districts, using the total AP Black population. (CD- 2, 4, 5, 13) (or

28.6% of the congressional districts[71]) and one additional majority-minority

district (CD-7) (for, a total of 5 majority-minority districts, which is 35.7% of the

| District | 18+ Pop | 18+ SR Black | % 18+ SR Black | 18+ AP Black | % 18+ AP Black | 18+ Latino | % 18+ Latino | 18+ NH White | % 18+ NH White |
|---|---|---|---|---|---|---|---|---|---|
| 001 | 589266 | 157770 | 26.77% | 166025 | 28.17% | 39938 | 6.78% | 440636 | 57.59% |
| 002 | 587555 | 281564 | 47.92% | 289612 | 49.29% | 30074 | 5.12% | 305611 | 39.94% |
| 003 | 586319 | 130099 | 22.19% | 136708 | 23.32% | 31274 | 5.33% | 492494 | 64.37% |
| 004 | 589470 | 308266 | 52.30% | 321379 | 54.52% | 59670 | 10.12% | 197536 | 25.82% |
| 005 | 621515 | 295885 | 47.61% | 308271 | 49.60% | 41432 | 6.67% | 273819 | 35.79% |
| 006 | 574797 | 50334 | 8.76% | 56969 | 9.91% | 52353 | 9.11% | 487400 | 63.70% |
| 007 | 566934 | 157650 | 27.81% | 169071 | 29.82% | 120604 | 21.27% | 225905 | 29.52% |
| 008 | 585857 | 170421 | 29.09% | 175967 | 30.04% | 35732 | 6.10% | 443123 | 57.91% |
| 009 | 592520 | 56416 | 9.52% | 61747 | 10.42% | 76361 | 12.89% | 495078 | 64.70% |
| 010 | 588874 | 126798 | 21.53% | 133097 | 22.60% | 38336 | 6.51% | 486487 | 63.58% |
| 011 | 595201 | 98212 | 16.50% | 106811 | 17.95% | 66802 | 11.22% | 469264 | 61.33% |
| 012 | 588119 | 207872 | 35.35% | 215958 | 36.72% | 28628 | 4.87% | 398843 | 52.13% |
| 013 | 574789 | 370024 | 64.38% | 383663 | 66.75% | 60467 | 10.52% | 125106 | 16.35% |
| 014 | 579058 | 77108 | 13.32% | 82708 | 14.28% | 61247 | 10.58% | 520854 | 68.07% |
| Total | 8220274 | 2488419 | 30.27% | 2607986 | 31.73% | 742918 | 9.04% | 5362156 | 65.23% |

PX 1, Ex. K-1.

The Parties have stipulated that the 2021 Enacted Plan contains 3 majority-Black congressional districts in the Atlanta MSA. Stip. ¶ 162. Enacted CD-2 is not in the MSA, but according to the Census data in the aforementioned exhibits, has an AP Black population that exceeds 50%. See PX 1, Ex. K-1 (showing CD-2 with an AP Black of 51.39%) & Ex. G (showing CD-2 with a non-Hispanic Black population of 49.03%). For purposes of this Order, the Court will use the total AP Black statistics for determining whether a district is majority-Black, because these are the statistics that were seemingly contemplated in the Parties' stipulations.

[71] 4/14 is approximately 28.6%.

264

congressional districts[72]). See PX 1, Ex. K-1 (reproduced below). Thus, under the

Enacted Congressional Plan, 28.57% of Georgia's Congressional Districts are

### Georgia U.S. House -- 2020 Census -- Enacted Plan

| District | Population | Deviation | % Deviation | AP Black | % AP Black | Latino | % Latino | NH White | % NH White |
|----------|-----------|-----------|-------------|----------|-----------|--------|----------|----------|-----------|
| 001 | 765137 | 1 | 0.00% | 230783 | 30.16% | 59328 | 7.75% | 440636 | 57.59% |
| 002 | 765137 | 1 | 0.00% | 393195 | 51.39% | 45499 | 5.95% | 305611 | 39.94% |
| 003 | 765136 | 0 | 0.00% | 188947 | 24.69% | 48285 | 6.31% | 492494 | 64.37% |
| 004 | 765135 | -1 | 0.00% | 423763 | 55.38% | 88947 | 11.63% | 197536 | 25.82% |
| 005 | 765137 | 1 | 0.00% | 392822 | 51.34% | 56496 | 7.38% | 273819 | 35.79% |
| 006 | 765136 | 0 | 0.00% | 78871 | 10.31% | 78299 | 10.23% | 487400 | 63.70% |
| 007 | 765137 | 1 | 0.00% | 239717 | 31.33% | 181851 | 23.77% | 225905 | 29.52% |
| 008 | 765136 | 0 | 0.00% | 241628 | 31.58% | 54850 | 7.17% | 443123 | 57.91% |
| 009 | 765137 | 1 | 0.00% | 87130 | 11.39% | 117758 | 15.39% | 495078 | 64.70% |
| 010 | 765135 | -1 | 0.00% | 184137 | 24.07% | 58645 | 7.66% | 486487 | 63.58% |
| 011 | 765137 | 1 | 0.00% | 143404 | 18.74% | 99794 | 13.04% | 469264 | 61.33% |
| 012 | 765136 | 0 | 0.00% | 294961 | 38.55% | 43065 | 5.63% | 398843 | 52.13% |
| 013 | 765137 | 1 | 0.00% | 520094 | 67.97% | 93554 | 12.23% | 125106 | 16.35% |
| 014 | 765135 | -1 | 0.00% | 118694 | 15.51% | 97086 | 12.69% | 520854 | 68.07% |
| **Total** | 10711908 | | 0.00% | 3538146 | 33.03% | 1123457 | 10.49% | 5362156 | 50.06% |

majority-Black and 35.71% are majority-minority, and 64.29% are majority-white.

Id.

The Black voting age population in Georgia is 31.73%, total minority voting

age population is 47.18%, and the white voting age population is 52.82%. PX 1

---

[72] 5/14 is approximately 35.7%. Conversely, with the added majority Black district in the Illustrative Congressional Plan, the proportion of majority-white districts drops to approximately 64.3% (i.e., 9 of 14 districts), which is closer to the proportion of the white population in Georgia (55.7%) (see PX 1 ¶ 18 & fig.2).

¶ 18, fig.2. Under the Enacted Congressional Plan, the only group that has representation that is equal to or exceeds their proportion of the State's population is white voters, who receive 64.29% of the districts, but only make up 55.7% of the electorate.

The Illustrative Congressional Plan, however, reaches near proportional representation. The addition of one majority-Black district brings the proportion of Black congressional districts to 35.7% (i.e., 5 of 14 congressional districts), which is close to the 33.3% AP Black voting age population in the State (PX 1 ¶ 18 & fig.2.). The additional Illustrative CD-6, moreover, brings the number of majority-minority congressional districts to 6, which is approximately 42.9% of the 14 congressional districts and close to the 44.3% of the total minority voting age population (PX 1 ¶ 18 & fig.2). And 57.14% of Georgia's congressional districts will be majority-white districts and close to the 52.82% of the total white voting age population. Id.

The Court understands that Defendants are arguing that the recent election of five Black Congresspersons to the U.S. House of Representatives (35.7% of Georgia's congressional delegation) is proportionate to the percentage of

266

Georgia's Black residents (33.03%); therefore, Georgia's political system is equally open to Black voters. As is clear from the text of Section 2, "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in their population." 52 U.S.C. § 10301(b). Furthermore, it is abundantly clear that it is reversable error for the District Court to attempt to maximize the number of majority-minority districts. DeGrandy, 512 U.S. at 1000; Miller, 515 U.S. at 926–27. However, the existence of near proportional representation or a remedy that results in proportional representation, in and of itself, is not reversible error because "proportionality is not dispositive." DeGrandy, 512 U.S. at 1000; see also Allen, 599 U.S. at 26–30, 42 (affirming three-judge court's finding of a Section 2 violation, even though the remedy would result in proportional representation). Having considered the evidence provided in support of and to rebut the Senate Factors and after conducting a "careful[] and searching review [of] the totality of the circumstances," the Court finds that Black voters do not have equal access to the political process in the challenged area. DeGrandy, 512 U.S at 1026 (O'Conner, J., concurring).

> The Supreme Court recently confirmed that:
>
> what must be shown to prove a § 2 violation[,] [ ] requires consideration of the totality of circumstances in each case and demands proof that the political processes leading to nomination or election in the State or political subdivision are not *equally open* to participation by members of a protected class *in that its members have less opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice.

Brnovich, 141 S. Ct. at 2332 (cleaned up) (emphasis in original). The Court has reviewed all of the evidence before it, and even with Georgia's election of five Black congresspersons, the Black voters in the area of the challenged congressional districts do not have an equal opportunity to participate. As Justice O'Connor opined, "the presence of proportionality [does not] prove the absence of dilution." DeGrandy, 512 U.S. at 1026.

This past summer, the Supreme Court was again confronted with the question of proportionality. Allen, 599 U.S. at 26–30. In Justice Thomas's dissent, he opined that it is error to use proportionality as a benchmark for a Section 2 violation." Allen, 599 U.S. at 71–73 (Thomas, J., dissenting). Justice Kavanaugh specifically addressed this issue and explained that Gingles "does not mandate a

268

proportional number of majority-minority districts." <u>Allen</u>, 559 U.S. at 43 (Kavanaugh, J., concurring). Rather, a Section 2 violation occurs only when (1) the redistricting maps split the minority community and (2) a reasonably configured district could be drawn in that area. <u>Id.</u> He concluded that "[i]f <u>Gingles</u> required proportional representation, then States would be forced to group together geographically dispersed minority communities in unusually shaped districts. <u>Id.</u> That is not the case here, as is evidenced above, Illustrative CD-6 is more compact on objective measures than Enacted CD-6, and the district is in a relatively small area of the State. <u>See</u> Section II(C)(1)(b)–(c) *supra*.

Consistent with <u>DeGrandy</u>, <u>Brnovich</u>, and <u>Allen</u>, the Court finds that if there is sufficient evidence of minority voter dilution under the totality of the circumstances, taking into consideration the Senate Factors, then proportionality cannot immunize the State from a Section 2 challenge. In other words, proportionality is neither a benchmark for plaintiffs, nor a safe harbor for States.

269

Accordingly, the Court finds that proportionality neither weighs in favor of Defendants, nor weighs against finding a Section 2 violation.[73]

### j)   Demographic Changes

Finally, the Court considers Georgia's demographic changes as part of its totality of the circumstances analysis. See Singleton, 582 F. Supp. 3d at 977. The greatest population growth since the last Decennial Census was in metro-Atlanta. PX 1 ¶ 25 & fig.4. More than half (53.27%) of the population increase in the counties included in Illustrative CD-6 results from the increased Black population. Id. ¶ 42 & fig.8. And, in all but Fulton County, the Black population accounts for most of the population changes. Id. The Enacted Congressional Plan does not account for the growth in the Black population in this area.

---

[73] Achieving proportional representation is not a factor to weigh against finding a Section 2 violation. De Grandy was evaluating proportionality under the Enacted Congressional Plan, not the remedial plan. Its statement that proportionality cannot prove a Section 2 case does not readily extend to say that achieving proportionality weighs *against* a Section 2 case. Id. at 1000. See Allen, 599 U.S at 26–30; see also id. at 71–73 (Kavanaugh, J., concurring).

270

**Figure 8**
**Four-County Area: 2010 Census to 2020 Census Population and Black Population Changes**

|  | 2020 Population | 2020 Black Population | 2010–2020 Population Change | 2010–2020 Black Population Change | Black Population Change as Percentage of Total Change |
|---|---|---|---|---|---|
| Cobb | 766,149 | 223,116 | 78,071 | 42,151 | 53.99% |
| Douglas | 144,237 | 74,260 | 11,834 | 20,007 | 169.06% |
| Fayette | 119,194 | 32,076 | 12,627 | 9,578 | 75.85% |
| Fulton | 1,066,710 | 477,624 | 146,129 | 60,732 | 41.56% |
| **Total** | **2,096,290** | **807,076** | **248,661** | **132,468** | **53.27%** |

PX 1 ¶ 42 & fig.8; Id. ¶ 43.

In Allen, the three-judge court noted that, over the past decade, the Black population grew by 6.53%, and the white population's share of Alabama's total population decreased by 3.92%. Singleton, 582 F. Supp. 3d at 977. The Black population's growth in Georgia, as a whole, and in metro-Atlanta, specifically, is greater than the demographic changes in Alabama. In fact, during the same period, Georgia's Black population grew by 15.84% and accounted for 5.00% percent of Georgia's population growth, while the white population's share of the State's total population decreased by 5.82%. PX 1 ¶ 14 & fig.1. In metro-Atlanta alone, the Black population is responsible for 51.04% of Atlanta MSA's

271

population growth, and their population share increased by 2.30%. PX 1 ¶ 30 & fig.5. Conversely, the white population in the Atlanta MSA decreased by 2.83%, their share of the population decreased by 7.08%. Id. Meaning, that the demographic shifts in Georgia—as a whole and in the area where the proposed majority-minority district is located—are greater than those in Alabama, where a Section 2 violation was found and affirmed.

Despite the growth in the Black population in the affected areas and the voter polarization between white and Black Georgians, see Section II(C)(2)(4)(c) *supra*, the Enacted Congressional Plan did not increase the number of majority-Black districts in the Atlanta metro area. By failing to do so, the Enacted Congressional Plan in effect dilutes and diminishes the Black population's voting power in that area of the State. Accordingly, the Court finds that the population changes in metro-Atlanta weigh heavily in favor of finding a Section 2 violation.

### 5.  *Conclusions of Law*

The Court finds that the Pendergrass Plaintiffs have met their burden in establishing that (1) the Black community in the west-metro Atlanta metro area is sufficiently numerous and compact to constitute an additional majority-Black

272

district; (2) the Black community is politically cohesive; and (3) that the white majority votes as a bloc to typically defeat the Black-preferred candidate. The Court also finds that in evaluating the totality of the circumstances, Georgia's electoral system is not equally open to Black voters. Specifically, the Court finds that Senate Factors One, Two, Three, Five, and Seven weigh in favor of showing the present realities of lack of opportunity for Black voters. The Court also finds that Senate Factor Six weighs slightly in favor finding a Section 2 violations. Additionally, the growth of Georgia's Black population in metro-Atlanta while the white population decreased weighs in favor of a Section 2 violation.

Only Senate Factors Four, Eight[74] and Nine do not weigh in favor of finding a Section 2 violation. The Court also finds that proportionality does not weigh against finding a Section 2 violation.

In sum, the Court finds that the majority of the totality of the circumstances' evidence weighs in favor of finding a Section 2 violation. Because <u>Pendergrass</u>

_____

[74] The Eleventh Circuit found that Senate Factor Eight is given little weight. <u>Marengo Cnty. Comm'n</u>, 731 F.2d at 1572. And the Court gives less weight to Senate Factor Nine because this is not an intentional discrimination case.

273

Plaintiffs have carried their burden of proof on all of the legal requirements, the Court concludes that SB 2EX violates Section 2 of the Voting Rights Act.

### D.   Legislative Districts

The Court will now discuss the State legislative districts (i.e., State Senate and State House districts). First, the Court will discuss the first Gingles precondition for all illustrative legislative districts. This portion of the Section is divided into different regions of the State (i.e., metro Atlanta, eastern Black Belt, Macon-Bibb, and southwest Georgia). For the regions where both the Alpha Phi Alpha Plaintiffs and the Grant Plaintiffs challenged districts, the Court will first make its findings as to all of the Alpha Phi Alpha illustrative districts and will then make findings as to all of the Grant illustrative districts. For the illustrative districts that survive the first Gingles precondition, the Court will then evaluate them under the second and third Gingles preconditions (Alpha Phi Alpha first and then Grant). For the illustrative districts that survive all three Gingles precondition, the Court will then turn and evaluate whether the political process is equally open to Black voters in those areas (again, Alpha Phi Alpha first and Grant second).

274

### 1.     First *Gingles* Precondition

The Court finds that the Alpha Phi Alpha Plaintiffs have met their burden in proving the first Gingles precondition in three of the proposed district in south-metro Atlanta (i.e., Cooper SD-17, SD-28, and HD-74). The Alpha Phi Alpha Plaintiffs have not met their burden in proving the first Gingles precondition in one of the House district in south-metro Atlanta, the districts in the Eastern Black Belt, in and around Macon-Bibb, or southwest Georgia (Cooper SD-23, HD-133, HD-117, HD-145, HD-171).

The Court finds that the Grant Plaintiffs have met their burden in proving the first Gingles precondition in the south-metro Atlanta Senate districts, two House districts in metro Atlanta, and two House districts in the Macon-Bibb region (i.e., Esselstyn SD-25, SD-28, HD-64, HD-117, HD-145, and HD-149). The Grant Plaintiffs have not met their burden in proving the first Gingles precondition as to the proposed district in the eastern Black Belt, or one proposed district in south-metro Atlanta (Esselstyn SD-23, HD-74).

### a)     Racial predominance

The Court begins its discussion of the illustrative districts by finding that race did not predominate in the drawing of either the Cooper or Esselstyn

275

Legislative Plans. In a Section 2 case "the question [of] whether additional majority-minority districts can be drawn . . . involves a 'quintessentially race-conscious calculus." Allen, 599 U.S. at 31 (plurality opinion) (quoting DeGrandy, 512 U.S. at 1020). "The line that [has] long since [been] drawn is between consciousness and predominance." Id. at 33 (plurality opinion). Race does not predominate when a mapmaker "adhere[s] . . . to traditional redistricting criteria," testifies that "race was not the predominate factor motivating his design process," and explains that he never sought to "maximize the number of majority-minority" districts. Davis, 139 F.3d at 1426.

Both Mr. Cooper and Mr. Esselstyn testified at the trial and preliminary injunction that they were aware of race when drawing their illustrative legislative plans, but that race did not outweigh any of the other traditional redistricting principles. See Tr. 108:4–11 (Mr. Cooper testifying that he is "aware of [race], but it didn't control how these districts were drawn); Tr. 522:5–14 ("I'm constantly looking at the shape of the district, what it does for population equality, . . . political subdivisions, communities of interest, incumbents, all that. So while yes, at time [race] would have been used to inform a decision, it was one

276

of a number of factors."); Alpha Phi Alpha Fraternity, 587 F. Supp. 3d at 1244 (crediting Mr. Cooper's testimony that race did not predominate when he drew his illustrative maps); id. at 1245–46 (crediting Mr. Esselstyn's testimony that race was but one factor he considered when drawing his illustrative maps). The Court again finds that Mr. Cooper and Esselstyn testified credibly that race did not predominate when they drew their illustrative legislative plans. Accordingly, the Court finds that race did not predominate in the creation of the Cooper Legislative Plan or the Esselstyn Legislative Plan.

The Court will now determine whether the Black community is sufficiently numerous and compact in each of the proposed legislative districts.

### b)      Metro Atlanta region

#### (1)      *Alpha Phi Alpha*

##### (a)      numerosity

The Court finds that the Alpha Phi Alpha Plaintiffs have met their burden in showing that the Black voting age population in metro Atlanta is large enough to create two additional majority-Black Senate districts and two majority-Black House districts in south-metro Atlanta. "[A] party asserting § 2 liability must

277

show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." Bartlett, 556 U.S. at 20.

It is undisputed that Cooper SD-17 and SD-28 have an AP BVAP of 62.55% and 51.32%, respectively, both of which exceed the 50% threshold required by Gingles. APAX 1, Ex. O-1. It is also undisputed that Cooper HD-74, and HD-117 have an AP BVAP of 61.49% and 54.64%, respectively. APAX 1, Ex. AA-1.

Based on these numbers, the Court finds that the Alpha Phi Alpha Plaintiffs have met their burden with respect to the numerosity prong of the first Gingles precondition in all additional majority-Black districts that Mr. Cooper proposed in metro Atlanta (i.e., SD-17, SD-28, HD-74, and HD-117).

### (b)    Compactness

The Court finds that the Alpha Phi Alpha Plaintiffs have met their burden to show that the minority community is sufficiently compact to warrant the creation of two additional majority-Black State Senate (Cooper SD-17 and SD-28) and one majority-Black House district (Cooper HD-74) in south-metro Atlanta.

The standards governing the compactness inquiry for these additional districts is the same as the compactness inquiry in the Pendergrass case. See

278

Section II(C)(1)(b) *supra.* The Court must consider if the illustrative proposed districts adhered to traditional redistricting principles, namely: population equality, contiguity, empirical compactness scores, the eyeball test for irregularities and contiguity, respecting political subdivisions, and uniting communities of interest. See id.

### i)   *Cooper SD-17*

The Court finds that Cooper SD-17 is reasonably compact. The Court notes that Cooper SD-17 is in the same area as Enacted SD-17. APAX 1 ¶ 104 ("a majority-Black Senate District 17 can be drawn in the vicinity of 2021 Senate District 17").

### ((a))   empirical measures

#### ((1))   *population equality*

The Court finds that Cooper SD-17 is not malapportioned. See Reynolds v. Sims, 377 U.S. 533, 577 (1964) (requiring "an honest and good faith effort to construct districts . . . of nearly equal population as practicable."); Brown v. Thomson, 462 U.S. 835, 842 (1983) (finding "minor deviations" do not violate the Fourteenth Amendment). The General Assembly's "General Principles for Drafting Plans" specifies that "[e]ach legislative district . . . should be drawn to

279

achieve a total population that is substantially equal as practicable." Stip. ¶ 135; JX 2, 2.

The ideal population size of a State Senate district is 191,284. Stip. ¶ 277. The General Assembly did not enumerate a specific deviation range that is acceptable for the State Senate districts. However, relying on the Enacted Senate Plan as a rough guide, an acceptable population deviation range is between -1.03% and +0.98% is acceptable. APAX 1, Ex. M-1. Cooper SD-17 has a population deviation of +0.002%, which is 35 people from perfect correlation. APAX 1, Ex. O-1. Cooper SD-17 achieves better population equality than Enacted SD-17, which has a population deviation of +0.67%. APAX 1, Ex. M-1. Thus, the Court finds that Cooper SD-17 achieves population equality that is consistent with the General Assembly's Redistricting Guidelines and traditional redistricting principles.

### ((2))  *contiguity*

The Parties stipulated that Cooper SD-17 is a contiguous district. Stip. ¶ 300. Hence, the Court finds that Cooper SD-17 complies with the traditional redistricting principle of contiguity.

280

### ((3))   *compactness scores*

The Court finds that Cooper SD-17 is more compact than Enacted SD-17. In reaching this conclusion, the Court, as it did in the <u>Pendergrass</u> case, looks to the objective compactness scores of the Polsby-Popper and the Reock indicatosr.

Using the Reock measure, Cooper SD-17 is 0.37 compared with Enacted SD-17, which is 0.35. GX 1, Attach. H. As such, Cooper SD-17 is 0.02 points more compact under the Reock indicator. When using the Polsby-Popper measure, Cooper SD-17 is 0.17 as is the Enacted SD-17, i.e., the two districts have identical Polsby-Popper scores. <u>Id.</u> Hence, the Court finds that on the empirical compactness measures, Cooper SD-17 fares better than or is identical to Enacted SD-17. Accordingly, the Court finds that Cooper SD-17 is slightly more compact when compared to Enacted SD-17.

### ((4))   *political subdivisions*

The Court also finds that Cooper SD-17 generally respected political subdivisions. That proposed district consists of portions of DeKalb, Henry, and Rockdale Counties. APAX 1 ¶ 105 & fig.17D. Enacted SD-17 also split three counties—Henry, Newton and Rockdale. APAX 1 ¶ 102 & fig.17C. Thus, the

281

Court finds that both Cooper SD-17 and Enacted SD-17 split the same number of counties. Although the county splits remain the same, the Court notes that Cooper SD-17 splits more VTDs (4) than Enacted SD-17 (none). APAX 1, Exs. T-1, T-3. There was no testimony that Cooper SD-17 split municipalities, even though there was testimony regarding the municipalities that were included in the district, such as McDonough in Henry County and Stonecrest in DeKalb County. Tr. 117:5–11.

Although Cooper SD-17 splits more VTDs, the Court finds that generally, SD-17 respects political subdivisions because he split the same number of counties and seemingly kept municipalities intact.

((b))   <u>**eyeball test**</u>

The Court finds that Cooper SD-17 is visually compact under the eyeball test:



APAX 1 ¶ 105 & fig.17D.

Moreover, using the mapping tool provided by Mr. Esselstyn, the Court finds that the district at its most distant points is less than 30 miles in length. Id. Cooper SD-17 has no appendages or tentacles. Id. And there is no contrary evidence or testimony in the Record. In fact, Mr. Morgan testified that Cooper SD-17 is "geographically more compact in the sense that it doesn't go quite the distance as the enacted District 17 . . . [g]eographically, generally, yes, it appears more compact." Tr. 2027:11–24. Accordingly, the Court finds that Cooper SD-17 is visually compact.

283

((c))   **communities of interest**

The Court finds that Cooper SD-17 respects communities of interest. Cooper SD-17 includes neighboring parts of south DeKalb, Henry, and Rockdale Counties, connecting the nearby communities of Stonecrest, Conyers, and McDonough. APAX 1, 45-6 ¶¶ 104-5 & fig.17D. Both Cooper SD-17 and Enacted SD-17 overlap in and around McDonough in Henry County. Id. at 44, 46.

Mr. Cooper testified that he is familiar with this area of Georgia because he has drawn districting maps for Henry County before, dating back to 1991 and most recently in the 2018 Dwight v. Kemp case. Tr. 116:12–24. He also testified that the communities in Cooper SD-17 are primarily suburban or exurban. Tr. 116:6–8. And, the distance between the portions of the district in south DeKalb and south Henry Counties are probably a 10-minute drive from one another. Tr. 231:14–20. Furthermore, he testified that in configuring the district in this manner, he was able to keep Newton County, whole (rather than split it, as the Enacted Senate Plan does) and include it in Cooper SD-43, which is compact and majority-Black. APAX 1, 48 & fig.17F.

284

Moreover, Mr. Cooper examined ACS data showing that the counties included in Cooper SD-17 share certain socioeconomic characteristics, such as similar educational attainment rates among Black residents in Henry, Rockdale, and DeKalb Counties. APAX 1 ¶¶ 127-128 & Ex. CD at 21-22.

The testimony of Mr. Lofton, who lives in McDonough, bolster's Mr. Cooper's testimony. Mr. Lofton testified regarding the interconnectedness of the different counties in south-metro Atlanta, including competing against one another in sports. Tr. 1306:23-25 ("I visited Rockdale even from high school. We used to compete against Rockdale County Heritage High School when I was in high school. We were [in] the same region."). Mr. Lofton testified about the similarities and connections between DeKalb, Stonecrest, Conyers and McDonough. Tr. 1308:16-22 (discussing the "major thoroughfares" connecting DeKalb, Rockdale, and Henry Counties that people drive up and down "all day."); Id. at 1308:23-1309:8 (discussing travelling between McDonough, Stonecrest, Conyers, and Covington for shopping and dining "because they're not terribly far out of the way."). He also testified that Henry, Rockdale, and

DeKalb Counties are getting more diverse and "on par" with one another. Id. at 1298:16-20, 1306:16-1307:8, 1308:4-7.

In sum, the Court finds that Cooper SD-17 is a small district contained wholly within metro Atlanta, unlike the districts in LULAC and Miller. There was extensive testimony from Mr. Cooper and a resident of McDonough about the interrelatedness of the communities in the district. Furthermore, Mr. Cooper's report details the shared socio-economic characteristics of the voters living in the district. In all the Court finds that this testimony shows that the district preserves existing communities of interest.

## ((d))   conclusions of law

The Court determines that the Alpha Phi Alpha Plaintiffs have carried their burden in establishing that the Black community is sufficiently numerous and compact in Cooper SD-17 to constitute an- additional majority-Black district. The Court finds that Cooper SD-17 complies with the traditional redistricting principles of population equality, contiguity, compactness, respect for political subdivisions, and preservation of communities of interest. Additionally, when visually inspecting the district, it is relatively small in size and does not contain

286

any appendages or tentacles. Accordingly, the Court finds that the <u>Alpha Phi</u> <u>Alpha</u> Plaintiffs have carried their burden in meeting the first <u>Gingles</u> precondition in the area contained in Cooper SD-17.

### ii) *Cooper SD-28*

The Court finds also that the <u>Alpha Phi Alpha</u> Plaintiffs have shown that it is possible to draw an electoral district consistent with traditional redistricting principles in the area encompassed by Cooper SD-28. As an initial note, Mr. Cooper explained that Cooper SD-28 is in the same general area as, and correlates with, Enacted SD-16. APAX 1 ¶ 99 ("a majority-Black District 28 [ ] can be drawn in the vicinity of 2021 Senate District 16").

### ((a))   <u>empirical measures</u>

### ((1))   *population equality*

The Court finds that Cooper SD-28 achieves relative population equality. As stated above, the General Assembly did not enumerate a specific acceptable deviation range for the State Senate Districts. However, relying on the Enacted Plan as a guide, a population deviation range between -1.03% and +0.98% is acceptable. APAX 1, Ex. M-1. In comparison, Cooper SD-28 has a population deviation of -0.73%, which is within range of the population deviations in the

Enacted Senate Plan. APAX 1, Ex. O-1. The Court finds that Cooper SD-28 is consistent with the General Assembly's Redistricting Guidelines, and traditional redistricting principles.

### ((2))   contiguity

The Parties stipulated that Cooper SD-28 is a contiguous district. Stip. ¶ 300. Hence, the Court finds that Cooper SD-28 complies with the traditional redistricting principle of contiguity.

### ((3))   compactness scores

The Court finds Cooper SD-28's compactness scores are within the range of compactness scores found in the Enacted Senate Plan. APAX 1, Exs. S-1, S-3. Cooper SD-28 and Enacted SD-16 have identical Reock scores of 0.37. Enacted SD-16 is more compact on the Polsby-Popper measure with a score of 0.31.while Cooper SD-28 has a Polsby-Popper score of 0.18. APAX 1, Exs. S-1, S-3.

Although Enacted SD-16 is more compact on the Polsby-Popper measure, Cooper SD-28 is within the range of compactness scores found in the Enacted Senate Plan. Specifically, the Enacted Senate Plan has a minimum Polsby-Popper of 0.13. APAX 1, Ex. S-3. Cooper SD-28's Polsby-Popper score (0.18) exceeds the minimum threshold Polsby-Popper score found in the Enacted Senate Plan.

Id. Accordingly, the Court finds that Cooper SD-28 falls within the range of compactness scores found in the Enacted Senate Plan and therefore constitutes a compact district for purposes of the first Gingles precondition.

### ((4)) *political subdivisions*

The Court finds that Cooper SD-28 generally respects political subdivisions. The Court notes that Cooper SD-28 does have more political subdivision splits than Enacted SD-16. Cooper SD-28 contains portions of Fayette, Spalding, and Clayton Counties, resulting in three county splits. APAX 1 ¶ 99. Enacted SD-16 splits only Fayette County, and keeps Spalding, Pike, and Lamar Counties whole. Additionally, Cooper SD-28 splits two VTDs, whereas Enacted SD-16 splits none. APAX 1, Exs. T-1, T-3. Mr. Cooper testified, "[y]ou can see that I separated or made the boundary for District 28, which is the new majority Black district, following the municipal lines of Griffin, which can be kind of odd shaped in places." Tr. 114:4-7; APAX 11, at 41 ¶ 99 & fig.17B; see also Id. Ex. T-1 (listing a single split VTD in Fayette County and one in Spalding County).

Although those increased splits do exist, Mr. Cooper testified that he was able to keep municipalities whole. Specifically, when drawing these districts, he

289

was able to keep the city of Griffin wholly within Cooper SD-28 and Peachtree City was kept wholly within Cooper SD-39. APAX 1 ¶ 99 & fig.17A; Tr. 114:1–7, 238:4–7. Mr. Cooper explained that some of his mapping decisions, were made to comply with population equality. See Tr. 238:23–239:3 ("once you pick up Griffin and some of the area between Spalding and Fayetteville, there's a lot of population as you approach Fayetteville. So, from one person one voter standpoint you could not include Peachtree City in District 28."). The Court credits Mr. Cooper's testimony regarding decisions for drawing boundary lines. Therefore, the Court finds that Cooper SD-28 respects political subdivisions.

((b))   <u>eyeball test</u>

The Court finds that Cooper SD-28 is visually compact under the eyeball test:



APAX 1 ¶ 99 & fig.17A.

Using the mapping tool, the Court finds that at its most distant points, Cooper SD-28 is approximate 30 miles long. Id. Mr. Morgan testified that north to south the district is 24 miles long. Tr. 1982:7–12. Cooper SD-28 does not contain any tentacles or appendages. Mr. Cooper also testified that when looking at the district, one can see that "[t]he towns and cities are—suburbs are all very close together." Tr. 113:18–21. The Court agrees with Mr. Cooper's assessment, the district itself visually encompasses a small geographic area. Defendant submits

291

no evidence or testimony in the Record suggesting that Cooper SD-28 is not visually compact. See generally DX 1; Tr. 1896:13-23. Accordingly, the Court concludes that Cooper SD-28 is visually compact.

