# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ALPHA PHI ALPHA FRATERNITY
INC., et al.,

        *Plaintiffs*,

        vs.

BRAD RAFFENSPERGER, in his
official capacity as Secretary of State
of Georgia.

        *Defendant*.

Case No. 1:21-cv-5337

# PLAINTIFFS' OBJECTIONS TO DEFENDANT'S REMEDIAL
# PROPOSAL AND MEMORANDUM OF LAW

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

PROCEDURAL BACKGROUND.............................................................3

LEGAL STANDARD...............................................................................5

ARGUMENT ..........................................................................................7

    I.    The 2023 Proposed Senate Plan Fails to Remedy the Section 2 Violation 9

       A.    The Court Found a Section 2 Violation in South Metro Atlanta ......... 9

       B.    The 2023 Proposed Senate Plan Leaves the Vote Dilution Area Virtually Untouched ................................................................ 11

    II.    The 2023 Proposed House Plan Also Fails to Remedy the Section 2 Violation ........................................................................... 18

    III.    The Court Should Enter Plaintiffs' Proposed Remedial Maps or Appoint a Special Master ............................................................ 22

CONCLUSION .....................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. Milligan*,
    599 U.S. 1 (2023)...............................................................3, 7, 8, 9

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger*,
    2023 WL 7037537 (N.D. Ga. Oct. 26, 2023) ...........................*passim*

*Alpha Phi Alpha Fraternity Inc. v. Raffensperger*,
    587 F. Supp. 3d 1222 (N.D. Ga. 2022)...............................................3

*Bush v. Vera*,
    517 U.S. 952 (1996) (plurality opinion) ..........................................17

*Cooper v. Harris*,
    581 U.S. 285 (2017)....................................................................17, 21

*United States v. Dallas Cnty. Comm'n*,
    850 F.2d 1433 (11th Cir. 1988) ...............................................1, 6, 21

*Dillard v. Crenshaw Cnty.*,
    831 F.2d 246 (11th Cir. 1987) ...............................................6, 7, 17

*League of United Latin Am. Citizens v. Perry*,
    457 F. Supp. 2d 716 (E.D. Tex. 2006)..............................................7

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006)....................................................................7, 16

*Miss. State Ch., Operation PUSH v. Mabus*,
    932 F.2d 400 (5th Cir. 1991) ............................................................9

*Perry v. Perez*,
    565 U.S. 388 (2012) (per curiam).....................................................7

*Shaw v. Hunt*,
    517 U.S. 899 (1996)................................................................6, 8, 16

*Singleton v. Allen*,
    2023 WL 5691156 (N.D. Ala. Sept. 5, 2023)......................6, 22, 23

*Louisiana v. United States*,
    380 U.S. 145 (1965)...........................................................................7

*Wilson v. Jones*,
130 F. Supp. 2d 1315 (S.D. Ala. 2000) .................................................6

**STATUTES, RULES, AND REGULATIONS**

Fed. R. Civ. P. 53(c)...........................................................................23

Georgia General Assembly, HB1EX: Georgia House of
Representatives Redistricting Act of 2023 .....................................5

Georgia General Assembly, SB1EX: Georgia Senate Redistricting Act
of 2023 ...............................................................................................5

Ga. R. Super. Ct. 5.1 ...........................................................................28

**OTHER AUTHORITIES**

Georgia Recorder (Oct. 27, 2023),
https://georgiarecorder.com/2023/10/27/georgia-special-
legislative-session-on-tap-for-the-holidays-after-judge-tosses-
political-maps/ .................................................................................5

Jill Nolan, *Georgia special legislative session on tap for the holidays
after judge tosses political maps*, GEORGIA RECORDER (Oct. 27,
2023), https://georgiarecorder.com/2023/10/27/georgia-special-
legislative-session-on-tap-for-the-holidays-after-judge-tosses-
political-maps/ .................................................................................5

S. Rep. No. 97-417 (1982) ....................................................................6

**INTRODUCTION**

Following a trial in which Plaintiffs proved illegal vote dilution under Section 2 of the Voting Rights Act in specific areas of Georgia, this Court gave Defendant very specific instructions. It identified specific areas of the State—south-metro Atlanta, west-metro Atlanta, and the area around Macon-Bibb—where vote dilution had been proven, and even delineated the boundaries of those areas by reference to particular clusters of districts in the enacted map. The Court ordered that a remedy must add new majority-Black districts *in those areas*.

Yet the 2023 Proposed Senate and House Plans leave the vote-dilution areas identified by the Court largely untouched. They provide no remedy for the vote dilution that was the subject of the September trial. They certainly do not "completely remedy" the violation, as the State was required to do. *United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1437-38 (11th Cir. 1988).

