UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ALPHA PHI ALPHA FRATERNITY INC., et al.,<br><br>　　*Plaintiffs*,<br><br>　　vs.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia.<br><br>　　*Defendant.* | Case No. 1:21-cv-5337 |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR OBJECTIONS TO DEFENDANTS' REMEDIAL PROPOSAL**

Make no mistake: The *Alpha Phi Alpha* Plaintiffs absolutely *do* contest whether the General Assembly's Proposed Plans create two additional Black-majority Senate Districts and two additional Black-majority House Districts in south-metro Atlanta, and one additional Black-Majority House District in west-metro Atlanta. Defendant's statement to the contrary on the first page of its brief is wrong.

1

Plaintiffs' objection is straightforward and compelled by the Voting Rights Act: The Proposed Plans do not create additional Black-majority opportunity districts in the areas where this Court determined that Black voters are being harmed by vote dilution in violation of Section 2. It does not matter that the Proposed Plans make changes in North Atlanta outside the vote-dilution areas identified by the Court. It does not matter that the Proposed Plans eliminate North Atlanta districts that were electing Democrats. What matters is that *the voters whose rights have been violated do not live in North Atlanta.*

A lawful remedial plan must create new opportunities for the Black voters who are being harmed by the vote dilution that was proven and found in south-metro Atlanta and other specific areas. Not just renumbered districts. New opportunities. The Proposed Plans do not do that, and the numbers, *which Defendant does not dispute*, prove this beyond any doubt. In the south-metro Counties that were a focus of trial and of this Court's intensely local appraisal and determination of vote dilution—counties like Fayette, Spalding, Henry, and Newton—the number of Black voters in Black-majority districts went up by less than

3,000 for the entire Proposed Senate Plan. By contrast, almost 100,000 Black voters in North Atlanta, where no vote dilution was alleged or found, were shuffled around in order to increase the total number of Black-majority districts and create the illusion of a remedy. The problem is not that these changes alter the political reality for Black voters in North Atlanta. The problem is that it maintains the status quo for Black voters in the south-metro Atlanta area.

    Defendant does not even contest the point, arguing instead only that the configuration of the Proposed Plans served partisan goals. *See* Consol. Resp. to Pls.' Objs. Regarding Remedial Plans ("Def.'s Br.") at 50. That is unavailing. Partisan goals, "whatever [their] validity in the realm of politics, cannot justify" a Section 2 violation. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 441 (2006); *see also Perry v. Perez*, 565 U.S. 388, 393 (2012) (per curiam) (courts "should be guided by the legislative policies underlying a state plan ... to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act." (quoting *Abrams v. Johnson*, 521 U.S. 74, 79 (1997)).

The fundamental problem with the Proposed Plans is not that they seek to achieve partisan goals, but that they do so while disregarding the Court's order to remedy vote dilution in south-metro and west-metro Atlanta. They do not remedy the harm *to Black voters in particular areas of Georgia* which this Court found. This Court should sustain Plaintiffs' objections and put a lawful remedy into place.

## I.  Defendant Misstates the Standard for VRA Injuries and Remedies

Defendant's basic conception of harm and remedy here is wrong. Defendant argues that the General Assembly need only "draw the additional majority-Black districts in the defined *regions*," Def.'s Br. at 27, regardless of whether the purported "additional" districts change anything for Black *voters*. Defendant touts the fact that "more Black individuals of voting age will now be included in majority-Black districts," even as he concedes that this is true almost entirely by dint of changes *outside the area where Black voters are injured by vote dilution*— and even though in that area there has been little more than a "reshuffling of Black voters from existing majority-Black districts." Def.'s Br. at 43. He even wrongly suggests that, by focusing on the harms the

Court found to Black voters in south-metro Atlanta, west-metro Atlanta, and the area around Macon-Bibb arising from vote dilution, Plaintiffs are "mov[ing] the goalposts." *Id.* at 43-44.

But these goal posts are set by black letter law. The scope of the harm dictates the scope of the remedy required. That is why "a district court's remedial proceedings bear directly on and are inextricably bound up in its liability findings," Def.'s Br. at 23 (citing *Wright v. Sumter Cty. Bd. Of Elections & Registration*, 979 F.3d 1282, 1302-03 (11th Cir. 2020)). And here, the Court found specific harms—violations of the Voting Rights Act impacting Black voters in "south-metro Atlanta," "west-metro Atlanta," and "in and around Macon-Bibb." Pls.' Objs. to Def.'s Remedial Proposal & Memo. of Law ("Pls.' Br."), at 4 (quoting *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 2023 WL 7037537, at *143 (N.D. Ga. Oct. 26, 2023)). The remedy must follow that harm.

