1
2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

3

4    ALPHA PHI ALPHA FRATERNITY,        )A.M. SESSION
     INC., ET AL.,                      )
5                      PLAINTIFFS,      )
                                        )DOCKET NO.1:21-CV-05337-SCJ
6          -vs-                         )
                                        )
7    BRAD RAFFENSPERGER,                )
                                        )
8                      DEFENDANT.       )
     _____
9    COAKLEY PENDERGRASS,               )
     ET AL.,                            )
10                     PLAINTIFFS,      )
                                        )DOCKET NO. 1:21-CV-5339-SCJ
11         -VS-                         )
                                        )
12   BRAD RAFFENSPERGER, ET AL.,        )
                                        )
13                     DEFENDANTS.      )
     _____
14   ANNIE LOIS GRANT, ET AL.,          )
                                        )
15                     PLAINTIFFS,      )
                                        )DOCKET NO. 1:22-CV-00122-SCJ
16         -VS-                         )
                                        )
17   BRAD RAFFENSPERGER, ET AL.,        )
                                        )
18                     DEFENDANTS.      )
     _____

19
20          TRANSCRIPT OF REMEDIAL HEARING PROCEEDINGS
              BEFORE THE HONORABLE STEVE C. JONES
21              UNITED STATES DISTRICT JUDGE
                WEDNESDAY, DECEMBER 20, 2023

22

23          VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
     OFFICIAL COURT REPORTER FOR THE HONORABLE STEVE C. JONES
24              UNITED STATES DISTRICT COURT
                     ATLANTA, GEORGIA
25                     404-215-1479
              VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV

2

1  APPEARANCES:

2  ON BEHALF OF THE PLAINTIFFS:

3   ARI J. SAVITZKY, ESQ.
    RAHUL GARABADU, ESQ.
4   JUAN RUIZ TORO, ESQ.
    ABHA KHANNA, ESQ.
5   BENJAMIN WINSTEAD, ESQ.
    MICHAEL JONES, ESQ.
6   ADAM SPARKS, ESQ.

7

   ON BEHALF OF THE DEFENDANT:
8
    BRYAN P. TYSON, ESQ.
9   DIANA F. LA ROSS, ESQ.
    BRYAN JACOUTOT, ESQ.
10  RUSSELL WILLARD, ESQ.
    DONALD P. BOYLE, JR., ESQ.
11  FRANK STRICKLAND, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    WITNESS                              PAGE

3      MS. KHANNA                          5
       MR. TYSON                          36
4      MS. KHANNA                         55
       MR. SAVITZKY                       61

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (HELD IN OPEN COURT AT 9:25 A.M.)

2          THE COURT:  Okay.  Ms. Wright, you can call the case

3    for the day.

4          THE DEPUTY CLERK:  Yes, sir.  The Court calls the

5    matter of Alpha Phi Alpha Fraternity, Inc., and others v. Brad

6    Raffensperger, Civil Action No. 1:21-CV-5337; Coakley

7    Pendergrass and others v. Brad Raffensperger and others, Civil

8    Action No. 1:21-CV-5339; and Annie Lois Grant and others v.

9    Brad Raffensperger and others, Civil Action No. 1:22-CV-122.

10         THE COURT:  All right.  And we'll start off first

11   with the Alpha attorneys.  Introduce yourselves, proceeded by

12   either Grant or Pendergrass, and then we'll go to the State

13   and introduce your lawyers involved.

14         You may proceed.

15         MR. SAVITZKY:  Good morning, Your Honor.

16         THE COURT:  Good morning.

17         MR. SAVITZKY:  Good to be back in your courtroom.

18   Ari Savitzky from the ACLU.

19         THE COURT:  I haven't seen you in two months.  I

20   started feeling like you didn't love me anymore, you know.

21         MR. SAVITZKY:  Ari Savitzky for the Alpha Phi Alpha

22   plaintiffs.  And with me at counsel table are Juan Ruiz Toro

23   and Rahul Garabadu from WilmerHale and the ACLU of Georgia

24   respectively.

25         THE COURT:  Good morning to you-all.  Thank you.

1          MR. SAVITZKY:  Good morning.

2          MS. KHANNA:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MS. KHANNA:  Abha Khanna on behalf -- I'll be

5   speaking to you on behalf of the Pendergrass plaintiffs.  With

6   me at counsel table are Mike Jones and Adam Sparks, we

7   represent also the Grant plaintiffs.  And Mr. Jones will be

8   speaking on behalf of the Grant plaintiffs today.

9          THE COURT:  Always good having a Jones in the house.

10  Good morning to you-all.

11          Yes, Mr. Tyson.  I haven't talked with you -- I

12  haven't had a new case with you in about two months.  Are you

13  getting bored with me or something?

14          MR. TYSON:  Your Honor, it's not an election year

15  yet, but it's coming very soon.

16          THE COURT:  Listen, listen, don't talk like that.

17  We're going to have a nice clean election 2024 year.

18          MR. TYSON:  Certainly we are.

19          Your Honor, Bryan Tyson for the defendant Secretary

20  Raffensperger.  I'm joined by Bryan Jacoutot, Diana La Ross,

21  Don Boyle from our firm.  And then Russ Willard from the

22  Attorney General's Office is joining us as well.

23          Mr. Jaugstetter is here with Ms. Wright on behalf of

24  the Legislature.

25          And I was asked to convey regrets and greetings from

1  Senator Echols and from Representative Leverett.  They are

2  part-time legislators who have obviously been dealing with

3  these issues.  They wanted to be here today, but weren't able

4  to be.  They asked me to -- they didn't want that to make you

5  think there was any indication on how seriously they took this

6  process.

7        THE COURT:  I do not take it personally.  I have

8  enough people here to keep me entertained.

9        MR. TYSON:  Thank you, Your Honor.

10        THE COURT:  Thank you.

11        MR. TYSON:  Oh, and I'm sorry, Your Honor.  I

12  neglected to introduce Frank Strickland is here as well.

13        THE COURT:  Good morning to each and every one of

14  you-all.

15        This Court conducted a bench trial on plaintiffs'

16  claims, as well as the claims of two related cases, alleging

17  Section 2 violations.  We have the Alpha plaintiffs, we have

18  the Pendergrass plaintiffs, and we have the Grant plaintiffs,

19  and of course everybody else that is associated with that, v.

20  Raffensperger case.

21        The Court issued a consolidated order on October 26,

22  2023, containing its findings of facts and conclusions of law.

23  Ultimately, this Court concludes that the 2021 plans violated

24  Section 2 in specific geographic areas of the state.

25        To remedy the statutory violations, the Court ordered

1   the creation of two additional Black -- majority Black Senate

2   districts in South Metro Atlanta, one additional majority

3   Black House district in West Metro Atlanta, and two additional

4   majority Black House districts in and around Macon-Bibb.

5          In accordance with the Supreme Court precedent, this

6   Court afforded the Georgia General Assembly the opportunity to

7   meet the requirements of Section 2 by adopting substitute

8   measures.  During a special session, beginning on November the

9   29th, 2023, the General Assembly enacted SB 1EX, a remedial

10  State Senate plan, HB 1EX, a remedial State House plan, which

11  is known as remedial plans here out.

12         On December 8th, 2023, Governor Brian Kemp signed the

13  bills into law.

14         Plaintiffs have filed objections to remedial plans,

15  and we're here this morning to hear their objections and then

16  the response from the defendants.

17         Having considered the parties' briefs and the

18  disagreements among the parties about the use of the term

19  "minority opportunity district," at pages 509 and 510 of the

20  Court's October 26th order, this order was based on a

21  Section 2 inquiry that, from the outset, was focused on the

22  voting rights of Black voters in specific areas in the state.

23         Given that the scope of this case has always been

24  about Black voters, the Court was not asked to address other

25  minority groups, nor does the Court recall any evidence

1  pertaining to the existence of any minority opportunity

2  district consisting of a minority other than Black voters.

3      For example, I do not recall any evidence offered at

4  trial regarding political cohesiveness among Black, Latino,

5  and Asian voters.  I also do not recall any evidence that

6  white voters voted as a bloc to defeat the opportunity of

7  these minority groups to elect a candidate of their choice.

8  Nor was there any evidence to support a finding of the

9  totality of the circumstances.

10      It is my understanding the Pendergrass group will go

11  first.  The Court invites the parties to address these

12  thoughts in their presentation today.

13      Pendergrass plaintiffs may proceed.

14      MS. KHANNA:  Thank you, Your Honor.  Just one or two

15  housekeeping things before we proceed.

16      One is I think on behalf of all the parties, we'd

17  like to formally submit into evidence the various declarations

18  and expert reports that have been attached to our pleadings in

19  I think all three cases.

20      THE COURT:  Any objection from Alpha?

21      MR. SAVITZKY:  No, Your Honor.  And for us, that

22  would be the Cooper declaration and the exhibits thereto that

23  were attached to our objections.

24      THE COURT:  And since Ms. Khanna speaks for both

25  Grant and Pendergrass, any objection from the State?

1    MR. TYSON:  No, Your Honor.  And all of our exhibits

2   attached to our brief are going in as well.

3    THE COURT:  So ordered.

4    You may proceed with the next matter.

5    MS. KHANNA:  Thank you, Your Honor.

6    One last housekeeping thing.  There was some question

7   earlier among the parties -- among counsel whether or not the

8   Court would allow the plaintiffs to reserve time for rebuttal.

9   I know you've given me an hour --

10    THE COURT:  An hour.  However you want to do that one

11   hour, you can do five minutes now and 55 minutes after the

12   State.

13    MS. KHANNA:  I don't think I will do quite that

14   division of time, Your Honor, but I will reserve some time for

15   rebuttal -- at least I will certainly try.

16    THE COURT:  Yes, ma'am.

17    MS. KHANNA:  Good morning, Your Honor.

18    THE COURT:  Good morning.

19    MS. KHANNA:  May it please the Court, Abha Khanna

20   again on behalf of the Pendergrass plaintiffs.

21    We are here today to discuss whether the General

22   Assembly's reported remedy to the Section 2 violation that

23   this Court found within Georgia's congressional districts is

24   adequate and lawful.  Plaintiffs submit it is neither.

25    This Court's October 26th ruling was both thorough

1  and clear.  On page 514 of its order, it declared that

2  Georgia's 2021 congressional map, quote, violates Section 2 of

3  the Voting Rights Act as to the following districts and areas:

4  Enacted Congressional Districts 3, 6, 11, 13, and 14.

5       On page 514 to 515 of the Court's order, it afforded

6  the General Assembly an opportunity to craft a remedy to that

7  violation in the first instance.

8       On page 510, the Court expressly retained

9  jurisdiction to determine whether the remedial plans adopted

10  by the General Assembly remedy the Section 2 violations by

11  incorporating, quote, additional districts in which Black

12  voters have a demonstrable opportunity to elect their

13  candidates of choice.

14       On that same page, the Court cautioned that an

15  acceptable remedy must completely remedy the prior dilution of

16  minority voting strength and fully provide equal opportunity

17  for minority citizens to participate and to elect candidates

18  of their choice.

19       On page 511, the Court made that -- made clear that

20  compliance with that standard will require the Court to

21  evaluate a remedial proposal under the Gingles standard to

22  determine whether it provides Black voters with an additional

23  opportunity district.

24       And as this Court has already mentioned, on page 509

25  to 510, it stated in no uncertain terms the State cannot

1   remedy the Section 2 violation described herein by eliminating

2   minority opportunity districts elsewhere in the plans.

3        This Court does not need to comb through the evidence

4   or ring its hands to determine whether the General Assembly's

5   remedial congressional plan comports with the Court's clear

6   instructions.  It plainly does not.

7        THE COURT:  How?

8        MS. KHANNA:  I'll walk you through point by point,

9   Your Honor.

10       And, in fact, as the record, as the arguments have

11  borne out, that was exactly the point.

12       The Court identified five congressional districts

13  where Black Georgians suffered a Section 2 vote dilution

14  injury.  The State's response?  No.  We'll craft a partial

15  remedy for part of that area, but for the rest, we're going to

16  look elsewhere.

17       The Court specified that the remedy must include an

18  additional district in which Black voters have an opportunity

19  to elect their candidate of choice.  The State's response was

20  no.  We'll draw a new map that includes the same number of

21  districts in which Black voters have an opportunity to elect

22  their preferred candidates.

23       The Court instructed that the State cannot eliminate

24  existing opportunity districts elsewhere in the plan.  The

25  State's response:  No.

1          Instead it would knowingly and intentionally

2    eliminate a majority-minority district that once did but no

3    longer provides Black voters an opportunity to elect their

4    preferred candidates.

5          I will walk through each of these objections one by

6    one, Your Honor, and provide more detail.  I know exactly

7    what -- I understand that's what the Court is looking for, but

8    I just want to preface, Your Honor --

9          THE COURT:  Any way you plan on presenting it.

10         MS. KHANNA:  I appreciate it.

11         We have seen this movie before.  This is not the

12   first time a Section 2 defendant has taken the opportunity

13   afforded by a Court to remedy a Section 2 violation and

14   squandered it by trying to sneak in a new way to dilute

15   minority voting strength.  That's been par for the course

16   since 1965.

17         This is not even the first time this year where a

18   state has openly defied a Court order, refused to follow the

19   law under Section 2, and challenged a federal court to hold it

20   accountable.

21         Now, Georgia clutches its pearls at the very notion

22   that it could be pulling a stunt like Alabama.  But make no

23   mistake:  It has taken a page out of Alabama's playbook and

24   pulled a stunt all on its own.

25         That playbook is nothing new.  In fact, Section 2 was

1    designed to prevent against the ever ingenious and not so

2    ingenious stunts that states try to pull to avoid providing an

3    equal opportunity for minority voters.

4          Let me walk through each of plaintiffs' specific

5    objections to the remedial congressional plan.

6          With the Court's indulgence, I'm going to try to use

7    the Elmo.

8          THE COURT:  All right.  To the general public, can

9    you-all see it on your cameras?  Can you-all in the jury box

10   see it?  All right.

11         Of course, can Mr. Tyson and all the parties see it?

12         Everybody can see it but me.  Mine is not working.

13         I don't count.  I can see it right here.

14         MS. KHANNA:  Your Honor, on the screen right now is

15   from Mr. Cooper's remedial report, which we just admitted into

16   evidence, Figure 1 on page 5.

17         In red, Your Honor, this is the area that this Court

18   expressly and specifically defined as home to a Section 2

19   violation in need of a remedy.  That's CDs 3, 6, 11, 13, and

20   14.

21         In finding and defining the parameters of the

22   Section 2 violation, this Court identified these voters in

23   these districts who suffered a vote dilution injury.

24         This, Your Honor, is the 2023 plan drawn by the

25   General Assembly.  And if we look closer at CD-6 -- I won't

1   try to zoom for the sake of time.  The new majority Black

2   district, which is CD-6, we see that it only partially draws

3   from that vote dilution area.  In fact, more than a quarter of

4   its population draws from what was neighboring CD-5, which lay

5   entirely outside the vote dilution area.

6           Now, CD-5 was not home to a Section 2 violation.

7   CD-5's voter -- voters were not in need of a Section 2 remedy.

8   As defendants' own expert, Dr. Barber, admits, CD-5 was

9   already a majority-minority district in which Black voters had

10  an opportunity to elect their preferred candidates.

11          The General Assembly, in choosing to provide a

12  Section 2 remedy to those without a Section 2 injury, also

13  chose to deprive a Section 2 remedy for those with a Section 2

14  injury.

15          And as the Supreme Court stated in LULAC v. Perry,

16  the State's creation of an opportunity district for those

17  without a Section 2 right offers no excuse for its failure to

18  provide an opportunity for those with a Section 2 right.

19          Let's also take a look at CD-7 under the map -- under

20  the 2023 remedial map.  Now, CD-7 -- CD-7 in the old map laid

21  out entirely outside of the vote dilution area.

22          In the new map, CD-7 is dramatically redrawn to -- to

23  dive into the vote dilution area.  More than 75 percent of its

24  population pulls directly from the districts that this Court

25  said plaintiffs are -- Black voters suffered a violation of

their voting rights under Section 2, pulls those -- 75 percent

of its population from the vote dilution area, and joins it up

with a -- into a new minority white district that goes as far

north as Lumpkin County.

And just think about that, Your Honor.  When the

General Assembly sat down to remedy the violation identified

by this Court in a specific handful of districts, it said, eh,

we're going to remedy this violation by providing a remedy for

people outside those districts.  And for some -- for the

people who live in those districts, we're going to

specifically redraw another district that was entirely

unaffected by the Section 2 violation so that it spans some

six counties, grabs those voters who have suffered a vote

dilution injury, and draw them in a new district in which they

cannot elect -- they have no opportunity to elect their

preferred candidates.

Now, defendant makes a few arguments in response.

Defendant contends on page 26 of their brief -- of his brief

that, quote, this Court's order did not find the particular

district boundaries it listed violated Section 2.

And I confess, Your Honor, that I am at a loss to

reconcile that argument with the Court's statement on page 514

in which it declared in bold that, quote, SB 2EX violates

Section 2 of the Voting Rights Action as to the following

districts areas:  Enacted Congressional Districts 4, 6, 11,

1  13, and 14.

2       Defendant seems to contend that we, plaintiffs, are

3  being too literal in taking the Court at its word that the map

4  violates Section 2 in these specific districts.  And, in fact,

5  the Court was just broadly gesturing at a region when it

6  enumerated precise districts where the Section 2 violation

7  occurred.

8       Under defendant's reading, the Court could just as

9  well have omitted the reference to specific districts

10  altogether and the overall finding would have been the same.

11       Respectfully, Your Honor, I do not think that the

12  Court's reference to these specific districts was a slip of

13  the pen.  I assume that the Court enumerated these districts

14  for a reason, and that that reason was to make clear where the

15  Section 2 violation occurred and needed to be cured.

16       Second, defendant finds support for his regional

17  understanding of the Section 2 violation in the fact that the

18  Court, quote, identified the injury and the remedy in two

19  distinct parts of its order.  And that's on page 28 of the

20  defendant's brief.

21       Now, the defendant's brief repeatedly contends that

22  this makes sense, this kind of separation between injury and

23  remedy makes sense because of a, quote, unquote, regional

24  approach to Section 2 and because of generalized federalism

25  concerns.

1          But defendant fails to cite any case law in support

2    of these purported principles.  And, in fact, the case law

3    says just the opposite.

4          Precedent does not invite states to approximate a

5    Section 2 remedy upon a finding -- upon a finding of a Section

6    2 violation.  To the contrary, it requires a complete remedy

7    that fully provides an equal opportunity to elect.

8          Precedent does not invite courts to turn the other

9    way whenever a state contends that it remedies a Section 2

10   violation in some or even most respects.

11         To the contrary, it demands that courts, quote,

12   cannot authorize an element of an election proposal that will

13   not with certitude completely remedy the Section 2 violation.

14         Precedent does not invite states to craft a Section 2

15   remedy divorced from the Section 2 injury.  To the contrary.

16   Under Section 2, the right and the remedy are inextricably

17   bound together.  And, in fact, it is a bedrock principle of

18   law that dates back to Marbury v. Madison, and has been

19   reiterated in countless opinions since that there is no right

20   without a remedy and there is no remedy without a right.  The

21   two are bound together.

22         Third, defendant contends on page 31 of his brief

23   that even if the legislature was limited to the enumerated

24   districts for drawing the new majority Black districts, the

25   new districts include, quote, significant areas from the

1    districts identified by the Court.

2           Now, as an initial matter, defendant spends the next

3    several pages of his brief defending the House and the Senate

4    remedial plans on this basis, but makes no mention whatsoever

5    of the congressional plan.

6           But even setting that aside, Your Honor, defendant's

7    plea for partial credit rings hollow where Section 2 precedent

8    calls for a full and complete remedy.

9           Plaintiff's next objection is to the State's

10   elimination of a minority opportunity district elsewhere in

11   the plan, in direct contravention of this Court's order.

12          Part of this, Your Honor, is simple math.  This Court

13   held on page 510 of its order that the Section 2 remedy must

14   incorporate an additional district in which Black voters have

15   a demonstrable opportunity to elect their candidates of

16   choice.

17          We don't have to look much farther than the expert

18   report submitted by Dr. Barber on behalf of defendant to see

19   that the General Assembly's remedial map does no such thing.

20          On page 8 of Dr. Barber's report, in paragraph 1,

21   Dr. Barber tells us that collectively there were five

22   majority-minority VAP districts in the 2021 plan.  That's

23   V-A-P, VAP districts.

24          Two paragraphs down he also tells us that

25   collectively there are five majority-minority VAP districts in

1    the 2023 plan.

2            In Section 2.5 of his report, Dr. Barber also

3    performs an analysis of what he calls electoral effectiveness

4    of the two plans.

5            According to Dr. Barber, in both maps there are five

6    congressional districts that are likely to be solidly

7    Democratic in future elections.  Now, why Dr. Barber chooses

8    to phrase his effectiveness analysis in partisan terms is

9    anyone's guess.

10           But, regardless, his report and his Table 4 makes

11   clear that the 2021 plan had five majority-minority districts

12   that were effective for Black-preferred candidates, and the

13   2023 plan just swaps out one majority-minority district for

14   another to achieve that same effect:  Five Black opportunity

15   districts in the 2021 plan, and five Black opportunity

16   districts in the 2023 plan.

17           There is no dispute that the 2023 plan does not

18   incorporate an additional district in which Black voters have

19   a demonstrable opportunity to elect their candidates of choice

20   as required by this Court.

21           Now, this Court went on.  We can end there, Your

22   Honor, to show that they have not abided by this Court's

23   order.  But on page 509 to 510 the Court further and

24   specifically instructed:  The State cannot remedy the Section

25   2 violation described herein by eliminating minority

1    opportunity districts elsewhere in the plan.

2         Now, this Court just made clear this morning that in

3    referring to minority opportunity districts, it was referring

4    to the subject of the vote dilution inquiry during the

5    liability phase, which were Black voters in Georgia.

6         But even if one were to limit their understanding to

7    that context, limit the understanding of minority to just be

8    Black voters in the context of this case, then a minority

9    opportunity district would mean a district in which Black

10   voters have a reasonable opportunity to elect their candidates

11   of choice.

12        And if there remained any confusion on that point,

13   one need only look further down the page, on the same page,

14   where the Court makes clear that the remedial plans adopted by

15   the General Assembly must remedy the Section 2 violations by

16   incorporating additional districts in which Black voters have

17   a demonstrable opportunity to elect their candidates of

18   choice.

19        And if anyone were still confused as to what this

20   Court meant when it was talking about the prohibition on

21   eliminating minority opportunity districts elsewhere in the

22   plan, all they'd need to do was read the next paragraph where,

23   once again, this Court clarifies that the Court will evaluate

24   a remedial proposal to determine whether it provides Black

25   voters with an additional opportunity district.

 1          But that is not how the defendant or the General
 2   Assembly chose to read this Court's order.  Instead, as the
 3   defendant explains on page 49 of his brief, they decided to
 4   basically stop reading on page 509 of this Court's order where
 5   the Court said that the remedy involves an additional majority
 6   Black congressional district in West Metro Atlanta.

 7          Defendant argues on page 49 that because this Court
 8   clearly required additional majority Black districts, the
 9   definition of minority opportunity district that is most
10   logical based on this Court's ruling and decision is limited
11   to majority Black districts.

12          The defendant goes on.  Under that most logical
13   reading, according to defendant, no existing minority
14   opportunity district, that is, no majority Black districts
15   were eliminated in any of the remedial plans.  As the -- then
16   the defendant argues that that should end the analysis of the
17   legislature's compliance on that point.

18          Needless to say, Your Honor, plaintiffs disagree.

19          And I'll go one step further, Your Honor, and submit
20   that the General Assembly's and the defendant's feigned
21   ignorance of the distinction between a majority Black district
22   and a minority opportunity district or a Black opportunity
23   district, is not in good faith.  It is an attempt to play fast
24   and loose with the language of this Court's order, and it
25   attempts to catch plaintiffs and Georgia's Black voters and

1  this Court in a game of gotcha.  This Court should not play

2  along.

3          The State of Georgia knows full well what an

4  opportunity district is.  During his opening statement at the

5  beginning of trial, defendant's counsel pointed to the

6  election of Representative Lucy McBath from District 7 as

7  proof that Georgia had five congressional districts in which

8  Black voters had a sufficient opportunity to elect

9  Black-preferred candidates in satisfaction of Section 2.

10         He repeatedly referred to Representative McBath as

11 both a Black and Black-preferred candidate.  And he

12 specifically asked that if this Court finds a Section 2

13 violation, what is the impact on the 7th District?  Could the

14 legislature just dismantle that opportunity district?

15         Now, during my closing statement at the end of trial,

16 I responded directly to that question.  And I stated, at

17 page 2372 of the transcript, that the question posed by the

18 State should be seen for what it is, which is a threat to just

19 trade-off minority opportunities from one district to another.

20         THE COURT:  On page 237 what?

21         MS. KHANNA:  Page 2372.

22         THE COURT:  I'm going to tell you what you said on

23 2371.  On 2371 you said, Congressional District 7, Gwinnett

24 County, is a majority-minority district.  Now, to be clear,

25 there is nothing in the record about the preference of each

1   racial group in this district and the performance of each

2   racial groups' preferred candidate.

3        MS. KHANNA:  Correct, Your Honor, and that's true.

4        And I know that Your Honor this morning emphasized

5   that there was nothing in the record particularly about Latino

6   and Asian voters.  That is part of a separate objection that

7   we have about the new and independent violation of

8   Section 2 that the 2023 map imposes.

9        But when it comes to the 2021 map, the State's very

10  own -- it's not about -- the State's own comments in the

11  record, the State's own admissions in the record, and the

12  State's own evidence in the record, indicates that there

13  are -- that's -- sorry -- Congressional District 7 was a

14  district in which Black voters had an opportunity to elect the

15  Black-preferred candidate.

16       THE COURT:  Dr. Palmer was being cross-examined by

17  Mr. Jacoutot.  And Mr. Jacoutot asked the question, "To be

18  clear, you specifically did not analyze Congressional

19  District 7 in your report?"

20       And Dr. Palmer's response was, "No.  That was not

21  part of the focus area."

22       MS. KHANNA:  That is correct, Your Honor.  And I

23  guess I would -- I believe that the -- when the State came up

24  here and it argued and it provided evidence that there was

25  sufficient opportunity, Black voters have had their day --

1          THE COURT:  The argument becomes evidence.

2          MS. KHANNA:  They provided evidence in the course of

3   Dr. Alford's report, Your Honor, that basically said that

4   Section 2 has been satisfied in this state because of the

5   existence of Lucy McBath's district.  Because of the existence

6   of CD-7 in which Black voters had the opportunity to elect the

7   Black and Black-preferred candidate.

8          I don't believe, Your Honor, that this -- that the

9   defendant is prepared to take that back or argue otherwise.

10  That is exactly what -- the basis for their defense was that

11  there has been enough opportunity provided in the state of

12  Georgia, and this Court disagreed.  This Court said, no, there

13  needs to be an additional opportunity district.

14         When I responded to the defendant's threat to

15  trade-off Black opportunities from one district to another, I

16  specifically said, Your Honor, that what I hear defendant

17  saying is if plaintiffs want more opportunities for Black

18  voters in CD-6, in Western Metro Atlanta, the State may just

19  choose to eliminate the opportunity in CD-7 in Gwinnett

20  County.

21         And I said, make no mistake, Your Honor, the State

22  cannot feign innocence in pulling a bait and switch on

23  minority voters and try to zero out minority voting strength

24  across the state in purported compliance with the Voting

25  Rights Act.  Indeed, Johnson v. De Grandy, written some 30

1   years ago, saw this argument coming.

2          In short, Your Honor, the elimination of an

3   opportunity district in which Black voters had the opportunity

4   to elect their preferred candidate, the Black-preferred

5   candidate in CD-7, was exactly what defendant threatened might

6   happened, was exactly what plaintiffs argued against, and it

7   is exactly what this Court expressly prohibited in its order

8   when it said it may not eliminate the opportunity elsewhere in

9   the plan.

10          And yet just a few weeks later it is exactly what the

11  State of Georgia did.  And I'll say now exactly what I said

12  back at trial.  This Court should reject the State's attempt

13  to use the gains of Black voters -- that Black voters have

14  accomplished through sheer numbers to impose a ceiling on

15  minority voting opportunities in the state.

16          And I said one more thing that day, Your Honor.  My

17  last words before sitting down at closing argument at that

18  point were that plaintiffs are prepared to continue this fight

19  to ensure that not another election goes by based on unlawful

20  maps and to try to stave off the State's ever morphing and

21  ever ingenious ways of diluting minority voting strength.  And

22  I meant what I said, Your Honor, just like this Court meant

23  what it said in its order a few weeks ago -- a few weeks

24  later, and that's why we are here today.

25          Before I move on to our final objection about the new

1    and independent Section 2 violation, I do want to clarify,

2    Your Honor, that in arguing that the 2023 remedial

3    congressional map is an inadequate remedy, plaintiffs are not

4    making a coalition district claim.  Plaintiffs are not relying

5    on the votes and the voting patterns of Latino or Asian

6    voters.

7            Plaintiffs are relying on the evidence in the record

8    and the existing understanding of what -- where in the map

9    Black voters had the opportunity to elect.  And at the end of

10   the day, there is no dispute that Black voters had the

11   opportunity to elect a preferred candidate in five districts

12   in 2021 and five districts in 2023.

13           And if the Court does not think that that was in the

14   record in the liability phase, it is in the record today in

15   the form of Dr. Barber's report.

16           The last objection, Your Honor, plaintiffs contend

17   that not only does SB3EX utterly fail under the governing

18   standard for a Section 2 remedy, it independently violates

19   Section 2 anew.

20           We've outlined that argument in our briefs, and I'll

21   just highlight a few points here.

22           First, on Gingles 1.  Defendant cannot and does not

23   dispute that CD-7, as drawn by the legislature in 2021 --

24           THE COURT:  You're making a new Section 2 claim in a

25   remedial hearing.

1          MS. KHANNA:  Absolutely, Your Honor.  And this is

2    something we saw exactly in Alabama as well just a few months

3    ago.

4          THE COURT:  Go ahead.

5          MS. KHANNA:  Where we argued and the Court found that

6    not only was the, quote, unquote, remedial map an unlawful and

7    inadequate remedy under the governing standard for Section 2

8    remedies, it also independently violated Section 2 anew.

9          I don't think the Court needs to reach that, Your

10   Honor.  I don't think it needs to, because I think the law and

11   this Court's order are clear on what a remedy to a Voting

12   Rights Act violation can and cannot do.

13         THE COURT:  I guess what I'm saying to you, if you're

14   making a new Section 2 claim today, which you can't, you're

15   asking the Court to resolve a matter in a matter of 20 days

16   that took 22 months to do on the other matter.  In other

17   words -- go ahead, go ahead.  I apologize for interrupting.

18   Go ahead.

19         MS. KHANNA:  No, no.  And of course, Your Honor, I'm

20   here to answer your questions, and I completely understand

21   the -- I understand the hesitance.  And, again, I don't think

22   Your Honor has to reach the question of whether there's a new

23   and independent violation of Section 2.

24         I guess two points in response to that concern, Your

25   Honor.  One is that some two years ago we had not that much

1   longer than 20 days to put together our Section 2 argument and

2   evidence the first time around, and this Court had no trouble

3   finding that we had satisfied -- we had shown a likelihood of

4   success on the merits based on that time period.

5            THE COURT:  Preliminary hearing.  Preliminary

6   injunction hearing.

7            MS. KHANNA:  At the preliminary injunction hearing.

8            THE COURT:  That was a preliminary injunction

9   hearing.  There's a big difference between a preliminary

10  injunction hearing and a full course matter where discovery is

11  allowed, motion for summary judgment is allowed.

12           I apologize.  I told my staff I was going to let you

13  guys talk.  So go ahead.

14           MS. KHANNA:  Not at all, Your Honor.  And you're

15  right, that was a preliminary injunction hearing.  It was an

16  expedited hearing.  And plaintiffs had provided evidence on an

17  expedited basis and defendants had the opportunity to provide

18  argument and evidence in response, also on an expedited basis,

19  and this Court was able to find a likelihood of success on the

20  merits in that timeline.

21           But more fundamentally, Your Honor, let's just step

22  back for a second.  Why is it interesting?  Why is it

23  important that the State saw fit to independently create a new

24  Section 2 violation in the course of its purported remedy of

25  this Court's Section 2 violation?

1          That is because the Court -- it is interesting

2    because the State of Georgia is playing games.  The State of

3    Georgia is using the opportunity that this Court provided, is

4    going off of two years of this Court's hard work, to say, you

5    wanted what you get.  We're going to raise another one.  We're

6    going -- we know exactly what we're doing, and we're going to

7    make you chase us around the state, in district after

8    district, to actually achieve an equal opportunity for Black

9    voters in this state.

10          It's a constant game of Whac-A-Mole.  And under

11   defendant's strategy, in order for a Section 2 plaintiff to

12   bring a successful claim in any part of the state, it must

13   bring a Section 2 claim in every part of the state.  Because

14   what voters -- what plaintiffs asked for in this case, and

15   what this Court granted in this case, was an additional

16   opportunity.

17          And what the State decided to give it instead was the

18   same opportunity.  And it did that, both by refusing to remedy

19   the violation in the first instance and by creating a new

20   violation otherwise.

21          And the Court, as a matter of principle, should be

22   offended.  At least -- well, I will speak on my own behalf.  I

23   am offended and plaintiffs are offended at the thought that

24   the State of Georgia would use the opportunity given by this

25   Court, after finding a Section 2 violation, to thumb its nose

1    at Section 2 altogether and say what?  Challenge the Court,

2    dare the Court, dare the plaintiffs, you're going to do this

3    again.

4         So as I mentioned, Your Honor, I don't believe that

5    the Court needs to reach whether or not there is an

6    independent coalition district claim under Section 2 under the

7    map.  We believe that it has before it the evidence available

8    to make that finding.  And at the very least it can use that

9    evidence and it can use the State's knowledge of its willful

10   elimination of a coalition district as evidence that it was

11   never intending to remedy this violation at all.  It was

12   always intending, and it threatened again -- it made clear

13   back at trial that it's going to do what it did today, it is

14   going to rob Peter to pay Paul, to make sure -- to zero out

15   Black voting opportunity across the state:  Five opportunity

16   districts in the 2021 plan, five opportunity districts in the

17   2023 plan.

