IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **ALPHA PHI ALPHA FRATERNITY INC., et al.,** | **CIVIL ACTION FILE** |
| | **No. 1:21-CV-05337-SCJ** |
| **Plaintiffs,** | |
| **v.** | |
| **BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia,** | |
| **Defendant.** | |

## ORDER

This action is before the Court to address Plaintiffs' objections to SB 1EX, the remedial State Senate redistricting plan, and HB 1EX, the remedial State House redistricting plan (the "Remedial Senate Plan" and "Remedial House Plan," respectively, and collectively, the "2023 Remedial Plans"). Doc. No. [354].[1] As

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers cited herein are those imprinted by the Court's docketing software.

explained below, the Court **OVERRULES** Plaintiffs' objections and **APPROVES** the 2023 Remedial Plans.

## I.    BACKGROUND

Plaintiffs filed this suit alleging that Georgia's Senate and House electoral plans passed by the General Assembly (SB 1EX and HB 1EX, respectively, and henceforth the "2021 Enacted Plans") diluted the votes of Black Georgians in violation of Section Two of the Voting Rights Act of 1965 ("Section 2"). This Court conducted a bench trial on Plaintiffs' claims as well as the claims from two related cases alleging Section 2 violations.[2] Following the trial, this Court issued a consolidated Opinion and Memorandum of Decision on October 26, 2023, containing its Findings of Fact and Conclusions of Law. Doc. No. [333] ("October 26, 2023 Order"). Ultimately, this Court concluded that the 2021 Enacted Plans violated Section 2 in specific geographic areas of the State. To remedy the statutory violations, the Court ordered the creation of two additional majority-Black Senate districts in south-metro Atlanta, one additional majority-Black

---

[2] See Grant v. Raffensperger, No. 1:22-cv-00122-SCJ (challenging the 2021 Enacted Plans at issue here) and Pendergrass v. Raffensperger, No. 1:21-cv-05339-SCJ (challenging SB 2EX, the 2021 congressional electoral plan). The Court addresses the Pendergrass and Grant Plaintiffs' objections to the State's remedial plans in separate orders.

House district in west-metro Atlanta, and two additional majority-Black House districts in-and-around Macon-Bibb. Id. at 509.

In accordance with Supreme Court precedent, this Court afforded the Georgia General Assembly the opportunity to meet the requirements of Section 2 by adopting substitute measures. Id. (citing Wise v. Lipscomb, 437 U.S. 535, 539–40 (1978)). During a special session beginning November 29, 2023, the General Assembly passed the Remedial Senate plan, and the Remedial House plan. On December 8, 2023, Governor Brian Kemp signed the bills into law. Doc. No. [351].

Plaintiffs objected to the 2023 Remedial Plans (Doc. No. [354]), Defendant responded (Doc. No. [369]), and Plaintiffs replied (Doc. No. [370]). This Court conducted a hearing on the objections and the response thereto on December 20, 2023. With this background and the Parties' arguments in mind, the Court now determines whether the 2023 Remedial Plans comply with this Court's October 26, 2023 Order.

## II.    OBJECTIONS

Plaintiffs assert that the Remedial Senate Plan leaves the "vote dilution area" "virtually untouched." Doc. No. [354], 11, 15. Plaintiffs argue that, based

3

on a "localized finding" of proven vote dilution specific to 2021 enacted Senate Districts ("2021 SDs") 10, 16, 17, 25, 28, 30, 34, 35, 43, and 44 (i.e., per Plaintiffs, the ten-district "vote-dilution area"), the Court directed the General Assembly to add "two additional majority-Black Senate districts in south-metro Atlanta." Doc. No. [354], 15. Thus, according to Plaintiffs, while the Court's order required the General Assembly to add two majority-Black districts in the vote-dilution area, the Remedial Senate Plan instead largely preserves 2021 SDs 16 and 17, leaving many Black voters in the area (including Plaintiff Eric Woods) without relief from continuing vote dilution. Id. at 15–17.