### ((c))   communities of interest

Mr. Cooper testified that the areas of Fayette and Spalding County that he included in Cooper SD-28 are growing, becoming more diverse and suburban, and thus more similar to Clayton County. Tr. 113:6-114:18; see also Tr. 242:15-24. He noted that these parts of Spalding and Fayette Counties are experiencing population growth and change as well as suburbanization, which warranted grouping them with Clayton County. Tr. 113:6-114:18. Moreover, he explained that the areas he connected are similarly suburban and exurban in nature, in comparison to the more rural and predominantly white Pike and Lamar Counties, which were not included in Cooper SD-28. Tr. 113:24-25 ("Yes. This area is predominantly a suburban/exurban. So the area matches up socioeconomically, I believe.").

292

Mr. Cooper also explained why it made sense to not include western Fayette County in Illustrative District 28, highlighting the differences between Peachtree City and Griffin. Tr. 114:19-115:5

> THE COURT: What are the commonalities of the people in Griffin and Peachtree City?
>
> THE WITNESS: Well, the -- Griffin and Peachtree City are quite different, frankly.
>
> THE COURT: They are.
>
> THE WITNESS: Peachtree City is predominantly white. Just kind of sprung up there I think in the 1980s. They drive around in golf carts. I mean, that's --.
>
> THE COURT: Yeah.
>
> THE WITNESS: Yeah. And so it doesn't really fit with Griffin exactly, which is one of the reasons why I didn't include it in District 28. It is the western part of Fayette County.

Tr. 1311:21-1312:13.

Additionally, Mr. Cooper examined ACS data showing that the counties included in Cooper SD-28—namely, Fayette, Spalding, and Clayton—share socioeconomic commonalities. Specifically, Fayette, Spalding, and Clayton Counties share certain socioeconomic characteristics, as all have a relatively high proportion of Black residents in the labor force. APAX 1, at 56 ¶ 125, Ex. CD, at 53-55.

293

The testimony of Mr. Lofton, a lifelong metro Atlantan, and a long-time resident of Henry County with connections in Fayette, Clayton, and DeKalb Counties, was consistent with Mr. Cooper's. Mr. Lofton attested to the interconnectedness of the communities included in Cooper SD-28. For example, as Mr. Lofton explained, if you visit shopping centers in Griffin you will see Fayette and Clayton car tags. Tr. 1302:9-11. Mr. Lofton also testified that areas covered by Cooper SD-28 share common places of worship and that Black communities in the area share certain socioeconomic characteristics, like similar educational attainment. Id. at 1309:25-1310:9. Gina Wright, who testified that she was familiar with the area, agreed that the area of South Clayton County that is included in Cooper SD-28 is suburban. Id. at 1685:2-20.

Thus, the Court finds that Cooper SD-28 is a small district contained wholly within metro Atlanta and has no resemblance to the districts in LULAC and Miller. Mr. Cooper testified extensively about the communities that are contained within the district, the shared socio-economic factors, and the characteristics that unite them. Additionally, Mr. Lofton, with his lifelong experience as a resident in the area, explained how the communities interact with

one another. The Court finds that the size of the district coupled with the witness testimony shows Cooper SD-28 preserves communities of interest.

### ((d))   conclusions of law

The Court finds that the <u>Alpha Phi Alpha</u> Plaintiffs have carried their burden in establishing that the Black community is sufficiently numerous and compact in Cooper SD-28 to constitute an additional majority-Black district. The Court finds that Cooper SD-28 complies with the traditional redistricting principles of population equality, contiguity, compactness, respect for political subdivisions, and preservation communities of interest. Additionally, when visually inspecting the district, it is relatively small in size and does not contain any appendages or tentacles. Accordingly, the Court finds that the <u>Alpha Phi Alpha</u> Plaintiffs have carried their burden on the first <u>Gingles</u> precondition in the area encompassed by Cooper SD-28

### iii)    *Cooper HD-74*

The Court finds that Cooper HD-74 is reasonably compact. The Court notes that Cooper SD-17 is in the area of Enacted HD-74. APAX 1 ¶ 162.

295

((a))   **empirical measures**

((1))   *population equality*

The Court finds that Cooper HD-74 is not malapportioned. See <u>Reynolds</u>, 377 U.S. at 577 (requiring "an honest and good faith effort to construct districts . . . of nearly equal population as practicable."); <u>Brown</u>, 462 U.S. at 842 (finding "minor deviations" are not violative of the Fourteenth Amendment). The General Assembly's "General Principles for Drafting Plans" specifies that "[e]ach legislative district . . . should be drawn to achieve a total population that is substantially equal as practicable." Stip. ¶ 135; JX 2, 2.

The ideal population size of a State House District is 59,511. Stip. ¶ 278. The General Assembly did not enumerate the deviation range for State House Districts. However, relying on the Enacted House Plan as a rough guide, a population deviation range between -1.40% and +1.34% is acceptable. APAX 1, Z-1. Cooper HD-74 has a population deviation of +0.78%. APAX 1, Ex. AA-1. Cooper HD-74 achieves better population equality than Enacted HD-74, which has a population deviation of -0.93%. APAX 1, Ex. M-1. Thus, the Court finds that Cooper HD-74 achieves population equality that is consistent with the General Assembly's Redistricting Guidelines and traditional redistricting principles.

296

((2))   *contiguity*

The Parties stipulated that Cooper HD-74 is a contiguous district. Stip. ¶ 300. Hence, the Court finds that Cooper HD-74 complies with the traditional redistricting principle of contiguity.

((3))   *compactness scores*

The Court finds that Cooper HD-74 is more compact than Enacted HD-74. In reaching this conclusion, the Court, as it did in the Pendergrass case, looks at the objective compactness scores of the Polsby-Popper and Reock measures.

Using the Reock indicator, Cooper HD-74 measures 0.63 as compared to Enacted HD-74 which measures 0.50. APAX 1, Exs. AG-1, AG-2. This means that on the Reock measure, Cooper HD-74 is 0.13 points more compact than Enacted HD-74. Id. Using the Polsby-Popper measure, Cooper HD-74 has an 0.11 compactness advantage: Cooper HD-74 is 0.36 and Enacted HD-74 is 0.25. Id. Hence, the Court finds that on the empirical compactness scores, Cooper HD-74 fares better than Enacted HD-74.

Accordingly, the Court finds that Cooper HD-74 is more compact when compared to Enacted HD-74.

297

***((4))   political
subdivisions***

The Court also finds that Cooper HD-74 exhibits respect for political subdivisions more so than Enacted HD-74. Cooper HD-74 consists of portions of Clayton, Henry and Spalding Counties. APAX 1 ¶ 164 & fig.29. Enacted HD-74 also split three counties—Fayette, Harris, and Spalding. APAX 1 ¶ 162 & fig.28. Yet Cooper HD-74 split fewer VTDs than Enacted HD-74. Enacted HD-74 split five VTDs while Cooper HD-74 split only two. APAX 1, Exs. AH-1, AH-3. There is no testimony or opinion that Cooper HD-74 split municipalities. In fact, Mr. Morgan, Defendant's mapping expert, agreed that it includes the "panhandle of Clayton, which is not included in the enacted District 74." Tr. 2049: 10–12. Thus, the Court finds that Mr. Cooper respected political subdivisions when drawing Cooper HD-74.

**((b))   <u>eyeball test</u>**

The Court finds that Cooper SD-17 is visually compact under the eyeball test:

298

APAX 1 ¶ 164 & fig.29.

Using the mapping tool provided by Mr. Esselstyn, the Court finds that the district at its most distant points is less than 15 miles in length. Id. Cooper HD-74 has no appendages or tentacles. Id. Mr. Cooper testified that the district "couldn't be more compact." Tr. 122:18. And, Mr. Morgan testified that Cooper HD-74 is "a smaller geographic area and it contains the panhandle of Clayton, which is not included in the enacted District 74." Tr. 2027:11–24. The Court agrees with both mapping experts, Cooper HD-74 is a very compact district, visually. Accordingly, the Court finds that Cooper HD-74 passes the eyeball test.

299

((c))   **communities of interest**

The Court finds that Cooper HD-74 respects communities of interest. Cooper HD-74 unites nearby, adjacent communities on either side of the line between south Clayton and Henry Counties. APAX 1 ¶ 198. As Mr. Cooper testified, "the distance[] there to get from one part of the district to the other are . . . maybe a 20-minute drive at most, unless you're going during rush hour traffic or something." Tr. 272:24-273:2.

Mr. Cooper testified that the communities included in the district are "largely suburban" in nature. Tr. 273:17-22. Consistent with that, Mr. Cooper's examination of the ACS data shows that the counties included in Cooper HD-74 share a similar proportion of population in the labor force (71.0%, 58.2%, and 69.5% respectively). APAX 1 ¶ 198. Mr. Lofton's testimony was consistent, testifying that Black communities in south-metro Atlanta are "middle class, upper middle class, professional, college educated. A lot of families, single families." Tr. 1309:25-1310:4.

The Court finds that Cooper HD-74 complies with the traditional redistricting principle of preserving communities of interest. Defendant's expert

admitted that Mr. Cooper's district is geographically compact. This district in no way resembles the districts in <u>Miller</u> and <u>LULAC</u> that stretched across large swaths of their respective States. There is unrebutted testimony that the voters in this area have similar socio-economic characteristics. Accordingly, the Court finds that Cooper HD-74 complies with the traditional redistricting principle of preserving communities of interest.

### ((d))   <u>conclusions of law</u>

The Court determines that the <u>Alpha Phi Alpha</u> Plaintiffs have carried their burden in establishing that the Black community is sufficiently numerous and compact in Cooper HD-74 to constitute an additional majority-Black district. The Court finds that Cooper HD-74 complies with the traditional redistricting principles of population equality, contiguity, compactness scores, respect for political subdivisions, and preservation of communities of interest. Additionally, when visually inspecting the district, it is relatively small in size and does not contain any appendages or tentacles. Accordingly, the Court finds that the <u>Alpha Phi Alpha</u> Plaintiffs have carried their burden in meeting the first <u>Gingles</u> precondition as to the area contained in Cooper HD-74.

301

### iv) *Cooper HD-117*

The Court next finds that the <u>Alpha Phi Alpha</u> Plaintiffs have not shown that it is possible to draw an electoral district consistent with traditional redistricting principles in the area encompassed by Cooper HD-117. As an initial note, Mr. Cooper explained that Cooper HD-117 is in the same general area, and correlates with, Enacted HD-117. APAX 1 ¶ 165 ("another majority-Black House District can be drawn around where District 117 in the 2021 House Plan is drawn").

#### ((a))   <u>empirical measures</u>

##### ((1))   *population equality*

The Court finds that Cooper HD-117 is not malapportioned. As stated above, the General Assembly did not enumerate the deviation range for the State Senate Districts. However, using the Enacted House Plan as a guide a population deviation range of ±1.40% is acceptable. Stip. ¶ 302. In comparison, Cooper SD-28 has a population deviation of -1.38%, which is within the deviation found in the Enacted House Plan. APAX 1, Ex. AA-1. The Court does note that Enacted HD-117 has a lower population deviation--+1.04%. The population deviation of Cooper HD-117 is higher than its enacted corollary, and it is barely within the

302

range of population deviations approved by the Georgia General Assembly when it passed the Enacted House Plan. Although the Court finds that Cooper HD-117 is not malapportioned, the Court also finds that it respects the traditional redistricting principle of population equality less than Enacted HD-117.

*((2))   contiguity*

The Parties stipulated that Cooper HD-117 is a contiguous district. Stip. ¶ 300. Hence, the Court finds that Cooper HD-117 complies with the traditional redistricting principle of contiguity.

*((3))   compactness scores*

The Court finds Cooper HD-117's compactness scores are either identical or very close to the compactness scores found in the Enacted House Plan. APAX 1, Exs. AG-1, AG-2. Cooper HD-117 and Enacted HD-117 have identical Reock scores of 0.41. Id. Enacted HD-117 is slightly more compact on the Polsby-Popper measure with a score of 0.28 while Cooper HD-117 has a Polsby-Popper score of 0.26. APAX 1, Exs. AG-2, AG-3. In sum, , the districts have identical Reock scores, but Enacted HD-117 is slightly more compact on the Polsby-Popper measure.

Despite a disadvantage of 0.02 points on the Polsby-Popper measure, Cooper HD-117 is well within the range of compactness scores of the Enacted

303

House Plan. Specifically, the Enacted Senate Plan has a minimum Polsby-Popper score is 0.10. APAX 1, Ex. AG-2. Cooper HD-117's Polsby-Popper score (0.26) far exceeds the lowest threshold Polsby-Popper score found in the Enacted House Plan. Id. Accordingly, the Court finds that Cooper HD-117 has identical or near identical compactness scores as Enacted HD-117, and Cooper HD-117 falls comfortably within the range of compactness scores in the Enacted House Plan. Therefore, Cooper HD-117 constitutes a compact district for purposes of the first Gingles precondition.

### ((4))  *political subdivisions*

In considering respect for the preservation of political subdivisions, Cooper HD-117 fares worse than Enacted HD-117. For example, Cooper HD-117 has more political subdivision splits than Enacted HD-117. Both districts split Henry and Spalding Counties. APAX 1 ¶ 165 & fig.29A; ¶ 167 & fig.29C. But, Cooper HD-117 splits six VTDs, while Enacted HD-117 splits only one. APAX 1, Exs. AH-1, AH-3. Mr. Cooper testified, "[y]ou can see that I separated or made the boundary for District 28, which is the new majority Black district, following the municipal lines of Griffin, which can be kind of odd shaped in places."

304

Tr. 114:4-7; APAX 11, at 41 ¶ 99 & fig.17B; <u>see also</u> <u>id.</u> at T-1 (listing a single split VTD in Fayette County and one in Spalding County). Mr. Cooper also testified that he did not keep the cities of Griffin or Locust Grove intact. Tr. 276:22–277:1. The Court finds that on balance, Cooper HD-117 reflects less respect for political subdivisions than Enacted HD-117.

**((b))   <u>eyeball test</u>**

The Court finds that Cooper HD-117 is visually compact under the eyeball test:



APAX 1 ¶ 198, Ex. AC-1.

305

Using the mapping tool, the Court finds that at its most points, Cooper HD-117 is less than 20 miles long. Id. Cooper HD-117 does not contain any tentacles or appendages. Defendant's own mapping expert agreed that Cooper HD-117 and Enacted HD-117 are both fairly compact. Tr. 2051:20-2052:1. ("Q. And illustrative 117 and enacted 117 are similarly compact? A. On compactness scores or just looking at it? Q. Both. A. I mean, it's hard to say whether it would be that way on compactness scores. But looking at it, they're both fairly compact, yes. They're not a great distance between anything."). Consistent with Defendant's mapping expert, the Court concludes that Cooper HD-117 is visually compact.

### ((c))   communities of interest

Cooper HD-117 unites communities that are geographically proximate to one another. Cooper HD-117 is in an area that includes adjacent portions of South Henry County around Locust Grove and a portion of Spalding County, including much of Griffin (Spalding County's seat and largest city) which is majority-Black. APAX 1 ¶ 198 & Ex. AC-2.

306

Mr. Cooper testified that "everyone" in Cooper HD-117 "lives close by." Tr. 123:17. Again, Defendant's mapping expert agreed, testifying that Griffin and Locust Grove are "close." Tr. 1794:23. When specifically asked about the connection between Griffin and Locust Grove, Mr. Cooper testified that "they are in an exurban area of Metro Atlanta." Tr. 277:25. Further Mr. Cooper noted that the area has a "somewhat younger population" (Tr. 123:24) and has a similar Black labor force participation rate. APAX 1 ¶ 198.

Mr. Lofton's testimony was consistent with respect to the proximity and connections between the communities in Cooper HD-117. For example, he testified about the shared commercial centers used by residents of the area, such as Tanger Outlets, and about how Highways 138 and 155 are important transportation corridors that unite the district. Tr. 1308:20-1309:8.

Thus, the Court finds that Cooper HD-117 is a small district contained wholly with metro Atlanta and has no resemblance to the districts in LULAC and Miller. Mr. Cooper testified about the communities that are contained within the district, the shared socio-economic factors, and the characteristics that unite them. Additionally, Mr. Lofton, with his lifelong experience as a resident in the area,

307

explained how the communities interact with one another. The Court finds that the size of the district coupled with the witness testimony shows Cooper HD-117 preserves communities of interest.

((d))   <u>conclusions of law</u>

The Court finds that the <u>Alpha Phi Alpha</u> Plaintiffs have not carried their burden in establishing that the Black community is sufficiently compact in Cooper HD-117 to constitute an additional majority-Black district. Although Cooper HD-117 complies with the traditional redistricting principles of contiguity, compactness scores, and preservation of communities of interest, the Court finds that it split more political subdivisions than Enacted HD-117. Additionally, the district's population deviation is both higher than Enacted HD-117 and is barely within the range of the Enacted House Plan's population deviations.

Although there is no requirement that an illustrative district match or perform better than the correlating enacted district,[75] the Court finds that the higher deviation coupled with the splitting of an additional four VTDs as well as two municipalities leads to a finding that the district could not be drawn in accordance with traditional redistricting principles.

Accordingly, the Court finds that the Alpha Phi Alpha Plaintiffs have not carried their burden on the first Gingles precondition in the area encompassed by Cooper HD-117.

### (2)   *Grant*

The Court finds that the Grant Plaintiffs have met their burden in proving the three Gingles preconditions in relation to the challenged Senate districts in metro Atlanta and two of the challenged House districts in metro Atlanta.

---

[75] See Wright v. Sumter Cnty. Bd. of Elections & Registration, 301 F. Supp. 3d 1297, 1326 (M.D. Ga. 2018), aff'd, 979 F.3d 1282 (11th Cir. 2020) (opining that an illustrative plan can be "far from perfect" in terms of compactness yet satisfy the first Gingles precondition).

309

### (a)    numerosity

The Court finds that Grant Plaintiffs have met their burden in showing that the Black voting age population in metro Atlanta is large enough to create two additional majority-Black Senate districts, two majority-Black House districts in south metro Atlanta, and one additional majority-Black House district in western metro Atlanta. "[A] party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." Bartlett, 556 U.S. at 20.

It is undisputed that Esselstyn SD-25 and SD-28 have an AP BVAP of 58.93% and 57.28%, respectively, both of which exceed the 50% threshold required by Gingles. GX 1 ¶ 27 & tbl.1; Stip. ¶ 234.

**Table 1: Illustrative Senate plan majority-Black districts with BVAP percentages.**

| District | BVAP% | District | BVAP% | District | BVAP% |
|---|---|---|---|---|---|
| 10 | 61.10% | 26 | 52.84% | 39 | 60.21% |
| 12 | 57.97% | 28 | 57.28% | 41 | 62.61% |
| 15 | 54.00% | 34 | 58.97% | 43 | 58.52% |
| 22 | 50.84% | 35 | 54.05% | 44 | 71.52% |
| 23 | 51.06% | 36 | 51.34% | 55 | 65.97% |
| 25 | 58.93% | 38 | 66.36% | | |

310

It is also undisputed that Esselstyn HD-64, HD-74, and HD-117 have an AP BVAP of 50.24%, 53.94%, and 51.56%, respectively. Stip. ¶ 239, GX 1 ¶ 48 & tbl.5.

**Table 5: Illustrative House plan majority-Black districts with BVAP percentages.**

| District | BVAP% | District | BVAP% | District | BVAP% | District | BVAP% |
|---|---|---|---|---|---|---|---|
| 38 | 54.23% | 69 | 62.73% | 91 | 60.01% | 137 | 52.13% |
| 39 | 55.29% | 74 | 53.94% | 92 | 68.79% | 140 | 57.63% |
| 55 | 55.38% | 75 | 66.89% | 93 | 65.36% | 141 | 57.46% |
| 58 | 63.04% | 76 | 67.23% | 94 | 69.04% | 142 | 50.14% |
| 59 | 70.09% | 77 | 76.13% | 95 | 67.15% | 143 | 50.64% |
| 60 | 63.88% | 78 | 51.03% | 113 | 59.53% | 145 | 50.38% |
| 61 | 53.49% | 79 | 71.59% | 115 | 53.77% | 149 | 51.53% |
| 62 | 72.26% | 84 | 73.66% | 116 | 51.95% | 150 | 53.56% |
| 63 | 69.33% | 85 | 62.71% | 117 | 51.56% | 153 | 67.95% |
| 64 | 50.24% | 86 | 75.05% | 126 | 54.47% | 154 | 54.82% |
| 65 | 63.34% | 87 | 73.08% | 128 | 50.41% | 165 | 50.33% |
| 66 | 53.88% | 88 | 63.35% | 129 | 54.87% | 177 | 53.88% |
| 67 | 58.92% | 89 | 62.54% | 130 | 59.91% | | |
| 68 | 55.75% | 90 | 58.49% | 132 | 52.34% | | |

Based on these numbers, the Court finds that the <u>Grant</u> Plaintiffs have met their burden with respect to the numerosity prong of the first <u>Gingles</u> precondition in all additional majority-Black districts that Mr. Esselstyn proposed in metro Atlanta (i.e., SD-25, SD-28, HD-64, HD-74, and HD-117).

**(b)**     **compactness**

The Court finds that the <u>Grant</u> Plaintiffs have also met their burden to show that the minority community is sufficiently compact to warrant the creation of two additional majority-Black State Senate districts in south-metro Atlanta. They have also met their burden in showing that one additional compact

311

majority-Black district can be drawn in south metro Atlanta and one can be drawn in west-metro Atlanta. The <u>Grant</u> Plaintiffs have not met their burden with respect to Esselstyn HD-74, in south-metro Atlanta.

The standards governing the compactness inquiry for these additional proposed State Senate Districts is the same as the compactness inquiry undertaken in the <u>Pendergrass</u> case. <u>See</u> Section II(C)(1)(b) *supra*. The Court must consider if the illustrative proposed districts adhered to traditional redistricting principles, namely: population equality, contiguity, empirical compactness scores, the eyeball test for irregularities and contiguity, respect for political subdivisions, and preserving communities of interest. <u>See</u> Section II(C)(1)(b) *supra*.

### i) *Esselstyn SD-25*[76]

The Court finds that the minority community in Esselstyn SD-25 is sufficiently compact.

_____

[76] Esselstyn's State Senate districts in metro-Atlanta do not correlate to any of the enacted State Senate districts. <u>Compare</u> GX 1 ¶ 27 & fig. 4, <u>with</u> GX 1, attach D. Accordingly, the Court will compare the Esselstyn State Senate districts t the overall Enacted Senate Plan's statistics.

((a))   **empirical measures**

((1))   *population equality*

The Court finds that Esselstyn SD-25 is not malapportioned. See Reynolds, 377 U.S. at 577 (requiring "an honest and good faith effort to construct districts . . . of nearly equal population as practicable."); Brown, 462 U.S. at 842 ("minor deviations" are not violative of the Fourteenth Amendment). The General Assembly's "General Principles for Drafting Plans" specifies that "[e]ach legislative district . . . should be drawn to achieve a total population that is substantially equal as practicable." Stip. ¶ 135; JX 2, 2.

The ideal population size of a State Senate District is 191,284. Stip. ¶ 277. The General Assembly did not enumerate a specific acceptable deviation range for the State Senate Districts. However, using the Enacted Plan as a rough guide, a population deviation range between -1.03% and -0.98% is acceptable. GX 1, Attach. E. Esselstyn SD-25 has a population deviation of +0.74%. GX 1, Attach. F. This deviation falls squarely within the range of deviations in the Enacted Senate Plan. Thus, the Court finds that Esselstyn SD-25 achieves population equality that is consistent with the General Assembly's Redistricting Guidelines and traditional redistricting principles.

313

((2))   *contiguity*

The Parties stipulated that Esselstyn SD-25 is a contiguous district. Stip. ¶ 258. Hence, the Court finds that Esselstyn SD-25 complies with the traditional redistricting principle of contiguity.

((3))   *compactness scores*

The Court finds that Esselstyn SD-25 is more compact than Enacted SD-25. In reaching this conclusion, the Court, as it did in the <u>Pendergrass</u> case, looks at the objective compactness scores of the Polsby-Popper measure and Reock indicator.

Using the Reock indicator, Esselstyn's SD-25 is 0.57 as compared to the Enacted Senate Plan, which has an average Reock score of 0.42. GX 1, Attach. H. Thus, under the Reock measure, Esselstyn SD-25 is 0.15 points more compact than Enacted Senate Plan's average Reock score. Under the Polsby-Popper measure, Esselstyn's SD-25 is 0.34, and the Enacted Senate Plan has an average score of 0.29, a 0.05 point advantage for Esselstyn's SD-25 on this measure. <u>Id.</u> Hence, the Court finds that upon application of the empirical compactness measures, Esselstyn SD-25 fares better than the Enacted Senate Plan's average compactness scores.

314

The State's mapping expert, Mr. Morgan, agreed that Esselstyn SD-25 is significantly more compact than Enacted SD-25. Tr. 1850:8–11. Mr. Morgan conceded, furthermore, that Esselstyn SD-25 is more compact on the Reock and Polsby-Popper scale than *all* of the districts implicated by in the Enacted Senate Plan, except for one with an identical Polsby-Popper score. Tr. 1895:17–1896:1.

In sum, the Court finds that Esselstyn SD-25 is sufficiently compact w.

### ((4))   *political subdivisions*

The Court also finds that in creating Esselstyn SD-25, Mr. Esselstyn respected political subdivisions. Esselstyn SD-25 consists of portions of Henry and Clayton Counties. GX 1 ¶ 30 & fig.6. Additionally, Esselstyn SD-25 does not split any VTDs. GX 1 ¶ 40 & fig.10. See below for a graphic depiction of the Esselstyn Senate Plan's VTD splits:

315



**Figure 10: VTD splits in illustrative State Senate plan by county.**

GX 1 ¶ 40 & fig.10.

Mr. Esselstyn also testified that he made an effort to keep municipalities intact. Tr. 544:8–12 (testifying that McDonough is mostly intact, and that Locust Grove, Hampton, Bonanza and Lovejoy are kept intact). Accordingly, the Court finds that Esselstyn SD-25 reflects a respect for political subdivisions.

**((b))   <u>eyeball test</u>**

The Court finds that Esselstyn SD-25 is visually compact under the eyeball test:

316



GX 1 ¶ 30 & fig.6.

Using the mapping tool provided by Mr. Esselstyn, the Court finds that the district at its most distant points is approximately 20 miles in length. Id. Esselstyn SD-25 has no appendages or tentacles. Id. There is no contrary evidence or testimony in the Record. In fact, Mr. Morgan's report includes no analysis on the visual compactness of Esselstyn SD-25. Accordingly, the Court finds that Esselstyn SD-25 is visually compact.

317

((c))   **communities of interest**

The Court finds that Esselstyn SD-25 demonstrates respect for communities of interest. Mr. Esselstyn testified that the district is in metro Atlanta. Tr. 484:5–9. He also explained that he combined Henry and Clayton Counties because they are adjacent to one another. Tr. 544:1–7.

On cross-examination, Mr. Esselstyn admitted that he was unable to articulate a community of interest that connects south Clayton County with Locust Grove. Tr. 546:16–21. the Grant Plaintiffs, however, supplemented this testimony with testimony from Jason Carter, a former member of the State Senate and 2014 candidate for Governor of Georgia. Mr. Carter noted that Mr. Esselstyn's districts in south metro Atlanta are "suburban and exurban," "clearly [] fast-growing, . . . Atlanta commuter communit[ies] that ha[ve] all of the traffic concerns and the concerns of . . . expanding schools and massive population boom." Id. at 953:20–954:3. See also id. at 958:9–19 (similar); id. at 959:6–19 (similar); id. at 962:1–965:17 (similar). Addressing their shared interests, Mr. Carter explained that residents of these areas need their government officials to be responsive to their "transportation, education, [and] healthcare" needs. Id.

318

at 955:7–21. In the same vein, Eric Allen, 2020 candidate for Lt. Governor, testified that the residents of Esselstyn SD-25 share similar entertainment districts, hospitals, transit systems, education systems, employment, and all travel on I-75, I-285, I-20, and I-85. Tr. 1000:18–1001:2. In fact, the State's own map drawer, Ms. Wright, testified in connection with Enacted SD-28 and said that it was important to keep the city of Locust Grove wholly within that district (Tr. 1634:3–6), which Mr. Esselstyn accomplished (Tr. 546:16–21).

In sum, the Court finds that Esselstyn SD-25 is a small district contained wholly within metro Atlanta. It is comprised of two adjacent counties. The communities share the same concerns with transportation routes and have both experienced recent major population growth. Additionally, the Court finds that this district is not long and sprawling, like the districts in LULAC and Miller that stretched across large portions of the States and combined disparate minority populations. Rather, as is evidenced by the size of the district and the trial testimony, Esselstyn SD-25 preserves communities of interest.

319

((d))   <u>conclusions of law</u>

The Court determines that the <u>Grant</u> Plaintiffs have carried their burden in establishing that the Black community is sufficiently numerous and compact in Esselstyn SD-25 to constitute an additional majority-Black district. The Court finds that Esselstyn SD-25 complies with the traditional redistricting principles of population equality, contiguity, compactness, respect for political subdivisions, and preservation of communities of interest. Additionally, when visually inspecting the district, it is relatively small in size and does not contain any appendages or tentacles. Accordingly, the Court finds that the <u>Grant</u> Plaintiffs have carried their burden in meeting the first <u>Gingles</u> precondition in the area contained in Esselstyn SD-25.

### ii)     *Esselstyn SD-28*[77]

The Court finds also that <u>Grant</u> Plaintiffs have shown that it is possible to draw a reasonably compact electoral district consistent with traditional redistricting principles in the area encompassed by Esselstyn SD-28.

_____

[77] As stated *supra*, the Court compares Esselstyn SD-28 to the Enacted Senate Plan as a whole. <u>See</u> Section II(D)(1)(b)(2)(b)(i) *supra*.

((a))   **empirical measures**

*((1))   population equality*

The Court finds that Esselstyn SD-28 achieves relative population equality. As stated above, the General Assembly did not enumerate a specific acceptable deviation range for the Enacted Senate Plan. However, using the Enacted Plan as a guide, a population deviation range between -1.03% and -0.98% is acceptable. GX 1, Attach. D. Accordingly, the Court finds that Esselstyn SD-28 is within the acceptable range of population deviations approved by the Georgia General Assembly when it passed the Enacted Senate Plan. Thus, it achieves population equality that is consistent with the Enacted Senate Plan, the General Assembly's Redistricting Guidelines, and traditional redistricting principles.

*((2))   contiguity*

The Parties stipulated that Esselstyn SD-28 is a contiguous district. Stip. ¶ 258. Hence, the Court finds that Esselstyn SD-28 complies with the traditional redistricting principle of contiguity.

*((3))   compactness scores*

The Court finds Esselstyn SD-28's compactness scores, while lower on a side-by-side comparison with the Enacted Senate Plan, are within the acceptable

321

range of compactness scores found in the Enacted Senate Plan. GX 1, Attach. H. Esselstyn SD-28 has a Reock score of 0.38 and a Polsby-Popper score of 0.19. Id. The Enacted Senate Plan has an average Reock score of 042 and Polsby-Poppper score of 0.29. Accordingly, the Enacted Senate Plan's average compactness scores beats Esselstyn SD-28 on all empirical measures—0.05 points on Reock and 0.10 on Polsby-Popper.

Despite a lower compactness score under both empirical measures, Esselstyn SD-28 is within the range of compactness scores found in the Enacted Senate Plan. Specifically, the Enacted Senate Plan has a minimum Reock score of 0.17. GX 1, Attach. H. Esselstyn SD-28's Reock score (0.38) far exceeds that minimum threshold Reock score in the Enacted Senate Plan. Id. Similarly, the Enacted Senate Plan's minimum Polsby-Popper score is 0.13. Id. Esselstyn SD-28's Polsby-Popper score (0.19) exceeds, albeit slightly, the minimum threshold Polsby-Popper score in the Enacted Senate Plan. Id. Accordingly, the Court finds that Esselstyn SD-28 falls within the range of compactness scores in the Enacted Senate Plan and therefore constitutes a compact district for purposes of the first Gingles precondition.

322

*((4))   political subdivisions*

The Court finds that Esselstyn SD-28 exhibits respect for political subdivisions. Esselstyn SD-28 contains portions of Clayton, Coweta, Fayette, and Fulton Counties. GX 1 ¶ 31.

**Figure 10: VTD splits in illustrative State Senate plan by county.**



GX 1 ¶ 40 & fig.10. As this chart shows, the only county that is included within Esselstyn SD-28 with VTD splits is Fulton County. Put differently, Esselstyn SD-28 does not split any VTDs in Coweta, Clayton, and Fayette Counties, which make up the majority of the district. Id.; at ¶ 31 & fig.7. Even though Esselstyn SD-28 splits the city of Newnan, 90% of the city is contained within a single

323

district. Tr. 549:2-5, 550:25-551:9. Esselstyn, moreover, did not split any VTDs in Newnan, which is in Coweta County, itself. GX 1 ¶ 40 & fig.10.