The numbers tell the story. For example, the 2023 Proposed Senate Plan increases the number of Black voters in Black-majority districts in the south-metro area as defined by the Court by a *net of only 3,000 voters*. A Senate district is nearly *180,000 people*, and the Court ordered Defendants to add *two* new majority-Black districts in the south-metro area. The inescapable conclusion is that the Proposed Plans do not come close to following the Court's order. Putting eyes on the 2023

1

Proposed Plans confirms the total failure of compliance: The State left Enacted Senate District 16, one of the central focuses of the September vote dilution trial, totally untouched; Enacted Senate District 17, another one of the key challenged districts in south-metro Atlanta, was renamed but retains almost the same geography, with a few Black-majority precincts shuffled in, and a few others shuffled out.

What the numbers and the maps show is that, instead of adding new majority-Black districts in the areas identified by the Court that were the subject of the trial and the Court's order, the 2023 Proposed Plans add "new" majority-Black districts anchored outside of the vote-dilution area, in places like Cobb County, north Dekalb County, and Gwinnett County—shifting around tens of thousands of Black voters in areas that have nothing to do with the geographically-defined vote dilution that Defendant was ordered to remedy. Those changes inflate the statewide number of Black-majority Senate and House districts, but they necessarily do not change the reality for Black voters in the areas, like south-metro Atlanta, identified by the Court.

The 2023 Proposed Plans fail to address the vote dilution found by this Court after trial. They instead perpetuate it. The Court should reject the 2023 Proposed Plans and take proper remedial action by appointing a Special Master or, in the alternative, entering Plaintiffs' proposed maps, which outperform the State's proposed plans on most every metric and comply with the Court's judgment.

## PROCEDURAL BACKGROUND

Despite massive growth in the Black population, the General Assembly's 2021 Enacted Senate and House Plans kept the number of Black-majority districts essentially the same. Within hours of their passage, Plaintiffs challenged those plans under Section 2 of the Voting Rights Act. *See* ECF Nos. 1 & 26. After a six-day preliminary injunction hearing in February 2022, this Court held that Plaintiffs were likely to succeed on the merits in a number of areas, including with respect to Senate and House districts in the Metro Atlanta area, but nevertheless denied the motion. *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 587 F. Supp. 3d 1222, 1301 (N.D. Ga. 2022). The State held the 2022 elections using the unlawful maps.

Eighteen months later, following the Supreme Court's decision in *Allen v. Milligan*, 599 U.S. 1 (2023), which reaffirmed the *Gingles* vote-dilution framework for Section 2, this Court held a consolidated trial of multiple state legislative districting cases, including this case and *Grant v. Raffensperger*, No. 22-cv-122 (Jan. 11, 2022). Over the course of eight trial days in September, Plaintiffs proved the existence of vote dilution in specific, identified areas of Georgia's Senate and House maps, including and especially in the south-metro Atlanta area.

On October 26, 2023, the Court concluded that Plaintiffs had proven a lack of equal openness in Georgia's election system as a result of the challenged

redistricting plans as to particular geographic areas which the Court identified in south-metro Atlanta, west-metro Atlanta, and the area in and around Macon-Bibb. *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 2023 WL 7037537, at \*143 (N.D. Ga. Oct. 26, 2023). The court delineated the specific districts that comprise those vote dilution areas, where districts would need to be changed in order to remedy vote dilution: Enacted Senate Districts 10, 16, 17, 25, 28, 30, 34, 35 43, and 44 and Enacted House Districts 61, 64, 74, 78, 117, 133, 142, 143, 145, 147, and 149. *Id*. The Court specified that the remedy for the VRA violations proven at trial must include "two additional majority-Black Senate districts in south-metro Atlanta; two additional majority-Black House districts in south-metro Atlanta, one additional majority-Black House district in west-metro Atlanta, and two additional majority-Black House districts in and around Macon-Bibb." *Id*.

The Court then afforded the General Assembly an opportunity to enact VRA-compliant maps by December 8, 2023. In doing so, the Court affirmed that it would "not allow another election cycle on redistricting plans that the Court has determined on a full trial record to be unlawful." *Alpha Phi Alpha*, 2023 WL 7037537, at \*144.

On October 26, 2023, Governor Brian Kemp issued a proclamation calling the General Assembly back into a special legislative session starting on November 29, 2023 to respond to the Court's directive to redraw the state legislative and

congressional maps.[1]  On December 1, 2023, after little debate and few opportunities

for public comment, the State Senate passed the Georgia Senate Redistricting Act of

2023 ("SB1EX"), which revised that chamber's district boundaries on a near-party-

line vote; the House in turn passed SB1EX on a party-line vote on December 5,

2023.[2]  The House passed its own revised district lines on December 1, 2023 with

the party-line passage of the Georgia House of Representatives Redistricting Act of

2023 ("HB1EX").  The State Senate followed suit, passing HB1EX along a party-

line vote on December 5, 2023.[3]  Governor Kemp signed SB1EX and HB1EX into

law on December 8, 2023.