The State's attempt to divorce the Court's liability findings—which were grounded in Plaintiffs' evidence and which focused on south-metro Atlanta, west-metro Atlanta, and the area around Macon-Bibb—and the Court's remedial findings is entirely at odds with both long-standing

principles of equity and the requirements of Section 2. Traditional principles of equity dictate that "the nature of the violation determines the scope of the remedy." *Mississippi State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 406 (5th Cir. 1991). Injunctive relief is by definition tailored "to fit the nature and extent of the ... violation established." *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1041 (5th Cir. 1982). It is the very "essence of equity jurisdiction … to mould each decree to the necessities of the particular case." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971) (internal quotation marks omitted). Thus, courts "should not, in the name of state policy, refrain from providing remedies fully adequate to redress … violations which have been adjudicated and must be rectified." *White v. Weiser*, 412 U.S. 783, 797 (1973).

Remedying violations of Section 2 requires application of these principles. The Senate Report that accompanied the 1982 Amendments to Section 2 emphasized "[t]he basic principle of equity that the remedy fashioned must be commensurate with the right that has been violated." and expected courts to "exercise [their] traditional equitable powers to

6

fashion ... relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." S. Rep. No. 97-417, at 31 (1982). Congress expected courts to "exercise [their] traditional equitable powers to fashion ... relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." *Id.*; *see also Singleton v. Allen*, No. 2:21-CV-1291-AMM, 2023 WL 5691156, at *73 (N.D. Ala. Sept. 5, 2023) (citing same). In Section 2 cases, the question is whether the remedial plan corrects the "original violation" found, *Dillard v. Crenshaw Cnty.*, 831 F.2d 246, 248 (11th Cir. 1987), which here includes harm from vote dilution to Black voters in south-metro Atlanta, west-metro Atlanta, and the area around Macon-Bibb, Pls.' Br. at 4.

Because the Proposed Plans do not remedy the harms suffered by *those specific* Black voters in *those specific* areas of Georgia, the Court cannot accept them. *Cf. United States v. Osceola Cnty.*, 474 F. Supp. 2d 1254, 1256 (M.D. Fla. 2006) (refusing to accept a jurisdiction's remedial

7

plan because it included two at-large seats that would be "completely out of reach of the Hispanic community" that the Court had found to be harmed by vote dilution); *United States v. Village of Port Chester*, 704 F. Supp. 2d 411, 450-52 (S.D.N.Y. 2010) (requiring that a jurisdiction implement an "education program and election day support for Spanish-speakers" so that a proposed remedial plan that introduced a new voting system would be fully understood by the Hispanic voters experiencing the Section 2 violation the court had found).

## II.   Defendant Mischaracterizes *Shaw v. Hunt*

Defendant's attempted reliance on *Shaw v. Hunt*, 517 U.S. 899 (1996), is misplaced. *See* Def.'s Br. at 28-30. While states do "retain broad discretion in drawing districts to comply with the mandate of §2," *Shaw*, 517 U.S. at 917 n.9, that discretion does not permit a state legislature to ignore the "intensely local appraisal" conducted by a district court when it comes to fashioning a remedy for proven violations of federal law. *See Allen v. Milligan*, 599 U.S. 1, 19 (2023) (citation omitted). The discretion owed to the state "has limits." *League of United Latin Am. Citizens*, 548 U.S. at 429.

The Supreme Court made clear in *Shaw*, moreover, that "[i]f a § 2 violation is proved for *a particular area, . . .* [t]he vote-dilution injuries suffered by the[] persons [residing in that area] are not remedied by creating a safe majority-black district somewhere else in the State." *Shaw*, 517 U.S. at 917 (emphasis added). The example provided in *Shaw* is illustrative: "[I]f a geographically compact, cohesive minority population lives in south-central to southeastern North Carolina," a remedial district that spans the north-central region of the state would not address the Section 2 violation because the "black voters of the south-central to southeastern region would still be suffering precisely the same injury that they suffered before [the misplaced remedial district] was drawn." *Id.* According to *Shaw*, a majority-Black district drawn elsewhere, away from where the Section 2 violation was found, cannot be

9

a sufficient remedy because the "right to an undiluted vote" belongs to individuals, not the minority community as a group. *Id.*[1]

Here, the Court conducted the "searching local appraisal of the facts" required in Section 2 vote dilution cases. *See Alpha Phi Alpha Fraternity Inc.*, 2023 WL 7037537, at *143. And it found Section 2 violations in the areas Plaintiffs challenged: Most notably, in and around the five-county region in south-metro Atlanta. Yet, the State's ostensibly "new" majority-Black Senate and House districts are untethered to the Court's liability analysis, specifically its findings that the State had diluted the voting power of Black voters in south-metro and west-metro Atlanta. For example, in the Proposed Senate Plan, almost 100,000 Black voters are added to Black-majority districts in areas like Cobb County, North Dekalb County and Gwinnett County, where there was no finding