18        Understanding where the Court's -- where the majority

19   of the Court's questions are, I'm not going to march through

20   each and every one of the elements of the new Section 2 --

21        THE COURT:  You do what you planned on doing.  This

22   is your hour.

23        MS. KHANNA:  I appreciate it, Your Honor, but my job

24   here on behalf of my clients is to respond to this Court's

25   questions and to resolve any concerns that this Court has

1    about whether or not this 2023 plan is a lawful remedy.

2        In our briefs we made clear that Gingles 1, when it

3    comes to the coalition district in CD-7 under the 2021 map,

4    not in dispute.  No question that these three minority groups

5    together can create a majority of a reasonably configured

6    congressional district.  In fact, the very same congressional

7    district the legislator drew in 2021.

8        On Gingles 2 and 3, no dispute of Dr. Palmer's

9    analysis that Black voters, Asian voters, and Hispanic voters

10    in CD-7 are cohesive within each group and across the groups.

11        I'm just going to quickly pull up Dr. Palmer's

12    remedial report on page 5, Figure 3.  Here Dr. Palmer used the

13    same method to analyze racially polarized voting that this

14    Court has credited at the liability phase.

15        And then we see a clear indication, particularly in

16    the most recent elections -- look at the 2022 election -- that

17    Black and Hispanic and Asian voters are cohesively voting one

18    way and white voters are cohesively voting another.

19        And if we look specifically at the senator election

20    vote, both the general election and the runoff election, we

21    see that when it comes to Senator Warnock -- again, Senator

22    Warnock is someone who defended, has repeatedly hailed in this

23    court as proof that Black voters in Georgia have the

24    opportunity to elect their preferred candidates.

25        How many times has defendant's counsel told us that

1   the dawn -- it's a new day.  Senator Warnock has been elected.
2   Black voters have an equal opportunity.

3        We see in Senator Warnock's election statewide, we
4   see it in CD-7, an extremely cohesive minority population in
5   favor of Senator Warnock, and a cohesive white population
6   against Senator Warnock.

7        And as the numbers reflected in Tables 1 and 2 of the
8   Palmer report bear out, well over 90 percent of each of these
9   minority groups voted for Senator Warnock into 2022, compared
10  to just 18 percent of white voters.  And in election where
11  Senator Warnock won by a margin of less than 100,000 votes,
12  the support of each of these minority groups was critical.

13       Instead of disputing Dr. Palmer's analysis, defendant
14  reverts to the same old refrain that the plaintiffs were
15  required to prove cohesion through the use of primary
16  elections.

17       Your Honor, they don't cite a single case that
18  actually requires that.  There is no such authority that
19  requires that.  The case law that we cite makes clear that
20  primaries are actually not informative of this question, and
21  this Court has already rejected defendant's repeated attempts
22  to discredit plaintiff's Gingles 2 and 3 evidence by calling
23  on the need for primary election evidence.

24       And, finally, on the totality of the circumstances,
25  Your Honor.  Plaintiffs have shown many of the same Senate

1  Factors that weighed in their favor at the liability phase and
2  continue to weigh in their favor in finding a new Section 2
3  violation of the 2023 map.

4          But there, in particular, I think the analysis of
5  Senate Factors 8 and 9 not only demonstrate our -- you know,
6  the new Section 2 violation, but I think they only go further
7  to demonstrate the extent to which the 2023 map is not an
8  adequate lawful remedy.

9          The State's decision to double down on its Section 2
10  violation after being charged by this Court with remedying the
11  Section 2 violation, demonstrates both its lack of
12  responsiveness, to say the very least, to Georgia's Black
13  voters, and the tenuous (sic) of any policy rational they can
14  put forward in defense of the plan.

15          In LULAC v. Perry, the Supreme Court rejected Texas's
16  congressional plan on the totality of the circumstances,
17  noting that even if we accept the District Court's finding
18  that the State's action was taken primarily for political and
19  not racial reasons, the redrawing of the district lines was
20  damaging to Latinos in District 23.

21          Here, even if we accept defendant's assertion that
22  the dismantling of an effective coalition district, an
23  effective Black opportunity district in CD-7 was -- was done
24  primarily for both political and not racial reasons, the
25  redrawing of district lines was damaging to Black voters and

1  to minority voters in District 7.

2      And as we've already demonstrated, it was damaging to

3  Black voters specifically found by this Court to have suffered

4  a vote dilution injury.

5      In LULAC v. Perry the Court held that this policy,

6  whatever its validity in the realm of politics, cannot justify

7  the effect on Latino voters.

8      Similarly here, defendant's policy, whatever its

9  validity in the realm of politics, cannot justify the effect

10 on Black voters throughout the state of Georgia and the effect

11 on minority voters in CD-7 in particular.

12     Following along on pages 441 and 442 of the Court's

13 opinion, in LULAC v. Perry, the Court rejected the suggestion

14 like the one the defendants make here, that it was reducing

15 the State's needed flexibility in complying with Section 2 and

16 instead found, as is the case here, that the problem here is

17 entirely of the State's own making.

18     The State chose to break apart a performing

19 opportunity district to protect the party in power, perhaps,

20 from a cohesive and politically active minority community, to

21 protect the party in power from the opportunity of Black

22 voters to elect the Black and the Black-preferred candidate in

23 CD-7.

24     And the State then purported to compensate for this

25 harm by creating a new district generally, kind of sort of, in

1  the previously identified vote dilution area.

2          Under Section 2 the State must be held accountable

3  for the effect of its choices in denying an equal opportunity

4  to Black voters and minority voters.

5          Ultimately, Your Honor, the General Assembly's

6  remedial process is an affront to this Court.  It is an

7  affront to the Voting Rights Act, and it is an affront to

8  Black voters in the state of Georgia.

9          Plaintiffs respectfully request that the Court enjoin

10  the 2023 plan as an unlawful and inadequate remedy to the

11  Section 2 violation found by this Court and proceed to the

12  judicial adoption of a lawful congressional map.

13          I don't know if I have extra time, Your Honor, to

14  reserve.

15          THE DEPUTY CLERK:  You do.  You have about

16  17 minutes.

17          MS. KHANNA:  I'm going to preserve about 17 minutes,

18  Your Honor, for rebuttal.  Thank you.

19          THE COURT:  Thank you, Ms. Khanna.

20          Before you go, Mr. Tyson, I need to say something.

21          Mr. Tyson in his opening, indicated that Chairman

22  Echols and Chairman Leverett could not be here.  And the Court

23  said something that I want to apologize to everybody in this

24  courtroom for.  I said something that was totally

25  inappropriate, I said, well, I have enough people here to

 1  entertain me.  You-all are not here to entertain me.  As

 2  journalists, you are here to report what's happening and give

 3  it back to the public that can't be here today.  As

 4  journalists, you're here to make sure that this Court, as all

 5  courts, meet its responsibility.

 6        And those that are not journalists, you're here

 7  because you're interested in your community and making sure

 8  the laws of this community are enforced by this Court.

 9        So I want to apologize to everybody in this courtroom

10  for making that statement.  That was totally inappropriate.

11  It was wrong.

12        You know, sometimes as judges we think we always get

13  it right, at least I do, but I got that completely wrong.

14        So please accept my apology.  You're here in an

15  responsible matter.

16        You may proceed, Mr. Tyson.

17        That's why my law clerks tell me, don't talk too

18  much, Mr. Tyson.

19        MR. TYSON:  As I've been told, you don't get in

20  trouble for things you don't say.

21        THE COURT:  Exactly.

22        MR. TYSON:  Well, thank you, Your Honor.

23        Bryan Tyson for the secretary to respond to what

24  we've heard today.

25        And what we've heard is very serious charges made

1    against the State.  The idea is that the State is playing

2    games, that the State's actions were an affront to the Court,

3    that there is some connection between Alabama's activities and

4    specifically not drawing additional majority Black districts

5    that were required and the actions of the State of Georgia.

6        And so I wanted to begin by just resetting for us

7    again what was the legislature charged to do.  And the charge

8    was:  Draw an additional majority Black district in Western

9    Metro Atlanta.

10       Now, obviously, we made a number of arguments at the

11   trial, and we've heard some of those repeated here, that the

12   lack of opportunity was something broader than just the number

13   of majority Black districts in the state, and this Court

14   rejected those arguments.

15       We talked about Congresswoman McBath in the course of

16   the trial.  The Court rejected those arguments ultimately and

17   determined that the remedy here was an additional majority

18   Black seat.

19       And so in looking at what the legislature did

20   compared to the illustrative plan -- sorry, Ms. Wright.  We

21   have in Dr. Barber's report -- and Dr. Barber is, obviously, a

22   political science expert from BYU, he testified in the Rose

23   case as the plaintiffs referenced, and the idea was to have

24   him help evaluate these remedial plans for the Court.

25       In his report, he finds that the population overlap

1    between the plaintiffs' illustrative District 6 and the

2    District 6 the legislature drew was over 70 percent of the

3    population.  I'm at a bit of a loss as to exactly what the

4    legislature did wrong in this area.

5         We talked about the Shaw v. Hunt case.  As we said in

6    our brief, that was a case where North Carolina drew a

7    district completely on the other side of the state in terms of

8    where the actual vote dilution issue was located.

9         Here we have a district that is more than 70 percent

10   the exact same of what the plaintiffs drew, just in slightly

11   different areas than what the plaintiffs desired it to be

12   drawn in.

13        And so, again, the Court required an additional

14   majority Black district in West Metro Atlanta.  I don't know

15   how plaintiffs can say this is not an additional majority

16   Black district in Western Metro Atlanta.

17        As the testimony of Senator Echols indicated that we

18   cited, the legislature relied on communities of interest, they

19   look at other factors.  They did what a legislature is

20   supposed to do, took the plaintiffs' illustrative plan,

21   crafted a district that met with the requirements this Court

22   instructed.  And as a result, we're now at a point, as

23   Dr. Barber's report also references, that now 46 percent of

24   Black voters in Georgia live in a majority Black district.

25   That's up from 27 percent before.

1          Again, the remedy in this case was an additional

2    district for Black voters to have the majority that control

3    the outcome of those elections.  And that's clearly what the

4    State has created in drawing the remedial plans here.

5          So, ultimately, the objections get down to, as we

6    heard from Ms. Khanna, the question of, well, could we --

7    could the State not include any population from outside of

8    this vote dilution area as they've specified.  That's the

9    first issue they raised.

10          Now, I think it's important to note that the

11    plaintiffs also went outside that area in drafting their

12    remedy.

13          So if we look at the districts that Mr. Cooper drew,

14    you can see, obviously, his District 6 is in the same general

15    area, but his District 13 pushes beyond that district.  His

16    District 4 changed.

17          The ultimate changes that were made here -- it's

18    not -- there's not a limitation of the legislature to only

19    work within the district specified by the Court.  And I think

20    the Court would have specified in its instructions to the

21    legislature --

22          THE COURT:  The McGee case does not require it, does

23    it?

24          MR. TYSON:  Correct, Your Honor.  And that's the

25    other piece.

1        The expectation and the nature of a vote dilution

2   injury is, you didn't draw a district.  Not that every single

3   voter in a particular area is going to end up in a majority

4   Black district.

5        And that's where this case is far more like McGee

6   than it is like Shaw, because in Shaw you weren't even

7   touching the same part of the state.  In this situation,

8   you're in the exact same area.  And as the plaintiffs' expert

9   indicates, they can go outside of that area as well in how

10  they crafted their district.

11       So the fact that District 6 pulls in some population

12  from District 5, isn't really relevant.  And also District 5

13  becomes a majority Black district.

14       I know Ms. Khanna talked a lot about we went from

15  five majority-minority districts to five majority-minority

16  districts.  But the State clearly went from two majority Black

17  voting age population districts to four.  If you're using

18  total Black voting -- or Black population, it went from four

19  districts to five districts.

20       And so clearly the State added the additional

21  district.  That's the cure to the vote dilution injury.  The

22  vote dilution injury isn't every single voter has a right to

23  be placed in a majority Black district if they desire that.

24       The resolution is, you didn't draw a district in this

25  area, draw a district in this area.  The State has fulfilled

1   its responsibilities on that front in this plan.

2          One other piece here, there's a lot of citation to

3   LULAC.  And LULAC, again, was more like Shaw.  You had the

4   State of Texas fold up a Latino majority district on one side

5   of the state, create a nonperforming district on the other

6   side of the state.  Very different in terms of the overall

7   claims.  Versus here, where 70 percent of the population,

8   according to Dr. Barber's analysis, is in exactly the same

9   place, exactly the same area.

10         So there's no basis to conclude that merely by not

11  including some voters that plaintiffs wish had been included

12  on District 6, the legislature has somehow violated this

13  Court's order or created some independent Section 2 problem on

14  the plan.

15         Now, I want to talk next about the coalition district

16  issues that Ms. Khanna covered, because this is obviously

17  where the plaintiffs are focusing most of their injury and

18  their arguments.

19         And as Senator Echols explained in the transcripts

20  that we've cited to the Court, the Senate began by adding the

21  majority Black district that this Court required in Western

22  Metro Atlanta.  That's District 6.

23         She then talked about that, as a result of that, the

24  other districts had to move east, and she explained that

25  process.  Comparing that back to what Mr. Cooper did, his

1   districts also moved east once that happened.

2          And on his illustrative plan, District 13 went

3   farther south and around Metro Atlanta.   Senator Echols

4   explained that they -- the legislature moved District 5 over,

5   District 4 over, District 13 over to the east.   They naturally

6   moved into the area currently occupied by District 7, which

7   resulted in the changes that are happening there.

8          And, significantly, Ms. Khanna has accused the

9   legislature of bad faith here.   The Black voters who were in

10  District 7 previously, are in District 7 -- I'm sorry -- in a

11  majority Black district, as I understand the configuration as

12  it stands now, that also is supported by Dr. Barber's analysis

13  overall in terms of Black voters being located in Black

14  districts.

15         So to the argument that Black voters have somehow

16  lost an opportunity, Black voters who are in Gwinnett County

17  have gained an opportunity there.

18         Now, Ms. Khanna makes the argument if they're outside

19  the vote dilution districts, that shouldn't matter.   But I

20  think in terms of this Court's consideration of the

21  legislature's actions, there was not a reduction of

22  opportunity there.   If anything, it was just from one district

23  to another district in that Gwinnett area.

24         So let's get to the minority opportunity district

25  question.   The plaintiffs assume that minority opportunity

1    district refers to all minorities.  But as this Court

2    indicated, this case has been about the rights and

3    opportunities for Black voters from the very beginning of the

4    case.

5            And ultimately what we have here is not a situation

6    where we've just maintained -- as a technical matter, I guess

7    I should say, the Court -- Ms. Khanna's correct that there

8    were five majority-minority districts previously, and there

9    are five majority-minority districts now.  But the makeup of

10   those districts is what was important to the plaintiffs' claim

11   here.

12           Their claim here was, Black voters don't have

13   opportunities because the current districts don't give them

14   those opportunities.  And so within those majority-minority

15   districts, there now is additional majority Black districts,

16   which is what this Court required, and the way to remedy the

17   vote dilution that was occurring -- that the Court found was

18   occurring on that plan.

19           Plaintiffs essentially want to now swap all the

20   references to Black voters in this Court's order and the

21   record with references to all minority voters in Georgia, when

22   the record and the evidence before the Court relates to Black

23   voters exclusively.

24           Another factor the Court has to consider in the

25   deference it has to give to the legislative decisions and the

1  good faith it has to presume by the legislature, is that the

2  legislature wasn't shy about its political motivations.

3  Senator Echols talked about looking at election return data.

4  There were discussions about the political impact, which is

5  not surprising in a political branch of government.

6       Now, this is not an argument that partisanship can

7  somehow excuse a Section 2 violation.  That's not what I'm

8  saying.  But it's recognizing that within the bounds of

9  Section 2 and the Constitution, the legislature is permitted

10  to consider those types of partisan issues, as long as it

11  doesn't run afoul of Section 2 or the Constitution in doing

12  that.

13       So with that, Your Honor, I think that resolves, in

14  terms of our mind, any objection to the location, that the

15  district is where it needs to be, as this Court ordered.  The

16  legislature is able to, and did create an additional majority

17  Black district as they were ordered to do so.

18       And ultimately there was no elimination of a minority

19  opportunity district because Black voters now have more

20  opportunity districts than they did before in the 2021 plan.

21       So I'd like to move next to the question of a

22  separate Section 2 violation and whether that's an issue here.

23       First, I think the Court is absolutely correct that

24  in terms of the evidence that's in front of the Court, up

25  until the filing of the plaintiffs' objections, there was no

1   evidence related to Asian voters, no evidence related to
2   Latino voters.

3          So we're in a situation where there's a new alleged
4   Section 2 violation.  And so what the plaintiffs are asking
5   the Court to do is conduct the intensely local appraisal the
6   Court has to conduct in this very tight timeline, number one,
7   but, also, in a lot of ways in a case that's more complicated
8   than the underlying case involving Black voters.  Because one
9   of the things that's both significant about this -- that this
10  coalition as being alleged is, it's not just Black and Latino
11  voters.  Those are many of the coalition district claims you
12  see across the country.

13         What plaintiffs are asking is to find a coalition of
14  Black, Latino, and Asian voters.  Because Black and Latino
15  voters, on citizen voting age population in District 7, is not
16  enough to make a majority.

17         We first submit that the plaintiffs are wrong on the
18  law in terms of the coalition district protections.  And
19  you've seen that in our briefs in terms of dealing with the
20  impact of a coalition claim.

21         We don't believe the text of Section 2 supports that.
22  It's references to a protected class, a class of voters.  It's
23  not multiple classes of voters put together.

24         We also don't believe the Concerned Citizens of Hardy
25  County case gets the plaintiffs where they want to go.

1          THE COURT:  All right.  Let me ask you this.

2          There's an old saying, a dictum from the Supreme

3     Court is not like a dictum from anybody else.  Okay?

4          The Alabama v. Legislative Black Caucus case, the

5     then judge, Bill Pryor, said Hardy did find the Eleventh

6     Circuit to a coalition.  Now, he is now Chief Judge Bill Pryor

7     of the Eleventh Circuit.  I find him to be a rational man,

8     Mr. Tyson.

9          Is it your position that Judge Pryor's finding in the

10    Alabama Black Caucus case -- not Black Caucus case, but I

11    can't -- look it up and find it, one of you-all -- shouldn't

12    be considered?

13         MR. TYSON:  So, Your Honor, I think you're right to

14    consider, obviously, always --

15         THE COURT:  Well, not only consider.  Judge Pryor

16    made a finding that coalition districts are recognized in the

17    Eleventh Circuit.

18         MR. TYSON:  So, Your Honor, I think a couple things.

19         Number one, we would say that that three-judge panel

20    case, you have to look at the other three-judge panel case

21    where we said it's at least an open question.

22         If you want to go with the concept that, yes, this

23    was a binding precedent -- or at least should be given a lot

24    of weight --

25         THE COURT:  I'll take it one step further.  There is

1  a judge you're familiar with, he's now deceased, a great

2  friend, he had a courtroom right across the hall from me,

3  Judge Bill O'Kelley.  He made a finding that this district,

4  the coalition districts are recognized by a circuit.

5        Now, I ask you that question because it seems like

6  we're going off into whether or not there is going to be a

7  finding of a Section 2 violation.  But I'll say again, it took

8  22 months to make a finding.

9        It's like this:  I've been told by the Secretary of

10  State through the Attorney General, I have until January 16th

11  to make decisions and give them a map so I can have an

12  election -- they can have an election here on March 12th.

13        Proceed.

14  MR. TYSON:  Your Honor, you're exactly right.  And I

15  think that the key point here -- a couple of things.

16        Number one, we've had a lot of the developments of

17  Bartlett since Concerned Citizens was issued.  I know some of

18  those cases are more recent.  But I think at the end of the

19  day, getting to the larger point, we can kind of set aside the

20  legal arguments on coalition districts.

21        If you look at the evidence the plaintiffs have

22  brought you, I think that's where we're still dramatically

23  insufficient.  Even if we get in a situation where the Fifth

24  Circuit reverses in Galveston and we kind of have even further

25  eroding of that type of a claim, the plaintiffs have presented

1   you evidence essentially of a coalition based on political
2   performance in general elections.

3        Now, I understand the argument primaries weren't
4   helpful and relevant for Black voters, and the Court found
5   that.

6        Here we're looking for -- the Concerned Citizens case
7   talks about looking for evidence that Latino voters were
8   working for Black candidates, looking for evidence of a
9   political coalition beyond just how everybody voted.

10       And that's why we would submit that the plaintiffs
11  bringing you just that type of evidence only showing, okay,
12  these groups of voters support the same candidates in general
13  elections, is not enough to show the existence of a political
14  coalition even if this is binding in some way or there's some
15  approach there.

16       That was the holding in Concerned Citizens.  You
17  didn't bring us the evidence that was needed to show the
18  existence of a coalition.  And that evidence in this case has
19  to be more than just Black and Latino voters in a coalition.
20  It also has to be Asian voters.

21       So I think all those pieces indicate -- this is a
22  serious evidentiary piece that the plaintiffs are asking you
23  to step out on a legal basis and a factual basis on a very
24  significant issue to find a new Section 2 violation here.

25       So ultimately that's kind of our problem, both with

1   the overall structure and with Gingles 1, I think, is that

2   there needs to be evidence of a coalition if you're going to

3   say 50 percent of a minority population exists.

4          On Gingles 2 and 3, we have the same type of evidence

5   here from Dr. Palmer.  I know the Court has dealt with that

6   extensively in the main case.

7          There obviously is less cohesion among Asian voters

8   than there is among Black voters.  You can see on the chart

9   Ms. Khanna put up, there was less cohesion there.  And I think

10  there are open questions on the extent of the cohesion, is

11  that enough like it is for Black voters.

12         But ultimately the claim at the end of the day is

13  totality of the circumstances to find a lack of equal

14  openness.  And ultimately that's the question where there's so

15  little evidence to find that as to both Black, Latino, and

16  Asian voters in this area.

17         Again, this is our intensely local appraisal.  The

18  Senate Factor 1 evidence from the plaintiffs is a handful of

19  items that were all within a few years of each other, only as

20  recently as 2012 -- very much unlike the evidence this Court

21  considered at trial regarding Black voters.

22         Some disparate impact on Asian and Latino voters.

23  But, again, Senate Factor 1 is a history of official

24  discrimination against Latino and Asian voters that has to

25  being found.

1          Plaintiffs have offered nothing on Senate Factor 2,

2    which is where'd we look at the partisanship question.  The

3    same things Dr. Alford said about partisanship and Black

4    voters apply for Asian and Latino voters.  They haven't

5    brought you evidence of connections between racial identity

6    and partisanship in terms of the race or party being

7    downstream of race, like you heard from Dr. Burton and others

8    at the trial for Black voters.

9          Senate Factor 3, they've identified no election

10   practices that adversely impact Latino and Asian voters in

11   their briefing.

12         Senate Factor 5 on socioeconomic issues.  There's

13   just not the same connection between Black, Latino, and Asian

14   voters on all those various socioeconomic categories, as there

15   were for Black voters versus white voters.

16         In the evidence that Dr. Collingwood has submitted,

17   there are situations where Asian voters exceed white voters on

18   some of those socioeconomic indicators, different than Black

19   and Latino voters.  But, again, it has to be everybody in

20   those categories.

21         We have no evidence of racial appeals about Latino

22   and Asian voters.  We have discussion of elected officials who

23   are Latino and Asian in a state that's 4.8 percent Asian,

24   10 and a half percent Latino.

25         In terms of the legislature, Georgia has Asian and

1    Latino members of the legislature.  There are -- the idea that

2    we've got to look solely at the members of Congress piece, I

3    think we've got to look broader again, because the question is

4    equal openness here.

5         And on unresponsiveness and the State's policies, on

6    Senate Factor 8, we have only argument of counsel on this

7    unresponsiveness component.

8         Ms. Khanna is asking you to presume unresponsiveness

9    just because the legislature didn't do what the plaintiffs

10   would have preferred the legislature do in the drawing of the

11   districts.

12        Senate Factor 9, the Court has found that

13   partisanship was the reason for the 2021 maps.  That's clear

14   from the transcripts the Court has, the debate that

15   partisanship was a huge part of the 2023 maps.  And we get

16   back, again, in the plaintiffs' argument to the idea that

17   because race and partisanship are inseparable in Georgia,

18   therefore, everything that could be just partisanship is also

19   about race.

20        And at the end of the day, the Voting Rights Act

21   cannot be interpreted in a way where it protects political

22   parties or it protects political coalitions, like Bartlett

23   told us.

24        At the end of the day, what the plaintiffs want is

25   for the Court to say that every district that elects a

1  Black-preferred candidate, regardless of the makeup of that

2  district, acquires protection under the Voting Rights Act.

3       But, ultimately, that's an argument this Court,

4  number one, rejected on the proportionality argument we made

5  and said we don't look at the candidates, we look at the

6  districts.  That was the point of looking at that.  That's

7  what the Voting Rights Act required.

8       And so it cannot be a situation where all Democrats

9  who are elected to Congress, for example, cannot count for

10 proportionality analysis, but can count towards the remedy in

11 protecting certain districts.

12      So ultimately, Your Honor, we'd submit there is no

13 basis to find an independent violation of Section 2 for the

14 failure to draw a District 7 as it was configured on the 2021

15 plan.

16      As a matter of evidence, the plaintiffs haven't given

17 you that.  And, ultimately, essentially what they're trying to

18 do is bring a Rucho-barred partisan gerrymandering claim in

19 through the Voting Rights Act.

20      Plaintiffs' counsel complained about the idea of this

21 game of Whac-A-Mole that is being played, as she said, by the

22 state.  In a lot of ways, I mean, this Court knows how much

23 time we spent working through what does Section 2 require.

24      And the Whac-A-Mole from the State's perspective is

25 the shifting theories of the plaintiffs.  This case was

1   brought about Black voters.  The Court agreed with the

2   plaintiffs regarding Congressional District 6 that Mr. Cooper

3   drew and said go draw this additional majority Black district.

4       Now that the legislature did that, now the claim is,

5   oh, no, it's now about all minority voters.  And so, again, we

6   have a constantly shifting theory.

7       The only thing at the end of the day, Your Honor,

8   that's consistent is the protection of Democratic districts.

9   The Voting Rights Act is too important of a law to be used for

10  partisan purposes.  It's also too important of a law to be

11  endangered by requiring partisan outcomes as a result of the

12  provisions of that act.

13      So ultimately, Your Honor, this Court, by case law,

14  has to defer to the legislature's decisions about how to

15  comply with this Court's orders up to the point that there is

16  a new Section 2 violation or a violation of the Constitution.

17  And we would submit that as a matter of law, in fact, there is

18  no basis to conclude that that is met in this situation.

19      So, Your Honor, I will mention one other point that I

20  know is important to the Secretary.  You mentioned the

21  election calendar.  That, obviously, is critically important

22  moving forward.  We've submitted the 2024 election calendar

23  with our brief so the Court has that.  The other 2022 election

24  issues we discussed at the preliminary injunction phase remain

25  in effect and those timelines are there.

1          So from the State's perspective, we would submit that

2    there's no basis for the Court to conclude that Georgia cannot

3    use the districts it drew in 2023 for the 2024 elections, and

4    the Court should allow the State to proceed immediately to

5    prepare it for elections using those districts.

6          THE COURT:  Thank you, Mr. Tyson.

7          MR. TYSON:  Thank you, Your Honor.

8          THE COURT:  That citation is Alabama Legislative

9    Black Caucus v. Alabama, it's 989 F. Supp. 2d 1227, the

10   statement being made by Chief Judge Bill Pryor, then Judge

11   Bill Pryor, is on page 1279 through 80.  It was dealing

12   with -- well, that's the case.

13         Thank you, Mr. Tyson.

14         MR. TYSON:  Thank you, Your Honor.

15         THE COURT:  Ms. Khanna, you have 17 minutes.

16         MS. KHANNA:  Thank you, Your Honor.

17         Again, in this presentation defendant's counsel --

18   clearly we are trading who is playing the game of Whac-A-Mole.

19   And let me just draw the Court's attention to a consistent

20   theme throughout the State's litigation of this case.

21         And that theme has been to look anywhere and

22   everywhere other than the law and facts of the case in front

23   of it to escape the inevitable, to escape the fact that it

24   needs to remedy the Section 2 violation.

25         When Allen v. Milligan came down in the way that the

1  defendant did not like, in a way that the State of Georgia did

2  not prefer, in favor of Section 2 plaintiffs, the State of

3  Georgia says, well, let's not look at Allen v. Milligan.

4  Let's look at the college admissions case.  That's where this

5  Court should look to when determining whether or not there's a

6  Voting Rights Act violation in Georgia.

7          We talked about coalition districts.  This Court

8  mentioned the Eleventh Circuit has said in multiple instances

9  that it is -- the coalition districts are recognized by

10  Section 2.  If you look at the State's brief, the first case

11  it cites is the Sixth Circuit.  Don't look at the Eleventh

12  Circuit, Your Honor, look at the Sixth Circuit.  I like that

13  case better than this case.

14          This Court specified five districts where there is a

15  Section 2 violation.  The State says, I'm going to look

16  somewhere else, Your Honor.  I don't like those facts.  I

17  don't like those districts.  I don't care about those voters.

18  I'm going to look somewhere else.

19          Mr. Tyson focused a lot of his presentation on the

20  extent to which plaintiffs could prove an additional and a new

21  Section 2 violation based on the coalition district that we've

22  outlined in our briefs.  I've already explained, Your Honor, I

23  think the Court has before it what it needs in order to find a

24  violation.  I don't think the Court has to go there.

25          I understand why Mr. Tyson wants to focus his

1    argument on that piece of it, but I'm not going to do that and
2    I did not do that, Your Honor.

3         And I think -- let's talk about where this Court, I
4    believe, is most concerned.  And that is whether or not this
5    2023 map is a lawful remedy to the Section 2 violation already
6    found and not the new violation.

7         At the very beginning of his presentation, Mr. Tyson
8    put up the quote on page 509 of this Court's order calling for
9    an additional majority Black district.

10        And that was the last quote that appeared in his
11   presentation.  He did not put up pages 510 and 511, which are
12   also included in this Court's remedy section of its opinion in
13   which this Court three times refers to opportunity district.

14        I don't think that was a mistake.  I don't think that
15   was an oversight.  I think -- the State would say that the
16   Court must have just messed up.  The Court probably meant
17   majority Black district because that's what it said on
18   page 509.  And let's just disregard all the other references
19   in the same section in the next two pages to an opportunity
20   district.  And let's pretend that that's not there.

21        Mr. Tyson focused on plaintiffs' argument about what
22   does a minority opportunity mean.  And he focused on one word
23   and that is the word "minority."  And he said that plaintiffs
24   are really trying to make that word more expansive than this
25   Court envisioned in adjudicating this Section 2 claim

1    originally.

2        So I understand the Court's concern that it mentioned

3    at the very top of this hearing, that its primary concern,

4    when it discussed minority voting rights in the original

5    Section 2 liability phase, was Black voters.

6        So let's agree for the moment that when the Court

7    says minority opportunity districts, it's referring to Black

8    opportunity districts.

9        Mr. Tyson does not address the second part of that

10   phrase, that is the word "opportunity." He does not explain

11   how opportunity, how Black opportunity, is equated with

12   majority Black.

13       He does not explain how opportunity necessarily

14   equals majority. That's not what the Court said. That's not

15   what the Court -- I don't believe that's what the Court meant,

16   and it's certainly not what the case law means when it comes

17   to affording an additional opportunity for Black voters to

18   elect a preferred candidate.

19       We've seen it in Alabama. We saw it in Alabama

20   where the Court said, the remedy needs to provide an

21   additional opportunity for Black voters to elect their

22   preferred candidates. And the remedy that the Court adopted

23   there was not a majority Black district. It was an additional

24   district in which Black voters had the opportunity -- just

25   like this Court said repeatedly in its order, and just like

1    the State's counsel seems to try to read out of the order.

2         Dr. Barber seems to understand the opportunity.

3    Dr. Barber performed an effectiveness analysis.  And that

4    effectiveness analysis looks at -- he calls them the

5    Democratic candidates.  But as we know from the record in this

6    case, the Black-preferred candidate in these elections is the

7    Democratic candidate.

8         And when he does an effectiveness analysis is, he

9    shows five districts in which voters had the opportunity --

10   sorry -- in which Black voters had the opportunity to elect in

11   2021 five districts in which Black voters had the opportunity

12   to elect in 2023.

13        Mr. Tyson makes the distinction between the Shaw and

14   the LULAC cases by showing, well, the level of overlap between

15   the provision of an opportunity to those without a Section 2

16   right and those with a Section 2 right was farther there.  And

17   his argument is that, well, we'd still have some -- yeah,

18   yeah, it's not -- we didn't give -- our remedy does go outside

19   the area.  Our remedy does provide a, quote, unquote, remedy

20   for people without a Section 2 right, but it still allows for

21   some overlap, Your Honor.  We should get partial credit, Your

22   Honor.  That is not the standard.  It is not enough to say our

23   case is not as bad as LULAC.  That is not the legal standard

24   for a complete and a full and a sufficient remedy.

25        I'm trying to think of the right analogy, Your Honor,

1  and I've had -- I keep coming back to this one instance where

2  my son, a few years ago, when he was five or six, had hit his

3  sister or something.  He got in trouble.  He broke the rules,

4  he got in trouble.  And we told him -- I told him, you know,

5  apologize to your sister.  Make it right.  And I want you to

6  write her a letter.  I was really trying to make him see, you

7  violated the rules and you've got to make it right.  And I

8  said write her a letter.

9          And he apologized to his sister in front of me.  And

10  then he sat down to write her a letter.  And on a piece of

11  paper, my six-year-old son wrote the letter "A."  And he

12  handed it over.  And he said, I wrote her a letter.  He was

13  six.

14          And I don't like -- Your Honor, I don't like the idea

15  of analogizing the State of Georgia to a petulant child who

16  just doesn't like that he has to abide by the rules, and who

17  tries to defy his mother by pretending to comply with the

18  letter of her order, of her ruling, knowing full well he is

19  not doing that.  But I don't think that's an entirely

20  dissimilar analogy to what's going on here.

21          The State says you said majority Black, I'm just

22  going to stop reading the rest of it.  We did a majority Black

23  district and you're stuck.  I did it.  Now what?