Additionally, Plaintiffs maintain that, in the Remedial Senate Plan, Senate District ("2023 SD") 42 presents a problem because over 75% of its population is the same as (or very similar to) 2021 SD 17. Furthermore, Plaintiffs point out that the remaining 25% of the population of 2023 SD 42 is acquired by swapping out Black voters to 2023 SD 17 (a new majority-Black district made up largely of 2021 SDs 10 and 44, which were already majority-Black districts) and shifting in Black voters from 2021 SD 43, another Black-majority district. Doc. No. [354], 17–19. Plaintiffs contend that this district exemplifies that instead of providing a "complete" remedy, the Remedial Senate Plan merely "shuffles" Black voters

4

from one majority-Black district to another and creates new majority-Black districts outside the "vote dilution area." Doc. No. [354], 6.

Turning to the Remedial House Plan, Plaintiffs argue that the Court found vote dilution in specifically delineated areas around Atlanta: in south-metro Atlanta, with reference to Cooper House District ("HD") 74[3] (Henry, Spalding, and the neighboring part of Clayton County) and Esselstyn HD 117 (South Henry County); in west-metro Atlanta, in Douglas, Fulton, and Paulding Counties. Thus, according to Plaintiffs, the State was required to enact a remedy that benefited the voters in these specific "vote dilution areas," but it failed to do so.

Specifically, according to Plaintiffs, 2023 remedial House Districts ("2023 HDs") 74 and 117 add parts of Henry County to a new Black-majority district while removing portions of central Henry County, which had previously been in a Black-majority district. Doc. No. [354], 23. Plaintiffs contend that while this swap (resulting in a *net* increase of 12,555 in the Black Voting Age Population ("BVAP") in Henry County) is potentially enough to support one additional new

_____

[3] Plaintiff refers to the illustrative plans they put forward in support of their Section 2 claims. These illustrative plans are discussed in detail in the October 26, 2023 Order. Doc. No. [333], 98–142.

5

Black-majority district, it cannot support two. Doc. No. [354], 20. Such swaps across the south-metro Atlanta "vote-dilution area," Plaintiffs argue, result in a *net* increase of only 15,747 Black voters into majority-Black districts—a number insufficient to convert any two existing non-majority-Black House districts in the "vote dilution area" into majority-Black House districts. Id. In west-metro Atlanta, Plaintiffs maintain there is a *net* increase of only 2,661 Black voters in the "vote dilution area," which increase is restricted solely to Douglas County. Id. at 25.

In contrast, according to Plaintiffs, areas that were not at issue in the case had their BVAPs "balloon" (e.g., 2021 HDs 115 and 116 were 58% and 52% BVAP, respectively, and under the Remedial House Plan are 74% and 75% BVAP, respectively). Id.

Plaintiffs thereby claim that the Remedial Plans do not provide a complete remedy and that either a special master should be appointed to redraw the plans, or their illustrative plans should be adopted to provide a complete remedy to the vote dilution found by the Court. Id. at 27–29.

In response, Defendant points out that the Court's order required new districts in specific *regions*, as opposed to specific *districts*. Doc. No. [333], 31–32.

Defendant recognizes that a Section 2 violation cannot be remedied by creating a new majority-Black district "somewhere else in the state." Id. at 32. Defendant nevertheless emphasizes that this prohibition does not require remedial districts precisely or only in the districts specified by the Court following the liability phase of the proceedings. Id. at 32–33. Furthermore, Defendant asserts that the remedial districts were placed in the geographic areas specified by the Court. Id. at 36. Therefore, according to Defendant, the State has complied with this Court's order, which, under Plaintiffs' arguments, completes the Court's inquiry.

### III.   LEGAL STANDARD

The task before this Court is to determine whether the 2023 Remedial Plans remedy the Section 2 violations identified in the October 26, 2023 Order through the incorporation of additional legislative districts in the areas identified by the Court in which Black voters have a demonstrable opportunity to elect their candidates of choice. The Eleventh Circuit has instructed that the new plans must "completely remed[y] the prior dilution of minority voting strength and fully provide[] equal opportunity for minority citizens to participate and to elect candidates of their choice." United States v. Dallas Cnty. Comm'n, 850 F.2d 1433, 1437–38 (11th Cir. 1988) (quoting S.REP. No 97-417, at 31 (1982)); see also Dillard