Based on the foregoing, the Court finds that Esselstyn SD-28 exhibits a respect for political subdivisions.

((b))   **eyeball test**

The Court finds that Esselstyn SD-28 is visually compact under the eyeball test:



GX 1 ¶ 31 & fig.7.

Using the mapping tool, the Court finds that at its most distant points, Esselstyn SD-28 is approximate 25 miles long. <u>Id.</u> Esselstyn SD-28 does not contain any tentacles or appendages. Defendants submit no evidence or testimony in the Record suggesting that Esselstyn SD-28 is not visually compact. <u>See generally</u> DX 3; Tr. 1896:13-23. Accordingly, the Court concludes that Esselstyn SD-28 is visually compact.

((c))   <u>communities of interest</u>

The Court finds that Esselstyn SD-28 respects communities of interest. Because Esselstyn SD-25 and SD-28 are in close proximity to one another, much of the testimony adduced about SD-28 was also discussed in relation to Esselstyn SD-25. See Tr. 484:5–9 (Mr. Esselstyn testimony); <u>see also generally</u> <u>id.</u> 953:20– 965:17 (Mr. Carter testimony). The Court thereby incorporates its general analysis on communities of interest in south-metro Atlanta from Esselstyn SD-25 above into this section on Esselstyn SD-28. <u>See</u> Section II(D)(1)(2)(b)(i)(c) *supra*.

Specific to Esselstyn SD-28, Mr. Esselstyn testified that he drew the district to best keep together municipalities in Fulton County, and specifically to keep 90% of Newnan intact. Tr. 548:20–549:24. Similar to Locust Grove, Mr. Esselstyn

325

admitted that he was unable to articulate a community of interest that connects the city of Newnan with Fulton and Clayton Counties (Tr. 548:20–549:1). Again, however, the Grant Plaintiffs' supplemented this testimony with testimony from Mr. Allen, who testified that all of Esselstyn SD-28 is within metro Atlanta. Tr. 1002:18–20. He also mentioned that the area was serviced by the same healthcare systems (i.e., Emory Hospital and Grady Hospital) and relied on the same interstates for transportation. Id. at 1002:21–1003:5. Additionally, the State's map drawer, Ms. Wright, who is herself a resident of nearby Henry County (Tr. 1653:17–21), testified about the general communities in this area. In reference to the Enacted Senate Plan, Ms. Wright testified that it makes sense to group Coweta and Fayette Counties in a single district because the counties "are commonly sharing resources and things like that." Tr. 1656:18–21.

Thus, the Court finds that Esselstyn SD-28 is a small district contained wholly within metro Atlanta. Its communities share the same concerns with transportation routes and have experienced recent major population growth. Additionally, the Court finds that this district is not long and sprawling, like the districts in LULAC and Miller that stretched across large portions of their

326

respective States and combined disparate minority populations. Rather, as is evidenced by the size of the district and the trial testimony, Esselstyn SD-28 preserves communities of interest.

### ((d))   conclusions of law

The Court finds that the <u>Grant</u> Plaintiffs have carried their burden in establishing that the Black community is sufficiently numerous and compact in Esselstyn SD-28 to constitute an additional majority-Black district. The Court finds that Esselstyn SD-28 complies with the traditional redistricting principles of population equality, contiguity, compactness scores, respect for political subdivisions, and preservation of communities of interest. Additionally, when visually inspecting the district, it is relatively small in size and does not contain any appendages or tentacles. Accordingly, the Court finds that the <u>Grant</u> Plaintiffs have carried their burden on the first <u>Gingles</u> precondition in the area encompassed by Esselstyn SD-28.

### iii)   *Esselstyn HD-64*

The Court finds that the <u>Grant</u> Plaintiffs have shown that it is possible to draw a State House district consistent with traditional redistricting principles in the area encompassed by Esselstyn HD-64.

327

### ((a))   **Empirical measures**

#### ((1))   *population equality*

The Court finds that Esselstyn HD-64 achieves better population equality than Enacted HD-64. Enacted HD-64 has a population deviation of -0.88%, whereas Esselstyn HD-64 has a population deviation of +0.23%. GX 1, attachs. I, J. Accordingly, Esselstyn HD-64 achieves population equality consistent with the General Assembly's Guidelines and traditional redistricting principles.

#### ((2))   *contiguity*

The Parties stipulated that Esselstyn HD-64 is a contiguous district. Stip. ¶ 258. Hence, the Court finds that Esselstyn HD-64 complies with the traditional redistricting principle of contiguity.

#### ((3))   *compactness scores*

The Court finds that Esselstyn HD-64's compactness score is within the range of scores achieved by the Enacted House Plan. Esselstyn HD-64 has a compactness measure of 0.22 on both metrics. GX 1, Attach. L. Enacted HD-64 has a Reock score of 0.38 and Polsby-Popper score of 0.36. Id. While Esselstyn HD-64 is less compact than Enacted HD-64 using empirical measures, the proposed district is still within the range of acceptable range of compactness

328

scores found in the Enacted House Plan (i.e., a minimum Reock score of 0.12 and a minimum Polsby-Popper score of 0.10). Id. Accordingly, the Court finds that Esselstyn HD-64 is reasonably compact in terms of empirical scoring.

### ((4)) political subdivisions

The Court finds that Esselstyn HD-64 respects political subdivisions. Esselstyn HD-64 consists of portions of Douglas, Fulton, and Paulding Counties. GX 1 ¶ 49. Esselstyn HD-64 splits one more county than Enacted HD-64, which includes only portions of Douglas and Paulding Counties. GX 1, Attach. I. When comparing the VTD splits in Enacted HD-64 and Esselstyn HD-64, they both split only one VTD (in Paulding County). GX 1, Attach. L. [78] Additionally, Mr. Esselstyn testified he was able to keep Lithia Springs intact, which is an incorporated community. Tr. 562:4-13.

Defendants' mapping expert, Mr. Morgan, did not opine about Esselstyn HD-64 in his report. DX 3. However, at the trial, he testified that Esselstyn HD-

---

[78] The statistics for the VTD splits can be found on page 14 of subdivision of the Political Subdivisions Chart entitled GA House Enacted and page 14 of Political Subdivisions Chart entitled GA House Illustrative. GX 1, Attach. L.

64 contains the same Fulton and Douglas County precincts as Enacted HD-61. Tr. 1826:17–21. Outside of this testimony, Mr. Morgan offered no opinion about whether Esselstyn HD-64 exhibited respect for existing political subdivisions.

The Court finds that not only are Esselstyn HD-64 subdivision splits consistent with Enacted HD-64, but Esselstyn HD-64 on the whole respects political subdivisions.

((b))   <u>eyeball test</u>

The Court finds that Esselstyn HD-64 is visually compact:



GX 1 ¶ 49 & fig.14.

330

Mr. Esselstyn testified that he modeled the shape of Esselstyn HD-64 on the shape of Enacted HD-61. Tr. 560:14–24. Visually, the Court finds that Esselstyn HD-64 does not have appendages or tentacles. Esselsyn HD-64 is relatively small in size. In fact, when measured with the mapping tool, it is less than 20 miles at its most distant points. GX 1 ¶ 49 & fig.14.

Because of these considerations and the fact that Defendants do not meaningfully dispute the visual compactness of this district, the Court finds that Esselstyn HD-64 is visually compact.

((c))   **communities of interest**

The Court finds that Esselstyn HD-64 preserves communities of interest and does not combine disparate communities. As an initial note, the Court finds that Esselstyn HD-64 is in the same relative area as Illustrative CD-6. Both proposed districts combine areas in-and-around Fulton and Douglas Counties.[79] GX 1 ¶ 49. As the Court stated above, it found that Illustrative CD-6 preserved communities of interest. See Section II(C)(1)(b)(3) *supra*.

_____

[79] Esselstyn HD-64 also contains parts of Pauling County, and Illustrative CD-6 combines areas in Cobb and Fayette Counties.

331

Specific to Esselstyn HD-64, Mr. Allen explained that the residents of this west-metro Atlanta district have shared interests. Tr. 1004:1–10. They rely on the same roadways and face many of the same transportation-related challenges. Id. at 1004:11–22. They rely on the same healthcare systems and share an interest in preserving access to Grady Hospital, the only Level One Trauma Center in the metro area. Id. at 1005:1–24. Accordingly, the Court finds that Esselstyn HD-64 preserves existing communities of interest.

### ((d)) conclusions of law

The Court finds that the Grant Plaintiffs have carried their burden in establishing that the Black community is sufficiently numerous and compact in Esselstyn HD-64 to constitute an additional majority-Black district. The Court finds that Esselstyn HD-64 complies with the traditional redistricting principles of population equality, contiguity, compactness, respect for political subdivisions, and preservation of communities of interest. Additionally, when visually inspecting the district, it is relatively small in size and does not contain any appendages or tentacles. Accordingly, the Court finds that the Grant

332

Plaintiffs have carried their burden in meeting the first Gingles precondition in the area encompassed by Esselstyn HD-64.

### iv)   Esselstyn HD-74

The Court finds that Grant Plaintiffs have not shown that it is possible to draw a legislative district consistent with traditional redistricting principles in the area encompassed by Esselstyn HD-74.

#### ((a))   empirical measures

##### ((1))   population equality

The Court finds that Esselstyn HD-74's population deviation of -1.84% is greater than any district in the Enacted House Plan (-1.40% and +1.34%). Esselstyn HD-74 is nearly one point greater than the deviation of Enacted HD-74 (-0.93%). GX 1, attachs. J, I. ; Stip. ¶ 278. Mr. Esselstyn admitted that it was one of the most underpopulated districts on his House Plan. Tr. 567:23–568:6."[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as practicable." Reynolds, 377 U.S. at 577.

> [M]inor deviations from mathematical equality among State legislative districts are insufficient to make out a prima facie case . . . under the Fourteenth

333

> Amendments . . . . Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations.

Brown, 462 U.S. at 842 (quoting Reynolds, 377 U.S. at 577) (quotation marks omitted). More recently, the Supreme Court held that population deviations that are below 10 percent are not entitled to a safe harbor. Cox v. Larios, 542 U.S. 947, 949 (2004). Specifically, "the equal-population principle remains the only clear limitation on improper districting practices, and we must be careful not to dilute its strength." Id. at 949–50. In 2004, that three-judge court noted that with technology it is possible to have perfect population equality. Larios v. Cox, 300 F. Supp. 2d 1320, 1341 (N.D. Ga. 2004). In 1991, a court in the Northern District of Illinois similarly remarked that "[t]he use of increasingly sophisticated computers in the congressional map drawing process has reduced population deviations to nearly infinitesimal proportions." Harstert v. State Bd. of Elections, 777 F. Supp. 634, 643 (N.D. Ill. 1991).

Although perfect population deviation is not a requirement by the Supreme Court or the Georgia General Assembly, "[e]ach legislative district of the General Assembly shall be drawn to achieve a total population that is

334

substantially equal as practicable, considering the principles listed below." JX 2, 2. The Court finds that Esselstyn HD-74 achieves population equality less so than Enacted HD-74. Using the Georgia Enacted House Plan as a guide, the accepted population deviation range is ±1.40%. Esselstyn HD-74, at -1.84%, is significantly greater than that range.

### ((2))   *contiguity*

The Parties stipulated that Esselstyn HD-74 is a contiguous district. Stip. ¶ 258. Hence, the Court finds that Esselstyn HD-74 complies with the traditional redistricting principle of contiguity.

### ((3))   *compactness scores*

The Court finds that the Esselstyn HD-74's compactness scores are within the acceptable range of compactness scores on the overall Enacted House Plan. Esselstyn HD-74 has a Reock score of 0.30 and a Polsby-Popper score of 0.19. GX 1, Attach. L. The Court notes that Enacted HD-74 performs better on the Reock measure (0.50) as well as the Polsby-Popper measure (0.25). Id. The Court notes Esselstyn HD-74's scores do not fall below the minimum compactness scores for the Enacted Plan—0.12(on Reock) and 0.10 (on Polsby-Popper). Id. In sum, the Court finds that Esselstyn HD-74 is less compact than Enacted HD-74.

*((4))*  *political*
*subdivisions*

The Court finds that Esselstyn HD-74 generally exhibited respect for communities of interest. The Court notes that Esselstyn HD-74 splits one less county than Enacted HD-74. GX 1 ¶ 50 & fig.15 (Esselstyn HD-74 is contained in Clayton and Fulton Counties); GX 1, Ex. I (Enacted HD-74 is contained in Fayette, Henry, and Spalding Counties).

However, at the trial Mr. Esselstyn testified that he split Peachtree City. Tr. 567:6–13; 1657:22–23. It is worth noting that the Enacted House Plan also split Peachtree City. Id. Esselstyn HD-74 testified that he was able to keep the communities of Irondale, Brooks, and Woolsey "if not entirely intact, almost entirely intact," but conceded that Irondale is not an incorporated municipality. Tr. 566:22–567:5.

336

Finally, Esselstyn HD-74 split fewer VTDs than Enacted HD-74. Enacted HD-74 split four VTDs, one in Fayette and three in Spalding Counties (GX 1, Ex. L),[80] whereas Esselstyn HD-74 split only one VTD in Clayton County (id.).

Based on the foregoing, the Court finds that Esselstyn HD-74 reflects respect for political subdivisions.

((b))   **eyeball test**

The Court finds that Esselstyn HD-74 is visually compact:

---

[80] The statistics for the VTD splits can be found on pages 11 and 15 of subdivision of the Political Subdivisions Chart entitled GA House Enacted and page 2 of Political Subdivisions Chart entitled GA House Illustrative. GX 1, Attach. L.

337



Figure 15: Map of southern Metro Atlanta area of illustrative plan with majority-Black House districts indicated.

GX 1 ¶ 50 & fig.15.

Esselstyn HD-74 does not have appendages or tentacles. Using the mapping tool, Esselstyn HD-74 is approximately 20 miles in length at its most distant points.

Defendants do not meaningfully dispute the visual compactness of this district. Accordingly, the Court finds that Esselstyn HD-74 is visually compact.

((c))   **communities of interest**

The Court finds that Esselstyn HD-74 combines rural, urban, and suburban populations. In fact, Mr. Esselstyn testified that the proposed district contained

338

rural, urban, and suburban populations. Tr. 566:22–24. Mr. Carter's testimony about the communities of interest in this district was generally the same as his testimony about the communities of interest in Esselstyn HD-117, SD-25, and SD-28 because they are in the same relative region of the state. However, on cross-examination, Mr. Carter agreed that the parts of south Fayette County included in Esselstyn HD-74 were exurban, if not rural, compared with other parts of the district. Tr. 987:2–16.

The Court finds that the testimony specific to Esselstyn HD-74 shows that it combined widely diverse communities into a district. Accordingly, the Court finds that Esselstyn HD-74 combines disparate communities into one district.

## ((d))   conclusions of law

The Court has determined that the <u>Grant</u> Plaintiffs have not carried their burden in establishing that the Black community in Esselstyn HD-74 is sufficiently numerous and compact to constitute an additional majority-Black district. Although the Black population in Esselstyn HD-74 exceeds 50%, the Court finds that it does so by having one of the most underpopulated districts in the Esselstyn House Plan. Tr. 567:23–568:6. Additionally, the Court finds that

339

although the district is visually compact, it is significantly less compact than Enacted HD-74 in other ways. Furthermore, Mr. Esselstyn admitted and Mr. Carter agreed that the district combines urban, suburban, and rural communities. Neither witness was able to explain the commonalities that the voters in Esselstyn HD-74 share, except for the general commonalities that all metro Atlanta voters share. Accordingly, the Court concludes that the Grant Plaintiffs have not carried their burden in meeting the first Gingles precondition in the area drawn by Esselstyn HD-74.

### v)   *Esselstyn HD-117*

The Court finds that the Grant Plaintiffs have shown that it is possible to draw a legislative district consistent with traditional redistricting principles in the area encompassed by Esselstyn HD-117.

#### ((a))   Empirical measures

##### ((1))   *population equality*

The Court finds that Esselstyn and Enacted HD-117 have comparable population deviations. Esselstyn HD-117 has a population deviation of +1.06% whereas Enacted HD-117 has a population deviation of +1.04%. GX 1, Attachs. I, J. The Court finds that the difference in population deviations between the two

340

districts is not legally significant. Additionally, the Court finds that Esselstyn HD-117's population deviation is within the range of population deviations found in the Enacted House Plan (-1.40% and 1.34%). Id. at Attach. I. Accordingly, the Court finds that Esselstyn HD-117 complies with traditional redistricting principle of population equality.

### ((2))   contiguity

The Parties stipulated that Esselstyn HD-117 is a contiguous district. Stip. ¶ 258. Hence, the Court finds that Esselstyn HD-117 complies with the traditional redistricting principle of contiguity.

### ((3))   compactness scores

The Court finds that Esselstyn and Enacted HD-117 are comparably compact. Esselstyn HD-117 has a Reock score of 0.40 and a Polsby-Popper score of 0.33. GX 1, Attach. L. Enacted HD-117 has a Reock score of 0.41 and a Polsby-Pooper score of 0.28. Id. Thus, Enacted HD-117 is more compact on the Reock measure (by 0.01 points), and Esselstyn HD-117 is more compact on the Polsby-Popper score (by 0.05 points). Generally, however, the two districts are roughly equal in terms of objective compactness scores. The Court also finds that Esselstyn HD-117 performs better than the Enacted House Plan's average

341

compactness scores (0.39 on Reock and 0.28 on Polsby-Popper). Id. Accordingly, the Court finds that Esselstyn HD-117 is compact as compared to Enacted HD-117 and overall qualifies as a compact district.

### ((4)) political subdivisions

The Court finds that Esselstyn HD-117 demonstrates respect for political subdivisions. Esselstyn HD-117 is wholly within Henry County, meaning it does not split any counties (GX 1 ¶ 50 & fig.15), whereas Enacted HD-117 consists of Henry and Spalding Counties (GX 1, Ex. I). Accordingly, Esselstyn HD-117 splits one less county than Enacted HD-117.

Conversely, however, Mr. Esselstyn split the city of McDonough, even though he kept the core of the city whole. Tr. 571:19–25. Mr. Esselstyn also split the city of Locust Grove, by using I-75 as a boundary.[81] Tr. 571:16–21. Finally,

_____

[81] Mr. Esselstyn, however, crossed over I-75 in another district. Tr. 571:16–21

Esselstyn HD-117 splits two VTDs in Henry County, whereas the Enacted HD-117 split only one VTD in Henry County. GX 1, Ex. L.[82]

Given the above evidence, the Court finds that Mr. Esselstyn, generally, respected political subdivisions in creating Esselstyn HD-117.

((b))   **Eyeball test**

The Court finds that Esselstyn HD-117 is visually compact:



Figure 15: Map of southern Metro Atlanta area of illustrative plan with majority-Black House districts indicated.

---

[82] The statistics for the VTD splits can be found on page 13 of subdivision of the Political Subdivisions Chart entitled GA House Enacted and page 13 of Political Subdivisions Chart entitled GA House Illustrative. GX 1, Attach. L.

GX 1 ¶ 50 & fig.15.

Esselstyn HD-117 does not have appendages or tentacles. Using the mapping tool, Esselstyn HD-117 is approximately 15 miles at its most distant points. Defendants do not meaningfully dispute the visual compactness of this district. Accordingly, the Court finds that Esselstyn HD-117 is visually compact.

((c))   <u>Communities of interest</u>

The Court finds that Esselstyn HD-117 respects communities of interest. The testimony about HD-117 is virtually identical to the testimony regarding Esselstyn HD-74 because both districts are relatively close in proximity. <u>See</u> Section II(D)(1)(b)(2)(i)(c), <u>id.</u> at (ii)(c), <u>id.</u> at (iii)(c) *supra* (HD-74 and in Senate districts for south metro). There is no evidence or testimony opining or showing that Esselstyn HD-117 includes disparate communities.

The Court does not find Mr. Esselstyn's split of McDonough and Locust Grove to constitute a failure in preserving communities of interest. Mr. Esselstyn testified that when drawing the district, he made his best effort to keep the core of McDonough whole and only the "fringes of McDonough [ ] are outside of District 117." Tr. 570: 22–25. And Locust Grove is divided based on the I-75

344

boundary. Tr. 571:16–19. The Court credits Mr. Esselstyn's explanations for the reasons why McDonough and Locust Grove were not kept intact and finds that they are sufficient for purposes of showing that Mr. Esselstyn preserved communities of interest.

In sum, the Court finds that Esselstyn HD-117 is a small district contained wholly within metro Atlanta. The communities share the same concerns with transportation routes and have experienced recent major population growth. Additionally, the Court finds that this district is not long and sprawling, like the districts in LULAC and Miller that stretched across large portions of their respective States and combined disparate minority populations. Rather, as is evidenced by the size of the district and the trial testimony, Esselstyn HD-117 preserves communities of interest.

### ((d))   Conclusions of law

The Court finds that the Grant Plaintiffs have carried their burden in establishing that the Black community is sufficiently numerous and compact in Esselstyn HD-117 to constitute an additional majority-Black district. The Court finds that Esselstyn HD-117 complies with the traditional redistricting principles

345

of population equality, contiguity, compactness, respect for political subdivisions, and preservation of communities of interest. Additionally, when visually inspecting the district, it is relatively small in size and does not contain any appendages or tentacles. Accordingly, the Court finds that the Grant Plaintiffs have carried their burden in meeting the first Gingles precondition in the area drawn by Esselstyn HD-117.

### c)   Eastern Black Belt region

#### (1)   *Alpha Phi Alpha*

The Court finds that the Alpha Phi Alpha Plaintiffs have not met their burden in establishing that the Black community in the eastern Black Belt sufficiently large and geographically compact to constitute an additional majority-Black Senate or House district.

#### (a)   numerosity

The Court finds that the Alpha Phi Alpha Plaintiffs have met their burden in showing that the Black voting age population in the eastern Black Belt is large enough to constitute an additional majority-Black district. Bartlett, 556 U.S. at 20 ("[A] party asserting § 2 liability must show by a preponderance of the evidence

that the minority population in the potential election district is greater than 50 percent.").

Cooper SD-23 has an AP BVAP of 50.21%, which slightly exceeds the 50% threshold required by Gingles. APAX 1, 227 & Ex. O-1. As the Court discusses further below, it is significant that Mr. Cooper removed Black population from SD-22 to create SD-23, which resulted in two underpopulated districts that meet the 50% majority-Black threshold by only slight margins. Tr. 257:1-4.

The Black voting age population in the eastern Black Belt is also large enough to constitute an additional majority-Black House district. Cooper HD-133 has an AP BVAP of 51.97%, which exceeds the 50% threshold required by Gingles APAX 1, Ex. AA-1. Thus, Cooper HD-133 meets the first Gingles precondition's numerosity requirement.

### (b)   compactness

The Court concludes that neither Cooper SD-23 nor Cooper HD-133 are, on the whole, compact pursuant to the standards for the first Gingles precondition in the Alpha Phi Alpha Plaintiffs' case.

347

i)      *Cooper SD-23*

((a))   **empirical measures**

((1))   *population equality*

The ideal population size of a State Senate District is 191,284 people. Stip. ¶ 277. Cooper SD-23 has a population of 190,081 people, which constitutes a population deviation of -0.63%. APAX 1, Ex. O-1. The neighboring majority-Black district, SD-22, is also underpopulated—its population is 189,518, which constitutes a population deviation of -0.92%. APAX 1, Ex. O-1. Conversely, Enacted SD-23 is slightly underpopulated with a population of 190,344, with a population deviation of only -0.49%. APAX 1, Ex. M-1. For its part, Enacted SD-22 is overpopulated with a population of 193,163 and a population deviation of +0.98%. Id.

The Supreme Court has indicated a strong preference for "population equality with little more than *de minimis* variation." Connor v. Finch, 431 U.S. 407, 414 (1977) (internal quotation mark omitted) (quoting Chapman v. Meier, 420 U.S. 1, 27 (1975)). While the Equal Protection Clause does not require that Legislative Districts meet perfect population deviations, with the advent of technology, it seems that ±10% deviation is no longer a safe harbor for proposed districts. See

348

Section II(D)(1)(b)(2)(b)(iii)(a)(1) *supra* (Esselstyn HD-74); see also JX 2, 2 (stating a guideline that "[e]ach legislative district of the General Assembly shall be drawn to achieve a total population that is substantially equal as practicable, considering the principles listed below.").

The Court finds that Cooper SD-23 itself is not malapportioned. To create the district, however, Mr. Cooper reduced the population in SD-22 to nearly the lowest deviation on the Cooper Senate Plan. Tr. 254:14-255:3, 1783:10-14. Therefore, the Court concludes it is significant that Mr. Cooper's creation of SD-23 required creating increasing the population deviation in SD-22, so that it is barely within Mr. Cooper's ±1.00% deviation guidepost. Stop. ¶ 301, APAX 1 ¶ 111. Moreover, even though the General Assembly did not enumerate a specific population deviation range for the Legislative Districts, the Court finds Cooper SD-23 performs worse on the population equality metric than Enacted SD-23. JX 2, 2; APAX 1, Exs. O-1, M-1. Accordingly, the Court finds that the evidence shows that Cooper SD-23 achieves the traditional redistricting principle of population equality less so than Enacted SD-23.

349

### ((2))   *contiguity*

The Parties stipulated that Cooper SD-23 is a contiguous district. Stip. ¶ 300. Therefore, the Court finds that Cooper SD-23 complies with the traditional redistricting principle of contiguity.

### ((3))   *compactness scores*

Under the objective Reock and Polsby-Popper measures, Cooper SD-23 and Enacted SD-23 are comparably compact. In fact, they achieve the same scores: Enacted SD-23 has a Reock score of 0.37 and a Polsby-Popper score of 0.16. APAX 1, Ex. S-3. Likewise, Cooper's SD-23 has a Reock score 0.37 and a Polsby-Popper 0.16. Id., Ex. S-1. Thus, the Court considers Cooper's SD-23 to be comparably compact to Enacted SD-23.

### ((4))   *political subdivisions*

Both Enacted SD-23 and Cooper SD-23 split two counties: Enacted SD-23 splits Richmond and Columbia Counties while Cooper SD-23 splits Richmond and Wilkes Counties. Tr. 119: 4-13. However, Cooper SD-23 splits the City of Washington (Tr. 258:24 – 259:2), whereas Enacted SD-23 does not. APAX 1 ¶ 107 & fig.18 (the city of Washington is in Wilkes County and all of Wilkes County is

350

within Enacted SD-24). Additionally, Cooper SD-23 splits two VTDs in Wilkes

County, whereas Enacted SD-23 splits none. APAX 1, Exs. T-1, T-3. Thus, the

Court concludes that Cooper SD-23 does not exhibit respect for political

subdivisions as well as Enacted SD-23.

((b))   **eyeball test**

The Court concludes that Cooper SD-23 does not pass the eyeball test for

visual compactness:



APAX 1 ¶ 108 & fig.19A.

Cooper SD-23 is an oddly shaped, sprawling district that spans north to south from Wilkes County to Jenkins County and east to west from Twiggs County to Burke County. APAX Ex. 1, fig.19A. Milledgeville in Baldwin County (western part of the district) is more than 100 miles from Augusta in Richmond County (eastern part of the district). DX 2 ¶ 36. Based on the foregoing, Cooper SD-23 is not visually compact.

Admittedly, Enacted SD-23 is also large and sprawling, albeit in a different way than Cooper SD-23. However, as a majority-white district, Enacted SD-23 is not subject to Gingles' compactness requirements. LULAC, 548 U.S. at 430–31 ("[T]here is no § 2 right to a district that is not reasonably compact, the creation of a noncompact district does not compensate for the dismantling of a compact opportunity district." (citing Abrams, 521 U.S. at 91–92)). In other words, the large and sprawling nature of Enacted SD-23 does not alleviate the concerns with the shape and size of Cooper SD-23. Moreover, plaintiffs, who have alleged a Section 2 violation, have the burden to show that the minority community is sufficiently compact to create the proposed majority-minority district. Based on

352

the foregoing, the Court concludes <u>Alpha Phi Alpha</u> Plaintiffs have not met their burden to show visual compactness.

### ((c))   <u>communities of interest</u>

The Court furthermore finds that the <u>Alpha Phi Alpha</u> Plaintiffs have not carried their burden in showing that Cooper SD-23 unites communities of interest. Mr. Cooper stated that the "Black Belt" formed a community of interest in relation to Cooper SD-23. Tr. 267:12–22. But when asked to define the factors that unite the Black communities in Cooper SD-23, Mr. Cooper only vaguely referenced "cultural and historical factors," a response the Court finds unpersuasive. First, the Black Belt is a wide region that "stretches from one side of the State to another and "that is a pretty significant amount of distance to define as one community." Tr. 1619:6-9.

353



**Georgia's Black Belt School Districts**

APAX 1 ¶ 18 & fig.1.

Ms. Wright, the State's map drawer, testified that there is a natural barrier in the area of the Ogeechee River that runs through Warren, Glascock, and Jefferson Counties, which runs through the center of Cooper SD-23. Tr. 1639:12-1640:1. She also testified that Augusta is a more urban area, whereas the surrounding counties are rural. Tr. 1639:12-14; 1695:25-1696:8.

With respect to the demographic makeup of the district, Mr. Morgan, Defendant's mapping expert, described Cooper SD-23 as a district that "connects

354

separate enclaves of Black population." DX 2 ¶ 35. The Court agrees. For example,

Cooper SD-23 links Black population from Milledgeville in Baldwin County to

the Black population residing more than 100 miles away in Augusta. Id.

Furthermore, Mr. Cooper conceded that Cooper SD-23 includes counties from

different regions and splits a regional commission. Tr. 260:23–261:13.



DX 2 ¶ 34 & Ex. 23.

The Court finds that, although communities of interest are hard to define,

the distance between the Black population in Cooper SD-23 coupled with the

355

sprawling geographic nature of the district indicates that there is not a unified community of interest in Cooper SD-23. Mr. Cooper's vague reference to shared historical and cultural similarities of the Black Belt is insufficient to establish communities of interest. The Black Belt runs across the southeastern United States, and in Georgia, it spans from Augusta, near the South Carolina border to the southwest corner of the State near Alabama and Florida. Stip. ¶ 118; GX 1 ¶ 19 & fig.1. The Court finds that portions of Cooper SD-23 are both urban and rural and that a river divides the proposed district.

The Court also finds that the lay witness testimony does not sufficiently prove that Cooper SD-23 preserves communities of interest. Dr. Diane Evans,[83] who lives in Jefferson County—at the heart of Cooper SD-23—testified about communities in the proposed district that share numerous interests. She said that Black residents in the eastern section of the Black Belt attend the same houses of worship and share church leadership. Tr. 627:19-628:6. She identified other common interests shared by the Black residents in the area such as sports, and

---

[83] The Court granted Plaintiffs' motion to incorporate Dr. Evans's testimony as part of the Alpha Phi Alpha record. Tr. 633:18-634:10.

farming; she said they also have similar policy concerns regarding high school dropout rates and education. Id. at 625:3-8, 629:22-630:13.

While the Court finds Dr. Evans to be highly credible, the Court also finds that the evidence presented at trial is not enough to show that the Black communities in Esselstyn SD-23 are part of a community of interest. Although there is some evidence of shared concerns over high rates of gun violence and low high school graduation rates, it is unclear how these commonalities unite the widely dispersed Black communities in the proposed district. Additionally, given the widely dispersed nature of the pockets of high concentration of Black people, the evidence is insufficient to show that all of the communities in this area share these same concerns.

Although the three-judge court in Singleton found a community of interest in Alabama's Black Belt, the evidence in this case differs. There, the three-judge court found that "Black voters in the Black Belt share common 'political beliefs, cultural values, and economic interests.'" Singleton, 582 F. Supp. 3d at 953. The Court finds that there is not sufficient evidence in the Record for it to conclude that the Black community in this region constitutes a community of interest.

357

Accordingly, the Court finds that Cooper SD-23 does not preserve communities of interest.

### ((d))   conclusions of law

The Court concludes that the Black community is not sufficiently compact in Cooper SD-23. This conclusion is based on (a) the underpopulation of Cooper SD-23 (and its ripple effect of reducing the population in Cooper SD-22), (b) Cooper SD-23's treatment of political subdivisions, (c) a lack of visual compactness, and (d) Cooper SD-23's unification of geographically distant disparate black populations without preserving articulable communities of interest.

Accordingly, the Court finds that the Alpha Phi Alpha Plaintiffs have not carried their burden in meeting the first Gingles precondition as to Cooper SD-23. The three Gingles requirements are necessary preconditions, intended "to help courts determine which claims could meet the totality-of-the-circumstances standard for a § 2 violation." Bartlett, 556 U.S. at 21. Failure to prove any one of the preconditions is fatal to a plaintiff's Section 2 claim. Greater Birmingham Ministries, 992 F.3d at 1332. Because the Alpha Phi Alpha Plaintiffs have not

358

successfully carried their burden in establishing that the Black community in the eastern Black Belt is sufficiently compact, they have failed to demonstrate that the Enacted Senate Plan violates Section 2 with respect to the area of Cooper SD-23.