## LEGAL STANDARD

At the remedial stage, this Court applies the same *Gingles* standard it

considered at trial.  However, "[w]hen ... the districting plan is offered as a

replacement for one invalidated by the court," Plaintiffs no longer bear the burden

---

[1] Jill Nolan, *Georgia special legislative session on tap for the holidays after judge tosses political maps*, Georgia Recorder (Oct. 27, 2023), https://georgiarecorder.com/2023/10/27/georgia-special-legislative-session-on-tap-for-the-holidays-after-judge-tosses-political-maps/.

[2] *See* Georgia General Assembly, SB1EX: Georgia Senate Redistricting Act of 2023, at https://www.legis.ga.gov/legislation/65851.

[3] *See* Georgia General Assembly, HB1EX: Georgia House of Representatives Redistricting Act of 2023, at https://www.legis.ga.gov/legislation/65850.

to prove a violation of the Voting Right Act.  *See Wilson v. Jones*, 130 F. Supp. 2d 1315, 1322 (S.D. Ala. 2000), *aff'd sub nom. Wilson v. Minor*, 220 F.3d 1297 (11th Cir. 2000).  Instead, the question is whether the proposed map perpetuates the violations identified by the Court after trial.  Accordingly, the Court's liability findings are highly relevant to its review of a remedial plan.  *See United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1438-39 (11th Cir. 1988).

A proposed remedial plan must "completely remedy the Section 2 violation." *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 252-53 (11th Cir. 1987); *accord Dallas Cnty. Comm'n*, 850 F.2d at 1437-38.  It must "fully provide[] equal opportunity for minority citizens to participate and elect candidates of their choice."  *Dallas Cnty. Comm'n*, 850 F.2d at 1437-38 (quoting S. Rep. No. 97-417, at 31 (1982)).

Moreover, a Section 2 violation in a particular area cannot be remedied by a plan that fails to account for the "vote-dilution injuries suffered by [the] persons" in that area.  *Shaw v. Hunt*, 517 U.S. 899, 917 (1996).  Therefore, a court must evaluate a proposed remedy under the *Gingles* standard to determine if it solves the Section 2 violation in the challenged areas.  *Id.*  "The requirement of a complete remedy means that we cannot accept a remedial plan that (1) perpetuates the vote dilution we found, or (2) only partially remedies it."  *Singleton v. Allen*, 2023 WL 5691156, at *49-50 (N.D. Ala. Sept. 5, 2023) (citations and subsequent history omitted).

In addition, a Section 2 remedial plan should eschew districting considerations that may perpetuate vote dilution, like partisan gerrymandering, *cf. League of United Latin Am. Citizens v. Perry*, 457 F. Supp. 2d 716, 721 (E.D. Tex. 2006), "incumbency protection," *League of United Latin Am. Citizens v. Perry,* 548 U.S. 399, 440-41 (2006), and core retention, *Allen v. Milligan*, 599 U.S. at 21. Although a remedial plan may "'be guided by the legislative policies underlying' a state plan – even one that was unenforceable," that guidance is limited by the extent to which those policies "'lead to violations of the Constitution or Voting Rights Act.'" *Perry v. Perez*, 565 U.S. 388, 393 (2012) (per curiam); *see also Dillard*, 831 F.2d at 249 ("[A]ny proposal to remedy a Section 2 violation must itself conform with Section 2.").

In the end, the Court has "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States*, 380 U.S. 145, 154 (1965). Here, that duty requires rejecting the State's proposal.

## ARGUMENT

This Court heard testimony from 19 witnesses, reviewed 59 exhibits, and considered thousands of pages of briefs, expert reports, and post-trial proposed findings of fact and conclusions of law. It concluded that Georgia's 2021 Enacted

Senate and House Plans dilute the votes of Black Georgians in violation of Section 2. The Court's 519-page opinion methodically evaluated Plaintiffs' challenges to the 2021 Enacted Plans, conducting the "intensely local appraisal" that is required in Section 2 cases. *Allen*, 599 U.S. at 19. The Court identified specific areas where vote dilution is occurring—one in the Senate, three in the House—and ordered that the remedy be tailored to the violations in those areas.