---

[1] Defendant's argument that his Proposed Plans "increase the number of majority-Black districts," Def.'s Br. at 49, statewide is also insufficient to show that it has completely remedied the prior vote dilution because, as *Shaw* explained, the right to an undiluted vote does not belong to the minority as a group, but rather to the individual voters who have been harmed. *Shaw*, 517 U.S. at 917 ("To accept that the district may be placed anywhere implies that the claim, and hence the coordinate right to an undiluted vote (to cast a ballot equal among voters), belongs to the minority as a group and not to its individual members. It does not.")

of vote dilution. *See* Pls.' Br. at 2. But in the south-metro Atlanta area, that number is two orders of magnitude less. Notwithstanding the renumbering of a few districts, the actual Black voters that the Court identified as having their voting power diluted and experiencing harm will, under the Proposed Plans, "still be suffering precisely the same injury that they suffered before [the Proposed Plans were] drawn." *Shaw*, 517 U.S. at 917.

It is no response to argue that *Shaw* "le[ft] open the question what exactly constitutes 'somewhere else in the state.'" Def.'s Br. at 27.[2] Wherever the bounds of "somewhere else" fall, they are exceeded here. To start, this case is even more extreme than *Shaw*—the new majority-Black districts have virtually *no* overlap with the vote-dilution area, and the Proposed Plans add fewer than 3,000 Black voters in the vote-dilution

---

[2] Defendant suggests that the remedial maps need not be connected to the injury determined by the Court because the Court "identified the *injury* and the *remedy* in two distinct parts of the Order." *See* Def.'s Br. at 33 (emphasis in original). Not only does Defendant fail to provide any legal support for this novel theory, but he fails to address Eleventh Circuit precedent that "a district court's remedial proceedings bear directly on and are inextricably bound up in its liability findings." *Wright*, 979 F.3d at 1302-03.

11

area to majority-Black districts in the Senate, and similarly low numbers in the House. In all events, Defendant's suggestion regarding the theoretical ambiguity of "somewhere else" is no excuse to disregard the teaching of *Shaw*, not to mention fundamental principles of equity and decades of Section 2 litigation. Applying that teaching and those principles here leads to a clear conclusion: New opportunities for Black voters in North Atlanta do not and cannot remedy vote dilution harms in south-metro Atlanta. It is that simple.

This Court gave the General Assembly clear instructions, a clear description of the violation to be remedied, and an opportunity to put a remedy into place. Whatever discretion is still owed to the State is necessarily constrained by the paramount duty to ensure a remedy for the Section 2 violations that this Court found. *See League of United Latin Am. Citizens*, 548 U.S. at 430. The Black Georgia voters harmed by that vote dilution are entitled to nothing less.

## CONCLUSION

For the foregoing reasons, and those set out in their Objections to Defendants' Remedial Proposal and Memorandum of Law, Plaintiffs respectfully request that the Court appoint a special master to begin devising a complete Section 2 remedy or adopt the APA Remedial Plans or any other lawful remedial plans.

Respectfully submitted,

By: /s/*Rahul Garabadu*
Rahul Garabadu (Bar 553777)
*rgarabadu@acluga.org*
Cory Isaacson (Bar 983797)
Caitlin F. May (Bar 602081)
ACLU FOUNDATION OF GEORGIA, INC.
P.O. Box 570738
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060

/s/*Debo Adegbile*
Debo Adegbile*
*debo.adegbile@wilmerhale.com*
Robert Boone*
Alex W. Miller*
Cassandra Mitchell*
Maura Douglas*
Eliot Kim*
Juan M. Ruiz Toro*

/s/*Sophia Lin Lakin*
Sophia Lin Lakin*
*slakin@aclu.org*
Ari J. Savitzky*
Ming Cheung*
Casey Smith*

ACLU FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

George P. Varghese*
Denise Tsai*
Tae Kim*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

WILMER CUTLER PICKERING
  HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888

Charlotte Geaghan-Breiner*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

Facsimile: (617) 526-5000

De'Ericka Aiken*
Ed Williams*
Sonika R. Data*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Ave. NW
Washington, D.C. 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Anuj Dixit*
Marisa A. DiGiuseppe*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Counsel for Plaintiffs*
\*Admitted *pro hac vice*

14

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1**

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, using a font type of Century Schoolbook and a point size of 14.

*/s/ Rahul Garabadu*

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused to be served the foregoing ***Plaintiffs' Reply Brief in Support of Objections to Defendant's Remedial Proposal*** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel or parties of record on the service list:

This 19th day of December, 2023.

*/s/ Rahul Garabadu*