24          Mr. Tyson said a few things that I wrote down in its

25  discussion -- in his discussion of District 7.  He said Black

1  voters in Gwinnett County have gained an opportunity there.

2  He said Black voters have more opportunity now than they did

3  before.

4          Your Honor, I'm not going to march through all the

5  arguments and evidence that we've already combed through to

6  show why that's not true, but I will say that I can imagine

7  you show this map to Black voters in Gwinnett County, if they

8  feel like they have more opportunity now than they did before.

9  If they feel like they have gained an opportunity in the

10 destruction of CD-7 and the dismantling of an opportunity

11 district where they had the ability to elect their preferred

12 candidates, I -- I -- I would -- I guess I'd like to be a fly

13 on the wall when the Secretary likes to -- tries to convince

14 Black voters in Gwinnett County that they have gained an

15 opportunity.

16         In the last line of this Court's order on page 516,

17 this Court said, "The Court issues this order to ensure that

18 Georgia continues to move toward equal openness and equal

19 opportunity for everyone to participate in the electoral

20 system."

21         And I would submit, Your Honor, that the 2023 map

22 makes no step toward that goal.  It holds serve.  One step

23 forward, one step back.  Zero out the opportunity.

24         At the end of the day, it is undisputed that what we

25 have here is a map in which white voters maintain all the

1  opportunity that they had before, Black voters have the same

2  opportunity to elect, just shuffled around the map different

3  ways.  And the State's political justification for demanding

4  and insisting and holding onto the voting power for white

5  preferred candidates, while imposing a cap and a ceiling on

6  the voting power for Black-preferred candidates, it is

7  inconsistent with this Court's ruling, it is inconsistent with

8  Section 2, it is inconsistent with the rights of Georgia's

9  Black voters.

10          Once again, I'd ask the Court to strike it down.

11          THE COURT:  Thank you, Ms. Khanna.  We're going to

12  stop and take a break.  We'll start back at ten minutes after

13  11:00.  Thank you.

14          (A break was taken.)

15          THE COURT:  It is my understanding a second

16  presentation will come from Alpha.  As soon as everybody is

17  seated, you may proceed.

18          MR. SAVITZKY:  Thank you, Your Honor.

19          And, again, it's Ari Savitzky from the ACLU for the

20  Alpha plaintiffs.  Good to see you again.

21          Before I begin the argument, two brief housekeeping

22  matters.

23          First of all, if I may approach, I'd like to pass the

24  Court --

25          THE COURT:  Yes, sir.

1          MR. SAVITZKY:  -- a paper copy of the presentation.

2          THE COURT:  Thank you.

3          MR. SAVITZKY:  And the second item is just a question

4    about how we proceed.  To the extent that I have time left

5    after the initial presentation, and to the extent that

6    Mr. Tyson presents live testimony, would any of the balance of

7    my time be available to use for cross-examination?

8          THE COURT:  If Mr. Tyson presents live testimony,

9    that comes out of his hour.  Hopefully, everybody is going to

10   be professional and you won't -- your cross-examination will

11   not extend any longer than necessary.  But you get one hour to

12   make your presentation, Mr. Tyson gets one hour to make his

13   presentation.  You can always reserve time.

14         But, again, if Mr. Tyson puts up evidence, your

15   cross-examination counts in his hour.  And, again, you-all are

16   very outstanding and ethical lawyers, so I'm sure you-all will

17   not extend it longer than necessary either way.

18         MR. SAVITZKY:  Understood, Your Honor.

19         May it please the Court.

20         THE COURT:  Mr. Savitzky.

21         MR. SAVITZKY:  We truly hoped that we wouldn't need

22   to be here today.  Because the Court's directions were very

23   specific:  Draw additional Black majority opportunity

24   districts in specific areas.  Areas that we started talking

25   about in February of 2022.  We spent the better part of two

1   weeks talking about in early September, areas like South Metro
2   Atlanta.
3           And we're here today because the proposed plans do
4   not do what this Court said must be done to remedy unlawful
5   vote dilution in those specific areas, like South Metro
6   Atlanta.
7           We're here because the proposed plans do not add new
8   Black opportunity Senate and House districts in the specific
9   areas of Georgia where vote dilution was proven to exist.
10  We're here because the plans do not, to paraphrase this
11  Court's order at page 510, add additional Senate and House
12  districts in South Metro Atlanta in which Black voters have a
13  demonstrable opportunity to elect their candidates of choice.
14          We're here, and this is the most important, because
15  the harm to Black voters in South Metro Atlanta and those
16  other specific areas in this Court's order that this Court
17  found requires a remedy and this is not it.  And the numbers
18  show it and the maps show it, and that's what we're going to
19  show you today.
20          So let's start with the legal standard.  What is the
21  legal standard?  The remedy phase in a Section 2 case.
22  General assemblies put together proposed legislative plans.
23  And to be clear, I'm here talking about State Senate, State
24  House plans.
25          The question is:  Do those proposed plans completely

remedy the Section 2 violation that was already found by this Court.  Do the proposed plans fully provide equal opportunity for minority citizens, for Black Georgians, to participate and elect candidates of their choice in the areas, the specific areas where vote dilution was found.

That's the standard.  A complete remedy.  Anything less fails to remedy the very serious harm to Black voters in those areas caused by a political process that in those areas is not equally open to all, as this Court found.

Next question:  What's a complete remedy?  What does that mean?  One piece is, did the State actually add additional Black majority districts?  But that's not enough.

Did the State add them in the places where vote dilution was proven to be occurring?  Where Black voters are experiencing the harm?  Because in the end, again, it's the voters who are harmed.  Not counties, not precincts, not chunks of land.  It's voters.  Specific voters in specific areas where vote dilution is occurring.  That is who is harmed.  That is who has a right under Section 2, Black voters in South Metro Atlanta.

And we know from the many cases, including Milligan, this Court's decision, the Section 2 inquiry is an intensely local appraisal.  You've heard that phrase more than once in courtroom.

And when Section 2 liability is determined on that

1  intensely local basis, the remedy needs to be localized as

2  well.  Adding Black majority districts, opportunities for

3  Black voters, anywhere else other than the place where the

4  vote dilution harm is happening doesn't work.  It's not a

5  remedy.  It's not a complete remedy.  It doesn't remedy the

6  harms experienced by Black voters in the areas where vote

7  dilution is occurring.

8        That's why the Shaw case we rely on matters so much.

9  What the Court said there is, if a Section 2 violation is

10  proved for a particular area, a remedy is required for that

11  area.  The harm suffered by Black voters in that area are not

12  remedied by creating a safe majority Black district somewhere

13  else.

14        And by the way, in the Shaw case, it wasn't an

15  entirely different area of the state.  There was 20 percent

16  overlap.  The Court said it wasn't enough.  It's a different

17  part of the state.  That's what matters.

18        Is the remedy in the place where the vote dilution is

19  occurring where the Court found vote dilution?

20        One more piece on the legal standard.  It doesn't

21  matter whether there's somewhere else, it's on the other side

22  of the Atlanta Metro area, or on the other side of the whole

23  state.  It doesn't matter what's happening in the somewhere

24  else.  It doesn't matter whether there are coalition districts

25  there or who's getting elected there.

1    If the remedy isn't in the area where the vote

2  dilution was identified, it doesn't help the voters who are

3  harmed.  It doesn't help the voters who need a remedy.  It

4  can't be a complete remedy.  It isn't a complete remedy.  And

5  that is why, again, the Court in Shaw stressed the right to an

6  undiluted vote, the right to cast a ballot equal among voters

7  belongs to individual members of the minority group, not to

8  the minority as a group.  It belongs to the voters who are

9  harmed.  I cannot stress that point enough.

10    That isn't, by the way, just the law of Section 2.

11  It floats from basic principles of equity.  The violation is

12  an intensely local appraisal.  The remedy flows from the

13  violation.  The remedy flows from the harm.

14    This Court sits in equity today.  And to do equity,

15  the harm must be remedied.  Here the harm is in South Metro

16  Atlanta, in West metro area.  In specific areas.  Specific

17  counties.

18    Are the new opportunity districts -- are there new

19  opportunities there?  This is a fundamental difference between

20  our position and the State's position.  The State seems to

21  think that it doesn't matter whether their plans make a

22  difference in the political reality for Black voters in

23  specific places like South Metro Atlanta where the Court found

24  vote dilution.

25    But in the end, whether the harm is experienced in

those areas by Black voters is remedied is the only thing that matters.  The label on a reconfigured district doesn't matter. The political reality for Black voters in the specific places where vote dilution is happening and harming those voters, like South Metro Atlanta, that is what matters.

These plans are not a complete remedy at all -- especially in the Senate.  But in both the Senate and the House, they don't change the reality for Black voters in the areas where vote dilution is happening.

The areas we're talking about are no secret.  We had an eight-day trial.  We had mappers on the stand for days, between all the different mappers who testified.  We had individual witnesses talking about their communities, testimony about what county tags you would see in the parking lot when you were in Griffin, where the outlet mall is in Locust Grove, golf carts in Peachtree City came up more than once, if I recall correctly.  Very specific testimony.  Very specific areas.  And geographically specific analyses of racially polarized voting in specific areas as well.

Primary among those areas was South Metro Atlanta, where the demographic story is one of massive growth and change for the Black population in those five counties that we identified and talked about, Fayette County, Spalding County, Henry County, Newton County, Rockdale, quadrupled, quadrupled, over the last 20 years with no change in representation, no

1    change in opportunities, I should say.

2         No one ever mentioned during this trial in the state

3    legislative context Cobb County, Gwinnett County, North

4    DeKalb.  There was no racially polarized voting analysis

5    there.  There was -- there were no illustrative districts

6    drawn there.  That wasn't what the trial was about.

7         And at the end of the trial, the Court rendered a

8    decision and identified the areas where the maps would need to

9    change.  They're here on the screen.  They need to change in

10   those specific areas because Black voters in those areas,

11   chief among them in the South Metro area in both the Senate

12   and the House, are being harmed.

13        The question before the Court today is whether the

14   proposed plans completely remedy localized geographically

15   specific vote dilution harms to Black voters that were proved

16   up at trial.  They don't.  Our objections should be sustained,

17   the Court should proceed to put a lawful plan in place.

18        And this isn't just a matter of some voters being

19   left out.  There are no new opportunities for Black voters in

20   South Metro Atlanta under this Senate plan.  Let me repeat

21   that.  No new opportunities for Black voters in South Metro

22   Atlanta under this plan.

23        Whatever else the State says --

24        THE COURT:  What did you ask for in your lawsuit?  Do

25   you ever go back and look and see what you asked for in your

1  lawsuit?

2        MR. SAVITZKY:  We asked for the addition of Black

3  majority districts.

4        THE COURT:  Yeah.  In this area you asked for two

5  majority Black districts.

6        MR. SAVITZKY:  Yes, Your Honor.

7        THE COURT:  And you said you didn't get that.

8        MR. SAVITZKY:  No, Your Honor, not Black majority

9  districts that create new opportunities for Black voters and

10  remedy vote dilution.

11        Again, it's not -- we didn't ask for the lines to be

12  changed around so that there was a new district number.  We

13  asked for the Black voters who we represent to have a

14  political reality in which the playing field is equal, the

15  opportunities are equal.  That's the question.

16        And I will -- I know this is a long run, we're going

17  to look at the maps.  The numbers show those new opportunities

18  are not there.  The political -- the change in the political

19  reality is not there.

20        And it is not merely enough to change the district

21  numbers around if you don't change the reality for Black

22  voters.  That doesn't remedy vote dilution.

23        The number of Black voters in Black majority

24  districts, in the counties we're talking about, increases

25  under the proposed plan by less than 3,000 people.  A single

1  Senate district is about 180,000 people.  That's what I mean

2  about no new opportunities.

3          And instead of adding new opportunities for Black

4  voters in the South Metro area, the proposed Senate plan

5  shifts Black voters around to create additional Black majority

6  districts in areas outside the place where the Court found

7  vote dilution.  And the same thing happens in the House plan

8  as well.

9          I just want to say we're not disagreeing just to be

10 disagreeable here.

11         THE COURT:  And I don't take it that way.

12         MR. SAVITZKY:  But -- and just to put a finer point

13 on it, you're not going to hear me talking about the

14 Macon-Bibb area today, because when I look at those numbers,

15 and you should hold the State to their burden, so to speak.

16 And I don't want to prejudice anything Mr. Jones is going to

17 say about that.

18         THE COURT:  Yeah, he's already staring you down.

19         MR. SAVITZKY:  But I'm not going to focus on that

20 today because I want to focus on the places where I think the

21 number are most stark.

22         THE COURT:  You make the argument you came here to

23 make.  This is very, very important.  Don't worry about

24 Mr. Jones.  Don't worry about Mr. Tyson.  You make your

25 argument.

1          MR. SAVITZKY:  And my point is only that this is

2     really about the numbers.  You can look at where Black voters

3     have been added to Black majority districts and see where the

4     new opportunities for Black voters are.  And you can see that

5     those opportunities are not in South Metro Atlanta.  They're

6     not in West Metro Atlanta.  They're not in the places where

7     the Court found vote dilution.  And in the end, that is all

8     that matters.  Is there going to be a remedy for those voters

9     who are harmed by vote dilution in those areas.

10         So I'd ask that the Senate plan is especially stark.

11    And I want to start there and -- with that -- with that lead

12    in, we'll actually start looking at some maps.

13         What do the Court's decisions, excuse me, say about

14    the Senate map?  The Court identified a set of ten districts,

15    we see them here in grey, where the plaintiffs have proved a

16    lack of equal openness in Georgia's election system.

17         It's the region that covers most of South Metro

18    Atlanta.  It's very depicted here.  The Court identified this

19    vote dilution area, again, based on the evidence.  I won't go

20    through it again.  We have the demographic evidence.  We have

21    the testimony of individual residents and witnesses.  We have

22    the illustrative districts.

23         THE COURT:  Hold on one second.

24         Go ahead.

25         MR. SAVITZKY:  This is the area where the harm is

1  being experienced by Black voters with respect to the Senate

2  map.  This is the area where new opportunities are needed to

3  remedy the harm.  Now, the State is going to say that this is

4  the liability area and that's different than the remedy.  They

5  say the remedy is in South Metro Atlanta.

6          I disagree with that on multiple levels.  One level,

7  again, it's an equity case.  The remedy follows the harm.  The

8  remedy follows the violation.  Divorcing the harm from the

9  remedy is the opposite of what you're supposed to be doing as

10  a court in equity.

11          But, just as a practical matter, South Metro Atlanta

12  is in this area.  Right?  I mean, we don't have to talk about

13  Putnam County or Hart County, talk about the five counties we

14  focused on at trial.  Either way, it's South Metro Atlanta.

15  That's where we're focused.  That's where the remedy needs to

16  be.

17          And the question is whether there are two new Black

18  majority Senate districts that create new opportunities for

19  Black voters in this area in South Metro Atlanta.

20          Just briefly, how did we get here?  Here are the

21  illustrative districts we presented.  You see the 2021 plan on

22  the right side.  This Court said contributed to vote dilution,

23  running from the split in Fayetteville down to Spalding County

24  and Griffin, Pike and Lamar.  And we showed an illustrative

25  district there including Spalding, Griffin, Fayetteville,

1   Tyrone.   You heard a huge amount of evidence about this area.

2               And then here's the other Senate district we talked

3   about at length at trial.   On the right-hand side we see the

4   district in the 2021 map.   We heard a tremendous amount about

5   how Senate District 17 diluted the Black voting stream,

6   contributed to that vote dilution, drawing diverse communities

7   in Henry County, in McDonough, out into Newton County,

8   splitting Newton County, and then to Morgan and Walton.   And

9   you can see the more compact district, including much of Henry

10  County, on the left.

11              So looking again at the set of Senate districts that

12  this Court identified and said we need to change, again, we're

13  talking about the South Metro area.   That's where vote

14  dilution, and most importantly, where the harm to Black voters

15  is occurring.   That's where the playing field is uneven.

16  That's where the two Senate districts, the two new opportunity

17  districts, must be drawn to remedy the harm.

18              So let's now look at the proposed plan.   We see here

19  in red these are the Black majority Senate districts in the

20  proposed plan overlaid on that vote dilution area, which is in

21  grey.   And now we see the change between the old map, the 2021

22  map that this Court concluded was unlawful, and the new map.

23  So this overlays the two.   The 2021 map is in blue, the new

24  map, proposed map is in red.

25              So the purple areas here were in Black majority

1  districts before, and they're still in Black majority

2  districts in the proposed map.  The lines may change there,

3  but the reality for Black voters in terms of political

4  opportunities in that purple area doesn't change.

5       The red areas around the margins in a few places,

6  those are the areas that have been newly added to Black

7  majority districts.  And then the blue areas around the edges

8  have been removed.  So, for example, you can see in Newton

9  County, around Covington and elsewhere, voters there removed

10  from a Black majority District 43 and they are placed into

11  this new District 42, which, as we'll talk about, is almost

12  identical to District 17.  And, again, we see the gray shading

13  of that vote dilution area.

14       Just looking here, we can see there is very little of

15  that South Metro vote dilution area that's newly added to

16  Black majority districts.  A few chunks of Henry are added in,

17  chunks of Newton are taken out, south -- a piece of South

18  Fulton here along Coweta is in, a piece of Douglas is out.

19       Outside of the gray shaded area, in areas that we did

20  not have a trial about, in Cobb County, in North Fulton, in

21  North DaKalb, we see Black voters in those areas, densely

22  populated areas, being added to Black majority districts.

23       That's the problem in a nutshell.

24       You can put whatever district numbers you want on

25  this map, but in the end what matters is whether the position,

1  the reality of Black voters in South Metro Atlanta is

2  changing.

3       It's not.  We know this from the numbers.

4       This is from the Cooper declaration.  In that grey

5  area, that vote dilution area, the number of Black voters

6  added to Black majority districts in the vote dilution area is

7  under 3,000 -- 2,940.  Increase of less than 3,000 Black

8  voters in Black majority districts in South Metro Atlanta

9  where there was supposed to be two additional opportunity

10  districts.  Just from that number we know the situation cannot

11  have changed.

12       And we'll talk about this more, but we can also see

13  what's happening outside of the vote dilution area.  We can

14  see how the two additional districts were really created, by

15  adding almost 100,000 Black Georgians in areas outside of the

16  South Metro area in North DeKalb, in North Fulton and Cobb,

17  into Black majority districts, 50 percent BVAP districts.

18  That's how we get that increase overall.

19       But let's zoom in a bit.  We talked about Fayette and

20  Spalding Counties.  We looked at District 28, District 16.

21  These are two of the five South Metro counties where there was

22  a massive level of Black population growth change that we

23  focused at trial.  In the proposed Senate plan, there's no

24  change at all to District 16.  It doesn't change.

25       District 34, above it doesn't change.  It's 70

1  percent BVAP on the other side of that split at Fayetteville.

2  No change.  The district lines under the proposed plan in

3  Fayette County and Spalding County do not change.

4          And when we look at the county-level numbers, they

5  show it.  Fayette County, zero Black Georgians added to Black

6  majority districts in Fayette County.  Spalding County, zero

7  Black Georgians added to Black majority districts.

8          And by the way, this includes Eric Woods, who is one

9  of the named plaintiffs in the Alpha Phi Alpha case who lives

10  in Tyrone.

11          Defendant may dismiss this by saying not every named

12  plaintiff needs to be added to a remedial district.  That's

13  not the point.  This isn't a case where Mr. Woods sort of had

14  it bad, got unluckily, didn't live in the right place.  There

15  were no changes at all in Fayette County.  There were no

16  changes at all in Spalding County.  From the perspective of

17  Black voters in those counties, nothing changes.

18          Let's zoom in on Henry County.

19          I may have to go to the ELMO here.

20          THE COURT:  What's wrong?

21          MR. SAVITZKY:  What do we think?  Do we need to

22  switch?

23          Excuse me, Your Honor.

24          THE COURT:  No, take your time.

25          THE DEPUTY CLERK:  The camera is on when you're

ready.

MR. SAVITZKY:  Okay.  Let's zoom in on Henry County.
We can see what the swap -- you can see there's some changes,
but the net effect is the same.  No new opportunities for
Black voters in the South Metro area.

In red we see some of the precincts that were moved
into a Black majority district around McDonough, not all of
McDonough, not most of McDonough, added to a district that's
been relabeled District 17 here in Henry and Clayton made up
almost entirely of areas that were already in Black majority
districts.

And then in blue, we see -- and it runs up all the
way along that border in Newton County.  We see other areas
that are removed from the existing Black majority district.
And we can see what this swap looks like by looking at the
county-level numbers.

In the proposed plan, 21,000 Black voters in Henry
County are added into a Black majority Senate district, some
into 17, the purported new one.  Some into District 10, which
was already majority Black.  And then at the same time, 17,646
Black voters in Newton County, around Covington and elsewhere,
are removed from a Black majority Senate district.  And
they're placed into proposed District 42, where their votes
will be diluted, along with Black voters in Henry County, in
the same way that Black voters' votes were diluted under the

1    previous plan, with a remarkably similar configuration of

2    districts in that area.  The change is de minimis.  This isn't

3    a new opportunity for Black voters in South Metro Atlanta.

4         It's a shell game.  Look at proposed Senate

5    District 42 on the left and look at enacted District 17 on the

6    right.  It's a near carbon copy with a new label.  A new

7    District 42 runs from McDonough through Henry County to Newton

8    County, splits Newton County.  Now it picks up more of

9    Covington, Black majority predicts there, and then out to

10   Morgan and Walton Counties.

11        The BVAP of the Senate District 42 is 34.41 percent.

12   The BVAP of that old district that was contributing to vote

13   dilution, is 33.82 percent.  There's less than a point of

14   difference in the BVAP of these two districts.

15        And according to the core constituency reports, there

16   are over 76 percent exact same, same voters.

17        And this district sort of illustrates how the shell

18   game happens.  The new District 17 is nearly 80 percent drawn

19   from Senate Districts 10 and 44 under the old plan.

20   38 percent of it comes from Senate District 10, already a

21   Black majority district.  39 percent plus coming from

22   District 44, already a Black majority district.

23        Senate Districts 10 and 44 are pushed up.  They move

24   north.  And the newly-configured Senate districts 10 and 44

25   remain Black majority districts, but they're built out in

1    large part of old Senate District 42 in North DeKalb, which is

2    eliminated.

3        75 percent -- over 75 percent of District 42 under

4    the 2021 map is parcelled out in between District 10 and

5    District 44 in the new map.  60,000 voters go to District 10,

6    77,000 go to District 44.

7        Now, the old District 42 was not a Black majority

8    district.  It wasn't in the vote dilution area identified by

9    the Court.  It's not in the South Metro area.  We didn't have

10   a trial about District 42.  We didn't have a trial about North

11   DeKalb County.  But that's where Black voters are actually

12   being added in large numbers to a Black majority district.

13       Again, looking at those constituency reports, nearly

14   50,000 Black voters who were in Senate District 42 under the

15   old map are added into Black majority districts.  27,000 go to

16   Senate District 10 in the proposed plan; 21,000 go to

17   District 44 under the proposed plan.

18       It's an order of magnitude more than the change you

19   see in the South Metro area, which is virtually nothing.

20       So let me be clear:  It doesn't matter in our view

21   what was happening in old District 42.  It doesn't matter who

22   elected Democrats.  It doesn't matter if it was a coalition

23   district, anything like that.  The only thing that matters is

24   that it's not in South Metro Atlanta.

25       Whatever happens to Black voters in the old

1    District 42 in North DeKalb, it can't be a remedy for vote

2    dilution in South Metro Atlanta.

3        So now having eliminated Senate District 42, there is

4    a new district number than can be used.  It's applied here to

5    old 17, which is renamed 42, but is over 75 percent the same

6    as District 17.  That's the shell game, Your Honor.

7        District 17 is renumbered, largely unchanged.  Black

8    voters in the South Metro area gain no new net opportunities

9    to elect candidates of choice.

10       Maybe Black voters in areas in North DeKalb gain some

11   new influence.  That's irrelevant.  It's irrelevant to the

12   need for a remedy for vote dilution in South Metro Atlanta,

13   the remedy this Court ordered.

14       I'll just focus briefly on one final area in the

15   Senate plan.  This one is a little closer to where one of

16   Mr. Esselstyn's districts, 28 was drawn.  Similar story,

17   though.  And the State says this District 28 here is one of

18   the new districts.

19       And you see the area of South Fulton County is newly

20   placed in a Black majority district, 28.  It's a few thousand

21   voters.  Not a very densely populated area.

22       And then in blue we see this area of Douglas, which

23   actually is somewhat densely populated, over 3,000 Black

24   voters are removed from a Black majority district in the vote

25   dilution area.  In the area where vote dilution is occurring.

1          But then this new district, this ostensibly new

2     district, it runs up to Cobb County.  And it adds almost

3     30,000 Black voters to a district in Cobb County, outside the

4     vote dilution area, outside the area where we had a trial

5     about vote dilution, outside the area where the harm is being

6     experienced.

7          So, again, no new opportunities for Black Georgians

8     in the vote dilution area, in the area where the harm is

9     occurring.

10          And zooming out, we'll see what the proposed plan

11     looks like, see what it does and doesn't do for Black voters.

12     South Metro Atlanta, very few changes.  None in that Senate

13     District 16 at all.  Some shifts around the margins in 17 and

14     28.  All of them are offset, Henry for Newton, South Fulton

15     for Douglas.

16          And then outside the vote dilution area, in the North

17     Metro, that's where the change is happening for voters.

18     Outside the vote dilution area in places that were not the

19     subject of the trial we held in September, where there's no

20     finding of vote dilution.  In places that do not require a

21     remedy to come into compliance with the Court's order.  In

22     places where the changes don't affect the political

23     opportunities for Black voters in South Metro Atlanta.  That's

24     where we're seeing the change.

25          95,500 Black voting age Georgians added to Black

1   majority districts in the North Metro.  In the North Metro.

2   In an area that cannot provide a remedy for Black voters in

3   South Metro Atlanta.

4          And the county-level numbers show it, too.  We look

5   at those.  Almost 30,000 Black voters added to Black majority

6   districts in Cobb County.  Over 47,000 Black voters added to

7   Black majority districts in DeKalb County.  20,000 in Fulton.

8   Almost all of that in North Fulton.  Outside the vote dilution

9   area.  All of it outside of the vote dilution area.

10          And the reason to move all of these Black voters in

11  an area where there's no need to do so, where it doesn't

12  remedy vote dilution in South Metro Atlanta, is to get that

13  total number of Black majority, 50 percent plus BVAP

14  districts, to go from 14 to 16, which it does.

15          That's not enough.  Under this proposal, the vote

16  dilution in South Metro Atlanta goes entirely unaddressed.

17  None of this solves the illegal vote dilution that was proved

18  at trial and that's harming Black voters in South Metro

19  Atlanta.

20          Remember, when a Section 2 violation is proved, this

21  is Shaw again, for a particular area, a remedy is required for

22  that area.  The injury is not remedied by creating a Black

23  majority district somewhere else.  Giving more influence to

24  Black voters in some other area of the state, other than South

25  Metro Atlanta, doesn't remedy the vote dilution problem.  It

1  doesn't matter if it's on the other side of the Atlanta Metro
2  or the other side of the fall line.  It's not in South Metro
3  Atlanta.

4          The idea that the interests of Black voters in Cobb
5  County are just interchangeable with those of Black voters in
6  Henry, Newton, is wrong.  The Supreme Court's repeatedly
7  rejected it.  This Court's rejected it.

8          The harm is being experienced in South Metro Atlanta.
9  Black Georgians in South Metro Atlanta need a remedy and the
10  proposed Senate plan does not provide one.

11          I do have one other set of Senate maps I want to look
12  at briefly.

13          The Court remembers Mr. William Cooper, testified at
14  trial, he submitted a remedial plan where his focus is to work
15  within that vote dilution area and add those two new Black
16  majority opportunity districts.  And all this shows that it's
17  entirely possible to do that.

18          His remedial plans do that.  They have comparable
19  compactness scores, comparable county splits, precinct splits,
20  change 15 Senate districts, the exact same number as the
21  proposed Senate plan.

22          And look at these green areas.  These are the areas
23  that are newly added to Black majority districts under that
24  plan.  We see Fayette County, part of Douglas County, Spalding
25  County, Henry County, they are added to Black majority

1  districts, all in the vote dilution area.

2      And looking at those numbers, we have the numbers

3  from the remedial plan, too.  In the vote dilution area,

4  88,000 Black voters newly added to Black majority districts.

5  Outside the vote dilution area, North Metro Atlanta, none,

6  zero.  It wasn't necessary.

7      88,000, I think I would submit is about what you

8  would expect to bring two Senate districts above 50 percent

9  BVAP in the South Metro area.

10     And we can look briefly at the county numbers as

11  well.  They tell the same story.  These are remedial plans.

12  Don't move Black voters into new majority districts in Cobb

13  County or DeKalb County or North Fulton County.  All the

14  movement happens in the area where the Court indicated it

15  should, in the South Metro counties.

16     I understand the State's going to say that you should

17  disregard these maps.  I would say the Court's authority to

18  consider any maps, any submissions, is clear and well settled.

19  But let's because -- we're not wedded to these maps.  A

20  special master would be a very appropriate, in our view, way

21  to proceed here.

22     They just show very simply there can be no doubt that

23  this was possible.  The remedy was absolutely possible.

24     And I should note, by the way, these plans are

25  publicly released and were available during the special

1  session.

2        One last point.  And I'll talk briefly about the

3  House plan as well.

4        The State says that the plan that the General

5  Assembly adopted was chosen like partisan considerations,

6  partisan constraints.  That may be.

7        That isn't how this works.  As the Court of Appeals

8  said in Dillard, any proposal to remedy a Section 2 violation

9  must itself conform with Section 2.  In LULAC the Court put it

10 well:  Whatever the validity of partisan goals or incumbency

11 protection in the realm of politics, that can't justify

12 unlawful vote dilution.

13        If the unlawful vote dilution remains, it doesn't

14 matter why.  This -- and I know the Court knows this very

15 well -- this is not and never has been an intent case.  It's

16 not about intent.  It doesn't matter why the General Assembly

17 drew these proposed plans.  It matters whether the proposed

18 plans remedy the unlawful effects of vote dilution by creating

19 new opportunities for Black voters in South Metro Atlanta.

20        The State can have partisan goals.  But where

21 partisan goals in Section 2 compliance conflict, Section 2

22 compliance must take precedence.  The fundamental problem with

23 the proposed Senate plan is not that it sought to achieve a

24 partisan goal; but that it seems to have only done that

25 without following the Court's order and remedying vote

1 dilution.

2       The problem is, it doesn't include a remedy.  They

3 didn't do both things.  They didn't do both partisan goals and

4 a remedy.  They just did one thing.  And here's where that

5 leaves us.

6       The General Assembly does not enact a plan that

7 completely remedies vote dilution as proven up in this

8 courtroom, detailed in this Court's decision.  The Court can

9 and must do so itself.  The Court has not merely the power but

10 the duty to ensure that a remedy for unlawful vote dilution is

11 brought into place.

12       At this juncture it just doesn't matter why the

13 General Assembly prioritized strongly-held partisan goals over

14 Section 2 compliance.  It doesn't matter why these proposed

15 plans were drawn.

16       It just matters whether they remedy the violation.

17 Black voters in the South Metro area are entitled to that

18 remedy.  That's what matters now.  These plans don't provide

19 it.

20       Your Honor, with my remaining time, I'll talk a

21 little bit about the House plan as well.

22       THE COURT:  Okay.  Mr. Tyson, I usually take a lunch

23 break at 12:30.  It is 11:55 now.  You have an hour.  I'll

24 give you the option.  If you start now, you won't finish your

25 part.  Or we can stop and take the lunch break now and start

1  back and you resume your part at 1:00.

2          MR. TYSON:  Your Honor, I don't know if Mr. Savitzky

3  was quite finished with his presentation.

4          THE COURT:  Oh, I thought he was stopping.

5          MR. SAVITZKY:  Oh, I'll speak about the House plans

6  next.

7          THE COURT:  Oh, okay.  I'm sorry.  I thought you were

8  stopped.  I'm sorry.

9          MR. SAVITZKY:  I can take us a little closer to

10  12:30.

11          THE COURT:  You do whatever you need to do.  I'm here

12  for the duration.

13          MR. SAVITZKY:  Thank you, Your Honor.

14          And if I may ask Ms. Wright how much time I have

15  left.

16          THE DEPUTY CLERK:  You have about 19 minutes.

17          MR. SAVITZKY:  All right.  Thank you very much.

18          I'll proceed, Your Honor.

19          THE COURT:  Thank you.  I'm sorry, I thought you had

20  stopped.

21          MR. SAVITZKY:  So, Your Honor, just moving to the

22  House side.

23          We can see here, the story is actually much the same

24  in the House.  Bottom line is that the proposed House plan

25  does not completely remedy the vote dilution the Court found

1  especially in Metro Atlanta, which is where I want to focus my

2  time.

3          On the screen here, the two vote dilution areas that

4  the Court identified comprise of districts that need to change

5  consistent with the areas where vote dilution was proven,

6  South Metro area, West Metro area.  On the left we have the

7  area that includes parts of Fayette, Spalding, Henry, Clayton

8  Counties.

9          Again, we spent so much time talking about these

10  areas at trial.  Incredibly close attention to these areas in

11  the Court's opinion.

12          And the remedy was we need two additional Black

13  majority opportunity districts in that South Metro area.  And

14  on the right we have the West Metro area, really anchored in

15  Douglas County, including parts of Fulton, Spalding, the area

16  where the Grant plaintiffs had drawn an additional

17  illustrative district there and where the Court found vote

18  dilution and the need to draw an additional Black majority

19  opportunity district.

20          Now, let's look at the same map looking at the House.

21  Again, the purple area was in a Black majority district

22  before, and it's in the Black majority district in the new

23  proposed plan.  Nothing changes to the reality of Black voters

24  in those areas.  They were in a Black majority district before

25  and they still are.

1          The red areas around the periphery are newly added to

2  Black majority districts.  Blue areas around the periphery are

3  removed from Black majority districts.  And we can see the

4  gray is that vote dilution area, those districts.

5          Right away we can see a few things.  Large portions

6  of the vote dilution areas are not included.  None of Spalding

7  County is included, for example.  Parts of Henry and Newton

8  are removed from Black majority districts under this plan.