v. Crenshaw Cnty., 831 F.2d 246, 252–53 (11th Cir. 1987) ("This Court cannot authorize an element of an election proposal that will not with certitude completely remedy the Section 2 violation."). Nonetheless, a complete remedy "does not mean that a § 2 plaintiff has the right to be placed in a majority-minority district once a violation of the statute is shown." Shaw v. Hunt, 517 U.S. 899, 917 n.9 (1996). This is because the State retains broad discretion in drawing districts to comply with the mandate of Section 2. Id. (citing Voinovich v. Quilter, 507 U.S. 146, 156–57 (1993); Growe v. Emison, 507 U.S. 25, 32–37 (1993)).

## IV.   ANALYSIS

As an initial matter, the Court rejects a foundational assumption of Plaintiffs' arguments: that because the October 26, 2023 Order listed specific House and Senate districts from the 2021 Enacted Plan where it found that Plaintiffs had proven vote dilution—referred to now by Plaintiffs as the "vote dilution area"—the State was confined to making changes only in those districts when creating the 2023 Remedial Plans. First, Plaintiffs cite no relevant authority to support this view.[4] Second, and more importantly, the Court's intent in

---

[4] At the hearing, Plaintiffs' counsel cited Shaw v. Hunt, 517 U.S. 899, 918 (1996) for the

8

delineating specific districts (derived from the list of districts Plaintiffs challenged in the lawsuit) was to distinguish areas of the State where Plaintiffs satisfied their burden of proving Section 2 violations and those areas where they failed to carry their burden. The Court did not, and could not, confine the General Assembly to working only within the enumerated districts to create the additional majority-Black districts. Cf. Shaw, 517 U.S. at 917 n.9 ("States retain broad discretion in drawing districts to comply with the mandate of § 2."). Rather, the Court set forth geographic guidance by specifying the addition of Black-

_____

proposition that a 20% overlap between the remedial district and the vote dilution area is insufficient for Section 2 purposes. Tr. at 65. Doc. No. [372]. However, the Court finds Shaw inapposite here. Shaw addressed claims challenging two North Carolina districts that the claimants contended were drawn on the basis of race in violation of the Equal Protection Clause and the Fourteenth Amendment; it dealt not at all with the evaluation of a remedial plan put forward by the State. Shaw, 517 U.S. at 901. North Carolina conceded that the challenged districts did classify voters on the basis of race but argued that the redistricting plan was narrowly tailored to further the State's compelling interests in complying with Section 2. Id. at 918. The Court rejected that the State's purported Section 2 interest was narrowly tailored because only 20% of the challenged district was in the county in which a heavy concentration of African Americans resided. In other words, use of racial classification of voters to draw a district that was not geographically compact could not be justified simply because a small portion of the challenged district contained voters who were protected under Section 2. Id. There is no claim in this case that the 2023 Remedial Plans are invalid because voters were classified on the basis of race or that the districts at issue are not geographically compact. Thus, Shaw does not support Plaintiffs' argument.

majority districts in the following regions: south-metro Atlanta; west-metro Atlanta, and in-and-around Macon-Bibb. Doc. No. [333], 509.

It is certainly true that the State cannot remedy vote dilution in a given area by creating a safe majority-Black district somewhere else in the State. See Shaw, 517 U.S. at 917. Here, the General Assembly drew two additional majority-Black Senate districts: Remedial 2023 SDs 17 and 28. Remedial SD 17 is wholly contained inside of the vote dilution area, and Remedial SD 28 is nearly contained therein. See Doc. No. [369-2], 20 & fig. 1 (Dr. Michael Barbour's Report). And 56% of the BVAP in Remedial SD 28 was drawn from within that same "vote dilution area." Id.



2023 Remedial SDs–17 and 28 shown in grey
BVAP overlap: SD–17=56.8%, SD–28=100%

The SDs listed in the October 26, 2023 Order are shown in green.