### ii)     *Cooper HD-133*

As with Cooper SD-23, the Court concludes, based on the following measures of compactness, that Cooper HD-133 does not satisfy the first <u>Gingles</u>' precondition's compactness requirement either.

#### ((a))   <u>empirical measures</u>

##### ((1))   *population equality*

The ideal population size of a State House District is 59,511 people. Stip. ¶ 278. Cooper HD-133 and Enacted HD-133 have identical population deviations of -1.33%. APAX 1, Exs. Z-1, AA-1. Accordingly, the Court finds that the population of Cooper HD-133 complies with the General Assembly's guidelines and the traditional redistricting principle for population equality.

### ((2))   *contiguity*

The Parties stipulated that Cooper HD-133 is a contiguous district. Stip. ¶ 300. Therefore, the Court finds that Cooper HD-133 complies with the traditional redistricting principle of contiguity.

### ((3))   *compactness scores*

Under the Reock and Polsby-Popper measures, Cooper HD-133 is much less compact than Enacted HD-133: Enacted HD-133 has a Reock score of 0.55 and a Polsby-Popper score of 0.42, whereas Cooper's HD-133 has a Reock score 0.26 and a Polsby-Popper 0.20. DX 2, 25 & Chart 7. Accordingly, the Court concludes that Cooper HD-133 is not comparably compact to Enacted HD-133. The Court does note, however that both of these compactness scores are within the range of compactness scores found in the Enacted House Plan, i.e., minimum Reock score is 0.12 and minimum Polsby-Popper score is 0.10. APAX 1, Ex. AG-2. Although Cooper HD-133 exceeds the minimum threshold, the Court finds that, compared to Enacted HD-133, it performs far worse on compactness measures.

((4))   *political*
*subdivisions*

Evidence at trial established that Mr. Cooper sacrificed preservation of political subdivisions, including counties and precincts, in creating Cooper HD-133. Mr. Cooper testified that there are more splits in this area of the Cooper House Plan than in other illustrative plans he has drawn. Tr. 282:3-4. Also, Cooper HD-133 split *nine* precincts—again, more than any other district on the Cooper House Plan. DX 2 ¶ 62; APAX 1, T-1, T-3. Furthermore, to create Cooper HD-133, Mr. Cooper made changes to Enacted HD-128—a majority-Black district—that resulted in additional split counties in that area. Tr. 282:13–19. Likewise, the creation of Cooper HD-133 required changes to Enacted HD-126 that resulted in additional county splits in that district. Tr. 283:23–284:11. Thus, the Court determines that Cooper HD-133 does not respect political subdivisions, either itself in the proposed district, or in the districts experiencing the ripple effect of Mr. Cooper's changes to the area.

((b))   **eyeball test**

The Court concludes that Cooper HD-133 does not pass the eyeball test:

361



APAX 1 ¶ 169 & fig.31.

Cooper HD-133 is a long district that stretches from Wilkes County in the north, narrows around Milledgeville, and then widens out to Wilkinson County in the south. DX 2, 75 fig.31. According to Mr. Morgan, Defendants' mapping expert, Cooper HD-133 stretches north to south for 90 miles to pick up Black population from Milledgeville. DX 2 ¶ 61. In these ways, Cooper HD-133 stands in stark contrast to Enacted HD-133, which covers a much smaller geographic area. See DX 2, 74 fig.30. Thus, the Court concludes that Cooper HD-133 is not visually compact.

362

**((c))  communities of interest**

Finally, the Court finds that the <u>Alpha Phi Alpha</u> Plaintiffs have not carried their burden in showing that Cooper HD-133 unites communities of interest. Mr. Cooper identified the "Black Belt" as a community of interest that joined the various counties within Cooper HD-133. Tr. 280:23 – 25. He further stated that the counties in Cooper HD-133 are rural in nature, and with the exception of Glascock County, are significantly Black. <u>Id.</u> at 281:3-8.

The Court finds that, although communities of interest are hard to define, <u>Alpha Phi Alpha</u> Plaintiffs have not produced sufficient evidence show that this 90-mile district preserves communities of interest as opposed to combining disparate communities. This is true even in light of Dr. Evan's testimony, which is incorporated here (<u>see</u> Section II(D)(1)(c)(1)(b)(i)(c) *supra*). Without more, the Court cannot conclude that Cooper HD-133 preserves communities of interest.

**((d))  conclusions of law**

The Court concludes that the Black community is not sufficiently compact in Cooper HD-133. This conclusion is based on the following findings of fact: compared to Enacted HD-133 Cooper HD-133 splits more VTDs, and added numerous county splits in the area. Additionally, the creation of Cooper HD-133

363

led to increased VTD splits in neighboring districts. Cooper HD-133, moreover, is not visually compact and unites Black populations whose only commonalities are being in the Black Belt in mostly rural areas—an insufficient showing of communities of interest.

Accordingly, the Court concludes that the <u>Alpha Phi Alpha</u> Plaintiffs have not carried their burden in meeting the first <u>Gingles</u> precondition as to Cooper HD-133. Like with Cooper SD-23, *supra*, failure to prove any one of the preconditions is fatal to Plaintiffs' Section 2 claim. <u>Greater Birmingham Ministries</u>, 992 F.3d at 1332. Accordingly, <u>Alpha Phi Alpha</u> Plaintiffs have failed to demonstrate that the Enacted House Plan violates Section 2 with respect to that area of the State.

### *(2)    <u>Grant</u>: Esselstyn SD-23*

The Court finds that the <u>Grant</u> Plaintiffs failed to prove that the Black community is not sufficiently compact to constitute an additional majority-Black Senate district in the Eastern Black Belt region.

### (a)    <u>numerosity</u>

The Court finds that the <u>Grant</u> Plaintiffs have met their burden in showing that the Black voting age population in the eastern Black Belt is large enough to

constitute an additional majority-Black district. It is undisputed that Esselstyn SD-23 has an AP BVAP of 51.06%, which exceeds the 50% threshold required by Gingles. GX 1 1 ¶ 27 & tbl.1; Stip. ¶ 234.

### (b)  compactness

Based on a review of traditional redistricting principles, the Court finds that the minority community is not sufficiently compact to warrant the creation of an additional majority-Black district in the eastern Black Belt as found in Esselstyn SD-23. Additionally, Esselstyn SD-23 fails to respect the other traditional redistricting principles (visual compactness and preservation of communities of interest).

#### i)  *empirical measures*

##### ((a))  population equality

The Court finds that Esselstyn SD-23 is not malapportioned. Nevertheless, as explained below, the Court finds that Esselstyn SD-23 has the *greatest* population deviation of any district in the Esselstyn and Enacted Senate Plans.

The ideal population size of a State Senate District is 191,284 people. Stip. ¶ 277. Esselstyn SD-23 has a population of 188,095 people, which amounts to a population deviation of -1.67%. GX 1, attach E. Esselstyn SD-23 is the most

underpopulated district in either the Esselstyn or Enacted Senate Plan. Additionally, the Court finds that neighboring majority-Black district, SD-22 is underpopulated under the Esselstyn Senate Plan. Esselstyn SD-22 has a population of 188,930, which is a population deviation of -1.23%. GX 1, attach E. In the Enacted Senate Plan, conversely, Enacted SD-23 is slightly underpopulated with a population of 190,344 (a population deviation of -0.49%), and Enacted SD-22 is overpopulated with a population of 193,163 (a population deviation of +0.98%). GX 1, Attach. D.

Although the General Assembly did not enumerate a specific deviation range for the Legislative Districts, the Court finds that the population of Esselstyn SD-23 does not comply with the guideline that "[e]ach legislative district of the General Assembly shall be drawn to achieve a total population that is substantially equal as practicable, considering the principles listed below." JX 2, 2. Additionally, in creating Esselstyn SD-23, Mr. Esselstyn did not keep his deviations within the range of the Enacted Senate Plan, which is ±1.03%. Cf. Stip. ¶ 301 (indicating the 2021 Senate Plan's population deviation range in comparison to Mr. Cooper's population deviation range). Thereby, for all these

366

reasons, Esselstyn SD-23 fails to achieve population equality to the same degree as any district in the Enacted Senate Plan.

### ((b))   contiguity

The Parties stipulated that Esselstyn SD-23 is a contiguous district. Stip. ¶ 258. Hence, the Court finds that Esselstyn SD-23 complies with the traditional redistricting principle of contiguity.

### ((c))   compactness scores

Under the Reock and Polsby-Popper measures, Esselstyn SD-23 and Enacted SD-23 are comparably compact. Enacted SD-23 has a Reock score of 0.37 and a Polsby-Popper score of 0.16. GX 1, Attach. H. Esselstyn SD-23 has a Reock score 0.34 and a Polsby-Popper 0.17. Id. Thus, Enacted SD-23 is 0.03 points more compact on the Reock measure, but Esselstyn SD-23 is 0.01 points more compact on Polsby-Popper. On the whole, the Court finds that the Enacted and Esselstyn SD-23 are comparably compact.

### ((d))   political subdivisions

The Court finds that Esselstyn SD-23 split more counties than Esselstyn SD-23. Enacted SD-23 splits Richmond and Columbia Counties but otherwise keeps nine counties whole. DX 3 ¶ 31. Meanwhile, Esselstyn SD-23 split more

counties than any other district on the Esselstyn Senate Plan. DX 3 ¶¶ 33, 36. Specifically, Esselstyn SD-23 splits Richmond, McDuffie, Wilkes, Greene, and Baldwin Counties. GX 1 ¶ 29; Tr. 536:22–237:5, 1818:7–13. As part of Esselstyn SD-23's ripple effect, Esselstyn SD-22 includes more counties than Enacted SD-22. DX 3 ¶ 31. Enacted SD-22, which is a majority-Black district, is wholly within Richmond County. Id. Under the Esselstyn Senate Plan, however, Esselstyn SD-22 includes parts of Richmond and Columbia Counties. Based on the foregoing, the Court overall finds that it does not respect political subdivisions.

### ii)    eyeball test

The Court finds that Esselstyn SD-23 is not visually compact and does not pass the eyeball test:

368



GX 1 ¶ 29 & fig.5.

Esselstyn SD-23 is a long sprawling district that spans from Wilkes and Greene counties in the north, down to Screven County in the south. DX 3, 16. Additionally, Esselstyn SD-23 starts in Augusta in the east and stretches to Milledgeville in the west. GX 1 ¶ 29 & fig.5. From the Augusta portion of the district to Milledgeville, the district is approximately 80 miles using the mapping tool. Tr. 1854:18–22. It is more than 100 miles from Greene County to Screven

369

County. GX 1 ¶ 29 & fig.5. The Court finds that Esselstyn SD-23 it is not visually compact.

As with the Alpha Phi Alpha case's proposed Senate district in this area, the Court acknowledges that Enacted SD-23 is also large and sprawling. GX 1 ¶ 29 & fig.2. However, for purposes of a Section 2 violation, the large and sprawling nature of Enacted SD-23, a non-remedial district, does not alleviate the concerns with the shape and size of Esselstyn SD-23. See LULAC, 548 U.S. at 430–31. Enacted SD-23 is a majority-white district that was not required to comply with Gingles' compactness requirements. The Grant Plaintiffs, who have alleged a Section 2 violation, however, must show that the minority community is sufficiently compact to create a majority-minority district. Upon review of Esselstyn SD-23, the Court finds that the proposed district is not visually compact.

### iii)   communities of interest

The Court finds that the Grant Plaintiffs have not carried their burden in showing that Esselstyn SD-23 unites communities of interest. Rather, the evidence shows that the areas of high Black concentration in Esselstyn SD-23 are

spread out across the district and have large areas of intervening white population.

Mr. Esselstyn was unable to identify any community of interest shared by the counties and portions of counties in Esselstyn SD-23. Tr. 539:11–23. The district combines geographically separate Black populations in McDuffie and Wilkes Counties and in Milledgeville. Tr. 540:15–541:13.



DX 3, Ex. 29.

371

Esselstyn SD-23's disparate Black population, moreover, is separated by an intervening white population. The Black population is concentrated in distinct areas of Augusta, the middle of Burke County, south Jefferson County, Hancock and Warren Counties, Milledgeville, and north Wilkes County. Id. As the map shows, between those pockets within the district, the Black population ranges between 0 and 35%. Id. Thereby, the concentrations of Black population in Esselstyn SD-23 are not in close proximity to one another.

In defining what constitutes a community of interest, Mr. Esselstyn explained, "[t]here's not a simple definition for communities of interest in my mind because they can vary a lot. They can be made up of a large number of counties. Like the Black Belt could be considered a community of interest." Tr. 479:19-23. Ms. Wright testified that she does not consider the Black Belt to be a community of interest, however, because it stretches from one side of the State to the other and "that is a pretty significant amount of distance to define as one community." Tr. 1619:6-9.

The Court finds that Mr. Esselstyn's definition that the "Black Belt" alone is insufficient to constitute a community of interest. There is not a unified

372

community of interest in Esselstyn SD-23 given the distance separating the Black populations in Esselstyn SD-23 and the large distance the district spans. As discussed above, the Court also does not find that Dr. Evan's testimony sufficiently establishes that there is a unified community of interest in the area drawn by Esselstyn SD-23. See Section II(D)(1)(b)(1)(b)(iii) *supra*. The Black Belt runs across the southeastern United States, and in Georgia, it spans from Augusta, near the South Carolina border, and to the southwest corner of the State near Alabama and Florida. Stip. ¶ 118; GX 1 ¶ 19 & fig.1. Tr. 1639:12-1640:1; 1695:25-1696:8.

Again, although the counties in this region do share commonalities, such as high rates of gun violence and low high school graduation rates, it is unclear how these commonalities unite the widely dispersed Black communities in the proposed district. Furthermore, the State's map drawer, Ms. Wright testified about geographic boundaries in this region and said that portions of the region are urban, portions are rural, and portions are more suburban. Tr. 1640:12–1641:1.

Pursuant to the evidence presently before this Court, it finds that Esselstyn SD-23 does not preserve communities of interest, but rather unites distinct Black communities within the eastern portion of the Black Belt.

### iv)   conclusions of law

The Court finds that the Black community is not sufficiently compact in Esselstyn SD-23. The Court finds that Esselstyn SD-23 is underpopulated and has the greatest population deviation of any district in either the Enacted or Esselstyn Senate Plans. Esselstyn SD-23 does not respect political subdivisions, and its creation accounts for the increased county splits in the Esselstyn Senate Plan as a whole. The district is not visually compact and unites disparate Black populations with intervening white populations.

Accordingly, the Court finds that the Grant Plaintiffs have not carried their burden in meeting the first Gingles precondition in the area drawn by Esselstyn SD-23. Failure to prove any one of the preconditions is fatal to plaintiffs' Section 2 claim. Because the Grant Plaintiffs have not successfully carried their burden in establishing that the Black community is sufficiently compact to warrant the

374

creation of an additional majority-Black State Senate district in the eastern Black Belt, the Court concludes there is no Section 2 violation in this region.

### d) Macon-Bibb region

#### (1) *Alpha Phi Alpha: Cooper HD-145*

The Court finds that the Alpha Phi Alpha Plaintiffs have not met their burden in establishing that an additional majority-Black House district can be drawn in or around Macon-Bibb.

#### (a) numerosity

The Court finds that the Alpha Phi Alpha Plaintiffs have met their burden in showing that the Black voting age population in and around Macon-Bibb is large enough to create a majority-Black House districts. "[A] party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." Bartlett, 556 U.S. at 20.

It is undisputed that Cooper HD-145 has an AP BVAP of 50.20%. APAX 1, AA-1. Accordingly, the Court finds that Black population is sufficiently numerous in Cooper HD-145.

### (b)   compactness

The Court finds, however, that the <u>Alpha Phi Alpha</u> Plaintiffs have not shown that it is possible to draw an electoral district consistent with traditional redistricting principles in the area encompassed by Cooper HD-145. As an initial note, Mr. Cooper explained that Cooper HD-145 is in the same general area, and correlates with, Enacted HD-145. APAX 1 ¶ 181–82 & fig.34.

### i)   *empirical measures*

### ((a))   population equality

The Court finds that Cooper HD-145 is not malapportioned, but Cooper HD-145's population deviation is double the deviation of Enacted HD-145. As stated above, the General Assembly did not enumerate an acceptable deviation range for State Senate Districts. However, using the Enacted House Plan as a guide, a population deviation range between ±1.40% is acceptable. Stip. ¶ 302. In comparison, Cooper SD-28 has a population deviation of +1.18%. APAX 1, Ex. AA-1. The Court does note that Enacted HD-145's population deviation is half that at +0.59%. APAX 1, Ex. Z-1. Thus, the Court finds that this district does not comply with the traditional redistricting principle of population equality as well as Enacted HD-145.

((b))   **contiguity**

The Parties stipulated that Cooper HD-145 is a contiguous district. Stip. ¶ 300. Hence, the Court finds that Cooper HD-145 complies with the traditional redistricting principle of contiguity.

((c))   **compactness scores**

The Court finds Cooper HD-145's compactness scores are comparable to Enacted HD-145. APAX 1, Exs. AG-1, AG-2. Enacted HD-145 has a higher Reock Score (0.38) than Cooper HD-145 (0.25), but Cooper HD-145 has a higher Polsby-Popper Score (0.22) than Enacted HD-145 (0.19). Id.

Although Enacted HD-145 is more compact on the Reock measure, Cooper HD-145 is well within the range of compactness scores of the Enacted House Plan. Specifically, the Enacted House Plan has a minimum Reock score of 0.12. APAX 1, Ex. AG-2. Cooper HD-145's Reock score (0.25) far exceeds the minimum threshold Reock score. Id. Accordingly, the Court finds that Cooper HD-145 constitutes a compact district for purposes of the first Gingles precondition, though, less so than Enacted HD-145.

377

### ((d))  **political subdivisions**

The Court finds that Cooper HD-145 demonstrates a respect for political subdivisions more so than Enacted HD-145. Cooper HD-145 is contained within portions of two counties—Bibb and Monroe. APAX 1 ¶ 183 & fig.35, Ex. AH-1. Meanwhile, Enacted HD-145 contains portions of Bibb, Houston, Monroe, Paulding Counties, and all of Crawford County. APAX 1 ¶ 181–82 & fig.34, Ex. AH-3. Thus, Cooper HD-145 splits half of the Counties that Enacted HD-145 splits. Both districts split the same number of VTDs, three. APAX 1, Exs. AH-1, AH-3. Mr. Cooper testified that in Monroe County he followed county and VTD lines. Id. at 167:10-12. Accordingly, the Court finds that Cooper HD-145 exhibits respect for political subdivisions more so than Enacted HD-145.

#### ii)     *eyeball test*

The Court finds that Cooper HD-145 is not visually compact under the eyeball test:



APAX 1 ¶ 198 & fig.35.

Using the mapping tool, the Court finds that at its most distant points, Cooper HD-145 is less than 30 miles long. Id. Despite its small size, the district does contain a tentacle. The majority of the district is contained within the western half of Bibb County, but one thin line extends into Monroe County. Id. When asked why the district extended into Monroe County, Mr. Cooper explained that his decision to include portions of Monroe County was because it has "a very small population. And [he] made that decision to make sure we has

379

a district that was within plus or minus 1.5 percent, taking into account where incumbents live in Macon-Bibb." Id. 16–19.

Although the Court credits Mr. Cooper's testimony regarding the reasons for extending the district in this manner, the Court still finds that the district does not pass the eyeball test.

### iii)   communities of interest

Mr. Cooper testified that Cooper HD-145 stays entirely within the Macon-Bibb MSA. Tr. 166:19-20. Mr. Cooper's report also demonstrated commonalities shared by the portion of the district that is within Bibb County. About 91% of all persons and 96% of Black persons in Cooper HD-145 are Macon-Bibb residents. APAX 1 ¶ 201. One-third of the Black population and nearly half (47.5%) of Black children in Macon-Bibb live in poverty. Id. By contrast, 11.6% of the white population in Macon-Bibb and 14.1% of white children live in poverty. Id. The Court finds that there is evidence in the Record of the commonalities in the communities in Bibb County, but there is nothing about Monroe County.

On cross-examination, Mr. Cooper was unable to provide an explanation of the connections between the communities in downtown Macon and Monroe

380

County. Tr. 288:13–15. The Court credits Mr. Cooper's non-racial reasons for extending the district into Monroe County (population equality, incumbency protection, and avoidance of VTD splits). The Court finds, however, that this testimony does not remedy the lack of evidence about the commonalities between Monroe County and the rest of the district (even if that portion is only a small part of the districts composition).

Accordingly, the Court finds that Cooper HD-145 does not comply with the traditional redistricting principle of preserving communities of interest.

### iv)   conclusions of law

The Court finds that the Alpha Phi Alpha Plaintiffs have carried their burden in establishing that the Black community is sufficiently numerous to constitute an additional majority-Black district. The proposed district is not compact, however. Although, Cooper HD-145 complies with traditional redistricting principles of contiguity, empirical compactness scores, and respect for political subdivisions, the Court finds that the district fails to comply with population equality to the same degree as Enacted HD-145, and it united disparate communities. Additionally, the Court finds that the district is not

visually compact, it contains a tentacle that stretches into Monroe County, and the Record is devoid of any evidence showing a connection between this portion of the district and Bibb County. Accordingly, the Court finds that the Alpha Phi Alpha Plaintiffs have not carried their burden on the first Gingles precondition in the area encompassed by Cooper HD-145.

### (2)   *Grant*

Based on the following analysis, the Court finds that the Grant Plaintiffs have met their burden in establishing that the Black community was sufficiently numerous and compact to create two additional majority-Black districts in the Macon-Bibb region.

### (a)   numerosity

The Court finds that the Grant Plaintiffs have met their burden in showing that the Black voting age population in the area around Macon-Bibb is large enough to create two majority-Black House districts in the region. Bartlett, 556 U.S. at 20 ("[A] party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent."). It is undisputed that the proposed House districts—Esselstyn

382

HD-145 and HD-149—have AP BVAP of 50.38% and 51.53%, respectively. Stip. ¶ 239, GX 1 ¶ 48 & tbl.5.

**Table 5: Illustrative House plan majority-Black districts with BVAP percentages.**

| District | BVAP% | District | BVAP% | District | BVAP% | District | BVAP% |
|---|---|---|---|---|---|---|---|
| 38 | 54.23% | 69 | 62.73% | 91 | 60.01% | 137 | 52.13% |
| 39 | 55.29% | 74 | 53.94% | 92 | 68.79% | 140 | 57.63% |
| 55 | 55.38% | 75 | 66.89% | 93 | 65.36% | 141 | 57.46% |
| 58 | 63.04% | 76 | 67.23% | 94 | 69.04% | 142 | 50.14% |
| 59 | 70.09% | 77 | 76.13% | 95 | 67.15% | 143 | 50.64% |
| 60 | 63.88% | 78 | 51.03% | 113 | 59.53% | 145 | 50.38% |
| 61 | 53.49% | 79 | 71.59% | 115 | 53.77% | 149 | 51.53% |
| 62 | 72.26% | 84 | 73.66% | 116 | 51.95% | 150 | 53.56% |
| 63 | 69.33% | 85 | 62.71% | 117 | 51.56% | 153 | 67.95% |
| 64 | 50.24% | 86 | 75.05% | 126 | 54.47% | 154 | 54.82% |
| 65 | 63.34% | 87 | 73.08% | 128 | 50.41% | 165 | 50.33% |
| 66 | 53.88% | 88 | 63.35% | 129 | 54.87% | 177 | 53.88% |
| 67 | 58.92% | 89 | 62.54% | 130 | 59.91% | | |
| 68 | 55.75% | 90 | 58.49% | 132 | 52.34% | | |

Thus, the Court finds that the <u>Grant</u> Plaintiffs have met their burden with respect to the numerosity prong of the first <u>Gingles</u> precondition for the additional two majority-Black House districts that Mr. Esselstyn proposed in the Macon-Bibb region.

### (b)   compactness

The Court also finds that Mr. Esselstyn drew two additional majority-Black districts in the Macon-Bibb region that are sufficiently compact and that comply with traditional redistricting principles.

383

### i)   *Esselstyn HD-145*

The Court finds that the <u>Grant</u> Plaintiffs have shown that it is possible to draw a legislative district consistent with traditional redistricting principles in the area encompassed by Esselstyn HD-145.

### ((a))   <u>empirical measures</u>

### ((1))   *population equality*

The Court finds that Esselstyn HD-145 achieves population equality better than Enacted HD-145. Esselstyn HD-145 has a population deviation of -0.26%, whereas Enacted HD-145 has a population deviation of +0.59%. GX 1, attachs. I, J. Accordingly, the Court finds that Esselstyn HD-145 achieves relative population equality better than the Enacted HD-145 and complies with the General Assembly's population equality guidelines and traditional redistricting principles.

### ((2))   *contiguity*

The Parties stipulated that Esselstyn HD-145 is a contiguous district. Stip. ¶ 258. Hence, the Court finds that Esselstyn HD-145 complies with the traditional redistricting principle of contiguity.

384

*((3))* **compactness scores**

The Court finds that Enacted HD-145 and Esselstyn HD-145 are comparably the same under empirical compactness measures. Enacted HD-145 has a Reock score of 0.38 and a Polsby-Popper score of 0.19. GX 1, Attach. L. Esselstyn HD-145 has a Reock score of 0.34 and a Polsby-Popper score of 0.21. Id. Accordingly, Enacted HD-145 performs better on the Reock measure (by 0.04 points) and Esselstyn HD-145 performs better on the Polsby-Popper measure (by 0.02 points). The Court finds that Enacted HD-145 and Esselstyn HD-145 are therefore comparably compact based on these objective compactness measures.

*((4))* **political subdivisions**

The Court finds that Esselstyn HD-145 demonstrates respect for political subdivisions. Esselstyn HD-145 contains portions of Bibb and Houston Counties. GX 1 ¶ 51 & fig.16. Enacted HD-145 contains portions of Bibb, Houston, Monroe, and Peach Counties. GX 1, Ex. L. As such, Esselstyn HD-145 contains two fewer county splits than Enacted HD-145. Moreover, Esselstyn HD-145 splits two VTDs

(one in Houston and one in Bibb Counties)[84] while Enacted HD-145 splits four

VTDs (one in Bibb and three in Houston Counties). GX 1, Ex. L. Accordingly,

Esselstyn HD-145 splits fewer VTDs than Enacted HD-145, a factor that supports

a finding that Esselstyn HD-145 exhibits respect for political subdivisions based

on objective metrics.

((b))   **eyeball test**

The Court finds that Esselstyn HD-145 is visually compact:

_____

[84] The statistics for the VTD splits can be found on pages 7 and 13 of subdivision of the Political Subdivisions Chart entitled GA House Enacted and pages 8 and 13 of Political Subdivisions Chart entitled GA House Illustrative. GX 1, Attach. L.



Figure 16: Map of central Black Belt region of illustrative plan with majority-Black House districts indicated.

GX 1 ¶ 51 & fig.16.

Esselstyn HD-145 does not have appendages or tentacles. <u>Vera</u>, 517 U.S. at 962–63. Using the mapping tool, Esselstyn HD-145 is less than 20 miles in length at its most distant points. There is no evidence in the Record that suggests that Esselstyn HD-145 is not visually compact. Accordingly, the Court concludes that Esselstyn HD-145 is visually compact.

387

((c))   <u>**communities of interest**</u>

The Court also finds that Esselstyn HD-145 demonstrates respect for communities of interest. Mr. Esselstyn testified that HD-145 preserves communities of interest because it combines populations from adjacent counties in communities that are highly developed. Tr. 578:22–579:10. For example, Esselstyn HD-145 keeps an entire Air Force base intact. Tr. 578:4–7.

Commenting on Mr. Esselstyn's HD-145, Ms. Fenika Miller, a lifelong Houston County resident and community organizer, identified several needs and interests shared by the Black residents in this area. Tr. 644:3–646:3. Ms. Miller observed that North Houston County and South Bibb County both lack certain public services and accommodations. Tr. 654:16–655:6. North Houston County has one grocery store, no public transportation, and lacks parks and recreation services. Tr. 654:16–22. "And for South Bibb, that would be the same . . . It used to be a thriving community and now most of those businesses have shuttered. And, typically, most of the shopping and the growth have moved." Tr. 654:23–655:2.

388

The Court finds that Esselstyn HD-145 is a small district contained in and around Macon. The communities share the same infrastructural concerns. Additionally, the Court finds that Esselstyn HD-145 is not long and sprawling, and, as is evidenced by the size of the district and the trial testimony, preserves communities of interest.

((d))   **conclusions of law**

The Court finds that the <u>Grant</u> Plaintiffs have carried their burden in establishing that the Black community is sufficiently numerous and compact in Esselstyn HD-145 to constitute an additional majority-Black district. The Court finds that Esselstyn HD-145 complies with the traditional redistricting principles of population equality, contiguity, compactness scores, respect for political subdivisions, and preservation of communities of interest. Additionally, when visually inspecting the district, it is relatively small in size and does not contain any appendages or tentacles. Accordingly, the Court finds that the <u>Grant</u> Plaintiffs have carried their burden in meeting the first <u>Gingles</u> precondition in the area drawn by Esselstyn HD-145.

389

###### i)   *Esselstyn HD-149*

The Court finds that the <u>Grant</u> Plaintiffs have shown that it is possible to draw a legislative district consistent with traditional redistricting principles in the area of Esselstyn HD-149.

###### ((a))   <u>empirical measures</u>

###### ((1))   *population equality*

The Court finds that Esselstyn HD-149 performs significantly better on population equality than Enacted HD-149—Esselstyn HD-149′s population deviation is -0.20%, whereas Enacted HD-149′s population deviation is -1.04%. GX 1 ¶¶ 46, 53 & attachs. I, J. Thus, the Court finds that Esselstyn HD-149 complies with the principle of population equality.

###### ((2))   *contiguity*

The Parties stipulated that Esselstyn HD-149 is a contiguous district. Stip. ¶ 258. Hence, the Court finds that Esselstyn HD-149 complies with the traditional redistricting principle of contiguity.

###### ((3))   *compactness scores*

Esselstyn HD-149 is also more compact on both compactness measures than Enacted HD-149. Esselstyn HD-149 has a Reock score of 0.44 and a Polsby-

Popper score of 0.28. GX 1, Attach. L. Enacted HD-149 has a Reock score of 0.32 and a Polsby-Popper score of 0.22. Id. Accordingly, the Court finds that Esselstyn HD-149 is reasonably compact as it compares to Enacted HD-149 under the objective compactness measures.

**((4))  *political***
**  *subdivisions***

The Court finds that Esselstyn HD-149 respects political subdivisions. Esselstyn HD-149 includes all of Twiggs and Wilkinson Counties and portions of Baldwin and Bibb Counties[85]. GX 1 ¶ 51 & fig.16. Enacted HD-149 includes all of Wilkinson, Twiggs, Bleckley, and Dodge Counties and a portion of Telfair County. GX 1, Attach. I. Thus, both plans are primarily made up of whole counties—Esselstyn HD-149 splits two counties and Enacted HD-149 splits one.

However, Esselstyn HD-149 has more VTD splits than Enacted HD-149— Esselstyn HD-149 splits three VTDs in Baldwin and one in Bibb, whereas there

---

[85] The Court notes that although Esselstyn HD-149 splits Bibb County, this split does not show less respect for communities of interest than the Enacted House Plan. Both the Enacted and Esselstyn House Plans split Bibb County four ways (Enacted HD-142, Hd-143, HD-144, and HD-145) and (Esselstyn HD-142, HD-143, HD-145, and HD-149). GX 1, Attach. L.

are no VTD splits in Enacted HD-149. GX 1, Attach. L.[86] Mr. Esselstyn testified that these splits can be partially explained by his decision to keep Mercer University mostly intact (with an exception for one portion excluded because it would have split another VTD), as well as keeping the core of Milledgeville, Georgia College, and a Native American historical site intact. Tr. 491:3–13, 580:7–11. Although Esselstyn HD-149 contains more VTD splits than Enacted HD-149, the Court finds Mr. Esselstyn's explanations for keeping other specific subdivisions intact (i.e., colleges, landmarks, the cores of towns) to be credible. Accordingly, the Court finds that Mr. Esselstyn generally respected political subdivisions when he drafted Esselstyn HD-149.

### ((b))   eyeball test

The Court also finds that Esselstyn HD-149 is visually compact:

---

[86] The statistics for the VTD splits can be found on pages 7–8 of Political Subdivisions Chart entitled GA House Illustrative.

Figure 16: Map of central Black Belt region of illustrative plan with majority-Black House districts indicated.



GX 1 ¶ 51 & fig.16.