The State's proposed remedy ignores the literal text and the manifest purpose of the Court's ruling. Rather than adding majority-Black districts in the vote-dilution areas identified by the Court, the State looked elsewhere, contravening the settled rule that vote dilution as to one particular area is "not remedied by creating a safe majority-black district somewhere else in the State." *Shaw*, 517 U.S. at 917. The General Assembly easily could have complied with the Court's order, while changing the same number of districts, minimizing splits, and maintaining district compactness. Yet the 2023 Proposed Plans create virtually no new opportunities for Black voters in the vote-dilution areas, falling far short of "completely remedy[ing] the Section 2 violation" that this Court found. *Alpha Phi Alpha*, 2023 WL 7037537, at *143 (quoting *Dallas Cnty. Comm'n*, 850 F.2d at 1437-38); *see also Dillard*, 831 F.2d at 252-53.

# I.      The 2023 Proposed Senate Plan Fails to Remedy the Section 2 Violation

## A. The Court Found a Section 2 Violation in South Metro Atlanta

This is an equity case, and thus "the nature of the violation determines the scope of the remedy." *Miss. State Ch., Operation PUSH v. Mabus*, 932 F.2d 400, 406 (5th Cir. 1991). Here, the nature of the violation is geographically defined, consistent with the "intensely local" nature of a Section 2 claim. *Allen v. Milligan*, 599 U.S. 1, 19 (2023). In particular, and as to the Senate map, the Court found that the *Alpha Phi Alpha* and *Grant* Plaintiffs had proved "a lack of equal openness in Georgia's election system" as to the area encompassed by 2021 Enacted Senate Districts ("SDs")10, 16, 17, 25, 28, 30, 34, 35 43, and 44. *See Alpha Phi Alpha*, 2023 WL 7037537, at *144. That region covers most of south-metro Atlanta, as depicted below:



Cooper Decl. App'x 2 at 1.

The Court identified that area based on the evidence presented at trial. For example, the *Alpha Phi Alpha* Plaintiffs focused their Senate challenge on a five-county region in south-metro Atlanta (consisting of Fayette, Spalding, Henry, Rockdale, and Newton), where between 2000 and 2020 the Black population quadrupled from 74,249 to 294,914. *Alpha Phi Alpha*, 2023 WL 7037537, at *11. Those areas are rapidly growing and diversifying, and there are significant connections between communities in and around the five-county area, as the Court's findings discussed in detail. *Id*. at *78-85. Black voters in the area were placed in majority-white districts, Enacted SDs 16 and 17, even though—as Plaintiffs showed through Cooper Illustrative SDs 17 and 28 in the same areas—two additional majority-Black districts could be drawn *in that same area* consistent with traditional districting principles. *Id*. at *80, *83. Voting in those areas is racially polarized, as shown by localized, precinct-level analysis, such that Black voters in those areas, in Enacted SDs 16 and 17, will be consistently outvoted by white bloc voting against their preferred candidates. *Id*. at *116.

Consistent with this localized analysis, the Court made localized determinations, concluding that Plaintiffs proved that "under the totality of the circumstances, Georgia's electoral system is not equally open to Black voters in the

districts meeting the *Gingles* preconditions (i.e., Cooper SD-17, SD-28, SD-74)." *Alpha Phi Alpha*, 2023 WL 7037537 at *118.

Based on the Court's properly localized findings, *Alpha Phi Alpha*, 2023 WL 7037537, at *77-*113 (district by district analysis of Alpha and Grant's illustrative districts), its specification of a ten-district vote-dilution area in the Senate map, *id.* at *144, and its specific directive that Defendant draw "two additional majority-Black Senate districts *in south-metro Atlanta*," *id.* at *143 (emphasis added), there can be no doubt about what the State was required to do in crafting a remedy: Draw a Senate Plan that adds two new majority-Black districts in the areas specified by the Court where the evidence showed, and where the Court determined, that the Enacted Plan resulted in vote dilution.

## B. The 2023 Proposed Senate Plan Leaves the Vote Dilution Area Virtually Untouched

The 2023 Proposed Senate Plan falls remarkably short of remedying the Section 2 violation that the Court found.

Under the proposed plan, Enacted SDs 16 and 17, which the Court struck down as resulting in unlawful vote dilution, remain largely untouched. The below map overlays the 2021 Enacted Senate Plan and the 2023 Proposed Plan, showing the Black-majority districts in both plans. Purple areas are in Black-majority districts in both plans; red areas are newly added into Black-majority districts; blue

areas have been removed from Black-majority districts in the 2023 Proposed Senate Plan. The vote-dilution area is shaded.



Cooper Decl. App'x 2 at 3.