9  And as in the Senate map, lots of red in North Metro Atlanta,

10  outside of where this Court found vote inclusion.  Outside of

11  where the plaintiffs proved vote dilution, including Gwinnett

12  County, which, of course, had nothing to do with the state

13  legislative case.

14          Now zooming in on the South Metro area, we can see in

15  the vote dilution area parts of Henry are added to Black

16  majority districts.  No changes for Black voters in Fayette

17  County.  No changes for Black voters in Spalding County.

18          And the other thing to notice is that Black voters

19  are removed from Black majority districts in neighboring areas

20  of Henry and then in Newton County as well.  And those are

21  those blue bands that we see there.

22          And so overall, sticking with the South Metro area,

23  we see an increase in that gray area of 15,000 Black Georgians

24  in Black majority districts.  It's about a quarter of the size

25  of a House district, not enough of a change to account for two

1    additional Black majority opportunity districts.  Not
2    necessarily enough to do one, definitely not two.
3          And just looking at that number, we know this isn't a
4    complete remedy.  But, in fact, looking at the county-level
5    numbers shows it's even less.  Zooming in again, we can see
6    that parts of Henry have been added -- oh, sorry.
7          We can see that the vote dilution area number, that
8    15,000, actually overstates the extent of the new
9    opportunities for Black voters.  The net gain in that
10   five-county area, in that South Metro area, is actually lower
11   because of those blue areas in Henry County and in Newton
12   County.
13         Consider the county numbers.  Just add them up.
14   Spalding County, zero Black Georgia voters added to Black
15   majority districts.  Fayette County, zero.  Henry, 12,555 net,
16   because some Henry County voters were taken out.  Newton
17   County, 5,546 removed.  So in that five-county area, in that
18   South Metro area, the actual net increase, Black voters in
19   Black majority districts, is 7,009, about 7,000 voters.
20         Again, the remedy this Court required was two
21   additional Black majority opportunity districts in the South
22   Metro Atlanta area.  And once you consider the Black voters
23   who have been removed from existing Black majority districts,
24   it's hard to conclude there is even one, let alone two.
25         Zooming in the Metro Atlanta -- or the West Metro,

1    excuse me, Atlanta area, we can see that in the vote dilution

2    areas here, a small part of Douglas County is added.  And

3    looking at the numbers, you can see how many people that is.

4    2,661.  Less than 5 percent of the population of the House

5    district.  Not enough to create an additional majority Black

6    opportunity House district in the area identified by the

7    Court.  Not enough to change the political reality for Black

8    voters in that area.

9           So, again, the story on the House side is similar to

10   the Senate.  And the areas that were the focus of trial, where

11   the Court ordered the map must change to add new opportunities

12   for Black voters to remedy vote dilution, proposed House plan

13   does not add those new opportunities.  Doesn't add new Black

14   majority opportunity districts in the areas where the vote

15   dilution harm is occurring.

16          By the way, the similarities don't end there.  Look

17   at the North Metro Atlanta zooming in.  Tens of thousands of

18   Black voters in the North Metro were added to Black majority

19   districts in areas that cannot provide a remedy in West South

20   Metro Atlanta.

21          We see all of these red areas in the North Metro, in

22   Cobb, DeKalb, Gwinnett Counties.  None of these places were at

23   issue at trial, in the Court's decision.  And the numbers

24   shows the differences in magnitude.

25          Remember, it was 2,600 Black voters added to Black

1   majority districts in Douglas County, in West Metro.  The net
2   in the South Metro is 7,000.

3          Now, let's look at the additions in Cobb and DeKalb
4   and Gwinnett.  8,500 Black voters added to Black majority
5   districts in DeKalb.  Over 13,500 in Cobb.  Almost 15,000 in
6   Gwinnett.  That's where the change is happening.  That doesn't
7   provide a remedy in South Metro and West Metro.

8          Just like with the Senate, we have tens of thousands
9   of Black voters added to Black majority districts in areas
10  that are irrelevant to the Court's decision and that don't
11  remedy vote dilution.

12         You cannot remedy the localized vote dilution problem
13  which is experienced in South Metro Atlanta and West Metro
14  Atlanta.  Black Georgians in those areas need a remedy.  The
15  proposed House plan doesn't provide one -- certainly not a
16  complete one.

17         And briefly we can just look at an alternative.
18  Again, Mr. Cooper submitted one.  Green areas are newly added
19  to Black majority districts.  Mr. Cooper's remedial plan adds
20  over 13,000 Black voters to Black majority districts in West
21  Metro Atlanta, over 25,000 in South Metro Atlanta.

22         And looking at the county-level numbers again, no
23  change in Cobb, no change in DeKalb, no change in Fulton, no
24  change in Gwinnett.  Not necessary.  It wouldn't remedy vote
25  dilution.

1        The changes aren't happening in the areas where the

2   Court identified vote dilution harm.  Bottom line is that the

3   proposed Senate and House plans are not a complete remedy.

4   Maybe they were the State's best attempt.  Maybe the realities

5   of politics in the General Assembly were such that they needed

6   to leave Senate District 16 untouched, unchanged in Fayette

7   and Spalding Counties.  Or draw the same Senate District 17,

8   more or less, and just rename it Senate District 42.  Maybe

9   that's what was politically possible.  Maybe it was

10  politically easier.  I don't know.  And I submit it doesn't

11  matter.

12        The right remedy, the lawful remedy, is the one that

13  gives complete relief to Black voters in places like South

14  Metro Atlanta.  The relief that they are absolutely entitled

15  to following this Court's decision.

16        That remedy might not be politically easy.  It might

17  even not be politically feasible for the General Assembly.

18        That's not the standard.  The only question is

19  whether the harm suffered by Black voters in South Metro

20  Atlanta and elsewhere have been remedied.  The only question

21  is whether Black voters in those areas have those new

22  political opportunities where their political reality has

23  changed.

24        If, in the end, it's not possible, for whatever

25  reason, for the General Assembly to pass Senate and House

1    plans that remedy vote dilution, and for whatever reason they

2    haven't, and I submit they haven't, drawn those new Black

3    majority districts, those new opportunities in the areas where

4    the Court required that they be drawn, then the task passes to

5    this Court to ensure a remedy.  To you, Judge.

6            These maps don't do it.  They're not a complete

7    remedy.  They're not a lawful remedy.  They don't give Black

8    voters in South Metro Atlanta, in West Metro Atlanta, in the

9    places where the harm is being experienced, where vote

10   dilution is happening, the new opportunities to which they are

11   entitled under Section 2.

12           We ask the Court to sustain our objections, to

13   appoint a special master or otherwise put a lawful remedy into

14   place.

15           Thank you, Your Honor.

16           THE COURT:  Thank you, Mr. Savitzky.

17           We'll take a lunch break and start back at 1:20.

18   Thank you-all.

19           Have a good lunch, everyone.

20           (Lunch break taken from 12:10 p.m. to 1:20 p.m.)

21           (Change of reporter.)

22

23

24

25

1          C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF GEORGIA

5

6        I do hereby certify that the foregoing pages are a true

7    and correct transcript of the proceedings taken down by me in

8    the case aforesaid.

9

         This the 20th day of December, 2023.
10

11

12

13

14                     /s/Viola S. Zborowski _____
                       VIOLA S. ZBOROWSKI,
15                     RDR, FAPR, CMR, CRR, RPR, CRC
                       OFFICIAL COURT REPORTER TO
16                     THE HONORABLE STEVE C. JONES

17

18

19

20

21

22

23

24

25

## /

**/S/VIOLA** [1] - 95:14

## 1

**1** [8] - 13:16, 18:20, 26:22, 31:2, 32:7, 49:1, 49:18, 49:23
**10** [9] - 50:24, 77:19, 78:19, 78:20, 78:23, 78:24, 79:4, 79:5, 79:16
**100,000** [2] - 32:11, 75:15
**11** [3] - 10:4, 13:19, 15:25
**11:00** [1] - 61:13
**11:55** [1] - 86:23
**12,555** [1] - 90:15
**1227** [1] - 54:9
**1279** [1] - 54:11
**12:10** [1] - 94:20
**12:30** [2] - 86:23, 87:10
**12TH** [1] - 47:12
**13** [6] - 10:4, 13:19, 16:1, 39:15, 42:2, 42:5
**13,000** [1] - 92:20
**13,500** [1] - 92:5
**14** [4] - 10:4, 13:20, 16:1, 82:14
**15** [1] - 83:20
**15,000** [3] - 89:23, 90:8, 92:5
**16** [5] - 75:20, 75:24, 81:13, 82:14, 93:6
**16TH** [1] - 47:10
**17** [14] - 35:16, 35:17, 54:15, 73:5, 74:12, 77:9, 77:19, 78:5, 78:18, 80:5, 80:6, 80:7, 81:13, 93:7
**17,646** [1] - 77:20
**18** [1] - 32:10
**180,000** [1] - 70:1
**19** [1] - 87:16
**1965** [1] - 12:16
**1:00** [1] - 87:1
**1:20** [2] - 94:17, 94:20
**1:21-CV-5337** [1] - 4:6
**1:21-CV-5339** [1] - 4:8
**1:22-CV-122** [1] - 4:9
**1EX** [2] - 7:9, 7:10

## 2

**2** [114] - 6:17, 6:24, 7:7, 7:21, 9:22, 10:2, 10:10, 11:1, 11:13, 12:12, 12:13, 12:19, 12:25, 13:18, 13:22, 14:6, 14:7, 14:12, 14:13, 14:17, 14:18, 15:1, 15:12, 15:20, 15:24, 16:4, 16:6, 16:15, 16:17, 16:24, 17:5, 17:6, 17:9, 17:13, 17:14, 17:15, 17:16, 18:7, 18:13, 19:25, 20:15, 22:9, 22:12, 23:8, 24:4,

26:1, 26:18, 26:19, 26:24, 27:7, 27:8, 27:14, 27:23, 28:1, 28:24, 28:25, 29:11, 29:13, 29:25, 30:1, 30:6, 30:20, 31:8, 32:7, 32:22, 33:2, 33:6, 33:9, 33:11, 34:15, 35:2, 35:11, 41:13, 44:7, 44:9, 44:11, 44:22, 45:4, 45:21, 47:7, 48:24, 49:4, 50:1, 52:13, 52:23, 53:16, 54:24, 55:2, 55:10, 55:15, 55:21, 56:5, 56:25, 57:5, 58:15, 58:16, 58:20, 61:8, 63:21, 64:1, 64:19, 64:22, 64:25, 65:9, 66:10, 82:20, 85:8, 85:9, 85:21, 86:14, 94:11
**2,600** [1] - 91:25
**2,661** [1] - 91:4
**2,940** [1] - 75:7
**2.5** [1] - 19:2
**20** [4] - 27:15, 28:1, 65:15, 67:25
**20,000** [1] - 82:7
**2012** [1] - 49:20
**2021** [20] - 6:23, 10:2, 18:22, 19:11, 19:15, 23:9, 26:12, 26:23, 30:16, 31:3, 31:7, 44:20, 51:13, 52:14, 58:11, 72:21, 73:4, 73:21, 73:23, 79:4
**2022** [4] - 31:16, 32:9, 53:23, 62:25
**2023** [23] - 6:22, 7:9, 7:12, 13:24, 14:20, 19:1, 19:13, 19:16, 19:17, 23:8, 26:2, 26:12, 30:17, 31:1, 33:3, 33:7, 35:10, 51:15, 54:3, 56:5, 58:12, 60:21, 95:9
**2024** [3] - 5:17, 53:22, 54:3
**20TH** [1] - 95:9
**21,000** [2] - 77:17, 79:16
**22** [2] - 27:16, 47:8
**23** [1] - 33:20
**237** [1] - 22:20
**2371** [2] - 22:23
**2372** [2] - 22:17, 22:21
**25,000** [1] - 92:21
**26** [2] - 6:21, 15:18
**26TH** [2] - 7:20, 9:25
**27** [1] - 38:25
**27,000** [1] - 79:15
**28** [6] - 16:19, 75:20, 80:16, 80:17, 80:20, 81:14
**29TH** [1] - 7:9
**2D** [1] - 54:9
**2EX** [1] - 15:23

## 3

**3** [7] - 10:4, 13:19, 31:8, 31:12,

32:22, 49:4, 50:9
**3,000** [4] - 69:25, 75:7, 80:23
**30** [1] - 24:25
**30,000** [2] - 81:3, 82:5
**31** [1] - 17:22
**33.82** [1] - 78:13
**34** [1] - 75:25
**34.41** [1] - 78:11
**36** [1] - 3:3
**38** [1] - 78:20
**39** [1] - 78:21

## 4

**4** [4] - 15:25, 19:10, 39:16, 42:5
**4.8** [1] - 50:23
**42** [15] - 74:11, 77:23, 78:5, 78:7, 78:11, 79:1, 79:3, 79:7, 79:10, 79:14, 79:21, 80:1, 80:3, 80:5, 93:8
**43** [1] - 74:10
**44** [7] - 78:19, 78:22, 78:23, 78:24, 79:5, 79:6, 79:17
**441** [1] - 34:12
**442** [1] - 34:12
**46** [1] - 38:23
**47,000** [1] - 82:6
**49** [2] - 21:3, 21:7

## 5

**5** [8] - 3:3, 13:16, 31:12, 40:12, 42:4, 50:12, 91:4
**5,546** [1] - 90:17
**50** [4] - 49:3, 75:17, 82:13, 84:8
**50,000** [1] - 79:14
**509** [6] - 7:19, 10:24, 19:23, 21:4, 56:8, 56:18
**510** [7] - 7:19, 10:8, 10:25, 18:13, 19:23, 56:11, 63:11
**511** [2] - 10:19, 56:11
**514** [3] - 10:1, 10:5, 15:22
**515** [1] - 10:5
**516** [1] - 60:16
**55** [2] - 3:4, 9:11

## 6

**6** [10] - 10:4, 13:19, 15:25, 38:1, 38:2, 39:14, 40:11, 41:12, 41:22, 53:2
**60,000** [1] - 79:5
**61** [1] - 3:4

## 7

**7** [11] - 22:6, 22:23, 23:13, 23:19,

34:1, 42:6, 42:10, 45:15, 52:14, 59:25
**7,000** [2] - 90:19, 92:2
**7,009** [1] - 90:19
**70** [4] - 38:2, 38:9, 41:7, 75:25
**75** [5] - 14:23, 15:1, 79:3, 80:5
**76** [1] - 78:16
**77,000** [1] - 79:6
**7TH** [1] - 22:13

---

### 8

**8** [3] - 18:20, 33:5, 51:6
**8,500** [1] - 92:4
**80** [2] - 54:11, 78:18
**88,000** [2] - 84:4, 84:7
**8TH** [1] - 7:12

---

### 9

**9** [2] - 33:5, 51:12
**90** [1] - 32:8
**95,500** [1] - 81:25
**989** [1] - 54:9
**9:25** [1] - 4:1

---

### A

**A.M** [1] - 4:1
**ABHA** [2] - 5:4, 9:19
**ABHA** [1] - 2:4
**ABIDE** [1] - 59:16
**ABIDED** [1] - 19:22
**ABILITY** [1] - 60:11
**ABLE** [3] - 6:3, 28:19, 44:16
**ABSOLUTELY** [4] - 27:1, 44:23, 84:23, 93:14
**ACCEPT** [3] - 33:17, 33:21, 36:14
**ACCEPTABLE** [1] - 10:15
**ACCOMPLISHED** [1] - 25:14
**ACCORDANCE** [1] - 7:5
**ACCORDING** [4] - 19:5, 21:13, 41:8, 78:15
**ACCOUNT** [1] - 89:25
**ACCOUNTABLE** [2] - 12:20, 35:2
**ACCUSED** [1] - 42:8
**ACHIEVE** [3] - 19:14, 29:8, 85:23
**ACLU** [3] - 4:18, 4:23, 61:19
**ACQUIRES** [1] - 52:2
**ACT** [10] - 10:3, 24:25, 27:12, 35:7, 51:20, 52:2, 52:7, 52:19, 53:9, 55:6
**ACT** [1] - 53:12
**ACTION** [4] - 4:6, 4:8, 4:9, 15:24
**ACTION** [1] - 33:18
**ACTIONS** [3] - 37:2, 37:5, 42:21

**ACTIVE** [1] - 34:20
**ACTIVITIES** [1] - 37:3
**ACTUAL** [2] - 38:8, 90:18
**ADAM** [1] - 2:6
**ADAM** [1] - 5:6
**ADD** [9] - 63:7, 63:11, 64:11, 64:13, 83:15, 90:13, 91:11, 91:13
**ADDED** [30] - 40:20, 71:3, 74:6, 74:15, 74:16, 74:22, 75:6, 76:5, 76:7, 76:12, 77:8, 77:18, 79:12, 79:15, 81:25, 82:5, 82:6, 83:23, 83:25, 84:4, 89:1, 89:15, 90:6, 90:14, 91:2, 91:18, 91:25, 92:4, 92:9, 92:18
**ADDING** [4] - 41:20, 65:2, 70:3, 75:15
**ADDITION** [1] - 69:2
**ADDITIONAL** [41] - 7:1, 7:2, 7:3, 10:11, 10:22, 11:18, 18:14, 19:18, 20:16, 20:25, 21:5, 21:8, 24:13, 29:15, 37:4, 37:8, 37:17, 38:13, 38:15, 39:1, 40:20, 43:15, 44:16, 53:3, 55:20, 56:9, 57:17, 57:21, 57:23, 62:23, 63:11, 64:12, 70:5, 75:9, 75:14, 88:12, 88:16, 88:18, 90:1, 90:21, 91:5
**ADDITIONS** [1] - 92:3
**ADDRESS** [3] - 7:24, 8:11, 57:9
**ADDS** [2] - 81:2, 92:19
**ADEQUATE** [2] - 9:24, 33:8
**ADJUDICATING** [1] - 56:25
**ADMISSIONS** [2] - 23:11, 55:4
**ADMITS** [1] - 14:8
**ADMITTED** [1] - 13:15
**ADOPTED** [4] - 10:9, 20:14, 57:22, 85:5
**ADOPTING** [1] - 7:7
**ADOPTION** [1] - 35:12
**ADVERSELY** [1] - 50:10
**AFFECT** [1] - 81:22
**AFFORDED** [3] - 7:6, 10:5, 12:13
**AFFORDING** [1] - 57:17
**AFFRONT** [4] - 35:6, 35:7, 37:2
**AFORESAID** [1] - 95:8
**AFOUL** [1] - 44:11
**AGE** [2] - 40:17, 45:15, 81:25
**AGO** [5] - 25:1, 25:23, 27:3, 27:25, 59:2
**AGREE** [1] - 57:6
**AGREED** [1] - 53:1
**AHEAD** [6] - 27:4, 27:17, 27:18, 28:13, 71:24
**ALABAMA** [8] - 12:22, 27:2, 46:4, 46:10, 54:8, 54:9, 57:19

**ALABAMA'S** [2] - 12:23, 37:3
**ALFORD** [1] - 50:3
**ALFORD'S** [1] - 24:3
**ALLEGED** [2] - 45:3, 45:10
**ALLEGING** [1] - 6:16
**ALLEN** [2] - 54:25, 55:3
**ALLOW** [2] - 9:8, 54:4
**ALLOWED** [1] - 28:11
**ALLOWS** [1] - 58:20
**ALMOST** [7] - 74:11, 75:15, 77:10, 81:2, 82:5, 82:8, 92:5
**ALONE** [1] - 90:24
**ALPHA** [11] - 4:5, 4:11, 4:21, 6:17, 8:20, 61:16, 61:20, 76:9
**ALTERNATIVE** [1] - 92:17
**ALTOGETHER** [2] - 16:10, 30:1
**AMOUNT** [2] - 73:1, 73:4
**ANALOGIZING** [1] - 59:15
**ANALOGY** [2] - 58:25, 59:20
**ANALYSES** [1] - 67:18
**ANALYSIS** [13] - 19:3, 19:8, 21:16, 31:9, 32:13, 33:4, 41:8, 42:12, 52:10, 58:3, 58:4, 58:8, 68:4
**ANALYZE** [2] - 23:18, 31:13
**ANCHORED** [1] - 88:14
**ANEW** [2] - 26:19, 27:8
**ANNIE** [1] - 4:8
**ANSWER** [1] - 27:20
**APART** [1] - 34:18
**APOLOGIZE** [5] - 27:17, 28:12, 35:23, 36:9, 59:5
**APOLOGIZED** [1] - 59:9
**APOLOGY** [1] - 36:14
**APPEALS** [1] - 50:21
**APPEALS** [1] - 85:7
**APPEARANCES** [1] - 2:1
**APPEARED** [1] - 56:10
**APPLIED** [1] - 80:4
**APPLY** [1] - 50:4
**APPOINT** [1] - 94:13
**APPRAISAL** [4] - 45:5, 49:17, 64:23, 66:12
**APPRECIATE** [2] - 12:10, 30:23
**APPROACH** [3] - 16:24, 48:15, 61:23
**APPROPRIATE** [1] - 84:20
**APPROXIMATE** [1] - 17:4
**AREA** [106] - 11:15, 13:17, 14:3, 14:5, 14:21, 14:23, 15:2, 23:21, 35:1, 38:4, 39:8, 39:11, 39:15, 40:3, 40:8, 40:9, 40:25, 41:9, 42:6, 42:23, 49:16, 58:19, 65:10, 65:11, 65:15, 65:22, 66:1, 66:16, 68:11, 69:4, 70:4, 70:14, 71:19, 71:25, 72:2, 72:4, 72:12, 72:19,

73:1, 73:13, 73:20, 74:4, 74:13,
74:15, 74:19, 75:5, 75:6, 75:13,
75:16, 77:5, 78:2, 79:8, 79:9,
79:19, 80:8, 80:14, 80:19, 80:21,
80:22, 80:25, 81:4, 81:5, 81:8,
81:16, 81:18, 82:2, 82:9, 82:11,
82:21, 82:22, 82:24, 83:15, 84:1,
84:3, 84:5, 84:9, 84:14, 86:17,
88:6, 88:7, 88:13, 88:14, 88:15,
88:21, 89:4, 89:14, 89:15, 89:22,
89:23, 90:7, 90:10, 90:17, 90:18,
90:22, 91:1, 91:6, 91:8
**AREAS**[64] - 6:24, 7:22, 10:3, 15:25,
17:25, 38:11, 62:24, 63:1, 63:5,
63:9, 63:16, 64:4, 64:5, 64:8,
64:18, 65:6, 66:16, 67:1, 67:9,
67:10, 67:18, 67:19, 67:20, 68:8,
68:10, 70:6, 71:9, 73:25, 74:5,
74:6, 74:7, 74:19, 74:21, 74:22,
75:15, 77:10, 77:13, 80:10, 83:22,
88:3, 88:5, 88:10, 88:24, 89:1,
89:2, 89:6, 89:19, 90:11, 91:2,
91:10, 91:14, 91:19, 91:21, 92:9,
92:14, 92:18, 93:1, 93:21, 94:3
**ARGUE**[1] - 24:9
**ARGUED**[3] - 23:24, 25:6, 27:5
**ARGUES**[2] - 21:7, 21:16
**ARGUING**[1] - 26:2
**ARGUMENT**[21] - 15:22, 24:1, 25:1,
25:17, 26:20, 28:1, 28:18, 42:15,
42:18, 44:6, 48:3, 51:6, 51:16,
52:3, 52:4, 56:1, 56:21, 58:17,
61:21, 70:22, 70:25
**ARGUMENTS**[8] - 11:10, 15:17,
37:10, 37:14, 37:16, 41:18, 47:20,
60:5
**ARI**[1] - 61:19
**ARI**[2] - 4:18, 4:21
**ARI**[1] - 2:3
**ASIAN**[20] - 8:5, 23:6, 26:5, 31:9,
31:17, 45:1, 45:14, 48:20, 49:7,
49:16, 49:22, 49:24, 50:4, 50:10,
50:13, 50:17, 50:22, 50:23, 50:25
**ASIDE**[2] - 18:6, 47:19
**ASSEMBLIES**[1] - 63:22
**ASSEMBLY**[16] - 7:6, 7:9, 10:6,
10:10, 13:25, 14:11, 15:6, 20:15,
21:2, 85:5, 85:16, 86:6, 86:13,
93:5, 93:17, 93:25
**ASSEMBLY'S**[5] - 9:22, 11:4, 18:19,
21:20, 35:5
**ASSERTION**[1] - 33:21
**ASSOCIATED**[1] - 6:19
**ASSUME**[2] - 16:13, 42:25

**AT**[1] - 4:1
**ATLANTA**[62] - 7:2, 7:3, 21:6, 24:18,
37:9, 38:14, 38:16, 41:22, 42:3,
63:2, 63:6, 63:12, 63:15, 64:20,
65:22, 66:16, 66:23, 67:5, 67:20,
68:20, 68:22, 71:5, 71:6, 71:18,
72:5, 72:11, 72:14, 72:19, 75:1,
75:8, 78:3, 79:24, 80:2, 80:12,
81:12, 81:23, 82:3, 82:12, 82:16,
82:19, 82:25, 83:1, 83:3, 83:8,
83:9, 84:5, 85:19, 88:1, 89:9,
90:22, 90:25, 91:1, 91:17, 91:20,
92:13, 92:14, 92:21, 93:14, 93:20,
94:8
**ATTACHED**[3] - 8:18, 8:23, 9:2
**ATTEMPT**[3] - 21:23, 25:12, 93:4
**ATTEMPTS**[2] - 21:25, 32:21
**ATTENTION**[2] - 54:19, 88:10
**ATTORNEY**[2] - 5:22, 47:10
**ATTORNEYS**[1] - 4:11
**AUTHORITY**[2] - 32:18, 84:17
**AUTHORIZE**[1] - 17:12
**AVAILABLE**[3] - 30:7, 62:7, 84:25
**AVOID**[1] - 13:2

# B

**BAD**[3] - 42:9, 58:23, 76:14
**BAIT**[1] - 24:22
**BALANCE**[1] - 62:6
**BALLOT**[1] - 66:6
**BANDS**[1] - 89:21
**BARBER**[8] - 14:8, 18:18, 19:2,
19:5, 19:7, 37:21, 58:2, 58:3
**BARBER**[1] - 18:21
**BARBER'S**[6] - 18:20, 26:15, 37:21,
38:23, 41:8, 42:12
**BARRED**[1] - 52:18
**BARTLETT**[2] - 47:17, 51:22
**BASED**[7] - 7:20, 21:10, 25:19, 28:4,
48:1, 55:21, 71:19
**BASIC**[1] - 66:11
**BASIS**[11] - 18:4, 24:10, 28:17,
28:18, 41:10, 48:23, 52:13, 53:18,
54:2, 65:1
**BEAR**[1] - 32:8
**BECOMES**[2] - 24:1, 40:13
**BEDROCK**[1] - 17:17
**BEGAN**[1] - 41:20
**BEGIN**[2] - 37:6, 61:21
**BEGINNING**[4] - 7:8, 22:5, 43:3,
56:7
**BEHALF**[1] - 2:2, 2:7
**BEHALF**[9] - 5:4, 5:5, 5:8, 5:23,

8:16, 9:20, 18:18, 29:22, 30:24
**BELONGS**[2] - 66:7, 66:8
**BENCH**[1] - 6:15
**BENJAMIN**[1] - 2:5
**BEST**[1] - 93:4
**BETTER**[2] - 55:13, 62:25
**BETWEEN**[13] - 16:22, 21:21, 28:9,
37:3, 38:1, 50:5, 50:13, 58:13,
58:14, 66:19, 67:12, 73:21, 79:4
**BEYOND**[2] - 39:15, 48:9
**BIBB**[2] - 7:4, 70:14
**BIG**[1] - 28:9
**BILL**[5] - 46:5, 46:6, 47:3, 54:10,
54:11
**BILLS**[1] - 7:13
**BINDING**[2] - 46:23, 48:14
**BIT**[3] - 38:3, 75:19, 86:21
**BLACK**[307] - 7:1, 7:3, 7:4, 7:22,
7:24, 8:2, 8:4, 10:11, 10:22,
11:13, 11:18, 11:21, 12:3, 14:1,
14:9, 14:25, 17:24, 18:14, 19:12,
19:14, 19:15, 19:18, 20:5, 20:8,
20:9, 20:16, 20:24, 21:6, 21:8,
21:11, 21:14, 21:21, 21:22, 21:25,
22:8, 22:9, 22:11, 23:14, 23:15,
23:25, 24:6, 24:7, 24:15, 24:17,
25:3, 25:4, 25:13, 26:9, 26:10,
29:8, 30:15, 31:9, 31:17, 31:23,
32:2, 33:12, 33:23, 33:25, 34:3,
34:10, 34:21, 34:22, 35:4, 35:8,
37:4, 37:8, 37:13, 37:18, 38:14,
38:16, 38:24, 39:2, 40:4, 40:13,
40:16, 40:18, 40:23, 41:21, 42:9,
42:11, 42:13, 42:15, 42:16, 43:3,
43:12, 43:15, 43:20, 43:22, 44:17,
44:19, 45:8, 45:10, 45:14, 46:4,
46:10, 48:4, 48:8, 48:19, 49:8,
49:11, 49:15, 49:21, 50:3, 50:8,
50:13, 50:15, 50:18, 52:1, 53:1,
53:3, 54:9, 56:9, 56:17, 57:5,
57:7, 57:11, 57:12, 57:17, 57:21,
57:23, 57:24, 58:6, 58:10, 58:11,
59:21, 59:22, 59:25, 60:2, 60:7,
60:14, 61:1, 61:6, 61:9, 62:23,
63:8, 63:12, 63:15, 64:3, 64:7,
64:12, 64:14, 64:19, 65:2, 65:3,
65:6, 65:11, 65:12, 66:22, 67:1,
67:3, 67:8, 67:22, 68:10, 68:15,
68:19, 68:21, 69:2, 69:5, 69:8,
69:9, 69:13, 69:21, 69:23, 70:3,
70:5, 71:2, 71:3, 71:4, 72:1,
72:17, 72:19, 73:5, 73:14, 73:19,
73:25, 74:1, 74:3, 74:6, 74:10,
74:16, 74:21, 74:22, 75:1, 75:5,

75:6, 75:7, 75:8, 75:15, 75:17, 75:22, 76:5, 76:7, 76:17, 77:5, 77:7, 77:10, 77:14, 77:17, 77:18, 77:20, 77:21, 77:22, 77:24, 77:25, 78:3, 78:9, 78:21, 78:22, 78:25, 79:7, 79:11, 79:12, 79:14, 79:15, 79:25, 80:7, 80:10, 80:20, 80:23, 80:24, 81:3, 81:7, 81:11, 81:23, 81:25, 82:2, 82:5, 82:6, 82:7, 82:10, 82:13, 82:18, 82:22, 82:24, 83:4, 83:5, 83:9, 83:15, 83:23, 83:25, 84:4, 84:12, 85:19, 86:17, 88:12, 88:18, 88:21, 88:22, 88:23, 88:24, 89:2, 89:3, 89:8, 89:15, 89:16, 89:17, 89:18, 89:19, 89:23, 89:24, 90:1, 90:9, 90:14, 90:18, 90:19, 90:21, 90:22, 90:23, 91:5, 91:7, 91:12, 91:13, 91:18, 91:25, 92:4, 92:9, 92:14, 92:19, 92:20, 93:13, 93:19, 93:21, 94:2, 94:7
**BLACK-PREFERRED** [10] - 19:12, 22:9, 22:11, 23:15, 24:7, 25:4, 34:22, 52:1, 58:6, 61:6
**BLOC** [1] - 8:6
**BLUE** [7] - 73:23, 74:7, 77:12, 80:22, 89:2, 89:21, 90:11
**BOLD** [1] - 15:23
**BORDER** [1] - 77:13
**BORED** [1] - 5:13
**BORNE** [1] - 11:11
**BOTTOM** [2] - 87:24, 93:2
**BOUND** [2] - 17:17, 17:21
**BOUNDARIES** [1] - 15:20
**BOUNDS** [1] - 44:8
**BOX** [1] - 13:9
**BOYLE** [1] - 5:21
**BOYLE** [1] - 2:10
**BRAD** [3] - 4:5, 4:7, 4:9
**BRANCH** [1] - 44:5
**BREAK** [7] - 34:18, 61:12, 61:14, 86:23, 86:25, 94:17, 94:20
**BRIAN** [1] - 7:12
**BRIEF** [12] - 9:2, 15:18, 16:20, 16:21, 17:22, 18:3, 21:3, 38:6, 53:23, 55:10, 61:21
**BRIEFING** [1] - 50:11
**BRIEFLY** [6] - 72:20, 80:14, 83:12, 84:10, 85:2, 92:17
**BRIEFS** [5] - 7:17, 26:20, 31:2, 45:19, 55:22
**BRING** [5] - 29:12, 29:13, 48:17, 52:18, 84:8
**BRINGING** [1] - 48:11
**BROADER** [2] - 37:12, 51:3

**BROADLY** [1] - 16:5
**BROKE** [1] - 59:3
**BROUGHT** [4] - 47:22, 50:5, 53:1, 86:11
**BRYAN** [2] - 2:8, 2:9
**BRYAN** [3] - 5:19, 5:20, 36:23
**BUILT** [1] - 78:25
**BURDEN** [1] - 70:15
**BURTON** [1] - 50:7
**BVAP** [7] - 75:17, 76:1, 78:11, 78:12, 78:14, 82:13, 84:9
**BYU** [1] - 37:22