The Remedial House Plan adds three majority-Black districts in the metro-Atlanta area:[5] Remedial HD 74, HD 117, and HD 64. Like the new Senate districts, Remedial HDs 74 and 117 significantly overlap districts enumerated in the Court's October 26, 2023 order:

---

[5] The Remedial House Plan added two additional majority-Black House districts in the Macon-Bibb area as instructed by this Court. Plaintiffs do not contest any aspects of those additional districts. Doc. No. [354], 25 n.4.

11



2023 Remedial HDs–74 and 117 shown in grey
BVAP overlap: HD–74=93.3%, HD–117=34.1%

The HDs listed in the October 26, 2023 Order are shown in green.

Finally, HD 64 has significant areas in common with the Court's enumerated districts.[6]

---

[6] As explained by Defendant's expert, Dr. Barber, the horseshoe shape of the enumerated districts around Remedial HD 64 made substantial overlap difficult. Importantly, however, Plaintiffs' illustrative plan offered a majority-Black district in this same area with even less overlap than the House Remedial Plan. Doc. No. [369-2], 32.



2023 Remedial HD–64 shown in grey
BVAP overlap: 32.5%

The HDs listed in the October 26, 2023 Order are shown in green.

Notably, in <u>Shaw</u>, the case Plaintiffs rely on, the geographic discrepancy was actually "somewhere else in the state." <u>Shaw</u>, 517 U.S. at 917. The example given by the Court was of two districts with no overlap. <u>Id.</u>

Plaintiffs' objections contain the overarching theme that the 2023 Remedial Plans do not cure vote dilution for enough Black voters in the specified areas. However, it is certain that "the inevitably rough-hewn, approximate redistricting

13

remedy" will result in members of the minority group residing outside of the minority-controlled districts. McGhee v. Granville Cnty., 860 F.2d 110, 119 (4th Cir. 1988). Thus, Plaintiffs' only remaining argument is that Plaintiffs' proposed districts help more Black voters than the 2023 Remedial Plans. To put it more starkly, Plaintiffs contend that their illustrative plans are better remedies than the State's Remedial Plans. Because this Court cannot intrude upon the domain of the General Assembly, however, it declines Plaintiffs' invitation to compare the 2023 Remedial Plans with plans preferred by Plaintiffs and crown the illustrative plans the winners. See Allen v. Milligan, 599 U.S. 1, 21 (2023) ("The District Court . . . did not have to conduct a beauty contest between plaintiffs' maps and the State's.") (quoting Singleton v. Merrill, 582 F. Supp. 3d 924, 1012 (N.D. Ala. 2022)).

As the Court recognized in its October 26, 2023 Order, "redistricting and reapportioning legislative bodies is a legislative task [which] the federal courts should make every effort not to preempt." Doc. No. [333], 509. Here, the committee hearing transcripts show that the General Assembly created the 2023 Remedial Plans in a manner that politically protected the majority party (i.e., the Republican Party) as much as possible. Doc. No. [369-3], Tr. 12:2–12; [369-4], Tr.

14

25:21–25. However, redistricting decisions by a legislative body with an eye toward securing partisan advantage do not alone violate Section 2. <u>See</u> <u>Rucho v. Common Cause</u>, 588 U.S. ___, 139 S. Ct. 2484, 2501 (2019). In fact, federal judges have no license to reallocate political power between the two major political parties, given the lack of constitutional authority and the absence of legal standards to direct such decisions. <u>Id.</u> at 2507; <u>see also</u> <u>Seastrunk v. Burns</u>, 772 F.2d 143, 151 (5th Cir. 1985) ("It is the legislature's function to make decisions of basic political policy. Thus, even where a legislative choice of policy is perceived to have been unwise, or simply not the optimum choice, absent a choice that is either unconstitutional or otherwise illegal under federal law, federal courts must defer to that legislative judgment."). Plaintiffs' objections to the contrary are overruled.

## V.    CONCLUSION

The Court finds that the General Assembly fully complied with this Court's order requiring the creation of Black-majority districts in the regions of the State where vote dilution was found. Hence, the Court **OVERRULES** Plaintiffs' objections (Doc. No. [354]) and **HEREBY APPROVES** SB 1EX and HB 1EX.

15

**IT IS SO ORDERED** this 28th day of December, 2023.

_____
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**