Visually, the Court finds that Esselstyn HD-149 does not have appendages or tentacles. Using the mapping tool, Esselstyn HD-149 is approximately 50 miles long at its most distant points. Although generally a larger district than others at issue in this Order, Esselstyn HD-145 is still significantly smaller than Enacted

393

HD-149, which is, at its most distant points, approximately 80 miles apart. GX 1, Attach. I.[87]

There is no evidence in the Record disputing the visual compactness of Esselstyn HD-149 and thereby the Court finds Esselstyn HD-149 is visually compact.

((c))   **communities of interest**

The Court finds that Esselstyn HD-149 respects communities of interest. Mr. Esselstyn testified that one commonality between all the individuals in Esselstyn HD-149 is that they are within the same Enacted Senate District (Enacted SD 25). Tr. 582:9–16. Additionally, a prior State House candidate from the area, Ms. Miller, testified that Esselstyn HD-149 contains rural communities that have few shopping areas, food security concerns, and no hospitals (individuals have to drive to either Macon or Milledgeville to go to the hospital).

---

[87] The Court measured the distance using the diagonal beginning at the top of Wilkinson County to the portion of Telfair County that borders Ben Hill County. GX 1, Attach. I. This measurement cuts across part of Laurens County in the neighboring district, Enacted HD-155. If the Court were to take the same measurement and avoid cutting across Enacted HD-155, however, the length of Enacted HD-149 would be longer.

394

Tr. 653:18–25. This district also contains two places of higher education: Mercer University at one end of the district (in Bibb County) and Georgia College at the other (in Baldwin County, i.e., Milledgeville). Tr. 491:3–7, 579:21–58:7; <u>see also</u> Tr. 1898:2–16.

The Court finds that Esselstyn HD-149 adequately preserves communities of interest. The majority of the district is rural and shares the same infrastructure concerns. The district is not long and sprawling. Accordingly, Esselstyn HD-149 preserves communities of interest for purposes of the first <u>Gingles</u> precondition.

### ((d))   conclusions of law

The Court finds that the <u>Grant</u> Plaintiffs have carried their burden in establishing that the Black community in Esselstyn HD-149 is sufficiently numerous and compact to create an additional majority-Black district. The Court finds that Esselstyn HD-149 complies with the traditional redistricting principles of population equality, contiguity, compactness, respect for political subdivisions, and preservation of communities of interest. Additionally, when visually inspecting the district, does not contain any appendages or tentacles.

395

Accordingly, the Court finds that the <u>Grant</u> Plaintiffs have carried their burden in showing the first <u>Gingles</u> precondition in the area drawn by Esselstyn HD-149.

### e) <u>Southwest Georgia region</u>

#### (1) *<u>Alpha Phi Alpha: Cooper HD-171</u>*

The Court finds that <u>Alpha Phi Alpha</u> Plaintiffs have not carried their burden with respect to establishing that an additional compact majority-Black district in southwest Georgia could be drawn. To begin, the Court notes that following the preliminary injunction hearing, the Court concluded that the <u>Alpha Phi Alpha</u> Plaintiffs had a substantial likelihood of success in proving a Section 2 violation in this area of the State. <u>Alpha Phi Alpha Fraternity</u>, 587 F. Supp. 3d at 1293–1302. "A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain* success." <u>Schiavo Ex. rel. Schindler v. Schiavo</u>, 403 F.3d 1223, 1232 (11th Cir. 2005). At trial, conversely, the plaintiffs have the higher burden of proving every aspect of their case by *a preponderance of the evidence*. <u>See</u> <u>Mo. State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.</u>, 894 F.3d 924, 930 (8th Cir. 2018).

In conducting a thorough and sifting analysis of the evidence provided at the trial, the Court finds that while the <u>Alpha Phi Alpha</u> Plaintiffs met the lower

threshold of proof at the preliminary injunction phase, they were unable to clear the hurdle of preponderance of the evidence at the trial. Accordingly, the Court finds that with the evidence currently before it, <u>Alpha Phi Alpha</u> Plaintiffs were unable to show by a preponderance of the evidence that an additional compact majority-Black district could be drawn in southwest Georgia.

### (a)   numerosity

The Court finds that the <u>Alpha Phi Alpha</u> Plaintiffs have met their burden in showing that the Black voting age population in southwest Georgia is large enough to create an additional majority-Black House district It is undisputed that Cooper HD-171 has an AP BVAP of 58.06%. APAX 1, AA-1. Accordingly, the Court finds that the Black population is sufficiently numerous to constitute an additional majority-Black district in southwest Georgia.

### (b)   compactness

The Court finds that the <u>Alpha Phi Alpha</u> Plaintiffs have not shown that it is possible to draw an additional majority-Black House district in the area drawn by Cooper HD-171 consistent with traditional redistricting principles. As an initial note, Mr. Cooper explained that the district is drawn in the same general area as Enacted HD-153 and HD-171. APAX 1, ¶ 176 & fig.32. This differs from

the preliminary injunction, where it was only compared to House District 153. Alpha Phi Alpha Fraternity, 587 F. Supp. 3d at 1295–96. Thus, the Court considers the differences between the districts proposed by the Alpha Phi Alpha Plaintiffs in its instant compactness analysis.

i)      *empirical measures*

((a))   **population equality**

The Court finds that Cooper HD-171 achieves relative population equality. As stated above, the General Assembly did not enumerate the deviation range for the State House Districts. However, using the Enacted House Plan as a guide, the Enacted House Plan has a population deviation range between ±1.40%. Stip. ¶ 302. In comparison, Cooper HD-171 has a population deviation of +1.38%, which is within the population deviation of the Enacted House Plan. APAX 1, Ex. AA-1. However, of any of Mr. Cooper's illustrative districts, this district departs the most from the population deviation in the Enacted Plan. Enacted HD-171 has a population deviation of -0.46%, meaning that it is almost 1 percentage point closer to achieving perfect population deviation than Cooper HD-171. APAX 1, Ex. Z-1. Although Cooper HD-171's population deviation is within the acceptable

398

range of, the Court finds that its wide disparity in comparison to the Enacted Plan is of concern.

Thus, while HD-171 district is consistent with the population deviations in Enacted House Plan, the Court finds that is does not respect population equality nearly to the same degree as Enacted HD-171.

**((b))   <u>contiguity</u>**

The Parties stipulated that Cooper HD-171 is a contiguous district. Stip. ¶ 300. Hence, the Court finds that Cooper HD-171 complies with the traditional redistricting principle of contiguity.

**((c))   <u>compactness scores</u>**

The Court finds that Enacted HD-171 performs better on both compactness measures than Cooper HD-171. Enacted HD-171 has a Reock score of 0.35 and a Polsby-Popper score of 0.37. APAX 1, Ex. AG-2. Cooper HD-171 has a Reock score of 0.28 and a Polsby-Popper score of 0.20. APAX 1, Ex. AG-1.

At the preliminary injunction, the Court found that. Mr. Cooper's illustrative district in this region had comparable compactness scores to its corollary. <u>Alpha Phi Alpha Fraternity</u>, 587 F. Supp. 3d at 1296. However, at the preliminary injunction, Mr. Cooper submitted an illustrative district that

399

compared to Enacted HD-153, not HD-171. Id. Enacted HD-153 has a Reock score of 0.30 and a Polsby-Popper score of 0.30, which are higher, but much closer to Cooper HD-171's scores of 0.28 and 0.20, respectively. Id., APAX 1, Exs. AG-1, AG-2. However, Mr. Cooper has now changed the configuration of his illustrative district in this region, and now it correlates with Enacted HD-171, which has higher compactness scores in comparison.

Accordingly, the Court finds that Cooper HD-171 is not as compact as Enacted HD-171, nor are the compactness scores as comparable to its corollary district as they were on the preliminary injunction evidence.

### ((d))  political subdivisions

The Court finds that Cooper HD-171 does not respect political subdivisions as well as Enacted HD-171. Cooper HD-171 splits two counties (Dougherty and Thomas) and keeps Mitchell County whole; whereas, Enacted HD-171 only splits Grady County and keeps Decatur and Mitchell Counties whole. APAX 1 ¶¶ 175, 177 & figs.32, 33. Cooper HD-171 splits seven VTDs, but Enacted HD-171 splits only one. APAX 1, Exs. AH-1, AH-3. Additionally, in drawing Cooper HD-171,

Mr. Cooper created a split in neighboring Lee County, which was kept whole in the Enacted House Plan. Tr. 290:23–291:12.[88]

Accordingly, the Court finds that Cooper HD-171 fails to respect political subdivisions as well as Enacted HD-171.

*ii)* *eyeball test*

The Court finds that Cooper HD-171 is visually compact under the eyeball test:



_____

[88] Mr. Cooper testified that the split of Lee County was to eliminate a four way split of Dougherty County. Tr. 290:10–12. Under the Cooper House Plan, Dougherty County is split between three districts (Cooper HD-153, HD-154, and HD-171).

APAX 1 ¶ 177 & fig.33.

Using the mapping tool, the Court finds that at its most distant points, Cooper HD-171 is less than 60 miles long, which is consistent with the surrounding districts in the Enacted House Plan. Id. Ms. Wright testified that because of the decreases in population in the southern portion of the State, the map drawers had to collapse (i.e., consolidate) the prior districts to account for the population changes. Tr. 1623:17–12.

Cooper HD-171 does not contain any tentacles or appendages. In reviewing Cooper HD-171 the Court finds that it is visually compact, and thus passes the eyeball test.

### iii)    communities of interest

The Court finds Cooper HD-171 preserves communities of interest. Mr. Cooper offered extensive testimony regarding the connections between the communities included in Cooper HD-171, and the Court also received documentary evidence on point. Mr. Cooper pointed out that US-19 and the historic Dixie Highway run as a corridor through Mitchell County between Albany and Thomasville. APAX 1 ¶ 178. The communities along that corridor,

402

such as Albany, Camilla, Pelham, Meigs, and Thomasville, work together under the auspices of the Southwest Georgia Regional Commission, including to designate the Dixie Highway as a state-recognized scenic byway. Tr. 128:18-129:19, 294:23–295:4; APAX 54 (Corridor Management Plan); APAX 325 (Designation of Historic Dixie Highway Scenic Byway).

Mr. Cooper testified further about the connection between Thomasville and Albany: "there are commonalities between the Black population in Thomasville and the Black population in Albany. The two towns are only about 60 miles apart. It takes you about an hour to get there along Highway 9. They're in the same high school football leagues." Tr. 128:22-129:1. Bishop Reginald T. Jackson of the Sixth District AME also testified that Dougherty, Mitchell, and Thomas Counties—all included in Cooper HD-171—share certain similarities, including more "rural and agrarian" communities, similar education attainment levels, and income levels "at the lower end of middle class." Tr. 382:12–19, 383:11–384:2. Further evidencing the connections between the communities in Cooper HD-171, Plaintiff Janice Stewart lives in Thomasville, but attends church

at Saint Peter AME Church in Camilla, Georgia (in Mitchell County). Stip.  ¶¶ 64, 80-81.

Thus, the Court finds that there is sufficient testimony and evidence to show the Black community in Cooper HD-171 interacts with one another and shares a number of similar concerns. Mr. Cooper testified extensively about the communities that are contained within the district, the shared socio-economic factors, and the characteristics that unite them and Plaintiffs submitted lay witness testimonial evidence of the same. Accordingly, the Court finds that Cooper HD-171 preserves communities of interest.

### iv)    conclusions of law

Ultimately, the Court concludes that the Alpha Phi Alpha Plaintiffs have not met their burden in showing that a compact majority-Black district could be drawn in southwest Georgia. Although the Alpha Phi Alpha Plaintiffs were able to show that the district preserved communities of interest and was visually compact, the district fared far worse on all the objective measures of compactness than Enacted HD-171. Cooper HD-171 had the greatest population deviation disparity of any of Mr. Cooper's illustrative districts. The district is significantly

less compact on both compactness measures. Additionally, the district split more counties than Enacted HD-171 and had the most political subdivision splits of any of Mr. Cooper's new majority-Black districts.

Of all of the illustrative districts submitted in these cases, no other illustrative district performed worse on all objective measures. Even Esselstyn HD-74 and Esselstyn SD-23, in the companion <u>Grant</u> case, and Cooper SD-23, Cooper HD-133, and Cooper HD-145 performed equally or better on at least one objective measure. Moreover, the disparity in the performance on objective measures is stark here and does not lend to a finding that Cooper HD-171 is a reasonably compact district, consistent with traditional redistricting principles. Accordingly, the Court concludes that in southwest Georgia, the <u>Alpha Phi Alpha</u> Plaintiffs did not meet their burden under the first <u>Gingles</u> precondition.

* * * *

In sum, the Court makes the following conclusions with respect to the first <u>Gingles</u> preconditions.

The <u>Alpha Phi Alpha</u> Plaintiffs have proven by a preponderance of the evidence that Black community is sufficiently numerous and compact to create:

405

- Two additional majority-Black Senate districts in south-metro Atlanta, and

- One additional majority-Black House district in south-metro Atlanta, in the area depicted in Cooper HD-74.

The <u>Grant</u> Plaintiffs have proven by a preponderance of the evidence that the Black community is sufficiently numerous and compact to create:

- Two additional majority-Black Senate districts in south-metro Atlanta,

- One additional majority-Black House district in south-metro Atlanta, in the area depicted in Esselstyn HD-117,

- One additional majority-Black House district in west-metro Atlanta, and

- Two additional majority-Black house districts in the Macon-Bibb region.

Conversely, the <u>Alpha Phi Alpha</u> Plaintiffs have ***NOT*** proven by a preponderance of the evidence that the Black community is sufficiently numerous and compact to create:

- One additional majority-Black Senate district in the eastern Black Belt region,

- One additional majority-Black House district in south-metro Atlanta, in the area depicted in Cooper HD-117,

406

- One additional majority-Black House district in the eastern Black Belt region,

- One additional majority-Black House district around the Macon-Bibb region, or

- One additional majority-Black district in southwest Georgia.

The <u>Grant</u> Plaintiffs have ***NOT*** proven by a preponderance of the evidence that the Black community is sufficiently numerous and compact to create:

- One additional majority-Black Senate district in the eastern Black Belt region, or

- One additional majority-Black House district in south-metro Atlanta, in the area depicted in Esselstyn HD-74.

The Court now determines whether the <u>Alpha Phi Alpha</u> and <u>Grant</u> Plaintiffs have satisfied the remaining two <u>Gingles</u> preconditions, in the areas where they successfully proved the first <u>Gingles</u> precondition.

407

### 2. *Second <u>Gingles</u> Precondition*

The Court finds that the <u>Alpha Phi Alpha</u> and <u>Grant</u> Plaintiffs have each proven the second <u>Gingles</u> precondition for all their remaining proposed majority-Black districts.

### a)      **<u>Alpha Phi Alpha</u>**

The Court finds that the <u>Alpha Phi Alpha</u> Plaintiffs have met their burden in establishing the second <u>Gingles</u> precondition in the relevant areas. Dr. Handley evaluated 16 recent (2016-2022) general and runoff statewide elections, including for U.S. Senate, Governor, School Superintendent, Public Service Commission, and Commissioners of Agriculture, Insurance, and Labor. APAX 5, 5; Stip.   ¶¶ 316-317. She also looked at 54 recent (2016-2022) State legislative elections in the areas of interest, including 16 State Senate contests and 38 State House contests. Tr. 890:2-12; APAX 5, 7-8; Stip. ¶ 324.

All 2022 State legislative contests in the Enacted Plans identified as districts of interest were analyzed, even if the contest did not include at least one Black candidate. APAX 5, 7–8. In addition, because there has only been one set of State legislative elections under the Enacted Plans (in 2022), Dr. Handley also analyzed biracial State legislative elections held between 2016 and 2020 in the State

408

legislative districts under the previous State House and State Senate plans in the seven areas of interest. Id.

Dr. Handley focused on elections that include at least one Black candidate, an approach that multiple courts have endorsed in other cases because they are the most probative for measuring racial polarization. Tr. 871:3-6, 872:11-14; see also id. at 871:10-14 ("[I]f I have enough contests that include Black candidates, I focus on those, because the courts have made it clear and because we want to make sure that Black voters are able to elect Black candidates of choice and not just white candidates of choice, if that's what they choose to do."); Robinson, 605 F. Supp. 3d at 801 (crediting Dr. Handley's opinion that "courts consider election contests that include minority candidates to be more probative than contests with only White candidates, because this approach recognizes that it is not sufficient for minority voters to be able to elect their preferred candidate only when that candidate is White"); United States v. City of Eastpointe, 378 F. Supp. 3d 589, 610 (E.D. Mich. 2019) ("These [white-only] elections are, however, less probative because the fact that black voters also support white candidates acceptable to the majority does not negate instances in which a white voting majority operates to

409

defeat the candidate preferred by black voters when that candidate is a minority."); United States v. City of Euclid, 580 F. Supp. 2d 584, 598 (N.D. Ohio 2008) ("These contests are probative of racial bloc voting because they . . . featured African–American candidates.").

Courts, including the Eleventh Circuit, agree that reviewing biracial elections is probative of the polarization inquiry. Davis, 139 F.3d at 1417 n.5 ("[E]vidence drawn from elections involving black candidates is more probative in Section Two cases[.]"); Wright, 301 F. Supp. 3d at 1313 ("While still relevant, elections without a black candidate are less probative in evaluating the Gingles factors."); see also Tr. 871:5-6; Tr. 2222:11-15. However, the Court wants to make clear, that a Section 2 violation does not require Black voters to vote for Black candidates and white voters to vote in opposition to Black candidates. See DeGrandy, 512 U.S. at 1027 (explaining that this assumption is empirically false).

As the Court addressed in its credibility determinations, the Court agrees with the Alabama State Conference of the NAACP court that although elections with Black and white candidates may be the most helpful in determining polarization, the manner in which Dr. Handley chose her data set makes her

410

findings less reliable. Ala. State Conf. of NAACP, 612 F. Supp. 3d at 1274. However, the Court notes that the Parties stipulated to her findings and Defendants' expert did not take issue with her data set. Stip.   ¶¶ 318–341; 2199:11–2200:4

That Black voters in the seven areas of interest are politically cohesive is not contested. In fact, Defendant stipulated that in the 16 recent statewide general and general runoff elections from 2016-2022, Black voters were "highly cohesive" in their support for their preferred candidate. Stip.  ¶¶ 320 ("In these 16 statewide general and general runoff elections from 2016-2022, Black voters were highly cohesive in their support for their preferred candidate."), 330 ("In the seven areas of interest, Black voters were very cohesive in supporting their preferred candidates in general elections for statewide offices."). As Dr. Handley concluded and Defendant stipulated, Black-preferred candidates typically received 96.1% of the Black vote in statewide races in these areas and only 11.2% of the White vote. Stip.  ¶¶ 321, 322.

Dr. Handley's analysis of State legislative general elections in the areas of interest also found "starkly racially polarized" voting. Tr. 862:4-6; APAX 5, 7. As

with the statewide general elections, "Black voters were very cohesive in support of their preferred candidates and white voters bloc voted against these candidates." Tr. 890:19-21. Again, this is not contested—the Parties stipulated that, in State legislative general elections, Black voters were highly cohesive in their support for their preferred candidate. Stip. ¶¶ 326 ("In these 54 State legislative elections, Black voters were highly cohesive in their support for their preferred candidates."), 335 ("In the seven areas of interest, Black voters exhibit cohesive support for a single candidate in State legislative general elections.").

In all but one of the 54 State legislative elections that Dr. Handley analyzed (i.e., 98.1%) were starkly racially polarized, with Black candidates receiving a very small share of the white vote and the overwhelming support of Black voters. See Tr. 890:16-21; APAX 5, 7. As Dr. Handley concluded and the Parties stipulated, on average, over 97% of Black voters supported their preferred Black State Senate candidates and over 91% supported their preferred Black State House candidates. Stip. ¶ 327.

Defendant's expert, Dr. Alford, agreed "with [Dr. Handley's] analysis that Black voters in general elections in the areas of Georgia that she analyzed are very

412

cohesive in their support for a single preferred candidate." Tr. 2224:14-18. Consistent with the uncontested evidence, the Court finds that Black voters in the seven areas of Georgia that Dr. Handley analyzed are highly cohesive in supporting a single preferred candidate.[89] Moreover, the Black voter cohesion is stronger in the relevant areas (between 91 and 98%) than in the voter cohesion in Alabama (92.3%), which the Supreme Court agreed with the three-judge court was "very clear." <u>Allen</u>, 599 U.S. at 22. Accordingly, the <u>Alpha Phi Alpha</u> Plaintiffs have satisfied the second <u>Gingles</u> precondition in the relevant areas.

### b)    <u>Grant</u>

The Court finds that the <u>Grant</u> Plaintiffs have proven the second <u>Gingles</u> precondition as well. The <u>Grant</u> Plaintiffs' expert in racial polarization, Dr. Palmer, determined that Black voters had a clearly identifiable candidate of

---

[89] The Court notes that Dr. Alford opined that the Black preferred candidate was always the Democrat. <u>See, e.g.</u>, Tr. 2144:11–25; <u>see also</u> Stip.  ¶¶ 319, 325, 331. As noted above and in the Court's summary judgment order (<u>APA</u> Doc. No. [268]), the Court found that partisan affiliation is not relevant to the second and third <u>Gingles</u> preconditions. Accordingly, Dr. Alford's conclusions regard partisanship are not relevant, here. However, the Court will consider his conclusions as a part of Senate Factor Two. <u>See</u> Section (D)(4)(b)(3) *infra*.

413

choice in every election examined, across the focus areas and in each State Senate and House district. Stip.   ¶¶ 268, 270; GX 2 ¶ 18, tbl.1 & figs.2–4. On average, Black voters supported their candidates of choice with 98.5% of the vote. Stip. ¶ 269; GX 2 ¶ 18.

Table 1: Average Support for Black-Preferred Candidates by Voters' Race

|  | Focus Area | Black Voters | White Voters |
|---|---|---|---|
| House | Black Belt | 98.1% | 10.4% |
|  | Southern Atlanta | 98.7% | 4.6% |
|  | Western Atlanta | 98.2% | 7.7% |
| Senate | Black Belt | 98.4% | 8.2% |
|  | Southern Atlanta | 98.9% | 10.7% |

GX 2 ¶ 18 & tbl. 1.



GX 2 ¶ 18 & fig.2.

Defendants' racially polarized voting expert, Dr. Alford, does not dispute

Dr. Palmer's conclusions as to the second <u>Gingles</u> precondition. DX 8, 2–5;

Tr. 2251:2–5. However, Dr. Alford notes that in all of the races examined by

Dr. Palmer, the Black voters' candidate of choice was the Democrat candidate.

DX 8, 4. As the Court discussed extensively in its Order on the cross-motions for

summary judgment, the second and third <u>Gingles</u> preconditions are results based

inquiries that do not require plaintiffs to prove that race cause the polarization or

disprove that party caused the polarization. See Grant Doc. No. [229], 51–57. Thus, Dr. Alford's suggestions about the cause and effect of racial polarization are not persuasive for the Gingles preconditions.

As the data above shows, Black voters in south-Metro and west-Metro Atlanta support the same candidate more than 98% of the time and in the Macon-Bibb region, Black voters supported the same candidate 98.1% of the time. GX 2 ¶ 18 & tbl.1. "Bloc voting by [B]lacks tends to prove that the [B]lack community is politically cohesive, that is, it shows that [B]lacks prefer certain candidates whom they could elect in a single-member, [B]lack majority district." Gingles, 478 U.S. at 68. As was noted above, Dr. Palmer's data shows that Black voter cohesion is greater in these areas than it is in Alabama (92.3%), where the Supreme Court credited the lower court's finding of "very strong" Black voter cohesion. Allen, 599 U.S. at 22. Accordingly, the Court finds that the Grant Plaintiffs have satisfied their burden on the second Gingles precondition. Based on the stipulated facts, expert reports, and testimony provided in this case, the Court concludes that Black voters in the focus areas are politically cohesive.

416

### 3. *Third <u>Gingles</u> Precondition*

The Court also finds that the <u>Alpha Phi Alpha</u> and <u>Grant</u> Plaintiffs have proven the third <u>Gingles</u> precondition for all the legislative districts remaining.

### a) <u>Alpha Phi Alpha</u>

The Court finds that the <u>Alpha Phi Alpha</u> Plaintiffs have met their burden in establishing the third <u>Gingles</u> precondition in their remaining proposed legislative districts. Dr. Handley concluded that the starkly racially polarized voting in the areas that she analyzed "substantially impedes" the ability of Black voters to elect candidates of their choice to the Georgia General Assembly unless districts are drawn to provide Black voters with this opportunity. <u>See</u> APAX 5, 22; <u>see also</u> Tr. 892:15-21.

Specifically, in the seven areas of interest, white voters consistently bloc voted to defeat the candidates supported by Black voters. <u>See</u> APAX 5, 21–22. Indeed, Dr. Handley testified that, in general elections, due to White bloc voting, candidates preferred by Black voters were consistently unable to win elections and will likely continue to be unable to win elections outside of majority-Black districts. <u>See</u> Tr. 890:16-21 (noting that in 53 out of 54 State legislative contests, "Black voters were very cohesive in support of their preferred candidates and

417

white voters bloc voted against these candidates); cf. Tr. 863:9-11 ("In each of the areas, the districts that provided Black voters with an opportunity to elect were districts that were at least 50 percent Black in voting age population.").

Dr. Handley testified that white voters voted as a bloc against Black-preferred candidates in all the 16 general elections that she analyzed. Tr. 862:4-14, 877:14-21. As Dr. Handley concluded and Defendant stipulated, Black-preferred candidates typically received only 11.2% of the white vote. Stip. ¶¶ 321, 322. Similarly, in the State legislative elections Dr. Handley analyzed, the Black-preferred candidate on average secured the support of only 10.1% of white voters in State Senate races and 9.8% of white voters in State House races. Stip. ¶ 328.

This pattern of white bloc voting against Black-preferred candidates is not contested. In fact, the Parties stipulated that white voters were "very cohesive" in their support for their preferred candidates in both statewide and State legislative general elections (Stip. ¶¶ 332, 336), and that the candidates preferred by white voters in the seven areas of interest are voting against the candidates preferred by Black voters (Stip. ¶ 337).

Defendant's expert, Dr. Alford, similarly agreed that "with small exceptions, white voters are highly cohesive" in "the general elections that Dr. Handley analyzed across the areas of interest in Georgia," and that, in these general elections, "large majorities of Black and white voters are supporting different candidates." Tr. 2224:25-2225:9; see also DX 8, 6.

Due to the low level of white support for Black-preferred candidates, Dr. Handley found that blocs of white voters in the areas of interest were able to consistently defeat Black-preferred candidates in State legislative general elections, except where the districts were majority Black. APAX 5, 22; Tr. 891:5-7 ("Black-preferred Black candidates were successful only in districts that were majority Black in the elections that I looked at."). As Dr. Handley testified and Defendant stipulated, all but one of the successful Black State legislative candidates in the contests that Dr. Handley analyzed were elected from majority Black districts—the one exception being a district that was majority minority in composition. Stip. ¶ 329; Tr. 891:13-21.

"Because voting is starkly polarized in general elections," Dr. Handley concluded that "without drawing districts that provide Black voters with an

opportunity to elect [their candidate of choice] districts in the areas examined will not elect Black-preferred candidates." Tr. 906:5-8. The Court finds that the uncontested evidence shows white voters in the relevant areas only vote for the Black-preferred candidate between 9.8% to 11.2% of the time. White voters in Georgia vote in opposition to the Black-preferred candidate at a higher rate than in Alabama (where 15.4% of white voters supported the Black-preferred candidate) where the Supreme Court affirmed the three-judge court's finding of "very clear" racial polarization. Allen, 599 U.S. at 22. Accordingly, the Court finds that the Alpha Phi Alpha Plaintiffs have met their burden and proved that white voters bloc vote in opposition to the Black-preferred candidate. In other words, in the relevant areas, the Black-preferred candidate will typically be defeated by white voters in majority-white districts.

### b) Grant

The Court also finds that the Grant Plaintiffs carried their burden on the third Gingles precondition. The Grant Plaintiffs' expert, Dr. Palmer, demonstrated that white voters in the legislative focus area usually vote as a bloc to defeat Black-preferred candidates. This too has been stipulated by the Parties.

420

Stip. ¶¶ 271–74. In each legislative district examined and in the focus areas as a whole, white voters had clearly identifiable candidates of choice for every election examined. GX 2 ¶ 18 & fig.2; Tr. 404:20–405:18.

In the elections Dr. Palmer examined, white voters were highly cohesive in voting in opposition to the Black-preferred candidate. Stip. ¶ 271. On average, Dr. Palmer found that white voters supported Black-preferred candidates with only 8.3% of the vote. Id. ¶ 272; see also GX 2 ¶ 18. In other words, on average, 91.7% of the time white voters voted against the Black-preferred candidate.

Dr. Palmer then calculated in the success of Black preferred candidates in districts under the Enacted Plan. GX 2 ¶ 21. In the races examined, Dr. Palmer concluded that the Black-preferred candidate was only successful in majority-Black districts. GX 2 ¶ 21 & fig.4.



Figure 4: Average Performance of Black-Preferred Candidates by District

GX 2 ¶ 18 & fig.4. When he performed the same analysis with Mr. Esselstyn's illustrative majority-Black districts, he found that the Black-preferred candidate would have been successful in all of the elections that he analyzed. GX 2 ¶¶ 23, 25 & fig.5.

422

Overall, Dr. Palmer found "strong evidence of racially polarized voting across the areas . . . examined." GX 2 ¶ 7; see also GX ¶¶ 18–19; Tr. 398:10–16, 407:17–21. As a result of this racially polarized voting, candidates preferred by Black voters have generally been unable to win elections in the focus areas if not in a majority-Black district. Tr. 408:9–409:12; GX 2 ¶¶ 20–21 & fig.4. Dr. Palmer concluded that "Black-preferred candidates win almost every election in the Black-majority districts, but lose almost every election in the non-Black-majority districts." GX 2 ¶ 21. Defendants' expert Dr. Alford does not dispute Dr. Palmer's conclusions as to the third Gingles precondition. DX 8, 2–3; Tr. 2251:6–9. However, Dr. Alford opined once more that in all of the elections that Dr. Palmer reviewed, the Black-preferred candidate was a Democrat and the white-preferred candidate was a Republican. DX 8, 3–5. The Court does not find Dr. Alford's conclusion relevant to the Gingles preconditions because it relates to the *causes* and not the *effects* of voter behavior. See Section II(D)(1)(b)(2) *supra*.

Using the returns from the 31 statewide elections, Dr. Palmer also analyzed whether Black voters in Mr. Esselstyn's additional majority-Black State Senate and House districts could elect their candidates of choice. GX 2 ¶¶ 22, 24, 25. He

423

specifically concluded that "[i]n House Districts 64, 74, and 149, and Senate Districts 23, 25, and 28, the Black-preferred candidate won a larger share of the vote in all 40 statewide elections. In House District 117, the Black-preferred candidate won all 19 elections since 2018." GX 2 ¶ 24 & tbl.9. Dr. Alford does not dispute Dr. Palmer's performance analysis of Esselstyn's Legislative Plan. Tr. 2250:20–22.



Figure 5: Vote Shares of Black-Preferred Candidates in Under the Illustrative Maps

PX 2 ¶ 25 & fig.5.

Again, the evidence of polarization is stronger in this case than it was in

Allen: in the focus areas the highest average support of white voters for the Black-

preferred candidate was 10.7%, whereas in Alabama 15.4% of white voters

425

supported the Black-preferred candidates—which was "very clear" evidence of racially polarized voting. <u>Allen</u>, 599 U.S. at 22. Based on the stipulated facts, expert reports, and testimony provided in this case, the Court concludes that white voters in Esselstyn SD-25, SD-28, HD-64, HD-74, HD-145, and HD-149 "very clearly" vote as a bloc to defeat Black-preferred candidates. Accordingly, the Court finds that the <u>Grant</u> Plaintiffs have satisfied their burden in proving the third <u>Gingles</u> precondition.

* * * *

The Court finds that in Cooper SD-17, SD-28, HD-74, HD-117 and Esselstyn SD-25, SD-28, HD-64, HD-117, HD-145, and HD-149, the <u>Alpha Phi Alpha</u> and <u>Grant</u> Plaintiffs, respectively, have proven all three <u>Gingles</u> preconditions by a preponderance of the evidence. Thus, the Court will evaluate whether, under the totality of the circumstances, the political process is equally open to Black voters in these areas.

### 4.   *Totality of the Circumstances*

The Court now turns to the totality of the circumstances inquiry to determine if Georgia's political process is equally open to the affected Black

426

voters. <u>Wright</u>, 979 F.3d at 1288 ("[I]n the words of the Supreme Court, the district court is required to determine, after reviewing the 'totality of the circumstances' and, 'based upon a searching practical evaluation of the past and present reality, whether the political process is equally open to minority voters.'" (quoting <u>Gingles</u>, 478 U.S. at 79)).

For the proposed districts where Plaintiffs satisfied the <u>Gingles</u> preconditions, the Court must now determine if the electoral system is equally open to them. Put differently, the Court must determine if the Black voters in these areas have less of an opportunity to elect a candidate of their choice based on race. <u>Wright</u>, 979 F.3d at 1288.