As reflected above, under the 2023 Proposed Senate Plan, SD 16 in Fayette and Spalding Counties does not change at *all*. *See also* Cooper Decl., Ex. B at 2. As with the 2021 Enacted Senate Plan, the 2023 Proposed Plan packs majority-Black neighborhoods in northeast Fayette County into SD 34 (which is also unchanged, remaining a 69.54% BVAP district, *see* Cooper Decl. Ex. C at 22) and then joins the remaining areas of Fayette County with Spalding County and predominantly white Pike and Lamar Counties in SD 16. Despite all the evidence at trial about Peachtree City and Griffin and the surrounding areas, the map is untouched. The number of

Black voters in Fayette and Spalding Counties who have been newly added to a Black-majority Senate District under the 2023 Proposed Senate Plan is zero. Cooper Decl. App'x 3 at 1. With literally no changes from the 2021 Enacted Plan declared unlawful by the Court, Black voters in Fayette and Spalding Counties, both of which saw double-digit increases in the Black population over the last decade, will continue to have their voting strength diluted under the 2023 Proposed Senate Plan. *See Alpha Phi Alpha*, 2023 WL 7037537 at *11. For example, *Alpha Phi Alpha* Plaintiff Eric Woods, who lives in Tyrone, Georgia in Enacted SD 16, would continue residing in a non-majority-Black district and being subjected to vote dilution under the 2023 Proposed Senate Plan.

The 2023 Proposed Senate Plan does something very similar with 2023 Proposed SD 42. That district is a near-carbon copy of 2021 Enacted SD 17, which this Court determined needed to be changed. Just like Enacted SD 17, 2023 Proposed SD 42 starts in diverse areas of Henry County, including (still) portions of McDonough, extends into (and splits) Newton County, and then extends further into predominantly white and more rural Walton and Morgan Counties. *Alpha Phi Alpha*, 2023 WL 7037537 at *79. The population of the two districts is over 75% the same. Cooper Decl. Ex. B at 6. The remaining 25% involves swapping out Black voters in South Henry County to 2023 Proposed SD 17 (a re-numbered Black-

majority district made up mostly out of existing majority-Black 2021 Enacted SDs 10 and 44) and swapping in Black voters from neighboring Newton County, *removing them* from an existing Black-majority district, 2021 SD 43 (the removed area is depicted in blue in the map above). Cooper Decl. App'x 2 at 3 & App'x 3 at 1. Notwithstanding this swap, 2023 Proposed SD 42 maintains almost exactly the overall shape, BVAP, and effect of illegal 2021 Enacted SD 17.

The numbers bear out just how little the 2023 Proposed Senate Plan changes the vote-dilution area in south-metro Atlanta. The 2023 Proposed Senate Plan adds just a net *3,000* Black voters into majority-Black districts in the vote-dilution area as a whole. *E.g.*, Cooper Decl. App'x 3 at 3. Three of the five counties that were Plaintiffs' primary focus at trial—Fayette, Spalding, and Rockdale counties—see no change in the number of Black voters in Black-majority districts. Cooper Decl. App'x 3 at 1. Henry County sees an increase of 21,386, while Newton County sees a *decrease* of nearly the same amount. Cooper Decl. App'x 3 at 1. And in the western-metro area, Douglas County, on which the *Grant* plaintiffs focused, sees a decrease as well. Cooper Decl. App'x 3 at 1.

So how did the State reach an overall total of 16 majority-Black districts? By moving around Black voters from one majority-Black district to another, and by creating "new" majority-Black districts in parts of the Atlanta metro that are outside

of the vote-dilution area identified by the Court. For example, and as noted, the 2023 Proposed Senate Plan's "new" Black-majority SD 17 (in Henry and Clayton Counties) is comprised almost entirely of 2021 Enacted SDs 10 and 44, both of which were already Black-majority districts, such that the vast majority of Black voters in this "new" district were already in a Black-majority district under the enacted plan. Cooper Decl. Ex. B at 2. The 2023 Proposed Senate Plan then shifts Senate Districts 10 and 44 up into north Dekalb County, displacing 2021 Enacted SD 42, a plurality-White (49.91%) district that is outside the vote-dilution area and unrelated to this case. In doing this, the 2023 Proposed Senate Plan moves 47,383 Black voters in north Dekalb County, where no vote dilution was alleged or found, into Black-majority districts. Cooper Decl. App'x 3 at 1. 2023 Proposed SD 28—the other "new" majority-Black district in Proposed Plan—plays the same shell game. The Black voters whom that district newly brings into a Black-majority district are almost entirely in Cobb County—well outside the Court's area of focus—and overall most of the Black voters in the district were already in Black-majority districts under the 2021 Enacted Plan. Cooper Decl. Ex. B at 3-4, App'x 3 at 1; *see also* Cooper Dec. Ex. B at 3-4.