## C

**CALENDAR** [2] - 53:21, 53:22
**CAMERA** [1] - 76:25
**CAMERAS** [1] - 13:9
**CANDIDATE** [14] - 8:7, 11:19, 22:11, 23:2, 23:15, 24:7, 25:4, 25:5, 26:11, 34:22, 52:1, 57:18, 58:6, 58:7
**CANDIDATES** [24] - 10:13, 10:17, 11:22, 12:4, 14:10, 15:16, 18:15, 19:12, 19:19, 20:10, 20:17, 22:9, 31:24, 48:8, 48:12, 52:5, 57:22, 58:5, 60:12, 61:5, 61:6, 63:13, 64:4, 80:9
**CANNOT** [19] - 10:25, 11:23, 15:15, 17:12, 19:24, 24:22, 26:22, 27:12, 34:6, 34:9, 51:21, 52:8, 52:9, 54:2, 66:9, 75:10, 82:2, 91:19, 92:12
**CAP** [1] - 61:5
**CARBON** [1] - 78:6
**CARE** [1] - 55:17
**CAROLINA** [1] - 38:6
**CARTS** [1] - 67:16
**CASE** [52] - 4:2, 5:12, 6:20, 7:23, 17:1, 17:2, 20:8, 29:14, 29:15, 32:17, 32:19, 34:16, 37:23, 38:5, 38:6, 39:1, 39:22, 40:5, 43:2, 43:4, 45:7, 45:8, 45:25, 46:4, 46:10, 46:20, 48:6, 48:18, 49:6, 52:25, 53:13, 54:12, 54:20, 54:22, 55:4, 55:10, 55:13, 57:16, 58:6, 58:23, 63:21, 65:8, 65:14, 72:7, 76:9, 76:13, 85:15, 89:13, 95:8
**CASES** [5] - 6:16, 8:19, 47:18, 58:14, 64:21
**CAST** [1] - 66:6
**CATCH** [1] - 21:25
**CATEGORIES** [2] - 50:14, 50:20
**CAUCUS** [4] - 46:4, 46:10, 54:9

**CAUSED** [1] - 64:8
**CAUTIONED** [1] - 10:14
**CD-5** [3] - 14:4, 14:6, 14:8
**CD-5'S** [1] - 14:7
**CD-6** [3] - 13:25, 14:2, 24:18
**CD-7** [15] - 14:19, 14:20, 14:22, 24:6, 24:19, 25:5, 26:23, 31:3, 31:10, 32:4, 33:23, 34:11, 34:23, 60:10
**CDS** [1] - 13:19
**CEILING** [2] - 25:14, 61:5
**CERTAIN** [1] - 52:11
**CERTAINLY** [4] - 5:18, 9:15, 57:16, 92:15
**CERTIFY** [1] - 95:6
**CERTITUDE** [1] - 17:13
**CHAIRMAN** [2] - 35:21, 35:22
**CHALLENGE** [1] - 30:1
**CHALLENGED** [1] - 12:19
**CHANGE** [34] - 67:8, 67:22, 67:25, 68:1, 68:9, 69:18, 69:20, 69:21, 73:12, 73:21, 74:2, 74:4, 75:22, 75:24, 75:25, 76:2, 76:3, 78:2, 79:18, 81:17, 81:24, 83:20, 88:4, 89:25, 91:7, 91:11, 92:6, 92:23, 92:24, 94:21
**CHANGED** [4] - 39:16, 69:12, 75:11, 93:23
**CHANGES** [12] - 39:17, 42:7, 76:15, 76:16, 76:17, 77:3, 81:12, 81:22, 88:23, 89:16, 89:17, 93:1
**CHANGING** [1] - 75:2
**CHARGE** [1] - 37:7
**CHARGED** [2] - 33:10, 37:7
**CHARGES** [1] - 36:25
**CHART** [1] - 49:8
**CHASE** [1] - 29:7
**CHIEF** [2] - 46:6, 54:10
**CHIEF** [1] - 68:11
**CHILD** [1] - 59:15
**CHOICE** [11] - 8:7, 10:13, 10:18, 11:19, 18:16, 19:19, 20:11, 20:18, 63:13, 64:4, 80:9
**CHOICES** [1] - 35:3
**CHOOSE** [1] - 24:19
**CHOOSES** [1] - 19:7
**CHOOSING** [1] - 14:11
**CHOSE** [3] - 14:13, 21:2, 34:18
**CHOSEN** [1] - 85:5
**CHUNKS** [3] - 64:17, 74:16, 74:17
**CIRCUIT** [1] - 47:4
**CIRCUIT** [8] - 46:6, 46:7, 46:17, 47:24, 55:8, 55:11, 55:12
**CIRCUMSTANCES** [4] - 8:9, 32:24, 33:16, 49:13

**CITATION** [2] - 41:2, 54:8
**CITE** [3] - 17:1, 32:17, 32:19
**CITED** [2] - 38:18, 41:20
**CITES** [1] - 55:11
**CITIZEN** [1] - 45:15
**CITIZENS** [2] - 10:17, 64:3
**CITIZENS** [4] - 45:24, 47:17, 48:6, 48:16
**CITY** [1] - 67:16
**CIVIL** [3] - 4:6, 4:7, 4:9
**CLAIM** [14] - 26:4, 26:24, 27:14, 29:12, 29:13, 30:6, 43:10, 43:12, 45:20, 47:25, 49:12, 52:18, 53:4, 56:25
**CLAIMS** [4] - 6:16, 41:7, 45:11
**CLARIFIES** [1] - 20:23
**CLARIFY** [1] - 26:1
**CLASS** [2] - 45:22
**CLASSES** [1] - 45:23
**CLAYTON** [2] - 77:9, 88:7
**CLEAN** [1] - 5:17
**CLEAR** [18] - 10:1, 10:19, 11:5, 16:14, 19:11, 20:2, 20:14, 22:24, 23:18, 27:11, 30:12, 31:2, 31:15, 32:19, 51:13, 63:23, 79:20, 84:18
**CLEARLY** [5] - 21:8, 39:3, 40:16, 40:20, 54:18
**CLERK** [4] - 4:4, 35:15, 76:25, 87:16
**CLERKS** [1] - 36:17
**CLIENTS** [1] - 30:24
**CLOSE** [1] - 88:10
**CLOSER** [3] - 13:25, 80:15, 87:9
**CLOSING** [2] - 22:15, 25:17
**CLUTCHES** [1] - 12:21
**CMR** [1] - 95:15
**COAKLEY** [1] - 4:6
**COALITION** [26] - 26:4, 30:6, 30:10, 31:3, 33:22, 41:15, 45:10, 45:11, 45:13, 45:18, 45:20, 46:6, 46:16, 47:4, 47:20, 48:1, 48:9, 48:14, 48:18, 48:19, 49:2, 55:7, 55:9, 55:21, 65:24, 79:22
**COALITIONS** [1] - 51:22
**COBB** [12] - 68:3, 74:20, 75:16, 81:2, 81:3, 82:6, 83:4, 84:12, 91:22, 92:3, 92:5, 92:23
**COHESION** [4] - 32:15, 49:7, 49:9, 49:10
**COHESIVE** [4] - 31:10, 32:4, 32:5, 34:20
**COHESIVELY** [2] - 31:17, 31:18
**COHESIVENESS** [1] - 8:4
**COLLECTIVELY** [2] - 18:21, 18:25
**COLLEGE** [1] - 55:4

**COLLINGWOOD** [1] - 50:16
**COMB** [1] - 11:3
**COMBED** [1] - 60:5
**COMING** [4] - 5:15, 25:1, 59:1, 78:21
**COMMENTS** [1] - 23:10
**COMMUNITIES** [3] - 38:18, 67:13, 73:6
**COMMUNITY** [3] - 34:20, 36:7, 36:8
**COMPACT** [1] - 73:9
**COMPACTNESS** [1] - 83:19
**COMPARABLE** [2] - 83:18, 83:19
**COMPARED** [2] - 32:9, 37:20
**COMPARING** [1] - 41:25
**COMPENSATE** [1] - 34:24
**COMPLAINED** [1] - 52:20
**COMPLETE** [14] - 17:6, 18:8, 58:24, 64:6, 64:10, 65:5, 66:4, 67:6, 90:4, 92:16, 93:3, 93:13, 94:6
**COMPLETELY** [9] - 10:15, 17:13, 27:20, 36:13, 38:7, 63:25, 68:14, 86:7, 87:25
**COMPLIANCE** [7] - 10:20, 21:17, 24:24, 81:21, 85:21, 85:22, 86:14
**COMPLICATED** [1] - 45:7
**COMPLY** [2] - 53:15, 59:17
**COMPLYING** [1] - 34:15
**COMPONENT** [1] - 51:7
**COMPORTS** [1] - 11:5
**COMPRISE** [1] - 88:4
**CONCEPT** [1] - 46:22
**CONCERN** [3] - 27:24, 57:2, 57:3
**CONCERNED** [1] - 56:4
**CONCERNED** [4] - 45:24, 47:17, 48:6, 48:16
**CONCERNS** [2] - 16:25, 30:25
**CONCLUDE** [4] - 41:10, 53:18, 54:2, 90:24
**CONCLUDED** [1] - 73:22
**CONCLUDES** [1] - 6:23
**CONCLUSIONS** [1] - 6:22
**CONDUCT** [2] - 45:5, 45:6
**CONDUCTED** [1] - 6:15
**CONFESS** [1] - 15:21
**CONFIGURATION** [2] - 42:11, 78:1
**CONFIGURED** [3] - 31:5, 52:14, 78:24
**CONFLICT** [1] - 85:21
**CONFORM** [1] - 85:9
**CONFUSED** [1] - 20:19
**CONFUSION** [1] - 20:12
**CONGRESS** [2] - 51:2, 52:9
**CONGRESSIONAL** [14] - 9:23, 10:2, 11:5, 11:12, 13:5, 18:5, 19:6, 21:6, 22:7, 26:3, 31:6, 33:16,

35:12
**CONGRESSIONAL** [6] - 10:4, 15:25, 22:23, 23:13, 23:18, 53:2
**CONGRESSWOMAN** [1] - 37:15
**CONNECTION** [2] - 37:3, 50:13
**CONNECTIONS** [1] - 50:5
**CONSIDER** [7] - 43:24, 44:10, 46:14, 46:15, 84:18, 90:13, 90:22
**CONSIDERATION** [1] - 42:20
**CONSIDERATIONS** [1] - 85:5
**CONSIDERED** [3] - 7:17, 46:12, 49:21
**CONSISTENT** [3] - 53:8, 54:19, 88:5
**CONSISTING** [1] - 8:2
**CONSOLIDATED** [1] - 6:21
**CONSTANT** [1] - 29:10
**CONSTANTLY** [1] - 53:6
**CONSTITUENCY** [2] - 78:15, 79:13
**CONSTITUTION** [3] - 44:9, 44:11, 53:16
**CONSTRAINTS** [1] - 85:6
**CONTAINING** [1] - 6:22
**CONTEND** [2] - 16:2, 26:16
**CONTENDS** [4] - 15:18, 16:21, 17:9, 17:22
**CONTEXT** [3] - 20:7, 20:8, 68:3
**CONTINUE** [2] - 25:18, 33:2
**CONTINUES** [1] - 60:18
**CONTRARY** [3] - 17:6, 17:11, 17:15
**CONTRAVENTION** [1] - 18:11
**CONTRIBUTED** [2] - 77:22, 73:6
**CONTRIBUTING** [1] - 78:12
**CONTROL** [1] - 39:2
**CONVEY** [1] - 5:25
**CONVINCE** [1] - 60:13
**COOPER** [7] - 8:22, 39:13, 41:25, 53:2, 75:4, 83:13, 92:18
**COOPER'S** [2] - 13:15, 92:19
**COPY** [2] - 62:1, 78:6
**CORE** [1] - 78:15
**CORRECT** [6] - 23:3, 23:22, 39:24, 43:7, 44:23, 95:7
**CORRECTLY** [1] - 67:17
**COUNSEL** [9] - 4:22, 5:6, 9:7, 22:5, 31:25, 51:6, 52:20, 54:17, 58:1
**COUNT** [3] - 13:13, 52:9, 52:10
**COUNTIES** [9] - 15:13, 64:16, 66:17, 67:22, 69:24, 72:13, 75:21, 76:17, 84:15
**COUNTIES** [5] - 75:20, 78:10, 88:8, 91:22, 93:7
**COUNTLESS** [1] - 17:19
**COUNTRY** [1] - 45:12
**COUNTS** [1] - 62:15

**COUNTY** [11] - 67:14, 76:4, 77:16, 82:4, 83:19, 84:10, 90:4, 90:10, 90:13, 90:17, 92:22

**COUNTY** [67] - 15:4, 22:24, 24:20, 42:16, 45:25, 60:1, 60:7, 60:14, 67:23, 67:24, 68:3, 72:13, 72:23, 73:7, 73:8, 73:10, 74:9, 74:20, 76:3, 76:5, 76:6, 76:15, 76:16, 76:18, 77:2, 77:13, 77:18, 77:21, 77:24, 78:7, 78:8, 79:11, 80:19, 81:2, 81:3, 82:6, 82:7, 83:5, 83:24, 83:25, 84:13, 88:15, 89:7, 89:12, 89:17, 89:20, 90:11, 90:12, 90:14, 90:15, 90:16, 90:17, 91:2, 92:1

**COUNTY-LEVEL** [5] - 76:4, 77:16, 82:4, 90:4, 92:22

**COUPLE** [2] - 46:18, 47:15

**COURSE** [9] - 6:19, 12:15, 13:11, 24:2, 27:19, 28:10, 28:24, 37:15, 89:12

**COURT** [63] - 4:1, 4:2, 4:10, 4:16, 4:19, 4:25, 5:3, 5:9, 5:16, 6:7, 6:10, 6:13, 8:20, 8:24, 9:3, 9:10, 9:16, 9:18, 11:7, 12:9, 13:8, 22:20, 22:22, 23:16, 24:1, 26:24, 27:4, 27:13, 28:5, 28:8, 30:21, 35:19, 36:21, 39:22, 46:1, 46:15, 46:25, 54:6, 54:8, 54:15, 61:11, 61:15, 61:25, 62:2, 62:8, 62:20, 68:24, 69:4, 69:7, 70:11, 70:18, 70:22, 71:23, 76:20, 76:24, 86:22, 87:4, 87:7, 87:11, 87:19, 94:16, 95:3, 95:15

**COURT** [3] - 12:19, 31:23, 72:10

**COURT** [180] - 4:4, 6:15, 6:21, 6:23, 6:25, 7:5, 7:6, 7:24, 7:25, 8:11, 9:8, 9:19, 9:23, 10:8, 10:14, 10:19, 10:20, 10:24, 11:3, 11:12, 11:17, 11:23, 12:7, 12:13, 12:18, 13:17, 13:22, 14:15, 14:24, 15:7, 16:3, 16:5, 16:8, 16:13, 16:18, 18:1, 18:12, 19:20, 19:21, 19:23, 20:2, 20:14, 20:20, 20:23, 21:5, 21:7, 22:1, 22:12, 24:12, 25:7, 25:12, 25:22, 26:13, 27:5, 27:9, 27:15, 28:2, 28:19, 29:1, 29:3, 29:15, 29:21, 29:25, 30:1, 30:2, 30:5, 30:25, 31:14, 32:21, 33:10, 33:15, 34:3, 34:5, 34:13, 35:6, 35:9, 35:11, 35:22, 36:4, 36:8, 37:2, 37:13, 37:16, 37:24, 38:13, 38:21, 39:19, 39:20, 41:20, 41:21, 43:1, 43:7, 43:16, 43:17, 43:22,

43:24, 44:15, 44:23, 44:24, 45:5, 45:6, 46:3, 48:4, 49:5, 49:20, 51:12, 51:14, 51:25, 52:3, 52:22, 53:1, 53:13, 53:23, 54:2, 54:4, 55:5, 55:7, 55:14, 55:23, 55:24, 56:3, 56:13, 56:16, 56:25, 57:6, 57:14, 57:15, 57:20, 57:22, 57:25, 60:17, 61:10, 61:24, 62:19, 63:4, 63:16, 64:2, 64:9, 65:9, 65:16, 65:19, 66:5, 66:14, 66:23, 68:7, 68:13, 68:17, 70:6, 71:7, 71:14, 71:18, 72:22, 73:12, 73:22, 79:9, 80:13, 83:13, 84:14, 85:7, 85:9, 85:14, 86:8, 86:9, 87:25, 88:4, 88:17, 89:10, 90:20, 91:7, 91:11, 93:2, 94:4, 94:5, 94:12

**COURT'S** [47] - 7:20, 9:25, 10:5, 11:5, 13:6, 15:19, 15:22, 16:12, 18:11, 19:22, 21:2, 21:4, 21:10, 21:24, 27:11, 28:25, 29:4, 30:18, 30:19, 30:24, 33:17, 34:12, 41:13, 42:20, 43:20, 53:15, 54:19, 56:8, 56:12, 57:2, 60:16, 61:7, 62:22, 63:11, 63:16, 64:22, 71:13, 81:21, 83:6, 83:7, 84:17, 85:25, 86:8, 88:11, 91:23, 92:10, 93:15

**COURTROOM** [6] - 4:17, 35:24, 36:9, 47:2, 64:24, 86:8

**COURTS** [3] - 17:8, 17:11, 36:5

**COVERED** [1] - 41:16

**COVERS** [1] - 71:17

**COVINGTON** [3] - 74:9, 77:21, 78:9

**COWETA** [1] - 74:18

**CRAFT** [3] - 10:6, 11:14, 17:14

**CRAFTED** [2] - 38:21, 40:10

**CRC** [1] - 95:15

**CREATE** [8] - 28:23, 31:5, 41:5, 44:16, 69:9, 70:5, 72:18, 91:5

**CREATED** [3] - 39:4, 41:13, 75:14

**CREATING** [5] - 29:19, 34:25, 65:12, 82:22, 85:18

**CREATION** [2] - 7:1, 14:16

**CREDIT** [2] - 18:7, 58:21

**CREDITED** [1] - 31:14

**CRITICAL** [1] - 32:12

**CRITICALLY** [1] - 53:21

**CROSS** [4] - 23:16, 62:7, 62:10, 62:15

**CROSS-EXAMINATION** [3] - 62:7, 62:10, 62:15

**CROSS-EXAMINED** [1] - 23:16

**CRR** [1] - 95:15

**CURE** [1] - 40:21

**CURED** [1] - 16:15

**CURRENT** [1] - 43:13

## D

**DAKALB** [1] - 74:21

**DAMAGING** [3] - 33:20, 33:25, 34:2

**DARE** [2] - 30:2

**DATA** [1] - 44:3

**DATES** [1] - 17:18

**DAWN** [1] - 32:1

**DAYS** [3] - 27:15, 28:1, 67:11

**DE** [1] - 24:25

**DE** [1] - 78:2

**DEALING** [3] - 6:2, 45:19, 54:11

**DEALT** [1] - 49:5

**DEBATE** [1] - 51:14

**DECEASED** [1] - 47:1

**DECEMBER** [2] - 7:12, 95:9

**DECIDED** [2] - 21:3, 29:17

**DECISION** [8] - 21:10, 33:9, 64:22, 68:8, 86:8, 91:23, 92:10, 93:15

**DECISIONS** [4] - 43:25, 47:11, 53:14, 71:13

**DECLARATION** [2] - 8:22, 75:4

**DECLARATIONS** [1] - 8:17

**DECLARED** [2] - 10:1, 15:23

**DEFEAT** [1] - 8:6

**DEFENDANT** [1] - 2:7

**DEFENDANT** [23] - 5:19, 12:12, 15:17, 15:18, 16:2, 16:16, 17:1, 17:22, 18:2, 18:18, 21:1, 21:3, 21:7, 21:12, 21:13, 21:16, 24:9, 24:16, 25:5, 26:22, 32:13, 55:1, 76:11

**DEFENDANT'S** [13] - 16:8, 16:20, 16:21, 18:6, 21:20, 22:5, 24:14, 29:11, 31:25, 32:21, 33:21, 34:8, 54:17

**DEFENDANTS** [3] - 7:16, 28:17, 34:14

**DEFENDANTS'** [1] - 14:8

**DEFENDED** [1] - 31:22

**DEFENDING** [1] - 18:3

**DEFENSE** [2] - 24:10, 33:14

**DEFER** [1] - 53:14

**DEFERENCE** [1] - 43:25

**DEFIED** [1] - 12:18

**DEFINED** [1] - 13:18

**DEFINING** [1] - 13:21

**DEFINITELY** [1] - 90:2

**DEFINITION** [1] - 21:9

**DEFY** [1] - 59:17

**DEKALB** [12] - 68:4, 75:16, 79:1, 79:11, 80:1, 80:10, 82:7, 84:13,

91:22, 92:3, 92:5, 92:23
**DEMANDING** [1] - 61:3
**DEMANDS** [1] - 17:11
**DEMOCRATIC** [4] - 19:7, 53:8, 58:5, 58:7
**DEMOCRATS** [2] - 52:8, 79:22
**DEMOGRAPHIC** [2] - 67:21, 71:20
**DEMONSTRABLE** [5] - 10:12, 18:15, 19:19, 20:17, 63:13
**DEMONSTRATE** [2] - 33:5, 33:7
**DEMONSTRATED** [1] - 34:2
**DEMONSTRATES** [1] - 33:11
**DENSELY** [3] - 74:21, 80:21, 80:23
**DENYING** [1] - 35:3
**DEPICTED** [1] - 71:18
**DEPRIVE** [1] - 14:13
**DEPUTY** [4] - 4:4, 35:15, 76:25, 87:16
**DESCRIBED** [2] - 11:1, 19:25
**DESIGNED** [1] - 13:1
**DESIRE** [1] - 40:23
**DESIRED** [1] - 38:11
**DESTRUCTION** [1] - 60:10
**DETAIL** [1] - 12:6
**DETAILED** [1] - 86:8
**DETERMINE** [4] - 10:9, 10:22, 11:4, 20:24
**DETERMINED** [2] - 37:17, 64:25
**DETERMINING** [1] - 55:5
**DEVELOPMENTS** [1] - 47:16
**DIANA** [1] - 2:9
**DIANA** [1] - 5:20
**DICTUM** [2] - 46:2, 46:3
**DIFFERENCE** [4] - 28:9, 66:19, 66:22, 78:14
**DIFFERENCES** [1] - 91:24
**DIFFERENT** [8] - 38:11, 41:6, 50:18, 61:2, 65:15, 65:16, 67:12, 72:4
**DILLARD** [1] - 85:8
**DILUTE** [1] - 12:14
**DILUTED** [3] - 73:5, 77:24, 77:25
**DILUTING** [1] - 25:21
**DILUTION** [94] - 10:15, 11:13, 13:23, 14:3, 14:5, 14:21, 14:23, 15:2, 15:14, 20:4, 34:4, 35:1, 38:8, 39:8, 40:1, 40:21, 40:22, 42:19, 43:17, 63:5, 63:9, 64:5, 64:14, 64:18, 65:4, 65:7, 65:18, 65:19, 66:2, 66:24, 67:4, 67:9, 68:15, 69:10, 69:22, 70:7, 71:7, 71:9, 71:19, 72:22, 73:6, 73:14, 73:20, 74:13, 74:15, 75:5, 75:6, 75:13, 78:13, 79:8, 80:2, 80:12, 80:25, 81:4, 81:5, 81:8, 81:16, 81:18,

81:20, 82:8, 82:9, 82:12, 82:16, 82:17, 82:25, 83:15, 84:1, 84:3, 84:5, 85:12, 85:13, 85:18, 86:1, 86:7, 86:10, 87:25, 88:3, 88:5, 88:18, 89:4, 89:6, 89:11, 89:15, 90:7, 91:1, 91:12, 91:15, 92:11, 92:12, 92:25, 93:2, 94:1, 94:10
**DIRECT** [1] - 18:11
**DIRECTIONS** [1] - 62:22
**DIRECTLY** [2] - 14:24, 22:16
**DISAGREE** [2] - 21:18, 72:6
**DISAGREEABLE** [1] - 70:10
**DISAGREED** [1] - 24:12
**DISAGREEING** [1] - 70:9
**DISAGREEMENTS** [1] - 7:18
**DISCOVERY** [1] - 28:10
**DISCREDIT** [1] - 32:22
**DISCRIMINATION** [1] - 49:24
**DISCUSS** [1] - 9:21
**DISCUSSED** [2] - 53:24, 57:4
**DISCUSSION** [3] - 50:22, 59:25
**DISCUSSIONS** [1] - 44:4
**DISMANTLE** [1] - 22:14
**DISMANTLING** [2] - 33:22, 60:10
**DISMISS** [1] - 76:11
**DISPARATE** [1] - 49:22
**DISPUTE** [5] - 19:17, 26:10, 26:23, 31:4, 31:8
**DISPUTING** [1] - 32:13
**DISREGARD** [2] - 56:18, 84:17
**DISSIMILAR** [1] - 59:20
**DISTINCT** [1] - 16:19
**DISTINCTION** [2] - 21:21, 58:13
**DISTRICT** [2] - 95:3, 95:4
**DISTRICT** [136] - 7:3, 7:19, 8:2, 10:23, 11:18, 12:2, 14:2, 14:9, 14:16, 15:3, 15:11, 15:14, 15:20, 18:10, 18:14, 19:13, 19:18, 20:9, 20:25, 21:6, 21:9, 21:14, 21:21, 21:22, 21:23, 22:4, 22:14, 22:19, 22:24, 23:1, 23:14, 24:5, 24:13, 24:15, 25:3, 26:4, 29:7, 29:8, 30:6, 30:10, 31:3, 31:6, 31:7, 33:19, 33:22, 33:23, 33:25, 34:19, 34:25, 37:8, 38:7, 38:9, 38:14, 38:16, 38:21, 38:24, 39:2, 39:15, 39:19, 40:2, 40:4, 40:10, 40:13, 40:21, 40:23, 40:24, 40:25, 41:4, 41:5, 41:15, 41:21, 42:11, 42:22, 42:23, 42:24, 43:1, 44:15, 44:17, 44:19, 45:11, 45:18, 47:3, 51:25, 52:2, 53:3, 55:21, 56:9, 56:13, 56:17, 56:20, 57:23, 57:24, 59:23, 60:11, 65:12, 67:2, 69:12, 69:20,

70:1, 72:25, 73:2, 73:4, 73:9, 74:24, 75:25, 76:2, 76:12, 77:7, 77:8, 77:14, 77:18, 77:22, 78:12, 78:17, 78:21, 78:22, 79:8, 79:12, 79:23, 80:4, 80:7, 80:20, 80:24, 81:1, 81:2, 81:3, 82:23, 88:17, 88:19, 88:21, 88:22, 88:24, 89:25, 91:5, 91:6
**DISTRICT** [66] - 22:6, 22:13, 22:23, 23:13, 23:19, 33:17, 33:20, 34:1, 38:1, 38:2, 39:14, 39:15, 39:16, 40:11, 40:12, 41:12, 41:22, 42:2, 42:4, 42:5, 42:6, 42:10, 45:15, 52:14, 53:2, 59:25, 73:5, 74:10, 74:11, 74:12, 75:20, 75:24, 77:9, 77:19, 77:23, 78:5, 78:7, 78:11, 78:18, 78:20, 78:22, 79:1, 79:3, 79:4, 79:5, 79:6, 79:7, 79:10, 79:14, 79:16, 79:17, 79:21, 80:1, 80:3, 80:6, 80:17, 81:13, 93:6, 93:7, 93:8
**DISTRICTS** [4] - 10:4, 15:25, 78:19, 78:23
**DISTRICTS** [155] - 7:2, 7:4, 9:23, 10:3, 10:11, 11:2, 11:12, 11:21, 11:24, 13:23, 14:24, 15:7, 15:9, 15:10, 15:25, 16:4, 16:6, 16:9, 16:12, 16:13, 17:24, 17:25, 18:1, 18:22, 18:23, 18:25, 19:6, 19:11, 19:15, 19:16, 20:1, 20:3, 20:16, 20:21, 21:8, 21:11, 21:14, 22:7, 26:11, 26:12, 30:16, 37:4, 37:13, 39:13, 40:15, 40:16, 40:17, 40:19, 41:24, 42:1, 42:14, 42:19, 43:8, 43:9, 43:10, 43:13, 43:15, 44:20, 46:16, 47:4, 47:20, 51:11, 52:6, 52:11, 53:8, 54:3, 54:5, 55:7, 55:9, 55:14, 55:17, 57:7, 57:8, 58:9, 58:11, 62:24, 63:8, 63:12, 64:12, 65:2, 65:24, 66:18, 68:5, 69:3, 69:5, 69:9, 69:24, 70:6, 71:3, 71:14, 71:22, 72:18, 72:21, 73:11, 73:16, 73:17, 73:19, 74:1, 74:2, 74:7, 74:16, 74:22, 75:6, 75:8, 75:10, 75:14, 75:17, 76:6, 76:7, 77:11, 78:2, 78:14, 78:24, 78:25, 79:15, 80:16, 80:18, 82:1, 82:6, 82:7, 82:14, 83:16, 83:20, 83:23, 84:1, 84:4, 84:8, 84:12, 88:4, 88:13, 89:2, 89:3, 89:4, 89:8, 89:16, 89:19, 89:24, 90:1, 90:15, 90:19, 90:21, 90:23, 91:14, 91:19, 92:1, 92:5, 92:9, 92:19, 92:20, 94:3

**DIVE** [1] - 14:23
**DIVERSE** [1] - 73:6
**DIVISION** [1] - 9:14
**DIVORCED** [1] - 17:15
**DIVORCING** [1] - 72:8
**DON** [1] - 5:21
**DONALD** [1] - 2:10
**DONE** [3] - 33:23, 63:4, 85:24
**DOUBLE** [1] - 33:9
**DOUBT** [1] - 84:22
**DOUGLAS** [7] - 74:18, 80:22, 81:15, 83:24, 88:15, 91:2, 92:1
**DOWN** [13] - 15:6, 18:24, 20:13, 25:17, 33:9, 39:5, 54:25, 59:10, 59:24, 61:10, 70:18, 72:23, 95:7
**DOWNSTREAM** [1] - 50:7
**DR** [26] - 14:8, 18:18, 18:20, 18:21, 19:2, 19:5, 19:7, 23:16, 23:20, 24:3, 26:15, 31:8, 31:11, 31:12, 32:13, 37:21, 38:23, 41:8, 42:12, 49:5, 50:3, 50:7, 50:16, 58:2, 58:3
**DRAFTING** [1] - 39:11
**DRAMATICALLY** [2] - 14:22, 47:22
**DRAW** [12] - 11:20, 15:14, 37:8, 40:2, 40:24, 40:25, 52:14, 53:3, 54:19, 62:23, 88:18, 93:7
**DRAWING** [5] - 17:24, 37:4, 39:4, 51:10, 73:6
**DRAWN** [11] - 13:24, 26:23, 38:12, 68:6, 73:17, 78:18, 80:16, 86:15, 88:16, 94:2, 94:4
**DRAWS** [2] - 14:2, 14:4
**DREW** [8] - 31:7, 38:2, 38:6, 38:10, 39:13, 53:3, 54:3, 85:17
**DURATION** [1] - 87:12
**DURING** [6] - 7:8, 20:4, 22:4, 22:15, 68:2, 84:25
**DUTY** [1] - 86:10

## E

**EARLY** [1] - 63:1
**EASIER** [1] - 93:10
**EAST** [3] - 41:24, 42:1, 42:5
**EASY** [1] - 93:16
**ECHOLS** [6] - 6:1, 35:22, 38:17, 41:19, 42:3, 44:3
**EDGES** [1] - 74:7
**EFFECT** [7] - 19:14, 34:7, 34:9, 34:10, 35:3, 53:25, 77:4
**EFFECTIVE** [3] - 19:12, 33:22, 33:23
**EFFECTIVENESS** [5] - 19:3, 19:8, 58:3, 58:4, 58:8
**EFFECTS** [1] - 85:18

**EIGHT** [1] - 67:11
**EIGHT-DAY** [1] - 67:11
**EITHER** [3] - 4:12, 62:17, 72:14
**ELECT** [31] - 8:7, 10:12, 10:17, 11:19, 11:21, 12:3, 14:10, 15:15, 17:7, 18:15, 19:19, 20:10, 20:17, 22:8, 23:14, 24:6, 25:4, 26:9, 26:11, 31:24, 34:22, 57:18, 57:21, 58:10, 58:12, 60:11, 61:2, 63:13, 64:4, 80:9
**ELECTED** [5] - 32:1, 50:22, 52:9, 65:25, 79:22
**ELECTION** [20] - 5:14, 5:17, 17:12, 22:6, 25:19, 31:16, 31:19, 31:20, 32:3, 32:10, 32:23, 44:3, 47:12, 50:9, 53:21, 53:22, 53:23, 71:16
**ELECTIONS** [9] - 19:7, 31:16, 32:16, 39:3, 48:2, 48:13, 54:3, 54:5, 58:6
**ELECTORAL** [2] - 19:3, 60:19
**ELECTS** [1] - 51:25
**ELEMENT** [1] - 17:12
**ELEMENTS** [1] - 30:20
**ELEVENTH** [5] - 46:5, 46:7, 46:17, 55:8, 55:11
**ELIMINATE** [4] - 11:23, 12:2, 24:19, 25:8
**ELIMINATED** [3] - 21:15, 79:2, 80:3
**ELIMINATING** [3] - 11:1, 19:25, 20:21
**ELIMINATION** [4] - 18:10, 25:2, 30:10, 44:18
**ELMO** [1] - 76:19
**ELMO** [1] - 13:7
**ELSEWHERE** [10] - 11:2, 11:16, 11:24, 18:10, 20:1, 20:21, 25:8, 74:9, 77:21, 93:20
**EMPHASIZED** [1] - 23:4
**ENACT** [1] - 86:6
**ENACTED** [4] - 7:9, 10:4, 15:25, 78:5
**END** [18] - 19:21, 21:16, 22:15, 26:9, 40:3, 47:18, 49:12, 51:20, 51:24, 53:7, 60:24, 64:15, 66:25, 68:7, 71:7, 74:25, 91:16, 93:24
**ENDANGERED** [1] - 53:11
**ENFORCED** [1] - 36:8
**ENJOIN** [1] - 35:9
**ENSURE** [4] - 25:19, 60:17, 86:10, 94:5
**ENTERTAIN** [2] - 36:1
**ENTERTAINED** [1] - 6:8
**ENTIRELY** [9] - 14:5, 14:21, 15:11, 34:17, 59:19, 65:15, 77:10, 82:16, 83:17
**ENTITLED** [3] - 86:17, 93:14, 94:11
**ENUMERATED** [3] - 16:6, 16:13,