Again, the Court notes that Georgia has made great strides since the passage of the Voting Rights Act to give Black voters more of an equal opportunity to participate in the political process. For example, Georgia's current congressional delegation has five Black representatives to the U.S. House of Representatives and one Black senator. However, the Court acknowledges that as far as the State General Assembly's representation is concerned, the numbers

427

are less proportional.[90] <u>See</u> GX 1  ¶¶ 22 (indicating the Enacted State Senate Plan contains 14 majority-Black districts out of 56 districts, or 25%), 45 (indicating the Enacted State House Plan contains 49 majority-Black districts out of 180 districts,[91] or approximately 27.2%).

Like the <u>Pendergrass</u> case, however, the whole of the evidence in the <u>Alpha Phi Alpha</u> and <u>Grant</u> Plaintiffs' case for the totality of the circumstances inquiry shows that, while promising gains have been made in the State of Georgia, the political process is not currently *equally* open to Black Georgians. When evaluating the Senate Factors, the evidence shows that Black voters have *less* of opportunity to partake in the political process than white voters. Thus, the Court determines that the totality of the circumstances inquiry supports finding a Section 2 violation in the <u>Alpha Phi Alpha</u> and the <u>Grant</u> Plaintiffs' case.

---

[90] The Court's reference to proportionality here is only to support a general observation regarding the trajectory of minority voters' equal access to the political system in Georgia.

[91] The Georgia Legislative Black Caucus, however, only has 41 members in the Georgia House of Representatives. Stip. ¶ 348.

428

### a)      <u>Alpha Phi Alpha</u>

The Court finds that the <u>Alpha Phi Alpha</u> Plaintiffs have proven that, under the totality of the circumstances, Georgia's electoral system is not equally open to Black voters in the districts meeting the <u>Gingles</u> preconditions (i.e., Cooper SD-17, SD-28, SD-74).

### (1)     *Totality of circumstances inquiry: purpose and framework*

To reiterate, for a Section 2 violation to be found, the Court must conduct "an intensely local appraisal" of the electoral mechanism at issue, as well as a "searching practical evaluation of the 'past and present reality.'" <u>Allen</u>, 599 U.S. at 19 (citing <u>Gingles</u>, 478 U.S. at 79). The purpose of this appraisal is to determine the "essential inquiry" of a Section 2 case, which is "whether the political process is *equally open* to minority voters." <u>Ga. State Conf. of the NAACP</u>, 775 F.3d at 1342 (emphasis added) (quoting <u>Gingles</u>, 478 U.S. at 79). Put differently, the totality of the circumstances inquiry ensures that violations of Section 2 may only be found when "members of the protected class have *less opportunity* to participate in the political process." <u>Chisom</u>, 501 U.S. at 397 (emphasis added).

429

The legal framework for the totality of the circumstances inquiry is the same applied in the Pendergrass case. In short, in this analysis the Court considers the relevant Senate Factors—Georgia's history of discrimination and its voting practices enhancing the opportunity for discrimination, racial polarization in elections, socioeconomic factors, use racial appeals, Black-candidate success in elections, elected officials' responsiveness to the Black community, and the State's policy justification for the enacted map. Gingles, 478 U.S. at 44–45. The Court also considers the proportionality achieved by the Enacted Legislative Plans. The Court ultimately concludes that the totality of the circumstances' inquiry weighs in favor of finding a Section 2 violation in the Alpha Phi Alpha case.

> (2) ***Senate Factors One and Three: historical evidence of discrimination and State's use of voting procedures enhancing opportunity to discriminate***

The Court first turns to Georgia electoral practices, both past and present, that bear on discrimination against Black voters under Senate Factors One and

Three.[92] Senate Factor One focuses on "[t]he extent of any history of official discrimination in the state . . . that touched the right of the members of minority group to register, to vote, or otherwise to participate in the democratic process[.]" Gingles, 478 U.S. at 36–37. Senate Factor Three "considers 'the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting.'" Wright, 979 F.3d at 1295 (quoting Gingles, 478 U.S. at 44–45).

The Court finds that the Alpha Phi Alpha Plaintiffs have presented evidence of both past and present history in Georgia that the State's voting practices disproportionately effect Black voters. Like in the Pendergrass case, the Court is careful in this analysis to assess both past *and present* efforts that have caused a disproportionate impact on Black voters. Allen, 599 U.S. at 19. Both

---

[92] Like in the Pendergrass case, the Court considers both Senate Factors One and Three together because there is significant overlap in the trial evidence for the two factors. Cf., e.g., Singleton, 582 F. Supp. 3d at 1020 (considering Senate Factors One, Three, and Five together).

431

types of evidence are relevant because certainly "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." Greater Birmingham Ministries, 992 F.3d at 1325 (quoting Bolden, 446 U.S. at 74). But past discrimination and disproportionate effects cannot be completely overlooked. See Allen, 599 U.S. at 14, 19 (assessing a history of discrimination in Alabama following Reconstruction); League of Women Voters, 81 F.4th at 1333 (asserting that "[p]ast discrimination *is relevant*" and citing to Allen). Accordingly, taking these statements from recent Supreme Court and Eleventh Circuit cases, the Court and evaluates Georgia's practices of discrimination *past and present* as relevant evidence in the totality of the circumstances inquiry.

**(a)    historical evidence of discrimination broadly**

Courts have continuously found that Georgia has a history of discrimination. Wright, 301 F. Supp. 3d at 1310 ("Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy. Racism and race discrimination were apparent and conspicuous realities, the norm rather

432

than the exception."); <u>Cofield</u>, 969 F. Supp. at 767 ("African-Americans have in the past been subject to legal and cultural segregation in Georgia[.]"); <u>id.</u> ("Black residents did not enjoy the right to vote until Reconstruction. Moreover, early in this century, Georgia passed a constitutional amendment establishing a literacy test, poll tax, property ownership requirement, and a good-character test for voting. This act was accurately called the 'Disfranchisement Act.' Such devices that limited black participation in elections continued into the 1950s.").

During the trial, Defendant stipulated that "up until 1990 we had historical discrimination in Georgia." Tr. 1524:14–15. <u>Alpha Phi Alpha</u> Plaintiffs' experts conclusions are consistent with this assertion. Plaintiffs' expert Dr. Ward concluded that "Georgia has a long history of state-sanctioned discrimination against Black voters that extended beyond written law to harassment, intimidation and violence." APAX 4, 1. [93] Another expert in these cases,

_____

[93] The numbering in Dr. Ward's report resets after the first two pages. As the substance of Dr. Ward's report starts on the second page 1, the Court intends for its citations to refer to the pages of Dr. Ward's substantive findings and conclusions.

433

Dr. Burton[94] opined that "[t]hroughout the history of the state of Georgia, voting rights have followed a pattern where after periods of increased nonwhite voter registration and turnout, the state has passed legislation, and often used extralegal means, to disenfranchise minority voters." PX 4 at 10; see also Tr. 1428:3–24. The Alpha Phi Alpha Plaintiffs' expert, Dr. Jones, also testified that Georgia has "used basically every expedient . . . associated with Jim Crow to prevent Black voters from voting in the state of Georgia." Tr. 1162:9–11.

This unrebutted testimony and the extensive accounts of Georgia's history of discrimination in Alpha Phi Alpha Plaintiffs' expert reports demonstrate that Georgia's history—including its voting procedures— spans from the end of the Civil War onward. See, e.g, Tr. 1431:13–17; APAX 2, 7; APAX 4, 3–13. This history has uncontrovertibly burdened Black Georgians. Id.

_____

[94] The Parties agreed and the Court permitted Alpha Phi Alpha Plaintiffs to incorporate Dr. Burton's trial testimony and portions of his expert report that were directly testified about into the Alpha Phi Alpha case. Tr. 1464:11-25.

**(b)** **Georgia practice from the passage of the VRA to 2000**

Congress enacted the Voting Rights Act of 1965 to address these discriminatory practices. One of the Voting Rights Act's provisions was the preclearance requirement, which mandated certain jurisdictions with well-documented practices of discrimination (including Georgia) to get approval from the federal government before making changes to their voting laws. 52 U.S.C. § 10304 .

The Voting Rights Act, however, did not instantly translate into equal voting in Georgia. In fact, Dr. Jones opined that "Georgia resisted the VRA from its inception." APAX 2, 8. In the early years following the passage of the VRA, "Georgia refused to submit new laws for preclearance." Id. Specifically, between 1965 and 1967, Georgia submitted only one proposed change to DOJ for preclearance. Id. Among states subject to preclearance in their entirety, Georgia ranked second only to Alabama in the disparity in voter registration between its Black and white citizens in 1976. Tr. 1437:10–1438:3. These continued disparities following the VRA were at least caused because "Georgia resisted the Voting Rights Act [and] for a period, it refused to comply." Tr. 1163:9–17. Even still, from

435

1965 to 1981, the Department of Justice objected to more than 200 changes submitted by Georgia, which accounted for almost one-third of DOJ's objections for *all* states during that period. APAX 2, 8–9.

Georgia's history of discrimination against Black voters did not end in 1981. When the VRA was reauthorized in 1982, the Senate Report specifically cited to Georgia's discriminatory practices that diminished the voting power of Black voters. S. Rep. 97-417, 9th Cong. 2d Sess. 10, 13 (1982). During the 2006 reauthorization process of the Voting Rights Act, Georgia legislators "took a leadership position in challenging the reauthorization of the [A]ct." Tr. 1164:2–17. As Dr. Jones reminds us, "Georgia's resistance to the VRA is consistent with its history of resisting the expansion of voting rights to Black citizens at every turn." APAX 2, 9. Even following the 2000 Census, the district court in the District of Columbia refused to preclear the General Assembly's Senate plan because the court found "the presence of racially polarized voting" and that "the State ha[d] failed to demonstrate by a preponderance of the evidence that the reapportionment plan for the State will not have a retrogressive effect." Ashcroft, 195 F. Supp. 2d at 94.

436

**(c)** **more recent voting practices with a disproportionate impact on Black voters**

The Court moreover concludes that the <u>Alpha Phi Alpha</u> Plaintiffs submitted evidence of more recent practices in Georgia which disproportionately impact Black voters and have resulted in a discriminatory effect. These practices include county at-large voting sytems, polling place closures, voter purges, and the Exact Match requirement. The <u>Alpha Phi Alpha</u> Plaintiffs also rely on the Georgia General Assembly's passage of SB 202 following the 2020 presidential election as evidence of recent and present practice disproportionally affecting Black voters.[95]

---

[95] The Court reiterates that Dr. Burton clearly denied that the General Assembly or Georgia Republicans are racist. Tr. 1473:18–1474:9. As articulated by Dr. Burton, "I am not saying that the legislature is [racist]—I am saying that some of the legislation that comes out has a disparity—it affects Black citizens differently than white citizens to the disadvantage on Black citizens, but I am not saying that they are racist. But the effect has a disparate impact among whites and Blacks and other minorities." Tr. 1474:4–9. Section 2 of the VRA does not require the Court to find that the General Assembly passed the challenged maps to discriminate against Black voters, or that the General Assembly is racist in any way. Nothing in this Order should be construed to indicate otherwise.

As in Pendergrass, the evidence in the <u>Alpha Phi Alpha</u> case shows that following <u>Shelby County</u> and the end of pre-clearance, the U.S. Commission on Civil Rights found that Georgia had adopted five of the most common restrictions that impose roadblocks to the franchise for minority voters: (1) voter ID laws, (2) proof of citizenship requirements, (3) voter purges, (4) cuts in early voting[96], and (5) widespread polling place closures. Tr. 1442:3–12 (referencing PX 4, 48–49). No other State has engaged in all five practices. <u>Id.</u> (referencing PX 4, 48–49).

The Court ultimately weighs the evidence submitted and determines that the evidence of Georgia's present voting practices disproportionately impact Black voters. The Court proceeds by assessing the <u>Alpha Phi Alpha</u> Plaintiffs' evidence of (i) at-large voting practices, (ii) Georgia's practice of closing polling places, (iii) Georgia's Exact Match requirement, (iv) the General Assembly's passage of SB 202, and (v) the State's rebuttal evidence of open and fair election

---

[96] While it may have been true at the time of this report that Georgia had made cuts to early voting, the Court acknowledges Mr. Germany's trial testimony was that SB 202 increased early voting opportunities by adding two mandatory Saturdays and expressly permitted counties to hold early voting on Sundays at their discretion. Tr. 2269:8–21.

438

procedures.[97] The Court finally (vi) renders its conclusion of law on this Senate Factor.

### i)   at-large voting

One example of a recent discriminatory practice that Dr. Jones relied on was recent use of at-large voting systems in Georgia. APAX 2, 10–12. It is undisputed that as a state, Georgia does not use at-large voting systems. However, some counties do. In fact, as recently as 2015, a federal court, under Section 2, enjoined Fayette County's use of at-large voting methods for electing members to the Fayette County Board of Commissioners and Board of Education. Id. (citing Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs, 118 F. Supp. 3d 1338, 1339 (N.D. Ga. 2015)). Following the enactment of the remedial maps, a Black candidate was elected for the first time to the Fayette County Board

---

[97] The Court may evaluate statewide evidence to determine whether Black voters have an equal opportunity in the election process. LULAC, 548 U.S. at 438 ("[S]everal of the [ ] factors in the totality of circumstances have been characterized with reference to the State as a whole."); see also Allen, 599 U.S. at 22 (crediting the three-judge court's finding lack of equal openness with respect to state wide evidence (citing Singleton, 582 F. Supp. 3d at 1018–24); Gingles, 478 U.S. at 80 (crediting district court's findings of lack of equal opportunity that was supported by statewide evidence).

of Commissioners. APAX 2, 11. This evidence was unrebutted. The Court notes that Cooper SD-28 even contains a portion of Fayette County. APAX 1 ¶ 99. The Court finds that the 2015 district court opinion finding that Fayette County's use of at-large voting violated Section 2 is particularly persuasive in showing recent discriminatory practices in voting given that this county is a part of one of the challenged areas.

### ii) *polling place closures*

The Court finds that there is also compelling evidence that Georgia's recent closure of numerous polling places disproportionately impacts Black voters. Between 2012 and 2018, Georgia closed 214 voter precincts, "decreasing the number of precincts in many minority majority neighborhoods." APAX 2, 29 (citing Patrik Jonsson, "Voting After Shelby: How a 2013 Supreme Court Ruling Shaped the 2018 Election," Christian Science Monitor, November 21, 2018, https://www.csrnonitor.com/USAlJustice/2018/1121/Voting-after-Shelby-How-a-2013-Supreme-Court-ruling-shaped-the-2018-election; The Leadership Conference on Civil and Human Rights, "Democracy Diverted: Polling Place Closures and the Right to Vote," at 32, September 2019,

440

https://civilrights.org/democracy-diverted/). In five of the counties where the polls were closed Black turnout was under 50% in 2020, when it had been between 61.36% and 77.50% in the 2018 election. APAX 2, 29–30 (citing Mark Niesse and Maya T. Prabhu, "Voting Locations Closed across Georgia after Supreme Court Ruling," The Atlanta Journal-Constitution, April 31, 2018, https://www.ajc.com/news/state--regional-govt--politics/votingprecincts-closed-across-georgia-since-election-oversight-1iftedJ

bBkHxpflirn0Gp9pKu7dfrN/; Georgia Secretary of State, "Elections," 2018. https://sos.ga.gov/index.php/elections.)

A 2020 study found that "about two-thirds of the polling places that had to stay open late for the June primary to accommodate waiting voters were in majority-Black neighborhoods, even though they made up only about one-third of the state's polling places." APAX 2, 30 (citing Stephen Fowler, "Why Do Nonwhite Georgia Voters Have to Wait in Line for Hours?," ProPublica (Oct. 17, 2020), https://www.propublica.org/article/why-do-nonwhite-georgia-voters-have-to-wait-in-line-for-hours-their-numbers-have-soared-and-their-polling-places-have-dwindled). Additionally, on average, the "wait time after 7 p.m.

441

across Georgia was 51 minutes in polling places that were 90% or more nonwhite, but only 6 minutes in polling places that were 90% white." Id. The study that Dr. Jones cited for these statements is the same as the one cited by Dr. Burton that found that "[i]n 2020, the nine counties in metro Atlanta that had nearly half of the registered voters (and the majority of the Black voters in the state)[, but] had only 38% of the state's polling places." PX 4, 50 n.173. Notably, at trial, both Drs. Jones and Burton testified consistently about polling place closures and that they disproportionately impacted Black voters. Tr. 1432:21–25; 1440:16–1441:21; 1347:10–1348:9.

The Court concludes that the Alpha Phi Alpha Plaintiffs' evidence of polling place closures—and, notably, in metro-Atlanta where some of the challenged districts are located—is recent evidence of a voting practice with a disproportionate impact on Black voters.

### iii)    exact match

The Alpha Phi Alpha Plaintiffs' evidence also shows Georgia's voting practices include roadblocks to the voting efforts of minority voters in the form

442

of the Exact Match system and the State's purging of voter registration lists.[98]APAX 2, 23–28.

These practices, however, have been determined in prior decisions by the Court to *not* be illegal under federal law. The prior decisions upholding the Exact Match requirement and registration list purges certainly impact the weight to afford these voting practices. However, in this case, the evidence shows— without contradicting the prior legal determinations—that these practices have a *disproportionate effect* on Black voters for purposes of the instant totality of the circumstances' inquiry. Specifically, when these prior decisions are considered in the light of the legal frameworks at issue, the Court finds that these practices can be used as evidentiary support of a disproportionate discriminatory impact on Black voters in Georgia without contradicting or minimizing the prior decisions upholding Georgia's laws.

---

[98] In light of the Court's ruling allowing Dr. Burton's testimony and specific references to is report to be incorporated into the <u>Alpha Phi Alpha</u> case (1464:11-25), the Court may rely on Dr. Burton's report's analysis of the Commission's report in the <u>Alpha Phi Alpha</u> case. <u>See</u> Tr. 1441:25–1442:15 (Dr. Burton referencing his report and testifying about the U.S. U.S. Commission on Civil Rights, <u>An Assessment of Minority Voting Rights Access in the United States: 2018 Statutory Enforcement Report</u> (Washington, 2018), 369).

Specifically, Georgia's Exact Match procedure was determined to not violate VRA's Section 2 because when the burden on voters, the disparate impact, and the State's interest in preventing fraud were considered together, the weighing of these considerations counseled against finding a violation. Fair Fight Action, 634 F. Supp. 3d at 1246. The Exact Match ruling in Fair Fight relied on the Brnovich decision and emphasized that "the modest burdens allegedly imposed by [the Exact Match law], the small size of the disparate impact, and the State's justifications" did not support a Section 2 violation. Id. at 1245–46 (quoting Brnovich, 141 S. Ct. at 2346). Even without a Section 2 violation, however, the Court found that the Exact Match requirement disproportionately impacted Black voters given that: Black voters were a smaller portion of the electorate but as of January 2020, 69.4% of individuals flagged as "missing identification required" were African American, and 31.6% of the voters flagged for pending citizenship 31.6% were African American, whereas white voters only accounted for 20.9%. Fair Fight Action, 634 F. Supp. 3d at 1160, 1162; Tr. 1283:3–10. Thus, the Court's decision in Fair Fight itself acknowledged that the Exact Match practice in Georgia has a *discriminatory impact* on Black voters—which is the

444

inquiry specifically at issue here. When the Court considers Fair Fight's determination in the light of the Civil Rights' Commission's report that generally Exact Match practices are a roadblock to minority voters, the Court concludes that this modern practice in Georgia supports that Georgia's modern voting practices have a discriminatory effect on Black voters.

### iv)   SB 202's disproportionate impact

The Alpha Phi Alpha Plaintiffs also cite to Georgia's passage of SB 202 as evidence of modern discrimination. The General Assembly passed SB 202 following the 2020 Presidential election. APAX 2, 28–29; Tr. 1182:1–9. A challenge to SB 202 is pending in the Northern District of Georgia and has not been resolved at the time the Court enters this Order.[99] In re SB 202, 1:21-mi-55555 (N.D. Ga.

---

[99] The Court notes that on October 11, 2023, the district court assigned the SB 202 case ruled on a pending motion for preliminary injunction that involves Section 2 and constitutional challenges to several provisions in SB 202. In re SB 202, 1:21-mi-55555, ECF No. 686 (N.D. Ga. Oct. 11, 2023). The court denied the plaintiffs' motions for preliminary injunction and found that there was not a substantial likelihood of success on the merits of any of their claims. Id. at 61. No rulings in that case are binding on this Court. McGinley, 361 F.3d at 1331 ("[A] district judge's decision neither binds another district judge[.]"). However, the Court is cautious in its discussion of SB 202 to avoid inconsistent rulings and creating confusion.

Dec. 23, 2021). The Court acknowledges that the evidence presented in that case is not presently before this Court.[100] Given this pending challenge to SB 202, the Court proceeds cautiously in an effort of judicial restraint, which counsels against the Court preemptively making any findings that could lead to inconsistent rulings with decisions already made or implicating the ultimate determination of the legality of the law.

With these qualifications in mind, the Court cannot ignore that evidence on SB 202 has been presented by the Plaintiffs as proof of present discriminatory practices in Georgia's treatment of Black voters. See, e.g., APAX 2, 28–29.[101] Defendants likewise provided rebuttal testimony. See generally Tr. 2261–2307. The Court, treading cautiously, tethers its findings regarding SB 202 to the

---

[100] To be abundantly clear, this Court does not have a challenge to SB 202 before it. Plaintiffs' experts have provided evidence regarding potential motivations behind SB 202 and the impact that its passage had on Black voters. See APAX 2, PX 4, GX 4. And Defendants provided counter evidence. See generally Tr. 2261–2307 (testimony of Ryan Germany). The Court evaluates solely the evidence adduced in this case.

[101] Drs. Burton and Jones concluded that certain portions of SB 202 have an actual or perceived negative impact on Black voters. See Tr. 1185:17–1186:16 (Dr. Jones opining that Black voters increased use of absentee ballots and their use of drop boxes correlated with the passage of SB 202); Tr. 1445: 1–25 (Dr. Burton opining that certain provisions of SB 202 were put in place because of the gains made by Black voters in the electorate).

testimony and evidence advanced by the <u>Alpha Phi Alpha</u> Plaintiffs' experts *for*

*purposes of the totality of the circumstances inquiry on the Senate Factors*. Namely, the

Court considers the passage of SB 202, once again, as some evidence of practices

with a disproportionate impact on Black voters. This conclusion is made with the

expert conclusion of Dr. Burton in mind that "in Georgia [it] was the pattern that

every time . . . that Black citizens made gains in some way or another or were

being successful, that the party in power in the state, whether it's Democrat or

Republican, found ways or came up with ways to either disenfranchise, but

particularly dilute or in some way make less effective the franchise of Black

citizens than those of white citizens." Tr. 1428:9–21. Dr. Burton specifically cites

the passage of SB 202 as evidence of this pattern in his trial testimony

(Tr. 1442:16–1444:25), which was incorporated by the <u>Alpha Phi Alpha</u> Plaintiffs

in their case (Tr. 1464:10–25).

Accordingly, the Court considers SB 202 as evidence of a current

manifestation of a historical pattern that following an election, the General

Assembly responsively passes voting laws that disproportionately impact Black

voters in Georgia.

447

### (d)   Defendant's rebuttal evidence

The Court now turns to Defendants' rebuttal evidence. Defendants do not affirmatively rebut the Alpha Phi Alpha Plaintiffs' expert evidence with their own expert evidence. Instead, Defendants cross-examined Drs. Jones and Burton on the prior legal determinations upholding some of the voting practices raised. See, e.g., Tr. 1251:16–19. The Court, however, has already determined that it is not inconsistent with these prior rulings to now find that these voting practices have a discriminatory impact on Black voters for purposes of the instant totality of the circumstances. See Section II(D)(4)(a)(2)(iii) *supra* exact match section.

Defendants instead, through lay witness testimony, submitted that Georgia has implemented legislation to make it easier for all voters to participate.[102] In favor of Defendants on these factors, the Court considers Mr. Germany's testimony about SB 202. Mr. Germany indicates that the motive

---

[102] The Court notes that on cross-examination Mr. Germany explained that SB 202 received numerous complaints; however, he is unable to quantify whether those complaints primarily came from Black voters because the Secretary of State's Office does not analyze the impact of the legislation on particular categories of voters—i.e., white voters v. Black voters. In his opinion, that analysis is not helpful to the overall goal to "make it easy for everyone, regardless of race." Tr. 2283:2–2285:5.

448

for passing the law was to alleviate stress on the electoral system and increase voter confidence. Tr. 2265:3–23. Moreover, SB 202, among other things, expanded the number of early voting days in Georgia. Tr. 1476:7–9, 2269:8–21. Mr. Germany testified that Georgia employs no-excuse absentee voting (Tr. 2268:9–16) and was the second state in the country to implement automatic voter registration through the Department of Driver Services, which also allows voters to register the vote using both paper registration and online voter registration (Tr. 2263:12–20). Georgia furthermore offers free, state-issued, identification cards that voters can use to satisfy Georgia's photo ID laws. Tr. 2264:15–22.

The Court has also been presented additional evidence that immediately prior to Shelby County, the DOJ precleared Georgia's 2011 Congressional Plan. Tr. 1471:14–20. Moreover, following the passage of SB 202, Georgia experienced record voter turnout in the 2022 midterm election cycle. Tr. 1480:3–8.

(e)   **conclusion on Senate Factors One and Three**

In sum, the majority of the evidence before the Court shows that Georgia has a long history of discrimination against Black minority voters. This history

449

has persisted in the wake of the VRA and even into the present through various voting practices that disproportionately affect Black voters. The <u>Alpha Phi Alpha</u> Plaintiffs have provided concrete recent examples of the discriminatory impact of recent Georgia practices, some specifically in the area of the districts proposed.

Defendants conversely have submitted some recent evidence of Georgia increasing the access and availability of voting. The evidence even shows that *overall* voter turnout has increased in the most recent national election.[103] These efforts are commendable, and the Court encourages these developments. In the Court's view, however, it is insufficient rebuttal evidence. Thereby, *in toto*, the Court concludes that Georgia has a history—uncontrovertibly in the past, and extending into the present—of voting practices that disproportionately impact Black voters. Thus, Senate Factors One and Three on the whole weigh in favor of finding a Section 2 violation.

_____

[103] As discussed in greater detail, *infra*, Black voter turnout rate decreased by 15 points from the 2020 election cycle to the 2022 election cycle and recorded the lowest voter turnout rate in a decade. <u>See</u> Section II(D)(4)(e)(1) *infra*.

450

### (3) *Senate Factor Two: racial polarization*

The second Senate Factor assesses "the extent to which voting in the elections of the State or political subdivision is racially polarized." Wright, 979 F.3d at 1305 (quoting LULAC, 548 U.S. at 426). As indicated in the Alpha Phi Alpha Summary Judgment Order, polarization is a factor to be considered in the totality of circumstances inquiry, in addition to the second and third Gingles preconditions. Alpha Phi Alpha Doc. No. [268], 44. Pursuant to persuasive authority, the Court finds that when a Defendant has raised a race-neutral reason for the polarization, the Court must look beyond the straight empirical conclusions of polarization. See Nipper, 39 F.3d at 1524 (plurality opinion) (finding that Defendants may rebut evidence of polarization by showing racial bias is based on nonracial circumstances); Uno, 72 F.3d at 983 (asserting the evidence of racial polarization on the second and third Gingles preconditions "will endure *unless* and *until* the defendant adduces credible evidence tending to prove the detected voting patterns can most logically be explained by factors unconnected to the intersection of race with the electoral system.").

451

Defendants have consistently argued that partisanship is a race-neutral explanation for polarization of voters in Georgia. See, e.g., Tr. 2410:18–2411:14. In an intentional discrimination context, the Eleventh Circuit cautioned courts "against conflating discrimination on the basis of party affiliation with discrimination on the basis of race . . . . [e]vidence of *race-based* discrimination is necessary to establish a constitutional violation." League of Women Voters, 66 F.4th at 924.

The Court acknowledges that whether voter polarization is on account of partisanship or race is a difficult question to disentangle. During an extended colloquy with the Court, Dr. Alford testified that "voting behavior is very complicated" and that in his view democracy is about "voting for a person that follows their philosophy or they think is going to respond to their needs." Tr. 2182:4–5; 2183:4–8. He went on to clarify that party identity and affiliation is exceptionally strong in this country and starts at a young age. Tr. 2183:8–2184:6.

Dr. Alford concluded that, from the empirical evidence presented by the Alpha Phi Alpha Plaintiffs, one cannot causally determine whether the data is best explained by party affiliation or racial polarization. He specifically testified:

> [T]he kind of data that we use here, which is, you know ecological and highly abstract data, cannot demonstrate cohesion in sort of its natural form.
>
> Much of the work on things like individual-level surveys, exit polls, et cetera, also make it very difficult in a non-experimental setting to demonstrate causation. It really takes an experimental setting. So there is some work done in experimental settings, but this is not an area of inquiry that is—scientific causation in the social sciences is very difficult to establish. This is not an area where there has been any work that's established that.

Tr. 2226:7–18.

The Court is not in a position to resolve the global question of what causes voter behavior. Such question is empirically driven, and one in which expert political scientists and statisticians do not agree. The Court can, however, assess the *evidence* of polarization presented at trial. In doing so, the Court determines that the Alpha Phi Alpha Plaintiffs have shown sufficient evidence of racial polarization in Georgia voting for this factor to weigh in favor of finding a Section 2 violation.

First, the Alpha Phi Alpha Plaintiffs present Dr. Handley's report, indicating strong evidence of racial polarization in voting. APAX 5. Plaintiffs also offered testimony about the strong connection between race and partisanship as

453

it currently exists in Georgia. Dr. Handley testified that Black and white voters have, for over decades, realigned their partisan affiliations based on the political parties' positions with respect to racial equality and civil rights. See Tr. 885:1-886:7. See also APAX 10, 4 ("Researchers have traced Southern realignment—the shift of white voters from overwhelming support for the Democratic party to nearly equally strong support for the Republican party—to the Democratic party's support for civil rights legislation beginning in the 1960s.").

This testimony was supported by various experts in the case. Dr. Burton testified that in the 1960s there was a "huge shift of African-Americans from the party of Lincoln, the Republican party, to the Democratic party and the shift of white conservatives from the Democratic party to the Republican party." Tr. 1445:4-7. Dr. Ward testified that race has consistently been the best predictor of partisan preference since the end of the Civil War. Tr. 1343:14-25. Dr. Ward explained that racially polarized voting has "been the predominant trend through political eras and political cycles" and even though "Black party preference has shifted dramatically from reconstruction to the present, [] more

454

often than not, that party preference is dramatic and demonstrable." Tr. 1343:17-20.

Moreover, Dr. Ward described how the composition and positions of political parties in Georgia were forged in response to the history of Black political participation. APAX 4, 3, 19-20. Dr. Burch's testimony regarding political science studies of the Black Belt is consistent: "living in Black belt areas with . . . legacies of slavery predict white partisan identification and racial attitudes." APAX 6, 33.

Empirically, Dr. Burton testified about the success of Black candidates in the light of the percentage of white voters in the district.[104] The following chart was displayed during the trial and presents his findings:

_____

[104] Race of a candidate is not dispositive for a polarization inquiry. DeGrandy, 512 U.S. at 1027 ("The assumption that majority-minority districts elect only minority representatives, or that majority-white districts elect only white representatives, is false as an empirical matter. And on a more fundamental level, the assumption reflects the demeaning notion that members of the defined racial groups ascribe to certain minority views that must be different from those of other citizens." (Kennedy, J, concurring in part) (citation omitted)). The Court, however, finds that an assessment of the success of Black candidates in reference to different percentages of white voters, is good evidence that partisanship is not the best logical explanation of racial voting patterns in Georgia.

455

Winning Candidates in 2020 in Georgia House of Representatives

| Percentage white registered voters in district | White Republicans[197] | Black Democrats | White Democrats |
|---|---|---|---|
| Under 40% | 0 | 48 | 7 |
| 40–46.2% | 1 | 3 | 2 |
| 46.2–54.9 | 11 | 1 | 6 |
| 55–62.4% | 23 | 0 | 5 |
| Over 62.4% | 68 | 0 | O |

Winning Candidates in 2020 in Georgia State Senate

| Percentage white registered voters in district | White Republicans | Black Democrats | White Democrats |
|---|---|---|---|
| Under 47% | 0 | 16 | 1 |
| 47–54.9% | 3 | 0 | 3 |
| Over 55% | 51 | 0 | 0 |

PX 4, 56 (footnote content omitted).