The 2023 Proposed Senate Plan thus is not a lawful remedy. "If a § 2 violation is proved for a particular area," a remedy is required *for that area*; the harms suffered

by Black voters in that area is "not remedied by creating a safe majority-black district somewhere else in the State." *Shaw v. Hunt*, 517 U.S. 899, 917 (1996) (emphasis added); *accord League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006). Allowing "new" Black-majority districts drawn outside the vote-dilution area to serve as a remedy would "impl[y] that the [vote dilution] claim, and hence the coordinate right to an undiluted vote (to cast a ballot equal among voters), belongs to the minority as a group and not to its individual members." *Shaw*, 517 U.S. at 917. That is not the law. *Id.*

The 2023 Proposed Senate Plan flouts those principles and this Court's clear directive. Black voters in Spalding County (including Griffin), in Tyrone or Fayetteville in Fayette County, or in much of Henry County (including portions of McDonough), receive no relief under the 2023 Proposed Senate Plan, and will remain unable to elect the candidate of their choice. 17,000 Black voters in neighboring Newton County are *removed* from a majority-Black district. *See* Cooper Decl. App'x 3 at 1. Rather than providing new opportunities for Black voters, the 2023 Proposed Senate Plan only moves Black voters from one majority-Black district to another while adding to Black-majority districts tens of thousands of Black voters from areas that are outside the vote-dilution area and were never at

issue at trial.  This shell game necessarily fails to "completely remedy" the Section 2 violation.  *E.g.*, *Dillard v. Crenshaw Cnty*, 831 F.2d 246, 252-53 (1987).

Nor can Defendant argue that any aspect of the 2023 Proposed Senate Plan was somehow necessary, or the best possible remedy.  As William Cooper's remedial maps show, it was entirely possible to create two new majority-Black SDs in the vote dilution area.  Mr. Cooper's Remedial Senate Plan changes the same number of overall districts, but in his Plan, the net number of Black voters who have been newly added to Black-majority SDs in the vote dilution area is 88,035.  Cooper Decl. ¶ 21.  The net number for that figure from outside the vote dilution area is *zero*. *Id*.  The 2023 Proposed Senate Plan's intentional movement of Black voters outside of the area where the Court determined vote dilution is occurring, seemingly in order to hit racial targets for districts whose creation does not remedy vote dilution, is likely illegal.  *See, e.g.*, *Cooper v. Harris*, 581 U.S. 285, 300-301 (2017); *see also Bush v. Vera*, 517 U.S. 952, 968-970 (1996) (plurality opinion) (race predominated when a legislature deliberately "spread[] the Black population" with no VRA compliance need).  And in any case, it comes nowhere close to compliance with the Court's clear and specific order to add two additional majority-Black districts *in the identified area where unlawful vote dilution is occurring*.

## II.     The 2023 Proposed House Plan Also Fails to Remedy the Section 2 Violation

The 2023 Proposed House Plan is similarly non-compliant.  As to the House, this Court identified three vote-dilution areas in south-metro Atlanta, western metro Atlanta, and Macon—the areas encompassed by Enacted House Districts ("HDs") 61, 64, 74, 78, 117, 133, 142, 143, 145, 147, and 149.  *See Alpha Phi Alpha*, 2023 WL 7037537, at *144.  After finding Section 2 violations in those three regions, it instructed the State to draw "two additional majority-Black Senate districts in south-metro Atlanta; two additional majority-Black House districts in south-metro Atlanta, one additional majority-Black House district in west-metro Atlanta, and two additional majority-Black districts in and around Macon-Bibb."  *Id.* at *143.

Here too, the Court's Section 2 analysis was methodical and intensely local. It considered population changes, racial polarization, and the like in *those* areas, and it assessed vote dilution by looking at both sets of Plaintiffs' illustrative districts. *See Alpha Phi Alpha*, 2023 WL 7037537, at *10-13 (population changes), *83-*88 & *92-*98 (Metro Atlanta area), *104-*113 (Macon-Bibb area); 113-119 (racial polarization in areas of focus).

The Court found that the *Alpha Phi Alpha* and *Grant* Plaintiffs had collectively established Section 2 violations as to two districts in south-metro Atlanta, one district in western metro Atlanta, and two districts in central Georgia,

in and around Macon-Bibb. Specifically, in south-metro Atlanta, the Court identified the dilutive areas by reference to Cooper HD 74 (which consisted of Henry, Spalding, and the neighboring part of Clayton County) and Esselstyn HD 117 (in South Henry County). In western metro Atlanta, the Court found a Section 2 violation in the area covered by the *Grant* Plaintiffs' HD 64, across Douglas, Fulton, and Paulding Counties. *See Alpha Phi Alpha*, 2023 WL 7037537, at *92.