17:23
**ENVISIONED** [1] - 56:25
**EQUAL** [15] - 10:16, 13:3, 17:7, 29:8, 32:2, 35:3, 49:13, 51:4, 60:18, 64:2, 66:6, 69:14, 69:15, 71:16
**EQUALLY** [1] - 64:9
**EQUALS** [1] - 57:14
**EQUATED** [1] - 57:11
**EQUITY** [5] - 66:11, 66:14, 72:7, 72:10
**ERIC** [1] - 76:8
**ERODING** [1] - 47:25
**ESCAPE** [2] - 54:23
**ESPECIALLY** [3] - 67:7, 71:10, 88:1
**ESQ** [11] - 2:3, 2:3, 2:4, 2:4, 2:5, 2:5, 2:6, 2:9, 2:10, 2:10, 2:11
**ESQ** [1] - 2:8
**ESQ** [1] - 2:9
**ESSELSTYN'S** [1] - 80:16
**ESSENTIALLY** [3] - 43:19, 48:1, 52:17
**ETHICAL** [1] - 62:16
**EVALUATE** [3] - 10:21, 20:23, 37:24
**EVERYWHERE** [1] - 54:22
**EVIDENCE** [45] - 7:25, 8:3, 8:5, 8:8, 8:17, 11:3, 13:16, 23:12, 23:24, 24:1, 24:2, 26:7, 28:2, 28:16, 28:18, 30:7, 30:9, 30:10, 32:22, 32:23, 43:22, 44:24, 45:1, 47:21, 48:1, 48:7, 48:8, 48:11, 48:17, 48:18, 49:2, 49:4, 49:15, 49:18, 49:20, 50:5, 50:16, 50:21, 52:16, 60:5, 62:14, 71:19, 71:20, 73:1
**EVIDENTIARY** [1] - 48:22
**EXACT** [4] - 38:10, 40:8, 78:16, 83:20
**EXACTLY** [15] - 11:11, 12:6, 24:10, 25:5, 25:6, 25:7, 25:10, 25:11, 27:2, 29:6, 36:21, 38:3, 41:8, 41:9, 47:14
**EXAMINATION** [3] - 62:7, 62:10, 62:15
**EXAMINED** [1] - 23:16
**EXAMPLE** [4] - 8:3, 52:9, 74:8, 89:7
**EXCEED** [1] - 50:17
**EXCLUSIVELY** [1] - 43:23
**EXCUSE** [5] - 14:17, 44:7, 71:13, 76:23, 91:1
**EXHIBITS** [2] - 8:22, 9:1
**EXIST** [1] - 63:9
**EXISTENCE** [5] - 8:1, 24:5, 48:13, 48:18
**EXISTING** [5] - 11:24, 21:13, 26:8, 77:14, 90:23

**EXISTS** [1] - 49:3
**EXPANSIVE** [1] - 56:24
**EXPECT** [1] - 84:8
**EXPECTATION** [1] - 40:1
**EXPEDITED** [3] - 28:16, 28:17, 28:18
**EXPERIENCED** [7] - 65:6, 66:25, 72:1, 81:6, 83:8, 92:13, 94:9
**EXPERIENCING** [1] - 64:15
**EXPERT** [5] - 8:18, 14:8, 18:17, 37:22, 40:8
**EXPLAIN** [2] - 57:10, 57:13
**EXPLAINED** [4] - 41:19, 41:24, 42:4, 55:22
**EXPLAINS** [1] - 21:3
**EXPRESSLY** [3] - 10:8, 13:18, 25:7
**EXTEND** [2] - 62:11, 62:17
**EXTENSIVELY** [1] - 49:6
**EXTENT** [6] - 33:7, 49:10, 55:20, 62:4, 62:5, 90:8
**EXTRA** [1] - 35:13
**EXTREMELY** [1] - 32:4

## F

**FACT** [12] - 11:10, 12:25, 14:3, 16:4, 16:17, 17:2, 17:17, 31:6, 40:11, 53:17, 54:23, 90:4
**FACTOR** [1] - 43:24
**FACTOR** [7] - 49:18, 49:23, 50:1, 50:9, 50:12, 51:6, 51:12
**FACTORS** [2] - 33:1, 33:5
**FACTORS** [1] - 38:19
**FACTS** [3] - 6:22, 54:22, 55:16
**FACTUAL** [1] - 48:23
**FAIL** [1] - 26:17
**FAILS** [2] - 17:1, 64:7
**FAILURE** [2] - 14:17, 52:14
**FAITH** [3] - 21:23, 42:9, 44:1
**FALL** [1] - 83:2
**FAMILIAR** [1] - 47:1
**FAPR** [1] - 95:15
**FAR** [2] - 15:3, 40:5
**FAST** [1] - 21:23
**FAVOR** [4] - 32:5, 33:1, 33:2, 55:2
**FAYETTE** [11] - 67:23, 75:19, 76:3, 76:5, 76:6, 76:15, 83:24, 88:7, 89:16, 90:15, 93:6
**FAYETTEVILLE** [3] - 72:23, 72:25, 76:1
**FEASIBLE** [1] - 93:17
**FEBRUARY** [1] - 62:25
**FEDERAL** [1] - 12:19
**FEDERALISM** [1] - 16:24
**FEIGN** [1] - 24:22

**FEIGNED** [1] - 21:20
**FEW** [14] - 15:17, 25:10, 25:23, 26:21, 27:2, 49:19, 59:2, 59:24, 74:5, 74:16, 80:20, 81:12, 89:5
**FIELD** [2] - 69:14, 73:15
**FIFTH** [1] - 47:23
**FIGHT** [1] - 25:18
**FIGURE** [2] - 13:16, 31:12
**FILED** [1] - 7:14
**FILING** [1] - 44:25
**FINAL** [2] - 25:25, 80:14
**FINALLY** [1] - 32:24
**FINDINGS** [1] - 6:22
**FINER** [1] - 70:12
**FINISH** [1] - 86:24
**FINISHED** [1] - 87:3
**FIRM** [1] - 5:21
**FIRST** [13] - 4:10, 8:11, 10:7, 12:12, 12:17, 26:22, 28:2, 29:19, 39:9, 44:23, 45:17, 55:10, 61:23
**FIT** [1] - 28:23
**FIVE** [27] - 9:11, 11:12, 18:21, 18:25, 19:5, 19:11, 19:14, 19:15, 22:7, 26:11, 26:12, 30:15, 30:16, 40:15, 40:19, 43:8, 43:9, 55:14, 58:9, 58:11, 59:2, 67:22, 72:13, 75:21, 90:10, 90:17
**FIVE-COUNTY** [2] - 90:10, 90:17
**FLEXIBILITY** [1] - 34:15
**FLOATS** [1] - 66:11
**FLOWS** [2] - 66:12, 66:13
**FLY** [1] - 60:12
**FOCUS** [8] - 23:21, 55:25, 70:19, 70:20, 80:14, 83:14, 88:1, 91:10
**FOCUSED** [7] - 7:21, 55:19, 56:21, 56:22, 72:14, 72:15, 75:23
**FOCUSING** [1] - 41:17
**FOLD** [1] - 41:4
**FOLLOW** [1] - 12:18
**FOLLOWING** [5] - 10:3, 15:24, 34:12, 85:25, 93:15
**FOLLOWS** [2] - 72:7, 72:8
**FOREGOING** [1] - 95:6
**FORM** [1] - 26:15
**FORMALLY** [1] - 8:17
**FORWARD** [2] - 33:14, 53:22, 60:23
**FOUR** [2] - 40:17, 40:18
**FRANK** [1] - 2:11
**FRANK** [1] - 6:12
**FRATERNITY** [1] - 4:5
**FRIEND** [1] - 47:2
**FRONT** [4] - 41:1, 44:24, 54:22, 59:9
**FULFILLED** [1] - 40:25
**FULL** [5] - 18:8, 22:3, 28:10, 58:24,

59:18
**FULLY** [3] - 10:16, 17:7, 64:2
**FULTON** [10] - 74:18, 74:20, 75:16, 80:19, 81:14, 82:7, 82:8, 84:13, 88:15, 92:23
**FUNDAMENTAL** [2] - 66:19, 85:22
**FUNDAMENTALLY** [1] - 28:21
**FUTURE** [1] - 19:7

## G

**GAIN** [3] - 80:8, 80:10, 90:9
**GAINED** [4] - 42:17, 60:1, 60:9, 60:14
**GAINS** [1] - 25:13
**GALVESTON** [1] - 47:24
**GAME** [7] - 22:1, 29:10, 52:21, 54:18, 78:4, 78:18, 80:6
**GAMES** [2] - 29:2, 37:2
**GARABADU** [1] - 2:3
**GARABADU** [1] - 4:23
**GENERAL** [22] - 7:6, 7:9, 9:21, 10:6, 10:10, 11:4, 13:25, 14:11, 15:6, 18:19, 20:15, 21:1, 21:20, 35:5, 47:10, 85:4, 85:16, 86:6, 86:13, 93:5, 93:17, 93:25
**GENERAL** [6] - 13:8, 31:20, 39:14, 48:2, 48:12, 63:22
**GENERAL'S** [1] - 5:22
**GENERALIZED** [1] - 16:24
**GENERALLY** [1] - 34:25
**GEOGRAPHIC** [1] - 6:24
**GEOGRAPHICALLY** [2] - 67:18, 68:14
**GEORGIA** [27] - 4:23, 7:6, 12:21, 20:5, 22:3, 22:7, 24:12, 25:11, 29:2, 29:3, 29:24, 31:23, 34:10, 35:8, 37:5, 38:24, 43:21, 50:25, 51:17, 54:2, 55:1, 55:3, 55:6, 59:15, 60:18, 63:9, 90:14
**GEORGIA** [1] - 95:4
**GEORGIA'S** [6] - 9:23, 10:2, 21:25, 33:12, 61:8, 71:16
**GEORGIANS** [10] - 11:13, 64:3, 75:15, 76:5, 76:7, 81:7, 81:25, 83:9, 89:23, 92:14
**GERRYMANDERING** [1] - 52:18
**GESTURING** [1] - 16:5
**GINGLES** [7] - 10:21, 26:22, 31:2, 31:8, 32:22, 49:1, 49:4
**GIVEN** [5] - 7:23, 9:9, 29:24, 46:23, 52:16
**GOAL** [2] - 60:22, 85:24
**GOALS** [5] - 85:10, 85:20, 85:21, 86:3, 86:13

**GOLF** [1] - 67:16
**GOTCHA** [1] - 22:1
**GOVERNING** [2] - 26:17, 27:7
**GOVERNMENT** [1] - 44:5
**GOVERNOR** [1] - 7:12
**GRABS** [1] - 15:13
**GRANDY** [1] - 24:25
**GRANT** [7] - 4:8, 4:12, 5:7, 5:8, 6:18, 8:25, 88:16
**GRANTED** [1] - 29:15
**GRAY** [4] - 74:12, 74:19, 89:4, 89:23
**GREAT** [1] - 47:1
**GREEN** [2] - 83:22, 92:18
**GREETINGS** [1] - 5:25
**GREY** [3] - 71:15, 73:21, 75:4
**GRIFFIN** [3] - 67:15, 72:24, 72:25
**GROUP** [5] - 8:10, 23:1, 31:10, 66:7, 66:8
**GROUPS** [7] - 7:25, 8:7, 31:4, 31:10, 32:9, 32:12, 48:12
**GROUPS'** [1] - 23:2
**GROVE** [1] - 67:16
**GROWTH** [2] - 67:21, 75:22
**GUESS** [6] - 19:9, 23:23, 27:13, 27:24, 43:6, 60:12
**GUYS** [1] - 28:13
**GWINNETT** [13] - 22:23, 24:19, 42:16, 42:23, 60:1, 60:7, 60:14, 68:3, 89:11, 91:22, 92:4, 92:6, 92:24

## H

**HAILED** [1] - 31:22
**HALF** [1] - 50:24
**HALL** [1] - 47:2
**HAND** [1] - 73:3
**HANDED** [1] - 59:12
**HANDFUL** [2] - 15:7, 49:18
**HANDS** [1] - 11:4
**HARD** [2] - 29:4, 90:24
**HARDY** [2] - 45:24, 46:5
**HARM** [23] - 34:25, 63:15, 64:7, 64:15, 65:4, 65:11, 66:13, 66:15, 66:25, 71:25, 72:3, 72:7, 72:8, 73:14, 73:17, 81:5, 81:8, 83:8, 91:15, 93:2, 93:19, 94:9
**HARMED** [6] - 64:16, 64:19, 66:3, 66:9, 68:12, 71:9
**HARMING** [2] - 67:4, 82:18
**HARMS** [2] - 65:6, 68:15
**HART** [1] - 72:13
**HB** [1] - 7:10
**HEAR** [3] - 7:15, 24:16, 70:13

**HEARD** [8] - 36:24, 36:25, 37:11, 39:6, 50:7, 64:23, 73:1, 73:4
**HEARING** [9] - 26:25, 28:5, 28:6, 28:7, 28:9, 28:10, 28:15, 28:16, 57:3
**HELD** [1] - 4:1
**HELD** [2] - 18:13, 34:5, 35:2, 81:19, 86:13
**HELP** [3] - 37:24, 66:2, 66:3
**HELPFUL** [1] - 48:4
**HENRY** [21] - 67:24, 73:7, 73:9, 74:16, 76:18, 77:2, 77:9, 77:17, 77:24, 78:7, 81:14, 83:6, 83:25, 88:7, 89:7, 89:15, 89:20, 90:6, 90:11, 90:15, 90:16
**HEREBY** [1] - 95:6
**HEREIN** [2] - 11:1, 19:25
**HESITANCE** [1] - 27:21
**HIGHLIGHT** [1] - 26:21
**HISPANIC** [2] - 31:9, 31:17
**HISTORY** [1] - 49:23
**HIT** [1] - 59:2
**HOLD** [3] - 12:19, 70:15, 71:23
**HOLDING** [2] - 48:16, 61:4
**HOLDS** [1] - 60:22
**HOLLOW** [1] - 18:7
**HOME** [2] - 13:18, 14:6
**HONOR** [87] - 4:15, 5:2, 5:14, 5:19, 6:9, 6:11, 8:14, 8:21, 9:1, 9:5, 9:14, 9:17, 11:9, 12:6, 12:8, 13:14, 13:17, 13:24, 15:5, 15:21, 16:11, 18:6, 18:12, 19:22, 21:18, 21:19, 23:3, 23:4, 23:22, 24:3, 24:8, 24:16, 24:21, 25:2, 25:16, 25:22, 26:2, 26:16, 27:1, 27:10, 27:19, 27:22, 27:25, 28:14, 28:21, 30:4, 30:23, 32:17, 32:25, 35:5, 35:13, 35:18, 36:22, 39:24, 44:13, 46:13, 46:18, 47:14, 52:12, 53:7, 53:13, 53:19, 54:7, 54:14, 54:16, 55:12, 55:16, 55:22, 56:2, 58:21, 58:22, 58:25, 59:14, 60:4, 60:21, 61:18, 62:18, 69:6, 69:8, 76:23, 80:6, 86:20, 87:2, 87:13, 87:18, 87:21, 94:15
**HONORABLE** [1] - 95:16
**HOPED** [1] - 62:21
**HOPEFULLY** [1] - 62:9
**HOUR** [9] - 9:9, 9:10, 9:11, 30:22, 62:9, 62:11, 62:12, 62:15, 86:23
**HOUSE** [25] - 7:3, 7:4, 7:10, 18:3, 63:8, 63:11, 63:24, 67:8, 68:12, 70:7, 85:3, 86:21, 87:5, 87:22, 87:24, 88:20, 89:25, 91:4, 91:6,

91:9, 91:12, 92:15, 93:3, 93:25
**HOUSE** [1] - 5:9
**HOUSEKEEPING** [3] - 8:15, 9:6, 61:21
**HUGE** [2] - 51:15, 73:1
**HUNT** [1] - 38:5

## I

**IDEA** [7] - 37:1, 37:23, 51:1, 51:16, 52:20, 59:14, 83:4
**IDENTICAL** [1] - 74:12
**IDENTIFIED** [17] - 11:12, 13:22, 15:6, 16:18, 18:1, 35:1, 50:9, 66:2, 67:23, 68:8, 71:14, 71:18, 73:12, 79:8, 88:4, 91:6, 93:2
**IDENTITY** [1] - 50:5
**IGNORANCE** [1] - 21:21
**ILLEGAL** [1] - 82:17
**ILLUSTRATES** [1] - 78:17
**ILLUSTRATIVE** [9] - 37:20, 38:1, 38:20, 42:2, 68:5, 71:22, 72:21, 72:24, 88:17
**IMAGINE** [1] - 60:6
**IMMEDIATELY** [1] - 54:4
**IMPACT** [5] - 22:13, 44:4, 45:20, 49:22, 50:10
**IMPORTANT** [9] - 28:23, 39:10, 43:10, 53:9, 53:10, 53:20, 53:21, 63:14, 70:23
**IMPORTANTLY** [1] - 73:14
**IMPOSE** [1] - 25:14
**IMPOSES** [1] - 23:8
**IMPOSING** [1] - 61:5
**IN** [1] - 4:1
**INADEQUATE** [3] - 26:3, 27:7, 35:10
**INAPPROPRIATE** [2] - 35:25, 36:10
**INC** [1] - 4:5
**INCLUDE** [4] - 11:17, 17:25, 39:7, 86:2
**INCLUDED** [4] - 41:11, 56:12, 89:6, 89:7
**INCLUDES** [3] - 11:20, 76:8, 88:7
**INCLUDING** [6] - 41:11, 64:21, 72:25, 73:9, 88:15, 89:11
**INCLUSION** [1] - 89:10
**INCONSISTENT** [1] - 61:7, 61:8
**INCORPORATE** [2] - 18:14, 19:18
**INCORPORATING** [2] - 10:11, 20:16
**INCREASE** [4] - 75:7, 75:18, 89:23, 90:18
**INCREASES** [1] - 69:24
**INCREDIBLY** [1] - 88:10
**INCUMBENCY** [1] - 85:10

**INDEED** [1] - 24:25
**INDEPENDENT** [6] - 23:7, 26:1, 27:23, 30:6, 41:13, 52:13
**INDEPENDENTLY** [3] - 26:18, 27:8, 28:23
**INDICATE** [1] - 48:21
**INDICATED** [4] - 35:21, 38:17, 43:2, 84:14
**INDICATES** [2] - 23:12, 40:9
**INDICATION** [2] - 6:5, 31:15
**INDICATORS** [1] - 50:18
**INDIVIDUAL** [3] - 66:7, 67:13, 71:21
**INDULGENCE** [1] - 13:6
**INEVITABLE** [1] - 54:23
**INEXTRICABLY** [1] - 17:16
**INFLUENCE** [2] - 80:11, 82:23
**INFORMATIVE** [1] - 32:20
**INGENIOUS** [3] - 13:1, 13:2, 25:21
**INITIAL** [2] - 18:2, 62:5
**INJUNCTION** [6] - 28:6, 28:7, 28:8, 28:10, 28:15, 53:24
**INJURY** [14] - 11:14, 13:23, 14:12, 14:14, 15:14, 16:18, 16:22, 17:15, 34:4, 40:2, 40:21, 40:22, 41:17, 82:22
**INNOCENCE** [1] - 24:22
**INQUIRY** [3] - 7:21, 20:4, 64:22
**INSEPARABLE** [1] - 51:17
**INSISTING** [1] - 61:4
**INSTANCE** [3] - 10:7, 29:19, 59:1
**INSTANCES** [1] - 55:8
**INSTEAD** [6] - 12:1, 21:2, 29:17, 32:13, 34:16, 70:3
**INSTRUCTED** [3] - 11:23, 19:24, 38:22
**INSTRUCTIONS** [2] - 11:6, 39:20
**INSUFFICIENT** [1] - 47:23
**INTENDING** [2] - 30:11, 30:12
**INTENSELY** [5] - 45:5, 49:17, 64:22, 65:1, 66:12
**INTENT** [2] - 85:15, 85:16
**INTENTIONALLY** [1] - 12:1
**INTERCHANGEABLE** [1] - 83:5
**INTEREST** [1] - 38:18
**INTERESTED** [1] - 36:7
**INTERESTING** [2] - 28:22, 29:1
**INTERESTS** [1] - 83:4
**INTERPRETED** [1] - 51:21
**INTERRUPTING** [1] - 27:17
**INTRODUCE** [3] - 4:11, 4:13, 6:12
**INVITE** [3] - 17:4, 17:8, 17:14
**INVITES** [1] - 8:11
**INVOLVED** [1] - 4:13
**INVOLVES** [1] - 21:5

**INVOLVING** [1] - 45:8
**IRRELEVANT** [3] - 80:11, 92:10
**ISSUE** [5] - 38:8, 39:9, 44:22, 48:24, 91:23
**ISSUED** [2] - 6:21, 47:17
**ISSUES** [6] - 6:3, 41:16, 44:10, 50:12, 53:24, 60:17
**ITEM** [1] - 62:3
**ITEMS** [1] - 49:19
**ITSELF** [2] - 85:9, 86:9

**J**

**JACOUTOT** [1] - 2:9
**JACOUTOT** [3] - 5:20, 23:17
**JANUARY** [1] - 47:10
**JAUGSTETTER** [1] - 5:23
**JOB** [1] - 30:23
**JOHNSON** [1] - 24:25
**JOINED** [1] - 5:20
**JOINING** [1] - 5:22
**JOINS** [1] - 15:2
**JONES** [5] - 5:6, 5:7, 5:9, 70:16, 70:24
**JONES** [2] - 2:5, 95:16
**JOURNALISTS** [3] - 36:2, 36:4, 36:6
**JR** [1] - 2:10
**JUAN** [1] - 4:22
**JUAN** [1] - 2:4
**JUDGE** [4] - 46:5, 46:19, 46:20, 47:1
**JUDGE** [7] - 46:6, 46:9, 46:15, 47:3, 54:10, 94:5
**JUDGES** [1] - 36:12
**JUDGMENT** [1] - 28:11
**JUDICIAL** [1] - 35:12
**JUNCTURE** [1] - 86:12
**JURISDICTION** [1] - 10:9
**JURY** [1] - 13:9
**JUSTIFICATION** [1] - 61:3
**JUSTIFY** [3] - 34:6, 34:9, 85:11

**K**

**KEEP** [2] - 6:8, 59:1
**KEMP** [1] - 7:12
**KEY** [1] - 47:15
**KHANNA** [13] - 5:4, 8:24, 9:19, 35:19, 39:6, 40:14, 41:16, 42:8, 42:18, 49:9, 51:8, 54:15, 61:11
**KHANNA** [25] - 2:4, 3:3, 3:4, 5:2, 5:4, 8:14, 9:5, 9:13, 9:17, 9:19, 11:8, 12:10, 13:14, 22:21, 23:3, 23:22, 24:2, 27:1, 27:5, 27:19, 28:7, 28:14, 30:23, 35:17, 54:16
**KHANNA'S** [1] - 43:7

**KIND** [5] - 16:22, 34:25, 47:19, 47:24, 48:25
**KNOWING** [1] - 59:18
**KNOWINGLY** [1] - 12:1
**KNOWLEDGE** [1] - 30:9
**KNOWN** [1] - 7:11
**KNOWS** [3] - 22:3, 52:22, 85:14

**L**

**LABEL** [2] - 67:2, 78:6
**LACK** [4] - 33:11, 37:12, 49:13, 71:16
**LAID** [1] - 14:20
**LAMAR** [1] - 72:24
**LAND** [1] - 64:17
**LANGUAGE** [1] - 21:24
**LARGE** [3] - 79:1, 79:12, 89:5
**LARGELY** [1] - 80:7
**LARGER** [1] - 47:19
**LAST** [7] - 9:6, 25:17, 26:16, 56:10, 60:16, 67:25, 85:2
**LATINO** [22] - 8:4, 23:5, 26:5, 34:7, 41:4, 45:2, 45:10, 45:14, 48:7, 48:19, 49:15, 49:22, 49:24, 50:4, 50:10, 50:13, 50:19, 50:21, 50:23, 50:24, 51:1
**LATINOS** [1] - 33:20
**LAW** [17] - 6:22, 7:13, 12:19, 17:1, 17:2, 17:18, 27:10, 32:19, 36:17, 45:18, 53:9, 53:10, 53:13, 53:17, 54:22, 57:16, 66:10
**LAWFUL** [9] - 9:24, 31:1, 33:8, 35:12, 56:5, 68:17, 93:12, 94:7, 94:13
**LAWS** [1] - 36:8
**LAWSUIT** [2] - 68:24, 69:1
**LAWYERS** [2] - 4:13, 62:16
**LAY** [1] - 14:4
**LEAD** [1] - 71:11
**LEAST** [7] - 9:15, 29:22, 30:8, 33:12, 36:13, 46:21, 46:23
**LEAVE** [1] - 93:6
**LEAVES** [1] - 86:5
**LEFT** [6] - 62:4, 68:19, 73:10, 78:5, 87:15, 88:6
**LEGAL** [6] - 47:20, 48:23, 58:23, 63:20, 63:21, 65:20
**LEGISLATIVE** [2] - 46:4, 54:8
**LEGISLATIVE** [4] - 43:25, 63:22, 68:3, 89:13
**LEGISLATOR** [1] - 31:7
**LEGISLATORS** [1] - 6:2
**LEGISLATURE** [23] - 17:23, 22:14,

26:23, 37:7, 37:19, 38:2, 38:4,
38:18, 38:19, 39:18, 39:21, 41:12,
42:4, 42:9, 44:1, 44:2, 44:9,
44:16, 50:25, 51:1, 51:9, 51:10,
53:4
**LEGISLATURE** [1] - 5:24
**LEGISLATURE'S** [3] - 21:17, 42:21,
53:14
**LENGTH** [1] - 73:3
**LESS** [10] - 32:11, 49:7, 49:9, 64:7,
69:25, 75:7, 78:13, 90:5, 91:4,
93:8
**LETTER** [6] - 59:6, 59:8, 59:10,
59:11, 59:12, 59:18
**LEVEL** [8] - 58:14, 72:6, 75:22, 76:4,
77:16, 82:4, 90:4, 92:22
**LEVELS** [1] - 72:6
**LEVERETT** [2] - 6:1, 35:22
**LIABILITY** [7] - 27:7, 26:14, 31:14,
33:1, 57:5, 64:25, 72:4
**LIKELIHOOD** [2] - 28:3, 28:19
**LIKELY** [1] - 19:6
**LIMIT** [2] - 20:6, 20:7
**LIMITATION** [1] - 39:18
**LIMITED** [2] - 17:23, 21:10
**LINE** [4] - 60:16, 83:2, 87:24, 93:2
**LINES** [5] - 33:19, 33:25, 69:11,
74:2, 76:2
**LISTED** [1] - 15:20
**LISTEN** [2] - 5:16
**LITERAL** [1] - 16:3
**LITIGATION** [1] - 54:20
**LIVE** [5] - 15:10, 38:24, 62:6, 62:8,
76:14
**LIVES** [1] - 76:9
**LOCAL** [5] - 45:5, 49:17, 64:23, 65:1,
66:12
**LOCALIZED** [3] - 65:1, 68:14, 92:12
**LOCATED** [2] - 38:8, 42:13
**LOCATION** [1] - 44:14
**LOCUST** [1] - 67:16
**LOGICAL** [2] - 21:10, 21:12
**LOIS** [1] - 4:8
**LOOK** [42] - 11:16, 13:25, 14:19,
18:17, 20:13, 31:16, 31:19, 38:19,
39:13, 46:11, 46:20, 47:21, 50:2,
51:2, 51:3, 52:5, 54:21, 55:3,
55:4, 55:5, 55:10, 55:11, 55:12,
55:15, 55:18, 68:25, 69:17, 70:14,
71:2, 73:18, 76:4, 78:4, 78:5,
82:4, 83:11, 83:22, 84:10, 88:20,
91:16, 92:3, 92:17
**LOOKED** [1] - 75:20
**LOOKING** [18] - 12:7, 37:19, 44:3,

48:6, 48:7, 48:8, 52:6, 71:12,
73:11, 74:14, 77:15, 79:13, 84:2,
88:20, 90:3, 90:4, 91:3, 92:22
**LOOKS** [3] - 58:4, 77:15, 81:11
**LOOSE** [1] - 21:24
**LOSS** [2] - 15:21, 38:3
**LOST** [1] - 42:16
**LOVE** [1] - 4:20
**LOWER** [1] - 90:10
**LUCY** [2] - 22:6, 24:5
**LULAC** [9] - 14:15, 33:15, 34:5,
34:13, 41:3, 58:14, 58:23, 85:9
**LUMPKIN** [1] - 15:4
**LUNCH** [5] - 86:22, 86:25, 94:17,
94:19, 94:20

## M

**MA'AM** [1] - 9:16
**MACON** [2] - 7:4, 70:14
**MACON-BIBB** [2] - 7:4, 70:14
**MADISON** [1] - 17:18
**MAGNITUDE** [2] - 79:18, 91:24
**MAIN** [1] - 49:6
**MAINTAIN** [1] - 60:25
**MAINTAINED** [1] - 43:6
**MAJORITY** [123] - 7:1, 7:2, 7:4, 12:2,
14:1, 14:9, 17:24, 18:22, 18:25,
19:11, 19:13, 21:5, 21:8, 21:11,
21:14, 21:21, 22:24, 30:18, 31:5,
37:4, 37:8, 37:13, 37:17, 38:14,
38:15, 38:24, 39:2, 40:3, 40:13,
40:15, 40:16, 40:23, 41:4, 41:21,
42:11, 43:8, 43:9, 43:14, 43:15,
44:16, 45:16, 53:3, 56:9, 56:17,
57:12, 57:14, 57:23, 59:21, 59:22,
62:23, 64:12, 65:2, 65:12, 69:3,
69:5, 69:8, 69:23, 70:5, 71:3,
72:18, 73:19, 73:25, 74:1, 74:7,
74:10, 74:16, 74:22, 75:6, 75:8,
75:17, 76:6, 76:7, 77:7, 77:10,
77:14, 77:18, 77:20, 77:22, 78:9,
78:21, 78:22, 78:25, 79:7, 79:12,
79:15, 80:20, 80:24, 82:1, 82:5,
82:7, 82:13, 82:23, 83:16, 83:23,
83:25, 84:4, 84:12, 88:13, 88:18,
88:21, 88:22, 88:24, 89:2, 89:3,
89:8, 89:16, 89:19, 89:24, 90:1,
90:15, 90:19, 90:21, 90:23, 91:5,
91:14, 91:18, 92:1, 92:4, 92:9,
92:19, 92:20, 94:3
**MAJORITY-MINORITY** [12] - 12:2,
14:9, 18:22, 18:25, 19:11, 19:13,
22:24, 40:15, 43:8, 43:9, 43:14

**MAKEUP** [2] - 43:9, 52:1
**MALL** [1] - 67:15
**MAN** [1] - 46:7
**MAP** [41] - 10:2, 11:20, 14:19, 14:20,
14:22, 16:3, 18:19, 23:8, 23:9,
26:3, 26:8, 27:6, 30:7, 31:3, 33:3,
33:7, 35:12, 47:11, 56:5, 60:7,
60:21, 60:25, 61:2, 71:14, 72:2,
73:4, 73:21, 73:22, 73:23, 73:24,
74:2, 74:25, 79:4, 79:5, 79:15,
88:20, 89:9, 91:11
**MAPPERS** [2] - 67:11, 67:12
**MAPS** [13] - 19:5, 25:20, 51:13,
51:15, 63:18, 68:8, 69:17, 71:12,
83:11, 84:17, 84:18, 84:19, 94:6
**MARBURY** [1] - 17:18
**MARCH** [1] - 47:12
**MARCH** [2] - 30:19, 60:4
**MARGIN** [1] - 32:11
**MARGINS** [2] - 74:5, 81:13
**MASSIVE** [2] - 67:21, 75:22
**MASTER** [2] - 84:20, 94:13
**MATH** [1] - 18:12
**MATTER** [29] - 4:5, 9:4, 18:2, 27:15,
27:16, 28:10, 29:21, 36:15, 42:19,
43:6, 52:16, 53:17, 65:21, 65:23,
65:24, 66:21, 67:2, 68:18, 72:11,
79:20, 79:21, 79:22, 83:1, 85:14,
85:16, 86:12, 86:14, 93:11
**MATTERS** [11] - 61:22, 65:8, 65:17,
67:2, 67:5, 71:8, 74:25, 79:23,
85:17, 86:16, 86:18
**MCBATH** [3] - 22:6, 22:10, 37:15
**MCBATH'S** [1] - 24:5
**MCDONOUGH** [5] - 73:7, 77:7, 77:8,
78:7
**MCGEE** [2] - 39:22, 40:5
**MEAN** [6] - 20:9, 52:22, 56:22,
64:11, 70:1, 72:12
**MEANS** [1] - 57:16
**MEANT** [5] - 20:20, 25:22, 56:16,
57:15
**MEASURES** [1] - 7:8
**MEET** [2] - 7:7, 36:5
**MEMBERS** [3] - 51:1, 51:2, 66:7
**MENTION** [2] - 18:4, 53:19
**MENTIONED** [6] - 10:24, 30:4, 53:20,
55:8, 57:2, 68:2
**MERELY** [3] - 41:10, 69:20, 86:9
**MERITS** [2] - 28:4, 28:20
**MESSED** [1] - 56:16
**MET** [2] - 38:21, 53:18
**METHOD** [1] - 31:13
**METRO** [1] - 66:16

**METRO** [92] - 7:2, 7:3, 21:6, 24:18, 37:9, 38:14, 38:16, 41:22, 42:3, 63:1, 63:5, 63:12, 63:15, 64:20, 65:22, 66:15, 66:23, 67:5, 67:20, 68:11, 68:20, 68:21, 70:4, 71:5, 71:6, 71:17, 72:5, 72:11, 72:14, 72:19, 73:13, 74:15, 75:1, 75:8, 75:16, 75:21, 77:5, 78:3, 79:9, 79:19, 79:24, 80:2, 80:8, 80:12, 81:12, 81:17, 81:23, 82:1, 82:3, 82:12, 82:16, 82:18, 82:25, 83:1, 83:2, 83:8, 83:9, 84:5, 84:9, 84:15, 85:19, 86:17, 88:1, 88:6, 88:13, 88:14, 89:9, 89:14, 89:22, 90:10, 90:18, 90:22, 90:25, 91:17, 91:18, 91:20, 91:21, 92:1, 92:2, 92:7, 92:13, 92:21, 93:14, 93:19, 94:8
**MICHAEL** [1] - 2:5
**MIGHT** [3] - 25:5, 93:16
**MIKE** [1] - 5:6
**MILLIGAN** [3] - 54:25, 55:3, 64:21
**MIND** [1] - 44:14
**MINE** [1] - 13:12
**MINIMIS** [1] - 78:2
**MINORITIES** [1] - 43:1
**MINORITY** [58] - 7:19, 7:25, 8:1, 8:2, 8:7, 10:16, 10:17, 11:2, 12:2, 12:15, 13:3, 14:9, 15:3, 18:10, 18:22, 18:25, 19:11, 19:13, 19:25, 20:3, 20:7, 20:8, 20:21, 21:9, 21:13, 21:22, 22:19, 22:24, 24:23, 25:15, 25:21, 31:4, 32:4, 32:9, 32:12, 34:1, 34:11, 34:20, 35:4, 40:15, 42:24, 42:25, 43:8, 43:9, 43:14, 43:21, 44:18, 49:3, 53:5, 56:22, 56:23, 57:4, 57:7, 64:3, 66:7, 66:8
**MINUTES** [7] - 9:11, 35:16, 35:17, 54:15, 61:12, 87:16
**MISTAKE** [3] - 12:23, 24:21, 56:14
**MOLE** [4] - 29:10, 52:21, 52:24, 54:18
**MOMENT** [1] - 57:6
**MONTHS** [5] - 4:19, 5:12, 27:2, 27:16, 47:8
**MORGAN** [2] - 73:8, 78:10
**MORNING** [13] - 4:15, 4:16, 4:25, 5:1, 5:2, 5:3, 5:10, 6:13, 7:15, 9:17, 9:18, 20:2, 23:4
**MORPHING** [1] - 25:20
**MOST** [11] - 17:10, 21:9, 21:12, 31:16, 41:17, 56:4, 63:14, 70:21, 71:17, 73:14, 77:8