Clearly there is a meaningful difference in Black candidate success depending on the percentage of white voters in a district. When the white voter

_____

Cf. Johnson, 196 F.3d at 1221–22 ("We do not mean to imply that district courts *should* give elections involving [B]lack candidates more weight; rather, we merely note that in light of existing case law district courts may do so without committing clear error.").

percentage is lowest, Black Democratic candidates have the most success. This effect inverts as the percentage of white voters increases, culminating in *no* Black Democrat candidate success (regardless of party) when the white voter percentage reaches 47% (for the State Senate) or 55% (for the State House). PX 4, 56. These findings are consistent with Dr. Palmer's unrebutted findings about the challenged districts: Black voters voted for the same candidate, on average, 98.4% of the time and white voters voted for a different candidate, on average, 87.6% of the time. Stip. ¶¶ 219, 223.

In contrast to this evidence, Defendants' expert, Dr. Alford, provided the Court with data from the most recent Republican primary election where Herschel Walker was a candidate and received 60% of both Black and white voters votes. DX 8, 9 & tbl. 1; Tr. 2209:3–13. He qualified that the number of Black voters who voted in the Republican primary was small, therefore, he could not conclude that Mr. Walker was the Black-preferred candidate. Tr. 2237:18–19. But rather, the data showed that white voters did not vote as a bloc to defeat Walker's candidacy. Tr. 2237:19–21. His remaining analysis involved descriptive conclusions based on Dr. Handley's data set and, most importantly, did not offer

additional support for a conclusion that voter behavior caused by partisanship rather than race. See generally DX 8.

In light of the foregoing evidence, the Court finds that Senate Factor Two weighs heavily in favor of finding a Section 2 violation.

### (4)    Senate Factor Five: [105] socioeconomic disparities

Senate Factor Five considers socioeconomic disparities between Black and white voters and these disparities' impact on Black voter participation. The Eleventh Circuit recognized in binding precedent that "disproportionate educational, employment, income level, and living conditions arising from past discrimination tend to depress minority political participation.'" Wright, 979 F.3d at 1294 (quoting Marengo Cnty. Comm'n, 731 F.2d at 1568). "Where these conditions are shown, and where the level of black participation is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." Id. (quoting

_____

[105] Senate Factor Four—a history of candidate slating—is not at issue because Georgia does not use a slating process. Alpha Phi Alpha Fraternity, Inc, 587 F. Supp. 3d at 1317.

Marengo Cnty., 731 F.2d at 1568-69); Dallas Cnty. Comm'n, 739 F.2d at 1537 ("Once lower socio-economic status of [B]lacks has been shown, there is no need to show the causal link of this lower status on political participation.")).

### (a)    Black voter participation

The Court finds that the Alpha Phi Alpha Plaintiffs have shown that Black voters have lower voter turnout rates than white voters. Dr. Burch testified that in the 2020 statewide general election that white voters had a turnout rate of 67.4%. Tr. 1051:7–12. Depending on whether she calculated the voting age population for SR Black[106] or Black alone and in combination[107], or registered Black voter turnout[108] ranged between 53.7% to 55.8%. Meaning, that that the disparity between white and Black voter turnout ranged from 11.6 to 13.7%. APAX 6, 6–7; Tr. 1051:7–18. Specifically, in the metro Atlanta clusters, Dr. Burch calculated that in the 2020 election, the east Atlanta cluster had a voter turnout

---

[106] Voter turnout for SR BVAP is 55.8%. APAX 6, 6–7. The white voting age population's turnout rate was 67.4%; thus, there was a 11.6% turnout gap. Id.; Tr. 1051:13–16.

[107] Voter turnout for SR BVAP is 53.7%. APAX 6, 6–7. The white voting age population's turnout rate was 67.4%; thus, there was a 13.7% turnout gap. Id.

[108] Black registered voter turnout was 60.0% and white registered voter turnout was 72.6%; thus, there was a 12.6% turnout gap. Id.; Tr. 1051:16–18.

gap between 11.8% and 14.6%, the southwest Atlanta cluster had a voter turnout gap between 9.2% and 12.4%, and southeast Atlanta cluster had a voter turnout gap between 10.1% and 13.0%. APAX 6, 10 & figs. 1–3.

In the 2022 general election, again, statewide white voter turnout exceeded Black voter turnout between 11.1% and 13.3%.[109] Tr. 1052:6–13. Dr. Burch determined that the turnout gap also persisted across the county clusters at issue in this case for both 2020 and 2022 general election data. Tr. 1051:22-1052:2 ("So with respect to the county clusters, I saw a pretty sizable turnout gap in 2020 for almost all of the county clusters that I analyzed no matter how I calculated it. And I think the lowest gap was I think – in 2020 was 8.9 percentage points. So even with those county clusters it was a sizable gap."); id. at 1052: 16-18 ("Again, in 2022, we still see gaps even in all of the turnout clusters—in all of the county

_____

[109] Voter turnout for SR BVAP was 42.3%. APAX 6, 10. The white voting age population's turnout rate was 53.4%; thus, there was a 11.1% turnout gap. Id. Voter turnout for SR BVAP was 41.4%. Id. The white voting age population's turnout rate was 53.4%; thus, there was a 12.0% turnout gap. Id. Black registered voter turnout was 45.0% and white registered voter turnout was 58.3%; thus, there was a 13.3% turnout gap. Id.

clusters, Black voters still vote less than white voters in those clusters.")[110]; APAX 6, 7–10, 11–13.

Defendants did not put forth rebuttal evidence contesting that Black voter participation in the political process was lower than white voters. Defendants also did not challenge or rebut the accuracy of Dr. Burch's findings on voter turnout, but rather questioned the choices that she made when considering which elections to consider and what counties were included in which clusters. Tr. 1106:16–1115:6. On cross-examination, Defendant did not rebut that there is a voter turnout gap between white and Black voters in Georgia.

The Court also understands Defendant to argue that Black voter turnout is, at least, in part motivated by voter excitement for the candidate. Tr. 1114:1–22. The Court is not persuaded by this argument. Even assuming that Defendant's theory of voter mobilization could be a valid legal argument rebutting statistical

---

[110] Specifically, in the metro Atlanta clusters, Dr. Burch calculated that in the 2022 election, the east Atlanta cluster had a voter turnout gap between 10.8% and 13%, the southwest Atlanta cluster had a voter turnout gap between 3.2% and 9.1%, and southeast Atlanta cluster had a voter turnout gap between 5.7% and 10.1%. APAX 6, 11–13 & figs. 4–6.

461

evidence of depressed Black voter turnout, Defendants submitted no evidence connecting lower Black voter turnout to a lack of motivation to vote. Some nonempirical testimonial evidence on cross examination that the candidates on a ballot impact voter turnout is insufficient to rebut the expert statistical evidence presented by the <u>Alpha Phi Alpha</u> Plaintiffs that Black voter turnout is, on the whole and across elections, disproportionately lower than white voter turnout, and that Black voters participate less in the political process than white voters. Thus, the Court concludes that the <u>Alpha Phi Alpha</u> Plaintiffs submitted evidence that Black Georgians participate in the political process, both generally and in voter turnout, less than white voters.

### (b)   <u>socio-economic disparities</u>

The Court also concludes that there is sufficient evidence in the Record to show disproportionate educational, employment, income level, and living conditions arising from past discrimination. Black Georgians suffer disparities in socioeconomic status, including in the areas of education, employment, and income. APAX 6, 13-21. As Defendant acknowledged, with respect to "[s]ocioeconomic disparities[,] I don't think you'll find a lot of disagreement from

462

the parties here. The census numbers are what they are." Tr. 49:4-6. According to Census estimates, the unemployment rate among Black Georgians is 8.7% and the unemployment rate among white Georgians is 4.4%. Stip. ¶ 342.

The Census estimates that 21.5% of Black Georgians are living below the poverty compared to 10.1% of white Georgians. Stip. ¶ 344. Black Georgians also receive SNAP benefits at a higher rate than white Georgians, with 22.7% of Black Georgians receiving SNAP benefits compared to 7.7% of white Georgians. Id. ¶ 345.

According to Census estimates, 13.3% of Black adults in Georgia lack a high school diploma, compared to 9.4% of white adults in Georgia. Stip. ¶ 346. 35% of white Georgians over the age of 25 have obtained a bachelor's degree or higher, compared to only 24% of Black Georgians over the age of 25. Id. ¶ 347. The rate of poverty for Black Georgians is more than twice that of white Georgians. Tr. 1059:2-4. The median income for Black Georgian households is about $25,000 less than that of white Georgian households. Tr. 1059:4–6. Black Georgians experience poverty rates more than double those of white Georgians. APAX 6, 19.

Black Georgians fare worse than white Georgians in terms of various health outcomes, such as infant mortality, hypertension, diabetes, obesity, overall mortality rates, and cancer. APAX 6, 31–33; Tr. 1063:22-1064:7. Black Georgians between the age of 19-64 years old are more likely to lack health insurance than white Georgians in the same age demographic, which affects access to health care and health outcomes. APAX 6, 32; Tr. 1064:11-16.

The Court concludes that the Alpha Phi Alpha Plaintiffs have adduced sufficient evidence to show that socio-economic disparities between white and Black Georgians, where Black Georgians are generally impacted more negatively than white Georgians on a number of metrics.

### (c)     conclusions on Senate Factor Five

Under binding precedent, the Alpha Phi Alpha Plaintiffs have proven that rates of Black voter political participation are depressed as compared to white voters participation. The aforementioned evidence also shows that Black Georgians suffer from significant socioeconomic disparities, including educational attainment, unemployment rates, income levels, and healthcare access. When both of these showings have been made, the law does not require a

464

causal link be proven between the socioeconomic status and Black voter participation. Wright, 979 F.3d at 1294.[111] Accordingly, the Court concludes that the socioeconomic evidence and the lower rates of Black voter participation support a finding that Senate Factor Five weighs heavily in favor of a Section 2 violation.

### (5)   Senate Factor Six: racial appeals in Georgia's political campaigns

Senate Factor Six "asks whether political campaigns in the area are characterized by subtle or overt racial appeals." Wright, 979 F.3d at 1296. Courts have continually affirmed district courts' findings of "overt and blatant" as well as "subtle and furtive" racial appeals. Gingles, 478 U.S. at 40; see also Allen, 599 U.S. at 22–23. However, in the Alabama district court proceedings, preceding the Allen appeal, the trial court assigned less weight to the evidence of racial appeals because the plaintiffs had only shown three examples of racial appeals in recent campaigns, but did not submit "any systematic or statistical evaluation of the

_____

[111] While not required as a matter of law, as a matter of social science, Dr. Burch's report indicates that the academic literature demonstrates a strong and consistent link between socioeconomic status and voter turnout. Tr. 1055:4–10.

465

extent to which political campaigns are *characterized* by racial appeals" and thus the court could not be evaluate if these appeals "occur frequently, regularly, occasionally, or rarely." Singleton, 582 F. Supp. 3d at 1024 (emphasis added).

Similarly here, the Court finds that there is evidence of isolated racial appeals in recent Georgia statewide campaigns. However, there is no evidence for the Court to determine if these appeals *characterize* political campaigns in Georgia. Thus, while the Alpha Phi Alpha Plaintiffs submitted evidence of discrete instances[112] in recent elections where racial appeals were invoked—

---

[112] The Alpha Phi Alpha Plaintiffs have provided the following evidence of racial appeals used in recent Georgia elections across the past few election cycles:

In the 2018 gubernatorial election, then-Secretary of State Kemp, (now twice-elected Governor) used a social media campaign to associate Stacey Abrams with the Black Panther Party and ran a commercial advertisement where he discussed rounding up illegal immigrants in his pickup truck. APAX 2, 38; Tr. 1364:12–16.

In the 2020 U.S. Senatorial election, then-Senator Kelly Loeffler ran a campaign ad against "a dangerous Raphael Warnock," whose skin had been darkened, and who was also associated with communism, protests, and civil unrest. Tr. 1193:19–1195:5; APAX 31; APAX 2, 39.

In 2022, during the senatorial race between Senator Warnock and Herschel Walker, Mr. Walker ran an advertisement that aimed to distinguish "between the Black candidate and himself" as the Republican candidate, in order to "associate himself with the white voter [and] mak[e] the Black candidate look menacing and problematic . . . ."

466

which is "some evidence" of political campaigns being characterized by racial appeals — the Court cannot meaningfully evaluate whether these appeals "occur frequently, regularly, occasionally, or rarely" and thereby does not afford great weight to this factor. Singleton, 582 F. Supp. 3d at 1024.

### (6)   *Senate Factor Seven: minority candidate success*

Senate Factor Seven "focuses on 'the extent to which members of the minority group have been elected to public office in the jurisdiction.'" Wright, 979 F.3d at 1295 (quoting LULAC, 548 U.S. at 426). Unlike the second and third Gingles preconditions, the Court now must specifically look at the success of *Black* candidates, not just the success of Black preferred candidates. Assessing the results of Georgia's recent elections, the Court finds that Black candidates have achieved little success, particularly in majority-white districts.

---

Tr. 1198:9–1199:4; APAX 2, 43–44.

Also in 2022, in the Republican primary for governor, former Senator David Purdue stated in an interview, that Abrams was "demeaning her own race" and to let her "go back where she came from." APAX 2, 38 (quoting Reid J. Epstein, "David Perdue Makes Racist Remarks about Stacey Abrams as He Ends a Lackluster Campaign, N.Y. Times, (May 23, 2022), https://www.nytimes.com/2022/05/23/us/politics/david-perdue-staceyabrams-racist-remarks.html.).

467

As a population, Black Georgians have historically been and continue to be underrepresented by Black elected officials across Georgia's statewide offices. Georgia has never elected a Black governor (Stip. ¶ 349) and Black candidates have otherwise only had isolated success in statewide partisan elections in the last 30-years. Specifically, in 2000, David Burgess was elected Public Service Commissioner, in 2002 and 2006 Mike Thurmond was elected to Labor Commissioner, and in 1998, 2002, and 2006 Thurbert Baker was elected Georgia Attorney General.[113] Stip. ¶ 361. Most recently, after 230 years of exclusively white Senators, Senator Raphael Warnock was twice elected to U.S. Senate and in his most recent election he defeated a Black candidate. APA Doc. No. [284], 11. Finally, nine Black individuals have been elected to statewide nonpartisan office in Georgia. Stip. ¶ 362.

In Georgia's congressional elections, only 12 Black candidates have ever been elected to the Congress. Tr. 1201:1–5. Five Black individuals serve in the

_____

[113] The Court takes judicial notice of the specific elections that each candidate successfully won. See Scott, 2019 WL 4200400, at *3 n. 4 (taking judicial notice of the publicly filed election results); see also n.65 *supra*.

468

United States House of Representatives from Georgia's current congressional districts. Stip. ¶ 359. Four of these Black congresspersons are elected in majority-Black districts. PX 1, K-1. The other Black Representative, congresswoman Lucy McBath, represents Congressional District 7.

In State legislative districts, the Georgia Legislative Black Caucus has only 14 members in the Georgia State Senate (25%) and 41 members in the Georgia House of Representatives (less than 23%).[114] Stip. ¶ 348. As incorporated in the Alpha Phi Alpha case, Dr. Burton's testimony referred to the 2020 and 2022 legislative elections, where Black candidates had little to no success when they did not make up the majority of a district.[115] Specifically, Black candidates in the 2020 legislative elections did not have any success when they did not make up at least 45.1% of a House District or 53.8% of a Senate District.

---

[114] The Enacted Senate Plan contains 14 majority-Black districts. Stip. ¶¶ 176, 186; APAX 1, M-1. The Enacted House Plan contains 49 majority-Black districts. Stip. ¶¶ 183, 186, APAX 1, Z-1.

[115] Erick Allen was elected to Georgia House District 40 in 2018 and re-elected in 2020, even though House District 40 was not a majority-Black district in 2018 or 2020. Tr. 1012:2–12.

469

Winning Candidates in 2020 in Georgia House of Representatives

| Percentage white registered voters in district | White Republicans[197] | Black Democrats | White Democrats |
|---|---|---|---|
| Under 40% | 0 | 48 | 7 |
| 40–46.2% | 1 | 3 | 2 |
| 46.2–54.9 | 11 | 1 | 6 |
| 55–62.4% | 23 | 0 | 5 |
| Over 62.4% | 68 | 0 | O |

Winning Candidates in 2020 in Georgia State Senate

| Percentage white registered voters in district | White Republicans | Black Democrats | White Democrats |
|---|---|---|---|
| Under 47% | 0 | 16 | 1 |
| 47–54.9% | 3 | 0 | 3 |
| Over 55% | 51 | 0 | 0 |

PX 4, 56.

Although the Court finds that Black candidates have achieved some success in statewide elections following 2000, the Court ultimately concludes Senate Factor Seven weighs heavily in favor of the Alpha Phi Alpha Plaintiffs. The Supreme Court in Gingles, when discussing the success of a select few Black

470

candidates, cautioned courts in conflating the success of a few minority candidates as dispositive. Gingles, 478 U.S. at 76.

In short, since Reconstruction, Georgia has only elected *four* Black candidates in statewide partisan elections: Mike Thurmond, Thurbert Baker, David Burgess, and Raphael Warnock. Stip. ¶ 361. For statewide non-partisan elections, Georgia has elected nine successful Black candidates: Robert Benham, Leah Ward-Sears, Harold Melton, Verda Colvin, John Ruffin, Clarence Cooper, Herbert Phipps, Yvette Miller, Clyde Reese. Stip. ¶ 362. Georgia has sent twelve successful Black candidates to the U.S. House of Representatives. Tr. 1201:1–5. Currently, there are 55 members of the Georgia General Assembly that are in Georgia's Legislative Black Caucus (of 236 total members), and all are elected from majority-minority districts. Stip. ¶ 348; APA Doc. No. [284], 8–9. The Court concludes that these isolated successes of Black candidates show that the Black population is underrepresented in Georgia's statewide elected offices. This conclusion is even stronger in majority-white districts.

To be sure, Dr. Burton acknowledged, and even affirmed that some academic scholarship indicates that "the future electoral prospects of African-

American statewide nominees in growth states such as Georgia are indeed promising." Tr. 1470:2–24. The Court likewise is hopeful about the prospects increased enfranchisement of all voters and for the potential success of minority candidates in Georgia. However, Dr. Burton also emphasized that, specifically in Georgia, dating back to Reconstruction increased minority success led to "more legislation from whichever party is in power [to] disenfranchise or at least dilute or make the vote count less." Tr. 1470:14–16. Accordingly, the optimism about Georgia's future elections does not rebut the contrary evidence of the present success of Black candidates; accordingly, the Court finds that Senate Factor Seven weighs heavily in favor of finding a Section 2 violation.

### (7)    Senate Factor Eight: responsiveness to Black residents

Senate Factor Eight considers whether elected officials are responsive to the particularized needs of Black voters. A lack of responsiveness is "evidence that minorities have insufficient political influence to ensure that their desires are considered by those in power." Marengo Cnty. Comm'n, 731 F.2d at 1572. The Eleventh Circuit noted that "although a showing of unresponsiveness might have some probative value a showing of responsiveness would have very little."

472

Id. Alpha Phi Alpha Plaintiffs' expert, Dr. Burch, discussed the existence of significant socioeconomic disparities between Black and white Georgians, which he concluded contributed to the lower rates at which Blacks engage their elected representatives. APAX 6, 36. Id.

The Court cannot from the evidence before it find that its passage was due to the responsiveness or lack thereof to Black voters. There is no evidence that shows that a particular legislator received a complaint about pieces of legislation and ignored it. Accordingly, the Court finds that evidence about legislation is not persuasive.

Dr. Burch also concluded that socioeconomic disparities such as: education, residential conditions, incarceration rates, and healthcare concerns demonstrate that the Georgia legislature is not responsive to the Black community. APAX 6, 34. A number of lay witnesses testified about socioeconomic issues affecting Black voters. Tr. 639:24-640:25, Eric Woods Dep. Tr. 53:8-54:1; Phil Brown Dep.

Tr. 67:12-68:1. [116] However, there is evidence that concerns about healthcare access, education, property taxes, and gun safety are not unique to Black citizens. Tr. 639:24–640:25.

The Court finds that the arguments regarding socioeconomic disparities are not particularly helpful in determining whether Georgia's elected officials are responsive to Black Georgians. The Court finds that although there is evidence about concerns that Black voters have, there is not sufficient evidence that their representatives are not responsive to their needs. [117]

---

[116] The Parties submitted designations, counter designations, and objections to the named Plaintiffs' depositions to the Court prior to the start of the Trial. APA Doc. No. [275], Pendergrass Doc. No. [223], Grant Doc. No. [232]. At the Pretrial Conference, the Parties agreed to the admission of these depositions following the Court's ruling on the objections. APA Doc. No. [285], Pendergrass Doc. No. [274], Grant Doc. No. [247]. The Court issued rulings on the deposition objections and they are part of the Record. APA Doc. No. [292], Pendergrass Doc. No. [243], Grant Doc. No. [254].

[117] The Court notes that Dr. Evans testified that she attempted to call her State Senator, Representative, and county commissioner about redistricting concerns and her calls were generally unanswered. Tr.637:7–19. The Court acknowledges that Dr. Evans's representatives were unresponsive in this instance; however, the Court cannot extrapolate from this isolated occurrence that, as a whole, Georgia's elected officials are unresponsive to Black voters.

474

Ultimately, there is an absence of evidence regarding the level of responsiveness of Georgia's elected representatives to Black voters and white voters. Due to the lack of evidence, the Court finds that Senate Factor Eight does not weigh in favor of finding a Section 2 violation. See Greater Birmingham Ministries, 992 F.3d at 1334 (finding that failure to consider amendments to a particular piece of legislation does not show that legislatures were unresponsive to the needs of minority voters).

### (8) Senate Factor Nine: justification for the Enacted Congressional Plan

The Court finds that the State's justification for the Enacted State Legislature Plans factor favors Defendants and thus weighs against finding a Section 2 violation.

At the trial, Ms. Wright testified that the Enacted Congressional Plan began with the creation of a blank map that largely balanced population that then could be modified based on input from legislators. Tr. 1622:11–13. Ms. Wright also relied on information obtained from the public hearings on redistricting. Tr. 1668:24–1670:5. Political performance was an important consideration in the design of the Enacted Congressional Plan. Tr. 1669:20–23. In Enacted CD-6

specifically, Ms. Wright justified that the four-way split of Cobb Count by asserting that Cobb County was better able to handle a split of a congressional district than a smaller nearby county. Tr. 1672:9–1673:4. She further testified that the inclusion of parts of west Cobb County in Enacted CD-14 was because of population and political considerations, namely putting a democratic area into District 14 instead of District 11 (which was more political competitive). Tr. 1674:6–1675:2.

Similarly, for the Enacted House Plan, Ms. Wright started with a blank map and the ideal district size given the population changes. Tr. 1642:7–23. Initially, she did not consider incumbency and instead drew a map based solely on population. Tr. 1642:15–18. Ms. Wright then integrated information from public hearings regarding the public's preferences. Tr. 1643–46. In the Macon-Bibb area, specifically, she testified that there were comments about wanting to keep House Districts 142 and 143, majority-Black districts, in Macon-Bibb because the representatives were well-liked in the community. Tr. 1659:6–15. Eventually, she drafted the maps to avoid incumbency pairings and county splits. Tr. 1448:9–21. Ms. Wright testified that the growth in Georgia was concentrated

476

in the north (i.e., metro-Atlanta), which caused districts to be moved from the south into that area. Tr. 1469:16–19. Again, political performance was an important consideration in drafting the Enacted State House Plan. Tr. 1468:5–8.

The Alpha Phi Alpha Plaintiffs do not challenge that this is the process the State used to draw the Enacted Legislative Plans. Accordingly, the Court finds Defendants' evidence that the Enacted Legislative Plans were drawn to further partisan goals to be a sufficient, non-tenuous justification. Accordingly, Senate Factor Nine does not weigh in favor of a Section 2 violation.[118]

### (9)   *Proportionality*

Finally, the Court determines that proportionality does not weigh against finding a Section 2 violation in the Alpha Phi Alpha Plaintiffs' case. Currently, 25% of the State Senate and 27.2% of the State House elect members from majority-Black districts and the AP Black population is 33.03% of the State. APAX 1 ¶¶ 15, 17, 41

---

[118] As in the Pendergrass case, however, this factor will be accorded less weight given that, in Alpha Phi Alpha Plaintiffs' Section 2 case, a legislature's intent in drawing map is irrelevant.

477

Defendant argued, however, that Black voters have proportional representation in the General Assembly because 43% of the State House and 41% of the State Senate are Democrats, which is the Black-preferred candidate. Tr. 36:16–23. The Court categorically rejects Defendant's argument. First, the Court finds that there is no empirical evidence to suggest that every Democrat member of the General Assembly is a Black-preferred candidate.[119] This suggestion, absent supporting empirical evidence, leans dangerously close to "the demeaning notion that members of the defined racial group ascribes to certain minority views that must be different from those of other citizens." <u>DeGrandy</u>, 512 U.S. at 1027.

Furthermore, the number of Black-preferred candidates who are successfully elected is not the proper consideration for proportionality. As the Court's summary judgment order in the <u>Pendergrass</u> case reflects, the proper metric for determining proportionality is the number of majority-Black districts

---

[119] Although the Black-preferred candidate in all of the races examined by Dr. Handley were Democrats, Dr. Handley's research was confined to specific areas of the State and she did not evaluate whether all current Democrat members of the General Assembly were the Black-preferred candidate. Stip.  ¶¶ 309–15.

478

in proportion to the Black population, *not* the number of Black-preferred candidates elected. <u>Pendergrass</u> Doc. No. [215], 72; <u>see also</u> <u>De Grandy</u>, 512 U.S. at 1014 n.11 ("'Proportionality' as the term is used here links the number of majority-minority voting districts to minority members' share of the relevant population . . . This proviso speaks to the success of minority candidates, as distinct from the political or electoral power of minority voters.").

Here, therefore, the relevant numbers to consider in the proportionality analysis are the number of majority-minority districts in the Enacted Legislative Plans. Only 25% of the State Senate districts are majority-Black (14 districts of 56 districts total). APAX 1 ¶ 15. In the State House, 27.2% of the districts are majority-Black (49 districts of the 180 districts total).[120] APAX 1 ¶ 17. The <u>Alpha Phi Alpha</u> Plaintiffs' additional two State Senate districts that survive the <u>Gingles</u> preconditions bring the proportion of majority-Black Senate districts only to 28.6% of the total districts.[121] And the <u>Alpha Phi Alpha</u> Plaintiffs' additional one

---

[120] However, the Georgia Legislature's Black Caucus has only 41 members in the State House. Stip. ¶ 348.

[121] 16/56 = approximately 28.6%.

House district similarly only increases the proportion of majority-Black districts to be 27.8% of the total.[122] These proportions fall below both the AP Black population in the State (33.03% (Stip. ¶ 97)) and the AP Black voting age population (31.73% (Stip. ¶ 104)). Thus, proportionality is not achieved in the State House or State Senate, under the Enacted Plan or with the addition of two State Senate districts and one State House district. Thus, the Court concludes that proportionality does not weigh against the Alpha Phi Alpha Plaintiffs.

### (10) Conclusions of law

The Court finds that the Alpha Phi Alpha Plaintiffs have met their burden in establishing that (1) the Black community in south-metro Atlanta is sufficiently numerous and compact to constitute two additional majority-Black Senate districts and one additional majority-Black House district; (2) the Black community is politically cohesive in this area; and (3) that the white majority votes as a bloc to typically defeat the Black communities' preferred candidate in these areas. The Court also finds that in evaluating the Senate Factors, Georgia's

---

[122] 50/180 = approximately 27.8%

480

electoral system is not equally open to Black voters in these regions of the State. Specifically, the Court finds that Senate Factors One, Two, Three, Five, and Seven weigh in favor of showing the present realities of a lack of opportunity for Black voters. The Court also finds that Senate Factor Six weighs slightly in favor finding a Section 2 violation. Thereby, only Senate Factors Four, Eight[123] and Nine did not weigh in favor of finding a Section 2 violation. The Court also found that proportionality does not weigh against the Alpha Phi Alpha Plaintiffs. In sum, the Court finds that a majority of the totality of the circumstances evidence weighs in favor of finding a Section 2 violation in the proposed districts in metro Atlanta. Because the Alpha Phi Alpha Plaintiffs have carried their burden of proof on all of the legal requirements, the Court concludes that SB 1EX and HB 1EX violate Section 2 of the Voting Rights Act.

---

[123] Senate Factor Eight is given little weight. Marengo Cnty. Comm'n, 731 F.2d at 1572.

481

### b)   Grant

#### (1)   *Totality of circumstances inquiry standards and incorporation of the Pendergrass Case's Analysis on Senate Factors One, Three, Five*[124], *Six, Seven, and Eight*

The standards governing the Court's totality of the circumstances inquiry are the same in Grant Plaintiffs' case as they were in Pendergrass Plaintiffs' case. See Section II(C)(4) *supra*. Hence, the Court considers the aforementioned Senate Factors to determine if Grant Plaintiffs met their burden to show that the political process is not equally open to minority voters in Georgia.

Moreover, the totality of the circumstances evidence in both the Pendergrass case and the Grant case is largely the same. The expert reports

---

[124] The evidence on Senate Factor Five is largely the same for the Atlanta and Macon-Bibb region. However, Dr. Collingwood did provide specific evidence that **he** concluded that the "trend" in the Black Belt region "is very similar to the overall statewide trend for both the 2020 and 2022 general elections." Rep at 20. Dr. Collingwood furthermore determined that "whites vote at higher rates than [ ] Blacks in the clear majority of the precincts." Rep at 22. These findings are consistent with his findings in the metro Atlanta region where Black voters, generally, had lower turnout rates than white voters. Accordingly, the Court finds that Senate Factor Five weighs in favor of a Section 2 violation in Macon-Bibb region with the same force as the districts in the metro Atlanta region.

submitted (i.e., Dr. Burton[125] and Dr. Collingwood[126]) are identical in the two cases. At trial, <u>Pendergrass</u> Plaintiffs and <u>Grant</u> Plaintiffs simultaneously questioned and cross-examined the totality of circumstances witnesses. For a number of the Senate Factors, moreover, the evidence submitted would be considered by the Court in an identical manner. Accordingly, to avoid needless duplication, the Court hereby incorporates *in toto* its analysis in the <u>Pendergrass</u> case, *supra*, on Senate Factors Three, Five[127], Six, Seven, and Eight.[128]

The Court also incorporates Senate Factor One, <u>see</u> Section II(C)(4)(a) *supra*, with the following alterations to its analysis regarding polling place closures:

_____

[125] In <u>Pendergrass</u>, Dr. Burton's report is designated PX 4. In <u>Grant</u>, it is designated GX 4. The report's content and page numbers, however, do not change between the cases.

[126] In <u>Pendergrass</u>, Dr. Collingwood's report is designated PX 5. In <u>Grant</u>, it is designated GX 5. Again, the content and pages numbers in the report are identical in the cases.

[127] As noted in the <u>Pendergrass</u> case, for Senate Factor Five's consideration of minority voter participation in the political process, in 2022, voter turnout in Clayton, Henry, and Rockdale counties "slightly exceeded" white voter turnout. GX 5, 16. While these counties are directly implicated in the districts satisfying the <u>Gingles</u> preconditions in <u>Grant</u> Plaintiffs' Illustrative plan, the Court does not find this "slight" evidence to outweigh the strong evidence otherwise that Black Georgians participate less than white Georgians in the political process. <u>See</u> Section II(C)(4)(d) *supra*.

[128] Again, Senate Factor Four—a history of candidate slating for elections—is not at issue because Georgia's elections do not use a slating process.

With respect to the legislative districts in the metro Atlanta region, the Court in <u>Pendergrass</u> credited Dr. Burton's findings discussing polling place closures in Union City, Georgia. GX 4, 51. Union City, Georgia is located in the southwestern portion of the Fulton County. Both Esselstyn HD-64, and SD-28 have portions of their districts that are in southwest Futon County. GX 1 ¶ 31 & fig.7; ¶ 49 & fig.14. Unlike Illustrative CD-6, which clearly shows city designations, Esselstyn HD-64 and SD-28 do not delineate which cities are contained within a specific district. <u>Compare</u> PX 1 ¶ 46 & fig.10, <u>with</u> GX 1 ¶ 31 & fig.7; ¶ 49 & fig.14. Thus, the Court will not rely on the specific evidence of polling place closures in Union City as evidence of discrimination in the specific districts. However, this evidence is relevant because it shows disproportionate impact of polling place closures in the vicinity of the illustrative districts. Thus, the evidence of the polling place closures in Union City is relevant, but less persuasive with respect to Mr. Esselstyn's Atlanta districts then it was with respect to Illustrative CD-6.

484

The Court also finds that there is evidence that 38% of the State's polling places are in metro Atlanta, meanwhile nearly half of Georgia's voters and the majority of Black voters are registered to vote in metro Atlanta. GX 4, 51.

In the Macon-Bibb region, Dr. Burton discusses the number of polling places dropping in Macon-Bibb county from forty to thirty-two. GX 4, 49. These closures took place in primarily Black neighborhoods. Id. He also cites to a 2020 study that found that "about two-thirds of the polling places that had to stay open late for the June primary to accommodate waiting voters were in majority-Black neighborhoods, even though they made up only about one-third of the state's polling places." GX 4, at 50 (citing Fowler, "Why Do Nonwhite Georgia Voters Have to Wait in Line for Hours?"). Defendants did not rebut this evidence.