As with the Senate map, the General Assembly's responsibilities were clear. Because the voters in those delineated areas had been harmed by vote dilution, the remedy had to benefit those voters. But the 2023 Proposed House Plan does not comply with that directive. Start with south-metro Atlanta (depicted below). 2023 Proposed HDs 74 and 117 add portions of Henry County in the vote-dilution area into a new Black-majority district, but they also remove other portions of central Henry County (in blue) that had previously been included.



Cooper Decl. App'x 2 at 15.

The net BVAP increase in Black-majority districts for Henry County in the 2023 House Plan is 12,555—perhaps enough to create one new majority-Black district, but not enough for two. Cooper Decl. App'x 3 at 2. Meanwhile, the net increase of BVAP in Black-majority districts in Spalding and Fayette Counties is *zero*, and the net number in Newton County is negative. Cooper Decl. App'x 3 at 2. Across the south-metro Atlanta vote dilution area, a net 15,747 Black voters were moved into Black-majority districts, which is insufficient to bring any two of the existing non-majority-Black HDs in the vote dilution area above 50% BVAP. Cooper Decl. ¶ 42.

The numbers in western Atlanta are even starker.  There, the 2023 Proposed House Plan results in only a 2,661 net increase in the number of Black voters in the vote dilution area living in a majority-Black districts, all in Douglas County.  Cooper Decl. ¶ 41; *see* Cooper Decl. App'x 2 at 16; Cooper Decl. App'x 3 at 2, 4.  In contrast, the 2023 Proposed House Plan moves into Black-majority districts over 35,000 Black voters into majority-Black HDs in Cobb, Gwinnett, and Dekalb Counties, Cooper Decl. App'x 3 at 2—areas that were not at issue in this case and where no vote dilution remedy was ordered or required.  *Cf. Cooper*, 581 U.S. at 306.[4]  This reconfiguration of the metro Atlanta districts in turn increases the level of "packing" in the south-metro areas; HDs 115 and 116 in Henry County were 58% and 52% BVAP under the 2021 Enacted House Plan, but under the 2023 Proposed House Plan their concentration of Black voters balloons to 74% and 75% BVAP, respectively.  Cooper Decl. Ex. I-2 at 4.

---

[4] The 2023 Proposed House Plan's lines in the Macon-Bibb area do appear to include Black voters from the vote-dilution area in new majority-Black districts in numbers comparable to the APA remedial plan.  *See* Cooper Decl. App'x 3 at 4.  However, even if the Court were to find those districts sufficient, the 2023 Proposed House Plan still would not "completely remedy" the Section 2 violation due to its treatment of western- and south-metro Atlanta.  *United States v. Dallas Cnty. Comm'n*, 850 F.2d 1433, 1437-38 (11th Cir. 1988).

### III. The Court Should Enter Plaintiffs' Proposed Remedial Maps or Appoint a Special Master

The Court gave the General Assembly an opportunity to enact VRA-compliant maps. It did not do so. The Court must thus take remedial action to ensure that no other election cycle takes place "on redistricting plans that the Court has determined on a full trial record to be unlawful." *Alpha Phi Alpha*, 2023 WL 7037537, at *144. Such action is especially warranted here for two reasons. First, time is of the essence. As this Court already observed, any undue delay may well result in "another election cycle on redistricting plans that the Court has determined on a full trial record to be unlawful." *Id.* Second, the State had more than enough time to devise an acceptable remedy, and it failed to do so. As this Court observed in its opinion, "the Legislature has been on notice since at least the time that this litigation was commenced nearly 22 months ago that new maps might be necessary; the General Assembly already has access to an experienced cartographer; and the General Assembly has an illustrative remedial plan to consult." *Id.* at *145. The failure to provide an adequate remedy strongly suggests that, if given "a second bite at the apple," *Singleton*, 2023 WL 5691156, at *73, the General Assembly will again be unable to produce an acceptable remedy.

The Court now has two options.

One is to appoint a Special Master under Rule 53. Rule 53 allows the Court to appoint a master to "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(c). Courts frequently appoint special masters to oversee the remedial stage in reapportionment cases, and "[t]he Supreme Court has … held that a district court does not abuse its discretion by ordering a Special Master to draw a remedial map to ensure that a plan can be implemented as part of an orderly process in advance of elections, where the State was given an opportunity to enact a compliant map but failed to do so." *Singleton*, 2023 WL 5691156, at *73 (citing *North Carolina v. Covington*, 138 S. Ct. 2548 (2018), *appeal dismissed sub nom. Milligan v. Co-Chairs of Alabama Permanent Legis. Comm. on Reapportionment*, 2023 WL 6568350 (11th Cir. Oct. 3, 2023). To the extent the Court wishes to appoint a Special Master, Plaintiffs request the opportunity to expeditiously tender the names of qualified candidates.