**MOTHER** [1] - 59:17
**MOTION** [1] - 28:11
**MOTIVATIONS** [1] - 44:2
**MOVE** [7] - 25:25, 41:24, 44:21, 60:18, 78:23, 82:10, 84:12
**MOVED** [4] - 42:1, 42:4, 42:6, 77:6
**MOVEMENT** [1] - 84:14
**MOVIE** [1] - 12:11
**MOVING** [2] - 53:22, 87:21
**MR** [40] - 3:3, 3:4, 4:15, 4:17, 4:21, 5:1, 5:14, 5:18, 6:9, 6:11, 8:21, 9:1, 36:19, 36:22, 39:24, 46:13, 46:18, 47:14, 54:7, 54:14, 61:18, 62:1, 62:3, 62:18, 62:21, 69:2, 69:6, 69:8, 70:12, 70:19, 71:1, 71:25, 76:21, 77:2, 87:2, 87:5, 87:9, 87:13, 87:17, 87:21
**MS** [24] - 3:3, 3:4, 5:2, 5:4, 8:14, 9:5, 9:13, 9:17, 9:19, 11:8, 12:10, 13:14, 22:21, 23:3, 23:22, 24:2, 27:1, 27:5, 27:19, 28:7, 28:14, 30:23, 35:17, 54:16
**MULTIPLE** [3] - 45:23, 55:8, 72:6
**MUST** [14] - 10:15, 11:17, 18:13, 20:15, 29:12, 35:2, 56:16, 63:4, 66:15, 73:17, 85:9, 85:22, 86:9, 91:11

**N**

**NAMED** [2] - 76:9, 76:11
**NATURALLY** [1] - 42:5
**NATURE** [1] - 40:1
**NEAR** [1] - 78:6
**NEARLY** [2] - 78:18, 79:13
**NECESSARILY** [2] - 57:13, 90:2
**NECESSARY** [4] - 62:11, 62:17, 84:6, 92:24
**NEED** [21] - 11:3, 13:19, 14:7, 20:13, 20:22, 32:23, 35:20, 62:21, 66:3, 68:8, 68:9, 73:12, 76:21, 80:12, 82:11, 83:9, 87:11, 88:4, 88:12, 88:18, 92:14
**NEEDED** [5] - 16:15, 34:15, 48:17, 72:2, 93:5
**NEEDLESS** [1] - 21:18
**NEEDS** [12] - 24:13, 27:9, 27:10, 30:5, 44:15, 49:2, 54:24, 55:23, 57:20, 65:1, 72:15, 76:12
**NEGLECTED** [1] - 6:12
**NEIGHBORING** [2] - 14:4, 89:19
**NET** [6] - 77:4, 80:8, 90:9, 90:15, 90:18, 92:1
**NEVER** [2] - 30:11, 85:15

**NEW** [71] - 5:12, 11:20, 12:14, 12:25, 14:1, 14:22, 15:3, 15:14, 17:24, 17:25, 23:7, 25:25, 26:24, 27:14, 27:22, 28:23, 29:19, 30:20, 32:1, 33:2, 33:6, 34:25, 45:3, 48:24, 53:16, 55:20, 56:6, 63:7, 66:18, 68:19, 68:21, 69:9, 69:12, 69:17, 70:2, 70:3, 71:4, 72:2, 72:17, 72:18, 73:16, 73:22, 73:23, 74:11, 77:4, 77:19, 78:3, 78:6, 78:18, 79:5, 80:4, 80:8, 80:11, 80:18, 81:1, 81:7, 83:15, 84:12, 85:19, 88:22, 90:8, 91:11, 91:13, 93:21, 94:2, 94:3, 94:10
**NEWLY** [8] - 74:6, 74:15, 78:24, 80:19, 83:23, 84:4, 89:1, 92:18
**NEWLY-CONFIGURED** [1] - 78:24
**NEWTON** [15] - 67:24, 73:7, 73:8, 74:8, 74:17, 77:13, 77:21, 78:7, 78:8, 81:14, 83:6, 89:7, 89:20, 90:11, 90:16
**NEXT** [9] - 9:4, 18:2, 18:9, 20:22, 41:15, 44:21, 56:19, 64:10, 87:6
**NICE** [1] - 5:17
**NONE** [5] - 81:12, 82:17, 84:5, 89:6, 91:22
**NONPERFORMING** [1] - 41:5
**NORTH** [20] - 38:6, 68:3, 74:20, 74:21, 75:16, 79:1, 79:10, 80:1, 80:10, 81:16, 82:1, 82:8, 84:5, 84:13, 89:9, 91:17, 91:18, 91:21
**NORTH** [2] - 15:4, 78:24
**NORTHERN** [1] - 95:4
**NOSE** [1] - 29:25
**NOTE** [2] - 39:10, 84:24
**NOTHING** [8] - 12:25, 22:25, 23:5, 50:1, 76:17, 79:19, 88:23, 89:12
**NOTICE** [1] - 89:18
**NOTING** [1] - 33:17
**NOTION** [1] - 12:21
**NOVEMBER** [1] - 7:8
**NUMBER** [17] - 11:20, 37:10, 37:12, 45:6, 46:19, 47:16, 52:4, 69:12, 69:23, 70:21, 75:5, 75:10, 80:4, 82:13, 83:20, 90:3, 90:7
**NUMBERS** [21] - 25:14, 32:7, 63:17, 69:17, 69:21, 70:14, 71:2, 74:24, 75:3, 76:4, 77:16, 79:12, 82:4, 84:2, 84:10, 90:5, 90:13, 91:3, 91:23, 92:22
**NUTSHELL** [1] - 74:23

# O

**O'KELLEY** [1] - 47:3
**OBJECTION** [7] - 8:20, 8:25, 18:9, 23:6, 25:25, 26:16, 44:14
**OBJECTIONS** [9] - 7:14, 7:15, 8:23, 12:5, 13:5, 39:5, 44:25, 68:16, 94:12
**OBVIOUSLY** [8] - 6:2, 37:10, 37:21, 39:14, 41:16, 46:14, 49:7, 53:21
**OCCUPIED** [1] - 42:6
**OCCURRED** [2] - 16:7, 16:15
**OCCURRING** [10] - 43:17, 43:18, 64:14, 64:18, 65:7, 65:19, 73:15, 80:25, 81:9, 91:15
**OCTOBER** [3] - 6:21, 7:20, 9:25
**OF** [3] - 2:2, 2:7, 95:4
**OFFENDED** [3] - 29:22, 29:23
**OFFERED** [2] - 8:3, 50:1
**OFFERS** [1] - 14:17
**OFFICE** [1] - 5:22
**OFFICIAL** [1] - 49:23
**OFFICIAL** [1] - 95:15
**OFFICIALS** [1] - 50:22
**OFFSET** [1] - 81:14
**OLD** [13] - 14:20, 32:14, 46:2, 59:11, 73:21, 78:12, 78:19, 79:1, 79:7, 79:15, 79:21, 79:25, 80:5
**OMITTED** [1] - 16:9
**ON** [2] - 2:2, 2:7
**ONCE** [7] - 12:2, 20:23, 42:1, 61:10, 64:23, 67:17, 90:22
**ONE** [59] - 6:13, 7:2, 8:14, 8:16, 9:6, 9:10, 12:5, 12:6, 19:13, 20:6, 20:13, 21:19, 22:19, 24:15, 25:16, 27:25, 29:5, 30:20, 31:17, 34:14, 41:2, 41:4, 42:22, 45:6, 45:8, 46:11, 46:19, 46:25, 47:16, 52:4, 53:19, 56:22, 59:1, 60:22, 60:23, 62:11, 62:12, 64:11, 65:20, 67:21, 68:2, 71:23, 72:6, 76:8, 77:19, 80:14, 80:15, 80:17, 83:10, 83:11, 85:2, 86:4, 90:2, 90:24, 92:15, 92:16, 92:18, 93:12
**OPEN** [3] - 46:21, 49:10, 64:9
**OPEN** [1] - 4:1
**OPENING** [2] - 22:4, 35:21
**OPENLY** [1] - 12:18
**OPENNESS** [4] - 49:14, 51:4, 60:18, 71:16
**OPINION** [3] - 34:13, 56:12, 88:11
**OPINIONS** [1] - 17:19
**OPPORTUNITIES** [33] - 22:19, 24:15, 24:17, 25:15, 43:3, 43:13, 43:14,

65:2, 66:19, 68:1, 68:19, 68:21, 69:9, 69:15, 69:17, 70:2, 70:3, 71:4, 71:5, 72:2, 72:18, 74:4, 77:4, 80:8, 81:7, 81:23, 85:19, 90:9, 91:11, 91:13, 93:22, 94:3, 94:10
**OPPORTUNITY** [115] - 7:6, 7:19, 8:1, 8:6, 10:6, 10:12, 10:16, 10:23, 11:2, 11:18, 11:21, 11:24, 12:3, 12:12, 13:3, 14:10, 14:16, 14:18, 15:15, 17:7, 18:10, 18:15, 19:14, 19:15, 19:19, 20:1, 20:3, 20:9, 20:10, 20:17, 20:21, 20:25, 21:9, 21:14, 21:22, 22:4, 22:8, 22:14, 23:14, 23:25, 24:6, 24:11, 24:13, 24:19, 25:3, 25:8, 26:9, 26:11, 28:17, 29:3, 29:8, 29:16, 29:18, 29:24, 30:15, 30:16, 31:24, 32:2, 33:23, 34:19, 34:21, 35:3, 37:12, 42:16, 42:17, 42:22, 42:24, 42:25, 44:19, 44:20, 56:13, 56:19, 56:22, 57:7, 57:8, 57:10, 57:11, 57:13, 57:17, 57:21, 57:24, 58:2, 58:9, 58:10, 58:11, 58:15, 60:1, 60:2, 60:8, 60:9, 60:10, 60:15, 60:19, 60:23, 61:1, 61:2, 62:23, 63:8, 63:13, 64:2, 66:18, 73:16, 75:9, 78:3, 83:16, 88:13, 88:19, 90:1, 90:21, 91:6, 91:14
**OPPOSITE** [2] - 17:3, 72:9
**OPTION** [1] - 86:24
**ORDER** [32] - 6:21, 7:20, 10:1, 10:5, 12:18, 15:19, 16:19, 18:11, 18:13, 19:23, 21:2, 21:4, 21:24, 25:7, 25:23, 27:11, 29:11, 41:13, 43:20, 55:23, 56:8, 57:25, 58:1, 59:18, 60:16, 60:17, 63:11, 63:16, 79:18, 81:21, 85:25
**ORDERED** [6] - 6:25, 9:3, 44:15, 44:17, 80:13, 91:11
**ORDERS** [1] - 53:15
**ORIGINAL** [1] - 57:4
**ORIGINALLY** [1] - 57:1
**OSTENSIBLY** [1] - 81:1
**OTHERWISE** [3] - 24:9, 29:20, 94:13
**OUTCOME** [1] - 39:3
**OUTCOMES** [1] - 53:11
**OUTLET** [1] - 67:15
**OUTLINED** [2] - 26:20, 55:22
**OUTSET** [1] - 7:21
**OUTSIDE** [22] - 14:5, 14:21, 15:9, 39:7, 39:11, 40:9, 42:18, 58:18, 70:6, 74:19, 75:13, 75:15, 81:3, 81:4, 81:5, 81:16, 81:18, 82:8,

82:9, 84:5, 89:10
**OUTSTANDING** [1] - 62:16
**OVERALL** [6] - 16:10, 41:6, 42:13, 49:1, 75:18, 89:22
**OVERLAID** [1] - 73:20
**OVERLAP** [4] - 37:25, 58:14, 58:21, 65:16
**OVERLAYS** [1] - 73:23
**OVERSIGHT** [1] - 56:15
**OVERSTATES** [1] - 90:8
**OWN** [8] - 12:24, 14:8, 23:10, 23:11, 23:12, 29:22, 34:17

# P

**P.M** [1] - 94:20
**PAGE** [1] - 3:2
**PAGE** [29] - 10:1, 10:5, 10:8, 10:14, 10:19, 10:24, 12:23, 13:16, 15:18, 15:22, 16:19, 17:22, 18:13, 18:20, 19:23, 20:13, 21:3, 21:4, 21:7, 22:17, 22:20, 22:21, 31:12, 54:11, 56:8, 56:18, 60:16, 63:11
**PAGES** [6] - 7:19, 18:3, 34:12, 56:11, 56:19, 95:6
**PALMER** [4] - 23:16, 31:12, 32:8, 49:5
**PALMER'S** [4] - 23:20, 31:8, 31:11, 32:13
**PANEL** [2] - 46:19, 46:20
**PAPER** [2] - 59:11, 62:1
**PAR** [1] - 12:15
**PARAGRAPH** [2] - 18:20, 20:22
**PARAGRAPHS** [1] - 18:24
**PARAMETERS** [1] - 13:21
**PARAPHRASE** [1] - 63:10
**PARCELLED** [1] - 79:4
**PARKING** [1] - 67:14
**PART** [17] - 6:2, 11:15, 18:12, 23:6, 23:21, 29:12, 29:13, 40:7, 51:15, 57:9, 62:25, 65:17, 79:1, 83:24, 86:25, 87:1, 91:2
**PART-TIME** [1] - 6:2
**PARTIAL** [3] - 11:14, 18:7, 58:21
**PARTIALLY** [1] - 14:2
**PARTICIPATE** [3] - 10:17, 60:19, 64:3
**PARTICULAR** [6] - 15:19, 33:4, 34:11, 40:3, 65:10, 82:21
**PARTICULARLY** [2] - 23:5, 31:15
**PARTIES** [6] - 7:18, 8:11, 8:16, 9:7, 13:11, 51:22
**PARTIES'** [1] - 7:17
**PARTISAN** [13] - 19:8, 44:10, 52:18, 53:10, 53:11, 85:5, 85:6, 85:10,

85:20, 85:21, 85:24, 86:3, 86:13

**PARTISANSHIP** [8] - 44:6, 50:2, 50:3, 50:6, 51:13, 51:15, 51:17, 51:18

**PARTS** [6] - 16:19, 88:7, 88:15, 89:7, 89:15, 90:6

**PARTY** [3] - 34:19, 34:21, 50:6

**PASS** [2] - 61:23, 93:25

**PASSES** [1] - 94:4

**PATTERNS** [1] - 26:5

**PAUL** [1] - 30:14

**PAY** [1] - 30:14

**PEACHTREE** [1] - 67:16

**PEARLS** [1] - 12:21

**PEN** [1] - 16:13

**PENDERGRASS** [8] - 4:7, 4:12, 5:5, 6:18, 8:10, 8:13, 8:25, 9:20

**PEOPLE** [8] - 6:8, 15:9, 15:10, 35:25, 58:20, 69:25, 70:1, 91:3

**PERCENT** [27] - 14:23, 15:1, 32:8, 32:10, 38:2, 38:9, 38:23, 38:25, 41:7, 49:3, 50:23, 50:24, 65:15, 75:17, 76:1, 78:11, 78:13, 78:16, 78:18, 78:20, 78:21, 79:3, 80:5, 82:13, 84:8, 91:4

**PERFORMANCE** [2] - 23:1, 48:2

**PERFORMED** [1] - 58:3

**PERFORMING** [1] - 34:18

**PERFORMS** [1] - 19:3

**PERHAPS** [1] - 34:19

**PERIOD** [1] - 28:4

**PERIPHERY** [2] - 89:1, 89:2

**PERMITTED** [1] - 44:9

**PERRY** [4] - 14:15, 33:15, 34:5, 34:13

**PERSONALLY** [1] - 6:7

**PERSPECTIVE** [3] - 52:24, 54:1, 76:16

**PERTAINING** [1] - 8:1

**PETER** [1] - 30:14

**PETULANT** [1] - 59:15

**PHASE** [7] - 20:5, 26:14, 31:14, 33:1, 53:24, 57:5, 63:21

**PHI** [3] - 4:5, 4:21, 76:9

**PHRASE** [3] - 19:8, 57:10, 64:23

**PICKS** [1] - 78:8

**PIECE** [10] - 39:25, 41:2, 48:22, 51:2, 56:1, 59:10, 64:11, 65:20, 74:17, 74:18

**PIECES** [1] - 48:21

**PIKE** [1] - 72:24

**PLACE** [8] - 41:9, 65:3, 65:18, 68:17, 70:6, 76:14, 86:11, 94:14

**PLACED** [4] - 40:23, 74:10, 77:23, 80:20

**PLACES** [12] - 64:13, 66:23, 67:3, 70:20, 71:6, 74:5, 81:18, 81:20, 81:22, 91:22, 93:13, 94:9

**PLAINLY** [1] - 11:6

**PLAINTIFF** [2] - 29:11, 76:12

**PLAINTIFF'S** [2] - 18:9, 32:22

**PLAINTIFFS** [62] - 4:22, 5:5, 5:7, 5:8, 6:17, 6:18, 7:14, 8:13, 9:8, 9:20, 9:24, 14:25, 16:2, 21:18, 21:25, 24:17, 25:6, 25:18, 26:3, 26:4, 26:7, 26:16, 28:16, 29:14, 29:23, 30:2, 32:14, 32:25, 35:9, 37:23, 38:10, 38:11, 38:15, 39:11, 41:11, 41:17, 42:25, 43:19, 45:4, 45:13, 45:17, 45:25, 47:21, 47:25, 48:10, 48:22, 49:18, 50:1, 51:9, 51:24, 52:16, 52:25, 53:2, 55:2, 55:20, 56:23, 61:20, 71:15, 76:9, 88:16, 89:11

**PLAINTIFFS** [1] - 2:2

**PLAINTIFFS'** [10] - 6:15, 13:4, 38:1, 38:20, 40:8, 43:10, 44:25, 51:16, 52:20, 56:21

**PLAN** [68] - 7:10, 11:5, 11:24, 12:9, 13:5, 13:24, 18:5, 18:11, 18:22, 19:1, 19:11, 19:13, 19:15, 19:16, 19:17, 20:1, 20:22, 25:9, 30:16, 30:17, 31:1, 33:14, 33:16, 35:10, 37:20, 38:20, 41:1, 41:14, 42:2, 43:18, 44:20, 52:15, 68:17, 68:20, 68:22, 69:25, 70:4, 70:7, 71:10, 72:21, 73:18, 73:20, 75:23, 76:2, 77:17, 78:1, 78:19, 79:16, 79:17, 80:15, 81:10, 83:10, 83:14, 83:21, 83:24, 84:3, 85:3, 85:4, 85:23, 86:6, 86:21, 87:24, 88:23, 89:8, 91:12, 92:15, 92:19

**PLANNED** [1] - 30:21

**PLANS** [31] - 6:23, 7:11, 7:14, 10:9, 11:2, 18:4, 19:4, 20:14, 21:15, 37:24, 39:4, 63:3, 63:7, 63:10, 63:22, 63:24, 63:25, 64:2, 66:21, 67:6, 68:14, 83:18, 84:11, 84:24, 85:17, 85:18, 86:15, 86:18, 87:5, 93:3, 94:1

**PLAY** [2] - 21:23, 22:1

**PLAYBOOK** [2] - 12:23, 12:25

**PLAYED** [1] - 52:21

**PLAYING** [5] - 29:2, 37:1, 54:18, 69:14, 73:15

**PLEA** [1] - 18:7

**PLEADINGS** [1] - 8:18

**PLUS** [2] - 78:21, 82:13

**POINT** [18] - 11:8, 11:11, 20:12,

21:17, 25:18, 38:22, 47:15, 47:19, 52:6, 53:15, 53:19, 66:9, 70:12, 71:1, 76:13, 78:13, 85:2

**POINTED** [1] - 22:5

**POINTS** [2] - 26:21, 27:24

**POLARIZED** [3] - 31:13, 67:19, 68:4

**POLICIES** [1] - 51:5

**POLICY** [3] - 33:13, 34:5, 34:8

**POLITICAL** [24] - 8:4, 33:18, 33:24, 37:22, 44:2, 44:4, 44:5, 48:1, 48:9, 48:13, 51:21, 51:22, 61:3, 64:8, 66:22, 67:3, 69:14, 69:18, 74:3, 81:22, 91:7, 93:22

**POLITICALLY** [5] - 34:20, 93:9, 93:10, 93:16, 93:17

**POLITICS** [4] - 34:6, 34:9, 85:11, 93:5

**POPULATED** [3] - 74:22, 80:21, 80:23

**POPULATION** [17] - 14:4, 14:24, 15:2, 32:4, 32:5, 37:25, 38:3, 39:7, 40:11, 40:17, 40:18, 41:7, 45:15, 49:3, 67:22, 75:22, 91:4

**PORTIONS** [1] - 89:5

**POSED** [1] - 22:17

**POSITION** [4] - 46:9, 66:20, 74:25

**POSSIBLE** [5] - 83:17, 84:23, 93:9, 93:24

**POWER** [5] - 34:19, 34:21, 61:4, 61:6, 86:9

**PRACTICAL** [1] - 72:11

**PRACTICES** [1] - 50:10

**PRECEDENCE** [1] - 85:22

**PRECEDENT** [6] - 7:5, 17:4, 17:8, 17:14, 18:7, 46:23

**PRECINCT** [1] - 83:19

**PRECINCTS** [2] - 64:16, 77:6

**PRECISE** [1] - 16:6

**PREDICTS** [1] - 78:9

**PREFACE** [1] - 12:8

**PREFER** [1] - 55:2

**PREFERENCE** [1] - 22:25

**PREFERRED** [23] - 11:22, 12:4, 14:10, 15:16, 19:12, 22:9, 22:11, 23:2, 23:15, 24:7, 25:4, 26:11, 31:24, 34:22, 51:10, 52:1, 57:18, 57:22, 58:6, 60:11, 61:5, 61:6

**PREJUDICE** [1] - 70:16

**PRELIMINARY** [7] - 28:5, 28:7, 28:8, 28:9, 28:15, 53:24

**PREPARE** [1] - 54:5

**PREPARED** [2] - 24:9, 25:18

**PRESENTATION** [11] - 8:12, 54:17, 55:19, 56:7, 56:11, 61:16, 62:1,

62:5, 62:12, 62:13, 87:3
**PRESENTED** [2] - 47:25, 72:21
**PRESENTING** [1] - 12:9
**PRESENTS** [2] - 62:6, 62:8
**PRESERVE** [1] - 35:17
**PRESUME** [2] - 44:1, 51:8
**PRETEND** [1] - 56:20
**PRETENDING** [1] - 59:17
**PREVENT** [1] - 13:1
**PREVIOUS** [1] - 78:1
**PREVIOUSLY** [3] - 35:1, 42:10, 43:8
**PRIMARIES** [2] - 32:20, 48:3
**PRIMARILY** [2] - 33:18, 33:24
**PRIMARY** [4] - 32:15, 32:23, 57:3, 67:20
**PRINCIPLE** [2] - 17:17, 29:21
**PRINCIPLES** [2] - 17:2, 66:11
**PRIORITIZED** [1] - 86:13
**PROBLEM** [8] - 34:16, 41:13, 48:25, 74:23, 82:25, 85:22, 86:2, 92:12
**PROCEED** [13] - 4:14, 8:13, 8:15, 9:4, 35:11, 36:16, 47:13, 54:4, 61:17, 62:4, 68:17, 84:21, 87:18
**PROCEEDED** [1] - 4:11
**PROCEEDINGS** [1] - 95:7
**PROCESS** [4] - 6:6, 35:6, 41:25, 64:8
**PROFESSIONAL** [1] - 62:10
**PROHIBITED** [1] - 25:7
**PROHIBITION** [1] - 20:20
**PROOF** [2] - 22:7, 31:23
**PROPORTIONALITY** [2] - 52:4, 52:10
**PROPOSAL** [5] - 10:21, 17:12, 20:24, 82:15, 85:8
**PROPOSED** [31] - 63:3, 63:7, 63:22, 63:25, 64:2, 68:14, 69:25, 70:4, 73:18, 73:20, 73:24, 74:2, 75:23, 76:2, 77:17, 77:23, 78:4, 79:16, 79:17, 81:10, 83:10, 83:21, 85:17, 85:23, 86:14, 87:24, 88:23, 91:12, 92:15, 93:3
**PROTECT** [2] - 34:19, 34:21
**PROTECTED** [1] - 45:22
**PROTECTING** [1] - 52:11
**PROTECTION** [3] - 52:2, 53:8, 85:11
**PROTECTIONS** [1] - 45:18
**PROTECTS** [2] - 51:21, 51:22
**PROVE** [2] - 32:15, 55:20
**PROVED** [6] - 65:10, 68:15, 71:15, 82:17, 82:20, 89:11
**PROVEN** [4] - 63:9, 64:14, 86:7, 88:5
**PROVIDE** [14] - 10:16, 12:6, 14:11, 14:18, 28:17, 57:20, 58:19, 64:2, 82:2, 83:10, 86:18, 91:19, 92:7, 92:15

**PROVIDED** [5] - 23:24, 24:2, 24:11, 28:16, 29:3
**PROVIDES** [4] - 10:22, 12:3, 17:7, 20:24
**PROVIDING** [2] - 13:2, 15:8
**PROVISION** [1] - 58:15
**PROVISIONS** [1] - 53:12
**PRYOR** [5] - 46:5, 46:6, 46:15, 54:10, 54:11
**PRYOR'S** [1] - 46:9
**PUBLIC** [2] - 13:8, 36:3
**PUBLICLY** [1] - 84:25
**PULL** [2] - 13:2, 31:11
**PULLED** [1] - 12:24
**PULLING** [2] - 12:22, 24:22
**PULLS** [3] - 14:24, 15:1, 40:11
**PURPLE** [3] - 73:25, 74:4, 88:21
**PURPORTED** [5] - 17:2, 24:24, 28:24, 34:24, 77:19
**PURPOSES** [1] - 53:10
**PUSHED** [1] - 78:23
**PUSHES** [1] - 39:15
**PUT** [12] - 28:1, 33:14, 45:23, 49:9, 56:8, 56:11, 63:22, 68:17, 70:12, 74:24, 85:9, 94:13
**PUTNAM** [1] - 72:13
**PUTS** [1] - 62:14

## Q

**QUADRUPLED** [2] - 67:24
**QUARTER** [2] - 14:3, 89:24
**QUESTIONS** [4] - 27:20, 30:19, 30:25, 49:10
**QUICKLY** [1] - 31:11
**QUITE** [2] - 9:13, 87:3
**QUOTE** [12] - 10:2, 10:11, 15:19, 15:23, 16:18, 16:23, 17:11, 17:25, 27:6, 56:8, 56:10, 58:19

## R

**RACE** [4] - 50:6, 50:7, 51:17, 51:19
**RACIAL** [6] - 23:1, 23:2, 33:19, 33:24, 50:5, 50:21
**RACIALLY** [3] - 31:13, 67:19, 68:4
**RAFFENSPERGER** [5] - 4:6, 4:7, 4:9, 5:20, 6:20
**RAHUL** [1] - 4:23
**RAHUL** [1] - 2:3
**RAISE** [1] - 29:5
**RAISED** [1] - 39:9
**RATIONAL** [2] - 33:13, 46:7
**RDR** [1] - 95:15
**REACH** [3] - 27:9, 27:22, 30:5

**READ** [3] - 20:22, 21:2, 58:1
**READING** [4] - 16:8, 21:4, 21:13, 59:22
**READY** [1] - 77:1
**REALITIES** [1] - 93:4
**REALITY** [11] - 66:22, 67:3, 67:8, 69:14, 69:19, 69:21, 74:3, 75:1, 88:23, 91:7, 93:22
**REALLY** [6] - 40:12, 56:24, 59:6, 71:2, 75:14, 88:14
**REALM** [3] - 34:6, 34:9, 85:11
**REASON** [6] - 16:14, 51:13, 82:10, 93:25, 94:1
**REASONABLE** [1] - 20:10
**REASONABLY** [1] - 31:5
**REASONS** [2] - 33:19, 33:24
**REBUTTAL** [3] - 9:8, 9:15, 35:18
**RECENT** [2] - 31:16, 47:18
**RECENTLY** [1] - 49:20
**RECOGNIZED** [3] - 46:16, 47:4, 55:9
**RECOGNIZING** [1] - 44:8
**RECONCILE** [1] - 15:22
**RECONFIGURED** [1] - 67:2
**RECORD** [12] - 11:10, 22:25, 23:5, 23:11, 23:12, 26:7, 26:14, 43:21, 43:22, 58:5
**RED** [8] - 13:17, 73:19, 73:24, 74:5, 77:6, 89:1, 89:9, 91:21
**REDRAW** [1] - 15:11
**REDRAWING** [2] - 33:19, 33:25
**REDRAWN** [1] - 14:22
**REDUCING** [1] - 34:14
**REDUCTION** [1] - 42:21
**REFERENCE** [2] - 16:9, 16:12
**REFERENCED** [1] - 37:23
**REFERENCES** [5] - 38:23, 43:20, 43:21, 45:22, 56:18
**REFERRED** [1] - 22:10
**REFERRING** [3] - 20:3, 57:7
**REFERS** [2] - 43:1, 56:13
**REFLECTED** [1] - 32:7
**REFRAIN** [1] - 32:14
**REFUSED** [1] - 12:18
**REFUSING** [1] - 29:18
**REGARDING** [3] - 8:4, 49:21, 53:2
**REGARDLESS** [2] - 19:10, 52:1
**REGION** [2] - 16:5, 71:17
**REGIONAL** [2] - 16:16, 16:23
**REGRETS** [1] - 5:25
**REITERATED** [1] - 17:19
**REJECT** [1] - 25:12
**REJECTED** [8] - 32:21, 33:15, 34:13, 37:14, 37:16, 52:4, 83:7
**RELABELED** [1] - 77:9

**RELATED** [3] - 6:16, 45:1
**RELATES** [1] - 43:22
**RELEASED** [1] - 84:25
**RELEVANT** [2] - 40:12, 48:4
**RELIED** [1] - 38:18
**RELIEF** [2] - 93:13, 93:14
**RELY** [1] - 65:8
**RELYING** [2] - 26:4, 26:7
**REMAIN** [2] - 53:24, 78:25
**REMAINED** [1] - 20:12
**REMAINING** [1] - 86:20
**REMAINS** [1] - 85:13
**REMARKABLY** [1] - 78:1
**REMEDIAL** [28] - 7:9, 7:10, 7:11, 7:14, 10:9, 10:21, 11:5, 13:5, 13:15, 14:20, 18:4, 18:19, 20:14, 20:24, 21:15, 26:2, 26:25, 27:6, 31:12, 35:6, 37:24, 39:4, 76:12, 83:14, 83:18, 84:3, 84:11, 92:19
**REMEDIED** [5] - 65:12, 66:15, 67:1, 82:22, 93:20
**REMEDIES** [3] - 17:9, 27:8, 86:7
**REMEDY** [124] - 6:25, 9:22, 10:6, 10:10, 10:15, 11:1, 11:15, 11:17, 12:13, 13:19, 14:7, 14:12, 14:13, 15:6, 15:8, 16:18, 16:23, 17:5, 17:6, 17:13, 17:15, 17:16, 17:20, 18:8, 18:13, 19:24, 20:15, 21:5, 26:3, 26:18, 27:7, 27:11, 28:24, 29:18, 30:11, 31:1, 33:8, 35:10, 37:17, 39:1, 39:12, 43:16, 52:10, 54:24, 56:5, 56:12, 57:20, 57:22, 58:18, 58:19, 58:24, 63:4, 63:17, 63:21, 64:1, 64:6, 64:7, 64:10, 65:1, 65:5, 65:10, 65:18, 66:1, 66:3, 66:4, 66:12, 66:13, 67:6, 68:14, 69:10, 69:22, 71:8, 72:3, 72:4, 72:5, 72:7, 72:8, 72:9, 72:15, 73:17, 80:1, 80:12, 80:13, 81:21, 82:2, 82:12, 82:21, 82:25, 83:9, 84:23, 85:8, 85:18, 86:2, 86:4, 86:10, 86:16, 86:18, 87:25, 88:12, 90:4, 90:20, 91:12, 91:19, 92:7, 92:11, 92:12, 92:14, 92:24, 93:3, 93:12, 93:16, 94:1, 94:5, 94:7, 94:13
**REMEDYING** [2] - 33:10, 85:25
**REMEMBER** [2] - 82:20, 91:25
**REMEMBERS** [1] - 83:13
**REMOVED** [10] - 74:8, 74:9, 77:14, 77:22, 80:24, 89:3, 89:8, 89:19, 90:17, 90:23
**RENAME** [1] - 93:8
**RENAMED** [1] - 80:5