The Court finds that a reasonable inference can be drawn to find that within the last decade that polling place closures, like those in Macon-Bibb County disproportionately impacted Black voters. Macon-Bibb closed 20% of their polling places, primarily in majority-Black neighborhoods. Also, in the June 2020 primary, polling places that were in predominately Black neighbors disproportionately were forced to stay open late.

485

Accordingly, the Court finds that there is evidence supporting the reasonable inference that the large number of closed polling places in the metro Atlanta and the Macon-Bibb regions disproportionately impacts Black voters. Thus, the Court finds that the evidence of polling place closures supports a conclusion that there are present realities of discrimination in voting for Senate Factor One.

The Court will separately address Senate Factors Two (racial polarization) and Nine (justification for the Enacted State House and Senate Plans) as well as the proportionality analysis, because the evidence presented on these factors differ, even if ever-so-slightly, between the cases. Ultimately, like in the Pendergrass case, the Court concludes that the totality of the circumstances inquiry weighs in favor of finding a Section 2 violation in the Grant Plaintiffs' case.

### (2)    *Senate Factor Two: racial polarization*

The evidence presented in Grant Plaintiffs' case on racial polarization again draws on the *cause* of polarization: race or partisanship. Defendants have consistently argued that partisanship is a race-neutral explanation for

486

polarization of voters in Georgia. See, e.g., Tr. 2410:18–2411:14. Like in the Pendergrass case, the Court acknowledges that whether voter polarization is on account of partisanship and race is a difficult question to answer and again the Court focuses on the evidence before it of polarization in the Grant Plaintiffs' case. See Section II(C)(4)(b) *supra*.

Grant Plaintiffs' polarization expert indicated that "there is . . . strong evidence of racially polarized voting within the districts comprising the five focus areas [(i.e., the areas near-and-around the proposed Illustrative districts)]." GX 2 ¶ 19; see also id. ("There is consistent evidence of racially polarized voting in every House district analyzed, and in 12 of the 14 Senate districts. Voting is generally less polarized in Senate District 44, and not polarized in Senate District 39.").

In addressing Defendants' polarization argument, Plaintiffs also offered testimony about the strong connection between race and partisanship as it

487

currently exists in Georgia.[129] Tr. 424:5–8 (affirming that "race and party cannot be separated for the purpose of [Dr. Palmer's] racial polarization analysis"); 1460:11–15 ("[O]ne party is highly supporting . . . issues that are most important to minorities, particularly African Americans. And another party is not getting a good grade on how they're voting for them."); GX 4, 75–76 (indicating the "opposing positions that members of Georgia's Democratic and Republican parties take on issues inexplicably linked to race.").

In contrast to <u>Grant</u> Plaintiffs' evidence, Defendants' expert, Dr. Alford, only rendered descriptive conclusions based on Dr. Palmer's data set and, most importantly, did not offer additional support for a conclusion that voter behavior was caused by partisanship rather than race. DX 8. To be sure, Defendants did not offer any quantitative or qualitative evidence to support their theory that partisanship, not race, is controlling voting patterns in Georgia. Based on this

---

[129] The Court also finds Dr. Burton's assessment that the success of Black candidates depends on the percentage of white voters in a district to be persuasive in <u>Grant</u> Plaintiffs' case on this Senate Factor. <u>See</u> <u>supra</u> <u>Pendergrass</u>.

evidence, the Court finds that Senate Factor Two weighs in favor of finding a Section 2 violation.

### (3)   Senate Factor Nine: justification for the Enacted Legislative Plans

The Court finds that the State's justification for the Enacted State Legislature Plans factor weighs in favor of Defendants and thus weighs against finding a Section 2 violation.

At the trial, Ms. Wright testified that she began drawing the Enacted Senate Plan by determining the new ideal district size given the population changes and then starting with a blank map. Tr. 1621. She used a visual layer of existing districts in an attempt to retain the core districts. Tr. 1621. From here, Ms. Wright collapsed and built districts based on the population changes. Tr. 1623. She did not pair incumbents seeking reelection and avoided county splits. Tr. 1627. She tried to accommodate elected officials' requests. Tr. 1631. Admittedly, political performance was an important consideration in drafting the Enacted State Senate Plan. Tr. 1626.

Similarly, for the Enacted House Plan, Ms. Wright started with a blank map and the ideal district size given the population changes. Tr. 1641. Initially,

489

she did not consider incumbency and instead drew a map based solely on population. Tr. 1641. Ms. Wright then integrated information from public hearings regarding the public's preferences. Tr. 1643–46. In the Macon-Bibb area, specifically, she testified that there were comments about wanting to keep House districts 142 and 143, majority-Black districts, in Macon-Bibb because the representatives were well-liked in the community. Tr. 1658:6–15. Eventually, she drafted the maps to avoid incumbency pairings and county splits. Tr. 1467. Ms. Wright testified that the growth in Georgia was concentrated in the north (i.e., metro-Atlanta), which caused districts to be moved from the south into that area. Tr. 1468. Again, political performance was an important consideration in drafting the Enacted State House Plan. Tr. 1467.

Grant Plaintiffs do not contest Ms. Wright's testimony on the process the State used to draw the Enacted maps and the Court has found Ms. Wright to be highly credible. Accordingly, the Court finds Defendants' evidence that the Enacted State House and Senate Plans were drawn to further partisan goals to be

490

a sufficient, non-tenuous justification. Accordingly, Senate Factor Nine does not weigh in favor of a Section 2 violation.[130]

### (4)    Proportionality

Finally, the Court determines that, even more so than in Pendergrass Plaintiffs' case, proportionality does not weigh against finding a Section 2 violation in Grant Plaintiffs' case. In the Grant case, Defendants focus on the representation of Black *preferred* candidates as part of their proportionality analysis, submitting that both of Georgia's U.S. Senators are Black-preferred (and one himself is Black) and that 35.7% of the U.S. House of Representatives from Georgia are Black and Black-preferred. In the Georgia General Assembly, 43% of the members of the House of Representatives are Black-preferred (i.e., Democrats) and 41% of the Senators are Black-preferred (i.e., Democrats).

The argument about proportionality and the evidence submitted relate equally to Alpha Phi Alpha and Grant. Accordingly, the Court incorporates its analysis of proportionality in Alpha Phi Alpha (Section II(D)(4)(a)(9)) as fully set

---

[130] As in the Pendergrass case, however, this factor will be accorded less weight given that, in Grant Plaintiffs' Section 2 case, a legislature's intent in drawing map is irrelevant.

491

forth herein. Ultimately, the Court concludes that proportionality does not weigh

against a Section 2 violation in the <u>Grant</u> Plaintiffs' case.

### (5)    Conclusions of Law

The Court finds that <u>Grant</u> Plaintiffs have met their burden in establishing

that (1) the Black community in the western-Atlanta metro area is sufficiently

numerous and compact to constitute an additional majority-Black House district,

in the Black community in southwestern Atlanta metro area is sufficiently

numerous and compact to create one additional majority-Black House districts

and two additional majority-Black Senate districts, and the Black community in

the Macon-Bibb region is sufficiently numerous and compact to create two

additional majority-Black House districts; (2) the Black community is politically

cohesive in these areas; and (3) that the white majority votes as a bloc to typically

defeat the Black communities' preferred candidate in these areas. The Court also

finds that in evaluating the Senate Factors, Georgia's electoral system is not

equally open to Black voters in these regions of the State. Specifically, the Court

finds that Senate Factors One, Two, Three, Five, and Seven weigh in favor of

showing the present realities of lack of opportunity for Black voters. The Court

492

also finds that Senate Factor Six weighs slightly in favor finding a Section 2 violation. Accordingly, only Senate Factors Four, Eight[131] and Nine did not weigh in favor of finding a Section 2 violation. The Court also found that proportionality does not weigh against <u>Grant</u> Plaintiffs. In sum, the Court finds that a majority of the totality of the circumstances evidence weighs in favor of finding a Section 2 violation in the proposed districts in the metro Atlanta and Macon-Bibb regions. Because <u>Grant</u> Plaintiffs have carried their burden of proof on all of the legal requirements, the Court concludes that SB 1EX and HB 1EX violate Section 2 of the Voting Rights Act.

### E.   <u>Injunction Factors</u>

To obtain a permanent injunction, Plaintiffs must demonstrate (1) that they have suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that, considering the balance of hardships between Plaintiffs and Defendants, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

---

[131] The Eleventh Circuit found that Senate Factor Eight is given little weight. <u>Marengo Cnty. Comm'n</u>, 731 F.2d at 1572.

eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006). "[W]hether a permanent injunction is appropriate . . . turns on whether [Plaintiffs] can establish by a preponderance of the evidence that this form of equitable relief is necessary." Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1182 n.10 (11th Cir. 2007). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." eBay Inc., 547 U.S. at 391. However, the Supreme Court has held that "[a]n injunction should issue only if the traditional four-factor test is satisfied." Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 157 (2010).

### 1.    *Irreparable Harm and Inadequate Remedies at Law*

The Eleventh Circuit has explained that an injury is irreparable "if it cannot be undone through monetary remedies." Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987) (citation omitted). It has also been held that "[a]bridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury." Cardona v. Oakland Unified Sch. Dist., 785 F. Supp. 837, 840 (N.D. Cal. 1992); see also League of Women Voters of N.C. v. North Carolina, 769 F.3d 224,

247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury.") (citations omitted).

In view of this Court's finding, *supra*, that the Enacted Plans violate Section 2 of the Voting Rights Act,[132] this Court further finds that Plaintiffs have met their burden of establishing by the preponderance of the evidence that the resulting injury of having to vote under unlawful plans cannot be undone through any form of monetary or post-election relief. See League of Women Voters, 769 F.3d at 247 ("[O]nce the election occurs, there can be no do-over and no redress."). Defendants also do not contend that adequate legal remedies are available.

### 2. *Balance of Hardships and Public Interest*

The last two requirements for a permanent injunction involve a balancing of the equities between the Parties and the public. eBay Inc., 547 U.S. at 391.

"Where the government is the party opposing the . . . injunction, its interest and harm—the third and fourth elements—merge with the public

---

[132] See generally Section II(D)–(F) *supra*.

495

interest." <u>Florida v. Dep't of Health & Hum. Servs.</u>, 19 F.4th 1271, 1293 (11th Cir. 2021). (citation omitted).[133] All Defendants in each of the cases at issue were named in their official capacities as governmental actors and oppose the permanent injunction. Therefore, the Court will address the third and fourth permanent injunction factors together in a merged format in accordance with applicable authority. <u>See</u> <u>Swain v. Junior</u>, 961 F.3d 1276, 1293 (11th Cir. 2020) (indicating that the balance of the equities and public interest factors "'merge' when, as here, 'the Government is the opposing party'" (quoting <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009))).

───────────────────────

[133] The Court recognizes that the <u>Florida</u> case, cited above, involved a preliminary injunction determination and that a permanent, rather than preliminary injunction is at issue in the cases *sub judice*. Nevertheless, considering the overlapping language in the permanent injunction and preliminary injunction standards (as set forth in the Court's preliminary injunction order), it appears to the Court that this principle of merging the government's interest and harm with the public interest applies equally in the permanent injunction context. <u>See</u> <u>Amoco Prod. Co. v. Vill. of Gambell, AK</u>, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

Thus, the Court proceeds to the issue of whether the threatened injuries to Plaintiffs outweigh the harm that the permanent injunction would cause Defendants and the public.

As an initial matter, the Court notes that Defendants offered little to no evidence or argument at trial regarding what harm, if any, the public would suffer if a permanent injunction were to be issued. The State also offered no evidence or argument of what hardships it would suffer if it was enjoined from using the redistricting plans at issue. However, it is without doubt that the State would have to endure the cost of a special session of the General Assembly to create new redistricting plans. Nevertheless, placing an actual value on the monetary hardship would be a matter of speculation because the State has not specified its anticipated costs.

At the preliminary injunction phase, the State did offer specific evidence of harm and hardship. "More specifically, the evidence at the preliminary injunction hearing showed that elections are complex and election calendars are finely calibrated processes, and significant upheaval and voter confusion can result if changes are made late in the process." Alpha Phi Alpha Fraternity, 587

497

F. Supp. 3d at 1324. This Court found that based upon that evidence "the public interest of the State of Georgia would be significantly undermined by altering the election calendar and unwinding the electoral process at this point." Id. Similar temporal concerns are not at issue at the present stage of these cases.

This Court acknowledges that the Supreme Court has held that court orders affecting elections "can themselves result in voter confusion and consequent incentive to remain away from the polls[,]" and that "[a]s an election draws closer, that risk will increase." Purcell, 549 U.S. at 4–5 (per curiam). But even by issuing an injunction in October 2023 in these three cases, this Court is not "alter[ing] the election rules on the eve of an election" for the Congressional, State House, and Senate districts subject to elections set for November 2024. Republican Nat'l Comm. v. Democratic Nat'l Comm., 598 U.S. ----, 140 S. Ct. 1205, 1207 (2020). Therefore, the risk articulated in the Purcell jurisprudence is de minimis where, as here, the State has not alleged any harm which would result due to a shortly impending election. The Court also notes when the Court inquired as to if there is a "cutoff date" for the Secretary of State to prepare for the 2024 General Election in the event of an injunction, Defense Counsel

498

represented in a pretrial conference call that there is no "magic day." <u>Grant</u> Doc. No. [255], Tr. 16:15–16. Counsel further indicated that to give the "county officials time to get information entered into the voter registration database," the new maps should be in place by "late January, early February." <u>APA</u> Doc. No. [293], Tr. 16:15–22; <u>see also</u> Doc. No. [285], <u>Pendergrass</u>, Doc. Nos. [285], [296], <u>Grant</u> Doc. Nos. [247], [255].

Where, as here, a permanent injunction would require a government defendant merely to comply with federal law, both the balance of hardships between the parties and the public interest weigh in favor of its issuance. <u>See, e.g.</u>, <u>Project Vote/Voting For Am., Inc. v. Long</u>, 813 F. Supp. 2d 738, 744 (E.D. Va. 2011), <u>aff'd and remanded</u>, 682 F.3d 331 (4th Cir. 2012) ("The balance of hardships does not weigh in favor of the defendants, as a permanent injunction will simply compel the defendants to comply with their responsibilities under the NVRA and, thus, will prevent them from denying the public of a statutory right.").

Further, an injunction issued to prevent the continuous denial by the State of a statutorily-guaranteed right is necessarily in the public interest. "[I]t would not be equitable or in the public's interest to allow the state to violate the

requirements of federal law, especially when there are no adequate remedies available." <u>Montana Med. Ass'n v. Knudsen</u>, 591 F. Supp. 3d 905, 917 (D. Mont. 2022) (cleaned up); <u>see also</u> <u>id.</u> (noting that "it is inherently against the public interest" to allow any State's laws to violate federal law).

Congress has also recognized that the public is benefitted when voting rights are enforced. <u>Cf.</u> <u>Torres v. Sachs</u>, 69 F.R.D. 343, 347 (S.D. N.Y. 1975) (construing 42 U.S.C. § 1973l(e), voting rights enforcement proceedings).

Lacking direct evidence of how the State faces a legally cognizable hardship, or how its enjoinment would be contrary to the public interest, the balance of the final two factors weighs in favor of permanently enjoining the State's usage of the redistricting plans at issue in these three cases.

### F.   <u>Affirmative Defenses</u>

In this section, the Court addresses Defendants' affirmative defenses. While these defenses were not specifically argued by Defendants during the bench trial, they were set forth in the Pretrial Order. <u>Grant</u> Doc. No. [243], 26; <u>Pendergrass</u> Doc. No. [231], 28-29; <u>APA</u> Doc. No. [280], 23-24. The affirmative defenses raised in each case are the same: (1) that Eleventh Amendment and

500

sovereign immunity bars these cases, (2) that there is no private right of action under Section 2, (3) that these cases should be heard by a three-judge court, and (4) that to afford the Plaintiffs the requested relief requires interpreting the VRA in a way that violates the Constitution.[134] As notated below, the Court has previously rejected Defendants' affirmative defenses regarding Section 2's private right of action and that a three-judge court is required in these cases. APA Doc. No. [65], 6-34; Grant Doc. No. [43], 7-33; Pendergrass Doc. No. [50], 6-20. The Court now considers each of these affirmative defenses below.

### 1.    *Eleventh Amendment Immunity and Sovereign Immunity*

The Eleventh Amendment to the United States Constitution prohibit suits against a State by a citizen of that State. Hans v. Louisiana, 134 U.S. 1, 10–15 (1890)). Under the Fourteenth and Fifteenth Amendments, however, Congress can abrogate States' sovereign immunity to redress discriminatory state action when Congress unequivocally expresses the intent to do so. Ala. State Conference

---

[134] Defendants also raised affirmative defenses regarding constitutional and statutory standing. Grant Doc. No. [243] at 26; Pendergrass Doc. No. [231] at 28; APA Doc. No. [280] at 23. However, these issues have been addressed above. See Section I(A)*supra*.

of the Nat'l Ass'n for the Advancement of Colored People v. Alabama, 949 F.3d

647, 649–50, 654–55 (11th Cir. 2020), judgment vacated as moot, 141 S. Ct. 2618

(2021) (hereinafter "Alabama NAACP"). The Eleventh Circuit held that the VRA

does just that:

> By design, the VRA was intended to intrude on state sovereignty to eradicate state-sponsored racial discrimination in voting. Because the Fifteenth Amendment permits this intrusion, [the State] is not immune from suit under § 2 of the VRA. Nor is § 2 any great indignity to the State. Indeed, "it is a small thing and not a great intrusion into state autonomy to require the [S]tates to live up to their obligation to avoid discriminatory practices in the election process."

 Id. at 655 (footnote omitted) (second alteration in original) (quoting Marengo

Cnty. Comm'n, 731 F.2d at 1561).

Alabama NAACP also noted that the Fifth and Sixth Circuits, and a three-

judge panel in this district, have reached the same conclusion. Id. at 651 (citing

OCA-Greater Houston v. Texas, 867 F.3d 604, 614 (5th Cir. 2017); Mixon v. Ohio,

193 F.3d 389, 398–99 (6th Cir. 1999); Ga. State Conf. of NAACP v. Georgia, 269 F.

Supp. 3d 1266, 1274-75 (N.D. Ga. 2017)).

502

Of course, the Court recognizes that <u>Alabama NAACP</u> is no longer controlling because the judgment was ultimately vacated as moot. <u>Ala. State Conf. of the NAACP</u>, 141 S. Ct. 2618. Nevertheless, the analysis contained in the opinion is persuasive. <u>See, e.g.</u>, <u>Friends of the Everglades v. S. Fla. Water Mgmt. Dist.</u>, 570 F.3d 1210, 1218 (11th Cir. 2009) ("We are free to give statements in a vacated opinion persuasive value if we think they deserve it."); <u>Tallahassee Branch of NAACP v. Leon Cnty.</u>, 827 F.2d 1436, 1440 (11th Cir. 1987) (noting that court was free to consider a vacated opinion as persuasive even though not binding).

In <u>Kimel v. Florida Board of Regents</u>, the Supreme Court held that, to abrogate a State's sovereign immunity, Congress must (1) make its intention to do so "unmistakably clear in the language of the statute" and (2) act pursuant to a valid <u>Grant</u> of constitutional authority. 528 U.S. 62, 73 (2000) (cleaned up); <u>accord</u> <u>Alabama NAACP</u>, 949 F.3d at 650 (citing <u>Bd. of Trs. of Univ. of Ala. v. Garrett</u>, 531 U.S. 356, 363 (2001)). However, "an express abrogation clause is not required. Instead, a court may look to the entire statute, and its amendments, to determine whether Congress clearly abrogated sovereign immunity." <u>Alabama</u>

503

NAACP, 949 F.3d at 650 (citing, *inter alia*, Kimel, 528 U.S. at 76 ("[O]ur cases have never required that Congress make its clear statement in a single section or in statutory provisions enacted at the same time.")).

Alabama NAACP concluded that the first part of this test was met because the VRA explicitly permits private parties to sue to enforce its provisions, which prohibit States and political subdivisions from imposing practices or procedures that abridge a citizen's right to vote on account of race. 949 F.3d at 651–52. Specifically, the Eleventh Circuit stated:

> The VRA, as amended, clearly expresses an intent to allow private parties to sue the States. The language of § 2 and § 3, read together, imposes direct liability on States for discrimination in voting and explicitly provides remedies to private parties to address violations under the statute. . . . It is implausible that Congress designed a statute that primarily prohibits certain state conduct, made that statute enforceable by private parties, but did not intend for private parties to be able to sue States.

Id. at 652. This Court agrees.

As to the second part of the Kimel test, Alabama NAACP concluded that Congress can abrogate a State's sovereign immunity pursuant to its powers under the Fourteenth Amendment to "redress discriminatory state action." 949

504

F.3d at 649; see also id. at 654 ("While Congress may not abrogate a State's immunity when acting pursuant to its Article I powers, it may do so under its enforcement powers pursuant to § 5 of the Fourteenth Amendment. . . . [I]f § 5 of the Fourteenth Amendment permits Congress to abrogate state sovereign immunity, so too must § 2 of the Fifteenth Amendment.").

Notably, even though no longer controlling, Alabama NAACP was not the first Eleventh Circuit case to conclude that Congress acted pursuant to a valid Grant of authority under the Fourteenth and Fifteenth Amendments in adopting Section 2. In determining that Section 2 was a proper exercise of that Grant of authority, Alabama NAACP relied on the prior Eleventh Circuit decision in Marengo County. In Marengo County, the United States and private citizens challenged a county's at-large system of electing commissioners under the Fourteenth and Fifteenth Amendments, as well as Section 2. 731 F.2d at 1552. In considering the Section 2 claims, the Eleventh Circuit made clear that "[t]he Civil War Amendments overrode state autonomy apparently embodied in the Tenth and Eleventh Amendments." Id. at 1560–61 (citations omitted). The Fourteenth and Fifteenth Amendments thus provided direct authority for Congress to

505

abrogate any sovereign immunity to which States might otherwise have been entitled under the Eleventh Amendment.

Given the aforementioned, the Court comfortably concludes that Section 2 is a valid expression of congressional enforcement power under the Fourteenth and Fifteenth Amendments. Hence Defendants affirmative defenses asserting sovereign immunity and Eleventh Amendment immunity are without merit.

### 2.    *Section 2 Private Right of Action*

In adjudicating Defendants' Motions to Dismiss, the Court rejected their contentions that there is no private right of action under Section 2 of the VRA. APA Doc. No. [65], 31-34; Grant Doc. No. [43], 30-33; Pendergrass Doc. No. [50], 17-20. Defendants maintain their contentions to perfect the record on appeal, but otherwise have offered no new arguments or evidence in favor of this defense. Thereby, the Court incorporates in this Order its prior conclusions of law from the Orders on Defendants' Motions to Dismiss. APA Doc. No. [65], 31-34; Grant Doc. No. [43], 30-33; Pendergrass Doc. No. [50], 17-20. The Court also acknowledges that recently, the Supreme Court affirmed an Alabama three-judge court's preliminary injunction, which found that the private plaintiffs had a

506

substantial likelihood of success in proving that Alabama congressional map violated Section 2. <u>Allen</u>, 143 S. Ct. 1487. [135] Accordingly, the Court rejects Defendants' argument and affirmative defense that Section 2 does not contain a private right of action.

### 3.    *28 U.S.C. § 2284: Three-Judge Court*

In the Court's Orders denying Defendants' Motions to Dismiss the Court also addressed in great detail Defendants' affirmative defenses that Plaintiffs' claims require adjudication by a three-judge court. <u>APA</u> Doc. No. [65], 6-31; <u>Grant</u> Doc. No. [43], 7-28; <u>Pendergrass</u> Doc. No. [50], 6-17. Defendants maintain their assertions for purposes of appeal, but again have not raised new arguments or evidence in support of this affirmative defense. Thus, the Court incorporates its prior analysis from its Orders on the Motions to Dismiss into this Order and rejects Defendants' contentions and affirmative defense that these cases ought to

---

[135] Although the Supreme Court did not comment on the private right of action issue, it affirmed a preliminary injunction order that analyzed whether Section 2 created a private right of action. <u>Allen</u>, 143 S. Ct. at 1517; <u>Singleton</u>, 582 F. Supp. 3d at 1031–32.

507

have been heard by a three-judge court. APA Doc. No. [65], 6-31; Grant Doc. No. [43], 7-28], Pendergrass Doc. No. [50], 6-17.

### 4.   *Section 2's Constitutionality*

In Attachment D to the Pretrial Order, Defendants assert as an affirmative defense in each case that "[t]o Grant the relief Plaintiffs seek, the Court must interpret the Voting Rights Act in a way that violates the U.S. Constitution." APA Doc. No. [280], 24; Grant Doc. No. [243], 26; Pendergrass Doc. No. [231], 29. Defendants offered no argument or support for this assertion through motion practice or at trial. To the extent that Defendants are arguing generally that Section 2 of the VRA is unconstitutional, the Supreme recently rejected the same argument urged by the State of Alabama in Allen v. Milligan, 599 U.S. 1, 41, (2023). Accordingly, the Court concludes that there is no merit to the affirmative defenses challenging the constitutionality of Section 2 in the cases pending in this Court.

### G.   Remedy

As correctly noted by Defense Counsel in his closing argument at trial, the parameters and the instructions around what the State of Georgia is supposed to do to comply with Section 2 of the VRA is a critical part of this Court's order, now

508

that the Court has found in favor of Plaintiffs. Tr. 2394:1–14. The remedy involves an additional majority-Black congressional district in west-metro Atlanta; two additional majority-Black Senate districts in south-metro Atlanta; two additional majority-Black House districts in south-metro Atlanta, one additional majority-Black House district in west-metro Atlanta, and two additional majority-Black House districts in and around Macon-Bibb.[136]

The Court is conscious of the powerful concerns for comity involved in interfering with the State's legislative responsibilities. As the Supreme Court has repeatedly recognized, "redistricting and reapportioning legislative bodies is a legislative task with the federal courts should make every effort not to preempt." Wise v. Lipscomb, 437 U.S. 535, 539 (1978). As such, it is "appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet" the requirements of Voting Rights Act "by adopting a substitute measure rather than for the federal court to devise . . . its own plan." Id. at 540. The State cannot

---

[136] The Court notes that there is significant overlap in the metro Atlanta districts drawn by Mr. Cooper and Mr. Esselstyn. The Court **ORDERS** the above remedy collectively for Alpha Phi Alpha and Grant Plaintiffs.

509

remedy the Section 2 violations described herein by eliminating minority opportunity districts elsewhere in the plans.

The Court also recognizes that Plaintiffs and other Black voters in Georgia whose voting rights have been injured by the violation of Section 2 of the Voting Rights Act have suffered significant harm. Those citizens are entitled to vote as soon as possible for their representatives under a lawful apportionment plan. Therefore, the Court will require that new legislative maps be drawn forthwith to remedy the Section 2 violation.

The Court will provide the General Assembly the opportunity to adopt a remedial Congressional plan, Senate plan, and House plan by December 8, 2023, and consistent with, this Order.

This Court retains jurisdiction to determine whether the remedial plans adopted by the General Assembly remedy the Section 2 violations by incorporating additional legislative districts in which Black voters have a demonstrable opportunity to elect their candidates of choice.

An acceptable remedy must "completely remed[y] the prior dilution of minority voting strength and fully provide[] equal opportunity for minority

citizens to participate and to elect candidates of their choice." United States v. Dallas Cnty. Comm'n, 850 F.2d 1433, 1437–38 (11th Cir. 1988) (quoting S.REP. No. 97-417, at 31 (1982)); see also Dillard v. Crenshaw Cnty., 831 F.2d 246, 252–53 (11th Cir. 1987) ("This Court cannot authorize an element of an election proposal that will not with certitude completely remedy the Section 2 violation."). This will require the Court to evaluate a remedial proposal under the Gingles standard to determine whether it provides Black voters with an additional opportunity district. Id.

In the event that the State is unable or unwilling to enact remedial plans by December 8, 2023 that satisfy the requirements set forth above, the Court will proceed to draw or adopt remedial plans.

## III.   CONCLUSION

Having held a non-jury trial and considered the evidence and arguments of the Parties, based on the Court's holistic analysis and searching local appraisal of the facts under the Section 2 standard of the Voting Rights Act, the Court finds and concludes that:

Pendergrass and Grant Plaintiffs lack standing to bring suit against the members of the State Election Board; thus, Sarah Tindall Ghazal, Janice W. Johnston, Edward Lindsey, and Matthew Mashburn are **DISMISSED** from this case.[137]

Alpha Phi Alpha Plaintiffs have carried their burden of demonstrating a lack of equal openness in Georgia's election system as a result of the challenged redistricting plans, SB 1EX and HB 1EX, SB 1EX and HB 1EX, as to the following enacted districts/areas: Enacted Senate Districts 10, 16, 17, 34, 43, 44, and Enacted House Districts 74 and 78.[138] Alpha Phi Alpha Plaintiffs have not met their burden as to the remaining challenged districts.

---

[137] As stated herein, the Clerk is **DIRECTED** to terminate William Duffey, Jr. as a named party based upon his September 1, 2023 resignation from the State Election Board.

[138] These districts are derived from Alpha Phi Alpha Plaintiffs' Complaint (APA Doc. No. [141]) and Mr. Cooper's expert report (APAX 1).

<u>Pendergrass</u> Plaintiffs have carried their burden of demonstrating a lack of equal openness in Georgia's election system as a result of the challenged redistricting plan, SB 2EX, as to the following enacted district/ areas: Enacted Congressional Districts 3, 6, 11, 13, and 14.

<u>Grant</u> Plaintiffs have carried their burden of demonstrating a lack of equal openness in Georgia's election system as a result of the challenged redistricting plans, SB 1EX and HB 1EX, SB 1EX and HB 1EX, as to the following enacted districts/areas: Enacted Senate Districts 10, 16, 17, 25, 28, 30, 34, 35, 44, and Enacted House Districts 61, 64, 78, 117, 133, 142, 143, 145, 147, and 149.[139] <u>Grant</u> Plaintiffs have not met their burden as to the remaining challenged districts.

_____

[139] These districts are derived from <u>Grant</u> Plaintiffs' Complaint (<u>Grant</u> Doc. No. [118]) and Mr. Esselstyn's expert report (GX 1).

This Court further concludes that declaratory and permanent injunctive relief are appropriate. The Court, therefore, **DECLARES** the rights of the parties as follows.

SB 2EX violates Section 2 of the Voting Rights Act as to the following districts/areas: Enacted Congressional Districts 3, 6, 11, 13, and 14.

SB 1EX violates Section 2 of the Voting Rights Act as to the following areas/districts: Enacted Senate Districts 10, 16, 17, 25, 28, 30, 34, 35, 43, and 44.

HB 1EX violates Section 2 of the Voting Rights Act as to the following areas/districts: Enacted House Districts 61, 64, 74, 78, 117, 133, 142, 143, 145, 147, and 149.

The Court **PERMANENTLY ENJOINS** Defendant Raffensperger, as well as his agents and successors in office, from using SB 2EX, SB 1EX, and HB 1EX in any future election.

The Court's injunction affords the State a limited opportunity to enact new plans that comply with the Voting Rights Act by **DECEMBER 8, 2023**. This timeline balances the relevant equities and serves the public interest by providing

514

the General Assembly with its rightful opportunity to craft a remedy in the first instance, while also ensuring that, if an acceptable remedy is not produced, there will be time for the Court to fashion one—as the Court will not allow another election cycle on redistricting plans that the Court has determined on a full trial record to be unlawful.

The Court is confident that the General Assembly can accomplish its task by **DECEMBER 8, 2023**: the General Assembly enacted the Plans quickly in 2021; the Legislature has been on notice since at least the time that this litigation was commenced nearly 22 months ago that new maps might be necessary; the General Assembly already has access to an experienced cartographer; and the General Assembly has an illustrative remedial plan to consult.

Pursuant to Federal Rule of Civil Procedure 58, the Clerk is **DIRECTED** to enter judgment in favor of the Alpha Phi Alpha Plaintiffs (in Civil Action No. 1:21-cv-05337), Pendergrass Plaintiffs (in Civil Action No. 1:21-cv-05339), and Grant Plaintiffs (in Civil Action No. 1:22-cv-00122) and against Brad Raffensperger. Attorneys' fees and costs are also awarded to each set of Plaintiffs pursuant to 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988.

515

After entry of judgment, the Clerk is **DIRECTED** to close these three cases. The Court will retain jurisdiction over these matters for oversight and further remedial proceedings, if necessary.

* * * * *

The Court reiterates that Georgia has made great strides since 1965 towards equality in voting. However, the evidence before this Court shows that Georgia has not reached the point where the political process has equal openness and equal opportunity for everyone. Accordingly, the Court issues this Order to ensure that Georgia continues to move toward equal openness and equal opportunity for everyone to participate in the electoral system.

**IT IS SO ORDERED** this 26th day of October, 2023.

**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

516