In the alternative, the Court can enter Plaintiffs' Remedial Senate and House Plans (the "APA Remedial Plans"), drawn by William Cooper. *See* Cooper Decl. App'x 1. The APA Remedial Plans completely remedy the Section 2 violations while fully complying with traditional districting principles and altering as little as possible. The raw numbers confirm that the Plan is filing-ready: Compared with the

2023 Plan, the APA Remedial Senate Plan outperforms the 2023 Proposed Senate Plan on compactness metrics, *see* Cooper Decl. Fig. 4, and it has comparable county, VTD, and municipal splits, *id.* Fig. 5. The APA Remedial House Plan compares favorably to the 2023 Proposed House Plan on compactness grounds and on county, VTD, and municipal splits, *id.* Figs. 9 & 10.

The APA Remedial Plans are also effective at eliminating vote dilution in the target areas. For example, Plaintiffs' Remedial SD 17 unites southern DeKalb with Rockdale and Henry counties and merges parts of McDonough and Locust Grove into the same district. Cooper Decl. App'x 1 at 3. These three counties and two cities were the exact area the Court examined and ultimately ruled had a sufficiently numerous and compact Black population to warrant a "new" majority black district. Plaintiffs' Remedial SD 28 combines south Clayton, east Fayette, and west Spalding counties. These same portions of Clayton, Fayette and Spalding are the areas Plaintiffs challenged with Illustrative SD 28. Other similarities between Illustrative SD 28 and Plaintiffs' Remedial SD 28 include keeping Griffin whole.

The same is true of the APA Remedial House Plan. For example, APA Remedial HD 74 joins adjacent parts of Clayton, Henry, and Spalding counties. Cooper Decl. App'x 1 at 6. As with APA Remedial SDs 17 and 28, Remedial HD

74 creates a "new" black majority district precisely where the Court found a Section 2 violation. *Alpha Phi Alpha*, 2023 WL 7037537, at *144.

* * *

As the Court said in its order, "Georgia has made great strides since 1965 towards equality in voting." *Alpha Phi Alpha*, 2023 WL 7037537 at *145. But it also acknowledged that there is more work to be done. *Id*. The Proposed Plans do not advance the work of building an equal political process in Georgia. They do not comply with the Court's directive. This Court should reject the Proposed Plans and order the adoption of lawful remedial plans that would actually remedy the vote dilution that continues to harm Black Georgians in violation of Section 2.

## CONCLUSION

For the foregoing reasons, the Court should appoint a special master or adopt the APA Remedial Plans or any other lawful remedial plans.

Respectfully submitted,

By: /s/*Rahul Garabadu*          /s/*Sophia Lin Lakin*
Rahul Garabadu (Bar 553777)      Sophia Lin Lakin*
*rgarabadu@acluga.org*           *slakin@aclu.org*
Cory Isaacson (Bar 983797)       Ari J. Savitzky*
Caitlin F. May (Bar 602081)      Ming Cheung*
ACLU FOUNDATION OF GEORGIA,      Jennesa Calvo-Friedman*
   INC.                          ACLU FOUNDATION
P.O. Box 570738                  125 Broad Street, 18th Floor
Atlanta, Georgia 30357           New York, New York 10004

25

Telephone: (678) 981-5295
Facsimile: (770) 303-0060

/s/*Debo Adegbile*
Debo Adegbile*
*debo.adegbile@wilmerhale.com*
Robert Boone*
Alex W. Miller*
Cassandra Mitchell*
Maura Douglas*
Eliot Kim*
Juan M. Ruiz Toro*
Joseph D. Zabel*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

Charlotte Geaghan-Breiner*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Telephone: (212) 519-7836
Facsimile: (212) 549-2539

George P. Varghese*
Denise Tsai*
Tae Kim*
WILMER CUTLER PICKERING HALE
  AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

Ed Williams*
De'Ericka Aiken*
Sonika R. Data*
WILMER CUTLER PICKERING HALE
  AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Anuj Dixit*
Marisa A. DiGiuseppe*
WILMER CUTLER PICKERING HALE
  AND DORR LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Counsel for Plaintiffs*
*Admitted pro hac vice

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1**

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, using a font type of Times New Roman and a point size of 14.

*/s/ Rahul Garabadu*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused to be served the foregoing *Plaintiffs' Objections to Defendant's Remedial Proposal and Memorandum of Law* with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel or parties of record on the service list:

This 12th day of December, 2023.

/s/ Rahul Garabadu