**RENDERED** [1] - 68:7
**RENUMBERED** [1] - 80:7
**REPEAT** [1] - 68:20
**REPEATED** [2] - 32:21, 37:11
**REPEATEDLY** [5] - 16:21, 22:10, 31:22, 57:25, 83:6
**REPORT** [4] - 13:15, 18:18, 18:20, 19:2, 19:10, 23:19, 24:3, 26:15, 31:12, 32:8, 36:2, 37:21, 37:25, 38:23
**REPORTED** [1] - 9:22
**REPORTER** [1] - 94:21
**REPORTER** [1] - 95:15
**REPORTS** [3] - 8:18, 78:15, 79:13
**REPRESENT** [2] - 5:7, 69:13
**REPRESENTATION** [1] - 67:25
**REPRESENTATIVE** [3] - 6:1, 22:6, 22:10
**REQUEST** [1] - 35:9
**REQUIRE** [4] - 10:20, 39:22, 52:23, 81:20
**REQUIRED** [12] - 19:20, 21:8, 32:15, 37:5, 38:13, 41:21, 43:16, 52:7, 65:10, 82:21, 90:20, 94:4
**REQUIREMENTS** [2] - 7:7, 38:21
**REQUIRES** [4] - 17:6, 32:18, 32:19, 63:17
**REQUIRING** [1] - 53:11
**RESERVE** [4] - 9:8, 9:14, 35:14, 62:13
**RESETTING** [1] - 37:6
**RESIDENTS** [1] - 71:21
**RESOLUTION** [1] - 40:24
**RESOLVE** [2] - 27:15, 30:25
**RESOLVES** [1] - 44:13
**RESPECT** [1] - 72:1
**RESPECTFULLY** [2] - 16:11, 35:9
**RESPECTIVELY** [1] - 4:24
**RESPECTS** [1] - 17:10
**RESPOND** [2] - 30:24, 36:23
**RESPONDED** [2] - 22:16, 24:14
**RESPONSE** [8] - 7:16, 11:14, 11:19, 11:25, 15:17, 23:20, 27:24, 28:18
**RESPONSIBILITIES** [1] - 41:1
**RESPONSIBILITY** [1] - 36:5
**RESPONSIBLE** [1] - 36:15
**RESPONSIVENESS** [1] - 33:12
**REST** [2] - 11:15, 59:22
**RESULT** [3] - 38:22, 41:23, 53:11
**RESULTED** [1] - 42:7
**RESUME** [1] - 87:1
**RETAINED** [1] - 10:8
**RETURN** [1] - 44:3
**REVERSES** [1] - 47:24

**REVERTS** [1] - 32:14
**RIGHT-HAND** [1] - 73:3
**RIGHTS** [5] - 7:22, 15:1, 43:2, 57:4, 61:8
**RIGHTS** [11] - 10:3, 15:24, 24:25, 27:12, 35:7, 51:20, 52:2, 52:7, 52:19, 53:9, 55:6
**RING** [1] - 11:4
**RINGS** [1] - 18:7
**ROB** [1] - 30:14
**ROCKDALE** [1] - 67:24
**ROSE** [1] - 37:22
**ROSS** [1] - 5:20
**ROSS** [1] - 2:9
**RPR** [1] - 95:15
**RUCHO** [1] - 52:18
**RUCHO-BARRED** [1] - 52:18
**RUIZ** [1] - 2:4
**RUIZ** [1] - 4:22
**RULES** [3] - 59:3, 59:7, 59:16
**RULING** [4] - 9:25, 21:10, 59:18, 61:7
**RUN** [2] - 44:11, 69:16
**RUNNING** [1] - 72:23
**RUNOFF** [1] - 31:20
**RUNS** [3] - 77:12, 78:7, 81:2
**RUSS** [1] - 5:21
**RUSSELL** [1] - 2:10

**S**

**SAFE** [1] - 65:12
**SAKE** [1] - 14:1
**SAT** [2] - 15:6, 59:10
**SATISFACTION** [1] - 22:9
**SATISFIED** [2] - 24:4, 28:3
**SAVITZKY** [26] - 2:3, 3:4, 4:15, 4:17, 4:21, 5:1, 8:21, 61:18, 62:1, 62:3, 62:18, 62:21, 69:2, 69:6, 69:8, 70:12, 70:19, 71:1, 71:25, 76:21, 77:2, 87:5, 87:9, 87:13, 87:17, 87:21
**SAVITZKY** [6] - 4:18, 4:21, 61:19, 62:20, 87:2, 94:16
**SAW** [4] - 25:1, 27:2, 28:23, 57:19
**SB** [2] - 7:9, 15:23
**SB3EX** [1] - 26:17
**SCIENCE** [1] - 37:22
**SCOPE** [1] - 7:23
**SCORES** [1] - 83:19
**SCREEN** [3] - 13:14, 68:9, 88:3
**SEAT** [1] - 37:18
**SEATED** [1] - 61:17
**SECOND** [6] - 16:16, 28:22, 57:9,

61:15, 62:3, 71:23
**SECRET** [1] - 67:10
**SECRETARY** [4] - 5:19, 47:9, 53:20, 60:13
**SECRETARY** [1] - 36:23
**SECTION** [2] - 56:12, 56:19
**SECTION** [110] - 6:17, 6:24, 7:7, 7:21, 9:22, 10:2, 10:10, 11:1, 11:13, 12:12, 12:13, 12:19, 12:25, 13:18, 13:22, 14:6, 14:7, 14:12, 14:13, 14:17, 14:18, 15:1, 15:12, 15:20, 15:24, 16:4, 16:6, 16:15, 16:17, 16:24, 17:5, 17:9, 17:13, 17:14, 17:15, 17:16, 18:7, 18:13, 19:2, 19:24, 20:15, 22:9, 22:12, 23:8, 24:4, 26:1, 26:18, 26:19, 26:24, 27:7, 27:8, 27:14, 27:23, 28:1, 28:24, 28:25, 29:11, 29:13, 29:25, 30:1, 30:6, 30:20, 33:2, 33:6, 33:9, 33:11, 34:15, 35:2, 35:11, 41:13, 44:7, 44:9, 44:11, 44:22, 45:4, 45:21, 47:7, 48:24, 52:13, 52:23, 53:16, 54:24, 55:2, 55:10, 55:15, 55:21, 56:5, 56:25, 57:5, 58:15, 58:16, 58:20, 61:8, 63:21, 64:1, 64:19, 64:22, 64:25, 65:9, 66:10, 82:20, 85:8, 85:9, 85:21, 86:14, 94:11
**SEE** [55] - 13:9, 13:10, 13:11, 13:12, 13:13, 14:2, 18:18, 31:15, 31:21, 32:3, 32:4, 39:14, 45:12, 49:8, 59:6, 61:20, 67:14, 68:25, 71:3, 71:4, 71:15, 72:21, 73:3, 73:9, 73:18, 73:21, 74:8, 74:12, 74:14, 74:21, 75:12, 75:14, 77:3, 77:6, 77:12, 77:13, 77:15, 79:19, 80:19, 80:22, 81:10, 81:11, 83:24, 87:23, 89:3, 89:5, 89:14, 89:21, 89:23, 90:5, 90:7, 91:1, 91:3, 91:21
**SEEING** [1] - 81:24
**SENATE** [60] - 7:1, 7:10, 18:3, 32:25, 33:5, 41:20, 49:18, 49:23, 50:1, 50:9, 50:12, 51:6, 51:12, 63:8, 63:11, 63:23, 67:7, 68:11, 68:20, 70:1, 70:4, 71:10, 71:14, 72:1, 72:18, 73:2, 73:5, 73:11, 73:16, 73:19, 75:23, 77:18, 77:22, 78:4, 78:11, 78:19, 78:20, 78:23, 78:24, 79:1, 79:14, 79:16, 80:3, 80:15, 81:12, 83:10, 83:11, 83:20, 83:21, 84:8, 85:23, 89:9, 91:10, 92:8, 93:3, 93:6, 93:7, 93:8, 93:25
**SENATOR** [1] - 31:19
**SENATOR** [13] - 6:1, 31:21, 32:1,

32:3, 32:5, 32:6, 32:9, 32:11, 38:17, 41:19, 42:3, 44:3
**SENSE** [2] - 16:22, 16:23
**SEPARATE** [2] - 23:6, 44:22
**SEPARATION** [1] - 16:22
**SEPTEMBER** [2] - 63:1, 81:19
**SERIOUS** [3] - 36:25, 48:22, 64:7
**SERIOUSLY** [1] - 6:5
**SERVE** [1] - 60:22
**SESSION** [2] - 7:8, 85:1
**SET** [4] - 47:19, 71:14, 73:11, 83:11
**SETTING** [1] - 18:6
**SETTLED** [1] - 84:18
**SEVERAL** [1] - 18:3
**SHADED** [1] - 74:19
**SHADING** [1] - 74:12
**SHAW** [9] - 38:5, 40:6, 41:3, 58:13, 65:8, 65:14, 66:5, 82:21
**SHEER** [1] - 25:14
**SHELL** [3] - 78:4, 78:17, 80:6
**SHIFTING** [2] - 52:25, 53:6
**SHIFTS** [2] - 70:5, 81:13
**SHORT** [1] - 25:2
**SHOW** [12] - 19:22, 48:13, 48:17, 60:6, 60:7, 63:18, 63:19, 69:17, 76:5, 82:4, 84:22
**SHOWED** [1] - 72:24
**SHOWING** [2] - 48:11, 58:14
**SHOWN** [2] - 28:3, 32:25
**SHOWS** [4] - 58:9, 83:16, 90:5, 91:24
**SHUFFLED** [1] - 61:2
**SHY** [1] - 44:2
**SIC** [1] - 33:13
**SIDE** [12] - 38:7, 41:4, 41:6, 65:21, 65:22, 72:22, 73:3, 76:1, 83:1, 83:2, 87:22, 91:9
**SIGNED** [1] - 7:12
**SIGNIFICANT** [3] - 17:25, 45:9, 48:24
**SIGNIFICANTLY** [1] - 42:8
**SIMILAR** [3] - 78:1, 80:16, 91:9
**SIMILARITIES** [1] - 91:16
**SIMILARLY** [1] - 34:8
**SIMPLE** [1] - 18:12
**SIMPLY** [1] - 84:22
**SINGLE** [4] - 32:17, 40:2, 40:22, 69:25
**SISTER** [3] - 59:3, 59:5, 59:9
**SITS** [1] - 66:14
**SITTING** [1] - 25:17
**SITUATION** [7] - 40:7, 43:5, 45:3, 47:23, 52:8, 53:18, 75:10
**SITUATIONS** [1] - 50:17
**SIX** [4] - 15:13, 59:2, 59:11, 59:13
**SIX-YEAR-OLD** [1] - 59:11

**SIXTH** [2] - 55:11, 55:12
**SIZE** [1] - 89:24
**SLIGHTLY** [1] - 38:10
**SLIP** [1] - 16:12
**SMALL** [1] - 91:2
**SNEAK** [1] - 12:14
**SOCIOECONOMIC** [3] - 50:12, 50:14, 50:18
**SOLELY** [1] - 51:2
**SOLIDLY** [1] - 19:6
**SOLVES** [1] - 82:17
**SOMEONE** [1] - 31:22
**SOMETIMES** [1] - 36:12
**SOMEWHAT** [1] - 80:23
**SOMEWHERE** [6] - 55:16, 55:18, 65:12, 65:21, 65:23, 82:23
**SON** [2] - 59:2, 59:11
**SOON** [2] - 5:15, 61:16
**SORRY** [9] - 6:11, 23:13, 37:20, 42:10, 58:10, 87:7, 87:8, 87:19, 90:6
**SORT** [3] - 34:25, 76:13, 78:17
**SOUGHT** [1] - 85:23
**SOUTH** [2] - 42:3, 74:17
**SOUTH** [66] - 7:2, 63:1, 63:5, 63:12, 63:15, 64:20, 66:15, 66:23, 67:5, 67:20, 68:11, 68:20, 68:21, 70:4, 71:5, 71:17, 72:5, 72:11, 72:14, 72:19, 73:13, 74:15, 74:17, 75:1, 75:8, 75:16, 75:21, 77:5, 78:3, 79:9, 79:19, 79:24, 80:2, 80:8, 80:12, 80:19, 81:12, 81:14, 81:23, 82:3, 82:12, 82:16, 82:18, 82:24, 83:2, 83:8, 83:9, 84:9, 84:15, 85:19, 86:17, 88:6, 88:13, 89:14, 89:22, 90:10, 90:18, 90:21, 91:19, 92:2, 92:7, 92:13, 92:21, 93:13, 93:19, 94:8
**SPALDING** [14] - 67:23, 72:23, 72:25, 75:20, 76:3, 76:6, 76:16, 83:24, 88:7, 88:15, 89:6, 89:17, 90:14, 93:7
**SPANS** [1] - 15:12
**SPARKS** [1] - 5:6
**SPARKS** [1] - 2:6
**SPEAKING** [2] - 5:5, 5:8
**SPEAKS** [1] - 8:24
**SPECIAL** [4] - 7:8, 84:20, 84:25, 94:13
**SPECIFIC** [25] - 6:24, 7:22, 13:4, 15:7, 16:4, 16:9, 16:12, 62:23, 62:24, 63:5, 63:8, 63:16, 64:4, 64:17, 66:16, 66:23, 67:3, 67:17, 67:18, 67:19, 68:10, 68:15

**SPECIFICALLY** [9] - 13:18, 15:11, 19:24, 22:12, 23:18, 24:16, 31:19, 34:3, 37:4

**SPECIFIED** [5] - 11:17, 39:8, 39:19, 39:20, 55:14

**SPENDS** [1] - 18:2

**SPENT** [3] - 52:23, 62:25, 88:9

**SPLIT** [2] - 72:23, 76:1

**SPLITS** [3] - 78:8, 83:19

**SPLITTING** [1] - 73:8

**SQUANDERED** [1] - 12:14

**STAFF** [1] - 28:12

**STAND** [1] - 67:11

**STANDARD** [11] - 10:20, 10:21, 26:18, 27:7, 58:22, 58:23, 63:20, 63:21, 64:6, 65:20, 93:18

**STANDS** [1] - 42:12

**STARING** [1] - 70:18

**STARK** [2] - 70:21, 71:10

**START** [8] - 4:10, 61:12, 63:20, 71:11, 71:12, 86:24, 86:25, 94:17

**STARTED** [2] - 4:20, 62:24

**STATE** [28] - 6:24, 7:22, 12:18, 17:9, 24:4, 24:11, 24:24, 25:15, 29:7, 29:9, 29:12, 29:13, 30:15, 34:10, 35:8, 37:13, 38:7, 40:7, 41:5, 41:6, 50:23, 52:22, 65:15, 65:17, 65:23, 68:2, 82:24, 89:12

**STATE** [50] - 4:12, 7:10, 8:25, 9:12, 10:25, 11:23, 19:24, 22:3, 22:18, 23:23, 24:18, 24:21, 25:11, 28:23, 29:2, 29:17, 29:24, 34:18, 34:24, 35:2, 37:1, 37:5, 39:4, 39:7, 40:16, 40:20, 40:25, 41:4, 47:10, 54:4, 55:1, 55:2, 55:15, 56:15, 59:15, 59:21, 63:23, 64:11, 64:13, 66:20, 68:23, 70:15, 72:3, 80:17, 85:4, 85:20

**STATE'S** [27] - 11:14, 11:19, 11:25, 14:16, 18:9, 23:9, 23:10, 23:11, 23:12, 25:12, 25:20, 30:9, 33:9, 33:18, 34:15, 34:17, 37:2, 51:5, 52:24, 54:1, 54:20, 55:10, 58:1, 61:3, 66:20, 84:16, 93:4

**STATEMENT** [5] - 15:22, 22:4, 22:15, 36:10, 54:10

**STATES** [3] - 13:2, 17:4, 17:14

**STATES** [1] - 95:3

**STATEWIDE** [1] - 32:3

**STATUTORY** [1] - 6:25

**STAVE** [1] - 25:20

**STEP** [7] - 21:19, 28:21, 46:25, 48:23, 60:22, 60:23

**STEVE** [1] - 95:16

**STICKING** [1] - 89:22

**STILL** [6] - 20:19, 47:22, 58:17, 58:20, 74:1, 88:25

**STOP** [4] - 21:4, 59:22, 61:12, 86:25

**STOPPED** [2] - 87:8, 87:20

**STOPPING** [1] - 87:4

**STORY** [5] - 67:21, 80:16, 84:11, 87:23, 91:9

**STRATEGY** [1] - 29:11

**STREAM** [1] - 73:5

**STRENGTH** [4] - 10:16, 12:15, 24:23, 25:21

**STRESS** [1] - 66:9

**STRESSED** [1] - 66:5

**STRICKLAND** [1] - 6:12

**STRICKLAND** [1] - 2:11

**STRIKE** [1] - 61:10

**STRONGLY** [1] - 86:13

**STRONGLY-HELD** [1] - 86:13

**STRUCTURE** [1] - 49:1

**STUCK** [1] - 59:23

**STUNT** [2] - 12:22, 12:24

**STUNTS** [1] - 13:2

**SUBJECT** [2] - 20:4, 81:19

**SUBMISSIONS** [1] - 84:18

**SUBMIT** [12] - 8:17, 9:24, 21:19, 45:17, 48:10, 52:12, 53:17, 54:1, 60:21, 84:7, 93:10, 94:2

**SUBMITTED** [5] - 18:18, 50:16, 53:22, 83:14, 92:18

**SUBSTITUTE** [1] - 7:7

**SUCCESS** [2] - 28:4, 28:19

**SUCCESSFUL** [1] - 29:12

**SUFFERED** [7] - 11:13, 13:23, 14:25, 15:13, 34:3, 65:11, 93:19

**SUFFICIENT** [3] - 22:8, 23:25, 58:24

**SUGGESTION** [1] - 34:13

**SUMMARY** [1] - 28:11

**SUPP** [1] - 54:9

**SUPPORT** [5] - 8:8, 16:16, 17:1, 32:12, 48:12

**SUPPORTED** [1] - 42:12

**SUPPORTS** [1] - 45:21

**SUPPOSED** [3] - 38:20, 72:9, 75:9

**SUPREME** [5] - 7:5, 14:15, 33:15, 46:2, 83:6

**SURPRISING** [1] - 44:5

**SUSTAIN** [1] - 94:12

**SUSTAINED** [1] - 68:16

**SWAP** [3] - 43:19, 77:3, 77:15

**SWAPS** [1] - 19:13

**SWITCH** [1] - 24:22, 76:22

**SYSTEM** [2] - 60:20, 71:16

**T**

**TABLE** [2] - 4:22, 5:6

**TABLE** [1] - 19:10

**TABLES** [1] - 32:7

**TAGS** [1] - 67:14

**TALKS** [1] - 48:7

**TASK** [1] - 94:4

**TECHNICAL** [1] - 43:6

**TEN** [2] - 61:12, 71:14

**TENS** [2] - 91:17, 92:8

**TENUOUS** [1] - 33:13

**TERM** [1] - 7:18

**TERMS** [13] - 10:25, 19:8, 38:7, 41:6, 42:13, 42:20, 44:14, 44:24, 45:18, 45:19, 50:6, 50:25, 74:3

**TESTIFIED** [3] - 37:22, 67:12, 83:13

**TESTIMONY** [6] - 38:17, 62:6, 62:8, 67:14, 67:17, 71:21

**TEXAS** [1] - 41:4

**TEXAS'S** [1] - 33:15

**TEXT** [1] - 45:21

**THE** [67] - 2:2, 2:7, 4:2, 4:4, 4:10, 4:16, 4:19, 4:25, 5:3, 5:9, 5:16, 6:7, 6:10, 6:13, 8:20, 8:24, 9:3, 9:10, 9:16, 9:18, 11:7, 12:9, 13:8, 22:20, 22:22, 23:16, 24:1, 26:24, 27:4, 27:13, 28:5, 28:8, 30:21, 35:15, 35:19, 36:21, 39:22, 46:1, 46:15, 46:25, 54:6, 54:8, 54:15, 61:11, 61:15, 61:25, 62:2, 62:8, 62:20, 68:24, 69:4, 69:7, 70:11, 70:18, 70:22, 71:23, 76:20, 76:24, 76:25, 86:22, 87:4, 87:7, 87:11, 87:16, 87:19, 94:16, 95:16

**THEME** [2] - 54:20, 54:21

**THEORIES** [1] - 52:25

**THEORY** [1] - 53:6

**THEREFORE** [1] - 51:18

**THERETO** [1] - 8:22

**THEY'VE** [2] - 39:8, 50:9

**THIRD** [1] - 17:22

**THOROUGH** [1] - 9:25

**THOUGHTS** [1] - 8:12

**THOUSAND** [1] - 80:20

**THOUSANDS** [2] - 91:17, 92:8

**THREAT** [2] - 22:18, 24:14

**THREATENED** [2] - 25:5, 30:12

**THREE** [5] - 8:19, 31:4, 46:19, 46:20, 56:13

**THREE-JUDGE** [2] - 46:19, 46:20

**THROUGHOUT** [2] - 34:10, 54:20

**THUMB** [1] - 29:25

**TIGHT** [1] - 45:6

**TIMELINE** [2] - 28:20, 45:6
**TIMELINES** [1] - 53:25
**TO** [1] - 95:15
**TODAY** [17] - 5:8, 6:3, 8:12, 9:21, 25:24, 26:14, 27:14, 30:13, 36:3, 36:24, 62:22, 63:3, 63:19, 66:14, 68:13, 70:14, 70:20
**TOGETHER** [6] - 17:17, 17:21, 28:1, 31:5, 45:23, 63:22
**TOOK** [4] - 6:5, 27:16, 38:20, 47:7
**TOP** [1] - 57:3
**TORO** [1] - 2:4
**TORO** [1] - 4:22
**TOTAL** [2] - 40:18, 82:13
**TOTALITY** [4] - 8:9, 32:24, 33:16, 49:13
**TOTALLY** [2] - 35:24, 36:10
**TOUCHING** [1] - 40:7
**TOWARD** [2] - 60:18, 60:22
**TOWARDS** [1] - 52:10
**TRADE** [2] - 22:19, 24:15
**TRADE-OFF** [2] - 22:19, 24:15
**TRADING** [1] - 54:18
**TRANSCRIPT** [2] - 22:17, 95:7
**TRANSCRIPTS** [2] - 41:19, 51:14
**TREMENDOUS** [1] - 73:4
**TRIAL** [28] - 6:15, 8:4, 22:5, 22:15, 25:12, 30:13, 37:11, 37:16, 49:21, 50:8, 67:11, 68:2, 68:6, 68:7, 68:16, 72:14, 73:3, 74:20, 75:23, 79:10, 81:4, 81:19, 82:18, 83:14, 88:10, 91:10, 91:23
**TRIES** [2] - 59:17, 60:13
**TROUBLE** [4] - 28:2, 36:20, 59:3, 59:4
**TRUE** [3] - 23:3, 60:6, 95:6
**TRULY** [1] - 62:21
**TRY** [7] - 9:15, 13:2, 13:6, 14:1, 24:23, 25:20, 58:1
**TRYING** [5] - 12:14, 52:17, 56:24, 58:25, 59:6
**TURN** [1] - 17:8
**TWO** [34] - 4:19, 5:12, 6:16, 7:1, 7:3, 8:14, 16:18, 17:21, 18:24, 19:4, 27:24, 27:25, 29:4, 40:16, 56:19, 61:21, 62:25, 69:4, 72:17, 73:16, 73:23, 75:9, 75:14, 75:21, 78:14, 83:15, 84:8, 88:3, 88:12, 89:25, 90:2, 90:20, 90:24
**TYPE** [3] - 47:25, 48:11, 49:4
**TYPES** [1] - 44:10
**TYRONE** [2] - 73:1, 76:10
**TYSON** [23] - 5:11, 5:19, 13:11, 35:20, 35:21, 36:16, 36:23, 46:8,

54:6, 54:13, 55:19, 55:25, 56:7, 56:21, 57:9, 58:13, 59:24, 62:6, 62:8, 62:12, 62:14, 70:24, 86:22
**TYSON** [1] - 36:18
**TYSON** [16] - 2:8, 3:3, 5:14, 5:18, 6:9, 6:11, 9:1, 36:19, 36:22, 39:24, 46:13, 46:18, 47:14, 54:7, 54:14, 87:2

## U

**ULTIMATE** [1] - 39:17
**ULTIMATELY** [13] - 6:23, 35:5, 37:16, 39:5, 43:5, 44:18, 48:25, 49:12, 49:14, 52:3, 52:12, 52:17, 53:13
**UNADDRESSED** [1] - 82:16
**UNAFFECTED** [1] - 15:12
**UNCERTAIN** [1] - 10:25
**UNCHANGED** [2] - 80:7, 93:6
**UNDER** [31] - 10:21, 12:19, 14:19, 15:1, 16:8, 17:16, 21:12, 26:17, 27:7, 29:10, 30:6, 31:3, 35:2, 52:2, 64:19, 68:20, 68:22, 69:25, 75:7, 76:2, 77:25, 78:19, 79:3, 79:14, 79:17, 82:15, 83:23, 89:8, 94:11
**UNDERLYING** [1] - 45:8
**UNDERSTOOD** [1] - 62:18
**UNDILUTED** [1] - 66:6
**UNDISPUTED** [1] - 60:24
**UNEVEN** [1] - 73:15
**UNITED** [1] - 95:3
**UNLAWFUL** [9] - 25:19, 27:6, 35:10, 63:4, 73:22, 85:12, 85:13, 85:18, 86:10
**UNLIKE** [1] - 49:20
**UNLUCKILY** [1] - 76:14
**UNQUOTE** [3] - 16:23, 27:6, 58:19
**UNRESPONSIVENESS** [3] - 51:5, 51:7, 51:8
**UNTOUCHED** [1] - 93:6
**UP** [23] - 15:2, 23:23, 31:11, 38:25, 40:3, 41:4, 44:24, 46:11, 49:9, 53:15, 56:8, 56:11, 56:16, 62:14, 67:16, 68:16, 77:9, 77:12, 78:8, 78:23, 81:2, 86:7, 90:13
**UTTERLY** [1] - 26:17

## V

**VALIDITY** [3] - 34:6, 34:9, 85:10
**VAP** [2] - 18:22, 18:23, 18:25
**VARIOUS** [2] - 8:17, 50:14
**VERSUS** [2] - 41:7, 50:15
**VIEW** [2] - 79:20, 84:20

**VIOLA** [1] - 95:14
**VIOLATED** [5] - 6:23, 15:20, 27:8, 41:12, 59:7
**VIOLATES** [4] - 10:2, 15:23, 16:4, 26:18
**VIOLATION** [57] - 9:22, 10:7, 11:1, 12:13, 13:19, 13:22, 14:6, 14:25, 15:6, 15:8, 15:12, 16:6, 16:15, 16:17, 17:6, 17:10, 17:13, 19:25, 22:13, 23:7, 26:1, 27:12, 27:23, 28:24, 28:25, 29:19, 29:20, 29:25, 30:11, 33:3, 33:6, 33:10, 33:11, 35:11, 44:7, 44:22, 45:4, 47:7, 48:24, 52:13, 53:16, 54:24, 55:6, 55:15, 55:21, 55:24, 56:5, 56:6, 64:1, 65:9, 66:11, 66:13, 72:8, 82:20, 85:8, 86:16
**VIOLATIONS** [4] - 6:17, 6:25, 10:10, 20:15
**VIRTUALLY** [1] - 79:19
**VOTE** [96] - 11:13, 13:23, 14:3, 14:5, 14:21, 14:23, 15:2, 15:13, 20:4, 31:20, 34:4, 35:1, 38:8, 39:8, 40:1, 40:21, 40:22, 42:19, 43:17, 63:5, 63:9, 64:5, 64:13, 64:18, 65:4, 65:6, 65:18, 65:19, 66:1, 66:6, 66:24, 67:4, 67:9, 68:15, 69:10, 69:22, 70:7, 71:7, 71:9, 71:19, 72:22, 73:6, 73:13, 73:20, 74:13, 74:15, 75:5, 75:6, 75:13, 78:12, 79:8, 80:1, 80:12, 80:24, 80:25, 81:4, 81:5, 81:8, 81:16, 81:18, 81:20, 82:8, 82:9, 82:12, 82:15, 82:17, 82:25, 83:15, 84:1, 84:3, 84:5, 85:12, 85:13, 85:18, 85:25, 86:7, 86:10, 87:25, 88:3, 88:5, 88:17, 89:4, 89:6, 89:10, 89:11, 89:15, 90:7, 91:1, 91:12, 91:14, 92:11, 92:12, 92:24, 93:2, 94:1, 94:9
**VOTED** [3] - 8:6, 32:9, 48:9
**VOTER** [3] - 14:7, 40:3, 40:22
**VOTERS** [214] - 7:22, 7:24, 8:2, 8:5, 8:6, 10:12, 10:22, 11:18, 11:21, 12:3, 13:3, 13:22, 14:7, 14:9, 14:25, 15:13, 18:14, 19:18, 20:5, 20:8, 20:10, 20:16, 20:25, 21:25, 22:8, 23:6, 23:14, 23:25, 24:6, 24:18, 24:23, 25:3, 25:13, 26:6, 26:9, 26:10, 29:9, 29:14, 31:9, 31:17, 31:18, 31:23, 32:2, 32:10, 33:13, 33:25, 34:1, 34:3, 34:7, 34:10, 34:11, 34:22, 35:4, 35:8, 38:24, 39:2, 41:11, 42:9, 42:13,

42:15, 42:16, 43:3, 43:12, 43:20, 43:21, 43:23, 44:19, 45:1, 45:2, 45:8, 45:11, 45:14, 45:15, 45:22, 45:23, 48:4, 48:7, 48:12, 48:19, 48:20, 49:7, 49:8, 49:11, 49:16, 49:21, 49:22, 49:24, 50:4, 50:8, 50:10, 50:14, 50:15, 50:17, 50:19, 50:22, 53:1, 53:5, 55:17, 57:5, 57:17, 57:21, 57:24, 58:9, 58:10, 58:11, 60:1, 60:2, 60:7, 60:14, 60:25, 61:1, 61:9, 63:12, 63:15, 64:7, 64:14, 64:16, 64:17, 64:19, 65:3, 65:6, 65:11, 66:2, 66:3, 66:6, 66:8, 66:22, 67:1, 67:3, 67:4, 67:8, 68:10, 68:15, 68:18, 68:19, 68:21, 69:9, 69:13, 69:22, 69:23, 70:4, 70:5, 71:2, 71:4, 71:8, 72:1, 72:19, 73:14, 74:3, 74:9, 74:21, 75:1, 75:5, 75:8, 76:17, 77:5, 77:17, 77:21, 77:24, 78:3, 78:16, 79:5, 79:11, 79:14, 79:25, 80:8, 80:10, 80:21, 80:24, 81:3, 81:11, 81:17, 81:23, 82:2, 82:5, 82:6, 82:10, 82:18, 82:24, 83:4, 83:5, 84:4, 84:12, 85:19, 86:17, 88:23, 89:16, 89:17, 89:18, 90:9, 90:14, 90:16, 90:18, 90:19, 90:22, 91:8, 91:12, 91:18, 91:25, 92:4, 92:9, 92:20, 93:13, 93:19, 93:21, 94:8

**VOTERS'** [1] - 77:25

**VOTES** [4] - 26:5, 32:11, 77:23, 77:25

**VOTING** [11] - 10:3, 15:24, 24:24, 27:11, 35:7, 51:20, 52:2, 52:7, 52:19, 53:9, 55:6

**VOTING** [22] - 7:22, 10:16, 12:15, 15:1, 24:23, 25:15, 25:21, 26:5, 30:15, 31:13, 31:17, 31:18, 40:17, 40:18, 45:15, 57:4, 61:4, 61:6, 67:19, 68:4, 73:5, 81:25

## W

**WALK** [3] - 11:8, 12:5, 13:4

**WALL** [1] - 60:13

**WALTON** [2] - 73:8, 78:10

**WANTS** [1] - 55:25

**WARNOCK** [7] - 31:21, 31:22, 32:1, 32:5, 32:6, 32:9, 32:11

**WARNOCK'S** [1] - 32:3

**WAYS** [4] - 25:21, 45:7, 52:22, 61:3

**WEDDED** [1] - 84:19

**WEEKS** [4] - 25:10, 25:23, 63:1

**WEIGH** [1] - 33:2

**WEIGHED** [1] - 33:1

**WEIGHT** [1] - 46:24

**WEST** [14] - 7:3, 21:6, 38:14, 66:16, 71:6, 88:6, 88:14, 90:25, 91:19, 92:1, 92:7, 92:13, 92:20, 94:8

**WESTERN** [4] - 24:18, 37:8, 38:16, 41:21

**WHAC** [4] - 29:10, 52:21, 52:24, 54:18

**WHAC-A-MOLE** [4] - 29:10, 52:21, 52:24, 54:18

**WHATSOEVER** [1] - 18:4

**WHERE'D** [1] - 50:2

**WHITE** [9] - 8:6, 15:3, 31:18, 32:5, 32:10, 50:15, 50:17, 60:25, 61:4

**WHOLE** [1] - 65:22

**WILLARD** [1] - 5:21

**WILLARD** [1] - 2:10

**WILLFUL** [1] - 30:9

**WILLIAM** [1] - 83:13

**WILMERHALE** [1] - 4:23

**WINSTEAD** [1] - 2:5

**WISH** [1] - 41:11

**WITNESS** [1] - 3:2

**WITNESSES** [2] - 67:13, 71:21

**WON** [1] - 32:11

**WOODS** [2] - 76:8, 76:13

**WORD** [5] - 16:3, 56:22, 56:23, 56:24, 57:10

**WORDS** [2] - 25:17, 27:17

**WORKS** [1] - 85:7

**WORRY** [2] - 70:23, 70:24

**WRIGHT** [4] - 4:2, 5:23, 37:20, 87:14

**WRITE** [3] - 59:6, 59:8, 59:10

**WRITTEN** [1] - 24:25

**WROTE** [3] - 59:11, 59:12, 59:24

## Y

**YEAR** [4] - 5:14, 5:17, 12:17, 59:11

**YEARS** [6] - 25:1, 27:25, 29:4, 49:19, 59:2, 67:25

**YOU-ALL** [10] - 4:25, 5:10, 6:14, 13:9, 36:1, 46:11, 62:15, 62:16, 94:18

**YOURSELVES** [1] - 4:11

## Z

**ZBOROWSKI** [1] - 95:14

**ZBOROWSKI** [1] - 95:14

**ZERO** [8] - 24:23, 30:14, 60:23, 76:5, 76:6, 84:6, 90:14, 90:15

**ZOOM** [4] - 14:1, 75:19, 76:18, 77:2

**ZOOMING** [5] - 81:10, 89:14, 90:5, 90:25, 91:17